# 21-1678-cr(L),
## 21-1708-cr(CON), 21-2214-cr(CON), 21-2466-cr(XAP)

# United States Court of Appeals
### *for the*
# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

JAMES PATTERSON,

*Defendant,*

RUBEN WEIGAND, AKA Sealed Defendant 1, HAMID AKHAVAN,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX FOR DEFENDANTS-APPELLANTS
### Volume 1 of 12 (Pages DJA1 to DJA196)

CHRISTOPHER TAYBACK
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000

WILLIAM A. BURCK
DEREK L. SHAFFER
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000

*Attorneys for Defendant-Appellant Hamid Akhavan*

*(For Continuation of Appearances See Inside Cover)*

IRA P. ROTHKEN
JARED R. SMITH
ROTHKEN LAW FIRM
3 Hamilton Landing, Suite 280
Novato, California 94949
(415) 924-4250

*Attorneys for Defendant-Appellant
   Hamid Akhavan*

MICHAEL H. ARTAN, ESQ.
624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017
(213) 688-0370

*Attorneys for Defendant-Appellant
   Ruben Weigand, AKA Sealed
   Defendant 1*

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... DJA1

Sealed Indictment, dated March 31, 2020 ................. DJA59

Opinion and Order of the Honorable Jed S. Rakoff,
    dated August 31, 2020 ........................................... DJA75

Government's Motion *in limine* To Preclude
    Defendants' Experts, dated February 16, 2021 ......DJA119.1

    Exhibit A to Government's Motion *in limine* -
    Letter from Christopher Tayback to Christopher
    J. DiMase, Nicholas S. Folly and Tara LaMorte,
    with Enclosure, dated November 3, 2020 ........... DJA119.34

    Exhibit B to Government's Motion *in limine* -
    Letter from Michael J. Gilbert to Christopher J.
    DiMase, Nicholas S. Folly and Tara LaMorte,
    with Enclosure, dated November 3, 2020 ........... DJA119.46

    Exhibit C to Government's Motion *in limine* -
    Letter from Michael J. Gilbert to Christopher J.
    DiMase, Nicholas S. Folly and Tara LaMorte,
    with Enclosure, dated December 21, 2020 ......... DJA119.74

    Exhibit D to Government's Motion *in limine* -
    E-mail from Shriram Harid to Christopher J.
    DiMase, Nicholas S. Folly, Tara LaMorte and
    Emily Deininger, dated January 19, 2021 ........... DJA119.79

Letter Motion, by Third Parties Visa Inc. and Martin
    Elliott, for an Order Granting Video Testimony of
    Martin Elliott, dated February 17, 2021
    (Unredacted version reproduced in
    Confidential Appendix) ......................................... DJA120

ii

**Page**

Annexed to Letter Motion -
(i) Subpoena to Martin Elliott, dated
    February 17, 2021 ................................................ DJA125

(ii) Subpoena to Visa Inc., dated
    February 11, 2021 ................................................ DJA126

(iii) Declaration of Martin Elliott, dated
February 17, 2021
(Unredacted version reproduced in
Confidential Appendix) ......................................... DJA139

Superseding Information, filed on
    February 19, 2021 ................................................ DJA141

Memorandum Order of the Honorable Jed S.
    Rakoff, dated February 20, 2021 .......................... DJA146

Defendants' Request to Charge, filed on
    February 23, 2021 ................................................ DJA159

Exhibit A to Defendants' Request to Charge -
Excerpts from The Court's Instructions of Law to
the Jury, in *USA v. Nkansah* (Southern District of
New York Case No. 08-cr-1234) .......................... DJA188

Government's Request to Charge, dated
    February 23, 2021 ................................................ DJA193

Opinion and Order of the Honorable Jed S. Rakoff,
    dated March 1, 2021 ............................................ DJA233

Transcript of Trial (Jury *Voir Dire*), dated
    March 1, 2021 ...................................................... DJA258

Transcript of Trial (Openings), dated
    March 1, 2021 ...................................................... DJA300

Transcript of Trial (Testimony of Michael Tassone),
    dated March 2, 2021 ............................................ DJA402

iii

**Page**

Transcript of Trial (Testimonies of Michael Tassone
and John Verdeschi), dated March 3, 2021 ............  DJA595

Transcript of Trial (Testimonies of John Verdeschi,
Jessica Volchko and Oliver Hargreaves), dated
March 4, 2021 ......................................................  DJA787

Transcript of Trial (Testimony of Oliver
Hargreaves), dated March 8, 2021 ........................  DJA963

Transcript of Trial (Testimony of Oliver
Hargreaves), dated March 9, 2021 ........................ DJA1144

Transcript of Trial (Testimonies of Oliver
Hargreaves and Richard Clow), dated
March 10, 2021 ..................................................... DJA1291

Transcript of Trial (Testimonies of Richard Clow
and Robert Hupcher), dated March 11, 2021 ......... DJA1438

Transcript of Trial (Testimonies of Robert Hupcher
and James Patterson), dated March 12, 2021 ......... DJA1639

Transcript of Trial (Testimony of James Patterson),
dated March 15, 2021 ........................................... DJA1838

Transcript of Trial (Testimonies James Patterson,
Charles Brown, Darcy Cozzetto and Martin
Elliott), dated March 16, 2021 .............................. DJA2027

Transcript of Trial (Testimonies of Martin Elliott,
Darcy Cozzetto and Michael Steinbach), dated
March 17, 2021 ..................................................... DJA2212

Transcript of Trial (Testimonies of Michael
Steinbach, Jacob Pechet, John Wang and Ronald
Shimko), dated March 18, 2021 ............................ DJA2427

iv

**Page**

Transcript of Trial (Testimonies of Daniel Whelan
    and Joao Paulo Reginatto), dated
        March 19, 2021 ...................................................... DJA2614

Transcript of Trial (Summations), dated
        March 22, 2021 ...................................................... DJA2735

Transcript of Trial (Jury Charge), dated
        March 23, 2021 ...................................................... DJA2917

Transcript of Trial (Verdict), dated March 24, 2021 .. DJA2955

Trial Exhibits:

    GX 1901-T – Transcript of Ruben Weigand's
    Post-Arrest Interrogation ..................................... DJA2967

    HAX-5014 – Excerpts from Presentation of
    Cannabis and Hemp Products .............................. DJA2971

    HAX-10057 – Actors Federal Credit Union –
    Statements of Account ......................................... DJA2974

    HAX-14004 – Excerpt from List of Customer
    Card Transactions ................................................ DJA3014

    HAX-14005 – Circle Eaze Transaction
    Summary .............................................................. DJA3015

    HAX-14008 – Circle Eaze Transaction Record... DJA3016

The Court's Instructions of Law to the Jury, filed on
        March 24, 2021 ...................................................... DJA3084

Verdict, dated March 24, 2021 ................................... DJA3106

Order of the Honorable Jed S. Rakoff, dated
        June 18, 2021 ......................................................... DJA3107

Transcript of Sentencing of Defendant Hamid
    Akhavan, dated June 18, 2021 .............................. DJA3108

v

**Page**

Opinion of the Honorable Jed S. Rakoff, dated
    July 2, 2021............................................................ DJA3146

Notice of Appeal by Defendant Ruben Weigand,
    dated July 7, 2021 ................................................. DJA3170

Transcript of Forfeiture Hearing, dated
    August 12, 2021 ..................................................... DJA3172

Notice of Appeal by Defendant Hamid Akhavan,
    dated September 14, 2021...................................... DJA3231

Notice of Appeal by the Government, dated
    September 30, 2021 ............................................... DJA3235

DJA1

**Query    Reports    Utilities    Help    Log Out**

APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CRIMINAL DOCKET FOR CASE #: 1:20-cr-00188-JSR All Defendants

Case title: USA v. Weigand                    Date Filed: 03/05/2020

Assigned to: Judge Jed S. Rakoff

**Defendant (1)**

**Ruben Weigand**
*TERMINATED: 06/30/2021*
*also known as*
Sealed Defendant 1
*TERMINATED: 06/30/2021*

represented by **Andrew J. Levander**
Dechert LLP (NYC)
1095 Avenue of the Americas
New York, NY 10036-6797
(212) 698-3500
Fax: (212) 698-3500
Email: andrew.levander@dechert.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine Talbot McCarthy**
Wilson Sonsini Goodrich & Rosati (NYC)
1301 Avenue of the Americas, 40th Fl
New York, NY 10019
212-497-7790
Email: kmccarthy@wsgr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Michael J. Gilbert**
Sheppard Mullin Richter & Hampton LLP
30 Rockefeller Plaza
New York, NY 10112
212-653-8700
Email: MGilbert@sheppardmullin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael S Sommer**
Wilson, Sonsini, Goodrich & Rosati P.C.
1301 Avenue of the Americas
40th Floor
New York, NY 10019-6033
212-497-7728
Email: msommer@wsgr.com
*TERMINATED: 04/03/2020*

DJA2

*LEAD ATTORNEY*
*Designation: Retained*

**Morris J. Fodeman**
Wilson, Sonsini, Goodrich & Rosati, PC
1301 Avenue of The Americas, 40th Floor
New York, NY 10019
(212)-447-7704
Fax: (212)-999-5899
Email: mfodeman@wsgr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Amy Elizabeth Lesperance**
Dechert, LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
212-698-3541
Email: amy.lesperance@dechert.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Michael Artan**
Michael H. Artan, Lawyer
624 So. Grand Ave.
Suite 2200
Los Angeles, CA 90017
213-688-0370
Email: michaelartan@yahoo.com
*ATTORNEY TO BE NOTICED*

**Shriram Harid**
Dechert LLP (NYC)
1095 Avenue of the Americas
New York, NY 10036-6797
(212) 698-3500
Fax: (212) 698-3599
Email: shriram.harid@dechert.com
*ATTORNEY TO BE NOTICED*

**Steven Pellechi**
Dechert LLP (NYC)
1095 Avenue of the Americas
New York, NY 10036-6797
631-241-0381
Email: steven.pellechi@dechert.com
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1349.F ATTEMPT AND CONSPIRACY TO COMMIT BANK FRAUD | Imprisonment for a total term of on Count 1: Fifteen (15) Months. |

DJA3

(1s)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1349.F ATTEMPT AND CONSPIRACY TO COMMIT BANK FRAUD (1) | All underlying indictment count are dismissed on the motion of the US |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

Assigned to: Judge Jed S. Rakoff

**Defendant (2)**

**Hamid Akhavan**
*TERMINATED: 09/01/2021*

represented by **Christopher Tayback**
Quinn Emanuel Urquhart Oliver & Hedges
865 S Figueroa Street 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Fax: (213) 443-3100
Email: christayback@quinnemanuel.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Ira Perry Rothken**
Rothken Law Firm
3 Hamilton Landing
Suite 280
Novato, CA 94949
415-924-4250
Fax: 415-924-2905
Email: ira@techfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Anthony Burck**
Quinn Emmanuel Urquhart & Sullivan, LLP
777 6th Street NW 11th floor
Washington, DC 20005
202-538-8000
Fax: 202-538-8100
Email: williamburck@quinnemanuel.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Brian Westfall McGrail**
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I St NW
Washington, DC 20005
Ste #900
Washingston, DC 20005
571-403-1815
Email: brianmcgrail@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**David Z. Chesnoff**
Chesnoff & Schonfeld
520 South 4th St.
Las Vegas, NV 89101
(702) 384-5563
Fax: (702) 598-1425
Email: dzchesnoff@cslawoffice.net
*TERMINATED: 06/01/2020*
*Designation: Retained*

**Derek Lawrence Shaffer**
Quinn Emanuel Urquhart & Sullivan LLP
1300 I Street, NW
Suite 900
Washington, DC 20005
202-538-8000
Email: derekshaffer@quinnemanuel.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jared Robinson Smith**
Rothken Law Firm
3 Hamilton Lndg
Ste 280
Novato, CA 94949
415-924-4250
Fax: 415-924-2905
Email: jared@techfirm.net
*ATTORNEY TO BE NOTICED*

**Mari Fagel Henderson**
Quinn Emanuel Urquhart & Sullivan, LLP
865 South Figueroa Street
10th Floor
Los Angeles, CA 90017
310-386-2006
Email: marihenderson@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

DJA5

**Paul Joseph Slattery**
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
919-724-5969
Email: paulslattery@quinnemanuel.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Sara Catherine Clark**
Quinn Emanuel Urquhart & Sullivan
711 Louisiana St.
Suite 500
Houston, TX 77002
713-221-7010
Fax: 713-221-7100
Email: saraclark@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1349.F ATTEMPT AND CONSPIRACY TO COMMIT BANK FRAUD (1s) | Imprisonment for a total term of on Count 1: Thirty (30) Months. Supervised release for a term of on Count 1: Three Years |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1349.F ATTEMPT AND CONSPIRACY TO COMMIT BANK FRAUD (1) | Underlying indictment/information count is dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

Assigned to: Judge Jed S. Rakoff

**Defendant (3)**

**James Patterson**                    represented by **Emily Schulman**
Wilmer Cutler Pickering Hale and Dorr
60 State Street
Boston, MA 02109
617-526-6077
Fax: 617-526-5000
Email: emily.schulman@wilmerhale.com

DJA6

*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|

18:1349.F ATTEMPT AND CONSPIRACY
TO COMMIT BANK FRAUD
(1)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|

None

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|

None

**Interested Party**

**Circle Internet Financial, LLC**     represented by **Matthew G. Lindenbaum**
Nelson Mullins Riley & Scarborough LLP
One Financial Center
35th Floor
Boston, MA 02111
617-217-4700
Fax: 617-217-4710
Email:
matthew.lindenbaum@nelsonmullins.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Interested Party**

**Rosemary Stack**     represented by **Justin Goodyear**
Wilmer Cutler Pickering Hale and Dorr LLP
(NYC)
7 World Trade Center
250 Greenwich St.
New York, NY 10007
(212)-230-8800
Fax: (212)-230-8888
Email: Justin.Goodyear@wilmerhale.com
*ATTORNEY TO BE NOTICED*

DJA7

**Interested Party**

**Michael Farrell**                    represented by **Justin Goodyear**
                                       (See above for address)
                                       *ATTORNEY TO BE NOTICED*

**Interested Party**

**Bank of America, N.A.**              represented by **Justin Goodyear**
                                       (See above for address)
                                       *ATTORNEY TO BE NOTICED*

**Interested Party**

**Visa, Inc**

**Interested Party**

**Martin Elliott**

**Interested Party**

**Capital One Bank (USA), N.A.**

**Interested Party**

**TD Bank N.A.**

**Plaintiff**

**USA**                                represented by **Christopher Joseph Dimase**
                                       U.S. Attorney's Office, SDNY
                                       One St. Andrew's Plaza
                                       New York, NY 10007
                                       (212)-637-2433
                                       Fax: (212)-637-2527
                                       Email: christopher.dimase@usdoj.gov
                                       *LEAD ATTORNEY*
                                       *ATTORNEY TO BE NOTICED*
                                       *Designation: Assistant US Attorney*

                                       **Nicholas Folly**
                                       United States Attorney's Office, SDNY
                                       One Saint Andrew's Plaza
                                       New York, NY 10007
                                       212 637-1060

DJA8

Fax: (212)-637-2527
Email: nicholas.folly@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Tara Marie La Morte**
DOJ-USAO
Lrm Jones, Lisa
1 St. Andrews Plaza
New York, NY 10007
212-637-1041
Email: tara.lamorte2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Emily Sarah Deininger**
DOJ-USAO
United States Attorney's Office
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007
212-637-2472
Email: emily.deininger@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/09/2020 | 1 | SEALED DOCUMENT placed in vault. (mhe) (Entered: 03/09/2020) |
| 03/09/2020 | 5 | SEALED S(2) INDICTMENT as to Sealed Defendant 1 (1) count(s) 1. (jm) Modified on 3/16/2020 (jm). (Entered: 03/16/2020) |
| 03/10/2020 | 2 | SEALED DOCUMENT placed in vault. (mhe) (Entered: 03/10/2020) |
| 03/10/2020 | 3 | SEALED DOCUMENT placed in vault. (mhe) (Entered: 03/10/2020) |
| 03/10/2020 | 4 | SEALED DOCUMENT placed in vault. (mhe) (Entered: 03/10/2020) |
| 03/13/2020 | 6 | Order to Unseal S(2) Indictment as to Sealed Defendant 1. (Signed by Magistrate Judge Ona T. Wang on 3/13/20)(jm) (Entered: 03/16/2020) |
| 03/13/2020 | | INDICTMENT UNSEALED as to Ruben Weigand. (jm) (Entered: 03/16/2020) |
| 03/13/2020 | | Case Designated ECF as to Ruben Weigand. (jm) (Entered: 03/16/2020) |
| 03/13/2020 | | Case as to Ruben Weigand ASSIGNED to Judge Jed S. Rakoff. (jm) (Entered: 03/16/2020) |
| 03/13/2020 | | Attorney update in case as to Ruben Weigand. Attorney Christopher Joseph Dimase,Nicholas Folly,Tara Marie La Morte for USA added. (jm) (Entered: 03/16/2020) |
| 03/16/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Ruben Weigand held on 3/16/2020. 15 minute phone PTC, without audio/ transcript, on March 16, 2020. (bw) (Entered: 03/18/2020) |
| 03/17/2020 | 8 | ORDER as to Ruben Weigand: On March 17, 2020, the Court convened a telephonic bail |

| | | |
|---|---|---|
| | | review hearing in this case. Present by phone were Assistant U.S. Attorney Christopher Dimase for the Government and Michael Artan for defendant Ruben Weigand (who had waived his appearance at the conference). The entire session was also recorded by a court reporter. For the reasons stated by the Court, see Transcript 3/17/2020, the Court determines that there is no condition or combination of conditions that will reasonably assure the appearance of defendant as required. See 18 U.S.C. § 3142(e). Because, however, defendant is presently being detained in California, the arraignment will not occur until April 28, 2020, at 2:00 p.m. (Arraignment set for 4/28/2020 at 02:00 PM before Judge Jed S. Rakoff. Initial Appearance set for 4/28/2020 at 02:00 PM before Judge Jed S. Rakoff. (Signed by Judge Jed S. Rakoff on 3/17/2020)(ap) Modified on 3/19/2020 (ap). (Entered: 03/18/2020) |
| 03/17/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Bond Hearing as to Ruben Weigand held on 3/17/2020. A 30 minute telephone bail application was heard on March 17,2020. Government: Christopher DiMase, AUSA. DEFENSE: Michael Artan. Court reporter present. Courts decision: defense bail application denied. An arraignment is set for April 28, 2020 at 2:00 pm (bw) (Entered: 03/18/2020) |
| 03/17/2020 | | ORAL ORDER as to Ruben Weigand. Arraignment set for 4/28/2020 at 02:00 PM before Judge Jed S. Rakoff. (bw) (Entered: 03/18/2020) |
| 03/27/2020 | 12 | ORDER as to Hamid Akhavan unsealing the S(1) superseding indictment.. (Signed by Magistrate Judge Sarah L Cave on 3/27/20)(jm) (Entered: 04/02/2020) |
| 03/27/2020 | 13 | S (1) INDICTMENT FILED as to Hamid Akhavan (2) count(s) 1. (jm) Modified on 4/2/2020 (jm). (Originally filed under seal on 3/27/20) (Entered: 04/02/2020) |
| 03/27/2020 | | Arrest of Hamid Akhavan in the United States District Court - Central District of California. (jm) (Entered: 04/03/2020) |
| 03/31/2020 | 9 | NOTICE OF ATTORNEY APPEARANCE: Michael S Sommer appearing for Ruben Weigand. Appearance Type: Retained. (Sommer, Michael) (Entered: 03/31/2020) |
| 03/31/2020 | 10 | NOTICE OF ATTORNEY APPEARANCE: Morris J. Fodeman appearing for Ruben Weigand. Appearance Type: Retained. (Fodeman, Morris) (Entered: 03/31/2020) |
| 03/31/2020 | 11 | NOTICE OF ATTORNEY APPEARANCE: Katherine Talbot McCarthy appearing for Ruben Weigand. Appearance Type: Retained. (McCarthy, Katherine) (Entered: 03/31/2020) |
| 03/31/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Pretrial Conference as to Ruben Weigand held on 3/31/2020. The Government is ordered to produce Rule 16 discovery on a rolling basis, with production to be completed within four weeks. Also, provided that the defendant waives his in-court presence, his April 28 arraignment will be telephonic, and the defendant need not travel to New York. (lnl) (Entered: 04/01/2020) |
| 03/31/2020 | 15 | ORDER as to Ruben Weigand, Hamid Akhavan unsealing the S(3) superseding indictment. (Signed by Magistrate Judge Ona T. Wang on 3/31/20)(jm) (Entered: 04/02/2020) |
| 03/31/2020 | 16 | (S3) SUPERSEDING INDICTMENT FILED as to Ruben Weigand (1) count(s) 1s, Hamid Akhavan (2) count(s) 1s. (jm)(Filed under seal on 3/9/20) (Entered: 04/02/2020) |
| 04/03/2020 | | Rule 5(c)(3) Documents Received as to Hamid Akhavan from the United States District Court - Central District of California. (jm) (Entered: 04/03/2020) |
| 04/03/2020 | 17 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU** - MOTION for Law Firm of Wilson Sonsini Goodrich & Rosati, P.C. to Withdraw as Attorney . |

|  |  | Document filed by Ruben Weigand. (Sommer, Michael) Modified on 4/3/2020 (ka). (Entered: 04/03/2020) |
|---|---|---|
| 04/03/2020 |  | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Ruben Weigand: Notice to Attorney Sommer, Michael to RE-FILE Document 17 MOTION for Law Firm of Wilson Sonsini Goodrich & Rosati, P.C. to Withdraw as Attorney. Use the event type Letter Motion found under the event list Motions. (ka)** (Entered: 04/03/2020) |
| 04/03/2020 | 18 | MEMO ENDORSEMENT 17 Motion to Withdraw as Attorney. Michael S Sommer withdrawn from case as to Ruben Weigand...ENDORSEMENT...SO ORDERED. (Signed by Judge Jed S. Rakoff on 4/3/2020) (jw) (Entered: 04/06/2020) |
| 04/09/2020 | 19 | MOTION for David Z. Chesnoff to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-19391291. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hamid Akhavan. (Chesnoff, David) (Entered: 04/09/2020) |
| 04/09/2020 | 20 | WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Hamid Akhavan. (Chesnoff, David) (Entered: 04/09/2020) |
| 04/09/2020 |  | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 19 MOTION for David Z. Chesnoff to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-19391291. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (ad)** (Entered: 04/09/2020) |
| 04/10/2020 | 21 | PROTECTIVE ORDER as to Ruben Weigand, Hamid Akhavan...regarding procedures to be followed that shall govern the handling of confidential material... (Signed by Judge Jed S. Rakoff on 4/10/2020) (ap) (Entered: 04/13/2020) |
| 04/15/2020 | 22 | ORDER MODIFYING PRETRIAL RELEASECONDITIONS as to Hamid Akhavan: IT IS HEREBY ORDERED that the conditions of pre-trial release shall be modified to postpone the commencement of the Location Monitoring condition until after Defendant has been discharged from his residential drug treatment program. All other conditions previously ordered shall remain in effect. (Signed by Judge Jed S. Rakoff on 4/15/2020) (ap) (Entered: 04/16/2020) |
| 04/17/2020 | 23 | TRANSCRIPT of Proceedings as to Ruben Weigand re: Conference held on 3/17/2020 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Lisa Picciano Franko, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/8/2020. Redacted Transcript Deadline set for 5/18/2020. Release of Transcript Restriction set for 7/16/2020. (McGuirk, Kelly) (Entered: 04/17/2020) |
| 04/17/2020 | 24 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand. Notice is hereby given that an official transcript of a Conference proceeding held on 3/17/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/17/2020) |
| 04/20/2020 |  | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Ruben Weigand held on 4/20/2020. A telephone conference was held on April 20, 2020. Duration 15 minutes. Counsel for defendant and the government present. The defense renews its bail application for Mr. Weigand. Defense's moving papers are due no |

**DJA11**

| | | |
|---|---|---|
| | | later than Tuesday, April 21. The Government's opposition is due by 12:00 AM on Friday, April 24. Oral argument will be held at 4 PM on Friday, April 24. (Motions due by 4/21/2020. Responses due by 4/24/2020. Oral Argument set for 4/24/2020 at 04:00 PM before Judge Jed S. Rakoff) (ap) (Entered: 04/20/2020) |
| 04/20/2020 | | NOTICE as to Ruben Weigand. Dial in information for the oral argument to be held at 4 PM on Friday, April 24, 2020: USA TOLL FREE DIAL UP: 888-363-4735 International caller paid: 215-446-3657 Access code: 1086415. (bw) (Entered: 04/20/2020) |
| 04/20/2020 | | MEMORANDUM TO THE DOCKET CLERK: as to Ruben Weigand. Dial in information for the oral argument to be held at 4 PM on Friday, April 24, 2020: USA TOLL FREE DIAL UP: 888-363-4735, International caller paid: 215-446-3657, Access code:1086415. (ap) (Entered: 04/20/2020) |
| 04/21/2020 | 25 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU** - MOTION for Reconsideration *(Bail Reconsideration)*. Document filed by Ruben Weigand. (Attachments: # 1 Exhibit A-E)(Levander, Andrew) Modified on 4/21/2020 (ka). (Entered: 04/21/2020) |
| 04/21/2020 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Ruben Weigand: Notice to Attorney Levander, Andrew to RE-FILE Document 25 MOTION for Reconsideration (Bail Reconsideration). Use the event type Letter Motion found under the event list Motions. (ka)** (Entered: 04/21/2020) |
| 04/22/2020 | 26 | NOTICE of filing of Letter for Bail Reconsideration dated 04/21/2020 as to Ruben Weigand (Attachments: # 1 Letter for Bail Reconsideration, # 2 Exhibit A-E)(Levander, Andrew) (Entered: 04/22/2020) |
| 04/23/2020 | 27 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU** - MEMORANDUM in Opposition by USA as to Ruben Weigand re 25 MOTION for Reconsideration *(Bail Reconsideration)*.. (Folly, Nicholas) Modified on 4/23/2020 (ka). (Entered: 04/23/2020) |
| 04/23/2020 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Ruben Weigand: Notice to Attorney Folly, Nicholas to RE-FILE Document 27 Memorandum in Opposition to Motion. Use the event type Letter found under the event list Other documents. (ka)** (Entered: 04/23/2020) |
| 04/23/2020 | | MEMORANDUM TO THE DOCKET CLERK as to Ruben Weigand, Hamid Akhavan. The telephonic arraignments for the defendants have been adjourned to Tuesday, April 28, 2020 at 2:00pm. USA Toll Free Dial In: 888-363-4735; International Caller Paid: 215-446-3657; Access Code: 1086415 (jw) (Entered: 04/24/2020) |
| 04/23/2020 | | Set/Reset Deadlines/Hearings as to Ruben Weigand, Hamid Akhavan:Telephonic Arraignment set for 4/28/2020 at 02:00 PM before Judge Jed S. Rakoff (jw) (Entered: 04/24/2020) |
| 04/24/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Oral Argument as to Ruben Weigand held on 4/24/2020. A telephonic argument on defendant's motion for bail reconsideration was held on April 24, 2020 at 4:00 pm before Judge Rakoff. Present were Nicolas Folly, AUSA, Tara LaMorte, AUSA and Christopher Dimase, AUSA for the government. For the defendant Andrew Levander, Michael Gilbert and Michael Artan. Courtney DeFeo, Pretrial Services Officer, present. Kristen Carannante, court reporter, present. Court's decision: Motion taken under advisement. (lnl) (Entered: 04/27/2020) |
| 04/27/2020 | 28 | MEMORANDUM ORDER as to Ruben Weigand. Defendant Ruben Weigand moves under 18 U.S.C. § 3142(f) for reconsideration of the Courts March 17, 2020 order detaining him pending trial. Alternatively, he moves for temporary release under 18 |

**DJA12**

| | | |
|---|---|---|
| | | U.S.C. § 3142(i) to facilitate his participation in the preparation of his defense. For the following reasons, his motions are denied. (Signed by Judge Jed S. Rakoff on 4/27/20) (jw) (Entered: 04/28/2020) |
| 04/28/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Initial Appearance as to Ruben Weigand, Hamid Akhavan held on 4/28/2020. Levander, Michael Arten and Michael Dechert for deft Weigand. David Chesnoff for deft Akhaven. Both defts Weigand and Akhaven present. AUSAs Tara LaMorte, Nicholas Folly and Christopher Dimase. FBI Agents Matthew Mahaffey and Ronald Shimko. Court reporter present. (ap) (Entered: 04/29/2020) |
| 04/28/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Arraignment as to Ruben Weigand (1) Count 1,1s and Hamid Akhavan (2) Count 1,1s held on 4/28/2020. On April 28,2020 a telephonic arraignment was held before Judge Rakoff. Present: Andrew Levander, Michael Arten and Michael Dechert for deft Weigand. David Chesnoff for deft Akhaven. Both defts Weigand and Akhaven present. AUSAs Tara LaMorte, Nicholas Folly and Christopher Dimase. FBI Agents Matthew Mahaffey and Ronald Shimko. Court reporter present. Both defts waive public reading of the indictment and plead not guilty. All motions due June 17, 2020, Responses July 1,2020, argument to be heard July 13,2020 at 4:00pm. (Motions due by 6/17/2020. Responses due by 7/1/2020. Oral Argument set for 7/13/2020 at 04:00 PM before Judge Jed S. Rakoff) (ap) (Entered: 04/29/2020) |
| 04/28/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: **Plea entered by Ruben Weigand (1) Count 1,1s and Hamid Akhavan (2) Count 1,1s Not Guilty.** (ap) (Entered: 04/29/2020) |
| 04/29/2020 | | MEMORANDUM TO THE DOCKET CLERK: as to Ruben Weigand, Hamid Akhavan. A trial date is set for December 1, 2020 at 9:30 am. Time is excluded until that date, in the interest of justice pursuant to section 3161 of Title 28. (ap) (Entered: 04/29/2020) |
| 04/29/2020 | | Set/Reset Hearings as to Ruben Weigand, Hamid Akhavan: Jury Trial set for 12/1/2020 at 09:30 AM before Judge Jed S. Rakoff. (ap) (Entered: 04/29/2020) |
| 05/01/2020 | 29 | ORDER as to Ruben Weigand: IT IS HEREBY ORDERED that Defendant Ruben Weigand not be removed to the Southern District of New York for 30 days from the date of this Order and that the parties report to the Court, prior to the expiration of the 30-day period, as to whether an order of removal should be entered. (Signed by Judge Jed S. Rakoff on 5/1/2020) (ap) (Entered: 05/04/2020) |
| 05/05/2020 | 30 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Conference held on 4/28/2020 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Jennifer Thun, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/26/2020. Redacted Transcript Deadline set for 6/5/2020. Release of Transcript Restriction set for 8/3/2020. (McGuirk, Kelly) (Entered: 05/05/2020) |
| 05/05/2020 | 31 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Conference proceeding has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 05/05/2020) |
| 05/08/2020 | 32 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Conference |

Case 21-2466, Document 21, 12/17/2021, 3230483, Page20 of 283

**DJA13**

| | | |
|---|---|---|
| | | held on 4/28/2020 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Jennifer Thun, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/29/2020. Redacted Transcript Deadline set for 6/8/2020. Release of Transcript Restriction set for 8/6/2020. (McGuirk, Kelly) (Entered: 05/08/2020) |
| 05/08/2020 | 33 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Conference proceeding held on 4/28/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 05/08/2020) |
| 05/11/2020 | 34 | MOTION for Bill of Particulars *Pursuant to Fed. R. Crim.P. 7(f) and Memorandum of Law in Support*. Document filed by Hamid Akhavan. (Chesnoff, David) (Entered: 05/11/2020) |
| 05/14/2020 | 35 | MOTION for Bill of Particulars . Document filed by Ruben Weigand. (Gilbert, Michael) (Entered: 05/14/2020) |
| 05/14/2020 | 36 | MEMORANDUM in Support by Ruben Weigand re 35 MOTION for Bill of Particulars .. (Levander, Andrew) (Entered: 05/14/2020) |
| 05/18/2020 | 37 | MEMORANDUM in Opposition by USA as to Ruben Weigand, Hamid Akhavan re 34 MOTION for Bill of Particulars *Pursuant to Fed. R. Crim.P. 7(f) and Memorandum of Law in Support*., 35 MOTION for Bill of Particulars .. (La Morte, Tara) (Entered: 05/18/2020) |
| 05/20/2020 | 38 | MEMORANDUM ORDER as to Ruben Weigand, Hamid Akhavan re: 34 MOTION for Bill of Particulars *Pursuant to Fed. R. Crim.P. 7(f) and Memorandum of Law in Support* filed by Hamid Akhavan. On March 31, 2020, a grand jury returned an S3 supersedingindictment against Hamid Akhavan and Ruben Weigand, charging them with one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349. ECF No. 16. The indictment alleges that, from 2016 through 2019, Akhavan, Weigand, and other, unnamed co-conspirators engaged in a conspiracy, the Transaction Laundering Scheme, to deceive banks into processing over $100 million of credit and debit card payments to marijuana retailers by disguising the transactions so as to create the false appearance that they were unrelated to the purchase of marijuana. For the following reasons, after considering all of the parties arguments, the motions are granted only with respect to the requests for the identities of the co-conspirators, and are otherwise denied. The Government is accordingly directed to provide the names of the co-conspirators (Akhavans Request 1; Weigands Requests 7, 9, and 10) in a formal bill of particulars, to be filed by no later than June 19, 2020, but with leave to supplement or amend the list up to six weeks prior to trial for good cause shown. SO ORDERED. (Signed by Judge Jed S. Rakoff on 5/20/20)(jw) (Entered: 05/20/2020) |
| 05/20/2020 | | Set/Reset Deadlines/Hearings as to Ruben Weigand, Hamid Akhavan:Government Responses due by 6/19/2020. (jw) (Entered: 05/20/2020) |
| 05/22/2020 | 39 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU** - NOTICE of Letter re: Status Update as per Order of May 1, 2020 as to Ruben Weigand re: 29 Order,. (Gilbert, Michael) Modified on 5/26/2020 (ka). (Entered: 05/22/2020) |
| 05/24/2020 | 40 | MEMORANDUM ORDER as to Ruben Weigand, Hamid Akhavan. The Government is accordingly directed to provide the names of the co-conspirators (Akhavan's Request 1; |

**DJA14**

|  |  | Weigand's Requests 7, 9, and 10) in a formal bill of particulars, to be filed by no later than June 19, 2020, but with leave to supplement or amend the list up to six weeks prior to trial for good cause shown. (Signed by Judge Jed S. Rakoff on 5/20/2020) (See ORDER set forth) (ap) (Entered: 05/26/2020) |
|---|---|---|
| 05/24/2020 | 42 | ORDER as to Ruben Weigand. Pursuant to the parties' joint letter dated May 22, 2020, this Court's May 1 order directing that the defendant be detained at the Santa Ana City Jail, without being removed to the Southern District of New York, will remain in effect until June 30, 2020. Prior to that date, the parties are directed to report to the Court as to whether an order of removal should be entered at that time. SO ORDERED. (Signed by Judge Jed S. Rakoff on 5/24/2020)(jbo) (Entered: 05/27/2020) |
| 05/26/2020 |  | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Ruben Weigand: Notice to Attorney Gilbert, Michael to RE-FILE Document 39 Notice (Other). Use the event type Letter found under the event list Other documents. (ka)** (Entered: 05/26/2020) |
| 05/26/2020 | 41 | NOTICE of filing of Letter re Status Update as per Order of May 1, 2020 as to Ruben Weigand (Attachments: # 1 Letter re Status Update as per Order of May 1, 2020)(Gilbert, Michael) (Entered: 05/26/2020) |
| 05/26/2020 |  | MEMORANDUM TO THE DOCKET CLERK as to Hamid Akhavan. A Curcio hearing will be held at 3 PM on Wednesday, May 27, 2020. Dial-In: (929) 251-9612; Access Code: 902 906 854 (jw) (Entered: 05/27/2020) |
| 05/26/2020 |  | Set/Reset Deadlines/Hearings as to Hamid Akhavan: Curcio Hearing set for 5/27/2020 at 03:00 PM before Judge Jed S. Rakoff (jw) (Entered: 05/27/2020) |
| 05/27/2020 |  | MEMORANDUM TO THE DOCKET CLERK as to Hamid Akhavan. The Court has determined that it is necessary for the May 27, 2020 Curcio hearing to take place under seal. Accordingly, while the hearing will proceed at 3 PM on May 27, it will no longer take place at the dial-in noted above. (jw) (Entered: 05/27/2020) |
| 06/01/2020 | 43 | MEMORANDUM ORDER as to Hamid Akhavan. The Court accordingly finds that a rational defendant could knowingly and intentionally waive the conflict at issue here, and that defendant Akhavan has in fact done so. The motion for substitution of counsel is therefore granted. Mr. Chesnoff is relieved as counsel of record, to be replaced by the above-named counsel from Quinn Emanuel and the Rothken Firm. (Signed by Judge Jed S. Rakoff on 5/30/2020) (See ORDER set forth) (ap) Modified on 6/1/2020 (ap). (Entered: 06/01/2020) |
| 06/01/2020 | 44 | MOTION for Ira Perry Rothken to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number NYSDC-20055590. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan. (Attachments: # 1 Affidavit of Ira Rothken, # 2 Text of Proposed Order)(Rothken, Ira) Modified on 6/1/2020 (laq). (Entered: 06/01/2020) |
| 06/01/2020 |  | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice as to Ruben Weigand, Hamid Akhavan to RE-FILE Document No. 44 MOTION for Ira Perry Rothken to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-20055590. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from California Supreme Court;. Re-file the motion as a Corrected Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (laq)** (Entered: 06/01/2020) |
| 06/04/2020 | 45 | AMENDED MOTION for Ira Perry Rothken to Appear Pro Hac Vice . **Motion and** |

| | | |
|---|---|---|
| | | **supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hamid Akhavan. (Attachments: # 1 Affidavit of Ira Rothken, # 2 Text of Proposed Order) (Rothken, Ira) (Entered: 06/04/2020) |
| 06/04/2020 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 45 AMENDED MOTION for Ira Perry Rothken to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (ad)** (Entered: 06/04/2020) |
| 06/04/2020 | 46 | NOTICE OF ATTORNEY APPEARANCE: William Anthony Burck appearing for Hamid Akhavan. Appearance Type: Retained. (Burck, William) (Entered: 06/04/2020) |
| 06/05/2020 | | MEMORANDUM TO THE DOCKET CLERK: as to Ruben Weigand, Hamid Akhavan. The deadlines set by the Court at the defendants' April 28 arraignment are extended as follows: The deadline for defense motions is extended to June 24, 2020 with the Government's answering deadline correspondingly extended to July 8, 2020. Oral argument on any defense motions is adjourned from July 13 to July 27, 2020 at 11 AM. (ap) (Entered: 06/05/2020) |
| 06/05/2020 | | Set/Reset Deadlines/Hearings as to Ruben Weigand, Hamid Akhavan: Motions due by 6/24/2020. Responses due by 7/8/2020 Oral Argument set for 7/27/2020 at 11:00 AM before Judge Jed S. Rakoff. (ap) (Entered: 06/05/2020) |
| 06/05/2020 | 47 | FIRST MOTION for Paul Joseph Slattery to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number NYSDC-20133545. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan. (Attachments: # 1 Affidavit of Paul Slattery ISO Admission Pro Hac Vice, # 2 Exhibit A to Affidavit of Paul Slattery, # 3 Text of Proposed Order for Admission Pro Hac Vice)(Slattery, Paul) (Entered: 06/05/2020) |
| 06/05/2020 | 48 | FIRST MOTION for Christopher Tayback to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number NYSDC-20133953. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan. (Attachments: # 1 Affidavit of Christopher Tayback ISO Admission Pro Hac Vice, # 2 Exhibit A to Affidavit of Christopher Tayback, # 3 Text of Proposed Order for Admission Pro Hac Vice)(Tayback, Christopher) (Entered: 06/05/2020) |
| 06/05/2020 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 47 FIRST MOTION for Paul Joseph Slattery to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-20133545. Motion and supporting papers to be reviewed by Clerk's Office staff., 48 FIRST MOTION for Christopher Tayback to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number BNYSDC-20133953. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (ad)** (Entered: 06/07/2020) |
| 06/08/2020 | 49 | ORDER FOR ADMISSION PRO HAC VICE 45 Motion for Ira P. Rothken to Appear Pro Hac Vice as to Hamid Akhavan. The motion of Ira P. Rothken, Esq., for admission to practice Pro Hac Vice in the above captioned action is granted. IT IS HEREBY ORDERED that Applicant is admitted to practice Pro Hac Vice in the above captioned action in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing the discipline of attorneys (Signed by Judge Jed S. Rakoff on 6/5/20) (jw) (Entered: 06/08/2020) |
| 06/08/2020 | | Attorney update in case as to Hamid Akhavan. Attorney Ira Perry Rothken for Hamid Akhavan added. (jw) (Entered: 06/08/2020) |
| 06/08/2020 | 50 | ORDER FOR ADMISSION PRO HAC VICE 47 Motion for Paul Slattery to Appear Pro |

| | | |
|---|---|---|
| | | Hac Vice as to Hamid Akhavan. The motion of Paul Slattery, Esq., for admission to practice Pro Hac Vice in the above captioned action is granted. IT IS HEREBY ORDERED that Applicant is admitted to practice Pro Hac Vice in the above captioned action in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing the discipline of attorneys. (Signed by Judge Jed S. Rakoff on 6/8/20) (jw) (Entered: 06/08/2020) |
| 06/08/2020 | | Attorney update in case as to Hamid Akhavan. Attorney Paul Joseph Slattery for Hamid Akhavan added. (jw) (Entered: 06/08/2020) |
| 06/08/2020 | 51 | ORDER FOR ADMISSION PRO HAC VICE 48 Motion for Christopher Tayback to Appear Pro Hac Vice as to Hamid Akhavan (2). The motion of Christopher Tayback, Esq., for admission to practice Pro Hac Vice in the above captioned action is granted. IT IS HEREBY ORDERED that Applicant is admitted to practice Pro Hac Vice in the above captioned action in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing the discipline of attorneys. (Signed by Judge Jed S. Rakoff on 6/8/2020) (jw) (Entered: 06/08/2020) |
| 06/08/2020 | | Attorney update in case as to Hamid Akhavan. Attorney Christopher Tayback for Hamid Akhavan added. (jw) (Entered: 06/08/2020) |
| 06/08/2020 | 52 | MOTION for Sara Catherine Clark to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hamid Akhavan. (Attachments: # 1 Affidavit, # 2 Exhibit, # 3 Text of Proposed Order)(Clark, Sara) (Entered: 06/08/2020) |
| 06/08/2020 | | Pro Hac Vice Fee Payment: for 52 MOTION for Sara Catherine Clark to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.**. Filing fee $ 200.00, receipt number ANYSDC-20154141. (Clark, Sara) (Entered: 06/08/2020) |
| 06/08/2020 | 53 | AMENDED MOTION for Sara Catherine Clark to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hamid Akhavan. (Attachments: # 1 Affidavit, # 2 Exhibit, # 3 Text of Proposed Order)(Clark, Sara) (Entered: 06/08/2020) |
| 06/08/2020 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice as to Ruben Weigand, Hamid Akhavan to RE-FILE Document No. 52 MOTION for Sara Catherine Clark to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing signed, notarized affidavit;. Re-file the motion as a Corrected Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order. (laq)** (Entered: 06/08/2020) |
| 06/08/2020 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 53 AMENDED MOTION for Sara Catherine Clark to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (laq)** (Entered: 06/08/2020) |
| 06/09/2020 | 54 | ORDER FOR ADMISSION PRO HAC VICE 53 Motion for Sara Catherine Clark to Appear Pro Hac Vice as to Hamid Akhavan. The motion of Sara Catherine Clark, Esq., for admission to practice Pro Hac Vice in the above captioned action is granted. IT IS HEREBY ORDERED that Applicant is admitted to practice Pro Hac Vice in the above captioned action in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this |

**DJA17**

| | | |
|---|---|---|
| | | Court, including the Rules governing the discipline of attorneys. (Signed by Judge Jed S. Rakoff on 6/9/20) (jw) (Entered: 06/09/2020) |
| 06/09/2020 | | Attorney update in case as to Hamid Akhavan. Attorney Sara Catherine Clark for Hamid Akhavan added. (jw) (Entered: 06/09/2020) |
| 06/10/2020 | 55 | MOTION for Jared Robinson Smith to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hamid Akhavan. (Attachments: # 1 Affidavit of Jared R Smith, # 2 Text of Proposed Order)(Rothken, Ira) (Entered: 06/10/2020) |
| 06/10/2020 | | Pro Hac Vice Fee Payment: for 55 MOTION for Jared Robinson Smith to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff..** Filing fee $ 200.00, receipt number ANYSDC-20192051. (Rothken, Ira) (Entered: 06/10/2020) |
| 06/10/2020 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 55 MOTION for Jared Robinson Smith to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (laq)** (Entered: 06/10/2020) |
| 06/12/2020 | 56 | ORDER FOR ADMISSION PRO HAC VICE 55 Motion for Jared R. Smith to Appear Pro Hac Vice as to Hamid Akhavan. The motion of Jared R. Smith, Esq., for admission to practice Pro Hac Vice in the above captioned action is granted. IT IS HEREBY ORDERED that Applicant is admitted to practice Pro Hac Vice in the above captioned action in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing the discipline of attorneys. (Signed by Judge Jed S. Rakoff on 6/12/20) (jw) (Entered: 06/12/2020) |
| 06/22/2020 | 57 | NOTICE of Filing of Letter re Status Update as per Order of May 1, 2020 as to Ruben Weigand (Attachments: # 1 Letter re Status Update as per Order of May 1, 2020)(Gilbert, Michael) (Entered: 06/22/2020) |
| 06/23/2020 | 58 | MEMO ENDORSEMENT as to Ruben Weigand on 57 NOTICE of Filing of Letter re Status Update as per Order of May 1, 2020 as to Ruben Weigand (Attachments: # 1 Letter re Status Update as per Order of May 1, 2020). ENDORSEMENT: SO ORDERED. (Signed by Judge Jed S. Rakoff on 6/23/2020) (lnl) (Entered: 06/23/2020) |
| 06/23/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Ruben Weigand, Hamid Akhavan held on 6/23/2020 was held in the above-captioned case without transcription or recording. Present: all relevant parties. Court's decision: The application to file under seal defense motions containing references to and/or identifying information regarding unindicted cococonspirators named in the Bill of Particulars is granted. Defendants shall also file a public, redacted copy of each such motion. (ap) (Entered: 06/24/2020) |
| 06/23/2020 | 59 | SEALED DOCUMENT placed in vault. (dn) (Entered: 06/24/2020) |
| 06/24/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Ruben Weigand, Hamid Akhavan held on 6/24/2020 in the above-captioned case without transcription or recording. Present: all relevant parties. Court's decision: The deadline for defense motions is extended to June 26, 2020 with the Government's answering deadline correspondingly extended to July 10, 2020. (Motions due by 6/26/2020. Responses due by 7/10/2020) (ap) (Entered: 06/24/2020) |
| 06/24/2020 | 60 | FIRST MOTION for Derek L. Shaffer to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number NYSDC-20405241. **Motion and supporting papers to be reviewed by** |

| | | |
|---|---|---|
| | | **Clerk's Office staff.** Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan. (Attachments: # 1 Affidavit of Derek Shaffer ISO Motion to Appear Pro Hac Vice, # 2 Exhibit ISO Affidavit of Derek Shaffer, # 3 Text of Proposed Order Granting Motion to Appear Pro Hac Vice)(Shaffer, Derek) (Entered: 06/24/2020) |
| 06/25/2020 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 60 FIRST MOTION for Derek L. Shaffer to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-20405241. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (laq)** (Entered: 06/25/2020) |
| 06/26/2020 | 61 | MOTION to Dismiss *the Indictment*. Document filed by Ruben Weigand. (Levander, Andrew) (Entered: 06/26/2020) |
| 06/26/2020 | 62 | MEMORANDUM in Support by Ruben Weigand re 61 MOTION to Dismiss *the Indictment*.. (Levander, Andrew) (Entered: 06/26/2020) |
| 06/26/2020 | 63 | MOTION to Compel *Discovery*. Document filed by Ruben Weigand. (Levander, Andrew) (Entered: 06/26/2020) |
| 06/26/2020 | 64 | MEMORANDUM in Support by Ruben Weigand re 63 MOTION to Compel *Discovery*.. (Levander, Andrew) (Entered: 06/26/2020) |
| 06/26/2020 | 65 | DECLARATION of Michael J. Gilbert in Support as to Ruben Weigand re: 63 MOTION to Compel *Discovery*.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Gilbert, Michael) (Entered: 06/26/2020) |
| 06/26/2020 | 66 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION to Dismiss . Document filed by Hamid Akhavan. (Attachments: # 1 Memorandum of Points and Authorities in Support of Motion to Dismiss)(Slattery, Paul) Modified on 6/28/2020 (ka). (Entered: 06/26/2020) |
| 06/26/2020 | 67 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION to Compel *Discovery and Set Disclosure Deadlines*. Document filed by Hamid Akhavan. (Attachments: # 1 Memorandum of Points and Authorities in Support of Motion to Compel, # 2 Exhibits) (Slattery, Paul) Modified on 6/28/2020 (ka). (Entered: 06/26/2020) |
| 06/26/2020 | 68 | MOTION to Suppress . Document filed by Ruben Weigand. (Levander, Andrew) (Entered: 06/26/2020) |
| 06/26/2020 | 69 | MEMORANDUM in Support by Ruben Weigand re 68 MOTION to Suppress .. (Levander, Andrew) (Entered: 06/26/2020) |
| 06/26/2020 | 70 | DECLARATION of Michael J. Gilbert in Support as to Ruben Weigand re: 68 MOTION to Suppress .. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Gilbert, Michael) (Entered: 06/26/2020) |
| 06/28/2020 | | **\*\*\*NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR as to Hamid Akhavan: Notice to Attorney Slattery, Paul to RE-FILE Document 66 MOTION to Dismiss. ERROR(S): Filing Error of Attachment #1 Memorandum must be filed individually. Event code Memorandum in Support of Motion located under Replies, Opposition and Supporting documents.\*\*\*NOTE: Separate docket entry for each. (ka)** (Entered: 06/28/2020) |
| 06/28/2020 | | **\*\*\*NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR as to Hamid Akhavan: Notice to Attorney Slattery, Paul to RE-FILE Document 67 MOTION to Compel Discovery and Set Disclosure Deadlines. ERROR(S): Filing Error of Attachment #1. Memorandum of Points and Authorities in Support of Motion must be filed individually. Event code** |

| | | |
|---|---|---|
| | | **Memorandum in Support of located under Replies, Opposition and Supporting documents.***NOTE: Separate docket entry for each. (ka)** (Entered: 06/28/2020) |
| 06/28/2020 | 71 | MOTION to Dismiss *Indictment*. Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan. (Slattery, Paul) (Entered: 06/28/2020) |
| 06/28/2020 | 72 | MEMORANDUM in Support by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re 71 MOTION to Dismiss *Indictment*.. (Slattery, Paul) (Entered: 06/28/2020) |
| 06/28/2020 | 73 | MOTION to Compel *Discovery and Set Disclosure Deadlines*. Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan. (Slattery, Paul) (Entered: 06/28/2020) |
| 06/28/2020 | 74 | MEMORANDUM in Support by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re 73 MOTION to Compel *Discovery and Set Disclosure Deadlines*.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Slattery, Paul) (Entered: 06/28/2020) |
| 06/29/2020 | | ***DELETED DOCUMENT. Deleted document number 75. ORDER FOR ADMISSION PRO HAC VICE re: Attorney Derek L. Shaffer, as to Ruben Weigand (1). The document was incorrectly filed in this case. (bw)** (Entered: 06/30/2020) |
| 06/29/2020 | | ***DELETED DOCUMENT. Deleted document number 76. ORDER FOR ADMISSION PRO HAC VICE re: Attorney Paul Slattery, as to Ruben Weigand (1). The document was incorrectly filed in this case. (bw)** (Entered: 06/30/2020) |
| 06/29/2020 | | ***DELETED DOCUMENT. Deleted document number 77. ORDER FOR ADMISSION PRO HAC VICE re: Attorney Christopher Tayback, as to Ruben Weigand (1). The document was incorrectly filed in this case. (bw)** (Entered: 06/30/2020) |
| 06/29/2020 | 75 | ORDER FOR ADMISSION PRO HAC VICE: granting 60 Motion for Derek L. Shaffer to Appear Pro Hac Vice as to Hamid Akhavan (2). The motion of Derek L. Shaffer, Esq., for admission to practice Pro HaC Vice in the above captioned action is granted. IT IS HEREBY ORDERED that Applicant is admitted to practice Pro Hac Vice in the above captioned action in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing the discipline of attorneys. (Signed by Judge Jed S. Rakoff on 6/29/2020) (bw) (Entered: 06/30/2020) |
| 06/29/2020 | | Attorney update in case as to Hamid Akhavan (2). Attorney Derek Lawrence Shaffer for Hamid Akhavan added. (bw) (Entered: 06/30/2020) |
| 06/29/2020 | 76 | ORDER FOR ADMISSION PRO HAC VICE as to Hamid Akhavan on re: 47 FIRST MOTION for Paul Joseph Slattery to Appear Pro Hac Vice. The motion of Paul Slattery, Esq., for admission to practice Pro Hac Vice in the above captioned action is granted. IT IS HEREBY ORDERED that Applicant is admitted to practice Pro Hac Vice in the above captioned action in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing the discipline of attorneys. (Signed by Judge Jed S. Rakoff on 6/29/2020)(bw) (Entered: 06/30/2020) |
| 06/29/2020 | 77 | ORDER FOR ADMISSION PRO HAC VICE: as to Hamid Akhavan on re: 48 FIRST MOTION for Christopher Tayback to Appear Pro Hac Vice. The motion of Christopher Tayback, Esq., for admission to practice Pro Hac Vice in the above captioned action is granted. IT IS HEREBY ORDERED that Applicant is admitted to practice Pro Hac Vice in the above captioned action in the United States District Court for the Southern District of New York.All attorneys appearing before this Court are subject to the Local Rules of |

| | | |
|---|---|---|
| | | this Court, including the Rules governing the discipline of attorneys. (Signed by Judge Jed S. Rakoff on 6/29/2020)(bw) (Entered: 06/30/2020) |
| 07/06/2020 | | MEMORANDUM TO THE DOCKET CLERK as to Ruben Weigand, Hamid Akhavan. The Government's deadline to respond to defendants' pretrial motions is extended to July 14, 2020 (jw) (Entered: 07/06/2020) |
| 07/06/2020 | | Set/Reset Deadlines/Hearings as to Ruben Weigand, Hamid Akhavan:Government Responses due by 7/14/2020. (jw) (Entered: 07/06/2020) |
| 07/06/2020 | 78 | NOTICE OF ATTORNEY APPEARANCE: Jared Robinson Smith appearing for Hamid Akhavan. Appearance Type: Retained. (Smith, Jared) (Entered: 07/06/2020) |
| 07/15/2020 | 79 | MEMORANDUM in Opposition by USA as to Ruben Weigand, Hamid Akhavan re 68 MOTION to Suppress ., 73 MOTION to Compel *Discovery and Set Disclosure Deadlines.*, 61 MOTION to Dismiss *the Indictment.*, 71 MOTION to Dismiss *Indictment.*, 63 MOTION to Compel *Discovery.*. (Dimase, Christopher) (Entered: 07/15/2020) |
| 07/16/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Ruben Weigand, Hamid Akhavan held on 7/16/2020. A teleconference was held on July 16, 2020 before Judge Rakoff without transcription or recording. Present were counsel for both defendants and the government. Court's decision: defendants may each submit a reply brief in support of their motions by 5:00pm Monday July 20, 2020. (Replies due by 7/20/2020) (ap) (Entered: 07/16/2020) |
| 07/16/2020 | 80 | SEALED DOCUMENT placed in vault. (mhe) (Entered: 07/16/2020) |
| 07/17/2020 | 81 | NOTICE of Filing Letter re: Status Update as per Order of June 23, 2020 as to Ruben Weigand (Attachments: # 1 Letter re Status Update as per Order of June 23, 2020) (Gilbert, Michael) (Entered: 07/17/2020) |
| 07/20/2020 | 82 | REPLY MEMORANDUM OF LAW in Support as to Ruben Weigand re: 68 MOTION to Suppress ., 61 MOTION to Dismiss *the Indictment.*, 63 MOTION to Compel *Discovery*. . (Levander, Andrew) (Entered: 07/20/2020) |
| 07/20/2020 | 83 | REPLY MEMORANDUM OF LAW in Support by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re: 73 MOTION to Compel *Discovery and Set Disclosure Deadlines.*, 71 MOTION to Dismiss *Indictment.*. . (Burck, William) (Entered: 07/20/2020) |
| 07/21/2020 | 84 | ENDORSED LETTER as to Ruben Weigand addressed to Judge Jed S. Rakoff from Michael J. Gilbert dated 7/17/20 re: The parties have conferred and write to request that this Court's Order staying Weigand's removal to the Southern District of NY remain in effect for an additional 30 days, and that no order of removal be entered on July 30, 2020...ENDORSEMENT: SO ORDERED. However, the Court is unlikely to grant further such extensions beyond August 31, 2020. (Signed by Judge Jed S. Rakoff on 7/21/20)(jw) (Entered: 07/21/2020) |
| 07/23/2020 | | MEMORANDUM TO THE DOCKET CLERK as to Ruben Weigand, Hamid Akhavan: A telephonic oral argument will be heard on July 27, 2020 at 11:00am. The public may dial in to listen toll free in the USA at 888-363-4735; International caller paid 215-446-3657; access code 1086415. (lnl) (Entered: 07/23/2020) |
| 07/23/2020 | | Set/Reset Deadlines/Hearings as to Ruben Weigand, Hamid Akhavan: Telephone Conference set for 7/27/2020 at 11:00 AM before Judge Jed S. Rakoff. (lnl) (Entered: 07/23/2020) |
| 07/24/2020 | 85 | NOTICE of Waiver of Right to be Physically Present at Hearing as to Ruben Weigand |

|            |    | (Attachments: # 1 Waiver of Right to be Physically Present at Hearing)(Gilbert, Michael) (Entered: 07/24/2020) |
|------------|----|---|
| 07/24/2020 | 86 | NOTICE of Waiver of Right to be Physically Present at Hearing as to Ray Akhavan as to Ruben Weigand, Hamid Akhavan (Burck, William) (Entered: 07/24/2020) |
| 07/24/2020 |    | MEMORANDUM TO THE DOCKET CLERK as to Ruben Weigand, Hamid Akhavan. The dial in information for the argument on Monday July 27 at 11:00am has changed. The public may listen in by dialing 646-518-9805; webinar ID access code 946-5720-3220. (jw) (Entered: 07/27/2020) |
| 07/27/2020 |    | Minute Entry for proceedings held before Judge Jed S. Rakoff:Oral Argument as to Ruben Weigand, Hamid Akhavan held on 7/27/2020 re: 68 MOTION to Suppress filed by Ruben Weigand, 73 MOTION to Compel *Discovery and Set Disclosure Deadlines* filed by Hamid Akhavan, 71 MOTION to Dismiss *Indictment* filed by Hamid Akhavan. Present: For defendant Weigand: Andrew Levander, Michael Gilbert, and Michael Artan. For defendant Akhaven: Paul Slattery, Christopher Tayback, Derek Shaffer, Sara Clark, William Burck, Ira Rothken and Jared Smith. For the government: AUSA's Christopher Dimase, Tara LaMorte and Nicholas Folly. Court reporter Kelly Surina present. (jw) Modified on 8/6/2020 (ap). (Entered: 07/30/2020) |
| 08/18/2020 | 87 | NOTICE of Filing Letter re: Stay of Removal to New York as to Ruben Weigand (Attachments: # 1 Letter re Request for Further Stay of Removal)(Levander, Andrew) (Entered: 08/18/2020) |
| 08/20/2020 | 88 | MEMO ENDORSEMENT as to Ruben Weigand on re: 87 NOTICE of Filing Letter re: Stay of Removal to New York as to Ruben Weigand (Attachments: # 1 Letter re Request for Further Stay of Removal). ENDORSEMENT: SO ORDERED. (Signed by Judge Jed S. Rakoff on 8/19/2020) (ap) (Entered: 08/20/2020) |
| 08/20/2020 | 89 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Conference held on 7/27/2020 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Kelly Surina, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/10/2020. Redacted Transcript Deadline set for 9/21/2020. Release of Transcript Restriction set for 11/18/2020. (McGuirk, Kelly) (Entered: 08/20/2020) |
| 08/20/2020 | 90 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Conference proceeding held on 7/27/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 08/20/2020) |
| 08/31/2020 |    | MEMORANDUM TO THE DOCKET CLERK: as to Hamid Akhavan. For the Akhavan hearing on Thursday, September 3, 2020 at 4:00pm the public dial-in info is: +1 646 518 9805, Webinar ID: 999 2386 5317, Passcode: 432168. (jbo) (Entered: 08/31/2020) |
| 08/31/2020 |    | Set/Reset Hearings as to Hamid Akhavan: Status Conference set for 9/3/2020 at 04:00 PM before Judge Jed S. Rakoff. (jbo) (Entered: 08/31/2020) |
| 08/31/2020 | 91 | OPINION & ORDER as to Ruben Weigand, Hamid Akhavan. For the foregoing reasons, defendants' motions to dismiss are denied and Weigand's motion to suppress is denied. Defendants' motion to compel and to set pretrial disclosure deadlines is denied, except as follows: The Government is ordered to promptly produce to defendants documents concerning (1) communications between merchant banks, credit card companies, or |

issuing banks on the one hand and the defendants on the other hand; (2) how, when, and by whom MCCs are assigned to transactions; and (3) the relation MCCs have, if any, to the approval or rejection of transactions. For devices seized from defendants, if the Government has not already done so, it must share the entire contents of each device with the device's owner by no later than 5:00 pm on September 2, 2020. The Government must share responsive documents with both defendants by no later than 5:00 pm on September 14, 2020. The Court orders that, to the extent the Government has additional details regarding the March 2018 meeting described in the Government's June 22, 2020 letter - including, without limitation, the meetings' attendees the Government must immediately produce that information in accordance with its Brady obligations. Giglio materials must be produced as specified in the Court's Individual Rules. Exhibits and witness lists must be produced four weeks prior to trial, subject to change for good cause. The Government must file a notice on the docket by no later than 5:00 pm on September 4, 2020 stating by when it will disclose Jencks Act material. (Signed by Judge Jed S. Rakoff on 8/31/2020) (jw) (Entered: 09/01/2020)

| 09/02/2020 | 92 | NOTICE of of Filing of Letter in Opposition to Remand Recommendation as to Hamid Akhavan (Attachments: # 1 Letter Regarding Opposition to Remand Recommendation, # 2 Exhibits)(Burck, William) (Entered: 09/02/2020) |
| 09/02/2020 | 93 | ERRATA as to Ruben Weigand, Hamid Akhavan. Two minor errors in the Opinion and Order dated August 31, 2020, ECF No. 91, are hereby corrected as follows: On page 2, lines 13-16, the parenthetical beginning with the word "here" and ending with the word "Company" is deleted. On page 3, lines 14-15, the phrase "Weigand and Akhavan were principals of" is replaced with the phrase "Weigand and Akhavan and their co-conspirators made use of an entity called."SO ORDERED. (Signed by Judge Jed S. Rakoff on 9/2/2020)(jw) (Entered: 09/02/2020) |
| 09/02/2020 | 94 | NOTICE of of Filing of Supplemental Letter Regarding Bond Revocation Hearing as to Hamid Akhavan re: 92 Notice (Other). (Attachments: # 1 Supplemental Letter Regarding Bond Revocation Hearing, # 2 Exhibits)(Burck, William) (Entered: 09/02/2020) |
| 09/03/2020 | | MEMORANDUM TO THE DOCKET CLERK as to Hamid Akhavan. The proceeding scheduled for 4pm today is rescheduled to 5pm today. The dial in information remains the same as previously posted. (jw) (Entered: 09/03/2020) |
| 09/03/2020 | | Set/Reset Deadlines/Hearings as to Hamid Akhavan: Status Conference set for 9/3/2020 at 05:00 PM before Judge Jed S. Rakoff (jw) (Entered: 09/03/2020) |
| 09/04/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Bond Hearing as to Hamid Akhavan held on 9/4/2020. A Zoom bail application was held before Judge Rakoff on September 4. Present were Nicholas Folly, AUSA, Tara LaMorte, AUSA and Christopher de Maise, AUSA for the government, Christopher Tayback, William Burke, Paul Slattery, Ira Rothkin, Jared Smith for the defense, Pretrial Services Officer John Moscato, and a court reporter. Court's decision: The defendant shall enter an inpatient drug abuse rehabilitation program in California as soon as Pretrial Services is able to arrange that. While those arrangements are pending the defendant shall continue attending his out patient program and submit to testing as often as Pretrial can arrange for it. Said in patient treatment shall continue until the defendant must come to NY to prepare for trial or until Pretrial Services has decided the defendant has received the maximum benefit thereof. All other conditions remain. GPS and/or cell phone monitoring shall be implemented as soon as possible. (ap) (Entered: 09/04/2020) |
| 09/04/2020 | 95 | RESPONSE by USA as to Ruben Weigand, Hamid Akhavan *to Court's Direction to Government to Submit Letter Regarding Production of Jencks Act Material.* (La Morte, Tara) (Entered: 09/04/2020) |

**DJA23**

| | | |
|---|---|---|
| 09/15/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Ruben Weigand, Hamid Akhavan held on 9/15/2020. A phone conference was held on September 15, 2020, without transcription or recording. Present were Nicholas Folly, AUSA, Tara LaMorte, AUSA and Christopher de Maise, AUSA for the government, Christopher Tayback, William Burke, Paul Slattery, Ira Rothkin, Jared Smith, and Katherine Talbot McCarthy for the defense. (ap) (Entered: 09/15/2020) |
| 09/15/2020 | 96 | FIRST MOTION for Michael Harry Artan to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number NYSDC-21668495. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Ruben Weigand as to Ruben Weigand, Hamid Akhavan. (Attachments: # 1 Affidavit of Michael H. Artan in Support of Motion for Admission Pro Hac Vice, # 2 Exhibit A to Affidavit, # 3 Order for Pro Hac Vice Admission)(Artan, Michael) (Entered: 09/15/2020) |
| 09/16/2020 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 96 FIRST MOTION for Michael Harry Artan to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-21668495. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (vba)** (Entered: 09/16/2020) |
| 09/17/2020 | 97 | ORDER FOR PRO HAC VICE ADMISSION granting 96 Motion for Michael H. Artan to Appear Pro Hac Vice as to Ruben Weigand (1). (Signed by Judge Jed S. Rakoff on 9/17/2020) (lnl) (Entered: 09/17/2020) |
| 09/24/2020 | 98 | NOTICE of filing of Letter for Bail Reconsideration dated 09/24/2020 as to Ruben Weigand (Attachments: # 1 Letter for Bail Reconsideration, # 2 Exhibit A-B, # 3 Exhibit C, # 4 Exhibit D_I)(Levander, Andrew) (Entered: 09/24/2020) |
| 09/25/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Ruben Weigand, Hamid Akhavan held on 9/25/2020. On September 25, 2020, there was a teleconference in the above-captioned case, without transcription or recording. Present were Tara LaMorte, AUSA for the Government, M. Gilbert and I. Rothken for defendant Weigand, and S. Clark for defendant Akhavan. (ap) (Entered: 09/29/2020) |
| 09/28/2020 | 99 | MEMORANDUM OF LAW by USA as to Ruben Weigand . (Folly, Nicholas) (Entered: 09/28/2020) |
| 09/30/2020 | 100 | NOTICE of Filing Letter re Supplemental Medical Opinion in Support of Mr. Weigand's Renewed Bail Application as to Ruben Weigand (Levander, Andrew) (Entered: 09/30/2020) |
| 09/30/2020 | | MEMORANDUM TO THE DOCKET CLERK as to Ruben Weigand. On September 30, 2020 at noon there will be a hearing before Judge Rakoff on Weigand's motion for reconsideration of the denial of bail. The public can access the hearing using the following dial-in information. Phone number: 8662055379. Access code: 173 133 2495. This Hearing will be adjourned to Friday at 10am (jw) (Entered: 09/30/2020) |
| 09/30/2020 | | MEMORANDUM TO THE DOCKET CLERK as to Ruben Weigand. The telephonic bail appeal hearing for defendant Weigand will be adjourned to Friday October 2, 2020 at 10am. The public may use the previously posted dial in information. (jw) (Entered: 09/30/2020) |
| 09/30/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Teleconference Status Conference as to Ruben Weigand held on 9/30/2020 without transcription or recording. Present were C. DiMase, N. Folly, AUSAs, for the Government, and M. Gilbert, M. Artan, A. Levander for defendant Weigand. (jw) (Entered: 09/30/2020) |
| 09/30/2020 | 101 | ORDER as to Ruben Weigand..... WHEREAS, oral argument on Weigand's renewed bail |

DJA24

| | | |
|---|---|---|
| | | application is scheduled for October 2, 2020 at 10 a.m. IT IS HEREBY ORDERED that the stay of Defendant Ruben Weigand' s removal to New York be extended until the Court has ruled on Weigand's renewed bail application (ECF No. 98-1), which it will do by no later than October 5, 2020. SO ORDERED. (Oral Argument set for 10/2/2020 at 10:00 AM before Judge Jed S. Rakoff.) (Signed by Judge Jed S. Rakoff on 9/30/2020) (jbo) (Entered: 09/30/2020) |
| 10/01/2020 | | MEMORANDUM TO THE DOCKET CLERK: as to Ruben Weigand. A bail hearing will be heard by Judge Rakoff on October 2, 2020 at 10:00am. The public can access the telephonic bail appeal hearing for defendant Weigand, scheduled for Friday, October 2, 2020 at 10am, using the following dial-in information. Phone number: 8662055379. Access code: 173 551 4495. (ap) Modified on 10/2/2020 (ap). (Entered: 10/02/2020) |
| 10/01/2020 | | Set/Reset Hearings as to Ruben Weigand: Bail Hearing set for 10/2/2020 at 10:00 AM before Judge Jed S. Rakoff. (ap) (Entered: 10/02/2020) |
| 10/02/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Bond Hearing as to Ruben Weigand held on 10/2/2020. On October 2, 2020 a telephonic bail appeal was heard before Judge Rakoff. Present were Christopher Dimase, AUSA & Marie La Morte, AUSA for the government. Shiriram Harid, Andrew Levander, Michael Gilbert, and Michael Artan for the defendant who was himself present. Court reporter Paula Spears. Court's decision: The defense shall submit proposed bail conditions by noon October 3, 2020, Govt' shall submit proposed bail conditions by 9:00am Monday October 5, the Court will render its decision by close of business Monday October 5, 2020. (Court Reporter Paula Speer) (ap) (Entered: 10/02/2020) |
| 10/02/2020 | 102 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Conference held on 10/2/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/23/2020. Redacted Transcript Deadline set for 11/2/2020. Release of Transcript Restriction set for 12/31/2020. (McGuirk, Kelly) (Entered: 10/02/2020) |
| 10/02/2020 | 103 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Conference proceeding held on 10/2/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/02/2020) |
| 10/02/2020 | 104 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Conference held on 9/21/20 before Judge William H. Pauley, III. Court Reporter/Transcriber: Kristen Carannante, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/23/2020. Redacted Transcript Deadline set for 11/2/2020. Release of Transcript Restriction set for 12/31/2020. (McGuirk, Kelly) (Entered: 10/02/2020) |
| 10/02/2020 | 105 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Conference proceeding held on 9/21/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/02/2020) |

**DJA25**

| 10/03/2020 | 106 | NOTICE OF ATTORNEY APPEARANCE: Andrew J. Levander appearing for Ruben Weigand. Appearance Type: Retained. (Levander, Andrew) (Entered: 10/03/2020) |
|---|---|---|
| 10/03/2020 | 107 | NOTICE OF ATTORNEY APPEARANCE: Michael J. Gilbert appearing for Ruben Weigand. Appearance Type: Retained. (Gilbert, Michael) (Entered: 10/03/2020) |
| 10/03/2020 | 108 | NOTICE OF ATTORNEY APPEARANCE: Steven Pellechi appearing for Ruben Weigand. Appearance Type: Retained. (Pellechi, Steven) (Entered: 10/03/2020) |
| 10/03/2020 | 109 | NOTICE of Filing Letter re: Bail Conditions as to Ruben Weigand (Attachments: # 1 Letter re Bail Conditions)(Levander, Andrew) (Entered: 10/03/2020) |
| 10/03/2020 | 110 | NOTICE OF ATTORNEY APPEARANCE: Shriram Harid appearing for Ruben Weigand. Appearance Type: Retained. (Harid, Shriram) (Entered: 10/03/2020) |
| 10/05/2020 | 111 | RESPONSE by USA as to Ruben Weigand *Regarding Defendant's Proposed Bail Conditions*. (Dimase, Christopher) (Entered: 10/05/2020) |
| 10/06/2020 | 112 | OPINION AND ORDER as to Ruben Weigand: the Court grants Weigand's motion and orders his release pending trial in accordance with the schedule set forth below and with the following conditions: 1. Weigand will sign a $3 million personal recognizance bond, secured by $470,000 in cash collateral provided by Weigand's close friends and family, and seven financially responsible co-signers who shall sign the bond to the extent of $1.15 million. The defense shall promptly identify the seven financially responsible co-signers to the Government; but regardless of whether the Government finds them satisfactory, that will not delay defendant's release. However, if the Government finds that the co-signers are unsatisfactory to the Government, then the Government can apply to the Court for further action, even including remand. 2. Weigand must be released from the facility where he is currently housed in Santa Ana, California, by no later than Friday, October 9. If the Government can promptly make arrangements, Weigand will then be transported from California to New York by plane under the supervision of the U.S. Marshals, no later than Friday, October 9. Alternatively, at the Government's election or if the Government is unable to transport Weigand to New York by plane no later than Friday, October 9, then Weigand will be released to the custody of the retained private security guards and transported from California to New York by plane under the supervision of said guards, at his own expense, by no later than Friday, October 9. 3. Immediately upon Weigand's arrival in New York, he shall be escorted by the Marshals or by his private security guards to an apartment in Manhattan rented at his expense, the location of which shall be furnished beforehand to Pre-Trial Services and the Government. He shall remain there at all times of day and night but may leave to meet his counsel at their New York office under the supervision of armed security guards. Any other exceptions must be expressly authorized by Pre-Trial Services or this Court, in writing, in advance. 4. Weigand's detention in the rented apartment will be secured at all times by on-premises armed security guards, paid for by Weigand. 5. Weigand will give his express consent in writing to the use of reasonable force by the armed security guards to thwart any attempt to flee or to leave his apartment for any reason not authorized by this Order, Pre-Trial Services, or the Court. In addition, the Court hereby authorizes such use of force. 6. With the exception of Weigand's counsel, who will be permitted to visit Weigand freely, any visitors for Weigand will require express pre-approval in writing by Pre-Trial Services. 7. Weigand will be subject to strict supervision and electronic GPS monitoring, as directed by Pre-Trial Services. 8. Weigand will execute a waiver of his right to challenge extradition from both Germany and Luxembourg. 9. Santa Ana Jail is directed to release Weigand from its custody into the custody of the U.S. Marshals Service no later than Friday, October 9. If the U.S. Marshals Service will be unable to transport Weigand to New York by plane by October 9, then the U.S. Marshals Service shall so notify the Santa Ana Jail, which shall release Weigand into the custody of the |

DJA26

| | | |
|---|---|---|
| | | private security guards described above no later than Friday, October 9. The Government is hereby ordered to take all necessary steps to effectuate this release and transfer. SO ORDERED. (Signed by Judge Jed S. Rakoff on 10/5/2020) (lnl) (Entered: 10/06/2020) |
| 10/08/2020 | 113 | PRB Bond Entered as to Ruben Weigand in amount of $ 3,000,000. (jm) (Main Document 113 replaced on 3/29/2021) (jbo). (Entered: 10/09/2020) |
| 10/09/2020 | 114 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Conference held on 10/2/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/30/2020. Redacted Transcript Deadline set for 11/9/2020. Release of Transcript Restriction set for 1/7/2021. (McGuirk, Kelly) (Entered: 10/09/2020) |
| 10/09/2020 | 115 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Conference proceeding held on 10/2/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/09/2020) |
| 10/20/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Ruben Weigand, Hamid Akhavan held on 10/20/2020. A teleconference was held before Judge Rakoff on 0ctober 20, 2020 case, without transcription or recording. Present were counsel for defendant Akhaven: William Anthony Burck, Sara Catherine Clark, Ira Perry Rothken, Christopher Tayback, for defendant Ruben Weigand: Michael Artan, Shriram Harid, Andrew J. Levander, Michael J. Gilbert, for the government: Tara LaMorte, AUSA, Christopher Dimase, AUSA and Nicholas Folly. (ap) (Entered: 10/21/2020) |
| 10/21/2020 | 116 | NOTICE of Proposed Order Pretrial Deadlines as to Ruben Weigand, Hamid Akhavan (La Morte, Tara) (Entered: 10/21/2020) |
| 10/22/2020 | 117 | ORDER as to Ruben Weigand: IT IS HEREBY ORDERED that the following schedule shall apply: 11/3/2020 : Government and defendants serve respective expert notice; Government serves witness and exhibit lists, and 3500 materials; 11/10/2020: Government serves Rule 404(b) notice; Government and defendants simultaneously file motions in limine; defendants serve respective witness and exhibit lists, and 3500 materials; 11/17/2020: Government and defendants serve any supplemental expert notice; 11/20/2020: Government and defendants simultaneously file responses to motions in limine; defendants serve any opposition to Rule 404(b) notice. There will be a final pretrial conference on 11/25/2020 at 11:00 a.m. (Motions due by 11/10/2020. Responses due by 11/24/2020. Pretrial Conference set for 11/25/2020 at 11:00 AM before Judge Jed S. Rakoff) (Signed by Judge Jed S. Rakoff on 10/21/2020) (ap) (Entered: 10/22/2020) |
| 11/04/2020 | 118 | PROTECTIVE ORDER as to Ruben Weigand, Hamid Akhavan...regarding procedures to be followed that shall govern the handling of confidential material.... (Signed by Judge Jed S. Rakoff on 11/4/20)(jw) (Entered: 11/04/2020) |
| 11/06/2020 | | MEMORANDUM TO THE DOCKET CLERK as to Hamid Akhavan. There will be a hearing on conditions of pretrial release as to defendant Akhavan at 4pm on Monday, November 9. The public will be able to join through a dial-in, to be provided. (jw) (Entered: 11/06/2020) |
| 11/24/2020 | | MEMORANDUM TO THE DOCKET CLERK: as to Ruben Weigand, Hamid Akhavan. |

**DJA27**

|  |  | The Final Pretrial Conference is canceled. There will be a Curcio hearing for defendant Weigand on Nov. 30 at 3pm, in-court. (ap) (Entered: 11/24/2020) |
|---|---|---|
| 11/24/2020 |  | Set/Reset Hearings as to Ruben Weigand, Hamid Akhavan: (Curcio Hearing set for 11/30/2020 at 03:00 PM before Judge Jed S. Rakoff) (ap) (Entered: 11/24/2020) |
| 11/24/2020 |  | Minute Entry for proceedings held before Judge Jed S. Rakoff:Status Conference/Teleconference as to Ruben Weigand, Hamid Akhavan held on 11/24/2020 without transcription or recording. Present were counsel for all parties. The jury trial set to begin December 1, 2020, is adjourned pending further order of the Court. The Curcio hearing as to defendant Weigand scheduled for 3 pm on November 30 will take place by videoconference. Members of the public may listen in by dialing (866) 205-5379 and using access code 1791394745. (jw) (Entered: 11/30/2020) |
| 11/25/2020 |  | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Hamid Akhavan held on 11/25/2020. On November 25, 2020, there was a teleconference in this case as to defendant Akhavan, without transcription or recording. Present were counsel for the Government and for defendant Akhavan. By December 1, counsel shall file letter briefs regarding the Court's authority (or lack thereof) to issue a writ compelling Akhavan's transfer into federal custody pending trial, without compelling his immediate transportation to S.D.N.Y. (ap) (Entered: 12/01/2020) |
| 11/30/2020 |  | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Ruben Weigand held on 11/30/2020. On November 30, 2020, there was a teleconference in this case as to defendant Weigand, without transcription or recording. Present were counsel for the Government and for defendant Weigand. Weigand's application to move to a different address is granted. All conditions of pretrial release otherwise remain in full force and effect. (ap) (Entered: 12/01/2020) |
| 11/30/2020 |  | Minute Entry for proceedings held before Judge Jed S. Rakoff: (Webex Video) Curcio Hearing as to Ruben Weigand held on 11/30/2020. Present were deft Weigand and his counsel Michael Gilbert, Shriram Harid, and Michael Artan, AUSA's Nicholas Folly and Tara LaMorte for the government, court reporte4r Jennifer Thun. Court's decision: Any conflict that might exist for attorney Harid is entirely waivable. Deft so waives. (jbo) (Entered: 12/02/2020) |
| 12/01/2020 | 119 | NOTICE of of Filing of Letter Regarding Writ as to Hamid Akhavan (Burck, William) (Entered: 12/01/2020) |
| 12/01/2020 | 120 | SEALED DOCUMENT placed in vault. (jus) (Entered: 12/01/2020) |
| 12/01/2020 | 121 | SEALED DOCUMENT placed in vault. (jus) (Entered: 12/01/2020) |
| 12/01/2020 | 122 | NOTICE of Filing of Letter as to Hamid Akhavan (Folly, Nicholas) (Entered: 12/01/2020) |
| 12/01/2020 | 123 | NOTICE of Filing of Letter re: Exclusion of Time as to Ruben Weigand, Hamid Akhavan (Folly, Nicholas) (Entered: 12/01/2020) |
| 12/02/2020 | 124 | MEMO ENDORSEMENT as to Ruben Weigand, Hamid Akhavan on re: 123 NOTICE of Filing of Letter re: Exclusion of Time. ENDORSEMENT: SO ORDERED. (Signed by Judge Jed S. Rakoff on 12/1/2020) (ap) (Entered: 12/02/2020) |
| 12/02/2020 | 125 | NOTICE of Filing Letter re: Speedy Trial Act as to Ruben Weigand (Gilbert, Michael) (Entered: 12/02/2020) |
| 12/14/2020 | 126 | PROTECTIVE ORDER as to Ruben Weigand, Hamid Akhavan...regarding procedures to be followed that shall govern the handling of confidential material... (Signed by Judge Jed S. Rakoff on 12/14/2020) (ap) (Entered: 12/14/2020) |

| 12/23/2020 | 127 | ORDER as to Hamid Akhavan: As to defendant Hamid Akhavan, the Clerk of Court is hereby directed to receive the moneys paid in the Central District of California in the Courts registry until further Order of the Court. (Signed by Judge Jed S. Rakoff on 12/23/2020) (Forwarded to finance unit via email on 12/23/2020) (ap) (Entered: 12/23/2020) |
| 12/30/2020 | | Arrest of Hamid Akhavan (2). (bw) (Entered: 01/07/2021) |
| 01/06/2021 | | MEMORANDUM TO THE DOCKET CLERK as to Ruben Weigand. January 7, 2021 at 3pm, Judge Rakoff will hear a telephonic scheduling conference. The public may listen in by dialing 888-363-4735 USA toll-free, 215-446-3657 international caller paid, access code 1086415 (jw) (Entered: 01/06/2021) |
| 01/06/2021 | | Set/Reset Deadlines/Hearings as to Ruben Weigand: Telephonic Status Conference set for 1/7/2021 at 03:00 PM before Judge Jed S. Rakoff (jw) (Entered: 01/06/2021) |
| 01/07/2021 | 128 | Minute Entry for proceedings held before Magistrate Judge Kevin Nathaniel Fox: Status Conference as to (20-Cr-188-2) Hamid Akhavan held on 1/7/2021. Date of Arrest: 12/30/2020, on writ. AUSA Tara Lamorte. Defense Counsel Christopher Tayback (Retained). Proceeding: Violations of pretrial conditions. BAIL DISPOSITION: Detention on consent without prejudice. ADDITIONAL PROCEEDINGS: Conference before District Judge on 1/7/2021. (bw) (Entered: 01/07/2021) |
| 01/07/2021 | 129 | CONSENT TO PROCEED BY TEL/VIDEO by (20-Cr-188-2) Hamid Akhavan. This proceeding was conducted by reliable videoconferencing technology. (Signed by Magistrate Judge Kevin Nathaniel Fox on 1/7/2021) (bw) (Entered: 01/07/2021) |
| 01/07/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Status Conference/Telephone as to Ruben Weigand, Hamid Akhavan held on 1/7/2021. Court reporter Martha Martin, for deft Weigand Michael Gilbert, Michael Artan, Shirian Hared, for deft Akhaven Jared Smith, Ira Rothken, William Burke & Christopher Tayback. For the government, AUSAs Christopher DeMase, Nicholas Folly, Tara LaMorte (jw) (Entered: 03/16/2021) |
| 01/14/2021 | 130 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Conference held on 1/7/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Martha Martin, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/4/2021. Redacted Transcript Deadline set for 2/16/2021. Release of Transcript Restriction set for 4/14/2021. (McGuirk, Kelly) (Entered: 01/14/2021) |
| 01/14/2021 | 131 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Conference proceeding held on 1/7/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 01/14/2021) |
| 01/21/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Ruben Weigand held on 1/21/2021. A teleconference was held on January 21, 2021, without transcription or recording, as to defendant Weigand. Present were Tara LaMorte, AUSA, for the Government, and Shriram Harid for Weigand. (ap) (Entered: 01/26/2021) |
| 02/02/2021 | | MEMORANDUM TO THE DOCKET CLERK as to Ruben Weigand. This case is set for a jury trial beginning March 2, 2021. The Court adopts the parties' joint proposed pretrial schedule, as follows. Feb. 16, 2021: Government serves 404(b) notice; all parties file |

**DJA29**

| | | |
|---|---|---|
| | | motions in limine. Feb. 23, 2021: defendants serve any opposition to Rule 404(b) notice; all parties file responses to motions in limine; all parties file proposed requests to charge and voir dire (jw) (Entered: 02/02/2021) |
| 02/02/2021 | | Set/Reset Deadlines/Hearings as to Ruben Weigand: Motions in Limine due by 2/16/2021. Defendants Opposition due by 2/23/2021 (jw) (Entered: 02/02/2021) |
| 02/02/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Ruben Weigand, Hamid Akhavan held on 2/2/2021. On Tuesday, Feb. 2, there was a teleconference, without transcription or recording. Present were counsel for all parties. (lnl) (Entered: 02/04/2021) |
| 02/03/2021 | [132](#) | MOTION for Mari F. Henderson to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-23808283. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hamid Akhavan. (Attachments: # [1](#) Affidavit Affidavit, # [2](#) Exhibit COGS, # [3](#) Text of Proposed Order Proposed Order)(Henderson, Mari) (Entered: 02/03/2021) |
| 02/03/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 132 MOTION for Mari F. Henderson to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-23808283. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 02/03/2021) |
| 02/04/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff on 2/4/21, there was a teleconference, without transcription or recording. Present were Matt Lindenbaum and Rob Lindholm for third party Circle Internet Financial; Michael Gilbert, Shriram Harid, and Michael Artan for Ruben Weigand; and Tara LaMorte and Nicholas Folly, AUSAs, for the Government. Court's decision: Circle Internet Financial may file a motion to quash by Friday, February 5. Weigand may file a response by Tuesday, February 9. Circle Internet Financial may file a reply by Thursday, February 11. The Government may file a response by Thursday, February 11. If the Government files a response, then either party may file a further reply by Monday, February 15. (jw) (Entered: 02/11/2021) |
| 02/05/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: A teleconference was held 2-5-2021, without transcription or recording, as to defendant Akhavan. Present were counsel for the Government and for Akhavan. A hearing regarding Akhavans alleged violations of conditions of pretrial release is scheduled for February 10, 2021, at 11 am, by teleconference. The public may listen in by dialing 888-363-4735 USA toll-free, 215-446-3657 international caller paid, access code 1086415. (jw) (Entered: 02/05/2021) |
| 02/05/2021 | [133](#) | MOTION for Matthew Lindenbaum to Appear Pro Hac Vice *for Non-Party Circle Internet Financial, LLC*. Filing fee $ 200.00, receipt number NYSDC-23843374. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Ruben Weigand as to Ruben Weigand, Hamid Akhavan. (Attachments: # [1](#) Affidavit Affidavit of Matthew Lindenbaum, # [2](#) Certificates of Good Standing, # [3](#) Proposed) (Lindenbaum, Matthew) (Entered: 02/05/2021) |
| 02/05/2021 | [134](#) | NOTICE OF ATTORNEY APPEARANCE Emily Sarah Deininger appearing for USA. (Deininger, Emily) (Entered: 02/05/2021) |
| 02/05/2021 | [135](#) | MOTION in Limine *Admit Business Records Based on Rule 902(11) Declarations*. Document filed by USA as to Ruben Weigand, Hamid Akhavan. (Deininger, Emily) (Entered: 02/05/2021) |
| 02/05/2021 | [136](#) | NOTICE of Letter re Pretrial Release as to Hamid Akhavan (Attachments: # [1](#) Exhibit Letter Requesting Pretrial Release)(Clark, Sara) (Entered: 02/05/2021) |

**DJA30**

| | | |
|---|---|---|
| 02/05/2021 | 137 | NOTICE of Notice of Motion to Quash as to Ruben Weigand, Hamid Akhavan (Attachments: # 1 Non-Party Circle Internet Financial, LLC's Memorandum of Law in Support of Its Motion to Quash Defendant Ruben Weigand's Subpoena Duces Tecum, # 2 Exhibit A - Subppoena, # 3 Exhibit B - Affidavit, # 4 Exhibit C - Superseding Indictment)(Lindenbaum, Matthew) (Entered: 02/05/2021) |
| 02/05/2021 | 138 | ORDER FOR ADMISSION PRO HAC VICE granting 132 Motion for Mari F. Henderson to Appear Pro Hac Vice as to Hamid Akhavan (2). (Signed by Judge Jed S. Rakoff on 2/5/21) (jbo) (Entered: 02/08/2021) |
| 02/07/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 133 MOTION for Matthew Lindenbaum to Appear Pro Hac Vice *for Non-Party Circle Internet Financial, LLC*. Filing fee $ 200.00, receipt number ANYSDC-23843374. Motion and supporting papers to be reviewed by Clerk's Offic. The document has been reviewed and there are no deficiencies. (bcu) (Entered: 02/07/2021)** |
| 02/08/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff on 2/8/2021, there was a teleconference, without transcription or recording. Present were Matthew Lindenbaum for Circle Internet Financial, Shriram Harid for Weigand, and Ira Rothken and Sara Clark for Akhavan. Court's decision: Akhavan may respond to Circle Internet Financial's motion to quash on the same schedule as Weigand. (jw) (Entered: 02/11/2021) |
| 02/09/2021 | 139 | MEMORANDUM OF LAW in Opposition by Hamid Akhavan re: 137 Notice (Other), *of Motion to Quash*. (Clark, Sara) (Entered: 02/09/2021) |
| 02/09/2021 | 140 | RESPONSE to Motion by Hamid Akhavan re: 135 MOTION in Limine *Admit Business Records Based on Rule 902(11) Declarations.*. (Clark, Sara) (Entered: 02/09/2021) |
| 02/09/2021 | 141 | MEMORANDUM OF LAW in Opposition by Ruben Weigand re: 137 Notice (Other), *of Motion to Quash as to Ruben Weigand*. (Gilbert, Michael) (Entered: 02/09/2021) |
| 02/09/2021 | 142 | DECLARATION of Lynda Larsen in Opposition as to Ruben Weigand re: 137 Notice (Other),. (Attachments: # 1 Exhibit A., # 2 Exhibit B., # 3 Exhibit C., # 4 Exhibit D., # 5 Exhibit E.)(Gilbert, Michael) (Entered: 02/09/2021) |
| 02/09/2021 | 143 | RESPONSE in Opposition by Ruben Weigand re: 135 MOTION in Limine *Admit Business Records Based on Rule 902(11) Declarations.*. (Gilbert, Michael) (Entered: 02/09/2021) |
| 02/09/2021 | 144 | RESPONSE by USA as to Hamid Akhavan re: 136 Notice (Other) *Opposition to Letter re Pretrial Release*. (Deininger, Emily) (Entered: 02/09/2021) |
| 02/10/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephonic Violation of pretrial supervision as to Hamid Akhavan held on 2/10/2021. On February 10, 2021 a telephonic violation of pretrial supervision hearing was held before Judge Rakoff. Present were Eve Giniger, court reporter, Christopher Tayback, Ira Rothken, Jared Smith, Mari Henderson and Sara Clark for the defendant, AUSAs Nicholas Folly, Emily Deininger, and Tara Lamorte, for the government, and John Moscato, Pretrial Services Officer. The defenses motion for pretrial release is taken under advisement. The jury trial for defendant Akhaven and his co-defendant Weigand is moved to March 1, 2021 at 9:30a.m. (lnl) (Entered: 02/10/2021) |
| 02/10/2021 | | Set/Reset Deadlines/Hearings as to Ruben Weigand, Hamid Akhavan: Jury Trial set for 3/1/2021 at 09:30 AM before Judge Jed S. Rakoff. (lnl) (Entered: 02/11/2021) |
| 02/10/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Teleconference held on 2/10/2021, without transcription or recording. Present were counsel for all parties. Court's |

| | | |
|---|---|---|
| | | decision: The Government's application to file a short reply in support of its motion in limine, ECF No. 135 is granted. (jw) (Entered: 02/11/2021) |
| 02/11/2021 | 145 | ORDER FOR ADMISSION PRO HAC VICE 133 Motion for Matthew G. Lindenbaum to Appear Pro Hac Vice. IT IS HEREBY ORDERED that Applicant's motion is granted and that Applicant is admitted to practice pro hac vice in the above captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing discipline of attorneys. (Signed by Judge Jed S. Rakoff on 2/11/21) (jw) (Entered: 02/11/2021) |
| 02/11/2021 | 146 | SDNY Screening Instructions for Weigand (jw) (Entered: 02/11/2021) |
| 02/11/2021 | | MEMORANDUM TO THE DOCKET CLERK as to Ruben Weigand, Hamid Akhavan. On February 19 at 5pm, Judge Rakoff will have a waiver of indictment, arraignment, and plea proceeding for a defendant, James Patterson, that the Government plans to add to this case. The proceeding will take place by Skype and dial in information for the public will be added to the docket on a date closer to the proceeding. (jw) (Entered: 02/11/2021) |
| 02/11/2021 | 147 | MEMORANDUM OF LAW in Support by USA as to Ruben Weigand, Hamid Akhavan re: 137 Notice (Other), *Government's Memorandum of Law in Support of Circle's Motion to Quash*. (La Morte, Tara) (Entered: 02/11/2021) |
| 02/11/2021 | 148 | REPLY MEMORANDUM OF LAW in Support by USA as to Ruben Weigand, Hamid Akhavan re: 135 MOTION in Limine *Admit Business Records Based on Rule 902(11) Declarations.* . (Deininger, Emily) (Entered: 02/11/2021) |
| 02/11/2021 | 149 | NOTICE of Non-Party Circle Financial LLC's Reply to Defendants Hamid Akhavan and Ruben Weigand's Opposition to Circle Financial LLC's Motion to Quash as to Ruben Weigand, Hamid Akhavan re: 137 Notice (Other),. (Lindenbaum, Matthew) (Entered: 02/11/2021) |
| 02/12/2021 | 150 | MEMORANDUM ORDER as to Hamid Akhavan. The Court hereby orders that, once all custodial holds are lifted (including any imposed by the California state authorities), Akhavan shall be released pending trial on the following conditions: 1. All conditions of pretrial release in effect prior to Akhavan's arrest in November 2020 remain in effect. (Signed by Judge Jed S. Rakoff on 2/12/2021) (See ORDER set forth) (ap) (Entered: 02/12/2021) |
| 02/14/2021 | 151 | ORDER as to Ruben Weigand, Hamid Akhavan: For the foregoing reasons, the Government's letter motion, ECF No. 135, is granted in part and denied in part without prejudice. The following exhibits are self-authenticating and will not be excluded at trial based on the hearsay rule: GX 2301, 2302, 2303-2308, 2404, 2406, 2420, 2509, 2602-2610, 2702-2704, 2705-2716, 2717, 3002, 3003, 3103, 3301, 3402-3404, 3503, 3504, and 4301. All other potential objections are, of course, reserved for trial. SO ORDERED. (Signed by Judge Jed S. Rakoff on 2/14/2021) (lnl) (Entered: 02/16/2021) |
| 02/16/2021 | 152 | MEMORANDUM OF LAW in Opposition by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re: 137 Notice (Other), *of Motion to Quash*. (Clark, Sara) (Entered: 02/16/2021) |
| 02/16/2021 | 153 | MEMORANDUM OF LAW in Opposition by Ruben Weigand re: 137 Notice (Other), . (Gilbert, Michael) (Entered: 02/16/2021) |
| 02/16/2021 | 154 | MOTION in Limine *#1*. Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan. (Clark, Sara) (Entered: 02/16/2021) |
| 02/16/2021 | 155 | MEMORANDUM in Support by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re 154 MOTION in Limine *#1*.. (Clark, Sara) (Entered: 02/16/2021) |

**DJA32**

| | | |
|---|---|---|
| 02/16/2021 | 156 | MOTION in Limine *#2*. Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan. (Clark, Sara) (Entered: 02/16/2021) |
| 02/16/2021 | 157 | MEMORANDUM in Support by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re 156 MOTION in Limine *#2*.. (Clark, Sara) (Entered: 02/16/2021) |
| 02/16/2021 | 158 | MOTION in Limine *#3*. Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan. (Clark, Sara) (Entered: 02/16/2021) |
| 02/16/2021 | 159 | MEMORANDUM in Support by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re 158 MOTION in Limine *#3*.. (Attachments: # 1 Exhibit)(Clark, Sara) (Entered: 02/16/2021) |
| 02/16/2021 | 160 | MOTION in Limine *#4*. Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan. (Clark, Sara) (Entered: 02/16/2021) |
| 02/16/2021 | 161 | MEMORANDUM in Support by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re 160 MOTION in Limine *#4*.. (Clark, Sara) (Entered: 02/16/2021) |
| 02/16/2021 | 162 | MOTION in Limine *#5*. Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan. (Clark, Sara) (Entered: 02/16/2021) |
| 02/16/2021 | 163 | MEMORANDUM in Support by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re 162 MOTION in Limine *#5*.. (Clark, Sara) (Entered: 02/16/2021) |
| 02/16/2021 | 164 | MOTION in Limine *#6*. Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan. (Clark, Sara) (Entered: 02/16/2021) |
| 02/16/2021 | 165 | MEMORANDUM in Support by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re 164 MOTION in Limine *#6*.. (Clark, Sara) (Entered: 02/16/2021) |
| 02/16/2021 | 166 | MOTION in Limine *#7*. Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan. (Clark, Sara) (Entered: 02/16/2021) |
| 02/16/2021 | 167 | MEMORANDUM in Support by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re 166 MOTION in Limine *#7*.. (Clark, Sara) (Entered: 02/16/2021) |
| 02/16/2021 | 168 | MOTION in Limine . Document filed by USA as to Ruben Weigand, Hamid Akhavan. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(La Morte, Tara) (Entered: 02/16/2021) |
| 02/16/2021 | 169 | MOTION in Limine . Document filed by USA as to Ruben Weigand, Hamid Akhavan. (Folly, Nicholas) (Entered: 02/16/2021) |
| 02/16/2021 | 170 | MOTION in Limine . Document filed by USA as to Ruben Weigand, Hamid Akhavan. (Folly, Nicholas) (Entered: 02/16/2021) |
| 02/16/2021 | 171 | MOTION in Limine . Document filed by Ruben Weigand. (Gilbert, Michael) (Entered: 02/16/2021) |
| 02/16/2021 | 172 | MEMORANDUM in Support by Ruben Weigand re 171 MOTION in Limine .. (Gilbert, Michael) (Entered: 02/16/2021) |
| 02/16/2021 | 173 | DECLARATION of Michael J. Gilbert in Support as to Ruben Weigand re: 171 MOTION in Limine .. (Attachments: # 1 Appendix, # 2 Exhibit 1 to Appendix, # 3 Exhibit 2 to Appendix, # 4 Exhibit 22 to Appendix, # 5 Exhibit 23 to Appendix, # 6 Exhibit 28 to Appendix)(Gilbert, Michael) (Entered: 02/16/2021) |
| 02/16/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Ruben Weigand, Hamid Akhavan held on 2/16/2021. A teleconference was held on |

| | | |
|---|---|---|
| | | February 16, 2021, without transcription or recording. Present were counsel for all parties. Court's decision: Defendants' application to file their motions in limine under seal with redacted copies for the public record is granted. (bw) (Entered: 02/19/2021) |
| 02/17/2021 | 174 | NOTICE of Letter-Motion to Allow Video Testimony of Martin Elliott as to Ruben Weigand, Hamid Akhavan (Attachments: # 1 Appendix Government Subpoena to Martin, # 2 Appendix Akhavan Subpoena to Visa, # 3 Appendix Elliott Declaration)(Asner, Marcus) (Entered: 02/17/2021) |
| 02/17/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Ruben Weigand, Hamid Akhavan held on 2/17/2021. There was a teleconference on February 17, 2021, without transcription or recording. Present were Marcus Asner, counsel for non-party Martin Elliott, as well as counsel for all parties. Court's decision: By midnight February 18, 2021, Elliott may file a letter brief in support of his motion to offer trial testimony by video. Defendants may respond by letter brief by 5:00 p.m. on February 18, 2021. The Government may file a response by 5:00 p.m. on February 18, 2021, if it takes a position on the motion. The Court will hear oral argument, if necessary, on February 19, 2021 at 11:45 am by teleconference. The public may listen by dialing 888-363-4735 USA toll free, 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 international caller paid, access code 1086415. (bw) (Entered: 02/19/2021) |
| 02/17/2021 | | ORAL ORDER as to Ruben Weigand, Hamid Akhavan. Telephone Conference set for 2/19/2021 at 11:45 AM before Judge Jed S. Rakoff. (bw) (Entered: 02/19/2021) |
| 02/18/2021 | 175 | MEMORANDUM OF LAW in Opposition by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re: 174 Notice (Other), . (Clark, Sara) (Entered: 02/18/2021) |
| 02/18/2021 | 176 | NOTICE of filing of joinder to arguments set forth in the opposition to Visa's application to permit Martin Elliot to testify remotely filed today by Defendant Hamid Ray Akhavan. See ECF No. 175 as to Ruben Weigand (Attachments: # 1 Letter)(Gilbert, Michael) (Entered: 02/18/2021) |
| 02/18/2021 | | MEMORANDUM TO THE DOCKET CLERK as to James Patterson. The Skype plea on February 19, 2021 at 5:00pm may be listened to by the public using the dial-in: 19179332166; Conference ID: 964200457 (jw) (Entered: 03/04/2021) |
| 02/19/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Status Conference as to Ruben Weigand, Hamid Akhavan held on 2/19/2021. On Feb. 19 2021 at 11:45am argument was heard on non-party Martin Elliott, to offer trial testimony by video. Present were Marcus Asner, counsel for non-party Martin Elliott, Tara LaMorte, AUSA for the government and counsel for both defendants, and court reporter Jennifer Thune. Court's decision - non-party Martin Elliott's motion is granted. (bw) (Entered: 02/19/2021) |
| 02/19/2021 | 199 | S(4) INFORMATION (Felony) filed as to James Patterson (3) count(s) 1. (jm) (Entered: 02/26/2021) |
| 02/19/2021 | 200 | WAIVER OF INDICTMENT by James Patterson. (jm) (Entered: 02/26/2021) |
| 02/19/2021 | 201 | Waiver of Right to be Present at Criminal Proceeding. as to James Patterson. (jm) (Entered: 02/26/2021) |
| 02/19/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Arraignment via telephone as to James Patterson (3) Count 1 held on 2/19/2021. Present were court reporter Jennifer Thune, AUSA Christopher DiMasse for the government, the defendant and his counsel, Emily Schulman. The defendant waives his right to prosecution by indictment and is arraigned on the S4 information, pleads guilty as charged. SENS 2/22/2022 at 4:00pm, PSI ref to Probation. The deft's bail is cont'd. (jbo) (Entered: 03/26/2021) |

**DJA34**

| | | |
|---|---|---|
| 02/19/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Plea entered by James Patterson (3) Guilty as to Count 1. (jbo) (Entered: 03/26/2021) |
| 02/19/2021 | | Set/Reset Hearings as to James Patterson: Sentencing set for 2/22/2022 at 04:00 PM before Judge Jed S. Rakoff. (jbo) (Entered: 03/26/2021) |
| 02/19/2021 | | Order of Referral to Probation for Presentence Investigation and Report as to James Patterson. (Signed by Judge Jed S. Rakoff on 2/19/21)(jbo) (Entered: 03/26/2021) |
| 02/20/2021 | 177 | MEMORANDUM ORDER as to Hamid Akhavan. On February 5, 2021, with Court authorization, third party Circle Internet Financial LLC ("Circle") moved to quash a subpoena issued by defendant Ruben Weigand pursuant to Federal Rule of Criminal Procedure 17(c). That motion is now fully briefed. For the reasons that follow, the motion is granted in part and denied in part. For these reasons, Circle's motion to quash the subpoena is granted in part and denied in part (Signed by Judge Jed S. Rakoff on 2/20/21) (jw) (Entered: 02/22/2021) |
| 02/22/2021 | 178 | ORDER as to Ruben Weigand. IT IS HEREBY ORDERED that the Court authorizes defendant Weigands limited travel, under the supervision of armed security at all times, to a specific retail store or purveyor of clothing in preparation for forthcoming court proceedings. SO ORDERED (Signed by Judge Jed S. Rakoff on 2/22/21)(jw) (Entered: 02/22/2021) |
| 02/22/2021 | 179 | ORDER PERMITTING ENTRY INTO THE COURTHOUSE as to Hamid Akhavan. IT IS HEREBY ORDERED that Defendant Akhavan is permitted to enter the courthouse for the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York 10007 for any pretrial hearings and to attend trial in the above captioned case, notwithstanding his recent release from a federal detention facility, and provided that Mr. Akhavan complies fully with the conditions outlined in the Courts memorandum order of February 12, 2021 in the above-captioned case, including that he obtain an approved SARS-CoV-2 test on the fifth day, after quarantining for four days. ECF No. 150, at 911. This order permits Mr. Akhavan to enter the courthouse as a specific exception to Chief Judge McMahons Second Amended Standing Order, which otherwise prohibits entry by [p]ersons who have been released from a federal... prison or other correctional institution within the last 14 days... "21-mc-164 (CM), ECF No. 3, at 2. This order is entered so that Mr. Akhavan may appear at his trial and any related proceedings at which he has a right to be present. SO ORDERED (Signed by Judge Jed S. Rakoff on 2/22/21)(jw) (Entered: 02/22/2021) |
| 02/22/2021 | | REMARK as to Ruben Weigand, Hamid Akhavan: There will be Curcio hearings as to defendants Akhavan and Weigand at 9:00 am on Monday, March 1 in Courtroom 26B. (jbo) (Entered: 02/22/2021) |
| 02/22/2021 | | Set/Reset Hearings as to Ruben Weigand, Hamid Akhavan: Curcio Hearing set for 3/1/2021 at 09:00 AM before Judge Jed S. Rakoff. (jbo) (Entered: 02/22/2021) |
| 02/22/2021 | | REMARK as to Ruben Weigand, Hamid Akhavan: The criminal jury trial as to defendants Weigand and Akhavan will begin Monday, March 1, 2021 at approximately 9:30 am. The proceedings will be open to the public. Jury selection will take place in the jury assembly room at the Daniel Patrick Moynihan Courthouse, 500 Pearl Street. All other proceedings will take place in courtroom 26B. A video feed of the proceedings in courtroom 26B will be available in an overflow room, courtroom 14B. Members of the public may listen in to the proceedings in courtroom 26B by dialing 888-363-4735 USA toll free, 215-446-3657 international caller paid, access code 1086415. Members of the public who use this dial-in information must mute themselves for the duration of the proceeding. (jbo) Modified on 3/1/2021 (lnl). (Entered: 02/22/2021) |

| 02/22/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Ruben Weigand held on 2/22/2021. On February 22, there was a teleconference as to defendant Weigand, without transcription or recording. Present were counsel for the Government, counsel for defendant Weigand, and counsel for defendant Akhavan. Court's decision: Weigand may file a motion to dismiss the indictment under the Speedy Trial Act by Feb. 23. The Government's opposition is due Feb. 25. A reply brief may be filed by Feb. 26. (lnl) (Entered: 02/23/2021) |
|---|---|---|
| 02/22/2021 | | Set/Reset Deadlines/Hearings as to Ruben Weigand: Motions due by 2/23/2021. Responses due by 2/25/2021. Replies due by 2/26/2021. (lnl) (Entered: 02/23/2021) |
| 02/22/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Ruben Weigand, Hamid Akhavan held on 2/22/2021. There was a teleconference on February 22, without transcription or recording. Present were Tara LaMorte, Emily Deininger, Nicholas Folly, AUSAs, for the Government; Marcus Asner, David Russell, and Emily Schier for third parties Visa and Martin Elliott; Michael Gilbert and Shriram Harid for defendant Ruben Weigand; and Bill Burke, ChristopherTayback, Sarah Clarke, Mari Henderson, Ira Rothken, and Jared Smith for defendant Hamid "Ray" Akhavan. (lnl) (Entered: 02/23/2021) |
| 02/23/2021 | 180 | MEMORANDUM in Opposition by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re 168 MOTION in Limine .. (Clark, Sara) (Entered: 02/23/2021) |
| 02/23/2021 | 181 | MEMORANDUM in Opposition by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re 170 MOTION in Limine .. (Clark, Sara) (Entered: 02/23/2021) |
| 02/23/2021 | 182 | Request To Charge by Ruben Weigand, Hamid Akhavan. (Attachments: # 1 Exhibit A) (Clark, Sara) (Entered: 02/23/2021) |
| 02/23/2021 | 183 | MOTION to Dismiss on Speedy Trial . Document filed by Ruben Weigand. (Gilbert, Michael) (Entered: 02/23/2021) |
| 02/23/2021 | 184 | MEMORANDUM in Support by Ruben Weigand re 183 MOTION to Dismiss on Speedy Trial .. (Gilbert, Michael) (Entered: 02/23/2021) |
| 02/23/2021 | 185 | MEMORANDUM in Opposition by Ruben Weigand re 170 MOTION in Limine ., 168 MOTION in Limine .. (Gilbert, Michael) (Entered: 02/23/2021) |
| 02/23/2021 | 186 | DECLARATION of Michael J. Gilbert in Opposition as to Ruben Weigand re: 170 MOTION in Limine ., 168 MOTION in Limine .. (Attachments: # 1 Exhibit A., # 2 Exhibit B., # 3 Exhibit C.)(Gilbert, Michael) (Entered: 02/23/2021) |
| 02/23/2021 | 187 | Proposed Voir Dire Questions by Ruben Weigand. (Gilbert, Michael) (Entered: 02/23/2021) |
| 02/23/2021 | 188 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Conference held on 2/19/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Jennifer Thun, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/16/2021. Redacted Transcript Deadline set for 3/26/2021. Release of Transcript Restriction set for 5/24/2021. (McGuirk, Kelly) (Entered: 02/23/2021) |
| 02/23/2021 | 189 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Conference proceeding held on 2/19/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be |

**DJA36**

| | | |
|---|---|---|
| | | made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/23/2021) |
| 02/23/2021 | 190 | PROPOSED EXAMINATION OF JURORS by USA as to Ruben Weigand, Hamid Akhavan. (Folly, Nicholas) (Entered: 02/23/2021) |
| 02/23/2021 | 191 | Request To Charge by USA as to Ruben Weigand, Hamid Akhavan. (Deininger, Emily) (Entered: 02/23/2021) |
| 02/23/2021 | 192 | MEMORANDUM in Opposition by USA as to Ruben Weigand, Hamid Akhavan re 162 MOTION in Limine #5., 154 MOTION in Limine #1., 166 MOTION in Limine #7., 160 MOTION in Limine #4., 164 MOTION in Limine #6., 156 MOTION in Limine #2., 171 MOTION in Limine ., 158 MOTION in Limine #3.. *Government's Omnibus Opposition to Defendants' Motions in Limine* (La Morte, Tara) (Entered: 02/23/2021) |
| 02/24/2021 | | MEMORANDUM TO THE DOCKET CLERK as to Ruben Weigand, Hamid Akhavan. A Curcio hearing will begin at 9:00am, Monday March 1, 2021 in Courtroom 26B (jw) (Entered: 02/24/2021) |
| 02/24/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Telephone Conference as to Ruben Weigand, Hamid Akhavan held on 2/24/2021 without transcription or recording. Present were counsel for the Government, defendants Weiganda and Akhavan, and third parties Visa and Martin Elliott. (jw) (Entered: 02/25/2021) |
| 02/24/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Status Conference/Teleconference as to Hamid Akhavan held on 2/24/2021 without transcription or recording, as to defendant Akhavan. Present were Sara Clarke, Chris Tayback, Mari Henderson, Ira Rothken, and Jared Smith for Akhavan and Justin Goodyear, Brian Smith, and Kevin Gallagher for third parties Rosemary Stack and Michael Farrell. Courts decision: Stack and Farrell's application for leave to file a motion to quash is granted. The motion shall be filed by Thursday, February 25, Akhavan's opposition by Friday, February 26, and a reply brief, if any, by Sunday, February 28. ( Brief due by 2/28/2021., Motions due by 2/25/2021., Defendant Opposition is due by 2/26/2021) (jw) (Entered: 02/25/2021) |
| 02/24/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference without transcript or recording as to Hamid Akhavan held on 2/24/2021. Present were Sara Clarke, Chris Tayback, Mari Henderson, Ira Rothken, and Jared Smith for Akhavan and Justin Goodyear, Brian Smith, and Kevin Gallagher for third parties Rosemary Stack and Michael Farrell. Court's decision: Stack and Farrell's application for leave to file a motion to quash is granted. The motion shall be filed by Thursday, February 25, Akhavan's opposition by Friday, February 26, and a reply brief, if any, by Sunday, February 28. (jbo) (Entered: 02/26/2021) |
| 02/25/2021 | 193 | MEMORANDUM ORDER as to Hamid Akhavan. At the request of counsel for defendant Hamid ("Ray") Akhavan, this Court long delayed the transfer of Akhavan from California to New York so that his California-based counsel could have freer access to him while preparing for trial. Based on these conversations, the Court has concluded that Akhavan's further requested accommodation cannot be granted. There is no longer enough time for Akhavan to properly quarantine and test for COVID-19 following his release, without jeopardizing the health and safety of others. must remain in custody at the MCC. The Court expects that the MCC and the U.S. Marshals Service will permit Akhavan's counsel to consult with him regularly before and during trial, and the Court is confident that defense counsel will promptly bring to the Court's attention any unreasonable obstacles counsel encounters in that regard.For the foregoing reasons, the Court hereby rescinds its Memorandum Order, ECF. No. 150, permitting Akhavan's |

**DJA37**

| | | |
|---|---|---|
| | | temporary release pending trial, and remands Akhavan to the custody of the U.S. Marshals (Signed by Judge Jed S. Rakoff on 2/25/21)(jw) (Entered: 02/25/2021) |
| 02/25/2021 | 194 | MEMORANDUM in Opposition by USA as to Ruben Weigand re 183 MOTION to Dismiss on Speedy Trial .. (La Morte, Tara) (Entered: 02/25/2021) |
| 02/25/2021 | 195 | MEMORANDUM in Opposition by USA as to Ruben Weigand re 183 MOTION to Dismiss on Speedy Trial .. (La Morte, Tara) (Entered: 02/25/2021) |
| 02/26/2021 | 196 | ORDER as to Hamid Akhavan. The Court hereby orders the Metropolitan Correctional Center ("MCC") in New York, New York, to accept clothing for the defendant to use during the pendency of his trial. The Court now orders the MCC to accept up to five sets of clothing, including, but not limited to, five undershirts, five pair socks, two pairs of shoes, five dress shirts, five pairs of suit pants, five suit jackets, five ties, two belts, and five sweaters, and to permit such clothing to be made available to the defendant prior to each court date in this case. In addition, the Court shall permit the defendant to change into business attire daily at the Court prior to each appearance and appear before the jury without restraints during the pendency of his trial. Counsel for the defendant shall deliver a copy of this order to the appropriate personnel at the MCC. (Signed by Judge Jed S. Rakoff on 2/26/21)(jw) (Entered: 02/26/2021) |
| 02/26/2021 | 197 | JOINT MOTION to Quash *and in the Alternative to Allow Testimony by Video*. Document filed by Bank of America, Michael Farrell, Rosemary Stack as to Hamid Akhavan. (Goodyear, Justin) (Entered: 02/26/2021) |
| 02/26/2021 | 198 | MEMORANDUM in Support by Bank of America, N.A., Michael Farrell, Rosemary Stack as to Hamid Akhavan re 197 JOINT MOTION to Quash *and in the Alternative to Allow Testimony by Video*.. (Goodyear, Justin) (Entered: 02/26/2021) |
| 02/26/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Status Conference/teleconference as to Ruben Weigand held on 2/26/2021 without transcription or recording. Present were Nick Folly and Emily Deininger, AUSAs, for the Government; Sara Clark for Hamid Akhavan; Michael Gilbert and Michael Artan for Ruben Weigand; and Helen Cantwell and Tara Raam for Capital One Bank (USA), N.A., and TD Bank N.A. (jw) (Entered: 02/26/2021) |
| 02/26/2021 | 202 | MOTION for Emily R. Schulman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-24123444. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by James Patterson. (Attachments: # 1 Declaration of Emily R. Schulman, # 2 Certificate of Good Standing - MA, # 3 Certificate of Good Standing - DC, # 4 Text of Proposed Order)(Schulman, Emily) (Entered: 02/26/2021) |
| 02/26/2021 | 203 | NOTICE of Letter to Court as to James Patterson (Dimase, Christopher) (Entered: 02/26/2021) |
| 02/26/2021 | 204 | REPLY MEMORANDUM OF LAW in Support as to Ruben Weigand re: 183 MOTION to Dismiss on Speedy Trial . . (Gilbert, Michael) (Entered: 02/26/2021) |
| 02/26/2021 | 205 | MOTION for Brian Westfall McGrail to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-24128495. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hamid Akhavan. (Attachments: # 1 Affidavit Affidavit of Brian W. McGrail, # 2 Exhibit Certificate of Goodstanding, # 3 Text of Proposed Order Proposed Order)(McGrail, Brian) (Entered: 02/26/2021) |
| 02/26/2021 | 206 | RESPONSE in Opposition by Hamid Akhavan re: 197 JOINT MOTION to Quash *and in the Alternative to Allow Testimony by Video*.. (Clark, Sara) (Entered: 02/26/2021) |
| 02/26/2021 | 207 | ENDORSED LETTER as to James Patterson addressed to Judge Jed S. Rakoff from Christopher DiMase, dated 2/26/2021, re: he parties write jointly with a proposed, agreed |

| | | |
|---|---|---|
| | | upon bail package for the Court's consideration in the above-captioned case. Specifically, the parties request that the Court enter an order containing the following bail conditions as to the defendant. ENDORSEMENT: SO ORDERED. (Signed by Judge Jed S. Rakoff on 2/26/2021) (lnl) (Entered: 03/01/2021) |
| 03/01/2021 | 208 | OPINION & ORDER as to Ruben Weigand, Hamid Akhavan; For the foregoing reasons, Weigand's motion to dismiss the indictment on speedy trial grounds, ECF No. 183, is denied, and Visa and Elliotts motion to testify by video, ECF No. 174, is granted. SO ORDERED. (Signed by Judge Jed S. Rakoff on 3/1/2021) (See OPINION & ORDER as set forth) (lnl) (Entered: 03/01/2021) |
| 03/01/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 205 MOTION for Brian Westfall McGrail to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-24128495. Motion and supporting papers to be reviewed by Clerk's Office staff., 202 MOTION for Emily R. Schulman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-24123444. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 03/01/2021) |
| 03/01/2021 | 209 | REPLY MEMORANDUM OF LAW in Support by Bank of America, N.A., Michael Farrell, Rosemary Stack as to Hamid Akhavan re: 197 JOINT MOTION to Quash *and in the Alternative to Allow Testimony by Video*. . (Goodyear, Justin) (Entered: 03/01/2021) |
| 03/01/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Voir Dire/ Curcio Hearing held on 3/1/2021 as to Ruben Weigand, Hamid Akhavan. Present for the government: AUSAs Nicholas Folly, Tara La Morte, and Emily Deininger. Present for deft. Weigand: Michael Artan, Morris Fodeman, Katherine McCarthy, Michael Gilbert and Shriram Harid. Present for deft Akhaven: William Burck, Christopher Tayback, Sara Clark, Ira Rothken. Court reporter Rose Prater. 11:00am A jury is empaneled, trial begins. At 4:30pm Court is adjourned until the next day. (jw) (Entered: 03/16/2021) |
| 03/02/2021 | 210 | Proposed Jury Instructions by USA as to Ruben Weigand, Hamid Akhavan, James Patterson. (Attachments: # 1 Exhibit A (Proposed Preliminary Instruction))(Deininger, Emily) (Entered: 03/02/2021) |
| 03/02/2021 | 211 | Proposed Jury Instructions by Ruben Weigand, Hamid Akhavan as to Ruben Weigand, Hamid Akhavan, James Patterson. (Attachments: # 1 Exhibit Proposed Preliminary Instruction)(McGrail, Brian) (Entered: 03/02/2021) |
| 03/02/2021 | 212 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan, James Patterson re: Conference held on 2/19/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Jennifer Thun, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/23/2021. Redacted Transcript Deadline set for 4/2/2021. Release of Transcript Restriction set for 6/1/2021. (McGuirk, Kelly) (Entered: 03/02/2021) |
| 03/02/2021 | 213 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan, James Patterson. Notice is hereby given that an official transcript of a Conference proceeding held on 2/19/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 03/02/2021) |
| 03/02/2021 | 214 | ORDER as to Ruben Weigand, Hamid Akhavan: ORDERED that, pursuant to Title 18, United States Code, Sections 6002 and 6003, TASSONE give testimony and provide |

|  |  |  |
|---|---|---|
|  |  | other information as to all matters about which he may be questioned in United States v. Hamid Akhavan, et al.; and IT IS FURTHER ORDERED that, pursuant to Title 18, United States Code, Sections 6002 and 6003, no testimony or other information compelled under this Order, or any information directly or indirectly derived from such testimony or other information, may be used against TASSONE in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with this Order. This order shall become effective only if after the date of this Order TASSONE refuses to testify or provide other information on the basis of his privilege against self-incrimination. (Signed by Judge Jed S. Rakoff on 3/2/2021) (lnl) (Entered: 03/02/2021) |
| 03/02/2021 | 215 | MOTION in Limine *Preclude Cross-Examination of CW-1 re Weigand's May 2019 Statements*. Document filed by USA as to Ruben Weigand, Hamid Akhavan, James Patterson. (Attachments: # 1 Exhibit A)(Deininger, Emily) (Entered: 03/02/2021) |
| 03/02/2021 |  | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Ruben Weigand, Hamid Akhavan held on 3/2/2021. A teleconference was held March 2, 2021, without recording or transcription, regarding defendants Akhavan and Weigand. Present were Brian McGrail, admitted pro hac vice for purposes of the teleconference on behalf of Akhavan; Michael Gilbert on behalf of Weigand; Nick Folly on behalf of the Government; and Helen Cantwell and David Sewell on behalf of TD Bank, N.A (lnl) (Entered: 03/03/2021) |
| 03/02/2021 |  | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/2/2021 (jw) (Entered: 03/16/2021) |
| 03/03/2021 | 216 | ORDER as to Ruben Weigand, Hamid Akhavan: For the foregoing reasons, the trial subpoenas directed to Stack and Farrell are modified to require that they appear to testify by two-way video, not in person. The Court will hear oral argument on this motion after Clow's testimony. At that time, the Court will quash the subpoenas unless the defense can identify relevant, admissible, non-cumulative testimony that it seeks from Stack and Farrell. SO ORDERED. (Signed by Judge Jed S. Rakoff on 3/3/2021) (lnl) (Entered: 03/03/2021) |
| 03/03/2021 | 217 | ORDER as to Ruben Weigand, Hamid Akhavan: IT IS HEREBY ORDERED that the Court will permit the witness from Capital One to testify via live two-way video from the Eastern District of Virginia, on the condition that the Court will not take responsibility for setting up the technology, and it will be incumbent on Capital One (USA) N.A. to ensure that the necessary arrangements are made. SO ORDERED. (Signed by Judge Jed S. Rakoff on 3/2/2021) (lnl) (Entered: 03/03/2021) |
| 03/03/2021 | 218 | RESPONSE in Opposition by Ruben Weigand re: 215 MOTION in Limine *Preclude Cross-Examination of CW-1 re Weigand's May 2019 Statements*.. (Gilbert, Michael) (Entered: 03/03/2021) |
| 03/03/2021 |  | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/3/2021 (jw) (Entered: 03/16/2021) |
| 03/04/2021 | 219 | ORDER as to Ruben Weigand, Hamid Akhavan: IT IS HEREBY ORDERED that the Court will permit the witness from TD Bank to testify via live two-way video from the District of New Jersey, on the condition that the Court will not take responsibility for setting up the technology, and it will be incumbent on TD Bank, N.A. to ensure that the necessary arrangements are made. (Signed by Judge Jed S. Rakoff on 3/4/2021) (ap) (Entered: 03/04/2021) |
| 03/04/2021 | 221 | ORDER FOR ADMISSION PRO HAC VICE granting 205 Motion for Brian W. McGrail to Appear Pro Hac Vice as to Hamid Akhavan (2). (Signed by Judge Jed S. Rakoff on |

| | | |
|---|---|---|
| | | 3/4/2021) (lnl) (Entered: 03/05/2021) |
| 03/04/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/4/2021 (jw) (Entered: 03/16/2021) |
| 03/05/2021 | 220 | ORDER FOR ADMISSION PRO HAC VICE granting 202 Motion for Emily R. Schulman to Appear Pro Hac Vice as to James Patterson (3). (Signed by Judge Jed S. Rakoff on 3/4/2021) (lnl) (Entered: 03/05/2021) |
| 03/07/2021 | 223 | ORDER as to Hamid Akhavan. Upon the application of the defendant, Hamid "Ray" Akhavan (Register No. 79407-112), by and through his attorneys, the Court hereby orders the Metropolitan Correctional Center ("MCC") in New York, New York, to permit Mr. Akhavan to meet with his attorneys, including Christopher Tayback, William Burck, and/or Sara Clark on Monday, March 8, 2021, and Tuesday March 9, 2021, from 4:30 PM to 9:00 PM, in order for Mr. Akhavan to prepare for and assist in his defense (Signed by Judge Jed S. Rakoff on 3/7/21)(jw) (Entered: 03/08/2021) |
| 03/08/2021 | 222 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** MOTION to Exclude . Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan, James Patterson. (Attachments: # 1 Exhibit)(Clark, Sara) Modified on 3/12/2021 (dkc). (Entered: 03/08/2021) |
| 03/08/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/8/2021 (jw) (Entered: 03/16/2021) |
| 03/09/2021 | 224 | MEMORANDUM in Opposition by USA as to Ruben Weigand, Hamid Akhavan, James Patterson re 222 MOTION to Exclude .. (Deininger, Emily) (Entered: 03/09/2021) |
| 03/09/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/9/2021 (jw) (Entered: 03/16/2021) |
| 03/10/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/10/2021 (jw) (Entered: 03/16/2021) |
| 03/11/2021 | 225 | NOTICE of Letter re: redacted submissions and trial exhibits as to Ruben Weigand, Hamid Akhavan, James Patterson (Folly, Nicholas) (Entered: 03/11/2021) |
| 03/11/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/11/2021 (jw) (Entered: 03/16/2021) |
| 03/12/2021 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Hamid Akhavan: Notice to Attorney Sara Clark to RE-FILE Document 222 MOTION to Exclude .. Use the event type Letter Motion found under the event list Motions. (dkc)** (Entered: 03/12/2021) |
| 03/12/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/12/2021. Trial continues. At 4:30pm - 5:45pm. The Court holds a hearing regarding the next witnesses (jw) (Entered: 03/16/2021) |
| 03/13/2021 | 226 | NOTICE of Letter Regarding Expert Testimony as to Ruben Weigand, Hamid Akhavan, James Patterson (Clark, Sara) (Entered: 03/13/2021) |
| 03/13/2021 | 227 | NOTICE of filing of Letter re: Anticipated Testimony from Defense Expert Witnesses as to Ruben Weigand (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Gilbert, Michael) (Entered: 03/13/2021) |
| 03/13/2021 | 228 | NOTICE of Regarding Documents Discussed During March 12, 2021 Hearing as to Ruben Weigand, Hamid Akhavan, James Patterson (La Morte, Tara) (Entered: 03/13/2021) |

Case 21-2466, Document 21, 12/17/2021, 3230483, Page48 of 283

| | | |
|---|---|---|
| 03/14/2021 | 229 | NOTICE of Letter re Anticipated Testimony from Defense Expert Witnesses as to Ruben Weigand, Hamid Akhavan, James Patterson (Deininger, Emily) (Entered: 03/14/2021) |
| 03/14/2021 | 230 | NOTICE of Letter Reply to Opposition of Expert Testimony by Jeffrey Rankin as to Ruben Weigand, Hamid Akhavan, James Patterson re: 229 Notice (Other). (Clark, Sara) (Entered: 03/14/2021) |
| 03/15/2021 | 231 | NOTICE of filing of Reply Letter in Response to the Governments March 14, 2021 Letter Opposing Testimony from Weigands Proposed Expert Witnesses as to Ruben Weigand (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Gilbert, Michael) (Entered: 03/15/2021) |
| 03/15/2021 | 232 | ORDER as to Ruben Weigand, Hamid Akhavan: The Court hereby orders: 1.The Government must file an unredacted version of ECF No. 224 on the docket by 11:59 p.m. today. 2.When an exhibit is received into evidence at trial in this action, the offering party must make the document accessible to the public and the press by no later than 11:59 p.m. the following day. 1 If the version of the document received into evidence contains redactions, then the version made accessible to the public shall contain the same redactions. 3.Before making an exhibit accessible to the public, the offering party must confer with the other parties regarding any further redactions the parties would like to make, beyond those redactions contained in the version received in evidence. Such further redactions should be clearly distinguishable from the redactions present on the version received in evidence, and the basis for each such further redaction should be stated on the face of the document (e.g., "PIIn for "sensitive personally identifying informationn). 4.All exhibits already in evidence must be made accessible to the public in accordance with the procedure stated immediately above by no later than 11:59 p.m. tomorrow. The Court will issue an opinion explaining the reasons for this ruling in due course. SO ORDERED. (Signed by Judge Jed S. Rakoff on 3/15/2021)(lnl) (Entered: 03/15/2021) |
| 03/15/2021 | 233 | NOTICE of Letter Responding to Letter Submitted by Matthew Russell Lee of Inner City Press as to Ruben Weigand, Hamid Akhavan, James Patterson (Clark, Sara) (Entered: 03/15/2021) |
| 03/15/2021 | 234 | NOTICE of Unredacted Memorandum in Opposition by USA as to 222 Motion to Exclude as to Ruben Weigand, Hamid Akhavan, James Patterson (Deininger, Emily) (Entered: 03/15/2021) |
| 03/15/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/15/2021 (jw) (Entered: 03/16/2021) |
| 03/16/2021 | 235 | NOTICE of Letter Responding to Court's March 15, 2021 Request Regarding Materiality as to Ruben Weigand, Hamid Akhavan (La Morte, Tara) (Entered: 03/16/2021) |
| 03/16/2021 | 236 | NOTICE of of Letter Regarding Materiality as to Ruben Weigand, Hamid Akhavan, James Patterson (Henderson, Mari) (Entered: 03/16/2021) |
| 03/16/2021 | 237 | NOTICE of Letter Application - Exonerating Bond as to Hamid Akhavan (Henderson, Mari) (Entered: 03/16/2021) |
| 03/16/2021 | 241 | ORDER EXONERATING BOND as to Hamid Akhavan. (Signed by Judge Jed S. Rakoff on 3/16/2021) (See ORDER as set forth) (lnl) (Entered: 03/18/2021) |
| 03/16/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/16/2021 (jw) (Entered: 03/22/2021) |
| 03/17/2021 | 238 | NOTICE of filing of Letter Application for Lynda Larsen to Testify Remotely as to Ruben Weigand (Attachments: # 1 Proposed Order)(Gilbert, Michael) (Entered: 03/17/2021) |

| 03/17/2021 | 239 | NOTICE of Letter re: preclusion of Circle testimony and evidence as to Ruben Weigand, Hamid Akhavan (Folly, Nicholas) (Entered: 03/17/2021) |
| 03/17/2021 | 240 | NOTICE of Letter re: HAX 5014 as to Hamid Akhavan (Attachments: # 1 Exhibit Ex. A-C)(Clark, Sara) (Entered: 03/17/2021) |
| 03/17/2021 | 242 | ORDER as to Ruben Weigand: IT IS HEREBY ORDERED that the Court will permit Ms. Larsen to testify via live twoway video, on the condition that the Court will not take responsibility for setting up the technology, and it will be incumbent on the parties to ensure that necessary arrangements are made. SO ORDERED. (Signed by Judge Jed S. Rakoff on 3/17/2021) (lnl) (Entered: 03/18/2021) |
| 03/17/2021 | 243 | LETTER by Martin Elliott as to Hamid Akhavan addressed to Judge Jed S. Rakoff from Marcus A. Asner dated 3/17/2021, re: Video testimony of Mr. Elliott. Document filed by Martin Elliott. (lnl) (Entered: 03/18/2021) |
| 03/17/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/17/2021 (jw) (Entered: 03/22/2021) |
| 03/18/2021 | 244 | NOTICE OF ATTORNEY APPEARANCE: Amy Elizabeth Lesperance appearing for Ruben Weigand. Appearance Type: Retained. (Lesperance, Amy) (Entered: 03/18/2021) |
| 03/18/2021 | 245 | NOTICE of of Letter Response Re Circle Witness Testimony as to Ruben Weigand, Hamid Akhavan, James Patterson re: 239 Notice (Other). (Henderson, Mari) (Entered: 03/18/2021) |
| 03/18/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/18/2021 (jw) (Entered: 03/22/2021) |
| 03/19/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/19/2021. Charge Conference. Trial continues (jw) (Entered: 03/22/2021) |
| 03/22/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/22/2021. The parties make their closing statements. At 3:45pm court is adjourned until the next day. (jw) (Entered: 03/24/2021) |
| 03/23/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/23/2021. Charge by the Court. Exceptions to the charge. At 10:30 am, after marshal is sworn, the jury retires to deliberate. At 3:00 court is adjourned until the next day. (jw) (Entered: 03/24/2021) |
| 03/24/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Ruben Weigand, Hamid Akhavan held on 3/24/2021. The jury delivers a verdict as to both defendants guilty as charged. The government's motion for remand as to Weigand is denied. The defenses presentencing motions are due April 21, 2021, government replies are due May 12, 2021, replies May 19, 2021. If argument is necessary the Court will hear the parties on May 26, 2021 at 5:00pm. PSI referral made to Probation. Sentence set for June 25, 2021 at 11:00am for defendant Akhaven and June 25, 2021 at 12:00 noon for Weigand. Defendant Akhaven continued remanded, defendant Weigands bail conditions continued (jw) (Entered: 03/24/2021) |
| 03/24/2021 | | JURY VERDICT as to Ruben Weigand (1) Guilty on Count 1s and Hamid Akhavan (2) Guilty on Count 1s. (jw) (Entered: 03/24/2021) |
| 03/24/2021 | | Set/Reset Deadlines/Hearings as to Ruben Weigand, Hamid Akhavan:Presentencing Motions due by 4/21/2021. Replies due by 5/19/2021. Government reply due by 5/12/2021; Oral Argument set for 5/26/2021 at 05:00 PM before Judge Jed S. Rakoff (jw) (Entered: 03/24/2021) |

**DJA43**

| 03/24/2021 | | Set/Reset Deadlines/Hearings as to Hamid Akhavan: Sentencing set for 6/25/2021 at 11:00 AM before Judge Jed S. Rakoff (jw) (Entered: 03/24/2021) |
|---|---|---|
| 03/24/2021 | | Set/Reset Deadlines/Hearings as to Ruben Weigand: Sentencing set for 6/25/2021 at 12:00 PM before Judge Jed S. Rakoff (jw) (Entered: 03/24/2021) |
| 03/24/2021 | 246 | THE COURT'S INSTRUCTIONS OF LAW TO THE JURY as to USA v. Ruben Weigand, Hamid Akhavan. [Court Exhibit 1] (bw) (Entered: 03/24/2021) |
| 03/25/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Ruben Weigand, Hamid Akhavan held on 3/25/2021. A teleconference was held March 25, 2021, without transcription or recording, as to defendants Weigand and Akhavan. Present were Nicholas Folly, Tara La Morte, and Emily Deininger, AUSAs, for the Government; Michael Gilbert, Shriram Harid, and Michael Artan for Weigand; and William Burck for Akhavan. Court's decision: the defendants' application to expedite the sentencings to May 2021 is denied. The sentencings are rescheduled to June 18, 2021 at 11:00 a.m. as to defendant Akhavan and June 18, 2021 at 12 noon as to defendant Weigand. (lnl) (Entered: 03/25/2021) |
| 03/26/2021 | 247 | Verdict as to Ruben Weigand, Hamid Akhavan. (jw) (Entered: 03/26/2021) |
| 03/29/2021 | 248 | LETTER by Ruben Weigand, Hamid Akhavan addressed to Clerk of Court, Southern District of New York from Jordan Ellison dated 3/25/2021 re: Jordan Ellison writes to request that the Court docket the attached letter/request. (ap) (Entered: 03/29/2021) |
| 03/30/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference without transcription or recording as to Ruben Weigand, Hamid Akhavan held on 3/30/2021. Present were Nick Folly, AUSA and Emily Deininger, AUSA for the Government, Chris Tayback and Sara Clark for Akhavan, and Michael Artan and Shriram Harid for Weigand. Court's decision: post-trial motions pursuant to Rules 29 and 33 may be filed on or before April 21, 2021. Oppositions are due April 12, replies are due May 19, and oral argument, if necessary, will take place May 26, 2021 at 5:00 pm. (Oral Argument set for 5/26/2021 at 05:00 PM before Judge Jed S. Rakoff.) (jbo) (Entered: 03/30/2021) |
| 03/31/2021 | 249 | NOTICE of Response re: Journalist Inquiry as to Ruben Weigand, Hamid Akhavan (Folly, Nicholas) (Entered: 03/31/2021) |
| 04/01/2021 | 250 | OPINION as to Ruben Weigand, Hamid Akhavan: 1. The Government must file an unredacted version of ECF No. 224 on the docket by 11:59 p.m. today [i.e., March 15]. 2. When an exhibit is received into evidence at trial in this action, the offering party must make the document accessible to the public and the press by no later than 11:59 p.m. the following day.6 If the version of the document received into evidence contains redactions, then the version made accessible to the public shall contain the same redactions. 3. Before making an exhibit accessible to the public, the offering party must confer with the other parties regarding any further redactions the parties would like to make, beyond those redactions contained in the version received in evidence. Such further redactions should be clearly distinguishable from the redactions present on the version received in evidence, and the basis for each such further redaction should be stated on the face of the document (e.g., "PII" for "sensitive personally identifying information"). 4. All exhibits already in evidence must be made accessible to the public in accordance with the procedure stated immediately above by no later than 11:59 p.m. tomorrow [i.e., March 16]. Counsel for all parties subsequently informed the Court that they had complied with this Order. (Signed by Judge Jed S. Rakoff on 4/1/2021) (See OPINION as set forth)(lnl) (Entered: 04/01/2021) |
| 04/01/2021 | 251 | LETTER as to Ruben Weigand, Hamid Akhavan addressed to Judge Jed S. Rakoff from |

|            |     | Matthew Russell Lee, Inner City Press, dated 3/11/2021; re: Press Access to improperly redacted documents & exhibits in US v. Weigand, et al., 20-cr-120 (JSR). (lnl) (Entered: 04/01/2021) |
|------------|-----|---|
| 04/01/2021 | 252 | LETTER as to Ruben Weigand, Hamid Akhavan addressed to Judge Jed S. Rakoff from Matthew Russell Lee, Inner City Press, dated 3/10/2021; re: : Press Access to improperly redacted documents & exhibits in US v. Weigand, et al.,20-cr-120 (JSR). (lnl) (Entered: 04/01/2021) |
| 04/01/2021 |     | Minute Entry for proceedings held before Judge Jed S. Rakoff:Status Conference/Teleconference as to Ruben Weigand held on 4/1/2021, without transcription or recording, as to defendant Weigand. Present were Nick Folly, AUSA, for the Government and Shriram Harid for Weigand. Court's decision: Weigand's unopposed request (1) to permit him rooftop access, under guard, and (2) to permit him to travel to a COVID-19 vaccination site, under guard and in coordination with Pretrial Services, is granted. (jw) (Entered: 04/01/2021) |
| 04/02/2021 | 253 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 04/02/2021) |
| 04/02/2021 | 254 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 04/02/2021) |
| 04/02/2021 | 255 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 04/02/2021) |
| 04/02/2021 | 256 | LETTER by James Patterson addressed to Judge Jed S. Rakoff from Christopher DiMase et al., dated 2/26/2021, re: The Government writes regarding an error in the cooperation agreement (the "Original Agreement") to which defendant James Patterson pled guilty on February 19, 2021, in the above-captioned case. (lnl) (Entered: 04/02/2021) |
| 04/02/2021 | 257 | MEMORANDUM ORDER as to Hamid Akhavan. Akhavan's second ex parte request for leave to issue third-party subpoenas is granted in part and denied in part. To avoid disclosing information that could reveal Akhavan' s trial strategy, the Court orders that this order be temporarily sealed. It will be unsealed and docketed following the close of evidence at trial. (Signed by Judge Jed S. Rakoff on 11/9/2020) (See ORDER set forth) (ap) (Entered: 04/05/2021) |
| 04/16/2021 |     | Minute Entry for proceedings held before Judge Jed S. Rakoff:Status Conference/Teleconference as to Ruben Weigand, Hamid Akhavan held on 4/16/2021, without transcription or recording. Present were Tara La Morte, AUSA, for the Government; Christopher Tayback for defendant Akhavan; and Shriram Harid for defendant Weigand. Court's Decision: Akhavan's application for leave to file a thirty-five page brief is granted. (jw) (Entered: 04/19/2021) |
| 04/21/2021 | 258 | MEMORANDUM OF LAW in Support by Hamid Akhavan . (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Clark, Sara) (Entered: 04/21/2021) |
| 04/21/2021 | 259 | NOTICE of Motion as to Ruben Weigand, Hamid Akhavan, James Patterson re: 258 Memorandum of Law in Support. (Clark, Sara) (Entered: 04/21/2021) |
| 04/21/2021 | 260 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/1/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 261 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/1/21 has been filed by the court reporter/transcriber in the above-captioned matter. The |

| | | |
|---|---|---|
| | | parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 263 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/2/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 265 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/3/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 267 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/4/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 269 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/8/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 271 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/9/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 272 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/10/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 273 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/10/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to |

| | | |
|---|---|---|
| | | Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 275 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/11/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 276 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/12/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 277 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/12/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 278 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/15/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 279 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/15/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 280 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/16/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 281 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/17/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be |

| | | made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
|---|---|---|
| 04/21/2021 | 282 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/17/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 283 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/17/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 284 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/18/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 285 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/18/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 286 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/19/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 287 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/19/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 288 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/22/2021 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. |

| | | |
|---|---|---|
| | | Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 289 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/22/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 290 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/23/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 291 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/23/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 292 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/24/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 293 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand, Hamid Akhavan. Notice is hereby given that an official transcript of a Trial proceeding held on 3/24/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 294 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/2/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 295 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/3/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. |

| | | |
|---|---|---|
| | | Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 296 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/4/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 297 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/8/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 298 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/9/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 299 | TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/11/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/12/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/20/2021. (McGuirk, Kelly) (Entered: 04/21/2021) |
| 04/21/2021 | 300 | MOTION for Acquittal . Document filed by Ruben Weigand. (Gilbert, Michael) (Entered: 04/21/2021) |
| 04/21/2021 | 301 | MEMORANDUM in Support by Ruben Weigand re 300 MOTION for Acquittal .. (Gilbert, Michael) (Entered: 04/21/2021) |
| 04/21/2021 | | ***DELETED DOCUMENT. Deleted document number 262. "TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/2/21 before Judge Jed S. Rakoff," as to Ruben Weigand, Hamid Akhavan. The document was incorrectly filed in this case. [*** NOTE: This document was originally docketed on 4/21/2021 by (McGuirk, Kelly). Court Reporters Office/SDNY requested the deletion of this docket entry on 4/21/2021. ***] (bw) (Entered: 04/22/2021) |
| 04/21/2021 | | ***DELETED DOCUMENT. Deleted document number 264. "TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/3/21 before Judge Jed S. Rakoff," as to Ruben Weigand, Hamid Akhavan. The document was incorrectly filed in this case. [*** NOTE: This document was originally docketed on 4/21/2021 by (McGuirk, Kelly). Court Reporters Office/SDNY requested the deletion of this docket entry on 4/21/2021. ***] (bw) (Entered: 04/22/2021) |
| 04/21/2021 | | ***DELETED DOCUMENT. Deleted document number 266. "TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/4/21 before |

**DJA50**

| | | |
|---|---|---|
| | | **Judge Jed S. Rakoff," as to Ruben Weigand, Hamid Akhavan. The document was incorrectly filed in this case. [*** NOTE: This document was originally docketed on 4/21/2021 by (McGuirk, Kelly). Court Reporters Office/SDNY requested the deletion of this docket entry on 4/21/2021. ***] (bw)** (Entered: 04/22/2021) |
| 04/21/2021 | | **\*\*\*DELETED DOCUMENT. Deleted document number 268. "TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/8/21 before Judge Jed S. Rakoff," as to Ruben Weigand, Hamid Akhavan. The document was incorrectly filed in this case. [*** NOTE: This document was originally docketed on 4/21/2021 by (McGuirk, Kelly). Court Reporters Office/SDNY requested the deletion of this docket entry on 4/21/2021. ***] (bw)** (Entered: 04/22/2021) |
| 04/21/2021 | | **\*\*\*DELETED DOCUMENT. Deleted document number 270. "TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/9/21 before Judge Jed S. Rakoff," as to Ruben Weigand, Hamid Akhavan. The document was incorrectly filed in this case. [*** NOTE: This document was originally docketed on 4/21/2021 by (McGuirk, Kelly). Court Reporters Office/SDNY requested the deletion of this docket entry on 4/21/2021. ***] (bw)** (Entered: 04/22/2021) |
| 04/21/2021 | | **\*\*\*DELETED DOCUMENT. Deleted document number 274. "TRANSCRIPT of Proceedings as to Ruben Weigand, Hamid Akhavan re: Trial held on 3/11/21 before Judge Jed S. Rakoff," as to Ruben Weigand, Hamid Akhavan. The document was incorrectly filed in this case. [*** NOTE: This document was originally docketed on 4/21/2021 by (McGuirk, Kelly). Court Reporters Office/SDNY requested the deletion of this docket entry on 4/21/2021. ***] (bw)** (Entered: 04/22/2021) |
| 04/22/2021 | 302 | MEMORANDUM in Support by Ruben Weigand re 300 MOTION for Acquittal .. *(corrected)* (Gilbert, Michael) (Entered: 04/22/2021) |
| 05/10/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference without transcription or recording as to Ruben Weigand, Hamid Akhavan held on 5/10/2021. Present were Emily Deininger, AUSA, for the Government; Chris Tayback for Akhavan; and Michael Artan for Weigand. Court's decision: the Government's application for leave to file an overlength brief of 50 pages is granted. (jbo) (Entered: 05/10/2021) |
| 05/12/2021 | | MEMORANDUM TO THE DOCKET CLERK as to Ruben Weigand: Sentencing is moved to 3:00pm on the same date as previously scheduled, June 18, 2021. (jbo) (Entered: 05/12/2021) |
| 05/12/2021 | | Set/Reset Hearings as to Ruben Weigand: Sentencing set for 6/18/2021 at 03:00 PM before Judge Jed S. Rakoff. (jbo) (Entered: 05/12/2021) |
| 05/12/2021 | 303 | MEMORANDUM in Opposition by USA as to Ruben Weigand, Hamid Akhavan, James Patterson re 300 MOTION for Acquittal .. (Deininger, Emily) (Entered: 05/12/2021) |
| 05/18/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Hamid Akhavan held on 5/18/2021. A teleconference was held May 18, 2021, without transcription or recording. Present were Chris Tayback and Sara Clark for Akhavan, Michael Artan for Weigand, and Tara La Morte, AUSA for the Government. Court's decision: Each defendant may file a 15-page reply brief in support of his motion for a judgment of acquittal or in the alternative for a new trial. (lnl) (Entered: 05/18/2021) |
| 05/19/2021 | 304 | REPLY MEMORANDUM OF LAW in Support by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan re: 300 MOTION for Acquittal . . (McGrail, Brian) (Entered: 05/19/2021) |
| 05/19/2021 | 305 | REPLY MEMORANDUM OF LAW in Support as to Ruben Weigand re: 300 MOTION |

| | | |
|---|---|---|
| | | for Acquittal . . (Gilbert, Michael) (Entered: 05/19/2021) |
| 05/21/2021 | | MEMORANDUM TO THE DOCKET CLERK as to Hamid Akhavan: The Court finds the defendants' motions for judgment of acquittal or in the alternative for a new trial, ECF Nos. 259, 300, suitable for decision without oral argument. The motions are submitted, and the oral argument scheduled for May 26, 2021 is cancelled. (lnl) (Entered: 05/21/2021) |
| 05/21/2021 | | Terminate Deadlines and Hearings as to Hamid Akhavan: Oral Argument on 5/26/2021 cancelled. (lnl) (Entered: 05/21/2021) |
| 05/28/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Hamid Akhavan held on 5/28/2021. A teleconference was held May 28, 2021, as to defendant Akhavan, without transcription or recording. Present were Nicholas Folly and Emily Deininger, AUSAs, for the Government; Chris Tayback, Sara Clark, Ira Rothken and Jared Smith for Akhavan; and Michael Gilbert, Michael Artan, and Shriram Harid for defendant Weigand. (ap) (Entered: 05/28/2021) |
| 06/04/2021 | 306 | Rule 5(c)(3) Documents Received as to Hamid Akhavan from the United States District Court - Central District of California. (jm) (Entered: 06/04/2021) |
| 06/09/2021 | | MEMORANDUM TO THE DOCKET CLERK as to Ruben Weigand, Hamid Akhavan: While the sentencing of the these defendants will occur on June 18 in courtroom 14B of the Moynihan Courthouse, there will be an opportunity for the public to listen, should they wish to. The dial in information goes as follows: 888-363-4735, toll free USA; 215-446-3657 caller paid international; access code 1086415. (jbo) (Entered: 06/09/2021) |
| 06/12/2021 | 309 | SENTENCING SUBMISSION by USA as to Ruben Weigand. (Attachments: # 1 Exhibit A (Consent Proposed Order of Forfeiture))(Deininger, Emily) (Entered: 06/12/2021) |
| 06/12/2021 | 310 | SENTENCING SUBMISSION by Ruben Weigand. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N)(Gilbert, Michael) (Entered: 06/12/2021) |
| 06/12/2021 | 311 | SENTENCING SUBMISSION by USA as to Hamid Akhavan. (Folly, Nicholas) (Entered: 06/12/2021) |
| 06/12/2021 | 312 | SENTENCING SUBMISSION by Hamid Akhavan. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit)(Clark, Sara) (Entered: 06/12/2021) |
| 06/12/2021 | 313 | Sentencing Letter by USA as to Hamid Akhavan addressed to Jed S. Rakoff from Tara M. La Morte dated June 12, 2021 re: Letter in Support of Forfeiture. (Attachments: # 1 Text of Proposed Order Proposed Order of Forfeiture)(La Morte, Tara) (Entered: 06/12/2021) |
| 06/15/2021 | 315 | ORDER as to Ruben Weigand, Hamid Akhavan. U.S.S.G. § 2B1.1 Application Note 3(B) provides: "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." The parties are directed to address in their papers due tonight whether the Court should apply this application note and, if so, how much each defendant gained from the offense (Signed by Judge Jed S. Rakoff on 6/15/21)(jw) (Entered: 06/15/2021) |
| 06/15/2021 | 316 | NOTICE of Letter in Response to the Government's Letter dated June 12, 2021 as to Ruben Weigand re: 309 Sentencing Submission. (Gilbert, Michael) (Entered: 06/15/2021) |
| 06/15/2021 | 317 | MEMORANDUM OF LAW in Opposition by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan, James Patterson re: 313 Letter - Sentencing filed by USA, 311 Sentencing Submission filed by USA . (Clark, Sara) (Entered: 06/15/2021) |

**DJA52**

| | | |
|---|---|---|
| 06/15/2021 | 318 | SENTENCING SUBMISSION by USA as to Hamid Akhavan. (Folly, Nicholas) (Entered: 06/15/2021) |
| 06/15/2021 | 319 | SENTENCING SUBMISSION by USA as to Ruben Weigand. (Deininger, Emily) (Entered: 06/15/2021) |
| 06/17/2021 | | MEMORANDUM TO THE DOCKET CLERK as to Ruben Weigand: The sentencing will still occur on June 18, 2021 in courtroom 14B of the Moynihan courthouse but at 4:00pm. (jbo) (Entered: 06/17/2021) |
| 06/17/2021 | | Set/Reset Hearings as to Ruben Weigand: Sentencing set for 6/18/2021 at 04:00 PM before Judge Jed S. Rakoff. (jbo) (Entered: 06/17/2021) |
| 06/17/2021 | | MEMORANDUM TO THE DOCKET CLERK as to Hamid Akhavan: The sentencing will still occur in courtroom 14B of the Moynihan courthouse but at 3:00pm. (jbo) (Entered: 06/17/2021) |
| 06/17/2021 | 320 | CONSENT PRELIMINARY ORDER OF FORFEITURE/MONEY JUDGMENT as to Ruben Weigand. (Signed by Judge Jed S. Rakoff on 6/17/2021) (See ORDER set forth. Three certified copies forwarded to AUSA Alexander Wilson via interoffice mail) (ap) (Entered: 06/21/2021) |
| 06/18/2021 | 321 | ORDER as to Ruben Weigand, Hamid Akhavan: The defendants' motions for judgment of acquittal or, in the alternative, for a new trial, ECF Nos. 259 & 300, are denied. The Court will issue an opinion setting forth the reasons for this ruling by July 2, 2021. (Signed by Judge Jed S. Rakoff on 6/18/2021) (ap) (Entered: 06/21/2021) |
| 06/18/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Sentencing held on 6/18/2021 for Hamid Akhavan (2) Count 1s. Present were the defendant and his counsel, Christopher Tayback, AUSAs Tara LaMorte, Nicholas Folly and Christopher DiMase for the government, and a court reporter. On Count 1 : 30 months jail, remanded, 3 years SR, $100 assess, $100,000.00 fine, $103,750 forfeiture. Dismiss all underlying indictments/information. (jw) (Entered: 09/02/2021) |
| 06/22/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Ruben Weigand, Hamid Akhavan held on 6/22/2021. A teleconference was held 6-22-2021, without transcription or recording in the above-captioned case. Present were Emily Sarah Deininger, AUSA, for the Government, Christopher Tayback and Sara Clark for Mr. Akhavan; and Michael Gilbert and Michael Artan for Mr. Weigand. (lnl) (Entered: 06/23/2021) |
| 06/24/2021 | 322 | CONSENT PRELIMINARY ORDER OF FORFEITURE/MONEY JUDGMENT as to (S3 20 Cr. 188) Ruben Weigand....[*** See this Consent Preliminary Order of Forfeiture/Money Judgment ***]... IT IS HEREBY STIPULATED AND AGREED, by and between the United States of America, by its attorney Audrey Strauss, Acting United States Attorney, Assistant United States Attorneys, Nicholas Folly, Tara La Morte, and Emily Deininger, and the de.fondant, and his counsel, Michael Gilbert, Esq., that: 1. As a result of the offense charged in Count One of the Superseding Indictment, which the defendant was convicted of at trial, a money judgment in the amount of $384,000.00 in United States currency (the "Money Judgment"), representing the Government's estimate of the value of the Forfeitable Property that the defendant personally obtained, shall be entered against the defendant. 2. In the event that the defendant, by the date of his sentencing, pays $300,000.00 toward the Money Judgment, the Government will accept such payment in full satisfaction of the Money Judgment. 3. In the event that the defendant has not satisfied the Money Judgment by the date of his sentencing, the Government may move to satisfy the full amount of the Money Judgment, up to $384,000.00, through the forfeiture of any available property, including any substitute |

DJA53

|  |  | assets. 4. Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, this Consent Preliminary Order of Forfeiture/Money Judgment is final as to the defendant, RUBEN WEIGAND, and shall be deemed part of the sentence of the defendant, and shall be included in the judgment of conviction therewith....[*** See this Consent Preliminary Order of Forfeiture/Money Judgment ***]... 10. The Clerk of the Court shall forward three certified copies of this Consent Preliminary Order of Forfeiture/Money Judgment to Assistant United States Attorney Alexander J. Wilson, Co-Chief of the Money Laundering and Asset Forfeiture Unit, United States Attorney's Office, One St. Andrew's Plaza, New York, New York 10007. 11. The signature page of this Consent Preliminary Order of Forfeiture/Money Judgment may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the and the same instrument. SO ORDERED: (Signed by Judge Jed S. Rakoff on 6/18/2021) [*** NOTE: The Clerk of the Court has forwarded three certified copies of this Consent Preliminary Order of Forfeiture/Money Judgment to AUSA Alexander J. Wilson, via interoffice mail on 6/24/2021. ***] (bw) (Entered: 06/24/2021) |
|---|---|---|
| 06/25/2021 |  | Minute Entry for proceedings held before Judge Jed S. Rakoff: Sentencing held on 6/25/2021 for Ruben Weigand (1) Count 1s. Present were the defendant and his counsel Michael Artan, Shriram Harid and Michael Gilbert, AUSA's Nicholas Folly, Tara LaMorte and Sarah Deininger for the government and a court reporter. SENT: 15 months jail, vol surr 8-2-2021 to the institution. SR 3 years, $100 assess. $300,000 forfeiture, $50,000 fine. Dismiss underlying indictments. (jbo) (Entered: 06/25/2021) |
| 06/25/2021 | 323 | MOTION to Stay the Forfeiture Order Pending Appeal. Document filed by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan, James Patterson. (Clark, Sara) (Entered: 06/25/2021) |
| 06/29/2021 |  | Minute Entry for proceedings held before Judge Jed S. Rakoff:Telephone Conference as to Ruben Weigand held on 6/29/2021, without transcription or recording. Emily Sarah Deininger, AUSA, was present for the government, and Shriram Harid and Michael Artan were present for Mr. Weigand. (jw) (Entered: 07/01/2021) |
| 06/29/2021 | 335 | NOTICE OF APPEAL by Hamid Akhavan from 321 Order, Terminate Motions. Filing fee $ 505.00, receipt number 465401281978. (tp) (Entered: 07/07/2021) |
| 06/30/2021 |  | DISMISSAL OF COUNTS on Government Motion as to Ruben Weigand (1) Count 1. (jw) (Entered: 06/30/2021) |
| 06/30/2021 | 324 | FILED JUDGMENT IN A CRIMINAL CASE as to Ruben Weigand (1), Count(s) 1 is dismissed on the motion of the US. Found guilty to Count(s) 1s, Imprisonment for a total term of on Count 1: Fifteen (15) Months. Supervised release for a term of Count 1: Three Years. The court makes the following recommendations to the Bureau of Prisons: FCI Lompoc or another facility in southern California. The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons before 2pm on 8/2/2021. If the defendant plans to change where he lives or anything about his living arrangements (such as the people he lives with), he must notify the Probation Officer immediately. Special Assessment of $100 which is due immediately. Fine of $50,000.00. The fine shall be paid at the rate of 10% of the defendant's gross monthly income, beginning with the secondmonth of supervised release. (Signed by Judge Jed S. Rakoff on 6/25/21)(jw) (Entered: 06/30/2021) |
| 07/01/2021 | 325 | AMENDED JUDGMENT IN A CRIMINAL CASE as to Ruben Weigand (1), Count(s) 1 are dismissed on the motion of the US. Found guilty to Count(s) 1s. Imprisonment for a total term of on Count 1: Fifteen (15) Months. The court makes the following recommendations to the Bureau of Prisons: CI Lompoc or Terminal Island or another facility as close as possible to the the Los Angeles metropolitan area. The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons |

| | | before 2pm on 8/2/2021. Special Assessment of $100 which is due immediately (Signed by Judge Jed S. Rakoff on 7/2/21)(jw) (Entered: 07/01/2021) |
|---|---|---|
| 07/02/2021 | 326 | TRANSCRIPT of Proceedings as to Hamid Akhavan re: Conference held on 6/18/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/23/2021. Redacted Transcript Deadline set for 8/2/2021. Release of Transcript Restriction set for 9/30/2021. (McGuirk, Kelly) (Entered: 07/02/2021) |
| 07/02/2021 | 327 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Hamid Akhavan. Notice is hereby given that an official transcript of a Conference proceeding held on 6/18/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 07/02/2021) |
| 07/02/2021 | 328 | TRANSCRIPT of Proceedings as to Ruben Weigand re: Conference held on 6/18/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Pamela Utter, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/23/2021. Redacted Transcript Deadline set for 8/2/2021. Release of Transcript Restriction set for 9/30/2021. (McGuirk, Kelly) (Entered: 07/02/2021) |
| 07/02/2021 | 329 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Ruben Weigand. Notice is hereby given that an official transcript of a Conference proceeding held on 6/18/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 07/02/2021) |
| 07/02/2021 | 330 | MEMORANDUM in Opposition by USA as to Hamid Akhavan re 323 MOTION to Stay *the Forfeiture Order Pending Appeal*.. (Attachments: # 1 Exhibit A (Proposed Order of Forfeiture / Money Judgment))(Deininger, Emily) (Entered: 07/02/2021) |
| 07/02/2021 | 331 | ORDER RELEASING PROPERTY as to Hamid Akhavan. (Signed by Judge Jed S. Rakoff on 7/2/2021) (See ORDER as set forth) (lnl) (Entered: 07/02/2021) |
| 07/02/2021 | 332 | OPINION as to Ruben Weigand, Hamid Akhavan. Hamid "Ray" Akhavan and Ruben Weigand conspired to defraud U.S. banks and credit unions by tricking them into processing more than $150 million of cardholder transactions for marijuana purchased through the marijuana deli very company Eaze when the banks and credit unions had a firm policy of not allowing such transactions. The Court permitted the defense to argue extensively thatbanks profited from the scheme; such evidence was relevant to materiality. What the Court did not permit, and properly so, was an argument that the defendants needed to cause, or to intend, pecuniary harm; that is not an element of bank fraud. For the foregoing reasons, by bottom-line order dated June 18, 2021, the Court denied the defendants' motions for judgment of acquittal or, in the alternative, for a new trial, ECF Nos. 259 & 300. (Signed by Judge Jed S. Rakoff on 7/2/21)(jw) (Entered: 07/02/2021) |
| 07/02/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference without transcription or recording as to Hamid Akhavan held on 7/2/2021. AUSA Emily |

| | | |
|---|---|---|
| | | Sarah Deininger was present for the government; Sara Clark was present for Mr. Akhavan. (jbo) (Entered: 07/07/2021) |
| 07/02/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference without transcription or recording as to Ruben Weigand held on 7/2/2021. AUSA Tara LaMorte was present for the government; Michael Artan was present for Mr. Weigand. (jbo) (Entered: 07/09/2021) |
| 07/06/2021 | 333 | REPLY MEMORANDUM OF LAW in Support as to Hamid Akhavan re: 323 MOTION to Stay *the Forfeiture Order Pending Appeal.* . (Clark, Sara) (Entered: 07/06/2021) |
| 07/06/2021 | 334 | SECOND AMENDED JUDGMENT IN A CRIMINAL CASE as to Ruben Weigand (1). The defendant was found guilty after a plea of not guilty. All underlying indictment count are dismissed on the motion of the US; Imprisonment for a total term of on Count 1: Fifteen (15) Months. The court makes the following recommendations to the Bureau of Prisons: Allenwood FCI. The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons before 2pm on 8/2/21. Assessment: $100.00. (Signed by Judge Jed S. Rakoff on 7/6/21)(jbo) (Entered: 07/07/2021) |
| 07/07/2021 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Hamid Akhavan to US Court of Appeals re: 335 Notice of Appeal. (tp) (Entered: 07/07/2021) |
| 07/07/2021 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Hamid Akhavan re: 335 Notice of Appeal were transmitted to the U.S. Court of Appeals. (tp) (Entered: 07/07/2021) |
| 07/08/2021 | 336 | ORDER as to Hamid Akhavan. The defendant's motion to stay the forfeiture order pending appeal or to reconsider the forfeiture order at an evidentiary hearing is granted in part, insofar as the Court will hold an evidentiary hearing at 10:00 a.m. on August 12, 2021. (Evidentiary Hearing set for 8/12/2021 at 10:00 AM before Judge Jed S. Rakoff.) (Signed by Judge Jed S. Rakoff on 7/8/21)(jbo) (Entered: 07/09/2021) |
| 07/09/2021 | 345 | NOTICE OF APPEAL by Ruben Weigand from 325 Amended Judgment,, 334 Second Amended Judgment,, 332 Memorandum & Opinion,. (nd) (Entered: 07/12/2021) |
| 07/12/2021 | 337 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 07/12/2021) |
| 07/12/2021 | 338 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 07/12/2021) |
| 07/12/2021 | 339 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 07/12/2021) |
| 07/12/2021 | 340 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 07/12/2021) |
| 07/12/2021 | 341 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 07/12/2021) |
| 07/12/2021 | 342 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 07/12/2021) |
| 07/12/2021 | 343 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 07/12/2021) |
| 07/12/2021 | 344 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 07/12/2021) |
| 07/12/2021 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Ruben Weigand to US Court of Appeals re: 345 Notice of Appeal. (nd) (Entered: 07/12/2021) |
| 07/12/2021 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Ruben Weigand re: 345 Notice of Appeal were transmitted to the U.S. Court of Appeals. (nd) (Entered: 07/12/2021) |
| 07/14/2021 | | USCA Appeal Fees received $ 505.00, receipt number 465401282689 as to Ruben Weigand on 07/14/2021 re: 345 Notice of Appeal filed by Ruben Weigand. **[USCA Case No. 21-1708]**(nd) (Entered: 07/14/2021) |

DJA56

| 08/05/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference without transcription or recording as to Ruben Weigand held on 8/5/2021. AUSA Nicholas Folly was present for the government; Michael Gilbert and Shriram Harid were present for Mr. Weigand. (jbo) (Entered: 08/06/2021) |
|---|---|---|
| 08/06/2021 | 346 | ORDER as to Ruben Weigand: IT IS HEREBY ORDERED that: Pretrial Services shall promptly release Weigand's passport to his counsel, Michael J. Gilbert; and Weigand's bail bond and all accompanying conditions shall be exonerated and the $470,000 in cash collateral provided by co-signers shall be released to them. SO ORDERED. (Signed by Judge Jed S. Rakoff on 8/6/2021) (lnl) (Entered: 08/06/2021) |
| 08/10/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Hamid Akhavan held on 8/10/2021. A telephone conference was held August 10, 2021 without transcription or recording. AUSA Tara LaMorte was present for the government; Sara Clark was present for Mr. Akhavan. (bw) (Entered: 08/11/2021) |
| 08/11/2021 | | MEMORANDUM TO THE DOCKET CLERK as to Hamid Akhavan. The dial in for the hearing that will occur on August 12, 2021 at 10:00 am, in courtroom 14B of the Moynihan courthouse, will be 888-363-4735 USA toll free, access code 1086415 (jw) (Entered: 08/12/2021) |
| 08/12/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Oral Argument as to Hamid Akhavan held on 8/12/2021 regarding the issue of forfeiture. Present were AUSA's Christopher Dimase, Nicholas Folly, Tara LaMorte and Emily Deininger for the government, the defendant and his counsel Sara Clark, William Burck and Patrick Pharcao, and court reporter Rebecca Forman. Court's decision The issue is taken under advisement. (jbo) (Entered: 08/12/2021) |
| 08/16/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference without transcription or recording as to Hamid Akhavan held on 8/16/2021. AUSA Tara LaMorte was present for the government and Sarah Clark was present for Defendant Akhavan. The Court granted defendant's request to file post-forfeiture-hearing summation briefs. The briefing schedule is set as follows: Simultaneous opening briefs, 10 pages double-spaced, are due Thursday, August 19. Simultaneous reply briefs are due Monday, August 23. (Brief due by 8/19/2021. Replies due by 8/23/2021.) (jbo) (Entered: 08/17/2021) |
| 08/19/2021 | 347 | SENTENCING SUBMISSION by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan, James Patterson. (Burck, William) (Entered: 08/19/2021) |
| 08/19/2021 | 348 | SENTENCING SUBMISSION by USA as to Hamid Akhavan. (La Morte, Tara) (Entered: 08/19/2021) |
| 08/20/2021 | 349 | SENTENCING SUBMISSION by USA as to Hamid Akhavan. (La Morte, Tara) (Entered: 08/20/2021) |
| 08/23/2021 | 350 | RESPONSE by Hamid Akhavan as to Ruben Weigand, Hamid Akhavan, James Patterson re: 348 Sentencing Submission filed by USA . (Clark, Sara) (Entered: 08/23/2021) |
| 08/23/2021 | 351 | RESPONSE by USA as to Hamid Akhavan re: 347 Sentencing Submission filed by Hamid Akhavan *Government's Response to Akhavan's Post-Forfeiture Hearing Submission*. (La Morte, Tara) (Entered: 08/23/2021) |
| 08/30/2021 | 352 | OPINION AND ORDER as to Hamid Akhavan. While the Court thus finds the $17 million forfeiture amount unconstitutionally excessive, the Court must still consider what forfeiture amount would be constitutional. The Court finds that $103,750 -- the value of the Eaze stock option given to Akhavan - - is proportional to the gravity of his offense. DX-2. This amount is a reasonable estimate, given the available information, and roughly |

| | | |
|---|---|---|
| | | equivalent to the amount of the fine the Court imposed. For the foregoing reasons, the Court orders forfeiture in the amount of $103,750. (Signed by Judge Jed S. Rakoff on 8/30/2021) (See ORDER set forth) (ap) (Entered: 08/30/2021) |
| 09/01/2021 | | DISMISSAL OF COUNTS on Government Motion as to Hamid Akhavan (2) Count 1. (jw) (Entered: 09/02/2021) |
| 09/01/2021 | 353 | FILED JUDGMENT IN A CRIMINAL CASE as to Hamid Akhavan (2), Count(s) 1 is dismissed. Found Guilty to Count(s) 1s, Imprisonment for a total term of on Count 1: Thirty (30) Months. Supervised release for a term of on Count 1: Three Years. The court makes the following recommendations to the Bureau of Prisons: Incarceration in FCI Lompoc. Special Assessment of $100 which is due immediately. Fine of $100,000.00. The fine shall be paid at the rate of 10% of his gross monthly income, beginning with the second month of supervised release. (Signed by Judge Jed S. Rakoff on 8/31/21)(jw) (Entered: 09/02/2021) |
| 09/03/2021 | 354 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Hamid Akhavan. Notice is hereby given that an official transcript of a Conference proceeding held on 8/12/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Moya, Goretti) (Entered: 09/03/2021) |
| 09/03/2021 | 355 | TRANSCRIPT of Proceedings as to Hamid Akhavan re: Conference held on 8/12/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/24/2021. Redacted Transcript Deadline set for 10/4/2021. Release of Transcript Restriction set for 12/2/2021. (Moya, Goretti) (Entered: 09/03/2021) |
| 09/14/2021 | 356 | NOTICE OF APPEAL by Hamid Akhavan from 353 Judgment. Filing fee $ 505.00, receipt number 465401285801. (tp) (Entered: 09/14/2021) |
| 09/14/2021 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Hamid Akhavan to US Court of Appeals re: 356 Notice of Appeal - Final Judgment. (tp) (Entered: 09/14/2021) |
| 09/14/2021 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Hamid Akhavan re: 356 Notice of Appeal - Final Judgment were transmitted to the U.S. Court of Appeals. (tp) (Entered: 09/14/2021) |
| 09/16/2021 | 357 | AMENDED ORDER as to Ruben Weigand: IT IS HEREBY ORDERED that: Pretrial Services shall promptly release Weigand's passport to his counsel, Michael J. Gilbert; and Weigand's bail bond and all accompanying conditions shall be exonerated and the $470,000 in cash collateral provided by co-signers shall be released to them. The Court authorizes the release of the cash collateral to counsel for Weigand, who will promptly arrange for the return of the collateral to each of the co-signers. SO ORDERED. (Signed by Judge Jed S. Rakoff on 9/16/2021) (lnl) (Entered: 09/16/2021) |
| 09/16/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference without transcription or recording as to Ruben Weigand held on 9/16/2021. Present were AUSA Emily Deininger for the Government; Michael Gilbert and Shriram Harid for Mr. Weigand, and court Finance Manager Courtney Decassreres. The Court granted the defense request to submit a proposed amended order regarding return of cash collateral to co-signers of Mr. Weigand's bail bond. (jbo) (Entered: 09/20/2021) |

| 09/24/2021 | | CASH BAIL RETURNED as to Ruben Weigand as per 357 Order, dated 9/16/2021, from Judge Jed S. Rakoff, in the amount of $470,000.00, Trace No. 03759307, Check Dated 9/22/2021, payable to Sheppard Mullin Richter & Hampton LLP. (nm) (Entered: 09/24/2021) |
|---|---|---|
| 09/30/2021 | 358 | NOTICE OF APPEAL by USA as to Hamid Akhavan from 353 Judgment. (tp) (Entered: 09/30/2021) |
| 09/30/2021 | | Appeal Remark as to Hamid Akhavan re: 358 Notice of Appeal - Final Judgment. $505.00 Appeal Fee Waived. USA filer. (tp) (Entered: 09/30/2021) |
| 09/30/2021 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Hamid Akhavan to US Court of Appeals re: 358 Notice of Appeal - Final Judgment. (tp) (Entered: 09/30/2021) |
| 09/30/2021 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Hamid Akhavan re: 358 Notice of Appeal - Final Judgment were transmitted to the U.S. Court of Appeals. (tp) (Entered: 09/30/2021) |
| 10/08/2021 | 359 | SATISFACTION OF JUDGMENT as to (20-Cr-188-01) Ruben Weigand re 324 Judgment. Satisfaction is acknowledged between United States of America, plaintiff, and Ruben Weigand, defendant, for the fine/restitution in the amount of $50,000.00 and the special assessment in the amount of $100.00, amounting in all to the sum of $50,100.00. Judgment entered in the Judgment Book of the United States District Court for the Southern District of New York on the 1st day of July, 2021.(bw) (Entered: 10/13/2021) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 12/07/2021 16:51:00 | | |
| PACER Login: | cpwashington16 | Client Code: |
| Description: | Docket Report | Search Criteria: | 1:20-cr-00188-JSR |
| Billable Pages: | 30 | Cost: | 3.00 |

**DJA59**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X
                          :

UNITED STATES OF AMERICA          :

       - v. -                 :       <u>SEALED INDICTMENT</u>

                          :

HAMID AKHAVAN,                 S3 20 Cr. 188 (__)
      a/k/a "Ray Akhavan," and    :
RUBEN WEIGAND,

                          :

           Defendants.

                          :

- - - - - - - - - - - - - - - - - - X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAR 3 1 2020

<u>COUNT ONE</u>
(Conspiracy to Commit Bank Fraud)

     The Grand Jury charges:

<u>OVERVIEW OF THE SCHEME</u>

     1.    From at least in or about 2016, up to and including in

or about 2019, HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN

WEIGAND, the defendants, principals at one of the leading on-

demand marijuana delivery companies in the United States (the

"Online Marijuana Marketplace Company"), and other co-

conspirators, engaged in a scheme to deceive United States banks

and other financial institutions into processing in excess of

one hundred million dollars in credit and debit card payments

for the purchase and delivery of marijuana products (the

"Transaction Laundering Scheme").  Because many United States

banks are unwilling to process payments involving the purchase

of marijuana, the Online Marijuana Marketplace Company used
fraudulent methods to avoid these restrictions and to receive in
excess of one hundred million dollars from customers located in
California and Oregon who purchased marijuana through the Online
Marijuana Marketplace Company.

2.    To effectuate the Transaction Laundering Scheme, HAMID
AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants,
and several of the principals of the Online Marijuana
Marketplace Company, arranged for the money received from the
Online Marijuana Marketplace Company's customers to be disguised
as payments to over a dozen phony online merchants and other
non-marijuana businesses (the "Phony Merchants"), including
transactions that appeared to be for stenographic services,
music stores/pianos, and cosmetic stores.  To accomplish this
deceit, the Online Marijuana Marketplace Company relied on third
party payment processors (the "Payment Processors") who worked
with AKHAVAN, WEIGAND, and other co-conspirators to create phony
offshore corporations and websites (i.e., the Phony Merchants)
and open offshore merchant bank accounts.  AKHAVAN, WEIGAND, and
other members of the conspiracy used the Phony Merchants'
offshore bank accounts to disguise payments made to the Online
Marijuana Marketplace Company for the purchase of marijuana
products and to deceive United States banks about the true
nature of the financial transactions they were processing.

2

Working together, AKHAVAN, WEIGAND, other Payment Processors, and principals of the Online Marijuana Marketplace Company deceived United States banks and financial institutions— including federally insured institutions—into processing in excess of one hundred million dollars in marijuana purchases made through the Online Marijuana Marketplace Company.

BACKGROUND ON THE ONLINE MARIJUANA MARKETPLACE COMPANY

3.   At all times relevant to this Indictment, the Online Marijuana Marketplace Company was a California-based company that arranged for on-demand sale and delivery of marijuana products to customers located in California and Oregon.  Through the Online Marijuana Marketplace Company's mobile application and website (collectively, the "Applications"), customers could order marijuana from different dispensaries listed on the Applications.  Specifically, customers used the Applications to select the marijuana product(s) of their choice, and to receive delivery of their selection shortly thereafter.  Although the Online Marijuana Marketplace Company operated the technology platform through which users purchase marijuana (i.e., the Applications), it was not the actual retailer of the marijuana. The actual retailers, referred to as "dispensaries," contracted with the Online Marijuana Marketplace Company to fulfill orders placed by customers through the Applications.

3

DJA62

4.   To request and receive a delivery of marijuana through
the Applications, a user created an Online Marijuana Marketplace
Company account through the company's website or mobile
application.  Once the customer selected his or her product(s)
for purchase, the Application generated a check-out screen for
the order where the customer could select a payment option.  At
various points from in or around 2016, through in or around
2019, one of the payment options offered by the Online Marijuana
Marketplace Company for purchases of marijuana were credit cards
and debit cards.  For purchases with credit cards or debit
cards, the Applications allowed customers to enter their card
information and then complete the payment using that
information.

5.   Once a customer placed an order, a delivery driver
would deliver the order to the customer shortly thereafter.
Once the delivery was complete, the Online Marijuana Marketplace
Company generated and transmitted via email a receipt for the
purchase.  When customers made purchases by credit cards or
debit cards, those purchases would appear on the customers' card
statements as though they were from merchants other than the
Online Marijuana Marketplace Company (e.g., a merchant from whom
the customer had not in fact purchased the marijuana).

6.   The Online Marijuana Marketplace Company stopped
accepting credit card payments in or around mid-2019.

4

DJA63

<u>BACKGROUND ON CREDIT AND DEBIT CARD PROCESSING</u>

7.    Credit and debit card transactions are usually processed through payment networks (the "Payment Networks"), run by entities such as MasterCard or Visa (the "Credit Card Companies"), that provide authorization, clearing and settlement services for credit and debit card transactions.  Financial institutions, as members of these payment networks, can offer payment processing services directly to merchants, but more commonly partner with non-bank third parties — including payment processors, Independents Sales Organizations ("ISOs"), and Merchant Service Providers ("MSPs," collectively with ISOs and payment processors, the "Processors") — for such third parties to process payments on behalf of the sponsoring financial institutions.  These processors are typically required to be registered with the Payment Networks.

8.    Processors typically use Payment Networks set up by the Credit Card Companies.  The Credit Card Companies have rules that prohibit their credit cards from being used for marijuana purchases.  Violations of these rules can lead to penalties and ultimately to a merchant being terminated.  Debit cards that are issued by banks often fall under the same rules because the Processors typically use the Credit Card Companies' Payment Networks.

5

DJA64

9.    When purchases are made with a credit or debit card,
merchant category codes ("MCCs") are assigned to each
transaction that are specific to the category of product or
service being purchased.  Because the Credit Card Companies do
not support marijuana transactions, they do not have marijuana
merchant codes.  As a result, in order to process a marijuana
transaction through a Credit Card Company, a false merchant code
— i.e., a merchant code associated with a different product or
product category — would have to be used.  HAMID AKHAVAN, a/k/a
"Ray Akhavan," and RUBEN WEIGAND, the defendants, and their co-
conspirators, used merchant codes for other products — typically
referred to as "miscoding" — in order to get around these rules.

10.   Online credit card and debit card payment transactions
typically consist of two steps: (1) an authorization; followed
by (2) clearing and settlement.  Card authorization for online
purchases generally works as follows:

a.    A cardholder (i.e., the individual making the
purchase online) initiates a transaction by entering a credit or
debit card number, card expiration date, and other security
features required by the merchant, such as the Card Verification
Value ("CVV") number or the cardholder's zip code.

b.   The merchant uses its payment software or gateway[1]
to transmit the cardholder's information and the details of the
transaction, including the name and location of the merchant,
the MCC, a description of the goods and services purchased
(sometimes referred to as the "descriptor"), the amount of the
transaction, and the transaction date, to its partner Processor
(or directly to the merchant's bank, which is often referred to
as the "acquiring bank").

c.   The Processor captures the transaction
information and routes it through a Payment Network to the
cardholder's "issuing bank," as defined below, to be approved or
declined.

d.   The bank issuing the credit or debit card to the
customer ("issuing bank") receives the transaction information
from the Processor and responds by approving or declining the
transaction.  Issuing banks in the United States generally will
not extend credit (i.e., approve) transactions that involve
unlawful activity under federal law, such as the sale of
marijuana.[2]

_____

[1] A payment gateway is a technology used by merchants to accept
debit or credit card purchases from customers.  For online
sales, this typically refers to the "checkout" portals used to
enter credit card information or credentials.

[2] Although the personal use of marijuana has been legalized under
state law in several states, including California and Oregon,
marijuana is a Schedule I Controlled Substance under the

7

e.   The issuing bank sends a response code back to the Processor, and that code reaches the merchant's payment gateway and is stored in a batch file pending settlement, which is described below.

f.   If the merchant receives authorization, the issuing bank will place a hold for the amount of the purchase on the cardholder's account pending settlement.

g.   Finally, the merchant typically provides the customer a receipt to complete the sale.  This entire authorization process usually takes place within seconds.

h.   In order to accept transactions on behalf of the Credit Card Companies, the acquiring bank must be a registered member of the Credit Card Companies.

11.   Step two of the credit card and debit payment card process is clearing and settlement, which pertains to the recording of the movement of funds ("clearing"), and the actual flow of funds ("settlement"). Clearing and settlement generally works as follows:

a.   During the clearing stage, the issuing bank posts to each cardholder's account the transaction information that it received from the merchant (or from the Processor after

---

Controlled Substances Act, and the possession, distribution, and use of marijuana is unlawful under federal statutes, including Title 21, United States Code Sections 841 and 844.

receiving it from the merchant), including the name of the merchant and the amount for each transaction. However, in the clearing stage, there is no exchange or transfer of funds.

b.   The acquiring bank then credits the merchant's account and submits the transaction to the respective Credit Card Company's Payment Network for settlement.

c.   In the settlement stage, the Credit Card Companies use their Payment Networks to forward each transaction to the appropriate issuing bank, which ordinarily will transfer funds for the approved transaction, less a fee.

d.   The Credit Card Companies typically use their Payment Networks to pay the acquiring bank (and sometimes the Processor) its respective percentages from the remaining funds, after which the Processor pays the merchant an amount equal to the cardholder purchases, minus a fee charged to merchants for processing the debit and credit card transactions (i.e., the "merchant discount rate").

e.   The final step is for the issuing bank to use the information it has received from each transaction to prepare monthly cardholder statements, which are distributed to cardholders. These statements typically identify each credit or debit card purchase made by the cardholder, the amount of the purchase, and the name associated with the merchant.

THE TRANSACTION LAUNDERING SCHEME

12.  During the time period charged in this Indictment, because most banks in the United States were unwilling to process credit and debit card transactions involving marijuana, HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants, and other members of the conspiracy, used several strategies to trick United States issuing banks into authorizing marijuana transactions for the Online Marijuana Marketplace Company.  The primary method used by AKHAVAN, WEIGAND, and other co-conspirators, involved the creation and use of the Phony Merchants.  These fraudulent companies were used to open offshore bank accounts with merchant acquiring banks and to initiate credit card charges for marijuana purchases made through the Online Marijuana Marketplace Company.  Because of the high risk associated with processing transactions that involved unlawful activity (i.e., the sale of marijuana), employees at some of the acquiring banks charged high fees for the acquiring banks to process these transactions.

13.  HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants, worked with other co-conspirators to create the Phony Merchants — including phony online merchants purportedly selling dog products, dive gear, carbonated drinks, green tea, and face creams — and establish Visa and MasterCard merchant processing accounts with one or more offshore acquiring banks.

10

AKHAVAN, WEIGAND, and their co-conspirators arranged for more than a dozen Phony Merchants to be used by the Online Marijuana Marketplace Company.  For example, some of the website names for the Phony Merchants included: absolutsoda.com; diverkingdom.com; fly2skyshop.com; goodegreenbazaar.com; greenteacha.com; happypuppybox.com; outdoormaxx.com; and soniclogistix.com.  The Phony Merchants also typically had web pages suggesting that they were involved in selling legitimate goods, such as carbonated drinks, face cream, dog products, and diving gear. Yet, as noted above, these companies were actually being used to facilitate the approval and processing of marijuana transactions.  Furthermore, the Phony Merchants were not based in the United States, and many of them had the same address listed as their company address.  In addition, while these entities claimed to be based outside the United States, their customer service telephone numbers were American phone numbers.

14.  Between at least in or about 2017 and at least in or about July 2019, more than approximately $100 million in credit and debit card transactions were processed for several of the Phony Merchants that were being used by HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants, and other co-conspirators, to process marijuana purchases involving the Online Marijuana Marketplace Company.  Some of the merchant websites listed for those transactions include: greenteacha.com,

medical-stf.com, organikals.store, and soniclogistix.com.
AKHAVAN, and others, also worked with and directed others to
apply incorrect MCCs to the Online Marijuana Marketplace Company
marijuana transactions in order to disguise the nature of those
transactions and create the false appearance that the
transactions were completely unrelated to marijuana. Some of
the MCCs/categories listed for the transactions listed above
included stenographic services, music stores/pianos, and
cosmetic stores. None of the merchant website names listed for
those transactions referred to the Online Marijuana Marketplace
Company or to marijuana.

                    STATUTORY ALLEGATIONS

        15. From at least in or about 2016, up to and including in
or about 2019, in the Southern District of New York and
elsewhere, HAMID AKHAVAN, a/k/a "Ray Akhavan," and RUBEN
WEIGAND, the defendants, and others known and unknown, willfully
and knowingly combined, conspired, confederated, and agreed
together and with each other to commit bank fraud, in violation
of Title 18, United States Code, Section 1344.

        16. It was a part and object of the conspiracy that HAMID
AKHAVAN, a/k/a "Ray Akhavan," and RUBEN WEIGAND, the defendants,
and others known and unknown, willfully and knowingly, would and
did execute, and attempt to execute, a scheme and artifice to
defraud a financial institution, the deposits of which were then

federally insured, and to obtain moneys, funds, credits, assets,

securities, and other property owned by, and under the custody

and control of, such financial institution, by means of false

and fraudulent pretenses, representations, and promises, in

violation of Title 18, United States Code, Section 1344, to wit,

AKHAVAN and WEIGAND participated in a scheme to deceive

financial institutions and other financial intermediaries—

including federally insured banks—into processing and

authorizing payments to and from marijuana sale and delivery

businesses and their customers in the United States by

disguising the transactions to create the false appearance that

they were unrelated to the purchase of marijuana, and thereby

obtain money of, or under the custody and control, of those

financial institutions and intermediaries.

> (Title 18, United States Code, Section 1349.)

<u>FORFEITURE ALLEGATION</u>

17.  As a result of committing the offense alleged in

Count One of this Indictment, HAMID AKHAVAN, a/k/a "Ray

Akhavan," and RUBEN WEIGAND, the defendants, shall forfeit to

the United States, pursuant to Title 18, United States Code,

Section 982(a)(2)(A), any and all property constituting, or

derived from, proceeds obtained directly or indirectly, as a

result of the commission of said offense, including but not

limited to a sum of money in United States currency representing

the amount of proceeds traceable to the commission of said offense.

### Substitute Assets Provision

18.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third person;

      c.   has been placed beyond the jurisdiction of the Court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable

DJA73

property.

        (Title 18, United States Code, Section 981;
      Title 21, United States Code, Section 853; and
       Title 28, United States Code, Section 2461.)


_____
Foreperson

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

15

DJA74

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

v.

### HAMID AKHAVAN, a/k/a "Ray Akhavan," and
### RUBEN WEIGAND,

                              Defendants.

### SEALED INDICTMENT

S3 20 Cr. 188

(18 U.S.C. § 1349.)

                    GEOFFREY S. BERMAN
                  United States Attorney.

### A TRUE BILL

_____ 3/9/20_____
                              Foreperson.

3/9/2020        Filed Indictment under seal

                              USMJ Wang

                                    MGL

DJA75

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
UNITED STATES OF AMERICA,                :
                                         :      20-cr-188 (JSR)
          -v-                            :
                                         :      OPINION & ORDER
RUBEN WEIGAND and HAMID AKHAVAN,         :
                                         :
          Defendants.                    :
                                         :
-----------------------------------x

JED S. RAKOFF, U.S.D.J.

     The indictment in this case alleges that many banks will not
approve credit or debit card transactions for marijuana, even in
states like California and Oregon that permit the sale of
marijuana.   To circumvent this, the indictment continues,
defendants  Ruben  Weigand  and  Hamid  Akhavan,  and  their
co-conspirators, set up fictitious businesses, complete with
websites and bank accounts, purporting to sell a host of products
like dog food, face creams, green tea, carbonated drinks, and
diving gear.  They then used these fictitious businesses to fool
the banks into approving marijuana credit card and debit card sales
by disguising those transactions as sales of dog food and the like.
As a result, the banks processed more than $100 million worth of
transactions that they otherwise would have declined.  Based on
these allegations, the indictment here charges defendants with one
count of conspiracy to commit bank fraud.

1

DJA76

Now before the Court are defendants' motions to dismiss the indictment, defendant Weigand's motion to suppress electronically stored information that the Government seized from him pursuant to a warrant, and defendants' motions to compel certain discovery and to set pretrial disclosure deadlines.

## I.   MOTIONS TO DISMISS

The following allegations are drawn from the third superseding indictment.  The Court accepts them as true for the purpose of evaluating the defendants' motions to dismiss.  See United States v. Goldberg, 756 F.2d 949, 950 (2d Cir. 1985).

A credit or debit card transaction generally involves five parties: the cardholder (here, the would-be purchaser of marijuana), the merchant (here, the company created by the defendants and their co-conspirators to facilitate these card purchases, which the indictment calls the "Online Marijuana Marketplace Company"), and three intermediaries -- the issuing bank, which issued the customer's card and funds the transaction; the processor (e.g., Visa), which processes the transaction; and the merchant's bank, also known as the "acquiring bank," which receives funds on behalf of the merchant.  S3 Superseding Indictment, ECF No. 16, at ¶¶ 7, 10.  In the usual course, a cardholder initiates a transaction by seeking to purchase a good or service (such as here the purchase of marijuana) and offering a credit or debit card for payment.  The merchant then transmits

2

information regarding the transaction to the processor (or to the merchant's bank, which then passes the information on to the processor).  This information includes a "merchant category code" ("MCC") that describes the category of product or service that the merchant sells.  Id. ¶¶ 9, 10(d).  The processor then passes that information to the issuing bank, which approves or declines the transaction.  If the issuing bank approves the transaction, it then transfers funds through the processor to the merchant's bank. Finally, the merchant's bank credits the merchant's account, and the issuing bank debits the cardholder's account (in the case of a debit card) or includes the charge on the cardholder's next monthly statement (in the case of a credit card).  See id. ¶ 11(b)-(d).

The indictment alleges that Weigand and Akhavan were principals of the Online Marijuana Marketplace Company, which developed a website and mobile phone application through which customers in California and Oregon could order marijuana for delivery from a variety of retailers.  Id. ¶¶ 1, 3.  Many United States banks, however, are unwilling to process card payments for marijuana.  Id. ¶ 1.  Weigand and Akhavan, together with unnamed co-conspirators, allegedly deceived United States banks by disguising the transactions to create the false appearance that they were unrelated to the purchase of marijuana.  Id. ¶¶ 1, 16.

DJA78

To do so, Weigand, Akhavan, and their co-conspirators, beginning in 2016 and continuing through mid-2019, created a series of fictitious merchants purportedly selling legitimate goods including dog products, diving gear, carbonated drinks, green tea, and face creams (the "Phony Merchants"). The conspirators created web pages to support the illusion that the Phony Merchants had actually sold these legitimate goods. Id. ¶ 13. The conspirators worked with third-party payment processors and offshore merchant banks to create bank accounts for these Phony Merchants. Id. ¶ 12. The conspirators then applied incorrect MCCs to the Online Marijuana Marketplace Company transactions in order to create the appearance that the transactions were related to the Phony Merchants and unrelated to marijuana. Id. ¶ 14.

When cardholders attempted to use credit and debit cards to make marijuana purchases from the Online Marijuana Marketplace Company, the issuing banks, at least some of which were federally insured financial institutions, were tricked into believing that cardholders were purchasing legitimate goods from the Phony Merchants. Id. The issuing banks approved over $100 million of credit and debit card transactions for the Online Marijuana Marketplace Company. Id.

The defendants move to dismiss on three grounds: (A) failure to state an offense; (B) lack of specificity; and (C) violation of a provision in an appropriations act (the "Rohrabacher-Farr

4

Amendment") that bars certain Government interference with state medical marijuana regimes.  The Court addresses each argument in turn.

**A.   <u>Failure to State an Offense</u>**

Defendants argue that the indictment does not state an offense, for three reasons:

(1)   Bank fraud requires an intent to inflict harm on a financial institution, and the indictment does not allege such an intent.   Weigand Mem. in Support of Mot. to Dismiss, ECF No. 62 ("Weigand MTD"), at 12; Akhavan Mem. in Support of Mot. to Dismiss, ECF No. 72 ("Akhavan MTD"), at 15.

(2)   Bank fraud requires an intent to deceive a financial institution, but the indictment does not allege that defendants made misrepresentations to issuing banks -- only to intermediaries who are not protected by the bank fraud statute.   Weigand MTD 15, 17.

(3)   Because at least some issuing banks were willing to process marijuana-related transactions, the indictment does not allege that defendants' misrepresentations were material. Akhavan MTD 15; Weigand MTD 17.

As noted, this indictment charges defendants with conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349.  Bank fraud, in turn, is defined in 18 U.S.C. § 1344, as follows:

5

> Whoever knowingly executes, or attempts to execute, a scheme or artifice -
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.[1]

The bank fraud statute was modeled on prior federal fraud statutes, as a Senate Judiciary Committee Report explained:

> The proposed bank fraud statute is modeled on the present wire and mail fraud statutes which have been construed by the courts to reach a wide range of fraudulent activity. Like these existing fraud statutes, the proposed bank fraud offense proscribes the conduct of executing or attempting to execute "a scheme or artifice to defraud" or to take the property of another "by means of false or fraudulent pretenses, representations, or promises."

S. Rep. No. 98-225, at 378 (1983); see also 18 U.S.C. § 1341 (prohibiting "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," using the mail); 18 U.S.C. § 1343 (same, but with use of interstate wire connection).

To state a violation of Subsection 1 of the bank fraud statute, the Government must allege that a defendant (1) knowingly

---

[1] "Financial institution" is defined at 18 U.S.C. § 20. The indictment here alleges that at least some of the issuing banks were financial institutions, as defined in Section 20. ECF No. 16, ¶ 16.

executed (or attempted to execute) a scheme to "deceive [a] bank,"[2] (2) through "a misrepresentation or concealment of material fact,"[3] and (3) to "deprive it of something of value,"[4] with (4) "knowledge that [the defendant] would likely harm the bank's property interest" through the scheme.[5]

To state a violation of Subsection 2, the Government must allege that a defendant (1) knowingly executed (or attempted to execute) a scheme through which the defendant "intend[ed] to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution" (hereinafter, "bank property");[6] (2) the defendant made "false or fraudulent pretenses, representations, or promises" (hereinafter, "misrepresentations");[7] (3) the misrepresentations were "of

---

[2] Shaw v. United States, 137 S. Ct. 462, 469 (2016).

[3] Neder v. United States, 527 U.S. 1, 3 (1999).

[4] Shaw, 137 S. Ct. at 469. Although the defendant must intend, through the scheme, to "deprive [the bank] of something of value," id. at 465, the Government need not allege "that the defendant intend that the victim bank suffer [financial] harm," id. at 467. A scheme to obtain an accountholder's funds is enough, because the bank holds a property interest in those funds, akin to a bailee. Id. at 465.

[5] Id. at 468.

[6] Loughrin, 573 U.S. at 355-56. While the indictment must allege an intent to obtain bank property, it need not allege that "the defendant's scheme created a risk of financial loss to the bank." Id. at 366 n.9.

[7] Id.

7

material fact";[8] and (4) the misrepresentations were the "means" by which defendant intended to obtain the bank property.[9]

### 1.  Intent to Harm Banks

Defendants first argue that the indictment must be dismissed for failure to allege an intent to harm.  Defendants cite United States v. Miller, a Ninth Circuit opinion that reasoned in the case of wire fraud (but with frequent analogies to bank fraud) that "the government can[not] escape the burden of showing that some actual harm or injury [to the victim's money or property] was contemplated by the schemer."  United States v. Miller, 953 F.3d 1095, 1102 (9th Cir. 2020) (quoting United States v. Regent Office Supply Co., 421 F.2d 1174, 1180 (2d Cir. 1970)) (alterations in original).  Defendants argue that here the indictment does not adequately allege an intent to impose "actual harm or injury" on the issuing banks.

In describing the sorts of harm that qualify, however, the Supreme Court's bank fraud precedents cast a wide net.  The

---

[8] Neder v. United States, 527 U.S. 1, 3 (1999).

[9] Loughrin, 573 U.S. at 355-56.  The Supreme Court has described this as "a relational component:  The criminal must acquire (or attempt to acquire) bank property 'by means of' the misrepresentation . . . such that the connection between the two is something more than oblique, indirect, and incidental."  Id. at 362-63.  In other words, the Government must prove that "the defendant's false statement [was] the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control."  Id. at 363.

indictment need only describe a scheme to "deprive [the bank] of something of value," Shaw, 137 S. Ct. at 469 (Subsection 1) or to "obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution," Loughrin, 573 U.S. at 356 (Subsection 2).  The Government need not allege harm in the sense of pecuniary loss.  Shaw, 137 S. Ct. at 467 (Subsection 1 "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss."); Loughrin, 573 U.S. at 366 n.9 (Subsection 2 does not "require[] the Government to prove that the defendant's scheme created a risk of financial loss to the bank" or that it, in fact, caused "damage.").

Here, the indictment alleges that the defendants intended to deprive the issuing banks of certain property rights and to obtain money that was under bank control.  The particular property rights at issue depend on whether the transaction was by credit card or by debit card.  When a customer bought marijuana with a credit card, the issuing bank transferred to the merchant bank its own funds, which it had offered on credit to the cardholder.  When a customer used a debit card, the bank transferred funds from the cardholder's account.  Nevertheless, even in the debit card situation, the bank, prior to the transfer, held a property interest in those funds.  "When a customer deposits funds," sometimes the bank "becomes the owner of the funds," subject to a customer's right to withdraw them; other times "the bank merely

9

assumes possession." Shaw, 137 S. Ct. at 466. But even in the latter case, "the bank is like a bailee" and has a "special qualified property" right in the account. Id. (quoting 2 W. Blackstone, Commentaries on the Laws of England 452-454 (1766)).

Because the indictment alleges that defendants intended to deprive the bank of these property rights, and to thereby obtain money under bank control, it sufficiently describes an intent to cause harm under both subsections of the bank fraud statute. Compare United States v. Lebedev, 932 F.3d 40, 49 (2d Cir. 2019), cert. denied sub nom. Gross v. United States, 140 S. Ct. 1224 (2020) (upholding bank fraud conviction where "there was sufficient evidence showing that [defendant] caused false information to be sent to financial institutions to disguise the fact that their customers were transacting business with" an unlicensed Bitcoin exchange, "with the intent to obtain funds under those institutions' custody and control"). Id. at 49.

To be sure, the foregoing analysis applies Supreme Court precedent. Defendants argue that more is required in the Second Circuit because a panel of the Second Circuit stated in 2012 that bank fraud requires an "intent to victimize the institution by exposing it to actual or potential loss." See United States v. Nkansah, 699 F.3d 743, 748 (2d Cir. 2012) (emphasis supplied; internal quotation marks omitted). Last year, the Second Circuit declined to address whether this holding survives Shaw and

10

<u>Loughrin</u>.  <u>See</u> <u>United States v. Calderon</u>, 944 F.3d 72, 92 (2d Cir. 2019) ("We need not wade into this debate.").

Though apparently an open question, this is not a difficult one.  Four years after the Second Circuit's decision in <u>Nkansah</u>, the Supreme Court, as already noted, explicitly held that Subsection 1 requires no "intent to cause financial loss," <u>Shaw</u>, 137 S. Ct. at 467, and that Subsection 2 requires no "risk of financial loss to the bank," <u>Loughrin</u>, 573 U.S. at 366 n.9.  Thus, <u>Nkansah</u> is no longer good law.

Finally, defendants argue that even if the indictment alleges some intent to harm banks, the only bank property at stake here is the "ethereal right to accurate information," Weigand Reply in Support of Def'ts' Mots., ECF No. 82, at 7, which, they argue, cannot support a fraud conviction in light of the Supreme Court's recent decision in <u>Kelly v. United States</u>, 140 S. Ct. 1565 (2020). This argument, however, stretches <u>Kelly</u> to the breaking point. <u>Kelly</u> concerned public corruption and the misuse of regulatory power, holding that an allegedly corrupt state regulatory decision, where no actual money changed hands, did not have as its object money or property.  <u>See Kelly</u>, 140 U.S. at 1572-74.

Here, by contrast, the object of the alleged scheme was money. The banks had concrete property interests in these funds, and defendants allegedly sought to injure those interests by causing the banks to relinquish those funds through deception.  Thus, the

11

indictment sufficiently stated an intent to harm their property interests; whether the banks also had a "right to accurate information," "ethereal" or otherwise, is beside the point.

2.   Intent to Deceive Banks

Defendants next argue that the Government has not alleged an intent to deceive a covered financial institution (i.e., an issuing bank). Rather, "the Government has maintained that the defendants were responsible for sending 'application packages' and credentials for the Phony Merchants only to offshore banks and payment processors," which, unlike the issuing banks are not protected by the bank fraud statute. Weigand MTD 18.   In other words, the defendants argue that the defendants' deception must be aimed at the same banks as are harmed.

If the charge here were wire fraud, the argument would be meritless. Five courts of appeals, including the Second Circuit, have concluded that the wire fraud statute does not "require convergence between the parties intended to be deceived and those whose property is sought in a fraudulent scheme." United States v. Greenberg, 835 F.3d 295, 306-07 (2d Cir. 2016); see id. n.16 (collecting cases).

But when it comes to the bank fraud statute, it appears that the Supreme Court does require such convergence. With respect to Subsection 1, this is because of how the Court construes the statutory language itself. Specifically, Subsection 1 of the bank

DJA87

fraud statute requires that a defendant attempt both to "deceive [a] bank" and to "deprive it of something of value." Shaw, 137 S. Ct. at 469. But because the bank fraud statute only applies to federally insured banks, the Supreme Court has also read a similar requirement into Subsection 2 for "federalism-related reasons": the indictment must allege "some real connection to a federally insured bank -- namely, [that] a false statement will naturally reach such a bank (or a custodian of the bank's property)." Loughrin, 573 U.S. at 365 n.8.[10]

But though this convergence is required, here it is met. Specifically, the indictment states that the purpose of defendants' alleged misrepresentations to merchant's banks (e.g., inaccurate MCCs) was so that those misrepresentations would be conveyed to the issuing banks to secure their approval for the transactions. Accordingly, the indictment adequately alleges an intent to deceive financial institutions protected by the bank fraud statute.

---

[10] For example, building upon an example offered by the Supreme Court in Loughrin, imagine a con artist who tricks a tourist into buying a handbag, claiming it is a designer brand. The tourist purchases the handbag by credit card. The MCC and other transaction information transmitted to the bank were accurate. Was this bank fraud? The con artist intended to obtain bank property, and he made misrepresentations of material fact. However, the con artist never intended that the misrepresentations would be conveyed to the financial institution. Therefore, the con artist did not deceive a bank (Subsection 1), and the misrepresentation was not the means by which the defendant obtained bank funds (Subsection 2). This was fraud, but not bank fraud.

DJA88

   3.   <u>Materiality</u>

Finally, defendants argue that the indictment does not state a claim because it does not allege that the misrepresentations were material.  This borders on the frivolous.  The indictment explicitly alleges that many issuing banks would not have approved these transactions if they had known marijuana was involved.  ECF No. 16, ¶ 1.

Defendants, however, argue that the indictment implicitly concedes that at least <u>some</u> issuing banks would have been willing to process marijuana transactions, even if they knew they were marijuana transactions.  But the Government need not allege that every issuing bank would have refused to process accurately presented marijuana transactions.  The indictment alleges that many banks would have refused to do so; that is enough, at this stage, to allege materiality.

For the foregoing reasons, the indictment states a claim for conspiracy to commit bank fraud.

**B.   Lack of Specificity**

Defendants next move to dismiss the indictment for lack of specificity.  On rare occasion, "specification of how a particular element of criminal charge will be met . . . is of such importance to the fairness of the proceeding that it must be spelled out in the indictment," but otherwise, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly

14

informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" United States v. Stringer, 730 F.3d 120, 125-26, 124 (2d Cir. 2013) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)).

Defendants argue that the indictment is insufficiently specific for four reasons:

(1) The indictment does not point to a specific transaction or misrepresentation. Akhavan MTD 10.

(2) Although, as this Court ordered, the Government provided a bill of particulars identifying the alleged co-conspirators, it offered "nothing concrete . . . to indicate how the alleged scheme was executed, or by whom . . . [nor] who the intended victim supposedly was." Id. at 12.

(3) The indictment essentially charges a violation of bank policy, without citing any specific policy. Id. at 9-10.

(4) The indictment does not allege that the misrepresentations induced the issuing banks to enter into the transactions, i.e., that they otherwise would have been unwilling to do so. Id.

These arguments are largely an attempt to relitigate the motion for a bill of particulars. See Order, ECF No. 38, at 5-7 (finding that, apart from the request for a list of

15

DJA90

co-conspirators, the information sought by defendants was either "irrelevant" or "merely evidentiary detail at best," and the indictment was "sufficiently clear" without such information). In particular, the Court has already considered and denied defendants' request (1) for information regarding specific transactions and misrepresentations and (2) for more concrete information regarding how the alleged scheme was executed and against which victims. The Court adheres to its prior holding that the indictment is sufficiently particular on these points.

The Court likewise rejects the arguments that the indictment (3) does not cite a bank policy and (4) does not show that the misrepresentations induced the banks to act. The indictment alleges that the defendants "engaged in a scheme to deceive United States banks . . . into processing . . . payments for the purchase and delivery of marijuana products." ECF No. 16, ¶ 1. It asserts that "many United States banks are unwilling to process payments involving the purchase of marijuana, [so] the Online Marijuana Marketplace Company used fraudulent methods to avoid these restrictions." Id. This sufficiently describes the applicable bank policies and alleges that the defendants intended deception to be the means by which they obtained bank property.

In short, the Court reaffirms its prior holding that "[t]he indictment's description of the Transaction Laundering Scheme . . . is sufficiently clear for the defendants to understand the

crime with which the Government accuses them . . . thus placing
the defendants on notice and allowing them to prepare a defense."
Order, ECF No. 40, at 6.

## C.   The Rohrabacher-Farr Amendment

Finally, defendants argue that the indictment must be
dismissed because it contravenes an appropriations law binding on
the Government.   The Rohrabacher-Farr Amendment was originally
passed by Congress as part of the omnibus spending bill in 2014;
it has been renewed each year since.   The amendment provides, in
part, that "[n]one of the funds made available in this . . . Act
to the Department of Justice may be used, with respect to . . .
California [or] Oregon . . ., to prevent such States from
implementing their own State laws that authorize the use,
distribution, possession, or cultivation of medical marijuana."
Consolidated Appropriations Act of 2020, Pub. L. No. 116-93, §
531, 133 Stat. 2317 (2019).

Defendants contend that "the Government is attempting to
prosecute Defendants for a federal felony based only on conduct
that is legal under applicable state law," thus violating the
Rohrabacher-Farr Amendment.   Akhavan MTD 24.   The defendants rely
on United States v. McIntosh, 833 F.3d 1163 (9th Cir. 2016).   In
McIntosh, the Ninth Circuit considered appeals by defendants
charged with marijuana-related violations of the Controlled
Substances Act.   The Ninth Circuit opined that the Rohrabacher-Farr

Amendment limited the DOJ's authority to bring such prosecutions. "By officially permitting certain [marijuana-related] conduct, state law provides for non-prosecution of individuals who engage in such conduct. If the federal government prosecutes such individuals, it has prevented the state from giving practical effect to its law providing for non-prosecution of individuals who engage in the permitted conduct," which would violate the Rohrabacher-Farr Amendment. Id. at 1176-77. Therefore, the Ninth Circuit remanded to the district courts, holding that "[i]f DOJ wishes to continue these prosecutions, Appellants are entitled to evidentiary hearings to determine whether their conduct was completely authorized by state law, by which we mean that they strictly complied with all relevant conditions imposed by state law on the use, distribution, possession, and cultivation of medical marijuana." Id. at 1179.

If the defendants here had been similarly charged with violations of the Controlled Substances Act, then this Court would need to consider whether to adopt the reasoning of McIntosh. But the indictment in this case does not charge defendants for behavior that is legal under state medical marijuana laws. It charges conspiracy to commit bank fraud. The Rohrabacher-Farr Amendment does not condone bank fraud by a medical marijuana dispensary any more than it condones murder, robbery, or assault. Thus, the Amendment, and McIntosh, are inapplicable on their own terms. See

id. at 1178 (noting that the Rohrabacher-Farr Amendment does not apply when the DOJ "prosecutes individuals who engage in conduct unauthorized under state medical marijuana laws").

For these reasons, the motions to dismiss are denied.

## II.   MOTION TO SUPPRESS

Defendant Weigand moves to suppress evidence seized from two cell phones and a computer that were in his possession when he was arrested on March 9, 2020 at Los Angeles International Airport. The evidence was seized pursuant to a warrant, which a magistrate judge issued upon the application of FBI Special Agent Matthew Mahaffey.

The affidavit supporting the request for a warrant, which is filed at ECF No. 70-1 ("Aff."), describes the alleged scheme, attaches the indictment, and identifies the three devices.  It avers that Weigand, Akhavan, a cooperating witness, and various co-conspirators communicated using an end-to-end encrypted messaging application (i.e., an application that transmits communications in such a way that they can only be read on the sender's and the recipient's devices and cannot be intercepted by wiretap or by a search warrant served on an internet service provider).  It also avers that the alleged conspirators used an encrypted email service.

The affidavit includes several quotations from a group message on the encrypted messaging application involving the

cooperating witness on April 27, 2018. Other participants in the
group message had the display names "Ray CE" and "Ruben Weigand";
according to the cooperating witness, these were Akhavan and
Weigand, respectively. The conversation appears to relate to the
setup of a Phony Merchant, including what prices the conspirators
should display on the fictitious website to ensure that they
matched the price points for the associated marijuana
transactions. Later that day, the conversation turned to the brief
descriptions of goods and services that issuing banks would list
on customers' monthly credit card statements. Id. ¶ 17(c).

According to the affidavit, the conspirators continued
communicating about the alleged scheme using the encrypted
messaging application until at least late 2018 and using encrypted
emails until May 2019. Weigand also spoke with the cooperating
witness about the alleged scheme by phone in May 2019 (i.e.,
approximately ten months before Weigand was arrested).

The affidavit does not link criminal activity specifically to
the three seized devices. However, it says generally that "[l]ike
individuals engaged in any other kind of activity, individuals who
engage in fraud and money laundering offenses store records
relating to their illegal activity and to persons involved with
them in that activity on electronic devices such as the Subject
Devices." Id. ¶ 22. The affidavit further states that files can

be recovered "months or even years after they have been created or saved." Id. ¶ 23.

The affidavit sought permission for, if necessary, up to "a complete review of all the [electronically stored information] from the Subject Device to locate all data responsive to the warrant." Id. ¶ 27.  The agent sought to seize certain specific, detailed categories of information.  Warrant, ECF No. 70-2, at 5-6.

A magistrate judge approved the warrant.  To be lawful under the Constitution, a search warrant must, inter alia, set forth evidence establishing probable cause to believe a crime has been committed and that evidence of that crime can be found in what is to be searched.  "[P]robable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983).  It is a "flexible, common-sense standard," Texas v. Brown, 460 U.S. 730, 742 (1983), which requires a case-by-case analysis of the totality of the circumstances, see Illinois v. Gates, 462 U.S. at 230.  A nexus with criminal activity may be supported by a "reasonable inference from the facts presented based on common sense and experience." United States v. Singh, 390 F.3d 168, 182 (2d Cir. 2004) (internal quotation marks omitted).

DJA96

Even where probable cause is established, still "those searches deemed necessary should be as limited as possible," as to avoid a "'general warrant,'" i.e., "a general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971) (citations omitted). At the same time, some threshold review may be necessary to identify items of potential relevance because courts recognize "the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'" United States v. Riley, 906 F.2d 841, 845 (2d Cir. 1990).

"To be sufficiently particular under the Fourth Amendment, a warrant must satisfy three requirements." United States v. Ulbricht, 858 F.3d 71, 99 (2d Cir. 2017), overruled on other grounds by Carpenter v. United States, 138 S. Ct. 2206 (2018). It must (i) "identify the specific offense for which the police have established probable cause," (ii) "describe the place to be searched," and (iii) "specify the items to be seized by their relation to designated crimes." Id. (internal citation omitted). "The Fourth Amendment does not require a perfect description of the data to be searched and seized." Id. at 100. Indeed, "[s]earch warrants covering digital data may contain some ambiguity." Id. (internal citation omitted).

In light of these standards, Weigand argues that the Government lacked probable cause because (A) the affidavit did not

22

link his specific devices to the crime, Weigand Mem. in Support of Mot. to Suppress ("Weigand MTS") 9; and (B) any probable cause that might have previously existed had dissipated due to the passage of time between any alleged conspiratorial communications and the seizure, id. at 11.  He also argues that the warrant was (C) overbroad because it permitted a preliminary search of the entire device, id. at 14; and (D) insufficiently particular because it failed to provide meaningful guidelines for what could be seized, id. at 15.  The Court addresses each of these arguments in turn.

### A.   Probable Cause

Under the circumstances of this case, there was probable cause to believe the devices would contain evidence of crime.  The charged crime is conspiracy, so communications with alleged co-conspirators, and evidence regarding such communications, is directly relevant.  The affidavit tends to show that Weigand used encrypted messaging applications and encrypted email to communicate about the alleged conspiracy.  There was, thus, probable cause to believe that evidence of the alleged conspiracy would have existed on electronic devices possessed by Weigand.

Weigand offers no persuasive support for his claim that the Government must show that these very devices were used for conspiratorial communications in order to justify searching them. Weigand, in addition to citing to cases where warrants were

lawfully issued, cites to one case where a warrant was held improper because "two-year-old evidence of participation in a heroin mill, not at the dwelling to be searched, is stale and cannot support a search warrant." United States v. Thomas, 757 F.2d 1359, 1368 (2d Cir. 1985). That case is inapposite because in Thomas, the Court knew that the location to be searched was different from the location of the old heroin mill. Weigand does not allege that the Government knew that Weigand had, for instance, changed phones between the end of the period of the charged conspiracy and his arrest.

Therefore, there was probable cause to search these devices -- at least at some point in time.

## B.   Passage of Time

Weigand correctly points out that there is a further question whether probable cause continued to exist despite the passage of time. The Government's general allegations that files can be stored for a long time and can be recovered even after deletion are insufficient to provide probable cause that evidence would remain on Weigand's devices indefinitely. That said, the affidavit quotes messages on the encrypted messaging application that were less than 2 years old at the time of seizure and avers that there were pertinent encrypted emails and phone calls within one year prior to the time of seizure. Under these circumstances, there was still probable cause to believe evidence would remain.

DJA99

## C.   Preliminary Search of the Entire Device

Weigand argues that "the [w]arrant made no attempt to limit the scope of the search to the locations on the [d]evices for which there was probable cause to believe evidence of the scheme could be found." Weigand MTS 13.  The Government responds that it must be able to conduct a preliminary search of the entire device to determine which folders, files, and data may be responsive to the warrant.  This is analogous to "searches for papers," for which "it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." Andresen v. Maryland, 427 U.S. 463, 482 n.11 (1976).

Here, the magistrate judge reasonably issued a warrant that permitted threshold searches across the entirety of the devices. Weigand objects that such a review is overbroad given the terabytes of at-issue data and the fact that the devices clearly contained legitimate files of a personal nature, such as folders full of family photos and a folder labeled "private." To be sure, the Government must reasonably limit its initial search, taking only those steps reasonably necessary to identify documents responsive to the warrant.  This is what the affidavit requested and what the warrant permitted.  See Aff. ¶¶ 25-27.

Weigand is incorrect to suggest that the review must be limited from the outset to folders that, on their face, might be

linked to crime.  "[F]ew people keep documents of their criminal transactions in a folder marked 'drug records.'"  United States v. Riley, 906 F.2d 841, 845 (2d Cir. 1990).

D.   **Particularity of the Specific Requests**

Finally, Weigand argues that the designated categories of material to be seized are overbroad and insufficiently particular. The Court considers the evidence by category:

- Evidence of the subject offenses and evidence concerning co-conspirators, their relationships and relationships with victims, and transactions between co-conspirators and victims, from 2016-2019.  Warrant, ECF No. 70-2, at 5-6, #2-5.

This evidence goes to the heart of the alleged scheme; its relevance is readily apparent.

- "Evidence concerning the location of other evidence of the Subject Offenses," such as social media accounts, and passwords for those accounts.  Id. #6-7.

Because this evidence would show the location of other evidence, it is relevant.  Of course, the warrant did not authorize the Government to search other locations (e.g., Weigand's social media accounts) or to use passwords that it found.  Rather, if the Government uncovered evidence showing that further evidence of the conspiracy existed in other locations, it would then need to seek another warrant.

- "[E]vidence concerning the identity or location of the owner or user of the Subject Device" and concerning subscriber information for the devices.  Id. #1, 9.

Evidence that Weigand owns and used these devices is of threshold relevance in determining whether other documents on the device could be evidence that he committed a crime.  Subscriber information is relevant to ascertaining identity.  Billing records and location information are also independently relevant, as the affidavit establishes probable cause to believe that Weigand spoke with co-conspirators by phone and met with them in person.

- "[N]on-content transactional information of activity of the Subject Devices, including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations." Id. #8.

Setting aside location information (which is already included in the previous category), this category of data is somewhat broad. At oral argument, the Court inquired as to its relevance.  The Government explained that this data is relevant, especially when viewed in conjunction with other information, to establish that Weigand was the specific individual who used the device at a particular time.  For example, if the method of connection was through Weigand's home internet, then that would help to corroborate the location of the device and Weigand's control over it.  The Court finds this justification sufficient and concludes that this category of data was described with enough particularity.

For these reasons, the warrant was supported by probable cause; probable cause remained despite the passage of time; a limited, preliminary review of the entire device was justified;

**DJA102**

and the specific categories of information to be seized were described with enough particularity. The motion to suppress is, therefore, denied.[11]

### III. MOTIONS TO COMPEL DISCOVERY AND SET PRETRIAL DISCLOSURE DEADLINES

Defendants move to compel production of many categories of materials under Rule 16, move to compel production of a narrow set of materials under Brady, and request that the Court set pretrial disclosure deadlines for exhibits, witness lists, and Jencks Act and Giglio material.

#### A.   Rule 16 Discovery

Defendants first seek to compel discovery under Federal Rule of Criminal Procedure 16.

Under Federal Rule of Criminal Procedure 16(a)(1)(E), the Government generally must provide an item to the defendant "if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Describing which items are "material to preparing a defense," the

---

[11] The Government further argues that courts "accord[] great deference to a magistrate's determination," and that, here, the officers acted in good faith reliance on the warrant. See United States v. Leon, 468 U.S. 897, 914 (1984). Because the Court finds that the warrant was properly issued, the Court need not reach these arguments.

Second Circuit has said that "[e]vidence is material if it could be used to counter the government's case or to bolster a defense," United States v. Ulbricht, 858 F.3d 71, 109 (2d Cir. 2017) (internal citations omitted), or if it would "[e]nable[] the defendant significantly to alter the quantum of proof in his favor," United States v. Maniktala, 934 F.2d 25, 29 (2d Cir. 1991). "The defendant must make a prima facie showing of materiality and must offer more than the conclusory allegation that the requested evidence is material.  The Government should interpret the language of Rule 16 broadly to ensure fairness to the defendant." United States v. Urena, 989 F. Supp. 2d 253, 261 (S.D.N.Y. 2013) (internal citations omitted).

However, Rule 16(a)(2) excludes from the scope of Rule 16(a)(1)(E) "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case," as well as "statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500," also known as the Jencks Act.  Grand jury materials are also excluded from the scope of Rule 16(a)(1)(E), per Rule 16(a)(3).

In their instant motion, defendants cast a wide net, seeking eleven categories of material under Federal Rule of Criminal Procedure 16.  The Court addresses them in turn.

1.   <u>Issuing Bank and Credit Card Company Policies</u>

The defendants argue that marijuana-related policies of issuing banks and credit card companies are "essential" because "without the actual policies, there is no way to drill into questions of, <u>e.g.</u>, notice to the Defendants, reliance by a given bank, or how any of the thousands of transactions even connects to any supposed policy or fraud surrounding same." Akhavan Reply in Support of Def'ts' Mots., ECF No. 83 ("Akhavan Reply"), at 9. However, "the Government represents that it has produced all 'documents and objects' within the meaning of Rule 16(a)(1)(E) in its possession, custody, and control that bear on these issues." Gov't Response in Opp. to Def'ts' Mots., ECF No. 79 ("Opp."), at 32. In addition, it represents that "to the extent that the Government comes into possession of additional documents or objects reflecting Issuing Bank and/or Credit Card Company policies pertaining to marijuana transactions and related information, the Government will produce them," unless the material is not discoverable under Rule 16(a)(2). <u>Id.</u> at 33.

In light of the Government's representations, this request is denied as moot.

2.   <u>Evidence Regarding MCCs</u>

Defendants seek "evidence linking merchant banks, their contracts with the Credit Card Companies and/or issuing banks, their communications with Defendants, the assignment of MCCs to

30

transactions, or those MCCs being the cause of the transactions going through." Akhavan Mem. in Support of Mot. to Compel ("Akhavan MTC") 5. Defendants argue that MCCs are "fundamental to the Government's proof" because they are "the mechanism for the fraud alleged." Id. The Government counters that the defendants' focus on MCCs is misplaced because the creation of the Phony Merchants, and not the false MCCs, was the "primary method" by which defendants perpetrated the alleged fraud. Opp. 33. Therefore, "contracts and rules from banks and/or other entities reflecting the particulars of how those codes are typically assigned and who assigns them are not material." Id. at 34. The Government contends that what matters here is that "Akhavan and others directed others to apply incorrect MCC codes (however generated) to transactions conducted through the Online Marijuana Marketplace Company." Id. at 34.

The Court agrees with defendants. The Government concedes that some "electronic communications on this issue . . . bear on the defendants' intent," and the Government says it intends to prove that "Akhavan and others directed others to apply incorrect MCC codes . . . to transactions." Id. at 34. Therefore, evidence regarding how MCCs are typically assigned, when, and by whom is relevant. Because the Government seeks to demonstrate that MCCs were assigned in an "incorrect," and thus fraudulent, manner, the defense should receive discovery into the baseline for how a

"correct" MCC would be assigned.  And because the government seeks to demonstrate that Akhavan directed others to assign incorrect MCCs, it is relevant who assigns MCCs and how they do so.

The Government is ordered to promptly produce to defendants documents in its possession, custody, or control concerning (1) communications between merchant banks, credit card companies, or issuing banks on the one hand and the defendants on the other hand; (2) how, when, and by whom MCCs are assigned to transactions; and (3) the relation MCCs have, if any, to the approval or rejection of transactions.

### 3.   Transaction Analyses

The defendants claim that the Government must produce analyses linking specific credit card transactions by the Online Marijuana Marketplace Company to specific issuing banks with anti-marijuana policies.  These analyses are necessary, defendants contend, to demonstrate materiality and intent to deceive.

The Government responds that this is an indictment for conspiracy, and no actual victim is needed.  Therefore, the Government need not offer such an analysis and such an analysis is not material.  Nevertheless, "[t]he Government notes that to the extent it generates any transactional analyses that it intends to use in its case-in-chief, it will produce such analyses pursuant to Rule 16 or, if warranted, as an expert disclosure." Opp. 36.

**DJA107**

The Government is correct that it need not offer evidence of particular transactions to prove conspiracy. If it chooses to generate such analyses and intends to use them in its case in chief, then it must produce them, as it has represented that it will. This request is denied.

> 4.   Information   Regarding   the   Proportion   of
>      Transactions Involving Medical Marijuana

The Government told the defendants by letter that the Online Marijuana Marketplace Company represented, through its attorneys, that before January 2018 100% of the transactions at issue were for medical marijuana; by contrast, after January 2018 99% of the transactions were for recreational marijuana. ECF No. 74-1, Ex. A. Defendants argue that the calculation is "fallacious" and is attributable to skimpy record-keeping at dispensaries. Akhavan Reply 8. They move to compel additional information on this point, arguing that it is essential, primarily given their argument under the Rohrabacher-Farr Amendment.

However, as noted above, the Rohrabacher-Farr Amendment is inapplicable. See supra Section I.C. The relative proportions of medical and recreational marijuana might be relevant for other reasons -- e.g., in showing materiality, if issuing banks would be willing to process medical marijuana transactions but not recreational ones. Still, the Government has represented that it has no additional information to support or refute the company's

purported figures, and that it will share additional information if it acquires any.  The request is therefore denied as moot.

    5.   <u>Data Collected During Searches and Seizures</u>

    The Government concedes that it possesses data collected during searches and seizures (specifically, the contents of two cell phones belonging to Akhavan and two cell phones and a laptop belonging to Weigand).  It says that it is conducting forensic analyses and will produce the entirety of the analysis to the device's owner and the responsive documents to both defendants.

    Because all parties agree that each defendant is entitled to all date seized from him, and that each defendant is entitled to responsive data seized from the other defendant, this request is granted.  If the Government has not already done so, it must share the entire contents of each seized device with the device's owner by no later than 5:00 pm on September 2, 2020.  The Government must share responsive documents with both defendants by no later than 5:00 pm on September 14, 2020.

    6.   <u>Documents Produced by Third Parties</u>

    Defendants speculate that, because of the "extensive lists of unindicted co-conspirators and potentially allegedly victimized banks" recently disclosed, the Government may have additional relevant material in its possession that was produced by third parties.  Akhavan MTC 17; <u>see also</u> Weigand Mem. in Support of Mot. to Compel ("Weigand MTC") 7.  Defendants also point to the

34

**DJA109**

Government's June 22, 2020 letter, which disclosed exculpatory information shared with the Government by attorneys for the Online Marijuana Marketplace Company.  ECF No. 74-1.

The Government responds simply that "[t]he Government has produced documents gathered from third parties consistent with the obligations imposed by Rule 16," Opp. 38-39, and that defendants' speculation that the Government possesses other such material discoverable under Rule 16 is unfounded.  Because the Government represents that it has produced all Rule 16-responsive documents in this category, and defendants have offered no persuasive reason to doubt this representation, this request is denied as moot.

> 7.   Taint Protocols

As noted above, the Government seized evidence from the defendants.  That evidence contains potentially privileged material, so defendants request that the Court order the Government to produce the protocols it has applied to ensure that the prosecution team is not exposed to privileged material.  Akhavan MTC 17; see also Weigand MTC 8.

The defendants cite no authority for this request.[12]  The Government notes that the "prosecution team is attuned to avoiding exposure to privileged information" and represents that the

---

[12] The Government cites one district court case in Texas denying a similar request, United States v. Sledziejowski, 2018 WL 2288962 *9 (N.D. Tex. May 18, 2018), on the basis that there was no authority to support such a request.

Government "will take action to ensure that the prosecution team is screened from reviewing privileged communications that may be contained on [Weigand's] devices," now that Weigand has provided a list of attorneys.  Opp. 39-40.  The Government also requested that Akhavan provide a list of his attorneys, but he had not yet done so when the Government filed its Opposition.  Id. at 40 n.19.

Under these circumstances, a "taint protocol" is not "material to preparing the defense" and so does not fall within the scope of Rule 16(a)(1)(E).  Accordingly, this request is denied.  Further, to facilitate the application of a proper privilege screen by the Government, Akhavan, if he has not yet done so, must produce to the Government by no later than 5:00 pm on September 2, 2020, a list of attorneys with whom he may have engaged in attorney-client privileged communications.

8.   Grand Jury Materials

Defendants contend that "the Indictment is subject to dismissal for lack of specificity," so "the grand jury testimony should be disclosed."  Akhavan MTC 18.

In order to pierce the veil of secrecy provided by Federal Rule of Criminal Procedure 6(e), a defendant must demonstrate a "particularized need" for disclosure.  United States v. Procter & Gamble Co., 356 U.S. 677, 683 (1958).  Usually, this means "specific allegations of government misconduct."  United States v. Torres, 901 F.2d 205, 233 (2d Cir. 1990), abrogated on other

36

grounds as recognized by <u>United States v. Marcus</u>, 628 F.3d 36, 41
(2d Cir. 2010).  Defendants do not come close to meeting the high
burden for overcoming grand jury secrecy, and so the request is
denied.

        9.    <u>Memoranda   Regarding   Witnesses'   Statements   or
Interviews</u>

Defendants request memoranda regarding interviews or meetings
in this matter to aid in the preparation of their defense.  Akhavan
MTC 21; <u>see also</u> Weigand MTC 10.  Defendants invoke Rule 16 but do
not otherwise provide any authority for this request, which the
Government calls an "end-run around the Jencks Act."  Opp. 36-37.
The  Government  cites  circuit  precedent  that  production  of
non-exculpatory Jencks Act statements cannot be ordered prior to
witness testimony, <u>United States v. Coppa</u>, 267 F.3d 132, 145 (2d
Cir. 2001), and that the Jencks Act "is the exclusive vehicle for
disclosure of statements made by government witnesses," <u>United
States v. Percevault</u>, 490 F.2d 126, 131 (2d Cir. 1974).  The
Government represents that it will produce the requested documents
as needed to satisfy its obligations under <u>Brady</u>, <u>Giglio</u>, and the
Jencks Act.  Opp. 37.

The  Court  addresses  <u>Giglio</u>  and  Jencks  Act  materials
separately below, but insofar as defendants seek this material
under Rule 16, the Government is correct that the request is barred

both by Rule 16(a)(2) and by the Jencks Act.  This request is therefore denied.

### 10.  Defendants' and Co-Conspirators' Statements

Defendants seek their statements, and the statements of alleged co-conspirators, under Rule 16(a)(1)(A)-(C) & (E).  The Government responds that it has provided each defendant with his own statements in accordance with Rule 16(a)(1)(A) & (B).  To that extent, therefore, this request is denied as moot.

Insofar as defendants seek each other's statements and other co-conspirators' statements, they invoke Rule 16(a)(1)(C) & (E). Rule 16(a)(1)(C) on its face applies only to "organizational defendants," and not to defendants who were merely part of organizations; thus, it does not apply here.  Rule 16(a)(1)(E), as described above, imposes a broad set of disclosure obligations on the Government.  Defendants offer no specific rationale for the request for co-conspirators' statements under Rule 16(a)(1)(E), and the Government offers no response.  Therefore, the request is denied without prejudice.

### 11.  Criminal History Records

Defendants request criminal history records under Rule 16(d). The Government represents that it has produced any such record "that it knows exists within its possession, custody, and control." Opp. 41.  Therefore, this request is denied as moot.

**B.   Brady Material**

Defendants next seek materials, and a representation that the Government will comply with its obligations, under Brady v. Maryland, 373 U.S. 83, 87 (1963).

Under Brady and its progeny, the Government has a constitutional duty "to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001) (quoting Brady v. Maryland, 373 U.S. 83, 87 (1963)). Favorable evidence can be exculpatory or impeaching. Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see United States v. Mahaffy, 693 F.3d 113, 131 (2d Cir. 2012) ("Aside from exculpatory material, Brady applies to material that would be an effective tool in disciplining witnesses during cross-examination.") (quotations marks and citation omitted). Evidence becomes material if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Youngblood v. West Virginia, 547 U.S. 867, 870 (2006) (quotation marks omitted).

"Unlike Rule 16 and the Jencks Act . . . Brady is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation . . . ." United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1991) (internal quotation marks omitted). Accordingly, the purpose of Brady "is not to provide the defendant with complete

disclosure of all evidence in the government's file which might conceivably assist him in the preparation of his defense, but to assure that he will not be denied access to exculpatory information known to the government but unknown to him." United States v. Ruggiero, 472 F.2d 599 (2d Cir. 1973).

In light of these standards, the Government sent a letter on June 22, 2020, ECF No. 74-1, which disclosed to defendants that the attorneys for the Online Marijuana Marketplace Company made several representations to the Government. One of those representations was that those attorneys learned from employee interviews that Akhavan purportedly said during a March 2018 meeting, inter alia, that he does not "miscode," that he would use the closest MCC code for what is being processed, and that to that end he considered using a medical-related MCC code for marijuana transactions. Id. Defendants argue that this was important and potentially exculpatory information and that the Government provided only a terse summary. Weigand MTC 9-10.

The Government appears to believe that Brady might not have required this disclosure, claiming that the Government sent the June 22, 2020 letter "out of an abundance of caution." Opp. 43 n.20. The Government did not otherwise respond to defendants' arguments that, under Brady, it must produce more detailed information regarding the Online Marijuana Marketplace Company's attorney proffer, nor did the Government represent that it does

not have such information.  This Court's Individual Rules require disclosure of Brady materials within two weeks of the indictment being filed or, for Brady material that becomes known to the Government following filing of the indictment, "within two weeks of when it becomes known and, in any event, no later than four weeks prior to any trial or guilty plea."  Hon. Jed S. Rakoff, Individual Rules of Practice, R. 13.  Therefore, the deadline to disclose additional Brady materials received from the Online Marijuana Marketplace Company's attorney proffer, if the Government has additional such materials, has long since passed.

The Government does argue, generally, that it has acknowledged its Brady obligations and its intent to abide by them. Opp. 43.  It claims that, "[b]ecause the defendants have made no particularized showing that materials exist requiring disclosure, the Government need do no more than acknowledge its obligations." Id. at 44.  The Government cites cases in which a court denied specific discovery requests under Brady in light of an apparent good-faith representation from the Government that it recognized and intended to comply with its Brady obligations.

If the Government had represented that it recognized its Brady obligations with respect to information regarding the March 2018 meeting, has complied with them, and has no further exculpatory information on the topic, then the Court would take no action. But it has not done so.  Instead, the Government's brief seems to

imply that the Government believes it had discretion regarding whether to share the information it received from the Online Marijuana Marketplace Company attorneys regarding the March 2018 meeting. If so, the Government misapprehends its <u>Brady</u> obligations. The statements attributed to Akhavan during the March 2018 meeting, as described in the June 22, 2020 letter, speak directly to significant components of the Government's theory of the case and are potentially exculpatory.

Therefore, the Court orders that, to the extent the Government has additional details regarding that meeting -- including, without limitation, the meetings' attendees -- the Government must immediately produce that information in accordance with its <u>Brady</u> obligations.

## C.   **Pretrial Disclosure Schedule**

Finally, defendants request a pretrial disclosure schedule. (The trial of this case is currently set for December 1, 2020.) The Court sets the following schedule:

- <u>Giglio</u> material: the Government must comply with the Court's Individual Rules, which will be strictly enforced (i.e., <u>Giglio</u> material (with certain specified exceptions) must be disclosed four weeks prior to trial).

- Exhibits and witness lists: exhibits and witness lists must be disclosed four weeks prior to trial, with subsequent changes permitted for good cause.

DJA117

- Jencks Act material: all parties agree that the Court lacks power to compel pretrial production of Jencks Act material. That said, the Government has an obligation to disclose Jencks Act material to defendants sufficiently early to permit them to adequately prepare a defense. As noted at oral argument, the Court would be pleased if the Government produces this material four weeks in advance of trial, which the Court strongly believes would be in the interests of justice in this case. The Court directs the Government to file a notice on the docket by no later than 5:00 pm on September 4, 2020 stating by when it will disclose Jencks Act material.

The Court determines that the foregoing schedule offers adequate time for defendants to prepare a defense. Insofar as defendants' motion requests earlier disclosures, it is denied.

\*      \*      \*

For the foregoing reasons, defendants' motions to dismiss are denied and Weigand's motion to suppress is denied. Defendants' motion to compel and to set pretrial disclosure deadlines is denied, except as follows:

- The Government is ordered to promptly produce to defendants documents concerning (1) communications between merchant banks, credit card companies, or issuing banks on the one hand and the defendants on the

43

**DJA118**

other hand; (2) how, when, and by whom MCCs are assigned to transactions; and (3) the relation MCCs have, if any, to the approval or rejection of transactions.

- For devices seized from defendants, if the Government has not already done so, it must share the entire contents of each device with the device's owner by no later than 5:00 pm on September 2, 2020. The Government must share responsive documents with both defendants by no later than 5:00 pm on September 14, 2020.

- If he has not yet done so, Akhavan must produce to the Government a list of attorneys with whom he may have engaged in attorney-client privileged communications during the relevant period by no later than 5:00 pm on September 2, 2020.

- The Court orders that, to the extent the Government has additional details regarding the March 2018 meeting described in the Government's June 22, 2020 letter -- including, without limitation, the meetings' attendees -- the Government must immediately produce that information in accordance with its Brady obligations.

- Giglio materials must be produced as specified in the Court's Individual Rules.

DJA119

- Exhibits and witness lists must be produced four weeks prior to trial, subject to change for good cause.

- The Government must file a notice on the docket by no later than 5:00 pm on September 4, 2020 stating by when it will disclose Jencks Act material.

SO ORDERED.

Dated:   New York, NY
         August 31, 2020          JED S. RAKOFF, U.S.D.J.

DJA119.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

HAMID AKHAVAN,
     a/k/a "Ray Akhavan,"

and

RUBEN WEIGAND,

     Defendants.

**S3 20 Cr. 188 (JSR)**

**Government's Motion *in Limine* To Preclude Defendants' Experts**

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Nicholas Folly,
Tara M. La Morte,
Emily Deininger,
Assistant United States Attorneys
    *Of Counsel*

DJA119.2

**TABLE OF CONTENTS**

**Background** ............................................................................................................... **1**

**I. Defendant Akhavan's Expert Disclosures** ...................................................... **1**

**II. Defendant Weigand's Expert Disclosures** .................................................... **5**

**Argument** .................................................................................................................... **7**

**I. Law Governing Admissibility of Expert Testimony** ..................................... **7**

**II. The Court Should Preclude Defendants From Offering "Expert" Testimony on Matters the Jury Is Capable of Understanding Through Lay Witnesses** ........................................... **10**

**III. The Court Should Preclude Expert Testimony on Irrelevant Matters** ........................... **14**

**IV. The Court Should Preclude Certain Expert Testimony as Unreliable** ........................... **22**

**V. The Court Should Preclude Weigand's Expert From Offering Testimony That Invades the Jury's Function** ................................................................................... **26**

**VI. The Court Should Preclude Akhavan's Expert, John Vardaman, From Testifying About His Prospective Employment With the DOJ Frauds Section as well as From Revealing Privileged Government Information** ........................................................................... **27**

**Conclusion** ............................................................................................................... **29**

i

## TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. Romano Enterprises*, 303 F.3d 256 (2d Cir. 2002) ................................. 9
*Andrews v. Metro North Commuter R. Co.*, 882 F.2d 705 (2d Cir. 1989)...................... 8
*Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346 (S.D.N.Y. 2003) ........................ 23
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ........................ 14
*General Electric Company v. Joiner*, 522 U.S. 136 (1997)..................................... 9, 25
*Grand Cent. P'ship v. Cuomo*, 166 F.3d 473 (2d Cir. 1999)..................................... 28
*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) ........................................................ 9
*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .............................................. 9
*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2004)...................................... 10
*LaSalle Bank Nat. Ass'n v. CIBC Inc.*, 08 Civ. 8426 (WHP), 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) ........................................................................................................ 9
*SEC v. Lipson*, 46 F. Supp. 2d 758 (N.D. Ill. 1998) ............................................... 23
*United States v. Alameh*, 341 F.3d 167 (2d Cir. 2003) .......................................... 21
*United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994) .............................................. 8
*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)...................................... 10
*United States v. Castillo*, 924 F.2d 1227 (2d Cir. 1991) ........................................... 8
*United States v. Collins*, 581 Fed. Appx. 59 (2d Cir. 2014) .................................... 13
*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994)............................................ 7, 27
*United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005) ............................................. 8
*United States v. Gatto*, --F.3d--, 2021 WL 137250 (2d Cir. Jan. 15, 2021) ............... 16
*United States v. Jacques Dessange, Inc.*, No. 99 Cr. 1182 (DLC), 2000 WL 294849 (S.D.N.Y. Mar. 21, 2000) .................................................................................. 26
*United States v. Lesniewski*, No. 11 Cr. 1091 (VM), 2013 WL 3776235 (S.D.N.Y. July 12, 2013) ................................................................................................................ 26
*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999) .......................................... 9
*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008)............................................... 8
*United States v. Mendlowitz*, No. 17 Cr. 248 (VSB) ............................................... 13
*United States v. Newkirk*, No. 14-CR-534-02 (JSR), 2016 WL 1659149 (S.D.N.Y. Apr. 19, 2016) ................................................................................................................ 17
*United States v. Newkirk*, No. 14 Cr. 534 (JSR), 2016 WL 1659149 (S.D.N.Y. Apr. 19, 2016), *aff'd*, 683 Fed. Appx. 95 (2d Cir. 2017) ........................................................... 12, 13
*United States v. Sanchez*, 517 F.3d 651 (2d Cir. 2008) .......................................... 21
*United States v. Sanders*, No. 12 Cr. 574 (LAK), 2013 WL 1421487 (S.D.N.Y. Mar. 27, 2013) 17

**Other Authorities**

Charles A. Wright & Victor J. Gold, Federal Practice and Procedure: Evidence § 6253 (1997)... 8

ii

**Rules**

Fed. R. Evid. 602 ........................................................................................................................ 8

Fed. R. Evid. 702 ............................................................................................................. 7, 22, 27

iii

The Government submits this motion *in limine* to preclude the defendants' experts from testifying because they offer opinions that do not require specialized knowledge, that are not relevant, that are not reliable, and that would usurp the jury's function.

### Background

### I.  Defendant Akhavan's Expert Disclosures

By letter dated November 3, 2020, Akhavan notified the Government that he intends to call three expert witnesses: (1) Jeff Rankin; (2) Monica MacGregor; and (3) John Vardaman. Akhavan's letter described the qualifications of these witnesses, summarized the testimony they are expected to offer, and provided a brief description of the bases for their opinions.  *See* Exhibit A.  Akhavan's letter also included the curriculum vitae for each of the witnesses.  *See id.*

<u>*Jeff Rankin*</u>.  According to Akhavan's disclosures, from 2007 through June 2020, Rankin served as a business executive at U.S. Bank, focusing on commercial cards for large market and public sector clients; prior to that, he worked at Visa Inc. and Bank of America.  Akhavan proposes that Rankin testify, in sum and substance, to the following:

1.  The "roles, processes, and responsibilities of each of the players that make up the payment network," *i.e.*, the "merchant, the independent sales organization ("ISO"), payment services providers ("PSP"), the merchant/acquiring bank, the credit card network, and the issuing bank," as well as the "privity, and lack of privity, between each player.";

2.  "Visa and MasterCard rules and regulations and how to apply them with respect to the subject areas below," which apparently include the onboarding of cannabis merchants, acquiring banks' onboarding of merchants; the selection and availability of MCCs, and various (and undefined e-commerce customs and practices;

3.  The "evolution of the Visa and MasterCard rules, customs and practices as they relate to cannabis;"

1

4. The "roles, rules, customs and practices related to e-commerce, payment gateways, processors, debit cards, and credit cards";

5. The "various risk levels of consumer transactions and the indemnity, remedy, and risk allocation processes built into the credit card networks that favor issuing banks";

6. The "role and responsibilities of acquiring banks, and rules" they must follow in onboarding clients, and "the KYC process, including the merchant application process";

7. The "process of how an MCC is selected and by whom," specifically that the acquiring banks have the "sole responsibility and discretion" in selecting an MCC;

8. The "purpose, history, and evolution of MCCs," including that there was no "product level" MCC for cannabis during the relevant period, and "when there is no specific product-level MCC that applies," the acquiring bank has the discretion to select an MCC that fits, and that "MCCs are not made to identify products but general categories";

9. "[W]ithin the Visa/MasterCard network, a merchant bank has discretion to onboard a cannabis client"; and

10. The "lack of specificity of rules and practices regarding what content should appear on a merchant website and what information must be included in a merchant name" and that such information "is not for the benefit of the issuing banks" but rather to "reduce cardholder confusion" so as to minimize disputes and chargebacks.

Exhibit A at 1-3.

_Monica MacGregor_.    According to Akhavan's disclosure, MacGregor is currently a Managing Director in BRG's Global Investigations and Strategic Intelligence practice, and describes herself as an expert in "evaluating, designing, implementing and remediating" AML, sanctions, and anti-corruption compliance programs.    From 2015 to 2017 she served as a BSA

2

Officer at Oriental Bank, based in Puerto Rico, and prior to that worked in a number of consulting roles. Akhavan proposes that MacGregor testify, in sum and substance, to the following:

1. The "role and responsibility of issuing banks when it comes to cannabis transactions," including that the banks "take on the risk that their account holders may purchase cannabis";

2. That "issuing bank policies regarding transaction monitoring for cannabis purchases are to a large extent policies in paper, not actionable in practice" because "there is no specific transactional typology to easily identify cannabis transactions";

3. That there is a "lack of consumer notice by the issuing banks regarding use of their branded cards to purchase cannabis as compared to other comparable goods and services";

4. The limited information provided to issuing banks "through the Visa and MasterCard networks" and "the related responsibilities of the issuing and acquiring banks," including the data that issuing banks look to "as a matter of custom and practice" in determining whether to approve or reject transactions, and that "algorithms based on MCCs are not sufficient" to detect cannabis transactions;

5. That during the relevant period "there was no specific MCC code for cannabis"; and

6. "Due to the lack of sufficient information provided by the credit card companies, other investigative methods and due diligence procedures would be required to reliably detect cannabis transactions"

Exhibit A at 3-5.

_John Vardaman_. According to Akhavan's disclosure, Vardaman is an expert on "banking compliance, anti-money laundering ("AML")/bank secrecy act ("BSA") laws, and other financial crimes." He currently serves on the advisory board of a company and provides legal advice concerning payment services in high-risk industries, and previously served as Chief Compliance Officer for a regulatory technology company that "works with state-legal compliance companies

3

and financial institutions to ensure compliance with relevant laws and regulations." He has prior Government service, including serving as the Assistant Deputy Chief for Policy in DOJ's then-Asset Forfeiture and Money Laundering Section, where he purportedly "drafted the DOJ policy for cannabis banking, known as the Cole Memorandum," and "worked closely" with FinCEN "to draft the simultaneously issued FinCEN Guidance on BSA Expectations Regarding Marijuana Related Businesses."

Akhavan proposes that Vardman testify, in sum and substance, to the following:

1. "[A]bout" the issuance of the Cole Memorandum, "which laid out eight priorities for federal prosecutors in enforcing offenses related to cannabis," and issuance of the FinCEN guidance, "which clarifies how financial institutions can provide services to" Marijuana Related Businesses ("MRB");

2. Since issuance of the FinCEN guidance, it is "well known that numerous financial institutions are actively servicing" the marijuana industry, based on certain FinCEN issued reports and statistics, and that the guidance "has to be considered a qualified success" in allowing the cannabis industry to access the banking system and addressing the Cole Memorandum's policy goals;

3. That the 2018 recission of the Cole Memorandum "had no practical effect on DOJ enforcement practices with respect to cannabis banking," and that the memo "remains the de facto guidepost for federal prosecutors";

4. That the "federal government permits issuing and acquiring banks to enter the cannabis space," that the industry "is operating under the color of state law with the acquiescence of the federal government," and as a result, issuing banks "can permissively service an industry that remains illegal under federal law";

5. The lack of enforcement actions taken against banks since the issuance of the FinCEN guidance means that banks "can and do rely on the federal government's hands-off policies with respect to cannabis banking"' and

6. That "the government is on record saying banking MRBs is a permissible activity."

Exhibit A at 6-7.

4

## II.  Defendant Weigand's Expert Disclosures

By letter dated November 3, 2020, Weigand notified the Government that he intends to call Stephen Mott as an expert witness, and by letter dated December 21, 2020, notified the Government that he intends to call Donald Vilfer as an expert witness.  *See* Exhibits B, C. Weigand's letters described the qualifications of these witnesses, summarized the testimony they are expected to offer, and provided a brief description of the bases for their opinions.  *See* Exhibits B, C.  Weigand also provided the curriculum vitae for each of the witnesses.  *See id.*

*Stephen Mott*.  According to Weigand's disclosure, since 1998 Mott has served as the president of a consulting company for electronic payments transaction businesses.  He was a senior executive at MasterCard between 1995 and 1998, where he states that he created a new electronic security protocol to help member banks use the internet safely as a delivery channel for financial products.

Weigand proposes that Mott testify, in sum and substance, to the following:

1. The "mechanics of credit and debit card transactions," including the "roles of the various participants in those transactions," "especially merchants, merchant acquiring banks, independent sales organizations ("ISOs"), payment service providers ("PSPs"), payment networks, issuing banks, payment gateways, third-party risk management specialists, and cardholders";

2. The "concerns and operating parameters of issuing banks" including their "consideration of customer creditworthiness and "the factors that are material or immaterial to them when determining whether to approve or decline credit and debit transactions";

3. "Steps that issuing banks may take in order to detect and root out fraud and other suspicious activity";

4. Information about "non-secure e-commerce transactions" including interchange fees paid to issuing banks versus chargeback liability, "among other topics" relating to such transactions;

5

5.   "Standards and protocols employed by Visa and MasterCard when determining membership in the United States and abroad";

6.   "Visa and MasterCard's approach to international transactions"; and

7.   The ways by which Visa and MasterCard "oversee and manage the integrity of the global payments system," including "the jurisdictional constraints imposed on non-U.S. acquiring banks by Visa and MasterCard."

Exhibit B.

_Donald Vilfer_.   According to Weigand's disclosure, since 2002 Vilfer, a former FBI Supervisory Special Agent, has provided electronic device forensic analysis services through his company, Digital Evidence Ventures.   Weigand proposes that Vilfer testify to the following topics:

• The "files located on" forensic copies of the three electronic devices seized by the Government from Weigand on the day of his arrest, including the "timing and manner of their creation, modification, and use"; and

• Weigand's "use of those devices during the period relevant to the Indictment."

Exhibit C at 3.   However, in describing the bases for Vilfer's testimony, Weigand relayed that Vilfer's testimony would be based on (as relevant here), "[a] USB drive that appears to be the source of [certain] materials" described in the Government's preliminary exhibit list, "and which may be the source of other materials the Government located on Mr. Weigand's laptop."   Exhibit C at 2. Weigand subsequently produced a copy of this drive (the "Weigand USB Drive") to the Government.

Following these disclosures, the Government and Weigand's counsel engaged in several communications regarding the scope of Vilfer's proposed testimony, including specific discussion of what opinions, if any, Vilfer intended to offer based on the Weigand USB Drive.   In an email

dated January 19, 2021, Weigand's counsel relayed that, like the Government's FBI/Investigative analyst, who would testify as to forensic searches and analyses of electronic devices that were seized from the defendant, Vilfer is likewise "not an 'expert witness' for whom additional disclosures are required under the Federal Rules, beyond those provided to the Government." *See* Exhibit D.  Counsel affirmed this to the Government on a phone call that took place on February 12, 2021.

As to the Weigand USB drive, counsel merely noted that "[n]otwithstanding our position on Mr. Vilfer's status as an 'expert witness'" under the rules, he "may rely on the USB drive mentioned in our supplemental disclosure to provide testimony on the source of certain materials located on Mr. Weigand's laptop." *Id.*   To date, Weigand's counsel has not committed as to whether or not they would seek to introduce the drive, and what opinions, expert or otherwise, they may offer based upon it.

## Argument
### I.  Law Governing Admissibility of Expert Testimony

Rule 702 of the Federal Rules of Evidence provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert witness may give testimony about that knowledge, in the form of an opinion or otherwise.  Fed. R. Evid. 702.  While expert witnesses are often uniquely situated to explain a "complicated morass of obscure terms and concepts" to the jury, *see United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994), expert testimony is properly excludable where "persons of common understanding are [ ] capable of comprehending the primary facts and drawing correct conclusions

7

from them" *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (internal quotation marks and citations omitted).

A fact witness may testify as to matters about which the witness has personal knowledge, so long as the testimony is otherwise admissible. Fed. R. Evid. 602. Fact testimony, even when offered by a person with specialized knowledge, is admissible if it is relevant, within the personal knowledge of the witness, and helpful, as opposed to testimony that is not probative and merely a waste of time. *See* 29 Charles A. Wright & Victor J. Gold, Federal Practice and Procedure: Evidence § 6253, at 117 (1997); *United States v. Mejia*, 545 F.3d 179, 196 (2d Cir. 2008) (district court erred in allowing expert testimony "about matters that required no specialized knowledge"); *Andrews v. Metro North Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) (vacating jury verdict where district court allowed expert to testify "about matters that were neither scientific nor in any way beyond the jury's ken"). An expert's opinions are inadmissible if they do not result "from a process of reasoning which can be mastered only by specialists in the field." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) (citation and internal quotation marks omitted); *see also United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (the district court should not admit testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help").

Relatedly, trial courts should not admit "expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994); *see also LaSalle Bank Nat. Ass'n v. CIBC Inc.*, 08 Civ. 8426 (WHP), 2012 WL

8

DJA119.13

466785 (S.D.N.Y. Feb. 14, 2012) ("[A]n expert witness may not offer testimony which merely rehashes the testimony of percipient witnesses.").

Of course, expert testimony, like all evidence, is subject to Rule 401, and thus experts cannot testify as to matters that are irrelevant to the case. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702 [02], p. 702-181988.

Applying Rule 702, the Court must determine whether the expert's reasoning and methodology underlying his testimony is valid, and whether that reasoning or methodology was applied reliably to the facts. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Amorgianos v. Romano Enterprises*, 303 F.3d 256, 267 (2d Cir. 2002). As the Supreme Court instructed in *General Electric Company v. Joiner*, 522 U.S. 136 (1997), "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." 522 U.S. at 146.

In addition, as relevant here, a district court must exclude expert testimony that will "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (expert testimony that "expresses a legal conclusion" precluded). "Even if a jury were not misled into adopting a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury." *Id.* at 364. Thus, while an

9

expert "may opine on an issue of fact within the jury's province," the expert may not "give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

Finally, the Court must apply Rule 403 before admitting expert testimony.  Applying this rule in the expert context, courts have recognized that the risk of undue prejudice and confusion is particularly high when experts are permitted to testify as to matters with little probative value.  *See Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2004) ("[T]he Supreme Court, echoed by members of our own court, has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations."); *see also Daubert*, 509  U.S. at 595 (courts should "exercise[s] more control over experts than over lay witnesses" in conducting Rule 403 analysis).

## II.  The Court Should Preclude Defendants From Offering "Expert" Testimony on Matters the Jury Is Capable of Understanding Through Lay Witnesses

Defendants's proffered "experts" seek to testify to an array of facts that are within the ken of the average juror's understanding, including based on the anticipated testimony of lay witnesses with personal knowledge of the relevant facts.  Specifically, and as described above, the defendants propose to have their respective experts testify regarding the following topics:

- The roles, processes, and responsibilities of the various players that comprise the credit/debit payment processing network (*see* Rankin Topics 1, 6; Mott Topic 1);[1]

---

[1] The numbering of these topics corresponds to the Government's lists contained in the background section of this memorandum.

10

- Rules, regulations, and protocols employed by Visa and MasterCard regarding cannabis, merchant onboarding, MCCs, information transmitted to issuing banks via the card networks; membership, international transactions, jurisdictional constraints on non-U.S. acquiring banks, and content of merchant websites and names (*see* Rankin Topics 2, 3, 7, 9, 10; MacGregor Topic 4; Mott Topics 5, 6, 7);

- Information surrounding MCCs, including the MCCs that are available and how they are selected for merchants (Rankin Topics 7, 8; MacGregor Topic 5);

- Various (and undefined) e-commerce "roles, rules, customs, and practices" (Rankin Topic 4; *see* Mott Topic 4);

- The ways in which Visa and MasterCard "oversee and manage the integrity of the global payments system" (*see* Mott Topic 7).

The Government's percipient witnesses will address these concepts. As reflected in the Government's witness list served upon the defendants, witnesses from several of the victim issuing banks, Visa, and MasterCard, as well as other witnesses, including two co-conspirators, will testify in this trial.[2] These witnesses will discuss the players, terms and processes of the credit and debit payment system and put them in context. Such testimony will cover pertinent Visa and MasterCard rules, regulations and policies, merchant onboarding, and policing of those policies. The jurors

---

[2] By letter dated November 3, 2020, the Government, provided the defense with a non-exhaustive list of topics it anticipates certain of these witnesses would address, and specifically stated that it "does not believe such notification is warranted because the expected testimony of the witnesses . . . would not constitute expert testimony" under the Rules, but was providing notice in an "abundance of caution."

11

will not and do not need an expert to explain or define these concepts.  Indeed, multiple aspects of

these concepts are reflected in numerous conversations between the defendants, co-conspirators,

and others.  There is nothing technical or confusing about the language they use, and there is no

more of a need for an "expert" to explain how the payments system works than there is for an

"expert" to "interpret" the co-conspirators' testimony and statements.[3]

The defendants' proposed experts present concerns similar to those that resulted in the

preclusion of expert testimony in other recent cases.  For example, in *United States v. Newkirk*,

No. 14 Cr. 534 (JSR), 2016 WL 1659149 (S.D.N.Y. Apr. 19, 2016), *aff'd*, 683 Fed. Appx. 95 (2d

Cir. 2017) (summary order), the defendant sought to provide expert testimony to explain "the

mechanics of mergers and acquisitions, the role of transactional attorneys, and the meaning of

terms like 'restricted stock,' 'pledge agreement,' and 'priority of security interest.'"  *Id.* at *2.  This

Court excluded the testimony, explaining that the expert has nothing "to contribute to a reasonable

juror that can't be obtained from the fact witnesses. . . .   There are some terms that may not be

familiar to the jury, but then they get explained by the fact witnesses in everyday language and

indeed there doesn't seem to be much dispute about their meaning."  *Id.*  In affirming this Court's

ruling, the Second Circuit explained that the district court "acted well within its discretion in

concluding that other witnesses with financial backgrounds were competent to explain the

transactions and related terminology presented by the case."  *Newkirk*, 683 Fed. Appx. 95, 96-97

---

[3] Tellingly, the defendants' respective witness list include witnesses from MasterCard, Visa, Wells Fargo, Bank of America, Citibank (all of which are on the Government's witness list, albeit in most cases by name), as well as other bank witnesses.

(2d Cir. 2017) (citing *United States v. Nouri*, 711 F.3d 129, 145 (2d Cir. 2013) (upholding preclusion of expert testimony on customary commissions by brokerage firms where cumulative of other evidence at trial); *United States v. Collins*, 581 Fed. Appx. 59, 60 (2d Cir. 2014) (summary order) (upholding exclusion of testimony by two lawyers on materiality of corporate agreement, and "the work of transactional lawyers" generally, where "fact witnesses proved sufficient" to explain defense to jury)).

Indeed, Judge Broderick excluded expert testimony on some of these precise topics in *United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019). In that decision, the Court affirmed its prior order excluding the defendant's proposed expert testimony concerning general industry practices in the payment processing industry, ruling, as relevant here, that expert testimony was not needed for the jury to understand concepts surrounding the usage of credit cards, including fees, methods used by credit card processors with merchant customers, and the various players involved in credit card processing, including customers, merchants, merchant banks, issuing banks, payment processors, and the card networks. *Id.* at *5-*6. The Court observed, as a secondary matter, that the Government had put on percipient witnesses who addressed these topics, explaining that "[b]ecause many of these witnesses had prior experience working for credit card processors or had knowledge generally about the industry because of their work history, there was no need for expert testimony related to industry practice." *Id.* at *7. Accordingly, "even if such testimony were appropriately the subject for expert testimony," the defendant's expert's testimony would have been duplicative. *Id.*

So it is here.  Testimony surrounding the workings of the payment industry are not properly the subject of expert testimony and should be excluded as such.

### III.   The Court Should Preclude Expert Testimony on Irrelevant Matters

As noted above, Rules 401 and 403 of the Federal Rules of Evidence apply equally to expert testimony as to lay testimony.  As the Supreme Court observed, "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993).

Beyond not being properly the subject of expert testimony, for the reasons explained below, a substantial portion of the proposed testimony is irrelevant to resolution of the issues presented in this case, and should be excluded.  Especially considering the lack of probative value, admission of this evidence will serve to unnecessarily cloud and confuse the issues before the jury.

### A.   Testimony Offered By Rankin, MacGregor, and Mott

*Victim Bank Diligence and Effective Enforcement of Marijuana Prohibition Policies.*  As noted in Government motion *in limine* III, the defendants seek to offer expert opinions regarding the ability of issuing banks to effectively enforce policies prohibiting them from conducting business involving illegal credit and debit marijuana transactions, as well as the nature of diligence that they would need to undertake to effectively enforce those policies.  Specifically, as set forth above, MacGregor intends to opine that "issuing bank policies regarding transaction monitoring for cannabis purchases are to a large extent policies in paper, not actionable in practice" (MacGregor Topic 2), that "due to lack of sufficient information provided by the credit

14

card companies, other . . . due diligence procedures would be required to reliably detect cannabis transactions" (MacGregor Topic 6), that "algorithms based on MCCs are not sufficient" to detect marijuana transactions (MacGregor Topic 4), and that issuing banks "take on the risk" that their cardholders will use their cards to purchase marijuana products (MacGregor Topic 1; *see also* MacGregor Topic 3).  Rankin seeks to opine regarding "the risk allocation processes built into the credit card networks that favor issuing banks" (Rankin Topic 5),[4] and Mott intends to provide expert testimony regarding "steps issuing banks may take . . . to detect . . . fraud and other suspicious activity." (Mott Topic 3).

As discussed fully in motion *in limine* III, the binding precedent in this Circuit is clear: none of this is relevant.  Accordingly, these expert opinions should be precluded.  That it may be difficult for issuing banks to "reliably detect" the defendants' fraud has no relevance to whether or not the defendants concocted a scheme to commit bank fraud.

Equally irrelevant, prejudicial, and misleading are the defendants' experts' opinions concerning what level of due diligence issuing banks would have to undertake in order to effectively detect illegal and miscoded marijuana transactions. Such opinions are plainly calculated to invite the jury to make a negative assessment of the victim banks' diligence measures as compared with the expert's opinion of what those measures should or could be. This is, again, an attempt to cast victim banks as negligent or insufficiently diligent in rooting out the defendants' fraud.  For all the reasons set forth in motion *in limine* III, these opinions are irrelevant to proving

---

[4] The scope of Rankin's opinion in this regard is not entirely clear.

15

or defending against a bank fraud conspiracy charge, and serve no purpose other than to confuse and mislead the jury.  In addition, to the extent these experts are attempting to opine as to what the victim banks actually can and cannot afford to do in terms of due diligence, they are plainly not qualified to do so, no basis for such opinions are anywhere within their expert notices, and obviously they cannot testify as to the mindset to the mindset of the victim banks.  Accordingly, the Court should preclude the defendants from offering these expert opinions.

*Issuing Bank Profits*. Defendants seek to admit expert testimony regarding and relatedly, "interchange fees paid to issuing banks versus chargeback liability for online transactions" (Mott Topic 4).  However, for the reasons explained fully in motion *in limine* I, that the victim banks may have avoided liability or benefitted through fees associated with the transactions processed as a result of from the  defendants' fraud scheme has no bearing on whether the defendants conspired to commit bank fraud, and testimony to this effect—expert or otherwise—should be excluded. Indeed, earlier this year the Second Circuit upheld the district court's exclusion of similar expert testimony as irrelevant to providing or defending against a wire fraud scheme, and otherwise as confusing to the jury.  *See United States v. Gatto*, --F.3d--, 2021 WL 137250, at *8 (2d Cir. Jan. 15, 2021) (upholding district court's exclusion of expert testimony regarding whether victim universities profited from defendants' wire fraud scheme, which had resulted in victim universities obtaining top basketball recruits).

*E-commerce roles, rules, customs, and practices.*  Defendants seek to offer expert testimony pertaining to "e-commerce, payment gateways, processors, debit cards and credit cards," (Rankin Topic 4; *see* Mott Topic 4 ("non-secure e-commerce transactions" and "other [related]

16

topics")).  There is no further explanation as to what practices, customs, roles and rules the experts

seek to discuss, although one can infer that it pertains to something *other* than testimony

surrounding how the payment processing system functions, as that topic (which is relevant, but

not properly the subject of expert testimony) is specifically addressed separately in each of these

expert disclosures.  Aside from not being properly the subject of expert testimony, generalized

testimony regarding e-commerce practices has no bearing on any matter of consequence in this

action.

     *Issuing Bank "Custom and Practice."* MacGregor seeks to testify regarding the data that

issuing banks look to "as a matter of custom and practice" in determining whether to approve or

reject transactions.  As with the experts' proffered testimony on e-commerce practices, as

discussed above, this testimony is not properly the subject of expert testimony.  In any event, this

proposed testimony, like much of the testimony the defendants see to offer through their expert

witnesses, concerns general industry practices.  Courts in this District—including this Court—

have precluded, on relevancy grounds, proposed expert testimony about general industry practices

especially where, as here, it is not helpful in assessing a defendant's conduct.  For example, in

*United States v. Sanders*, No. 12 Cr. 574 (LAK), 2013 WL 1421487, at *2 (S.D.N.Y. Mar. 27,

2013), Judge Kaplan precluded proposed expert testimony as to "custom and usage in the insurance

industry" as irrelevant to the question of whether "inaccurate information allegedly supplied by

the defendant was not material to the insurance carriers" and unhelpful to the jury "given the

abundant evidence thus far offered by percipient witnesses"); *see also*, *e.g.*, *United States v.*

*Newkirk*, No. 14 Cr. 534 (JSR), 2016 WL 1659149, at *1 (S.D.N.Y. Apr. 19, 2016).  In this case,

17

the "custom and practice" of issuing banks generally is not relevant to assessing the defendants'
intent and conduct, and actual victim bank witnesses will testify as to what information they
receive in connection with credit and debit transactions, as well as what is important to them in
connection with continuing to authorizing transactions.

*Evolution of Rules.* Defendants seek to offer expert testimony regarding the "evolution of
Visa and MasterCard rules customs and practices as they relate to cannabis" (Rankin Topic 3), the
"purpose, history, and evolution of MCCs," (Rankin Topic 8). But the "evolution" of undefined
customs, practices, and MCC codes is irrelevant. What matters is what—*during the charged
timeframe*—the procedures were for the assignment of MCC codes, the availability and nature of
such codes, and the selection and assignment of those codes to a U.S.-based e-merchant. The
history and evolution of the card networks' marijuana "customs and practices as they relate to
cannabis" and MCC code development, and their applicability (or not) outside of the charged
timeframe and/or to non-U.S.-based merchants are irrelevant; they do not help in answering
questions at issue in this prosecution.

*Merchant Bank Ability to Onboard Cannabis Client.* Rankin seeks to opine that "within
the Visa/MasterCard network, a merchant bank has discretion to onboard a cannabis client."
(Rankin Topic 9). Whether accurate or not, this misses the point. The issues in this case are
whether Visa and MasterCard allow their networks to be used for the credit or debit purchases of
marijuana products—regardless of the type of merchant involved—and whether the use of a card
for such a purchase is material to the issuing bank. Notably, none of defendants' experts, while
seeking to testify (albeit improperly) about Visa and MasterCard rules pertaining to marijuana,

18

DJA119.23

intends to opine that the card networks permit such transactions.  Like thousands of merchants who sell more than one type of product or service, a merchant that sells marijuana may legally accept debit and credit payments for other goods and services it provides.  As such, beyond not being properly within the scope of expert testimony, whether Visa or MasterCard allowed acquiring banks to onboard marijuana merchants simply doesn't answer the relevant questions in this case.  Finally, the Government intends to call witnesses on behalf of Visa and MasterCard at this trial, who can offer direct testimony as to what they permit their partner acquiring banks to do.

     *Other Visa and MasterCard "Standards," "Protocols," and "Approach[es]."*
Weigand's expert Stephen Mott seeks to offer expert opinions regarding "standards and protocols" used by the card networks when "determining membership in the United States and abroad"; the card networks' "approach to international transactions"; and the ways in which the networks "oversee and manage the integrity of the global payments system," including "the jurisdictional constraints imposed on non-U.S. acquiring banks."  (Mott Topics 5, 6, 7).  Again, none of this is properly within the scope of expert testimony.  Even assuming that some narrow portion of this testimony might constitute relevant background information for the jury not otherwise admitted through percipient witness testimony, it is simply impossible to tell from this exceptionally broad and vague expert notice what Mott would say.

   **B.  Testimony Offered by Vardaman**

     Vardaman's proposed testimony—which, in sum, amounts to his opinion that in light of DOJ policy, enforcement priorities, and FinCEN guidance, banks are free to bank cannabis notwithstanding that it remains illegal under federal criminal laws—has no relevance whatsoever

to whether the defendants agreed to commit bank fraud.  Rather, it is an overt and improper effort to hold mini-trials on DOJ enforcement priorities and prosecutorial discretion and invite jury nullification.

Vardman's testimony is fatally problematic for multiple reasons.  First, Vardaman—who, as explained in Section VI, below, recently accepted an offer of employment with the DOJ Frauds section—is seeking to put components of the Department of Justice on trial.  This is improper.  As the Supreme Court explained in *Wayte v. United States*, absent a violation of constitutional dimension, such as a deliberate decision to prosecute on the basis of a prohibited factor like race or religion, the Government's enforcement decisions and prosecutorial priorities are not subject to judicial review, and certainly are not within the proper purview of the jury:

> In our criminal justice system, the Government retains "broad discretion" as to whom to prosecute. *United States v. Goodwin,* 457 U.S. 368, 380, n. 11, 102 S.Ct. 2485, 2492, n. 11, 73 L.Ed.2d 74 (1982); accord, *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 248, 100 S.Ct. 1610, 1616, 64 L.Ed.2d 182 (1980). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978). This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern.  Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives  and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy. All these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute.

20

470 U.S. 598, 608 (1985); *see also United States v. Sanchez*, 517 F.3d 651, 670 (2d Cir. 2008). "The decision as to whether to prosecute generally rests within the broad discretion of the prosecutor." *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) (internal quotation marks and citation omitted). Accordingly, evidence concerning the exercise of prosecutorial discretion as a policy matter is simply not an appropriate subject for this trial.

Second, the fact that some undefined banks (*see* Ex. A at 7) may rely on the Cole Memorandum and FinCEN guidance in determining whether to permit certain business involving marijuana transactions is irrelevant to whether the defendants' scheme to defraud is material in this case. As explained in  motion in *limine* IV, whether it was "reasonable" for banks to process certain marijuana-related transactions in light of these documents  does not help answer the legally relevant question of whether it was important to them to know what they were processing.

Third, the FinCEN guidance is separately irrelevant because it applies *when merchants selling marijuana tell the truth and do not conceal their true identity and business*. That is not what happened here. In marked contrast, the defendants in this case orchestrated a sophisticated scheme to deceive virtually every participant in the payment processing system. That scheme involved lies upon lies to disguise the U.S. based marijuana-related merchant as multiple innocuous UK companies, each with a fake website, fake customer service, and fake goods and services. Indeed, the FinCEN guidance provides that a business that appears to be disguising its marijuana activities raises a red flag and may implicate one of the Cole Memorandum priorities, *i.e.* an area upon which that DOJ *should* focus its prosecutorial resources.

21

Indeed, the last paragraph of Vardman's expert disclosure is emblematic of the complete distraction that would occasion his testimony. As he states, "[t]aking the Government's very own action through its words, and inaction through lack of enforcement, the alleged risk is, at best, theoretical and fictitious." (Ex. A at 7). Setting aside the fact that Vardaman is presumably referring to the rate of enforcement of federal marijuana trafficking laws, as opposed to the rate of enforcement of frauds involving lies to U.S. financial institutions, properly assessing this testimony would require, at a minimum, testimony and evidence from other Government officials and from bank officials, as well as analyses of DOJ enforcement actions and the effect of that on bank risk taking and decision making processes.

Vardman conflates the ambiguous effects of one policy standard regarding marijuana sales and banking, with the actual facts and charges in this fraud case. Having no probative value, the evidence should also be precluded under Rule 403. Admission of evidence of the Department of Justice's marijuana enforcement priorities, purported lack of enforcement actions, and purported acquiescence to banks seeking to bank cannabis merchants would be unfairly prejudicial to the Government and would result in several mini-trials on the scope and appropriate interpretation of the Cole Memorandum and FinCEN guidance, the exercise of prosecutorial discretion, and banks consider these factors, and how those considerations inevitably change in light of fraud perpetrated by merchants that might otherwise be acceptable.

## IV.  The Court Should Preclude Certain Expert Testimony as Unreliable

Several of the defendants' experts' opinions should be precluded for the independent reason that the defendants have not demonstrated that the opinions are the "product of reliable principles and methods." Fed. R. Evid. 702(c). "The proponent of expert testimony bears the

22

burden of establishing its admissibility by a preponderance of the evidence." *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003). The defendants have not met that burden here, particularly in light of the abstract and highly generalized nature of their experts' opinions. Of course, the fact that an expert may generally possess "specialized knowledge" to qualify as an expert witness does not automatically render her opinions in the case reliable. *SEC v. Lipson*, 46 F. Supp. 2d 758, 761 (N.D. Ill. 1998).

In particular, the Government asserts that the following expert opinions should be excluded as not reliably the product of any sort of principles or methods:

- The "various risk levels of consumer transactions and the indemnity, remedy, and risk allocation processes built into the credit card networks that favor issuing banks" (Rankin Topic 5);

- That "issuing bank policies regarding transaction monitoring for cannabis purchases are to a large extent policies in paper, not actionable in practice" because "there is no specific transactional typology to easily identify cannabis transactions"; (MacGregor Topic 2);

- That there is a "lack of consumer notice by the issuing banks regarding use of their branded cards to purchase cannabis as compared to other comparable goods and services" (MacGregor Topic 3);

- "Due to the lack of sufficient information provided by the credit card companies, other investigative methods and due diligence procedures would be required to reliably detect cannabis transactions" (MacGregor Topic 6);

- The "concerns and operating parameters of issuing banks" including their "consideration of customer creditworthiness and "the factors that are material or immaterial to them when determining whether to approve or decline credit and debit transactions" (Mott Topic 2);

- "Steps that issuing banks may take in order to detect and root out fraud and other suspicious activity" (Mott Topic 3);

23

- The ways by which Visa and MasterCard "oversee and manage the integrity of the global payments system," (Mott Topic 7);

- That the FinCEN guidance "has to be considered a qualified success" (Vardaman Topic 2);

- That "the recission of the Cole memorandum had no practical effect on DOJ enforcement policies with respect to cannabis banking," and that it "remains the de facto guidepost for federal prosecutors"; (Vardaman Topic 3);

- That the government has "in, effect, encouraged banks to facilitate" the industry (Vardman Topic 4);

- That "banks can and do rely on the federal government's hands-off policies with respect to cannabis banking" (Vardamon Topic 5);  and

- Opinions, if any, based upon a USB drive in Weigand's possession that has been produced to the Government.  (*See* Exs. C, D).

The defendants have offered no "bases and reasons," Fed. R. Crim. P. 16(b)(1)(C), supporting such opinions outside of their "education, training, professional experience, other specialized knowledge," and review of guidebooks (mostly undefined) and certain broad categories of documents produced by the Government in discovery.  Indeed, for several of the categories above it is impossible to discern *what* opinions will even be expressed.  For example, what steps does Mott believe issuing banks can or should take to root out fraud?  How is Rankin measuring the "various risk levels" and "risk allocation processes" he proffers?  What are "[t]he ways" the card networks manage the integrity of the payment system, according to Mott?  What due diligence procedures does MacGregor believe would be sufficient to "reliably" identify marijuana transactions?  We don't know.  But most certainly, the experts' generalized "bases and reasons" do nothing to show *how* such "expert" testimony drawn from these sources meet *Daubert's* reliability requirement or how such opinions are "connected to existing data" by

24

DJA119.29

anything other than the *ipse dixit* of the respective expert.  *Joiner*, 522 U.S. at 146.  We do not know, for example, why or how MacGregor believes that issuing bank policies are not actionable in practice, the basis for her conclusion that issuing bank notice to consumers regarding cannabis transactions is lacking as compared to "comparable" goods and services, or why she believes that algorithms based on MCCs are insufficient.  Indeed, some of this amounts merely to assertions of fact about which these experts have no personal knowledge, and all of it is prohibited expert *ipse dixit*.

Similarly it is impossible to assess the reliability of Vardman's opinions, and he otherwise appears to lack any basis for them.  He fails to explain how he measured the "success" of the FinCEN guidance, assessed the "practical effect" of the Cole Memorandum's recission, and fails to provide the basis for his opinions that banks "can and do rely on the federal government's hands-off policies with respect to cannabis banking," and that the Cole Memorandum "remains the de facto guidepost for federal prosecutors."  Indeed, Vardaman appears to have never worked at a bank—let alone any of the issuing banks that had policies prohibiting these activities—and has not worked in a federal prosecutor's office since 2016 (notably, the year that the charged conspiracy began).

Accordingly, the defendants have fallen far short of demonstrating the reliability of the "expert" testimony they seek to offer, and it should be precluded for this independent reason as well.

Relatedly, as noted above, Weigand provided the Government with "[a] USB drive [in Weigand's possession] that appears to be the source of [certain] materials" described in the

25

Government's preliminary exhibit list, "and which may be the source of other materials the Government located on Mr. Weigand's laptop." Ex. C at 2. While reiterating the information contained in Vilfer's expert notice, *i.e.* that the drive may supply *the basis* for testimony for the source of certain materials located on Mr. Weigand's laptop, Weigand's counsel have not informed the Government as to whether it intends to introduce the drive or the specifics of any opinions that will derive from it. Weigand has also utterly failed to provide any "bases and reasons" for his conclusion that the USB drive "appears to be" the source of certain materials located on Weigand's laptop. Accordingly, the Court should exclude any opinions based upon the Weigand USB Drive.

## V.  The Court Should Preclude Weigand's Expert From Offering Testimony That Invades the Jury's Function

Next, Weigand's expert witness, Stephen Mott, seeks to offer testimony about the "concerns and operating parameters of issuing banks" including their "consideration of customer creditworthiness" and "the factors that are material or immaterial to them when determining whether to approve or decline credit and debit transactions." (Mott Topic 2). This testimony is clearly inadmissible, as the issue of materiality is for the jury to decide, not the expert. *See United States v. Lesniewski*, No. 11 Cr. 1091 (VM), 2013 WL 3776235, at \*9-\*10 (S.D.N.Y. July 12, 2013) (precluding expert testimony as to materiality of representations in wire, mail, and healthcare fraud case); *United States v. Jacques Dessange, Inc.*, No. 99 Cr. 1182 (DLC), 2000 WL 294849, at \*3 (S.D.N.Y. Mar. 21, 2000) (precluding expert in immigration fraud case from opining on whether certain information is ordinarily material to agency decision, as such testimony "usurps the jury's function by rendering an opinion on an ultimate legal conclusion"). Expert testimony that purports to tell the jury how to resolve this factual dispute does not "help the trier of fact to

26

understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, but instead usurps the jury's function by dictating a particular outcome. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

Accordingly, for this additional reason as well, this portion of Mott's testimony should be excluded.

**VI. The Court Should Preclude Akhavan's Expert, John Vardaman, From Testifying About His Prospective Employment With the DOJ Frauds Section as well as From Revealing Privileged Government Information**

Finally, to the extent Vardaman is not entirely excluded (as he should be), the Government submits that he should be prohibited from testifying about his anticipated employment with the DOJ Frauds section as such testimony has no relevance and would be extraordinarily prejudicial to the Government.  By way of brief background, in or about mid-December, this Office and the defendants learned that Vardaman had accepted a position with the DOJ Frauds section in Washington, D.C.  At this time, trial in this matter had been set for January 25.  The Government understands that Vardaman anticipated that it would take some period of time for the background process to occur before he could begin work, and apparently intended to testify and then begin working at DOJ.  In the first week of January, however, the parties learned that the trial had been postponed due to the pandemic, and subsequently learned that it would be scheduled for May, unless the Court was able to fit the trial into a date in the first quarter of the year, in which case it would do so.  Shortly afterwards, on or about January 27, the parties were informed that the trial would likely be set for March 2 (now March 1).  In early February, DOJ informed Vardaman that his anticipated start date was March 1.  Vardaman is seeking to postpone his start date so that he could testify for the defense in this trial.

27

Introduction of any evidence that Vardaman intends to work for the Government following his defense testimony is wholly irrelevant.  In addition, introduction of such evidence would be unfairly prejudicial to the Government insofar as it would lend an unwarranted implication of endorsement by the Government of Vardaman's purported "expertise," and should be precluded.

In addition, to the extent Vardaman is permitted to testify at all, the Court should preclude any testimony or evidence that would reveal privileged Government information.  As described in Akhavan's disclosure, Vardaman was apparently involved in drafting the Cole Memorandum during his previous stint at DOJ, and further played a role in drafting FinCEN guidance during that time.  Again, assuming *arguendo* that he is permitted to testify about that Memorandum or guidance at all, his testimony should be strictly limited to the content appearing on the face of those documents.  Any and all testimony beyond what is contained on the face of those documents, *e.g.* concerning other rationales or thought processes behind the documents, other options considered and rejected, non-public communications within DOJ and between DOJ and FinCEN regarding the development or enforcement of those documents, and DOJ's and FinCEN's post-implementation discussions regarding the appropriate interpretation and application of those documents, are all privileged and should not be elicited.  *See Grand Cent. P'ship v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (the deliberative process privilege protects "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency" (internal quotation marks and citations omitted)).

28

DJA119.33

**Conclusion**

For the foregoing reasons, the Court should preclude the defendants' proposed expert testimony.[5]

Dated: New York, New York
       February 16, 2021

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        United States Attorney for the
                                        Southern District of New York

                                By:
                                        ____/s/_____
                                        Tara M. La Morte
                                        Nicholas Folly
                                        Emily Deininger
                                        Assistant United States Attorneys
                                        Tel.: 212-637-1041/1060/2472

---

[5] In the event the Court does not preclude the defendants' experts in their entirety, they should be ordered to make additional expert disclosures in accordance with their obligations under Rule 16. Relatedly, the defendants should be ordered to make disclosures of any expert statements under Rule 26.2, as well as correspondence with defense counsel.  With the exception of materials produced several days ago by Akhavan for Mr. Rankin—materials that were largely created back in December and early January—the defendants have claimed that no such statements exist.

29

DJA119.34

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California  90017-2543 | TEL (213) 443-3000 | FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3170**

WRITER'S INTERNET ADDRESS
**christayback@quinnemanuel.com**

November 3, 2020

**VIA EMAIL**
Christopher J. DiMase
Nicholas S. Folly
Tara LaMorte
*Assistant United States Attorneys*
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Re:    Disclosure of Potential Defense Experts in *United States v. Weigand, et al.*, 20 cr. 188 (JSR)

Dear AUSAs DiMase, Folly and LaMorte:

Defendant Hamid "Ray" Akhavan ("Akhavan") hereby provides notice, pursuant to Federal Rule of Criminal Procedure 16, that he expects to call the following witnesses to provide expert testimony in the areas outlined herein: (1) Jeffrey Rankin, (2) Monica MacGregor, and (3) John Vardaman.  A copy of each of their CVs is attached.

**(1) Jeff Rankin**

**Mr. Rankin's Qualifications**

    Mr. Rankin is an expert in credit card processing and payment services.  He has more than 25 years of experience working at all levels of the payment network, from credit card companies, to merchant member banks and issuing member banks.  Most recently, he was a senior executive at U.S. Bank, where he provided payment services to a broad range of large market clients, including the United States Federal Government, state governments, public and private universities and large Fortune-listed corporate entities worldwide.  Prior to U.S. Bank, Mr. Rankin worked as a client services executive at Visa, Inc. and a merchant services executive at Bank of America, where he developed experience in advising high-risk merchants, including those involved in adult entertainment and gambling.

**quinn emanuel urquhart & sullivan, llp**
NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG |
PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

While at Visa, Mr. Rankin's responsibility was managing member relationships for issuing, acquiring and processing members across the Midwest, which included interpreting rules and regulations. When advising acquiring members, Mr. Rankin assisted acquiring banks in utilizing Visa guidelines and reporting tools to understand know your customer ("KYC") protocols, how to set up merchant category codes ("MCCs"), and how to settle transactions.

**Bases for Mr. Rankin's Testimony**

Mr. Rankin will base his explanations of credit card rules and regulations and issuing and acquiring bank responsibilities on his education, training, professional experience, and other specialized knowledge. To the extent he renders opinions, they will be based on those same things as well as his review and consideration of:

1. Documents and information produced by the government in connection with this proceeding, including, but not limited to Visa Core Rules and Interlink Rules (April 2020) and MasterCard Rules and Transaction Processing Rules (December 2019), subpoena returns from Visa, disclosure correspondence and other materials from the government for Visa.

2. MasterCard and Visa publications, guidelines, and references.

3. Cardholder and credit card agreements for JP Morgan Chase, U.S. Bank, Bank of America and Capital One.

4. Merchant Applications.

5. Office of the Comptroller of the Currency Comptroller's Handbook on Merchant Processing.

6. The content and functionality of the Eaze platform.

Mr. Rankin is continuing to review additional data and information. He may offer additional opinions, or additional bases for his opinions, as a result of his ongoing review of data and information and in response to evidence, opinions, or testimony presented during the trial proceedings. As a result, defendant Akhavan respectfully reserves his right to supplement this disclosure at any time before Mr. Rankin's trial testimony and/or as permitted by the Court.

**Mr. Rankin's Expected Testimony**

With reference to the specific facts and allegations of the case:

Mr. Rankin will explain the roles, processes and responsibilities of each of the players that make up the payment network – the merchant, the independent sales organization ("ISO"), payment service providers ("PSP"), the merchant/acquiring bank, the credit card network and the issuing bank. He will describe the privity, and lack of privity, between each player. Specifically, there is no contract or agreement between the merchant and the card-issuing banks. The merchant relies on the acquiring bank, including the terms of its' agreement with the acquiring bank for rules, law and compliance.

2

Mr. Rankin will explain the Visa and MasterCard rules and regulations and how to apply them with respect to the subject areas below. He will also testify to the evolution of the Visa and Mastercard rules, customs and practices as they relate to cannabis.

Mr. Rankin will testify that under Visa and MasterCard rules, there is no specific written rule prohibiting merchant banks from onboarding cannabis merchants in a state where cannabis is legal, where the merchant will be conducting intrastate business. Rather, he will testify that within the Visa/MasterCard network, a merchant bank has discretion to onboard a cannabis client.

Mr. Rankin will explain the role and responsibilities of acquiring banks, and rules acquiring banks must follow, in onboarding clients, signing the merchant up and integrating them into the network. He will explain the KYC process, including the merchant application process.

Mr. Rankin will explain the process of how an MCC is selected and by whom. He will testify that MCCs are established by the acquiring bank, not the merchant.

Mr. Rankin will testify that the acquiring bank has the sole responsibility and discretion in selecting an MCC. MCCs are not made to identify products but general categories.

Mr. Rankin will explain the purpose, history and evolution of MCCs. Mr. Rankin will testify that during the relevant period, there was no product level MCC for cannabis. He will explain that when there is no specific product-level MCC that applies, it is under the discretion of the acquiring bank to select an MCC that fits. Mr. Rankin will testify that regardless of the MCC chosen by the acquiring banks there was no MCC that would allow the issuing banks to know that any transaction involved the sale of cannabis. Mr. Rankin will also testify regarding the various risk levels of consumer transactions and the indemnity, remedy, and risk allocation processes built into the credit card networks that favor issuing banks.

Mr. Rankin will testify as to the roles, rules, customs and practices related to e-commerce, payment gateways, processors, debit cards and credit cards. He will testify about the lack of specificity of rules and practices regarding what content should appear on a merchant website and what information must be included in a merchant name. He will explain that the purpose of merchant names and websites is not for the benefit of the issuing banks. Rather, it is to reduce cardholder confusion so that when the transaction appears on the cardholder's statement, they are able to recognize the purchase, thereby reducing the number of disputes and chargebacks.

**(2) Monica MacGregor**

**Ms. MacGregor's Qualifications**

Ms. MacGregor is an expert in evaluating, designing, implementing and remediating Anti-Money Laundering, Sanctions and Anti-Corruption Compliance Programs to the satisfaction of both financial institution regulators as well as Boards of Directors. She is a senior compliance professional with over 20 years of experience specializing in the areas of Anti-Money Laundering and Sanctions, Anti-Corruption, the investigation of International Financial Crimes and Global Risk Management. She is currently a Managing Director in Berkeley Research Group's Global Investigations and Strategic Intelligence practice. Ms. MacGregor is a Certified Anti-Money Laundering Specialist and a Certified ISO 37001 (Anti-Corruption) Lead Auditor.

Most recently, Ms. MacGregor served as a senior in-house compliance officer for Oriental Bank in Puerto Rico during the period when cannabis was legalized.  While there, she leveraged her past experience working with financial institutions to re-evaluate their risk profiles, integrate technology platforms and design tailored policies and procedures to effectively meet ever increasing demands relating to customer due diligence ("CDD"),  enhanced due diligence ("EDD") and Suspicious Activity Monitoring and Reporting systems.  During her tenure she successfully remediated an FDIC mandated Consent Order and laid the groundwork for sustained regulatory compliance as the basis for managed growth and diversification by the institution.

Ms. MacGregor has served as a financial expert assisting the Asset Forfeiture and Money Laundering Division of the DOJ with the investigation and prosecution of systemic compliance deficiencies at US and foreign institutions and has worked directly with DEA, FBI and ICE investigators.  Ms. MacGregor has also served as a liaison with foreign government agencies.  She has assisted numerous financial institutions with the remediation of their Anti-Money Laundering and Sanctions Compliance Programs and has presented her findings to a variety of institutions including FinCEN, OFAC and banking regulatory agencies.

**Bases for Ms. MacGregor's Testimony**

Ms. MacGregor will base her explanations of risk compliance and due diligence policies and procedures for issuing banks on her education, training, professional experience, and other specialized knowledge.  To the extent she renders opinions, they will be based on those same things as well as her review and consideration of:

1.  Documents and information produced by the government in connection with this proceeding, including, but not limited to, subpoena returns from Citibank, Bank of America and JP Morgan Chase, disclosure correspondence and other materials from the government for Citibank, Bank of America and JP Morgan Chase.

Ms. MacGregor is continuing to review additional data and information.  She may offer additional opinions, or additional bases for her opinions, as a result of her ongoing review of data and information and in response to evidence, opinions, or testimony presented during the trial proceedings.  As a result, defendant Akhavan respectfully reserves his right to supplement this disclosure at any time before Ms. MacGregor's trial testimony and/or as permitted by the Court.

**Ms. MacGregor's Expected Testimony**

With reference to the specific facts and allegations of the case:

Ms. MacGregor will testify regarding the role and responsibilities of issuing banks when it comes to cannabis transactions.  She will explain that issuing banks provide Visa or MasterCard branded credit-cards to their account holders as a service and that, as part of that service, these banks take on the risk that their account holders may purchase cannabis.

Ms. MacGregor will testify that issuing bank policies regarding transaction monitoring for cannabis purchases are to a large extent policies in paper, not actionable in practice.  In practice, there is no specific transactional typology to easily identify cannabis transactions.  Ms. MacGregor

4

will testify to the lack of consumer notice by the issuing banks regarding use of their branded cards to purchase cannabis as compared to other comparable goods or services.

Ms. MacGregor will testify to the monies made by issuing banks, including on cannabis transactions, among others, and the manner and method in which the funds are provided, as well as how risk is allocated within the system.

Ms. MacGregor will testify that issuing banks are given limited pieces of information or metadata through the Visa and MasterCard networks and will describe the related responsibilities of the issuing and acquiring banks. Visa and MasterCard have not created a system for issuing banks to make product level decisions on transactions, such as cannabis. Ms. MacGregor will testify about the data issuing banks look to, as a matter of custom and practice, in determining whether to approve or reject transactions. While an MCC would be the most efficient way to set up an algorithm to detect cannabis transactions, because there was and is no MCC for cannabis or most other products, algorithms based on MCCs are not sufficient.

Ms. MacGregor will testify that during the relevant period there was no specific MCC for cannabis and even codes such as those for pharmacy or medical miscellaneous would still not allow an issuing bank to determine whether the purchase was cannabis.

Ms. MacGregor will explain that due to the lack of sufficient information provided by the credit card companies, other investigative methods and due diligence procedures would be required to reliably detect cannabis transactions.

**(3) John Vardaman**

**Mr. Vardaman's Qualifications**

Mr. Vardaman is an expert on banking compliance, anti-money laundering ("AML")/bank secrecy act ("BSA") laws, and other financial crimes. He is an attorney with fifteen years of senior federal government experience in the enforcement and application of federal laws and policies concerning the Bank Secrecy Act, money laundering, and other financial crimes. Mr. Vardaman served with the U.S. Department of Justice for ten years identifying and addressing threats related to the financial system and national security, and worked for the Department of the Treasury on a range of terrorist financing issues in the wake of September 11th.

In 2014, while serving as Assistant Deputy Chief for Policy in the DOJ Asset Forfeiture and Money Laundering Section, Mr. Vardaman drafted the DOJ policy for cannabis banking, known as the Cole Memorandum, which outlined enforcement priorities for AML/BSA laws as they related to the banking of marijuana-related businesses ("MRBs"). The goal of the Cole Memorandum was to address the adverse public policy effects stemming from the lack of banking access available to the cannabis industry by outlining a path for banks to permissibly service MRBs. He also worked closely with the Financial Crimes Enforcement Network ("FinCEN") to draft the simultaneously issued FinCEN Guidance on BSA Expectations Regarding Marijuana-Related Businesses.

Mr. Vardaman has served as Chief Compliance Officer for Simplifya, a regulatory technology company that works with state-legal cannabis companies and financial institutions to ensure compliance with relevant laws and regulations. He has also served as Executive Vice

President of Hypur, a financial technology company specializing in banking platforms for MRBs. In these roles, Mr. Vardaman frequently met with financial institutions interested in serving MRBs to explain the complicated legal and regulatory landscape surrounding cannabis banking. He is currently on the advisory board of ComCard, where he gives legal advice regarding providing payment services in certain high-risk industries.

**Bases for Mr. Vardaman's Testimony**

Mr. Vardaman will base his explanations of banking for marijuana related businesses on his education, training, professional experience, and other specialized knowledge. To the extent he renders opinions, they will be based on those same things as well as his review and consideration of:

1. FinCEN Guidance (FIN-2014-G001) on  BSA Expectations Regarding Marijuana-Related Businesses, issued on February 14, 2014.

2. "Cole Memorandum" on Guidance Regarding Marijuana Related Financial Crimes, issued on February 14, 2014.

3. "Cole Memorandum" on Guidance Regarding Marijuana Enforcement, issued on August 29, 2013.

4. "Sessions Memorandum" on Marijuana Enforcement, issued on January 4, 2018.

5. FinCEN Marijuana Banking Updates from March 2017 through December 2019.

6. The Rohrabacher–Farr Amendment, signed into law on December 16, 2014.

Mr. Vardaman is continuing to review additional data and information. He may offer additional opinions, or additional bases for his opinions, as a result of his ongoing review of data and information and in response to evidence, opinions, or testimony presented during the trial proceedings. As a result, defendant Akhavan respectfully reserves his right to supplement this disclosure at any time before Mr. Vardaman's trial testimony and/or as permitted by the Court.

**Mr. Vardaman's Expected Testimony**

With reference to the specific facts and allegations in this case:

Mr. Vardaman will testify about the February 14, 2014 issuance of FinCEN guidance, which clarifies how financial institutions can provide services to MRBs, and the simultaneous issuance of the Cole memorandum, which laid out eight priorities for federal prosecutors in enforcing offenses related to cannabis. He will explain the FinCEN guidance on how financial institutions should conduct due diligence to assess the risk of providing services to MRBs.

Mr. Vardaman will testify that since the issuance of the 2014 FinCEN guidance, it is well known that numerous financial institutions (banks and credit unions) are actively servicing the industry, based, in part, on statistics extrapolated from SARs report data and released in quarterly FinCEN Marijuana Banking Updates. Mr. Vardaman will explain how six years after it was issued, the FinCEN guidance has to be considered a qualified success in bringing some measure of banking

access to the cannabis industry and addressing the underlying policy goals of the Cole Memorandum.

Mr. Vardaman will explain that the 2018 rescission of the Cole memorandum had no practical effect on DOJ enforcement practices with respect to cannabis banking, and that the Cole memorandum remains the de facto guidepost for federal prosecutors.  He will further explain how the FinCEN guidance remains in place, which confirms that the underlying federal policy towards cannabis banking has not changed.

Mr. Vardaman will testify that the federal government permits issuing and acquiring banks to enter the cannabis space, given the federal guidance on banking MRBs and the practical effect of how that guidance has played out.  He will explain that the government has, in effect, encouraged banks to facilitate this industry and endorsed or acquiesced to banking services, including credit card payment network services, for the cannabis industry.  The cannabis industry is operating under the color of state law with the acquiescence of the federal government, which has effectively suspended enforcement of federal cannabis laws in states where it has been legalized.  As a result, banks, including for example issuing banks, can permissively service an industry that remains illegal under federal law.

Mr. Vardaman will discuss the lack of enforcement actions taken against banks since the issuance of the FinCEN guidance.  There has not been a single enforcement action against a financial institution for solely banking cannabis since the issuance of the guidance in 2014.  Additionally, there have been no criminal regulatory sanctions for solely banking cannabis.  While the policy of non-enforcement of federal cannabis law was first issued during the Obama administration, it continues to the present.  Accordingly, banks can and do rely on the federal government's hands-off policies with respect to cannabis banking.

Mr. Vardaman will testify the government is on record saying banking MRBs is a permissible activity.  Taking the government's very own action through its words, and inaction through lack of enforcement, the alleged risk is, at best, theoretical and fictitious.

Sincerely,

Christopher Tayback

Christopher Tayback

7

**DJA119.41**

**ELEVEN**CANTERBURY

# JEFFREY RANKIN
# MISSOURI

## EXPERIENCE

### US BANK                                                                 2007 - 2020
*Large Market / Public Sector Commercial Card Executive, Retired June 2020*
- Business executive delivering $450MM annual revenue, $65MM Pre-tax Income Total 300 FTE under management
- Provided payment services to a broad range of large market clients, including the United States Federal Government, state governments, public and private universities and large Fortune-listed corporate entities worldwide.
- Maintained personal relationships with client executives
- Initiated and maintained client advisory panel with bi-annual meetings to gain market understanding and input for future offerings. Consistent ratings of 4.5 on 5.0 scale
- Teams based throughout the United States, Canada, Europe, and Singapore.

### VISA INC                                                                2003 - 2007
*Client Services Executive Midwest Region*
- New business development and client retention of national and region financial institutions and platform processing services 13 mid-western states.
- Additional accountability for credit union client relations throughout the US.
- Critical success in attaining new agreement from all clients prior to Visa conversion from bank owned to public stock ownership

### BANK OF AMERICA                                                         1993 - 2003
*Merchant Services Executive*
- Profit and loss responsibility for credit card merchant services business, 200,000 bank clients, $70B annual volume, $300MM revenue, $140MM NIBT
- 7 direct reports, 700 total staff. Integrated product development and lead generation with Small Business and Commercial Banking Divisions
- Commercial Card Senior Manager
- Entered business in start-up phase in 1996. Managed substantial growth in sales volume (from $300MM to $7B), built proprietary client card management system.

## EDUCATION & TRAINING

Business Management Major, University of Indianapolis
Certified Six Sigma Green Belt
American Bankers Association National School for Bank Card Management

## BOARDS & MEMBERSHIPS

Leukemia and Lymphoma Society Board Trustee
Consumer Credit Counseling Service Board President
Junior Achievement Project Business Instructor
Piedmont Youth Football League Co-founder and Commissioner
Matthews Athletic and Recreation Association Football Commissioner and Coach
Advisor and instructor for ABA Bankcard School

## Curriculum Vitae



**MÓNICA M. MACGREGOR**
BERKELEY RESEARCH GROUP, LLC
1800 M Street, NW 2nd Floor | Washington, DC 20036

### SUMMARY

Mónica MacGregor is a Managing Director in BRG's Global Investigations + Strategic Intelligence practice and is based in Washington, DC.   Ms. MacGregor is a senior compliance professional with over 20 years of experience specializing in the areas of Anti-Money Laundering and Sanctions, Anti-Corruption, the investigation of International Financial Crimes and Global Risk Management.  She has excelled in the management of high-stakes criminal, civil and internal cross-border investigations.

Ms. MacGregor has served as a financial expert assisting the Asset Forfeiture and Money Laundering Division of the DOJ with the investigation and prosecution of systemic compliance deficiencies at US and foreign institutions and has worked directly with DEA, FBI and ICE investigators.  Ms. MacGregor has also served as liaison with foreign government agencies.

Ms. MacGregor is an expert in evaluating, designing, implementing and remediating Anti-Money Laundering, Sanctions and Anti-Corruption Compliance Programs to the satisfaction of both financial institution regulators as well Boards of Directors.  She has distinguished herself through her ability to handle cross-border matters requiring remediation under various regulatory environments and jurisdictions and has handled complex investigations and other matters for US and foreign multinationals navigating the challenges posed by their globalized operations.  Ms. MacGregor has assisted AmLaw 100 attorneys in their defense of blue-chip clients and has presented her findings to a variety of institutions including FinCen, OFAC, several international organizations and the Volcker Commission.

Most recently Ms. MacGregor served as a senior in-house compliance officer leveraging her past experience working with financial institutions to re-evaluate their risk profiles, integrate technology platforms and design tailored policies and procedures to effectively meet ever increasing demands relating to CDD, EDD and Suspicious Activity Monitoring and Reporting systems.  During her tenure she successfully remediated an FDIC mandated Consent Order and lay the groundwork for sustained regulatory compliance as the basis for managed growth and diversification by the institution.

Ms. MacGregor has also quantified damages in complex litigation, international and investor state arbitration cases in a variety of forums in the US, Europe and Latin America.  Her fluency in English, Spanish and French and proficiency in Portuguese have allowed her to work in a myriad of countries across Western Europe, the Americas and the Caribbean.

### EDUCATION

B.Sc., Economics (Honours)        London School of Economics & Political Science

DJA119.43



**EMPLOYMENT HISTORY**

Oriental Bank
BSA Officer
2015-2017

Alvarez & Marsal
Senior Director
2009-2015

Huron Consulting Group
Director
2005-2009

PriceWaterhouseCoopers
Senior Associate
1998-2000

KPMG
Senior Associate
1993-1998

**PROFESSIONAL AFFILIATIONS**

**ASSOCIATION OF CERTIFIED ANTI-MONEY LAUNDERING SPECIALISTS**
Founding Board Member, US Capital Area Chapter, Association of Certified Anti-Money Laundering
Specialists

**HISPANIC NATIONAL BAR ASSOCIATION**
2017-2018    Member, Hispanic National Bar Association's Board of Governors
2012-2014    Co-Chair, Hispanic National Bar Association's Presidential Commission on the Status of
             Latinas in the Legal Profession
2008-2012    Commissioner, Hispanic National Bar Association's Presidential Commission on the Status
             of Latinas in the Legal Profession
2010-2012    Deputy President, Hispanic National Bar Association, Region V

**WOMEN IN WHITE COLLAR CRIMINAL DEFENSE ASSOCIATION**
Inducted Member, Washington, DC Chapter

**SPEECHES, SEMINARS & WEBINARS**
Frequent speaker on topics of Anti-Corruption, Anti-Money Laundering, Internal Investigations and
Compliance Risk Management for HNBA, FIBA, ABA Committees, Fortune 500 Companies and AmLaw
100 Firms.

# John W. Vardaman, III

PROFESSIONAL EXPERIENCE:

**ComCard, Inc.**                                               Los Angeles, CA
**Legal Counsel/Advisory Board**                                April 2020 - Present
- Provide legal and strategic advice to start-up business payments card company servicing merchants and customers in targeted industries.
- Coordinate with issuer processing company to develop and implement fraud prevention and payment compliance policies and procedures.
- Assess legal and logistic implications of providing payment services in certain high-risk industries.

**Simplifya, Inc.**                                             Denver, CO
**Chief Compliance Officer/General Counsel**                    June 2019 – March 2020
- Managed all legal issues involved with operating a start-up regulatory compliance software company, including content drafting and review, implementing best practices and internal controls, contract drafting and negotiation, overseeing outside counsel.
- Interfaced with licensed operators and financial institution to understand compliance needs and inform and adapt software offerings accordingly.
- Led client management and customer acquisition with financial institutions and governmental entities.
- Involved in all aspects of company operations, including budget, resource allocation, personnel, strategic planning, marketing, and business development.
- Speaker at numerous conferences regarding regulatory compliance, banking, and payments in highly regulated industries.

**Hypur, Inc.**                                                 Scottsdale, AZ
**Executive Vice President/General Counsel**                    April 2016 – June 2019
- Oversaw and manage all legal issues involved with operating electronic payments and banking compliance FinTech software company, including contract drafting and negotiation, overseeing outside counsel, meeting with banks and investors.
- Ensured that software was updated to enable banks to meet current legal, regulatory and compliance obligations.
- Wrote numerous articles and delivered presentations on the current state of law and policy regarding AML/BSA compliance issues, especially with respect to serving "high-risk" industries.

**United States Department of Justice**                         Washington, D.C.
*Deputy Chief, Asset Forfeiture/Money Laundering Section*       January 2011 – April 2016
- Coordinated with law enforcement, regulators, and prosecutors to identify trends in financial crime and ensure that legal authorities and enforcement priorities were aligned to address them.
- Led Department participation in working groups to improve communication and coordination between government and the financial services industry to enhance AML/BSA enforcement.
- Engaged with international bodies to promote cooperation on wide range of criminal issues such as money laundering, corruption, and transnational organized crime.
- Manage the Section's legislative agenda, including devising legislative strategy, working with Congress on drafting and technical assistance, briefing Members and staff, and coordinating with relevant stakeholders.

**United States Department of Justice**                         Washington, D.C.
*Senior Counsel, Office of Legal Policy*                        January 2006 – January 2011
- Developed and advanced policy on national security, law enforcement, and terrorism-related matters.

DJA119.45

- Worked with Congress to advocate legislative priorities of the Department, including Patriot Act reauthorization and the national security implications of a media shield law for reporters.
- Drafted testimony, policy papers, and talking points for senior Department officials.

**Coalition Provisional Authority**        Baghdad, Iraq
*Associate General Counsel*        November 2003 - July 2004
- Served as lead U.S. government official in Iraq to locate and repatriate assets of Saddam Hussein and the former Iraqi regime held around the world.
- Traveled to Jordan and Lebanon to negotiate with senior government and banking officials to secure the release of frozen Iraqi assets held in those countries.
- Investigated complex financial transactions, including abuse of the UN Oil-for-Food Program, to trace and return illicit profits of the Saddam regime.

**United States Department of the Treasury**        Washington, D.C.
*Special Assistant to the General Counsel*        July 2001 - December 2005
- Worked on wide array of financial crime issues, including terrorist financing and money laundering.
- Led Department response to *qui tam* lawsuit alleging fraud by contractor in Iraq against the U.S. government.
- Served on Task Force on Terrorist Financing working with foreign governments to coordinate international efforts to combat the financing of terrorist organizations.

**Manatt, Phelps & Phillips, LLP**        Washington, D.C.
*Associate – Litigation*        October 1997 - June 2001
- Wrote extensive pleadings for civil and criminal cases in state and federal courts, including motion for summary judgment in a complex savings and loan case and motion to dismiss an indictment for a defendant accused of providing material support to a terrorist organization.
- Argued motions in Virginia state court in case involving alleged malfeasance by corporate officers and directors in connection with the sale of on-line pharmaceutical company.

**District of Columbia Superior Court**        Washington, D.C.
*Clerk to Judge Ellen Segal Huvelle*        June - August 1995
- Researched and drafted memoranda on civil matters, including discrimination, breach of contract and defamation.

**Peter Hart Research**        Washington, D.C.
*Administrative Assistant*        August 1993 - July 1994
- Reviewed focus group and polling data and drafted reports for corporate clients.

EDUCATION:
**Georgetown University Law Center**        Washington, D.C.
J.D.        1997

**Vanderbilt University**        Nashville, TN
B.A. (Political Science and European History - Double Major)        1993

BAR ADMISSIONS: Virginia and the District of Columbia

AWARDS:
- Joint Civilian Service Commendation Award, 2004
- Attorney General's Award for Distinguished Service, 2015

DJA119.46

# Dechert
## LLP

Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036-6797
+1  212  698  3500  Main
+1  212  698  3599  Fax
www.dechert.com

**MICHAEL J. GILBERT**

michael.gilbert@dechert.com
+1 212 698 3886  Direct
+1 212 698 0426  Fax

November 3, 2020

**VIA E-MAIL**

Christopher J. DiMase
Nicholas S. Folly
Tara LaMorte
Assistant United States Attorneys
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Re:  Disclosure of Potential Defense Expert in *United States v. Weigand, et al.*, 20 cr. 188 (JSR)

Dear Chris, Nick, and Tara:

Defendant Ruben Weigand hereby provides notice, pursuant to Federal Rule of Criminal Procedure 16, that he expects to call Stephen C. Mott to provide expert testimony on credit card payment processing as outlined herein.  A copy of Mr. Mott's CV is attached.

## Mr. Mott's Qualifications

Mr. Mott is an expert on digital payments, security and electronic transactions.  He has more than three decades of experience in online and mobile transactions, debit and credit networks, authentication and security technologies, and emerging alternative payments.  Mr. Mott was a senior executive at MasterCard for three years, serving as Senior Vice President of Electronic Commerce and New Ventures from 1995 to 1998.  Mr. Mott's responsibilities at MasterCard included creating a new electronic security protocol and aiding member banks around the world to use the Internet as a safe new delivery channel for financial products.  More recently, Mr. Mott has worked as an industry consultant, helping banks, networks, security technology providers, merchants, payment gateways and other payment facilitators develop comprehensive consumer and small business payment strategies and make technology assessments for online and mobile transacting among payment card providers, and online buyers and sellers.  Mr. Mott's consulting experience and stature in the industry led to his election to serve on the steering committee for the Federal Reserve's recent Secure Payments Task Force, among other posts.

DJA119.47

Dechert
LLP

Christopher J. DiMase
November 3, 2020
Page 2

**Bases for Mr. Mott's Testimony**

Mr. Mott will base his explanations of credit card transactions and Issuing Banks' approval process and priorities for risk management on his education, training, professional experience, and work with industry organizations. To the extent he renders opinions, they will be based on those same things, as well as his review and consideration of:

1. Documents and information produced by the Government in connection with this case, including, but not limited to: (i) Visa Core Rules and Interlink Rules (April 2020) and MasterCard Rules and Transaction Processing Rules (December 2019), subpoena returns from Visa, and disclosure correspondence and other materials from the Government for Visa; (ii) subpoena returns from Citibank, Bank of America, and JP Morgan Chase, and disclosure correspondence and other materials from the Government for Citibank, Bank of America, and JP Morgan Chase, among other banks; and (iii) merchant applications.

2. Office of the Comptroller of the Currency (OCC) Comptroller's Handbook on Merchant Processing

3. Payment card industry publications, guidelines, references and reports/studies on electronic commerce ("eCommerce") best practices and operational realities for risk management and fraud mitigation, including network standards for vetting merchants and authentication of consumers.

Mr. Mott is continuing to review additional data and information. He may offer additional opinions, or additional bases for his opinions, as a result of his ongoing review of data and information and in response to evidence, opinions, or testimony presented during the trial proceedings. As a result, Defendant Weigand respectfully reserves his right to supplement this disclosure at any time before Mr. Mott's trial testimony and/or as permitted by the Court.

**Mr. Mott's Expected Testimony**

Mr. Mott will explain the mechanics of credit and debit card transactions, including the roles of the various participants in those transactions, especially merchants, merchant acquiring banks, independent sales organizations ("ISOs"), payment service provider ("PSPs"), payment networks, issuing banks, payment gateways, third-party risk management specialists, and cardholders.

DJA119.48

# Dechert
LLP

Christopher J. DiMase
November 3, 2020
Page 3

Mr. Mott will testify as to the concerns and operating parameters of issuing banks, including their consideration of customer creditworthiness and the factors that are material and immaterial to them when determining whether to approve or decline credit and debit card transactions.

Mr. Mott will testify as to the steps that issuing banks may take in order to detect and root out fraud and other suspicious activity.

Mr. Mott will explain non-secure e-commerce transactions, including the associated interchange fees paid to issuing banks versus chargeback liability for online transactions, among other topics related to non-secure e-commerce transactions.

Mr. Mott will testify as to the standards and protocols employed by Visa and MasterCard when determining their membership in the United States and abroad, Visa and MasterCard's approach to international transactions, and the ways in which they oversee and manage the integrity of the global payments system.  Relatedly, Mr. Mott will testify as to the jurisdictional constraints imposed on non-U.S. acquiring banks by Visa and MasterCard.

Sincerely,

*/s/ Michael J. Gilbert*
Michael J. Gilbert
Shriram Harid
Steven Pellechi
Dechert LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
Michael.gilbert@dechert.com
Shriram.harid@dechert.com
Steven.pellechi@dechert.com

Michael H. Artan
Michael H. Artan, Lawyer, A Professional Corporation
1 Wilshire Boulevard, Suite 2200
Los Angeles, CA 90071
michaelartan@yahoo.com

*Attorneys for Defendant Ruben Weigand*

| Stephen Craig Mott |
| Curriculum Vitae |

## Professional Summary

Steve Mott has more than three decades of experience in the fields of transaction economics, online and mobile transacting, innovative uses of debit networks, rewards and loyalty programs, authentication and security technologies, and emerging alternative payments—including smart cards, stored value, P2P, mobile/digital/real-time payments, electronic checks, and distributed ledger systems. BetterBuyDesign is a management advisory firm serving clients ranging from banks and processors to technology startups and investment firms. Consulting assignments typically include business case analyses and forecasts; strategy and business development; technology assessments; new product development; expert witness support; and due diligence evaluations. He regularly briefs investment firms on payment trends and prospects for major industry participants.

Steve speaks and writes frequently about the industry, presenting at more than two dozen payment, technology, retailing and customer conferences each year, serving as a member of several payments conferences planning committees and industry groups, and providing executive-level training and workshops on industry topics. Steve is viewed as an industry authority and thought leader on digital payments and security, including mobile, P2P, prepaid, real-time debit, EMV/NFC, digital wallets, distributive ledgers and other emerging POS and cloud-based technologies. An acknowledged pioneer in eCommerce, in 1997 Steve was named by Interactive Week (later eWeek) magazine as one of the "Top 25 Unsung Heroes of the Internet" and in 1998 by Business 2.0 magazine as one of the "Top 25 Most Intriguing Minds for the New Economy." Steve is a graduate of U.C. Berkeley and Harvard Business School, was a White House Fellow appointee, and previously held executive positions at McKinsey & Co., McGraw-Hill, MCI Telecommunications, MasterCard Worldwide, and as President of Priceline WebHouse Club, an Internet retailer.

## Expertise

| | |
|---|---|
| Alternative Payments, Stored Value | Electronic Checks: ACH, Check Imaging, RDC |
| Authentication Technologies; Standards & Rules | Electronic & Mobile Commerce and Banking |
| Credit &Debit Cards; Network Rules & Histories | Loyalty & Rewards Programs; Incentive Marketing |
| Data Security; Fraud & Risk Management | Payment Economics, Interchange, Market Pricing |
| Contact/Contactless Smart Cards (EMV/NFC) | Tokenization, Encryption, PCI Mitigation |
| EFT PIN & PINless Debit | Virtual Currency; Blockchain/Distributed Ledgers |

## Education

| Year | College or University | Degrees |
|---|---|---|
| 1979 | Harvard Business School | M.B.A. |
| 1974 | University of California at Berkeley | B.A. Economics; B.A. Journalism |

**DJA119.50**

| Stephen Craig Mott |
| :---: |
| **Stephen Craig Mott**<br>**Curriculum Vitae** |

## Professional Experience--Summary

Prior to 2000, job assignments included Engagement Manager at McKinsey & Co.; Director of Strategic Planning at McGraw-Hill; VP of Sales, Marketing and Product Development at MCI Communications; President of software development company Cognitive Systems, Inc.; SVP-Electronic Commerce & New Ventures at MasterCard (1995-1998); and President of Priceline WebHouse Club (1999-2000).  Current position (2/1998-7/1999 and 10/2001 to present:

From:            1998/2000
To:              Present
Organization:    BetterBuyDesign LLC (formerly CSI Management Services, Inc. until 2011)
Title:           Principal
Summary:         Management consulting; M&A due diligence and technology evaluations; IP and expert witness support; business case development and opportunity assessments; market strategies and forecasting for banks, processors, networks, merchants, technology and investment firms.  Spent 16 months as President of Priceline WebHouse Club (1999-2000) including design a private-label debit card payment system.  Consulted to clients, taught workshops and provided webinars on Internet payments and security; payment card interchange; online banking and bill payment; small business/B2B payment automation; mobile commerce at POS; Web 2.0; electronic check payments; virtual currencies; stored value; and loyalty and rewards programs; and mobile payments.

## Professional Experience--Detail

1998 – present              **BetterBuyDesign/CSI Management Services**              Stamford, CT
                            **PRINCIPAL/PRESIDENT**

Created and manages this consultancy for electronic payments transaction businesses.  Accomplishments included:

- Supported the Federal Reserve Faster Payments Initiative by serving on Secure Payments Task Force Steering Committee, with three key assignments in first year of operation, including Chair of Standards Assessment Team; also member of Faster Payments Task Force; served on rules and standards sub-group; founding member of Faster Payments Coalition
- Consulting on "Opt-Out Merchant" appeal of $5.2 bil. interchange suit settlement proposed in 2012, including provision of research on Honor All Cards (HAC) impacts, EMV deficiencies and market constraints from card network programs and rules on eCommerce
- Serving as a subject matter expert and resource for the Federal Reserve's Mobile Payments Industry Workgroup (MPIW), assisting with white papers on tokenization and card-not-present security

**DJA119.51**

> ### Stephen Craig Mott
> ### Curriculum Vitae

- Analyzed new, cloud-based, mobile handset- and tablet-originated POS transacting environments and technology for PCI exoneration and access to non-card brand networks
- Authored key expert report to support Durbin Amendment legislation
- Served on the Federal Reserve's Consumer Payments Research Center (CPRC) Advisory Group (from 2009-2018)
- Provided strategic support and technical assessments, including executive briefing and education sessions, on online and mobile transacting for three dozen banks, merchants, processors, networks, and technology companies
- Defined and articulated the marketplace for secure real-time debit account payments
- Evaluated and developed electronic check processing and online bill payment strategies for major technology players
- Provided market assessments and new product strategies for three stored value companies
- Developed comprehensive consumer and small business payments strategies for four banks
- Provided three large merchants with defensive programs to help them offset PCI Compliance challenges and conducted RFIs/RFPs in vetting processing service and security vendors
- Oversaw business development and generated strategies for biometric, software, and hardware security companies for offline and online markets
- Provided competitive analysis and due diligence assessments for M&A operations of several processors and security companies
- Assisted security companies in IPO and capitalization efforts; evaluated and developed business plans for several emerging technology firms
- Participated as subject-matter-expert and conference speaker/planner for the Fed, NACHA, BAI, FS-ISAC and BITS/FSR; also security briefer for the Merchant-Financial Services Cybersecurity Partnership
- Was named one of the "Top 25 Most Intriguing Minds for the New Economy" by Business 2.0 magazine in July, 1998

1999 – 2000                    **Priceline WebHouse Club, Inc.**                    Stamford, CT

#### PRESIDENT

Promoted during the first four months from Chief Strategist to SVP Operations to EVP Business Development to President, leading the launch of the priceline.com "name-your-own price" concept for buying groceries and gasoline online, and picking up at physical stores. Accomplishments included:

- Spearheaded the development and rollout of a nationwide network of 10,000 grocery stores
- Negotiated a national market development partnership with Kroger/several other major retailers
- Developed a unique settlement/payment processing system to support off-line fulfillment
- Worked with Symbol, Verifone, Hypercom, IBM and NCR on integration of barcode and related technologies for streamlining new payment types at POS
- Helped build a 750-person company that generated $228 million in revenues in 11 months

**DJA119.52**

> ### Stephen Craig Mott
> ### Curriculum Vitae

- Developed a business plan and PPM for spinning off the successful gasoline demand-collection business as a consumer wireless fulfillment operation

| 1995 - 1998 | **MasterCard International, Inc.** | Purchase, NY |
| --- | --- | --- |

### SENIOR VICE PRESIDENT, ELECTRONIC COMMERCE/NEW VENTURES

Directed the creation of a new infrastructure and built a business development team to facilitate efforts by member banks around the world to develop the Internet as a new delivery channel for financial products. Achievements included:

- Shaped and launched the secure electronic transaction (SET) protocol, generated 51 SET pilots in 32 countries in one year, and established a public key infrastructure (PKI) offering for international use
- Developed seminal new product offerings for the safe use of debit cards, EMV smart cards, and B2B procurement cards for Internet usage by banks, merchants, and consumers
- Won wide acclaim from the media for eCommerce programs and was named by Inter@ctive Week (now eWeek) as one of Top 25 "Unsung Heroes of the Internet" in December 1997
- Personally developed e-commerce strategy and technology partnerships with IBM, GTE, Netscape and Oracle

| 1994 - 1995 | **Ingenia, Inc. (part of Ingenia, s.a.)** | Stamford, CT |
| --- | --- | --- |

### PRESIDENT

Created a new subsidiary to launch North American operations after the parent company purchased a major portion of CSI business.  Transitioned CSI relationships with major banks in Europe to the successor company.  Designed, sold, and installed software programs for bank compliance with money laundering regulations.

| 1987 - 1994 | **Cognitive Systems, Inc.** | Stamford, CT |
| --- | --- | --- |

### PRESIDENT, CEO/PRESIDENT, COO

Held responsibility for operations, sales and marketing, research and development, and finance/administration for three spin-off firms performing contract-R&D and advanced technology product development.

- Built market and sold more than dozen major banks on correspondent banking services for automating wire/network money transfers
- Designed and oversaw production of innovative data mining and text processing program successfully used by US intelligence agency to track money laundering payments by terrorists and drug dealers.

**DJA119.53**

| Stephen Craig Mott |
| Curriculum Vitae |

- Commissioned, funded and supervised development of induction-based decision support software product that was successfully utilized in more than 200 innovative enterprise applications.
- Developed global distributor network for case-based reasoning development system.
- Leveraged business partnerships with European banks and software companies into leading market position against bigger French competitor (Ingenia) resulting in their buying the business.

1984 - 1987                              **MCI International, Inc.**                    Rye Brook, NY
<u>**VICE PRESIDENT, SALES AND MARKETING**</u>

Assumed responsibility for sales force management, the design and implementation of marketing programs, building of specialized customer interfaces, and product development by a staff of 250.  As the director of marketing, developed business cases, designed marketing programs, and negotiated relationships with foreign communications authorities to introduce international voice services, a billion-dollar business in four years.

- Developed product strategy and led a full array of sales and marketing efforts to establish a high-growth data communications division, which became a billion-dollar business in eight years
- Fielded a partitioned-DOS PC operating system (two years before multi-tasking) that helped 3,000 customers replace single-function, expensive telex machines with standard, low-cost PCs
- Designed a global, digital network service (combining fiber optic cable and satellite) that became a flagship offering in MCI's private line service offerings to financial services firms
- Developed a value-added correspondent banking automation/message processing service that cracked the NYC banking market and created a new business segment

*Additional Experience*

1982 - 1984, **McGraw-Hill, Inc.;** New York, New York - **<u>DIRECTOR</u> <u>OF</u> <u>STRATEGIC</u> <u>PLANNING</u> <u>AND</u> <u>MARKET</u> <u>FOCUS</u> <u>DEVELOPMENT.</u>**  Was hired by this former McKinsey client to coordinate an internal task force to develop a comprehensive corporate strategy for vertical market offerings via electronic technology, in conjunction with Michael Porter (HBS).

1979 - 1982, **McKinsey & Co.;** New York, New York and Stamford, Connecticut - **<u>ENGAGEMENT</u> <u>MANAGER.</u>** Managed strategy consulting engagements for McGraw-Hill, Amex, Arrow Electronics, Emery Air Freight, and other clients, which often included management and/or sales responsibilities.

<u>Military</u> <u>Service</u>: **United States Marine Corps,** 1967 - 1970 - Sergeant (E-5) running HAWK missile platoon; honorably discharged.

### Stephen Craig Mott
### Curriculum Vitae

---

### Representative Professional Affiliations, Achievements & Awards

- Founding member of the Faster Payments Council; served on Rules & Standards and Safety & Security workgroups

- Elected to the Steering Committee of the Federal Reserve's Secure Payments Task Force—one of two groups chartered to vet the Faster Payments Initiative; appointed member of both groups; headed working group refining security effectiveness criteria for evaluating solution proposals

- Author of two industry expert reports submitted to the Federal Reserve and to the courts computing the actual costs of debit card transactions, and assessing history and promulgation of network rules that suppress innovation—in support for the Durbin Amendments

- Resource to the Federal Reserve Bank's Mobile Payments Working Group, an ad hoc collection of representatives from the emerging mobile payments ecosystem deliberating on infrastructure needs and regulatory/technology roadmap for mobile NFC payments; contributions includes facilitation of meetings and co-authorship of annual reports; developed foundation for, coordinated/facilitated group session on QR Codes and payment players from China (Ali Pay, WeChat Pay, China Union Pay)

- Member of and consultant to the Financial Services Technology Consortium, an ad hoc group of financial institutions and technology providers who develop industry standards for securing electronic payments technologies; project manager for three-phase mobile commerce and fraud standards projects

- Sole U.S. consultant participating in 2010-2020 strategy assessment for the Canadian Payments Association, and for the Canadian Payments System Review (2009-2011)

- Subject matter expert on payments and member of planning committees for numerous conferences for two industry organizations (NACHA, the U.S. ACH governing body; BAI, the Bankers Administration Institute; and the Federal Reserve Bank); conducted workshops in online banking, authentication and electronic checking products; facilitated mobile commerce/banking development sessions

- Advisor and consultant to the Cellular Telecommunications Industry Association (CTIA) for development of consumer safeguards (security, identity, privacy) for mobile banking and commerce, and regular participant in twice-a-year conferences

- Board Director for IrisScan (later Iridian Technologies), a biometric authentication/verification company; member of several advisory boards and consultant to several Internet, mobile and e-payments start-ups, including PaySimple, Cardinal Commerce, Coin and Cellpoint Mobile

- Gerson Lehrman Group Leader, awarded to top 5% of industry experts consulted by investment and research firms for information and advice on electronic payments industry

- Speaker at two dozen industry conferences a year and author of more than 100 articles in past decade, including two 10-part series in Digital Transactions Magazine ("Tipping Points in Payments" and "Data Insecurity") and two six-part series ("The End of Interchange" and "Web 2.0 Transforming Payments"); regular contributor to n*genuity Magazine/Journal (produced by TSYS)

---

DJA119.55

### Stephen Craig Mott
### Curriculum Vitae

- Developed strategy and economic analysis for electronic checks/ACH for use via Internet and mobile for NACHA; supported Fed efforts for Check 21; developed check automation strategy for IBM
- Selected one of "Top 25 Most Intriguing Minds for the New Economy" by Business2.0 Magazine--July 1998; designated one of "Top 25 Unsung Heroes of the Internet" by Interactive Week Magazine (eventually eWeek)--December 1997

### Relevant Consulting Assignments

Steve Mott has performed numerous consulting assignments and engagements in new product and marketing strategy development, market segmentation, transaction processing design, operational evaluations, business case analysis, user research and authentication/security risk strategy assessments for dozens of banks, processors, networks, technology providers, merchants and billers.  Representative engagements include:

- Merchant/Biller Payments and Processing/Media Companies:
  - Providing support for J.D. Power on satisfaction rating assessments of small business merchant services providers, and certification of best practices for mPOS providers
  - Supported larger payments consulting firm in evaluation design requirements for fielding a internalized global payments processing and risk management capability for an eCommerce marketplace client, replacing existing payments provider
  - Provided model of existing mobile payments by channel for two large national merchants, sorting through more than two dozen mobile wallet offerings, including in-market testing of those wallets
  - Developed QR code market and technology strategy for group of merchants to offer alternative to EMV/NFC contactless
  - Provided competitive analysis of targeted competitor on behalf of large processor
  - Analyzed comparative positioning of major payments media company for content, conferences, and customer bases vis-à-vis emerging rivals
  - Worked with the Merchant Advisory Group (MAG) industry group (serving more than 150 of the 300 largest merchants) to provide analysis and advice on problems with EMVCo-controlled plans for tokenization of mobile payments
  - Worked as lead consultant to the Merchant Customer Exchange (MCX) to design a secure, merchant- and consumer-friendly mobile payments and marketing system. Responsibilities included identifying technology requirements and providers; development of issuing, acquiring, network, marketing and mobile component partners (including wallet management systems, applications, security, mobile offers, etc.), and evaluation of QR code viability, including patent coverage. (MCX was initially comprised of dozens of the nation's largest merchants, representing more than $1 trillion in retail sales)
  - Provided an extensive analysis of debit card costs and provider practices as input to the Federal Reserve to inform their rule-making on the Durbin Amendment mandates to the Dodd-Frank Financial Reform Act

**DJA119.56**

> **Stephen Craig Mott**
> **Curriculum Vitae**

- o Advised two Top 50 retailers on interchange and fee negotiation strategies with card networks, including development of comprehensive analysis across payment operations
- o Provided executive training/industry briefing sessions to nearly a dozen major merchants on eCommerce and mCommerce trends and opportunities
- o Defined and developed a comprehensive payments strategy for a top 30 retailer, including PCI mitigation, mobile and EMV deployment, and rebidding of card processing services
- o Supported a custom-blended beverage chain with development of mobile app to enable 'line-busting' with tablet-based POS system, including analysis and assessment of 15 different iPad-like product offerings
- o Conducted market assessment of current eCommerce product offerings for a very large processor, including detailed interviews with and evaluations of relationships with several target merchants
- o Performed due diligence on small business/B2B integrated payments provider and developed global payments strategy for hedge fund acquirer
- o Developed strategy and identified potential partners for small business B2B payment portal and gateway for a global payments provider, including identifying and negotiating with outsourcing partner
- o Supported three separate white paper inputs to the Federal Reserve on online debit card economics, risk, and tradeoffs among enhanced authentication options, to support merchant case for lower fees
- o Assessed 20 international online markets for debit card payments and security for a U.S. based payments provider
- o Developed Web 2.0 platform strategy and requirements for major card processor
- o Evaluated electronic debit payment options for several processors, merchants and debit networks
- o Reviewed prospects for Electronic Check Acceptance (ECA) for Retail and Bank deployment of remote check processing for two major processors
- o Provided analysis and negotiating support for better processing rates and services for numerous merchant clients (in POS and online venues)
- o Supported a comprehensive cost analysis and card acceptance rebidding project for a top fast-food retailer (QSR) in the U.S. and Canada, including training of franchisees on how to minimize payment fees and optimize communications access
- o Developed a detailed strategy for optimizing costs and service across all payment types and venues for a major telecommunications company
- o Provided high-level strategy advice and payments costing data to several national merchants and billers for both political and internal purposes
- o Supported new business applications that required upgrades in POS capabilities with collaborating hardware and software providers (e.g., IBM, Symbol Technologies, NCR, Verifone, etc.)
- o Provided market assessments and partner introductions for a variety of loyalty and rewards-system vendors seeking to gain entry into the card-marketing business
- o Developed strategies and product costing analysis on PINless debit for two networks, two processors, and a technology provider based on extensive interviews and

Page 8 of 25 Pages

**DJA119.57**

| Stephen Craig Mott |
| Curriculum Vitae |

research with consumers, merchants/billers, financial institutions, and third-party providers
- o Assisted two online merchants in procuring affiliate-based payment platforms from their processor
- o Assisted in developing new products for a top-three online bill payment provider
- o Helped position a leading convenience-bill payment processor for an advantageous sale to a bigger company
- o Consulted extensively to several major merchant/biller processors on product and pricing needs, ISO channel utilization and optimization, and integration/roll-out of new payment services
- o Conducted payment card processing contract rebidding efforts at nearly a dozen merchants—large and small
- o Developed industry cost data and economic trends for two EFT networks on a full array of payment products (data later used by merchants in litigation against the bank card associations)
- o Built an innovative payment system at an Internet merchant that generated $228 mil. in sales from 2 mil. customers and 10 mil. transactions in its initial year of operation (as President of Priceline WebHouse, 1999-2000); assignment included building a retail network of two dozen grocery chains
- Banks and Networks:
  - o Provided a banking industry security group with support services on projects involving mobile wearables, data-in-motion challenges, and cloud computing technology and security
  - o Helped a large consortium of major banks evaluate card payment tokenization efforts, including detailed critiques of brand efforts with EMV mobile payments and 3DS online security
  - o Provided assessments and critiques of network products, rules and economics regarding debit cards, EMV, online and mobile commerce and security, including mobile and digital wallets
  - o Conducted payments landscape assessments and trends briefings to C-level executive groups at three Top-10 issuers since late 2014
  - o Provided strategic advice to two Top-40 banks and a major card network on mobile payments and marketing options, including development of comprehensive model for projecting mobile adoption and revenue from 23 new business models and partnership configurations; also advised on participation with industry consortia
  - o Assessed the technology and market prospects for remote and mobile check deposit and capture for a banking industry group, a service provider/processor and a mid-sized bank
  - o Provided market assessment and technology evaluations for campus card system and related technology offered by a Top-10 credit union
  - o Provided comprehensive enterprise payments strategies for two Top-40 banks, and two smaller FIs, including detailed cost analyses and business impacts of emerging regulatory compliance and security requirements
  - o Evaluated full component of payments costs and service marketability for a Top-40 regional bank, including creation of and support for its Enterprise Payments Group

**DJA119.58**

**Stephen Craig Mott
Curriculum Vitae**

- o Conducted comprehensive briefings on digital payments to top management at a Top-3 network, with a strategy for moving into P2P and Real-time Debit capabilities
  - o Built forecasting model on how various constituencies can make money with multiple emerging revenue models for mobile marketing and offers; model foots to U.S. consumer economy in 35 product/service sectors and 21 financial services
  - o Developed strategy for a major, global non-bank network to making expedited payments in small business (B2B) and POS (mobile transacting) markets
  - o Provided market analysis and positioning recommendations for major non-bank network in stored value products
  - o Developed strategy for small commercial bank to enter prepaid payment market
  - o Provided due diligence analysis of two prepaid debit card providers
  - o Conducted research on market sizing and payment economics for electronic bill payment for a Top-three retail bank
  - o Assessed market opportunity for two EFT networks on mobile and contactless payments at POS
  - o Evaluated opportunity for EFT network banks to offer range of expedited payments, transfers and bill payments in competition with non-bank providers
- Security/Transaction Risk Management:
  - o Serving as an expert consulting resource for the successful appeal of the 2012 proposed Interchange Fee Settlement case (Eastern District of NY), analyzing security vulnerabilities with EMV and related network programs that adversely impacted market conditions and made basis of settlement untenable for merchants
  - o Managed the Federal Reserve's Secure Payments Task Force's Standards Assessment Team, a workgroup comprised to evaluate and recommend security solutions and recommendations on best practices for payment identity management, financial risk information-sharing, and data protection workgroups
  - o Assisted a leading payments service provider/processor with defining platform insourcing opportunities to better control risk and expedite payment settlement
  - o Provided a top chip card provider with a detailed assessment and executive workshop on US readiness for EMV, NFC, 3DS, tokenization and other security initiatives
  - o Assisted major restaurant chain in crafting and deploying a PCI exoneration strategy as part of contract rebidding process for card payment processing
  - o Supporting the Federal Reserve's MPIW assessment of mobile security threats and solutions, including co-authoring and supporting white papers on tokenization, eCommerce security, and QR codes
  - o Supported BITS/Financial Services Roundtable and Financial Services Technology Consortium projects on mobile security and architecture assessments, mobile check deposit and mobile banking
  - o Assisted online retailer, EFT network, and security provider with evaluating PIN-debit risks for online transacting
  - o Developed assessment of potential adoption of 19 online authentication technologies (2001-2002) (as an interim consultant for Benton International)
  - o Analyzed and evaluated 56 different security technologies for online transacting and banking (2005) for major debit network client

Page 10 of 25 Pages

**Stephen Craig Mott**
**Curriculum Vitae**

- o Responsible for Secure Electronic Transaction (SET) protocol and global marketing efforts while SVP-eCommerce at MasterCard (1995-1998)
- o Provided assessment of potential merchant and cardholder adoption of 3D-Secure technologies (e.g., VerifybyVisa/SecurCode/J-Secure) (2003-2004) for a major card processor and two large banks
- o Developed business strategies and evaluated products/market positioning for numerous transaction security companies (e.g., PaybyTouch, RSA Security, Certicom, Iridian Technologies, TouchCredit, ValiDator, FD/Asuretee, etc.)
- o Performed competitive assessment on eFalcon vs. PRISM for a major processor
- o Conducted Webinars and Seminars on FFIEC guidance for multi-factor authentication for BAI
- Alternative Payments
  - o Helped an online marketplace design and develop their own competitive offering to PayPal
  - o Provided Assisted several startup alternative payment companies with go-to-market assessments and strategies for the U.S. (e.g., PaySimple, mShift, Cardis, Cardinal Commerce, NoMoreCards, Coin, Index, Paydiant, etc.)
  - o Evaluated current POS systems for incorporation of new payment types and related programs for several start-ups
  - o Provided strategy development assessments for provider of PIN-debit in software for online purchases
  - o Provided market study and technical analysis to support development and launch of EFT service offering that combined checking account and debit card access
  - o Developed Web 2.0 strategy for newspaper industry initiative, illustrating how to turn local newspapers into social networks with embedded digital payments and transaction capabilities
  - o Served as co-project manager for FSTC's multi-phase standards and interoperability project on Mobile Payments Technology, including evaluation of new providers
  - o Member of Steering Committee of NACHA Internet Council (which is focused on online services and authentication)
  - o Provided the business case analysis for NACHA's credit-push initiative, which guarantee ACH transactions for online purchases and bill payments
  - o Helped design an end-to-end guaranteed ACH/EFT offering for online markets, using PINs for user identification
  - o Presented to and represented two alternative payment clients in a number of Merchant Payment Roundtable meetings
  - o Helped a leading online banking services provider define and enter real-time debit market
  - o Assisted a major private-label processor expand merchant offerings in e-checks

IMS ExpertServices.

13| Stephen C. Mott

www.expertservices.com | Expert Witness | Trial Strategy | Jury Consulting | Graphics | Technology

**DJA119.60**

> **Stephen Craig Mott**
> **Curriculum Vitae**

---

> **Representative Litigation and Corporate IP Expert Witness Support**

*Blackcard, Vesta, Fleet*

*1. Expert Witness Engagement:*

| | |
|---|---|
| Type of Matter: | **Countersuit to alleged patent infringement claim on PCI, EMV, OFX, and related protocols for retail banking, asserting anti-trust invalidation of patents** |
| Law Firm: | Latham & Watkins for **plaintiff** CapOne Bank |
| Case Name: | Intellectual Ventures I & II LLC v. Capital One Financial Corporation: Civil Action No. 8:14-cv-00111-PWG (U.S. District Ct-MD) |
| Services Provided: | Expert witness support, including **expert report** analyzing data processing and communications standards required for banking services for payment cards, ATMs, and online/mobile banking; **deposition** 4/2017 |
| Disposition: | Plaintiff's claim dismissed with appeal under consideration (as of 4/2018) |
| Period of Service: | March-October, 2017 |

*2. Expert Witness Engagement:*

| | |
|---|---|
| Type of Matter: | **Alleged patent infringement on Internet Banking without using pre-established account relationships** |
| Law Firm: | Faegre Baker Daniels LLP for **defendant** First Internet Bank of Indiana |
| Case Name: | Integrated Technological Systems, Inc. v. First Internet Bank of Indiana: Case No.2:16-CV-0417-JRG-RSP U.S. District Court-Eastern TX/Marshall Division |
| Services Provided: | Expert witness support, including **expert report**, for defense analyzing invalidity and non-infringement |
| Disposition: | Plaintiff's suit dismissed, and decision affirmed on appeal (2/2018) |
| Period of Service: | 1Q2017 |

*3. Expert Witness Engagement:*

| | |
|---|---|
| Type of Matter: | **Inter Partes Review (IPD) of patent claiming authentication of secured resources (accounts) via three-party transaction protocol** |
| Law Firm: | ERISE IP, P.A.-**Petitioner** |
| Case Name: | Unified Patents Inc. v. Textile Computer Systems: IPT2017-00296 (Patent No. 8,505,079) |
| Services Provided: | Expert witness support, including **declaration** to PTO Patent Trial and Review Board obviating validity of patent |
| Disposition: | Petition to assert certain claims as too broad to be patentable denied (3/2018) |
| Period of Service: | 1Q2017 |

*4. Expert Consultant Engagement:*

| | |
|---|---|
| Type of Matter: | **Disputed Value of Purchase of eCommerce Payment Processing Company** |

**DJA119.61**

**Stephen Craig Mott
Curriculum Vitae**

---

| | |
|---|---|
| Law Firm: | Gibson Dunn for **defendant** Susquehanna Investment Group |
| Case Name: | Great Hill Partners et al v. SIG Growth Equity Fund et al; Civil Action No.: 7906-VCG |
| Services Provided: | Consulting support, including collaboration with The Analysis Group, to provide a draft affirmative expert report on eCommerce fraud and chargeback trends, mitigation practices, and inter-relationships of processors, PSPs, networks and merchants to assess strategies for dealing with summary judgment motions. |
| Disposition: | Trial held in Delaware Chancery Courts; both parties countersuing on fraud and perjury claims (8/2018) |
| Period of Service: | May to December 2016; in further appeal |

*5. Expert Consultant Engagement:*

| | |
|---|---|
| Type of Matter: | **Merchant Class Action claim against Bank Card Networks and Banks on Interchange, Rules (e.g., Honor-all-cards), and Technologies (e.g., EMV, Contactless/NFC, etc.)** |
| Law Firm: | Constantine Cannon for Opt-out Merchant **Plaintiffs** |
| Case Name: | In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation No. 05-MD-1720 (JG) (JO) and Appeal 12-4671-cv(L) |
| Services Provided: | Providing evidence review, technical analysis of digital wallets and QR codes, evaluation of network rules, and assessment of regulatory and market actions globally; **expert report** filed 2013 and another in 2018 |
| Disposition: | Supreme Court reaffirmed successful appeal of original settlement (2012); case being re-litigated |
| Date of Service: | June 2012 to present |

*6. Expert Witness Engagement:*

| | |
|---|---|
| Type of Matter: | **Alleged Infringement of Patent ('724') for non-FI based money remittances** |
| Law Firm: | Baker & Botts LLP for **defendant** NetSpend Corp. |
| Case Name: | MiCash, Inc. v. NetSpend Corp.[Case No. 2:12-CV-248-JRG, Marshall Division, TX] |
| Services Provided: | Supported defendant in claims terms, invalidity and infringement defenses |
| Disposition: | Reached favorable settlement to defendant after draft expert report |
| Date of Service: | May to July 2013 |

*7. Expert Witness Engagement:*

| | |
|---|---|
| Type of Matter: | **Claim of Misappropriation of Trade Secrets and Other Contract Terms for Correspondent Banking Services** |
| Law Firm: | Fleeson, Gooing, Coulson & Kitch, LLC and Foulston, Sieken LLC, for **plaintiff** LendingTools.com, Inc. |
| Case Name: | LendingTools.com, Inc. v. Bankers' Bank of Kansas, N.A. and The Bankers' Bank, N.A. [Case No. 11-CV-1879, Sedgwick Co. District Court, Kansas] |
| Services Provided: | Expert witness support, including **expert report** on industry practices for correspondent banking services to support claims of misappropriated trade secrets/confidential information; **7.5 days of depositions;** bench review of expert testimony/qualifications; **testimony at trial** |

**IMS** ExpertServices.

**DJA119.62**

> **Stephen Craig Mott**
> **Curriculum Vitae**

| | |
|---|---|
| Disposition: | Plaintiff's claim dismissed (3/2016); appeal heard (6/2018) and won; settlement talks underway, but re-trial is currently scheduled for 2/2020 |
| Date of Service: | August 2012-March 2016 |

*8. Expert Witness Engagement:*

| | |
|---|---|
| Type of Matter: | **Alleged Violations of License Agreement for Use of Patents ('608 and '787)** |
| Law Firm: | Baker & Botts LLP and Fish, Richardson for **defendant** NetSpend Corp. |
| Case Name: | Alexsam, Inc. v. NetSpend Corp. [Cause NO.D-1-GN-07-003659, District Court of Travis County, TX] |
| Services Provided: | Expert witness support, including preparation of motions for summary judgments and defense of patent license agreement; **2 days of pre-trial deposition** and **testimony at jury trial** |
| Disposition: | Initial verdict of violation of License cut claims for royalties to one-third of original amount, and dismissed allegations of fraud |
| Date of Service: | March 2010 to September 2012; settled in 2014 |

*9. Expert Witness Engagement:*

| | |
|---|---|
| Type of Matter: | **Defense of Patent for Provision of Student Refunds for University Scholarship, Tuition, and Campus Card Payment Programs** |
| Law Firm: | Wiggin & Dana LLP for **plaintiff** Higher One, Inc. |
| Case Name: | Higher One, Inc. v. Touchnet Information Systems, Inc. [Case No. 3:09-cv-337-AWT] |
| Services Provided: | **Expert report** and **2 depositions** on claims terms and for prosecution of infringement suit on Higher One patent |
| Disposition: | Settlement approved 7/2015 |
| Date of Service: | Late 2010-July 2015 |

*10. Expert Witness Engagement:*

| | |
|---|---|
| Type of Matter: | **Alleged patent infringement on Flexible Spending/Multi-function Accounts** |
| Law Firm: | Fulbright & Jaworski, LLP for **defendant** United HealthCare. |
| Case Name: | Alexsam, Inc. v. United HealthCare, Inc. [Case No. 2:07-CV-512-TJW] |
| Services Provided: | Expert witness support, including draft expert report, for defense analyzing mid-1990s POS terminal capabilities |
| Disposition: | Settled prior to expert witness testimony |
| Date of Service: | 4Q/2010-2Q/2011 |

*11. Expert Consulting Engagement:*

| | |
|---|---|
| Type of Matter: | **Alleged Violation of License Agreement for Use of Patents ('608 and '787)** |
| Law Firm: | Alston and Bird, LLP for **defendant** Interactive Communications International, Inc. (InComm) |
| Case Name: | Alexsam, Inc. v. Interactive Communications International, Inc. (InComm) [Before Arbitrator Hon. Karl Bayer, Austin, TX] |

<div style="border:1px solid black; text-align:center;">

**Stephen Craig Mott**
**Curriculum Vitae**

</div>

| | |
|---|---|
| Services Provided: | Provided subject matter consulting and materials for expert report on defining reloadable cards, open banking networks and off-the-shelf POS devices |
| Disposition: | Favorable arbitration rendered in March 2012 |
| Date of Service: | October 2009 to January 2010 |

*12. Expert Consulting Engagement:*

| | |
|---|---|
| Type of Matter: | **Alleged Patent Infringement on Online/Mobile Banking Notification/Alerts** |
| Law Firm: | McDermott, Will & Emery LLP for **defendants** ATT Mobility, Zions Bank, Wells Fargo et al |
| Case Name: | Joao Bock Transaction Systems v. ATT Mobility, Zions Bank et al [Case No. 09-cv-0208] |
| Services Provided: | Industry and prior art research (including locating and interviewing original inventor); draft expert report prepared |
| Disposition: | Favorable settlement for multiple clients once prior art was discovered |
| Date of Service: | 2Q/2010 |

*13. Expert Witness Engagement:*

| | |
|---|---|
| Type of Matter: | **Alleged Patent Infringement regarding Flexible Spending/Multi-function Accounts** |
| Law Firm: | Standley, LLP for **defendant** Humana Corp. |
| Case Name: | Alexsam, Inc. vs. Evolution Benefits, Inc., Humana, Inc. [Case no.2-07CV-288DF] |
| Services Provided: | Evaluation of prior art and patent validity of Dorf patent on multi-function card applications; fact development on electronic card payment technology in 1990s |
| Disposition: | Favorable settlement for client, following **mock-trial preparation** in Shreveport |
| Date of Service: | Late 2009 |

*14. Expert Witness Engagement:*

| | |
|---|---|
| Type of Matter: | **Alleged Patent Infringement regarding Online Fraud Detection Techniques** |
| Law Firm: | Greenberg, Traurig/Ropes & Gray for **defendant** Retail Decisions |
| Case Name: | CyberSource v. Retail Decisions [Case 3 04-cv-03268-MHP] |
| Services Provided: | Evaluation of prior art and patent validity in **expert report** following USPTO re-examination |
| Disposition: | Summary judgment invalidated Plaintiff CyberSource's patent/claims from 2000-2001 era, based on Bilski and other aspects |
| Date of Service: | November 2008 to February 2009 |

*15. Expert Witness Engagement:*

| | |
|---|---|
| Type of Matter: | **Lawsuit among Credit Card Processors over Merchant Chargebacks, Fines** |
| Law Firm: | Davies, Ward, Phillips and Wineberg (Montreal) for **plaintiff** Retail Decisions |
| Case Name: | PaySystems v. BBG and Retail Decisions [Dist. of Montreal, Quebec: No: 500-17-025039-51] |
| Services Provided: | Historical research and analysis of causes of charge-backs in 2000-2005 era in POS, eCommerce and fuels sectors; **deposition support** |

IMS ExpertServices.

17| Stephen C. Mott

www.expertservices.com | Expert Witness | Trial Strategy | Jury Consulting | Graphics | Technology

**DJA119.64**

**Stephen Craig Mott**
**Curriculum Vitae**

Disposition:          Favorable settlement for client prior to trial
Date of Service:   March to September 2008

*16. Expert Witness Engagement:*
Type of Matter:      **Alleged Patent Infringement regarding Cash Rewards Programs**
Law Firm:             McDermott, Will & Emery for **defendant** American Express
Case Name:           Source, Inc. v. American Express [Case No. 2-05-cv-0347-TJW]
Services Provided:   Industry and prior art research, claims evaluation, **deposition support**
Disposition:          Favorable settlement for client prior to trial
Date of Service:     2Q-3Q/2007

*17. Expert Witness Engagement:*
Type of Matter:      **Alleged Patent Infringement regarding Prepaid, Multi-purpose Cards**
Law Firm:             McDermott, Will & Emery for **defendant** American Express
Case Name:           Alexsam, Inc. v. FSV Payments, et al [Case No. 2-03CV-337]
Services Provided:   Market research and technical analysis for draft expert report
Disposition:          Plaintiff case dismissed (2005)
Date:                 3Q-4Q/2005

*18. Expert Witness Engagement:*
Type of Matter:      **Alleged Patent Infringement regarding Supplemental Online Authentication**
                     **Methods**
Law Firm:             FR Brice & Co. (Australia) for **defendant** Cardinal Commerce Corp. (U.S.)
Case Name:           Patent Acceptance 2003243523 Opposition (by Visa, Inc.)
Services Provided:   Research and **expert report** on online authentication techniques and product
                     features and functions circa 2001-2003
Disposition:          Plaintiff claim by Visa was dismissed (2011)
Date of Service:     3Q/2009-1Q/2011

*19. Fact Witness:*
Type of Matter:       U.S. Department of Justice vs. Visa/Mastercard
Services Provided:    Deposition on behalf of DOJ (deposition on SET, EMV, B2B)
Date of Service:      May 2007

*Corporate Engagement:*
Type of Matter:      **Due Diligence on Foundational IP for securing PINs over open networks**
Corporate Client:     First Data
Purpose:              Determine which companies to buy to lock up desired IP
Services Provided:    Evaluation of seven patents in field of online security
Disposition:          Bid made for key provider, but client was outbid by new entrant to market
Date of Service:      3Q/2004-2Q/2005

*20. Corporate Engagement:*

**DJA119.65**

> **Stephen Craig Mott**
> **Curriculum Vitae**

| | |
|---|---|
| Type of Matter: | **Overlapping IP for use of PIN and PINless debit for online payments** |
| Corporate Client: | Online Resources Corp./BillMatrix Corp./Paymentech |
| Purpose: | Established basis for getting two key competitors to cross-license applications |
| Services Provided: | Evaluated prior art, history and interrelationships of patents; brokered CEO-level meetings and agreements with target licensees |
| Disposition: | One competitor became a sustaining partner, and cross-sued a third-party; settlement achieved through consensual agreements |
| Date of Service: | October 2005-June 2006 |

## Publications, Speaking Engagements, Client Briefings

### Recent Publications

**Digital Transactions Magazine and Website** (recent articles):  1/2009: "Can One-Time Passwords Bail out Online PIN Debit?";  2/2009: "Web 2.0: Why it Matters"; 7/2009: The Fed Should Regulate Cards Even More"; 9/2009: "It's Always Darkest Before the Dawn" (an article on reviving the payment card business with new innovations); 9/2010 and 10/2010: "Why Smart Cards are Coming to America"); 2/2011: "What NFC Should Look Like"; 4/2011: "Chicken Little's Loopy Logic"; 5/2011: "Why EMV is still Homeless in the U.S."; 7/2011 "What Visa is Up To"; 12/2011 "What's Wrong with the Mobile Wallet?"; 7/2012-9/2012 "The Great Mobile Alliance"; 7/2012 and 9/2012 "Why Banks and Merchants Should Work Together on Mobile"; 12/2012 "P2P: Trojan Horse for Digital Payments?"; 10/2013 "Mobile Wallets 2.0;  Arrive with a Thud"; "The Furious Race for Control of Tokenization, 4/2014; 5/2015 and 6/2015 "Mobile Wallet Wars"; "The Parallel Universe in Faster Payments", 11/2016; "The Great EMV Hangover" 2/2017;  three-part series on Federal Reserve's Faster Payments Initiative, 3/2017; "A New Protocol's Uncertain Promise", 7/2017; "The Fed's Path to Safer—Not Just Faster—Payments, 11/2017; "Payment Improvements Take the Long Way Home", 5/2018

**Giesecke + Devrient** PaySmart! customer publication, "The Banking Challenge," July 2016.

**Total Systems** (TSYS) Customer Magazine and Web Journal, **n>genuity**, 2008-2015 (articles on tokenization, security, mobile payments, Web 2.0 transacting, migration of POS away from mag-stripe, PCI as a driver to EMV adoption in the U.S., and new policies needed from CFPB to address migrating overdraft fee practices). "Learning from the Challenges of Rolling Out EMV", Spring 2017; "Why Europe's Payments Regulation Could Rock the U.S. Payments Industry", May 2018.

**Federal Reserve White Paper**: Is Payment Tokenization Ready for Primetime?  Perspectives from Industry Stakeholders on the Tokenization Landscape, June 11, 2015 (co-author)
**Federal Reserve White Paper:** Mobile Payments in the United States Mapping Out the Road Ahead, March 25, 2011 (co-author)

### Legacy Articles

DJA119.66

**Stephen Craig Mott
Curriculum Vitae**

**Banking Strategies Magazine and Online**, web-based magazine (2004-Current): "Girding for Battle", 5/2004; "ACH and Image Convergence: A Canny Compromise or a Bridge Too Far?", 6/2006; 6/2009 article on federal requirements for granting credit scores for the under-banked.

**Digital Transactions Magazine/www.digitaltransactions.net**  6/2008 to 10/2008. Six-part website and magazine series on reinventing payments technology to take advantage of new technology.

**Digital Transactions Magazine/www.digitaltransactions.net**. 8/2007 to 11/2007. Ten-part website (8 postings) and magazine (2 articles) series on Data Insecurity. Series covers growing risk for electronic payments against illogical responses of the payments industry.

**Digital Transactions Magazine/www.digitaltransactions.net.** 11/2006 to 2/2007. Ten-part website (8 postings) and magazine (2 articles) series on Ten Tipping Points in Payments. Series covers major trends and events changing the course of electronic payments in the U.S.

**Alogent** quarterly newsletter to customers. 10/2006. "The FFIEC Tidal Wave: More of a Rising Tide." Article reviews progress in mandating additional security for online banking.

**Banking Strategies**. September/October 2006. "Can ACH and Image Convergence Succeed?" Article analyzing controversial effort by big banks to combine electronic delivery of checks via the ACH (Automated Clearing House) system with image capture at the point of origination.

**Bankers Administration Institute (BAI) Research Note**. 2006, "Small Businesses in 2006: Finally Poised for Technology Solutions that Address Long-Standing Problems and New Opportunities in Payments." Ten-page perspective on payments needs for small businesses, encapsulating and providing perspective on a major market research project.

**Digital Transactions Magazine.** March/April, 2006. "PreCash: Winning Formula for the "Self-Banked". Profile of new walk-in bill payment business model.

**Intele-Card News.** April, 2006. "A Prepaid Card Association—But For Whom?" Article discussing the signature-card issuer orientation of new stored-value card association.

**Intele-Card News**. December, 2005. "Expert Predictions/ Dec. 2005". Annual feature offering predictions for the coming year on stored value card marketplace.

**Intele-Card News.** October, 2005. The "Tale of the Tape" on Why Stored Value Forecasts Differ So. Article comparing the large differences in research sizing the stored value card market.

**Banking Strategies**. August, 2005. Guest Spot: "The Trouble with Interchange." Commentary on the problems big banks are causing for themselves by holding the line in credit card interchange.

IMS ExpertServices.

20| Stephen C. Mott

www.expertservices.com | Expert Witness | Trial Strategy | Jury Consulting | Graphics | Technology

**DJA119.67**

| Stephen Craig Mott |
| :---: |
| **Stephen Craig Mott**<br>**Curriculum Vitae** |

**Digital Transactions Magazine.**  July, 2005.  "Too Much Purple Kool-aid?"  Rebuttal to critique by ex-Visa executive Norm Littel of original article on why PIN-debit products are better than signature-based products.

**Digital Transactions Magazine.**  March/April, 2005.  "Real-time Debit Real Soon, Please."  Article advocating low-cost, low-risk ATM-debit cards for online commerce.

**Digital Transactions Magazine.**  March/April, 2005.  "Checking the Chicken Little's of ID Theft".  Article separating hype from reality on the prevalence of ID threats.

**Digital Transactions Magazine**.  March/April, 2005.  "Now You're Getting Personal: My Brush with a Broken System."  Sidebar article to story on ID Theft.

**InteleCard News.**  December, 2004.  "Expert Predictions/ Dec. 2004."  Annual feature offering predictions for the coming year on stored value card marketplace.

**Banking Strategies**, November/December, 2004.  "Driving Toward a Holistic View of Payments."  Article embracing an enterprise view of payments and the creation of payment councils and czars to ensure banks are pushing for business opportunities across business units.

**Banking Strategies**.  May/June, 2004.  "Girding for Battle."  Article that argues that new payment types such as stored-value, micro-payments and just-in-time payments all are fertile ground for industry innovation.

**Intele-Card News**.  May, 2004. "It's Time to Ask: Who's Missing the Stored Value Party Now?"  Column on importance of getting into stored-value card market.

**ePayments Magazine**.  Vol. 5, 2003.  "Much Ado about Nothing."  Article on electronic commerce need for more completed transactions rather than obsessive focus on cutting fraud back further.

**Intele-Card News.**  November, 2003. "Stored Value: The Drumbeats Get Louder."  Column presenting the growing momentum of the stored-value card market.

**Intele-Card News.**  April, 2003.  "Magic Moment." Article defining the burgeoning interest in stored value cards.

**Intele-Card News**.  October, 2002.  "Value Proposition."  Article lays out foundation for value-added provided by stored value cards, including fostering of loyalty programs for customers.

**BAI Research Report**: Disruptive Innovation and retail Financial Services: Protecting the Franchise by Giving up the Growth.  December, 2001.  Synopsis of results of research project examining innovations in financial services from 1950-2000.

> **Stephen Craig Mott**
> **Curriculum Vitae**

**ePayments,** Issue #2, 2002.  "A Mess in the Making."  Article on major Internet merchants exploring alternative payment solutions beyond signature cards.

**Business 2.0.**  December, 2000.  "Trial by Fire."  Article recapping the innovative effort to use electronic information exchange and Internet access for purchases of everyday products to replace coupon-based incentive marketing.

**Computer Networks**, #6-30 May, 2000.  The second generation of digital commerce solutions.  An in-depth assessment of the first generation of electronic commerce

**Telecommunications Reports International Journal**, Winter, 1999.  "E-Commerce, Hype, Hope and the Next Frontier." Interview on barriers to adoption of electronic commerce.

**Business 2.0.**  June, 1999.  "New Rules: A Look Forward."  An interview updating the 10 Driving Principles for the New Economy."

**Financial Service Online**. June, 1998.  "Keeping the Sun from Setting on SET".  Article critiquing the emerging infrastructure for transacting online and suggesting the banks are losing an opportunity to secure electronic commerce by trying to over-burden it.

**Report on Electronic Commerce**.  December 8, 1998.  "IIPC Formed to Develop Micropayment Infrastructure."  Interview on creation of consortium sponsored by the University of Massachusetts to develop payment systems and standards for newspapers to offer digital content.

**Business 2.0**.  September, 1998.  "Winning One Customer at a Time."  Article on how electronic exchange of information will enable businesses to build much better relationships with consumers.

**Report on Electronic Commerce.**  June 9, 1998.  "Consultant considers Smart Cards a Key Tool for Protecting Digital Content."  Interview on prospects for adoption of smart cards.

Briefing paper, *International Center for Information Technologies*.  1988.  "Electronic Information Services: Looking Ahead by Looking Back.  (With Peter G. W. Keen and J. David Sulser.)  An in-depth look at the initial versions of home banking, online brokerage and purchasing from kiosks.

### Conferences/Speaking Engagements/Affiliations (partial list)

Federal Reserve Bank Mobile Payments Industry Workgroup (**MPIW**), 2010-Present.  Facilitator for mobile payments 'eco-system' discussions on how to implement mobile payments infrastructure; co-wrote position paper on findings and recommendations; organizer of sessions on digital wallets and QR codes

**ANSI ASC X.9** featured speaker at All Committees Meeting (2014); presenter on Faster Payments (2016).

IMS ExpertServices.

22| Stephen C. Mott

www.expertservices.com | Expert Witness | Trial Strategy | Jury Consulting | Graphics | Technology

**DJA119.69**

**Stephen Craig Mott**
**Curriculum Vitae**

Association of Financial Planners (**AFP**) national conference (2012-2016) speaking on blockchain/distributive ledgers; speaker at regional AFP sessions in Dallas, Washington, D.C., and Philadelphia (2014-2017).

Speaker at Banking Information Technology Secretariat (**BITS**)—part of the Financial Services Roundtable (**FSR**)—conferences (2007-2016). including FI/Retail collaboration on CyberSecurity (2015) and mobile/cloud security workgroups (2016).

Moderator of P2P session at inaugural **Money 2020** conference (2012); panelist on Durbin 2.0 session (2013); moderator on cross-border payments (2014); moderator on "No More Credit Cards" session (2018)

Merchant Advisory Group (**MAG**) conferences.  2010-2017.  Speaker and facilitator/author of mobile payments strategy and recommendations, including movement to EMV chip+PIN contactless form factor. SME resource for Special Interest Group on eCommerce.

**NACHA** Payments.  U.S. 1998-2018.  Member of planning committee (2004-2007) and frequent speaker and moderator at this Automated Clearing House (ACH) conference focused on developments in the marketplace for electronic payments. This is the biggest payments conference in the U.S.  Also spoke at NACHA Mega-Meeting (2010) and Alliance Annual Meeting (2015).  Frequent speaker at NACHA Internet Council (1997-2015), and served as a Steering Committee member (2004-2007).

Smart Card Alliance (**SCA**—now SecureTechnology Alliance), Payments Summit (2009-2017); Annual Member Conference (2005-2017); EMV Migration Forum/U.S. Payments Forum (2012-2017).  Speaker and moderator at many of these conferences; various webinars.

**Federal Reserve** Payments Conferences (2005-2015). Invited attendee and speaker at several of these conferences, held in Kansas City, Chicago, and Atlanta.

Giesecke + Devrient management conferences (2015-2016).  **G+D** is a global smart card/security provider.

ACH Regional Payment Association (**RPA**) annual conferences, 2008-2015.   Nineteen RPAs exist in the NACHA ACH system.

**Fiserv** Management briefing on mobile commerce (2015).

**FIS** Management/Customer briefing on mobile wallets (2014).

**BAI** TransPay/PaymentsConnect.  2004-2016. Member of planning committee and speaker at many of these annual conferences. Mobile Banking executive briefing session (2014).

**BAI** Retail Delivery annual conferences (1997-2015).  Member of planning committee (2003-2007) and frequent speaker and moderator for this largest retail banking conference, which covers all aspects of

## Stephen Craig Mott
## Curriculum Vitae

branch banking, ATMs, paper and electronic checking, credit and debit cards, DDA deposits and accounts, loyalty and rewards programs, technology development and operational strategies.

**CTIA**: The Wireless Association twice-a-year conferences (2009-2014).  Speaker and moderator at several conferences.

**FICO** Annual Conference (May, 2010).  Panelist at annual credit risk conference for leading bank issuer customers and technology providers supporting the FICO score and related risk management products.

Mobile Market Strategies Summit.  San Francisco (May 2012).  Speaker and panelist.

Mobile Commerce Summit.  Las Vegas.  June 2007, and June 2008.  Planner and speaker/moderator at this Source Media conference on developing the mobile device channel for banking and payments.

Financial Services Technology Consortium (FSTC)/Electronic Payments Forum (**EPF**) Conferences (1996-2007). Speaker at several of these conferences for banks and technology providers dealing with operational standards, security, and technology integration for electronic payment applications.

Association of Financial Planners (**AFP**) Retail Payments Forum (various years between 2006-2016).  Speaker on alternative payments, EMV and other payments subjects for this group of CFOs, Treasurers and Controllers for major retail chains.

Financial Services-Information Sharing and Analysis Center (**FS-ISAC**) bank security conference (2010).

BillMatrix (Fiserv) Customer Conference (2006).  Featured speaker on developments in electronic bill payment presented to a dozen top billers.

Alternative Payments Summit (2006).  Speaker on use of stored value cards and applications to foster better retail relationships with consumers.

Q&A Session for ACH and Image Convergence Webinar (2006).

IIR Prepaid Expo/Stored Value Conference (2005-2006).  Workshop provider on stored value and loyalty card applications and markets.

Intele-Card News Prepaid Conferences and Expos (2003-2006).  Member of Advisory Committee (2005-06) and speaker at this twice-a-year conference dealing with prepaid telecommunications, stored value, and loyalty card applications.

Card Forum and Expo, Ft. Lauderdale (2006).  Panelist on Card Association challenges and prospects.

Speaker CEO Vision, Montreal (March, 2006).  Presented perspectives on next generation of computing technology to CEOs of interlogiQ Network, an association area software companies with 300 members.

IMS ExpertServices.

24| Stephen C. Mott

www.expertservices.com  |  Expert Witness  |  Trial Strategy  |  Jury Consulting  |  Graphics  |  Technology

**DJA119.71**

> **Stephen Craig Mott**
> **Curriculum Vitae**

Micro-payments conference (2003-2006).  Speaker/moderator at this Peppercoin-sponsored conference dealing with micro-payment and loyalty card applications.

Online Resources/Princeton eCom Board and Customer Conferences (2004-2007).  Speaker at six different customer and board conferences for this online banking provider.

Food Marketing Institute (FMI)-Electronic Payments Group (October, 2006).  Presented on payments industry development to 18 or the 20 largest supermarket chains on costs, product developments, alternative payments, and rewards programs.  Executive briefing (2014).

Merchant Risk Council (2005-2007).  Speaker at this conference focused on payment card fraud and risk management aimed at resolving challenges between card companies and merchants.

NACHA's Electronic Bill Payment and Presentment Council (2007-2010).  Member, and moderator of sessions at two meetings dealing with online bill payment innovations.

Electronic Transaction Association (ETA) (various years between 1996-2014).  Member (2004-2007) and occasional speaker and presenter.  Member of Research Committee (2007).

Direct Response Forum (DRF), (2002-2007; 2014).  Occasional speaker and presenter at this merchant-oriented payments conference and exhibition aimed at card-not-present use of signature-based cards.

Paymentech Customer Conference (2006).  Presented assessment of payments market. [This conference later became the independent Merchant Advisory Group (MAG)].

Federal Reserve Bank-Boston (2006).  Speaker on developments in consumer use of credit and debit cards for this specialized-topic conference.

BAI Graduate School of Retail Banking (2003-2006).  Instructor at this banking school given each summer.  Topics included credit cards, enterprise payments, trends in payments landscape, and security.

NACHA's The Payments Institute (TPI) (2003-2015).  Instructor at this banking school given each summer.  Topics included credit cards, micro-payments, Internet payments, stored value cards, and security.

National Item Processing, Inc. (NPI)  Customer Annual Conferences (2003-2006).  Speaker at this money order processing conference, with presentations on developments in payment services and programs for the under-banked.

BAI ID Theft and Payments Fraud (2004-2006).  Member of planning committee and speaker/workshop provider at this security-oriented conference and exhibition.

NACHA Electronic Check Conferences (2003-2005).  Member of planning committee and speaker at this conference and exhibition that focuses on various forms of electronic check processing.

## Stephen Craig Mott
## Curriculum Vitae

Yodlee Customer Conference (2005).  Featured presenter to this group of online banking and bill payment users.

BAI SmartTactics (2003-2005).  Speaker and workshop provider at this collection of four mini-conferences on bank auditing, risk, and channel development.

STAR Board/Users Conferences (2003, 2007, and 2011).  Presented education sessions on developments in the credit and debit card technology, security and business opportunities.

Business 2.0Live, Monterrey (2000).  Featured speaker on developing one-to-one relationships through electronic marketing.

Information Week Conference (2000).  Speaker at this computing magazine's conference on innovative IT applications.

PKS Forum/Certicom ECC Conferences (1998-2000).  Speaker/panelist on these conferences focused on encryption technologies.

CardTech/SecureTech (1996-1999).  Frequent speaker on technology developments in smart cards, biometrics, and other card technology.

FMI-Market Technics (and local FMI groups) (1999-2000). Presenter of Priceline WebHouse Club business model for buying groceries and gas online, via marketing and loyalty discounts, for pickup at POS via purpose-built payment system.

Computer World Conference, Portugal (1999).  Presented latest developments in computing in financial services at international conference.

[MasterCard Speaking Engagements and Appearances] global appearances (1995-1998).  Speaker at multiple conferences of MasterCard member banks and presenter at dozens of press conferences regarding market developments in the use of smart cards, debit cards, and electronic commerce.  Held conferences for eCommerce Advisory Council (87 member banks in 56 countries) (1996-1997).

Council for Scientific and Industrial Research (CSIR). South Africa (1991).  CSIR sponsored tour of universities and keynote speech at AI Symposium.

American Association for Artificial Intelligence (AAAI), U.S. and Europe (1987-1994).  Industry conference and exhibition on advancement of artificial intelligence computer programming techniques into mainstream computing applications.  Spoke several times on natural language processing, case-based reasoning, and AI applications in financial services.

[Computing, government, and academic conferences dealing with AI.], U.S./Europe (1987-1994).  Speaker/panelist/presenter on use of Artificial Intelligence for financial services applications, including credit card risk/fraud management, automated help-desk/customer support, money laundering payment detection, use of case-based reasoning for decision support, and use of natural language processing to

IMS ExpertServices.

26| Stephen C. Mott

www.expertservices.com | Expert Witness | Trial Strategy | Jury Consulting | Graphics | Technology

DJA119.73

**Stephen Craig Mott
Curriculum Vitae**

support consumer access of computing systems, including branch banking, investment management/brokerage, and payment services.

International Communications Association, TeleCommunications Association, [and other telecommunications conferences], (1984-86).  Industry conference and exhibition.  Presented at several conferences MCI International's data communications business and promotional programs for trying international voice and data services.

**DJA119.74**



Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

**MICHAEL J. GILBERT**

michael.gilbert@dechert.com
+1 212 698 3886 Direct
+1 212 698 0426 Fax

December 21, 2020

**VIA E-MAIL**

Christopher J. DiMase
Nicholas S. Folly
Tara LaMorte
Assistant United States Attorneys
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Re:  Supplemental Disclosure of Potential Defense Expert in *United States v. Weigand, et al.*, 20
     cr. 188 (JSR)

Dear Chris, Nick, and Tara:

Defendant Ruben Weigand hereby provides notice, pursuant to Federal Rule of Criminal Procedure
16, that he may call Donald E. Vilfer to provide forensic expert testimony.  While, of course, we
are unable to determine before hearing the Government's case—particularly, the testimony of the
Government's Special Agents, CART Analysts, and related witnesses—if we will in fact call Mr.
Vilfer, if we do, we anticipate he would testify about the contents of the three electronic devices
seized from Mr. Weigand on the day of his arrest on or about March 9, 2020, along with Mr.
Weigand's use of those devices, as outlined herein.  A copy of Mr. Vilfer's CV is attached.

**Mr. Vilfer's Qualifications**

Mr. Vilfer has more than twenty years of experience as a computer crimes and mobile device
forensic investigator.  From 1986 to 2001, Mr. Vilfer served in the Federal Bureau of Investigation.
He served as a Special Agent, Supervisory Special Agent for the FBI's Rapid Start team, and
eventually Supervisory Special Agent for the FBI's White-Collar Crime and Computer Crimes
Squad, in which capacity he supervised the  FBI's Computer Forensics Team (CART) and the
FBI's participation on the High-Tech Task Force, supervised an international investigation of a
series of computer intrusions into financial institutions, oversaw the largest intellectual property
rights case in the FBI's history, and led investigations resulting in successful prosecutions in the
areas of computer crime, securities fraud, and bank fraud, among others.

**DJA119.75**



Christopher J. DiMase
December 21, 2020
Page 2

In 2002, Mr. Vilfer founded Vilfer & Associates (dba Digital Evidence Ventures), providing computer and mobile device forensic analysis services, along with electronic discovery and fact-finding services in support of complex litigation across a range of industries.  He has been involved in a multitude of projects involving metadata and forensic computer review.

Mr. Vilfer is a member of the Association of Certified Fraud Examiners (ACFE) and obtained the Access Certified Examiner (ACE) certification for computer forensics and decryption.

**Bases for Mr. Vilfer's Testimony**

Mr. Vilfer will base his potential testimony on the contents of Mr. Weigand's electronic devices and Mr. Weigand's use of those devices on his education, training, and professional experience. To the extent he renders opinions, they will be based on those same things, as well as his independent review and consideration of:

1. Forensic images of the three electronic devices seized by the Government from Mr. Weigand on the day of his arrest on or about March 9, 2020, which were produced by the Government to the defense and which reflect the contents of those devices.  As indicated in the Government's application for a warrant for the search and seizure of those devices, those three devices are Mr. Weigand's "OnePlus cell phone," his "silver MacBook Pro Model A1502," and his "Apple iPhone."  Affidavit at ¶¶ 3, 5, 28.[1]

2. A USB drive that appears to be the source of the materials identified under the 1800 series on the Government's preliminary exhibit list, as of November 3, 2020, and which may be the source of other materials the Government located on Mr. Weigand's Laptop (*i.e.*, 1000 Series–1700 Series).  We will produce promptly a forensic image of the contents of this USB drive to the Government.

3. Any discovery produced by the Government to the defense pursuant to Federal Rule of Criminal Procedure 16.

Mr. Vilfer's review of the above is ongoing and he may offer additional opinions, or additional bases for his opinions, as a result of his ongoing review of data and information and in response to evidence, opinions, or testimony presented at trial.  As a result, Defendant Weigand respectfully reserves his right to supplement this disclosure at any time before Mr. Vilfer's trial testimony and/or as permitted by the Court.

---

[1] We reserve the right to request that Mr. Vilfer be given access to the devices themselves.

DJA119.76



Christopher J. DiMase
December 21, 2020
Page 3

**Mr. Vilfer's Expected Testimony**

Mr. Vilfer will testify as to the files located on the forensic copies of Mr. Weigand's electronic devices, including the timing and manner of their creation, modification, and/or use.

Mr. Vilfer will also testify as to Mr. Weigand's use of those devices during the period relevant to the Indictment, including but not limited to Mr. Weigand's accessing web portals and websites; use of protonmail; document, file, or website creation; file transfer protocol (FTP) access; and Mr. Weigand's communications using those devices.

*/s/ Michael J. Gilbert*

Michael J. Gilbert
Shriram Harid
Steven Pellechi
Dechert LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
Michael.gilbert@dechert.com
Shriram.harid@dechert.com
Steven.pellechi@dechert.com

Michael H. Artan
Michael H. Artan, Lawyer, A Professional Corporation
1 Wilshire Boulevard, Suite 2200
Los Angeles, CA 90071
michaelartan@yahoo.com

*Attorneys for Defendant Ruben Weigand*

DJA119.77

# *Donald E. Vilfer, JD, CFE*

**Professional:**   **Vilfer & Associates, Inc., dba Digital Evidence Ventures** 2002-present. Founding partner for a Firm that emphasizes computer forensics, eDiscovery and fact-finding in support of complex litigation or referral for prosecution. Representative clients include law firms, state and local government, high-tech firms, aircraft manufacturers, financial institutions and school districts. Cases have included investigation of fraud, theft of intellectual property, computer crimes, employee misconduct, sexual harassment, cell phone location and defense of complex fraud. Extensive experience in obtaining and analyzing computer and cell phone forensic evidence. Experience as an expert witness and court-approved expert in multiple state and Federal jurisdictions as well as the International Trade Commission, having provided sworn testimony over 100 times.

**University of California, Davis** April 2018-present (full quarter class periodically as scheduled). Lecturer in Digital Forensics for the Masters in Forensics Science Program.

**Califorensics** 2002-2017. Founder and President of Digital Forensics and Investigative Services firm that served clients nationwide. Sold in 2013 and remained on as Director of Digital Forensics and eDiscovery.

**Perry-Smith LLP**, 2001-2002, Senior Director, Litigation Support and Investigative Services Group. Led the Litigation Support and Investigative Services practice area for Sacramento's largest regional accounting firm. Supported attorneys in civil and criminal litigation.

**Federal Bureau of Investigation**, 1986-2001.

1996-2001, Supervisory Special Agent for the White-Collar Crime and Computer Crimes Squad. Conducted and oversaw the investigation of white collar crime and computer crimes. Achieved successful prosecutions in the areas of Securities Fraud, Bank Fraud, Embezzlement, Intellectual Property Rights, Computer Crimes and Bankruptcy Fraud. Oversaw the largest Intellectual Property Rights case in the FBI. Supervised the FBI Computer Forensics Team (CART) and the FBI participation on the High-Tech Task Force. Supervised an international investigation of a series of computer intrusions into financial institutions, resulting in the arrest and conviction of those involved.

1994-1996, Supervisory Special Agent for the Rapid Start Team. At FBI Headquarters, Washington D.C., managed a team of professionals responsible for the on-site management of major cases and crisis worldwide on over 50 cases at venues from the White House to the Oklahoma City bombing command post.  Led a project  to develop an automated litigation support package for complex white-collar cases. Assisted with implementing automated analysis for Innocent Images project.

1986-1994, Special Agent. Investigated violent crimes, fugitive matters and white-collar crime. Five year FBI SWAT team member. While assigned as Special Agent, Washington D.C. field office, was the case agent an investigation of an international multi-billion dollar bank fraud (BCCI). Oversaw a team of agents and financial analysts responsible for gathering relevant evidence and tracing proceeds. Conducted investigation and asset tracking throughout the US, England, the Cayman Islands and Abu Dhabi.

DJA119.78

## Donald E. Vilfer, JD, CFE
### (continued)

As Assistant Division Counsel, provided legal advice and instruction to FBI Agents in criminal, civil, and employment law areas. Reviewed affidavits for search warrants and court orders.

**Delaware Ohio County Prosecuting Attorney's Office**, 1986. Prosecuted criminal cases and successfully briefed and argued an appeal.

|                        |                                                                                                                                      |
|------------------------|--------------------------------------------------------------------------------------------------------------------------------------|
| *Education:*           | Bachelor of Science, Criminal Justice/Pre-Law, Bowling Green State University, 1982.                                                  |
|                        | Ohio State University College of Law, Juris Doctorate, 1986. National Moot Court Team member, advancing to the national level.        |
| *Specialized Training:* | Access Certified Examiner (ACE) certification for Computer Forensics and Decryption.                                                  |
|                        | Certified in Physical and Logical Analysis of cell phones and mobile devices along with additional training in cell phone location evidence. |
|                        | Four months training at the FBI Academy, including courses in White Collar Crime.                                                    |
|                        | 50 Hour Certified Fraud Examination course, including investigation, computer crime, law and accounting. Received CFE Certification. |
|                        | Advanced White-Collar Crime courses during tenure with the FBI.                                                                      |
|                        | One week Computer Crimes course for FBI Supervisors.                                                                                  |
|                        | Advanced Computer Forensics training, including Windows Registry analysis and Mac OS forensics. Incident Response (hacking) training. |
|                        | Network Forensics and Cell Phone Location training.                                                                                  |
|                        | FBI Computer Security class.                                                                                                          |
|                        | FBI class for Supervisory Special Agents over Computer Crimes investigations.                                                        |
|                        | Continuing Legal Education Instructor, *Computer Forensics for Attorneys* and other courses |
|                        | Frequent guest and consultant to media on crime and computer forensics matters.                                                      |
|                        | FBI Instructor for International Law Enforcement Training Academy in Budapest.                                                        |
| *Publication:*         | Incorporating Cell Phone Data into Your Investigations The AWI Journal-September Vol. 9 No. 3 (2018) |
| *Affiliations:*        | Member of the Ohio Bar (inactive status). Member of the Association of Certified Fraud Examiners. |

***Expert Testimony***: Federal Courts, State Courts, FINRA, California Office of Administrative Hearings,

| From: | Harid, Shriram |
|---|---|
| To: | LaMorte, Tara (USANYS); Folly, Nicholas (USANYS); DiMase, Christopher (USANYS); Deininger, Emily (USANYS) |
| Cc: | Gilbert, Michael; EXT michaelartan@yahoo.com; Pellechi, Steven |
| Subject: | United States v. Weigand & Akhavan, 20 cr. 188 (Defense Exhibits & Vilfer Testimony) |
| Date: | Tuesday, January 19, 2021 12:53:55 PM |

Dear Chris, Nick, Tara, and Emily:  We write to follow up on two open issues we had previously discussed: (1) the Government's request that we produce a more particularized defense exhibit list; and (2) the Government's request for additional clarity on Donald E. Vilfer's expected testimony.

**Defense Exhibit List**

In our pre-trial disclosure to the Government on December 21, 2020, we noted that "[w]e are, of course, unable to determine before hearing the Government's case exactly which witnesses Mr. Weigand may call and which exhibits he may seek to offer during his direct case, if any." Nevertheless, we reserved our right "to introduce as evidence discovery produced by the Government to the defense pursuant to Federal Rule of Criminal Procedure 16, including, but not limited to, any exhibit identified on the Government's preliminary exhibit list as of November 3, 2020."

We stand by our previously stated position that it is very difficult for us to determine exactly which documents Mr. Weigand may seek to offer during his direct case, without a clear understanding of the evidence the Government intends to put forward.  Such an understanding has been impeded by the substantial overbreadth of the Government's preliminary exhibit list, which consists of over 8,700 files and numerous exhibits that actually include multiple sub-folders and constituent files, not all of which could realistically be offered during a two to three-week trial.  For instance, of the 715 Government "exhibits" identified as "Documents from Weigand Laptop" (1000 series – 1800 series), several "exhibits" contain dozens of files (*see, e.g.*, the exhibits in the 1000 series).

If the Government is able to narrow its preliminary exhibit list to give us a more accurate sense of the materials it intends to introduce at trial, it will aid our efforts to identify for the Government those documents in the discovery that Mr. Weigand may seek to introduce during his direct case.  As previously discussed, we reserve our right to offer as evidence any of the exhibits listed on the Government's preliminary exhibit list.  We also do not intend to identify for the Government those documents we plan to use for purposes of impeachment.

**Expert Disclosure for Donald E. Vilfer**

On November 3, 2020, the Government produced to the defense an expert notice for witnesses whose "expected testimony would not constitute expert testimony under Federal Rules of Evidence 702, 703, or 705," according to the Government.  Those witnesses included "an FBI analyst and/or Investigative Analyst with the United States Attorney's Office for the Southern District of New York" whose expected testimony would concern "forensic searches and analyses of electronic devices that were seized from the defendants and others (the "Devices.")."

The Government did not include in its notice the witnesses' expected "opinions [and] the bases and reasons for those opinions." Fed. R. Crim. P. 16(a)(1)(G).  Instead, the Government noted that it "may not seek to offer these witnesses as expert witnesses, as the focus of their

testimony will be on what they found on the Devices rather than any area of specialized knowledge on which they relied in conducting their examinations."

For the reasons cited in the Government's November 3 notice, Mr. Vilfer, whose expected testimony would concern the contents of the devices seized from Mr. Weigand based on his analysis of forensic images of those devices, is likewise not an "expert witness" for whom additional disclosures are required under the Federal Rules, beyond those already provided to the Government.

As we noted in our supplemental expert disclosure on December 21, 2020, one of the bases for Mr. Vilfer's potential testimony is "[a] USB drive that appears to be the source of the materials identified under the 1800 series on the Government's preliminary exhibit list . . . and which may be the source of other materials the Government located on Mr. Weigand's Laptop (*i.e.*, 1000 Series–1700 Series)."  Notwithstanding our position on Mr. Vilfer's status an "expert witness" under the Federal Rules, we note that Mr. Vilfer may rely on the USB drive mentioned in our supplemental disclosure to provide testimony on the source of certain materials located on Mr. Weigand's Laptop.


**Shriram Harid**
Associate

**Dechert LLP**
+1 212 649 8744  Direct
shriram.harid@dechert.com
dechert.com

---

This e-mail is from Dechert LLP, a law firm, and may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and any attachments. Thank you.

**DJA120**

# Arnold & Porter

Marcus A. Asner
+1 212.836.7222 Direct
Marcus.Asner@arnoldporter.com

February 17, 2021

<u>VIA ECF</u>

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street, Room 1340
New York, New York 10007

  Re: *United States v. Akhavan et uno*, 20-cr-0188 (JSR)

Dear Judge Rakoff:

  We write respectfully on behalf of third parties Visa Inc. ("Visa") and Martin Elliott, pursuant to Rule 2 of Your Honor's Individual Rules of Practice, to request that Mr. Elliott be allowed to testify at trial via live two-way video from a federal courthouse in the Northern District of California. The parties have discussed this request with chambers. Defendants Akhavan and Weigand object to the request, while the Government takes no position. Set forth below are Mr. Elliott's personal circumstances, the risks posed by the ongoing COVID-19 pandemic, and the relevant law that we believe together demonstrate that Mr. Elliott should be allowed to testify via live two-way video.

**Mr. Elliott's Relationship to the Case and Personal Circumstances**

  Visa and Mr. Elliott have been served with two subpoenas pertinent to this motion—one by the Government and one by Defendant Akhavan—which together require Mr. Elliott and Visa to testify at trial. *See attached* Gov't Subpoena to Martin Elliott (Feb. 17, 2021); Akhavan Subpoena to Visa (Feb. 11, 2021). Mr. Elliott was Visa's Global Head of Franchise Risk Management during the time period relevant to the indictment. As such, he is the individual at Visa who has the necessary experience to testify about the full range of required topics outlined. Mr. Elliott has no firsthand knowledge of the specific transactions at issue in this case. Rather, he is expected to provide process-type testimony about the workings of the Visa payment network.

  Mr. Elliott resides in the San Francisco Bay area. *See* Elliott Decl. ¶ 2. He is 57 years-old and has a number of ███████████████████████. *See id.* at ¶ 3. Mr. Elliott and his wife are the primary caretakers of his 83-year-old mother-in-law. *See* Elliott Decl. ¶ 2. His wife is 55 years-old and ████████████████████████. *See id.* at ¶ 4. No one in his household has contracted COVID-19, nor been vaccinated for it. *See id.* at ¶ 5.

DJA121

**Arnold & Porter**

The Honorable Jed S. Rakoff
February 17, 2021
Page 2

**The Present State of the COVID-19 Pandemic**

According to the Centers for Disease Control and Prevention ("CDC"), more than 27 million Americans so far have contracted COVID-19 and, as of the drafting of this motion, more than 486,000 have died from it. *See United States COVID-19 Cases and Deaths by State,* CDC COVID DATA TRACKER, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100k (last visited Feb. 17, 2021). New York and California are two of the states that have suffered the most from this deadly pandemic, and they continue to do so. California recently surpassed New York for the most deaths due to COVID-19—47,510 casualties to New York's 46,141. *See California*, JOHNS HOPKINS UNIV. CORONAVIRUS RES. CTR., https://coronavirus.jhu.edu/region/us/california (last visited Feb. 17, 2021); *New York*, JOHNS HOPKINS UNIV. CORONAVIRUS RES. CTR., https://coronavirus.jhu.edu/region/us/new-york (last visited Feb. 17, 2021).

The risk is even more dire for people in vulnerable health and age categories. Adults 50–64 years old are four times more likely to be hospitalized—and 30 times more likely to die—from contracting COVID than those aged 18–20. *See Older Adults*, CDC COVID-19 (Feb. 17, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. A number of preexisting conditions put a person at "increased risk for severe illness" from COVID-19, including "hospitalization, admission to the ICU, intubation or mechanical ventilation, or death." *People with Certain Medical Conditions*, CDC COVID-19 (Feb. 3, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. These include ██████████ ██████████. *See id.*

Travel increases a person's risk of contracting COVID-19 and the CDC has explicitly warned against individuals travelling at this time. *See Travel During COVID-19*, CDC COVID-19 (Feb. 16, 2021), https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html. In fact, the CDC website states in bold letters: "**COVID-19 Alert: Cases are Extremely High. Avoid Travel**." *Id.*

In New York, out-of-state travelers entering the state (with limited exceptions for travelers from nearby states) must first obtain a negative COVID-19 test no more than three days prior to reaching the state. *COVID-19 Travel Advisory*, N.Y. DEP'T. OF HEALTH, https://coronavirus.health.ny.gov/covid-19-travel-advisory (last visited Feb. 17, 2021). They must then quarantine for a minimum of three days, after which they must take another COVID-19 test. *See id.* Mr. Elliott would need to take even further steps to testify. Before entering the courthouse in the Southern District of New York, out-of-state travelers must "t[ake] a COVID PCR diagnostic test within three days prior to departure from the state of embarkation, (2) t[ake] another COVID PCR diagnostic test on day 5

**Arnold & Porter**

The Honorable Jed S. Rakoff
February 17, 2021
Page 3

after arrival in New York, and (3) receive[] negative results from both tests." *Entry Into SDNY Courthouses*, S.D.N.Y. OFFICE OF DIST. CT. EXEC. (Nov. 12, 2020).

These measures are crucial to protecting those who work at and visit the courthouse. That said, none of the Court's well-designed measures serves to protect people from contracting the virus while traveling to the courthouse or while traveling back to their home states following a court appearance. In fact, the Court's measures in part appear to reflect the reality that people traveling from out of state are at a higher risk of contracting COVID and bringing it into the courthouse. And none of these measures addresses the CDC's strong message that individuals at this time should "**Avoid Travel**."

**Mr. Elliot Satisfies the Prerequisites for Live Two-Way Video Testimony**

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

The right to face-to-face confrontation is not absolute. *Id.* at 850. Under Federal Rule of Criminal Procedure 15, for example, a prospective witness may be deposed prior to trial under "exceptional circumstances" and in the "interest[s] of justice." FED. R. CRIM. P. 15(a)(1). That deposition testimony may then be used at trial "as substantive evidence if the witness is unavailable." *United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999) (citing FED. R. CRIM. P. 15); *see also* FED. R. EVID. 804.

Presenting testimony in criminal trials by way of live two-way video is permissible upon the same showing required for Rule 15 depositions. *See Id.* at 81; *United States v. Donziger*, No. 11-CV-691 (LAK), 2020 WL 5152162, at *2 (S.D.N.Y. Aug. 31, 2020), *reconsideration denied*, No. 11-CV-691 (LAK), 2020 WL 8465435 (S.D.N.Y. Oct. 23, 2020). Live two-way video serves to "preserve[] the face-to-face confrontation" required by the Sixth Amendment. *Gigante*, 166 F.3d at 81. To allow testimony via live two-way video, a movant must show that (1) the witness's testimony is material, (2) the witness is "unavailable" within the meaning of the case law, and (3) testimony by live two-way video "furthers the interests of justice." *United States v. Mostafa*, 14 F. Supp. 3d 515, 521 (S.D.N.Y. 2014). Here, all three factors are satisfied.

First, Mr. Elliott's testimony is material. "Anticipated testimony is 'material' within the meaning of Rule 15 if it is 'highly relevant to a central issue in the case.'" *United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL 237651, at *24 (S.D.N.Y. Jan. 18,

**Arnold&Porter**

The Honorable Jed S. Rakoff
February 17, 2021
Page 4

2017) (quoting *United States v. Vilar*, 568 F. Supp. 2d 429, 440 (S.D.N.Y. 2008)).  But material testimony need not involve firsthand knowledge of the facts underlying the allegations.  *See Mostafa*, 14 F. Supp. 3d at 522.  The Government here alleges (among other things) a conspiracy to deceive banks into authorizing prohibited cannabis transactions through payment networks such as Visa's.  *See* Superseding Indictment 10–12.  Mr. Elliott's testimony is material because, without it, it will be more difficult for the jury to understand the underlying payment network system and rules at issue and to analyze whether the defendants violated the law.  *See Mostafa*, 14 F. Supp. 3d at 522.

Second, Mr. Elliott is unavailable.  This Court and others have recognized that the definition of unavailability under Rule 15 includes individuals with heightened COVID-19 risks.  For example, in *Donziger*, the court found that a witness living in Texas was unavailable to testify in person in New York because of his age (72 years-old) and the "concomitant health risk posed by COVID-19 if he were forced to travel and stay in New York for a prolonged period of time."  *Donziger*, 2020 WL 5152162, at *3.  Other courts have found witnesses unavailable to testify during the pandemic because testifying in person would require them to fly across the country to do so.  *See United States v. Davis*, No. 19-101-LPS, 2020 WL 6196741, at *4 (D. Del. Oct. 22, 2020).

Mr. Elliott is similarly unavailable due to his personal circumstances and the current state of the pandemic.  As noted, Mr. Elliott is 57 years-old, an age that makes him significantly more vulnerable to COVID-19.  *See* Elliott Decl. ¶ 2; *Older Adults*, *supra*.  In addition, ███████████████████████████████████████████ ████████████ on top of the risks already posed by his age.  *See* Elliott Decl. ¶ 3; *People with Certain Medical Conditions*, *supra*.

To testify in person, Mr. Elliott would have to spend approximately six hours in a plane each way with fellow travelers from New York City and San Francisco.  He may have to spend up to a week or more in a hotel in New York City and will have to quarantine again when he returns to California.  And if Mr. Elliott does contract COVID-19 before testifying, he would have to stay here longer and potentially be hospitalized away from his family.  This is a needless risk and burden for Mr. Elliott to endure and one that directly contravenes CDC guidance.  *See Travel During COVID-19*, *supra*.

Mr. Elliott's situation is unlike the witness's in *United States v. LaGuardia*, who used the pandemic as a cover to avoid the inconvenience of traveling to testify.  *See* Memo. in Opp'n. to Mot. in Limine, at  4–11, United States v. LaGuardia, No. 19-CR-0893 (Oct. 17, 2020), ECF No. 64.  Mr. Elliott has not left California since the beginning of the pandemic.  *See* Elliott Decl. ¶ 6.  He has taken care to heed the CDC's guidance because of his genuine fear that either he or someone else living with him will suffer

DJA124

**Arnold&Porter**

The Honorable Jed S. Rakoff
February 17, 2021
Page 5

severe illness if they contract COVID-19.  *See id.*  It would be unfair and dangerous to subject Mr. Elliott to the exact risks that he has sought to avoid merely because he is knowledgeable about the payment-network systems at issue in this case.

Finally, allowing Mr. Elliott to testify via live two-way video furthers the interests of justice because it helps the parties "present the material and relevant evidence in [their] search for truth" and "furthers the process of a fair trial."  *Mostafa*, 14 F. Supp. 3d at 524. As noted, Mr. Elliott is in the best position to testify about all of the subjects outlined in trial subpoenas served by the Government and Mr. Akhavan.  Thus, his testimony will help the jury understand and analyze whether the defendants violated the law, thus "further[ing] the process of a fair trial."  *Id.*; *see Donziger*, 2020 WL 5152162 at *3. Accordingly, his specific testimony furthers the interests of justice and the Court should find it as such.  *See Mostafa*, 14 F. Supp. 3d at 522, 524.

While Mr. Elliott's request to testify remotely must only satisfy the Rule 15 factors, *Gigante*, 166 F.3d at 81, his request is also justified under the higher *Craig* standard.  Under *Craig*, an exception for face-to-face confrontation requires an important public policy and an assurance of the testimony's reliability.  *See Craig*, 497 U.S. at 850. First, "there is no question that limiting the spread of COVID-19 and protecting at-risk individuals from exposure to the virus are critically important public policies."  *Donziger*, 2020 WL 5152162 at *2.  As noted, the CDC has warned against traveling, especially for at-risk persons, for this very reason.  *See Travel During COVID-19*, *supra*.  Second, having Mr. Elliott testify via live two-way video assures all of the Confrontation Clause's guarantees of reliability because  the key qualities of face-to-face confrontation are met: "(1) the giving of testimony under oath,  (2) the opportunity for cross-examination, (3) the ability of the fact-finder to observe demeanor evidence, and (4) the reduced risk that a witness will wrongfully implicate an innocent defendant when testifying in his presence." *Gigante*, 166 F.3d at 81.

For the reasons set forth above, we respectfully request that this Court allow Mr. Elliott to testify via live two-way video from the Northern District of California.

Respectfully,

*/s/ Marcus A. Asner*
Marcus A. Asner

cc:     All counsel of record (via ECF)

DJA125

Court Subpoena

# United States District Court
## SOUTHERN DISTRICT OF NEW YORK

TO:     Martin Elliott
        Visa, Inc.


GREETINGS:

WE COMMAND YOU that all and singular business and excuses being laid aside, you appear and attend before the United States District Court for the Southern District of New York, 500 Pearl Street, in the Borough of Manhattan, City of New York, New York, in the Southern District of New York, at the following date, time and place:

Appearance Date:     March 2, 2021              Appearance Time:    10:00 a.m.
Appearance Place:    Courtroom 26B

to testify and give evidence in the following matter:

*United States v. Hamid Akhavan*, S3 20 Cr. 188 (JSR)

and not to depart the Court without leave thereof, or of the United States Attorney.


### PERSONAL APPEARANCE IS REQUIRED


Failure to attend will constitute contempt of court and will subject you to civil sanctions and criminal penalties, in addition to other penalties of the Law.


DATED:    New York, New York
          February 17, 2021


AUDREY STRAUSS
*United States Attorney for the*
*Southern District of New York*


Tara La Morte
Assistant United States Attorney
Southern District of New York
Tel.: (212) 637-1041

**DJA126**

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Ruben Weigand and Hamid ("Ray") Akhavan | ) | Case No.  1: 20-cr-00188-JSR |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:   Visa, Inc., c/o David Russell, Arnold & Porter Kaye Scholer LLP, 250 West 55th Street, New York, NY 10019

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | Daniel Patrick Moynihan, United States Courthouse, 500 Pearl St., New York, NY 10007 | Courtroom No.: | 14B |
|---|---|---|---|
| | | Date and Time: | 03/01/2021 10:00 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:   Please see attached Rider.

*(SEAL)*

RUBY J. KRAJICK

*CLERK OF COURT*

Date:   FEB 1 1 2021

*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Hamid Akhavan , who requests this subpoena, are:

Christopher Tayback | 865 S. Figueroa St. 10th Floor, Los Angeles, CA | christayback@quinnemanuel.com | (213) 443-3000

William A. Burck | 1300 I St NW #900, Washington, DC 20005 | williamburck@quinnemanuel.com | (212) 849-7000

Sara C. Clark | 711 Louisiana St., Ste. 500, Houston, TX 77384 | saraclark@quinnemanuel.com | 713-221-7000

DJA127

89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.   1: 20-cr-00188-JSR

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____

on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                              *Server's signature*

                                        _____
                                              *Printed name and title*

                                        _____
                                              *Server's address*

Additional information regarding attempted service, etc:

Case 21-2466, Document 21, 12/17/2021, 3230483, Page215 of 283

DJA128

**Rider**

**Instructions**

1. **Previously Produced Materials**: The production of materials is sought with regard to any responsive materials not previously produced by You to Defendant Hamid ("Ray") Akhavan in this action.  Reproduction is not sought, nor is the burden of reproduction intended to be imposed, by the issuance of the instant requests.

2. **Relevant time period**: For each of the below inquiries, this request is limited to documents and communication in your possession, custody or control from the time period from 2016 through 2019.  This includes any document or communication in effect during this time period, even if executed or with an effective date prior to the relevant time period or that expired during the relevant time period, if such document or communication would be otherwise responsive.

3. **Rules of Construction:**   The following rules of construction apply to all discovery requests:

   a.  All/Any/Each. The terms "all," "any," and "each" shall each be construed as encompassing any and all.

   b.  And/Or. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

   c.  Number. The use of the singular form of any word includes the plural and vice versa.

4. **Applicable Protective Order**:  Any production made in response to these requests is subject to the Protective Order governing third-party productions, attached as Annex A hereto.

**Definitions**

1. **Agreement** means any contract, understanding, or agreement between Visa and the entities listed below.

2. **Visa** refers to Visa, Inc., and any of its relevant parent, affiliate, subsidiary, predecessor or successor entities.

3. **Communication**: The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

4. **Concerning.** The term "concerning" means relating to, referring to, describing, evidencing or constituting.

5. **Credit Card** means any Visa- or MasterCard- branded consumer credit card provided to a consumer that allows that consumer to purchase goods and services at merchants approved by Visa or MasterCard.

6. **Debit Card** means any card provided by a bank to an account holder that allows the holder to transfer money electronically to another bank account when making a purchase, including such cards associated with systems or networks associated Maestro, Interlink,

1

DJA129

Visa DPS, and any other debit card systems or networks associated with Visa and MasterCard.

7. **Document.** The term "document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

8. **Marijuana** and **Cannabis** are to be interpreted interchangeably as any product, substance, or thing containing the psychoactive dried resinous flower buds and leaves of the female hemp or cannabis plant.

9. "**You**" and "**Your**" refer to the recipient of this subpoena, and any of its relevant parent, affiliate, subsidiary, predecessor or successor entities.

10. **No Responsive Materials**:  To the extent no such documents described by a Request exist or are reasonably believed to exist, You are requested to so state.

### Requests for Production

1. Documents and Communications sufficient to identify any investigation or inquiry conducted by You regarding cannabis or marijuana-related businesses, including communications with issuing (i.e., consumer) or acquiring (i.e., merchant) banking institutions.

2. Documents or Communications concerning Your policies, processes or procedures for the investigation or identification of cannabis or marijuana-related businesses or transactions, including with regard to communications with issuing (i.e., consumer) or acquiring (i.e., merchant) banking institutions.

3. Documents or Communications reflecting any of Your policies, guidelines, training materials, or procedures for investigating, identifying and/or correcting incorrect merchant category codes in connection with cannabis transactions.

4. Documents or Communications identifying any action taken by You to remedy an erroneous merchant category code related to cannabis transactions.

5. Documents or Communications concerning the number of merchant miscoding investigations undertaken by You annually during the relevant time period in connection with actual or suspected cannabis transactions.

6. Documents or communications concerning actions taken by You in connection with an investigation into merchant miscoding involving cannabis transactions, including, but not limited to, fines, monitoring, terminations, referrals, civil proceedings, or any other remedy or corrective action.

7. Documents or communications concerning any criminal referrals by You related to cannabis transactions.

8. Documents or communications concerning any efforts made or actions taken by You to identify cannabis-related merchants or businesses located in California or Oregon that were accepting Your Credit or Debit Cards.

DJA130

9. Documents or communications regarding any of Your policies, guidelines, training materials, or procedures concerning the onboarding of cannabis or marijuana-related businesses as merchants within Your network.

10. Any public statement or guidance by You concerning Your policies and guidelines concerning Credit or Debit Card processing in the cannabis or marijuana industry in the United States, including any such statement or guidance concerning processing in California or Oregon.

11. Visa Core Rules and Visa Product and Service Rules, including any prior versions that may have been in effect during the relevant time period.

12. Visa Merchant Data Standards Manual, including any prior versions that may have been in effect during the relevant time period.

13. Member Agreements or other Agreements related to credit card processing in effect from 2016 through 2019 between Visa and the following merchant banks:  (a) E-Comprocessing, Ltd. (b) PXP Financial Group Limited f/k/a Kalixa Payments Group Limited, (c) Clearhaus A/S, and (d) Wirecard Bank AG and, where applicable, member status from 2016 through 2019 for the same entities.

14. Member Agreements or other Agreements related to credit card processing in effect from 2016 through 2019 between Visa and the following payment processors and/or independent sales operators ("ISOs"):  (a) EU Processing, (b) Clearsettle Limited, and (c) Genc & Er. Bilisim, Ltd. and, where applicable, member status from 2016 through 2019 for the same entities.

# Annex A

DJA132

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:20-cr-00188 |
| -against- | Hon. Jed S. Rakoff |
| Hamid Akhavan, | **[PROPOSED] PROTECTIVE ORDER** |
| a/k/a "Ray Akhavan," and | |
| Ruben Weigand, | |
| Defendants. | |

Upon the application of the Defendants Ruben Weigand and Hamid "Ray" Akhavan (together, the "Defendants"), the Court issues this protective order to address the production of discovery material to Defendants by non-parties to this action ("Third Parties," and this order the "Third Party Protective Order"), and in so doing finds and orders as follows:

1. Unless ordered by the Court or otherwise provided for herein, all documents, objects, and information (including electronically stored information) produced to the Defendants by Third Parties in connection with this action ("Third Party Discovery Material"), whether in response to subpoenas issued pursuant to Federal Rule of Criminal Procedure 17 or other requests, and whether or not marked Highly Confidential by any Third Party, shall be treated as confidential, and will be held and used by the Defendants, their counsel, and personnel employed by or contracted by defense counsel for the purposes of defending this action solely for the purpose of their defense in the above-captioned action (the "Case"). Such material shall not be shared or publicly disseminated except in accordance with this Order.

2.      Third Parties may designate portion[s] of Third Party Discovery Material as "Highly Confidential" by stamping or otherwise clearly marking as "Highly Confidential" the protected portion in a manner that will not interfere with legibility or audibility, and, to the extent any party to this action might seek to introduce at trial any document so marked, by producing for public use another copy of said Third Party Discovery Material with the confidential information redacted.

3.      The Third Party producing any given Third Party Discovery Material may designate as Highly Confidential material that consists of:

   (a)      previously nondisclosed confidential business information, trade secrets or financial information;

   (b)      any information of a personal or intimate nature regarding any individual; or

   (c)      any other category of information hereinafter given confidential status by the Court.

4.      If at any time prior to the trial of this action, a producing Third Party realizes that some portion[s] of Third Party Discovery Material that that Third Party previously produced should be designated as Highly Confidential, it may so designate by so apprising Defendants in writing, and such designated portion[s] of the Third Party Discovery Material will thereafter be treated as Highly Confidential under the terms of this order.

5.      Any party who objects to the designation of Third Party Discovery Material as Highly Confidential may at any time prior to the trial of this action serve upon counsel for the designating Third Party a written notice stating with particularity the grounds of the objection or request.  If agreement cannot be reached promptly, counsel for all affected parties will convene a joint telephone call with the Court to obtain a ruling.

6.      The Defendants may only disclose Third Party Discovery Material (whether designated Highly Confidential or otherwise) to:

(a)      the Defendants, their counsel, and personnel employed by or retained by defense counsel, for purposes of defending this action;

(b)      the Government;

(c)      as to any document, its author, its addressee, and any other person indicated on the face of the document as having received a copy;

(d)      any individual who defense counsel in good faith believes may be either a prospective witness in this action, or who may be able to provide the defense with leads to additional evidence or who is retained to provide advice, expertise, or other non-administrative services in connection with this matter and these individuals' counsel; and

(e)      the Court and its support personnel.

7.      Highly Confidential Third Party Discovery Materials may be displayed to and discussed with persons identified in Paragraphs 6(c) and 6(d) only on the condition that, prior to any such display or discussion, each such persons shall execute the agreement set forth in Annex A to this Order, and agree to by bound by this Order. In the event such person refuses to sign an agreement, the party desiring to disclose the Highly Confidential Third Party Discovery Material to such party may seek appropriate relief from the Court.

8.      Each person who has access to the Highly Confidential Third Party Discovery shall have a duty to take due precautions to prevent the unauthorized or inadvertent disclosure of such material.

DJA135

9.    The Third Party producing Third Party Discovery Material may authorize, in writing, disclosure of Third Party Discovery Material, including any Highly Confidential Third Party Discovery Material, beyond that otherwise permitted by this Order without further Order of this Court.

10.    This Order does not prevent the disclosure of any Third Party Discovery Material, including any designated as Highly Confidential, in any hearing or trial held in this action, or to any judge or magistrate judge, for purposes of this action.  Such disclosures shall be made pursuant to the rules and any further order of this Court.

11.    However, any Highly Confidential Third Party Discovery Material pertinent to any motion before the Court should initially be filed under seal, absent consent of the Third Party producing such Highly Confidential Third Party Discovery Material, or Order of the Court.  All filings should comply with the privacy protection provisions of Fed. R. Crim. P. 49.1 and the rules of this Court, and should be marked with the following statement:

**CONTAINS HIGHLY CONFIDENTIAL MATERIAL**

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER.**

12.    All persons are hereby placed on notice that the Court is unlikely to seal or otherwise afford confidential treatment to any Discovery Material *(including Third Party Discovery Material)* introduced in evidence at trial, even if such material has previously been sealed or designated as Confidential *or Highly Confidential*. The Court also retains unfettered discretion whether or not to afford confidential treatment to any Confidential *or Highly Confidential* Document, or information contained in any Confidential *or Highly Confidential* Document submitted to the Court in connection with any motion, application, or proceeding that may result in an order and/or decision by the Court.

4

13.     If, in connection with this action a Third Party inadvertently discloses information subject to a claim of attorney-client privilege or attorney work product protection ("Inadvertently Disclosed Information"), such disclosure shall not constitute or be deemed a waiver or forfeiture of any claim of privilege or work product protection with respect to the Inadvertently Disclosed Information and its subject matter.

14.     If a disclosing party makes a claim of inadvertent disclosure, the receiving party shall, within five business days, return or destroy all copies of the Inadvertently Disclosed Information, and provide a certification of counsel that all such information has been returned or destroyed.

15.     Not later than 60 calendar days after conclusion of this action and any appeal related to it, all Highly Confidential material of any type, all copies thereof, and all excerpts therefrom shall be returned to counsel for the applicable third party or destroyed at the third party's option, except that outside counsel for each of the parties may retain one copy of all Highly Confidential material, and except to the extent such material has been used as evidence at any trial or hearing. Notwithstanding this obligation to return or destroy information, counsel may retain any attorney work product.

16.     There is good cause for entry of this Third Party Protective Order set forth herein.

17.     A breach of the provisions of this Order shall be subject to sanctions, in the discretion of the Court as within or authorized by any statute, rule, or inherent power of the Court, or as otherwise provided by law.

18.     The provisions of this supplemental protective order shall not terminate at the conclusion of this criminal prosecution and the Court will retain jurisdiction to enforce this Order following termination of the case.

DJA137

19.    This Third Party Protective Order shall be effective immediately upon signature by this Court.

SO ORDERED:

Dated December 14, 2020

_____
Honorable Jed S. Rakoff
United States District Judge

6

DJA138

<u>Annex A to Third Party Protective Order</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:20-cr-00188 |
| -against- | Hon. Jed S. Rakoff |
| Hamid Akhavan, | <u>Non-Disclosure Agreement</u> |
| a/k/a "Ray Akhavan," and | |
| Ruben Weigand, | |
| Defendants. | |

I, _____, acknowledge that I have read and understand the Third Party Protective Order in this action governing the non-disclosure of those portions of Third Party Discovery Material that have been designated as Highly Confidential.  I agree that I will not disclose such Highly Confidential Discovery Material to anyone other than for purposes of this litigation and that at the conclusion of the litigation I will return all discovery information to the party or attorney from whom I received it. By acknowledging these obligations under the Third Party Protective Order, I understand that I am submitting myself to the jurisdiction of the United States District Court for the Southern District of New York for the purpose of any issue or dispute arising hereunder and that my willful violation of any term of the Third Party Protective Order could subject me to punishment for contempt of Court.

Dated: _____     Signed: _____

DJA139

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES,

                *Plaintiff,*

       v.                                     Case No. 20 Crim. 0188 (JSR)

HAMID AKHAVAN, *et uno*,

                *Defendants.*

---

### DECLARATION OF MARTIN ELLIOTT

      Martin Elliott hereby declares as follows:

      1.      During the time period 2016–19, I served as the Global Head of Franchise Risk Management at Visa Inc.  The Government has served a trial subpoena for me to testify in the upcoming trial in the above-captioned case.  I understand that Defendant Hamid Akhavan also has served a trial subpoena for a witness to appear on behalf of Visa, and that I am to be that witness.  I make this declaration to place certain information before the Court related to my medical history and living circumstances.

      2.      I currently reside in Redwood City, California, and am 57 years-old.  I live with my wife, who is 55 years-old.  My wife and I are the primary caregivers for my mother-in-law, who is 83 years-old and lives alone in nearby Belmont, California.

      3.      I have been diagnosed with a number of medical conditions.  These ███████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████

DJA140

4.      My wife also has been ███████████████████████████████

███████   In 2020, my mother-in-law ████████████████████████████

█████████████████████████████████

5.      Neither I, my wife, nor my mother-in-law have previously contracted COVID-19.

My wife and I have not been vaccinated against COVID-19 and—███████████████

█████████████████████████████████████████

6.      Given my health and age, as well as the health and age of my wife and mother-in-

law, we have diligently heeded the CDC's public health guidance to minimize our risk of

contracting COVID-19.  To this end, neither I, my wife, nor my mother-in-law have traveled

outside of California since COVID-19 started to take off in early 2020.  Furthermore, though I

did travel by airplane for a short visit to my daughter in Orange County, California, in the early

summer, when the rates of new COVID-19 infections were relatively low, I have not traveled by

airplane since then and certainly have no plans to travel by airplane since the significant uptick in

COVID-19 cases started in the fall of 2020.

7.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 17, 2021.


_____*/s/ Martin Elliott*_____

Martin Elliott

DJA141

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X
                                       :
UNITED STATES OF AMERICA               :
                                       :
        - v. -                         :        **SUPERSEDING**
                                       :        **INFORMATION**
JAMES PATTERSON,                       :
                                       :        **S4 20 Cr. 188 (JSR)**
              Defendant.               :
                                       :
                                       :
- - - - - - - - - - - - - - - - - - - X

**COUNT ONE**
**(Conspiracy to Commit Bank Fraud)**

     The United States Attorney charges:

     1.   From at least in or about 2016, up to and including in

or about 2019, in the Southern District of New York and

elsewhere, JAMES PATTERSON, the defendant, and others known and

unknown, willfully and knowingly combined, conspired,

confederated, and agreed together and with each other to commit

bank fraud, in violation of Title 18, United States Code,

Section 1344.

     2.   It was a part and object of the conspiracy that JAMES

PATTERSON, the defendant, and others known and unknown,

willfully and knowingly, would and did execute, and attempt to

execute, a scheme and artifice to defraud a financial

institution, the deposits of which were then federally insured,

and to obtain moneys, funds, credits, assets, securities, and

other property owned by, and under the custody and control of,

such financial institution, by means of false and fraudulent

pretenses, representations, and promises, in violation of Title

18, United States Code, Section 1344, to wit, PATTERSON

participated in a scheme to deceive financial institutions and

other financial intermediaries—including federally insured

banks—into processing and authorizing payments to and from

marijuana sale and delivery businesses, on the one hand, and

their customers in the United States, on the other, by

disguising those transactions to create the false appearance

that they were unrelated to the purchase of marijuana, and

thereby to obtain money of, or under the custody and control, of

those financial institutions and intermediaries.

(Title 18, United States Code, Section 1349.)

## FORFEITURE ALLEGATION

3.   As a result of committing the offense alleged in

Count One of this Information, JAMES PATTERSON, the defendant,

shall forfeit to the United States, pursuant to Title 18, United

States Code, Section 982(a)(2)(A), any and all property

constituting, or derived from, proceeds obtained directly or

indirectly, as a result of the commission of said offense,

including but not limited to a sum of money in United States

currency representing the amount of proceeds traceable to the

commission of said offense.

2

**DJA143**

Substitute Assets Provision

4.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property

3

of the defendant up to the value of the above forfeitable property.

                    (Title 18, United States Code, Section 981;
                Title 21, United States Code, Section 853; and
                Title 28, United States Code, Section 2461.)


                            _Audrey Strauss_
                            AUDREY STRAUSS
                            United States Attorney
                            Southern District of New York

4

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

JAMES PATTERSON,

Defendant.

SUPERSEDING INFORMATION

S4 20 Cr. 188 (JSR)

(18 U.S.C. § 1349.)

AUDREY STRAUSS
United States Attorney.

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
UNITED STATES OF AMERICA            :
                                    :
                                    :   20-cr-188 (JSR)
          -v-                       :
                                    :   MEMORANDUM ORDER
RUBEN WEIGAND & HAMID AKHAVAN,      :
                                    :
      Defendants.                   :
                                    :
-----------------------------------x
```

JED S. RAKOFF, U.S.D.J.

On February 5, 2021, with Court authorization, third party Circle Internet Financial LLC ("Circle") moved to quash a subpoena issued by defendant Ruben Weigand pursuant to Federal Rule of Criminal Procedure 17(c). That motion is now fully briefed. For the reasons that follow, the motion is granted in part and denied in part.

BACKGROUND

The S3 superseding indictment charges defendants Weigand and Hamid "Ray" Akhavan with conspiracy to commit bank fraud during the approximate period of 2016 to 2019. It alleges that the defendants and co-conspirators participated in what the Government calls a "transaction laundering scheme" to trick banks into processing debit and credit card transactions for marijuana. Specifically, the Government alleges that the defendants and others conspired to set up "phony merchants," complete with fictitious websites and offshore bank accounts, to process

1

transactions on behalf of Eaze, an online marijuana marketplace. The phony merchants appeared to sell legitimate products, "such as carbonated drinks, face cream, dog products, and diving gear.  Yet . . . these companies were actually being used to facilitate the approval and processing of marijuana transactions."  Indictment ¶ 13.  The indictment alleges that the conspirators used the phony merchants to launder more than $100 million worth of marijuana transactions.  Indictment ¶ 14.

Relevantly for present purposes, the indictment alleges that misrepresentations regarding the phony merchants and their sales mattered to the issuing banks because "[i]ssuing banks in the United States generally will not extend credit (i.e., approve) transactions that involve unlawful activity under federal law, such as the sale of marijuana."  Indictment ¶ 11(e).  At trial, one disputed issue will be the accuracy of this allegation.  To be sure, it is not seriously disputed that banks maintain policies against processing transactions involving unlawful activity under federal law.  But defendants intend to argue that these policies are pretextual -- designed to protect banks from liability, but not enforced in practice.  The dispute now before the Court concerns Weigand's attempt to acquire evidence on this topic.

LEGAL STANDARD

In contrast to the broad subpoena powers enjoyed by civil litigants and by the Government, utilizing the grand jury, a

2

criminal defendant may not command production of discovery
materials; rather, the defendant must seek leave of Court before
issuing a subpoena for documents returnable before trial.   See
Fed. R. Crim. P. 17(c).   Rule 17(c) provides, in pertinent part:

> (1) In General.   A subpoena may order the witness to
> produce any books, papers, documents, data, or other
> objects the subpoena designates.   The court may direct
> the witness to produce the designated items in court
> before trial or before they are to be offered in
> evidence.   When the items arrive, the court may permit
> the parties and their attorneys to inspect all or part
> of them.
>
> (2) Quashing or Modifying the Subpoena.   On motion made
> promptly, the court may quash or modify the subpoena if
> compliance would be unreasonable or oppressive.

In 1951, the Supreme Court explained that Rule 17(c) permits
a defendant to issue a subpoena to the Government compelling the
production only of "evidence" -- that is, "any material that had
been used before the grand jury or could be used at the trial."
Id. at 221.   Rule 17(c) did not permit broad "discovery" against
the Government.   Id.   But the fact that the defendant had sought
issuance of subpoenas directed to the Government, rather than to
a third party, was crucial to the Supreme Court's reasoning.   The
Court pointed out that Federal Rule of Criminal Procedure 16
permits only limited discovery from the Government and inferred
that "[i]t was not intended by Rule 16 to give a limited right of
discovery, and then by Rule 17 to give a right of discovery in the
broadest terms."   Id. at 220.

3

In 1974, the Supreme Court revisited the issue in the context of a subpoena issued to a third party, albeit a unique one: former president Richard Nixon. Relying upon <u>Bowman</u>, which it called "[t]he leading case in this Court interpreting" Rule 17(c), the Supreme Court found that "the Special Prosecutor, in order to carry his burden [to show entitlement to a Rule 17(c) subpoena], must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." <u>United States v. Nixon</u>, 418 U.S. 683, 698 (1974). <u>Nixon</u>, unlike <u>Bowman</u>, concerned a request for a subpoena directed to a third party. But on the other hand, the request was made <u>by the Government</u>, not by the defendant. Thus, like <u>Bowman</u>, <u>Nixon</u> did not consider whether, and under what circumstances, Rule 17(c) might be appropriately used by the defendant to seek discovery against a third party. Indeed, the <u>Nixon</u> Court recognized that a different standard might apply when a subpoena was issued to a third party, even by the Government:

> The District Court found here that it was faced with the more unusual situation where the subpoena, rather than being directed to the government by defendants, issues to what, as a practical matter, is a third party. The Special Prosecutor suggests that the evidentiary requirement of <u>Bowman</u> . . . does not apply in its full vigor when the subpoena duces tecum is issued to third parties rather than to government prosecutors. We need not decide whether a lower standard exists because we are satisfied that the relevance and evidentiary nature of the subpoenaed tapes were sufficiently shown as a preliminary matter to warrant the District Court's refusal to quash the subpoena.

<u>See</u> <u>id.</u> at 699 n.12 (punctuation omitted).

4

DJA150

Nevertheless, when confronted with defendants' requests to issue a Rule 17(c) subpoena to a third party, courts in this Circuit generally look to the three factors articulated in Nixon. See, e.g., United States v. Skelos, No. 1-CR-317 (KMW), 2018 WL 225453, at *1 (S.D.N.Y. May 17, 2018) ("[C]ourts in the Second Circuit have almost unanimously applied Nixon to subpoenas served on third-parties[.]"). But no binding authority requires such a result.[1] In 2019, when an appellant argued that a district court abused its discretion by quashing a Rule 17(c) subpoena, the Second Circuit explicitly declined to address whether district courts must apply Nixon or whether they might instead apply a different test. See United States v. Bergstein, 788 F. App'x 742, 746 (2d Cir. 2019).

An alternative test was articulated by Judge Scheindlin in United States v. Tucker, 249 F.R.D. 58 (S.D.N.Y. 2008). Judge Scheindlin explained that the Nixon standard

> is inappropriate where production is requested by (A) a criminal defendant; (B) on the eve of trial; (C) from a non-party; (D) where the defendant has an articulable suspicion that the documents may be material to his defense. A defendant in such a situation need only show that the request is (1) reasonably construed as "material to the defense," and (2) not unduly oppressive for the producing party to respond.

---

[1] The Second Circuit applied the Nixon factors in United States v. Ulbricht, 858 F.3d 71, 109 (2d Cir. 2017), but that case, like Bowman, involved a subpoena issued to the Government -- not to a third party.

5

Id. at 66.  Put simply, instead of applying Nixon, Judge Scheindlin went back to basics by requiring defendants to comply with Rule 17(c) itself, which precludes only a subpoena that is "unreasonable or oppressive."  The Second Circuit in Bergstrein refused to reject Tucker's more liberal approach, leaving the question open. Bergstein, 788 F. App'x at 746.  ("Whether under the Nixon standard or the standard articulated in Tucker, we conclude that the district court did not abuse its discretion in quashing the subpoenas. The district court may quash a Rule 17(c) subpoena 'if compliance would be unreasonable or oppressive.'") (citing Fed. R. Crim. P. 17(c)(2)).

Judge Scheindlin's approach is more consistent with modern principles of liberal discovery than Nixon.  Permitting issuance of reasonable third-party subpoenas to take discovery, even when a defendant cannot demonstrate in advance that the sought-after evidence is admissible appropriately aligns criminal discovery more closely with modern principles of liberal discovery and better balances the discovery powers of Government and defense.  A more liberal approach is also more consistent with the text of Rule 17(c) itself.  After all, "[a] subpoena for documents may be quashed if their production would be 'unreasonable or oppressive,' but not otherwise."  Nixon, 418 U.S. at 698 (quoting Fed. R. Civ. P. 17(c)(2).  That is the standard this Court will apply.

DJA152

ANALYSIS

Circle argues that the subpoena should be quashed principally because the documents it seeks are irrelevant.  Circle also argues that many of the documents are inadmissible hearsay, that public disclosure of Circle's confidential information would subject it to potential competitive harms, and that the requests are insufficiently specific.[2]  The Court begins with relevance.

## I. **Relevance**

In assessing whether the subpoena is "unreasonable," the Court must first consider whether it seeks relevant information.  The defendants principally contend that the subpoena seeks evidence that would be probative on the question of materiality.

The materiality of an alleged misrepresentations is an element of the charge of bank fraud.  Because the Government intends to prove a conspiracy to commit bank fraud, it must prove beyond a reasonable doubt the materiality of the misrepresentations that the defendants allegedly conspired to make.  "[A] false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision

_____

[2] The Government likewise asks the Court to quash the subpoena, principally arguing that the subpoena does not seek relevant material.  The Government cites caselaw to support its contention that it has standing to move to quash the subpoena in its own right.  The Court need not decide whether the Government has standing because Circle, the subpoenant and the movant, has standing.  The Court considers each of the Government's arguments in assessing the merits of Circle's motion.

of the decisionmaking body to which it was addressed." Neder v. United States, 527 U.S. 1, 16 (1999) (citation, alteration, and quotation marks omitted). However, a "mere metaphysical possibility" of influence is insufficient. United States v. Litvak, 808 F.3d 160, 173 (2d Cir. 2015). Rather, a misrepresentation is material when it is "reasonably likely to influence the [decisionmaker] in making a determination required to be made." United States v. Rigas, 490 F.3d at 208, 231 (2d Cir. 2007) (emphasis added). Accordingly, a principal question for the jury will be whether the alleged misrepresentations had a natural tendency to influence, or were reasonably likely to influence, the banks in deciding whether to process Eaze credit and debit card transactions.

To understand why the defendants believe that Weigand's subpoena seeks evidence that bears on materiality, one must first understand the business relationship between Circle and Eaze.[3] The parties (and Circle) agree that after the period described in the indictment, despite the fact that the Government pursued this case, Eaze has continued to permit its customers to purchase marijuana using credit and debit cards issued by U.S. banks. Beginning in July 2020, Circle has facilitated such payments for Eaze, acting

_____

[3] The following facts are drawn from the parties' briefing and proffered evidence for present purposes only. At trial, of course, the parties must substantiate any such claims they intend to make with admissible evidence.

8

as an intermediary between Eaze and the credit card companies.
Circle offers a "payment infrastructure" to companies like Eaze
"whereby online companies can take card and bank transfer payments
for goods or services and receive settlement in USD Coin," a
cryptocurrency with its value pegged 1:1 to the U.S. dollar.
Allaire Aff., ECF No. 137-3, ¶¶ 3-4.

Weigand hired a private investigator to initiate a marijuana
purchase on the Eaze platform via Circle.  See Larsen Decl., ECF
No. 142.  Based upon that investigator's findings and the other
limited evidence before the Court, there is reason to believe that
Circle charges a customer's debit or credit card for USD Coin in
the amount of the marijuana purchase; credits Eaze for the
purchase, nominally in USD Coin; converts that USD Coin back into
U.S. dollars; and transfers those dollars into Eaze's account.  In
essence, Circle offers Eaze USD Coin as a fig leaf separating the
issuing bank from Eaze.  But -- and here is defendants' key
allegation -- Circle does not hide what it is doing from the banks.
When Weigand's private investigator conducted a test buy, her
credit card statement included the word "Eaze" in the description
of the charge.  The private investigator's bank had in its
possession information tending to show that this charge related to
Eaze.

Akhavan and Weigand observe that anyone who Googles Eaze --
or anyone familiar with this case -- knows that Eaze is a marijuana

9

marketplace.  Given the ease with which a bank could figure out
that Eaze sells marijuana, and the alleged quantity of marijuana
sales consummated by Eaze (tens of millions of dollars annually),
defendants argue that a juror could infer that banks must know
what Eaze and Circle are doing.  The fact that banks nevertheless
process such transactions, like the private investigator's test
buy, could arguably support an inference that the banks would not
have cared about the misrepresentations that the defendants
allegedly made.

    To be sure, defendants' argument requires several inferential
steps, which a jury is free to make or to reject.  All the Court
must here decide is whether defendants' subpoena seeks relevant
information on this topic.

    The Government principally argues that the victim banks have
policies prohibiting use of their credit and debit cards to make
illegal purchases and that whether banks are effective at enforcing
those policies is beside the point because a victim's negligence
or ineptitude is no defense to bank fraud.  This is true as far as
it goes, but it misunderstands defendants' theory.  They intend to
argue not that banks are lackadaisical in their enforcement, but
rather that banks <u>do not care</u> about whether their cardholders are
purchasing marijuana (at least in states where that is legal).  If
defendants uncover evidence sufficient to support such an
inference, then, at least arguably, a juror might find that the

DJA156

alleged misstatements did not have a natural tendency to influence or a reasonable likelihood of influencing a bank's decision whether to process Eaze transactions.[4]

For these reasons, the Court finds that the subpoena seeks relevant materials.[5]

## II.  Other Objections

Circle argues that some of the documents sought by the subpoena are inadmissible hearsay.  While admissibility is the second Nixon factor, Rule 17(c) does not by its terms require that a subpoena seek only admissible evidence.  A subpoena for evidence, itself inadmissible, that could lead to the discovery of admissible evidence, is not necessarily "unreasonable or oppressive."  In any

---

[4] The Government points out that some Eaze/Circle transactions might have been for legal products (e.g., rolling paper).  If it turns out that Circle only or primarily processes Eaze transactions for non-marijuana products, then that could undermine the materiality argument the defendants are trying to make.  But this proves the defendants' point: documents responsive to the subpoena will likely address this issue.

The Government also argues that banks might be willing to process Circle's transactions because they are, nominally, purchases of USD Coin rather than marijuana.  Thus, even if the banks are knowingly processing marijuana transactions via USD Coin, the misrepresentations alleged in the indictment still would have been reasonably likely to influence the banks' decision whether to process the transactions at issue in this case.  This is a reasonable argument that the Government is free to present to the jury.  This argument does not, however, demonstrate that the subpoena does not seek relevant material.

[5]   The Court does not reach defendants' further argument that the subpoena seeks evidence relevant to impeachment.

event, this Court can and will address hearsay objections to specific documents at the pertinent time.  At this stage, the objection is too speculative to support the motion to quash.

The same goes for Circle's confidentiality objections. Circle claims, in general, that disclosure of these documents will reveal its proprietary methods and financial and customer information, harming it and placing it at a competitive disadvantage.  But a protective order is in place to preserve the confidentiality of such documents until trial.  And if a party chooses to offer a Circle exhibit at trial, then the Court will consider confidentiality objections at that time.

Finally, Circle argues that the subpoena is insufficiently specific because it seeks broad categories of documents across a six-year period.  Here, Circle has a point.  Given the information before the Court, Circle's commercial relationship with Eaze apparently began in July 2020.  Perhaps it took a few months for the parties to develop that business relationship before Circle actually processed its first Eaze payment.  But the defendants have failed to offer any reason to believe that Circle has relevant evidence from before 2020.  For this reason, the Court grants Eaze's motion to quash the subpoena insofar as it seeks documents from prior to January 1, 2020.

Also, Circle objects that certain categories of documents are overly broad, seeking all communications between Circle and

certain entities.  The Court agrees and grants the motion to quash with regard to subpoena items number 1 ("Communications between You and Eaze during the Relevant Time Period . . . .") and 3 ("Communications between You and any Marijuana Dispensaries during the Relevant Time Period . . . .").

      For these reasons, Circle's motion to quash the subpoena is granted in part and denied in part.

      SO ORDERED.

Dated:    New York, NY
          February 20, 2021                    _____
                                               United States District Judge

DJA159

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

RUBEN WEIGAND and
HAMID "RAY" AKHAVAN,

Defendants.

20-CR-188-JSR

**DEFENDANTS' REQUEST TO CHARGE**

**TABLE OF CONTENTS**

                                                                        **Page**

Instruction No. 1: Duty of the Court ................................................................1

Instruction No. 2: Role of the Jury....................................................................2

Instruction No. 3: Duty of Impartiality ............................................................4

Instruction No. 4: Presumption of Innocence and Burden of Proof .................5

Instruction No. 5: Reasonable Doubt ................................................................6

Instruction No. 6: Direct and Circumstantial Evidence ....................................7

Instruction No. 7: Credibility of Witnesses ......................................................8

Instruction No. 8: Credibility of Witnesses: Impeachment by Prior Inconsistent Statement ........10

Instruction No. 9: Defendant's Right to Not Testify .......................................11

Instruction No. 10: Consider Each Defendant Separately ...............................12

Instruction No. 11: Definitions: Knowingly, Intentionally/Willfully..............13

Instruction No. 12: Definitions: Specific Intent and Intent to Defraud ..........14

Instruction No. 13: Summary of the Charge....................................................15

Instruction No. 14: Elements: Financial Institution .......................................17

Instruction No. 15: Elements: Conspiracy ......................................................18

Instruction No. 16: Elements – Scheme to Defraud a Financial Institution ...............................20

Instruction No. 17: Elements – Scheme to Obtain Money or Property Under Bank's
    Control ............................................................................................22

Instruction No. 18: Good Faith ........................................................................25

Instruction No. 19: Selection of Foreperson; Right to See Exhibits and Hear Testimony;
    Communications with the Court ....................................................26

Instruction No. 20: Verdict; Need for Unanimity; Duty to Consult ...............27

DJA161

## <u>INTRODUCTORY INSTRUCTIONS</u>[1]

### <u>Instruction No. 1: Duty of the Court</u>

You have heard all the evidence in the case, as well as the final arguments of the lawyers for the parties. Before you retire to deliberate, it is my duty to instruct you as to the law that will govern your deliberations. These are the final and binding instructions, which entirely replace the preliminary instruction I gave you earlier. As I told you at the start of this case, and as you agreed, it is your duty to accept my instructions of law and apply them to the facts as you determine them.

Regardless of any opinion that you may have as to what the law may be or ought to be, it is your sworn duty to follow the law as I give it to you. Also, if any attorney or other person has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

Because my instructions cover many points, I have provided each of you with a copy of them, not only so that you can follow them as I read them to you now, but also so that you can have them with you for reference throughout your deliberations. In listening to them now and reviewing them later, you should not single out any particular instruction as alone stating the law, but you should instead consider my instructions as a whole.

---

[1]   Unless otherwise noted, these instructions are adapted from the Court's instructions in *United States v. Petit*, 20-cr-188 (JSR) (S.D.N.Y.), ECF No. 127.

1

<u>Instruction No. 2: Role of the Jury</u>

Your duty is to decide the fact issues in the case and arrive, if you can, at a verdict. You, the members of the jury, are the sole and exclusive judges of the facts. You pass upon the weight of the evidence; you determine the credibility of the witnesses; you resolve such conflicts as there may be in the testimony; and you draw whatever reasonable inferences you decide to draw from the facts as you determine them.

In determining the facts, you must rely upon your own recollections of the evidence. To aid in your recollection, we will send you a thumb-drive containing all the exhibits at the start of your deliberations, and if you need to review particular items of testimony, we can also arrange to provide them to you in transcript of read-back form.

What the lawyers have said—for instance, in opening statements, in closing arguments, in objections, or in questions—is not evidence. Nor is anything I may have said evidence. The evidence before you consists of just three things: the testimony given by witnesses that was received in evidence, the exhibits that were received in evidence, and the stipulations of the parties that were received in evidence.

You should bear in mind particularly that questions put to witnesses, although they can provide the context to answers, are not themselves evidence. It is only the answers that are evidence.

The evidence before you consists of the answers given by witnesses and the exhibits presented.

Testimony consists of the answers that were given by the witnesses to the questions that were permitted. Please remember that questions, although they may provide the context for answers, are not themselves evidence; only answers are evidence, and you should therefore disregard any question to which I sustained an objection. Also, you may not consider any answer

2

that I directed you to disregard or that I directed be stricken from the record. Likewise, you may not consider anything you heard about the contents of any exhibit that was not received in evidence.

Furthermore, you should be careful not to speculate about matters not in evidence. For example, there is no legal requirement that the Government prove its case through a particular witness or by use of a particular law enforcement technique. Nor should you speculate about why one or another person whose name may have figured in the evidence is not part of this trial or what his or her situation may be. Your focus should be entirely on assessing the evidence that was presented here for your consideration.

It is the duty of the attorney for each side of a case to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible. Counsel also have the right and duty to ask the Court to make rulings of law and to request conferences at the side bar out of the hearing of the jury. All such questions of law must be decided by me. You should not show any prejudice against any attorney or party because the attorney objected to the admissibility of evidence, asked for a conference out of the hearing of the jury, or asked me for a ruling on the law.

I also ask you to draw no inference from my rulings or from the fact that on occasion I asked questions of certain witnesses. My rulings were no more than applications of the law and my questions were only intended for clarification or to expedite matters. You are expressly to understand that I have no opinion as to the verdict you should render in this case.

DJA164

<u>Instruction No. 3: Duty of Impartiality</u>

You are to perform the duty of finding the facts without bias or prejudice as to any party. You are to perform your final duty in an attitude of complete fairness and impartiality.

The fact that the prosecution is brought in the name of the United States of America entitles the Government to no greater consideration than that given to any other party to this litigation. By the same token, the Government is entitled to no less consideration. All parties, whether Government or individuals, stand as equals.

The question of possible punishment of the defendant is of no concern to you, the members of the jury, and should not, in any sense, enter into or influence your deliberations. The duty of imposing sentence rests exclusively upon the Court.

It must be clear to you that if you were to let bias, or prejudice, or sympathy, or any other irrelevant consideration interfere with your thinking, there would be a risk that you would not arrive at a true and just verdict. So do not be guided by anything except clear thinking and calm analysis of the evidence.

DJA165

Instruction No. 4: Presumption of Innocence and Burden of Proof

Mr. Weigand and Mr. Akhavan are each charged with one federal crime, about which I will instruct you shortly. Bear in mind that the charges, or counts, are not themselves evidence of anything.

Mr. Weigand and Mr. Akhavan pleaded not guilty to the charges against them, and you must consider the evidence against each of them individually. As a result of a plea of not guilty, the burden is on the Government to prove each essential element of the charge for each defendant beyond a reasonable doubt. This burden never shifts to Mr. Weigand and Mr. Akhavan for the simple reason that the law never imposes upon a defendant in a criminal case the burden or duty of testifying, or calling any witness, or locating or producing any evidence.

In other words, they start with a clean slate and are presumed innocent until such time, if ever, that you as a jury are convinced that the Government has proven their guilt beyond a reasonable doubt as to each charge.

5

DJA166

<u>Instruction No. 5: Reasonable Doubt</u>

In order to convict Mr. Weigand and Mr. Akhavan on the Indictment, the Government is required to prove that charge beyond a reasonable doubt. The question that naturally arises is, "What is a reasonable doubt?" The words almost define themselves. It is doubt that a reasonable person has after carefully weighing all of the evidence. It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life. Proof beyond a reasonable doubt must therefore be proof of a convincing character that a reasonable person would not hesitate to rely on in making an important decision.

A reasonable doubt is not caprice or whim. It is not speculation or suspicion. It is not an excuse to avoid the performance of an unpleasant duty. The law does not require that the Government prove guilt beyond all possible doubt: Proof beyond a reasonable doubt is sufficient to convict.

If, after fair and impartial consideration of the evidence, you have a reasonable doubt as to a given defendant's guilt with respect to a particular charge against him, you must find that defendant not guilty of that charge. On the other hand, if, after fair and impartial consideration of all the evidence, you are satisfied beyond a reasonable doubt of a given defendant's guilt with respect to a particular charge against him, you should not hesitate to find that defendant guilty of that charge.

<u>Instruction No. 6: Direct and Circumstantial Evidence</u>

There are two types of evidence that you may properly use in reaching your verdict. One type of evidence is direct evidence.

Direct evidence is evidence that proves a fact directly. For example, where a witness testifies to what he or she saw, heard, or observed, that is called direct evidence.

Circumstantial evidence is evidence that tends to prove one fact by proof of other facts. There is a simple example of circumstantial evidence that is often used in this courthouse. Assume that when you came into the courthouse this morning the sun was shining and it was a nice day. Assume that there are blinds on the courtroom windows that are drawn and that you cannot look outside. As you are sitting here, someone walks in with an umbrella that is dripping wet. Someone else then walks in with a raincoat that is also dripping wet. Now, you cannot look outside the courtroom and you cannot see whether or not it is raining. So you have no direct evidence of that fact. But on the combination of the facts that I have asked you to assume, it would be reasonable and logical for you to conclude that between the time you arrived at the courthouse and the time these people walked in, it had started to rain.

That is all there is to circumstantial evidence. Using your reason and experience, you infer from established facts the existence or the nonexistence of some other fact. Please note, however, that it is not a matter of speculation or guess: it is a matter of logical inference.

The law makes no distinction between direct and circumstantial evidence. Circumstantial evidence is of no less value than direct evidence, and you may consider either or both, and may give them such weight as you conclude is warranted.

7

DJA168

<u>Instruction No. 7: Credibility of Witnesses</u>

It must be clear to you by now that counsel for the Government and counsel for the defendants are asking you to draw very different conclusions about various factual issues in the case. Deciding these issues will involve making judgments about the testimony of the witnesses you have listened to and observed. In making these judgments, you should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, and any other matter in evidence that may help you to decide the truth and the importance of each witness's testimony.

Your decision to believe or to not believe a witness may depend on how that witness impressed you. How did the witness appear? Was the witness candid, frank, and forthright, or did the witness seem to be evasive or suspect in some way? How did the way the witness testified on direct examination compare with how the witness testified on cross-examination? Was the witness consistent or contradictory? Did the witness appear to know what he or she was talking about? Did the witness strike you as someone who was trying to report his or her knowledge accurately? These are examples of the kinds of common sense questions you should ask yourselves in deciding whether a witness is or is not truthful.

How much you choose to believe a witness may also be influenced by the witness's bias. Does the witness have a relationship with the Government or a defendant that may affect how he or she testified? Does the witness have some incentive, loyalty, or motive that might cause him or her to shade the truth? Does the witness have some bias, prejudice, or hostility that may cause the witness to give you something other than a completely accurate account of the facts he or she testified to?

In this regard, you have heard testimony from witnesses who admitted to being involved in some of the alleged criminal activity with which the defendants are charged and testified either pursuant to a plea agreement or other agreement with the Government.

The law permits the use of testimony from such witnesses; indeed, such testimony, if found truthful by you, may be sufficient in itself to warrant conviction of a given defendant if it convinces you of that defendant's guilt beyond a reasonable doubt. However, the law requires that the testimony and motives of each such witness be scrutinized with particular care and caution. After carefully scrutinizing the testimony of a witness who is testifying pursuant to an agreement with the Government and taking account of the special features of such agreements, you may give the testimony as little or as much weight as you deem appropriate.

As to all witnesses, you should also consider whether a witness had an opportunity to observe the facts he or she testified about and whether the witness's recollection of the facts stands up in light of the other evidence in the case. In other words, what you must try to do in deciding credibility is to size up a person just as you would in any important matter where you are trying to decide if a person is truthful, straightforward, and accurate in his or her recollection.

DJA170

Instruction No. 8: Credibility of Witnesses: Impeachment by Prior Inconsistent Statement[2]

You have heard evidence that a witness made a statement on an earlier occasion that counsel argues is inconsistent with the witness' trial testimony. Evidence of a prior inconsistent statement is not to be considered by you as affirmative evidence bearing on the defendant's guilt. Evidence of the prior inconsistent statement was placed before you for the more limited purpose of helping you decide whether to believe the trial testimony of the witness who contradicted himself. If you find that the witness made an earlier statement that conflicts with his trial testimony, you may consider that fact in deciding how much of his trial testimony, if any, to believe.

In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact, or whether it had to do with a small detail; whether the witness had an explanation for the inconsistency, and whether that explanation appealed to your common sense.

It is exclusively your duty, based upon all the evidence and your own good judgment, to determine whether the prior statement was inconsistent, and if so how much, if any, weight to be given to the inconsistent statement in determining whether to believe all or part of the witness' testimony.

---

[2]  1 Leonard B. Sand *et al.*, Modern Federal Jury Instructions, Instruction 7-19 (2021).

DJA171

<u>Instruction No. 9: Defendant's Right to Not Testify</u>

Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the Government's burden to prove a defendant guilty beyond a reasonable doubt. A defendant is never required to prove that he or she is innocent.

Accordingly, you must not attach any significance to the fact that the defendant(s) did not testify. No adverse inference against either of the defendants may be drawn by you because that defendant did not take the witness stand, and you may not consider such silence against either of the defendants in any way in your deliberations in the jury room.

DJA172

Instruction No. 10: Consider Each Defendant Separately[3]

In reaching a verdict you must bear in mind that guilt is individual. Your verdict as to each defendant must be determined separately with respect to him solely on the evidence, or lack of evidence, presented against him without regard to the guilt or innocence of anyone else. Whether you find a particular defendant guilty or not guilty as to one offense should have no bearing on your verdict as to the other offenses charged.

In addition, some of the evidence in this case was limited to one defendant. Let me emphasize that any evidence admitted solely against one defendant may be considered only as against that defendant and may not in any respect enter into your deliberations as to the other defendant.

---

[3]   Adapted from the Court's instruction in *United States v. Lebedev*, 15-cr-769 (AJN) (S.D.N.Y), ECF No. 442.

12

Instruction No. 11: Definitions: Knowingly, Intentionally/Willfully

Before I instruct you on each of the counts specifically, I will define some terms and concepts that will come up repeatedly throughout these instructions, and that relate to a given defendant's state of mind. Specifically, a defendant cannot be convicted of any crime unless, among other things, he acted "knowingly" and "intentionally" (or, as it is sometimes put, "willfully").

Knowingly means to act consciously and voluntarily, rather than by mistake or accident or mere inadvertence.

"Intentionally" and "willfully" mean to act deliberately and with a bad purpose, rather than innocently.

Instruction No. 12: Definitions: Specific Intent and Intent to Defraud

Specific intent means more than just a general intent to commit an act. To prove specific intent, the Government must prove that the defendant you're considering purposefully and knowingly did that which the law forbids.

Intent to defraud means to act with the specific intent to deceive, for the purpose of causing some financial or property loss to another.[4] Property loss includes loss of intangible interests such as the right to control the use of one's assets, but only where the loss of the right to control those assets can or does result in tangible economic harm.[5]

An intent to defraud is more than causing a person to enter into transactions they would otherwise avoid,[6] or inducing a person to enter into a discretionary economic transaction that they would not have entered but for the defendant's misrepresentations.[7]

The question of whether the defendants knew their course of conduct would likely harm another's tangible economic interest is a question of fact for you to determine, like any other fact question.

---

[4]  *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017); 2 Sand *et al.*, Modern Federal Jury Instructions, Instruction 44-5 (2021).

[5]  *Finazzo*, 850 F.3d at 111; *see also United States v. Jabar*, 2017 WL 4276652, at *3–4 (W.D.N.Y. Sept. 27, 2017) (fraudulent intent necessarily includes an intent to cause harm that is more than "metaphysical") (citing *United States v. Starr*, 816 F.2d at 98, 100 (2d Cir. 1987)).

[6]  *Jabar*, 2017 WL 4276652, at *5 (quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007), and *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006)).

[7]  *United States v. Davis*, 2017 WL 3328240, at *8 (S.D.N.Y. Aug. 3, 2017) (citing *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015)); *see also Jabar*, 2017 WL 4276652, at *3 (quoting *Shellef*, 507 F.3d at 108).

14

DJA175

## CHARGES

Instruction No. 13: Summary of the Charge[8]

The defendants were originally charged in what is called an indictment, which is simply a charging instrument and is not evidence, so it will not be presented to you. The indictment in this case contains one count.

The single count charges that the defendants conspired—that is, agreed with each other or with one or more persons—to engage in a scheme to deceive United States banks into processing dollars in credit and debit card payments for the purchase and delivery of marijuana products.

The bank fraud statute, Title 18, Section 1344 of the United States Code, provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> (1)     to defraud a financial institution; or
>
> (2)     to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be [guilty of a crime].

The conspiracy to commit bank fraud statute, Title 18, Section 1349 of the United States Code provides:

> Any person who ... conspires to commit any offense under this chapter [including bank fraud under Section 1344] shall be [guilty of a crime].

The statute thus sets out two different forms of bank fraud: (1) a scheme to defraud a bank; and (2) a scheme to obtain money under a bank's control by means of false representations. The Indictment charges both forms of bank fraud. You will be instructed separately on each one. The order does not matter.

---

[8]   This instruction is adapted from the Court's instructions in *United States v. Nejad*, 18-cr-224 (AJN) (S.D.N.Y.), ECF No. 308, and *Petit*.

DJA176

You may find Mr. Weigand and Mr. Akhavan guilty of conspiracy to commit bank fraud if you find each and every element of conspiracy to commit one form of bank fraud proven beyond a reasonable doubt. You do not need to find both forms proven. But to find Mr. Weigand and Mr. Akhavan guilty, you must be unanimous as to which theory of bank fraud you find, and you must find every element of that theory proven beyond a reasonable doubt.

DJA177

Instruction No. 14: Elements: Financial Institution[9]

I use the common term "bank" throughout these instructions as a matter of convenience in lieu of repeating the phrase "financial institution."  However, you are instructed that the term financial institution has a very specific meaning in the context of a bank fraud prosecution, like this one. In this case, you are instructed that the Government must prove beyond a reasonable doubt that any financial institutions, however referred to, that were the object of the fraud were either federally insured depository institutions or credit unions with accounts insured by the National Credit Union Share Insurance Fund at the time of the alleged conspiracy. You are instructed that any reference to a "bank" in these instructions is a reference to a financial institution.

During this trial you have heard about banking and financial sector entities in Europe, as well as Visa and MasterCard.

It remains the government's burden to prove beyond a reasonable doubt that any objects of the bank fraud charge—whether referred to as a bank, credit union, or any other shorthand—were federally insured financial institutions that meet the definition set forth here.

It is not necessary for the Government to prove that the Defendant knew the identity of a particular financial institution or that the Defendant knew that the financial institution was insured by the Federal Deposit Insurance Corporation.

---

[9]  This instruction is adapted from 2 Sand *et al.*, Modern Federal Jury Instructions, Instruction 44-12 (2021).

Instruction No. 15: Elements: Conspiracy[10]

In order to find Mr. Weigand and Mr. Akhavan guilty of conspiracy to commit bank fraud, you must first find that an unlawful conspiracy to commit bank fraud existed. The Government must therefore prove the following two elements beyond a reasonable doubt:

1.      First, the Government must prove that the conspiracy existed. That is, that there was an agreement or understanding among at least two people to commit bank fraud.

2.      Second, the Government must prove that Mr. Weigand and Mr. Akhavan knowingly and willfully became members of that conspiracy, with knowledge of its unlawful objective.

The first element the Government must prove is that there was a conspiracy. A conspiracy is an agreement, or an understanding, of two or more persons to accomplish by concerted action one or more unlawful purposes, or "objects," of the conspiracy. In this case the only charged object of the conspiracy is to commit bank fraud. The object may be satisfied by either provision of the bank fraud statute, which I will discuss shortly.

If you conclude that the Government as proved beyond a reasonable doubt that the charged conspiracy existed and had bank fraud as its object, you must then consider whether the Government has proved beyond a reasonable doubt that Mr. Weigand and/or Mr. Akhavan intentionally joined in and participated in the conspiracy. To prove this element, the Government must prove beyond a reasonable doubt that the defendant you are considering entered into the conspiracy and did so knowingly and willfully and with knowledge of its unlawful objective. I have instructed you on the meaning of "knowingly" and "intentionally."

---

[10]     This instruction is adapted from the Court's instructions regarding conspiracy in *Petit* (Instructions 15, 16, and 20).

18

DJA179

I want to caution you that the mere association by one person with another person or group of persons does not make that first person a member of the conspiracy, even when coupled with knowledge that the second person (or group of persons) is taking part in a conspiracy. In other words, knowledge without participation is not sufficient. What is necessary is that the defendant you are considering participated in the conspiracy with knowledge of its unlawful purpose and with intent to aid in the accomplishment of its unlawful purpose.

In short, in order to satisfy the second essential element of the charged offense as to a given defendant, you must find beyond a reasonable doubt that the defendant you are considering, with an understanding of the unlawful character of the charged conspiracy, knowingly and intentionally, joined and participated in the conspiracy for the purpose of furthering its unlawful object.

DJA180

<u>Instruction No. 16: Elements – Scheme to Defraud a Financial Institution</u>

In order to prove Mr. Weigand and Mr. Akhavan guilty of conspiring to knowingly execute a scheme to defraud a bank under Section 1344(1), the Government must prove each of the following elements beyond a reasonable doubt, in addition to the two elements required to prove a conspiracy:

1.  First, there existed a scheme to defraud a bank;

2.  Second, that the defendants executed or attempted to execute the scheme knowingly, willfully and with intent to defraud a bank;

3.  Third, that the defendants executed or attempted to execute the scheme through a misrepresentation or concealment of a fact and that misrepresented or concealed fact was material; and

4.  Fourth, that at the time of the execution of the scheme, the bank met the legal requirements to qualify as a financial institution.

The first element the Government must prove beyond a reasonable doubt is that there was a scheme to defraud a bank. A "scheme" is simply a plan that is designed to accomplish an objective. A "scheme to defraud" is a pattern or course of conduct concerning a material matter designed to deceive a bank into releasing property with the intent to harm the bank's property interest. This subsection requires that the defendants intended to deceive the bank specifically; deception of a person or entity that is not a bank is not sufficient.[11]

The second element the Government must prove beyond a reasonable doubt is that the defendants intended to execute or attempted to execute the scheme knowingly, willfully, and with

---

[11]   *Shaw v. United States*, 137 S. Ct. 462, 469 (2016).

DJA181

an intent to defraud. I have already instructed you on the meaning of the terms "knowingly," "willfully," and "intent to defraud."

The third element the government must prove beyond a reasonable doubt is that the defendants executed the scheme through a misrepresentation or concealment of a fact and that misrepresented or concealed fact was material. A material fact is one you would reasonably expect to be of concern to a reasonable and prudent bank in relying upon the representation or statement in making a decision. This means that if you find a particular statement of fact to have been false, you must also determine whether that statement was one that a reasonable bank would have considered important in making its decision. It does not matter whether the bank actually relied on the misrepresentation; however, the misrepresentation had to be capable of influencing the bank. The same requirements applies to fraudulent half-truths or the concealment of material facts where that concealment makes an affirmative statement misleading.

The fourth element the Government must prove beyond a reasonable doubt is that the object of the scheme was a financial institution as that term is defined under the law. I have defined that term for you previously and you should apply that definition here. It is the Government's burden to prove to you beyond a reasonable doubt that any bank, credit union or other entity that it alleges was the object of the conspiracy meets that definition.

21

DJA182

Instruction No. 17: Elements – Scheme to Obtain Money or Property Under Bank's Control[12]

In order to prove Mr. Weigand and Mr. Akhavan guilty of conspiring to execute a scheme to obtain money or property owned by or under a bank's custody or control under Section 1344(2), the Government must prove each of the following elements beyond a reasonable doubt, in addition to the two elements required to prove a conspiracy:

1.      First, that there was a scheme to obtain money or property owned by or under the custody or control of a bank by means of false or fraudulent pretenses, representations, or promises as charged in the Indictment;

2.      Second, that the false or fraudulent pretenses, representations, or promises were material to a bank;[13]

3.      Third, that the defendants executed or attempted to execute the scheme knowingly, willfully, and with an intent to defraud;[14] and

---

[12]   This instruction is adapted from the Court's instructions in *Nejad* and *United States v. Nkansah*, No. 8-cr-1234 (JSR) (S.D.N.Y.) (attached in relevant part as Exhibit A).

[13]   Absent a meaningful requirement of materiality under this subsection, the Government could pursue a theory of federal bank fraud based on *any* alleged deviation from a bank or credit-card company's claimed policy (no matter how arbitrary) and obtain a conviction based on a finding that a particular transaction (no matter how voluntary, productive and legal it would otherwise be) might not have been processed absent the deviation. In *Finazzo*, the Second Circuit considered a hypothetical "in which a clothing retailer does business with a supplier, and the supplier misrepresents its identity to the retailer." 850 F.3d at 111 n.18. "[W]hat if [a] supplier misrepresents its identity merely because [a] retailer's board of directors has agreed not to transact business with the supplier due to inter-personal animus?" *Id.* Even though "the Government would likely be able to easily prove that the supplier's misrepresentation affected the retailer's decisionmaking," the Second Circuit has held that this kind of misrepresentation cannot support a "scheme to defraud." *Id.*

[14]   *Loughrin v. United States* held that intent to defraud *a bank* is not an element under subsection 2. 573 U.S. 351 (2014). But even after *Loughrin*, intent to defraud *someone* is an element under subsection 2.  *See* 2 O'Malley *et al.*, Federal Jury Practice & Instructions § 47:11 (6th ed.) (last updated February 2021); *United States v. Ajayi*, 808 F.3d 1113, 1119 (7th Cir. 2015); *United States v. Chittenden*, 848 F.3d 188, 195 n.4 (4th Cir.), *rev'd on other grounds*, 138 S. Ct. 447 (2017); *United States v. Kerley*, 784 F.3d 327, 343 (6th Cir. 2015); Ninth Circuit Pattern Jury Instruction § 8.127 (instruction last updated March 2015); Eighth Circuit Pattern Jury Instructions § 6.18.1344

22

4.      Fourth, that at the time of the execution of the scheme, the bank met the legal

requirements to qualify as a financial institution.

The first element that the Government must prove beyond a reasonable doubt is that there

was a scheme to obtain money or property owned by or under the custody or control of a bank by

means of false or fraudulent pretenses, representations or promises as described in the Indictment.

It is essential for this element that the charged false or fraudulent pretenses, representations or

promises be the means by which defendant obtains the property at issue—*i.e.*, that they be causally

related to the bank's relinquishment of the control of its property.[15] You must be convinced beyond

a reasonable doubt that the defendants intended that a false statement would reach such a bank (or

a custodian of the bank's property).[16]

---

(last updated July 2017); Seventh Circuit Pattern Jury Instructions 18 U.S.C. § 1344(2) (2020 ed.); *see also United States v. Kipp*, 2017 WL 2662983, at *21 (W.D.N.C. June 20, 2017) (acquitting a defendant charged under subsection 2 after a bench trial because the government failed to meet its "burden of showing specific intent to defraud"), *aff'd*, 793 F. App'x 166 (4th Cir. 2019); *cf. United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016) ("[A] representation is fraudulent only if made with the contemporaneous intent to defraud.").

For the same reasons noted *supra*, the intent to deceive needs to be oriented specifically around the bank's property or economic interests that the statute protects. *See, e.g.*, Ninth Circuit Pattern Jury Instruction § 8.127 (listing as separate elements that the defendant "knowingly carried out a scheme or plan to obtain money or property from [a financial institution] by making false statements or promises" and that "the defendant acted with intent to defraud"). "[O]nly a showing of intended harm will satisfy the element of fraudulent intent." *Novak*, 443 F.3d at 156. And mere intent to obtain property in the ordinary course of legitimate banking should not be mistaken for requisite fraudulent intent in this context. Otherwise, benign misrepresentations about someone's race, political affiliation, or weight could ground prosecutions for bank fraud to the extent that banks allegedly discriminate based on those inputs (however unexpectedly) when deciding to process transactions, merely because a defendant *intended* to obtain money or property. *See Finazzo*, 850 F.3d at 111 n.18; *cf. United States v. Phillips*, 731 F.3d 649, 652 (7th Cir. 2013) (en banc) (Posner, J.) (employing similar reasoning in 18 U.S.C. § 1014 prosecution).

[15]   *Loughrin*, 573 U.S. at 363

[16]    *See United States v. Weigand*, 2020 WL 5105481, at *5–6 (S.D.N.Y. Aug. 31, 2020), as corrected (Sept. 2, 2020).

23

DJA184

The second element the Government must prove beyond a reasonable doubt is that the false or fraudulent pretenses, representations or promises must relate to a material fact or matter. I have instructed you on what makes a fact "material," and you should follow that instruction here.

The third element the Government must prove beyond a reasonable doubt is that the defendants executed or attempted to execute the scheme knowingly, willfully, and with an intent to defraud.  I have instructed you on the terms "knowingly," "willfully," and "intent to defraud."

The fourth element the Government must prove beyond a reasonable doubt is that the object of the scheme was a financial institution as that term is defined under the law. I have defined that term for you previously and you should apply that definition here. It is the Government's burden to prove to you beyond a reasonable doubt that any bank, credit union or other entity that it alleges was the object of the conspiracy meets that definition.

DJA185

Instruction No. 18: Good Faith[17]

A defendant's good faith is a complete defense to the charge in this case. If Mr. Akhavan and Mr. Weigand believed in good-faith that they were acting properly, even if they were mistaken in that belief, there would be no crime of bank fraud by them. Likewise, a genuine belief that the scheme never exposed the victim to loss or risk of loss in the first place would demonstrate a lack of fraudulent intent.[18]

Good-faith on the part of Mr. Akhavan and Mr. Weigand is a complete defense on the charge of bank fraud. Mr. Akhavan and Mr. Weigand, however, do not have the burden of establishing or proving a defense in good-faith. They have no burden at all. The burden is on the Government to prove guilty knowledge, criminal intent, and a lack of good-faith beyond a reasonable doubt for each defendant as to the charge you are considering.

---

[17]  This instruction adapted from the Court's good-faith instruction in *Petit* (Instruction 13).

[18]  *United States v. Calderon*, 944 F.3d 72, 91 (2d Cir. 2019).

25

DJA186

## CONCLUDING INSTRUCTIONS

Instruction No. 19: Selection of Foreperson; Right to See Exhibits and Hear Testimony;
Communications with the Court

You will shortly retire to the jury room to begin your deliberations. As soon as you get to the jury room, please select one of your number as the foreperson, to preside over your deliberations and to serve as your spokesperson if you need to communicate with the Court.

You will be bringing with you into the jury room a copy of my instructions of law and a verdict form on which to record your verdict. In addition, we will send into the jury room a thumb-drive with all the exhibits that were admitted into evidence. If you want any of the testimony provided, that can also be done, in either transcript or read-back form. But please remember that it is not always easy to locate what you might want, so be as specific as you possibly can be in requesting portions of the testimony.

Any of your requests, in fact any communication with the Court, should be made to me in writing, signed by your foreperson, and given to the marshal, who will be available outside the jury room throughout your deliberations. After consulting with counsel, I will respond to any question or request you have as promptly as possible, either in writing or by having you return to the courtroom so that I can speak with you in person.

DJA187

<u>Instruction No. 20: Verdict; Need for Unanimity; Duty to Consult</u>

You should not, however, tell me or anyone else how the jury stands on any issue until you have reached your verdict and recorded it on your verdict form. As I have already explained, the Government, to prevail on a particular charge against a particular defendant, must prove each essential element of that charge beyond a reasonable doubt. If the Government carries this burden with respect to a defendant, you should find that defendant guilty of that charge.

Otherwise, you must find that defendant not guilty of that charge.

Each of you must decide the case for yourself, after consideration, with your fellow jurors, of the evidence in the case, and your verdict must be unanimous. In deliberating, bear in mind that while each juror is entitled to his or her opinion, you should exchange views with your fellow jurors. That is the very purpose of jury deliberation—to discuss and consider the evidence; to listen to the arguments of fellow jurors; to present your individual views; to consult with one another; and to reach a verdict based solely and wholly on the evidence. If, after carefully considering all the evidence and the arguments of your fellow jurors, you entertain a conscientious view that differs from the others', you are not to yield your view simply because you are outnumbered. On the other hand, you should not hesitate to change an opinion that, after discussion with your fellow jurors, now appears to you erroneous.

In short, your verdict must reflect your individual views and must also be unanimous.

This completes my instructions of law.

27

DJA188

# EXHIBIT A

DJA189



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U. S. DISTRICT COURT
FILED
JAN 29 2010
D.S.
S.D. OF N.Y.

................................................................

UNITED STATES OF AMERICA

     -v-

FELIX NKANSAH,

        Defendant.

................................................................x

S3 08 Cr. 1234 (JSR)

THE COURT'S INSTRUCTIONS OF LAW TO THE JURY

1

DJA190

TABLE OF CONTENTS

I. GENERAL INSTRUCTIONS

1.    Duty of the Court

2.    Duty of the Jury

3.    Duty of Impartiality

4.    Burden of Proof

5.    Reasonable Doubt

6.    Direct and Circumstantial Evidence

7.    Witness Credibility

8.    Defendant's Testimony

II. THE CHARGES

9.    Multiple Charges

10.   Count 1: Conspiracy to Defraud the United States

11.   Count 2: Filing A False Claim with the United States

12.   Count 3: Bank Fraud

13.   Count 4: Aggravated Identity Theft

14.   Count 5: Identity Theft

III. CONCLUDING INSTRUCTIONS

15.   Selection of Foreperson; Right to See Exhibits and Hear Testimony;
      Communications with Court

16.   Verdict; Need for Unanimity; Duty to Consult

DJA191

INSTRUCTION NO. 12

Count 3:  Bank Fraud

Count 3 charges Felix Nkansah with intentionally participating in a scheme to defraud a federally-insured bank.

In order for the defendant to be guilty of this charge, the Government must prove beyond a reasonable doubt each of the following three elements:

First, that at some time between early 2005 and August 2008, the defendant participated in a scheme to obtain money from a bank by means of false or fraudulent pretenses, representations or promises;

Second, that the defendant did so unlawfully, knowingly, and willfully and with an intent to defraud the bank; and

Third, that at the time the defendant participated in the alleged scheme, the bank was insured by the Federal Deposit Insurance Corporation.

With regard to the first element, the scheme in which the defendant is alleged to participate is a scheme by the defendant or others to obtain money from a bank by depositing and/or cashing tax refund checks in the names of third parties without the knowledge or permission of the third parties.  It is not necessary, however, for the Government to prove that the bank suffered an actual loss of funds, as long as the Government proves beyond a reasonable doubt that the scheme placed the bank at a risk of loss.

As to the second element, these terms have already been defined in my previous instructions.

As to the third element, the parties have stipulated that the banks in question during the relevant time period were insured by the Federal Deposit Insurance Corporation.  While the

18

DJA192

Government has charged that the defendant participated in a scheme to defraud more than one federally-insured bank, it need only prove that the scheme involved a single bank as long as you are unanimous that that particular bank was a target of the scheme.

[remainder of page is too faded to read reliably]

DJA193

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA                      :

      v.                                    :

                                :

Hamid Akhavan,                                :   **S3 20 Cr. 188 (JSR)**
      a/k/a "Ray Akhavan,"                      :

-and-                                         :

Ruben Weigand,                                :

        Defendants.                          :

                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X


## THE GOVERNMENT'S REQUESTS TO CHARGE


 

AUDREY STRAUSS
United States Attorney
Southern District of New York


Nicholas Folly
Tara LaMorte
Emily Deininger
Assistant United States Attorneys

*- Of Counsel -*

DJA194

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

UNITED STATES OF AMERICA    :

         v.        :

                :

Hamid Akhavan,    :   **S3 20 Cr. 188 (JSR)**
    a/k/a "Ray Akhavan,"    :

-and-    :

                :

Ruben Weigand,    :

                :

       Defendants.    :

                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

## <u>THE GOVERNMENT'S REQUESTS TO CHARGE</u>

Pursuant to Rule 30 of the Federal Rules of Criminal Procedure, the Government

respectfully requests the Court to include the following in its charge to the jury.

DJA195

**TABLE OF CONTENTS**

REQUEST NO. 1 GENERAL REQUESTS ............................................................................ **3**

REQUEST NO. 2 SUMMARY OF THE CHARGES ............................................................ **4**

REQUEST NO. 3 CONSPIRACY  (ELEMENTS) ................................................................ **5**

REQUEST NO. 4 BANK FRAUD CONSPIRACY  (ELEMENTS) ................................... **8**

REQUEST NO. 5 BANK FRAUD CONSPIRACY - ELEMENTS OF BANK FRAUD ............. **9**

REQUEST NO. 6 BANK FRAUD CONSPIRACY - EXISTENCE OF A SCHEME OR

ARTIFICE............................................................................................................**10**

REQUEST NO. 7 COUNT TWO: BANK FRAUD CONSPIRACY - INTENT TO DEFRAUD

OR OBTAIN BANK MONEY ......................................................................**13**

REQUEST NO. 8 CONSCIOUS AVOIDANCE ................................................................**16**

REQUEST NO. 9 COUNT TWO: BANK FRAUD CONSPIRACY - FEDERALLY INSURED

FINANCIAL INSTITUTION.......................................................................**18**

REQUEST NO. 10 VENUE ..................................................................................................**19**

REQUEST NO. 11 MOTIVE ...............................................................................................**20**

REQUEST NO. 12 DEFENDANT'S TESTIMONY [OR DEFENDANT'S RIGHT NOT TO

TESTIFY] ......................................................................................................**21**

REQUEST NO. 13 COOPERATING/IMMUNIZED WITNESS TESTIMONY ...........................**22**

REQUEST NO. 14 ACCOMPLICE TESTIMONY ...........................................................**23**

REQUEST NO. 15 PREPARATION OF WITNESSES [IF APPLICABLE] ...................................**24**

REQUEST NO. 16 UNCALLED WITNESSES – EQUALLY AVAILABLE ...............................**25**

REQUEST NO. 17 PERSONS NOT ON TRIAL OR NOT INDICTED ...........................................**26**

REQUEST NO. 18 EXPERT WITNESSES [IF APPLICABLE] .......................................................**27**

DJA196

REQUEST NO. 19 SUMMARY CHARTS - NOT ADMITTED AS EVIDENCE [IF

APPLICABLE] ..........................................................................................................29

REQUEST NO. 20 SUMMARY CHARTS - ADMITTED AS EVIDENCE [IF APPLICABLE]

...................................................................................................................................30

REQUEST NO. 21 STIPULATIONS [IF APPLICABLE] ....................................................31

REQUEST NO. 22 STATEMENTS OF THE DEFENDANT [IF APPLICABLE] ......................32

REQUEST NO. 23 RECORDINGS AND TRANSCRIPTS [IF APPLICABLE] ..........................33

REQUEST NO. 24 FALSE EXCULPATORY STATEMENTS [IF APPLICABLE] ....................34

REQUEST NO. 25 LAW ENFORCEMENT WITNESSES [IF APPLICABLE] ..........................35

REQUEST NO. 26 REDACTIONS [IF APPLICABLE] ......................................................36

REQUEST NO. 27 USE OF EVIDENCE OBTAINED PURSUANT TO SEARCH ....................37

CONCLUSION ...........................................................................................................38