# 21-1678-cr(L),
## 21-1708-cr(CON), 21-2214-cr(CON), 21-2466-cr(XAP)

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

JAMES PATTERSON,

*Defendant,*

RUBEN WEIGAND, AKA Sealed Defendant 1, HAMID AKHAVAN,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX FOR DEFENDANTS-APPELLANTS
### Volume 2 of 12 (Pages DJA197 to DJA472)

CHRISTOPHER TAYBACK
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000

WILLIAM A. BURCK
DEREK L. SHAFFER
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000

*Attorneys for Defendant-Appellant Hamid Akhavan*

*(For Continuation of Appearances See Inside Cover)*

IRA P. ROTHKEN
JARED R. SMITH
ROTHKEN LAW FIRM
3 Hamilton Landing, Suite 280
Novato, California 94949
(415) 924-4250

*Attorneys for Defendant-Appellant*
  *Hamid Akhavan*

MICHAEL H. ARTAN, ESQ.
624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017
(213) 688-0370

*Attorneys for Defendant-Appellant*
  *Ruben Weigand, AKA Sealed*
  *Defendant* 1

i

## TABLE OF CONTENTS

**Page**

District Court Docket Entries .................................... DJA1

Sealed Indictment, dated March 31, 2020 ................. DJA59

Opinion and Order of the Honorable Jed S. Rakoff,
    dated August 31, 2020 ........................................... DJA75

Government's Motion *in limine* To Preclude
    Defendants' Experts, dated February 16, 2021 ......DJA119.1

    Exhibit A to Government's Motion *in limine* -
    Letter from Christopher Tayback to Christopher
    J. DiMase, Nicholas S. Folly and Tara LaMorte,
    with Enclosure, dated November 3, 2020........... DJA119.34

    Exhibit B to Government's Motion *in limine* -
    Letter from Michael J. Gilbert to Christopher J.
    DiMase, Nicholas S. Folly and Tara LaMorte,
    with Enclosure, dated November 3, 2020........... DJA119.46

    Exhibit C to Government's Motion *in limine* -
    Letter from Michael J. Gilbert to Christopher J.
    DiMase, Nicholas S. Folly and Tara LaMorte,
    with Enclosure, dated December 21, 2020 ......... DJA119.74

    Exhibit D to Government's Motion *in limine* -
    E-mail from Shriram Harid to Christopher J.
    DiMase, Nicholas S. Folly, Tara LaMorte and
    Emily Deininger, dated January 19, 2021........... DJA119.79

Letter Motion, by Third Parties Visa Inc. and Martin
    Elliott, for an Order Granting Video Testimony of
    Martin Elliott, dated February 17, 2021
    (Unredacted version reproduced in
    Confidential Appendix) ......................................... DJA120

ii

**Page**

Annexed to Letter Motion -
(i) Subpoena to Martin Elliott, dated
February 17, 2021 ................................................ DJA125

(ii) Subpoena to Visa Inc., dated
February 11, 2021 ................................................ DJA126

(iii) Declaration of Martin Elliott, dated
February 17, 2021
(Unredacted version reproduced in
Confidential Appendix) ........................................ DJA139

Superseding Information, filed on
February 19, 2021 ................................................ DJA141

Memorandum Order of the Honorable Jed S.
Rakoff, dated February 20, 2021 .......................... DJA146

Defendants' Request to Charge, filed on
February 23, 2021 ................................................ DJA159

Exhibit A to Defendants' Request to Charge -
Excerpts from The Court's Instructions of Law to
the Jury, in *USA v. Nkansah* (Southern District of
New York Case No. 08-cr-1234) .......................... DJA188

Government's Request to Charge, dated
February 23, 2021 ................................................ DJA193

Opinion and Order of the Honorable Jed S. Rakoff,
dated March 1, 2021 ............................................ DJA233

Transcript of Trial (Jury *Voir Dire*), dated
March 1, 2021 ...................................................... DJA258

Transcript of Trial (Openings), dated
March 1, 2021 ...................................................... DJA300

Transcript of Trial (Testimony of Michael Tassone),
dated March 2, 2021 ............................................ DJA402

iii

**Page**

Transcript of Trial (Testimonies of Michael Tassone
and John Verdeschi), dated March 3, 2021 ............  DJA595

Transcript of Trial (Testimonies of John Verdeschi,
Jessica Volchko and Oliver Hargreaves), dated
March 4, 2021 ......................................................  DJA787

Transcript of Trial (Testimony of Oliver
Hargreaves), dated March 8, 2021 ........................  DJA963

Transcript of Trial (Testimony of Oliver
Hargreaves), dated March 9, 2021 ........................ DJA1144

Transcript of Trial (Testimonies of Oliver
Hargreaves and Richard Clow), dated
March 10, 2021 ....................................................DJA1291

Transcript of Trial (Testimonies of Richard Clow
and Robert Hupcher), dated March 11, 2021 .........DJA1438

Transcript of Trial (Testimonies of Robert Hupcher
and James Patterson), dated March 12, 2021 .........DJA1639

Transcript of Trial (Testimony of James Patterson),
dated March 15, 2021 ...........................................DJA1838

Transcript of Trial (Testimonies James Patterson,
Charles Brown, Darcy Cozzetto and Martin
Elliott), dated March 16, 2021 ..............................DJA2027

Transcript of Trial (Testimonies of Martin Elliott,
Darcy Cozzetto and Michael Steinbach), dated
March 17, 2021 ....................................................DJA2212

Transcript of Trial (Testimonies of Michael
Steinbach, Jacob Pechet, John Wang and Ronald
Shimko), dated March 18, 2021 ............................DJA2427

iv

Page

Transcript of Trial (Testimonies of Daniel Whelan
   and Joao Paulo Reginatto), dated
      March 19, 2021 ...................................................... DJA2614

Transcript of Trial (Summations), dated
      March 22, 2021 ...................................................... DJA2735

Transcript of Trial (Jury Charge), dated
      March 23, 2021 ...................................................... DJA2917

Transcript of Trial (Verdict), dated March 24, 2021 .. DJA2955

Trial Exhibits:

   GX 1901-T – Transcript of Ruben Weigand's
   Post-Arrest Interrogation ..................................... DJA2967

   HAX-5014 – Excerpts from Presentation of
   Cannabis and Hemp Products ............................. DJA2971

   HAX-10057 – Actors Federal Credit Union –
   Statements of Account .......................................... DJA2974

   HAX-14004 – Excerpt from List of Customer
   Card Transactions ................................................. DJA3014

   HAX-14005 – Circle Eaze Transaction
   Summary ................................................................. DJA3015

   HAX-14008 – Circle Eaze Transaction Record... DJA3016

The Court's Instructions of Law to the Jury, filed on
      March 24, 2021 ...................................................... DJA3084

Verdict, dated March 24, 2021 ................................... DJA3106

Order of the Honorable Jed S. Rakoff, dated
      June 18, 2021 ......................................................... DJA3107

Transcript of Sentencing of Defendant Hamid
      Akhavan, dated June 18, 2021 .............................. DJA3108

v

**Page**

Opinion of the Honorable Jed S. Rakoff, dated
    July 2, 2021............................................................ DJA3146

Notice of Appeal by Defendant Ruben Weigand,
    dated July 7, 2021 ................................................. DJA3170

Transcript of Forfeiture Hearing, dated
    August 12, 2021 ..................................................... DJA3172

Notice of Appeal by Defendant Hamid Akhavan,
    dated September 14, 2021..................................... DJA3231

Notice of Appeal by the Government, dated
    September 30, 2021 ............................................... DJA3235

DJA197

## **REQUEST NO. 1**

### **General Requests**

The Government respectfully requests that the Court give its usual instructions to the jury on the following matters:

a.    Duty of the Court

b.    Duty of the Jury

c.    Duty of Impartiality

d.    Presumption of Innocence and Burden of Proof

e.    Reasonable Doubt

f.    Direct and Circumstantial Evidence

g.    Witness Credibility

h.    Definitions: Knowingly, Intentionally/Willfully

i.    Selection of Foreperson

j.    Rights to See Exhibits and Hear Testimony

k.    Communications with the Court

l.    Verdict; Need for Unanimity; Duty to Consult

DJA198

## REQUEST NO. 2

### Summary of the Charges

With these instructions in mind, let us turn to the specific charges against the defendants, Hamid Akhavan, a/k/a "Ray Akhavan," and Ruben Weigand.  These charges were originally set forth in what is called an indictment, which is simply a charging instrument and is not itself evidence, so it will not be presented to you.  The Indictment in this case contained one count.

Count One charges that the defendants conspired—that is, agreed with each other or with one or more other persons—to commit bank fraud, from in or about 2016 through in or about 2019.

In reaching your verdict, bear in mind that guilt is personal and individual.  The case against each defendant stands or falls upon the proof against that defendant alone.[1]

---

[1] Adapted from Sand et al., *Modern Federal Jury Instructions*, 3-1, 3-2; Jury Charge of Hon. Jed S. Rakoff in *United States v. Allen*, 14 Cr. 272 (S.D.N.Y. 2015); and Jury Charge of Hon. Jed S. Rakoff in *United States v. Petit*, 19 Cr. 850 (S.D.N.Y. 2020).

4

DJA199

## REQUEST NO. 3

### Conspiracy

**(Elements)**

In order for a defendant to be guilty of conspiracy, the Government must prove beyond reasonable doubt; first, that the charged conspiracy existed; and second, that at some point the defendant knowingly and willfully joined the conspiratorial agreement and thereby became a member of the conspiracy.

Starting with the first element, what is a conspiracy?  A conspiracy is an agreement or an understanding of two or more persons to accomplish by concerted action one or more unlawful purposes. In this case, the unlawful purpose alleged to be the object of the conspiracy is a bank fraud scheme which I will describe shortly.

Conspiracy is an entirely distinct and separate offense from any actual bank fraud.  The actual commission of the object of the conspiracy is not an essential element of the crime of conspiracy.  Rather, the government is required to prove beyond a reasonable doubt only that two or more persons, in some way or manner, explicitly or implicitly, came to an understanding to accomplish the unlawful objective of bank fraud.

Further, although the indictment charges that the alleged conspiracy to commit bank fraud began in or around 2016, and continued up to and or around 2019, it is not essential that the government prove that the conspiracy started and ended on those specific dates or that it existed throughout that entire period. Rather, it is sufficient to satisfy the first element that you find that in fact a conspiracy was formed and that it existed for any time within the charged period.

5

DJA200

If you conclude that the government has proven beyond a reasonable doubt that the charged conspiracy existed, you must then consider the second essential element, which is that the defendant intentionally joined and participated in the conspiracy. To prove this element, the government must prove beyond a reasonable doubt that the defendant entered into the conspiracy to commit bank fraud and did so knowingly and willfully. To act "knowingly" means to act consciously and deliberately rather than mistakenly or inadvertently. To act "willfully" means to act purposely and voluntarily and with the specific intent to disobey or disregard the law.

In this regard, it is not necessary that a defendant be fully informed of all the details of the conspiracy in order to justify the inference of participation on his part. Nor does the given defendant need to know the full extent of the conspiracy or all its participants. Indeed, it is not necessary that the defendant know more than one other member of the conspiracy. It is also not necessary that a defendant receive any monetary benefit from participating in the conspiracy. Furthermore, the law does not require that a given defendant join the conspiracy through a written or verbal agreement; a tacit agreement or understanding is sufficient.

The law does not require that each conspirator have an equal role in the conspiracy. Even a single act may be sufficient to draw a defendant within the ambit of the conspiracy if it meets the essential requirements I have described. The defendant also need not have joined the conspiracy at the outset. The defendant may have joined it at any time in its progress, and he will still be held responsible for all that was done before he joined as well as all that was done during the conspiracy's existence while the defendant was a member.

However, I want to caution you that mere association by one person with another person does not make that first person a member of the conspiracy even when coupled with knowledge that the second person is committing a crime. Mere presence at the scene of a crime, even

6

DJA201

coupled with knowledge that a crime is taking place, is not sufficient to support a conviction. In other words, knowledge without participation is not sufficient. What is necessary is that the defendant participated in the conspiracy with knowledge of its unlawful purpose and with intent to aid in that accomplishment of its unlawful purpose.

In short, in order to satisfy the second essential element of the conspiracy charge, you must find beyond a reasonable doubt that the defendant, with an understanding of the unlawful character of the charged conspiracy, knowingly, willfully and with an intent to defraud joined and participated in the conspiracy for the purpose of furthering its unlawful object.[2]

---

[2] [2] Adapted from the charge of the Honorable Jed. S. Rakoff in *United States v. Petit*, 19 cr. 850 and *United States v. Margulies*, 17 Cr. 638 (JSR).

7

DJA202

## REQUEST NO. 4

### Bank Fraud Conspiracy

**(Elements)**

Count One charges the defendants with conspiring to commit bank fraud, in violation of Title 18, United States Code, Section 1349.  Count One charges:

*[The Court is respectfully requested to read Count One].*

DJA203

## REQUEST NO. 5

### Bank Fraud Conspiracy - Elements of Bank Fraud

The object of the conspiracy is bank fraud.  The elements of bank fraud are as follows:

First, that there was a scheme to defraud a bank or credit union or a scheme to obtain money owned by or under the custody or control of a bank or credit union, by means of false or fraudulent pretenses, representations, or promises;

Second, that the defendant executed or attempted to execute the scheme with the intent either to defraud the bank or credit union or to obtain money or funds owned by or under the custody or control of the bank or credit union; and

Third, that the bank or credit union involved was federally insured.[3]

---

[3] Adapted from the charge of the Honorable Shira A. Scheindlin in *United States* v. *Vasilevsky*, 08 Cr. 903 (SAS) (S.D.N.Y. 2009); Sand, *Modern Federal Jury Instructions*, Instr. 44-9.  *See* 18 U.S.C. § 1344.

9

DJA204

### REQUEST NO. 6

### Bank Fraud Conspiracy - Existence of a Scheme or Artifice

The first element of bank fraud is that that there was a scheme to defraud a bank or credit union <u>or</u> a scheme to obtain money owned by or under the custody or control of a bank or credit union, by means of false or fraudulent pretenses, representations, or promises;

This element requires proof of the existence of only one of these.  That is, <u>either</u> that there existed a scheme to defraud a bank or credit union <u>or</u> a scheme to obtain property under the custody or control of a bank or credit union by means of fraudulent pretenses, representations, or promises.

In order to prove the first theory of bank fraud, that there was a "scheme to defraud a bank or credit union," the Government must prove beyond a reasonable doubt that there was a pattern or course of conduct concerning a material matter designed to deceive a federally insured bank or credit union into releasing property.

A fraudulent representation must relate to a material fact or matter. A material fact is one that would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision. This means that if you find a particular statement of fact to have been false, you must determine whether that statement was one that a reasonable person might have considered important in making his or her decision. The same principle applies to fraudulent half truths or omissions of material facts.[4]

---

[4] Adapted from Sand, *Modern Federal Jury Instructions*, Instr. 44-10.

DJA205

In order to prove the second theory of bank fraud, the government must prove beyond a reasonable doubt that there was a scheme to obtain money or property owned by or under the custody and control of a bank or credit union by means of false or fraudulent pretenses, representations or promises. A representation is fraudulent if it was falsely made with the intent to deceive. Deceitful statements of half truth, the concealment of material facts, and the expression of an opinion not honestly entertained may constitute false or fraudulent representations under the statute.

With respect to the second theory of bank fraud, it is not necessary that the false or fraudulent pretenses, representations, or promises were made directly to the bank itself.  It is sufficient if they were made to any person, so long as the false or fraudulent pretenses, representations or promises were the mechanism naturally inducing the bank (or custodian of bank property) to part with money in its control.[5]

As to either theory, the deception need not be premised upon spoken or written words alone. The arrangement of the words, the omission of words, or the circumstances in which they are used may convey a false and deceptive appearance. If there is intentional deception, the manner in which it is accomplished does not matter.

In considering this element of bank fraud, it is unimportant whether a bank actually relied on a misrepresentation.  It is sufficient if the misrepresentation is one that is merely capable of influencing the bank's decision.[6]

---

[5] *See Loughrin v. United States*, 573 U.S. 351, 363 (2014) ("Section 1344(2)'s 'by means of' language is satisfied when, as here, the defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control.").

[6] *See Neder v. United States*, 527 U.S. 1, 25 (1999) (holding that federal fraud statutes do not incorporate a reliance element); *United States v. Shapiro*, 29 F. App'x 33, 35 (2d Cir. 2002) ("[A]ctual reliance is not

DJA206

It is not necessary for the Government to prove that the financial institutions actually lost money or were deprived of property as a result of the scheme. A scheme to defraud a bank also exists when a bank is provided false or fraudulent information that, if believed, would prevent the bank from being able to make informed economic decisions about what to do with its money or property.[7]

It also does not matter whether any of the banks involved might have discovered the fraud had the bank probed further.  If you find that a scheme or artifice existed, it is irrelevant whether you believe that any of the banks involved was careless, gullible, or even negligent.[8]

---

an element of bank fraud."); *United States v. Rodriguez,* 140 F.3d 163, 167 (2d Cir.1998) ("A misrepresentation is material if it's capable of influencing the bank's actions.").

[7] *See*, *e.g.*, *United States v. Atilla*, 15 Cr. 867 (RMB).

[8] *See United States v. Cherico*, No. 08 Cr. 786 (S.D.N.Y.) (CM), Oct. 31, 2011 Tr. at 1498:20-24.

12

DJA207

### REQUEST NO. 7

### Count Two: Bank Fraud Conspiracy - Intent to Defraud or Obtain Bank Money

The second element of bank fraud is about the defendant's intent.  There are two ways that this element can be met.

The first way this element can be met is if the defendant executed, attempted to execute, or participated in the scheme or artifice knowingly, willfully, and with the intent to defraud the bank or credit union.  I've already provided you with the definitions of knowingly and willfully and you should apply those same definitions here.  To act with a "specific intent to defraud" requires the defendant intended, at least in part, to deceive one or more federally insured banks or credit unions.  The defendants need not intend to cause the banks or credit unions any financial loss.  In this case, the Government alleges that the defendants intended to deprive the issuing banks and credit unions of certain property rights in funds that were used for credit and debit card transactions.

The second way this element can be met is if the defendant executed or attempted to execute the scheme knowingly and willfully and with the intent to obtain money or funds owned or under the custody or control of the bank.  It is not necessary that the defendant intended to defraud a bank.[9]  It is also not necessary that the defendant intended to cause harm to the issuing bank or credit union (such as by causing them to lose money), or to anyone else.[10]

This element requires that the defendant engaged in, or participated in, the scheme alleged with an understanding of its fraudulent or deceptive character and with an intention to

---

[9] *See Loughrin v. United States*, 573 U.S. 351, 355-356 (2014) (holding that Section 1344(2) of the bank fraud statute does not require that a defendant intended to defraud a bank).

[10] *United States v. Nejad*, No. 18-CR-224 (AJN), 2020 WL 883500, at *3 (S.D.N.Y. Feb. 24, 2020) (citing *Loughrin*, 573 U.S. at 355-57; *United States v. Lebedev*, 932 F.3d 40, 49 (2d Cir. 2019))

help it succeed.  It is not required that the defendant participate in or have knowledge of all the operations of the scheme.  The guilt of the defendant is not governed by the extent of his participation.  It also is not necessary that the defendant originated the scheme to defraud, or that the defendant participated in the alleged scheme from the beginning.  A person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and intentionally acts in a way to further the unlawful goals, becomes a member of the scheme and is legally responsible for all that may have been done in the past in furtherance of the criminal objective and all that is done thereafter.

Even if the defendant participated in the scheme to a lesser degree than others, he is nevertheless guilty, so long as the defendant became a member of the scheme to defraud with knowledge of its general scope and purpose.

The questions of whether a person acted knowingly, willfully, and with intent to defraud are questions of fact for you to determine, like any other fact question.  These questions involve the state of mind of the defendant.

Direct proof of knowledge and fraudulent intent is often unavailable.  Indeed, it is not typical that a person writes or states that as of a given time in the past he or she committed an act with fraudulent intent.  Such direct proof is not required.  The ultimate facts of knowledge and criminal intent, though subjective, may be established by circumstantial evidence, based upon a person's outward manifestations, words, conduct, acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn therefrom.

DJA209

When deciding whether the defendant possessed or lacked an intent to defraud, you need not limit yourself to just what the defendant said, but you may also look at what the defendant did and what others did in relation to the defendant and, in general, everything that occurred.[11]

A defendant's good faith is a complete defense to this charge. A statement made with good faith belief in its accuracy does not amount to an intentional false or misleading statement, and is not a crime. This is so even if the statement is itself inaccurate or misleading. If the defendant believed in good faith he was acting properly in making such a statement or causing it to be made, even if he was mistaken in that belief and even if others were injured by his conduct, there would be no crime. A defendant is under no burden to prove his or her good faith.[12] Rather, the burden of proof of establishing criminal intent and lack of good faith rests upon the government.

---

[11] Adapted from the charge of the Honorable Shira A. Scheindlin in *United States v. Vasilevsky*, 08 Cr. 903 (SAS) (S.D.N.Y. 2009); Sand, *Modern Federal Jury Instructions*, Instrs. 44-5, 44-11. *See also United States v. Schwartz*, 924 F.2d 410, 420 (2d Cir. 1991) ("It need not be shown that the intended victim of the fraud was actually harmed it is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim."); *United States v. King*, 860 F.2d 54, 55 (2d Cir. 1988) (same); *United States v. Karro*, 257 F.3d 112, 118 (2d Cir. 2001) (defendant who intentionally provides false information to lender about her identity to obtain credit card has intent to defraud, whether or not she intended to repay debts).

[12] Adapted from the charge of the Honorable Jed. S. Rakoff in *United States v. Margulies*, 17 Cr. 638 (JSR).

15

DJA210

**REQUEST NO. 8**

**Conscious Avoidance**

As I have explained, Count One requires the Government to prove that the defendant acted knowingly.  In determining whether the defendant acted knowingly, you may consider whether the defendant deliberately closed his eyes to what otherwise would have been obvious.

I would like to point out that the necessary knowledge on the part of the defendant with respect to any particular charge cannot be established by showing that that defendant was careless, negligent, or foolish.  However, one may not willfully and intentionally remain ignorant of a fact material and important to his conduct in order to escape the consequences of criminal law.  The law calls this "conscious avoidance" or "willful blindness."  In other words, the Government can prove either that the defendant actually knew the objective of the conspiracy or he consciously avoided knowledge of the object of the conspiracy.

Thus, if you find beyond a reasonable doubt that the defendant  was aware that there was a high probability a crime was being committed, but that the defendant deliberately and consciously avoided confirming this fact, such as by purposely closing his or her eyes to it or intentionally failing to investigate it, then you may treat this deliberate avoidance of positive knowledge as the equivalent of knowledge, unless you find that the defendant actually believed that he was not engaged in such unlawful behavior.  In other words, a defendant cannot avoid criminal responsibility for his own conduct by "deliberately closing his eyes," or remaining purposefully ignorant of facts which would confirm to him that he was engaged in unlawful conduct.

You must also keep in mind that there is an important difference between knowingly and intentionally participating in the conspiracy – which I just explained to you – and knowing the

16

DJA211

specific objective of the conspiracy on the other. You may consider conscious avoidance in deciding whether the defendant knew the objective of the conspiracy, that is, whether he reasonably believed that there was a high probability that a goal of the conspiracy was to commit the crime charged as objects of the conspiracy and took deliberate and conscious action to avoid confirming that fact but participated in the conspiracy anyway.  But conscious avoidance cannot be used as a substitute for finding that the defendant knowingly and intentionally joined the conspiracy in the first place.  It is logically impossible for a defendant to intend and agree to join a conspiracy if he or she does not actually know it exists.  However, if you find beyond a reasonable doubt that the defendant knowingly chose to participate in such a joint undertaking, you may consider whether the defendant took deliberate and conscious action to avoid confirming otherwise obvious facts about the purpose of that undertaking.

In sum, if you find that a defendant believed there was a high probability that a fact was so and that the defendant took deliberate and conscious action to avoid learning the truth of that fact, you may find that the defendant acted knowingly with respect to that fact.  However, if you find that the defendant actually believed the fact was not so, then you may not find that he acted knowingly with respect to that fact.[13]

---

[13] Adapted from Jury Charge of Hon. P. Kevin Castel, *United States v. William Walters*, 16 Cr. 338 (S.D.N.Y. 2017); Sand, et al., *Modern Federal Jury Instructions*, Instr. 3A-2.

DJA212

## REQUEST NO. 9

### Count Two: Bank Fraud Conspiracy - Federally Insured Financial Institution

The third element of the crime of bank fraud is that a financial institution in question was federally insured at the time of the scheme.  This simply means that the financial institution was a bank insured by the Federal Deposit Insurance Corporation or a credit union with accounts insured by the National Credit Union Share Insurance Fund during the time frame alleged in the Indictment.  The Government need not show that the defendant knew that a financial institution was federally insured to satisfy this third element.[14]

---

[14] *See* Sand, *Modern Federal Jury Instructions*, Instr. 44-11; 18 U.S.C. § 20(1) & (2).

18

DJA213

## REQUEST NO. 10

### Venue

The Government, in addition to proving the essential elements of that charge, must also prove that at least one act in furtherance of the charge occurred in the Southern District of New York. This is called establishing venue. The Southern District of New York includes all of Manhattan and the Bronx, as well as Westchester, Rockland, Putnam, Dutchess, Orange, and Sullivan Counties.

The Government does not have to prove that a completed crime was committed within the Southern District of New York, or that the defendant was ever in the Southern District of New York. It is sufficient to satisfy the venue requirement if any act in furtherance of the crime charged occurred in this District. The act itself may not be a criminal act. And the act need not have been taken by the defendant, so long as the act was part of the crime that you find the defendant committed.

Specifically, with respect to Count One, you need to find that it is more likely than not that an overt act in furtherance of the charged conspiracy was committed or caused to be committed in the Southern District of New York by the defendant or a coconspirator during the life of the conspiracy.

Unlike the elements of the offenses which must be proven beyond a reasonable doubt, the Government is only required to prove venue by a preponderance of the evidence. A preponderance of the evidence means that it is more probable than not that some act in furtherance of the crime you are considering occurred in this District.[15]

---

[15] Adapted from Jury Charge of Hon. Laura T. Swain in *United States v. Stewart*, 15 Cr. 287 (S.D.N.Y. 2016); Jury Charge of Hon. Gregory Woods in *United States v. Chow*, 17 Cr. 667 (S.D.N.Y. 2018).

DJA214

## REQUEST NO. 11

### Motive

Proof of motive is not a necessary element of any of the crimes with which the defendant is charged.  Proof of motive does not establish guilt, nor does the lack of proof of motive establish that the defendant is not guilty.  If the guilt of a defendant is shown beyond a reasonable doubt, it is immaterial what that defendant's motive for the crime or crimes may be, or whether the defendant's motive was shown at all.  The presence or absence of motive is, however, a circumstance which you may consider as bearing on the intent of the defendant.[16]

---

[16] Adapted from Sand et al., *Modern Federal Jury Instructions*, 6-18; the Hon. Deborah A. Batts's instructions in *United States v. Gupta*, 07 Cr. 177.

DJA215

## REQUEST NO. 12

### Defendant's Testimony [or Defendant's Right Not to Testify]

[*If any defendant testifies:*] A defendant in a criminal case never has any duty to testify or come forward with any evidence. This is because, as I have told you, the burden of proof beyond a reasonable doubt remains on the Government at all times, and each defendant is presumed innocent. In this case, the defendant did testify and he was subject to cross-examination like any other witness. You should examine and evaluate defendant's testimony just as you would the testimony of any witness with an interest in the outcome of the case.

[*If any defendant does not testify and requests an instruction concerning his election not to do so:*] [The defendant did not testify in this case. Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the Government's burden to prove a defendant guilty beyond a reasonable doubt. That burden remains with the Government throughout the entire trial and never shifts to a defendant.

A defendant is never required to prove that he is innocent. Therefore, you must not attach any significance to the fact that the defendant did not testify. No adverse inference against the defendant may be drawn by you because he did not take the witness stand, and you may not consider it against the defendant in any way in your deliberations in the jury room.[17]

---

[17] Adapted from Jury Charge of Hon. J. Paul Oetken in *United States v. Block*, 16 Cr. 595 (S.D.N.Y. 2017); Jury Charge of Hon. Gregory Woods in *United States v. Chow*, 17 Cr. 667 (S.D.N.Y. 2018).

DJA216

**REQUEST NO. 13**

**Cooperating/Immunized Witness Testimony**

You have also heard from witness(es) who testified that they pled guilty to criminal charges.  They each testified pursuant to an agreement to cooperate with the Government.  The law allows the use of testimony from cooperating witnesses.

Some witnesses in this case testified pursuant to an immunity order issued by the Court. These court order required these witnesses to testify at the trial, and granted the witnesses immunity from prosecution based on any statements they made during their testimony, so long as they provided truthful testimony.  Unlike cooperating witnesses, witnesses testifying pursuant to immunity orders have not entered into any agreement with the Government.  The fact that these witnesses testified pursuant to a grant of immunity does not mean that they have done anything wrong and should not be considered as reflecting negatively in any way on the defendants.

You cannot draw any inferences of any kind about the guilt of the defendants in this case merely from the fact that certain witnesses at this trial entered into agreement with the Government, or received immunity orders for their testimony, or pleaded guilty to crimes that may be similar or related to the crimes with which the defendants are charged.

Your concern is whether a witness has given truthful testimony in this courtroom.  In addition to using all of the other considerations I have described to evaluate testimony, in evaluating the testimony of those witnesses, you should also consider what effect, if any, the agreement or immunity order has had on the witness's motive to tell the truth.[18]

---

[18] Adapted from Jury Charge of Hon. Jed S. Rakoff in *United States v. Allen*, 14 Cr. 272 (S.D.N.Y. 2005); Jury Charge of Hon. Denise L. Cote in *United States v. Lopez*, 18 Cr. 6 (S.D.N.Y. 2019).

**REQUEST NO. 14**

**Accomplice Testimony**

You have heard from witnesses who testified that they were actually involved in the crimes related to those charged in the Indictment.  The law allows use of this testimony.  Indeed, such testimony, if found truthful by you, may be enough in itself to warrant conviction if it convinces you of a given defendant's guilt beyond a reasonable doubt.  Experience will tell you that the Government frequently must rely on the testimony of witnesses who admit participating in the alleged crimes at issue.  The Government must take its witnesses as it finds them and frequently must use such testimony in a criminal prosecution, because otherwise it would be difficult or impossible to detect and prosecute wrongdoers.

However, such testimony must be scrutinized with great care and viewed with particular caution.  The fact that a witness is an accomplice can be considered by you as bearing on the witness' credibility.  It does not follow, however, that simply because a person has admitted to participating in a crime, that that person is incapable of giving a truthful version of what happened.  After carefully scrutinizing the testimony of such witnesses, you may give it as little or as much weigh as you deem appropriate.[19]

---

[19] Adapted from Sand, Modern Federal Jury Instructions, Instr. 7-5; Jury Charge of Hon. Jed S. Rakoff in *United States v. Allen*, 14 Cr. 272 (S.D.N.Y. 2005); Jury Charge of Hon. Denise L. Cote in *United States v. Lopez*, 18 Cr. 6 (S.D.N.Y. 2019).

DJA218

## REQUEST NO. 15

### Preparation of Witnesses [If Applicable]

You have heard evidence that, prior to appearing in court, witnesses have discussed the facts of the case and their testimony with attorneys.  Although you may consider this fact when you are evaluating a witness's credibility, I should tell you that there is nothing either improper or unusual about a witness meeting with lawyers before testifying, so that the witness can be aware of the subjects he or she will be questioned about, and can focus on those subjects and have the opportunity to prepare or review relevant exhibits before being questioned about them. Such consultation helps conserve your time and the Court's time.  In fact, it would be unusual for a lawyer to call a witness without such consultation.[20]

---

[20] Adapted from Jury Charge of Hon. Gregory Woods in *United States v. Chow*, 17 Cr. 667 (S.D.N.Y. 2018).

24

DJA219

## REQUEST NO. 16

### Uncalled Witnesses – Equally Available

There are people whose names you heard during the course of the trial that did not appear in court to testify.  I instruct you that each party had an equal opportunity or lack of opportunity to call any of these witnesses.  Therefore, you should not draw any inferences or reach any conclusions as to what they would have said if they had been witnesses in this case.  Their absence should not affect your judgment in any way about what any witness would have testified about if he or she had been called as a witness.

You should remember my instruction, however, that the law does not impose on the defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence whatsoever, and that the burden always rests with the Government to prove a defendant's guilt beyond a reasonable doubt.[21]

---

[21] Adapted from Jury Charge of Hon. J. Paul Oetken in *United States v. Block*, 16 Cr. 595 (S.D.N.Y. 2017); Jury Charge of Hon. Gregory Woods in *United States v. Chow*, 17 Cr. 667 (S.D.N.Y. 2018).

DJA220

**REQUEST NO. 17**

**Persons Not on Trial Or Not Indicted**

You may not draw any inference, favorable or unfavorable, towards the Government or the defendant from the fact that any person other than the defendant is not on trial here. You also may not speculate as to the reasons why other persons are not on trial. Those matters are wholly outside your concern and have no bearing on your function as jurors. [22]

---

[22] Adapted from Jury Charge of Hon. J. Paul Oetken in *United States v. Block*, 16 Cr. 595 (S.D.N.Y. 2017); Jury Charge of Hon. Gregory Woods in *United States v. Chow*, 17 Cr. 667 (S.D.N.Y. 2018).

DJA221

**REQUEST NO. 18**

**Expert Witnesses [If Applicable]**

The law permits parties to offer opinion testimony from witnesses who were not involved in the underlying events of the case, but who by education or experience have expertise in a specialized area of knowledge.  In this case, [Jeff Rankin/Monica MacGregor/John Vardaman] was offered as such a witness by defendant Akhavan, while [Stephen Mott/Donald Vilfer] was offered as such a witness by defendant Weigand.  Specialized testimony is presented to you on the theory that someone who is learned in the field may be able to assist you in understanding specialized aspects of the evidence.

However, your role in judging credibility and assessing weight applies just as much to these witnesses as to other witnesses.  In weighing expert testimony, you may consider that witness's qualifications, his opinions, the reasons for testifying, as well as all of the other considerations that ordinarily apply when you are deciding whether or not to believe a witness's testimony.  You may give the opinion testimony whatever weight, if any, you find it deserves. For example, a specialized witness necessarily bases his or her opinions, in part or in whole, on what the witness learned from others, and you may conclude that the weight given the witness' opinions may be affected by how accurate or inaccurate that underlying information is.  More generally, if you find that the opinions of a specialized witness were not based on sufficient data, education, or experience, or if you should conclude that the trustworthiness or credibility of such a witness is questionable, or if the opinion of the witness is outweighed, in your judgement, by other evidence in the case, then you may, if you wish, disregard the opinions of that witness, either entirely or in part.  On the other hand, if you find that a specialized witness is credible, and that the witness' opinions are based on sufficient data, education, and experience, and that the

27

Case 21-2466, Document 22, 12/17/2021, 3230486, Page33 of 283

other evidence does not give you reason to doubt the witness' conclusions, you may, if you wish, rely on that witness' opinions and give them whatever weight you deem appropriate.

You may not substitute the expert's opinion for your own reason, judgment, and common sense.  The determination of the facts in this case rest solely with you.[23]

---

[23] Adapted from Jury Charge of Hon. Jed S. Rakoff in *United States v. Allen*, 14 Cr. 272 (S.D.N.Y. 2014).

28

### REQUEST NO. 19

### Summary Charts - Not Admitted as Evidence [If Applicable]

There have been a number of summary charts and exhibits that were shown to you but not admitted into evidence.  At the time that they were shown to you, I had noted this fact to you.  For these charts and exhibits that were not admitted into evidence, they serve merely as summaries and analyses of testimony and documents in the case and are here to act as visual aids for you.  It is the underlying evidence and the weight which you attribute to it that gives value and significance to these charts.  To the extent that the charts conform to what you determine the underlying facts to be, you should accept them. To the extent that the charts differ from what you determine the underlying evidence to be, you may reject them.[24]

---

[24] Adapted from Jury Charge of Hon. Ronnie Abrams in *United States v. Galanis*, 16 Cr. 371 (S.D.N.Y. 2018), and Sand et al., *Modern Federal Jury Instructions*, Instr. 5-13.

DJA224

**REQUEST NO. 20**

**Summary Charts - Admitted as Evidence [If Applicable]**

Now, some of the exhibits that were admitted into evidence were in the form of charts and summaries. For these charts and summaries that were admitted into evidence, you should consider them as you would any other evidence.[25]

---

[25] Adapted from the charge of the Hon. Ronnie Abrams in *United States v. Galanis*, 16 Cr. 371 (S.D.N.Y. 2018), and Sand, et al., *Modern Federal Jury Instructions*, Instr. 5-12. *See also* Fed. R. Evid. 1006.

30

DJA225

**REQUEST NO. 21**

**Stipulations [If Applicable]**

In this case you have heard evidence in the form of stipulations of testimony.  A stipulation of testimony is an agreement between the parties that, if called as a witness, the person would have given certain testimony.  You must accept as true the fact that the witness would have given that testimony.  However, it is for you to determine the effect to be given that testimony.

You also heard evidence in the form of stipulations that contain facts that were agreed to be true.  In such cases, you must accept those facts as true.[26]

---

[26] Adapted from Jury Charge of Hon. J. Paul Oetken in *United States v. Block*, 16 Cr. 595 (S.D.N.Y. 2017); Jury Charge of Hon. Gregory Woods in *United States v. Chow*, 17 Cr. 667 (S.D.N.Y. 2018).

### REQUEST NO. 22

### Statements of the Defendant [If Applicable]

There has been evidence that a defendant made statements to law enforcement authorities.  Evidence of these statements was properly admitted in this case, and may be properly considered by you.  You are to give the evidence of such statements such weight as you feel it deserves in light of all the evidence.  Whether you approve or disapprove of the use of these statements may not enter your deliberations.  I instruct you that no one's rights were violated and that the Government's use of this evidence is entirely lawful.[27]

---

[27] Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 5-19, and from the charge of the Honorable Lewis A. Kaplan in *United States v. Sterling*, 16 Cr. 488 (LAK).

DJA227

**REQUEST NO. 23**

**Recordings and Transcripts [If Applicable]**

You have heard a recording of certain statements that defendant Weigand made to law enforcement authorities.  In connection with that recording, you were provided with transcripts of the conversations to assist you while listening to the recordings.  I instructed you then, and I remind you now, that the transcripts are not evidence.  The transcripts were provided only as an aid to you in listening to the recordings.  It is for you to decide whether the transcripts correctly present the conversations recorded on the recordings that you heard.[28]

---

[28] Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 5-19.

DJA228

## REQUEST NO. 24

### False Exculpatory Statements [If Applicable]

You have heard testimony that a defendant made statements in which the defendant claimed that his conduct was consistent with innocence and not with guilt.  The Government claims that these statements in which the defendant exculpated himself are false.

If you find that the defendant gave a false statement in order to divert suspicion from himself, you may infer that the defendant believed that he was guilty.  You may not, however, infer on the basis of this alone that the defendant is, in fact, guilty of the crimes for which he is charged.

Whether or not the evidence as to the defendant's statements shows that the defendant believed that he was guilty, and the significance, if any, to be attached to any such evidence, are matters for you, the jury, to decide.[29]

---

[29] Sand *et al.*, *Modern Federal Jury Instructions*, 6-11.

34

DJA229

**REQUEST NO. 25**

**Law Enforcement Witnesses [If Applicable]**

You have heard the testimony of law enforcement officials. The fact that a witness may be, or may have been, employed by the Government as a law enforcement official or employee does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of other witnesses. At the same time, in considering the credibility of such a witness, you are entitled to consider whether the testimony may be colored by a personal or professional interest in the outcome of the case.

It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement or Government employee witnesses and to give that testimony whatever weight you find it deserves.[30]

---

[30] Adapted from Sand *et al.*, *Modern Federal Jury Instructions*, 7-16; and from the charge of the Honorable Richard J. Sullivan in *United States v. Ramirez*, 13 Cr. 135 (RJS) (S.D.N.Y. 2013).

35

DJA230

## REQUEST NO. 26

### Redactions [If Applicable]

We have, among the exhibits received in evidence, some documents that are redacted. "Redacted" means that part of the document or recording was covered over or taken out.  You are to concern yourself only with the part of the item that has been admitted into evidence.  You should not consider any possible reason why the other part of it has been covered over or deleted.[31]

---

[31] Adapted from the charge of the Honorable Lewis A. Kaplan in *United States v. Kevin Sterling*, S4 16 Cr. 488 (LAK).

DJA231

**REQUEST NO. 27**

**Use of Evidence Obtained Pursuant to Search**

You have heard testimony about evidence seized in connection with certain searches conducted by law enforcement officers.  Evidence obtained from these searches was properly admitted in this case, and may be properly considered by you.  Such searches were entirely appropriate law enforcement actions.

Whether you approve or disapprove of how the evidence was obtained should not enter into your deliberations, because I instruct you that the government's use of the evidence is entirely lawful.

You must, therefore, regardless of your personal opinions, give this evidence full consideration along with all the other evidence in the case in determining whether the government has met its burden of proof.[32]

---

[32] Adapted from the Jury Charge of the Hon. Robert Sweet in *United States v. Mejia*, 16 Cr. 45 (S.D.N.Y. 2016); Judge Charge of the Hon. Katherine B. Forrest in *United States v. Morales*, 15 Cr. 879 (KBF) (S.D.N.Y. 2017).

37

DJA232

## **<u>CONCLUSION</u>**

In submitting these requests to charge, the Government respectfully reserves the right to

submit additional or modified requests at or near the close of evidence.

Dated: New York, New York
       February 23, 2021

                                         Respectfully submitted,

                                         AUDREY STRAUSS
                                         United States Attorney


         By:      _____/s/_____
                  Nicholas Folly / Tara LaMorte / Emily Deininger
                  Assistant United States Attorneys
                  (212) 637-1060 / 1040 / 2472

38

DJA233

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
UNITED STATES OF AMERICA          :
                                  :
                                  :   20-cr-188 (JSR)
        -v-                       :
                                  :   OPINION & ORDER
HAMID AKHAVAN & RUBEN WEIGAND,    :
                                  :
        Defendants.               :
                                  :
----------------------------------x

JED S. RAKOFF, U.S.D.J.

        This case began less than one year ago, on March 9, 2020,

when a grand jury returned indictments against Ruben Weigand and

Hamid ("Ray") Akhavan for conspiracy to commit bank fraud.  Today,

the Court will empanel a jury to try the case.

        The intervening year has been challenging.  Just two days

after the indictments were returned, the World Health Organization

declared a global pandemic.[1]  Two days later, President Trump

announced that "[t]o unleash the full power of the federal

government, in this effort today I am officially declaring a

national emergency.  Two very big words."[2]  Since then, the total

_____

[1] James Keaton, et al., WHO Declares Coronavirus a Pandemic, Urges
Aggressive Action, Reuters (Mar. 12, 2020),
https://apnews.com/article/52e12ca90c55b6e0c398d134a2cc286e.

[2] The New York Times, Two Very Big Words: Trump Announces National
Emergency for Coronavirus (Mar. 13, 2020),
https://www.nytimes.com/video/us/politics/100000007032704/trump-
coronavirus-live.html.

1

DJA234

number of confirmed COVID-19 cases has surpassed 113 million worldwide, and more than 2.5 million people have died.[3]  In the United States alone, there have been more than 28 million confirmed cases, and more than half a million people have died.[4]

Recognizing the importance of the defendants' and the public's right to a speedy trial, and despite the complexity of this case and the many difficulties generated by the pandemic, the Court has expended considerable effort to bring the case swiftly and safely to trial.  So have many others: support personnel at the courthouse; Pretrial Services Officers; U.S. Marshals; witnesses who have been subpoenaed and who will travel to the courthouse, some from great distances; counsel for both sides, including some who have flown across the country to defend their clients; and now, dozens of jurors who, despite the risk, will board buses and subways to answer the call to discharge one of their most sacred civic duties.

Now before the Court are two motions relating to the pandemic and the Court's response to it.  First, Weigand moves to dismiss the indictment under the Speedy Trial Act and the constitutional

---

[3] Henrik Petterson, et al., Tracking COVID-19's Global Spread, CNN, https://www.cnn.com/interactive/2020/health/coronavirus-maps-and-cases/ (last accessed Feb. 28, 2021).

[4] Centers for Disease Control & Prevention ("CDC"), COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last accessed Feb. 28, 2021).

DJA235

Speedy Trial Clause, arguing that the COVID-19 pandemic did not offer a valid basis for adjourning this trial from its originally scheduled date, December 1, 2020, until today.  This motion borders on the frivolous and is denied for reasons set forth below.

Second, Martin Elliott and his employer, Visa, Inc., third parties, have been subpoenaed to give trial testimony in this case.  However, Elliott resides in California and contends that, because of his personal medical situation and that of his family, he is unable to travel to New York and back during the pandemic without seriously jeopardizing his and their health.  He moves for leave to testify by two-way videoconference.  The defendants oppose the motion, arguing that permitting such testimony would violate their Sixth Amendment right to confront witnesses against them.  The Court granted Elliott's motion orally on February 19, 2021, see Tr., and this Opinion sets forth the basis for that ruling.

I. WEIGAND'S MOTION TO DISMISS THE INDICTMENT ON SPEEDY TRIAL GROUNDS

Anyone who has appeared before the undersigned knows that this Court moves its cases swiftly.  This is especially true in criminal cases, where

> [i]nordinate delay between public charge and trial, wholly aside from possible prejudice to a defense on the merits, may seriously interfere with the defendant's liberty, whether he is free on bail or not, and may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.

3

DJA236

United States v. Taylor, 487 U.S. 326, 340 (alterations omitted).
Even so, moving a document-heavy white-collar case like this from
indictment to trial in less than one year would be an
accomplishment under even normal circumstances, let alone the
delays brought on by the pandemic.  The argument that the delay in
this action violated Weigand's rights under the Speedy Trial Act
is specious at best, and the claim that it violated his
constitutional rights is frivolous.  The Court takes up Weigand's
statutory and constitutional arguments, in turn.

    A. Speedy Trial Act

        1. Legal Standard

    The Speedy Trial Act sets guardrails on federal courts' powers
to delay criminal trials.  It provides that trial "shall commence
within seventy days from the filing date (and making public) of
the information or indictment, or from the date the defendant has
appeared before a judicial officer of the court in which such
charge is pending, whichever date last occurs."   18 U.S.C.
§ 3161(c)(1).   However, the 70-day clock is not always running.
Certain "periods of delay shall be excluded . . . in computing the
time within which the trial of any such offense must commence."
Id. § 3161(h).  Some exclusions operate automatically, including,
as relevant here, "[a]ny period of delay resulting from other
proceedings concerning the defendant, including but not limited to
. . . delay resulting from any pretrial motion, from the filing of

4

the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" and "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." Id. § 3161(h)(1)(D), (H). In addition to these automatic exclusions, the Court may exclude periods of time in the interests of justice. Specifically, the 70-day clock does not run

> if the judge granted [a] continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

Id. § 3161(h)(7)(A). "[I]n determining whether to grant [such] a continuance," the Court "shall consider" certain enumerated factors, "among other[]" non-enumerated factors; enumerated factors include "[w]hether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice." Id. §3161(h)(7)(B)(i).

DJA238

2. Analysis

Weigand's initial appearance before this Court took place remotely, with Weigand's consent, on April 28, 2020.  Thus, the 70-day clock would have begun ticking on that day.  However, on that day the Court set the case for trial on December 1, 2020 and, without objection, granted an exclusion of time until December 1, 2020 under 18 U.S.C. § 3161(h)(7)(A), finding the exclusion "necessary for the completion of discovery, the making and deciding of motions, the accommodation of counsel's complicated schedules, [and] the special delays put in place by the coronavirus crisis," among other reasons.  Tr., ECF No. 30, at 12:18-21.  Weigand concedes that time was properly excluded through December 1, 2020.

The case progressed swiftly.  On May 11, 2020, the defendants moved for a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f), and the Court granted that motion on May 20, 2020.  ECF Nos. 35-38.  On June 26, 2020, the defendants moved to dismiss the indictment, to compel certain discovery, and to suppress certain evidence seized from Weigand incident to his arrest.  ECF Nos. 61-74.  The parties briefed and argued the motions, and the Court issued an Opinion and Order granting them in part and denying them in part on August 31, 2020.  ECF No. 91.  Discovery continued in earnest through summer and fall 2020.  Throughout this time, the Court granted Weigand's requests to remain in custody in California, rather than requiring that he be

6

DJA239

brought to the Southern District of New York; this permitted his California-based counsel to meet with him more easily.  Moreover, on October 6, 2020, the Court granted Weigand's renewed motion for bail, permitting him to be released into the custody of private security guards and further facilitating his access to counsel. ECF No. 112.

The parties and the Court were on track to proceed with trial on December 1, 2020, but the trial did not proceed for one reason: the COVID-19 pandemic.  On November 30, 2020, Chief Judge McMahon issued a standing order announcing a "temporary curtailment of operations [that] is required to preserve public health and safety in light of the recent spike in coronavirus cases, both nationally and within the Southern District of New York."  Standing Order M-10-468, at 1, In re: Coronavirus/COVID 19 Pandemic, Dkt. No. 20-mc-622-CM (Nov. 30, 2020).  The Standing Order provided that "[a]ll jury trials scheduled for the period beginning December 1, 2020 and ending January 15, 2021 are adjourned."  Id. at 2.

On December 1, 2020, the Government filed a letter that stated in part, "For the reasons set forth in the Chief Judge's Standing Order, as well as those previously stated by the Court when it excluded time through today, the Government respectfully requests the exclusion of time under the Speedy Trial Act from today through January 15, 2021."  Ltr, ECF No. 123.  The Court endorsed the

DJA240

letter by writing, "So ordered," that same day.  ECF No. 124.  The Court adjourned the trial to January 25, 2021.

The Chief Judge issued a First Amended Standing Order on January 5, 2021, extending the suspension of jury trials in the District through February 12, 2021 because of a continuing surge in COVID-19 cases.  First Amended Standing Order M-10-468, <u>In re:</u> <u>Coronavirus/COVID 19 Pandemic</u>, Dkt. No. 20-mc-622-CM (Jan. 5, 2021).  On January 7, 2020, the Court conducted a teleconference regarding the need to further adjourn this trial.  The Court explained that it was still hopeful that the trial could proceed in March, or perhaps even in late February, but warned counsel that, due to limitations in the number of courtrooms that have been outfitted with equipment to permit safe trials during the pandemic and given previously scheduled cases, a trial in February or March might not be possible.  Because counsel were unavailable for a trial in April or early May, the Court

> set the trial down for May 17th.  And pursuant to the Speedy Trial rules, [the Court] exclude[d] all time between [January 7] and [May 17], finding that because of the pandemic the best interests of justice in excluding such time substantially outweighs the interests of the public and the defendants in a speedy trial.

Tr., ECF No. 130, at 9:11-16.

Weigand's counsel objected, arguing that Weigand is a German citizen with no criminal history; that this was a "no-loss" fraud in which no banks had been harmed; and that discovery had been

8

completed, pretrial motions had been decided, and "there's nothing remaining to do." Id. at 15:5-13.  The Court asked, "So you think those grounds override the risk of someone dying from COVID-19 if we went forward with a trial, say, tomorrow?"  Id. at 15:16-18. Weigand's counsel responded, "Certainly not, Your Honor."  Id. at 15:19-20.  The Court adhered to its ruling, excluding time through May 17, 2021.

    1. The Court's Exclusions Were Proper

    The Court's exclusions of time based on the pandemic were proper.  Due to specific surges in COVID-19 cases around the holidays, the Chief Judge adjourned all jury trials, ultimately for a period of 11 weeks.  During that time, many of the most vulnerable members of the public, and many courthouse employees, were vaccinated.  While the courthouse cannot entirely eliminate the possibility of COVID-19 transmission during a trial -- let alone the possibility of transmission during travel to and from the courthouse -- now that many of the most vulnerable members of our population have been vaccinated, and given the downward trend in cases, the "risk of someone dying from COVID-19" because of the trial is markedly lower now than it was in December.  As Weigand himself conceded, his interests in a slightly speedier trial do

DJA242

not override this risk, which would have been markedly more significant during the winter COVID-19 spike.[5]

> ### 2. Even Without the Court's Exclusion of Time, 70 Days of Non-Excludable Time Have Not Passed

Even setting aside this Court's pandemic-induced exclusions of time, 70 days of non-excludable time have not yet passed.

The Speedy Trial Act automatically excludes "[a]ny period of delay resulting from other proceedings concerning the defendant, including but not limited to . . . delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" and "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court."  18 U.S.C. § 3161(h)(1)(D), (H).  Other courts have found that motions in limine are pretrial motions for purposes of this provision.  E.g.,

---

[5] Weigand also argues that the Court's "so ordered" exclusion on December 1 was inadequate because it did not explicitly state the basis for the Court's exclusion of time.  The Supreme Court has explained on this issue that "the findings must be made, if only in the judge's mind, before granting the continuance," Zedner v. United States, 547 U.S. 489 (2006), and "must be put on the record by the time a district court rules on a defendant's motion to dismiss," id. at 506-07.  Before granting the exclusion of time, this Court found, in its own mind, that the exclusion was warranted because of the pandemic.  And the Court unambiguously explained its reasoning during the teleconference on January 7.  Tr., ECF No. 130, at 15:21-23 ("The whole reason for these adjournments is the pandemic, nothing else.  The government is ready to go.  I'm ready to go.").  Thus, there is no merit to the argument that the Court failed to articulate the basis for its ruling.

DJA243

United States v. Jones, No. 15-CR-133S, 2017 WL 2957818, at *6 (W.D.N.Y. July 11, 2017).  This Court agrees.

The Government filed a motion in limine on February 5, 2021, which the Court granted in part and denied in part on February 14. All parties filed additional motions in limine on February 16, 2021, which remain pending and on which the Court will rule before opening arguments today.

The February 5 motion was, and the February 16 motions will be, promptly resolved less than 30 days after they were taken under advisement.  Thus, time is excluded "from the filing of [each] motion through the . . . prompt disposition" of the motion, i.e., from February 5 through February 14 for the earlier motion and from February 16 through today for the subsequent motions.

Therefore, even assuming contrary to fact that there was a defect in the Court's exclusions of time in the interests of justice under the Speedy Trial Act, no more than 66 non-excludable days have passed since December 1, 2020: 65 days from December 2 through February 4, plus February 15 (the day between the Court's ruling on the initial motion in limine and the filing of the remaining motions).[6]

---

[6] February 15 might also be properly excluded because a third-party motion to quash was pending.  The Court need not resolve that question because, either way, 70 non-excludable days have not passed.

11

DJA244

B. <u>Speedy Trial Clause</u>

The Court need not dwell on Weigand's claim that the delay in this case violates his constitutional right to a speedy trial.

When conducting a constitutional speedy trial inquiry, courts look, as a threshold matter, to the length of the delay; a court "will only consider the other . . . factors when the defendant makes a showing 'that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay.'" <u>United States v. Ghailani</u>, 733 F.3d 29, 43 (2d Cir. 2013) (quoting <u>Doggett v. United States</u>, 505 U.S. 647, 652 (1992)) (further quotation marks omitted). A delay that "approaches one year" triggers further inquiry. <u>Doggett</u>, 505 U.S. at 652 n.1. Trial in this case will commence eight days shy of one year after indictment, so the Court assumes without deciding that further inquiry is necessary.

To assess whether a speedy trial violation has occurred, the Court considers four factors: "length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." <u>United States v. Moreno</u>, 789 F.3d 72, 78 (2d Cir. 2015) (quoting <u>Barker v. Wingo</u>, 407 U.S. 514, 530 (1972)) (brackets omitted). Balancing these factors, Weigand's claim easily fails. First, the less-than-one-year delay, while perhaps sufficient to trigger further inquiry, is unremarkable in a case of such complexity. Second, the delay through December 1, 2020 is equally

attributable to the Government and to the defendants, and the three-month delay thereafter is not attributable to the Government but rather to the pandemic, a neutral reason outside of the Government's control.  Third, while Weigand properly and timely asserted his speedy trial rights for delays after December 1, he explicitly waived any argument that prior delays were improper. Finally, Weigand argues that he has suffered various forms of prejudice: needing to undergo medical treatment in prison, a year away from his family, costs, loss of livelihood, and psychological trauma associated with incarceration during the pandemic. However, most of these had nothing to do with the three-month delay from December 1 to March 1, the only cognizable delay for present purposes.  The only prejudice he has demonstrated that is attributable to <u>that</u> delay is, almost circularly, the additional time he has spent away from his family and the associated costs and continued harms to his livelihood.

In sum, the three-month delay attributable to the pandemic comes nowhere close to violating Weigand's constitutional right to a speedy trial.

II.  <u>MARTIN ELLIOTT'S MOTION TO TESTIFY BY VIDEO</u>

The Court next turns to another coronavirus-related motion, the motion by third parties Visa, Inc., and Martin Elliott to offer trial testimony from California by two-way video technology.  The defendants oppose the motion, arguing that permitting videophonic

testimony would violate their rights under the Confrontation Clause of the Sixth Amendment. The Government takes no position. Following expedited briefing and oral argument, the Court granted the motion on February 19, 2021. This Opinion explains the basis for that ruling.

   A. <u>Background</u>

   The Government has subpoenaed Elliott, commanding that he testify at this trial. Akhavan has also subpoenaed Visa for trial testimony, and Visa intends to offer Elliott as its witness to discharge that obligation. Elliott was Visa's Global Head of Franchise Risk Management during the relevant period. Although he represents that he "has no firsthand knowledge of the specific transactions at issue in this case," he is expected to provide, in his counsel's words, "process-type testimony about the workings of the Visa payment network." Elliott Ltr. Motion, ECF No. 174, at 1. The defendants do not contest this description, although they maintain that "questions about what Visa's policies did (or did not) require and how Visa did (or did not) enforce those policies are among the most critical questions in this case." Ltr. Opp., ECF No. 175, at 5.

   Elliott is 57 years old and has been diagnosed with hypertension and atrial fibrillation (a heart condition). His wife is 55 and has been diagnosed with hypertension. To his knowledge, no one in his household has contracted COVID-19, and no

one has received the coronavirus vaccine.  He and his wife are also the primary caretakers of his 83-year-old mother-in-law, who has received the first dose of the COVID-19 vaccine.  Elliott lives in the San Francisco Bay area and would need to travel by commercial flight to testify in this trial.  He avers that he and his wife have diligently complied with Centers for Disease Control and Prevention ("CDC") guidance during the pandemic.  They have not left California since early 2020 and have not flown on an airplane since the early summer.

Elliott's age and preexisting conditions place him at increased risk of serious illness or death if he were to contract COVID-19.  The CDC has found that people aged 50-64 are 400 times more likely to die and 25 times more likely to be hospitalized from COVID-19 than children aged 5-17 years, and are more than 25 times more likely to die and 3 times more likely to be hospitalized than young adults aged 18-29.[7]  On top of that, "adults of any age" with "heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies" "are at increased risk of severe illness" from COVID-19, and "adults of any age" with hypertension "might be at an increased risk for severe illness."[8]

_____

[7]        CDC,     Older     Adults     and     COVID-19, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last accessed Feb. 28, 2021).

[8] CDC, Certain Medical Conditions and Risk for Severe COVID-19 Illness,     https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

Although COVID-19 cases are trending downward, they remain high, and the "CDC recommends that [people] do not travel at this time."[9]  Under present courthouse policy, those who do travel from outside New York and its adjacent states must quarantine for four days and then obtain a negative COVID-19 test on the fifth day before they may enter the courthouse.  Elliott points out that if he testified in person, then, due to the heightened risks faced by his wife and mother-in-law, he would also need to quarantine apart from his family after returning to California.

B. Legal Standard

None dispute that the Court has the inherent authority to permit testimony by videophonic means, unless doing so would be contrary to federal law.  Defendants argue that such testimony is impermissible here for one reason, the Confrontation Clause of the Sixth Amendment, which provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.

"The primary object of" this clause is "to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil

_____

precautions/people-with-medical-conditions.html (last accessed Feb. 28, 2021).

[9] CDC, Travel During COVID-19, https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html (last accessed Feb. 28, 2021).

16

DJA249

cases, being used against the prisoner." <u>Maryland v. Craig</u>, 497

U.S. 836, 845 (1990).  Instead, courts generally must permit

> a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

<u>Id.</u> (internal quotation marks and citation omitted).

    C. <u>Analysis</u>

A "confrontation" encompasses several elements -- "physical

presence, oath, cross-examination, and observation of demeanor by

the trier of fact" -- that together "serve[] the purposes of the

Confrontation Clause by ensuring that evidence admitted against an

accused is reliable and subject to . . . rigorous adversarial

testing[.]"  <u>Id.</u> at 846.  Despite the values of confrontation,

however, the Supreme Court "ha[s] never held . . . that the

Confrontation Clause guarantees criminal defendants the absolute

right to a face-to-face meeting with [all] witnesses against them

at trial."  <u>Id.</u> at 844.  For example, "a literal reading of the

Confrontation Clause would abrogate virtually every hearsay

exception," a result the Court has long rejected.  <u>Id.</u> at 848

(internal quotation marks and citation omitted).

Confrontation Clause analysis comprises two distinct

questions.  First, a court must ascertain whether the evidence in

question even implicates the accused's right to confront "witnesses against him." The Supreme Court identifies such evidence as "testimonial." This question is not difficult in this case. If Elliott were offering evidence by means of an affidavit, then some aspects of his testimony might bear on matters, like Visa's policies, that are sufficiently ministerial that his statement might qualify as non-testimonial. See, e.g., Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009) ("[H]aving been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial[,] [certain records would] not [be] testimonial."); United States v. Boyd, 686 F. Supp. 2d 382, 386 (S.D.N.Y. 2010), aff'd, 401 F. App'x 565 (2d Cir. 2010) ("[W]here the defendant had ample opportunity to confront the Government witness who undertook the final, critical stage of the DNA analysis, and where that witness was personally familiar with each of the prior steps, testified that the analysis included safeguards to verify that errors would not result in a false positive, and demonstrated that the prior steps were essentially mechanical in nature, the Confrontation Clause is satisfied."). But Elliott will be testifying live, so there is no doubt that his statements will be testimonial. See Melendez-Diaz, 557 U.S. at 310 ("[T]estimonial statements" include "ex parte in-court testimony or its functional equivalent" and "statements that were made under circumstances which would lead an objective witness

18

reasonably to believe that the statement would be available for use at a later trial[.]") (internal quotation marks and citations omitted).  After all, the purpose of the "testimonial" inquiry is to assess whether, in the words of the Sixth Amendment, the declarant is a "witness," and Elliott will obviously be one.  Put simply, testimony is always "testimonial."

Ordinarily, this ends the Confrontation Clause inquiry because a defendant has a right to confront witnesses against him. But in some cases, courts also face a second question: whether the "confrontation" requirement may be satisfied by something short of traditional, live, in-court testimony.

In Maryland v. Craig, for example, the Supreme Court found that live testimony through a one-way videoconferencing system satisfied the Confrontation Clause.  The state court permitted such technology so that a child witness could testify regarding alleged abuse without facing the accused.  The Court "f[ou]nd it significant" that, other than requiring the witness to face the defendant, the procedure "preserves all of the other elements of the confrontation right," including oath, cross-examination, and the ability of the judge, jury, and defendant to view the witness's demeanor.  Craig, 497 U.S. at 851.  The Court recognized "the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding," but it nevertheless found that the one-way videoconference procedure "adequately ensures that the testimony

DJA252

is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." Id. The Court concluded "that use of the one-way closed circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause." Id. at 852. And the Court held that Maryland's "interest in the physical and psychological well-being of [the] child abuse victim[]" was an important state interest furthered by the one-way video procedure used in the state court. Id. Therefore, the Court found no Confrontation Clause violation. Id. at 857.

The Second Circuit likewise approved the use of video testimony in United States v. Gigante, 166 F.3d 75 (2d Cir. 1999). Gigante held that, "upon a finding of exceptional circumstances, . . . a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice." Id. The Second Circuit reviews a district court's "exceptional circumstances" determinations for "abuse [of] discretion." Id. at 82.

The Gigante panel reasoned that Federal Rule of Criminal Procedure 15 permits deposition of pretrial witnesses in exceptional circumstances and that courts permit such deposition testimony to be used at trial if the witness is unavailable. The panel explained that

> two-way closed-circuit presentation of [the witness's] testimony afforded greater protection of Gigante's confrontation rights than would have been provided by a Rule 15 deposition [that was later introduced at trial]. It forced [the witness] to testify before the jury, and allowed them to judge his credibility through his demeanor and comportment; under Rule 15 practice, the bare transcript of [the witness's] deposition could have been admitted, which would have precluded any visual assessment of his demeanor.  Closed-circuit testimony also allowed Gigante's attorney to weigh the impact of [the witness's] direct testimony on the jury as he crafted a cross-examination.

Id.  The panel concluded that if Gigante could have been deposed under Rule 15, then a fortiori he could be examined by two-way videoconference.  Because the witness "was in the final stages of an inoperable, fatal cancer," id. at 79, and was "participat[ing] in the Federal Witness Protection Program," id. at 81-82, the Second Circuit held that the use of two-way videoconference technology was consistent with the Confrontation Clause.  Gigante has never been overturned by the Second Circuit.

The defendants argue that Gigante is no longer good law because it conflicts with the Supreme Court's 2004 opinion in Crawford v. Washington, 541 U.S. 36 (2004).  In Crawford, the Supreme Court ruled that certain out-of-court statements could not be admitted, consistent with the Confrontation Clause, unless the defendant was allowed to cross-examine the declarant.  Drawing from historical evidence, the Court explained that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of

21

ex parte examinations as evidence against the accused." Id. at 50. Thus, the Court held that testimonial out-of-court statements are only admissible when the witness is "unavailab[le]" and where there was "a prior opportunity for cross-examination." Id. at 68.

The error in defendants' reasoning is that Crawford and Gigante answered different questions. Crawford addressed whether confrontation was required for certain out-of-court statements. Gigante addressed whether, when the defendant undeniably has a Confrontation Clause right, that right can be vindicated in exceptional circumstances by video testimony. The answer to that question is yes. By arguing otherwise, defendants would have this Court believe that the Crawford Court overruled Maryland v. Craig. But the majority opinion in Crawford did not even mention Craig. This Court declines to find that the Supreme Court overruled Craig sub silentio, just fourteen years after issuing that opinion, with nary a word about stare decisis.

Because Crawford answered a different question than the question presented here, and because Gigante is consistent with Craig, the Court applies Gigante, asking whether Elliott is "unavailable" and whether "exceptional circumstances" warrant the use of two-way video testimony.[10] Here, these two inquiries largely

---

[10] The witness and the defendants suggest that Elliott's testimony must also be "material" to warrant the use of two-way video testimony, citing Judge Forrest's opinion in United States v. Mostafa, 14 F. Supp. 3d 515, 519 (S.D.N.Y. 2014). The Court need

DJA255

overlap.   Elliott cannot travel across the country without subjecting himself to a substantial risk of contracting COVID-19. Given his age and comorbidities (as well as, to a lesser extent, the risks his family would face), contracting COVID-19 could well result in serious illness or death.   Therefore, the Court finds that Elliott is "unavailable" to testify in person within the meaning of <u>Gigante</u>.   Likewise, the need to prevent Elliott's serious illness or death (and to protect his family) offers exceptional circumstances warranting the use of two-way video testimony.

The defendants point out that many trial participants (<u>e.g.</u>, counsel, witnesses, jurors, courthouse staff) must travel to the courthouse in the presence of others using public transit. However, this does not show that Elliott's circumstances are not exceptional.   If other trial participants present similarly severe risks of severe illness or death, the Court will similarly endeavor to limit such risks.   To that end, the Court has agreed to permit two defense attorneys to view the proceedings by video and, with reasonable advance notice, to argue non-jury motions.   Moreover, the Clerk of Court's procedure for summoning jurors has considered, and the Court's procedure for selecting jurors will consider,

_____

not consider whether such a requirement exists, because the witness and the defendants agree that Elliott's testimony satisfies any such materiality requirement.

23

prospective jurors' risks of contracting severe COVID-19.  Elliott

merely asks that the Court similarly consider his individualized

circumstances, which are exceptional.[11]

Because Elliott has demonstrated that he is unavailable to

testify, and because exceptional circumstances support his request

to testify by two-way video, his motion is granted.[12]

The Court has made clear, and here reiterates, that Elliott,

Visa, and their counsel are responsible for making all necessary

technological arrangements for Elliott's testimony.  The Court has

been assured that this technology will permit the defendants,

defense counsel, the questioner, the judge, and the jurors all to

---

[11] Judge Preska reached a similar conclusion in United States v.
Donziger, No. 11-CV-691 (LAK), 2020 WL 5152162, at *2 (S.D.N.Y.
Aug. 31, 2020), reconsideration denied, No. 11-CV-691 (LAK), 2020
WL 8465435 (S.D.N.Y. Oct. 23, 2020).   Judge Preska reasoned that
a witness "was at heightened risk of serious health complications
if he were to contract COVID-19, that the Government had proposed
adequate procedures to ensure the reliability of his testimony by
video, and that the video testimony would comport with the
requirements of the Sixth Amendment as construed in Maryland v.
Craig, 497 U.S. 836 (1990), United States v. Gigante, 166 F.3d 75
(2d Cir. 1999), and related decisions."   Id. at *1.   This Court
agrees, and the same rationale applies here.

[12] The standard articulated in Craig is satisfied, as well.   See
Craig, 497 U.S. at 850 ("[A] defendant's right to confront
accusatory witnesses may be satisfied absent a physical, face-to-
face confrontation at trial only where denial of such confrontation
is necessary to further an important public policy and only where
the reliability of the testimony is otherwise assured.").
Preventing the serious illness or death of a third-party witness
whose testimony is compelled by subpoena is an important public
policy.   And the procedures applied here, even more than the
one-way video testimony in Craig, will preserve every adversarial
element of confrontation other than physical presence itself.

DJA257

see and be seen by the witness.  Cf. United States v. Mostafa, 14 F. Supp. 3d 515, 525 (S.D.N.Y. 2014) (adopting similar approach). The Court has also been informed that Elliott will testify from his attorneys' offices in the San Francisco area and that counsel for the defendants have been invited to send representatives, who can be present in the same room as Elliott throughout the entirety of his testimony.  The Court need not address whether such procedures are constitutionally necessary in this case, but the Court agrees that they are prudent.  This approach, even more than the approaches approved in Craig and Gigante, will preserve almost all "the intangible elements of the ordeal of testifying in a courtroom."  See Gigante, 166 F.3d at 81.

For the foregoing reasons, Weigand's motion to dismiss the indictment on speedy trial grounds, ECF No. 183, is denied, and Visa and Elliott's motion to testify by video, ECF No. 174, is granted.

SO ORDERED.

Dated:    New York, NY
          March 1, 2021
Time:     12:02 a.m.

United States District Judge

25

DJA258

1

L31PWEIvd1                    Voir dire

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                        20-CR-188 (JSR)

5   RUBEN WEIGAND and
    HAMID AKHAVAN,
6
                 Defendants.           Jury Voir Dire
7
    ------------------------------x
8
                                       New York, N.Y.
9
                                       March 1, 2021
10                                     11:03 a.m.

11

12  Before:

                      HON. JED S. RAKOFF
13
                                       District Judge
14

15                       APPEARANCES

16  AUDREY STRAUSS
         United States Attorney for the
17       Southern District of New York
    BY:  NICHOLAS FOLLY
18       TARA MARIE LA MORTE
         EMILY S. DEININGER
19       Assistant United States Attorneys

20  DECHERT LLP
         Attorneys for Defendant Weigand
21  BY:  MICHAEL J. GILBERT
         SHRIRAM HARID
22       ANDREW J. LEVANDER
         STEPHEN PELLECHI
23       -and-
    MICHAEL H. ARTAN
24       Attorney for Defendant Weigand
         -and-
25

**DJA259**

```
L31PWEIvd1                    Voir dire

 1                                  APPEARANCES (CONTINUED)

 2    WILSON, SONSINI, GOODRICH
            Attorneys for Defendant Weigand
 3    BY:  MORRIS J. FODERMAN
            KATHERINE T. MCCARTHY
 4
      QUINN EMANUEL URQUHART & SULLIVAN, LLP
 5          Attorneys for Defendant Akhavan
      BY:  WILLIAM A. BURCK
 6          CHRISTOPHER TAYBACK
            SARA CLARK
 7          MARI HENDERSON
            DEREK SHAFFER
 8          PAUL SLATTERY
            -and-
 9    ROTHKEN LAW FIRM LLP
            Attorneys for Defendant Akhavan
10    BY:  IRA P. ROTHKEN
            JARED R. SMITH
11
      WILMER CUTLER PICKERING HALE AND DORR LLP
12          Attorneys for Interested Party
            Bank of America, N.A.
13    BY:  JUSTIN GOODYEAR

14    NELSON MULLINS RILEY & SCARBOROUGH LLP
            Attorneys for Interested Party
15          Circle Internet Financial, LLC
      BY:  MATTHEW G. LINDENBAUM
16

17

18

19

20

21

22

23

24

25
```

DJA260

3

L31PWEIvd1                    Voir dire

1          (In open court)

2          THE COURT:  All right.  Linda, do you want to call the

3     case?

4          (Case called)

5          Good morning, ladies and gentlemen.  So we're about to

6     pick a jury in a criminal case, so-called white collar criminal

7     case.  It will last about three weeks.  We'll, hopefully, do a

8     little bit better than that, but I think you should, worst

9     case, assume it might go as much as three weeks.  And, of

10    course, counsel and I are very much aware that a three-week

11    interruption of your lives, even without the further

12    complications of the pandemic, is a considerable inconvenience.

13         But those of you who have served on juries before

14    will, I think, agree with me that once you have served on a

15    jury, you find it an inspiring experience.  And why do I say

16    that?  Well, it's because of the tremendous power and

17    responsibility that our Constitution gives to jurors.  In most

18    countries in the world, it's judges who decide criminal cases

19    and civil cases.  In some countries, of course, it's dictators.

20         But in our country, under our Constitution, it is you,

21    it is the citizens of the United States, drawn from a

22    cross-section of the community, who get to decide matters of

23    such tremendous importance, whether a defendant is guilty or

24    not guilty, whether the government has carried its burden of

25    proof beyond a reasonable doubt and so forth.

4

L31PWEIvd1                    Voir dire

1          Especially in this time period, when you've been

2    subjected to all these pressures of the pandemic and other

3    situations, I think you will find that it is a particularly

4    inspiring experience to be part of deciding justice, and that's

5    what you, as jurors, will be asked to do.

6          Now, in a few minutes I'm going to start putting

7    questions to the first twelve of you, those who are in seats

8    Nos. 1 through 12, but I'll ask everyone else to listen

9    carefully to my questions because some of those people may be

10   excused and you may be called up in their place.  And if you

11   are, I don't want to have to repeat all of my questions.  I'll

12   simply say "Do you remember my questions?  Are there any that

13   you need to respond to?"  But before we do anything else, we

14   will swear you in.

15              (Jury venire sworn)

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

DJA262

L31AWEIVD2ps                    Voir Dire

1          THE COURT:  So let me tell you a little bit more about

2     this case.

3          The government charges that from around 2016 to 2019,

4     the two defendants who are named Ray Akhavan and Ruben Weigand

5     agreed to commit bank fraud by processing credit and debit

6     charges on behalf of a marijuana delivery company called Eaze

7     that were then disguised to make them look like they were not

8     marijuana purchases.  The defendants deny these charges and

9     have pled not guilty.  And under our system of justice, a

10     defendant is presumed innocent until and unless the government

11     has proven his guilt beyond a reasonable doubt.  Is there any

12     member of the first 12 jurors who would have any difficulty

13     applying that basic principle of law?

14          Very good.

15          Now, your duty will be to decide the facts and then

16     apply to those facts the law as I will give it to you in

17     written instructions.  So if there's anyone who has a problem

18     with following my instructions of law, please let me know now.

19          Very good.

20          Now, as I mentioned, the lawyers and I have estimated

21     this case will take three weeks.  We can't predict exactly how

22     long, because your deliberations last as little or as long as

23     you choose them to be, but I think three weeks is a pretty firm

24     estimate.

25          We will normally sit from 9:45 to 3:45, starting late

DJA263

L31AWEIVD2ps                    Voir Dire

1   so you can avoid the rush hour, leaving early so you can avoid

2   any rush hour.  We will take lunch from 12:45 to 1:45.  We will

3   take a midmorning break of about 15 minutes around 11:15.  We

4   will sit Monday through Friday, except there is a possibility

5   this Friday we won't sit because of other matters that I have,

6   but normally we will sit all five days of the week.

7           Does that schedule present a problem for anyone?

8           Yes, ma'am.  You need to come up to the microphone.

9           JUROR:  Well, I'm a third grade teacher, and we are

10  having New York State tests next month, and I would not want to

11  be away from my students for three weeks because I want to get

12  them prepared and ready for testing.  So that would be a little

13  hard for me.

14          THE COURT:  So are there not substitute teachers?

15          JUROR:  Well, because we're doing remote teaching and

16  we have a shortage of subs, there is not a guarantee that there

17  are subs.  So, for instance, today, I had to just post work for

18  them to do asynchronous, which means they're doing it

19  independently.  So they don't have any direct instruction.

20          THE COURT:  All right.  Let me think about it for a

21  minute or two.  You can take your seat.  Usually teachers are

22  frankly ideal jurors, so I'm very reluctant to excuse you, but

23  I understand the special situation.  Let me think about it a

24  minute or two.

25          JUROR:  Thank you.

DJA264

L31AWEIVD2ps                    Voir Dire

1        THE COURT:  And you are number?

2        JUROR:  12.  12.

3        THE COURT:  12, OK.

4        I am now going to ask the parties to introduce

5   themselves, the lawyers and their clients, and we'll start with

6   the government.

7        MR. FOLLY:  Good morning.  I am Nicholas Folly from

8   the United States Attorney's Office for the Southern District

9   of New York.

10       MS. LA MORTE:  I am Tara La Morte, also with the U.S.

11  Attorney's Office of the Southern District of New York.  And

12  one of our colleagues is in the back, walking up.  Her name

13  is -- I'll let her introduce herself.

14       MS. DEININGER:  I'm Emily Deininger.  I'm assistant

15  United States attorney for the Southern District of New York.

16       THE COURT:  Does any member of the first 12 jurors, do

17  any of you personally know any of the three people who were

18  just introduced?

19       Do any of you personally know any other assistant

20  United States attorney who works in the Southern District of

21  New York?

22       Do any of you personally know the U.S. Attorney,

23  Audrey Strauss?

24       MS. DEININGER:  Your Honor, if I may introduce Robert

25  Levine, our paralegal, who will be at counsel table with us for

**DJA265**

L31AWEIVD2ps                    Voir Dire

1   most of the trial.

2              THE COURT:  All right.  Does anyone know Mr. Levine?

3              Does any member of the first 12 jurors work for any

4   law enforcement agency or have a close relative who works for a

5   law enforcement agency?  By "close relative" I mean parent or

6   brother and sister or child.  I'm not interested in cousins and

7   aunts and things like that.  But is anyone among the first 12

8   jurors -- yes, ma'am.

9              JUROR:  Good morning, your Honor.  I'm assistant

10  county attorney at the Westchester County Attorney's Office.

11             THE COURT:  What area do you practice in?

12             JUROR:  I investigate and prosecute juvenile

13  delinquency cases, your Honor.

14             THE COURT:  OK.  I will excuse you.

15             And Juror No. 13, please come up and take the seat of

16  the juror who just left.

17             THE CLERK:  Anthony, what was that juror's number,

18  please?

19             JURY CLERK: 11.

20             THE CLERK:  Thank you.

21             THE COURT:  OK.  And Juror No. formerly 13, now 11,

22  you heard my few questions so far.  Any of those you need to

23  respond to?

24             No.  OK.  Very good.

25             Does any member of the first 12 jurors, or any member,

DJA266

L31AWEIVD2ps                    Voir Dire

1    again, of your immediate family and a close relative, work for

2    any agency of the federal government, even if it's not a law

3    enforcement agency?

4            So -- yes, ma'am.  Would you go to the microphone,

5    please.

6            JUROR:  Good morning.  I have a brother who works for

7    the navy.  He's a navy chief.

8            THE COURT:  Is there anything about that that would

9    prevent you from being a fair and impartial juror?

10           JUROR:  No.

11           THE COURT:  Very good.

12           JUROR:  I have one more condition.

13           THE COURT:  Yes.  Go ahead.

14           JUROR:  I have a tendency to use the bathroom

15   frequently.  I have a bladder problem.  Honestly, I feel

16   uncomfortable sitting down for long hours.

17           THE COURT:  Yes.  OK.  I will excuse you for that

18   reason.

19           Juror No. 14, please take the seat.  What is that

20   seat?

21           MR. FOLLY:  Juror No. 7.

22           THE COURT:  7.  Juror No. 14, please take seat no. 7.

23           New Juror 7, you heard the questions so far.  Are

24   there any that you need to respond to?

25           OK.  Go to the microphone.

DJA267

L31AWEIVD2ps                    Voir Dire

1          JUROR:  Good morning.  My issue is with the schedule.

2     So I am a full-time student but I only attend Thursday, Friday,

3     Saturday.  And your schedule intervenes with me missing like a

4     lot of --

5          THE COURT:  I'm sorry.  I'm having a little trouble

6     hearing you.

7          JUROR:  I'm a full-time student, and only go to school

8     Thursday, Friday, Saturday, because I go --

9          THE COURT:  Where are you a student?

10          JUROR:  In Hunter College.

11          THE COURT:  And what time are your classes?

12          JUROR:  All day Thursday, Friday, Saturday, because I

13     work sometime also, so that's the only way I can fit it in.

14          THE COURT:  OK.  I will excuse you.

15          JUROR:  Thank you.

16          THE CLERK:  What's your jury number, ma'am?  14?

17          THE COURT:  She's now 7.

18          JUROR:  Juror 14, then --

19          THE COURT:  OK.  So no. 15, please take seat no. 7.

20          So New Juror 7, you heard my questions.  Any of those

21     you need to respond to?

22          JUROR:  No, sir.

23          THE COURT:  Very good.

24          All right.  Counsel for defendant Weigand.

25          MR. GILBERT:  Good morning.  My name is Michael

L31AWEIVD2ps                    Voir Dire

1    Gilbert.  I'm with a law firm called Dechert here in New York.

2    My colleague Shriram Harid, is here.  And another colleague,

3    Michael Artan, who is a lawyer in California, is also here.

4              THE COURT:  Why don't you step forward a little bit so

5    everyone can see you.

6              There you go.

7              And introduce your client as well.

8              MR. GILBERT:  And Ruben Weigand is our client.

9              THE COURT:  So does any member of the first 12 jurors

10   know any of the folks who were just introduced at Mr. Weigand's

11   table?

12             Does any member of the jury or any member of your --

13   any close relative have any relation to the Dechert law firm?

14             Very good.  You may be seated.

15             Counsel for Mr. Akhavan.

16             MR. TAYBACK:  Good morning.  My name is Christopher

17   Tayback, an attorney at a law firm called Quinn Emanuel, along

18   with two of my colleagues, Sara Clark, who is in the back on

19   crutches, so she is noticeable, and Louie Furwin, who is not in

20   the room at the moment.  We have the privilege of representing

21   Ray Akhavan.

22             THE COURT:  Excuse me just a minute.

23             Sorry.  Does any member of the first 12 jurors know

24   personally any of the folks who were just introduced by

25   Mr. Akhavan's lawyer?

**DJA269**

L31AWEIVD2ps                    Voir Dire

1          Does any member of the first 12 or any member -- any

2      close relative have any relation to the Quinn Emanuel firm?

3          Very good.  You may be seated.

4          Does any member of the panel or any close relative

5      ever been convicted of a crime?

6          Would you go to the microphone.

7          JUROR:  My father was convicted of drug charges and

8      insurance fraud.

9          THE COURT:  OK.  Given that and your other situation,

10     I think you've now passed the test, so we will excuse you.

11     Thank you very much.

12         So Juror No. 16, please take the seat.  And let me ask

13     the new juror, you've heard my questions up to now.  Any of

14     those you need to respond to?

15         Yes?  Go to the microphone.

16         JUROR:  My brother, he was convicted, and I don't know

17     the thing but fraud, with credit cards and stuff like that.

18         THE COURT:  OK.  When did this occur?

19         JUROR:  I don't -- I guess two years ago?  Something

20     like that.  I'm not sure.

21         THE COURT:  I gather from your answers that he is not

22     someone you --

23         JUROR:  No, not a close --

24         THE COURT:  Yes.  You're not close.  OK.  Is there

25     anything about his problem that would prevent you from being a

DJA270

L31AWEIVD2ps                    Voir Dire

1    fair and impartial juror?

2              JUROR:  No.

3              THE COURT:  Very good.  Please be seated.

4              I'm waiting for my law clerk to bring me a list of

5    witnesses and we'll read that list to you and see if any of you

6    know any of those folks.  But while we're waiting, is there any

7    other reason that I haven't covered that any of the 12 jurors

8    think would prevent them from being fair and impartial jurors?

9              Yes.  Come to the microphone.  Thank you.

10             JUROR:  I have a medical procedure scheduled for

11   tomorrow that I've been -- I've had for quite some time.

12             THE COURT:  Yes.  What time?

13             JUROR:  5 o'clock.

14             THE COURT:  Well, we end at 3:45.

15             JUROR:  It's in Brewster, New York.

16             THE COURT:  What time would you have to leave to get

17   there?

18             JUROR:  Probably about 3.

19             THE COURT:  OK.  Well, if you wind up being on the

20   final jury, we'll end at 3 tomorrow so you can make that

21   appointment.

22             JUROR:  OK.  Thank you.

23             THE COURT:  Yes, ma'am.  Go to the microphone, please.

24             JUROR:  I know that you mentioned earlier that the

25   trial would be three weeks, potentially longer.  I know my job

DJA271

L31AWEIVD2ps                    Voir Dire

1    covers two weeks, but I would have to discuss with them the

2    third week, if I would be covered for that time.

3                THE COURT:  Yes.  Who do you work for?

4                JUROR:  I work for PayNear.  It's an internet-based

5    company, so I work from home.

6                THE COURT:  Yes.  My experience is that most companies

7    are willing to go the full.  And if they not, however, if they

8    tell you they're not, then tell me and I will have a heartfelt

9    conversation with whoever runs that company, and I've been

10   fortunate enough in the past to always convince the company to

11   cover you.  So I don't think it will be a problem.

12               JUROR:  OK.  Thank you.

13               THE COURT:  Yes.

14               JUROR:  I have a doctor's appointment at 3 o'clock

15   today.

16               THE COURT:  I'm sorry?

17               JUROR:  Doctor's appointment at 3 o'clock today.

18               THE COURT:  What's your problem?

19               JUROR:  It's actually for my husband.  He's got

20   vascular surgery.  It's for a cardiologist, Dr. Post.

21               THE COURT:  OK.  We will end, then, at 3 o'clock

22   today.

23               JUROR:  The appointment is at 3 o'clock.

24               Oh, we will end today?

25               THE COURT:  I'm sorry.  I'm having trouble hearing

DJA272

15

L31AWEIVD2ps                    Voir Dire

1    you.

2            JUROR:  I have an appointment today at 3 o'clock with

3    a cardiologist.

4            THE COURT:  I see.  Is that not something that could

5    be moved?

6            JUROR:  Well, the surgery is to take place soon.

7    We're doing our best to get as much information as possible

8    together before we make the decision on who to have the surgery

9    with.

10           THE COURT:  I think -- where is the appointment?

11           JUROR:  At Columbia Presbyterian.

12           THE COURT:  I think we're going to finish by well

13   before -- by 2 o'clock today.

14           JUROR:  Thank you.

15           THE COURT:  Because we're only going to have, after we

16   select the jury, we're just going to have opening statements,

17   and then the evidence will start tomorrow.

18           JUROR:  OK.  Thank you.

19           THE COURT:  OK?

20           All right.  Here's the list of witnesses, a very long

21   list.  At the end -- I'm going to read the whole list, and then

22   tell me whether you personally know any of these folks.  Some

23   of these people are going to be witnesses.  Some of them are

24   just people whose names will come up in the course of the

25   testimony, so we want to cover both.

**DJA273**

L31AWEIVD2ps                    Voir Dire

1              Koen Van Prat.  Christian Chmiel.  Stanley Skoglund.

2       Ozan Ozark.  Medhat Mourid.  Guy Mizrachi.  Tanya Wilkins.

3       Andrea Bricci.  Keith McCarty.  Nick Fasano.  Michael Tassone.

4       John Verdeschi.  Oliver Hargreaves.  Richard Clow.  Darcy

5       Cozzetto.  John Wang.  Jim Patterson.  Jessica Volchko.  Robert

6       Hupcher.  Ron Shimko.  Michael Steinbach.  Chuck Brown.  Martin

7       Elliott.  Patrick Leary.  Jacob Pechet.  Roie Edery.  Noah

8       Tutak.  Kate Farmer.  Michele Furlan.  Gary Murphy.  Jan

9       Marsalek.  Craig Wald.  Cameron Wald.

10             Anyone personally know any of those folks?

11             Very good.  Now I'm going to read you a long list of

12      companies, and the only question I need to know about from you

13      is whether you either work for or own stock in any of the

14      companies I list.  It's a long list.  And, again, at the end

15      I'll ask if anyone either works for or owns stock in any of

16      these companies.

17             Wirecard.  Kalixa.  Inovio.  EPC/Income Processing.

18      PXP Financial.  Clearsettle.  EUP.  EUprocessing.  Clearhaus.

19      Circle Internet Financial Inc.  Card Connect.  Settliego.

20      Eaze.  Webshield.  Allied Wallet.  Quantum Solutions.  CE.

21      Spinwild.  Senjo.  Bureau Solutions Ltd.  Genesis Bank.

22      Kantox.  PaySec.  PayGo.  Intrapay.  1A Commerce.  IMerchant

23      Services.  Emerald City.  Hometown Heart.  Natoma.  Perennial.

24      SCMF.  Sweetwood.  The Guild.  Torrey Holistics.  Caliva.

25      Embarc.  From the Earth.  From the Earth, Ventura.  Fume.

17

L31AWEIVD2ps                    Voir Dire

1  Green Dragon.  Green Goddess.  Green Tribe Gold.  Greenwolf.

2  Grupo Flor.  Indigo.  Kaleafa.  Superior Herbal Health.  Telos.

3  The Lift.  Urban Leaf.  Wildflower.

4          Anyone work for or have stock in any of those

5  companies?

6          Anyone work for or have stock in MasterCard or Visa?

7          Very good.

8          All right.  Now I'm going to ask each of you to tell

9  me individually what county or borough you live in -- we don't

10  need your address, just, "I live in Bronx" or "I live in

11  Westchester" -- what you do for a living, whether you're single

12  or have a significant other, and if you have a significant

13  other, what that person does.  And we'll begin with Juror

14  No. 1.

15          JUROR:  I live in the Bronx.  I am married.  And I

16  work with interior renovation.

17          THE COURT:  Does your wife work?

18          JUROR:  Oh, yeah.  My wife is a registered nurse.

19          THE COURT:  OK.  Juror No. 2.

20          JUROR:  I live in the Bronx.  I'm single.  And I'm

21  unemployed at this time.

22          THE COURT:  Juror No. 3.

23          JUROR:  I live in Manhattan.  I'm an attorney.  And

24  I'm single.

25          THE COURT:  What kind of law do you practice?

**DJA275**

L31AWEIVD2ps                    Voir Dire

 1            JUROR:  ERISA.

 2            THE COURT:  I'm sorry?

 3            JUROR:  ERISA.

 4            THE COURT:  ERISA.  My condolences.

 5            Juror No. 4.

 6            JUROR:  Yes.  I live in Putnam County.  I'm married.

 7    And I work in manufacturing.

 8            THE COURT:  In what respect?

 9            JUROR:  We make lighting fixtures.

10            THE COURT:  OK.  Juror No. 5.

11            JUROR:  I am in Manhattan.  I work as an

12    administrative associate.  And my fiancé is with Local

13    Teamsters 86.

14            THE COURT:  OK.  Juror No. 6.

15            JUROR:  I live in Manhattan.  I am a Catholic priest,

16    a Jesuit priest, associate pastor for St. Ignatius Loyola.

17            THE COURT:  Juror No. 7.

18            JUROR:  I'm in Manhattan.  I'm single.  And I am a

19    copy writer.

20            THE COURT:  Juror No. 8.

21            JUROR:  I live in the Bronx.  I'm single.  And I work

22    for a company named PayNear as a approval associate and

23    trainer.

24            THE COURT:  Juror No. 9.

25            JUROR:  My name is Ewing Wong.  I live in Manhattan.

DJA276

L31AWEIVD2ps              Voir Dire

1    I, I --

2             THE COURT:  I'm sorry.  I couldn't hear the last thing

3    you said.

4             JUROR:  Ewing Wong.  I'm single.  I live in Manhattan.

5    I'm unemployed.

6             THE COURT:  OK.  Thank you very much.

7             No. 10.

8             JUROR:  I have, from beginning of this, the start of

9    this, I was fine, but now I'm getting really nervous, like I'm

10   trembling and like losing concentration.

11            THE COURT:  Why?

12            JUROR:  I, I, I tend to have little panic attacks

13   sometimes.

14            THE COURT:  All right.  We will excuse you.

15            JUROR:  Thank you.

16            THE COURT:  OK.  I think we're up to 17?

17            THE CLERK:  Yes, sir.  17.

18            THE COURT:  17, please take the seat over there.

19            So before you tell us about yourself, you heard my

20   general questions.  Any of those you need to respond to?

21            JUROR:  No.

22            THE COURT:  OK.  Tell us about yourself.

23            JUROR:  Live in the Bronx.  I'm a paralegal, and my

24   significant other is in construction.

25            THE COURT:  And where are you a paralegal?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA277

L31AWEIVD2ps                    Voir Dire

1        JUROR:  Intellectual property law firm.  I'm currently

2    unemployed, but I was recently with a property law firm, in

3    Manhattan.

4        THE COURT:  Thank you.

5        Next.  I lost track now.  What number are we up to?

6        THE CLERK:  18.

7        THE COURT:  No, no.

8        THE CLERK:  Sorry.

9        JUROR:  I live in Westchester.  I'm married.  My

10   husband works in theater.  And I am a teacher.

11       THE COURT:  OK.

12       JUROR:  I live in Manhattan, and I'm separated, and I

13   work for the Manhattan DA as an advanced medical support

14   assistant.

15       THE COURT:  OK.  And finally Juror No. 12.

16       JUROR:  I live in the Bronx.  I'm married.  I'm a

17   teacher assistant, and my husband is a teacher.

18       THE COURT:  OK.  At this point, ladies and gentlemen,

19   counsel get to exercise what are called peremptory challenges,

20   which means that each side can challenge a certain number of

21   jurors for virtually any reason permitted by law.  The

22   government gets six challenges.  The defense jointly gets ten.

23   And we do this in rounds.  So in the first four rounds will be

24   one challenge for the government, two for the defense.  And

25   then the last two rounds will be one and one.  So we'll do the

L31AWEIVD2ps                    Voir Dire

1   first round of challenges.

2           MR. TAYBACK:  Your Honor, may I approach briefly?

3           THE COURT:  Yes.

4           (At the sidebar; jury panel not present)

5           MR. TAYBACK:  I did not get a list of the names.

6           MS. LA MORTE:  We don't have one either.

7           MR. TAYBACK:  Second question, I just thought I would

8   ask, do any jurors have a particularly strong view about the

9   legalization of marijuana.

10          THE COURT:  Yes.  Both sides had questions relating to

11  that.  I think it's, in this case, I think it's still an

12  irrelevance, total irrelevance, and I don't believe in giving

13  attitudinal questions.  Denied.

14          MR. TAYBACK:  The last --

15          THE COURT:  The last of your two items?  Of the three?

16          MR. TAYBACK:  I apologize.

17          MS. LA MORTE:  He's a lawyer, not a math person.

18          MR. TAYBACK:  Right.  The third one is, the third one,

19  observing the room, I'm not obviously entire -- my impression

20  is the jury pool seems to me to be older.  I don't know whether

21  that's a function of the vaccination, but I would say I don't

22  see anyone under 35, very few people.

23          THE COURT:  Oh, I don't agree.  Well, first, that's

24  not my observation.  But secondly, I'm looking at someone right

25  now who looks to me considerably younger.  Fine.  Secondly, I

DJA279

L31AWEIVD2ps               Voir Dire

1    don't know what your objection is.

2              MR. TAYBACK:  My objection would be that it's not a

3    representative pool.

4              THE COURT:  No.  Denied.

5              (In open court; jury panel present)

6              THE COURT:  I hope defense counsel are consulting as

7    to who they want to strike, because as soon as the government

8    tells me who they want to strike, we're going to ask you who

9    are yours.

10             MR. FOLLY:  We are exercising our peremptory on Juror

11   No. 3.

12             THE COURT:  OK.  Juror No. 3, you are excused.

13             The defense?

14             MR. GILBERT:  No. 6, your Honor.

15             THE COURT:  You have two collective choices.  Are you

16   waiving your second?

17             MR. TAYBACK:  No. 9, your Honor.

18             THE COURT:  OK.  So jurors 6 and 9, you are excused.

19             And now we'll get, what are we up to?  18?

20             THE CLERK:  21.  I'm sorry, 18.

21             THE COURT:  18 takes seat no. 3.  19 takes seat no. 6.

22   And 20 takes seat no. 9.

23             So Juror No. 3, you heard my general questions.  Any

24   of those you need to respond to?

25             Go ahead.  Go to the microphone.

DJA280

L31AWEIVD2ps                    Voir Dire

1           JUROR:  Good morning, your Honor.  Like many people,
2    I've been waiting for the vaccine.  I'm scheduled for March
3    13th.
4           THE COURT:  Where are you going?
5           JUROR:  Westchester County Center.
6           THE WITNESS:  And I've already had it a year ago.
7           THE COURT:  Yes.  I will excuse you.
8           JUROR:  Thank you.
9           THE COURT:  Juror 21, take seat no. 3.
10          JURY CLERK:  this is no. 20, your Honor.
11          THE COURT:  Oh, I'm sorry.
12          JUROR:  I did just want to mention, my cousin had
13   credit card fraud against my grandmother.  I do think I can be
14   impartial, but I wanted to make sure I mentioned it.
15          THE COURT:  Thank you for mentioning it, and you can
16   be seated.
17          And we need the microphone there.  Tell us about
18   yourself.
19          JUROR:  In Manhattan, I have a significant other who
20   is an architect.  I am a sales director for a software company.
21          THE COURT:  OK.
22          Juror No. 6.
23          So you heard my general questions.  Any of those you
24   need to respond to?
25          OK.  Go to the microphone.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA281

24

L31AWEIVD2ps                    Voir Dire

1           JUROR:  Good afternoon, your Honor.  I'm a full-time

2    student at LaGuardia Community College.  And my classes start

3    next Monday.  I'm going to class Monday through Thursday,

4    starting at 10:45 in the morning until 5:45 in the afternoon.

5           THE COURT:  How come they left out the evening?

6           JUROR:  Right.

7           THE COURT:  You are excused.

8           JUROR:  OK.

9           THE COURT:  No. 22 goes in the 6th seat.

10          Yes.  Juror No. 22, come up to no. 6.

11          Jury clerk: your Honor, no. 21 is up.

12          THE COURT:  Oh, I'm sorry.  My mistake.  21.

13          THE CLERK:  I have 21 in seat 3.

14          THE COURT:  No.  That was 20.

15          JUROR:  I have a sister who is a lawyer.

16          THE COURT:  My condolences.

17          Anything about that that would prevent you from being

18   a fair and impartial juror?

19          JUROR:  No.

20          THE COURT:  Please be seated.  And then someone give

21   her a microphone to tell us -- yes.  Tell us about yourself.

22          JUROR:  I live in Manhattan.  I'm single.  And I work

23   for a beauty products company.

24          THE COURT:  Thank you very much.

25          Juror No. 9.  Where are you, Juror No. 9?

DJA282

25

L31AWEIVD2ps                    Voir Dire

1          Oh, we haven't replaced -- that's why the numbers were

2    all -- all right.  So 22, now take seat no. 9.

3          THE CLERK:  I still have seat 6.

4          THE COURT:  Well, it's not right.  21 is in 6.

5          All right.  Juror No. 9, you heard my general

6    questions.  Any of those you need to respond to?

7          No.  Tell us about yourself as soon as we can get the

8    microphone to you.

9          JUROR:  I live in Manhattan.  I'm married.  My husband

10   is a jewelry designer.  I am unemployed right now due to COVID

11   but have spent 30 years as a VP of operations of a theater

12   ticket service.

13         THE COURT:  Thank you very much.

14         All right.  Counsel exercise their second round of

15   challenges, one for the government, two for the defense.

16         MR. FOLLY:  No. 12.

17         THE COURT:  Juror No. 12 is excused.  And Juror No.

18   23, take the seat.

19         Defense counsel?

20         MR. GILBERT:  No. 3, your Honor.

21         THE COURT:  No. 3.  You have two challenges.

22         MR. TAYBACK:  We pass the challenge, your Honor.

23         (Pause)

24         THE COURT:  Yes, waive.  He said pass.

25         So Juror No. 12.  Oh, I'm sorry.  Did we replace Juror

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

L31AWEIVD2ps                    Voir Dire

1    No. 3?

2              THE CLERK:  Seat 3 is now Juror No. 24.

3              THE COURT:  We need Juror 24 to come on up.

4              OK.  New Juror 12, you heard my general questions.

5    Any of those you need to respond to?

6              Sir?

7              JUROR:  I'm number --

8              THE COURT:  You're 12.

9              JUROR:  I'm no. 12.

10             No.

11             THE COURT:  OK.  As soon as we get a microphone to

12   you, tell us about yourself.

13             JUROR:  I live in Manhattan, and I'm self-employed.

14   My spouse is an academic.

15             THE COURT:  I'm sorry.  I didn't hear the last thing?

16             JUROR:  My spouse is academic.

17             My spouse is an academic.

18             THE COURT:  Ah.  Thank you very much.  I'm sorry.

19             OK.  And Juror No. 3.  You're Juror No. 3.  You have

20   something you need to raise.  OK.

21             JUROR:  Your Honor, I'm diabetic and I have sciatica

22   pain.  So I come from Bronx.  I have to take the subway and

23   just, I'm going to be in a position, I climb up and down the

24   subway.

25             THE COURT:  I will excuse you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L31AWEIVD2ps                    Voir Dire

1              JUROR:  Thank you so much.

2              THE COURT:  OK.  Juror No. 25, go up to seat no. 3.

3              So you heard my general questions.  Any of those you

4    need to respond to?

5              Tell us about yourself, as soon as we get you a

6    microphone.

7              JUROR:  Good morning.  I live in Westchester.  I am

8    married.  And my husband and I are both teachers.

9              THE COURT:  Thank you very much.

10             Counsel exercise their third round of challenges, one

11   for the government, two for the defense.

12             MR. FOLLY:  No. 7.

13             THE COURT:  No. 7, you're excused.  And no. 26, please

14   take their seat.

15             Defense counsel.

16             MR. GILBERT:  No. 3.

17             THE COURT:  Are you waiving your other challenge?

18             MR. TAYBACK:  Yes.

19             THE COURT:  OK.  All right.

20             No. 3, you're excused.  And no. --

21             THE CLERK:  27 is in seat 3.

22             THE COURT:  27, take seat 3.

23             OK.  New Juror No. 7, you heard my general questions.

24   Any of those you need to respond to?

25             Tell us about your -- as soon as we get you a

L31AWEIVD2ps               Voir Dire

1   microphone, tell us about yourself.

2              THE WITNESS:  I live in Manhattan.  I'm unemployed.

3   And my wife is a professor at Hunter College.

4              THE COURT:  OK.

5              Juror No. 3, you heard my general questions.  Any of

6   those you need to respond to?  Go up to the microphone.

7              JUROR:  Good morning.  My sister-in-law works at the

8   State Department.

9              THE COURT:  Your sister-in-law?

10             THE CLERK:  Works at the State Department.

11             THE COURT:  Oh, works with the State Department.

12             Anything about that that would prevent you from being

13  a fair and impartial juror in this case?

14             JUROR:  No.

15             THE COURT:  Very good.  Please be seated.

16             As soon as we get a microphone to you, tell us about

17  yourself.  No. 3.

18             JUROR:  I live in Manhattan.  I'm single.  And I'm

19  currently unemployed.

20             THE COURT:  OK.  Counsel exercise their fourth round

21  of challenges, one for the government, two for the defense.

22             MR. FOLLY:  Your Honor, it appears an additional --

23             THE COURT:  Oh, I'm sorry.  Juror No. 7 had something

24  to say.

25             JUROR:  Hello.  I've been waiting for an appointment

DJA286

L31AWEIVD2ps                    Voir Dire

1    to get a vaccine for a long time like a lot of people, and I

2    just got one for Wednesday at noon, at Tisch Hospital.

3              THE COURT:  Well, we may be able to accommodate you by

4    moving our lunch period a little bit earlier that day.  So I

5    think we can work that out.  Thank you very much for bringing

6    that to my attention.  We'll be sure that you get your shot.

7              MR. FOLLY:  Juror No. 12.

8              THE COURT:  Juror No. 12.

9              Defense counsel?

10             MR. GILBERT:  7, your Honor.

11             THE COURT:  7.  And do you waive your other challenge?

12             MR. TAYBACK:  I'm sorry.  Yes.

13             THE COURT:  OK.  So no. 28, please take seat 12.  And

14   29 take seat 7.

15             So Juror No. 12, new Juror No. 12, sir, you're now

16   no. 12.

17             JUROR:  Yes.

18             THE COURT:  So did you hear my general questions

19   before?

20             JUROR:  Yes.

21             THE COURT:  Any of those you need to respond to?

22             JUROR:  I live in the Bronx.  I'm married.

23             THE COURT:  I can't hear you.

24             JUROR:  I live in the Bronx.  I'm married.  And I'm

25   retired.

DJA287

L31AWEIVD2ps                    Voir Dire

1          THE COURT:  OK.  So that's fine.

2          Juror No. 7, you heard my general questions.  Any of

3    those you need to respond to?

4          No?

5          Tell us about yourself.

6          JUROR:  I live in Mount Vernon.  I work with Levy Ad

7    Experience.

8          THE COURT:  Very good.

9          All right.  Counsel exercise their fifth round.  And

10   this round is one challenge for each side.  So the two

11   defendants will collectively exercise one challenge.

12         MR. FOLLY:  Juror No. 8.

13         THE COURT:  OK.  Juror No. 8, you're excused.  And

14   Juror 29?

15         THE CLERK:  30.

16         THE COURT:  30.  Juror 30, please take that seat.

17         And on the defense?

18         MR. GILBERT:  No. 4, your Honor.

19         THE COURT:  Juror No. 4, you're excused.  And Juror

20   No. 31, please take that seat.

21         So Juror No. 8, you heard my general questions.  Any

22   of those you need to respond to?

23         No.

24         Tell us about yourself.

25         JUROR:  I live in the Bronx and I work like a chef,

DJA288

L31AWEIVD2ps                    Voir Dire

1   and my husband right now is unemployed.

2           THE COURT:  Very good.  And Juror No. 4, you heard my

3   general questions.  Any of those you need to respond to?

4           JUROR:  My brother was convicted of robbery.

5           THE COURT:  When was it?

6           When was that?

7           JUROR:  13 something like that.

8           THE COURT:  Are you close to him?

9           JUROR:  Yes.

10          THE COURT:  OK.  We will excuse you.

11          Juror No. 32, please take seat no. 4.

12          So you heard my general questions.  Any of those you

13  need to respond to?

14          JUROR:  Yes.

15          THE COURT:  Go ahead.

16          JUROR:  My name is Schmuel Schechter.  I'm

17  self-employed and I'm running two companies right now.  And I

18  can't afford to take off three weeks.  I'm running it myself

19  and my partner.

20          THE COURT:  All right.  I'll excuse you.

21          JUROR:  Thank you.

22          THE COURT:  Juror No. 33, please take seat no. 4.

23          So you heard my general questions.  Any of those you

24  need to respond to?

25          JUROR:  No.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA289

L31AWEIVD2ps                    Voir Dire

1           THE COURT:  Tell us about yourself.

2           JUROR:  I live in Putnam County and I'm a

3    self-employed automation engineer, and my wife is helping me

4    out with the business.

5           THE COURT:  Thank you very much.

6           Counsel exercise their final round of challenges, one

7    challenge per side.

8           MR. FOLLY:  We would like to waive our challenge.

9           THE COURT:  All right.  The government waives its

10   challenge.

11          MR. GILBERT:  12, your Honor.

12          THE COURT:  And the defense.

13          So, ladies and gentlemen, you are our jury to try this

14   case, but in an excess of caution --

15          MR. GILBERT:  Your Honor, we picked 12.

16          THE COURT:  Oh, you said 12.  I'm sorry.  I thought

17   you said --

18          THE CLERK:  Will Juror No. 34 please sit in seat 12.

19          THE COURT:  So Juror No. 12, you heard my general

20   questions.  Any of those you need to respond to?

21          JUROR:  No, sir.

22          THE COURT:  Tell us about yourself.

23          JUROR:  I live in the Bronx.  I have a significant

24   other.  He works for the Post Office.  And I'm a retired

25   correction officer.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA290

L31AWEIVD2ps                    Voir Dire

1              THE COURT:  Thank you very much.

2              So you are our jury to try this case, but in an excess

3    of caution, we're going to choose four alternates in case for

4    any reason someone has to be excused.

5              What number are we up to?

6              THE CLERK:  35.

7              THE COURT:  35, you should go to seat 13.  36, you

8    should go to seat 14.  37, you should go to seat 15.  And 38,

9    you should go to seat 16.

10             OK.  No. 13, you heard my general questions.  Any of

11   those you need to respond to?

12             JUROR:  No, sir.

13             THE COURT:  I'm sorry.  I'm looking at the wrong --

14   tell us about yourself.

15             JUROR:  Sure.  I live in Westchester County.  I'm a

16   fundraising consultant.  My wife is a school teacher.

17             THE COURT:  Thank you very much.

18             No. 13 -- oh, excuse me.  No. 14.  I'm sorry.  14.

19             JUROR:  Hi.  My problem is I'm a sole entrepreneur, so

20   I can't miss three weeks of work.

21             (Continued on next page)

22

23

24

25

**DJA291**

L31PWEIvd3                    Voir dire

1      THE COURT:  What kind of work do you do?

2      JUROR:  I have a tech startup.

3      THE COURT:  Okay, I will excuse you.

4      THE DEPUTY CLERK:  No. 39, please sit in seat 14.

5      THE COURT:  So No. 14, you heard my general questions.

6   Any of those you need to respond to?  Tell us about yourself.

7      JUROR:  I'm a special ed educator.  My husband --

8   well, my fiancé is a seventh grade teacher.  I live in the East

9   Bronx.  I work in the East Bronx.

10      THE COURT:  Very good.  No. 15, you heard my general

11   questions.  Any of those you need to respond to?

12      JUROR:  Yes, I have a twin brother that was arrested

13   in connection to insurance fraud and credit card fraud.

14      THE COURT:  Okay.  We will excuse you.

15      So we're up to 40, Linda?

16      THE DEPUTY CLERK:  Yes.

17      THE COURT:  40, take seat No. 15.  No. 15, you heard

18   my general questions.  Any of those you need to respond to?

19      JUROR:  No.

20      THE COURT:  Tell us about yourself.

21      JUROR:  Westchester, single and I work for JP Morgan.

22      THE COURT:  And finally, juror No. 16.  Juror No. 16,

23   you heard my general questions.  Any of those you need to

24   respond to?

25      JUROR:  Yes, your Honor.  I'm an electrical

DJA292

35

L31PWEIvd3                    Voir dire

1    contractor.  I'm a sole proprietor.  I work by myself.  I have

2    no other employees.

3              THE COURT:  I'll excuse you.

4              JUROR:  Thank you.

5              THE COURT:  No. 41, please take seat No. 16.  So

6    No. 16, you heard my general questions.  Any of those you need

7    to respond to?

8              JUROR:  Yes, your Honor.  My medication that I take

9    for my high blood pressure, a side effect is frequent

10   urination, hydrochlorothiazide, 25 milligrams daily.  I didn't

11   take it today because I knew I would be sitting for a long

12   time.

13             THE COURT:  Okay, I'll excuse you.

14             THE DEPUTY CLERK:  No. 42, please take seat 16.

15             THE COURT:  No. 16, you heard my general questions.

16   Any of those you need to respond to?

17             JUROR:  I'm from The Bronx and I work in a nursing

18   facility.  I'm a widow recently and some days I just don't

19   function well.

20             THE COURT:  I'm sorry?  I couldn't hear the last part.

21             JUROR:  I'm from The Bronx, and I work in a nursing

22   facility.  I recently became a widow a couple of months ago and

23   some days, I just can't function.

24             THE COURT:  Okay.  We will excuse you.

25             THE DEPUTY CLERK:  No. 45, please take --

DJA293

36

L31PWEIvd3                    Voir dire

1           THE COURT:  No, no, 43.

2           THE DEPUTY CLERK:  Oh, there is no 43, and there's no

3      44.  There's only 45.

4           THE COURT:  We'll need to bring up --

5           THE DEPUTY CLERK:  No. 45 for seat 16.

6           THE COURT:  I think we should bring up about ten

7      jurors.

8           (Pause)

9           THE COURT:  Is Mark Blume here?

10          JUROR:  Yes, right here.

11          THE DEPUTY CLERK:  Are you getting a vaccine?  Are you

12     the guy, or was it --

13          THE COURT:  No, it was for someone else, I thought.

14          MS. LA MORTE:  I think he was excused.

15          THE COURT:  Yes, he was excused.

16          THE DEPUTY CLERK:  Okay, great.

17          THE COURT:  Yes.

18          But it's nice to know your name.

19          JUROR:  I'm like everyone else.

20          THE COURT:  While we're waiting for the other jurors

21     to come from another room, just to give you a heads up, ladies

22     and gentlemen that are part of this jury, after we have the

23     last alternates chosen, which will be a few minutes, we're

24     going to excuse you for lunch, but before you go to lunch, my

25     courtroom deputy will take you to the courtroom where you will

DJA294

L31PWEIvd3                    Voir dire

1    come in each morning and where you will leave at the end of the

2    day.  It's different from the courtroom where we have

3    testimony.  It's different for you, and that's where you'll

4    come in in the morning and where you'll, in the evening, go

5    out.  So we want you to be familiar with that.

6              So after lunch, we'll bring you up to the courtroom

7    where we're hearing testimony, and you'll hear just the opening

8    argument of counsel, and each counsel has 30 minutes; so we'll

9    end probably a little early today.

10             All right.  I see we have some jurors coming in.

11             THE COURT:  So juror No. 16, you heard my general

12   questions.  Any of those you need to respond to?

13             JUROR:  No, I am the sole income of my household, but

14   other than that, nope.

15             THE COURT:  All right.  What do you do?

16             JUROR:  Contract web designer.

17             THE COURT:  You do that chiefly remotely, yes?

18             JUROR:  Remote, yes.

19             THE COURT:  And so you would be able to -- you could

20   do it in the early morning, you could do it in the late

21   afternoon and the evening?

22             JUROR:  Yes, I could.

23             THE COURT:  I don't think I can excuse you, but thank

24   you very much for raising that.

25             JUROR:  Okay.  Thank you.

DJA295

L31PWEIvd3                    Voir dire

1          THE COURT:  Counsel, exercise with respect to the

2     alternates, two rounds of challenges.  In the first round, it's

3     one for the government and two for the defense, and the second

4     round is one and one.  So this is your first alternate

5     challenge.

6          MR. FOLLY:  Your Honor, we're going to waive.

7          THE COURT:  The government waives.

8          MR. GILBERT:  15, your Honor.

9          THE COURT:  15.  Okay.

10         THE DEPUTY CLERK:  Juror No. 47 is now in seat 15.

11         THE COURT:  Okay.  Juror No. 15, you heard my general

12    questions.  Any of those you need to respond to?

13         JUROR:  Yes, your Honor.  I work very closely with law

14    enforcement and the district attorney's office.

15         THE COURT:  When you say you work very closely, what

16    do you do?

17         JUROR:  I am the director of a child advocacy center;

18    so I coordinate the team investigations for child abuse

19    allegations.  I supervise crime victim advocates for forensic

20    interviewers.  The only thing is I do have an appointment for

21    vaccine.  I don't have the time yet, but it's March 11th.

22         THE COURT:  It's borderline-ish, but I will excuse

23    you.

24         THE DEPUTY CLERK:  Thank you.  Seat No. 15 should now

25    be occupied by juror No. 48.

**DJA296**

L31PWEIvd3                    Voir dire

1          THE COURT:  So juror No. 15, you heard my general

2     questions.  Any of those you need to respond to?

3          JUROR:  Yes.  I am a nurse, and I'm the only nurse

4     with the doctor that I'm working with.

5          THE COURT:  Yes, you're excused.

6          THE DEPUTY CLERK:  Seat No. 15 should now be occupied

7     by juror No. 49.

8          THE COURT:  Juror No. 15, you heard my questions.  Any

9     of those you need to respond to?

10          JUROR:  Judge, I did not hear the names of the defense

11     counsel but I believe I heard Tara LaMorte of the government,

12     and I do know Tara.

13          THE COURT:  In what respect do you know her?

14          JUROR:  We were colleagues when I was the review

15     officer in the case of United States v. District Council of

16     Carpenters, according to Judge Berman.  Tara was in the civil

17     division handling the case of the government with another

18     colleague.

19          THE COURT:  All right.  Is there anything about that

20     prior experience that would prevent you from being a fair and

21     impartial juror in this case?

22          JUROR:  No.

23          THE COURT:  Tell us about yourself.

24          JUROR:  I'm an attorney.  I live in Manhattan, and I'm

25     single.

L31PWEIvd3                     Voir dire

1           THE COURT:  Okay.  Counsel, exercise their final round

2     of challenges, one for each side.

3           MR. FOLLY:  We'd like to waive, your Honor.

4           THE COURT:  Okay.  The government waives.

5           MR. TAYBACK:  Your Honor, could I just clarify?  The

6     juror sitting here is 15 or 16?

7           THE COURT:  15.

8           MR. TAYBACK:  Okay.  Strike 15.

9           THE COURT:  Okay, 15.

10          THE DEPUTY CLERK:  Juror No. 50 should now sit in seat

11    15.

12          THE COURT:  Juror No. 15, you heard my general

13    questions.  Any of those you need to respond to?

14          JUROR:  I live in The Bronx.  I'm married.  I'm a

15    pastor.

16          THE COURT:  Yes.

17          JUROR:  Also, I'm a healthcare worker.

18          THE COURT:  Thank you very much.  Okay.  Ladies and

19    gentlemen, you are the jury to try this case.

20          Now, a couple of housekeeping rules.  You should not

21    discuss this case with anyone outside.  Now, you may have to

22    tell an employer or a significant other that you're on jury

23    duty and it might last as much as three weeks, but then when

24    they inevitably say, well, what's the case about, you have to

25    say, I can't tell you.  The judge said I'm not allowed to

41

L31PWEIvd3                    Voir dire

1    discuss it.

2          And the reason is we want you to decide this case not

3    on what you hear from someone who wasn't here and didn't hear

4    the testimony, but on what you hear from what occurs in court,

5    from the evidence.  The evidence will be from witnesses and

6    from exhibits and there may be what we call stipulations, where

7    the parties agree on a fact.  Those are the only sources of

8    evidence, and we don't want you to have any other sources of

9    evidence.

10          So along the same lines, you shouldn't try to Google

11   the case.  You shouldn't try, in the unlikely event you see

12   anything in the media about it, just turn away.  Focus your

13   attention totally on what occurs in court.

14          A second rule, which is a little less obvious, is you

15   should not discuss the case even among yourselves until it's

16   given to you for your deliberations at the close of all of the

17   evidence.  And the reason for that rule is that the evidence is

18   going to come in a little bit at a time.  It will be quite a

19   while before you have the full picture; so we don't want you to

20   start forming opinions until you've heard all of the evidence.

21          And the final rule, which is really not a rule for you

22   but I want you to be aware of it, all the witnesses and all the

23   attorneys in this case and all the parties are under very

24   strict orders to have no contact with you whatsoever.  So if

25   you run into someone outside the courthouse coming in in the

L31PWEIvd3                    Voir dire

1   morning, or something like that, and they don't even -- and

2   they're one of the lawyers and they don't even smile or say

3   hello, it's not because they're being rude.  It's because

4   they're under very strict orders to have no contact with you

5   whatsoever.

6        Okay.  We're going to swear you in now and then please

7   follow my courtroom deputy, and she will take you to first

8   where you're going to have lunch and also where you will come

9   in in the morning and leave in the evening.  It's now 20 after

10  12:00.  At 20 after 1:00 we'll bring you up to that courtroom.

11  Let's say, maybe we'll say 1:30 to be sure.  At 1:30 we'll

12  bring you up.  You'll hear the opening arguments of counsel.

13  That will take us until 3:00, and then we'll adjourn for today

14  and start the first witness tomorrow.

15        So, Linda, if you would swear them in.

16        (Jury sworn)

17        THE COURT:  Yes, the jurors that we didn't have to

18  use, you are excused, and thank you so much for being

19  available.

20        We'll have to do this in groups.

21        Counsel, you're excused until 1:25.  At 1:25, I'll

22  meet you in the courtroom.

23        (Trial follows)

24

25

DJA300

1

L31AWEI1ps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                              20-cr-188 (JSR)

5   RUBEN WEIGAND and
    HAMID AKHAVAN,
6
              Defendants.              Trial
7   ------------------------------x

8
                                    New York, N.Y.
9
                                    March 1, 2021
10                                  9:15 a.m.

11
    Before:
12
                    HON. JED S. RAKOFF
13
                                    District Judge
14

15

16

17

18

19

20

21

22

23

24

25

DJA301

```
     L31AWEI1ps

1                                    APPEARANCES

2    AUDREY STRAUSS
         United States Attorney for the
3        Southern District of New York
     BY:  NICHOLAS FOLLY
4        TARA MARIE LA MORTE
         EMILY S. DEININGER
5        CHRISTOPHER J. DIMASE
         Assistant United States Attorneys
6
     DECHERT LLP
7        Attorneys for Defendant Weigand
     BY:  MICHAEL J. GILBERT
8        SHRIRAM HARID
         ANDREW J. LEVANDER
9        STEPHEN PELLECHI
         -and-
10   MICHAEL H. ARTAN
         Attorney for Defendant Weigand
11       -and-
     WILSON, SONSINI, GOODRICH
12       Attorneys for Defendant Weigand
     BY:  MORRIS J. FODERMAN
13       KATHERINE T. MCCARTHY

14   QUINN EMANUEL URQUHART & SULLIVAN, LLP
         Attorneys for Defendant Akhavan
15   BY:  WILLIAM A. BURCK
         CHRISTOPHER TAYBACK
16       SARA CLARK
         MARI HENDERSON
17       DEREK SHAFFER
         PAUL SLATTERY
18       -and-
     ROTHKEN LAW FIRM LLP
19       Attorneys for Defendant Akhavan
     BY:  IRA P. ROTHKEN
20       JARED R. SMITH

21   WILMER CUTLER PICKERING HALE AND DORR LLP
         Attorneys for Interested Party
22       Bank of America, N.A.
     BY:  JUSTIN GOODYEAR
23
     NELSON MULLINS RILEY & SCARBOROUGH LLP
24       Attorneys for Interested Party
         Circle Internet Financial, LLC
25   BY:  MATTHEW G. LINDENBAUM
```

DJA302

3

1          THE COURT:  All right.  Since Mr. Akhavan is not here,

2    we'll deal first with some matters that relate only to

3    Mr. Weigand.  But first, will counsel please identify

4    themselves for the record.

5          MR. FOLLY:  Good morning, your Honor.  Nicholas Folly,

6    Tara La Morte, and Emily Deininger for the government.

7          MR. GILBERT:  Good morning, your Honor.  Michael

8    Gilbert on behalf of Mr. Weigand.

9          THE COURT:  Who else?  Oh, is that Mr. Weigand there?

10          MR. GILBERT:  Yes, that is Mr. Weigand sitting next to

11    me.

12          DEFENDANT WEIGAND:  Good morning, your Honor.

13          MR. TAYBACK:  Good morning, your Honor.  Christopher

14    Tayback on behalf of Mr. Akhavan.  Behind me is Mr. Burck and

15    Sara Clark.

16          THE COURT:  OK.  So two matters relating to

17    Mr. Akhavan.

18          The first is that because I didn't think it would be

19    useful to have his armed guard here in the courthouse, what I

20    arranged, and had my law clerk send an email to counsel, was

21    that the armed guard or guards would leave him, make sure he

22    has entered the security area, and then, at the end of the day,

23    we'll have to call them, they'll pick him up once he leaves the

24    courthouse.  Understood?

25          MR. GILBERT:  Yes.  Thank you, your Honor.  I believe

DJA303

4

1    the guard came into the courthouse this morning.  But moving

2    forward it's not necessary --

3            THE COURT:  If they can come in, that's fine.  That's

4    even better.  Because otherwise I was going to suggest that you

5    would have to stick with Mr. Weigand at every moment.  If he

6    went to the men's room you'd have to go to the men's room, etc.

7    So you may prefer to have those important duties left to the

8    armed guard.

9            MR. GILBERT:  I will stick with him, your Honor.

10           THE COURT:  Very good.

11           We had a *Curcio* hearing some months ago, but my

12   understanding is there is some additional *Curcio* matter that

13   the government wishes to have Mr. Weigand questioned about?

14           MS. LA MORTE:  Your Honor, there is one additional

15   *Curcio* matter, but it came to Mr. Akhavan, not Mr. Weigand.

16           THE COURT:  Oh, I see.  Nothing as to Mr. Weigand.

17           MS. LA MORTE:  We were going to redo the *Curcio* that

18   occurred by videoconference with respect to Mr. Weigand.

19           THE COURT:  Because you interpret the statute as

20   requiring it to be in person?

21           MS. LA MORTE:  Yes, your Honor.  There is a -- when

22   you read that provision, it can be interpreted to require that

23   the --

24           THE COURT:  I don't interpret it that way, but, on the

25   other hand, since Mr. Akhavan is here, time is hanging heavy on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA304

5

1    our hands, so go ahead.

2           MS. LA MORTE:  This would be with respect to

3    Mr. Weigand, your Honor.

4           THE COURT:  OK.  So, Mr. Weigand, I'm going to have

5    the government put all the questions that their little hearts

6    desire to you at this time regarding possible conflict.

7           Go ahead.

8           MS. LA MORTE:  Your Honor, would you like me to stand

9    for this?

10          THE COURT:  No.

11          MS. LA MORTE:  OK.

12          THE COURT:  Just as a general matter, because of the

13   pandemic arrangements, I don't think any lawyer needs to stand

14   when making objections or any other -- the only time he needs

15   to stand is when the jury comes into the courtroom and when the

16   jury leaves the courtroom, out of respect for the jury.  But

17   otherwise it's better if you actually sit but speak directly

18   into the mike.

19          While I'm thinking about that, let me mention about

20   objections.  So I do not allow so-called speaking objections.

21   So if you have an objection, you say either -- no more than

22   three words.  The first word is "Objection."  And the second

23   word is either your ground, like "hearsay," "foundation," etc.,

24   or the rule under the Federal Rules of Evidence on which you're

25   basing your objection, like 403.  So if you feel you need a

DJA305

6

```
 1    sidebar, you may ask for one.  Usually I will grant that.  But
 2    I discourage having too many sidebars because, to do sidebars
 3    and not have them heard by the jury, we really have to go into
 4    a separate room down the hallway.  So it always takes a while.
 5    The jury is there twiddling their thumbs.  So I think we need
 6    to try to limit sidebars as much as possible.  But if you want
 7    a sidebar, I will give you a sidebar, unless I think it's
 8    utterly unnecessary.
 9              Any question about that?
10              OK.  So go ahead with the Curcio.
11              MS. LA MORTE:  Mr. Weigand, how old are you?
12              DEFENDANT WEIGAND:  I'm 38.
13              MS. LA MORTE:  How far did you go in school?
14              DEFENDANT WEIGAND:  I have a bachelor's degree.
15              MS. LA MORTE:  Do you currently consult a doctor for
16    any condition?
17              DEFENDANT WEIGAND:  No.
18              MS. LA MORTE:  Are you currently under the influence
19    of alcohol or drugs of any kind?
20              DEFENDANT WEIGAND:  No.
21              MS. LA MORTE:  Are you feeling well enough to proceed
22    with this hearing today?
23              DEFENDANT WEIGAND:  Yes, I do.
24              MS. LA MORTE:  Are you currently represented by
25    Michael Gilbert and Shriram Harid of the law firm of Dechert
```

DJA306

1    LLP and also by Michael Artan?

2              DEFENDANT WEIGAND:  Yes, I am.

3              MS. LA MORTE:  Mr. Gilbert, Mr. Harid, and Mr. Artan

4    are retained or appointed counsel?

5              DEFENDANT WEIGAND:  Retained.

6              MS. LA MORTE:  Do you know that Mr. Harid has applied

7    for a position with the U.S. Attorney's Office for the Southern

8    District of New York --

9              DEFENDANT WEIGAND:  Yes.

10             MS. LA MORTE:  -- that is the office that is

11   prosecuting you?

12             DEFENDANT WEIGAND:  Yes, I know.

13             THE COURT:  I'm sorry, excuse me.  What is the person

14   in the back -- either come in or stay out, but don't just stand

15   there with the door half open.

16             Go ahead.

17             MS. LA MORTE:  Mr. Weigand, because of Mr. Harid's

18   pending application for employment with the U.S. Attorney's

19   Office for the Southern District of New York, I wish to apprise

20   you of certain matters.  It is substantial to the idea of an

21   adequate defense in a criminal proceeding that your attorney

22   has no conflict or adverse interest of any kind.  That is to

23   say, he cannot, unless it is with your knowledge and consent,

24   have any conflicting interest in the case.  You have the right

25   to the assistance of a lawyer whose loyalty to you is undivided

DJA307

8

1    and not subject to any factor that might intrude upon that

2    loyalty.  The purpose of this is to ensure that you have a full

3    devoted defense furnished to you by an attorney who has no

4    other possible interest of any kind in this matter.  Do you

5    understand that?

6              DEFENDANT WEIGAND:  Yes, I understand.

7              MS. LA MORTE:  Do you understand that Mr. Harid's

8    application for employment with the U.S. Attorney's Office for

9    the Southern District of New York as a prosecutor creates a

10   potential that he may have allegiances to interests that may be

11   adverse to your interests?

12             DEFENDANT WEIGAND:  You can see it that way maybe,

13   yes.

14             MS. LA MORTE:  Do you understand that by deciding to

15   proceed with Mr. Harid and Mr. Gilbert, you are waiving any

16   argument as to your sentencing that they were ineffective or

17   deficient in their representation of you because Mr. Harid

18   suffered from a conflict of interest by virtue of his

19   application for a position with the U.S. Attorney's Office?

20             DEFENDANT WEIGAND:  Yes, I understand.

21             MS. LA MORTE:  Have you discussed these conflict-of-

22   interest matters with Mr. Gilbert, Mr. Harid, and Mr. Artan?

23             DEFENDANT WEIGAND:  Yes, I did.

24             MS. LA MORTE:  Are you satisfied with their

25   representation of you?

**DJA308**

9

1    DEFENDANT WEIGAND:  Yes, I am.

2    MS. LA MORTE:  If you could describe for me in your

3    own words your understanding of the conflict of interest that

4    potentially arises from Mr. Harid's representation of you while

5    pursuing his application for a position with the U.S.

6    Attorney's Office.

7    DEFENDANT WEIGAND:  Yeah.  I think it might be that he

8    would represent me less effectively to -- that's -- because

9    trying to get accepted as a prosecutor.

10    (Pause)

11    DEFENDANT WEIGAND:  So you couldn't hear?  OK.

12    I said, you might think that he is defending me less

13    effectively because he thinks that it's increasing his chance

14    to be selected as a U.S. Attorney.

15    MS. LA MORTE:  Mr. Weigand, do you understand that you

16    have a right to consult with a lawyer other than Mr. Gilbert

17    and Mr. Harid in order to determine whether you wish Dechert to

18    represent you?

19    DEFENDANT WEIGAND:  Yes, I know.

20    MS. LA MORTE:  This is a question for Mr. Harid.

21    Mr. Harid, have you discussed the potential conflicts of

22    interest with Mr. Weigand?

23    MR. HARID:  Yes, I have.

24    MS. LA MORTE:  And do you feel that he understands the

25    possible risks of being represented by a lawyer with a

DJA309

10

1    potential conflict of interest?

2            MR. HARID:  I do, yes.

3            MS. LA MORTE:  Mr. Harid, is there anything else you

4    would like the Court to state or inquire about in this regard?

5            MR. HARID:  Nothing else.  Thank you.

6            MS. LA MORTE:  Mr. Weigand, would you like the

7    opportunity to consult with another attorney?

8            DEFENDANT WEIGAND:  No.

9            MS. LA MORTE:  Do you still wish to proceed with

10   Mr. Harid and Dechert as your attorneys in this case?

11           DEFENDANT WEIGAND:  Yes, I want.

12           MS. LA MORTE:  Have you received any inducements,

13   promises, or threats with regard to your choice of counsel in

14   this case?

15           DEFENDANT WEIGAND:  No.

16           MS. LA MORTE:  Do you agree to waive any and all

17   future arguments on appeal or otherwise that you were denied

18   effective assistance of counsel because of Mr. Harid's pursuit

19   of a position as a federal prosecutor with the Southern

20   District of New York?

21           DEFENDANT WEIGAND:  Yes.

22           MS. LA MORTE:  Is your waiver of your right to

23   conflict-free representation voluntary?

24           DEFENDANT WEIGAND:  Yes.

25           MS. LA MORTE:  No further questions from the

DJA310

11

1    government.

2            THE COURT:  All right.

3            I find that Mr. Weigand fully understands the

4    potential conflict and has waived the conflict and can proceed.

5            I think we can proceed with the rulings on the motions

6    in limine for both parties, or all three parties, because this

7    could have taken the form of a written order from me, and

8    therefore it's not necessary that Mr. Akhavan be present, but

9    of course I will leave it to his counsel to inform him of those

10   rulings when he arrives.

11           This is in no particular order, but I would note for

12   the record first, there is no right to a motion in limine.  You

13   will not find motions in limine listed anywhere in the federal

14   rules.  They are a convenience for the parties, and I try to

15   accommodate those conveniences.  However, every one of my

16   rulings is subject to reconsideration if a party so-called

17   opens the door.  So if I've excluded some evidence and then the

18   door is opened, then the adversary party can reraise the

19   question at that time.  So being very aware of that, there may

20   be other reasons for reconsideration, but that would be usually

21   the only one.

22           So the first motion that I want to rule on is the

23   government's motion in limine no. 4, to preclude evidence or

24   argument regarding whether it was "reasonable" for banks to

25   process marijuana-related transactions.  That motion is

DJA311

12

1    granted, and that area will be excluded.

2              The second is the government's motion in limine no. 2

3    to preclude evidence or argument regarding federal enforcement

4    of marijuana laws, legalization of marijuana in certain states

5    and/or countries, and efforts to legalize marijuana.  That

6    motion is granted in part, excluding evidence relating to

7    federal efforts to legalize marijuana or to offer safe harbors

8    to banks.  In all other respects, I will take it up as the

9    matter is raised.  So with respect to these motions in limine,

10   if I reserve on any matter, then when a question is about to be

11   put to a witness -- here's Mr. Akhavan.

12              All right.  Mr. Akhavan is here.  So let me interrupt

13   the motions in limine.  Let's do the *Curcio* hearing with

14   respect to Mr. Akhavan.

15              MS. LA MORTE:  Yes, your Honor.  There are two

16   matters, two *Curcio*s, that have to occur with respect to

17   Mr. Akhavan.  One is the one that we had conducted before.  And

18   then the other one is a separate potential conflict for which

19   the government submitted a letter yesterday.  And so I will

20   start with the one that we had already done before.

21              THE COURT:  That's fine.

22              MS. LA MORTE:  Mr. Akhavan, how old are you?

23              DEFENDANT AKHAVAN:  42.

24              THE COURT:  You want to bring the microphone --

25              DEFENDANT AKHAVAN:  42, ma'am.

DJA312

13

1        THE COURT:  Very good.

2        MS. LA MORTE:  How far did you go in school?

3        DEFENDANT AKHAVAN:  High school, ma'am.

4        MS. LA MORTE:  Do you currently consult a doctor or

5   mental health professional for any condition?

6        DEFENDANT AKHAVAN:  No, ma'am.

7        MS. LA MORTE:  Are you currently under the influence

8   of alcohol, drugs, or medication of any kind?

9        DEFENDANT AKHAVAN:  No, ma'am.

10       MS. LA MORTE:  Do you understand what is happening

11   today?

12       DEFENDANT AKHAVAN:  Yes, ma'am.

13       MS. LA MORTE:  Mr. Akhavan, do you wish to have Quinn

14   Emanuel Urquhart & Sullivan, which I will abbreviate to Quinn

15   Emanuel, including attorneys Christopher Tayback and William

16   Burck, represent you in this matter?

17       DEFENDANT AKHAVAN:  Yes, ma'am.

18       THE COURT:  Do you wish to have Ira Rothken of the

19   Rothken Law Firm represent you in this matter?

20       DEFENDANT AKHAVAN:  Yes, ma'am.

21       MS. LA MORTE:  Have you been satisfied with the

22   services Quinn Emanuel provided you so far with respect to

23   matter?

24       DEFENDANT AKHAVAN:  Yes, ma'am.

25       MS. LA MORTE:  Has Quinn Emanuel represented you in

**DJA313**

```
1    other matters which occurred before this one?

2              DEFENDANT AKHAVAN:  No, ma'am.

3              MS. LA MORTE:  Turning to Mr. Rothken, have you been

4    satisfied with the services Mr. Rothken has provided you so far

5    with respect to this matter?

6              DEFENDANT AKHAVAN:  Yes, ma'am.

7              MS. LA MORTE:  Has Mr. Rothken represented you in

8    other matters which occurred before this one?

9              DEFENDANT AKHAVAN:  Not me directly, but my company.

10             MS. LA MORTE:  Were you satisfied with Mr. Rothken's

11   representation of your company in the prior matter?

12             DEFENDANT AKHAVAN:  Yes, ma'am.

13             MS. LA MORTE:  Your Honor, previously when we had done

14   this, we had referred to two particular individuals that are

15   involved as subject one and subject two.  May I have a moment

16   to consult as to whether we should use their names or continue

17   to refer to them in that manner?

18             THE COURT:  I think you should.

19             MS. LA MORTE:  Thank you.

20             Thank you, your Honor.

21             THE COURT:  That reminds me of something else I want

22   to check while it's on my mind.  The government has given me

23   three immunity orders.  When you're about to call a witness who

24   needs immunity, ask for a sidebar, and we will bring the

25   witness into the sidebar area, and I'll question him as to his
```

DJA314

15

1   taking the Fifth and I'll grant him immunity, and then and only
2   then will I sign the order.  So that is my practice, but we do
3   that out of the presence of the jury.
4          OK.  Go ahead.
5          And one other thing.  What's the full name of Quinn
6   Emanuel?
7          MS. LA MORTE:  I probably butchered it when I
8   pronounced it.  I can let them tell you.
9          MR. TAYBACK:  Quinn Emanuel Urquhart & Sullivan, your
10  Honor.
11         THE COURT:  I think the worst fate of the world is to
12  the third or fourth name in any law firm.
13         MS. LA MORTE:  OK, Mr. Akhavan.  Has Quinn Emanuel
14  informed you that they represent Ardhashir Akhavan, your
15  brother --
16         DEFENDANT WEIGAND:  Yes, ma'am.
17         MS. LA MORTE:  -- and Guy Mizrachi, who the government
18  asserts are subjects of the bank fraud conspiracy charge
19  brought against you in this case?
20         DEFENDANT AKHAVAN:  Yes, ma'am.
21         MS. LA MORTE:  Have your attorneys discussed with you
22  their representation of Ardhashir Akhavan?
23         DEFENDANT AKHAVAN:  Yes, ma'am.
24         MS. LA MORTE:  Have they discussed with you their
25  representation of Guy Mizrachi?

DJA315

1          DEFENDANT AKHAVAN:  Yes, ma'am.

2          MS. LA MORTE:  Do you understand that Quinn Emanuel

3    has a duty of loyalty to your brother and Mr. Mizrachi and that

4    they are required by their duty of loyalty to serve the best

5    interests of your brother and Mr. Mizrachi as well as your best

6    interests?

7          DEFENDANT AKHAVAN:  Yes, ma'am.

8          MS. LA MORTE:  Do you understand that your attorney's

9    representations of your brother and Mr. Mizrachi may put them

10   in a position where their duty to them conflicts with their

11   duty to you?

12         DEFENDANT AKHAVAN:  Yes, ma'am.

13         MS. LA MORTE:  And do you understand that it may be in

14   the best interests of your brother and Mr. Mizrachi to take

15   certain positions or actions that may be harmful to your

16   interest in this case?

17         DEFENDANT AKHAVAN:  Yes, ma'am.

18         MS. LA MORTE:  And do you understand that if you

19   continue to be represented by Quinn Emanuel, they cannot advise

20   or help you in doing anything that would hurt your brother or

21   Mr. Mizrachi, even if it's in your best interests that they do

22   so?

23         DEFENDANT AKHAVAN:  Yes, ma'am.

24         MS. LA MORTE:  Are you aware that your attorney may

25   have learned information from your brother and Mr. Mizrachi

DJA316

```
 1   that may be helpful in defending you but they are absolutely

 2   prohibited from using it to defend you because of the

 3   attorney-client privilege?

 4            DEFENDANT AKHAVAN:  Yes, ma'am.

 5            MS. LA MORTE:  Do you understand that Quinn Emanuel

 6   cannot help you in providing assistance to the government if

 7   you wish to do so that might hurt your brother or Mr. Mizrachi,

 8   even if it turns out that providing assistance for the

 9   government might be in your best interests?

10            DEFENDANT AKHAVAN:  Yes, ma'am.

11            MS. LA MORTE:  Do you understand that your attorneys

12   may not wish to take positions in your case before, during

13   trial, or at sentencing, that are critical of or harmful to the

14   interests of your brother or Mr. Mizrachi, even if criticizing

15   one of them -- one or both of them might be helpful for your

16   defense?

17            DEFENDANT AKHAVAN:  Yes, ma'am.

18            MS. LA MORTE:  Do you understand that should you go to

19   trial, Quinn Emanuel may refrain from making certain

20   arguments -- well, we are going to trial -- at your trial or at

21   some other proceeding, even though such arguments may be

22   beneficial to you, because of their representation of

23   Mr. Mizrachi and your brother?

24            DEFENDANT AKHAVAN:  Yes, ma'am.

25            MS. LA MORTE:  So that we are sure that you fully
```

**DJA317**

18

1    understand these issues, could you describe in your own words

2    your understanding of the potential problems created by Quinn

3    Emanuel's role as your attorney in this case and as counsel for

4    your brother and Mr. Mizrachi?

5         DEFENDANT AKHAVAN:  I understand it.  We've been

6    through it and had a *Curcio* hearing before, and they explained

7    everything to me, and I -- I'm good with it.

8         MS. LA MORTE:  So you do understand that your

9    attorneys may wish to take certain positions in your case that

10   they are unable to take due to their duty of loyalty to

11   Mr. Mizrachi and your brother?

12        DEFENDANT AKHAVAN:  Yes, ma'am.  He is my brother.

13        MS. LA MORTE:  Do you understand that in every

14   criminal case, including this one, a defendant is entitled to

15   assistance of counsel whose loyalty to him is undivided?

16        DEFENDANT AKHAVAN:  Yes, ma'am.

17        MS. LA MORTE:  Have you had the opportunity to speak

18   with Quinn Emanuel about the conflict of interest issues that

19   have arisen because of their representation of your brother?

20        DEFENDANT AKHAVAN:  Yes, ma'am.

21        MS. LA MORTE:  And with respect to their

22   representation of Mr. Mizrachi, have you had the opportunity to

23   speak with them about that?

24        DEFENDANT AKHAVAN:  Yes, ma'am.

25        MS. LA MORTE:  Has Quinn Emanuel informed you that

**DJA318**

19

1    they currently also represent Quantum Solutions?

2              DEFENDANT AKHAVAN:  Yes, ma'am.

3              MS. LA MORTE:  Has Mr. Rothken informed you that he

4    also currently represents Quantum Solutions?

5              DEFENDANT AKHAVAN:  Yes, ma'am.

6              MS. LA MORTE:  Are you aware that the government

7    asserts that Quantum Solutions is a subject of the bank fraud

8    conspiracy charge in this case?

9              DEFENDANT AKHAVAN:  Yes, ma'am.

10             MS. LA MORTE:  And you're aware that Mr. Rothken

11   previously represented Quantum Solutions in civil litigation

12   that involved some of the same allegations as those charged in

13   this criminal case against you?

14             MR. TAYBACK:  May I have one moment, your Honor?

15             DEFENDANT AKHAVAN:  I'm aware that he sent some emails

16   that may come up in the course of the trial, and it's -- I'm OK

17   with it.

18             MS. LA MORTE:  So that is a different issue.  Just to

19   be clear, I'm inquiring as to whether you understand that

20   Mr. Rothken had previously represented Quantum Solutions in a

21   civil case that involved some of the same allegations that are

22   at issue in this criminal case.

23             DEFENDANT AKHAVAN:  Yes, ma'am.

24             MS. LA MORTE:  Has Quinn Emanuel discussed with you

25   their representation of Quantum Solutions?

DJA319

1          DEFENDANT AKHAVAN:  Yes, ma'am.

2          MS. LA MORTE:  And has Mr. Rothken discussed with you

3    his current and previous representation of Quantum Solutions?

4          DEFENDANT AKHAVAN:  Yes, ma'am.

5          MS. LA MORTE:  So previously we discussed the duty of

6    loyalty that an attorney owes a client.  Do you understand that

7    Quinn Emanuel and Mr. Rothken both owe a duty of loyalty to the

8    company?

9          DEFENDANT AKHAVAN:  Yes, ma'am.

10         MS. LA MORTE:  And do you understand that the fact

11   that your attorneys represent both you and Quantum Solutions

12   may lead them to have divided loyalties between yourself and

13   the company?

14         DEFENDANT AKHAVAN:  Yes, ma'am.

15         MS. LA MORTE:  Do you understand that your attorneys

16   may have an incentive to put the interests of the company

17   before yours?

18         DEFENDANT AKHAVAN:  Yes, ma'am.

19         MS. LA MORTE:  Do you understand that your attorneys

20   may have learned certain information from their previous or

21   current representation of the company that is beneficial to

22   your defense, if the government doesn't grant permission, your

23   lawyers would be forbidden from using this information when

24   they're representing you?

25         DEFENDANT AKHAVAN:  Yes, ma'am.

DJA320

1          MS. LA MORTE:  Do you understand that it may be in the

2    best interests of the company to take certain positions --

3    Quantum Solutions -- to take certain positions or actions that

4    are harmful to your interests in this case?

5          DEFENDANT AKHAVAN:  Yes, ma'am.

6          MS. LA MORTE:  Do you understand that your attorneys

7    may not wish to take positions on your behalf throughout the

8    very stages of this case that are critical of Quantum Solution,

9    even if criticizing that company may be helpful to your

10    defense?

11          DEFENDANT AKHAVAN:  Yes, ma'am.

12          MS. LA MORTE:  Do you understand that your attorneys

13    may be limited in making arguments about your level of

14    involvement in the offense, the role in the offense, and your

15    culpability?

16          DEFENDANT AKHAVAN:  Yes, ma'am.

17          MS. LA MORTE:  Mr. Akhavan, do you understand that you

18    are entitled to an attorney who only has your interests in mind

19    and not the interests of any other person or third party?

20          DEFENDANT AKHAVAN:  Yes, ma'am.

21          MS. LA MORTE:  Have you received any inducements,

22    promises, or threats with regard to your choice of counsel in

23    this case?

24          DEFENDANT AKHAVAN:  No, ma'am.

25          MS. LA MORTE:  Do you understand, if you choose to

DJA321

1    continue with representation by Quinn Emanuel and Mr. Rothken,

2    you're waiving your right to be represented solely by attorneys

3    who have no potential conflict of interest?

4            DEFENDANT AKHAVAN:  Yes, ma'am.

5            MS. LA MORTE:  And do you agree that if the Court

6    permits you to proceed with Quinn Emanuel and Mr. Rothken, in

7    the event that you are convicted, you will not be permitted to

8    make any argument, on appeal or otherwise, based on the

9    representation of Quinn Emanuel and/or Mr. Rothken and the

10   conflicts or potential conflicts that we've been discussing?

11           DEFENDANT AKHAVAN:  Yes, ma'am.

12           MS. LA MORTE:  Do you agree to waive and give up any

13   argument of that kind?

14           DEFENDANT AKHAVAN:  I do.

15           MS. LA MORTE:  Do you wish to consult with -- you have

16   the right to consult with separate counsel if you wish

17   regarding these potential conflicts of interest.  Do you wish

18   to do that?

19           DEFENDANT AKHAVAN:  No, thanks.

20           MS. LA MORTE:  Your Honor, no further questions from

21   the government.

22           THE COURT:  All right.  Thank you very much.

23           I find that Mr. Akhavan is fully aware of the

24   potential conflicts that have been raised with him and that he

25   has knowingly and voluntarily waived those conflicts.  So he

DJA322

23

1    can continue to be represented by Quinn Emanuel.

2            Going back to the motions --

3            MS. LA MORTE:  Your Honor, there was one more

4    potential conflict, the new potential conflict.

5            THE COURT:  Oh, yes.  I'm sorry.  Go ahead.

6            MS. LA MORTE:  I'll turn it over to Mr. Folly for

7    that.

8            MR. FOLLY:  Mr. Akhavan, you stated earlier that you

9    are represented by Christopher Tayback and William Burck from

10   Quinn Emanuel, as well as Ira Rothken of the Rothken Law Firm.

11   Is that correct?

12           DEFENDANT AKHAVAN:  Yes, sir.

13           MR. FOLLY:  Are they retained counsel?

14           DEFENDANT AKHAVAN:  Yes, sir.

15           MR. FOLLY:  Are you aware that, at trial, certain

16   evidence could be introduced that refers to Mr. Rothken's

17   involvement in negotiations with the company Eaze, regarding an

18   exclusive processing relationship with your company?

19           DEFENDANT AKHAVAN:  Yes, sir.

20           MR. FOLLY:  Because of this, it is possible that you

21   may wish to advance defense theories that might reflect

22   adversely on Mr. Rothken and he might not want to pursue those

23   theories, because it might reflect adversely on him.  Do you

24   understand that?

25           DEFENDANT AKHAVAN:  Yes, sir.

DJA323

24

1          MR. FOLLY:  Because it could create a potential

2     conflict of interest, I wish to advise you of certain matters.

3     You should understand that, under the Constitution and the laws

4     of this country, you are entitled to the aid and assistance of

5     counsel at all times in these proceedings.  You are entitled to

6     counsel of your own choice unless there is a strong legal

7     reason for disqualifying that counsel.  Do you understand that?

8          DEFENDANT AKHAVAN:  Yes, sir.

9          MR. FOLLY:  You have the right to the assistance of a

10    lawyer whose loyalty to you is undivided and not subject to any

11    factor that might intrude upon that loyalty.  Do you understand

12    that?

13         DEFENDANT AKHAVAN:  Yes, sir.

14         MR. FOLLY:  Do you understand that because Mr. Rothken

15    might be mentioned at this trial as someone who participated in

16    some of the underlying events that might be discussed at this

17    trial, it creates the potential that he may have interests that

18    may be adverse to your own interests?  Do you understand that?

19         DEFENDANT AKHAVAN:  Yes, sir.

20         MR. FOLLY:  Do you understand that if you proceed with

21    Mr. Rothken, you are waiving any argument as to your sentencing

22    that your lawyers were ineffective or deficient in their

23    representation of you because Mr. Rothken suffered from a

24    conflict of interest by virtue of his involvement in some of

25    the underlying events in this case?

1           DEFENDANT AKHAVAN:  Yes, sir.

2           MR. FOLLY:  Have you had the opportunity to discuss

3    these conflicts-of-interest matters that I've been asking you

4    about with Mr. Burck and Mr. Tayback?

5           DEFENDANT AKHAVAN:  Yes, sir.

6           MR. FOLLY:  Are you satisfied with their

7    representation of you?

8           DEFENDANT WEIGAND:  I am.

9           MR. FOLLY:  Can you please describe in your own words

10   your understanding of the conflict of interest that potentially

11   may arise from Mr. Rothken's representation of you when

12   evidence may be introduced at this trial that refers to his

13   involvement in some of the underlying events in this case.

14          DEFENDANT AKHAVAN:  Mr. Tayback and Mr. Burck have

15   explained it to me, and I understand it, and I'm OK with it.

16          MR. FOLLY:  Can you explain the conflict in your own

17   words?

18          DEFENDANT AKHAVAN:  I understand that Ira, he knows

19   about some agreements and that might cause conflict between him

20   and my interests.

21          MR. FOLLY:  And you understand that he may give advice

22   as a result of that that diverges from your own interests?

23          DEFENDANT AKHAVAN:  I do.

24          MR. FOLLY:  Mr. Tayback, have you discussed the

25   potential conflict of interest with Mr. Akhavan?

DJA325

26

1            MR. TAYBACK:  I have.

2            MR. FOLLY:  Do you feel he understands the possible

3    risks of being represented by a lawyer with a potential

4    conflict of interest?

5            MR. TAYBACK:  I do.

6            MR. FOLLY:  Is there anything else you would like to

7    ask of Mr. Akhavan here today in this regard?

8            MR. TAYBACK:  No.

9            MR. FOLLY:  Mr. Akhavan, is there anything that you

10   wish to have explained further to you?

11           DEFENDANT AKHAVAN:  No, sir.

12           MR. FOLLY:  Do you still wish to proceed with

13   Mr. Rothken as one of your attorneys in this case?

14           DEFENDANT AKHAVAN:  Yes, sir.

15           MR. FOLLY:  Have you received any inducement,

16   promises, or threats with regard to your choice of counsel in

17   this case?

18           DEFENDANT AKHAVAN:  No, sir.

19           MR. FOLLY:  Are you agreeing to waive any and all

20   future arguments on appeal or otherwise that you were denied

21   effective assistance of counsel because of the conflict of

22   interest that we discussed with you here today?

23           DEFENDANT AKHAVAN:  Yes, sir.

24           MR. FOLLY:  Is your waiver of your right to

25   conflict-free counsel voluntary?

DJA326

```
1              DEFENDANT AKHAVAN:  Yes, sir.

2              MR. FOLLY:  No further questions, your Honor.

3              THE COURT:  So I find that Mr. Akhavan fully

4    understands this additional potential conflict and has waived

5    any such conflict and may continue to be represented by Quinn

6    Emanuel, et al., throughout this trial.

7              All right.

8              (Discussion held off the record)

9              THE COURT:  All right.  So we'll continue with the

10   motions in limine.

11             So I was talking about the government's motion in

12   limine no. 2 to preclude evidence or argument regarding federal

13   enforcement of marijuana laws, legalization of marijuana in

14   states and/or countries, and efforts to legalize marijuana

15   federally.  And I had granted the latter part, excluding

16   evidence relating to federal efforts to legalize marijuana or

17   to offer safe harbors to the banks.  And actually I think the

18   defense has not opposed an exclusion.

19             With respect to the rest, as I was beginning to tell

20   you before, I don't think I can rule across the board at this

21   point.  Therefore, before any counsel wants to put a question

22   to the witness related to the federal enforcement of marijuana

23   laws or the legalization of marijuana in certain states and/or

24   countries, they need to ask for a sidebar.  We'll take it up at

25   the sidebar at that time.
```

DJA327

28

1    I'm skeptical that this is really stuff that is the

2    subject of testimony.  For example, the fact that marijuana is

3    legal in certain states I think is an issue of law, which a

4    party can ask and I take judicial notice of the law for that

5    purpose if it's otherwise relevant.  But usually matters of law

6    are not properly a matter of testimony.

7    With respect to the defendant's argument that the

8    federal government ensure the banks that it will not enforce

9    federal law regarding marijuana in states where it was legal

10    and that this is part of their materiality or immateriality

11    argument, are you planning to do that through your own

12    witnesses?  It sounds like hearsay to me.

13    MR. TAYBACK:  Your Honor, it is certainly through our

14    own witnesses.  Our expert -- we have an expert that we

15    proffered, Mr. Gardovan.  But more importantly --

16    THE COURT:  I don't see how an expert can -- it's a

17    fact matter.  It doesn't -- all right.  Go ahead.

18    MR. TAYBACK:  But I would say, more importantly, I

19    think the whole business at the center of this case is the

20    marijuana delivery service.  I think it's reasonable to be able

21    to ask witnesses, some of whom deliver -- continue to work for

22    a company that delivers marijuana.  They do so with the belief

23    they're not going to be prosecuted federally.

24    THE COURT:  That's a different -- their belief is

25    different, from at least what you said to me.  You said in your

1  papers that, quote, the federal government assured the banks

2  that it would not enforce federal law regarding marijuana in

3  states where it is legal.  That sounds to me like a hearsay

4  issue.

5          MR. TAYBACK:  I do believe it goes to -- and this, I

6  believe, relates to an earlier ruling your Honor made with

7  respect to government's motion no. 4.  The standard, I believe,

8  should be whether the allegedly deceptive statement or act is

9  capable of influencing an objectively reasonable bank.  Our

10 view is that the knowledge and state of affairs of the banks,

11 as it relates to federal enforcement, influences that equation,

12 certainly is relevant to it.

13         THE COURT:  The issue I'm raising is not -- I have

14 some questions about relevancy, but the issue I'm raising is

15 hearsay.

16         MR. TAYBACK:  I believe it's not hearsay if it goes to

17 the state of mind of why the banks do what they do and why they

18 don't do other things.

19         THE COURT:  Well, we'll see how it comes out.  As I

20 indicated, I'm not ruling one way or the other at this time.

21         The next one is government motion in limine no. 3, to

22 preclude evidence or argument that the victim banks purportedly

23 failed to act with sufficient diligence or acted negligently in

24 enforcing policies prohibiting transacting business involving

25 marijuana transaction.  That motion is granted.

DJA329

1        The next one is government motion in limine no. 1, to

2    preclude evidence or argument that the scheme did not cause

3    pecuniary loss.  I think I'm going to want further argument on

4    that after we have picked the jury or after I finish the --

5    give you my rulings.

6        The next one is -- again, this is in no particular

7    order -- Mr. Akhavan's motion in limine no. 5 to preclude

8    evidence regarding transaction lines and commercial settlement

9    accounts.  That motion is denied.

10        The next one is Akhavan motion in limine no. 4, to

11    preclude the government from eliciting disguised expert

12    testimony from certain witnesses.  The details there do not

13    sound to me like disguised expert testimony.  So that motion is

14    denied but without prejudice; if there is a particular answer

15    that the parties think goes beyond the pale, I'll reconsider,

16    perhaps.

17        The next one is the government's separate motion,

18    which doesn't have a number, to preclude defendants' various

19    experts and to preclude -- this includes both the three experts

20    for Mr. Akhavan and the two experts for Mr. Weigand.  I think

21    that with respect to each of those, some of their testimony may

22    be admissible and some may not.  And therefore I think we'll

23    probably need to take, at a break shortly before the first

24    expert is proffered, a sidebar or preferably we can do this

25    simply end of the day before the first expert is offered, to go

31

1    over in more detail as to what I will permit and what I will

2    not permit in that regard.

3         In that, I should mention, the jury will sit from 9:45

4    to 3:45, in accordance with the pandemic rules of this

5    courthouse.  Lucky you, you get to come in at 9 o'clock every

6    morning so we can discuss things like what I just described,

7    and you get to stay who knows how long for the same purpose.

8    So just bear that in mind.

9         The next -- I think I also have real doubts for, just

10   to give an example, about Mr. Artan saying he's going to be a

11   future government employee or something like that.  I think

12   that is clearly prejudicial.

13        OK.  So, next is the government's motion in limine to

14   admit certain categories of evidence as direct evidence of the

15   defendants' bank fraud conspiracy or, in the alternative,

16   pursuant to Rule 404(b).  That motion is granted.

17        The next is the government's motion in limine no. 7,

18   to preclude evidence that the defendants failed to engage in

19   fraud with respect to other merchants and banks.  That motion

20   is granted in part.  But I think there may be instances where,

21   for example, the defendants seek to show that a document that

22   is being offered pertains to another business rather than Eaze,

23   a legitimate business, that would not be excluded.  So that's

24   the line I'm drawing for now.

25        Next we have Weigand's motion in limine no. 4,

DJA331

32

1    Akhavan's motion in limine no. 1, and government motion in

2    limine no. 9, all relating to prior arrests, prior convictions,

3    prior bad acts, wealth, and lifestyle.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DJA332**

L31PWEIh2

1          THE COURT:  I will grant the defendants' motions

2    regarding the exclusion of evidence relating to wealth,

3    lifestyle, and I don't think I need to reach the question of

4    prior convictions of Mr. Akhavan unless and until the

5    government's case is closed and he tells me he is going to take

6    the stand.

7          In that regard, while I'm thinking about it, while the

8    defense needs to tell me who their witnesses are going to be,

9    they've already given me a list, and also, when we get down to

10   it, who's coming next on any given day, the one thing that

11   defense doesn't have to tell me until the close of the

12   government's case is whether a given defendant will take the

13   stand, but then you have to tell me.  If, at that point, it's

14   dependent on a ruling on prior convictions, I will make the

15   ruling then.  Before you tell me otherwise, you'll just wait.

16         THE COURT:  Mr. Weigand's motions in limine two and

17   three to preclude documents seized from Weigand's laptop, where

18   no witness can testify to their substance or whether there's no

19   evidence to show that Weigand had the evidence on his laptop

20   during conspiracy, generally that motion is denied, but there

21   may be specific items where it's a closer call and it will be

22   taken up at the time.

23         Next, and this is a good example why the broad motions

24   in limine that you guys submitted were perfectly appropriate.

25   Some of these more nitty-gritty things, really, the Court can't

DJA333

L31PWEIh2

1   for sure rule on them until the specific testimony is elicited

2   or the specific document is offered.  So again, if you know

3   it's been challenged in a motion in limine, you need to alert

4   me to that so that if we have to have a sidebar before we get

5   before get to jury, we'll manage that.

6           Okay.  The Weigand motion in limine No. 5 and the

7   related Akhavan motion in limine No. 7 to preclude evidence of

8   Telegram, WhatsApp and ProtonMail, on the current showing, I

9   would grant that motion, but I think that the government may be

10  able to lay an adequate foundation.  It's, again, not really

11  possible to give a definitive ruling at this time.

12          And then there is Mr. Akhavan's motion in limine No. 2

13  to exclude Farm Solutions and MasterCard documents produced in

14  response to the grand jury subpoena.  That motion is denied.

15          And then there's Mr. Akhavan's motion in limine No. 6

16  to require the government to prove the prerequisites for

17  admission of certain alleged co-conspirator statements outside

18  the presence of jury and prior to admitting such statements

19  into evidence.  That motion is denied.  Once again, there may

20  be a particularly intricate situation that might arise with a

21  particular piece of testimony settled at the sidebar, but as a

22  general matter, that motion is denied.

23          And finally -- no, not finally.  Next, government's

24  motion in limine No. 5 and Weigand's motion in limine No. 6

25  relating to Mr. Weigand's post-arrest statements, I think the

L31PWEIh2

1    best I can tell you at this point, we can discuss it later

2    today, but is some come in and some don't.  So we'll take it up

3    further later.

4         Next, Akhavan's motion in limine No. 3 to preclude the

5    government from referring to victims or to shell or proxy

6    entities, that motion is denied.

7         And finally, government motion in limine No. 6 to

8    preclude the defendants from asserting a presence of counsel

9    defense.  Basically, I'm going to deny that motion because I

10   think -- I'm sorry.  Actually, I take that back.  The problem

11   there is anything that would suggest an advice-of-counsel

12   defense is going to be precluded.  So it's really a question of

13   how the question is phrased, and we'll take it up when the

14   question is raised.

15        Okay.

16        (Pause)

17        THE DEPUTY CLERK:  Ten more minutes.

18        MS. LA MORTE:  Your Honor?

19        THE COURT:  Yes.

20        MS. LA MORTE:  One additional motion that I don't

21   believe that your Honor has spoken about, and that had to do

22   with the cross of the government's witnesses on certain matters

23   pertaining to, for example, prior drug use and the like.

24        THE COURT:  Yes, that motion is granted.

25        MS. LA MORTE:  Thank you.

**DJA335**

L31PWEIh2

1          MR. GILBERT:  Your Honor, with regard to the motions

2     in limine relating to the negligence of the bank, do I

3     understand your ruling to permit the defense to argue that the

4     issuing banks were --

5          THE COURT:  I'm sorry, you need to speak louder.

6          MR. GILBERT:  Do I understand the ruling to,

7     nonetheless, permit the defense to argue that the banks were

8     willfully blind, not simply negligent?

9          THE COURT:  No.  The one motion I wanted to hear more

10    argument on -- and since we've got ten minutes, we may as

11    well -- is the motion, which I know is close to the heart of

12    the defense in this case, regarding that the scheme did not

13    cause pecuniary loss.

14         So let me hear from -- I guess this was the

15    government's motion to preclude evidence or argument that the

16    scheme did not cause pecuniary loss, but let me hear first, if

17    I may, from defense counsel as to what issue they think this is

18    relevant to.

19         MR. BURCK:  Thank you, your Honor.  Bill Burck, your

20    Honor.  Your Honor, we think that the pecuniary loss issue is

21    part of our defense.  As the Court recognized in the Circle

22    opinion about the subpoena that the banks didn't care about

23    these transactions, they were immaterial to the banks, and the

24    reason why we think the pecuniary loss issue is important to

25    that is because it's sort of the flip side of the fact that the

**DJA336**

L31PWEIh2

1    banks actually made money, not in the sense of any pejorative

2    sense, but they had fees that they get for processing these

3    transactions.

4         And there's nothing in the evidence to suggest that

5    they didn't get their fees or there was some attendant loss

6    that they suffered by processing these transactions.  And to

7    us, that goes right to the core of why the banks don't care,

8    and they know what's going on, and they allow it to happen, and

9    they continue to allow it to happen because --

10        THE COURT:  Let me make sure I understand what you

11   expect your evidence will show in that regard.  The government,

12   as I understand it, will be introducing evidence that the

13   defendants disguised these marijuana transactions to look like

14   transactions of other goods and services because they believed

15   that the banks would not otherwise process them and that,

16   therefore, they could offer a service to marijuana purchasers

17   who wanted to use credit cards by disguising that.

18        Your defense, so far as it relates to this issue, as

19   near as I can tell is, yeah, that may be what the defendants

20   thought, but they were wrong.  Objectively, the banks couldn't

21   care less and, therefore, it was immaterial to them whether it

22   said marijuana or widgets.  Do I have all that right?

23        MR. BURCK:  Your Honor, I think that's very close to

24   right.  I think the only thing I'd add is that -- and it's not

25   a question of willful blindness in the sense of -- it's a

DJA337

L31PWEIh2

1   question of they know what's going on and the system is set up

2   by MasterCard and Visa, with the bank's agreement, so that no

3   one ever finds out that it's marijuana.  So they know it's

4   marijuana.  They know these are marijuana transactions, but

5   there's no coding for marijuana.

6           THE COURT:  What's your proof that they knew it was

7   marijuana?

8           MR. BURCK:  I'm sorry, your Honor.  I couldn't hear.

9           THE COURT:  What's your proof that they knew it was

10  marijuana?

11          MR. BURCK:  Your Honor, I think there's going to be

12  two sets of proof that they knew it was marijuana.  First,

13  there is evidence from the beginning of the alleged scheme in

14  2016 that there were references to the company Eaze, which is

15  the company that is at the heart of the -- that advertised

16  itself as the biggest cannabis marketplace in California.  And

17  then after, and this goes to the subpoena that the Court issued

18  an opinion on, that the banks to this day, the issuing banks

19  and the credit card companies, to this day, allow Eaze to use

20  debit cards or allow, I should say, customers to use debit

21  cards with Bank of America and Citibank and everything on those

22  cards, with the Visa logos and everything, to buy cannabis.

23          Openly it says in the statements, and it says to the

24  whole system, that it's Eaze that they're buying these products

25  from.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**DJA338**

L31PWEIh2

1    THE COURT:  So that may show that they know now and

2    still don't consider it important, that would go to your

3    materiality, but I don't see how it shows that they knew then.

4    MR. BURCK:  Your Honor, there's going to be evidence,

5    we believe, that in the beginning of the scheme, in 2016,

6    that's part of the alleged timeframe here, that there were

7    references to Eaze and products that would clearly put someone

8    on notice they were talking about marijuana; that the period of

9    time in which there was a change to these strange websites that

10   have clearly have nothing to do with marijuana or appear to not

11   be marijuana, is only one piece of this entire timeframe.

12   And so we believe the evidence is going to show that

13   the banks, and certainly the credit card companies, understood

14   that these were transactions that were likely marijuana or were

15   marijuana and, that to this day, they are allowing Eaze to

16   openly process these transactions.  And the reason why we think

17   that's important --

18   THE COURT:  So why didn't the defendants, under your

19   theory, have any motive to disguise?

20   MR. BURCK:  Your Honor, our view is that they didn't

21   have a motive to disguise.  We have several defenses, your

22   Honor, on this front.  One, we don't think it was our clients

23   that came up with these fake websites.  We think it's actually

24   the government's cooperating witness, a man name Oliver

25   Hargraves, not our defendants.

L31PWEIh2

1          We also think that, again, Visa and MasterCard -- Visa

2    and MasterCard create the codes to allow people to sell

3    whatever they're going to sell over the credit cards.  The

4    merchant banks who are accused of being co-conspirators in this

5    whole thing are the ones who assign the codes for the

6    merchants, and our view is that the reason that Visa and

7    MasterCard and the banks don't have a code for marijuana,

8    whereas they do for gambling, your Honor -- they do for illegal

9    gambling; they actually say if you're going to use gambling,

10   there's a code you're supposed to use for it -- is because

11   they're trying to actually say we don't want to know about

12   marijuana, even though we know marijuana is being sold.

13          And it's important that it's happening now, your

14   Honor, from 2020 to this present time because there has been no

15   change in the law, as you know, your Honor, federal law or the

16   State laws that are at issue here that would say, oh, now Eaze

17   and the credit card companies and the banks are allowed to do

18   this.  Nothing has changed.

19          It's exactly the same system that was in place before,

20   except now arguably now it's more open.  And the reason why we

21   think that's important because it does go right to the

22   materiality question, which is that these banks ultimately

23   don't care at all that these are marijuana transactions.  What

24   they're doing, as the Court said in the Circle opinion, is

25   they're giving themselves a fig leaf to say we don't want to be

DJA340

41

L31PWEIh2

1    involved in illegal transactions, whatever that means.

2            And some banks, you'll see, your Honor, in the course

3    of the trial, have policies which are very vague that say,

4    well, we don't want illegal transactions done where they are

5    legal.  And they specify gambling, for example; it can be legal

6    in some states and not others.  They never talk about

7    marijuana.

8            There's going to be evidence, your Honor, about the

9    dialogue inside the banks, about the fact that they are -- and

10   the credit card companies in that they don't really know what

11   to do with marijuana because there is the federal problem and

12   there are state differences.

13           So, your Honor, in our view, if you look at today, we

14   can link this up and the evidence will show this, back to the

15   beginning of the scheme that there is evidence throughout and

16   now it's open, that Eaze is using debit cards and they used to

17   be credit cards and debit cards, to allow people to buy

18   marijuana and the banks knew.

19           THE COURT:  Forgive me for interrupting.  Part of what

20   you're saying is why I denied, just a minute ago, the willful

21   blindness question because the assertion here is the banks

22   actually knew, not they were just willfully blind.

23           MR. BURCK:  That's correct, your Honor.  We don't

24   intend to argue they are willfully blind.  We're not intending

25   to argue that it's negligence.  We're saying they knew, and the

L31PWEIh2

1  system is set up so they can have plausible deniability, your

2  Honor.  That is our argument.  It's not that --

3          THE COURT:  All right.  That's very helpful.  Did

4  co-counsel for the other defendants want to add anything to

5  that?

6          MR. GILBERT:  Yes, your Honor.  I would like to be

7  heard on the question your Honor raised about pecuniary harm,

8  and we think it's certainly relevant to show the intent of the

9  defendants and to show their good faith with.  We requested and

10  we think we're entitled to a good-faith instruction, and we

11  certainly believe that the evidence will show, with regard to

12  Mr. Weigand, that he had no intention to harm any bank in this

13  country, and that is a perfectly legitimate line of argument

14  that we intend to pursue and we think is consistent with the

15  law.

16          THE COURT:  Well, if you recall from my opinion on the

17  motions to dismiss, I think I take a somewhat different view of

18  harm than you do as to what the law requires or doesn't require

19  in that regard.  Putting aside the whole argument that's just

20  been made about the banks' actual knowledge, if the banks, in

21  fact, decided we're not going to process marijuana transactions

22  because we don't want to take on the risk that we might get

23  prosecuted or in trouble or litigated if we do, and your

24  clients then, in order to obtain money and property from the

25  banks, then disguise the true nature of the transactions, I

DJA342

43

L31PWEIh2

1   think that meets the harm requirement.

2           MR. GILBERT:  Our defense, your Honor, is that -- in

3   part, that there will be no evidence that Mr. Weigand had any

4   such intent or knowledge with regard to -- and so that's an

5   essential element of our defense.  I take it from your nodding

6   that you deem to be an appropriate line of --

7           THE COURT:  All right.  Let me hear from the

8   government.

9           MR. FOLLY:  Thank you, your Honor.  The government's

10  argument, fundamentally, is that pecuniary loss is simply not

11  an element of this case.  It's also not a theory that the

12  government is advancing at trial here.

13          THE COURT:  To me, it seems to me that if it's

14  permissible at all, it is linked solely to the issue of

15  materiality.  The argument is the banks really knew what was

16  going on, but they didn't care because they got their money.

17  And why isn't that then admissible?

18          MR. FOLLY:  Your Honor, I think that in the context of

19  this case, it really is a fact that the defense is using to try

20  to essentially tell this jury, like, there wasn't -- no one got

21  harmed; so there wasn't a crime.

22          THE COURT:  I understand, if your argument is a 403

23  argument, that it's relevant to materiality, but the prejudice

24  outweighs the relevance because they can, without even ever

25  mentioning that, they can argue the bank knew and here's why

**DJA343**

44

L31PWEIh2

1   you should find the bank knew.  That, I understand.  But I

2   don't understand any argument about this being irrelevant.  So

3   if this is a 403 argument --

4           MR. FOLLY:  Particularly here, yes, your Honor, and

5   particularly in this case, where the government is not alleging

6   that the banks lost money on these transactions, it's not part

7   of the theory.  It's only about --

8           THE COURT:  Yes, so I think -- I will think about this

9   a little bit more before, but I want to give you a ruling,

10   obviously, before opening statements.  I think the 403 issue is

11   a real one but can be handled by an instruction to the jury,

12   and I had asked each side to submit a preliminary instruction

13   that I can give to the jury before the end of this week

14   flagging, as I do in almost every trial now, flagging that here

15   are some of the issues you should be thinking about.

16           And I think that might be an opportune time to tell

17   them what the government is required to prove, which is that

18   they don't have to prove any loss of money by the banks.  I

19   don't think I get into more detail than that at a preliminary

20   instruction.  So I'm inclined to let it in, but I'll think

21   about it.

22           Were there further things you wanted to say?  I'm

23   sorry.

24           MR. FOLLY:  Your Honor, on that point, if your ruling

25   is that it's allowed in with the instruction that you're

**DJA344**

L31PWEIh2

1    contemplating, we would just ask for a ruling that that fact,

2    pecuniary harm to the banks, can only be argued in connection

3    with the defense theory on materiality --

4             THE COURT:  Absolutely.

5             MR. FOLLY:  -- and notice.

6             THE COURT:  And that I feel fairly strongly about,

7    with respect to all these motions in limine, if someone says to

8    the Court, from any party, this is coming in on theory X, and

9    then they try to suggest it for theory Y, you will not be happy

10   campers when you do that because, sua sponte, I will say

11   something very unpleasant to the jury about how you were

12   forbidden to do that and you've now violated my ruling.

13            So no one should try any trick like that, but I'm sure

14   we have very competent counsel here.  I'm sure that won't

15   happen.  So that sub-motion is granted.  It will be only coming

16   in for the limited purposes related to materiality.

17            Okay.  Linda?

18            MR. BURCK:  Your Honor, I just had two questions.

19   Sorry, your Honor.

20            THE COURT:  Let me just find out what the story is

21   with the jury.

22            (Pause)

23            THE DEPUTY CLERK:  Ten minutes.

24            THE COURT:  That's what they told us ten minutes ago.

25            THE DEPUTY CLERK:  Yes.

DJA345

L31PWEIh2

1            (Pause)

2            THE COURT:  All right.

3            MR. BURCK:  Your Honor?

4            THE COURT:  Yes.  I'm sorry, there were two people

5    that were about to talk, but you were first, I think.

6            MR. BURCK:  Thank you, your Honor.  I just had two

7    clarifying questions relating to your rulings on the motions

8    this morning.  First, I understand I believe the reasonableness

9    motion to grant.  Understood, your Honor.

10            We are -- I am planning to open, your Honor, very much

11   on the "don't care."  I'm not going to mention reasonable

12   banks.  I'm going to say:  These banks didn't care.  I assume

13   that's okay?

14            THE COURT:  Yes.

15            MR. BURCK:  And that doesn't cross the line?

16            THE COURT:  Yes.

17            MR. BURCK:  I just wanted to make sure.  I will not

18   mention the word "reasonable."

19            THE COURT:  That's your defense, and given my rulings,

20   you can certainly present that defense.

21            MR. BURCK:  Thank you, your Honor.

22            And then the second question is, I don't believe the

23   government opposed or moved to limit references to the fact

24   that marijuana is legal in California and Oregon for purposes;

25   so I assume we can say that, your Honor?  We're not going to go

**DJA346**

L31PWEIh2

1   beyond that.

2          THE COURT:  Yes.  Yes, I was really looking more at

3   that from an evidentiary standpoint.  It looked like there was

4   going to be some testimony about that, and that sounded like an

5   issue of law.  And the only person who can testify about law is

6   me; so that was the only nuance.  But I assumed that both sides

7   are in agreement that the jury can be informed that the sale of

8   marijuana is legal, so far as state law is concerned in those

9   two states.

10         MR. BURCK:  Thank you, your Honor.

11         MR. GILBERT:  We intend to open with a statement that

12  I described before, that there will be no evidence that

13  Mr. Weigand had any intent to cause harm to a U.S. bank,

14  pecuniary or otherwise.

15         THE COURT:  Well, that's certainly -- you know, intent

16  is an essential element of the crime; so you certainly can open

17  on denying that the government can prove intent.

18         MR. GILBERT:  Thank you.

19         THE COURT:  The government had something else?

20         MR. FOLLY:  Your Honor, defense counsel for Weigand

21  has proposed certain demonstratives to use in their opening

22  that the government has an objection to.

23         THE COURT:  Yes, let me see them.  Supposedly, you're

24  not supposed to hand paper exhibits.  However, both my law

25  clerk and me have been double vaccinated; so we will take the

**DJA347**

L31PWEIh2

1    risk.

2           Okay.  So let's take these one at a time.  The first

3    is entitled "Status of Eaze in January 2018;" although, it also

4    includes a nice photo of Mr. Weigand and a little reference to

5    his home in Germany.  But the main emphasis is, I'll read it:

6    "Eaze was a silicon valley company with sophisticated U.S.

7    investors."  What's the relevance of that?

8           MR. GILBERT:  It goes, your Honor, to Mr. Weigand's

9    understanding when he was first introduced to this situation

10   involving Eaze.  What was the information available to him was

11   that it was a U.S. company with sophisticated investors that

12   had been operating, accepting credit cards for some period of

13   time, a lengthy period of time before he even got involved; so

14   from his perspective, there was no reason to think that this

15   there was anything wrong.

16          THE COURT:  At best, that is only slightly relevant,

17   and it shouldn't be part of a demonstrative; so take out that

18   part.

19          MR. GILBERT:  Respectfully, your Honor, it goes to his

20   state of mind and --

21          THE COURT:  Well, I don't think so at all.  First of

22   all, here you're asserting a fact.  You don't say in your chart

23   Weigand believed X, Y or Z.  You say Eaze was a Silicon Valley

24   company with sophisticated U.S. investors.  How are you going

25   to prove that?

**DJA348**

L31PWEIh2

```
1            MR. GILBERT:  That, we think, will certainly come out
2     in testimony of the various Eaze witnesses who will be
3     testifying at trial, and it's in the discovery material.
4            THE COURT:  What do you mean by sophisticated U.S.
5     investors, as opposed to simple barefoot investors?
6            MR. GILBERT:  I don't think they were barefoot, your
7     Honor.  In 2017 I believe it was $50 million of venture capital
8     funds invested in Eaze; so I think the --
9            THE COURT:  I'm still mystified as to why you think
10    this proves anything about intent.
11           MR. GILBERT:  In our view --
12           THE COURT:  Because your argument is sophisticated
13    investors don't break the law?
14           MR. GILBERT:  From our client's perspective, yes.
15    That from what was available then, this was basically --
16           THE COURT:  What planet?
17           MR. GILBERT:  -- America being presented to him.  It
18    this was a sophisticated company with sophisticated backers
19    that had consultants that were out of Visa and MasterCard.  So
20    there was no reason for him to believe, walking into this, that
21    this was a situation that would ever involve all of these
22    people agreeing to violate U.S. law.  That will be the evidence
23    of what was the information that was available to him that goes
24    directly to what his state of mind was, what his intent was in
25    agreeing to do anything in connection with Eaze and --
```

**DJA349**

L31PWEIh2

1          THE COURT:  All right.  Is there any other objection

2     to the first?

3          MR. FOLLY:  Your Honor, I think a similar objection to

4     all of the charts is that it's the way that they're put

5     together and the things that are listed in them.  Among other

6     objections is they're argumentative and also seem to be --

7          THE COURT:  They're argumentative?  Oh, my gosh.  I've

8     never heard a presentation from any lawyer on opening

9     statements that is argumentative.  So the government, since

10    they don't want argumentative openings, is not going to say:

11    We think we can prove this beyond a reasonable doubt this guy

12    is guilty as sin, or anything like that, because you don't

13    believe that argument can be part of opening statements?  Come

14    on, counsel.  Give me a break.

15         MR. FOLLY:  Your Honor, the other additional issue

16    with these slides, particularly the way that Mr. Gilbert just

17    framed them, is that they are entirely about what the

18    defendant's state of mind, which unless the defendant --

19         THE COURT:  It's part of --

20         MR. FOLLY:  -- unless the defendant is testifying --

21         THE COURT:  Pardon?

22         MR. FOLLY:  Unless the defendant now is committing to

23    testifying.

24         THE COURT:  Oh, my gosh.  How long have you been a

25    prosecutor?

L31PWEIh2

| | |
|---|---|
| 1 | MR. FOLLY:  Your Honor, I've been a prosecutor nearly |
| 2 | five years. |
| 3 | THE COURT:  So is this your first fraud case? |
| 4 | MR. FOLLY:  No, your Honor.  It is not. |
| 5 | THE COURT:  So are you not aware of the law of the |
| 6 | United States that has existed since at least 1800 that the |
| 7 | government has to prove every essential element, including |
| 8 | intent, beyond a reasonable doubt? |
| 9 | MR. FOLLY:  Your Honor, I'm very aware of that.  The |
| 10 | concern with this slide is simply -- |
| 11 | THE COURT:  I think what your argument is, you're |
| 12 | saying, and I think it's only the first chart, that it relates |
| 13 | to, you're saying -- you're arguing there are things in the |
| 14 | first chart that can only come into evidence if the defendant |
| 15 | testifies because there will be no other source. |
| 16 | Now, that clearly is not true with respect to |
| 17 | "marijuana was recently legalized in California for |
| 18 | recreational use."  That is clearly not true, for Eaze was |
| 19 | already accepting Visa, MasterCard since 2016.  They expect to |
| 20 | be able to deduce that even through the government's witnesses. |
| 21 | MR. FOLLY:  I agree with that, your Honor. |
| 22 | THE COURT:  And the only one I'm having trouble with |
| 23 | is the first one, Eaze was a Silicon Valley company with |
| 24 | sophisticated U.S. investors.  I understand the whole point of |
| 25 | this chart is to say here was this simple, honest businessman |

DJA351

L31PWEIh2

1 from Germany, where people in Germany don't know anything about

2 American investments and here they did, this poor fellow got

3 roped into this terrible situation because, and then he goes

4 through his three items. And that's -- you know, far be it for

5 me to preclude an argument of that sort.

6       I'm going to -- I want to go back to defense counsel.

7 How do you propose, without your client taking the stand, to

8 show that he knew that Eaze was a Silicon Valley company with

9 sophisticated U.S. investors? Because unless you can show --

10 that's the relevance. This whole first chart goes to intent.

11 The other things you can show without, but how are you going to

12 show that he knew that without his taking the stand?

13       MR. GILBERT: Can I have one moment, your Honor?

14       THE COURT: Yes.

15       (Pause)

16       MR. GILBERT: Primarily, I think there will be --

17 well, I'll answer directly the question you've asked.

18       THE COURT: That's always a good idea.

19       MR. GILBERT: One way of doing that is through

20 cross-examination of the government's cooperating witness, who

21 met with Mr. Weigand and described Eaze and described the

22 background of this entire situation. So we expect he will not

23 quibble with the fact that he understood and described that

24 Eaze was a Silicon Valley company. I don't think there's any

25 debate about that, and it had sophisticated U.S. investors, it

DJA352

L31PWEIh2

1    had venture capital backing. That will certainly be -- there

2    will certainly be evidence of that.

3            And so for those reasons, I think it's entirely

4    supportable that we'll be able to show that that should be a

5    relevant consideration as to this individual's intent and what

6    his state of mind was about Eaze in general. It wasn't a

7    secret. I mean, there were billboards outside the airport in

8    Los Angeles that had Eaze on them, and his post-arrest

9    statement, which I understand your Honor hasn't made a ruling

10   on, but if those statements come in, he discusses that, which

11   shows that it was very well known --

12           THE COURT: All right. Forgive me for interrupting.

13   I'll think a little bit more about the first chart. The second

14   chart, only U.S. banks are covered by the bank fraud statute.

15   You may be entitled to an instruction of law at some point; so

16   but it's not for opening statement so that chart is excluded.

17   That chart is excluded.

18           The next chart, Eaze payment processing 1.0, what's

19   the point of this?

20           MR. GILBERT: This is demonstrative to help the jury

21   visualize a simple point, which is that Eaze was using payment

22   processing through New York, through the same merchant banks

23   that were involved in a later time, when Mr. Weigand had some

24   involvement, but that had been going on in 2016 and 2017

25   through this company called Clear Settle that's depicted here.

**DJA353**

L31PWEIh2

1           At that point, Mr. Weigand had nothing to do with it.

2      He only got involved starting with January 2018, what we refer

3      to, for simplicity sake, is Eaze processing version 1.1 --

4      that's how we'll describe it in opening for the jury -- so that

5      they understand clearly that that's when his connection to this

6      began.

7           And all of this was going on before he got involved,

8      which I think is critical to help the jury understand that

9      despite what we expect the government to say, that he was

10     some -- Mr. Weigand was some critical link to Europe --

11          THE COURT:  How are you going to prove that he knew

12     that without his taking the stand?

13          MR. GILBERT:  We'll be able to establish through

14     cross-examination of the government's cooperating witness that

15     there was a description of what had been the payment processing

16     that had been in place before, and the whole purpose of the

17     meeting that takes place in January of 2018 is to discuss and

18     to explain, in part, to Mr. Weigand what they were hoping to do

19     to change the already existing payment processing that Eaze was

20     doing.

21          THE COURT:  And then your last chart is Ruben

22     Weigand's focus was on Europe, and how are you going to prove

23     that without his taking the stand?

24          MR. GILBERT:  Through voluminous -- I shouldn't say --

25     there are voluminous chats being entered into evidence.  The

**DJA354**

L31PWEIh2

1    communications in which Mr. Weigand was involved, which is a

2    small subset of all of those, I think will clearly demonstrate

3    what we've said here, which is that his focus was on dealing

4    with European merchant banks and opening European accounts, all

5    of it was focused on Europe.

6              THE COURT:  All right.  Let me --

7              MR. GILBERT:  And in part, that is what the

8    government, as we understand it, is alleges his role to have

9    been.

10             THE COURT:  Let me ask the government.  The

11   representation is that they will be able to prove everything

12   that's on these charts independently of his taking the stand.

13   Of course, if that proves to be false, you are free on

14   summation, or anything else that anyone else says on opening

15   statement that isn't proved get up, and say:  Remember when he

16   said that he was going to show that?  You haven't heard one

17   word about that.

18             I will also instruct the jury, as I always do, that

19   nothing that any counsel says on opening argument is evidence.

20   But having said that and given the representations, putting

21   aside the second chart which I'm excluding, the one about all

22   the U.S. banks are covered by the bank fraud statute, any

23   remaining objection to the other three charts?

24             MR. FOLLY:  Your Honor, one concern with respect to

25   the Eaze payment processing 1.0 chart, for some reason, the

DJA355

56

L31PWEIh2

1    chart ends in 2018.  I think it is a misleading

2    characterization of what this case is about.  It's a conspiracy

3    charged through 2019.  It involves --

4              THE COURT:  What about that, counsel?  I'm sorry.

5    Counsel for Weigand, what about the claim is that this is

6    misleading because it limits itself to a period before the key

7    events in this case?

8              MR. GILBERT:  The purpose of the chart is simply to

9    depict when Mr. Weigand got involved.

10              THE COURT:  Yes.

11              MR. GILBERT:  And that's all this shows.  So it

12    doesn't purport to state that anything started in '18 and was

13    over at the end of '18.  So we can adjust it to add another

14    extension of it, but the whole point of it is not -- is a

15    simple one, which is he wasn't involved --

16              THE COURT:  I'm going to, on the representations made,

17    I'm going to allow all the charts except the one about only

18    U.S. banks are covered by the bank fraud statute.  It will be a

19    good test of the credibility of counsel to see whether this, in

20    fact, comes into evidence independent of the defendant taking

21    the stand.

22              MR. GILBERT:  Your Honor?

23              THE COURT:  Now, yes?

24              MR. GILBERT:  I'm sorry.  With regard to the -- and I

25    understand your ruling about the demonstrative, but the concept

**DJA356**

L31PWEIh2

1   which we would like to touch upon in the opening, and it's

2   critical to our defense, is that what Mr. Weigand's role was,

3   as the government I think agrees, related to merchant banks in

4   Europe.  I think there's a risk here that the jury is going to

5   be somewhat confused with various financial institutions, Visa,

6   MasterCard, various different banks in Europe.  And it is

7   critical that we be able to explain to them that the

8   specific --

9           THE COURT:  How is your chart, even as a matter of

10   law, because doesn't deal with indirect relationships which

11   are, of course, part of what was involved here.  So I think

12   it's misleading.  I continue to exclude it.

13           All right.  Now, we're going down -- I'm sorry, yes?

14           MR. FOLLY:  Your Honor, just one additional concern

15   about the way Mr. Gilbert articulated the argument or principle

16   that they intend to use in their opening about Weigand's not

17   having any intent to cause harm.  Your Honor, I think that

18   comes dangerously close to intent to cause the banks pecuniary

19   loss, and we are articulating a very narrow allegation with

20   respect to harm, which is depriving the banks of their

21   property --

22           THE COURT:  We're going to deal with that in the

23   preliminary instruction I'm going to give later this week.  I

24   think that will be sufficient, but thank you for raising it.

25           Now, the parties, their counsel and the marshals are

DJA357

L31PWEIh2

1    going to enter the jury room through the entrance that says

2    "closed," the one right near the elevators, and I will go down

3    there as well, and then we will pick the jury.  All right.  So

4    I'll meet you down there forthwith.

5              (Recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DJA358

L31AWEI3ps

```
1          A F T E R N O O N   S E S S I O N

2                    1:30 p.m.

3          (Jury not present)

4          THE COURT:  Anything counsel needs to raise with the

5     Court?

6          (Jury present)

7          THE COURT:  I want to remind counsel and the parties

8     that you need to stay in exactly where the marker is for your

9     seats.  There was some movement earlier this morning between

10    various people that unfortunately is not permissible because of

11    the pandemic requirement social distancing.  So just be sure

12    you keep in your seats.

13         OK.  Ladies and gentlemen, we are about to hear

14    opening arguments of counsel.  I want to caution you at the

15    beginning that nothing that counsel says is evidence.  The

16    evidence will come, as I mentioned downstairs, from testimony,

17    and it will be from this little box here next to me.  And the

18    witnesses can remove their mask because this is designed to

19    allow that.

20         It will come from documents, which you will see on

21    your screen.  And at the very end of the case we will give you

22    a thumb drive or some equivalent so you can access any and all

23    documents as well as an exhibit of the documents.

24         And occasionally there may be what's called a

25    stipulation where the parties agree on a particular fact, and
```

DJA359

L31AWEI3ps               Opening – Ms. Deininger

1    you can take that as evidence as well.

2            Those are the only sources of evidence.  Nothing that

3    counsel says, nothing that I say is evidence.

4            So why do we have opening arguments at all?  The

5    reason is because the evidence, as again I mentioned before, is

6    going to come in one little bit at a time, and it may be a

7    while till you see the whole picture.  So opening statements

8    are the opportunity that's given to counsel to give you a

9    preview of what they expect the proof will show, or will fail

10   to show, as the case may be.  So it's kind of an overview.

11           Each side gets a half –- each party gets a half hour.

12   So the government will have a half hour.  Then each of the

13   defendants will have a half hour.

14           The government goes first because, as I mentioned

15   earlier, the burden of proof is always on the government.  The

16   defendants are presumed innocent until and unless the

17   government has proven that they are guilty beyond a reasonable

18   doubt.  So for that reason the government gets the opportunity

19   to open first, because they have the burden of proof.

20           So we'll begin with the opening statement from the

21   government.

22

23           And you can take down your mask too.  That box is also

24   designed to allow you to take down your mask.

25           MS. DEININGER:  I'm sorry.  Can everyone hear me?

DJA360

L31AWEI3ps            Opening - Ms. Deininger

1          THE CLERK:  I'm sorry.  I have to change the

2     microphone cover.  Sorry, everybody.

3          MS. DEININGER:  These two men, Ray Akhavan, Hamid

4     Akhavan, and Ruben Weigand, for years, they built a business of

5     lies, in exchange for millions of dollars.  They offered a

6     unique set of services creating fake companies, fake products,

7     fake websites, and even ginning up fake web traffic for those

8     websites, all in the service of pushing money through U.S.

9     banks for illegal products.  With that multilayered web of lies

10    they duped the banks into approving more than $150 million in

11    debit and credit card transactions.  That's why we're here

12    today, because these two men, they made it their business to

13    commit bank fraud.

14          So let's talk about what the evidence is going to

15    show.  You're going to learn that from 2016 to 2019, the

16    defendants made millions tricking U.S. banks into approving

17    illegal purchases.

18          I'm going to explain how the defendants pulled this

19    off.  But before I do that, I want to talk to you about two

20    things that I think you're going to hear a lot about at trial.

21    The first thing that you're going to hear a lot about is the

22    companies the defendants were paying to lie for, their clients,

23    a company called Eaze.  Eaze was a marijuana delivery company.

24    It had an online application that its customers in California,

25    where marijuana is legal under state law, could use to order

**DJA361**

L31AWEI3ps          Opening - Ms. Deininger

1  marijuana products from marijuana dispensaries and have them

2  delivered to their door.  Eaze marketed itself as a mover of

3  product.  But Eaze wanted to give its customers the option to

4  use credit and debit cards.  And Eaze had a problem with that.

5  The credit companies and many U.S. banks don't allow debit and

6  credit cards to be used to purchase marijuana, because those

7  purchases are still illegal under federal law.  And that's

8  where defendants came in.  The defendants offered these and the

9  marijuana dispensaries a solution, a solution of tricking the

10  U.S. banks and card companies.  These marijuana dispensaries

11  hired defendants to get around the bank and credit card rules.

12  And how did they do that?  They lied.  The defendants created

13  layer upon layer of lies to disguise the transactions and make

14  them look like they were for other legal things.

15          The second thing that you're going to hear a lot about

16  at this trial are the credit card networks and the rules that

17  govern them.  Defendants' exploitation of these networks was

18  the heart of the scheme.

19          So who were the players in these networks?  Visa and

20  MasterCard are at the center of these networks.  They set rules

21  that the banks have to follow.  Then there are the merchants.

22  These are the companies selling something; take Target or

23  Starbucks.  In this case, Eaze and the marijuana dispensaries,

24  they were the merchants.  The merchants work with merchant

25  banks, that are sometimes also called acquiring banks.  If a

63

L31AWEI3ps            Opening - Ms. Deininger

1    merchant wants to accept credit and debit cards, it has to have

2    a bank account.  Without that, their customers would have to

3    pay in cash.

4            Then on the other side you have cardholder banks, or

5    issuing banks.  They offer credit and debit cards to the

6    public.  For example, you might have a Bank of America

7    MasterCard credit card, or a Wells Fargo Visa debit card.

8    Cardholder banks have their own rules about how their cards can

9    be used and what transactions they will approve.

10           So the rules of the cardholder banks and Visa and

11   MasterCard, those rules, those rules that you can't use the

12   cards for illegal purchases, including marijuana, the

13   defendants decided to make money breaking those rules.  And to

14   do that, they lied, and lied again.

15           Now let me tell you a little bit about the

16   step-by-step of how defendants ran their scheme.  Step one.

17   They bought shell companies with no connection to Eaze or the

18   marijuana dispensaries' actual business.  For example, they

19   bought a shell company called Linebeck Ltd.

20           Step two.  They used the shell companies to give bank

21   accounts to overseas merchant banks.  The bank account

22   applications were full of lies.  They lied about what the

23   companies sold, where the companies were located, and who

24   controlled them.  The bank account application for Linebeck

25   Ltd., it said that Linebeck was a British company selling face

DJA363

L31AWEI3ps            Opening – Ms. Deininger

1    cream off a website called organicals.org.  It wasn't.  That

2    was all lies.

3           Step three.  The defendant used the fake merchants and

4    the overseas merchant bank accounts to hide transactions in the

5    Visa and MasterCard network.  So, for an example, when an Eaze

6    customer uses a Visa credit card to purchase marijuana from

7    Eaze, instead of listing Eaze or one of the marijuana

8    dispensaries as the merchant, it would show up as a transaction

9    for organical face cream.

10          What was the point of all this deception, of the fake

11   products or the fake companies?  It was to deceive.  It was to

12   prevent the banks and credit card companies from understanding

13   the true nature of the transactions that the defendants were

14   pumping into the U.S. financial system.

15          And for a while the scheme worked.  The purchases were

16   approved and the cardholder banks sent money to the companies

17   that they thought were the real merchants.

18          Now, because these banks and credit card companies

19   don't allow marijuana transactions, the defendants had to cover

20   their tracks.  They knew the fake merchants had to look like

21   real businesses.  So they set up fake websites for those fake

22   companies, websites that appeared to be selling things, like

23   face cream, dog products.  They even carted in water.  They

24   even paid someone to generate fake traffic to those websites so

25   that, to an investigating bank, it would look like customers

65

L31AWEI3ps            Opening - Ms. Deininger

1   are actually visiting it.

2          And that wasn't all.  They did everything they could

3   to make sure they could not get caught.  They also told the

4   marijuana dispensaries to open up bank accounts in names that

5   couldn't be linked back to the actual marijuana business.  Lies

6   at every level.

7          The cardholder banks, like most people, they wanted to

8   know who they were actually doing business with.  But the

9   defendants took that option, the option of knowing the truth,

10  away from them.  They tricked the banks into approving

11  thousands and thousands of transactions for more than $150

12  million, money that came out of the cardholder banks' own

13  accounts based on lies.

14         So that is the scheme.  That's how it worked.

15         Let me tell you about the critical role that each of

16  these defendants played in running the scheme.  It started with

17  Hamid Akhavan, or Ray, as they called him.  Akhavan, plain and

18  simple, was the leader of the fraud scheme.  He oversaw

19  everything.  He hired a team to purchase the shell companies

20  and set up the fake websites for the fake merchants.

21  Eventually you'll learn that he brought Ruben Weigand into the

22  scheme.  Weigand had connections to insiders at the overseas

23  merchant banks.  He helped make sure the merchant bank accounts

24  got opened and that the accounts didn't later get flagged and

25  shut down.

**DJA365**

L31AWEI3ps          Opening - Ms. Deininger

1          He also played a critical role of arranging to get the

2     moneys moved from the overseas merchant bank accounts back to

3     the marijuana dispensary in the United States.

4          And as a result of all of this fraud and lies, the

5     defendants are charged together with one count of conspiring to

6     commit bank fraud.

7          OK.  So now you have a sense of what this case is

8     about.  I want to tell you how we're going to prove it.  The

9     evidence will come in several forms.  You'll see the emails and

10    documents that law enforcement agents recovered from Weigand's

11    computer that was with him at the time he was arrested, bank

12    account applications for the bank merchants, a ledger full of

13    profit calculations, and all of the other paperwork needed to

14    keep the defendants' fraud running.  There will be financial

15    records, records of the rules prohibiting illegal transactions,

16    records that show the thousands of purchases that were

17    processed in the state merchants' names, and records showing

18    how the defendants sent money for the marijuana purchases after

19    taking out their sizeable cut from the overseas merchant banks

20    back to the marijuana dispensaries.

21          You'll also hear from witnesses.  You'll hear from the

22    cardholder banks who approved these purchases based on the

23    defendants' lies.  They will tell you that it is essential to

24    their business that they receive true and accurate information

25    when deciding whether to approve card transactions.  And they

**DJA366**

67

L31AWEI3ps          Opening – Ms. Deininger

1   will tell you that they would not have approved these

2   transactions if they had known they were really for marijuana.

3           You'll hear from credit card companies, who will

4   explain how their networks operate, the rules for those

5   networks, and what they do to make sure those rules are

6   followed.  You'll learn how MasterCard eventually found out

7   about the defendants' scheme and quickly moved to begin

8   shutting it down.  You'll hear from the law enforcement agent

9   who arrested Weigand.  You'll hear the stories Weigand made up

10  when he was caught and how he lied and claimed he had never

11  been involved with Eaze, how he pretended that he had learned

12  about Eaze from seeing it on a billboard.

13          You're also going to hear from some of the people who

14  committed the bank fraud along with the defendants.  They will

15  be able to give you the inside view of how the scheme operated.

16  You're going to hear from several people who worked at Eaze,

17  including the former CEO.  He will tell you how getting credit

18  cards up and running was critical to Eaze.  He will tell you

19  how other credit card processers told Eaze that it couldn't be

20  done for marijuana transactions in the United States.  He will

21  tell you how Eaze ended up having to work with the defendants,

22  who charged fees that were far higher than normal.  And he will

23  tell you that Akhavan justified those fees by explaining that

24  he and his associates were taking on a serious threat, the

25  threat that they would get caught.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**DJA367**

L31AWEI3ps            Opening - Ms. Deininger

1          You're also going to hear from someone who set up the

2     fake merchants for defendants.  You'll hear how he bought shell

3     companies that existed only on paper, created websites for

4     those fake merchants, and then generated fake online traffic to

5     those websites.  You'll hear how he pulled together the bank

6     account applications for the fake companies, full of lies.  And

7     you'll hear about the meetings he attended with Akhavan,

8     Weigand, and other members of the scheme, meetings where they

9     planned out how the scheme would function.

10         Now, I want to be clear.  These people, these

11    individuals, have also committed crimes.  That fake website

12    creator and Eaze's former CEO are testifying because they have

13    pled guilty and entered into cooperation agreements with the

14    government requiring them to testify.  And they hope to receive

15    leniency at sentencing for doing so.  So you should scrutinize

16    their testimony carefully.  You should ask yourselves, how does

17    that testimony match up with all of the other evidence in this

18    case, evidence like the fake merchants and the lies in the bank

19    account application, the records showing the banks' rules and

20    the thousands of transactions that broke those rules, evidence

21    like the defendants' own words, their words.  You'll see their

22    words, in emails, in phone messages, explicitly discussing the

23    fraud scheme; their words planning the fake merchants, the fake

24    websites, and the fake website traffic, and the bank accounts

25    for the shell companies; their words expressing their fears

L31AWEI3ps                    Opening - Mr. Burck

1    about the truth being found out and everything they could do to

2    hide the truth so they might continue to make their millions

3    selling lies after lies.

4           All of this evidence ultimately is about one simple

5    thing.  It's about two men who built a business out of a

6    mountain of lies, lies designed to get illegal purchases

7    approved by U.S. banks.

8           Now, I'm going to sit down, but before I do, I want to

9    ask you to do three things.  First, pay close attention to the

10   evidence.  Second, listen to Judge Rakoff's instructions about

11   the law and follow them.  And, third, use your common sense

12   when examining the evidence and listening to the witnesses.  If

13   you do those three things, you'll reach the only conclusion

14   that is consistent with the evidence, the law, and that common

15   sense: the defendants are guilty.

16          THE COURT:  Thank you very much.

17          Which defendant wants to go first?

18          MR. BURCK:  Your Honor.

19          Good afternoon, your Honor.  Good afternoon, ladies

20   and gentlemen of the jury.

21          Who are the supposed victims of the credit card fraud

22   scheme the prosecutor just told you about?  It's not the card

23   holders.  It's not the regular people who have credit cards or

24   debit cards, who use them to make purchases, including

25   sometimes for marijuana.  This case isn't about card holders

**DJA369**

L31AWEI3ps                    Opening - Mr. Burck

1    getting scammed or having their credit card numbers stolen or

2    anything like that.  The victims are not the other side of

3    these marijuana sales.  It's not the small mom-and-pop

4    dispensaries who worked through Eaze to sell marijuana to

5    willing buyers.  No one is going to say they were scammed or

6    tricked out of anything.  No.  The victims in this case,

7    according to the government, are banks, big banks like

8    Citibank, Bank of America, and Wells Fargo.  Those are the

9    victims.  Multibillion dollar banks.  Sophisticated.

10          The prosecutors claim the banks are victims of bank

11   fraud because they supposedly had policies against permitting

12   people to buy marijuana using credit cards or debit cards

13   issued by the banks under the Visa and MasterCard logos.  These

14   policies, the prosecutors say, are taken very seriously by the

15   banks because marijuana remains illegal under federal law.

16   Sounds pretty simple, pretty straightforward.  But when you

17   hear the evidence in this case, it will not be so simple.  You

18   will learn that marijuana sales remain illegal under federal

19   law, but they are legal under California and Oregon law, where

20   these transactions occurred.  They are lawful under those state

21   laws.

22          The sales that occurred in this case happened in

23   California and Oregon.  There's where the people were located

24   who were buying the marijuana, and that's where the

25   dispensaries were located that were selling the marijuana.

L31AWEI3ps                    Opening - Mr. Burck

1   That's where Eaze, the company you heard about, the

2   marketplace, was located.

3           You will also learn that the credit card processing

4   systems are set up by the credit card companies, by Visa and

5   MasterCard, and by the banks, to conceal, to hide, the truth

6   that the banks know full well that their card holders are

7   buying marijuana with their credit cards and their debit cards.

8   The system is set up to hide the fact that they know.  The

9   system is designed and set up by the credit cards and the banks

10  to give them plausible deniability, plausible deniability that

11  credit card holders are using these cards to buy marijuana.

12          You're also going to learn that the credit card

13  companies and the banks could easily, could easily, set up a

14  system to block marijuana transactions if that's what they

15  really wanted to do.  But they haven't.  And they continue, to

16  this day, to this day, to permit flourishing online sales of

17  marijuana using debit cards, to this day.

18          And the reason, you'll learn, that the banks, who the

19  prosecutors claim were somehow defrauded, allow this is because

20  the reality is they just don't care that their card holders are

21  using the cards to buy marijuana, so long at least as it's

22  legal under the state laws in which the sellers and the buyers

23  are located.  They don't care.

24          And you will hear evidence that the credit card

25  companies and the issuing banks earn fees, they earn money,

L31AWEI3ps                    Opening - Mr. Burck

1    from these transactions, just as they do for any other credit
2    card transaction that they sponsor.  They make money from these
3    transactions.  And you also will not hear, despite the
4    government saying $150 million taken from banks, you will not
5    hear any evidence that these banks lost a dime from this
6    alleged scheme.  No wonder the banks don't care.  They didn't
7    lose any money.  And they've made money off of these
8    transactions.

9          These policies pay lip service to blocking illegal
10   transactions.  We'll talk about what that means.  But their
11   actions, the banks' action show their number one priority was
12   making sure their customers can use their cards to buy goods,
13   including marijuana, if it's permitted under state law, any
14   goods those customers want to buy.  Banks are businesses.  We
15   all know that.  And this is one of the ways they make money,
16   from fees from all of these credit card transactions.  They
17   just don't want to make it clear that they know what their
18   credit card holders are doing with those credit cards that they
19   sponsor.

20         My name is Bill Burck.  And along with my colleagues,
21   Christopher Tayback and Sara Clark, we have the honor and the
22   privilege to represent Ray Akhavan, sitting in the back there.

23         I'm going to tell you a little bit about Ray.  But
24   first I want to describe to you what we believe the evidence
25   will show in this trial and what we don't believe it will show.

DJA372

73

L31AWEI3ps                    Opening - Mr. Burck

1          The prosecutors' theories boil down to this:  Ray

2    helped an online company called Eaze trick Visa and MasterCard

3    into processing sales of marijuana using credit cards issued by

4    various U.S. banks.  That's it in kind of a nutshell.  Ray and

5    Eaze and a bunch of others did this, the prosecutors claim, by

6    miscoding and misdescribing marijuana transactions as more

7    benign or uncontroversial products.  If they hadn't done this,

8    the prosecutors say, the marijuana transactions would have been

9    blocked.

10          But the evidence will show something very different

11   occurred.  You will learn from witness testimony and documents

12   in this case that the system is set up to protect banks, to

13   protect them, from admitting knowledge that their customers are

14   using these cards for marijuana purchases.  You will hear that

15   Visa and MasterCard have created no codes, no specific codes

16   for marijuana, to help them identify and block marijuana

17   transactions.  Typical credit card transactions happen at one

18   time, and they're automated.  You will learn that the codes

19   created by Visa and MasterCard are a key part of this automated

20   process, to categorize goods and services that someone is

21   buying when they enter their credit card online, they walk into

22   a store.  You will hear their evidence, there is nothing,

23   nothing stopping Visa and MasterCard from creating a code to

24   block marijuana.  In fact, evidence will show that Visa and

25   MasterCard have done exactly this for gambling and for illegal

**DJA373**

L31AWEI3ps                    Opening - Mr. Burck

1    gambling.  They have a code that allows them to identify when a

2    gambling service is being purchased by a credit card.  And they

3    will block that.  Or they'll let it through if it's in a state

4    in which it's legal to gamble.  You'll hear evidence on that.

5         So we know know how to make the codes.  But they have

6    not done it.  And we expect you will hear evidence the banks

7    have written policies, written policies saying, no illegal

8    transactions can be used with our credit cards.

9         Let me show slide no. 2.

10        These are some excerpts from policies that credit card

11   companies and banks issue to card holders, to people who have

12   credit cards, telling them what you can and cannot do.  We'll

13   go through this in much more detail at the trial, but just to

14   give you a sense, here's what they say about illegal

15   transactions.  For example, at the top, "You agree not to use

16   your cards for illegal gambling or other illegal purpose."  You

17   see any reference to marijuana?

18        The next one: "You may not use or permit your account

19   to be used to make any illegal transaction.  You will only use

20   your account for transactions that are legal where you conduct

21   them."  Well, the evidence is going to show that that is quite

22   an interesting question with marijuana, since it is legal in

23   California and Oregon.

24        The other two, similarly, they reference gambling or

25   they make general statements: "You aren't permitted to use your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L31AWEI3ps                     Opening - Mr. Burck

1    account for unlawful transactions."

2         What you're not going to see in any of these warnings,

3    these policies, to card holders, is a statement that you as a

4    credit card holder cannot buy marijuana in states in which it

5    is legal.  You're not going to see any reference to marijuana,

6    in any of these statements from credit cards.  Gambling, yes.

7    Marijuana, no.

8         But it's not just missing from these policies, from

9    the internal policies.  It's missing from their internal

10   discussions, which, you will see some of this in the course of

11   the trial.  Marijuana is not something that these banks

12   targeted to stop.  The proof will be that they knew exactly

13   what was going on and they wanted it to happen.

14        The banks just didn't care, so long as the credit card

15   holders got what they paid for, there was no fraud to the

16   credit card holders, and the fees that are associated with that

17   transaction went to the banks, and to the credit card

18   companies.

19        The old adage "Actions speak louder than words" is

20   really, really important in this case.  The actions of the

21   banks, the credit card companies, don't line up with the words

22   that they have these policies.  And we're going to hear

23   testimony, we expect, from bank witnesses, who will, we expect,

24   say, oh, it matters to us.  And, again, using your common sense

25   and looking at what actually happened, we believe the evidence

**DJA375**

L31AWEI3ps                    Opening - Mr. Burck

1  will show that the banks knew exactly what was going on and

2  tacitly approved it.

3          One of the most important things in this case, one of

4  the most important pieces of evidence in this case, goes to the

5  question of whether or not these banks care. You're going to

6  hear from witnesses and evidence that the banks and the credit

7  card companies continue, continue, to process marijuana sales

8  to this day, through Eaze, using debit cards. To this very

9  day.

10         The banks and the credit card companies allow card

11 holders to use their debit cards to buy products online from

12 Eaze, the self-described largest cannabis marketplace in

13 California or, more simply, the Uber of weed.

14         Will you show slide 3.

15         These are examples of cards issued by one of the big

16 banks in this case, Bank of America. On the left is a credit

17 card. On the right is a debit card. The one on the left, the

18 banks will testify, you can't use this to make marijuana

19 transactions. The one on the right is a debit card. And

20 you're going to hear evidence that, to this day, Bank of

21 America and other banks allow you to use that card to knowingly

22 buy Eaze products, to buy marijuana. When I say "knowingly,"

23 I'm talking about the banks and Visa and MasterCard, know that

24 they are using debit cards to buy marijuana to this day.

25         Marijuana sales, the evidence in this case is going to

**DJA376**

L31AWEI3ps                    Opening – Mr. Burck

1    show, are immaterial to these banks.  When I say "immaterial,"

2    I mean they don't care.  They are fine with these kinds of

3    transactions.  You will learn from Judge Rakoff that

4    materiality is an important element which the government will

5    have to prove beyond a reasonable doubt in this case.  And we

6    believe the evidence will show overwhelmingly it was

7    immaterial.  It did not matter to these banks.  They knew what

8    was going on and they condoned it and they allowed it to go

9    forward.

10          Again, I ask you to use your common sense when you

11   hear testimony from bank witnesses saying, we care about this

12   and it was important to us.  Think about the evidence of what

13   they actually did, what was actually happening and what

14   actually is continuing to happen when you decide their

15   credibility.

16          You will also learn at this trial that Eaze, the

17   company at the center of this, continues to do its business of

18   linking up buyers and sellers of marijuana in California and

19   Oregon, despite federal law still banning marijuana sales.

20   Eaze continues to do its business.  They haven't been shut

21   down.

22          MS. DEININGER:  Objection.

23          THE COURT:  Well, I'm not sure that has any relevance,

24   ladies and gentlemen, but we'll take it for now.  This is just

25   opening argument.  I remind you that nothing that counsel says

**DJA377**

L31AWEI3ps                    Opening - Mr. Burck

1    is evidence.

2              But you should go on.

3              MR. BURCK:  Thank you, your Honor.

4              As the prosecutors said, they will have Eaze witnesses

5    at the trial.  Three of them, we expect, will have what are

6    called immunity agreements to testify.  One will be testifying

7    under what's called a cooperation deal with the prosecutors,

8    which the prosecutor told you about.  We expect that all four

9    of these Eaze employees will say that they worked, they were

10   aware of, or involved in, the supposed trickery of the credit

11   card companies and the banks.  But you will also learn that two

12   of these people still work at Eaze.  They haven't been fired.

13   They're still there.

14             You'll also learn that Eaze still doesn't use a code

15   for marijuana.  Still doesn't use one.  And that's because

16   there still isn't a code for marijuana created by Visa or

17   MasterCard.  And their banks remain fine with that.

18             You're also going to learn that the thousands and

19   thousands of credit card holders who used their credit cards

20   and their debit cards to buy marijuana during the time of this

21   alleged scheme, you're not going to hear any evidence that a

22   single one of them had their credit cards canceled by the

23   credit card companies or other banks.  Not one.  Out of all

24   those thousands of people who were supposedly doing something

25   illegal.  Not one.

**DJA378**

L31AWEI3ps                    Opening - Mr. Burck

1      Let me pause here to point out another crucial aspect

2  of the evidence in this case and something the prosecutors need

3  to prove beyond a reasonable doubt.  They must prove that the

4  defendants' intent, the defendants' intent, was to defraud the

5  banks that issued the cards, like Bank of America, Wells Fargo,

6  Citi -- the banks.  And in this trial, we do not believe there

7  will be a single shred of reliable testimony or evidence that

8  Ray Akhavan ever intended to defraud anyone, much less the

9  banks.  You heard the prosecutor in her opening blame Ray and

10  Ruben for a bunch of fake websites that the prosecutors say

11  were designed to fool the credit card companies and the banks.

12  But we expect the evidence will show that it was a man named

13  Oliver Hargreaves who was responsible for the websites.  They

14  reference Mr. Hargreaves, naming him as a cooperating witness.

15      Well, who is Oliver Hargreaves?  Well, it turns out

16  that Mr. Hargreaves, you'll learn this at trial, was already

17  accused of multiple federal felonies and secretly agreed to

18  help the prosecutors in this case to get himself a better deal.

19      And we think the evidence will show that the craziest

20  websites, the fake websites that the prosecutors laid out, the

21  ones they really rely on, those types of websites suddenly

22  appeared while Mr. Hargreaves was secretly cooperating with the

23  government.

24      MS. DEININGER:  Objection.

25      THE COURT:  Hold on a minute.

**DJA379**

L31AWEI3ps                    Opening - Mr. Burck

1            MR. BURCK:  We do not believe --

2            THE COURT:  Hold on.  There was an objection.

3            MR. BURCK:  I'm sorry.  I can't hear in here.  I'm

4    sorry.

5            THE COURT:  Overruled.

6            MR. BURCK:  Thank you, your Honor.  And my apologies,

7    your Honor.  I can't hear you very well in here.  That's why

8    I --

9            THE COURT:  No problem.

10           MR. BURCK:  No problem.

11           Let me step back briefly and repeat, we expect the

12   evidence will show that the craziest websites, the ones the

13   government is principally relying upon, suddenly appeared while

14   Mr. Hargreaves was secretly cooperating with the government.

15   We do not believe this is coincidence.  We don't think the

16   evidence will show this is coincidence.  Instead we expect the

17   evidence will show that these websites were Mr. Hargreaves's

18   creation while he was under the direction of the prosecutors.

19   And you will learn he had good reason to believe, and the

20   evidence will support, that this is true because

21   Mr. Hargreaves's job, expertise, is creating websites.  That

22   wasn't and never has been Ray's job, or his expertise.

23           So what was Ray's role in the alleged scheme to

24   allegedly defraud issuing banks?  Ray didn't work at Eaze.  He

25   didn't work at the credit card companies or the issuing banks.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA380

81

L31AWEI3ps                    Opening - Mr. Burck

1    Ray was an outside consultant to Eaze.  And Eaze wanted him to

2    advise them, based on his experience in the credit card

3    industry, on how to conduct credit card processing business.

4    The evidence will show that Ray was not part of the scheme to

5    defraud issuing banks.  Instead, we believe you will conclude,

6    after hearing all of the evidence, listening to the witnesses

7    and seeing the documents, that Ray's role was to help Eaze

8    navigate a system set up by Visa and MasterCard and the issuing

9    banks to permit marijuana transactions while not permitting the

10   buyer and the seller to be open about those transactions.  That

11   was the system we believe the evidence will show set up by the

12   credit card companies and the banks.

13          In sum, we expect the evidence will show that Ray

14   connected his contacts to the credit card industry, to Eaze, so

15   that Eaze could get marijuana from willing sellers, like

16   dispensaries, to willing buyers, like the thousands of card

17   holders who want to buy marijuana using their credit cards or

18   debit cards.  And the evidence will show that, by their

19   actions, the banks know what was going on, and welcomed these

20   transactions, which earn them fees and make their customers,

21   the credit card holders, the debit card holders, happy

22   shoppers.

23          Ladies and gentlemen, we appreciate your careful

24   attention to the evidence we'll hear at trial.  And like the

25   government, we ask that you use your common sense.  We ask that

L31AWEI3ps          Opening - Mr. Gilbert

1   you listen to Judge Rakoff.  We believe that if you do that,

2   after you've considered all the evidence in this case, you will

3   conclude the prosecutors have not proven their case beyond a

4   reasonable doubt, and we believe you will return a verdict of

5   not guilty for Ray Akhavan.  Thank you.

6           THE COURT:  Thank you very much.

7           Now we'll hear from counsel for Mr. Weigand.

8           MR. GILBERT:  Given what we've all been through in the

9   last year, it may be hard for you to remember, it may seem like

10  a distant memory of what life used to be like.  But let me ask

11  you to imagine something from our lives before this COVID.

12  Just for a minute, imagine a party, a big gathering of friends,

13  some music, some dancing, good food, conversation, and best of

14  all, no social distancing.  Just one of those nights when

15  everything was going well.  Everything is going smoothly and

16  everyone is getting exactly what they wanted out of the

17  evening, exactly what they came for.  And that's what happened

18  with Eaze.  Everyone got what they wanted.  The customers of

19  Eaze, they got legal marijuana delivered right to their door.

20  And they got to pay for it the way they paid for pretty much

21  everything else, using a credit card, exactly what they want to

22  do.

23          The drivers who worked for Eaze and did the

24  deliveries, they made money on the deliveries, and they didn't

25  have to pick up cash.  They were able to do their job without

L31AWEI3ps                    Opening - Mr. Gilbert

1  risking being robbed by having to drive around town with a lot

2  of cash in the car.  The Eaze investors and management, well,

3  they really had reason to party.  They did very, very well as

4  the value of the company skyrocketed.  The champagne was really

5  flowing for them.  The banks, I know you already figured that

6  part out, the banks did their thing.  They stood outside the

7  door where this lovely party was happening and from each person

8  who went inside, dressed to the nines, bringing a bottle of

9  wine, they took a little entrance fee.  And for good measure,

10 when people left laughing and a little tipsy on the way out,

11 they collected their fee too.  That's what banks do.

12                 (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

84

L31PWEI4                    Opening - Mr. Gilbert

1              MR. GILBERT:  And you may hear from some witnesses

2     from the banks at this trial that, as they stood outside the

3     door, collecting the fees, with the smell of good cooking

4     coming from inside, with people all dressed up, with the music

5     playing loud, well, they had no idea there could possibly be a

6     party going on inside.

7              Now, this was not Ruben Weigand's party.  It wasn't at

8     his house.  It wasn't even in his country.  It wasn't on his

9     continent.  He wasn't even on the guest list.  A friend said,

10    hey, come in and join us.  He came in late, and from what he

11    could see, everything was fine, but now Ruben Weigand is

12    sitting here.  Unfortunately, it's not a party.  It's as

13    serious as it can be, and only you, ladies and gentlemen, by

14    holding the government to its burden to prove the specific

15    crime they have charged, defrauding U.S. credit card-issuing

16    banks, and to prove it beyond a reasonable doubt, the highest

17    standard in our legal system, and let him leave and go back

18    home.

19             There will be no proof beyond a reasonable doubt that

20    Ruben Weigand, who has lived and worked his whole life in

21    Europe, ever intended to defraud banks in the United States,

22    banks whose only role in these transactions is that they issued

23    credit cards to people who wanted to buy marijuana in states

24    where it was perfectly legal to do so.

25             There will be no proof beyond a reasonable doubt that

**DJA384**

L31PWEI4                    Opening – Mr. Gilbert

1    Ruben Weigand acted with criminal intent towards U.S. banks.

2    There will be no evidence that he had any intent to harm a bank

3    in this country in any way, shape or form.  To be clear, there

4    will be no evidence that Ruben ever had a single meeting, a

5    single phone call, or wrote a single text message or e-mail to

6    any bank in the United States.  There will be no witness to say

7    that Ruben ever discussed banks in the United States with

8    anyone.

9            There will be no evidence that Ruben Weigand ever gave

10   a second thought to issuing banks in the United States, and at

11   the end of the day, you cannot conspire to deceive someone you

12   haven't even thought about.  The evidence will make clear that

13   before Ruben even knew about these credit card processing, Eaze

14   had already been taking credit card payments for years.  Eaze

15   had already been using European payment processors and European

16   merchant banks.

17           This had nothing to do with Ruben.  The evidence will

18   also show that when Ruben did get involved with Eaze payment

19   processing, when Eaze was looking to revise the processing

20   systems they had already been using since 2016, Ruben got

21   involved in 2018, and he had a very limited role.  And that

22   role was focused entirely on Europe, which is where he's from.

23           His role, to put it simply, is that he was an

24   introducer.  He introduced people he knew from his business

25   contacts in Europe to assist on the administrative end on the

L31PWEI4                    Opening - Mr. Gilbert

1    ground in Europe, as Eaze revised the payment processing system

2    they'd been using.  And you'll see he weighed in from time to

3    time on some e-mails or chats with some technical advice about

4    how to work with European banks and accounts.

5         And during the few months Ruben was involved, all of

6    the necessary steps to revise the Eaze processing system were

7    taken by others, most of them by Oliver Hargreaves, the

8    government's cooperating witness, who has cut a deal with them,

9    that gives him every reason to pin as much of it on Ruben as he

10   can.

11        But Oliver Hargreaves cannot change the fact that

12   there will be no evidence that Ruben had anything to do with

13   setting up the website that the government talked to you about

14   or those companies that they talked to you about.  There will

15   be no evidence that he even saw those websites.

16        My name is Michael Gilbert, along with Michael Artan,

17   who is seated in the back, and Shriram Harid and our

18   colleagues, we have the honor of representing Ruben Weigand in

19   this case.

20        Now, you've already heard from Mr. Akhavan's very able

21   lawyers about the incredibly tortured theory of bank fraud that

22   the prosecution is pursuing here, a fraud where everyone got

23   what they paid for, where the issuing banks, among them the

24   most sophisticated companies in the world, were supposedly

25   deceived about something that they could see out their windows

L31PWEI4                    Opening - Mr. Gilbert

1   in California; that people who were buying marijuana using

2   credit cards.

3           I won't repeat everything that Mr. Akhavan's lawyers

4   have said, but the fact that to this day you can continue to

5   use a card with a Visa/MasterCard logo on it to buy marijuana

6   through Eaze and the issuing banks continue day after day to

7   approve those transactions clearly labeled, coded as they say,

8   to make it clear, anyone who is looking at it, that it's

9   marijuana, that certainly bears repeating.

10          But as far as Ruben is concerned, there will be no

11  proof beyond a reasonable doubt that what the issuing banks did

12  with the little information, the codes that they got about

13  their card holder's transactions in the Visa/MasterCard system

14  that that mattered at all to Ruben.  His focus -- he wasn't

15  focused on Eaze at all.  And you'll see in the lengthy text

16  chain and all the documents, and there are many of them, for

17  much of them Ruben says nothing at all.  When he does chime in,

18  his focus is always on Europe and on the merchant banks in

19  Europe, not the alleged victims of this crime, U.S. issuing

20  banks.

21          His role stops and ends.  He was on the other side of

22  the ocean.  So how does Ruben end up here in this courtroom?

23  Well, despite everything I've just told you and everything you

24  heard, you will hear in this trial that in March of last year,

25  this man was on a vacation trip to Costa Rica.  He got off his

**DJA387**

L31PWEI4                    Opening - Mr. Gilbert

1   flight, connecting flight, in Los Angeles, and as he was

2   switching planes, he was arrested by the FBI.  He was

3   interrogated by the FBI.  He never made it to the connecting

4   flight.  He never went on that vacation.

5          Now, I will tell you a little bit more about Ruben,

6   who he is and his role in this Eaze credit card processing, but

7   before I do that, let me give you a few minutes about what Eaze

8   was doing before Ruben had anything to do with it.  Because it

9   is critical to understand what he was walking into, what the

10  evidence will show about what information was available to him

11  at the time he did get involved.

12         You've already heard Eaze was one of these Silicon

13  Valley darling companies, the next big thing, the Uber of pot,

14  a way to get marijuana delivered to your door with just a press

15  of a button on your phone.  And Eaze was not some

16  under-the-radar operation.  They had big-money investors,

17  lawyers, a well-developed website for all the world to see.  It

18  wasn't hidden.  By the end of 2017, Eaze had raised more than

19  $50 million from investors, and they wanted to have Eaze use

20  credit cards so the sales would increase, and Eaze did it.

21         They wanted to set up credit card processing and they

22  did it before Ruben was involved at all.  They used European

23  merchant bank accounts before Ruben was involved.  They used

24  European banks before Ruben was involved.  It was all in place

25  before Ruben had anything to do with it.  To use the label of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA388

L31PWEI4                     Opening – Mr. Gilbert

1    Silicon Valley, let's call that Eaze payment processing version

2    1.0.  That was already set up.

3           Who arranged for these European accounts and banks for

4    Eaze 1.0?  Starting as early as 2016, the evidence will show

5    that Eaze worked with a European company called Clearsettle, a

6    major European financial institution, a licensed UK financial

7    company.

8           Now, under the Visa/MasterCard rules, merchant banks

9    were required to contract only with companies in their own

10   jurisdictions.  It had become a common practice in Europe, and

11   other areas, for entities sometimes called proxy merchants, to

12   be set up in the same jurisdictions where their banks were.

13   Clearsettle was European.  Clearsettle could contract with

14   European parties.

15          You may have noticed yourself from time to time on a

16   credit card statement, if you purchase something online from

17   one company, it shows up on your company statement with the

18   name of a different company.  But you bought the product and

19   you paid for it.

20          It was only later, in early 2018, when Eaze processing

21   1.0, the first version, needed a system update, and they were

22   looking for the next thing, version 1.1.  Basically the same,

23   but a little bit different.

24          Now, let me pause here and say a little bit about

25   Ruben.  You will hear in this trial that Ruben is from Germany.

L31PWEI4                    Opening - Mr. Gilbert

1    That's where he grew up.

2          Now, it wasn't that long ago that all this payment

3    processing and being able to pay online for things was

4    something that couldn't be done.  We take it for granted now.

5    Ruben ran a company, a business called Payment Consultants.

6          MS. DEININGER:  Objection.

7          THE COURT:  Sustained.

8          MR. GILBERT:  You will hear that Ruben's unfortunate

9    involvement in this case traces back to a meeting you've

10   already heard about, where -- or you will hear about, I'm

11   sorry, in January of 2018.  He traveled to the U.S. for a trade

12   show.  A lot of payment processing people were attending.  He

13   was at Ray Akhavan's office for a meeting that had nothing to

14   do with Eaze.

15         Before that meeting, someone in Koen Van Prat, who

16   you'll hear about, came in with Oliver Hargreaves, the

17   government's star cooperating witness.  Ruben Weigand had never

18   heard or seen Oliver Hargreaves before.  The subject turned to

19   Eaze.  While marijuana had already been legal in California for

20   medical use, there was a big change in the works.  It was now

21   going to be legal for recreational use too.

22         For Eaze, this required increasing their credit card

23   processing capabilities, and they were looking to scale up

24   their system.  Now, think about the context.  Eaze was a

25   Silicon Valley company literally with billboards along the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**DJA390**

91

L31PWEI4                    Opening - Mr. Gilbert

1    highway in California.  Marijuana was legal in California and

2    about to become legal before --

3                MS. DEININGER:  Objection.

4                THE COURT:  Overruled.

5                MR. GILBERT:  I'm sorry, your Honor.  I couldn't hear

6    you?

7                THE COURT:  Overruled.

8                MR. GILBERT:  Thank you, your Honor.  It was legal

9    already for medical use and was about to become legal for

10   recreational use.  Venture capital funding, input from

11   consultants from the payment card systems, this was blue chip

12   America.

13              Based on the evidence about Eaze that you will see and

14   hear, Ruben had no reason to think that all of these people

15   involved in this would be in some grand conspiracy to violate

16   U.S. law.  Just at the point that Eaze was looking to

17   skyrocket, the processing version 1.0 had hit a wall, and they

18   were looking to do this update.

19              Ruben said at that meeting, you'll hear evidence of

20   it, Oliver Hargreaves will tell you, that there was discussion

21   about how Ruben would introduce people he knew in Europe, who

22   might be able to help Eaze and the team to prepare applications

23   to open additional merchant accounts in Europe, using the same

24   exact banks they had already been using in Europe but different

25   accounts.

**DJA391**

L31PWEI4                        Opening - Mr. Gilbert

1           The idea was that Ruben would introduce some people in

2    person during a trade show in London the next month.  At that

3    trade show in London in February of 2018, Ruben introduced

4    Oliver Hargreaves to one of his contacts in Europe, Andreas, to

5    get involved in the project.  And from there, it was clear that

6    Oliver's team would work with Andreas on new account

7    applications with the same merchant banks in Europe that they

8    had already been using.

9           Andreas was introduced to Eaze, and they started

10   communicate on a group e-mail, something called EU Processing,

11   which you'll hear about in this trial.  I'll just tell you

12   briefly about EU Processing.  It's not a company.  It's not an

13   office.  What is it?  Plain and simple, it's an e-mail address.

14   It's a shared e-mail address, meaning several people used it.

15          There will be no evidence that Ruben set up this EU

16   Processing e-mail account, created the account, or owned the

17   account.  It was an e-mail address used to coordinate the

18   various moving parts, dispensary, Eaze and the representatives

19   of the European merchant banks.  Oliver Hargreaves may look to

20   tie Ruben to everything that was said and done on that EU

21   Processing e-mail, but the evidence does not support it.

22   Guessing, speculating or reading between the lines is not proof

23   beyond a reasonable doubt.

24          Now, as you will see in this trial, Ruben returns to

25   Europe.  This connection has been made, and you're going to see

**DJA392**

L31PWEI4                    Opening - Mr. Gilbert

1   evidence, you're going to see chats and other communications,

2   that Ruben was on relating to the Eaze processing during the

3   next few months in early 2018.  Look at the evidence carefully.

4   You will see that much of it does not involve Ruben doing

5   anything, directing anyone to do anything, or contributing much

6   at all.  He weighs in from time to time with some technical

7   advice from his experience in Europe.

8           You'll see that most of the government's evidence

9   consists of communications that Ruben was not a part of in any

10  way.  And, in fact, you'll see that all of the key aspects of

11  the Eaze credit card processing system, version 1.1, were put

12  in place by Oliver and others.  But most importantly, you will

13  not see communications in which Ruben Weigand is discussing how

14  to go about fooling issuing banks in the United States.  If

15  Ruben was involved in a criminal conspiracy aimed at U.S.

16  issuing banks, you would think that in all the e-mails, chats

17  and texts, all the documents that you'll see in this trial, and

18  there are a lot, you would see him discussing how do you trick

19  banks in the United States.  You will not see that.

20          From mid-2018, Ruben was less and less involved in

21  these discussions and only occasionally heard from the parties,

22  and that makes sense.  He was the introducer.  He got people

23  connected, and they got things up and running.

24          Now, let me say a few words about Europe and about the

25  European side of this processing.  Let me be clear, those

**DJA393**

L31PWEI4                         Opening - Mr. Gilbert

1    merchant banks that you will hear about, they were not shady

2    underworld operations.  They were international financial

3    institutions.

4              MS. DEININGER:  Objection.

5              THE COURT:  Hold on.

6              (Pause)

7              Well, I'm doubtful about it, but I will allow it with

8    all the caveats that I've already given you.

9              The members of the jury, nothing counsel says is

10   evidence.  This is just his prediction.  It must be clear to

11   you by now that both sides are predicting very different

12   results of the testimony you will hear.  One side is saying

13   it's going to show a fraud filled with lies, the other side

14   says it's going to show nothing of the kind, and in any event,

15   their clients were not involved.

16             You're going to decide those conflicts and all the

17   other conflicts based on the testimony, not based on what

18   counsel says in opening arguments.  This is just supposed to

19   give you an overview.

20             And I do think, counsel, maybe you ought to trim your

21   remarks a bit.  It sounds like we're getting far into more

22   detail than is appropriate for opening argument.

23             MR. GILBERT:  Thank you, your Honor.

24             Well, I will just say that the evidence will show that

25   the merchant banks in Europe were all part of the

L31PWEI4                          Opening - Mr. Gilbert

1      Visa/MasterCard network.  In order to do that, they had to be

2      accepted onto that network by Visa and MasterCard.

3              Now, the government asks you to use your common sense

4      during this trial, and when you do, you'll be asking yourself:

5      Who are the witnesses against Ruben Weigand?  Almost every

6      single witness you will hear from has never met or spoken to

7      Ruben Weigand.  Listen closely to the witnesses from Eaze, the

8      beneficiaries of this credit card processing.  They barely know

9      who he is.

10             There is no one, no one who will take the stand and

11     tell you:  I can help you get inside the mind of Ruben Weigand

12     because I know him, I've spoken to him; he shared what he was

13     thinking with me.  So instead, what the government is trying to

14     do is string together a bunch of documents with no real

15     explanation and ask you to infer and to speculate and tell you

16     that it's proof beyond a reasonable doubt, but it is not.

17             Now, let me tell you about one witness who did have

18     one very important conversation with Mr. Weigand and that's the

19     government's cooperating witness, Oliver Hargreaves.  He's an

20     admitted money launder, extortionist, and he steals from his

21     own employer.  The evidence will show that.  The evidence will

22     also show that after he was arrested, he got on a flight and

23     went back to Spain.

24             But he got the hang of cooperating, and in May 2019,

25     you will hear he called Ruben.  Tape recorder in hand.  His

**DJA395**

L31PWEI4                    Opening - Mr. Gilbert

1   whole purpose in making that phone call, we expect he will

2   acknowledge, was to get Ruben to admit that he was involved in

3   a bank fraud scheme, that he conspired to victimize banks in

4   the United States.  He took his shot --

5           MS. DEININGER:  Objection.  Your Honor, the government

6   does not expect to introduce into evidence the call.

7           THE COURT:  No, but that doesn't mean that defense

8   can't elicit this on cross-examination.  Whether or not I will

9   allow that, we'll have to decide then, under all the facts and

10  circumstances.  But I don't think it's sufficiently outside the

11  bounds to warrant it an inappropriate in opening statement; so

12  it's overruled.

13          MR. GILBERT:  We expect the evidence will show that

14  when Oliver Hargreaves made this call, he got nothing, nothing

15  at all, from Ruben Weigand.

16          Now, the government also mentioned that Ruben made

17  some statements after he was arrested at the airport in

18  Los Angeles, and they said he was asked about Eaze, and he said

19  he saw it on a billboard.  And you'll listen yourself carefully

20  to that evidence.  But what the government is trying to do --

21  well, what you'll see, ladies and gentlemen, is that that

22  statement is just the opposite of what the government has

23  pointed to it for.

24          Think about it.  If Ruben Weigand had any inkling

25  whatsoever that he'd been involved in some grand conspiracy to

L31PWEI4                    Opening – Mr. Gilbert

1    victimize the most powerful financial institutions in the

2    United States, do you think he would have signed up for a

3    connecting flight in Los Angeles on his way to a vacation in

4    Costa Rica?  Of course not.

5             The government also said they found some statements

6    and wire confirmations about the Eaze processing on Ruben's

7    computer when he was arrested.  And look at that evidence very

8    carefully, and you will see document after document, file after

9    file, the evidence will show that these materials showed up on

10   his laptop only after this alleged conspiracy was over.

11            And most importantly, when you do look at the

12   materials that they got from his laptop, you will see that

13   there's no evidence of him doing anything with those materials

14   while this conspiracy was going on, this alleged conspiracy was

15   happening.

16            And most importantly, there is nothing in anything

17   from that laptop that is any evidence of Ruben defrauding a

18   U.S. credit card-issuing bank or even discussing a U.S. issuing

19   bank.  And again, if Ruben thought for one second he was

20   involved in some kind of criminal undertaking involving these

21   powerful U.S. institutions, why on earth would he take these

22   materials with him on his flight through the U.S. on a vacation

23   after this was already over?  He wouldn't.

24            Ladies and gentlemen, Ruben is charged with somehow

25   deceiving the most sophisticated financial companies in the

**DJA397**

L31PWEI4

1    world when those banks had easy, easy access to the very

2    information the government claims was the topic of some grand

3    deception.  How can you intentionally defraud someone you're

4    not even thinking about, have never communicated with, had no

5    reason to think could be hurt?  You cannot.  And Ruben did not.

6    If you hold the government to its burden of proof, you will

7    find that Ruben Weigand is not guilty.

8               THE COURT:  Thank you very much.

9               All right.  Ladies and gentlemen, that concludes

10   opening statements.  Tomorrow, we will start with the evidence

11   starting at 9:45.  Since we want to make sure that we finish

12   this trial in three weeks or less, it's important that we start

13   every day at 9:45.

14              So what I suggest is that you aim to be in the room

15   that my courtroom deputy showed you that you'll come into in

16   the morning, where you just came up from, by 9:30, and that

17   way, we can be sure that you're all here by 9:45 and we can

18   start right on time.

19              So have a very good evening, and I'll see you tomorrow

20   at 9:45.

21              THE DEPUTY CLERK:  We're going to go back out the way

22   we came in, ladies and gentlemen.

23              (Jury not present)

24              THE COURT:  Please be seated.  So the last objection

25   raised an issue that I don't think had been raised previously

**DJA398**

L31PWEI4

1    with the Court, but if I understand what counsel was arguing,

2    you want to argue that when the government attempted, through

3    its undercover agent -- I'm sorry, through its cooperating

4    witness to elicit incriminating statements from Mr. Weigand,

5    they got nothing.  And I think that is probably admissible, but

6    let me hear what the government's objection is.

7            MS. DEININGER:  Your Honor, the evidence of what

8    Mr. Weigand said on this call is -- I think is simply hearsay.

9    It is not being admitted against the --

10           THE COURT:  No, their argument is he was being -- this

11    presumably would come out in cross with your cooperator.  The

12    cooperator is being asked to elicit incriminating statements

13    from Mr. Weigand.  They had a conversation for that purpose,

14    and lo and behold, what Mr. Weigand said was not incriminating.

15    That seems to me to be evidence of his lack of criminal intent.

16           I can instruct the jury it's not being offered for its

17    substance; so I don't understand why that wouldn't be

18    admissible.

19           MS. DEININGER:  It's not that Mr. Weigand said

20    nothing.  They did have conversations, and so the only way to

21    assess whether or not what he said was incriminating would be

22    to hear what Mr. Weigand said in those conversations.

23           THE COURT:  Well, once they go down that road, even if

24    you previously had said you weren't going to introduce it, then

25    the door is open for you to introduce it, if you prefer, as a

**DJA399**

L31PWEI4

1    classic opening the door.  But they, obviously, have made that

2    strategic decision.

3         MS. DEININGER:  Your Honor, the government has no

4    intent on introducing those calls, and our position is that

5    asking questions about those statements would be directly

6    attempting to elicit those hearsay statements.

7         THE COURT:  If they were offering it for -- let me

8    give a hypothetical.  So in my hypothetical, undercover

9    cooperator X calls up Mr. Y and says: Don't you remember when

10   we agreed to rob that bank?  And Y says:  You got to be

11   kidding.  We never agreed to anything like that.  Don't joke

12   around.  That's baloney.  That would not be admissible to show

13   that they didn't rob the bank but, over a hearsay objection, it

14   would be admissible to show lack of intent because he was being

15   invited, by someone who allegedly was his co-conspirator, to

16   confirm incriminating matters and instead he didn't.

17        I'm raising this now because if there's case law on

18   this that you want to bring to my attention, that's fine, and

19   I'm not making any final ruling, but it seems to me that it's

20   probably admissible with a limiting instruction.

21        MS. DEININGER:  Yes, your Honor.  I think we would

22   like a chance to submit something in writing on that.

23        THE COURT:  Okay.  That's fine.

24        So just as a more general matter, if, at the end of

25   the day, in reflecting on the day's proceedings, you, any

DJA400

L31PWEI4

1  party, comes up with, gee, I wish I had argued more about so

2  and so, and I have not yet made a final ruling, then you are

3  free, without further permission needed from the Court, to send

4  an e-mail, copying of course all lawyers, saying, you know,

5  apropos the pending issue of so and so, we also want to bring

6  to your Honor's attention whatever you want to say.

7        By contrast, once I've ruled finally, I don't want to

8  hear from you.  Okay?

9        All right.  Very good.  So I look forward -- as I

10  said, we should congregate -- I don't think we have much to

11  discuss -- so maybe 9:30 tomorrow rather than 9:00, and we'll

12  start promptly at 9:45.

13        MS. LA MORTE:  Just one point of clarification on the

14  schedule, your Honor.  I don't remember if this juror was

15  selected, but there was some juror that had some sort of

16  doctor's appointment or vaccine.

17        THE COURT:  That juror was excused.

18        MS. LA MORTE:  I think it was three.

19        THE COURT:  There's no juror presently, that I can

20  recall, that has anything other than a total devotion to

21  listening to your testimony or to your presentation.  So I'm

22  sure if there's anything contrary, the juror will let me know,

23  but I'm pretty sure that everyone -- there were several jurors

24  that had that chronic problem, and I think they all wound up

25  being stricken.

DJA401

L31PWEI4

1          All right.  Very good.  I'm sorry, was there something

2     else?

3          MR. TAYBACK:  There is one additional matter.  We will

4     be submitting a proposed order on an application for, I believe

5     there's a plan to test the remote testimony devices this

6     afternoon in court.  In order to do that, we have to bring in a

7     couple extra laptops that are only for the purpose of that

8     testimony.

9          THE COURT:  It's all okay with me.  The person who

10    knows whether we need an order or not is really Linda; so you

11    should e-mail her and she will let you know.

12         MR. TAYBACK:  We will do that.  Thank you, your Honor.

13         THE COURT:  All right.  See you tomorrow.

14         (Adjourned to March 2, 2021, at 9:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

L32PWEI1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                          20-CR-188 (JSR)

5   RUBEN WEIGAND and
    HAMID AKHAVAN,
6
                    Defendants.          Trial
7
    ------------------------------x
8
                                         New York, N.Y.
9
                                         March 2, 2021
10                                       9:30 a.m.

11
    Before:
12
                          HON. JED S. RAKOFF
13
                                         District Judge
14

15                          APPEARANCES

16  AUDREY STRAUSS
         United States Attorney for the
17       Southern District of New York
    BY:  NICHOLAS FOLLY
18       TARA MARIE LA MORTE
         EMILY S. DEININGER
19       Assistant United States Attorneys

20  DECHERT LLP
         Attorneys for Defendant Weigand
21  BY:  MICHAEL J. GILBERT
         SHRIRAM HARID
22       ANDREW J. LEVANDER
         STEPHEN PELLECHI
23       -and-
    MICHAEL H. ARTAN
24       Attorney for Defendant Weigand
         -and-
25  WILSON, SONSINI, GOODRICH
         Attorneys for Defendant Weigand

L32PWEI1                    Trial

1    BY:  MORRIS J. FODERMAN
           KATHERINE T. MCCARTHY
2
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
3          Attorneys for Defendant Akhavan
     BY:  WILLIAM A. BURCK
4          CHRISTOPHER TAYBACK
           SARA CLARK
5          MARI HENDERSON
           DEREK SHAFFER
6          PAUL SLATTERY
           -and-
7    ROTHKEN LAW FIRM LLP
           Attorneys for Defendant Akhavan
8    BY:  IRA P. ROTHKEN
           JARED R. SMITH
9
     WILMER CUTLER PICKERING HALE AND DORR LLP
10         Attorneys for Interested Party
           Bank of America, N.A.
11   BY:  JUSTIN GOODYEAR

12   NELSON MULLINS RILEY & SCARBOROUGH LLP
           Attorneys for Interested Party
13         Circle Internet Financial, LLC
     BY:  MATTHEW G. LINDENBAUM
14

15

16

17

18

19

20

21

22

23

24

25

**DJA404**

L32PWEI1                    Trial

1          (Trial resumed; jury not present)

2          THE COURT:  Please be seated.  Okay.  We have a number

3    of things to take up.  First, my law clerk received a message

4    from juror No. 16.  You may recall that is the woman who had

5    said that she was the sole income for her household, but that

6    she felt she could work early in the morning and late in the

7    afternoon and in the evening; so it wouldn't be a problem for

8    her to serve.  But she's had second thoughts about that; so we

9    will take that up with her in a few minutes, as soon as she

10   arrives.

11         Then my law clerk tells me that the parties e-mailed

12   him about various evidentiary disputes that are likely to come

13   up today.  I thank you for doing that.  First, the government

14   intends to introduce through its first witness, Michael

15   Tassone, certain e-mails from the ProtonMail e-mail account

16   that allegedly was used by Weigand, and this was one of the

17   motions in limine that I had reserved on.

18         The defendants argue that the government has not shown

19   these were e-mails to and from Weigand.  Most of the e-mails

20   involving this e-mail address are signed "EUP" or

21   "EUprocessing," somewhere drafted by someone named Andreas.

22   Only three exchanges reference a Ruben.  The defendants argue

23   that this evidence is unfairly prejudicial because, among other

24   things, it may lead the jury into believing, without sufficient

25   evidence, that Mr. Weigand sent or received all of these

DJA405

L32PWEI1                    Trial

1    e-mails.

2            So let me hear the government on that.

3            MS. LA MORTE:  Yes, your Honor.  I have a few

4    responses to that.  The first response, your Honor --

5            THE COURT:  I'm sorry, we can continue because it only

6    relates to Mr. Weigand at the moment, but we need to bring in

7    the other defendant.  Thank you.

8            Yes.

9            MS. LA MORTE:  Your Honor, the first point that the

10   government wants to make, and I have several points to make, is

11   that the government doesn't have to show that Ruben,

12   Mr. Weigand, was the user or the controller of this account for

13   the e-mail to and from and including EUprocessing.com to come

14   in.

15           And just to take a step back for the Court, as the

16   Court is aware from the filings and the statements in this

17   case, in the 2016 and 2019 period, there were two primary

18   processors at play, one was Clearsettle and one was

19   EUprocessing.  And there's going to be witness testimony in

20   this case from several witnesses that both of those entities

21   were controlled by Ray Akhavan.

22           And within Eaze, the company, there's going to be

23   testimony that employees within the company referred to

24   Clearsettle as "Clearsettle" and to the EUprocessor as "EUP" or

25   "EUprocessing."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L32PWEI1                    Trial

1       Now, the government has identified EUprocessing as a

2   co-conspirator in a bill of particulars, which has been

3   furnished to the defendants.  And the whole point of setting up

4   the EUprocessing.com account, and there will be testimony on

5   this, is in furtherance of the scheme.  We provided your law

6   clerk --

7       THE COURT:  In short, you're saying regardless of

8   whether or not it came from Mr. Weigand, these are statements

9   of a co-conspirator in furtherance of a conspiracy?

10      MS. LA MORTE:  Yes, your Honor.  And there will be

11  witness testimony in the case to help corroborate that.  But in

12  addition, your Honor, we do have evidence and testimony that

13  goes to show separately that Ruben Weigand was the individual

14  that controlled this account, even though, at times, members of

15  his organization, such as Andreas may have used the account.

16      One of our cooperating witnesses is expected to

17  testify that Ruben directed him to send certain documents to

18  the EUprocessing.com address.  That witness will further

19  testify that whenever he wanted to reach Mr. Weigand via

20  e-mail, he would do so at the EUprocessing.com address, and as

21  the defense has noted, many of the e-mails are signed "EUP" --

22      THE DEPUTY CLERK:  Jury entering the courtroom.

23      THE COURT:  We'll take up the matter of the juror at

24  the sidebar in the other adjoining room.

25      (Continued on next page)

L32PWEI1                    Trial

1           (At the side bar)

2           THE COURT:  Come on in.

3           THE DEPUTY CLERK:  This is juror No. 16.  Only one

4    attorney from each side is supposed to be in this room, and

5    also one attorney for each entity.  There are too many people.

6           MR. GILBERT:  May we have our client in as well, your

7    Honor?

8           THE COURT:  Yes, but as a regular matter on sidebars

9    that will just be dealing with true and legal issues, no

10   clients.  It just complicates matters, but if they're here,

11   they're here; so....

12          MS. LA MORTE:  Your Honor, would like some of us to

13   leave?

14          THE COURT:  No, that's okay.  You know, space yourself

15   as best you can.

16          THE DEPUTY CLERK:  Six feet away.

17          THE COURT:  Being only five-foot-six myself, I have no

18   idea what six feet looks like.

19          MR. GILBERT:  I wondered myself.

20          MS. LA MORTE:  Being only five feet --

21          THE COURT:  All right.  So --

22          THE DEPUTY CLERK:  There are too many people in that

23   room right now.

24          THE COURT:  So why don't you fellows stay there.  You

25   can hear from there.

L32PWEI1                    Trial

1          Okay.  So I heard you had a problem?  What's the

2    problem?

3          JUROR:  Yes, your Honor.  So apologies, but yesterday

4    when you were questioning my occupation and the flexibility, I

5    realized right after, and I let the clerk with the microphone

6    know.  And I raised my hand that the financial hardship that a

7    three-week trial would prevent, there is no flexibility.  It is

8    a 9:00 to 5:00 contract with Verizon; so I'm not able to be as

9    flexible as initially the --

10         THE COURT:  Yes, I wish you would have told us when we

11   were first because now, of course, we have -- we could have

12   replaced you right away.

13         JUROR:  No, and I did -- excuse me.

14         THE COURT:  You indicated to someone?

15         THE DEPUTY CLERK:  So I indicated right away to the

16   clerk with the microphone, and I didn't even get a chance to

17   finish whether I'm from Manhattan or single; so it just kind of

18   quickly happened.  And right afterwards, I said to him that

19   there was further details that I think would be important to

20   the matter.  So apologies, your Honor.

21         THE COURT:  Yes.

22         JUROR:  But I did try.

23         THE COURT:  You have a -- normally, I would have

24   excused you without any question, and the problem now is, of

25   course, we can't replace you because the jury's been selected,

**DJA409**

L32PWEI1                    Trial

1    but what -- you say you have a 9:00 to 5:00 contract with

2    Verizon, what do you mean by that?

3            JUROR:  Yes, so when you asked if it was a remote

4    position, so it's not in an office at the moment due to Covid.

5    So you did ask if it was remote, and I said yes.  And then you

6    did question if there might be flexibility, and a quick moment

7    I thought, yes.  But then right as I, you know continued, I

8    realized the financial hardship that that would place.

9            THE COURT:  What's the financial hardship?

10           JUROR:  So the $50 a day would not be able to provide

11   me to pay my rent or student loans that are not federal loans.

12           THE COURT:  No, no, I understand that, but tell me

13   more about what you do for a living.

14           JUROR:  So I'm a web designer, but I supervise a team;

15   so it is 9:00 to 5:00 versus -- you know, freelance web design

16   would be more flexible that I could work weekends or after

17   hours, but that's not the case.

18           THE COURT:  Because?  Just because of that contract

19   with Verizon?

20           JUROR:  Right, because it's a 9:00 to 5:00 position,

21   and not being able to be there would disrupt.

22           THE COURT:  All right.  Do counsel for any of the

23   parties want to put any questions to the witness, to the juror?

24           MR. TAYBACK:  Not on behalf of Mr. Akhavan.

25           MR. GILBERT:  No, your Honor, on behalf of

DJA410

L32PWEI1                    Trial

1   Mr. Weigand.

2           THE COURT:  Very good.  Why don't you go back into the

3   courtroom.  We'll be with you.  I'll discuss it with the

4   attorneys, and we'll give you a decision very shortly.

5           JUROR:  Okay.  I appreciate your time.  Thank you.

6           THE DEPUTY CLERK:  In the jury box, Judge?

7           THE COURT:  Yes.

8           (Juror not present)

9           THE COURT:  So I'm always reluctant to excuse a juror

10  once we have a jury in place because you never know what's

11  going to happen.  Nevertheless, we have four alternates.  She's

12  No. 16, the very last; so if we had to excuse anyone, she's a

13  good candidate.  So I'm inclined to excuse her, but let me hear

14  if there's anyone that disagrees with that?

15          MS. LA MORTE:  No, your Honor, not from the

16  government.

17          MR. TAYBACK:  No, not from Mr. Akhavan.

18          MR. GILBERT:  No, your Honor.

19          THE COURT:  All right.  Let's go back.

20          (Continued on next page)

21

22

23

24

25

DJA411

L32PWEI1                    Trial

1          (In open court)

2          THE COURT:  All right.  Well, you'll be delighted to

3    know that the jury of lawyers have reached a verdict, and they

4    all agree that you should be excused.  So anyway, thank you for

5    bringing that to our attention.  I'm sorry that we didn't work

6    this out yesterday.

7          Anyway, when you go back to the jury room, just get

8    your stuff and leave.  Don't get into any conversation.  I'll

9    tell the jury that something unexpected came up, and you had to

10   be excused.  All right?

11         JUROR:  I appreciate it.  Thank you, your Honor.

12         THE DEPUTY CLERK:  Joe Dornley, juror No. 13, takes a

13   train from White Plains.  He called me, and he said the train

14   was delayed and he won't get to Grand Central until 9:30.

15         THE COURT:  Okay.  So we have other things to discuss.

16         THE DEPUTY CLERK:  Okay, very good.

17         JUROR:  Thank you, your Honor.

18         THE COURT:  Linda, let us know as soon as all of the

19   jurors are in.

20         THE DEPUTY CLERK:  Will do.

21         (Juror excused)

22         THE COURT:  Was there anything else the government

23   wanted to say on those exhibits?

24         MS. LA MORTE:  No, other than they're admissible as

25   statements of a co-conspirator, notwithstanding that whether or

DJA412

L32PWEI1                    Trial

1   not the government directly connects them to Ruben Weigand, but

2   in any event, the government intends to connect them to Ruben

3   Weigand.  And the e-mails are in furtherance of the scheme.

4           The only thing I would add is the government's

5   intention.  There are a number of these e-mails in this motion

6   in limine, and with respect to the first witness, and I believe

7   many of the other witnesses, the foundation is the same.  And

8   so the government is intending to move them in en mass, you

9   know, all at once.

10          THE COURT:  I will deal with that when you move them.

11          MS. LA MORTE:  Okay.

12          THE COURT:  But assuming -- well, let me hear from

13  defense counsel.

14          MR. GILBERT:  Thank you, your Honor.  Well, first,

15  with regard to the co-conspirator statement --

16          THE COURT:  Yes, you need to get a little bit closer

17  to the microphone.

18          MR. GILBERT:  If I understand the government's

19  position, I don't see how an e-mail address, which is what EUP

20  is, could possibly be a co-conspirator.

21          THE COURT:  Well, an e-mail address is an instrument

22  of either a person or an entity, and so if that person or

23  entity is a co-conspirator, then the e-mail address is an agent

24  of the co-conspirator.

25          MR. GILBERT:  The government hasn't produced any

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L32PWEI1                    Trial

1    metadata or any evidence that would demonstrate who it was

2    communicating with on the EUP e-mail address at any given time

3    or at any time at all.  And so in the absence of --

4           THE COURT:  No, no.  But maybe I'm misunderstanding

5    the government's point, but as I understand it, this is an

6    e-mail that was associated with EUprocessing?  And EUprocessing

7    is allegedly a co-conspirator.

8           MR. GILBERT:  Exactly.  I believe that's what the

9    government's articulating.  I don't understand how EUprocessing

10   could possibly be a co-conspirator because EUprocessing is an

11   e-mail address.  It isn't an entity.  It isn't a party.  It

12   isn't a person.

13          THE COURT:  When you say it's an e-mail address, what

14   function did it serve?

15          MR. GILBERT:  My understanding is that it was an

16   e-mail address that --

17          THE COURT:  I mean, it wasn't just out there in the

18   ether.

19          MR. GILBERT:  Right.  There are over 200 EUprocessing

20   e-mails that the government has listed on its exhibit list, and

21   the majority of them, at least on the face of them, suggest

22   that there were communications between someone named Andreas --

23          THE COURT:  No, no.  Excuse me.  That's important, but

24   what is your understanding, if you have one, as to what the

25   purpose of EUprocessing e-mail address was?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**DJA414**

L32PWEI1                    Trial

1       MR. GILBERT:  There are communications that purport to

2    be from EUprocessing that -- in which there are discussions

3    about merchant accounts related to processing these on the face

4    of them.  We don't disagree with that itself.

5       THE COURT:  All right.

6       MR. GILBERT:  But the concern, among others, is that,

7    in the absence of any evidence as to who was communicating

8    about the merchant account through this e-mail address and that

9    the e-mail address -- the exhibits that are from EUP, on the

10   face of them, demonstrate that there are multiple people

11   communicating at the e-mail --

12      THE COURT:  I guess maybe I'm still missing your

13   point.  Let's say, in my hypothetical, company X is a

14   co-conspirator and they have an e-mail address, and it is used

15   by various people to further the activities of company X, which

16   are alleged, in my hypothetical, to be unlawful.  Why doesn't

17   that clearly fit within the co-conspirator section?

18      MR. GILBERT:  If there was a company, let's say

19   hypothetically Hewlett Packard because I see the name there,

20   was listed as a co-conspirator, and there are e-mails that are

21   from the Hewlett Packard e-mail address, that would be one

22   thing.  That's not what we have here.  The EUP is not a Hewlett

23   Packard.  It's not a company.  It's not an entity.

24      THE COURT:  Who set it up?  Maybe I should ask the

25   government?

DJA415

L32PWEI1                    Trial

1           MR. GILBERT:  I don't believe that --

2           THE COURT:  Let me ask them.

3           MS. LA MORTE:  It's certainly not, as far as we are

4     aware, our knowledge, that it's a formally incorporated

5     company.  It's basically a criminal organization, your Honor.

6           THE COURT:  No.

7           MS. LA MORTE:  And there is case law --

8           THE COURT:  Wait a minute.

9           MS. LA MORTE:  It's Mitchum Weigand --

10          THE COURT:  Who set it up was my question.

11          MS. LA MORTE:  Who set it up?  Someone -- the e-mail

12    address or the organization?

13          THE COURT:  Well, let's -- when you say organization,

14    what do you mean?

15          MS. LA MORTE:  I'm referring to Mr. Weigand and his

16    agents.

17          THE COURT:  So you think Mr. Weigand created

18    EUprocessing?

19          MS. LA MORTE:  I'm not saying Mr. Weigand created

20    EUprocessing.  I'm saying EUprocessing.com was an e-mail that

21    was used by Mr. Weigand and his agents.

22          THE COURT:  I'm sorry?

23          MS. LA MORTE:  I'm sorry, your Honor.  This feedback

24    is --

25          THE COURT:  Yes.

DJA416

L32PWEI1                    Trial

1        MS. LA MORTE:  Our position, your Honor, is that

2    EUprocessing.com is an e-mail address that was created

3    specifically for this scheme for use by Mr. Weigand and his

4    agents to further the scheme.

5        THE COURT:  Okay.  So now back to Mr. Gilbert.

6    Assuming the government can introduce evidence to that effect,

7    why isn't that -- Weigand then becomes statements of

8    co-conspirators?

9        MR. GILBERT:  If I understand the government

10   correctly, I believe what they were saying is the way they

11   intend to introduce such evidence is to have the government's

12   cooperating witness testify that he sent communications to this

13   e-mail address, and I don't think that makes the connection

14   because I don't believe you will see any evidence that

15   Mr. Weigand then engaged in a communication with this person;

16   so --

17       THE COURT:  Well, that's a different question.  So

18   you're saying that while, hypothetically -- though you are not

19   conceding it, but it seems to me the government is well on its

20   way to establishing -- that this, the statements made by those

21   who set up and use this e-mail address, where a statement is

22   spoken of co-conspirators, that doesn't make the statements of

23   people from outside who made statements to the e-mail address,

24   the same as the co-conspirator; now, that's the point you're

25   making, yes?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA417

L32PWEI1                    Trial

1          MR. GILBERT:  Well, I don't believe the government

2     will be able to establish that any statement on its EUP address

3     was a statement of a co-conspirator because it --

4          THE COURT:  Well, I understand that's your position,

5     but I thought you were making a separate point now, which I

6     understood to be that, even assuming arguendo and contrary to

7     your view, that statements made on EUprocessing by people who

8     were associated with EUprocessing in the scheme as alleged here

9     might -- assuming they are statements of co-conspirators, that

10    that doesn't make a statement of an outsider that goes to the

11    e-mail address, the statement of a co-conspirator?  Isn't that

12    your fallback position?

13         MR. GILBERT:  That is one of them.

14         THE COURT:  Okay.

15         MR. GILBERT:  I can give you another one.

16         THE COURT:  So what about that?

17         MS. LA MORTE:  Your Honor, that might be a

18    case-by-case determination in terms of e-mails or messages that

19    are sent to EUprocessing.  I imagine some of them would be for

20    context, many of them are going to be of co-conspirators.

21         THE COURT:  Excuse me.

22         MS. LA MORTE:  If not all --

23         THE COURT:  Can you give me -- I have a few exhibits

24    that were apparently sent to my --

25         MS. LA MORTE:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L32PWEI1                    Trial

1           THE COURT:  Pick one and tell me what the foundation

2     you will lay for its admissibility.

3           MR. GILBERT:  Apologies, your Honor.  Can I interrupt

4     on a slightly different issue?  We have some concerns that the

5     first witness for the government may be in the courtroom.  We

6     just want to confirm that we're wrong about that.

7           MS. LA MORTE:  No.

8           THE COURT:  Is he here?  He shouldn't be here.

9           MS. LA MORTE:  He is here, your Honor, but he's not in

10    the courtroom.

11          MS. DEININGER:  Your Honor, the witness is present in

12    the courthouse.  He's not in the courtroom.  He's waiting in a

13    conference room outside.

14          THE COURT:  That's fine.

15          MR. GILBERT:  Okay.

16          THE COURT:  So he's not in the courtroom, that's all

17    we care about.

18          MS. DEININGER:  That's correct.

19          THE COURT:  Go ahead.

20          MS. LA MORTE:  All right.  Your Honor, I'm just

21    looking at the e-mail I sent your clerk this morning to find an

22    example.

23          THE COURT:  So I have here, it's Exhibit --

24          MS. LA MORTE:  I mean, we can start with 566 is one of

25    the ones I sent you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L32PWEI1                    Trial

1           THE COURT:  All right.  Let's start with 566.  So this

2    is an e-mail from EUprocessing.

3           MS. LA MORTE:  So they're actually -- on this one,

4    they're both from EUprocessing.  The bottom e-mail is a message

5    from EUprocessing to Michael Tassone, who is the government's

6    first witness, as well as John Wang, who is also on the

7    government's witness list.

8           It says:  Hello, Michael.  Hello, John.  A new

9    processing channel has been opened by the bank today.  The

10   accounts are set up, account names.  Please use the account as

11   an extension for Grieve Goddness.  In the e-mail it is spelled

12   G-o-d-d-n-e-s-s.  And then there's a chart below.

13          And what we see on this chart is a marijuana

14   dispensary name, all the way in the left-hand column.  These

15   are the dispensaries that advertise their products on the Eaze

16   platform.  You have a site address, which is the fake website.

17          THE COURT:  So --

18          MS. LA MORTE:  I'm sorry.

19          THE COURT:  So who do you contend this e-mail is from?

20   It says EUP.

21          MS. LA MORTE:  Two things, your Honor.  It is from the

22   EUprocessing organization, which is a co-conspirator identified

23   in this case.

24          THE COURT:  All right.  So this doesn't fall into the

25   category that I was asking about, which was e-mails from

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA420

L32PWEI1                    Trial

1    outsiders to the e-mail.  This is from the EUprocessing people?

2              MS. LA MORTE:  Correct.  Let me --

3              THE COURT:  Okay.  So I don't have any problems with

4    that.  The defense has their objections.  I'm overruling those

5    objections subject to, of course, laying a proper foundation

6    through the witness, but I thought there were some e-mails that

7    defense counsel has also objected to that came from other

8    people to EUP.

9              MS. LA MORTE:  That was not identified with

10   particularity from the government, but I have an example that I

11   sent to the Court, where there is a response sent to

12   EUprocessing.  If you want to --

13             THE COURT:  Yes, so if an e-mail that comes in from

14   the third party, who is not a co-conspirator, it is still

15   admissible if there's a response from the co-conspirator.

16             MS. LA MORTE:  Correct.

17             THE COURT:  Yes, thank you.  Good to know.

18             MS. LA MORTE:  You know better than I, your Honor.

19   Far better, but yes.  I didn't mean it that way.

20             THE COURT:  The objections are overruled.

21             MR. GILBERT:  If I may, your Honor, briefly be heard?

22             THE COURT:  Yes.

23             MR. GILBERT:  In addition to our -- to the hearsay

24   objection, we have a 403 objection, and I think our discussion

25   this morning really makes very clear how confusing and likely

DJA421

122

L32PWEI1                    Trial

1   it is that this will mislead the jury and ask them or require

2   them to speculate about who it is that actually communicated,

3   and it's a critical point.

4           THE COURT:  Well, I think I have to hear the testimony

5   of the witness before I can rule on the 403, but at least

6   tentatively I don't see it as a 403 problem.  Since there are a

7   whole bunch of these e-mails, we can confront the 403 issue on

8   the first or second one that comes up, and then if I rule in

9   your favor, the others will not come in, and if I rule against

10  you, the others probably will.  All right.

11          MR. TAYBACK:  Your Honor, so the record is clear,

12  Mr. Akhavan joins in those objections, although Mr. Gilbert

13  argued them.

14          THE COURT:  Okay, duly noted.  Why don't we just

15  assume, to make things easy, that any objection made by either

16  defendant is joined in by the other defendant automatically; so

17  you don't have to say anything on the record.  If there's

18  ever -- which I doubt that there will ever be -- an objection

19  made by one defendant and the other defendant does not want to

20  join in, then you have to tell me, but other than that, it will

21  just be assumed.

22          MR. TAYBACK:  Thank you, your Honor.

23          MR. GILBERT:  Thank you.

24          THE COURT:  All right.

25          MS. LA MORTE:  There was one additional document the

DJA422

L32PWEI1                    Trial

1   defense raised an objection to that is not an EUprocessing

2   e-mail.

3          THE COURT:  I'm sorry?

4          MS. LA MORTE:  There is one other -- I felt like I was

5   doing much better yesterday with my volume.  There was one

6   other document that the defense raised an objection to that the

7   government intended to admit with this witness.

8          THE COURT:  That's 679?

9          MS. LA MORTE:  Yes, your Honor.

10         THE COURT:  Let me pull that out.  Hang on.  All

11  right.  So this is an e-mail from Michael Tassone, who is --

12         MS. LA MORTE:  Your Honor, it's to Michael Tassone,

13  who is the government's first witness.

14         THE COURT:  I'm sorry, to Michael?

15         MS. LA MORTE:  Tassone.

16         THE COURT:  From Stephen Pearce.  Who's Stephen

17  Pearce?

18         MS. LA MORTE:  He is the CEO and owner of a marijuana

19  dispensary, at one point, called Wildflower.

20         THE COURT:  Okay.  And what's the basis for

21  admissibility?

22         MS. LA MORTE:  Co-conspirators' statement in

23  furtherance of --

24         THE COURT:  Who is the co-conspirator?

25         MS. LA MORTE:  Stephen Pearce, the owner of

DJA423

124

L32PWEI1                    Trial

1   Wildflower.

2           THE COURT:  So assuming that he is a co-conspirator, I

3   think -- any other objection that's being made because that

4   contrasts with the defense counsel.

5           MR. GILBERT:  Our objection is hearsay and relevance,

6   and if I may address the co-conspirator?

7           THE COURT:  Hearsay -- assuming they establish enough

8   to show that he's a co-conspirator, is there any other

9   objection you're raising?

10          MR. GILBERT:  Relevance.

11          THE COURT:  Yes.  Okay.  All right.  So subject to

12  foundation being laid, that objection is overruled.  All right.

13          MR. GILBERT:  May I be heard?  May I be heard briefly

14  on the co-conspirator issue, your Honor?

15          THE COURT:  Sure.

16          MR. GILBERT:  So we received a list literally of 146

17  individuals from the government that they notified us, pursuant

18  to your order, were co-conspirators in this scheme.

19  Mr. Stephen Pearce is not on that list.

20          MS. LA MORTE:  Wildflower, your Honor, is on that list

21  as an entity that is a co-conspirator.  Stephen Pearce is the

22  CEO and owner of Wildflower.  In November the government

23  produced an exhibit list that included documentation that

24  showed that Stephen Pearce is the owner of Wildflower.

25  Obviously, entities as to individuals, this is the highest

L32PWEI1                    Trial

1    member of the entity.

2         MR. GILBERT:  The list, in addition to 146

3    individuals, also included at least 50 entities, and many of

4    the individuals who were associated with entities were on the

5    list.  Mr. Pearce, again, was not on it.

6         THE COURT:  First of all, on its face, it seems to be

7    at least in part being stated in his capacity as CEO of

8    Wildflower.  Second of all, on its face, he expresses an

9    effective identity between Wildflower and himself, at least

10   with respect to matters in this matter.  So I think there's no

11   surprise that he would be considered a co-conspirator.

12        MR. GILBERT:  He -- I'm sorry.  He, also in the

13   e-mail, your Honor, recounts statements from a bank manager,

14   who is presumably not a co-conspirator and that -- those

15   statements do not fall within the objection.

16        THE COURT:  I'm sorry, what are you referring to?

17        MR. GILBERT:  In the first paragraph he says:  The

18   last bank closer, the manager, came right out and said we

19   cannot do any business with Eaze.

20        THE COURT:  So that's why I asked you if you had any

21   other objection because I thought you might have an objection

22   to that.  That is hearsay within the hearsay.  So the

23   co-conspirator hearsay exception doesn't cover that, but I take

24   it it's not being offered for its truth, but to explain what

25   follows in the rest of the letter.  So that objection, while it

DJA425

L32PWEI1                    Trial

1     is a separate objection, is overruled.

2             MR. GILBERT:  The same objection applies to the next

3     paragraph, where he says:  I've spoken with people with

4     supposed banking solutions.

5             THE COURT:  But all of this is just to explain why he

6     is saying that he either is going to take action or how he

7     wants them to indicate how they want to proceed.  None of it is

8     being offered for its truth.  It's just to explain what follows

9     from the rest of the letter.  Overruled.

10            Jimmy, what's the story on the jury?

11            THE LAW CLERK:  I have not been informed that the jury

12    are all here yet.

13            THE COURT:  Why don't you call down?

14            THE LAW CLERK:  Will do.

15            THE COURT:  Okay.  I'm a little disappointed to go

16    forward without the juror.  The juror said he was going to be

17    in Grand Central by 9:30.  That would have put them here by

18    now.

19            Anything else we need to take up?

20            MR. FOLLY:  Your Honor, there is one additional issue

21    with respect to an exhibit that we intended to offer during the

22    second witness' testimony today, who is an employee at

23    MasterCard.

24            THE COURT:  All right.  Hang on a minute.  Are they

25    being offered as a business record?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**DJA426**

L32PWEI1                    Trial

1              MR. FOLLY:  Your Honor, if it would be helpful, I can

2      hand you the exhibit here for the Court's reference.

3              THE COURT:  Okay.  For the record, these are

4      Government Exhibits 2309 and 2313.

5              MR. GILBERT:  With the Court's permission, my

6      colleague, Shriram Harid, will come up.

7              THE COURT:  Okay.  All right.  So go ahead.

8              MR. FOLLY:  Thank you, your Honor.  These records the

9      government is intending to offer them pursuant to the

10     declaration of the custodians of records as business records.

11     And, your Honor, there's no real dispute that these are

12     authentic business records that were kept in the ordinary

13     course of MasterCard's business.  I believe the real focus of

14     the dispute is the contents of these e-mails.

15             THE COURT:  All right.  Well, let me hear from defense

16     counsel.

17             MR. BURCK:  Thank you, your Honor.  Yes, there is no

18     dispute from us that these are authentic.  The issue for us,

19     your Honor, is really twofold.  One has to do with the content

20     of the documents and the origins of the documents, and the

21     second has to do with the witness that the government intends

22     to put up there to get these documents in.

23             The first issue, your Honor, is that this is

24     effectively -- we think, although we haven't been told this by

25     the government -- we believe this is effective as some kind of

DJA427

L32PWEI1                    Trial

1    compliance file.

2              THE COURT:  I'm sorry, you need to --

3              MR. BURCK:  I'm sorry.  Can you hear me now?

4              THE COURT:  Yes.

5              MR. BURCK:  We believe this is some kind of compliance

6    file --

7              THE COURT:  He just faded.

8              MR. BURCK:  So, your Honor, I was saying that we have

9    two objections.  One is based on the content of the file that

10   the government intends to introduce, not the authenticity, we

11   don't contest that; and the second is the witness who they

12   intend to use to get this evidence into before the jury.

13             On the first issue, your Honor --

14             THE COURT:  As to the second issue, why isn't that a

15   matter for voir dire?

16             MR. BURCK:  Your Honor, it very well might be.  We

17   wanted to raise it now because this witness, who they intend to

18   offer, he's not on any of the documents.  He's not on any

19   e-mails.  He's not copied.  There's no evidence he saw any of

20   this.  In fact, in the --

21             THE COURT:  But they're being offered as business

22   records.  Typically a business record witness is someone who is

23   a custodian of records or has similar kind of responsibilities.

24             MR. BURCK:  Your Honor, we understand that the

25   government intends to have this witness explain these

L32PWEI1                    Trial

1    documents.  He's not a custodian -- they haven't told us he's a

2    custodian, he's simply a custodian of record to offer these in,

3    We understand they intend to have him go through the documents

4    almost like a summary witness and explain what these documents

5    are.

6              The problem with that, your Honor, is that he has no,

7    by his own admission, your Honor, has no actual personal

8    knowledge of this investigation.  He told the government on

9    several occasions in interviews that he was not really involved

10   in the investigation that is --

11             THE COURT:  Okay.  So I'm still unclear what the

12   nature of your objections are.  Are you objecting -- forget

13   about the contents for the moment.  Are you objecting to

14   whether they are business records?

15             MR. BURCK:  Yes, we are, your Honor.  We're saying

16   they are not business records.

17             THE COURT:  On the ground that you think they're not

18   business records, or on the ground that you think this witness

19   cannot testify to the business records?

20             MR. BURCK:  I would say the first, your Honor.  The

21   reason why it's the first, this goes to the content, your

22   Honor.

23             THE COURT:  Okay.  So you think they're not business

24   records because?

25             MR. BURCK:  Because, your Honor, again, we're not

DJA429

L32PWEI1                    Trial

1   exactly sure what the government is going to allege this came

2   from.  But we understand from the discovery that this

3   investigation, the fact that there was an internal review that

4   was done by MasterCard, resulted not from normal business

5   activity, not from MasterCard's activity of going out and

6   searching or trying to proactively prevent or react to

7   violations, but instead came from an employee of MasterCard,

8   who doesn't work in compliance, has nothing to do with

9   compliance, just happens to work in another part of MasterCard,

10  who was, for some reason, buying marijuana off of Eaze and saw

11  that he could buy it with MasterCard and then decided to tell

12  people inside MasterCard, hey, this seems weird; we shouldn't

13  be able -- people shouldn't be able to do this.  And then it's

14  reported up into the compliance system.

15          And so our view, your Honor, is that that origin and

16  where it all leads is not normal, in fact, activity.  It's not

17  as if the compliance department itself discovered this.

18          THE COURT:  Let me hear from the government.

19          MR. FOLLY:  Your Honor, the origin e-mail that defense

20  counsel was referring to was what prompted the internal

21  investigation.  There was an employee at MasterCard who

22  discovered that --

23          THE COURT:  I'm sorry, let me interrupt you.  The jury

24  is all here; so I will tell my law clerk to ask that they be

25  brought up, but while we wait, we'll continue the discussion.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**DJA430**

L32PWEI1                    Trial

1          MR. FOLLY:  Thank you, your Honor.  There was an

2    employee at MasterCard who discovered that -- basically

3    discovered this very scheme.  He discovered that Eaze

4    transactions were being disguised through fake merchants, and

5    he brought that discovery to the attention of the compliance

6    group at MasterCard, who in turn took steps to shut the scheme

7    down.

8          And the origin e-mail, it's not being offered for its

9    truth.  It's being offered to show the effect on the listener.

10   Here, that was MasterCard's compliance department.  In the

11   defense's opening yesterday, they put --

12         THE COURT:  Okay.  So you're saying this is to rebut

13   their immateriality argument?

14         MR. FOLLY:  It's directly to rebut their immateriality

15   argument and also to help the government establish materiality.

16         It shows that when MasterCard learned about this very

17   scheme on trial here, that they took direct steps to respond to

18   that scheme, to gather information and to eventually shut down

19   those merchants.  And that's directly relevant for a

20   non-hearsay purpose.

21         THE COURT:  Okay.  Well, if it's a non-hearsay purpose

22   that you indicated, I don't see any objection.

23         MR. BURCK:  Well, your Honor, we also think, and I

24   wanted -- because I know the jury is coming up, your Honor.  We

25   think it's important that this witness is not an appropriate

DJA431

L32PWEI1                    Trial

1    witness to discuss this because the witness is -- he's a

2    senior-vice-president level.  I think compliance, to some

3    extent, reports to him.

4         There is zero evidence and, in fact, again, his

5    admission that he had nothing to do with the investigation.  So

6    to have these documents come in and have this witness

7    effectively describe an investigation that he had nothing to do

8    with, that he's not copied on, that he has no involvement in

9    would be very prejudicial to the defendants.

10        THE COURT:  All right.  So let me get back to the

11   government.  So the defense says, assuming you're proffer that

12   this is to show that this is how MasterCard reacted, in

13   contrast to the way the defense have argued they would have

14   reacted, that's all fine -- that is not to say it's all fine,

15   but assuming that's all fine -- this witness can't testify

16   about that.

17        MR. FOLLY:  This witness can testify in two primary

18   ways.  The first way is the fact is that he does have direct

19   personal knowledge of the general investigation.  He was

20   informed about it in realtime.  Was aware of the investigation

21   and the general steps that were taken to terminate these

22   merchants.  So that's the first part of it.

23        THE COURT:  Informed about it in realtime, that sounds

24   like hearsay to me.

25        MR. FOLLY:  Your Honor, it's not hearsay, again, for

DJA432

L32PWEI1                    Trial

1    the same reason we've discussed, which is that it's going to

2    MasterCard's response.

3            THE COURT:  I know, but his knowledge that that was

4    MasterCard's response comes through hearsay.  You are offering

5    it for the truth that he was so informed.

6            MR. FOLLY:  Your Honor, I think he learned about this

7    in his capacity as the person who oversaw this very group.

8    Your Honor, but there's a second reason that's relevant --

9            THE COURT:  That may or may not solve your problem,

10   but it doesn't make it any less hearsay.  There may be an

11   exception, but it doesn't make it any less hearsay.

12           MR. FOLLY:  Your Honor, I understand your point, your

13   Honor.  The second point, however, is that this witness does

14   have testimony that is relevant and important about these very

15   documents.  He can identify the people that are involved in

16   these e-mail communications.  He can help the jury understand

17   certain terminology that was used at MasterCard that is

18   reflected in these communications, and for that reason, it's

19   fully appropriate for the government to ask him questions about

20   evidence that will be in evidence at that time.

21           THE COURT:  I think the only objection I'm hearing so

22   far that may have some validity, though I'm not sure, relates

23   to how he learned about all of this.  That's different from him

24   saying, oh, yeah, that's a term we use every day, X or Y or

25   something like that he can testify to as being part of the

DJA433

L32PWEI1                    Trial

1    business without it being a hearsay problem.

2              But if he's saying I learned that such and such was

3    done by MasterCard, I'm not sure that you can get that in

4    without a hearsay objection.  That sounds like hearsay to me.

5              MR. FOLLY:  Your Honor, I think one reason it still

6    would be admissible, again, is that there is a challenge to the

7    state of mind of people at MasterCard in this case.  There is

8    an assertion that they wanted these transactions to continue.

9    If a MasterCard employee is told about something, and then he

10   does not, for example, allow these transactions to keep going

11   on, as the head of compliance, that's relevant, your Honor.

12             THE COURT:  All right.  I'm going to allow him to

13   testify because it sounds like, in any event, he has other

14   things to say, but we will take it -- as we get it to these

15   documents, we'll take it one step at a time, and you'll make an

16   objection and I'll rule.

17             MR. BURCK:  Thank you, your Honor.

18             THE COURT:  All right.  All right.  The jury is coming

19   up.

20             MS. LA MORTE:  Your Honor, may I put -- I have a

21   binder of exhibits for the witness, as well as a thumb drive

22   that he initialed.  Can I put that -- or how shall I handle

23   that?

24             THE COURT:  Whatever way you like.

25             MS. LA MORTE:  All right.  I'm going to put that up

L32PWEI1                    Trial

1    there.

2              THE DEPUTY CLERK:  Jury entering the courtroom.

3              (Jury present)

4              THE COURT:  All right.  Please be seated.  So good

5    morning, ladies and gentlemen, and I know one of you had a

6    train delay that was not that person's fault.  Thank you very

7    much for letting us know about that, and those things do

8    happen, but obviously, we do try to avoid that as much as we

9    can.

10             I can't help but mentioning, even though it has

11   nothing to do with anything, that today I'm celebrating my 25th

12   anniversary as a federal judge.  Eventually, I'll learn how to

13   do it right.

14             (Applause)

15             So anyway, now that I got that off my chest, I'm ready

16   to begin.  So please swear in the first witness.

17             MS. LA MORTE:  The government calls Michael Tassone.

18             One preliminary matter, your Honor, from my colleague.

19   We do need a sidebar.

20             THE COURT:  Okay.

21             (Continued on next page)

22

23

24

25

DJA435

136

L32PWEI1                    Trial

1           (At the side bar)

2           THE COURT:  So what's the problem?

3           MS. LA MORTE:  The immunity order, your Honor?

4    Apologies.

5           THE COURT:  So state your name for the record.

6           THE WITNESS:  Michael Tassone.

7           THE COURT:  Mr. Tassone, do I understand correctly

8    that you will invoke your Fifth Amendment right not to testify

9    with respect to any and all questions, if not granted immunity?

10          THE WITNESS:  Yes, your Honor.

11          THE COURT:  And are you aware that if I do grant

12   immunity and you then say something that is false, that would

13   subject you to punishment for perjury?

14          THE WITNESS:  Yes, I do.

15          THE COURT:  Very good.  I will sign the immunity

16   order.  I didn't realize that's what it was.  I left it on the

17   bench.

18          MS. LA MORTE:  That's why I didn't want to --

19          THE COURT:  You have another copy, very good.

20          Okay.  All right.  Very good.  Let's go back in.

21          MR. TAYBACK:  May I request a copy of the signed order

22   before cross-examination at some point?

23          THE COURT:  Why don't you take this one.  I have

24   another one on the bench.

25          MR. TAYBACK:  Thank you.
             (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA436

L32PWEI1                              Tassone - Direct

1           (In open court)

2           THE COURT:  Okay.  Are we ready to proceed?

3     MICHAEL TASSONE,

4        called as a witness by the Government,

5        having been duly sworn, testified as follows:

6           THE DEPUTY CLERK:  State your name and spell it slowly

7     for the record.  Please angle the microphone so you're speaking

8     directly into it.

9           THE WITNESS:  My name is Michael Tassone,

10    M-i-c-h-a-e-l, T-a-s-s-o-n-e.

11    DIRECT EXAMINATION

12    BY MS. LA MORTE:

13    Q.  Good morning, Mr. Tassone.

14    A.  Good morning.

15    Q.  How old are you?

16    A.  Thirty-two years old.

17    Q.  Where do you live?

18    A.  I live in Joshua Tree, California.

19    Q.  Are you currently employed?

20    A.  Yes, I am.

21    Q.  Where do you currently work?

22    A.  Eaze Technologies.

23    Q.  What is Eaze Technologies?

24    A.  Eaze is a marijuana marketplace platform that allows for

25    the sale of marijuana products through its platform.

DJA437

L32PWEI1                        Tassone - Direct

1    Q.  When you say marijuana-based platform, can you explain what

2    that means?

3    A.  Yes.  Eaze works with licensed dispensaries across the

4    State of California, and they sell marijuana products from

5    third-party manufacturers on the platform and that sale is

6    available to customers in the State of California over the age

7    of 21 years old.

8    Q.  So to be clear, who develops the products that are sold

9    through the Eaze platform?

10   A.  It's mostly third-party vendors and manufacturers.

11   Q.  How long have you worked at Eaze?

12   A.  Roughly six years.

13   Q.  So approximately when did you start?

14   A.  June of 2015.

15   Q.  What is your current title?

16   A.  V.P. of Operations.

17   Q.  Did there come a time when Eaze accepted credit and debit

18   cards for the purchase of marijuana through its website?

19   A.  Yes, there was.

20   Q.  During what period of time did this occur?

21   A.  Roughly the periods of 2016 through 2019.

22   Q.  And during that time period, were you involved with

23   facilitating Eaze's acceptance of card payments?

24   A.  Yes, I was.

25   Q.  Can you provide the jury with an overview of how you were

DJA438

L32PWEI1                        Tassone - Direct

1   involved?

2   A.  Yes.  My involvement was to work with licensed marijuana

3   dispensary partners that were partners with Eaze within our

4   network, and my involvement was to help them set up business

5   accounts with the credit card companies that we were working

6   with.  I was also to help them with any financial statements or

7   questions they had in regards to their credit card accounts.

8   Q.  And in connection with your involvement in that process,

9   did you participate in the scheme to conceal that the products

10  being sold were marijuana products?

11  A.  Yes, I did.

12  Q.  And did that scheme include concealing the fact that Eaze

13  was a company that was involved in selling this product?

14  A.  Yes, it was.

15  Q.  Who or what were you concealing this information from?

16  A.  The banks that were processing the transactions.

17  Q.  What do you mean by that?

18  A.  There were customer banks -- when a customer places a

19  purchase or transaction on the website, there are customer

20  banks that would process that transaction, and that's who was

21  seeing which types of transactions were coming through.

22  Q.  So can you explain to the jury, at a high level, how the

23  scheme worked?

24  A.  Yes.  So essentially a customer would make a purchase of

25  marijuana on the platform, and then they would see some sort of

DJA439

140

L32PWEI1                    Tassone - Direct

1    billing descriptor that was listed on their credit card or bank

2    statement, and that billing descriptor or -- billing descriptor

3    on their statement was for a different type of website not

4    listed as Eaze.

5    Q.  Who was in charge of this operation from the credit card

6    processing side?

7    A.  I was led to believe that that was Ray Akhavan.

8    Q.  Was he internal or external to Eaze?

9            MR. TAYBACK:  Objection, move to strike, hearsay.

10           THE COURT:  Sustained.

11   Q.  Did you come to learn who was in charge of the credit card

12   operations at Eaze from the processor side?

13   A.  Yes, I did.

14   Q.  Who did you learn that information from?

15           MR. TAYBACK:  Objection, hearsay.

16           THE COURT:  No, I have to -- she's setting a

17   foundation.  Go ahead.

18   Q.  Who did you learn that information from?

19   A.  I learned it from the former CEO Keith McCarty and the

20   other former CEO, Jim Patterson.

21           THE COURT:  Okay.  Then I will --

22           MS. LA MORTE:  I'm sorry, your Honor, I can't hear?

23           THE COURT:  On that foundation, I will reverse the

24   previous ruling and let the previous answer stand.

25           MS. LA MORTE:  And, your Honor, before I go on, is my

DJA440

L32PWEI1                    Tassone - Direct

1   microphone working?

2          THE WITNESS:  It could be louder.

3          MR. FOLLY:  Your Honor, I believe the court reporter

4   and the witness have indicated they're having a challenge

5   hearing.

6          THE COURT:  Challenge with who?

7          MR. FOLLY:  Ms. LaMorte.

8          THE COURT:  The witness can't hear well, so do you

9   want to speak a little louder or closer to the microphone?  I,

10  by nature, am a very soft-spoken fellow, but you go ahead.

11  BY MS. LA MORTE:

12  Q.  Was Ray Akhavan internal or external to Eaze?

13  A.  He was external.

14  Q.  Who were some of the other participants in the scheme that

15  worked with Ray?

16  A.  I would know them as Guy, Esra, Cat, Methat and Andreas.

17  Q.  Did you work with others internal to Eaze to implement the

18  scheme?

19  A.  Yes, I did.

20  Q.  Can you categorize or describe some of the people you

21  worked with internally?

22  A.  Yes.  It was former CEO, Keith McCarty; former CEO, Jim

23  Patterson; former SPV of Operations Darcy Cozzetto; former VP

24  of Operations, Noah Tutak, to name a few.

25          (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L32AWEI2ps                    Tassone - Direct

1  Q.  Now, Mr. Tassone, are you testifying here today because of
2  what is called an immunity order issued by this Court?
3  A.  Yes, I am.
4  Q.  What is your understanding of what this order requires you
5  to do?
6  A.  My understanding is that the order requires me to tell the
7  truth here today.
8  Q.  Does the order protect you from what you say today being
9  used against you?
10 A.  Yes, it does.
11 Q.  Does the order provide you with immunity from prosecution
12 in general, or with immunity from the use of your words today?
13 A.  No it does not protect me from prosecution in general, just
14 from what I tell here today.
15 Q.  What is your understanding of what happens if you don't
16 tell the truth?
17 A.  That I can be charged for that.
18 Q.  To your knowledge, does the immunity order protect you from
19 prosecution if you lie today or if you make a false statement?
20 A.  No, it does not.
21 Q.  OK.  Mr. Tassone.  Let's learn a little bit about your
22 background.  Where did you grow up?
23 A.  Chicago, Illinois.
24 Q.  Did you graduate high school?
25 A.  Yes, I did.

DJA442

L32AWEI2ps                    Tassone - Direct

1    Q.   When was that?

2    A.   2006.

3    Q.   Can you walk us through your educational background,

4    starting from what you graduated from high school.

5    A.   Yes.  After high school, I graduated from Illinois State

6    University with a bachelor's degree in business education -- in

7    business management.  That was in 2010.

8    Q.   What did you do after you received your business degree?

9    A.   I started working for a company based in Chicago, known as

10   Groupon.

11   Q.   And what kind of company is Groupon?

12   A.   It is an e-commerce website.

13   Q.   What was your role there?

14   A.   Senior account executive was my title, mainly inside sales.

15        (Pause)

16        THE CLERK:  The court reporter asks if the witness

17   could please repeat his title.

18        THE COURT:  Oh, I'm sorry.

19   A.   My title at Groupon was senior account executive.

20   Q.   From when to when did you work with Groupon?

21   A.   Roughly 2010 to 2015.

22   Q.   What did you do after you stopped working there?

23   A.   After Groupon, I shortly moved to California and started

24   working for Eaze.

25   Q.   And I believe you said earlier, but approximately when did

DJA443

L32AWEI2ps                    Tassone - Direct

1   you start working for Eaze?

2   A.  June of 2015.

3   Q.  And are you still currently working there?  Correct?

4   A.  Yes, I am.  I am working for a subsidiary of Eaze known as

5   Stachs LLC.

6   Q.  Who hired you to work at Eaze?

7   A.  The former VP of operations, Noah Tutak.

8   Q.  Who was in charge of Eaze when you began working there?

9   A.  The former CEO Keith McCarty.

10  Q.  And when you joined Eaze in 2015, what was your title at

11  the time that you joined?

12  A.  Operations specialist.

13  Q.  And what were your duties and responsibilities in that

14  position?

15  A.  My responsibilities were to manage relationships and

16  operations with our dispensary partners across the state of

17  California.

18  Q.  Who did you initially report to?

19  A.  I initially reported to the former VP of operations, Noah

20  Tutak.

21  Q.  And how if at all did your role change moving forward

22  through 2019?

23  A.  Through the course of my time at Eaze, I received several

24  different promotions and had essentially just grown in my

25  responsibility in scope of the operations and partner

DJA444

L32AWEI2ps                    Tassone – Direct

1  management with our dispensary partners.

2  Q.  OK.  Let's talk a little bit more now about how Eaze works.

3  When was Eaze started?

4  A.  It was founded in mid of 2014.

5  Q.  Who founded the company?

6  A.  Former CEO Keith McCarty.

7  Q.  Where is the company headquartered?

8  A.  San Francisco, California.

9  Q.  Where does the company operate?

10 A.  They operate in several different locations across the

11 state of California today.

12 Q.  Approximately how many employees did the company have when

13 you joined in 2015?

14 A.  Approximately, when I joined, about 12 to 15 employees.

15 Q.  And how did that change in the present, if at all?

16 A.  Today there's roughly 200 corporate employees and somewhere

17 close to a thousand employees that work in the warehouse or

18 work as a driver for the company.

19 Q.  OK, Mr. Tassone.  Let's focus on the 2016-to-2019 time

20 period.  Can you tell us what the different components or

21 divisions of Eaze's as a company work, different units?

22 A.  Yeah.  There are standard business departments.  So there's

23 a marketing department, customer service, operations, finance,

24 things like that.  And also product and engineering teams that

25 would build the website.

DJA445

L32AWEI2ps                    Tassone - Direct

1   Q.  And you were involved in operations.  Is that right?

2   A.  That's correct.

3   Q.  And during that time, did Eaze's platform sell marijuana

4   products that had been developed by third-party dispensaries,

5   like you had told us earlier?

6   A.  Yes, third-party dispensaries or third-party client

7   vendors.

8   Q.  So what is a marijuana dispensary?

9   A.  A marijuana dispensary is a licensed retailer in the state

10  of California that is licensed to sell marijuana products to

11  anyone of the age 21 or older.

12  Q.  Now you say it was a licensed retailer.  What particular

13  government or unit provides the license?

14  A.  There's requirements for both a city permit or license as

15  well as a state license.

16  Q.  And are there other names that you in the course of your

17  job have referred to the marijuana dispensaries that are

18  selling through the Eaze platform?

19  A.  Yes.  Delivery -- dispensaries, dispensary partners, or

20  depots.

21  Q.  OK.  Can you walk the jury through, step by step, how a

22  customer would order a product through the Eaze platform and

23  then receive that product.

24  A.  Yes.  So a customer would go to Eaze.com either on their

25  computer or phone.  They would set up an account profile, in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA446

147

L32AWEI2ps                    Tassone - Direct

1    which they would have to submit their driver's license, and

2    that would be checked by a real person on our customer service

3    team, to validate that they're 21 years of age.

4            From there, the customers would be able to browse a

5    menu of different various cannabis products.  Once they added

6    those products to their cart, they can go to check out.  Once

7    they check out, they are provided with a total amount that is

8    due, a payment option, as well as the estimated time of arrival

9    for their delivery.

10   Q.  And how does their delivery arrive?

11   A.  Their delivery arrives through a licensed delivery driver

12   who is employed by one of the local dispensaries.  So they

13   received the order and then they deliver it to the customer's

14   home address.

15   Q.  And to be clear, who is responsible for the delivery

16   driver?

17   A.  They would be a licensed dispensary, so they're

18   responsible.

19   Q.  Is there a receipt that's generated for the customer in the

20   course of ordering through Eaze?

21   A.  Yes, there is.

22   Q.  At what point in the process does that happen?

23   A.  The receipt is generated and usually sent to the customer

24   after the transaction has been successfully completed.

25   Q.  And how is the receipt generally delivered to the customer?

DJA447

L32AWEI2ps                    Tassone - Direct

1    A.  Generally it's been sent via email.

2    Q.  Are there receipts that are generated for the relevant

3    marijuana dispensary whose products were sold as well?

4    A.  I'm sorry.  Can you repeat that?

5    Q.  Sure.  Aside from receipts that go to the customer, are

6    there receipts that also go to the marijuana dispensary whose

7    product the customer purchased?

8    A.  Yes.  That's a part of the requirement from the BCC of

9    California, a statement.

10   Q.  And generally how is the receipt provided to the marijuana

11   dispensary?

12   A.  Those would also be sent via email.

13   Q.  So, again, during this 2016-to-2019 time period that we're

14   focusing op, how did Eaze generate revenue from this

15   relationship with the dispensary that is in operation?

16   A.  Yeah.  During that time, Eaze would have contractual

17   partnerships with Eaze license dispensaries, and then there

18   would be a percentage or a flat fee per transaction generally

19   that Eaze would take as part of the sale from the dispensaries.

20   Q.  Were there any other ways that Eaze obtained revenue during

21   the time period through this process?

22   A.  That was the main form.  There were some brand partner

23   agreements as well, where they would receive revenue from.

24   Q.  And how does the dispensary generate revenue?

25   A.  Dispensaries generate revenue from selling the marijuana

DJA448

149

L32AWEI2ps                 Tassone - Direct

1    products on our platform at a marked-up rate from what they

2    bought them, and then they would receive the margins from those

3    markups.

4    Q.  Now, Mr. Tassone, when you joined Eaze in 2015, how did

5    customers pay for the marijuana products that they ordered

6    through the platform?

7    A.  I'm sorry.  Can you repeat the year?

8    Q.  In 2015 when you joined Eaze, how did the customers pay for

9    product ordered through the platform?

10   A.  In 2015, customers can pay with cash.

11   Q.  Was there any other option in 2015?

12   A.  There was no other option.

13   Q.  So explain to us how that works, how the customer would pay

14   in cash.

15   A.  Yes.  So the customer would check out their products of

16   marijuana on the website.  They would be provided a total

17   amount due.  And then, when a delivery driver would show up to

18   deliver the products, the customer would pay them in cash.  If

19   there was any change due, then the driver would give them

20   change that was due to their order.

21   Q.  And then what would the driver do with the money?

22   A.  The driver would keep that money on them for the duration

23   of their shift that day, and then once they got -- when they

24   completed their shift, they would drive back to the delivery

25   depot and they would pass that money along to their supervisor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA449

L32AWEI2ps                    Tassone – Direct

1   Q.  Now, at some point did Eaze begin exploring offering a card

2   payment solution?

3   A.  Yes, they did.

4   Q.  And were you involved in discussions on that topic?

5   A.  Yes, I was.

6   Q.  Approximately when did those discussions begin?

7   A.  In the spring of 2016, from my perspective.

8   Q.  And who else at Eaze was involved in those discussions?

9   A.  The former CEO Keith McCarty, the former chief products

10  officer Roie Edery.

11  Q.  And what is your understanding of the obstacles if any in

12  offering the card payment solution at that time?

13  A.  The obstacles are challenges with offering a card payment

14  option, which is being able to do it in a space where the banks

15  didn't want to even allow dispensaries to open up cannabis

16  banks, and so being able to process transactions, it just

17  seemed very, very difficult to do.

18  Q.  So earlier you told us that Eaze in fact implemented a card

19  solution roughly in the fall of 2016.  Is that right?

20  A.  Yes, that's correct.

21  Q.  OK.  So we are going to talk in detail about that in a

22  little bit.  But first I want to discuss some basic principles

23  surrounding credit card processing.

24          So, Mr. Tassone, earlier you told us that you were

25  involved in operations surrounding Eaze's acceptance of card

151

L32AWEI2ps                    Tassone - Direct

1   payments.  Is that correct?

2   A.  Yes, that's correct.

3   Q.  And remind us how long you were involved in that process?

4   A.  Roughly 2016 through 2019.

5   Q.  And, Mr. Tassone, do you personally own and use credit

6   cards?

7   A.  Yes, I do.

8   Q.  And as a result of those experiences, both working at Eaze

9   and your own personal experience, do you have a basic

10  understanding of how credit card processing works?

11  A.  Yes, I do, from my experience, yes.

12  Q.  And who are the primary entities that are involved in

13  processing credit card transactions?

14  A.  The business and the banks, you know, my bank or my credit

15  card company.

16  Q.  Any other en-- I'm sorry.  Could you repeat your answer.

17  A.  Yes.  So the business in which I'm making the transaction

18  it was purchased from, myself, and then, you know, either my

19  bank or my card company would be involved in that transaction.

20  Q.  Any other entity that is involved in the transaction?

21  A.  Not to my knowledge.

22  Q.  OK.  So among the entities that you just named, who

23  issues -- what sort of entity if any issues your credit card?

24  A.  The bank or the credit card processing company.

25          I'm sorry.  My, my credit card company.

152

L32AWEI2ps                    Tassone - Direct

1    Q.  Yes.

2    A.  Yeah.

3    Q.  Have you used your personal credit card to make purchases

4    through Eaze?

5    A.  Yes, I have.

6    Q.  Now, as far as any purchase with your own credit card,

7    through Eaze or otherwise, have you ever had a transaction

8    declined?

9    A.  Yes, I have.

10   Q.  And who is your contact in that situation?

11   A.  I contact my credit card company.

12   Q.  Were there instances when that transaction was then

13   authorized?

14   A.  Yes.  Eventually it was.

15   Q.  And who authorized the transaction?

16   A.  Once I spoke to my credit card company, then they validated

17   that -- I validated the transaction was legitimate, and they

18   authorized it.

19   Q.  And in connection with your card purchases, do you receive

20   credit card statements?

21   A.  Yes, I do.

22   Q.  How often do you receive them, generally?

23   A.  Generally a month, monthly case -- monthly payments.

24   Q.  And who provides you with your credit card statements?

25   A.  The credit card company does.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA452

L32AWEI2ps                    Tassone - Direct

1    Q.  What do you think credit card company -- can you put that

2    in the context of a particular example.  So what kind of credit

3    card do you have?

4    A.  Yes.  So I have a -- one would be a Freedom Card from Chase

5    Bank.

6    Q.  So when you're saying "credit card company," can you be

7    specific with respect to your own credit card, which entity

8    you're referring to?

9    A.  Yes.  Chase Bank.

10   Q.  Chase Bank, OK.

11   A.  Yes.

12   Q.  Mr. Tassone, what kind of information is on your credit

13   card payment?

14   A.  My account information, as well as the number of

15   transactions and the financial amount of those transactions for

16   that statement period, which is generally a, you know, 30-day

17   or month-long period.  It all --

18   Q.  Did --

19   A.  I'm sorry.  Yeah.  And then it also just shows the -- shows

20   the name of the business or entity in which those transactions

21   occurred for.

22   Q.  And just to go back for a minute to clarify, which entity

23   issued you that statement?

24   A.  My credit card company or in this case specifically Chase

25   Bank.

DJA453

154

L32AWEI2ps                    Tassone - Direct

1   Q.  OK.  Does the information on your card statement help you

2   identify the merchant from whom you made purchases?

3   A.  Yes, it does.

4   Q.  Are you familiar with the term "descriptor"?

5   A.  Yes, I am.

6   Q.  How are you familiar with that term?

7   A.  I'm familiar with it through my work and experience at

8   Eaze, as well as just, you know, being a customer, using a

9   credit card, seeing the descriptors on my statement.

10  Q.  What is a descriptor?

11  A.  A descriptor is a -- something that identifies the business

12  or the merchant from which you made a purchase.

13  Q.  Mr. Tassone, have you ever had a situation where you did

14  not recognize a charge on your card statement?

15  A.  Yes, I have.

16  Q.  What did you do?

17  A.  The first thing, I Googled the name of the -- the name of

18  the business that was listed in the descriptor.  When I still

19  was looking for more answers or didn't know, then I contacted

20  my credit card company, which was Chase Bank.

21  Q.  And what did you -- what did you tell Chase Bank?

22          MR. GILBERT:  Objection.

23          THE COURT:  Ground?

24          MR. GILBERT:  Relevance, your Honor.

25          THE COURT:  Overruled.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA454

L32AWEI2ps                    Tassone - Direct

1    Q.  What did you tell Chase Bank?

2    A.  I told Chase Bank that I didn't recognize the charge and

3    wanted it to be reversed.

4    Q.  What is that process called?

5    A.  I know it to be called a chargeback.

6    Q.  Now, are you familiar with the term "acquiring bank" or

7    "receiving bank"?

8    A.  Yes, I am.

9    Q.  What is that?

10   A.  The -- and I'm sorry.  Could you repeat that question?

11   Q.  Yes.  I asked you if you're familiar -- sorry -- familiar

12   with the term "acquiring bank" or "receiving bank"?

13   A.  OK.  Yes, I am.

14   Q.  What is that?

15   A.  The receiving bank, to my knowledge, is the bank that is

16   holding -- holding the funds from a credit card or debit card

17   transaction.

18   Q.  OK.  So let's look at a few examples of Eaze transactions.

19            MS. LA MORTE:  Mr. Levine, can you display for the

20   witness what has been marked as Government Exhibit 686 and 709

21   for identification.

22   Q.  Do you recognize these?

23   A.  Yes, I do.

24   Q.  What do you recognize them to be?

25   A.  These are receipts that were emailed from Eaze to a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L32AWEI2ps                 Tassone - Direct

1    dispensary partner of ours, and so they're customer receipts

2    for transactions of marijuana that was purchased on our

3    website.

4    Q.  How are you familiar with receipts such as these?

5    A.  I'm sorry.  Can you repeat that?

6    Q.  How are you familiar with receipts such as these?

7    A.  This was common knowledge for me to see these in my normal

8    course of business, and I would also receive these as a

9    customer if I ordered from Eaze as well.

10   Q.  Are these receipts made in the course of Eaze's regularly

11   conducted business activity?

12   A.  Yes, they are.

13   Q.  Are these receipts routinely made by Eaze as a regular

14   practice of its business activity?

15   A.  Yes, it is.

16   Q.  Are these receipts made at or near the time of the

17   transactions set forth therein?

18   A.  Yes, they are.

19            MS. LA MORTE:  The government offers Government

20   Exhibit 686 and 709.

21            MR. GILBERT:  No objection, your Honor.

22            THE COURT:  Received.

23            (Government's Exhibits 686 and 709 received in

24   evidence)

25            MS. LA MORTE:  Mr. Levine, can you publish for the

DJA456

L32AWEI2ps                    Tassone - Direct

1    jury Government Exhibit 709.

2             Is that on everyone's screen?

3             A JUROR:  No.

4    Q.  Mr. Tassone, you told us that this is a receipt reflecting

5    a purchase from Eaze.  Is that right?

6    A.  Yes, that's correct.

7    Q.  And how was this receipt delivered?

8    A.  This was delivered and sent via email.

9    Q.  So let me direct your attention to the top left of this

10   exhibit, 709.  Who is this email from, according to the

11   exhibit?

12   A.  This is from the Eaze team.

13   Q.  And who is it to?

14   A.  Andy at Eaze.com.

15   Q.  And generally who is the "to"?  Who does that reflect?

16   A.  "To" is who the email is being sent to.

17   Q.  Is that the person that made the purchase or someone else?

18   A.  Yes.  That would be the person who made the purchase.

19   Q.  And what is the subject?

20   A.  The subject line is "Your order was delivered, Andrew!"

21   Q.  And can you tell us what the map on page 1 of this exhibit

22   reflected.

23   A.  The map is reflecting the address in which the order was

24   placed and then successfully delivered to.

25             MS. LA MORTE:  Your Honor, it's come to my attention

DJA457

L32AWEI2ps                    Tassone - Direct

1    that one of the jurors can't see their screen.

2            THE COURT:  Which juror is that?

3            A JUROR:  That one works.

4            THE COURT:  Yes.  You want to move over there?

5            THE LAW CLERK:  This one here is working, Judge.

6            THE COURT:  OK.

7            Can the juror now see?

8            A JUROR:  Yes.

9            THE COURT:  OK.  Go ahead.

10   Q.  All right.  Let me just go back to that last one.  What is

11   the map on page 1 of Government Exhibit 709 reflecting?

12   A.  The map is reflecting the address in which the order was

13   placed and then successfully delivered.

14   Q.  All right.  So let's look --

15           MS. LA MORTE:  And, Mr. Levine, can you blow up the

16   bottom half, where it says "itemized receipt," and the items

17   under it.

18   Q.  So you see on the left, Mr. Tassone, where it says "Durban

19   Poison, Releaf Balm," and "Original Mint Tablets"?

20   A.  Yes, I do.

21   Q.  With are these a reference to?

22   A.  These are a reference to the products, the marijuana

23   products that were added to the customer's cart and purchased.

24           MS. LA MORTE:  Mr. Levine, can we go to page 3 of the

25   receipt.  Actually go up one, please.  Thank you.

DJA458

L32AWEI2ps                    Tassone - Direct

1    Q.  OK.  And then, on the top of this receipt, you see where it

2    says "order total"?

3    A.  Yes, I do.

4    Q.  What is stated there?

5    A.  It says it's $82.61.

6    Q.  What does that reflect?

7    A.  That reflects the customer's total that they paid for the

8    order.

9    Q.  Thank you, Mr. Levine.

10            All right.  And then under there, do you see where it

11   says "credit card"?

12   A.  Yes, I do.

13   Q.  What is that a reference to?

14   A.  That would represent the payment type for this transaction,

15   which was a credit card.

16   Q.  All right.  So let me direct your attention to the blue box

17   that's on the screen.

18   A.  OK.

19   Q.  Do you see the bottom blue box?

20   A.  Yes, I do.

21   Q.  Can you read that aloud.

22   A.  "You will see a charge from 'Hot Robots' for $83.61 on your

23   statement."

24   Q.  When this says "on your statement," what is the "statement"

25   here referring to?

DJA459

L32AWEI2ps                    Tassone - Direct

1  A.  This is referring to the customer's credit card statement.

2  Q.  What is Hot Robots?

3  A.  Hot Robots, I believe, is a website.

4  Q.  Was Hot Robots the real -- is Hot Robots a website that is

5  connected to Eaze?

6  A.  No, it is not.

7  Q.  Is Hot Robots a real merchant for the transaction?

8          MR. TAYBACK:  Objection, foundation.

9          THE COURT:  OK.  Lay a foundation.  Lay a foundation.

10  Q.  When you say "website," Mr. Tassone, what do you mean?

11  A.  Website, website would be -- I'm sorry.  Can you rephrase

12  the question?

13  Q.  Sure.  You identified Hot Robots before as a website.

14  What -- explain to us, can you elaborate for us what that

15  means.

16  A.  Yes.  So if this showed up like on a customer's credit card

17  statement, they may Google it or, you know, go to HotRobots.com

18  and then be able to see a website.

19  Q.  And would that website be Eaze's website?

20  A.  No, it would not be.

21          THE COURT:  I think the question was:  Is Hot Robots a

22  real merchant for the transaction?  And I will allow you to

23  answer that, but then I'll have some follow-up questions.  So

24  what's the answer?  Yes or no.

25          THE WITNESS:  I'm sorry.  I can't hear you, Judge.

DJA460

161

L32AWEI2ps                    Tassone - Direct

1          THE COURT:  So the question was:  Is Hot Robots a real

2    merchant for the transaction?  Is the answer to that yes or no?

3          THE WITNESS:  No.

4          THE COURT:  How do you know that?

5          THE WITNESS:  Because it was not associated with Eaze.

6          THE COURT:  So these were just made up?

7          THE WITNESS:  To my knowledge, yes.

8          THE COURT:  All right.  The objection is overruled.

9    Q.  Mr. Tassone, what is the period of time that Eaze used

10   falsified merchants in connection with card purchases?

11   A.  Roughly the spring of 2016 through mid 2019.

12   Q.  And during this time period, to your knowledge, did Eaze

13   ever deal with actual names of the customers' banks in

14   connection with card transactions through its site?

15   A.  To my knowledge, no.

16   Q.  Why was Eaze using falsified merchants for card

17   transactions?

18   A.  There was a concern that, if Eaze was listed in a

19   customer's credit card statement, that potentially a bank or

20   credit card company would see that and flag that transaction,

21   and there was a concern because they were marijuana

22   transactions.

23   Q.  And when you say "bank" there, are you referring to the

24   customer's bank or some other bank?

25   A.  I'm referring to the customer's bank.

DJA461

L32AWEI2ps                    Tassone - Direct

1   Q.  Who did Eaze work with outside the company to accomplished

2   this?

3   A.  We worked with credit card processors.

4   Q.  What were the names of those credit card processors?

5   A.  During that time period, Clearsettle was one, and then EU,

6   or EUprocessing.

7   Q.  And what is your understanding of who was in charge of

8   those credit card processors?

9   A.  My understanding is that Ray Akhavan was.

10           MR. TAYBACK:  Objection, move to strike, hearsay.

11           THE COURT:  What's the basis of that understanding?

12           THE WITNESS:  What's the basis of the understanding?

13   I was told that from former CEO Keith McCarty and former CEO

14   Jim Patterson.

15           THE COURT:  Overruled.

16   Q.  To your knowledge, Mr. Tassone, was Ray Akhavan ever

17   employed by Eaze?

18   A.  Not to my knowledge.

19   Q.  To your knowledge, was he ever a director or officer of

20   Eaze?

21   A.  Not to my knowledge.

22   Q.  Did you understand Ray to work alone or with other people?

23   A.  I understood he worked with other people.

24   Q.  More specifically, what is your understanding of the role

25   that Ray and Keith played in the Eaze credit card operation?

DJA462

L32AWEI2ps                    Tassone - Direct

1    A.  I'm sorry.  Can you repeat that or rephrase that?

2    Q.  Sure.  I asked more specifically what is your understanding

3    of the role that Ray and Keith played in the credit card

4    operation?

5    A.  My understanding is that their role was to be able to

6    successfully process high-risk transactions, and in this case

7    specifically for marijuana transactions.

8    Q.  And just generally speaking, what does it mean to process a

9    card transaction?

10   A.  For basically when a customer uses their credit card,

11   having the company that is able to process and complete that

12   transaction so that their card has been charged, and -- their

13   card has been charged and then those funds are held in another

14   bank.

15   Q.  How did you refer to Ray's team internally at Eaze?

16   A.  Which time period?

17   Q.  Let's -- well, just tell me, how -- did that change at all

18   or the various means by which you referred to them.

19   A.  Sure.  In -- over the course of 2016, 2016, we referred to

20   them internally as the company Clearsettle, and then sometime

21   in 2018 and through 2019, we referred to them as EU or EUP or

22   EUprocessing.

23   Q.  OK.  Just to clarify, what period of time was Clearsettle a

24   processor for Eaze card transactions?

25   A.  2016 and 2017.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA463

L32AWEI2ps                    Tassone - Direct

1    Q.  And EUP or EUprocessing?

2    A.  2018 and 2019.

3    Q.  Now, during the course of that time, from 2016 and 2019,

4    would you say you became more involved, less involved, or

5    equally involved in the operation over time?

6    A.  More involved over time.

7    Q.  OK.  So let's take a step back and talk about how this

8    began.  So in 2016, how did you initially learn that Eaze was

9    interested in providing a card payment option for its

10   customers?

11   A.  I initially learned through our former CEO Keith McCarty.

12   Q.  What did Keith say to you?

13   A.  He said that he has found a solution that may be able to

14   find a way to successfully process credit card transactions

15   for, for a marijuana company.

16   Q.  Did he say anything specifically about the solution?

17   A.  Only that it was with a credit card processing company that

18   typically deals with high-risk processing and that they, you

19   know, would be experienced in order to do this.

20   Q.  Around this time period, what if anything did Keith McCarty

21   tell you about Ray Akhavan?

22   A.  Just that, you know, he led me to believe that he was in

23   charge of the company.

24   Q.  Did Keith McCarty ask you to do anything?

25   A.  Yes, he did.

DJA464

L32AWEI2ps                    Tassone - Direct

1   Q.  What was that?

2   A.  Keith asked me to coordinate a meeting, basically one of

3   our licensed dispensary partners at the time, in order to meet

4   Ray and the Clearsettle team.

5   Q.  Did you in fact coordinate that meeting?

6   A.  Yes, I did.

7   Q.  And what was the dispensary that was involved?

8   A.  They were known as Sweetwood.

9   Q.  Who were your points of contact or point of contact at

10  Sweetwood?

11  A.  That would be the principal or owner Craig Wald and his son

12  Cameron Wald.

13  Q.  And did there come a time that you actually participated in

14  a meeting with Sweetwood to discuss the concept?

15  A.  Yes, that's correct.

16  Q.  Approximately when did that meeting occur?

17  A.  In the spring of 2016.

18  Q.  What was the overall purpose of the meeting?

19  A.  The purpose of the meeting was to introduce Clearsettle and

20  Eaze and Sweetwood, the dispensary, as well as discuss the

21  processing options and -- processing options for processing

22  credit cards on the platform.

23  Q.  Mr. Tassone, you should have in front of you a thumb drive

24  that's marked as Government Exhibit 716.  Do you see that?

25  A.  Yes, I do.

**DJA465**

L32AWEI2ps                    Tassone – Direct

1   Q.  Do you recognize it?

2   A.  Yes, I do.

3   Q.  How do you recognize it?

4   A.  I initialed the card.

5   Q.  Have you reviewed the contents of it?

6   A.  Yes, I have.

7   Q.  When did you do that?

8   A.  I did that this previous Sunday.

9   Q.  What is on it?

10  A.  There are a list of several emails in which I either sent

11  or am listed on the email, and other documents as well.

12  Q.  What email account is used by you in connection with the

13  emails?

14  A.  Yes.  Either Michael.Eaze or Michael.Tassone@eaze.com.

15  Q.  Are both of those your work email accounts?

16  A.  Yes.  I also have new email, but yes.

17  Q.  But you use both those accounts for work-related reasons;

18  is that right?

19  A.  Yes, I do.

20  Q.  Are they fair and accurate copies emails from your work

21  accounts?

22  A.  Yes, they were.

23  Q.  And what is the general topic that's covered in these

24  emails?

25  A.  Credit card processing.

**DJA466**

L32AWEI2ps                    Tassone – Direct

1    Q.  Mr. Tassone, I'm now going to ask you whether Government

2    Exhibit 716 contains the following government exhibits, and I'm

3    going to read out a list.

4    A.  OK.

5    Q.  401, 713, 425, 428, 553, 554, 555, 565, 566, 567, 558, 706,

6    485, 489, 490, 560, 630, 674, 615, 683, 570, 574, 568, 630,

7    632, 638, 684, 589, 590, 594, 596, 597, 598, 599, 632, 642,

8    649, 650, 655, 661, 607, 674, 672, 678, 679, 680, 683, 714,

9    527, 523, 479, 698, 480, 481, 482, 483, 484, 485, 489, 490,

10   491, 492, 493, 494, 495, 499, 501, 502, 503, 504, 505, 507,

11   508, 511, 534, 691, 692, 693, 694, 695, 696, 697 -- almost

12   there -- 698, 699, 701, 702, 703, 704, 705, 706, 707, 708, 709,

13   710, 711, 712, 677, and 585.  Are those government exhibits

14   included on that drive?

15   A.  Yes, they are.

16   Q.  How do you know that?

17   A.  Because I reviewed them.

18          MS. LA MORTE:  The government offers Government

19   Exhibit 716, along with the list that I just read and I can

20   read again if that's necessary.

21          THE COURT:  I think we'll pass on your doing it again.

22          Any objection?

23          MR. GILBERT:  The objections we raised earlier.

24          THE COURT:  Yes.  The objections that were raised

25   outside the presence of the jury are preserved but overruled.

DJA467

168

L32AWEI2ps                    Tassone – Direct

1   So the exhibits are received.

2            (Government's Exhibits 401, 713, 425, 428, 553, 554,

3   555, 565, 566, 567, 558, 706, 485, 489, 490, 560, 630, 674,

4   615, 683, 570, 574, 568, 630, 632, 638, 684, 589, 590, 594,

5   596, 597, 598, 599, 632, 642, 649, 650, 655, 661, 607, 674,

6   672, 678, 679, 680, 683, 714, 527, 523, 479, 698, 480, 481,

7   482, 483, 484, 485, 489, 490, 491, 492, 493, 494, 495, 499,

8   501, 502, 503, 504, 505, 507, 508, 511, 534, 691, 692, 693,

9   694, 695, 696, 697, 698, 699, 701, 702, 703, 704, 705, 706,

10  707, 708, 709, 710, 711, 712, 677, and 585 received in

11  evidence)

12           MS. LA MORTE:  Mr. Levine, let's display for the

13  witness Government Exhibit 401.

14  Q.  Mr. Tassone, what is this?

15  A.  This is an email sent from Roie Edery.

16  Q.  Who is Roie Edery?

17  A.  Roie Edery is a former chief product officer at Eaze.

18  Q.  Did he have a role in connection with the Eaze credit card

19  scheme?

20  A.  Yes, he did.

21  Q.  What was his role?

22  A.  To help design and implement the technology side of the

23  processing payment option on Eaze.

24  Q.  And the email is sent to you; is that right?

25  A.  Yes, it is.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L32AWEI2ps                    Tassone - Direct

1   Q.  Who is cc'd?

2   A.  Keith McCarty and former director of business development,

3   Evan Tennenbaum.

4   Q.  Just briefly, who is Keith McCarty?

5   A.  He is the CEO.

6   Q.  And who is Evan Tennenbaum?

7   A.  He was a former director of business development.

8   Q.  And what is the subject of the email?

9   A.  The subject is "Sweetwood/payment processing meeting" --

10  I'm sorry -- "payment processor meeting."

11          MS. LA MORTE:  Mr. Levine, can you go to the last page

12  of this exhibit, which spans pages 2 to 3.  There we go.

13  Q.  So you see the email, the email, Mr. Tassone, April 19,

14  2016, at 11:13 a.m.?

15  A.  Yes, I do.

16  Q.  And who is that email from?

17  A.  It was from Edmonton & Co.

18  Q.  And can you read what it states.

19  A.  "Keith -- Tassone spoken with Sweetwood.  Craig is flexible

20  Monday or Tuesday for a meeting.  Craig and Ken are both free

21  for a meeting Monday morning.  He's ready to permit meeting."

22  Q.  And remind us loosely, what is and who Craig and Cameron

23  are?

24  A.  Sweetwood was a licensed dispensary partner within the Eaze

25  network.  Craig is Craig Wald, who is the principal owner.  And

DJA469

170

L32AWEI2ps                    Tassone – Direct

1   Cameron is Cameron Wald, his son, also a partner.

2           MS. LA MORTE:  OK.  Let's go to page 2, Mr. Levine.

3   The email that's April 19, 2016 at 6:19 p.m., from where it

4   says Roie Edery, sort of the middle of the document.

5   A.  Yes.  I see that.

6           MS. LA MORTE:  Mr. Levine, could you just blow that

7   up.

8           Who is this email from?

9   A.  This is from Roie Edery.

10  Q.  Can you read aloud what he says.

11  A.  He says, "Ray is available Monday to meet in his office in

12  Calabasas or on the phone, whatever works."

13  Q.  And the reference here, Ray, who do you understand that to

14  be?

15  A.  Ray Akhavan.

16  Q.  OK.  So let's go up further now, pages 1 through 2.

17          THE COURT:  Actually, counsel, I think this is a good

18  time to give the jury their midmorning break.

19          MS. LA MORTE:  Yes, your Honor.

20          THE COURT:  Ladies and gentlemen, we'll take a

21  15-minute break at this time and then resume.

22          THE WITNESS:  Did you say break?

23          THE COURT:  Yes.

24          (Jury not present)

25          THE COURT:  Is there anything counsel needs to raise

DJA470

171

L32AWEI2ps                    Tassone – Direct

1    with the Court?

2            MR. TAYBACK:  Not for Mr. Akhavan.

3            MR. GILBERT:  No, your Honor.

4            THE COURT:  OK.  We'll see you all in 15 minutes.

5            (Recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DJA471

172

L32PWEI3                    Tassone - Direct

1           (Trial resumed; jury not present)

2           THE COURT:  Please be seated.

3           MR. TAYBACK:  Your Honor, this is Christopher Tayback.

4    Before the jury comes back, I wanted to make a brief oral

5    application --

6           THE COURT:  Yes.

7           MR. TAYBACK:  -- to be able to meet with my client

8    over the lunch break in a conference room where we can

9    interact.  The marshal suggested I make the application in

10   order to effectuate that.

11          THE COURT:  It's fine with me.  Whatever the marshals

12   agree to is fine with me.

13          MR. TAYBACK:  Thank you, your Honor.

14          MR. FOLLY:  Your Honor, would you like the witness

15   back or would you prefer to wait for the jury?

16          THE COURT:  Yes, why don't we have the witness here.

17          Are you planning to cover all of those exhibits that

18   we just --

19          MS. LA MORTE:  No.

20          THE COURT:  That's a relief.

21          MS. LA MORTE:  I know.  I knew everyone was wondering,

22   but no.

23          (Pause)

24          THE DEPUTY CLERK:  Jury entering the courtroom.

25          (Jury present)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA472

L32PWEI3                              Tassone - Direct

1          THE COURT:  All right.  I received a note from a

2     juror, which we'll take up after -- at an appropriate time.

3     It's not pressing at the moment, but why don't we continue with

4     this witness.  Please proceed.

5     BY MS. LA MORTE:

6     Q.  So, Mr. Tassone, when we just broke before, we were looking

7     at Government Exhibit 401, which we will continue to look at.

8     So I believe we left off at the bottom of page 1, going into

9     page 2 of an e-mail, April 20th, 2016, at 2:18 p.m.; do you see

10    that?

11    A.  Yes, I do.

12    Q.  Who is that e-mail from?

13    A.  Roie Edery.

14    Q.  Can you read the e-mail aloud?

15    A.  If we must do a call, then fine, but I would say it will be

16    worth their while one hour drive -- I'm sorry.  It will be

17    worth their one-hour drive, as this will be a big opportunity

18    for them and Eaze.  Also, it could set them up to be the

19    initial pilot dispensary with payment processing.

20    Q.  Can you tell us what you understand this to mean?

21    A.  Yes.  This is Ray -- or I'm sorry, this is Roie explaining

22    that it would be a big opportunity for Sweetwood, which was the

23    dispensary at the time, to join this meeting in person.

24    Q.  And when it references the one-hour drive, what is that

25    referring to?