# 21-1678-cr(L),
## 21-1708-cr(CON), 21-2214-cr(CON), 21-2466-cr(XAP)

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

JAMES PATTERSON,

*Defendant,*

RUBEN WEIGAND, AKA Sealed Defendant 1, HAMID AKHAVAN,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX FOR DEFENDANTS-APPELLANTS
## Volume 6 of 12 (Pages DJA1301 to DJA1576)

CHRISTOPHER TAYBACK
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000

WILLIAM A. BURCK
DEREK L. SHAFFER
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000

*Attorneys for Defendant-Appellant Hamid Akhavan*

*(For Continuation of Appearances See Inside Cover)*

IRA P. ROTHKEN
JARED R. SMITH
ROTHKEN LAW FIRM
3 Hamilton Landing, Suite 280
Novato, California 94949
(415) 924-4250

*Attorneys for Defendant-Appellant
   Hamid Akhavan*

MICHAEL H. ARTAN, ESQ.
624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017
(213) 688-0370

*Attorneys for Defendant-Appellant
   Ruben Weigand, AKA Sealed
   Defendant 1*

i

# TABLE OF CONTENTS

Page

District Court Docket Entries ................................... DJA1

Sealed Indictment, dated March 31, 2020 ................ DJA59

Opinion and Order of the Honorable Jed S. Rakoff,
dated August 31, 2020 .......................................... DJA75

Government's Motion *in limine* To Preclude
Defendants' Experts, dated February 16, 2021 ......DJA119.1

Exhibit A to Government's Motion *in limine* -
Letter from Christopher Tayback to Christopher
J. DiMase, Nicholas S. Folly and Tara LaMorte,
with Enclosure, dated November 3, 2020 ........... DJA119.34

Exhibit B to Government's Motion *in limine* -
Letter from Michael J. Gilbert to Christopher J.
DiMase, Nicholas S. Folly and Tara LaMorte,
with Enclosure, dated November 3, 2020 ........... DJA119.46

Exhibit C to Government's Motion *in limine* -
Letter from Michael J. Gilbert to Christopher J.
DiMase, Nicholas S. Folly and Tara LaMorte,
with Enclosure, dated December 21, 2020 ......... DJA119.74

Exhibit D to Government's Motion *in limine* -
E-mail from Shriram Harid to Christopher J.
DiMase, Nicholas S. Folly, Tara LaMorte and
Emily Deininger, dated January 19, 2021 ........... DJA119.79

Letter Motion, by Third Parties Visa Inc. and Martin
Elliott, for an Order Granting Video Testimony of
Martin Elliott, dated February 17, 2021
(Unredacted version reproduced in
Confidential Appendix) ......................................... DJA120

ii

**Page**

Annexed to Letter Motion -
(i) Subpoena to Martin Elliott, dated
February 17, 2021 ................................................. DJA125

(ii) Subpoena to Visa Inc., dated
February 11, 2021 ................................................. DJA126

(iii) Declaration of Martin Elliott, dated
February 17, 2021
(Unredacted version reproduced in
Confidential Appendix) ......................................... DJA139

Superseding Information, filed on
February 19, 2021 ................................................. DJA141

Memorandum Order of the Honorable Jed S.
Rakoff, dated February 20, 2021 .......................... DJA146

Defendants' Request to Charge, filed on
February 23, 2021 ................................................. DJA159

Exhibit A to Defendants' Request to Charge -
Excerpts from The Court's Instructions of Law to
the Jury, in *USA v. Nkansah* (Southern District of
New York Case No. 08-cr-1234) .......................... DJA188

Government's Request to Charge, dated
February 23, 2021 ................................................. DJA193

Opinion and Order of the Honorable Jed S. Rakoff,
dated March 1, 2021 ............................................. DJA233

Transcript of Trial (Jury *Voir Dire*), dated
March 1, 2021 ....................................................... DJA258

Transcript of Trial (Openings), dated
March 1, 2021 ....................................................... DJA300

Transcript of Trial (Testimony of Michael Tassone),
dated March 2, 2021 ............................................. DJA402

iii

**Page**

Transcript of Trial (Testimonies of Michael Tassone
and John Verdeschi), dated March 3, 2021 ............ DJA595

Transcript of Trial (Testimonies of John Verdeschi,
Jessica Volchko and Oliver Hargreaves), dated
March 4, 2021 ...................................................... DJA787

Transcript of Trial (Testimony of Oliver
Hargreaves), dated March 8, 2021 ........................ DJA963

Transcript of Trial (Testimony of Oliver
Hargreaves), dated March 9, 2021 ........................ DJA1144

Transcript of Trial (Testimonies of Oliver
Hargreaves and Richard Clow), dated
March 10, 2021 .................................................... DJA1291

Transcript of Trial (Testimonies of Richard Clow
and Robert Hupcher), dated March 11, 2021 ......... DJA1438

Transcript of Trial (Testimonies of Robert Hupcher
and James Patterson), dated March 12, 2021 ......... DJA1639

Transcript of Trial (Testimony of James Patterson),
dated March 15, 2021 ........................................... DJA1838

Transcript of Trial (Testimonies James Patterson,
Charles Brown, Darcy Cozzetto and Martin
Elliott), dated March 16, 2021 .............................. DJA2027

Transcript of Trial (Testimonies of Martin Elliott,
Darcy Cozzetto and Michael Steinbach), dated
March 17, 2021 .................................................... DJA2212

Transcript of Trial (Testimonies of Michael
Steinbach, Jacob Pechet, John Wang and Ronald
Shimko), dated March 18, 2021 ............................ DJA2427

iv

**Page**

Transcript of Trial (Testimonies of Daniel Whelan
and Joao Paulo Reginatto), dated
March 19, 2021 ....................................................... DJA2614

Transcript of Trial (Summations), dated
March 22, 2021 ....................................................... DJA2735

Transcript of Trial (Jury Charge), dated
March 23, 2021 ....................................................... DJA2917

Transcript of Trial (Verdict), dated March 24, 2021 .. DJA2955

Trial Exhibits:

    GX 1901-T – Transcript of Ruben Weigand's
    Post-Arrest Interrogation ..................................... DJA2967

    HAX-5014 – Excerpts from Presentation of
    Cannabis and Hemp Products ............................. DJA2971

    HAX-10057 – Actors Federal Credit Union –
    Statements of Account .......................................... DJA2974

    HAX-14004 – Excerpt from List of Customer
    Card Transactions ................................................. DJA3014

    HAX-14005 – Circle Eaze Transaction
    Summary ................................................................ DJA3015

    HAX-14008 – Circle Eaze Transaction Record... DJA3016

The Court's Instructions of Law to the Jury, filed on
March 24, 2021 ....................................................... DJA3084

Verdict, dated March 24, 2021 ................................... DJA3106

Order of the Honorable Jed S. Rakoff, dated
June 18, 2021 ......................................................... DJA3107

Transcript of Sentencing of Defendant Hamid
Akhavan, dated June 18, 2021 .............................. DJA3108

v

**Page**

Opinion of the Honorable Jed S. Rakoff, dated
July 2, 2021............................................................ DJA3146

Notice of Appeal by Defendant Ruben Weigand,
dated July 7, 2021 ................................................. DJA3170

Transcript of Forfeiture Hearing, dated
August 12, 2021 ..................................................... DJA3172

Notice of Appeal by Defendant Hamid Akhavan,
dated September 14, 2021...................................... DJA3231

Notice of Appeal by the Government, dated
September 30, 2021 ............................................... DJA3235

L3AMWEI1                    Hargreaves – Cross                    1002

1          You see that?

2    A.  That's correct.

3    Q.  Then in bold type it says:  Please note we are ceasing

4    operations for support of websites and their maintenance.  We

5    will cease paying for these services after 30 June 2019.

6          You see that?

7    A.  Yes, I do.

8    Q.  The subject of the domains ending -- let me rephrase the

9    question.

10          The subject of the domains, hosting, and telephone

11   numbers were touched upon in the phone conversation that was

12   recorded and set forth in Weigand Exhibit 28, correct?

13   A.  Yes, sir.

14          MR. ARTAN:  If we could, your Honor, I would ask to

15   have Weigand Exhibit 28-T, the transcript, placed before the

16   witness.

17          THE COURT:  OK.

18          MR. ARTAN:  I'd like to go to page 3, line 16.

19   Q.  Now, in the transcript you are CS, correct?

20   A.  Yes.

21   Q.  You said:  Are you still dealing with the -- with the group

22   that the traffic -- that we were trying to deal with.

23          Do you see that?

24   A.  Yes, I do.

25   Q.  Mr. Weigand answers:  Possibly.  I know that there's

L3AMWEI1                    Hargreaves – Cross                    1003

1    still -- there's some guys that I know or that I introduced.

2    They are taking care of it.  I've seen, something

3    unintelligible, hosting and phone numbers and all of that.  So

4    this is -- became to my attention and, unintelligible, because

5    this.

6         Then it continues.  You say:  Yeah, mate.  Mr. Weigand

7    says:  So.  Then you say:  You should be aware on that note and

8    I -- you know -- I know that my team had made everyone and who

9    they have been communicating with as aware of it as they can,

10   but I just -- you know, based on past experience -- it's

11   probably good that I'm speaking to you so I can reaffirm it.

12   In June, you know, we wanted to hand this over to you.  Yeah.

13   We are not doing -- providing this service to anyone anymore,

14   and we wanted to hand this over to you when.

15        Then Mr. Weigand says up at line 9:  So this is -- so

16   you're shutting this operation down.  Is this going to be

17   much -- because I -- you say we're not.  We're not shutting.

18        Do you see that?

19   A.  Yes, sir.

20   Q.  And then you say, at line 14:  We're not -- it's -- we've

21   just -- we're just refocused and we're really -- and I am --

22   iMerchant pay direct is purely gonna be focused on our banking

23   relation.  That's it.  It's profitable for us and this service

24   isn't.  So we basically just really -- because you guys --

25   because whoever we were speaking with basically said you

DJA1303

L3AMWEI1                    Hargreaves – Cross                    1004

1   weren't set up to take it over yet, we basically extended it

2   and continued to -- and we've continued to manage it for you

3   until the end of June.

4            Do you see that?

5   A.  Yes, I do.

6   Q.  On the following page, on line 9, you say:  Yeah, yeah.

7   What you've done is paid for those, but we don't want to be

8   managing any of it beyond June.  I -- when it comes to June it

9   needs to come -- basically -- look, whoever we're communicating

10  with -- honest, whoever's been dealing with it, they're fully

11  aware of all of this, and I'm just letting you know.

12           Then on the following page, line 18, Mr. Weigand says:

13  So take over -- so I'm not operationally involved at all, but

14  I've rearranged some people, so that's OK.  I'll make sure they

15  are properly aware.  I guess they are, but yeah.  You know,

16  actually -- and that are more complicated and doing things your

17  own way.

18           Do you remember all that?

19  A.  Yes, sir.

20  Q.  Now, at no point during that conversation did you say to

21  Mr. Weigand, hey, I'm just repeating what was in that e-mail

22  that we sent in April.  You don't say anything like that,

23  correct?

24  A.  I didn't send the e-mail, sir.

25  Q.  The e-mail that Kate Farmer sent that we looked at earlier,

L3AMWEI1                    Hargreaves - Cross                    1005

1  you didn't mention that, did you?

2  A.  No, I didn't.

3  Q.  You referred to whomever was receiving the communications,

4  correct?

5  A.  Yes, I did.

6  Q.  And at no point did you say -- you were operationally

7  involved.  You didn't say anything like that, did you?

8  A.  No, I didn't.

9  Q.  You never contradicted or corrected anything that

10  Mr. Weigand said, did you?

11  A.  No, I did not.

12          MR. ARTAN:  Nothing further at this time, your Honor.

13          THE COURT:  Cross-examination from Mr. Tayback.

14  CROSS-EXAMINATION

15  BY MR. TAYBACK:

16  Q.  Mr. Hargreaves, can you hear me?

17  A.  Yes, I can.

18  Q.  My name is Chris Tayback.  I'm here representing

19  Mr. Akhavan.  I am going to ask you a few questions.  OK?

20  A.  Yes.

21  Q.  I want to start with following up --

22          THE COURT:  Just put questions, counsel.

23          MR. TAYBACK:  Thank you.

24  Q.  With respect to the circumstances of your arrest, you were

25  arrested and you testified about your efforts to attempt to

DJA1305

L3AMWEI1                    Hargreaves – Cross                    1006

1   commit extortion.

2           Do you recall that?

3   A.  Yes, sir.

4   Q.  Now, the attempted extortion that you described having

5   committed, that was to collect money from a man who was here in

6   New York?

7   A.  No, that's not correct.

8   Q.  It was to collect money from a man who you believed or you

9   had understood had stolen money from your employer?

10  A.  No.

11  Q.  What was the attempted extortion plot?

12  A.  So -- could you ask the question in a different way.

13  Q.  What were you attempting to recover through the extortion

14  scheme?

15  A.  Money.

16  Q.  Why did you try to get that money?

17  A.  To gain -- I was hoping to make money from doing that.

18  Q.  You were paid for it?

19  A.  I was going to be paid a commission or a percentage of what

20  was recovered.

21  Q.  One of the ways to obtain that money through the extortion

22  scheme -- by the way, you were obtaining money from a man,

23  correct, a person?

24  A.  That is correct.

25  Q.  And the man that you tried to extort, the way you did that

DJA1306

```
L3AMWEI1                    Hargreaves - Cross               1007
```

1  was to try to intimidate him, correct?

2  A.  Yes, sir.

3  Q.  One of the ways that you tried to intimidate him was you

4  sent him photos, correct?

5  A.  I didn't send photos, no, sir.

6  Q.  But photos were sent in connection with the scheme,

7  correct?

8  A.  That is correct, yes.

9  Q.  And you were charged with the extortion scheme, right?

10 A.  I was charged with attempted extortion, yes.

11 Q.  And you read the complaint that charged you with attempted

12 extortion?

13 A.  Yes, sir.

14 Q.  And that complaint says that this man was sent a photo of

15 his wife and daughter, correct?

16 A.  That is correct, sir.

17 Q.  And the intent of that communication, sending the photo,

18 was to intimidate him, correct?

19 A.  Yes, it was, sir.

20 Q.  A subsequent photo was also sent as part of this extortion

21 scheme, correct?

22 A.  Yes, sir.

23 Q.  And that photo was of the man's daughter and her boyfriend,

24 correct?

25 A.  That is correct, yes.

L3AMWEI1                    Hargreaves – Cross                    1008

1    Q.  And that was also sent for the same purpose, to try to

2    intimidate or threaten him, correct?

3    A.  Yes, it was.

4    Q.  In fact, your scheme was to try to convey a credible threat

5    that bad things would happen to this man if he didn't do what

6    you were asking, isn't that right?

7    A.  Yes, sir.

8    Q.  Now, after you were arrested you said that you spent the

9    next two days or more talking to the government, correct?

10   A.  Yes.  I spent time speaking with the government.

11   Q.  You recall in those rooms there were multiple law

12   enforcement agents?

13   A.  Yes, sir.

14   Q.  FBI?

15   A.  Yes, sir.

16   Q.  And IRS agents?

17   A.  I don't recall if that was the case or not.

18   Q.  And there were Assistant United States Attorneys,

19   prosecutors, correct?

20   A.  Yes, sir.

21   Q.  And these people took notes while you talked to them,

22   didn't they?

23   A.  Yes, sir.

24   Q.  By that point, that is to say, by the time you started

25   talking to these government lawyers and investigators, you had

DJA1308

L3AMWEI1                    Hargreaves – Cross                    1009

1   decided to cooperate with the government, right?

2   A.  Yes, I had.

3   Q.  Because you thought that was your best chance to save

4   yourself?

5   A.  Yes, I did.

6   Q.  As you said yesterday, it's your view that no person in

7   their right mind would want to go to jail, right?

8   A.  Yes.

9   Q.  That was your mindset at the time?

10  A.  Yes, sir.

11  Q.  So you would consider yourself to have been incentivized by

12  your arrest to tell the government everything you could think

13  of about the criminal activity that you knew of, right?

14  A.  I was incentivized to be honest about activities that I've

15  been involved in and that they were aware of.

16  Q.  In fact, you told them a lot of information, right?

17  A.  Yes, I did.

18  Q.  You told them about things that you did that were criminal,

19  correct?

20  A.  Yes, sir.

21  Q.  And you also described your general work that was not

22  criminal?

23  A.  Yes, sir.

24  Q.  Now, you didn't mention the efforts that you've described

25  throughout the course of your direct testimony to process

SOUTHERN DISTRICT REPORTERS, P.C.

DJA1309

L3AMWEI1                    Hargreaves - Cross                    1010

 1   marijuana payments until the middle of the second day that you

 2   spoke to the government, right?

 3   A.  If you say so.  I don't recall exactly when.

 4   Q.  I could not hear you.

 5   A.  I said if you say so.  I do not recall exactly when.

 6   Q.  You would expect it to show up in notes that the government

 7   was taking if they said it earlier?

 8   A.  Could I have one of these things that goes on the

 9   microphone.  I can't see them here, and I think it's affecting

10   my ability for you to hear me clearly.

11           Is that better?

12   Q.  Yes.

13   A.  Could you repeat the question, please.

14   Q.  I'll reask a new question.

15           In your conversations with the government, after you

16   were arrested and before you were released and sent home, you

17   didn't mention any of the fake websites that you testified

18   about in direct, correct?

19   A.  I don't recall when we started discussing it.

20   Q.  You didn't mention any of the allegedly fraudulent

21   documentation that you described in your direct testimony?

22   A.  Sorry.  At which point?

23   Q.  During your conversations with the government, after your

24   arrest and before you were sent home to Barcelona.

25   A.  I don't recall.

L3AMWEI1                    Hargreaves – Cross               1011

1    Q.  Is it true that you didn't use the word fraudulent at all

2    to describe the work you did with respect to processing what

3    you understood to be marijuana credit card transactions during

4    your conversations with the government from the time of your

5    arrest until you were sent home to Barcelona a couple of weeks

6    later?

7    A.  Sorry.  I can't recall that.

8    Q.  Would it refresh your recollection to see notes from that

9    conversation?

10   A.  By all means.

11        MR. TAYBACK:  Your Honor, may I place in front of the

12   witness 3501-0010.

13   Q.  Mr. Hargreaves, if you look at the date at the very top, I

14   am going to have you read this to yourself.  You could skim

15   through.  It's a number of pages.

16   A.  I'll let you know when I get to the bottom.

17   Q.  Confirm me that you don't mention this marijuana company

18   for which you did business, you claim.

19   A.  Sure.  Sorry.  You are asking me to confirm what again?

20   Q.  To confirm that you did not mention anything about this

21   alleged marijuana processing scheme you described in direct

22   testimony in this first meeting with the government.

23   A.  No, I do not.

24   Q.  Meaning you don't see any reference to it, correct?  Does

25   that refresh your recollection?

**DJA1311**

L3AMWEI1                    Hargreaves - Cross                    1012

1    A.  Yeah.  I see no reference to it.

2    Q.  Does that refresh your recollection --

3              THE COURT:  This is totally improper, totally

4    improper, and you know better.  You cannot refer to an exhibit

5    that's not in evidence.  You can't ask him to comment about

6    what's in the exhibit or what's not in the exhibit.  You can

7    ask him for his memory of the meeting and that's it.

8              MR. TAYBACK:  Understood, your Honor.

9    Q.  Let me ask you some questions about the second date that

10   you spoke to the government.  In fact, at that time, when you

11   mentioned -- at that time did you say to the government that

12   you tried to process medical marijuana traffic?

13   A.  I believe -- yes, I believe so.

14   Q.  And you said -- what you described at the time was we tried

15   to get involved in that, correct?

16   A.  Correct.

17   Q.  You said at that time that it was a U.S. client located in

18   Los Angeles, California, correct?

19   A.  Correct.

20   Q.  And you said at that time that they were a payment

21   processor that took in medical marijuana money, correct?

22   A.  Can I see this?  Is this something I can read?

23   Q.  Would it refresh your recollection to review notes?

24   A.  Yes, please.  Thank you.

25             MR. TAYBACK:  If you could place before the witness

DJA1312

L3AMWEI1                    Hargreaves - Cross                    1013

1    only Exhibit 3501-0011.  You could bring up the paragraph that

2    I referred to.

3    Q.  You can read this to yourself only.

4    A.  Thank you.

5    Q.  Does that refresh your recollection with respect to what

6    you said to the agents and the government lawyers the second

7    day --

8    A.  Yes, thank you.

9              MR. TAYBACK:  You can take it down.  Thank you.

10   Q.  What you said was, they were a payment processor that took

11   in medical marijuana money, correct?

12             MS. LA MORTE:  Objection to the extent he is reading

13   from the document, your Honor.

14             MR. TAYBACK:  I believe I am asking him --

15             THE COURT:  Yes.  Her point, which is correct, is,

16   just be sure that you are not looking down and reading from the

17   document because that would be then putting in evidence

18   something that's not in evidence.  But the question was

19   otherwise proper.  So it's just a question of decorum.

20             MR. TAYBACK:  Just my outline, your Honor.

21   Q.  Didn't you tell them that they were a payment processor

22   that took in medical marijuana money?

23   A.  I believe so, yes.

24   Q.  Didn't you tell them, we were trying to capture some of

25   that traffic and process it?

L3AMWEI1                    Hargreaves – Cross                    1014

1   A.  Yes, sir.

2   Q.  That meant you and your company, correct?

3   A.  Yes.

4   Q.  The company you were working for?

5   A.  Correct.

6   Q.  And you told them at that time, we actually tried to code

7   as medical services 8099, correct?

8   A.  That is correct.

9   Q.  Let me pause there.  8099 is a merchant category code?

10  A.  Yes, sir.

11  Q.  That's a four-digit number?

12  A.  Yes.

13  Q.  And 8099 stands for miscellaneous medical services.  Is

14  that your understanding?

15  A.  It is, yes.

16  Q.  Do you know that there is no merchant category code or MCC

17  for marijuana?

18  A.  Yes, I do.

19  Q.  Is it your understanding that in 2017, that marijuana was

20  legal in California for medical purposes only?

21  A.  Sorry.  I wasn't massively in favor of the laws about that.

22  Q.  You would agree that medical services miscellaneous is a

23  close approximation for marijuana in those circumstances?

24  A.  We were trying to -- I think the term that was used

25  frequently was, be elegant about the solution that we were

**DJA1314**

L3AMWEI1                    Hargreaves - Cross                    1015

1   trying to put together.

2   Q.  You thought that 8099 was an approximately correct code,

3   correct?

4   A.  I didn't personally.  It was something that was presented

5   to us by a consultant and by some of my coconspirators.

6   Q.  It's fair to say you had no opinion on it?

7   A.  I'm not saying I didn't have an opinion on it.  I just went

8   along with it.

9   Q.  You also told the government in this second day of meetings

10  that you did not end up processing any of it, correct?

11  A.  Through this bank, yeah.

12  Q.  And you said, we did not process a single dollar.  Isn't

13  that what you told them?

14  A.  Yes, sir.

15  Q.  And you said, we spent a lot of time and effort trying to

16  make that work, but it did not?

17  A.  As I mentioned, we couldn't make it work at Paynetics.

18  Q.  That's everything you told the government in those first

19  two days of meetings about the marijuana credit card

20  processing, correct?

21  A.  I believe so.

22  Q.  That's what you told them while you were concerned that you

23  were literally facing time in prison, something you really

24  wanted to avoid?

25  A.  It is something I told them, yes.

```
L3AMWEI1                    Hargreaves - Cross                  1016
```

1    Q.  You also spoke to the agents on October 2, several days

2    later.

3              Do you recall that?

4    A.  I recall that I was in the United States for a period of

5    about two weeks, during which I spoke to the agents on a number

6    of occasions.

7    Q.  Again, in this particular meeting you recall there were

8    four, five agents, a couple of lawyers for the government

9    taking notes?

10   A.  Yes, I do, sir.

11   Q.  And at that meeting you mentioned the marijuana processing

12   work again, correct?

13   A.  Again, you'd have to refresh my memory on exactly what I

14   said.

15   Q.  Would it refresh your recollection to look at notes?

16   A.  I'd appreciate that.  Thank you.

17             MR. TAYBACK:  May I place before the witness Exhibit

18   3501-0013 at page 4, just for the witness.

19   Q.  Read it to yourself only.

20   A.  OK.  I read it.

21             MR. TAYBACK:  You can take it down.  Thank you,

22   Mr. McLeod.

23   Q.  This October 2 meeting with the government, did you tell

24   them, we tried to do medical marijuana with Ray?

25   A.  Yes.

L3AMWEI1                    Hargreaves - Cross                    1017

1   Q.  And you told them that the application was a delivery

2   service -- I'm sorry.  The applicant was a delivery service.

3   A.  By applicant do you mean Eaze?

4   Q.  Yes.

5   A.  Yes.  I believe it was on a website.

6   Q.  But you didn't know the name of the company Eaze at that

7   point in time, correct?

8   A.  When I had spoken with the government.

9   Q.  I'm sorry?

10  A.  Do you mean when I was speaking with the government?

11  Q.  Yes.

12  A.  Yes, I knew who the company were.

13  Q.  You did not mention the name?

14  A.  I don't know if you notice, but I don't have a great

15  memory.

16  Q.  You told the government that we created a website and

17  application packs for him, correct?

18  A.  Correct.

19  Q.  You did not say that anything about those applications or

20  websites were fraudulent in that interview, correct?

21  A.  I did not use the word fraudulent, I believe.

22  Q.  You didn't use the word false either, correct?

23  A.  No, sir.

24  Q.  You didn't use the word misleading, correct?

25  A.  No, sir.

L3AMWEI1                    Hargreaves – Cross                    1018

1  Q.  You didn't use the word deceptive, correct?

2  A.  No, sir.

3  Q.  Yet, at that moment in time, on October 2, several days

4  after your arrest, you knew that the government, the FBI, the

5  agents, the prosecutors, what they were looking for was

6  criminality known to you, correct?

7          MS. LA MORTE:  Objection.

8          THE COURT:  Well, in terms of form, it's not a model

9  of precision, but I think it is within the realm of what can be

10  asked about what this witness knew or understood.

11          Overruled.  You may answer.

12  A.  Would you mind repeating the question?

13  Q.  Yes.

14          At that moment in time, on October 2, when you were

15  speaking to the government, to the agents and the lawyers both,

16  you knew they wanted to talk to you about was your knowledge of

17  criminality, correct?

18  A.  I was answering questions that were put to me based on

19  information, I presume, that was extracted from the devices

20  that they took from me when I was arrested.

21  Q.  At this point in time you also told them, that is to say,

22  on October 2, you also told the government that the client was

23  very demanding, in your opinion, correct?

24  A.  Yes.

25  Q.  And that they didn't pay your last invoice?

L3AMWEI1                    Hargreaves - Cross                    1019

1   A.  Yes, that's correct.

2   Q.  And you charged them 12 to $15,000 for the work?

3   A.  No.  It was more than that.

4   Q.  You recall it being more than that?

5   A.  I saw what you presented in front of me and I saw the

6   numbers there.  But as a totality it was more than that.

7   Q.  You are saying the amount that you believed you were owed

8   at the time and hadn't been paid was 12 to $15,000?

9   A.  Can I see the document again?  Do you mind?

10  Q.  If it would refresh your recollection.  Will it?

11  A.  What I'm saying is, I know what we charged per individual

12  application pack, but we didn't do just one application pack.

13  It was actually more money owed than just -- than one

14  application pack.

15  Q.  Let me ask you this.  Among the things you told the

16  government on October 2, that you did tell the government about

17  this is, is you felt aggrieved because they were a demanding

18  client and you were owed money, right?

19  A.  I wasn't owed money.  My company was owed money.  The money

20  did not come to me.  If you are asking me whether I was

21  personally aggrieved, not really, no.

22  Q.  But you believe your company was owed money, correct?

23  A.  Yes, we did.

24  Q.  That's something you shared with the government on October

25  2, correct?

```
L3AMWEI1              Hargreaves - Cross              1020
```

1   A.  I believe so, yes.

2   Q.  You also said that at that time, in October, you told the

3   government, we would resell services and packages, company,

4   director, website --

5        MS. LA MORTE:  Objection to the extent counsel is

6   quoting from the document.

7        MR. TAYBACK:  I'll rephrase the question.  I'll break

8   it into component parts.  I'll withdraw it.

9        May I ask another question, your Honor?

10       THE COURT:  Yes.

11  Q.  Mr. Hargreaves, at that time, on October 2, you told the

12  government that we would resell services and packages, right?

13  A.  At some point I discussed that with them, yes.

14  Q.  By resell you mean you would use the work that you had done

15  for different clients on different matters, correct?

16  A.  No.

17  Q.  What did you mean by resell?

18  A.  I meant if there was -- for example, we were not -- for

19  example, the companies, the shelf companies that we purchased,

20  we were not personally forming those companies.  It was a

21  service provider who would do that.  We would pay them and we

22  would put a markup on it and sell it to clients.

23  Q.  So you would get these items from other providers and then

24  mark them up, correct?

25  A.  Yes, sir.

L3AMWEI1                    Hargreaves - Cross                    1021

1   Q.  And at the time, October 2, when you were speaking to the

2   government, you did not describe any aspect of this as

3   fraudulent, didn't use that word.

4   A.  I don't recall the exact language I used.

5   Q.  Would it refresh your recollection to review the document?

6   A.  Is it the same document as before?

7   Q.  Yes.

8   A.  Then, no, I did not use that language.

9   Q.  You what?

10  A.  No, I did not use that language.

11  Q.  You didn't use the word false, correct?

12  A.  Correct, sir.

13  Q.  You didn't use the word deceptive?

14  A.  No, sir.

15  Q.  Now, isn't it true that you proposed at that time to use

16  some of that same work that you buy and resell to use it in

17  other efforts to try to obtain and identify other criminals?

18  I'll withdraw the question.

19          Did you try to use your business at that point in time

20  to help the government identify other criminals?

21  A.  Do you mean when I left the United States?

22  Q.  Did you propose that idea to the government in October?

23  A.  I don't know if I proposed it or not.  Again, if you can

24  share something that I can review, that would be helpful.

25  Q.  Now, you testified yesterday that after your arrest and

**DJA1321**

L3AMWEI1                    Hargreaves – Cross                    1022

1   your return to Barcelona that you really did not do much work

2   with respect to the marijuana processing that you described

3   earlier, correct?

4   A.  That is correct, yeah.

5   Q.  You spoke to the government again on November 20, correct?

6   A.  November 20 of when?  Sorry.

7   Q.  November 20.

8   A.  Sorry.  Of which year?

9   Q.  2018.

10  A.  I'm sorry.  I don't recall the exact dates of when the next

11  time I spoke to them.

12  Q.  Let me put it to you this way.  Even after you returned to

13  Barcelona, you continued to talk to the government, correct?

14  A.  Yes, of course.

15  Q.  How frequently?

16  A.  I had to speak -- I had to touch base with the agents every

17  48 hours or so.

18  Q.  So you not only spoke to them during the time you were in

19  the United States between late September and mid October, when

20  you returned, but you talked to them afterwards as well?

21  A.  Yes, sir.

22          MR. TAYBACK:  May I have one moment, your Honor?

23          THE COURT:  Yes.

24  Q.  Would it refresh your recollection as to the date that you

25  next spoke to the government about marijuana processing to

```
L3AMWEI1              Hargreaves - Cross              1023
```

1   review notes of your conversations?

2   A.  Yes, please.

3          MR. TAYBACK:  Can you place before the witness Exhibit

4   3501-0303.  Would you go to the next page.  This is just for

5   the witness.

6   Q.  You see at the top of the first page, if you could read to

7   yourself anything that indicates the date.

8   A.  Thank you.

9          MR. TAYBACK:  You can take that down.

10  Q.  Does that refresh your recollection --

11  A.  Would you mind putting the first one up again?

12  Q.  The first what?

13  A.  I saw some text.

14  Q.  Yes.

15         MR. TAYBACK:  Place that back up.

16  Q.  Does this refresh your recollection that you spoke to the

17  law enforcement agents about marijuana processing on November

18  20 of 2018?

19  A.  Yes.

20  Q.  At that time you, again, mentioned Ray, correct?

21  A.  Correct.

22  Q.  And he was identified as Ray, last name unknown, right?

23  A.  Yes.

24  Q.  You didn't know his last name?

25  A.  I didn't recall his last name.

DJA1323

L3AMWEI1                    Hargreaves – Cross                    1024

1   Q.  You, again, mentioned the application packets, correct?

2   A.  Yes.

3   Q.  The way you described it at that time, on November 20, was

4   that you were involved previously with Ray, last name unknown,

5   about the creation of application packets regarding medical

6   marijuana, right?

7   A.  Correct.

8   Q.  You didn't say at that time that they were fraudulent,

9   right?

10  A.  I think it was very clear from the conversations we had

11  that my business was completely based around fraudulent

12  application packs.

13  Q.  You didn't say the word fraudulent, correct?

14  A.  No, I didn't say.

15  Q.  You didn't say the word fake, correct?

16  A.  No, sir.

17  Q.  You didn't say the words intent to deceive, correct?

18  A.  No, sir.

19  Q.  You testified yesterday about some crimes that you had

20  committed after you were released from custody and went back to

21  Barcelona?

22  A.  Yes, sir.

23  Q.  Is it true that after agreeing to work as a cooperator for

24  the government and agree to tell the truth, you broke that

25  agreement, right?

L3AMWEI1                    Hargreaves – Cross                    1025

1   A.  Yes, sir.

2   Q.  I believe you said there were two separate thefts.  One was

3   $40,000.

4   A.  Two separate what?

5   Q.  Thefts that you committed.

6   A.  No.  One.

7   Q.  Did you indicate that you stole $40,000?

8   A.  Yes, sir.

9   Q.  That was from whom?

10  A.  The company.

11  Q.  Did you also steal $200,000?

12  A.  No, I did not.

13          MR. TAYBACK:  May I have one moment, your Honor?

14          THE COURT:  Yes.  Sometime in the next couple of

15  minutes we will give the jury their midmorning break.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

**DJA1325**

L3APWEI2                    Hargreaves – Cross                    1026

1  Q.  Did you say that among your -- in addition to stealing the

2  $40,000, you also transferred $200,000?

3  A.  Yes, sir.

4  Q.  And that was in a manner to you to be criminal at the time

5  you did it?

6  A.  I didn't -- so that transfer was to pay staff wages.  I

7  didn't really think about if it was criminal or not.  I was

8  under pressure, but I certainly shouldn't have done it.

9  Q.  Now, when did the government find out about what you've

10  described as these offenses?

11  A.  I told the --

12          MS. LA MORTE:  Objection.

13          THE COURT:  Sustained.

14  Q.  When did you tell the government about these events?

15  A.  I contacted the agents that were tasked with keeping in

16  contact with me.  I phoned them that same day and told them.

17  Q.  And when was that?

18  A.  I don't remember the date.

19  Q.  Do you remember the year?

20  A.  I'm going to go 2018.

21  Q.  Is it fair to say that at that point, you were even more

22  scared that you had maybe blown your cooperation deal?

23  A.  To be perfectly honest with you, I've been fairly nervous

24  throughout this whole situation, sir.

25  Q.  Is it true that at that point in time -- withdraw that

DJA1326

L3APWEI2                    Hargreaves - Cross                    1027

1   question.

2              THE COURT:  All right.  Ladies and gentlemen, we're

3   going to give you your mid-morning break at this time.  I do

4   want to keep it strictly to 15 minutes, since we're running a

5   little late.  So we'll reconvene in 15 minutes.

6              (Jury not present)

7              THE COURT:  The witness can step down.  We'll see you

8   in 15 minutes.

9              (Witness temporarily excused)

10             Please be seated.  So, Mr. Tayback, how much more do

11  you have?

12             MR. TAYBACK:  I would estimate an hour and a half.

13             THE COURT:  Okay.  I think that's reasonable with a

14  witness of this kind.  I wouldn't want it to go much beyond

15  that, but an hour and a half sounds reasonable.

16             Okay.  Real good.  We'll see you in 13 minutes.

17             MS. LA MORTE:  Your Honor, is the lunch break still at

18  the same time?

19             THE COURT:  Well, I was thinking we'd move the lunch

20  break to 1:00 to 2:00.

21             MS. LA MORTE:  Okay, that makes sense.  Okay.

22             (Recess)

23             THE COURT:  Please be seated.  The jury is on their

24  way up, please get the witness on the stand.  We will go to

25  1:00 and have lunch from 1:00 to 2:00.

L3APWEI2                    Hargreaves – Cross                    1028

1          THE LAW CLERK:  Jury entering the courtroom.

2          (Jury present)

3          THE COURT:  Please be seated.  All right.  Ladies and

4    gentlemen, we're going to go until 1:00 and take our lunch

5    break from 1:00 to 2:00; so we'll have a full hour now.

6          Go ahead, counsel.

7    BY MR. TAYBACK:

8    Q.  Mr. Hargreaves, while you were working for the government,

9    after you'd been released and sent home, you were authorized to

10   record telephone conversations, correct?

11   A.  Yes, sir.

12   Q.  Did you record any conversations with Mr. Akhavan during

13   that time period?

14   A.  Yes, sir.

15   Q.  How many?

16   A.  I remember one.  There may have been more, but I remember

17   one definitely.

18   Q.  And did you call Mr. Akhavan or did he call you?

19   A.  I don't recall.  I certainly -- I know that I made phone

20   calls to him.  I don't recall if the recorded call was incoming

21   or outgoing.

22   Q.  Did you -- you say you had multiple telephone conversations

23   with Mr. Akhavan after you were released?

24   A.  I said I remember having one.  There may have been more.  I

25   don't recall.

L3APWEI2                    Hargreaves - Cross                    1029

1   Q.  My question is slightly different.  Did you have

2   conversations with Mr. Akhavan after you were released that you

3   didn't record?

4   A.  I don't recall; so, no, I don't believe so.

5   Q.  And you recall one conversation with him that you did

6   record?

7   A.  Yes, sir.

8   Q.  Was it your goal in that conversation to try to get

9   Mr. Akhavan to say incriminating things?

10  A.  It was my goal to have a discussion with him about the

11  nature of our typical business.

12  Q.  The reason you recorded it, though, was to provide evidence

13  to the government if it was of value?

14  A.  That is correct, yes.

15  Q.  You testified previously about your plea agreement; do you

16  recall that?

17  A.  Yes, sir.

18  Q.  You did not enter into that written plea agreement that we

19  looked at yesterday until February of 2020, correct?

20  A.  That is correct, sir.

21  Q.  So that was about a month before this case was charged?

22  A.  If you say so, yes.

23  Q.  I'm asking you.

24  A.  I don't recall.

25  Q.  Is it your expectation, as you sit here now, that your

DJA1329

L3APWEI2                    Hargreaves – Cross                    1030

1   level of substantial assistance to the government will be

2   measured, at least in part, by how you do as a witness at this

3   trial?

4   A.  No.

5   Q.  You consider your testimony at this trial part of your

6   cooperation with the government, correct?

7   A.  Yes, sir.

8   Q.  I will ask you some questions now on a different topic.

9         You testified yesterday and used the term "high-risk

10  businesses;" do you recall that?

11  A.  Yes.

12  Q.  By high-risk you do not necessarily mean illegal, correct?

13  A.  No.

14  Q.  Well, you referenced gambling, which can be legal or

15  illegal, correct?

16  A.  Correct.

17  Q.  You mentioned Forex trading, which you said can be legal or

18  illegal, depending on licensing, right?

19  A.  Correct.

20  Q.  And you mentioned the travel industry?

21  A.  Yes.

22  Q.  How is the travel industry high-risk?

23  A.  Well, if you have an airline and an airline -- and you can

24  cancel your tickets -- you know, book your ticket four months

25  in advance, cancel it -- we look at it from the standpoint of

L3APWEI2                    Hargreaves - Cross                    1031

1  chargebacks.  And also, if an airline was to go bust, which is

2  not uncommon, it's a hell of a liability.

3  Q.  And so businesses that have a risk of bankruptcy would

4  constitute high risk?

5  A.  One of them, yeah.

6  Q.  And businesses that are in -- where the business is one to

7  likely generate chargebacks or returns, that's also high risk?

8  A.  Again, it's another thing that's taken into consideration.

9  Q.  Now, is it your understanding that -- let me back up.

10         You used the term sometimes acquiring banks?

11 A.  Yes, sir.

12 Q.  And is that the same as a merchant bank?

13 A.  No, it's not.

14 Q.  What's the merchant bank?

15 A.  Do you mean a merchant bank account?

16 Q.  Yes.

17 A.  It's an account given to a merchant that is typically

18 housed with an acquiring bank.

19 Q.  The term you use for the banks that would open accounts on

20 behalf of merchants was acquiring bank?

21 A.  Yes, sir.

22 Q.  And is it your understanding that acquiring banks monitor

23 the chargebacks from their merchants?

24 A.  Not only, but yes.

25 Q.  Isn't it true that regardless of -- even in the legal world

**DJA1331**

L3APWEI2                    Hargreaves – Cross                    1032

1   of credit card processing, chargebacks are a significant issue

2   for any acquiring bank?

3   A.  They're a significant issue for everybody.

4   Q.  And have you heard the term MIDs?

5   A.  Yes, sir.

6   Q.  What's a MIDs?

7   A.  It's a merchant account.

8   Q.  And who holds the merchant accounts?

9   A.  When you say hold, could you --

10  Q.  Are the merchant accounts opened with acquiring banks?

11  A.  Again, it really depends.  They can be, yes.

12  Q.  And it's your understanding that there's nothing illegal

13  about merchant banks opening MIDs for merchants, correct?

14  A.  I presume, if the nature of the business is legal, yes.

15  Q.  And can some of the merchants have multiple MIDs within a

16  merchant bank?

17  A.  Within a single merchant?

18  Q.  Within a single acquiring bank.

19  A.  Why would they do that?  Sorry.  I'm asking you a question.

20  Q.  Let me withdraw the question.  Ask you a new question.

21         Isn't it true that merchants can have multiple MIDs?

22  They can have different acquiring bank representations?

23  A.  Yes, sir.

24  Q.  And there's nothing wrong with that, in your view?

25  A.  In my opinion, no.

DJA1332

L3APWEI2                    Hargreaves – Cross                    1033

1   Q.  Now, isn't it correct that a high chargeback rate is

2   something that can get a merchant disqualified from

3   participating in the Visa or MasterCard networks; is that your

4   understanding?

5   A.  It would certainly lead to questions from the acquiring

6   bank usually.

7   Q.  And that's true even if the business is like a travel

8   agency or airline?

9   A.  Any business.

10  Q.  Is it your understanding that there is a percentage of

11  chargebacks that's used in the -- among European acquiring

12  banks to determine whether it's a risk that can be tolerated or

13  not?

14  A.  Yes, sir.

15  Q.  And what's that percentage?

16  A.  I don't recall.  It's different for Visa and MasterCard.

17  It's been a while.

18  Q.  Is it your understanding that European acquiring banks have

19  a higher percentage tolerance risk than American banks?

20  A.  I don't believe, no.

21  Q.  Do you know if that was ever true?

22  A.  I don't believe so, no.

23  Q.  How many -- if you have a sense, approximately how many

24  acquiring banks are there in Europe that process credit card

25  transactions?

```
L3APWEI2                    Hargreaves - Cross                    1034
```

1    A.  I have no idea.

2    Q.  It's more than the few that you've mentioned in your

3    testimony?

4    A.  Yes, sir.

5    Q.  Now, it's the merchant bank's responsibility -- withdraw

6    that.

7            It's your understanding, isn't it, that it's the

8    merchant bank's responsibility to monitor its merchants,

9    correct?

10   A.  The acquiring banks, you mean.

11   Q.  I apologize.  The acquiring banks?

12   A.  Yes.  Sorry.  If they have a direct relationship with the

13   merchant, and there was no business in between, then, yes.

14   However, if they have a relationship with a payment service

15   provider or payment facilitator, depending on license, then

16   they also are responsible.

17   Q.  And there are times where the acquiring bank's relationship

18   with the merchant is through an intermediary, correct?

19   A.  Yes, sir.

20   Q.  What are those intermediaries called?

21   A.  They could -- there are various different types of

22   intermediaries.  Typically, I would say a payment service

23   provider or payment facilitator.  There are different degrees

24   of responsibilities that are allowed.

25   Q.  What is an ISO?

```
L3APWEI2              Hargreaves - Cross              1035
```

1   A.  It can stand for an independent sales operator or an

2   independent sales organization.

3   Q.  And is that also sometimes an intermediary between the

4   merchant and the acquiring bank?

5   A.  That is what it is, yes.

6   Q.  That is what it is, correct?

7   A.  To answer your question directly, it stands for independent

8   sales operator or operative.

9   Q.  Now, were you -- you were not working as an ISO with

10  respect to any of the banks that you've identified as being

11  involved in the marijuana processing work, correct?

12  A.  No.  I was not an ISO, sir.

13  Q.  Were you aware of an ISO that was, in fact, serving that

14  purpose?

15  A.  In relation to which part, sir?

16  Q.  With respect to the marijuana processing work that you said

17  you worked on in 2018?

18  A.  Not in relation to Paynetics, but yes, in relation to

19  the -- well, the defendants, the banks that the defendants had

20  relationships with.

21  Q.  Was that ISO named Esepa?

22  A.  To be perfectly honest, I'm a little bit hazy about what

23  exactly their role was, but I'm familiar with that name, yes.

24  Q.  Do you remember the name of ISO that was involved?

25  A.  The reason I'm slightly hesitating is things mutated quite

L3APWEI2                    Hargreaves - Cross                    1036

1    a lot from initial discussions as we progressed.  And initially

2    there was a gentleman who -- called, I believe his name was,

3    Andreas.  He was meant to be, effectively, the ISO within the

4    scheme, and I remember receiving messages about Esepa, but

5    unless you can refresh my memory, I can't -- I know they were

6    involved certainly.

7    Q.  Do you know a person named Michael or Michele Kindle?

8    A.  I saw that we put his name on applications.

9    Q.  Do you know who that is?

10   A.  No, I don't really.

11   Q.  So you don't know if he's associated with Esepa, correct?

12   A.  I know as much as his name was on the -- his name was

13   brought up in relation with that, and on the documents we had,

14   his name was all over our documents as requested.

15   Q.  And is your understanding that he's associated with Esepa?

16   A.  Yes.

17   Q.  And, in fact, he was identified in some of the application

18   packages you looked at yesterday as a point of contact for a

19   number of them, correct?

20   A.  And that's why I recognize the name.

21   Q.  You testified on direct that you had reviewed, at some

22   point in time, the Visa rules or some parts of the Visa rules?

23   A.  Are you referring to my discussion regarding a question

24   that I posed in a message to Mr. Skoglund?

25   Q.  In part, yes.

DJA1336

L3APWEI2                    Hargreaves - Cross                    1037

1    A.  I asked that question, yes.

2    Q.  And so did you -- you did, in fact, review some aspect of

3    the Visa rules?

4    A.  I don't recall beyond that message.

5    Q.  Other than the instance that you described in your

6    testimony, do you have any recollection of ever reviewing the

7    Visa rules?

8    A.  To be honest with you, a few times I tried to actually

9    Google them and get up -- or request them from different

10   people.  It's quite arduous reading.

11   Q.  You did -- so the answer is, no, because it was arduous?

12   A.  No, I was really more -- to be perfectly honest, my role

13   within -- initially within this, this specific scheme, was one

14   to engage with acquiring banks and, at a later date, to create

15   application packs.  I wasn't -- there was a reason why we

16   engaged with consultants, that this was more their subject

17   matter.  They were more experts on the subject matter.

18   Q.  And one of the consultants you mentioned dealing with was

19   Stanley Skoglund?

20   A.  Yes, sir.

21   Q.  And he was someone you understood had previously been an

22   executive at Visa?

23   A.  That's my understanding, yes.

24   Q.  Do you understand what his position had been at Visa?

25   A.  No.

L3APWEI2              Hargreaves - Cross              1038

1   Q.  And did you find him knowledgeable about the Visa rules?

2   A.  Knowledgeable in I didn't really -- my knowledge was not

3   great; so he certainly knew more than I did.

4   Q.  So is it fair to say that you don't have any understanding

5   as to how the Visa rules applied to acquiring banks bringing on

6   merchants, correct?

7   A.  I know it's a fairly wide-ranging question, sir.

8   Q.  Is it fair to say you don't consider yourself an expert in

9   those Visa rules, correct?

10  A.  No, I relied on others.

11  Q.  You used the term a couple of times, including just now,

12  called a scheme.  You know the word scheme?

13  A.  Sure.

14  Q.  The phrase "card scheme" is something that's used in the

15  credit card industry, independent of any illegality, correct?

16  A.  I would say credit -- I would sometimes -- personally, I

17  would sometimes refer to Visa and MasterCard as the card

18  schemes.

19  Q.  And so the fact that the word "scheme" is in there doesn't

20  necessarily connote illegality, correct?

21  A.  Are you referring to the statement that I made?

22  Q.  Yes.

23  A.  I was referring to illegality.

24  Q.  Well, when you see the word "card scheme" in the credit

25  card business, you don't immediately think that that means

```
L3APWEI2                Hargreaves - Cross                1039
```

1  illegality, correct?

2  A.  No, I don't, sir.

3  Q.  And just to make clear I understand, you used, in that

4  context, it refers to a system or plan for the use of credit

5  cards or debit cards, right?

6  A.  Sorry, I'm getting a little bit lost in that line of

7  question.

8  Q.  A card scheme, in the terminology of credit card

9  processing, refers to the system for Visa or MasterCard to

10  process credit card transactions or debit card transactions?

11  A.  Me, myself, personally?  Yes.  Yes, actually.

12  Q.  Now, you talked about a few documents in your testimony

13  that you said were submitted to banks.  I want to ask you some

14  questions about that.

15       I believe you testified that you personally submitted

16  certain applications to some banks; is that right?

17  A.  No.  Myself, personally?  No.

18  Q.  Who did -- to your knowledge, if you have some

19  understanding, who did submit the applications that we looked

20  at yesterday to any bank?

21  A.  In my team, it would have been Kate Farmer.

22  Q.  And which banks do you recall actually having seen an

23  application submitted to?

24  A.  Having my seen?  Are you asking me ones that I personally

25  saw them submitted to --

**DJA1339**

```
       L3APWEI2              Hargreaves - Cross                  1040
 1     Q.  Yes.
 2     A.  Other than, therefore, cc'd?
 3     Q.  Yes.
 4     A.  I can't remember.
 5     Q.  So as you sit here now, you can't remember a single bank
 6     that you recall having seen the application submitted to?
 7     A.  No, I don't know.
 8     Q.  And your knowledge of that, your personal knowledge, were
 9     based on you being copied on an e-mail?
10     A.  Yes.  Unfortunately, I was copied on hundreds of e-mails
11     daily.
12     Q.  And were the submissions always by e-mail, do you know?
13     A.  So again, unfortunately, things mutated a little bit.
14     Initially, as I think I mentioned, it was meant to be literally
15     a physical handover.  That was what was discussed.  Then
16     communications started between us, my team and Ruben, and I
17     know that packs were presented to Ruben.  I know that
18     submissions were made to settlement banks, acquiring banks by
19     my team.
20     Q.  I'm going to ask you a few follow-up questions about that.
21     You understand Mr. Weigand, that's the Ruben you're referring
22     to?
23     A.  Yes, sir.
24     Q.  You don't have any understanding that he worked for any of
25     the banks, correct?
```

```
L3APWEI2                 Hargreaves - Cross                  1041
```

1    A.  No, I didn't say that, sir.

2    Q.  When you say it was submitted to him, I want to clarify

3    that you're not counting that as a submission to a bank?

4    A.  No, sir.

5    Q.  You also talked about settlement banks.  That's the phrase

6    you used?

7    A.  Yes, sir.

8    Q.  A settlement bank is different than an acquiring bank,

9    right?

10   A.  It's a different service, yes.

11   Q.  And the settlement bank is where they're not necessarily

12   part of the Visa or MasterCard network at all, correct?

13   A.  No, they provide effectively what I guess you could term a

14   business bank account.

15   Q.  So they just received the deposits, correct?

16   A.  Yes.

17   Q.  And the settlement banks that you submitted paperwork to,

18   what were they, which ones can you recall?

19   A.  Mistertango, Settlego, those are the two that spring to

20   mind.

21   Q.  Paygo, or no?

22   A.  Paygo, as in my company.

23   Q.  It was not -- is Paygo -- withdraw that question.

24          Paygo is not a settlement bank, correct?

25   A.  Are you talking about the company I worked for?

L3APWEI2                    Hargreaves - Cross                    1042

1   Q.  Yes, correct.

2   A.  No, it was not a settlement bank.

3   Q.  What is the nature of Paygo's business?

4   A.  It was an unlicensed payment service provider.

5   Q.  Isn't it correct it would have been the responsibility of

6   the ISO to actually submit any applications, if they were

7   submitted, to the acquiring banks?

8   A.  When you say the responsibilities, under what guise?  Do

9   you mean legally or --

10  Q.  Well, let me withdraw the question and rephrase it.

11          Isn't it true that, as you understood the process to

12  work during that period of time in 2018 when you were working

13  on it, that any application submitted would be submitted by the

14  ISO?

15  A.  So that was the initial discussions we had in the offices

16  in Calabasas, and again, as you -- as you -- I don't want to

17  say as you, I'm sure, have seen, but if you look at the notes,

18  you will notice that things evolved and changed constantly

19  because things were not quite going to plan, and that led to us

20  utilizing the merchants.

21          We were setting up e-mail accounts on behalf of the

22  merchants -- the fraudulent merchants, to clarify -- that

23  basically were then submitted through those e-mails.  We were

24  also providing documentation to the e-mail account,

25  EUprocessing, and a couple of other ones less frequently.

**DJA1342**

L3APWEI2                    Hargreaves – Cross                    1043

1   Q.  So --

2   A.  So, no, in the end, no I can't remember, and I can't

3   remember if we sent e-mails to Esepa or anyone else.  We were

4   asked -- sorry.  If you were listed as an ISO, certainly we

5   didn't send any e-mails outright knowingly to the gentleman

6   Andreas, who was originally meant to be the ISO.

7   Q.  So as you're here today, as you sit here today, you don't

8   have any idea if ISO, Esepa or any other ISO ever submitted any

9   application package that you prepared?

10  A.  I can only talk about what we did.

11  Q.  And as you sit here today, you can't remember a single bank

12  that you recall having seen the application submitted to the

13  acquiring bank?

14  A.  I don't know.

15  Q.  Now, the acquiring banks that I understood you referred to

16  yesterday were Kalixa, that's an acquiring bank?

17  A.  It was, yes.

18  Q.  Wirecard was an acquiring bank?

19  A.  Yes, sir.

20  Q.  And Ecom Processing was an acquiring bank?

21  A.  Yes, sir.

22  Q.  Those banks were all based in Europe, correct?

23  A.  Yes.

24  Q.  Kalixa is based in the United Kingdom?

25  A.  In Vienna, I believe.  Austria, sorry.

**DJA1343**

L3APWEI2                     Hargreaves - Cross                     1044

1   Q.  You believe in Vienna?

2   A.  Austria and United Kingdom.  I believe their license was in

3   the United Kingdom.

4   Q.  And Wirecard was based in Germany?

5   A.  Yes, sir.

6   Q.  And Ecom Processing was based in the UK?

7   A.  I think they're in -- I think they had offices in Sophia

8   and in London.

9   Q.  And to your knowledge, none of them are U.S. banks, right?

10  A.  Yes, sir -- no, sir, they're not.

11  Q.  And they're not the same as the issuing banks that you were

12  describing before, correct?

13  A.  Yes, sir.  Well, some of them provided issuing.  For

14  instance, Wirecard also issued.  I don't know if Ecom or Kalixa

15  also issued cards as well.

16  Q.  To be clear, when you described U.S. issuing banks, none of

17  them are U.S. issuing banks, to your knowledge?

18  A.  Not to my knowledge, no, sir.

19  Q.  It's true, isn't it, that you never -- you personally never

20  communicated with any U.S. issuing bank in connection with any

21  of the work that you describe doing for Eaze?

22  A.  No, I did not.

23  Q.  In fact, no one in your circle did, correct?

24  A.  No.

25  Q.  And you never reviewed any issue -- U.S. issuing bank

**DJA1344**

```
L3APWEI2                Hargreaves - Cross                1045
```

1   policies, correct?

2   A.  No, sir.

3   Q.  You didn't review policies from the Bank of America,

4   correct?

5   A.  No, I did not.

6   Q.  Or Citibank?

7   A.  No, sir.

8   Q.  Or Wells Fargo?

9   A.  No, sir.

10  Q.  So your preparation of these application packages was

11  solely for European banks, correct?

12  A.  That's correct, sir.

13  Q.  Either through an ISO or otherwise, correct?

14  A.  Through -- yeah, I mean, the application packs that I was

15  dealing with were for European banks.

16  Q.  Now, is it your understanding that, at the highest level of

17  the three acquiring banks I just mentioned, Kalixa, Wirecard

18  and Ecom Processing, that those banks knew that they were being

19  asked to process marijuana?

20          MS. LA MORTE:  Objection.  Foundation.

21          THE COURT:  Sustained.

22  Q.  Did you testify yesterday that -- didn't you previously

23  testify that some people within each of those banks knew that

24  they were processing marijuana?

25  A.  First, so sorry, are we talking about just Wirecard, Kalixa

```
L3APWEI2                    Hargreaves - Cross                    1046
```

1   and Ecom Processing?

2   Q.  Yes.

3   A.  I can -- only based on communications that I had with Ray

4   and Ruben.  I didn't directly discuss that with the banks.

5   Q.  Because you didn't discuss directly with those banks?

6   A.  No, sir.

7   Q.  In fact, did you ever speak to anybody at any of those

8   banks?

9   A.  Yes, sir.

10  Q.  With respect to the work for Eaze?

11  A.  No, sir.

12  Q.  On other matters?

13  A.  Yes, I did on other matters.

14  Q.  Do you know who Jan Marsalek is?

15  A.  Yes, sir.

16  Q.  And do you understand that he's the COO of Wirecard, or was

17  the COO of Wirecard?

18  A.  Yes, sir.

19  Q.  And your partner, he was -- I'm sorry, Jan Marsalek, he was

20  at that February 2018 meeting you described in London, correct?

21  A.  Yes, sir.

22  Q.  And the Eaze processing was discussed there, correct?

23  A.  It wasn't discussed with him, no.

24  Q.  You weren't present when it was discussed with him; is that

25  what you're saying?

L3APWEI2                    Hargreaves – Cross                    1047

1   A.   No.  I'm saying I didn't discuss it with him.

2   Q.   Do you know whether anybody else discussed it with him?

3   A.   No idea, sir.

4   Q.   So you don't remember saying -- as you sit here now, you

5   don't know whether he knew that that bank was processing

6   marijuana transactions?

7   A.   That's correct.

8   Q.   I want to ask you some questions about Kalixa, your

9   partner, Koen, Koen Vanpraet?

10  A.   He was not my partner, sir.

11  Q.   I'm sorry.  He was your business associate?

12  A.   Yes, sir.

13  Q.   Is that an accurate way to phrase it?

14  A.   Yes.

15  Q.   Your business associate, Koen Vanpraet, he became the CEO

16  of Kalixa, didn't he?

17  A.   My understanding is that Kalixa no longer exists, sir,

18  certainly in brand anyway.

19  Q.   He became the COO in 2019 for a period of time, correct?

20  A.   COO or -- I'm sorry, I don't know, to be honest with you.

21  I know that he works in the payment industry.

22  Q.   Let me ask it a different way.  At some point in time,

23  didn't you come to know that Koen Vanpraet started working for

24  Kalixa?

25  A.   I know that he started working for a company that I believe

L3APWEI2                    Hargreaves - Cross                   1048

1   was a new branding, for whatever reason, of Kalixa, but again,

2   that's information seen online, nothing else.

3   Q.  And I'm not sure I understand.  So do you know or do you

4   not know whether or not he ever became a CEO --

5   A.  I guess the question -- I can't answer that question

6   without asking you a question, and I'm not allowed to do that.

7   Q.  Don't ask me any questions.

8   A.  Sure.

9          MS. LA MORTE:  Objection on personal knowledge.  I

10  think it's clear, your Honor.

11         MR. TAYBACK:  I've not asked a question.

12         THE COURT:  There's no pending question at the moment.

13         MS. LA MORTE:  Okay.

14  Q.  Let me ask you about Clearsettle.  I'm sorry, let me ask

15  you about Ecom Processing.  Do you know a person named Yoni

16  Roth?

17  A.  Only by name.

18  Q.  Wasn't he also at the meetings in London in February of

19  2018?

20  A.  If he was, I don't recall.

21  Q.  Now, you've described a bank called Paynetics as well,

22  correct?

23  A.  Yes, sir.

24  Q.  And that's also an acquiring bank?

25  A.  Yes, sir.

L3APWEI2                      Hargreaves - Cross                    1049

1   Q.  And that's a bank that was not ultimately -- did not

2   ultimately process any of these transactions, correct?

3   A.  Correct.

4   Q.  You testified that Paynetics knew that the processing work

5   that was to be done was marijuana, correct?

6   A.  Yeah.  Yes.

7   Q.  Is that because you told them that?

8   A.  Yes.

9   Q.  Do you know whether Ecom Processing is still in business?

10  A.  I don't know, no.

11  Q.  Now, was it -- when you were doing this work with respect

12  to the processing of marijuana transactions in 2018, was it

13  your understanding that -- let me withdraw that.

14          If I could display for the witness Exhibit GX4004 at

15  page 45.  It's already in evidence.

16          If you could take that down, and I think I have the

17  wrong page.  I have to find the right page.

18          MR. TAYBACK:  May I have one moment, your Honor?

19          THE COURT:  Yes.

20          (Pause)

21          MR. TAYBACK:  Sorry, if you could bring up page 71 of

22  that document.

23  BY MR. TAYBACK:

24  Q.  Now, do you recognize this as the series of chats that you

25  looked at during your testimony, entitled Olliebaba?

**DJA1349**

L3APWEI2                    Hargreaves - Cross                    1050

1   A.  Yes.

2   Q.  You'll see a statement one, two, three, four bubbles down?

3   A.  Yes.

4   Q.  "Jan suggested we make nutra sites;" do you see that?

5   A.  Yes.

6   Q.  Did you understand that to refer to Jan Marsalek?

7   A.  Yes.

8   Q.  And did you have an understanding at this time that

9   Mr. Marsalek was the CEO -- or I'm sorry, the COO of Wirecard?

10  A.  Yes, I did.

11  Q.  And that he was aware of the applications that were to be

12  submitted for the processing of marijuana?

13  A.  Sorry, could you repeat that last question?

14  Q.  I'll rephrase it.

15          Was it your understanding at this time that

16  Mr. Marsalek was aware that applications were being submitted

17  for merchants that would be in the business of processing

18  marijuana?

19  A.  I don't know how to answer that.

20  Q.  I'm sorry?

21  A.  I don't know how to answer that.  I'm reading a statement

22  written by a third party alluding to this person.  I can't tell

23  you whether he knew something or didn't know something.

24  Q.  Do you recall at the time understanding that Mr. Marsalek

25  had suggested that some of these merchants should talk about

L3APWEI2                   Hargreaves - Cross                   1051

1   nutraceuticals, something like that?

2   A.  All I know is what is being said to me by the person

3   sending me that message and what is suggested within those

4   messages.  I can't tell you what Jan does or does not know.

5   Q.  So you have no recollection, as you sit here, whether or

6   not anyone at Wirecard, in fact, knew that they were being

7   asked to process marijuana?

8   A.  I don't know.  I didn't speak with anyone at Wirecard, sir.

9   Q.  And you don't know whether anybody at Ecom Processing was

10  being asked to process marijuana, correct?

11  A.  I did not speak to anyone at Ecomm Processing, sir.

12  Q.  And you have no understanding otherwise, correct?

13             THE COURT:  This would, under the guise of his

14  understanding, really call for hearsay.  Sustained.

15  Q.  And you have no knowledge of whether anyone at Kalixa knew

16  that they were being asked to process marijuana with respect to

17  any of the applications that you worked on?

18  A.  I can only -- I did not communicate with anyone at Kalixa

19  directly, no.

20  Q.  Now, let me ask you some questions about the websites that

21  you testified to working on.  Is it your understanding that

22  those websites are part of the submission to the acquiring

23  banks?

24  A.  Yes.

25  Q.  And as far as you know, that information, the websites

DJA1351

L3APWEI2                    Hargreaves - Cross                    1052

1   themselves, do not go to the issuing banks, correct?

2   A.  No, they don't.

3   Q.  And nor do the applications, correct?

4   A.  No, sir.

5   Q.  Now, I'm going to ask you some questions about the work

6   that you did -- you say you did on those applications.

7         Was it your understanding that the merchant itself or

8   the acquiring bank decides what an appropriate merchant

9   category code is?

10  A.  Certainly not the merchant.

11  Q.  The merchant?

12  A.  I said, it's certainly not the merchant.

13  Q.  Not the merchant, correct?

14  A.  Correct.

15  Q.  The acquiring bank, or do you know?

16  A.  I would -- I ought to say my memory is slightly hazy.

17  Q.  So your memory --

18  A.  If I was to give you my opinion, it would be that they

19  had -- that MCC codes are generated by Visa and MasterCard, and

20  those are provided to the acquiring banks.

21  Q.  Is that based on your hazy memory of what your

22  understanding was at the time?

23         MS. LA MORTE:  Objection.  Form.

24         THE COURT:  No, I think the door was opened.

25  Overruled.  You may answer.

DJA1352

L3APWEI2                    Hargreaves - Cross                    1053

1   A.  It's my understanding.

2   Q.  Based on the hazy recollection that you've just said you

3   had, or is it clearer now?

4   A.  It's what I think.

5   Q.  Now, the descriptors, do you know what a descriptor is?

6   A.  Yes, sir.

7   Q.  It's different than a merchant name, correct?

8   A.  Right.  It's the information that's on your credit card

9   statement, or you would see on your credit card statement.

10  Q.  So if you buy something from Amazon, it might be AMZN?

11  A.  Potentially.

12  Q.  A descriptor -- let me ask another question.

13          Isn't it true that, in your understanding, a

14  descriptor is not necessarily the same as the merchant's name?

15  A.  My understanding is it would need to be the phone number or

16  the website.

17  Q.  That must be included in the descriptor, correct?

18  A.  Yes, sir.

19  Q.  But the descriptor itself need not say Joe's Coffee Shop,

20  or any other particular merchant name, correct?

21  A.  Are you suggesting that if you have company name, website

22  name, it could be something completely different?  I'm sorry, I

23  don't understand that.

24  Q.  I can't answer your question, but I can ask you another

25  question.

L3APWEI2                    Hargreaves – Cross                    1054

1   A.  Sure.  Thank you.

2   Q.  Isn't it your understanding that the descriptor can be

3   different from the actual name of the merchant company?

4   A.  It's my understanding it would need to be the company or

5   the website for the company that made the application.

6   Q.  And the website could have a name different than the names

7   of merchant's name?

8   A.  It could be, yes.

9   Q.  Now, you didn't -- the applications that you worked on that

10  you described working on in 2018, those didn't vary much,

11  correct?

12  A.  We tried quite hard to make them vary, actually.

13  Q.  Well, do you recall taking -- if you could put up GX3915

14  and then go to the page that begins -- this is in evidence,

15  your Honor.  Go to the page that lists the articles of

16  incorporation.  Right there.

17          Do you see that you attach the articles for these

18  companies?  Do you see those?

19  A.  Yes, sir.

20  Q.  The articles you submitted for each of the applications,

21  for the different companies that you worked on, those are all

22  identical, right?

23  A.  They were all British companies, sir.

24  Q.  And they're -- meaning this -- these articles didn't vary

25  at all, correct?

DJA1354

L3APWEI2                    Hargreaves - Cross                    1055

1   A.  I hadn't actually read them all or looked at them all in

2   any detail.

3   Q.  You can take it down.  Thank you.

4           Now, when you began working on the solution for

5   obtaining -- for processing credit card transactions for Eaze,

6   you communicated with Mr. Akhavan regarding what he was saying

7   Eaze required, correct?

8   A.  Yes.

9   Q.  Isn't it true that one of the things that Mr. Akhavan made

10  clear to you is that he thought that the merchant category code

11  needed to be the closest thing to describe the delivery of

12  marijuana?

13  A.  I don't recall that.  If you have something that would

14  refresh my memory, that would be helpful.

15  Q.  And when you first started mentioning your understanding of

16  what the merchant category code for the sale of marijuana was,

17  you described to the government it was 8099, right?

18  A.  That was what we looked at originally, based on the

19  recommendations received.

20  Q.  And that's medical miscellaneous, correct?

21  A.  Yes.

22  Q.  And it's your understanding that that's the code that --

23  well, did you speak to Mr. Akhavan about numeric code that

24  could be used or should be used?

25  A.  Possibly.

L3APWEI2                    Hargreaves – Cross                    1056

1   Q.  And he suggested 8099, right?

2   A.  I don't recall.

3   Q.  Did you speak to Mr. Stanley Skoglund about what code to

4   use?

5   A.  Yes, I did.

6   Q.  And he suggested 8099, correct?

7   A.  Yes, he did.

8   Q.  Do you understand that -- with respect to the descriptors,

9   you testified that you communicated with Mr. Akhavan about what

10  descriptors could be used?

11  A.  Possibly.

12  Q.  Well, didn't he tell you that you needed to use a

13  descriptor that would remind the customer of what their

14  purchase was?

15  A.  Yes.  Sorry, yes, we discussed the fact that it was

16  important as much -- in fact, it was -- yeah, it was difficult.

17  We had to -- the descriptor had to match the -- what we termed

18  the proxy website, the fraudulent website, whatever you want to

19  call it, and the actual true merchant Eaze.  So it was trying

20  to come up with something that sort of met the requirements of

21  the acquiring bank and also jogged the memory of the customers

22  of Eaze to try and avoid chargebacks, basically.

23  Q.  And to avoid chargebacks by making sure that the customer,

24  when they looked at their bank statement, recognized that, oh,

25  yeah, this was a delivery or a delivery of marijuana?

DJA1356

L3APWEI2                    Hargreaves - Cross                    1057

1   A.  Sure, yeah.

2   Q.  So didn't Mr. Akhavan tell you that the descriptor needed

3   to have a reference to logistics or distribution for marijuana?

4   A.  Yes, we had conversations on that basis.

5   Q.  And he proposed some to you, correct?

6   A.  Yes.

7   Q.  One was Indus-DS, DIST?

8   A.  Something like that, yeah.

9   Q.  And you know Indus is a marijuana company, correct?

10  A.  I didn't know that, no.

11  Q.  It was your understanding that DIST stood for distribution?

12  A.  Yeah.

13  Q.  And did you have any understanding as to what Indus

14  referred to?

15  A.  I really didn't.

16  Q.  If you could bring up Exhibit GX1449, and if you could look

17  at the descriptor column.

18           This is in evidence also.

19           These descriptors, were they things that you came up

20  with?

21  A.  Certainly Goodegreenbazaar was, Organikals and Green -- and

22  Greenteacha.  I think Indus-dist and Soniclogistix, Ray was

23  involved in those, I think.  I can't remember, but the last

24  three certainly were.  We came up with those.

25  Q.  And is it your understanding when you came up with

**DJA1357**

```
L3APWEI2                    Hargreaves - Cross                    1058
```

1    Greenteacha and Goodegreenbazaar Organikals, that those were

2    referencing marijuana?

3    A.  No.  Greenteacha was tea.

4    Q.  But wasn't the purpose to remind the customer of what it

5    was they bought?

6    A.  No.  At this point, we were way beyond that being possible.

7    Q.  So Indus.distr.com, you didn't know what that referred to?

8    A.  You see, the thing is, you're looking at these as if they

9    were all done together.  These were created over a timeline of

10   quite a long period of time, and certainly at the beginning,

11   you will see, if you look beyond these descriptors or these

12   website addresses, there were ones that even involved, in some

13   way, Eeazzed, E-E-A-Z zed.  And so but unfortunately, you can

14   appreciate that the banks were not particularly -- certainly

15   banks -- I can only talk directly about Paynetics.  They were

16   not particularly interested in having things that remotely

17   sounded like -- that referenced marijuana.

18   Q.  Can we take this down and put up Exhibit 45004 at page 24.

19           Well, you recognize, if you go down to the bottom of

20   the page, where it begins "Lorry draft key"?

21   A.  Yes, I see that.

22   Q.  Do you see Mr. Akhavan is the person speaking here?  Do you

23   see that?  You've got to go up a little bit to see that.

24   A.  Thanks.

25   Q.  Do you see that?

L3APWEI2                    Hargreaves - Cross                    1059

1   A.  Yes, I see it.  Thank you.

2   Q.  If you go down, he says -- sorry, just above it there; just

3   one line above -- "Soniclogistix."  Mr. Akhavan is saying "Why?

4   I don't get it.  That makes no sense."  Do you see that?

5   A.  Yes, sir.

6   Q.  And if you look at the bottom of the page there, where it

7   says Sonistics?

8   A.  Yes.

9   Q.  He says, "Sonistics has to go.  That one makes zero sense."

10  Do you see that?

11  A.  Yeah, I see it.

12  Q.  If we could finish this.  It says, "The whole reason we use

13  the name, the whole reason we use the name Soniclogistix is so

14  we could have logistics in the descriptor;" do you see that?

15  A.  Yes, sir.

16  Q.  Okay.  Take it down.  Isn't it true that Mr. Akhavan

17  corrected proposed descriptors when he thought they didn't

18  refer adequately to marijuana or delivery?

19  A.  I think it was more to do with Eaze than marijuana.

20  Q.  That didn't refer to Eaze or marijuana or delivery or

21  something that would refresh the customer's recollection of

22  what they bought?

23  A.  Correct.

24  Q.  And if it was -- withdraw that.

25          I want to clear one thing up.  We looked at a chat --

L3APWEI2                    Hargreaves – Cross                    1060

1    well, withdraw that.  Let me go back.

2              You said the reason for that was to reduce

3    chargebacks; do you recall that?

4    A.  Excuse me?

5    Q.  You said a reason for a descriptor connecting to the

6    customer's purchase was to minimize chargebacks, correct?

7    A.  And ultimately account closure.

8    Q.  Which chargebacks can lead to account closures, correct?

9    A.  Certainly.

10   Q.  So the idea is you don't want customers puzzled over what

11   they bought and seeking to refund a purchase, correct?

12   A.  Correct.

13   Q.  And that means the customers and the bank statements that

14   they received through their banks, the idea is to reflect

15   accurately to the customer something that will remind them of

16   what they bought, right?

17   A.  Yes.

18   Q.  Now, we saw one of the chats just now.  You'll recall you

19   were asked some questions about communications on that platform

20   called Telegram, yes?

21   A.  Yes.

22   Q.  There are some references there to "deleted account"; you

23   saw that?

24   A.  Yes.

25   Q.  I believe you indicated, at one point in your testimony,

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

L3APWEI2                   Hargreaves – Cross                   1061

1   that you believe Mr. Akhavan's account was deleted.  That's not

2   accurate, correct?

3   A.  Did I?  Could you refresh my memory with that?

4   Q.  Let me ask a different question.

5          Having reviewed those chats, isn't it your

6   understanding that Ms. Farmer, your colleague's account is the

7   one that's deleted?

8   A.  It was an account that was deleted, yeah.

9   Q.  And but you saw Mr. -- you saw the icon associated with the

10  Ray, Ray CE, in that chat that you identified as Mr. Akhavan.

11  That is not deleted, correct?

12  A.  Yes, sir -- no, sir, I mean.

13  Q.  Now, isn't it correct that your -- that ultimately,

14  Mr. Akhavan left the E -- handling of the EU side of the

15  acquiring banks to you and your team?

16  A.  In what guise?

17  Q.  Let me rephrase the question.  Your responsibility, in

18  terms of the work that you did in 2018, was to prepare

19  application packages for European banks?

20  A.  Correct.

21  Q.  And your introduction to Mr. Akhavan in connection with the

22  Eaze work was because you and your business associate, Koen

23  Vanpraet, had pitched him that you had a solution, correct?

24  A.  Correct.

25  Q.  If you could put up IWX4.  This is also in evidence.

```
L3APWEI2                    Hargreaves - Cross                    1062
```

1          Do you recognize this as an e-mail on which you are

2    copied from Mr. Vanpraet?

3    A.  Yes, I do.

4    Q.  And it's dated September 12th, 2017; do you see that?

5    A.  Yes, I see that.

6    Q.  And do you see in the body of the text Mr. Vanpraet says --

7    go to the substance of it -- "Based on a few WhatsApp exchanges

8    I had with Ray, I would like to plan a call for me to introduce

9    my new role and company I represent, and at the same time,

10   exchange a few ideas Oliver and I have in regards to how we

11   believe we have a few interesting solutions for your business."

12         Do you see that?

13   A.  Yes, sir.

14   Q.  And then the next sentence says, "We took liberty in doing

15   some research as to how we can help you with the adult traffic,

16   but equally believe we can offer a solution for WWW.Eaze.com

17   processing."

18         The date of this e-mail, does that reflect the first

19   time that you began to discuss with anybody that you believe

20   associated with Mr. Akhavan, the idea that you had a solution

21   for processing transactions for Eaze?

22   A.  You'll have to show me the dates of certain messages I had

23   from Koen Vanpraet on WhatsApp.  I don't -- my recollection --

24   so I don't know if this came before or after messages I

25   received from Mr. Vanpraet.

DJA1362

L3APWEI2                    Hargreaves - Cross                    1063

1    Q.  My question isn't whether you spoke to Mr. Vanpraet about

2    it.  This is your first awareness of any communication with

3    anybody associated with Mr. Akhavan?

4    A.  I can't answer that.  I don't know if this is the first

5    e-mail.

6    Q.  Well, I believe you indicated in your testimony that you

7    started work in 2016 or 2017.  Is it fair to say that you

8    didn't meet with them to discuss your work until at least after

9    September of 2017?

10   A.  So I met -- Koen Vanpraet joined our company as the CEO in

11   August of 2017, and shortly thereafter introduced an

12   opportunity, which are the two opportunities expressed within

13   this e-mail, in relation -- if you're asking -- I didn't know

14   about this before then.

15   Q.  And my question is, this is all happening in 2017, not

16   2016, correct?

17   A.  This happened in 2017, yeah.

18   Q.  Now, when you -- the results of that overture was that

19   there was a meeting in Calabasas, California, outside

20   Los Angeles, in January of 2018?

21   A.  Yes, sir.

22   Q.  And your understanding was that Mr. Akhavan was acting on

23   behalf of Eaze?

24   A.  I didn't really question or ask what the relationship was.

25   I trusted Koen, and Koen had an existing relationship with him.

```
L3APWEI2              Hargreaves - Cross                1064
```

1   Q.  Fair to say, as you sit here, do you know whether

2   Mr. Akhavan ever worked for Eaze?

3   A.  I don't think he ever worked for them, no.

4   Q.  You don't think he worked for them?

5   A.  No, I don't think he worked for Eaze.

6   Q.  And did you have any understanding whether he was an

7   intermediary between --

8   A.  Just to clarify, when you say "worked for ease," do you

9   mean he was an employee of Eaze?

10  Q.  Your understanding was he was not an employee of Eaze,

11  correct?

12  A.  Correct.  I'm guessing.  I don't know if I can answer that

13  question.

14  Q.  So you don't know whether he worked for Eaze?

15  A.  No, I don't.

16  Q.  You don't know whether he was a consultant or an

17  intermediary of some sort, or what his status was?

18  A.  No, I don't.

19  Q.  Now, when you were meeting with the people from -- the

20  people in Calabasas, what company were you acting on behalf of?

21  A.  That's a good question.  It's difficult for me to answer

22  because I basically worked for my main employer, who had a

23  number of companies, as you know.  Where this business was

24  going to be placed, I could -- yeah.

25  Q.  Were you acting as an intermediary at that meeting on

```
L3APWEI2              Hargreaves - Cross              1065
```

1   behalf of anyone else who wasn't present?

2   A.  No, I was working for the company.

3   Q.  And is that the company Intrapay?

4   A.  It was -- so there was a bunch of companies that were owned

5   by a holding company called Sappaya, a lot of different brands.

6   I worked for all of them, basically, in some guise.

7   Q.  Among the names that you've mentioned in the your

8   testimony, just to be clear, that are companies that are

9   affiliated for the company you were working for at the time,

10  Intrapay was one of them?

11  A.  Yes.

12  Q.  And Paygo is another one?

13  A.  Yes, sir.

14  Q.  Did Mr. Akhavan tell you at all at that meeting why he

15  wanted to find a solution for Eaze?

16  A.  I presumed it was for financial gain.

17  Q.  But he didn't tell you that?

18  A.  If you're asking me if he said:  I want to do this to make

19  money, no, he did not.

20  Q.  So you presumed it?

21  A.  I presume that's why I was there, yeah.

22  Q.  But you don't know whether he had any other agenda or

23  reason to do it, correct?

24  A.  No, I don't.

25  Q.  Because all you know is what he said?

L3APWEI2                    Hargreaves - Cross                    1066

1   A.  Yes.

2   Q.  Now, even before that meeting, before you began working for

3   Eaze, you had acquired some of the shelf companies that you

4   described that you later used in connection with the

5   applications you prepared, correct?

6   A.  I don't recall.

7   Q.  Well, if we could put up IWX22.  If you could go down.

8   Actually, I'm sorry.  Go up.

9          The date of this e-mail from you is November 22nd,

10  2017; do you see that?

11  A.  Yes, I do.

12  Q.  And that's before you even had the meeting in Calabasas,

13  correct?

14  A.  Yes, it was.

15  Q.  If you could --

16          MR. TAYBACK:  May I have one moment?

17          (Pause)

18          If you could put up Exhibit 3906.

19  Q.  One of the companies that you used was called Hot Robots?

20  A.  Yes, sir.

21  Q.  And you indicate -- rather, Ms. Farmer -- MF is who?

22  A.  Michele Furlan.

23  Q.  Michela Furlan?

24  A.  Correct.

25  Q.  And that's a male, a male person, correct, Michele?

```
L3APWEI2                    Hargreaves - Cross                  1067
```

1    A.  Michele.

2    Q.  And it is a man, correct?

3    A.  It is a man, correct.

4    Q.  Indicates:  With respect to Hot Robots, we purchased it on

5    August 15th, 2017; do you see that?

6    A.  Yes, I do, sir.

7    Q.  And that was before your meeting in Calabasas, right?

8    A.  Yes, it was.

9    Q.  And now if you could go to -- we can take that down.  Thank

10   you.

11           THE COURT:  Counsel, keep in mind we're going to take

12   our lunch break in about three minutes.

13           MR. TAYBACK:  Will do.  This might be a good time for

14   the break, if we can take it three minutes early, your Honor.

15           THE COURT:  Okay.  So ladies and gentlemen, we'll take

16   our lunch break now.  We'll see you at 2:00.

17           (Jury not present)

18           THE COURT:  You may step down.  We'll see you at 2:00.

19           (Witness temporarily excused)

20           All right.  Mr. Tayback, how much more do you have?

21           MR. TAYBACK:  About 35 minutes or so.

22           THE COURT:  Okay.  Does the government want to give me

23   a ballpark on redirect?

24           MS. LA MORTE:  15 to 20 minutes.

25           THE COURT:  Okay.  So who is the next witness?

DJA1367

L3APWEI2                    Hargreaves – Cross                    1068

1            MS. LA MORTE:  A witness from Bank of America, your

2    Honor, Richard Clow.

3            THE COURT:  Okay.  And will that take us to the end of

4    the day?

5            MS. LA MORTE:  Yes, it will.

6            THE COURT:  All right.  Very good.  We'll see you at

7    2:00.

8            (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3AMWEI3                    Hargreaves – Cross                    1069

1                              AFTERNOON SESSION

2                                  2:05 p.m.

3              THE COURT:  The jury is on their way up, so please put

4      the witness back on the stand.

5              (Jury present)

6              THE COURT:  Counsel.

7              MR. TAYBACK:  May I place before the witness Exhibit

8      GX4105.  It's admitted in evidence and it is a long document,

9      so I would draw the witness' attention to row 20230.

10     Q.  If I could ask the witness, Mr. Hargreaves, do you recall

11     looking at this document, which I believe you indicated was a

12     summary of certain messages, WhatsApp messages of yours?

13     A.  It's a subsection of WhatsApp messages from my phone, yes.

14     Q.  It's a subset of messages from your phone, correct?

15     A.  Looks like it, yes.

16     Q.  Did you go through this chart and confirm that these

17     messages are accurate with respect to the messages that

18     actually existed on your phone?

19     A.  Yes.

20     Q.  Did you determine what subset to include in this chart?

21     A.  No, I didn't.

22     Q.  Who did?

23     A.  The government.

24     Q.  Meaning the prosecutors?

25     A.  Yes.  Sorry.

L3AMWEI3                    Hargreaves – Cross                    1070

1   Q.  If I could direct your attention to that row, that's a

2   WhatsApp communication between you and Koen Vanpraet, correct?

3   A.  Yes, it is.

4   Q.  The text of the message says:  Koen, apologies.  I forgot

5   we need a specific MCC code for Ray's business.

6            You see that line?

7   A.  Yes, sir.

8   Q.  This is you confirming to Mr. Vanpraet, and you include a

9   four-digit code there, 8099.

10            You see that?

11  A.  Correct.

12  Q.  That's your understanding of what the code was that should

13  be used for marijuana?

14  A.  It's the code that we were advised would be the best one to

15  use because there was not one for medical marijuana.

16            MR. TAYBACK:  You could take that down.

17  Q.  I asked some questions about Mr. Vanpraet before we broke.

18  Is it your understanding that Kalixa Bank is now known as PXP

19  Financial?

20  A.  I know that Kalixa Bank doesn't exist.  I know that PXP

21  does and I know that Koen Vanpraet works for them.

22  Q.  That's the institution at which Mr. Vanpraet works?

23  A.  I believe so, yes.

24  Q.  In fact, he's the CEO, correct?

25  A.  Is he?

**DJA1370**

```
L3AMWEI3                    Hargreaves - Cross                    1071
```

1   Q.  You don't know?

2   A.  I don't know his exact position, no.

3   Q.  Did you tell the government in any of your meetings with

4   them that he was the CEO of PXP Financial?

5   A.  I don't recall.

6   Q.  Would it refresh your recollection to review a passage from

7   the notes?

8   A.  That would be great.  Thanks.

9           MR. TAYBACK:  If you could place before the witness

10  what's been marked 3501-0076.  I'm sorry.  195.

11  Q.  If you could just look at the date and then a passage of

12  this document that we will direct you to, read it to yourself.

13  A.  Got it.  Thanks.

14  Q.  Does that refresh your recollection as to whether you told

15  the government --

16  A.  Yes, thank you.

17  Q.  You told the government on May 19 of 2020 that Mr. Vanpraet

18  was the CEO, correct?

19  A.  OK.  Yes.

20  Q.  Of PXP Financial, correct?

21  A.  Yes.

22  Q.  Didn't you also tell the government in a subsequent

23  interview that Mr. Vanpraet, in his capacity as president of a

24  bank, was fine processing Eaze transactions?

25  A.  Yes.  I don't recall if I said that or I didn't.  You are

DJA1371

L3AMWEI3                     Hargreaves – Cross                    1072

1    asking me if I told the government that?

2    Q.  Yes.

3    A.  Do you have something I could see?

4    Q.  Would it refresh your recollection to review notes?

5    A.  Certainly, it would.

6            MR. TAYBACK:  If you could place before the witness

7    3501-0076 at page 2.

8    Q.  If you look at the date and then also page 2.

9    A.  Yes.  Thanks.  Yes, I see it.  Thank you.

10   Q.  Does that refresh your recollection?

11   A.  Thank you.  Yes.

12   Q.  Did you tell the government in May of 2020 that

13   Mr. Vanpraet was fine processing the Eaze marijuana

14   transactions?

15   A.  Yes, I did.

16   Q.  Is it your understandings that PXP is an acquiring bank?

17   A.  I don't know what licenses they hold.

18   Q.  You testified about a meeting in London with Mr. Akhavan

19   and a number of other people.

20           Do you remember that?

21   A.  In January, yes.

22   Q.  I'm sorry.  It was January?

23   A.  I'm asking.  Is that when it was?

24   Q.  I believe it was February of 2018, is what you said

25   yesterday.

L3AMWEI3                    Hargreaves – Cross                    1073

1   A.  Sorry.  February.  Yes.  Thank you.

2   Q.  You indicated that Mr. Vanpraet was one of the people who

3   was present in London at that time, correct?

4   A.  Correct.

5   Q.  And he was one of the people that met with you, correct?

6   A.  He was one of the people there, yes.

7   Q.  And didn't Mr. Akhavan also introduce you to a woman from

8   Kalixa Bank named Andrea Bricci?

9   A.  I don't recall that, no.

10  Q.  You do know who Andrea Bricci is, correct?

11  A.  Yes.  I had a conversation with her on the phone.

12  Q.  In fact, she was the head of compliance for Kalixa at the

13  time you spoke to her?

14  A.  That's correct.

15  Q.  You spoke to her in November of 2018?

16  A.  I don't remember the date.

17  Q.  You spoke to her regarding processing transactions

18  including relating to Eaze?

19  A.  No, I did not.

20  Q.  Do you know whether or not Andrea Bricci, based on your

21  conversations with her, knew that Kalixa was processing

22  marijuana transactions for Eaze?

23  A.  I actually don't recall -- I recall sections of that

24  conversation.  I don't recall if I discussed Eaze with her or

25  not.

**DJA1373**

L3AMWEI3                    Hargreaves – Cross                    1074

1   Q.  Now, other than participation in chats, you never

2   introduced Mr. Akhavan by phone or in person to Kate Farmer?

3   A.  Only on Telegram, I believe.

4   Q.  You never introduced him by phone or in person to Michele

5   Furlan?

6   A.  No, I did not.

7           MR. TAYBACK:  You could bring up Exhibit IWX-22.

8   Q.  Before we go to this document, do you recall Mr. Akhavan

9   ever asking, in connection with those chats, who are these

10  people, who is KF?

11  A.  Yes, I do.

12  Q.  Because he didn't have any familiarity with who they were,

13  correct?

14  A.  He didn't know who Kate Farmer was until I introduced her.

15  Q.  By Telegram only, correct?

16  A.  Yes.

17  Q.  The same is true with Mitchell Furlan?

18  A.  Are you asking me whether he knew Michele Furlan?

19  Q.  Yes.  Did you have any reason to think he knew that person?

20  A.  Yes.

21  Q.  How?

22  A.  Before this endeavor, or whatever you are calling it, I

23  engaged in Michele Furlan, who was introduced to me as somebody

24  working, I believe -- to use the term ISO on behalf of

25  Mr. Akhavan seeking Asian banking partners for his adult

DJA1374

L3AMWEI3                    Hargreaves - Cross                 1075

1    business.

2    Q.  But you were the person who brought Michele Furlan into the

3    work that you were doing, correct?

4    A.  Yes, that's correct.

5             MR. TAYBACK:  Bring up IWX-22.

6    Q.  This is an e-mail from you, dated November 22 of 2017, to a

7    number of people.

8             Do you see that?

9    A.  Yes, sir.

10   Q.  And one of the recipients is Ray and also Koen Vanpraet.

11            You see that?

12   A.  Yes.

13   Q.  This is before your meeting in Calabasas, is that right?

14   A.  Yes, that's correct.

15   Q.  Because your meeting it wasn't until January of 2018,

16   right?

17   A.  Sorry.  Excuse me?

18   Q.  Your meeting in Calabasas was not until January of 2018,

19   right?

20   A.  Yes, that's correct.

21   Q.  And in this e-mail you are laying out the setup and your

22   proposed plan for how to offer a solution with respect to the

23   processing of credit and debit card transactions for Eaze,

24   right?

25   A.  That is correct.

DJA1375

```
L3AMWEI3              Hargreaves - Cross              1076
```

1    MR. TAYBACK:  If you scroll down.  If you go up a

2    little bit.

3    Q.  You say:  Websites.  All websites have been set up in house

4    at Pago by our dedicated team of developers.

5         You see that?

6    A.  Correct.  Yes, sir.  Yes, I do.

7    Q.  That had already been done before you even met in January,

8    correct?

9    A.  Yes.  Some had.

10   Q.  You say:  They were passing through strict compliance

11   checks prior to the application being issued to our acquirer.

12        That had already been done even before you met in

13   January of 2018, correct?

14   A.  That is correct.

15   Q.  You say:  Where they then pass through a final compliance

16   check before being approved.  You say:  All applications have

17   initially been compiled of X2 websites per company.

18        That work had already been done before you ever met in

19   Calabasas in January of 2018, right?

20   A.  That's correct.

21   Q.  Then you described features.  You see that?

22   A.  Yes, I do.

23   Q.  Those were existing features as of November, at least, of

24   2017, right?

25   A.  Yes.

```
L3AMWEI3                    Hargreaves - Cross               1077
```

1   Q.   Then you described company's key futures below that?

2   A.   Yes, I do.

3   Q.   Those were already things that were in place before you met

4   in Calabasas in January of 2018, right?

5   A.   That is correct.

6   Q.   If you go down further, there is descriptor fields and a

7   reference to those being partially dynamic.

8            You see that?

9   A.   Yes, sir.

10  Q.   Then it says defined in our back office and can be edited

11  to meet requirements.

12           Do you see that?

13  A.   Yes.

14  Q.   Who was your back office?

15  A.   I had a team -- we had an internal team of -- basically, it

16  was Michele and his team and the people I discussed.

17  Q.   Michele Furlan and Kate Farmer?

18  A.   Yeah.  Those were the key players, yes.  I don't recall

19  directly who I'm referring to, but it was -- we had access to

20  the compliance team at Intrapay, who we may have asked to look

21  over the application packs.

22  Q.   There may have been other people, but you can't remember

23  their names now, is that right?

24  A.   I can remember one of their names, yes, certainly.

25  Q.   What's that name?

L3AMWEI3                    Hargreaves - Cross                    1078

1   A.  Mark -- I can't pronounce his surname.  He is a Maltese

2   gentleman.  Mark Toomer.

3   Q.  There is another name that shows up on some of the e-mails

4   we looked at named Marty.  Was he part of that back office

5   team?

6   A.  No.

7   Q.  Who is Marty?

8   A.  I don't know.

9   Q.  Below this it says:  Existing descriptors for initial X4

10  proxies.

11           You see that?

12  A.  Yes.

13  Q.  Proxies, that's a word that's describing these companies

14  set up in Europe that would be acting for the dispensaries in

15  the United States?

16  A.  It's a term that we used for the pack as a whole.

17  Q.  Is there intending to be proxy companies for another

18  company, right?

19  A.  Again, proxy pack as in a fraudulent application pack.  We

20  called them proxy packs.

21  Q.  The word proxy to you is the same as fraudulent?

22  A.  To me, I'm telling you what we termed the application packs

23  that contained -- that are fraudulent.

24  Q.  And this description that you wrote here, it was, again,

25  before you even met with people in Calabasas, correct?

**DJA1378**

L3AMWEI3                    Hargreaves - Cross                    1079

1    A.  Yes, sir.

2    Q.  Here you talk about several companies, one called Lorry

3    Limited and International Standard Limited.  Those were

4    companies you acquired before you even met with Mr. Akhavan in

5    January of 2018, right?

6    A.  Yes.

7         MR. TAYBACK:  You could take this down.

8    Q.  That January 2018 meeting in Calabasas, we viewed some

9    photographs of that meeting.  Those are photographs you took,

10   right?

11   A.  Correct.

12   Q.  Took using your phone?

13   A.  Correct.

14        MR. TAYBACK:  If you could put up GX-101 through 105,

15   just scroll through them.  Next one.

16        Go to 102, 103, 104, and 105.

17   Q.  You took those pictures secretly, right?  That is to say,

18   you didn't say, hey, pose for a photo?

19   A.  No, I didn't say, hey, pose for a photo.

20   Q.  So you just took them without people knowing, correct?

21   A.  That is correct.

22   Q.  Why?

23   A.  I wasn't involved in the part of the conversation that was

24   going on, and I was text messaging with my former boss, and he

25   was curious to know what people in the meeting looked like.

**DJA1379**

1   Q.  That's Gary Murphy, is that correct?

2   A.  That's correct.

3          MR. TAYBACK:  If you can bring up 105 again.

4   Q.  You stated that the diagram on the white board in the back

5   was an outline of how you were proposing how things would work

6   for the Eaze transaction, correct?

7   A.  I didn't say it was how I was proposing.  I said it was

8   something drawn up on the board by Mr. Akhavan, which I

9   contributed to.

10  Q.  So is it different than the proposal that we just looked at

11  that you sent in November of 2017?

12  A.  So what you are looking at here on this board is a flow of

13  the logistics of an application being made by, in this case,

14  Eaze, and that flow resulting in one of the application packs I

15  created ending up in the hands of an acquiring bank.  If you

16  are referring to what the difference is -- sorry.  Please carry

17  on.

18  Q.  My question is, is this different than what you had

19  proposed in your e-mail from November that we just looked at?

20  A.  It involved the logistics and people involved in managing

21  the transaction fraudulent scheme.

22  Q.  When you described this to the government in your

23  interviews with them, what happened was a sloppy version of

24  this, correct?

25  A.  Did I use that language?

DJA1380

L3AMWEI3                    Hargreaves - Cross               1081

1   Q.  Would it refresh your recollection to look at the notes?

2   A.  If you wouldn't mind.

3          MR. TAYBACK:  If we could put before the witness

4   3501-2, first page, and then the date and then -- thank you.

5   A.  Correct, yes.

6          MR. TAYBACK:  You can take it down.  Thank you.

7   Q.  Does that refresh your recollection that you described what

8   happened as a sloppy version of what had been outlined?

9   A.  Yes, sir, I used the word sloppy.

10  Q.  Isn't it true that you considered Mr. Akhavan to be a

11  difficult client because -- withdraw that.

12         Isn't it true you considered him a difficult client?

13  A.  I find him a demanding client.

14  Q.  A demanding client?

15  A.  Yes.

16  Q.  Isn't it true that he expressed dissatisfaction along the

17  way with the solutions that you were providing?

18  A.  I think he was a perfectionist.

19  Q.  He expressed dissatisfaction with the work you were doing?

20  A.  At times, yes.

21  Q.  Now, you pitched a complete solution for Eaze's processing

22  of credit cards, correct?

23  A.  We pitched an initial idea, yes.

24  Q.  Your idea was termed a solution in that e-mail from

25  Mr. Vanpraet, correct?

**DJA1381**

L3AMWEI3                    Hargreaves – Cross                    1082

1   A.  Do you want to show me if you want me to confirm that

2   language.

3            MR. TAYBACK:  Put up for the witness Exhibit IWX-22.

4   I apologize.  It's actually an earlier e-mail.  It is IWX-4.

5   Q.  In that middle one-sentence paragraph it says:  We equally

6   believe we can offer a solution for www.eaze.com processing.

7   You see that?

8   A.  Yes.

9   Q.  That's what you went into that meeting in January

10  proposing, correct?

11  A.  Yes.

12  Q.  Isn't it fair to say that your experience in 2018 with

13  Mr. Akhavan was, he was frustrated that you didn't have a

14  solution, correct?

15  A.  Sorry.  You are saying his frustration or his

16  dissatisfaction to me that I did not have a solution.

17  Q.  Correct.

18  A.  I would say that it was a number of dissatisfactions all

19  the across a number of subjects.

20  Q.  Would you say that those number of dissatisfactions across

21  different subjects all related to the fact that the solution

22  you were proposing wasn't workable, in his view?

23  A.  I would say that the solution that we worked on together

24  again and again was being rebuffed by the banks that they were

25  being submitted to.  And initially in relation to Paynetics,

```
     L3AMWEI3                  Hargreaves - Cross                  1083
 1   yes.  There was frustration there as well.
 2   Q.  You viewed Mr. Akhavan as your client?
 3   A.  I did, yes.
 4   Q.  But you knew Eaze was the ultimate client, correct?
 5   A.  Yes.
 6   Q.  He came to you with a problem and you proposed a solution,
 7   right?
 8   A.  I think it was probably more Koen Vanpraet reached out to
 9   tell me he joined a new company.  I don't know what was
10   discussed specifically between the two of them, but this was
11   then presented as a business opportunity to me, and then we
12   engaged on pursuing a business opportunity.
13   Q.  One of the things you described as part of what you did at
14   some point in time was you engaged a third-party service to run
15   like a credit risk report on some of the companies you were
16   proposing?
17   A.  Is the question did I engage them?
18   Q.  Yes.
19   A.  No, I did not.
20   Q.  Did you work with them?
21   A.  We were given access to their software.
22   Q.  That's Webshield, correct?
23   A.  Yes, sir.
24   Q.  You have heard of Webshield, correct?
25   A.  Yes, I have, sir.
```

L3AMWEI3                    Hargreaves - Cross                    1084

1   Q.  What is Webshield?

2   A.  It's software service.

3   Q.  They provide the credit store of companies to banks and

4   merchants --

5   A.  They provide a software that has a range of services that

6   if you were going to encompass it into what is it for, it's to

7   assist any on any business that is taking on the risk of

8   providing a merchant account to a website, an online business.

9   This is a tool that can be used to assess -- to help in that

10  decision making.

11  Q.  This is the company that you referenced Christian Chmiel?

12  A.  Yes, it is.

13  Q.  He's affiliated with the company, correct?

14  A.  Yes.

15          MR. TAYBACK:  If you could display GX-3965.

16  Q.  This is an e-mail that was shown to you yesterday from Kate

17  Farmer to you.  It indicates there are some attachments.

18          Do you see that?

19  A.  Yes, I do.

20  Q.  If you go to the next page, do you recognize this as the

21  Webshield analysis of some of the work that you've been doing?

22  A.  The section you are showing me is not a Webshield analysis.

23  Q.  Where it says merchant services and then it says Webshield

24  red/yellow flags report in the upper left-hand corner, what

25  does that indicate?

L3AMWEI3                    Hargreaves - Cross                    1085

1   A.  It says Webshield red/yellow flag report.

2   Q.  What does that indicate?

3   A.  It's a report.

4   Q.  Indicating how Webshield would score these companies on

5   different aspects of them?

6   A.  Yeah.  The section you are seeing at the top there is

7   something that we created.  I presume Kate Farmer created and

8   I'm presuming it's notes based -- sorry.  It has disappeared.

9          MR. TAYBACK:  If you could put that up, please.

10  A.  I think whoever was in my team was entering the information

11  to the software, was trying to provide some overview and notes

12  as to why the scoring was as it is.

13  Q.  Was that coming from Kate Farmer, the person who sent the

14  e-mail?

15  A.  It might have been someone working underneath her.

16  Q.  You don't know who that person is, correct?

17  A.  It depends at what point this was done, at what time we had

18  employees come and go.

19  Q.  The idea that this summarizes what Webshield would have

20  detected in terms of deficiencies in the submissions?

21  A.  That's correct, sir.

22  Q.  As of this point in time, the companies you were proposing,

23  Lorry Limited, for example, is in the lower part of this page,

24  it shows high risk, correct?

25  A.  That's correct.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

L3AMWEI3                    Hargreaves - Cross                    1086

1   Q.  So that's not adequate for your purposes, right?

2   A.  Yes.  We would have wanted to improve this one.

3   Q.  If you go to the next one, International Standard, high

4   risk, 37 percent.

5            Do you see that?

6   A.  I do, yeah.

7   Q.  That's also not adequate for your purposes, correct?

8   A.  Actually, that's quite a good score, believe it or not.  I

9   know it's a little bit strange.  If you see to the right of it,

10  there are three boxes.  One is yellow filled in and then a

11  green one and then a red one.  You'll notice that even though

12  this says high risk, the box that is highlighted is -- I can't

13  actually read what it says in the yellow box.  Maybe you could

14  help me.

15           MR. TAYBACK:  You'll have to blow that up.

16  A.  I still can't read it, I'm afraid, but it's a traffic light

17  score.  Basically, regardless of what it says on the left, high

18  risk, if it is the green box, it's approved.  If the red box is

19  highlighted, it's flat declined.  If it's the yellow box, it's

20  open to discussion from the risk department of the organization

21  assessing this application form.

22  Q.  If you go to the bottom left, you'll see a third company

23  that's being discussed in this e-mail communication, another

24  one you previously formed, New Opal?

25  A.  Yes, sir.

L3AMWEI3                    Hargreaves – Cross                    1087

1   Q.  That's also labeled high risk and it has a yellow box,

2   correct?

3   A.  Yes, sir.

4   Q.  That high risk is 34 percent.

5           You see that?

6   A.  Yes, sir.

7   Q.  You are saying even though it says high risk, you consider

8   this to be pretty good?

9   A.  There is only so much you can do with a new company, sir.

10  Q.  After you were arrested and then returned to Europe, you

11  said that you didn't continue to do much work with respect to

12  the Eaze business, correct?

13  A.  No -- yes, that's correct.  Sorry.

14  Q.  After you were arrested and returned to Europe, you did

15  continue to communicate with the people that you had been

16  working with, Ms. Farmer, for example, correct?

17  A.  I continued in my employment, yes.

18  Q.  And you also continued to communicate with Michele Furlan,

19  right?

20  A.  Yes, sir.

21  Q.  Did you ever tell Mr. Furlan to change the descriptors at

22  all for any of the companies, the companies that were being

23  used to process -- that were intended to be used to process

24  transactions?

25  A.  For him to change the descriptors?

1    Q.  Correct.

2    A.  I don't recall.

3    Q.  I am going to ask you about some names that have come up in

4    this case and ask if you recognize them as descriptors being

5    used.  Absolute Soda?

6    A.  I am not sure.  I don't recognize that one, no.

7    Q.  Happy Puppy?

8    A.  I am not sure.

9    Q.  Diver Kingdom?

10   A.  Is there something you can share with me?

11   Q.  I'm asking if you recognize these as descriptors that you

12   used.

13   A.  I don't recognize them, no.

14   Q.  You recall we looked at a document earlier that had certain

15   descriptors that you said you did come up.  Green Tea?

16   A.  When you say come up with, I think it's important to say

17   that we don't decide what the descriptors are.

18   Q.  Who does?

19   A.  You can submit what you would like to the acquiring bank,

20   and they would come back and tell you what you are allowed to

21   have.

22   Q.  Based on that answer, who came up with the green tea

23   descriptor that you mentioned before?  Was it something you

24   submitted or something that the bank sent back?

25   A.  I don't recall if it was something -- I know it was the

**DJA1388**

L3AMWEI3                    Hargreaves - Cross                    1089

1    name of the website we created.  I don't know what was decided

2    upon as the ultimate -- or what was presented as the preferred

3    descriptor ultimately.

4    Q.  So is it fair to say that all of the descriptors that you

5    used, as you sit here now, you don't recall whether you came up

6    with them or whether the bank did?

7    A.  No.  What I'm saying is, I think it's important to

8    understand that I had a team that were dealing with the

9    application or were communicating back and forth with our

10   clients.  And although I was cc'd on a lot of e-mails, I wasn't

11   really involved in that day to day.  I was involved in other

12   areas of the business.

13   Q.  Let me ask you if you have any recollection whatsoever of

14   ever using the descriptors Absolute Soda.

15   A.  I don't recall it.

16   Q.  Happy Puppy?

17   A.  I also don't recall it.

18   Q.  Diver Kingdom.

19   A.  Doesn't ring a bell.

20   Q.  Hidden Kitten?

21   A.  I don't remember it now.

22   Q.  Outdoormaxx?

23   A.  Doesn't ring a bell.

24   Q.  As you sit here, you have no idea if those descriptors were

25   used, you have no idea where they would have come from?

L3AMWEI3                    Hargreaves - Cross                    1090

1    A.  I'm not familiar with them.  I don't remember those names

2    would probably be more appropriate.

3    Q.  You've talked about a number of the people that you have

4    communicated with during the time that you were working on

5    Eaze's matters.  That includes Gary Murphy, correct?  Did you

6    ever talk to him about what you were doing for Eaze?

7    A.  Yes.

8    Q.  And Koen Vanpraet?

9    A.  Yes.

10   Q.  Kate Farmer?

11   A.  Yes.

12   Q.  There is a person on some e-mails I saw named Timo?

13   A.  That's correct.

14   Q.  Who was that?

15   A.  Somebody in Michele's team.

16   Q.  We talked about a person named Marty.  You don't know who

17   that person is, right?

18   A.  No.

19   Q.  Michele Furlan?

20   A.  Yes, I do.

21   Q.  You mentioned that maybe Michele Furlan's wife or maybe

22   mother signed some of the applications?

23   A.  No.  I said there was a conversation that was had with him.

24   I can't remember if I asked him or he told me.  But in the

25   conversation it came up.  He made -- I don't know if it was

```
L3AMWEI3                  Hargreaves - Cross                  1091
```

1  joking or serious, I didn't really follow up on it, because I

2  really didn't care, to be honest, that his mother was good at

3  forging signatures.

4  Q.  That's your sole knowledge of that, correct?

5  A.  Of what?

6  Q.  Of who signed the applications.

7  A.  I know it was something that Michele was tasked to manage.

8  Q.  That may have been somebody then beyond Michele himself.

9         MS. LA MORTE:  Objection.  Calls for speculation.

10         THE COURT:  Sustained.

11  Q.  Was Mr. Stanley Skoglund also somebody you spoke to about

12  your work with respect to Eaze?

13  A.  In the early days, yes.

14  Q.  How about his other person whose name we saw, associate,

15  Michael Buechler?

16  A.  I know who that is.  I met with that person.  I have had

17  meetings with him because he was working.  I don't know if it

18  was in a consultancy.  I met with him once in London.  I

19  believe that was more about Intrapay integrating with a bank.

20  Again, I don't know if he was an employee or consultant of

21  Kalixa.

22  Q.  Then there is everyone who attended the meetings that you

23  described in Calabasas and in London in February, January and

24  February of 2018.  Those were also people that you discussed

25  your work with respect to Eaze, correct?

**DJA1391**

```
L3AMWEI3              Hargreaves - Cross              1092
```

1  A.  Some of the people in those meetings were, yes.

2          MR. TAYBACK:  And then if you could pull up IWX-57.

3          May I have one moment, please.

4          Show it just to the witness.

5  Q.  If I could ask you to take a look at this document.  I

6  believe it's an e-mail from -- I am going to ask if you

7  recognize what this is?

8  A.  I'm looking at e-mails, one sent to me by Kate Farmer, and

9  I'm looking at a second e-mail --

10          MS. LA MORTE:  Objection.

11  Q.  I'm just asking if you recognize what it is.

12  A.  They are e-mails.

13  Q.  Are you a recipient of these e-mails?

14  A.  I'm a recipient of -- I don't think I'm a recipient for the

15  ones on the right, W57002.  I think I am for the first one.

16  Q.  You can't tell whether the second page -- you understand

17  how when you read a printed e-mail it goes from bottom to top?

18  A.  Sir, I think your question was, am I a recipient.  I am

19  just looking at the one on the right.

20  Q.  I understand your question.  Let me rephrase it.

21          Do you believe this to be an e-mail exchange that this

22  was something that was ultimately sent to you?

23  A.  Are you asking me if that is a thread of e-mails?

24  Q.  Yes, I'm asking you that question.

25  A.  When you asked me that question, I am trying to count the

L3AMWEI3                    Hargreaves – Cross                    1093

1   amount of REs and forward REs and forwards at the top.

2   Q.  Let me rephrase the question slightly differently, without

3   introducing the document.

4           Did you ever receive e-mails from an e-mail address at

5   Esepa?

6   A.  My team appeared to have, yes.

7   Q.  Who were you dealing with at Esepa, if you know?

8   A.  It doesn't say who it is, but I know that we filled out

9   application forms with the name Michael Kindl.

10  Q.  Thank you.

11          Had you ever met Michael Kindl?

12  A.  No.

13  Q.  But you were comfortable communicating about what you were

14  doing with Eaze in these applications to a person who you never

15  met?

16  A.  Yes.

17  Q.  In fact, you talked to a lot of people about what you did,

18  correct?

19  A.  I talked to the people who we were either introduced to or

20  advised to, by whatever method of communication.

21  Q.  Is it safe to say you felt this was a criminal scheme that

22  you didn't need to keep secret?

23  A.  I communicated with people I was involved in within the

24  scheme.

25  Q.  If I could have you take a look --

DJA1393

L3AMWEI3                    Hargreaves - Cross                    1094

1   A.  I would definitely say I was more blasé than I should have

2   been, definitely.

3   Q.  If I could have you take a look at GX-105.

4           You identified the man sitting whose face -- is

5   wearing a blue jacket?

6   A.  I see him, yes.

7   Q.  You identified him as I think the head of a large Belgium

8   bank or European bank?

9   A.  No.  I referred to him as a sales representative.

10  Q.  From where?

11  A.  I believe I referred to him as a sales representative of

12  the bank --

13  Q.  That's a Belgium bank?

14  A.  Yes, it is.  It's a large bank.

15  Q.  It's a European bank is my question.

16  A.  OK.  Yes, it's European.

17  Q.  If you know.

18  A.  I do know, yes.

19  Q.  I think you said that he wasn't part of the conversations

20  with respect to the Eaze work, is that right?

21  A.  That's correct.

22  Q.  But all the drawing on the board behind him remained on the

23  board, correct?

24  A.  That is correct.

25  Q.  There was no intention to try to conceal that, right?

```
     L3AMWEI3                  Hargreaves - Cross                    1095
 1   A.  No.
 2   Q.  I am going to ask you a few questions about your practices
 3   with the phones.  I believe you said that you had several
 4   phones over the course of the time you've been working.  Some
 5   were broken, some were lost?
 6   A.  I had a number of phones, yes.
 7   Q.  When you were released and sent home back to Europe after
 8   having been arrested, you had two phones with you, correct?
 9   A.  Yes.
10   Q.  And you had been told that the government could monitor
11   your messages?
12   A.  They had -- they were using the GPS in my phone.
13   Q.  Do you know, in fact, whether the government ever actually
14   monitored any of your messages?
15   A.  You'd have to ask them.
16   Q.  You don't know?
17   A.  I do not know.  Sorry.  Your first question was -- could
18   you repeat the first question.
19   Q.  First question is, do you know whether the government ever
20   actually monitored any of your messages?
21   A.  They took a dump of my messages, and I was required to
22   provide them with messages thereafter and communicate my
23   communication with them.
24   Q.  How periodically did you do that?
25   A.  As requested.
```

L3AMWEI3                    Hargreaves – Cross                    1096

1    Q.  How periodically did that turn out to be?

2    A.  I don't recall exactly.

3    Q.  Once a month?

4    A.  I do not recall.

5    Q.  You can't estimate?

6    A.  No, I can't.

7    Q.  In between times when you allowed law enforcement to

8    examine your phone or phones, do you have any reason to believe

9    they had any idea what you were doing with them?

10             MS. LA MORTE:  Objection.

11             THE COURT:  No.  I think that's permissible.

12   Overruled.

13             Counsel, I am a little concerned about the quality of

14   your estimates in time.

15             MR. TAYBACK:  I believe this has five minutes and

16   then, if I can confer with my client, I should be able to wrap

17   it up.

18             THE COURT:  Very good.

19   A.  Sorry.  Could you repeat it.

20   Q.  My question is, in between the times that you allowed law

21   enforcement to examine your phone or phones, do you have any

22   reason to believe they had any idea what you were doing with

23   them?

24   A.  I have no idea what the U.S. Government is capable of doing

25   or not doing.

DJA1396

```
L3AMWEI3              Hargreaves - Redirect            1097
```

1    MR. TAYBACK:  May I have one moment, your Honor.

2    I have one clarifying question.

3    Q.  Just to be clear, when you said earlier, your testimony

4    about not speaking to anyone at Kalixa, when you spoke to

5    Andrea Bricci, she was a person who worked at Kalixa, correct?

6    A.  She was a person who worked at Kalixa, correct.

7    Q.  In compliance, correct?

8    A.  Yes.

9    MR. TAYBACK:  I have no further questions.

10   THE COURT:  Redirect, please.

11   REDIRECT EXAMINATION

12   BY MS. LA MORTE:

13   Q.  Good afternoon, Mr. Hargreaves.

14   A.  Good afternoon.

15   Q.  Mr. Hargreaves, on cross-examination you were asked a

16   number of questions about your meetings with the government

17   following your arrest.

18   Do you recall that?

19   A.  Yes, I do.

20   Q.  Now, during those meetings, Mr. Hargreaves, the government

21   asked you questions, correct?

22   A.  Yes.

23   Q.  And you responded to the questions that were asked of you

24   by the government, is that right?

25   A.  Yes, I did.

DJA1397

L3AMWEI3                    Hargreaves – Redirect                    1098

1   Q.  And you testified that you saw or you observed during these

2   meetings that notes were taken, right?

3   A.  Yes.

4   Q.  Those notes were taken by the government, right?

5   A.  Yes.

6   Q.  They weren't taken by you, right?

7   A.  No.

8   Q.  Prior to today, have you ever seen those notes?

9   A.  No.

10  Q.  Now, when the government asked you questions during those

11  meetings you responded to those questions?

12  A.  Yes, I did.

13  Q.  Did you respond truthfully?

14  A.  Yes.

15  Q.  Now, Mr. Hargreaves, you were asked questions about whether

16  you specifically used the term fraudulent or false or

17  misleading in these initial conversations that you had with the

18  government.

19          Do you recall that?

20  A.  Yes, I do.

21  Q.  And the defense counsel even showed you some notes from a

22  meeting that you had with the government on November 20 of

23  2018.

24          Do you recall that?

25  A.  Yes, I do.

DJA1398

L3AMWEI3                    Hargreaves - Redirect                1099

1    Q.  And you reviewed those notes, and you indicated that they

2    refreshed your recollection that you specifically did not use

3    the word fraudulent or false, correct?

4    A.  That's correct.

5    Q.  Now, sitting here now, do you recall whether during that

6    same November 20, 2018 meeting with the government that the

7    counsel showed you the government's notes that you used the

8    term miscoding to describe the Eaze scheme?

9    A.  I believe I did, yes.

10   Q.  In addition, Mr. Hargreaves, you testified on

11   cross-examination that, in any event, you thought it was clear

12   from your conversations with the government that your business

13   was completely based around fraudulent application packs, is

14   that right?

15             MR. TAYBACK:  Objection.  Leading.

16             THE COURT:  No.  I think the door was open to that

17   kind of question to clarify as to what was previously testified

18   to previously on cross-examination.  Overruled.

19   A.  Repeat the question, please.

20   Q.  Sure.  I said you had testified on cross-examination that

21   you thought it was clear from your conversations with the

22   government that your business was completely based around

23   fraudulent application packs, is that right?

24   A.  Yes, it was.

25   Q.  Now, part of your cooperation with the government was

DJA1399

L3AMWEI3                    Hargreaves - Redirect                    1100

1    providing full access to your phones, correct?

2    A.  Correct.

3    Q.  As well as full access to your ProtonMail?

4    A.  Correct.

5         MS. LA MORTE:  Now, Mr. Levine, can you put up

6    Government Exhibit 3916.  This is in evidence and can be

7    published to the jury.

8    Q.  Mr. Hargreaves, the subject matter of this e-mail is

9    International Standard WC app pack updated, is that right?

10   A.  Yes.

11   Q.  I believe that you testified that International Standard

12   was one of the shelf companies that was used in this scheme?

13   A.  Yes.

14   Q.  To remind us, did it have any actual operations whatsoever?

15   A.  No.

16   Q.  I believe you testified that the intent was to funnel Eaze

17   transactions through a merchant processing account with

18   International Standard, is that right?

19   A.  Yes.

20        MS. LA MORTE:  Now, can we scroll down.  Actually,

21   let's try page 28.  Can we blow up the top half.

22   Q.  Mr. Hargreaves, is this a truthful application or a

23   fraudulent application?

24   A.  It's a fraudulent application.

25   Q.  You remember there were discussions of MCC codes on

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

DJA1400

L3AMWEI3                    Hargreaves – Redirect                    1101

 1   cross-examination, correct?

 2   A.  Yes.

 3   Q.  Specifically, there is a discussion of MCC code 8099?

 4   A.  Yes.

 5   Q.  Can you just remind us, generally, what that code is for.

 6   A.  Medical services unknown or medical services miscellaneous,

 7   something like that.

 8   Q.  Let's look at this Wirecard application on behalf of

 9   International Standard.  You see on the right-hand side, under

10   contractual partner?

11   A.  Yes.

12   Q.  You see the company URL?

13   A.  Yes.

14   Q.  What is it?

15   A.  Goodegreenbazaar.com.

16   Q.  You see object of the company?

17   A.  Product and sale of sheet music.

18   Q.  Would the product and sale of sheet music, to your

19   knowledge, fall under a category for medical services?

20   A.  No.

21           MS. LA MORTE:  We can take that down.  Thank you, Mr.

22   Levine.

23           (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**DJA1401**

L3APWEI4                        Hargreaves – Redirect                   1102

1   Q.  Now, put up Government Exhibit 3604.

2           Mr. Hargreaves, do you remember reviewing this

3   exhibit?

4   A.  Yes.

5   Q.  This is one of the websites that your team designed; is

6   that right?

7   A.  Yes.

8   Q.  For purposes of the Eaze scheme?

9   A.  Yes.

10  Q.  Was this a truthful website or a fictitious website?

11  A.  Fictitious website.

12  Q.  And can you remind us of the people that had input into the

13  websites that your team designed?

14  A.  My internal team, which my internal team, initially Stanley

15  Skoglund, from day to day, Christian Chmiel, Ray, Ruben,

16  Michele -- I'm sorry, you mentioned my team.

17  Q.  Yes.

18          Okay.  We can take this down.  Let's put up Government

19  Exhibit 3958 for the jury, please.

20          Do you recall that we looked at this previously,

21  Mr. Hargreaves?

22  A.  Yes.

23  Q.  What is this?

24  A.  It's an e-mail to my ProtonMail account.

25  Q.  And what are the attachments?

**DJA1402**

```
L3APWEI4              Hargreaves - Redirect              1103
```

1  A.  Greenteacha's business plan Organikals' business plans.

2  Q.  And we looked at these business plans yesterday, correct?

3  A.  Yes.

4  Q.  And are these truthful or fraudulent business plans?

5  A.  Fraudulent.

6  Q.  And these plans were sent to EUprocessing@ProtonMail.com?

7  A.  Yes.

8  Q.  And I believe you testified yesterday that that was the

9  e-mail addressed used by Ruben, as far as you understood,

10  correct?

11  A.  Correct.

12  Q.  And finally, Mr. Levine, for now, let's put up Government

13  Exhibit 3959.

14         And again, Mr. Hargreaves, is this another e-mail to

15  Ruben?

16  A.  As far as I understood, yes.

17  Q.  And can you read that e-mail aloud, the first -- well,

18  yeah, just the first part under "Hi"?

19  A.  "Hi, the product doesn't exist in the first place; so we

20  cannot provide any certification.  We can remove those claims

21  from the site if you are okay with that."

22  Q.  And the reference here to "the site" is a reference to

23  what?

24  A.  I don't know which website it is.  The website associated

25  with Johnson NYC.

DJA1403

L3APWEI4                    Hargreaves – Redirect              1104

1   Q.  Was that a truthful website or a fictitious website?

2   A.  A fictitious one.

3   Q.  Okay.  We can take that down.

4          MR. ARTAN:  Your Honor, I'd like to impose an

5   objection.  Just merely repeating direct examination does not

6   constitute redirect.

7          THE COURT:  No, I think this was called into question

8   on cross, as to whether or not the witness was using the term

9   fraudulent simply to curry favor with the government or whether

10  it was his honest assessment of the events in which he was a

11  participant.  So I think this is perfectly proper redirect.

12  BY MS. LA MORTE:

13  Q.  And, Mr. Hargreaves, on cross-examination you were asked

14  about Ruben's involvement in the scheme; is that right?

15  A.  Yes, I was.

16  Q.  Can we put up Government Exhibit 3919, Mr. Levine.

17          This is an e-mail from Kate Farmer, and you're cc'd on

18  it; is that correct?

19  A.  Yes.

20  Q.  What is the e-mail address to whom this e-mail is directed?

21  A.  It's addressed to EUprocessing@ProtonMail.com.

22  Q.  And can you please read the greeting of the e-mail?

23  A.  "Hi Ruben."

24  Q.  Okay.  We can take that down.  And let's put up Government

25  Exhibit 4,008, and let's go to page 5, please.

**DJA1404**

L3APWEI4                     Hargreaves – Redirect                1105

1          Now, see, the third chat up from the bottom?

2   A.  Yes.

3   Q.  Who is that?  Who do you understand the author of that chat

4   to be?

5   A.  Ruben.

6   Q.  And what does he say there?

7   A.  "Please don't send to Gothardus, but to EUprocessing."

8   Q.  Okay.  Mr. Levine, we can take that down.

9          Okay.  In addition to questions regarding Ruben's

10  involvement in the scheme, you were also asked questions as to

11  the legality of the scheme; is that correct?  Do you recall

12  that?

13  A.  Yes.

14  Q.  Can we put up Government Exhibit 4004, and start on page

15  86, please.  And let's start towards the bottom.

16          Do you see where Ray's comment that says "Ollie" --

17  starts "Ollie"?

18  A.  Yes.

19  Q.  Can you read that, read those three comments?

20  A.  "Ollie, Ruben says all four were submitted to Kalixa.

21  Please confirm with Ruben."

22  Q.  When Ray says "Ruben said all four were submitted to

23  Kalixa," what do you understand him to mean, all four what?

24  A.  Application packs.

25  Q.  Let's go to the next page, page 87.  And then you see where

DJA1405

L3APWEI4                    Hargreaves - Redirect                1106

1    the chat continues with "Ray, we can't be off" towards the top.

2           Mr. Hargreaves, do you see towards the top?

3    A.  Yes.

4    Q.  We could start there.  I'll read Ray's comments and you can

5    read your comments.  Okay?

6    A.  Yes.

7    Q.  "We can't be off like this in our knowledge."

8    A.  "I will check with Ruben.  The advice we gave you is based

9    on the forms that we have filled out and forwarded to Ruben."

10   Q.  "I know.  I just want to make sure we get it right.

11   There's only you and Ruben; so it shouldn't be that hard."

12          And then what do you say?

13   A.  "Can you call me when you see this" -- I'm sorry.  "Ruben,

14   can you call me when you see this?"

15   Q.  Okay.  We can take that down.

16          Now, Mr. Hargreaves, you testified that the merchant

17   name with respect to the application packs was fraudulent in

18   the sense that it was a shell company; is that right, a shell

19   company name?

20   A.  Yes, it was a shell company name.

21   Q.  And you also provided testimony on cross-examination about

22   billing descriptors, correct?

23   A.  Yes.

24   Q.  And that those billing descriptors needed to be tied to the

25   shell companies; is that right?

DJA1406

L3APWEI4                    Hargreaves – Redirect              1107

1   A.  Yes.

2   Q.  And those billing descriptors, I believe you testified on

3   cross, would include the website and/or possibly -- and the

4   phone number, as well, possibly; is that right?

5   A.  Those were both options for a descriptor, yes.

6   Q.  And some of them that we discussed on cross-examination

7   that you were involved with was Greenteacha.com?

8   A.  Yes.

9   Q.  Soniclogistix?

10  A.  Yes.

11  Q.  Organikals?

12  A.  Yes.

13  Q.  Do any of those descriptors include the term Eaze?

14  A.  No, they don't.

15  Q.  Now, you testified that without a fraudulent application

16  packs, Eaze would not have been able to process card

17  transactions; is that right?

18          MR. TAYBACK:  Objection.  Foundation.

19          THE COURT:  All right.  Lay a foundation.

20  Q.  Mr. Hargreaves, you testified that you -- one of your --

21  your job was to create fraudulent application packs; is that

22  correct?

23  A.  It -- yes, it mutated into that.

24  Q.  And why did you do that?

25  A.  It was a requirement in order to obtain merchant accounts

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

DJA1407

L3APWEI4                    Hargreaves – Redirect                    1108

1   for the true merchant in question, in this case Eaze.

2   Q.  And to your understanding, why was that necessary to

3   proceed that way?

4   A.  Because they would not have been able to obtain a merchant

5   account certainly through us.

6   Q.  Now, focusing for a moment on the descriptors that were

7   used in the Eaze scheme, I believe you testified on

8   cross-examination that those descriptors would appear on the

9   card statements of Eaze customers; is that right?

10  A.  Yes, that's correct.

11  Q.  And on direct examination, we saw examples of Eaze

12  customers writing to the fake website address complaining that

13  they didn't recognize the charge; do you remember that?

14  A.  Yes, I do.

15  Q.  And you understood -- or did you understand that those Eaze

16  customers were located in the United States?

17  A.  I think -- I believe so, yes.

18  Q.  And which entity of the payment processing system issues

19  those card statements?

20  A.  Well, the issuing bank of the cardholders.  If they're in

21  the U.S., the U.S. bank.

22  Q.  And I believe you also testified that it's the U.S. banks

23  that are responsible for determining whether to authorize those

24  transactions?

25            MR. TAYBACK:  Objection.  Foundation.

DJA1408

L3APWEI4                     Hargreaves - Redirect              1109

1          MS. LA MORTE:  I can rephrase it, your Honor.

2          THE COURT:  Okay.

3   Q.  Mr. Hargreaves, who in the payment -- which entity in the

4   payment processing system is responsible for determining

5   whether to authorize a transaction?

6          MR. TAYBACK:  Objection.  Foundation.

7          THE COURT:  Overruled.

8   A.  The bank of the cardholder.

9   Q.  Now, Mr. Hargreaves, do you understand that passing lies to

10  banks is wrong; is that right?

11  A.  Yes, I do.

12  Q.  And you understand that -- and you actually, in this case,

13  you pled guilty to bank fraud and money laundering in

14  connection with the Eaze scheme; is that right?

15  A.  Yes, that's right.

16  Q.  And that scheme involved issuing banks in the United

17  States; is that right?

18          MR. TAYBACK:  Objection.  Foundation.

19          MS. LA MORTE:  Your Honor --

20          THE COURT:  I think you do have to lay a foundation

21  for his knowledge of that, if he has it.

22  Q.  Mr. Hargreaves, I believe you, just a few moments ago,

23  testified that your understanding was that the Eaze customer

24  base is located in the United States; is that right?

25  A.  Correct.

DJA1409

L3APWEI4                    Hargreaves – Redirect                    1110

1   Q.  And I believe you also testified a few moments ago that

2   your understanding, based on your participation in the scheme,

3   was that the issuing banks were predominantly in the United

4   States; is that correct?

5           MR. TAYBACK:  Objection.  I believe it misstates his

6   testimony.  Foundation.

7           THE COURT:  No, I don't think so.  This is a question

8   of his understanding in what is alleged to have been a

9   conspiracy, which, as the jury already knows from my

10  preliminary instruction, is an agreement or a tacit

11  understanding between one or more people.  So I think his

12  understanding is relevant.  Overruled.

13  BY MS. LA MORTE:

14  Q.  Mr. Hargreaves, do you need me to repeat it?

15  A.  Yes, please.

16  Q.  I said, I believe -- and I believe you also testified a few

17  moments ago that your understanding, based on your

18  participation in the scheme, was that the issuing banks were

19  predominantly in the United States; is that correct?

20  A.  Yes, it is.

21  Q.  And, Mr. Hargreaves, did you plead guilty because you're,

22  in fact, guilty?

23  A.  Yes.

24  Q.  Mr. Levine, are we able to display IWX22?

25          Mr. Hargreaves, do you recall reviewing this document

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

DJA1410

```
L3APWEI4                    Hargreaves - Redirect              1111
```

1    on cross-examination?

2    A.   Yes.

3    Q.   And yesterday Mr. Weigand's counsel asked you whether this

4    e-mail contains the word "miscoding," correct?  Do you remember

5    that, actually?

6    A.   Yes, I do.

7    Q.   And you could take a look, but I believe your answer was

8    that it doesn't contain the word miscoding; is that right?  And

9    you can just take a look and reanswer, if that's helpful.

10   A.   It doesn't contain that word.

11   Q.   Okay.  So let's look at what it does contain.  I believe if

12   you look under Set Up, do you see where it says "All traffic is

13   being routed via a proxy setup"?

14   A.   Yes, I see that.

15   Q.   Can you explain again what you mean -- why you use the term

16   "proxy"?

17   A.   Proxy is a term we'd use for proxy application, like a

18   fraudulent application pack.

19   Q.   Okay.  We can zoom out of that.

20          And with respect to the websites that are mentioned

21   here as part of your proposal, would these be true websites or

22   fictitious websites?

23   A.   Fictitious websites.

24   Q.   And then we can zoom out of that.

25          And then looking at -- if we scroll down, do you see

L3APWEI4                    Hargreaves - Redirect              1112

1   where it says "existing descriptors for initial four proxies;

2   company one, Lorry Limited; company two, International

3   Standard?

4   A.  Yes, I see that.

5   Q.  And again, we see the use of the term "proxies"?

6   A.  Yes.

7   Q.  And Lorry Limited and International Standard, can you

8   remind us what those were?

9   A.  Shell companies.

10  Q.  And were they used in the Eaze scheme?

11  A.  Yes.

12  Q.  Now, we can zoom out.  We can keep that up, though.

13          Now, you were also asked yesterday, or noted yesterday

14  I believe by Mr. Weigand's counsel, that there are multiple

15  domains that are on this e-mail, correct?

16  A.  Yes.

17  Q.  Can we blow up that, just the top part, Mr. Levine, for

18  now.

19          Okay.  Do you see where it says "from"?

20  A.  Yes.

21  Q.  That's you, right, obviously?

22  A.  Yes, it is.

23  Q.  Okay.  And then you see where it says "Guy"?

24  A.  Yes.

25  Q.  To your understanding, is that the same person that you

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**DJA1412**

L3APWEI4                    Hargreaves – Redirect                    1113

1  took a picture of at the Calabasas meeting?

2  A.  That's my understanding, yes.

3  Q.  And I believe you said that he was Ray's business partner;

4  is that right?

5  A.  Yes.

6  Q.  And then Medhat Mourid; do you see that name?

7  A.  Yes, I do.

8  Q.  I believe you testified about that individual as well; do

9  you recall that?

10  A.  Yes, I do.

11  Q.  Can you remind us what your understanding, like who this

12  was to your understanding, to your knowledge?

13  A.  Somebody who worked in -- he was in charge of the techie,

14  the tech aspects of Ray's business.

15  Q.  And then there's Ray, correct?

16  A.  Yes.

17  Q.  Koen Vanpraet?

18  A.  Yes.

19  Q.  Who we know was your partner.  Mark Breit, do you know who

20  that is?

21  A.  Yes, I do.

22  Q.  Who is that?

23  A.  It was another employee at -- within the group of

24  companies.

25  Q.  Is that the group of Gary Murphy companies, or some other

DJA1413

```
     L3APWEI4               Hargreaves - Redirect              1114
 1   companies?
 2   A.  Yes, that's correct.
 3   Q.  And his e-mail was at Pagoglobal, correct?
 4   A.  Yes.
 5   Q.  And this e-mail is dated November 22nd, 2017; do you see
 6   that?
 7   A.  Yes.
 8   Q.  And I believe that was mentioned that this was before the
 9   Calabasas meeting?
10   A.  Yes.
11   Q.  And this e-mail, if you look under Set Up, do you see where
12   it says "the present flow is CE, Clearsettle, Pago, Paynetics"?
13   A.  Yes.
14   Q.  Was this version of the scheme ever implemented?
15   A.  No.
16   Q.  And even before January, the January 2018 Calabasas
17   meeting, you had an earlier meeting with Ray and Koen; is that
18   right?
19   A.  That is correct.
20   Q.  And now, you were also asked -- hold on one sec.
21          So on cross-examination, Mr. Hargreaves, you were
22   asked a number of questions about whether the acquiring banks
23   that were involved in the Eaze scheme knew that it was a
24   transaction laundering scheme; do you recall that?
25   A.  Can you say that one more time?
```

L3APWEI4                   Hargreaves - Redirect              1115

1   Q.  Yes, and I'm sorry.  I'll repeat it, and if it's still

2   confusing, just tell me.

3          So on cross-examination you were asked a number of

4   questions about whether the acquiring banks that were involved

5   in the Eaze scheme knew that it was a transaction laundering

6   scheme; do you remember questions like that?

7   A.  Yes.

8   Q.  So based on your participation in the Eaze scheme, was it

9   your understanding that Ray and Ruben were working with

10  insiders at these acquiring banks?

11  A.  Yes, it was.

12  Q.  Now, you also testified on cross-examination that words to

13  the effect of 99 percent of the acquiring bank thought that

14  what was happening was legal, can you explain what you meant by

15  that?

16  A.  Yes.  Only a few -- you wouldn't have a blanket-wide

17  understanding of what was going on within an acquiring bank.

18  What you would have is somebody, hopefully, in a position of

19  power -- sorry, "power" is the wrong word -- knowledge or

20  insight or access to what was going on in the bank, to provide

21  guidance or, in a better situation, actually just push the

22  applications through, but obviously, that would depend on, you

23  know, the relationship and the position of that person.

24  Q.  Okay.  Mr. Hargreaves, do you have knowledge of anyone in

25  the Eaze scheme working with insiders at U.S. issuing banks?

**DJA1415**

L3APWEI4                     Hargreaves - Redirect                1116

1    A.  No, I don't.

2    Q.  Now, you were also asked on cross-examination about a

3    number of descriptors that you said that you didn't recall.  Do

4    you remember those questions?

5    A.  Yes.

6    Q.  They were Happy Puffy Box, remember, Hidden Kitten?

7    A.  Yes.

8    Q.  Now, ultimately, Mr. Hargreaves, you passed off this

9    business at some point in time; is that right?

10   A.  I'm sorry, I don't recall that.

11   Q.  Here, let me direct your attention to an exhibit.  Give me

12   one second.

13           (Pause)

14           Can we put up Government Exhibit 3970.  Take a look at

15   this, Mr. Hargreaves.

16   A.  It's an e-mail from Kate Farmer to EUprocessing.

17   Q.  Right.  And can you read the bold part of this e-mail?

18   A.  "Please note we are ceasing operations for support of

19   websites and their maintenance.  We will cease paying for these

20   services after the 30th of June 2019."

21   Q.  And did this, in fact, occur to your knowledge?

22   A.  Yes.

23   Q.  And who was this passed off to?  Who do you understand it

24   was passed off to?

25   A.  You mean managing the domains and hosting, et cetera?  To

DJA1416

L3APWEI4                    Hargreaves – Recross                1117

1    the company Spinwild.

2    Q.  And who was in charge of that company?

3    A.  Michele Furlan.

4             MS. LA MORTE:  One moment, your Honor.

5             (Pause)

6             No further questions.

7             THE COURT:  Any recross?

8             MR. ARTAN:  Just a bit, your Honor.

9    RECROSS EXAMINATION

10   BY MR. ARTAN:

11   Q.  Good afternoon, Mr. Hargreaves.  Can you hear me?

12   A.  Yes.  Yes, sir, I can.

13   Q.  Ms. LaMorte asked you a series of leading questions just

14   now.

15            MS. LA MORTE:  Objection.

16            THE COURT:  Sustained.

17   BY MR. ARTAN:

18   Q.  You were asked by Ms. LaMorte if you were always truthful

19   to the government; do you remember that?

20   A.  Yes.

21   Q.  And you said you were, right?

22   A.  Yes.

23   Q.  I'd like transcript page 880 put before the witness, if you

24   please, your Honor.  And I'm looking at lines 16 through 18.

25   A.  Sorry, was that question not in relation to --

```
L3APWEI4                    Hargreaves - Recross              1118
```

1   Q.  I haven't asked a question yet, sir.

2   A.  Sorry.  Apologies.

3           MR. ARTAN:  May I proceed, your Honor?

4   Q.  Do you see that question and answer?

5   A.  Yes, I do.

6   Q.  The question is:  "Were you truthful with the government

7   during those meetings?"  And your answer was:  "Not all the

8   time, but yes, in general," correct?

9   A.  That is correct.

10  Q.  So you were not always truthful with the government, were

11  you?

12  A.  No, I was not.

13          MR. ARTAN:  Thank you.

14          THE COURT:  Any recross from co-counsel?

15          MR. TAYBACK:  Briefly.

16  FURTHER RECROSS EXAMINATION

17  BY MR. TAYBACK:

18  Q.  Other than 809 -- can you hear me?  I'm sorry.  Can you

19  hear me?

20  A.  Yes, sir.

21  Q.  Other than 8099, were there any other codes that you used?

22  A.  I couldn't tell you what the exact codes were.

23  Q.  The person that you said you, on redirect, passed off the

24  work related to Eaze to was Michele Furlan, right?

25  A.  That's correct -- now, do you mean take -- whenever I said

L3APWEI4                    Hargreaves – Redirect                    1119

1    taking over the hosting the domains?

2    Q.  Yes.

3    A.  Yes, we did give him that work.

4    Q.  And that was the person you worked with, correct?

5    A.  Yes.

6          MR. TAYBACK:  No further questions.

7          THE COURT:  Anything else?

8          MS. LA MORTE:  Yes, one more thing.

9    FURTHER REDIRECT EXAMINATION

10   BY MS. LA MORTE:

11   Q.  Mr. Hargreaves, you were shown a transcript cite where you

12   had stated that you weren't always truthful with respect to the

13   government; is that correct?

14   A.  Yes.

15   Q.  And, Mr. Hargreaves, I believe you also testified that that

16   occurred in relation to your stealing $40,000 from your

17   employer; is that right?

18   A.  Yes.

19          MS. LA MORTE:  No further questions.

20          THE COURT:  Anything else?

21          MR. ARTAN:  If I could have a moment, please, your

22   Honor?

23          (Pause)

24          I'll be very brief, your Honor.

25          If we could go back to page 880, please.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

L3APWEI4                     Hargreaves – Recross                   1120

1            May I proceed, your Honor?

2            THE COURT:  Yes.

3  FURTHER RECROSS EXAMINATION

4  BY MR. ARTAN:

5  Q.  Do you see the question and answer?

6  A.  Yes, I do.

7  Q.  The question wasn't whether you were truthful with the

8  government during those meetings, correct?

9  A.  Correct.

10 Q.  And your theft of the $40,000 occurred after the meetings

11 with the government, correct?

12 A.  Yes, sir.

13           MR. ARTAN:  Thank you.  Nothing more.

14           MS. LA MORTE:  No further questions.

15           THE COURT:  Anything further from Mr. Tayback?

16           MR. TAYBACK:  No, your Honor.

17           THE COURT:  I'm a little unclear about the last couple

18 of answers.  When did this theft of 40,000 occur, date-wise?

19           THE WITNESS:  Certainly in the first half of 2018.

20           THE COURT:  I'm sorry?

21           THE WITNESS:  Certainly, I believe, to be in the first

22 half of 2018.

23           THE COURT:  Okay.  And didn't you meet with the

24 government both before and after?

25           THE WITNESS:  Yes, I did.

DJA1420

L3APWEI4                    Hargreaves - Recross              1121

1        THE COURT:  So when you answered the question from

2   counsel a minute ago that your theft of the 40,000 occurred

3   after the meetings with the government, did you mean after some

4   of the meetings with the government, or did you mean after all

5   of the meetings with the government?  That's what I was

6   confused about.

7        THE WITNESS:  Would it be possible for me to see -- to

8   look at what you're reading as well?

9        THE COURT:  Sure.

10       Does someone want to put that up on the screen again?

11       THE WITNESS:  Could someone take down the highlighted

12  bit, please?

13       I know that there's no time line.  It makes it a

14  little bit difficult for me to answer.

15       THE COURT:  Well, when did you first start meeting

16  with the government?  Wasn't it --

17       THE WITNESS:  It was at the end of --

18       THE COURT:  -- shortly -- didn't you originally start

19  providing information to them shortly after your arrest?

20       THE WITNESS:  That's correct, sir.

21       THE COURT:  And when was that?

22       THE WITNESS:  In September, October and -- shortly

23  after my arrest at the end of 2017, sir.

24       THE COURT:  Yes.  And then you met with them as

25  recently as last Sunday, yes?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

DJA1421

L3APWEI4                    Hargreaves – Recross                    1122

1              THE WITNESS:  That's correct.

2              THE COURT:  And numerous times in between, yes?

3              THE WITNESS:  Yes, sir.

4              THE COURT:  So at one point in time, you did not tell

5    them the truth regarding the $40,000 that you had stolen; is

6    that it?

7              THE WITNESS:  That's correct.

8              THE COURT:  And was that the only thing you did not

9    tell the truth about?

10             THE WITNESS:  I also told them about the transfer of

11   money, a lot of sum of 200,000 I believe was the amount.  I did

12   not tell them until after it was done.

13             THE COURT:  Okay.  And that partial misleading was

14   also as part of the same conversation or about the same time as

15   the 40,000 or later?

16             THE WITNESS:  Are you talking about when I told the

17   government about it?

18             THE COURT:  Yes.

19             THE WITNESS:  No, I told the agents about it the same

20   day it happened.  I don't recall what that day was.

21             THE COURT:  Maybe I'm missing the point.  You stole

22   40,000 and you transferred 200,000?

23             THE WITNESS:  Yes, these were separate events.

24             THE COURT:  They were separate events.  Were they

25   about the same time?

DJA1422

L3APWEI4                     Hargreaves – Recross              1123

1              THE WITNESS:  I'm sorry, I know this is frustrating --

2              THE COURT:  In any event, the $40,000, you initially

3      did not reveal to the government?

4              THE WITNESS:  That's correct, sir.

5              THE COURT:  And you knew that was misleading them,

6      yes?

7              THE WITNESS:  Yes, I did.

8              THE COURT:  And the 200,000 you also did not initially

9      reveal to the government?

10             THE WITNESS:  That is also correct.

11             THE COURT:  And that was also, you knew, misleading?

12             THE WITNESS:  Yes, sir.

13             THE COURT:  Okay.  But those are the only two

14     instances that you misled them, to the best of your knowledge?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  All right.  Very good.  Anything else?

17             MR. TAYBACK:  Your Honor, could I clear up one date

18     question with a question?

19             THE COURT:  Sure, yes.

20     FURTHER RECROSS EXAMINATION

21     BY MR. TAYBACK:

22     Q.  Mr. Hargreaves, you were arrested September of 2018,

23     correct, not 2017?

24     A.  Yes -- I'm sorry, I'm a little bit -- could I possibly look

25     at my document, my police document?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

L3APWEI4                    Clow – Direct                    1124

1          MR. ARTAN:  Your Honor, that might be something we

2    could stipulate to.

3          THE COURT:  Right.

4          MS. LA MORTE:  Yes.

5          THE COURT:  So when was Mr. Hargreaves --

6          MS. LA MORTE:  September 27th.  We can stipulate

7    September 27th, 2018.

8          THE COURT:  Okay.  Very good.

9          MR. TAYBACK:  Thank you.

10         THE COURT:  All right.  Anything else from anyone?

11         MS. LA MORTE:  No, your Honor.

12         THE COURT:  You are excused.  Thank you very much.

13         (Witness excused)

14         Please call your next witness.

15         MS. LA MORTE:  The government calls Richard Clow.

16         THE COURT:  Okay.  You can step into that box.  And

17   once you're in there, you can take off your mask.  Don't sit

18   down yet.

19    RICHARD CLOW,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows.

22         THE COURT:  Please be seated.  And state and spell

23   your name for the record.

24         THE WITNESS:  My name is Richard Clow, R-i-c-h-a-r-d,

25   C-l-o-w.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

DJA1424

L3APWEI4                      Clow - Direct                      1125

1           THE COURT:  Counsel.

2   DIRECT EXAMINATION

3   BY MS. LA MORTE:

4   Q.  Good afternoon, Mr. Clow.

5   A.  Good afternoon.

6   Q.  Mr. Clow, where do you work?

7   A.  I work at Bank of America in New York City.

8   Q.  How long have you worked at Bank of America?

9   A.  About three years.

10  Q.  What is your current title at Bank of America?

11  A.  Senior vice president, president emerging payments and

12  strategy.

13  Q.  Is that part of a particular unit or a group within Bank of

14  America?

15  A.  Yes, I am part of the enterprise payments team.

16  Q.  What is the enterprise payments team?

17  A.  We're an organization that works across all of the bank for

18  the wholesale and consumer businesses to define the strategies

19  for what we need to do in payments, and then execute on those

20  strategies for a wide range of things such as credit card,

21  realtime payments, working with digital wallets and partners.

22  Q.  So you mentioned consumer -- I believe you said the

23  consumer division?

24  A.  Yes.

25  Q.  What is that?

DJA1425

L3APWEI4                    Clow – Direct                    1126

1    A.  The consumer division is the division that provides

2    products and services to everyday people like you and I.

3    Q.  What are your duties and responsibilities as a senior vice

4    president of emerging payments and strategy?

5    A.  My responsibilities are to evaluate new and emerging

6    technologies and business models that relate to the way our

7    consumers want to pay for things, and to evaluate whether there

8    are things we should invest in, and then how we would go about

9    validating that they worked and that they were compliant with

10   our various policies and procedures.

11   Q.  Can you provide an example of that for the jury?

12   A.  Sure.  One example was Zelle, which is a payment network in

13   the United States that we enabled for consumers to move money

14   between people, and then my team helped lead the process where

15   we enabled small businesses to also start to use Zelle to move

16   money between a small business and their employees or to

17   collect payments from people.

18   Q.  What did you do before you worked at Bank of America?

19   A.  I worked at Citibank for 18 years.

20   Q.  And towards the end of your time at Citi, what was your

21   job?

22   A.  My job was the head of payments innovation, in a similar

23   role as I'm in at Bank of America.

24   Q.  Okay.  Let's talk a little bit more about Bank of America.

25   Where is Bank of America headquartered?

DJA1426

L3APWEI4                     Clow - Direct                        1127

1   A.  We're headquartered in Charlotte, North Carolina.

2   Q.  And who manages the affairs of Bank of America?

3   A.  Our board of directors and senior executives.

4   Q.  Are you familiar with the Federal Deposit Insurance

5   Corporation?

6   A.  Yes.

7   Q.  Is that also referred to as the FDIC?

8   A.  Yes.

9   Q.  Is Bank of America insured by the FDIC?

10  A.  Yes.

11  Q.  And what does it mean to be insured by the FDIC?

12  A.  It means that if our clients have deposits in the bank and,

13  for whatever reason, our bank became non-liquid or we did not

14  have money that they could withdraw against, that the FDIC

15  would provide the funds, up to certain limits, to our clients.

16  Q.  So a few moments ago we talked about the types of consumer

17  services that Bank of America offers its customers; do you

18  recall that?

19  A.  Yes.

20  Q.  And I believe you said that Bank of America, among other

21  products, issues credit cards to individual customers?

22  A.  Yes, we do.

23  Q.  And does Bank of America issue debit cards to customers?

24  A.  Yes, we do.

25  Q.  And with respect to those cards Bank of America is what is

DJA1427

L3APWEI4                        Clow - Direct                        1128

1   referred to as an issuing bank?

2   A.  Yes, we are.

3   Q.  And just what does it mean to be an issuing bank?

4   A.  It means that we're the bank that enables our clients to

5   purchase things at various different types of merchants in

6   different ways.

7   Q.  So during your time at Bank of America, what payment

8   networks does the bank -- did the bank partner with to issue

9   debit and credit cards?

10  A.  We primarily work with Visa and MasterCard.

11  Q.  Mr. Clow, are you generally familiar with Visa and

12  MasterCard's rules for their payment systems?

13  A.  Yes, I am.

14  Q.  How are you familiar with those rules?

15  A.  In my day-to-day activities evaluating new solutions and

16  bringing them to market, I need to know about how those

17  networks work and what responsibilities we have as an issuer.

18  Q.  And are those rules and -- relevant to Bank of America's

19  business?

20  A.  Yes, highly relevant.

21  Q.  Can you explain how so?

22  A.  The network rules define what an issuer needs to do to

23  enable payments, and simplest example is, you know, 20 years

24  ago you used to have to look at a store for a sticker to see if

25  MasterCard and Visa were accepted to make sure that you knew

L3APWEI4                    Clow - Direct                    1129

1   how you could pay for something there, and we really pride

2   ourselves in enabling our clients to have choice with how they

3   pay for things with the majority of merchants that they would

4   choose to shop at.

5   Q.  Is it important to Bank of America, as an issuing bank, to

6   comply with the card network rules?

7   A.  Yes.

8   Q.  Why is that?

9   A.  If we're not in compliance with the network rules, then

10  they could either fine us or ultimately not let us operate on

11  their network.

12  Q.  And would that affect Bank of America's business?

13  A.  Yes.  It would severely impact our ability for our clients

14  to use, or to have simple checkout processes, at the majority

15  of merchants that they shop today.

16  Q.  So during the 2018, 2019 time period, did Visa and

17  MasterCard have rules in place regarding illegal transactions

18  on the network?

19  A.  Yes.

20  Q.  Generally speaking, what do those rules provide with

21  respect to transactions that are illegal under the law?

22  A.  They define the roles of people to identify who is trying

23  to do the transactions and to block them effectively, and they

24  fall in a number of categories including, you know, illegal

25  activities.

```
L3APWEI4                      Clow - Direct                      1130
```

1  Q.  And does Bank of America consider purchases of marijuana

2  products from U.S. companies to fall within the prohibition of

3  those rules?

4  A.  Yes.

5  Q.  So earlier you told us that you started with Bank of

6  America, I believe you said, roughly three years ago; is that

7  right?

8  A.  Yes.

9  Q.  So that would have been in the 2018 time period?

10  A.  Yes, April of 2018.

11  Q.  So then focusing on that 2018 to 2019 time period, would

12  Bank of America have knowingly authorized direct credit or

13  debit purchases for marijuana products in the United States?

14  A.  No, we would not.

15  Q.  So, Mr. Clow, aside from the card network rules that we --

16  that you just discussed, did Bank of America independently have

17  its own policies and procedures in place concerning engagement

18  with marijuana businesses?

19  A.  Yes, we do, we have an enterprise policy related to

20  marijuana-related businesses.

21  Q.  And are you generally familiar with that enterprise policy

22  relating to the marijuana-related businesses?

23  A.  Yes, I am.

24  Q.  And how are you familiar with it?

25  A.  As part of my role in the payments organization, I need to

DJA1430

L3APWEI4                    Clow - Direct                    1131

 1  be familiar with any different types of high-risk transactions,

 2  and marijuana-related transactions are in that, are considered

 3  high risk.

 4  Q.  Can you provide the jury with just a general overview of

 5  Bank of America's policy in that regard?

 6  A.  Sure.  Basically stated, we -- in the United States, we do

 7  not do any form of business with marijuana-related businesses.

 8  Q.  And we will discuss this in a bit more detail later, but

 9  can you just describe generally for now why that's Bank of

10  America's policy?

11  A.  Marijuana is illegal in federal terms; so it's illegal from

12  our interpretation, and we are not going to engage in illegal

13  practices.

14  Q.  Can we put up on the screen side by side for the witness

15  what's been marked for identification as Government Exhibits

16  2410 and 2411?

17          THE COURT:  Ms. LaMorte, keep in mind that we're going

18  to stop in five minutes.

19          MS. LA MORTE:  Your Honor, then maybe it makes sense

20  for me to offer these, and then that's probably a good place to

21  stop.  Okay?

22          MR. BURCK:  Your Honor, we have no objection to these

23  exhibits.

24          MS. LA MORTE:  Well, then government offers Government

25  Exhibit 2410 and 2411.

DJA1431

```
L3APWEI4                    Clow - Direct                    1132
```

1    THE COURT:  They are received.

2    (Government's Exhibits 2410 and 2411 received in

3  evidence)

4    THE COURT:  And the witness is excused.  We'll see you

5  tomorrow at 9:45 a.m.  You can step down.

6    THE WITNESS:  Thank you.

7    (Witness temporarily excused)

8    THE COURT:  I don't know, ladies and gentlemen, the

9  lawyers here are really getting awfully soft.  They're letting

10  you go five minutes early.  I'll have to have a serious

11  discussion with them.

12    Seriously, now we are back on schedule; so tomorrow

13  will be our normal 9:45 and 3:45.  Have a very good evening,

14  and I'll see you tomorrow morning at 9:45.

15    (Jury not present)

16    THE COURT:  Please be seated.  All right.  This is not

17  binding, but I do want a best estimate.  When does the

18  government expect to rest?

19    MR. FOLLY:  Your Honor, our best estimate is that we

20  would rest a week from tomorrow, next Thursday, the 18th.

21    THE COURT:  All right.  Let me ask defense counsel,

22  putting aside the question of whether your clients will take

23  the stand or not, which you can reserve on until the close of

24  the government's case, other than that, how long do you expect

25  your case to take?

DJA1432

L3APWEI4                        Clow - Direct                        1133

1       MR. BURCK:  Your Honor, I think we would expect two

2   days.

3       THE COURT:  All right.  So that would bring us to the

4   end of the third week.  Now, we missed a day, and we had some

5   shortened days for unforeseen reasons, but I think the

6   government should consider shortening their case by one day.

7   Obviously, I'm not going to require you to do that.  I just

8   urge it upon you.

9       Okay.  I also want to remind everyone, even though

10  this is a fair way off, first, I will, at some point next week,

11  get you a proposed draft of my charge to the jury, and then

12  we'll have a charging conference.  And that almost certainly

13  will be in the late afternoon, early evening.

14      Second, don't forget that when the case goes to the

15  jury, we will need to provide them immediately with a list of

16  all of the exhibits and a thumb drive, or some equivalent to a

17  thumb drive, so they can access the exhibits without going

18  through thousands of pages of paper.

19      So, you know, what I don't want to have is a situation

20  where we excuse the jury and then I'm told, oh, the parties are

21  still putting that together.  So you should start thinking

22  about that now.  All right?

23      Anything else we need to take up?  Yes.

24      MR. HARID:  Your Honor?

25      THE COURT:  I'm not hearing you for some reason.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

DJA1433

L3APWEI4                    Clow - Direct                    1134

1          MR. HARID:  Can you hear me now?

2          THE COURT:  Yes.

3          MR. HARID:  Your Honor, we have an application.

4          THE COURT:  The problem is, how tall are you?

5          MR. HARID:  Six-three.

6          THE COURT:  Yes, well, that was very un-foresightful

7     on the part of your parents.  You know, speaking from the

8     depths of five-foot-six, I am environs as can be.

9          Anyway, go ahead.

10         MR. HARID:  Your Honor, we have an application

11    designed to streamline tomorrow's testimony, and it concerns

12    the next witness, who's Special Agent Hupcher.

13         THE COURT:  Yes.

14         MR. HARID:  We understand that the government will be

15    attempting to get various documents into evidence that -- and

16    covering various documents that Mr. Hargreaves testified about,

17    and I can list a few of them for the Court.

18         THE COURT:  Well, let me just -- I have a telephone

19    conference in another matter at 4:00; so let me see if I can

20    cut through this at least for now.  We can take it up further

21    tomorrow.

22         The only thing I've seen so far, but maybe I missed

23    it, was this whole question of whether the statements of the

24    defendant that were coming in through this agent should also

25    include other statements under completeness.  Is that a part of

DJA1434

L3APWEI4                    Clow - Direct                    1135

1   this witness?

2           MR. HARID:  No, your Honor.

3           MS. LA MORTE:  That's different, your Honor.

4           THE COURT:  Okay.  That's someone else.  All right.

5   So go ahead.  What are the exhibits?

6           MR. HARID:  Your Honor, we have two different sets of

7   global objections.  The first objection is that there will be

8   various application-specific documents that would be unduly

9   cumulative of Mr. Hargreaves' testimony.  So we would rather

10  the next witness not get into those.

11          And the second, I think --

12          THE COURT:  Well, I don't really understand that

13  objection, given two things.  First, last I heard, the

14  government's burden was proof beyond a reasonable doubt.  So,

15  of course, they have to corroborate testimony; and second,

16  unless I missed it, you and your colleagues were busy attacking

17  him as a liar.  So another reason why they have to corroborate.

18  So I don't really see the force of that objection.

19          MR. HARID:  I understand, your Honor.  There's a

20  separate objection, which is that the witness is an improper

21  witness for the various documents because he was not a case

22  agent in this matter, was just recently recruited by the

23  government to assist with testimony.  So the concern is that he

24  wouldn't have personal knowledge as to any of the documents

25  they're attempting to have him testify about.

L3APWEI4                    Clow - Direct                    1136

1      THE COURT:  Are you challenging the authenticity of

2  those documents?

3      MR. HARID:  No.

4      THE COURT:  Then if you're not challenging the

5  authenticity, my theory would be, or my understanding would be,

6  that the janitor could put them into evidence.  If there was a

7  question about authenticity, that's a different question.

8      MR. HARID:  I understand, your Honor.  It just

9  heightens the 403 issue we have, which we raised in Weigand

10  motion in limine No. 2, which is that they're not

11  self-explanatory documents, and they are nuanced documents that

12  would lead to jury confusion and speculation and --

13      THE COURT:  Well, first, if they are admissible but

14  your 403 argument is that you need a live witness to put them

15  in context, of course, you, in your case, can call some other

16  agent, if that's what you want to do.  That would be somewhat

17  unusual, but you're welcome to do that.

18      MR. HARID:  Your Honor, the concern is that the

19  documents include the co-defendants and alleged

20  co-conspirators, and we may or may not call the defendants to

21  testify, and separately the --

22      THE COURT:  I'm not sure what you're saying there.

23  The government has already established a basis for which the

24  jury could infer, if they wish, that there was a co-conspirator

25  relationship between the defendants here.  If these are

DJA1436

L3APWEI4                    Clow - Direct                    1137

1  subsequent to the conspiracy and you're raising a Bruton

2  problem, that's a different issue.  I'm not quite sure which

3  one you're raising.

4          MR. HARID:  Your Honor, one of the concerns the Court

5  identified was some of the e-mails concern unrelated business

6  activities unrelated to the charged scheme and unrelated to

7  Eaze, and without a witness with personal knowledge to

8  distinguish between --

9          THE COURT:  Yes, I mean, that I can only deal with as

10 they come in individually.  You're right to remind me of that,

11 and that's still alive, so to speak, but I can't deal with that

12 globally.

13         MR. HARID:  I understand.  Thank you.

14         THE COURT:  All right.  Very good.

15         Anything else?

16         MS. LA MORTE:  No.

17         THE COURT:  Very good.  We'll see you all tomorrow.

18         (Adjourned to 9:30 a.m. on March 11, 2021)

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

DJA1437

1138

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   OLIVER HARGREAVES

 4   Cross By Mr. Artan . . . . . . . . . . . . . . 994

 5   Cross By Mr. Tayback . . . . . . . . . . .1005

 6   Redirect By Ms. La Morte . . . . . . . . . .1097

 7   Recross By Mr. Artan . . . . . . . . . . .1117

 8   Recross By Mr. Tayback . . . . . . . . . .1118

 9   Redirect By Ms. La Morte . . . . . . . . . .1119

10   Recross By Mr. Artan . . . . . . . . . . .1120

11   Recross By Mr. Tayback . . . . . . . . . .1123

12    RICHARD CLOW

13   Direct By Ms. La Morte . . . . . . . . . .1125

14                  GOVERNMENT EXHIBITS

15   Exhibit No.                        Received

16    4116   . . . . . . . . . . . . . . . . . 995

17    2410 and 2411   . . . . . . . . . . . . .1132

18                  DEFENDANT EXHIBITS

19   Exhibit No.                        Received

20    WX-207   . . . . . . . . . . . . . . . . 996

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

L3BPWEI1                              Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              20-CR-188 (JSR)

5    RUBEN WEIGAND and
     HAMID AKHAVAN,
6
                   Defendants.              Trial
7
     ------------------------------x
8
                                          New York, N.Y.
9
                                          March 11, 2021
10                                        9:39 a.m.

11

12   Before:

                        HON. JED S. RAKOFF,
13
                                          District Judge
14

15                        APPEARANCES

16   AUDREY STRAUSS
          United States Attorney for the
17        Southern District of New York
     BY:  NICHOLAS FOLLY
18        TARA MARIE LA MORTE
          EMILY S. DEININGER
19        Assistant United States Attorneys

20   DECHERT LLP
          Attorneys for Defendant Weigand
21   BY:  MICHAEL J. GILBERT
          SHRIRAM HARID
22        ANDREW J. LEVANDER
          STEPHEN PELLECHI
23        -and-
     MICHAEL H. ARTAN
24        Attorney for Defendant Weigand

25

L3BPWEI1                        Trial

1                           APPEARANCES CONTINUED

2    QUINN EMANUEL URQUHART & SULLIVAN, LLP
          Attorneys for Defendant Akhavan
3    BY:  WILLIAM A. BURCK
          CHRISTOPHER TAYBACK
4         SARA CLARK
          MARI HENDERSON
5         DEREK SHAFFER
          PAUL SLATTERY
6         -and-
     ROTHKEN LAW FIRM LLP
7         Attorneys for Defendant Akhavan
     BY:  IRA P. ROTHKEN
8         JARED R. SMITH

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3BPWEI1                    Trial

1    (Trial resumed; jury not present)

2    THE COURT:  Please be seated.  All right.  The jury

3    should be up in five minutes.  Anything we need to take up

4    before then?  Good.  All right.

5    MR. HARID:  Your Honor?  We do have an issue that I

6    believe your law clerk raised with you, is that we have

7    specific objections to various documents that the government

8    intends to offer through the special agent coming up next,

9    Special Agent --

10   THE COURT:  All right.  Well, let's deal with as much

11   of that as we can.  So what's the first objection?

12   MS. LA MORTE:  Ms. Deininger is handling that.

13   THE COURT:  What's the first objection?

14   MR. HARID:  The first objection is to Government

15   Exhibit 1684, your Honor, and we've established, based on --

16   just one moment, your Honor.  The testimony of the first

17   witness in this case, Michael Tassone, established that this

18   e-mail predates the charged scheme.

19   I can point your Honor to page 150 of the transcript,

20   lines 1 through 7 and 18 through 20, which show that Eaze

21   didn't even begin using the card solution until the fall of

22   2016 and that they didn't even consider a current solution,

23   thinking about it, until the beginning -- the late -- the

24   spring of --

25   THE COURT:  Yes, but this sounds just like this is

**DJA1441**

L3BPWEI1                     Trial

1    from Mr. Weigand.  It looks on its face to be preparatory.  It

2    may have been preparatory to the conspiracy or not, but it's

3    still admissible.  Overruled.  Next?

4         MR. HARID:  All right.  The next document is

5    Government Exhibit 1684 and the important point we'd make here

6    is that the government's entire case is focused on six

7    so-called proxy merchants and those include -- those were

8    mentioned by the government's cooperating witness,

9    Mr. Hargreaves, and those six proxy merchants are International

10   Standard, Hot Robots, New Opal, Lorry, Linebeck and Johnson.

11   NYC.  This entire document doesn't concern any of those proxy

12   merchants, and it's not relevant to this case for that reason

13   and its prejudice --

14        THE COURT:  All right.  Let me hear from the

15   government on that one.

16        MS. DEININGER:  Your Honor, the government's case is

17   not limited to the six proxy merchants.  Those are just the

18   proxy merchants that Mr. Hargreaves testified to, and as is

19   clear from --

20        THE COURT:  And I think that is clear from the

21   indictment as well.  That objection is denied.  Next?

22        MR. HARID:  Your Honor, the next one we objected to

23   was -- your Honor, I'd like to return to the Telegram chats

24   that we were beginning to discuss last week, beginning with

25   Government Exhibit 1720.

DJA1442

L3BPWEI1                    Trial

1       THE COURT:  Well, I'm happy to have you do that, but

2   since we have limited time right now, why don't we finish the

3   government exhibits that you had objections to, and then we'll

4   turn to anything else.

5       MR. HARID:  Your Honor, this is one of the government

6   exhibits that --

7       THE COURT:  I'm sorry, the next thing that I have in

8   front of me, from what I thought was your list, is 1688; is

9   that right?

10      MR. HARID:  That's correct.

11      THE COURT:  Okay.  And is this one of those --

12      MR. HARID:  Mr. McLeod, could --

13      THE COURT:  -- Telegram chats?

14      MR. HARID:  The translated version.

15      THE COURT:  Let me ask the government, what is this?

16      MS. DEININGER:  The translated version shows that this

17  is an e-mail from Christian Chmiel, who your Honor has heard

18  testimony about as a co-conspirator, sending three reports to

19  Ruben Weigand regarding three of the shell companies that

20  Mr. Hargreaves testified regarding International Standard,

21  Lorry Limited and Hot Robots Limited.

22      THE COURT:  All right.  So what's the objection?

23      MR. HARID:  And the objection, your Honor, is there's

24  no engagement by Mr. Weigand.  This is an e-mail that begins

25  "FYI."  You know, obviously, this e-mail was directed initially

DJA1443

1144

L3BPWEI1                    Clow - Direct

1    to someone else, and there's no evidence to suggest that

2    Mr. Weigand ever responded to Mr. Chmiel, and that's where the

3    prejudice comes in.

4            THE COURT:  Yes, but the government's version is the

5    e-mail to Mr. Weigand from Christian Chmiel, C-h-m-i-e-l, for

6    Mr. Weigand's information.

7            THE LAW CLERK:  Jury entering the courtroom.

8            THE COURT:  To be continued.

9            (Jury present)

10           THE COURT:  Let's get the witness on the stand.

11           MS. LA MORTE:  Yes.

12           THE COURT:  Please be seated.

13           Morning, ladies and gentlemen, and thank you as always

14   for your excellent promptness.  And you will see the lights are

15   brighter; so with a little technical help, I was able to

16   accomplish something.

17           All right.  I remind the witness he's still under

18   oath.  Go ahead.

19    RICHARD CLOW,

20   DIRECT EXAMINATION (Resumed)

21   BY MS. LA MORTE:

22   Q.  Good morning, Mr. Clow.

23   A.  Good morning.

24   Q.  Where we last left off yesterday, we had introduced and

25   received into evidence Government Exhibits 2410 and 2411.

L3BPWEI1                    Clow - Direct

1    　　　Mr. Levine, can you display for everyone Government

2    Exhibit 2410.

3    　　　Mr. Clow, do you see that?

4    A.  Yes, I do.

5    Q.  What is the title of this document?

6    A.  Marijuana-related businesses.

7    Q.  And what is the effective date?

8    A.  21st of June, 2018.

9    Q.  And just generally what is this document?

10   A.  This is an enterprise policy that outlines our views on

11   marijuana-related businesses and prohibits working with some of

12   those businesses, and it defines exception processes for

13   others.

14   Q.  So you just mentioned that this is an enterprise policy;

15   what does that mean?

16   A.  Correct.  At the bank, that means that it applies to all

17   divisions of the company; so consumer, corporate, wealth, each

18   of the divisions that serves different segments of clients.

19   Q.  And would that include Bank of America's role as an issuer

20   withing credit and debit cards?

21   A.  Yes, it would.

22   Q.  And can we zoom in on pages 1 through 1, subsection III,

23   Policy Scope Applicability.

24   　　　And, Mr. Clow, why don't you just read those first

25   three lines immediately under Policy Scope Applicability?

L3BPWEI1                          Clow - Direct

1    A.   "This policy applies globally to Bank of America

2    Corporation, including wholly owned subsidiaries and

3    affiliates, collectively Bank of America or "bank," that are

4    engaged in commercial transactions including lending, traded

5    products and other financing activities.

6    Q.   Okay.  We can zoom out of that.

7              Now, let's go to page 1 and can we highlight section

8    II, background rationale.

9              Mr. Clow, what is the overall purpose of this section,

10   background rationale?

11   A.   This is used to define why we need to have an enterprise

12   policy related to marijuana-related businesses.

13   Q.   And can you read this first paragraph aloud, skipping the

14   parts that are in parenthesis?

15   A.   Certainly.  "Marijuana is a topic that represents unique

16   and significant compliance and reputation risks for global

17   financial institutions, given the different legislative

18   frameworks applicable to marijuana established by U.S. federal

19   government and various states and non-U.S. jurisdictions.  Bank

20   of America has no appetite for accepting compliance risk and

21   will only provide products and services in a manner that is

22   fully compliant with governing laws, rules, regulations and

23   regulatory guidance.  Therefore, this policy has been developed

24   to support compliance with such legal rules, regulations

25   including, without limitation, the Controlled Substances Act,

DJA1446

1147

L3BPWEI1                        Clow - Direct

1   Money Laundering, and other Anti-Money Laundering and financial

2   crimes regulations, while establishing a framework within which

3   the bank may engage with certain clients and prospects who may

4   have some role in a legalized marijuana economy."

5   Q.  Let's take a look at the highlighted part, where it states

6   "Bank of America has no appetite for accepting compliance

7   risk;" do you see that?

8   A.  Yes, I do.

9   Q.  What is meant by compliance risk?

10  A.  That's the risk of the bank not complying with rules or

11  regulations.

12  Q.  And then directing your attention to the last sentence or

13  the last clause, it states there "while establishing a

14  framework within which the bank may engage with certain clients

15  and prospects who may have some role in a legalized marijuana

16  economy;" do you see that?

17  A.  Yes, I do.

18  Q.  What does that mean?

19  A.  That means that there are economies outside the United

20  States where marijuana is legal.

21  Q.  And in certain circumstances, will Bank of America engage

22  in business with such entities?

23  A.  In certain circumstances, with the appropriate approvals.

24  Q.  Okay.  So let's talk now about what this policy does and

25  does not prohibit.  And we're going to focus on the section

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1447

1148

L3BPWEI1                        Clow - Direct

1    which is already up on the screen, key definitions.  Do you see

2    that?

3    A.  Yes.

4    Q.  And so directing your attention to the line that's under

5    MRB Review Team.  Do you see where it says "for purposes of

6    this policy"?

7    A.  Yes.

8    Q.  I'll read that aloud, and then we'll look at the two bolded

9    parts underneath.  "For purposes of this policy, clients

10   engaged in MRB activities will be designated as one of the

11   following:"

12           Now, before we move on, what is the reference to MRB,

13   what does that stand for in this policy?

14   A.  That's a marijuana-related business.  It's defined above.

15   Q.  So let's start with direct marijuana-related business,

16   which is also known -- seen as "direct MRB;" do you see that?

17   A.  Yes, I do.

18   Q.  Can you read the first two sentences aloud?

19   A.  Sure.  "Any individual or legal entity that is directly

20   involved in the manufacture, cultivation, distribution, sale or

21   dispensing of marijuana.  Includes clients that have a common

22   ownership with a direct MRB, regardless of whether the entities

23   are financially independent."

24   Q.  Can you provide an example of a direct marijuana-related

25   business under this definition?

L3BPWEI1                    Clow - Direct

1   A.  Marijuana dispensary would be an example.

2   Q.  And will Bank of America engage in any type of activity

3   with a direct marijuana-related business in the United States?

4   A.  No, we will not.

5   Q.  Now, let's just take a look at underneath where it says

6   "indirect marijuana-related business or indirect MRB;" do you

7   see that?

8   A.  Yes, I do.

9   Q.  Can you read the first sentence up to the colon?

10  A.  "Individuals or legal entities that are not directly

11  involved in the manufacture, cultivation, distribution, sale or

12  dispensing of marijuana in violation of the CSA but either."

13  Q.  And just before we go on, that reference to CSA in there;

14  do you see that?

15  A.  Yes.

16  Q.  What does that refer to?

17  A.  That's the Controlled Substance Act.

18  Q.  Okay.  So you can go on.  Can you read the (a), (b) and (c)

19  subsections?

20  A.  Yes.  "(a) advertise or promote their products or services

21  to direct MRBs or the cannabis industry; (b) intend to promote

22  the manufacture, cultivation, distribution, sale or dispensing

23  of marijuana; or (c) earn revenue through the sale of,

24  production, provision of service or leasehold, whether directly

25  or through intermediary, sales to a direct MRB."

**DJA1449**

L3BPWEI1                              Clow - Direct

1    Q.  Can you provide an example of an indirect MRB under this

2    definition?

3    A.  An indirect MRB could be a trucking company that aids in

4    the distribution of multiple products, including cannabis.

5    Q.  And then please read aloud the last line of this definition

6    of indirect MRB?

7    A.  "Exclude service companies and mass market merchandise

8    retailers and manufacturers where neither (a) nor (b) applies,

9    and end use of products or services by direct MRBs is unknown

10   or indeterminate from customer due diligence.  Bank of

11   America" --

12   Q.  Sorry.  I actually meant the last line; so keep going.

13   A.  "Bank of America only engages with indirect MRBs under

14   limited circumstances as outlined in this policy."

15   Q.  Okay.  Now, let's look at the policy requirements.  So we

16   can zoom out, and let's go to page 2, and let's zoom in on

17   section IV, policy requirements, through the end of the

18   subsection I.

19          Okay.  So now we're looking at policy requirements,

20   subsection IV.  Can you see where it says "initial MRB

21   identification"?

22   A.  Yes.

23   Q.  Can you read aloud the first two sentences of this first

24   paragraph?

25   A.  Yes.  "Client teams must make reasonable efforts to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1450

L3BPWEI1                    Clow - Direct

1    determine the extent of a client's (and guarantor's) engagement

2    in MRB activities through established business unit AML" --

3    which is anti-money laundering -- "and KYC" -- which is know

4    your customer -- "and credit-related due diligence processes."

5    Q.  So let's just stop there for one sec before I have you go

6    on to the next line.  What is the client teams being directed

7    to do here, in laymen's terms?

8    A.  In laymen's terms, they're being asked to do the due

9    diligence to understand the primary business that -- and

10   purpose of the business that they are -- that this specific

11   client or potential client is doing.

12   Q.  And what is the importance or significance of doing that?

13   A.  The bank has to adhere to the legal rules and regulations,

14   and as well as our policies; so we must understand the business

15   and the business practices that we're doing business with.

16   Q.  Okay.  And then just read the second sentence of this

17   paragraph, please?

18   A.  "Consideration should be given to the client's location,

19   type of operation or services, funds flow/ultimate source of

20   repayment, and likely engagement with or support of the

21   marijuana industry."

22   Q.  And what -- can you explain to us what that means?  How is

23   that information being used?

24   A.  Yes.  So clients in different businesses related to, let's

25   say, supply chain or distribution may support a

L3BPWEI1                    Clow – Direct

1    marijuana-related business and the funding may be done by

2    multiple companies.  The requirement of our client teams is to

3    understand in detail those fund flows for who is paying for

4    what, what the purpose of the payment is for and how we can

5    track that compliantly.

6    Q.  And for Bank of America to be able to perform this

7    function, is it important for the bank to have accurate

8    information concerning the nature of the business and its

9    operation and services?

10   A.  Yes.  It's one hundred percent reliant upon accurate data.

11   Q.  Okay.  Now, let's look at where it says subsection 1,

12   prohibited U.S. direct MRB; do you see that?

13   A.  Yes.

14   Q.  Can you read aloud the first paragraph under this section?

15   A.  "Bank of America must not knowingly enter into client

16   relationships with individuals or legal entities that are U.S.

17   direct MRBs unless such MRB has the proper license from the

18   federal government."

19   Q.  Keep going.

20   A.  "In no instances may bank products/services be provided to

21   a U.S. direct MRB as outlined in the financial crimes customer

22   due diligence enterprise standard."

23   Q.  Okay.  So let's, Mr. Clow, talk about an e-commerce company

24   that's located in the United States.  Under this policy, if

25   that e-commerce company facilitated the sale of marijuana

DJA1452

L3BPWEI1                     Clow - Direct

1    products, would it qualify as a U.S. direct MRB under the

2    provision that you just read?

3    A.  Yes, it would.

4    Q.  And under this policy, would Bank of America knowingly

5    conduct business directly with that U.S. e-commerce company?

6    A.  No, we would not.

7    Q.  Now, once that e-commerce -- U.S. e-commerce company was

8    authorized to facilitate the sale of marijuana products in

9    California, would Bank of America knowingly conduct business

10   with that entity?

11   A.  No, we would not.  This policy states that we are not

12   allowed to.

13   Q.  Okay.  We can zoom out of that.  Now, can we go down to

14   pages 2 through 3 and just highlight this whole section under

15   subsection 2.

16           Okay.  So, Mr. Clow, a few moments ago you testified

17   that Bank of America will allow for some business under certain

18   circumstances with an indirect marijuana-related business; is

19   that right?

20   A.  Correct.

21   Q.  And what is this section titled that we're looking at?

22   A.  "Higher risk, restricted indirect MRB and non-U.S. direct

23   MRB."

24   Q.  And can you please read the two sentences below that?

25   A.  Sure.  "The bank has a limited appetite for credit and

L3BPWEI1                          Clow – Direct

1    deposit services to some client relationships identified as an

2    indirect MRB or non-U.S. direct MRB solely in accordance with

3    this policy.  Eligible MRB activities are restricted as

4    outlined below."

5    Q.  And then we see a chart here, correct?

6    A.  Correct.

7    Q.  And just generally, what does this chart reflect?

8    A.  Really, generally, the chart reflects that if we are the

9    bank to states and localities that need to collect taxes, that

10   that's one exception in the United States, but then outside the

11   United States, in countries like Holland, where it's legal, we

12   can work with direct marijuana-related businesses.

13   Q.  Does anything in this list include a U.S. direct

14   marijuana-related business?

15   A.  No, those are strictly prohibited.

16   Q.  Is it important for Bank of America to have accurate

17   information about a particular business in order to be able to

18   determine whether it is a U.S. direct MRB or one of the

19   possibly allowable indirect marijuana-related businesses?

20   A.  Yes, it's critical.

21   Q.  Okay.  We can zoom out of that.  And I believe going back

22   to page 1, Mr. Levine.

23          Mr. Clow, I believe you indicated the effective date

24   of this policy was sometime in 2018; is that right?

25   A.  Correct.

L3BPWEI1                    Clow – Direct

1   Q.  And was there a subsequent version of this policy that was

2   implemented for the following years?

3   A.  Yes.  I'm not sure that it's annual, but I'm aware that

4   it's been revised once or twice.

5   Q.  Okay.  Let's just take this down then, and briefly put up

6   Government Exhibit 2411.  And this is up for everyone,

7   Mr. Levine?  Thanks.

8              Mr. Clow, do you see this Government Exhibit 2411 in

9   front of you?

10  A.  I do.

11  Q.  What is this?

12  A.  This is the updated marijuana related policy for May 13th,

13  2019.

14  Q.  And have you reviewed this policy?

15  A.  I'm familiar in that there were no material changes, just

16  clarifications in some areas.

17  Q.  Okay.  Just to be clear, then, you're saying there were no

18  material changes between the policy that we just looked at and

19  this later updated one?

20  A.  Correct.

21             MS. LA MORTE:  Okay.  We can take that down,

22  Mr. Levine.

23             Your Honor, the government now seeks to offer

24  Government Exhibits 2413 through 2416 as self-authenticating

25  records pursuant to rules 8036 and 902.11?

L3BPWEI1                    Clow - Direct

1            MR. BURCK:  No objection.

2            MR. GILBERT:  No objection.

3            THE COURT:  Received.

4            (Government's Exhibits 2413 through 2416 received in

5      evidence)

6      BY MS. LA MORTE:

7      Q.  Mr. Clow, do you have a binder in front of you?

8      A.  Yes.

9      Q.  Can you turn to Government Exhibit 2413?

10            And, Mr. Levine, you can put on Government

11     Exhibit 2413 on the screen for everyone.

12     A.  Okay.

13     Q.  What is the title of this document?

14     A.  Financial crimes compliance enterprise policy.

15     Q.  And then if you just take a look in your binder --

16     actually, before we do that, what is the last review date

17     that's indicated on this policy?

18     A.  26th of July 2016.

19     Q.  And then just take a look at your binder, at Government

20     Exhibits 2414 and through 2416.

21     A.  Okay.

22     Q.  What are those?

23     A.  These are subsequent versions of the financial crimes

24     compliance enterprise policy.

25     Q.  Okay.  So let's take this down, Mr. Levine, and let's put

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1456

L3BPWEI1                    Clow – Direct

1   up Government Exhibit 2415.

2           And what is -- this is one of the subsequent versions

3   of the financial crimes compliance enterprise policy; is that

4   correct?

5   A.  That's correct.

6   Q.  And what is the last review date on this policy?

7   A.  26th of June 2018.

8   Q.  Okay.  So let's zoom in on subsections I and subsections II

9   of this policy.

10          Mr. Clow, can you read aloud the policy statement?

11  A.  Yes.  "It is the policy of Bank of America Corporation and

12  its enterprise subsidiaries, the company, to fully comply with

13  the laws, rules and regulations enacted and promulgated in the

14  jurisdictions in which it does business that are aimed to

15  address financial crimes.  It is the company's policy that it

16  will not knowingly facilitate any financial crime and that it

17  will fully cooperate with any competent authority relating to

18  an investigation of a financial crime.  Any employee of the

19  company found to be involved in an activity related to a

20  financial crime may be subject to disciplinary action,

21  including termination, and referral to a competent authority

22  for appropriate action."

23  Q.  Now, Mr. Clow, is this policy that we're looking at, this

24  financial crimes compliance policy, is this an enterprise

25  policy as well?

DJA1457

1158

L3BPWEI1                          Clow - Direct

1    A.  Yes, it is.

2    Q.  And does that mean it applies across the bank?

3    A.  It does, all divisions.

4    Q.  Okay.  Now, let's just look at the background and rationale

5    for the policy.  Can you read that aloud?

6    A.  Yes.  "The company recognizes the harmful effect that

7    financial crimes have on the communities we serve, as well as

8    the global financial system and global markets in which we

9    participate.  Moreover, jurisdictions across the globe have

10   made compliance with laws, rules, and regulations related to

11   financial crimes a top priority for financial institutions.

12   Significant criminal or regulatory action and severe reputation

13   damage can occur when financial institutions fail to comply

14   with these laws, rules and regulations."

15   Q.  Okay.  We can zoom out of that, Mr. Levine.  Okay.  We can

16   take this down.

17            Now, Mr. Clow, I want to just spend a few minutes

18   talking about card processing.  So yesterday you mentioned that

19   Bank of America is an issuing bank, meaning that it issues

20   credit and debit cards to customers; is that right?

21   A.  Correct.

22   Q.  And based on your experience at the bank, are you familiar

23   with how credit and debit card processing works?

24   A.  Yes.

25   Q.  Mr. Levine, can you display for the witness only what has

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1458

1159

L3BPWEI1                    Clow - Direct

1    been marked as Government Exhibit 3706.

2            Mr. Clow, do you see that exhibit in front of you?

3    A.  Yes.

4    Q.  Would Government Exhibit 3706 assist you in explaining how

5    card transactions are processed?

6    A.  Yes.

7            MS. LA MORTE:  Your Honor, the government requests

8    permission to publish Government Exhibit 3706 as a

9    demonstrative.

10           THE COURT:  Yes.

11           MS. LA MORTE:  Mr. Levine is that published?  Thank

12   you.

13   BY MS. LA MORTE:

14   Q.  So, Mr. Clow, using Government Exhibit 3706, can you walk

15   us through how this process unfolds, step by step, when a Bank

16   of America cardholder uses their card to make a purchase?

17   A.  Yes.  So the cardholder in this example is just like

18   everyday people, you and I.  We go to a merchant and we, let's

19   say, fill a basket, whether it's online or in person, and then

20   there's a total of a purchase price that were asked to pay.

21   When you choose to use your credit card, that merchant takes

22   your credit card information, and then they integrate that with

23   a little bit of information that they send to their merchant

24   acquiring bank.  That information includes the merchant name,

25   it includes the address of the merchant.  It includes a couple

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1459

1160

L3BPWEI1                    Clow - Direct

1    of things about the security of the card, were you there in

2    person, did you use a mobile payment, and those types of

3    things.

4            It also includes what's called a merchant category

5    code, which classifies the kind of business that that merchant

6    does, and then it has the amount and the little bit of

7    information about the cardholder.  That information is shared

8    with the merchant bank, and the merchant bank's responsibility

9    is to collect that information and then send it over one of the

10   card networks, Visa or MasterCard.  That's determined by the

11   cardholder's card itself.

12           Then the cardholder bank or, in this case, Bank of

13   America as the issuing bank, would receive all of that

14   information, and we would be asked to make a decision, will we

15   authorize or permit this transaction on behalf of our client or

16   will we decline it?  So typically, that timeline that we're

17   required to operate on the network is less than a second.

18           So we take the merchant name, the amount, the address

19   that they're at, the way that the category -- the merchant

20   category is defined, and the amount that's due for our client,

21   and we see is this an okay transaction and okay for the

22   cardholder is do, they have that money in their account or do

23   they have access to it, if it's a credit line, and then we

24   would authorize.

25           So when we send the authorization it sends a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3BPWEI1                    Clow – Direct

1    confirmation and authorization code back through the merchant

2    bank to the merchant, and that's when typically the cash

3    register rings and it opens and you know the sale is completed.

4    So that would complete the transaction from an authorization

5    perspective.

6    Q.   Thank you.  So you listed some categories of information

7    that Bank of America, as an issuing bank, receives in

8    connection with a decision whether to authorize the transaction

9    or not, correct?

10   A.   Correct.

11   Q.   I believe you said merchant name, address, security

12   features, MCC code and the amount, and the date of the

13   purchase?

14   A.   Correct.

15   Q.   Is it important to Bank of America that this information be

16   accurate?

17   A.   Yes.

18   Q.   Why is that?

19   A.   Well, it's critical for us to make a decision about that

20   transaction and whether it's within our rules and compliance,

21   as well as if it's lawful or not.

22   Q.   Okay.  With we can take that down, Mr. Levine.

23            So you mentioned merchant category code.  Can you just

24   remind us briefly what that is?

25   A.   Merchant category code is used to describe what kind of

1162

L3BPWEI1                    Clow - Direct

1    business the merchant is in.  The merchant acquiring bank sets

2    that up as they take a new merchant on, and it helps us

3    identify the difference between a grocery purchase or, you

4    know, let's say an online subscription or travel, like an

5    airline ticket.

6    Q.  And I believe you just said there that the merchant

7    acquiring bank is the entity that assigns the MCC code; is that

8    right?

9    A.  That's correct.

10   Q.  Is an issuing bank -- does Bank of America have any role in

11   assigning MCC codes?

12   A.  No, an issuing bank does not.

13   Q.  As an issuing bank, does Bank of America have any role in

14   creating MCC codes?

15   A.  No, we do not.

16   Q.  Now, is it important to Bank of America that the MCC code

17   that it receives in connection with a transaction is accurate?

18   A.  Yes, it is.

19   Q.  Why is that?

20   A.  Well, I think the first thing is it's important so that we

21   know how to treat that transaction.  The second thing is there

22   are actually some benefits on the card where we may provide

23   more reward points or cash back or other types of things.  So

24   there are a number of features based upon the MCC code.

25   Q.  Okay.  So you also mentioned merchant name as a piece of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1462

1163

L3BPWEI1                          Clow - Direct

 1    information that Bank of America receives in connection with

 2    card transactions?

 3    A.  Yes.

 4    Q.  Is it important to Bank of America that the merchant name

 5    be accurate?

 6    A.  It is.

 7    Q.  Why -- sorry.  Go ahead.

 8    A.  It's important to us so that we understand who the merchant

 9    is, in case something happened that's incorrect, and we need to

10    support our client for a dispute.  And it's also important so

11    our clients can see where did they buy something and were they

12    there on that day and is that amount correct and did they

13    receive whatever it is that they bought.

14    Q.  And you also mentioned location as a piece of information

15    that Bank of America receives; is that right?

16    A.  Yes, it is.

17    Q.  And so this seems to be an obvious question.  What does the

18    location information reflect, the location of what?

19    A.  Traditionally, where is the store that someone walked into,

20    but today in an e-commerce setting, it's where is that merchant

21    set up and doing business for their e-commerce transactions.

22    Q.  And so like, typically speaking, what is that with respect

23    to a website?  If I go on a website and I make a purchase, what

24    location information do you expect to see?

25    A.  Typically, it's the physical address of where the business

DJA1463

1164

L3BPWEI1                        Clow - Direct

1   is headquartered.

2   Q.  So how, if at all, is Bank of America impacted if false

3   information concerning any of these categories is transmitted

4   across the network to Bank of America?

5   A.  We can make mistakes around transactions if they're

6   misclassified.  We can approve something that maybe we

7   shouldn't have.  We can provide too many points or cash back to

8   our clients if the information is wrong.  There are lots of

9   things that can go wrong.

10  Q.  Okay.  So just generally speaking, what happens after a

11  transaction is authorized?

12  A.  After the transaction is authorized, the bank creates a

13  file that we send over the network to the merchant.  So in the

14  case where a consumer used a debit card, then they have that

15  amount in their account, and we move it from their account to

16  what we call in a settlement account, an appropriate account

17  for the bank.  Then we add all of those up and send them over

18  to Visa or MasterCard, and then they split that to the merchant

19  acquiring bank, and the merchant acquiring bank then, in turn,

20  sends it to the bank account of the merchant.

21  Q.  That covers the debit scenario.  Let's talk about a credit

22  card scenario.  Can you explain to the jury the flow of funds

23  that happens in a credit scenario?

24  A.  Yes.  Certainly.  In a credit scenario, Bank of America has

25  given a line of credit, let's say, of $5,000 to a client.  So

DJA1464

1165

L3BPWEI1                    Clow - Direct

1   to authorize a purchase, they have to have that amount due,

2   that amount available.  Let's say it's $100.  So we would take

3   $100 from the line of credit that we provided to the client.

4   We put that hundred dollars into a similar settlement file that

5   we aggregate or summarize, and then we would send that file

6   onto the network, who would send it to the merchant acquiring

7   bank, who would ultimately send it in the merchant's bank

8   account.

9   Q.  So in relation to these credit/debit transactions, is the

10  money coming from the Bank of America account and then

11  transmitted over, or is it something else?

12  A.  It's a Bank of America account.

13  Q.  So the bank, Bank of America, has its own bank accounts?

14  A.  Yes, we have corporate accounts.

15  Q.  Roughly how many card transactions are coming across the

16  network for Bank of America's authorization decision in any

17  given period of time?

18  A.  We typically process somewhere between 20 and 30,000

19  transactions per minute.

20  Q.  Per minute?

21  A.  Per minute.

22  Q.  Okay.  So I now want to switch gears a bit and talk about

23  Bank of America's application of the marijuana-related policy

24  that we've been discussing in the context of card transactions.

25  So, Mr. Clow, are you familiar with how Bank of America

DJA1465

1166

L3BPWEI1                    Clow - Direct

1   monitors the card networks for marijuana-related transactions?

2   A.  Yes, I am.

3   Q.  How are you familiar with that?

4   A.  As part of my day-to-day role, I evaluate new ways to make

5   payments and part of that is being informed about the way the

6   network is currently working and the compliance with the

7   existing network rules.

8   Q.  Is there a particular team within Bank of America that's

9   dedicated to monitoring the network specifically for

10  potentially prohibited marijuana transactions?

11  A.  We have a network compliance team that evaluates both

12  potentially marijuana transactions and a number of other types

13  of high-risk transactions.

14  Q.  Are you familiar how the networks are -- or how the network

15  compliance team monitors the network for marijuana --

16  potentially prohibited marijuana transactions?

17  A.  Yes, I am.

18  Q.  And how are you familiar with that?

19  A.  The network compliance team reports to a peer of mine.

20  We -- I'm part of the management team that periodically reviews

21  the types of things that comes out on those reports.

22  Q.  Can you provide us an overview of how the network

23  compliance team monitors the networks for potentially

24  prohibited marijuana transactions?

25  A.  Yes.  In simple terms, we, on a quarterly basis, have a

DJA1466

1167

L3BPWEI1                    Clow - Direct

1    group of people that use some tools to look at all of the

2    transactions that we've processed in a month, and what they do

3    is they use a couple of key words, like for instance

4    "cannabis," to see if any of the merchants are suspected of

5    supporting a marijuana- or cannabis-based business.

6          Those transactions are then identified, and we can

7    identify the merchants.  So then once the merchants are

8    identified, we have a running list that we manage.  First,

9    we'll see if that merchant's been identified in the past.

10   Let's say the merchant is new, that team would do a very simple

11   publicly available information search, typically like a Google

12   search, to see if they have a website, if it looks like they're

13   advertising that they accept credit or debit cards.  If they

14   do, then we put them on the list that we use, where we share

15   those names with the network, either Visa or MasterCard or

16   both, and we ask the networks to go do the investigation and

17   due diligence with the acquiring bank because that's really who

18   manages the information about the merchants.

19   Q.  Okay.  Just to make sure that everyone is clear, you said

20   that if Bank of America identifies a particular merchant that

21   may be suspicious for selling marijuana products, you would

22   refer that to the network.  When you say that, do you mean Bank

23   of America's own compliance team, or do you mean Visa and

24   MasterCard?

25   A.  Yes, the network compliance team creates a list of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1467

L3BPWEI1                    Clow – Direct

1    suspected marijuana businesses that we report to the Visa team

2    and/or the MasterCard team to conduct the investigation.

3    Q.  Now, do you recall instances, Mr. Clow, where, through the

4    process you just described, Bank of America identified

5    merchants in the network that may be prohibited U.S. direct

6    marijuana-related businesses?

7    A.  Yes.

8    Q.  And just generally, what happened in those circumstances?

9    A.  In those circumstances, through an update process that we

10   have with the networks, the networks reported back that they've

11   terminated some business relationships, meaning that that

12   merchant was indeed accepting credit and debit cards for

13   marijuana transactions, and now they were eliminated from the

14   network so they can't do it going forward.

15          And in some cases, it was identified that they

16   actually weren't using the cards for marijuana-related

17   businesses or products, that it was actually not related to a

18   marijuana business.

19   Q.  So, okay.  A moment ago you outlined for us the procedure

20   that the Bank of America's network compliance team uses to try

21   and identify prohibited marijuana transactions.

22          MS. LA MORTE:  Your Honor, at this time, the

23   government offers Government Exhibits 2424, 2427, 2428, 2423

24   and 2425 pursuant to rules 8036 and 902.11.

25          MR. GILBERT:  No objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1169

L3BPWEI1                         Clow - Direct

1    MR. BURCK:  No objection.

2    THE COURT:  Received.

3    (Government's Exhibits 2424, 2427, 2428, 2423 and 2425

4    received in evidence)

5    BY MS. LA MORTE:

6    Q.  Mr. Levine, let's publish for everyone Government

7    Exhibit 2424.

8    Do you see that, Mr. Clow?

9    A.  Yes, I do.

10   Q.  What is this?

11   A.  This is the marijuana dispensary card transaction

12   monitoring process.

13   Q.  Is this reflective of the process that you had just

14   described earlier with respect to how Bank of America

15   identifies prohibited marijuana transactions?

16   A.  Yes, it is.

17   Q.  Can you read the -- just the title of the document, as well

18   as the two lines underneath?  The title in red at the top.

19   A.  Sure.

20   Q.  We can blow it up.

21   A.  "Marijuana dispensary card transaction monitoring."

22   Q.  And the two lines right underneath, "this procedure."  Can

23   you see it?  Do we have to blow it up?

24   A.  I don't see where -- oh, sorry.  "This procedure applies to

25   enterprise payments."  My apologies.

L3BPWEI1                    Clow - Direct

1    Q.  No, there we go.  Mr. Clow, what is transaction monitoring?

2    A.  Transaction monitoring is a way that we look at

3    transactions to try to detect patterns or anomalies or issues

4    based upon those transactions.

5    Q.  And then it states, you just read, "this procedure applies

6    to enterprise payments."  What does that mean?

7    A.  The procedure applies to enterprise payments means that

8    enterprise payments, which is the organization I'm a part of,

9    is responsible and accountable to do this transaction

10   monitoring.

11   Q.  And what is the overall purpose of this marijuana

12   transaction monitoring procedure?

13   A.  This procedure is in place so that we can continuously

14   approve our ability to know -- to make sure that we're not

15   unknowingly authorizing transactions that could be related to

16   marijuana.

17   Q.  What's the effective date of this particular procedure?

18   A.  The effective date is January 31st, 2019.

19   Q.  Can you tell, looking at this document, whether there were

20   previous versions in existence?

21   A.  I can.  There's the revision log in the table above.

22   Q.  Is that in the gray box?

23   A.  Yes, it is.

24   Q.  So just to take a step back for a minute, as a preliminary

25   matter, what type of data or information is being monitored

L3BPWEI1                        Clow - Direct

1   under this procedure?  Where is that data coming from?

2   A.  This information is coming from the network.  It's the same

3   information that we get for an authorization request, like I

4   described, in the basic flow chart for credit card or debit

5   card transaction.

6   Q.  Okay.  So, Mr. Levine, can we scroll in or zoom in on

7   articles I and II, which are on this page.

8           We don't have to go through all the bullet points in

9   article I, but generally, what is article I telling us?

10  A.  It's giving us the rationale for having this process.  It's

11  describing how --

12  Q.  Oh, wait.  I meant article I, those bullet points?

13  A.  Oh, overview, background, initial request, perform the

14  prohibited transactions audit, controls and monitoring,

15  escalation process, key contacts and related information.

16  Q.  Is it fair to say this is a table of contents of sorts for

17  this procedure?

18  A.  Yes, it is.

19  Q.  Okay.  Now, let's focus on article II.  Can you read that

20  aloud?

21  A.  "The marijuana dispensary card transaction monitoring

22  serves as a guideline for Bank of America network compliance

23  team to conduct monitoring of merchant transactions to identify

24  potential marijuana dispensaries, to take the necessary steps

25  to engage key stakeholders and respond timely."

**DJA1471**

L3BPWEI1                    Clow – Direct

1   Q.  And what are the "key stakeholders" referenced here,

2   generally?

3   A.  The key stakeholders generally are both the set of internal

4   Bank of America stakeholders, as well as the networks who are

5   accountable to do the investigations.

6   Q.  And that would be Visa and MasterCard predominantly?

7   A.  Correct.

8   Q.  Okay.  So let's zoom out, Mr. Levine, and go to the next

9   page.  And could we blow up article III.

10          Can you read aloud the first paragraph?

11  A.  Yes.  "Sale of marijuana is illegal under federal law,

12  while 33 states and the District of Columbia, allow sales for

13  recreational and or medical purposes.  The merchant acquirer is

14  responsible to evaluate the lawfulness of merchants before

15  allowing transactions to be submitted into the payment system.

16  Acquirers are regulated financial institutions that manage

17  risk, assess legality of transactions, and conduct due

18  diligence before they add a merchant to accept card payments.

19  Per network rules, it is necessary for acquirers to properly

20  code transactions, identifying the merchant's name and the line

21  of business using the industry standard merchant category

22  codes, MCC.  However, there is no MCC for marijuana sales as it

23  is federally prohibited."

24  Q.  Okay.  So according to this paragraph, which entity of the

25  payment processing system has the initial responsibility of

L3BPWEI1                    Clow - Direct

1    evaluating the lawfulness of merchants before allowing the

2    transactions to be submitted?

3    A.   The acquiring bank.

4    Q.   And then to be clear, with respect to the application of

5    this marijuana transaction monitoring procedure, in what

6    capacity is Bank of America operating --

7    A.   We're --

8    Q.   -- as a --

9    A.   We're acting as an issuer; so we're reporting on what

10   transactions were authorized that could be suspected of

11   indicating a merchant is in a marijuana business.

12   Q.   Okay.  And then in that same paragraph, one, two, three

13   four, like five lines up, do you see where it says "per network

14   rules"?

15   A.   Yes.

16   Q.   Can you just read that line aloud again?

17   A.   "Per network rules, it is necessary for acquirers to

18   properly code transactions, identifying the merchant's name and

19   line of business using industry standard merchant category

20   codes, (MCC)."

21   Q.   What is the significance of this?

22   A.   The significance is the network rules, in addition to the

23   laws, make it a requirement for acquirers to ensure they know

24   the business and that they send the information to us or the

25   issuers with valid and correct information.

DJA1473

L3BPWEI1                    Clow - Direct

1   Q.  Okay.  So now, let's turn to the second paragraph of this

2   background section.  There are some parts that are redacted,

3   but then it starts with "many;" do you see that?

4   A.  Yes.

5   Q.  Can you read that aloud?

6   A.  "Many of these businesses relate to non-marijuana product

7   transactions, such as legal services, videos, legislative

8   fund-raising, et cetera; therefore, permitted to accept cards

9   as a form of payment.  The enclosed procedure describe how Bank

10  of America conducts periodic research to confirm the acquirers

11  are not submitting marijuana dispensary transactions."

12  Q.  And what does this mean?

13  A.  What this means is that what the business is doing and the

14  way that we're receiving transactions isn't always reflected

15  accurately, and that we're seeking to identify those things

16  that we can't capture or understand during a transaction, after

17  the transaction and with the benefit of more information.

18  Q.  And is it fair to say that -- well, let me withdraw that.

19  We'll just continue.

20          Okay.  So let's zoom out of this.  And now, if we

21  scroll to pages 3 to 4 under article IV, we see -- go back up,

22  Mr. Levine.

23          Do you see we have a chart that sort of spans pages 3

24  to 4?

25  A.  Yes.

DJA1474

1175

L3BPWEI1                        Clow - Direct

1  Q.  One chart.  Is there a way that we can just go up a little

2  bit more, highlight article IV and this whole chart that

3  appears underneath?  There we go.

4           Mr. Clow, what does this chart generally reflect?

5  A.  This generally reflects the steps that we take to go about

6  seeking to identify these suspected marijuana transactions.

7  Q.  Okay.  So let's just go through these steps briefly.  So

8  step one states "request data pull from Bacardi with blank key

9  words for a one-month period on a quarterly basis."  What does

10 that mean?

11 A.  Bacardi is our technology environment where we keep all the

12 transactional data and we can run analytics using things like

13 key words.  What we're doing here is saying that we're going to

14 provide those key words.  We're going to run a query or a

15 search, and then we're going to get a set of results that we

16 then need to evaluate.

17           (Continued on next page)

18

19

20

21

22

23

24

25

DJA1475

L3BMWEI2                    Clow - Direct

1    Q.  You don't have to identify specific key words, but

2    generally speaking, what are you looking for with the key

3    words?

4    A.  We are looking to identify if the name of the merchant has

5    marijuana or cannabis type of reference.

6    Q.  Step 2 states:  Compare results to previously researched

7    merchants to identify new merchants.  I believe you touched on

8    this before.

9         What does this mean?

10   A.  Correct.  This is a process where we are just eliminating

11   duplicates.  So if we have seen transactions from a merchant

12   before and that merchant has been reported, we are really

13   seeking to identify who were the new merchants that have not

14   been reported before.

15   Q.  Then step 3:  Conduct external research Internet search for

16   new merchants identified to determine if any appear to accept

17   credit or debit cards for marijuana sales.

18   A.  Correct.  That's essentially the Google search to see if

19   there is any publicly available information about the business

20   and if they do accept credit and debit cards.

21   Q.  If a merchant is identified as potentially a prohibited

22   marijuana business, what is the next step?

23   A.  Then if they are potentially a marijuana-related business,

24   then we escalate them to the payment networks.

25   Q.  That would be Visa and MasterCard?

L3BMWEI2                    Clow - Direct

1    A.  Correct.

2    Q.  And then if we scroll down a little, what is step 4?

3    A.  Step 4 relates to adding the merchants to the repository

4    that we have.  Essentially, since we have implemented this

5    policy, we have kept a running list of the suspected merchants

6    and the outcomes and the investigations from each of the

7    networks.

8    Q.  Lastly, step 5.

9    A.  Provide the results in a semiannual high-risk transaction

10   stakeholder meeting.

11            This is where the network compliance team needs to

12   report out to the senior level of stakeholders to demonstrate

13   that they are doing what the policy says and allowing for any

14   questions or trends so that we can demonstrate we are adhering

15   to the policy.

16   Q.  Is this high-risk transaction stakeholder meeting an

17   internal Bank of America meeting?

18   A.  Yes, it is.

19   Q.  I believe you said this is where the network compliance

20   team is reporting its results?

21   A.  Correct.

22   Q.  Who typically attends these high-risk transaction

23   stakeholder meetings?

24   A.  It would be several of us from the leadership team at

25   enterprise payments.  It would include our compliance, our

DJA1477

1178

L3BMWEI2                    Clow - Direct

1   risks, sometimes legal counterparts.  The marijuana-related

2   business is one of several different high-risk types of

3   transactions that are reviewed.

4           MS. LA MORTE:  We can take that down.

5           Now let's display Government Exhibit 2427 for

6   everyone.

7   Q.  Mr. Clow, what is this that we are looking at?

8   A.  This is a list of suspected merchant names and what Bank of

9   America has done in the BAC actions and the notes.

10  Q.  What is the purpose of this document?

11  A.  The purpose of this document is to show what has happened

12  since we identified a potential marijuana-related business.  It

13  gives a little bit of information about the name of the

14  merchant, the location, and the MCC code they use, and then it

15  identifies what the networks have done as a follow-up

16  afterwards.

17  Q.  Just to put this in context, how, if at all, does this

18  relate to the marijuana transaction-monitoring procedure that

19  we just looked at?

20  A.  This is evidence of how we are identifying these suspected

21  merchants and how we are making sure that they are reported to

22  the network and that the networks sufficiently investigate

23  them.

24  Q.  Looking at just a couple of these columns, there is a

25  merchant name column.

L3BMWEI2                          Clow – Direct

1           You see that?

2    A.   Yes.

3    Q.   A merchant location column right next to it?

4    A.   Yes.

5    Q.   An MCC column.

6    A.   Yes.

7    Q.   Where is that information coming from, that data?

8    A.   All of that data comes from the merchant-acquiring bank.

9           MS. LA MORTE:  Let's just look at a couple of

10   examples.  Let's start with the fifth one from the bottom.  Can

11   you highlight that row, Auto Flowering Cannabis.

12   Q.   The MCC all the way on the left, you see that?

13   A.   Yes.

14   Q.   What is that?

15   A.   That means it's MasterCard.

16   Q.   Then Auto Flowering Cannabis.

17          What is that?

18   A.   That's the merchant name.

19   Q.   And then California reflects what?

20   A.   That's the state or the location of that merchant.

21   Q.   Then 5192.

22   A.   That's the merchant category code that was used.

23   Q.   What about this next section.  Can you read this aloud.

24   A.   Reported the merchant to MasterCard, who researched and

25   terminated the merchant.

DJA1479

L3BMWEI2                    Clow – Direct

1  Q.  And then the last piece of information.

2  A.  Terminated.

3  Q.  What does that mean?

4  A.  That means that that merchant is no longer on the

5  MasterCard network to accept payments.

6  Q.  Would this be a merchant that Bank of America would

7  consider a prohibited merchant under the marijuana-related

8  business policy?

9  A.  Yes.

10        MS. LA MORTE:  Let's zoom out of that, and we will

11  just look at one more example.

12        Let's look at the sixth one up from the bottom, Swiss

13  Cannabis, that row.

14  Q.  We don't have to go through all of these columns again, but

15  Swiss Cannabis, is that the name of the merchant?

16  A.  Yes.

17  Q.  Let's look at the information that appears next to the MCC

18  code.  Can you read that aloud.

19  A.  Reported merchant to Visa compliance which resulted in a

20  Visa investigation of merchant activity.

21  Q.  What do you understand that to mean?

22  A.  That means that Visa's compliance team couldn't understand

23  at first blush what the business did, so they referred it to an

24  investigation team.

25  Q.  And then this information on the right, read it aloud.

DJA1480

L3BMWEI2                    Clow - Direct

1   A.  Per Elizabeth, via Dawn:  Swiss Cannabis SA sells only

2   products with a lower THC content than 1 percent, which are 100

3   percent legal in Switzerland.  If the delivery address is in

4   the United States, the merchant website automatically removes

5   the product from the basket.

6   Q.  So according to this particular document, would this

7   merchant have been terminated from the network?

8   A.  No.

9        MS. LA MORTE:  We can zoom back out of that.

10  Q.  Generally speaking, what does Bank of America do with the

11  information of this type that's reflected in these charts?

12  A.  We use this to report and ensure that we are compliant with

13  not knowingly permitting transactions that are against our

14  policies.

15       MS. LA MORTE:  We can take this down and put up

16  Government Exhibit 2428.

17  Q.  Mr. Clow, is that -- that's up on everyone's screen?

18  A.  Yes, it is.

19  Q.  The title of the document is network data integrity

20  escalation procedure.

21       In laymen's terms, what is that?

22  A.  In laymen's terms, this is a way when the bank identifies

23  trends or patterns from different types of merchants that we

24  believe are not in accordance with the network rules and are

25  creating issues for our clients or for us in complying that we

L3BMWEI2                    Clow - Direct

1    report them to Visa or MasterCard so that they could

2    investigate.

3    Q.  Would those network rules include rules involving illegal

4    transactions coming across the network?

5    A.  Yes.

6            MS. LA MORTE:  Let's look at the second and third

7    bullet points on this first page.  Mr. Levine, can you zoom in

8    on the second bullet point and the third bullet point.

9    Q.  Can you read that second bullet point aloud.

10   A.  Yes.  Transaction data integrity is critical to ensuring

11   Bank of America is within compliance with the federal

12   regulations and network rules, and that the line of business

13   strategies are executed accurately.  The following networks are

14   impacted by this process:  Visa, MasterCard, American Express,

15   PULSE, STAR.

16   Q.  When it talks about transaction data integrity is critical

17   to ensure Bank of America is within compliance, does that

18   include the marijuana transaction monitoring procedure that we

19   have been discussing?

20   A.  Yes, it does.

21           MS. LA MORTE:  Let's zoom out of that.  Let's go to

22   pages 1 through 2, so just scroll down.  Can we highlight or

23   zoom in on the text that appears between the chart on page 1

24   and the chart on page 2.

25   Q.  Can you just read the first two sentences, beginning with

**DJA1482**

L3BMWEI2                    Clow - Direct

1   payment networks strategic analyst.

2   A.  Payment networks strategic analyst follows the steps below

3   to identify, escalate, review and discuss all network data

4   integrity issues with both internal and external stakeholders

5   on an ongoing basis.  Routine meetings are held with Visa and

6   MasterCard is to review and discuss all outstanding issues on a

7   monthly basis.

8   Q.  Now let's look at the text that appears below this big

9   chart.  You see that?  Can you read that?

10  A.  The estimated time spent identifying, escalating,

11  reviewing, tracking, and resolving issues is approximately 30

12  hours weekly.

13  Q.  What does this mean?

14  A.  What this means is, we are making a pretty significant

15  investment, almost a full-time employee's worth of time, to

16  have an ongoing set of processes to improve the way that our

17  compliance to the network rules and the laws are working.

18          MS. LA MORTE:  We could zoom back out of that.

19          Now let's go to page 4 of this exhibit, 2428, page 4.

20  Thank you.

21  Q.  We see a chart here on page 4.  You see next to this

22  subsection -- let's just start at the top, action.  Can you

23  read the text under action.

24  A.  Identify new data integrity issues by reviewing the control

25  reporting outlined below and collaborating with internal

L3BMWEI2                    Clow - Direct

1    partners/stakeholders.

2    Q.  Then you see under topic, next to No. 1, it says control

3    reporting results review?

4    A.  Yes.

5    Q.  What is that?

6    A.  That is the actual reporting results.  So these are

7    actually a list of different types of reports that that team

8    runs in order to identify suspicious transactions.

9    Q.  When you say it's a list of reports that that team runs,

10   are you referring to Bank of America's network compliance team?

11   A.  Yes.

12   Q.  Is marijuana merchants reflected on this list?

13   A.  Yes.  Subsection 5, merchants accepting cards for cannabis

14   purchases.

15   Q.  Let's just look at, also, subsection 9.  You see where it

16   says merchants with high claims rates?

17   A.  Yes.

18   Q.  What is that?

19   A.  High claims rates are merchants who our transactions and

20   our clients tend to represent or dispute transactions with.  So

21   if a certain merchant sells to 100 transactions and 40 of the

22   transactions are disputed, that's typically a red flag where we

23   want to investigate their practices or have the network

24   investigate their practices.

25   Q.  With respect then to merchants that have high charge-back

L3BMWEI2                    Clow - Direct

1    rates, in certain circumstances Bank of America will refer that

2    to the network for investigation?

3    A.  Yes.

4          MS. LA MORTE:  We can take this down and just briefly

5    let's put back up Government Exhibit 2424, pages 2 to 3.  There

6    we go.

7    Q.  Mr. Clow, this is a marijuana transaction monitoring

8    procedure we have been looking at.

9          Do you recall that?

10   A.  Yes.

11   Q.  These were the steps that you had discussed a few moments

12   ago in your testimony?

13   A.  Yes.

14   Q.  Looking to step 3, you see where it says escalate to

15   payment networks?

16   A.  Yes.

17   Q.  Is that what we have just been discussing with respect to

18   the previous exhibit?

19   A.  Yes.

20   Q.  Now let's look at step 5, which we talked a little bit

21   about before, provide the results of a semiannual high risk

22   transaction stakeholder meeting.

23          Do you recall discussing that meeting?

24   A.  Yes.

25   Q.  Do you from time to time participate in those meetings

DJA1485

L3BMWEI2                    Clow - Direct

1  yourself?

2  A.  From time to time.  I'm not a mandatory participant.  I

3  receive the report and I attend, depending on the topics.

4          MS. LA MORTE:  Let's zoom out of that.

5          Mr. Levine, we can take this down and let's put up

6  side by side Government Exhibits 2423 and 2425 in evidence for

7  everyone.

8  Q.  Mr. Clow, what are these documents?

9  A.  These are the presentations for the semiannual high-risk

10  transaction monitoring review.

11  Q.  Is this the output of step 5 of the transaction monitoring

12  procedure that we have just been discussing?

13  A.  Yes.

14  Q.  Let's actually just look at 2423 as an example.  Can you

15  just remind us what the purpose is of preparing these

16  documents.

17  A.  The purpose is to make sure that a wider group of people

18  than the network compliance team at an executive level can

19  review and inspect to make sure that the policy is being

20  adhered to, as well as the networks are complying with what we

21  need from them.

22          MS. LA MORTE:  Let's go to page 2.  We could blow up

23  this slide.

24  Q.  This is a Power Point presentation, is that right?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1486

1187

L3BMWEI2                    Clow - Direct

1   Q.  We don't have to go through everything on here, but,

2   generally, what does this reflect?

3   A.  This is the agenda and the outline of the key topics that

4   are reviewed in the meeting.

5   Q.  Is the marijuana transaction monitoring reflected on here?

6   A.  Yes.  The marijuana overview and audit results are right

7   here in the middle.

8           MS. LA MORTE:  Let's zoom back out and let's go to

9   page 12.  That's page 11.  We will go one more.  I was looking

10  at the page numbers on the bottom.  There we go.

11  Q.  It states here marijuana audit results.  What does that

12  refer to?

13  A.  This is the summary of the suspected transactions we spoke

14  about earlier and the disposition of what's happened in the

15  networks.

16          MS. LA MORTE:  Let's go to the next page.  Let's blow

17  this up.

18  Q.  You see this chart on the top, multilayer approach to

19  monitor marijuana industry?

20  A.  Yes.

21  Q.  Just a few things.  This first row, you see where it says

22  perform ad hoc reviews of merchants thought to be engaged in

23  sale of marijuana using credit/debit cards and then it says

24  reactive?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1487

1188

L3BMWEI2                    Clow - Direct

1  Q.  What does that mean?

2  A.  That means if there is public information available or if

3  an employee, perhaps, walks into a suspected business, that

4  that can also be reported to trigger review.

5  Q.  And then the next row states:  Quarterly search for

6  credit/debit card transactions known, legal marijuana

7  dispensaries, currently 10 states plus Washington, D.C.

8  Proactive.

9        What does that refer to?

10 A.  That refers to the policy where we stated on a quarterly

11 basis we will look at all transactions on a month-by-month

12 basis and report them.

13 Q.  Lastly, quarterly search of consumer credit/debit

14 transactions for the terms which are blocked out.  Follow-up

15 research will focus on trying to identify likely dispensaries.

16 Research will include Internet search and network engagement as

17 appropriate, proactive.

18        Does this relate to the marijuana transaction

19 monitoring procedure that we have been discussing?

20 A.  Yes, it does.

21 Q.  Let's just look here.  This is an example in this bottom

22 chart.  What is this bottom chart telling us?

23 A.  This bottom chart tells the results of the audit where it

24 shows counts of the types of merchants and the categories that

25 they are identified or classified in.

DJA1488

1189

L3BMWEI2                    Clow – Direct

1    Q.  By way of example, Q3 2018, what does that mean?

2    A.  So, from the beginning of the third quarter to the end of

3    the third quarter in 2018, we did the key word search in

4    looking across those transactions, and this is the summary of

5    the merchants that were identified.

6    Q.  It states in that quarter Bank of America reviewed 21

7    merchants, is that right?

8    A.  Yes.  The search resulted in 21 suspected merchants.

9    Q.  Then this top bullet point, eight merchants not a

10   dispensary based on internal research, what does that mean?

11   A.  That means eight of the companies, when we did that

12   publicly available Google search and investigated it a little

13   further, we realized it was actually not cannabis or

14   marijuana-based business.

15   Q.  Then it states nine of those merchants were sent to Visa?

16   A.  Correct.

17   Q.  And then these three bullet points reflect what?

18   A.  So the three bullets are the sum total of the nine, so five

19   were terminated, two were verified as not a dispensary, so they

20   are still on the network, so two were still under

21   investigation.

22   Q.  Then that last bullet point, is that essentially the same

23   but with respect to MasterCard?

24   A.  Correct.

25   Q.  Mr. Clow, if Bank of America receives false information

L3BMWEI2                    Clow - Cross

1    about a merchant across the network, does that impact Bank of

2    America's ability to identify potentially prohibited marijuana

3    transactions under the policies and procedures we have been

4    discussing?

5    A.  Yes.  We completely rely on the data that we receive.

6              MS. LA MORTE:  One moment, your Honor.

7              THE COURT:  Yes.

8              MS. LA MORTE:  No further questions.

9              THE COURT:  Cross-examination.

10   CROSS-EXAMINATION

11   BY MR. BURCK:

12   Q.  Good morning, Mr. Clow.  Can you hear me OK?

13   A.  Yes, I can.

14   Q.  My name is Bill Burck.  I'm a lawyer for Ray Akhavan.

15             MR. BURCK:  I wanted to start with, if we could put up

16   Government Exhibit 3706.

17   Q.  You recall testifying about this on direct examination,

18   this demonstrative?

19   A.  Yes.

20   Q.  I just want to talk about some of the relationships on this

21   demonstrative.

22             First of all, in this demonstrative Bank of America

23   would be the cardholder bank on the right-hand side, correct?

24   A.  Correct.

25   Q.  And the cardholder is, of course, below that, correct?

DJA1490

L3BMWEI2                    Clow - Cross

1   A.  Yes.

2   Q.  The client for the cardholder bank in this demonstrative is

3   the cardholder, correct?

4   A.  Correct.

5   Q.  The customer is the cardholder, correct?

6   A.  Yes.

7   Q.  You have an agreement or, I should say, Bank of America has

8   an agreement with cardholders about how to use the cards,

9   correct?

10  A.  Correct.

11  Q.  That's a contractual agreement?

12  A.  Yes.

13  Q.  You also have an agreement with Visa or MasterCard on how

14  to use their network, correct?

15  A.  Correct.

16  Q.  That's also a contractual agreement, correct?

17  A.  Correct.

18  Q.  For both of those agreements there are rights and

19  responsibilities that flow between the parties, correct?

20  A.  Correct.

21  Q.  Now, Bank of America does not have any kind of contractual

22  agreement with the merchant bank, right, the acquiring bank in

23  this chart?

24  A.  Correct.

25  Q.  Bank of America does not have any kind of relationship with

DJA1491

L3BMWEI2                    Clow - Cross

1    the merchant in this chart, correct?

2    A.  Correct.

3    Q.  No contractual relationship, correct?

4    A.  Correct.

5    Q.  You would also agree with me that the merchant is not a

6    client of the cardholder bank, correct?

7    A.  Correct.

8    Q.  And not a customer of the cardholder bank?

9    A.  Correct.

10   Q.  Same goes for the merchant bank, the acquiring bank, also

11   not a customer or a client, correct?

12   A.  In this context, correct.

13   Q.  That's all I'm talking about, this context.

14          The points of contact that Bank of America has in the

15   network are only with Visa, MasterCard, and the cardholder,

16   correct, direct points of contact?

17   A.  Correct.

18   Q.  No point of contact with the merchant bank, correct?

19   A.  Correct.

20   Q.  And no point of contact with the merchant as well, isn't

21   that right?

22   A.  Correct.

23   Q.  Now, you testified about the process by which a cardholder

24   submits the card and it goes to the network to make a payment

25   for a product, right?

DJA1492

1193

L3BMWEI2                    Clow – Cross

1   A.  Yes.

2   Q.  And you testified about the point at which the issuing bank

3   comes into that process, right?  I think you said that the

4   issuing bank, once they receive the information from the

5   merchant, merchant bank, the network, will then authorize or

6   decline a transaction, right?

7   A.  Correct.

8   Q.  Now, when the issuing bank is making that decision, it has

9   the following information.  It has the merchant's name, right?

10  A.  Yes.

11  Q.  The location --

12  A.  Yes.

13  Q.  -- of the merchant.

14          Yes?

15  A.  Yes.

16  Q.  I'm sorry.  You have to say it so the record --

17  A.  Sure.

18  Q.  It also has the name of the cardholder?

19  A.  Yes.

20  Q.  The cardholder's card number?

21  A.  Yes.

22  Q.  You said there was some security features it has?

23  A.  Yes.

24  Q.  It doesn't have, for example, though, the descriptor

25  information, correct?

L3BMWEI2                    Clow - Cross

1    A.  Correct.

2    Q.  And it doesn't have anything about what the specific

3    product is, right?

4    A.  Correct.

5    Q.  So when you receive that information, you either will

6    either authorize it or decline it, based on the information you

7    receive, correct?

8    A.  Correct.

9    Q.  When the issuing bank is making decisions, sometimes it

10   will call the cardholder once the cardholder submits the card,

11   correct?

12   A.  There are certain strategies we have where we can do that.

13   Q.  And that happens, correct?

14   A.  Periodically.

15   Q.  If somebody submits a card for a purchase and there is a

16   question the issuing bank has about it, the issuing bank can

17   and sometimes does call the cardholder, correct?

18   A.  Yes.  The majority of the cases, when it's about a fraud,

19   it's actually when we suspect it's not the client making the

20   transaction.

21   Q.  Exactly.  So when you do that, when you call the customer,

22   the cardholder, what types of questions are asked of the

23   cardholder about the transaction?

24   A.  Generally, it's, is this merchant the merchant transaction

25   that you want to authorize or not.  Are you there.  Do you have

L3BMWEI2                    Clow – Cross

1   your card.  Basic questions like that.

2   Q.  You do not ask if it is an illegal transaction, correct?

3         MS. LA MORTE:  Objection.  Foundation.

4         THE COURT:  No.  I'll allow that.

5   A.  Not to my knowledge.

6   Q.  You don't ask what product are you buying, do you?

7   A.  Only for a deep investigation.

8   Q.  That's not my question.

9         When somebody from Bank of America calls the customer

10  in the circumstance we are talking about, do they ask what

11  product are you buying?

12  A.  Not to my knowledge.

13  Q.  When Bank of America as the issuing bank makes the decision

14  about whether or not to authorize or decline, it doesn't have

15  any information about what the product is, the specific product

16  that's being purchased, correct?

17  A.  Correct.

18  Q.  And it doesn't have any information about the merchant

19  other than the merchant's name, isn't that correct?

20  A.  The merchant category code also describes the business that

21  the merchant is in.

22  Q.  The merchant category code, the merchant name, and the

23  location.  That's what you have?

24  A.  Yes.

25  Q.  But you don't have the descriptor information, correct?

L3BMWEI2                        Clow - Cross

1   A.  Correct.

2   Q.  And the descriptor information has more information about

3   the merchant than just the merchant name, correct?

4   A.  Correct.

5   Q.  It has more information than the MCC code does, correct?

6   A.  Correct.

7   Q.  Let's talk briefly about the payment structure for

8   cardholders with the issuing bank, with Bank of America.

9           I am going to show, just for the witness, Government

10  Exhibit 2407.  I don't believe this is in evidence.

11          Do you recognize this document?

12  A.  Yes, I do.

13  Q.  What is it?

14  A.  It's a credit card agreement for a consumer.

15          MR. BURCK:  Your Honor, we would offer Government

16  Exhibit 2407.

17          MS. LA MORTE:  No objection.

18          THE COURT:  Received.

19          (Government Exhibit 2407 received in evidence)

20          MR. BURCK:  Thank you, your Honor.

21          Publish that to the jury, please.

22  Q.  Now, you testified that this is a credit card agreement

23  between Bank of America and a consumer?

24  A.  Correct.

25  Q.  When you say consumer, you mean the cardholder?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1496

L3BMWEI2                    Clow - Cross

1    A.  Yes.

2    Q.  The beginning of this says:  This agreement is for your

3    credit card account with us, right?

4    A.  Yes.

5    Q.  And the your there, you're talking the cardholder.  The us

6    is Bank of America, is that right?

7    A.  Correct.

8            MR. BURCK:  I'd like to go to page 2 of this document:

9    Can we blow up under interest rates and interest charges just

10   the first paragraph, annual percentage rate.

11           This says:  Interest rates and interest charges,

12   annual percentage rate, APR for purchases.  It says it's a 0.0

13   percent introductory APR beginning January 12, 2019 through

14   your statement closing date in February 2020 on purchases.

15   Then we go down to the 19.49 percent.  19.49 percent.  This APR

16   will vary -- after that, your APR for the purchase introductory

17   balances will be 19.49 percent.  This APR will vary with the

18   market based on prime rate.

19           The 19.49 percent, that's the interest rate that's

20   charged on the card, credit card, correct?

21   A.  That's -- actually, it's the APR that's charged for the

22   transactions or balance that's not paid after the first billing

23   cycle.

24   Q.  The first billing cycle is 25 days after the purchase?

25   A.  Depending on when the transaction is, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**DJA1497**

L3BMWEI2                    Clow - Cross

1   Q.  If you don't pay off your balance within 25 days, you are

2   charged 19.49 percent, correct?

3   A.  For this agreement, yes.

4   Q.  For this agreement.

5           When it says this APR will vary with the market based

6   on the prime rate, what is the prime rate?

7   A.  The prime rate is a market rate that's set that's a

8   standard for all banks.

9   Q.  That can go up or down?

10  A.  Correct.

11  Q.  So this could be higher or lower, depending on the prime

12  rate?

13  A.  Correct.

14  Q.  It goes on to say:  For any other purchase transactions not

15  subject to an introductory APR, your APR will be 19.49 percent.

16          Again, same principle that you just testified about,

17  is that correct?

18  A.  That's correct.

19          MR. BURCK:  We can zoom out of that.  Can we go down

20  to the penalty APR and when it applies, third from the bottom.

21  Q.  Penalty APR and when it applies.  Up to 29.99 percent,

22  based on your credit worthiness.  This APR will vary with the

23  market based on the prime rate.  This APR may be applied to new

24  transactions on your account if you make a late payment,

25  correct?  Is that what it says?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1498

1199

L3BMWEI2                    Clow - Cross

1   A.  I am just reading.

2   Q.  Sure.

3   A.  Correct.

4   Q.  Below that it says:  How long will the penalty APR apply?

5   If your APR is increased for this reason, the penalty APR will

6   apply indefinitely, correct?

7   A.  Correct.

8   Q.  Mr. Clow, this says that if you are late in the payment,

9   you can have a penalty APR of up to 29.99 percent, right?

10  A.  Based upon your creditworthiness.

11  Q.  Based on your creditworthiness.

12          So it could be higher or lower than that?

13  A.  Correct.

14  Q.  What does it mean to make a late payment?

15  A.  It means if you have a minimum balance due on a specific

16  date, let's say it's the 15th of the month and it's not applied

17  or posted on your account by the 15th, then you could incur a

18  late fee.

19          MR. BURCK:  You can zoom out of that.

20  Q.  Bank of America charges interest for using -- or the APR

21  for using the credit cards, correct?

22  A.  No.  Actually, we don't.  We don't charge anything for

23  using the card.  We only charge when people have a balance that

24  they are lending from us.

25  Q.  If you have a balance beyond 25 days, you do charge the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1499

1200

L3BMWEI2                    Clow – Cross

1  cardholder the APRs that are listed here?

2  A.  Well, for this agreement, yes.

3  Q.  For this agreement.  And for other agreements, whatever is

4  in those agreements, right?

5  A.  Correct.

6  Q.  That's revenue for Bank of America, correct?

7  A.  Yes.  It's a lending revenue, yes.

8  Q.  It's like a loan, right?

9  A.  Correct.

10  Q.  And the more that people use their cards, the more

11  transactions are used and the more that Bank of America could

12  make off these transactions, right?

13  A.  For credit card transactions in this case.

14  Q.  Yes.

15  A.  Yes.

16  Q.  And then if people have balances they don't pay, at the end

17  of the 25 days, the interest rates that appear here would

18  apply, correct?

19  A.  Well, again, for this agreement or this person, yes.

20  Q.  If they are late, there are additional APR penalties that

21  apply, correct?

22  A.  Correct.

23       MR. BURCK:  Let's turn to page 12 of this agreement.

24  Can you highlight, Mr. McLeod, the purpose for using your

25  account under limitations and warnings.  No.  Purposes.  Sorry.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3BMWEI2                    Clow - Cross

1  The one above that.  Thank you.

2  Q.  This is a limitation or warning in the credit card

3  agreement, isn't that right?

4  A.  Correct.

5  Q.  This is directed to the cardholder who is the recipient of

6  this agreement, correct?

7  A.  Correct.

8  Q.  It says:  Purposes for using your account.  Then it says,

9  you, which, again, is the cardholder, is that right?

10  A.  Yes, correct.

11  Q.  You may not use this account to make a payment on this or

12  any other credit account with us or our affiliates.  You may

13  not use or permit your account to be used to make any illegal

14  transaction.  Right?

15  A.  Correct.

16  Q.  You will only use your account for transactions that are

17  legal where you conduct them, correct?

18  A.  Correct.

19  Q.  For example, Internet gambling transactions may be illegal

20  in your state.

21        You see that?

22  A.  Yes.

23  Q.  You go on below to say:  We will -- I'm sorry.  I'm saying

24  you just as a representative of Bank of America.  We, we as

25  Bank of America, will not be liable if you engage in an illegal

DJA1501

1202

L3BMWEI2                    Clow - Cross

1   transaction.

2          You see that?

3   A.  Yes.

4   Q.  We may deny authorization of any transactions identified as

5   Internet gambling.

6          You see that?

7   A.  Yes.

8   Q.  Now, you've testified at length that Bank of America

9   believes that marijuana transactions are illegal, right?

10  A.  Correct.

11  Q.  They are illegal because they are illegal under federal

12  law, right?

13  A.  Correct.

14  Q.  To Bank of America it doesn't matter that in California,

15  for example, it is legal, correct?

16  A.  Correct.

17  Q.  Isn't that what you testified?

18          Here, you don't say that marijuana is a prohibited

19  transaction, correct?

20  A.  We don't list it as another example, no.

21  Q.  And you list gambling, Internet gambling, as a potential

22  problem, right?

23  A.  Yes.

24  Q.  And you go on to say that you are still not going to be

25  liable if you engage in illegal transaction, right?

L3BMWEI2                    Clow – Cross

1   A.  Correct.

2   Q.  What does that mean, that you are not going to be liable

3   for that?

4   A.  It means that the bank would -- is protecting ourselves

5   from an illegal transaction that a customer does with one of

6   our products.

7   Q.  When you say you are not going to be liable, that means you

8   are still expecting to be paid for -- let me withdraw the

9   question.

10          Bank of America is still expecting that even if a

11  cardholder engages in a transaction that's illegal, Internet

12  gambling of some sort, the cardholder will pay for that

13  transaction, correct?

14  A.  Correct.  If we authorize the transaction on behalf of the

15  client for what they want to purchase, then we expect to be

16  repaid.

17  Q.  Got it.  OK.

18          Just briefly, again, the credit card service network

19  that we talked about, the two people or entities that know what

20  the customer bought are the customer who is purchasing it and

21  the merchant, right?

22  A.  Correct.

23  Q.  Everybody else, including the issuing bank, doesn't

24  actually know what the person bought, right?

25  A.  Correct.

DJA1503

L3BMWEI2                    Clow - Cross

1   Q.  Do you know why Bank of America has not included marijuana

2   in this list or in this particular paragraph?

3   A.  It's not intended to be an exhaustive list.

4   Q.  You have testified about multiple different policies

5   internally at Bank of America talking extensively about

6   marijuana, right?

7   A.  Correct.

8   Q.  Those were internal policies, right?

9   A.  Correct.

10  Q.  None of those policies is intended to be provided to the

11  external world, correct?

12  A.  Correct.

13  Q.  They are meant to be used by personnel at Bank of America,

14  correct?

15  A.  Correct.

16  Q.  This is something that you are trying to communicate to the

17  cardholder, correct?

18  A.  Yes.

19  Q.  This does not say that you cannot use credit cards from

20  Bank of America to make marijuana transactions, correct?

21  A.  Correct.

22  Q.  Also, when you write -- I'm sorry to say you.  I am just

23  trying to make it easier.  You will only use your account for

24  transactions that are legal where you conduct them.

25          You see that?

L3BMWEI2                    Clow - Cross

1    A.  Yes.

2    Q.  It doesn't say anything about federal versus state there,

3    right?

4    A.  Correct.

5    Q.  It doesn't say anything about a distinction between federal

6    law and state law, right?

7    A.  It does not.

8    Q.  When it says that the transactions that are legal where you

9    conduct them, it literally means the location where you are,

10   correct?

11   A.  Where you are in an Internet transaction is a very

12   different situation than where you are if you are standing in a

13   shop, so I do think that's worth a distinction.

14   Q.  That's very complicated, so let me ask you about an

15   example.  If you are in New York or if you are a New Yorker and

16   you are in New York and you want to buy some kind of Internet

17   gambling product in Las Vegas, what would Bank of America think

18   of that?  I'm assuming that in New York it's illegal?

19              MS. LA MORTE:  Objection.

20              THE COURT:  I don't have any real difficulty seeing

21   the relevance of any of this, counsel, but maybe we will give

22   the jury their midmorning break and you can explain it to me.

23              We will take a 15-minute break at this time.

24              (Jury not present)

25              MS. LA MORTE:  Your Honor, may the witness step down?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1505

1206

L3BMWEI2                    Clow - Cross

1     THE COURT: Yes.

2     MR. BURCK: Your Honor, I'm actually done with this

3  area. I was going to move on to something else, anyway.

4     THE COURT: That's fine. Please explain to me the

5  relevance of what we just spent ten minutes on.

6     MR. BURCK: Your Honor, the point of it was, all the

7  policies that the witness was testifying to were all directed

8  internally at people inside of Bank of America.

9     When they have an opportunity to talk to the

10  cardholder, who is the only person who is making the decision

11  about whether or not to purchase marijuana from a merchant --

12  and the witness testified that the only two people who know

13  anything about what actually is purchased are the cardholder

14  and the merchant. They don't say anything about marijuana.

15  They say that illegal transactions, they have an ambiguous

16  clause --

17     THE COURT: All of that, your questions, to your

18  credit, were a model of clarity. I am still finding the

19  relevance hard to grasp. If I understand the charge in this

20  case, it is that false statements were made in the form of

21  disguising marijuana as something else and that one of the

22  purposes of making those false statements was to defraud the

23  bank because they wanted to know the truth.

24     If, for example, there was a transaction that, in

25  fact, the bank might have approved, but you, the purchaser, or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3BMWEI2                    Clow - Cross

1    the person who was forwarding the information thought the bank

2    would not approve it, so you disguise it as something else,

3    that would be bank fraud, would it not?

4              MR. BURCK:  Your Honor, it would be if it actually

5    mattered to the bank.  This is the point of the questioning.

6    If I may explain.  I can also give you a preview of where I am

7    going with the cross-examination.

8              One of our defenses, your Honor, is that regardless of

9    the particulars of what the government has alleged is the

10   scheme, the fact is that the banks and MasterCard and Visa have

11   set up the system in a way where that information, the

12   information that they say is fraudulent, actually doesn't

13   actually matter or is even considered by the bank.  For

14   example, your Honor, very importantly, in the witness'

15   testimony --

16             THE COURT:  I have allowed what the bank thought as

17   bearing on materiality, but the ultimate standard is what a

18   reasonable bank in that situation, whether they would care or

19   not.

20             MR. BURCK:  Absolutely, your Honor.

21             THE COURT:  Your position, as I understand it, forgive

22   me, is that banks don't care -- reasonable banks don't care

23   about being lied to repeatedly over the course of years

24   involving hundreds of millions of dollars in transactions,

25   right?  That is your position.

L3BMWEI2                    Clow - Cross

1    MR. BURCK:  That's not quite my position, your Honor.

2    My position is a little different.  My position is that the

3    effort that's made -- your Honor, you will see this as I think

4    the cross goes on.  What they say, this is the whole plausible

5    deniability issue.  They understand that marijuana -- they

6    don't want to appear to be endorsing marijuana sales.  And they

7    are -- one of the reasons why I have elicited -- the only

8    reason I have elicited information about the payments that they

9    could receive --

10    THE COURT:  Just forgive me for interrupting.

11    Assuming for the sake of argument that all they want is

12    plausible deniability.  That still doesn't get you where you

13    want to go because the question is not what Bank of America

14    wanted, but what a reasonable bank would -- your argument has

15    got to be, if I understand it, that rather than wanting the

16    truth, a reasonable banker wouldn't care being lied to about

17    something that he thought was illegal.  All he cared about was

18    maintaining plausible deniability, this reasonable banker.

19    What's reasonable about that?

20    MR. BURCK:  Your Honor, I think it's reasonable for

21    several reasons.

22    One is, there is a financial motive, meaning that they

23    are making --

24    THE COURT:  We have to assume on your hypothesis that

25    a reasonable banker would say I will acquiesce in what

L3BMWEI2                    Clow - Cross

1  otherwise would be illegal because a reasonable banker wants

2  money above everything.

3          MR. BURCK:  Not above everything, but I'll go on.

4          Also, as the Court has already instructed the jury,

5  the Federal Government is not prosecuting most of these types

6  of transactions, so there is actually no regulatory risk to the

7  banks, which is very important, your Honor.  Again, the Court

8  has already acknowledged that and has told the jury that, which

9  I think is exactly right.

10          THE COURT:  That's a clever point.  You get one for

11  that.  I'll think about that one.

12          MR. BURCK:  Your Honor, one other point is that they

13  are also -- I am not sure we are going to be able to get this

14  in evidence.  Completely understood.  But the cannabis business

15  is a obviously a rapidly growing business, huge business, and

16  these banks, they want to be part of that business if and when

17  it is ever legalized.

18          THE COURT:  You think you are going to get that?

19          MR. BURCK:  That's why I said I don't think I am going

20  to get there.

21          THE COURT:  You've answered my questions.  I'm still a

22  little skeptical, but you have at least crossed the threshold

23  of conceivable relevance.  That's all you need at the moment.

24          Let me ask you one other thing.

25          MR. BURCK:  Sure, your Honor.

DJA1509

1210

L3BMWEI2                    Clow - Cross

1     THE COURT:  If I recall, there are subpoenas out for

2  the testimony, I can't remember which of the defendants served

3  the subpoenas, but the testimony of two other Bank of America

4  people.  What is it that you can get from them that you can't

5  get from this guy?

6     MR. BURCK:  Your Honor, I am going to consult with my

7  colleagues.  I don't think we are going to enforce those

8  subpoenas.  I don't want to commit to that.

9     THE COURT:  That's what I want to know because if

10  that's the case, I'll let those witnesses know that they can go

11  their merry way.

12     MR. BURCK:  I just want to be able to talk to people

13  to make sure that I know what's going on.

14     THE COURT:  OK.  Very good.

15     You want to consult right now?

16     MR. BURCK:  Your Honor, I've consulted.  We expect we

17  will not be enforcing those subpoenas.  The only reason why I

18  say expect.  We want to hear the end --

19     THE COURT:  That is perfectly fair.  At the end of the

20  testimony you will let me know.

21     MR. BURCK:  Yes, your Honor.  Thank you.

22     THE COURT:  We will take the remaining five-minute

23  break and resume.

24     (Recess)

25     THE COURT:  Please get the witness, and the jury is on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3BMWEI2                    Clow - Cross

1    their way up.

2           MR. BURCK:  Your Honor, just for your own scheduling

3    purposes, I should be done before the lunch break.

4           THE COURT:  Great.

5           (Jury present)

6           MR. BURCK:  Thank you, your Honor.

7    Q.  Mr. Clow, can you hear me OK?

8    A.  Yes, I can.  Thank you.

9    Q.  Thank you.

10          I just wanted to go back on one topic and then we will

11   move on.

12          You testified about the information that the credit

13   card issuer receives when an authorizer declines a transaction.

14          Do you recall that testimony?

15   A.  Yes.

16   Q.  You testified that descriptor information is not part of

17   what the issuing bank considers or even receives when the

18   authorizer declines a transaction, right?

19   A.  Correct.

20          MS. LA MORTE:  As to Bank of America.

21          MR. BURCK:  Bank of America.  I'm only talking about

22   Bank of America here.

23   Q.  The answer to that is that that was not considered by Bank

24   of America, correct?

25   A.  At the time of authorization, correct.

L3BMWEI2                    Clow – Cross

1    Q.  And also any information about the websites or the URLs of

2    these companies is also not considered or even received by Bank

3    of America at the time of authorization, right?

4    A.  Correct.

5    Q.  In fact, Bank of America makes no effort to determine

6    whether or not a transaction is legal or illegal at the time of

7    the authorization, correct?

8    A.  That's not correct.  We use the information that's

9    available to us, and we trust in the network that they are

10   going to enforce their policies.

11   Q.  You trust the network to determine whether something is

12   legal or illegal?

13   A.  Correct.

14   Q.  You testified earlier that you do not ask the cardholder,

15   when you call them in those circumstances, whether or not they

16   are making a lawful transaction, correct?

17           MS. LA MORTE:  I am going to object, your Honor, under

18   motion in limine No. 3.

19           MR. BURCK:  Your Honor, I think he already testified

20   as to this.

21           MS. LA MORTE:  Understood.  But the government objects

22   to the line of questioning.

23           MR. BURCK:  Ms. La Morte, I can't hear you.

24           THE COURT:  I think the objection as to this specific

25   question has been waived by the objection not having been put

DJA1512

L3BMWEI2                    Clow - Cross

1   when the question was put.

2        MS. LA MORTE:  Understood.

3        THE COURT:  What's the answer?

4   A.  Can you repeat the question, please.

5   Q.  Sure.  The question was, if Bank of America's employees

6   call or when Bank of America's employees call the cardholder in

7   some circumstances to determine if they are using their card,

8   they don't ask, is it a legal or lawful transaction?

9   A.  Correct, we do not.

10  Q.  I want to turn to Government Exhibit 2410, which is in

11  evidence.

12        You recall you testified about this document?

13  A.  Correct.

14  Q.  This is, as you described it, an enterprise policy for Bank

15  of America relating to marijuana-related businesses, right?

16  A.  Correct.

17  Q.  I want to go over some of the language and also some of the

18  other language in it.  Let's start with the first paragraph,

19  policy statements.

20  A.  Yes.

21        MR. BURCK:  Can you highlight the entire first

22  paragraph, Mr. McLeod.  Thank you.

23  Q.  Policy statement.  It says the marijuana-related businesses

24  policy establishes a framework for managing risks in conducting

25  business with clients that are engaged in marijuana-related

DJA1513

1214

L3BMWEI2                    Clow - Cross

1   business activities, right?  That's what it says?

2   A.  Yes.

3   Q.  In this case the clients are clients of Bank of America,

4   right?

5   A.  Yes.

6   Q.  Who are engaged in marijuana-related business activities,

7   right?

8   A.  Yes.

9   Q.  Those are defined as MRBs?

10  A.  Correct.

11  Q.  We talked about a different kind of client or customer a

12  few minutes ago, which were the credit card holders, right?

13  A.  Yes.

14  Q.  Credit card holders are not MRBs, right?

15  A.  Correct.  They are not MRBs.

16  Q.  So this policy is establishing a framework for managing

17  risks and conducting business with clients that are MRBs,

18  right?

19  A.  Correct.

20  Q.  It doesn't say anything about credit card holders, does it?

21  A.  It does not mention credit card holders.

22  Q.  In fact, nothing in this document ever mentions the word

23  credit cards or debit cards, does it?

24  A.  They are not explicitly mentioned, but the payments are

25  called out as an example of what's covered by the policy.

**DJA1514**

L3BMWEI2                    Clow - Cross

1   Q.  What about Visa and MasterCard, are they mentioned in this

2   document?

3   A.  No.

4   Q.  Let's go down to the key definitions.  The second paragraph

5   there:  For purposes of this policy, clients engaged in MRB

6   activities will be designated as one of the following:  Direct

7   marijuana-related businesses, direct MRBs.  I think you

8   testified that these are the types of businesses you will not

9   do business with, right?

10  A.  Correct.

11  Q.  Again, this is not a credit card holder, right?

12  A.  It does say any individual or legal entity.  I think that

13  when we are talking about an enterprise policy, we take the

14  broadest outlook on the applicability of the policy.

15  Q.  So you are testifying now that a credit card holder, a

16  person who has a credit card from Bank of America, is an MRB if

17  they engage in marijuana sales?

18  A.  No.  I'm saying if they directly sold, manufactured,

19  cultivated, etc.

20  Q.  You agree this is a definition?

21  A.  This is a definition.

22  Q.  A definition is of an MRB, correct?

23  A.  That's correct.

24  Q.  It is your testimony that any individual would include a

25  credit card holder as an MRB?

DJA1515

L3BMWEI2                    Clow – Cross

1   A.  No.  That's misstated.  I understand now.  No.

2   Q.  So credit card holders are not MRBs, right?

3   A.  Correct.

4   Q.  Going down to indirect marijuana-related businesses, you

5   testified that these sometimes, under certain circumstances,

6   can be in fact -- you can do business with them, right?

7   A.  Correct.

8   Q.  Again, these are not credit card holders, right?

9   A.  Correct.

10  Q.  So an indirect marijuana-related business is not a credit

11  card holder, right?

12  A.  Correct.

13  Q.  We saw, and you just testified, that this enterprise policy

14  was designed to be a framework for managing relationships with

15  clients who are MRBs or indirect MRBs, correct?

16  A.  Correct.

17  Q.  Didn't say anything about designing policies to deal with

18  credit card holders, did it?

19  A.  It does not.

20  Q.  We looked at the credit card holder agreement, the contract

21  between Bank of America and credit card holders, a few minutes

22  ago, right?

23  A.  Yes.

24  Q.  And we looked at the language in which it says you do not

25  allow illegal transactions, correct?

DJA1516

L3BMWEI2                    Clow – Cross

1   A.  Correct.

2   Q.  In that paragraph it didn't say anything about marijuana,

3   did it?

4   A.  No.  It didn't say anything about lots of other illegal

5   transactions, also.

6   Q.  But it did not say anything about marijuana, right?

7   A.  Correct.

8   Q.  It did say something about Internet gambling?

9   A.  Yes.  As an example.

10          MR. BURCK:  Can you show the witness what I believe is

11  in evidence as Government Exhibit 2423.  Let's start with

12  Government Exhibit 2427.  Sorry, Mr. McLeod.  This is in

13  evidence, your Honor.

14  Q.  You recall you testified about this document on direct

15  examination?

16  A.  Yes.

17  Q.  This was a document that reflected the work that was done

18  to monitor, after transactions have been authorized, to monitor

19  the use of credit cards with potential marijuana distributors,

20  right?

21  A.  It wasn't the use of credit cards.  It was just the

22  merchants themselves, suspected merchants.

23  Q.  Suspected merchants.  So this has nothing to do with credit

24  cards either?

25  A.  No.  What I'm saying is, the credit card and debit card

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3BMWEI2                    Clow - Cross

1    transactions are used to identify the merchants.  But the
2    investigations with the merchants are all that this represents.
3    Q.  Understood.  But this information is drawn from credit card
4    use and debit card use?
5    A.  Correct.
6    Q.  Your team used that information to monitor to see what
7    people are doing with their credit cards, correct?
8    A.  No, we don't.
9    Q.  Tell me what you do.
10   A.  What we do is, we use the data to identify these suspected
11   merchants, and then we report the suspect merchants to the
12   networks.  So we are looking for the networks to enforce the
13   rules that we have with them in our contract and that's really
14   the basis of this list.  The list is around the merchants and
15   their participation on the network.
16   Q.  Could you speak a little bit more into your microphone.
17   I'm having a little time hearing you.
18   A.  Sorry.
19   Q.  Just to break that down, Bank of America has information
20   from its credit card holders and its debit cardholders on their
21   use of credit cards and debit cards, correct?
22   A.  Yes.
23   Q.  And in that information are the merchant names that they
24   have bought goods or services from, correct?
25   A.  Yes.

DJA1518

L3BMWEI2                    Clow - Cross

1  Q.  And from that information Bank of America will do searches

2  to determine whether or not some of these merchants are in fact

3  involved in the cannabis business, correct?

4  A.  Yes.

5  Q.  Then you send that information onto Visa or MasterCard in

6  order for them to determine if these businesses are in fact

7  involved in the cannabis business, right?

8  A.  Correct.

9  Q.  Then they go to the merchant-acquiring banks to tell them

10 if there is -- or seek more information if there is a problem,

11 right?

12 A.  Correct.

13 Q.  Again, this information is drawn from credit card holders'

14 use of their credit cards, right?

15 A.  From their transactions, yes.

16         MR. BURCK:  Would you please, Mr. McLeod, blow up

17 Swiss Cannabis line.  I think it's the sixth from the bottom.

18 Q.  Before I ask you about Swiss Cannabis, I notice -- I should

19 say, the document here, every one of these merchants appears to

20 have the word cannabis or marijuana in them, right?

21 A.  Yes.  In this document, yes.

22 Q.  Those are the two key search words your team uses to

23 monitor for merchants that engage in cannabis sales, right?

24 A.  There are several of them.  It's not an exhaustive list.

25 Q.  What are some of the others?

DJA1519

1220

L3BMWEI2                    Clow - Cross

1   A.  I'm not at liberty to disclose that.  They are considered

2   proprietary to the bank.

3   Q.  Are they versions of cannabis and marijuana?

4   A.  Those are the primary subjects, yes.

5   Q.  But all of these are, in fact, cannabis or marijuana,

6   right?

7   A.  Yes.

8   Q.  So, on the Swiss Cannabis one you testified this was a

9   merchant that actually was allowed to stay in the system, the

10  network, right?

11  A.  That's what Visa determined.

12  Q.  Visa determined that.  You reported it up because you saw

13  the word -- again, I am saying you just for ease, no pun

14  intended -- that Swiss Cannabis, you reported up through the

15  Visa network and Visa determined actually they are OK.

16  A.  Correct.

17  Q.  You testified about the MCC codes that are used, right?

18  A.  Yes.

19  Q.  And you testified that MCC codes are very important to the

20  integrity of the system, right?

21  A.  Yes.

22  Q.  And you testified that there is no MCC code for marijuana,

23  right?

24  A.  Correct.

25  Q.  So you noticed that Swiss Cannabis uses an MCC code called

L3BMWEI2                    Clow – Cross

1    8099.

2          You see that?

3    A.  Yes.

4    Q.  Do you know what 8099 is?

5    A.  Not off the top of my head.

6          MR. BURCK:  Can we show the witness what's in evidence

7    as Akhavan Exhibit 10047).

8    Q.  Sir, that is a MasterCard quick reference booklet merchant

9    edition.  I don't know if you have seen this before.

10         Do you recognize it?

11   A.  I'm generally familiar with them.

12         MR. BURCK:  Let's take that down for a moment.

13   Q.  You are not aware of what 8099 is, correct?

14   A.  Not off the top of my head, no.

15   Q.  But you know it's not marijuana, right?

16   A.  Yes.

17   Q.  Because there is no MCC code for marijuana?

18   A.  Correct.

19   Q.  So in this particular case Swiss Cannabis, even though it's

20   engaged in some kind of marijuana-related business by the Visa

21   standard, did not use an MCC code that says marijuana, right?

22   A.  Correct.

23   Q.  And they weren't terminated from the system, were they?

24   A.  No.

25         MS. LA MORTE:  Object, your Honor, on 403.  I think

L3BMWEI2                    Clow - Cross

1   this is misleading.

2              THE COURT:  You can have redirect to clarify, but I

3   think it's allowable.  Overruled.

4              MR. BURCK:  Thank you, your Honor.

5              We can take that down.

6   Q.  Let's talk about the monitoring that's done after the fact,

7   after the authorizations have occurred, monitoring where you

8   draw information out of the credit card use.  Let's start with

9   Government Exhibit 2423.  You testified about this document.

10  This is actually kind of a summary of the information that we

11  were just looking at and other information you used to monitor

12  transactions after they have occurred, correct?

13  A.  Correct.

14  Q.  And it's called the 2018 year-end high risk transaction

15  monitoring review, right?

16  A.  Yes.

17             MR. BURCK:  Let's turn to page 12.  12 on the bottom

18  of the page.

19  Q.  The marijuana audit results, right.  This was a

20  presentation made by your team or people on your team, more

21  broadly, to stakeholders at Bank of America about what the

22  audit showed for marijuana, right?

23  A.  Correct.

24  Q.  If we turn to the next page -- and you testified about this

25  page as well, right?

DJA1522

L3BMWEI2                    Clow – Cross

1   A.  Correct.

2   Q.  I want to talk a little bit more about some of the numbers

3   that are listed here.  It's in the Q3 2018, Q4 2018.  So the

4   bottom of this slide.

5          Q3 2018 means the third quarter of 2018?

6   A.  Correct.

7   Q.  What months does that cover?

8   A.  That covers July, August, September of 2018.

9   Q.  Q4 2018 is the rest of the year?

10  A.  Correct.

11  Q.  Does this show the information that your team had collected

12  about a potential marijuana dispensary and other business sales

13  using the network at that time?

14  A.  Yes.

15  Q.  And you testified that there are 20 to 30,000 transactions

16  per minute that Bank of America will process?

17  A.  Correct.

18  Q.  That's credit card and debit card?

19  A.  Yes.

20  Q.  So that's, obviously, millions a day?

21  A.  Yes.

22  Q.  And billions over the course of a year?

23  A.  Of transactions, yes.

24  Q.  In Q3 2018, that's for those three months, your team

25  identified 21 total merchants who might be selling marijuana?

DJA1523

L3BMWEI2                    Clow - Cross

1    A.   Correct.

2    Q.   Then it says that there were eight merchants not a

3    dispensary base on internal research, meaning that eight of

4    them you determined were not marijuana sales?

5    A.   Correct.

6    Q.   Then nine were sent to Visa, right?

7    A.   Yes.

8    Q.   Five of them were terminated.  That's because they were

9    determined to be dispensaries or marijuana MRBs?

10   A.   Through Visa's process.

11   Q.   Visa informed you of this, this information that you are

12   reporting.  Two were not a dispensary and two remain under

13   research.  Below that it says four merchants were sent to

14   MasterCard.  Three were terminated.  One was not a dispensary.

15   Right?

16            There are, I think, 21 total merchants reviewed in Q3

17   2018 and eight of those 21 were terminated, is that right?

18   A.   Yes.

19   Q.   Now, let's look at Q4 2018.  In Q4 about half the number

20   that were identified in Q3 were identified.  That's ten.  Ten

21   merchants total, right?

22   A.   Correct.

23   Q.   Nine merchants not a dispensary based on internal research,

24   meaning the research that your team had done.

25   A.   Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1524

1225

L3BMWEI2                    Clow - Cross

1   Q.  That's like Google searches, things like that, right?

2   A.  Yeah.

3   Q.  Then one merchant was sent a Visa and Visa determined not a

4   dispensary, right?

5   A.  Correct.

6   Q.  So zero for ten, zero for ten were terminated for being

7   marijuana-related businesses in Q4 2018, isn't that right?

8   A.  Correct.

9   Q.  Let's go to the next, which is Government Exhibit 2425.

10  This was the following year, 2019, semiannual high risk

11  transaction monitoring review?

12  A.  Yes.

13  Q.  The following year.  Same process that we just talked

14  about?

15  A.  Correct.

16  Q.  Same kind of document?

17  A.  Correct.

18  Q.  Let's go to page 12 in the document first, marijuana audit

19  results.  Same thing as last time, last document we looked at.

20  It's going to show the results?

21  A.  Yes.

22  Q.  Let's go to the next page, page 13.  Let's go to the bottom

23  half of the page again.

24          This is now Q1 2019 and Q2 2019, right?

25  A.  Correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1525

L3BMWEI2                    Clow - Cross

1   Q.  These are the months immediately after the months we just

2   looked at, right?  Q1 2019 is January, February, March, right?

3   A.  Yes.

4   Q.  Of 2019?

5   A.  Yes.

6   Q.  Q2 is April, May, June of 2019?

7   A.  Yes.

8   Q.  First total audit results.  Merchant name audit.  Sixteen

9   merchants reviewed.  So a total of 16 potential merchants that

10  you discovered that might be marijuana dispensaries or

11  cannabis-related businesses?

12  A.  Yup.

13  Q.  Fifteen merchants not a dispensary, based on internal

14  research.  So that was the work that your team did and decided

15  in fact they were not dispensaries?

16  A.  Correct.

17  Q.  One merchant sent to MasterCard, confirmed not a

18  dispensary, right?

19  A.  Yes.

20  Q.  Then there is something, audit found no transactions at

21  dispensaries.  That's blacked out, but this seems to say that

22  zero of 16 merchants were terminated from the system in Q1

23  2019.

24  A.  Zero that we reported.  That doesn't mean that the networks

25  didn't terminate others.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1526

L3BMWEI2                    Clow - Cross

1   Q.  I'm asking you about what you did, not what other people

2   did.

3           Did Bank of America terminate, based on this process,

4   any merchants in the Q1 2019?

5   A.  We can't terminate the merchants, but none that we reported

6   were terminated.

7   Q.  So anyone that you reported, were any of them terminated by

8   the network in Q1 2019?

9   A.  No.

10  Q.  Zero, right?

11          Q2 2019.  Merchant name audit.  Twelve merchants

12  reviewed.  Again, ten merchants were identified by your process

13  as potential cannabis or marijuana-related businesses, right?

14  A.  Correct.

15  Q.  Ten merchants not a dispensary based on internal research.

16  Again, your team found ten, decided they were not?

17  A.  Correct.

18  Q.  And two were sent to Visa and determined not a dispensary?

19  A.  Correct.

20  Q.  In Q2 2019, of the 12 that your team reported into the

21  network, zero were terminated, right?

22  A.  Correct.

23  Q.  So between Q2 2019, Q1 2019, and Q4 2018, there were zero

24  merchants who were terminated based on the work that your team

25  did to identify potential cannabis and marijuana businesses,

DJA1527

L3BMWEI2                          Clow – Cross

1   right?

2   A.  Correct.

3            THE COURT:  You can't terminate, correct?  You can

4   only refer it to Visa or MasterCard or whoever to terminate it.

5            THE WITNESS:  That's correct.  We can only identify

6   the list of suspected merchants.

7            THE COURT:  When you make that reference, do you make

8   a recommendation one way or the other or do you simply say here

9   is what we have learned?

10           THE WITNESS:  We simply identify them.  We can't make

11  a recommendation.

12           THE COURT:  The decision making there is made by Visa

13  and MasterCard, not by Bank of America?

14           THE WITNESS:  100 percent, yes.

15  Q.  Just to follow up on a couple of the judge's questions, you

16  relied on Visa and MasterCard to make the determination as to

17  whether or not a merchant should be terminated, right?

18  A.  Correct.

19  Q.  And your agreement with Visa and MasterCard is they are the

20  ones who are going to make that decision, based on the

21  information they have, correct?

22  A.  They have to enforce their rules.

23  Q.  I'm sorry.  Can you please --

24  A.  Visa and MasterCard have to enforce their rules, so whether

25  it's them that terminates it or their acquiring bank, because

DJA1528

L3BMWEI2                    Clow - Cross

1    the network shows them illegal transactions, there could be a

2    nuance if it's the network or the acquiring bank, is my point.

3    Q.   But, again, as the judge asked you, it's Visa, MasterCard

4    that will make that determination based on your sending

5    information to them, correct?

6    A.   Correct.

7    Q.   Then they do their own work?

8    A.   Yes.

9    Q.   Again, Visa and MasterCard apparently -- I guess both did

10   not recommend any terminations, as far as you know, in those

11   three quarters, for three quarters of the year?

12   A.   For the merchants we reported.

13   Q.   You didn't report any others, as far as you know, right?

14   A.   Not to my knowledge.

15        MR. BURCK:  I'd like to show the witness only, I don't

16   believe these are in evidence, Government Exhibit 2421.

17   Q.   Do you recognize this?

18   A.   Yes.

19   Q.   What is it?

20   A.   This is a list of transactions that were identified during

21   our search.

22        MR. BURCK:  Your Honor, we would offer Government

23   Exhibit 2421.

24        MS. LA MORTE:  No objection.

25        (Government Exhibit 2421 received in evidence)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1529

L3BMWEI2                    Clow - Cross

1   Q.  This is information that was acquired by your monitoring

2   team?

3   A.  Correct.

4   Q.  And you will see the highlighted section, merchant name.

5   Auto Flowering Cannabis, SQ Cannabis card, Orla, SQ Cannabis

6   with Love, SQ Marijuana Therapeu.

7   A.  Yes.

8   Q.  That's the merchant name, right?

9   A.  Yes.

10  Q.  Then you have the location:  San Francisco, Orlando,

11  Shreveport, Coral Gables.

12  A.  Yes.

13  Q.  Merchant country code?

14  A.  Yes.

15  Q.  That's the currently it's located, right?

16  A.  Correct.

17  Q.  Now, nothing in here shows the descriptor information,

18  right.

19  A.  Correct.

20  Q.  You testified there is a search process that's done by Bank

21  of America after the transaction has been authorized to see if

22  there are any cannabis businesses that have been part of the

23  network, right?

24  A.  Correct.

25  Q.  You testified about two of those terms, which are cannabis

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1530

L3BMWEI2                    Clow – Cross

1  and marijuana, right?  There were others that you didn't want

2  to testify to because they are proprietary information.  Fine.

3  But you run those against the merchant name, right?

4  A.  Correct.

5  Q.  You don't run them against the descriptor information,

6  right?

7  A.  Correct.

8  Q.  You receive the descriptor information, isn't that right?

9  A.  Yes.

10 Q.  And you in fact send that on to the cardholder in a

11 statement at the end of the month, right?

12 A.  Yes.

13 Q.  But you don't search the descriptor information, right?

14         MS. LA MORTE:  Objection, your Honor.  Again, I am

15 going to go to motion *in limine* No. 3.

16         MR. BURCK:  Your Honor, I can probably clarify it so

17 motion *in limine* No. 3 doesn't become an issue.

18 Q.  Your team has made a decision about what information it

19 wants to use to do its searches, correct?

20         MS. LA MORTE:  Same objection.

21         THE COURT:  I am going to have to refresh my own

22 recollection about motion *in limine* No. 3.

23         MR. BURCK:  Your Honor, if you are inclined to

24 sustain, I would ask for a sidebar on this one.

25         THE COURT:  Just give me a minute.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1531

L3BMWEI2                    Clow – Cross

1       MR. BURCK:  Sure, your Honor.

2       THE COURT:  I have now refreshed my recollection.  The

3    objection is denied.

4       MR. BURCK:  Thank you, your Honor.

5  Q.  Let me repeat briefly, succinctly, your team makes a

6    decision about the information it wants or needs to determine

7    if a cannabis merchant is in the system, right?

8  A.  Correct.

9  Q.  It's a conscious decision, right?

10  A.  Well, it is a conscious decision about which words we

11    choose and what we search for, yes.

12  Q.  You testified that you have the descriptor information,

13    right?

14  A.  Yes.

15  Q.  And you testified earlier that the descriptor information

16    contains more information than just the merchant name, correct?

17  A.  It can if it's valid.  A lot of times the descriptor isn't

18    that valuable.

19  Q.  Understood.  What about the merchant name?  Is the merchant

20    name always accurate?

21  A.  The merchant name is always supposed to be accurate, yes.

22  Q.  What does a merchant name tell you about the merchant?

23  A.  It just tells them who they are doing business as, tells

24    them who they are.

25  Q.  You are familiar with, for example, Amazon, correct?

DJA1532

1233

L3BMWEI2                    Clow - Cross

1   A.  Yes.

2   Q.  Amazon's name -- obviously, we all know what Amazon is,

3   right?

4   A.  Correct.

5   Q.  But Amazon's name doesn't tell you anything about the

6   business, does it?

7   A.  Correct.

8   Q.  If there was a company that is not as famous as Amazon, its

9   name wouldn't necessarily tell you anything about what the

10  business is, right?

11  A.  That's right.

12  Q.  There is no requirement that you're aware of that merchant

13  names reflect the business they are in, right?

14  A.  Correct.

15  Q.  Like Google doesn't mean anything, right?

16  A.  I think Google means something.

17  Q.  Does Google say search engine in the title?

18  A.  No.

19  Q.  Apple.  Do they sell apples?

20  A.  No.

21  Q.  We know what they are, right?

22  A.  Yes.

23  Q.  Then there are companies that are not as famous as those

24  companies, right?  Those companies also have names that don't

25  necessarily reflect the business they are in, right?

DJA1533

1234

L3BMWEI2                         Clow - Cross

1    A.   Correct.

2    Q.   And there is no requirement they do, right?

3    A.   Correct.

4    Q.   And the descriptors do contain more information than the

5    merchant name, right?

6    A.   Correct.

7    Q.   And your team has made a conscious decision not to check

8    the descriptor information when they do their monitoring,

9    correct?

10            MS. LA MORTE:  Objection.  Same motion *in limine*.

11            THE COURT:  I will explain at the next break why I'm

12   overruling that objection.

13            You may answer that question.

14   Q.   I'm sorry.  I'll repeat it.  Your team made a conscious

15   decision not to check descriptor information as part of its

16   process of monitoring for whether or not the cannabis

17   businesses are being used in network.

18   A.   Correct.

19            THE COURT:  Why?

20            THE WITNESS:  Two reasons.  One, the descriptor

21   information isn't structured and it's very hard to search at

22   the scale of the data that we have in our environment and, two,

23   the accuracy of the descriptor data is not as clear and concise

24   or understandable as other key indicators, like the name and

25   the MCC code.

DJA1534

L3BMWEI2                    Clow - Cross

1   Q.  Just following the judge's question and your answer, in

2   most cases or in all cases the descriptor contains the merchant

3   name, doesn't it?

4   A.  Yes.

5   Q.  You just testified that the descriptor information is less

6   reliable than the merchant name?

7   A.  I said that the data that we get in the transaction can be

8   unreliable in both of those things.

9   Q.  That's a little different than what you testified to.  Let

10  me ask you --

11          THE COURT:  Counsel.

12          MR. BURCK:  Sorry, your Honor.  I'm having a little

13  bit of trouble hearing him, your Honor.

14          THE COURT:  That wasn't the thrust of your comment.

15          MR. BURCK:  You are right, your Honor.  I'm sorry.

16  Q.  Mr. Clow, you testified that your team checks the merchant

17  name, right?

18  A.  We search against the merchant name.

19  Q.  And the merchant name your team believes to be a

20  potentially reliable source of information, right?

21  A.  Right.  As reliable as it is for authorizing the

22  transaction.

23  Q.  Understood.

24          The merchant name is included in the descriptor

25  information, right?

1236

L3BMWEI2                        Clow - Cross

1   A.  Yes.  It's also in the descriptor.

2   Q.  And the descriptor has additional information, too,

3   correct?

4   A.  It can, yes.

5   Q.  So the merchant name, which you think your team says is

6   reliable, is in the descriptor information, right?

7   A.  Yes.

8   Q.  Yet, you don't check the descriptor information, right?

9   A.  Correct.

10  Q.  Again, you do send that information, the descriptor

11  information, on to the cardholder at the end of the month,

12  right?

13  A.  Yes.

14          MR. BURCK:  I want to show -- I don't believe this is

15  in evidence -- Government Exhibit 2426, just for the witness.

16  Q.  Do you recognize this?

17  A.  Yes.

18  Q.  What is this?

19  A.  This is a list of the suspected merchants.

20  Q.  Understood.

21          MR. BURCK:  Your Honor, we would offer government

22  Exhibit 2426.

23          MS. LA MORTE:  No objection.

24          THE COURT:  Received.

25          (Government Exhibit 2426 received in evidence)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1536

1237

L3BMWEI2                    Clow – Cross

1    Q.  This is, again, some information that was pulled by your

2    team for the summary purposes we talked about earlier, the

3    monitoring purposes?

4    A.  Correct.

5    Q.  You'll see a list of information:  State, merchant,

6    address, right?

7    A.  Correct.

8    Q.  Then you'll see some notes at the end:  Could not find in

9    merchant master list, etc., right?

10   A.  Correct.

11   Q.  As far as you recall, do you know if these merchants were

12   terminated from the system?

13   A.  I don't recall.

14   Q.  You don't recall.

15        Is there anything on this document that suggests they

16   were?

17   A.  No.  But some of these had multiple columns that go beyond.

18   Q.  Let me ask you, when you look at this information, it has

19   the state and then the merchants, for example, the first one,

20   the Herbal Cache?

21   A.  Yes.

22   Q.  Then it has an address, right?

23   A.  Yes.

24   Q.  It doesn't say cannabis or marijuana in it, right?

25   A.  That's correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1537

1238

L3BMWEI2                    Clow - Cross

1   Q.  The one blow it, Jet Room?

2   A.  Correct.

3   Q.  Then Green Dragon?

4   A.  Yup.

5   Q.  There is one that says Caroline's Cannabis, right?

6   A.  Yes.

7   Q.  And there is one a couple down, Southern Vermont Wellness?

8   A.  Yes.

9           MR. BURCK:  And then you go to the next page, please.

10  Q.  A couple of examples.  Again, these are all companies that

11  were at least suspected of potentially being cannabis related,

12  right?

13  A.  Yes.

14  Q.  That's why they are on this list?

15  A.  Yes.

16  Q.  And you have a lot of different companies in here, right?

17  A.  Yes.

18  Q.  And I'm not going to ask you to read them all because it

19  would take way too long, but there is nothing in here that says

20  cannabis or marijuana.  There are a couple that say canna,

21  right?

22  A.  Yup.

23  Q.  We looked at the number of companies that were terminated

24  in this time frame, right?

25  A.  Correct.

DJA1538

L3BMWEI2                     Clow - Cross

1  Q.  I think it was eight total in the course of a year?  They

2  are all in the Q --

3  A.  These have a long range on the audit, but I'll say, in

4  principle, in that timeline there were very few.

5  Q.  When your team is looking at this information, again, all

6  they are seeing is the merchant name, right, and the state and

7  the address?

8  A.  This is a summary, but yes.

9  Q.  But they can search online if they want to?

10  A.  Correct.

11  Q.  Here, for example, it says Big Sur Canna Botanicals.  You

12  will see that sort of toward the top?

13  A.  Yes.

14  Q.  There is the word canna in it, but canna is not a search

15  term.  It may -- it popped up here, but you are not going to

16  know necessarily whether this is a cannabis-related business,

17  right?

18  A.  No, we would not from the name.

19  Q.  There is nothing in here about the descriptor, right?

20  A.  That's on this page, no.

21  Q.  Then you go down:  Takoma Wellness Center, right?

22  A.  Yes.

23  Q.  Again there is nothing in the name that suggests marijuana,

24  right?

25  A.  No.

DJA1539

L3BMWEI2                    Clow – Cross

1          MR. BURCK:  You can take that down.

2     Q.  I am going to show you for identification purposes Akhavan

3     Exhibit 10017.

4          First of all, do you recognize that?

5     A.  Yes.  That's an image of one of our card products.

6          MR. BURCK:  Please show the witness Akhavan Exhibit

7     10018.

8     Q.  Do you recognize that?

9     A.  Yes.  That's another one of our card products.

10         MR. BURCK:  Can you show the witness Akhavan Exhibit

11    10037.

12    Q.  You recognize that?

13    A.  Yes.  That's our newest debit product.

14    Q.  I'm sorry?

15    A.  It's our newest debit product.

16         MR. BURCK:  Your Honor, we would offer Akhavan

17    Exhibits 10017, 10018, and 10037.

18         MS. LA MORTE:  No objection.

19         THE COURT:  Received.

20         (Defendant's Exhibits Akhavan 10017, 10018, and 10037

21    received in evidence)

22         MR. BURCK:  Let's start with 10017 and 10018.  We can

23    put them on together.  Thank you, Mr. McLeod.

24    Q.  These are two Bank of America issued credit cards, one

25    under MasterCard, one under Visa, correct?

DJA1540

1241

L3BMWEI2                    Clow - Cross

1   A.  Correct.

2   Q.  This is what Chris Martin, whoever that might be, probably

3   a fictitious name, these is the cards that he would have,

4   correct?

5   A.  Correct.

6   Q.  And these are the cards that somebody would use to make a

7   purchase either at a store, online, or whatever, right?

8   A.  Correct.

9   Q.  And each of the cards has Bank of America very promptly

10  displayed, right?

11  A.  Yes.

12  Q.  And has MasterCard and Visa very promptly displayed, right?

13  A.  Yes.

14  Q.  I think you testified to, and I think it's in some of the

15  documents that you testified about, that one of the issues that

16  Bank of America is concerned about to be engaging in marijuana

17  sales is brand risk, right?

18  A.  Correct.  Reputational risk.

19  Q.  I'm sorry.  Say that again.

20  A.  Reputational risk.

21  Q.  And the reputational risk relates to the value of the brand

22  of Bank of America, right?

23  A.  Actually, it's just as much of the perception that we are

24  doing -- we are supporting illegal businesses.

25  Q.  Right.  You don't want to be perceived as supporting a

DJA1541

L3BMWEI2                    Clow - Cross

1   marijuana business, right?

2   A.  Correct.  And legally we can't.

3   Q.  Legally you can't, but you also don't want to be?

4   A.  Correct.

5   Q.  Having the Bank of America logo used to make a marijuana

6   purchases is harmful to the reputation of the bank in the

7   bank's view, correct?

8   A.  If we knowingly supported the transaction it would be.

9   Q.  If you don't know about it, it's fine.

10  A.  I'm saying, if we are using our practices and the tools and

11  the contracts we have on our network to authorize the

12  transaction and our card member thinks that it's permissible,

13  it doesn't necessarily put us in a brand risk or reputational

14  risk.

15  Q.  If your cardholder thinks it's permissible, it doesn't put

16  you at risk?

17  A.  Again --

18  Q.  I'm sorry.  Reputational risk.

19  A.  Reputational risk.

20          MR. BURCK:  Can we show the witness Akhavan Exhibit

21  10037.  We can just use either one.  Perfect.  Thank you,

22  Mr. McLeod.

23  Q.  The card on the right is one we just looked at.  It's a

24  credit card?

25  A.  Yes.

DJA1542

L3BMWEI2                    Clow – Cross

1   Q.  And the one on the left is a debit card?

2   A.  Yes.

3   Q.  I think you testified debit cards are somewhat different

4   than credit cards, right?

5   A.  Yes.

6   Q.  The debit card comes from the bank account of the

7   individual who holds the card?

8   A.  Correct.

9   Q.  Or is linked to.  I'm sorry.  Linked to the bank account of

10  the individual that holds the card?

11  A.  That's right.

12  Q.  Then the credit card is an extension of credit by the bank?

13  A.  Yes.

14  Q.  In your testimony it doesn't matter at all whether or not a

15  cardholder uses his or her debit card or credit card to make a

16  marijuana purchase, right?

17  A.  They are both -- correct.  They are both considered

18  illegal.

19  Q.  Both are equally illegal?

20  A.  Correct.

21  Q.  No difference, right?

22  A.  No difference.

23  Q.  So the extension of credit that you do for a credit card

24  doesn't create any additional risk for you versus the debit

25  card, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1543

1244

L3BMWEI2                      Clow - Cross

1    A.  It creates credit risk.

2    Q.  Credit risk.

3    A.  In addition to the legal and reputational risk.

4    Q.  Let me ask you, in the course of the monitoring and the

5    work that you've done to understand if marijuana sales are

6    being done using your cards, have you ever done an analysis of

7    whether or not marijuana purchasers are less creditworthy than

8    others?

9    A.  Not to my knowledge.

10            MS. LA MORTE:  Objection to foundation for that.

11            THE COURT:  Sustained.

12   Q.  You testified, Mr. Clow, that credit risk is an issue for

13   credit cards, correct?

14   A.  Yes.

15   Q.  You have also testified about the fact that the bank does

16   not want its credit cards to be used to make marijuana

17   purchases, correct?

18   A.  Correct.

19   Q.  As far as you are aware, is there any credit risk to making

20   marijuana purchases?

21   A.  Based on what I'm aware of, there is no additional credit

22   risk for marijuana-based transaction than many other types of

23   transactions.

24   Q.  Thank you.

25            MR. BURCK:  You can take those down.

DJA1544

L3BMWEI2                    Clow - Cross

1     I'm sorry, Mr. McLeod.  Keep them up, please.

2  Q.  Mr. Clow, are you aware of a company called Circle Wallet?

3  A.  I am.

4  Q.  What is Circle Wallet?

5  A.  Circle Wallet is -- we would call it a staged wallet.  It's

6  a wallet that allows people to load funds from a bank account

7  or card and then use the credits that they purchase within

8  Circle to buy things at merchants who accept Circle.

9          MR. BURCK:  Your Honor, I'm sorry.  I just got a note

10  that the audio has cut out.  Is that right?

11          MS. LA MORTE:  I believe for the outside line, because

12  I just got a note, too, for whoever is dialing in.

13          MR. BURCK:  As long as the jury can hear me, I'm fine.

14          Sorry, your Honor.  Apologies.

15  Q.  I'm sorry, Mr. Clou.  Could you just repeat the last

16  answer.

17  A.  Sure.  Circle Wallet is an example of what we call a staged

18  wallet where a consumer can load credits onto that wallet using

19  a bank account or a card and then use those credits with

20  merchants who accept Circle as a method of payment.

21  Q.  Now, are you aware that Circle Wallet works with a company

22  called Eaze?

23  A.  I am.

24          MS. LA MORTE:  Objection.  401 and 403.

25          THE COURT:  It breaks my heart, but I think we are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3BMWEI2                    Clow - Cross

1    going to need a sidebar on this one.  Let's go to the sidebar.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1247

L3BMWEI2                    Clow - Cross

1    (At sidebar)

2    THE COURT:  First, so I don't forget, with respect to

3    the objection that was raised under motion *in limine* No. 3,

4    that motion was directed at whether the banks had acted

5    negligently, and I ruled that that was irrelevant.

6    But the questions that were put where you raised that

7    objection were designed to show that the bank made a conscious

8    decision not to do X or Y or Z., so it's not a matter of

9    negligence.  The implication is that they don't care.  That's

10   why they don't pursue descriptor information or whatever.

11   There are, of course, many arguments going the other way, but

12   it has nothing to do with negligence.  It's a question of

13   conscious decision.  That's why I asked the witness, so that

14   the jury would have a greater basis for evaluating that

15   argument why that was done, and he gave reasons that obviously

16   are different from what the defense is suggesting is the

17   reason, but that's a question for argument.

18   MS. LA MORTE:  For purposes of clarification, because

19   I find the argument to be circular, under the law, negligence

20   is not relevant to materiality.  The way I understand my

21   reading of this, too, is that also encompassed a failure of

22   diligence, and so an argument that a bank always could have

23   done more --

24   THE COURT:  That's not the argument.  Their argument

25   is, as I understand it --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**DJA1547**

L3BMWEI2                         Clow - Cross

1          MR. BURCK:  Your Honor, you are doing it better than I

2    am.

3          THE COURT:  -- is that this was purposeful because

4    they don't want to know and they don't want to terminate and it

5    is all part of this defense of, all they care about is making

6    money.  So the key word in the question he put, was that a

7    conscious decision.  That's different from failure to exercise

8    due diligence or negligence or anything like that.

9          Now, so far the evidence is they have made that

10   conscious decision for two reasons, neither of which support

11   the argument they want to make, but we will see whether they

12   will have enough to make that argument in summation.

13   Nevertheless, we will worry about that in a few days.

14         Now, on this one, let me hear, first, the government's

15   objections.

16         MS. LA MORTE:  The government believes that the Circle

17   evidence is both irrelevant and unfairly prejudicial and

18   misleading, in fact.  The use of a debit card or a credit card

19   to purchase marijuana directly, which is what the Eaze scheme

20   was about, is one thing.  Circle is a completely different

21   animal.  Again, it was post scheme.  I understand your Honor's

22   view on that.  It still may have some relevance there.

23         But as the witness just explained, the way that this

24   works is, you use your debit card, it's only a debit card, and

25   you use that to purchase an electronic wallet.  The witness

L3BMWEI2                    Clow - Cross

1   didn't say this yet.

2          What we know from the arguments is that this is a

3   cryptocurrency that you're purchasing in the wallet.  You use

4   your Bank of America debit card, you purchase things in a

5   wallet, in a cryptowallet, and that wallet can be used to buy

6   anywhere that accepts Circle.  It's different than your use of

7   a credit card directly to purchase a marijuana product.

8          So it's misleading, in the government's view, and not

9   relevant to what's charged in the scheme.

10         THE COURT:  Let me hear from the defense counsel.

11         MR. BURCK:  Your Honor, that's only part of the story.

12         The way that Circle actually works, which I believe

13  this witness will know about -- by the way, he learned of this,

14  based on the 302s, 3500 material, I should say, from the

15  government after we subpoenaed and then the Court issued its

16  ruling.  So he didn't know about Circle until then, apparently.

17         MS. LA MORTE:  He wasn't asked about Circle.  It's

18  different.

19         THE COURT:  For the purpose of my ruling on the

20  immediate objection, it is completely irrelevant.

21         MR. BURCK:  Totally irrelevant, your Honor.  It was a

22  side argument.

23         The core argument is that what Circle does is, Circle

24  will issue a wallet to a credit card or a debit card holder.

25  And if they want to buy $17.75 worth of marijuana, Circle will

L3BMWEI2                    Clow - Cross

1   give them $17.75 in cryptocurrency.  It's not as if there is

2   like an ATM where I take a thousand dollars out and I use it

3   however I want to use it.

4          This is a situation in which this company will say,

5   you buy a wallet from me for $17.75 or 19.99, or whatever, and

6   we will send that off to Eaze to send you marijuana.

7          The other thing, your Honor, which is critical, in the

8   credit card statements, which were received by the account

9   holders every month, it says Circle Wallet Eaze, E-a-z-e, on

10  the credit card statements, as of today, and the bank obviously

11  knows all about Eaze as of today and has for a while, if it

12  didn't know about it before.  It's the most famous --

13         THE COURT:  I do think this is potentially confusing,

14  and I'm reasonably confident that although I've had cases

15  involving cryptocurrency, many of the jurors don't even know

16  what that word means.

17         Why don't you just ask him, are you familiar with a

18  company called Eaze?  Have you heard such and such?  Is that

19  currently known to the bank, as far as you know, and have you

20  done anything about it?  That's what you want to get at.

21         MR. BURCK:  Perfect, your Honor.

22         MS. LA MORTE:  The government doesn't have an

23  objection to that.  But to the extent Circle is being

24  introduced --

25         THE COURT:  I am going to sustain the objection but

DJA1550

1251

L3BMWEI2                    Clow – Cross

1   allow those other questions.

2           I do think that the whole Circle argument, as you

3   point out, I think, for the jury to really fully appreciate it,

4   even with the explanation you gave, would require a very

5   considerable amount of background that would have to be adduced

6   and it would not be worth the candle.  But I will allow those

7   other questions.

8           MR. BURCK:  Your Honor, two brief points.

9           One thing is, Judge, I will do what you said in terms

10  of asking the questions.

11          On the Circle issue, I was just introducing that so

12  that there was some context for the jury as to how this is

13  happening.

14          THE COURT:  It doesn't matter.  It really doesn't

15  matter.  I think it does invite confusion.

16          I should note, this is a total irrelevancy, but I will

17  say it anyway because I've had the pleasure of Mr. Burck now

18  for two trials.  His demeanor is a model of what every trial

19  lawyer's demeanor should be.  I invite all of you to pay

20  attention to that.  He really knows what he's doing except, of

21  course, in this particular case.

22          All right.  Let's go.

23          MR. BURCK:  Your Honor, I should be able to finish

24  before lunch.

25              (Continued on next page)

DJA1551

L3BMWEI2                    Clow - Cross

1              (In open court)

2              MS. LA MORTE:  Will your Honor sustain the objection

3      on the record?

4              THE COURT:  Yes, sure.  The objection is sustained.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3BPWEI3                    Clow – Cross

1   Q.  Mr. Clow, are you familiar with a company called Eaze,

2   E-a-z-e?

3   A.  Yes, I've heard of them.

4   Q.  And you know that they are a marketplace for marijuana

5   sales, correct?

6   A.  Correct.

7   Q.  And they're an online business, correct?

8   A.  Yes.

9   Q.  And you're aware that Eaze was using the Visa network and

10  the MasterCard network to facilitate sales of marijuana, right?

11  A.  I became aware of that recently, yes.

12  Q.  Okay.  And are you aware that Eaze continues to sell

13  marijuana on the MasterCard and Visa network?

14  A.  I'm not aware of if that's still happening today.  I will

15  say we included that in one of our ad hoc reports to the

16  networks several weeks ago.

17  Q.  So you're saying you don't not know whether or not Eaze is

18  part of the Visa network or MasterCard network for selling

19  marijuana?

20  A.  To my knowledge, they weren't a direct merchant on the

21  network.  They worked through a wallet.

22  Q.  They worked through a wallet.  What's a wallet?

23  A.  A wallet, what we --

24          MR. BURCK:  Can I interrupt?  Your Honor, is this fair

25  testimony?

DJA1553

L3BPWEI3                    Clow - Cross

1    MS. LA MORTE:  I was going to object.

2    THE COURT:  I think he invited this and, therefore, I

3    think we have to allow it.

4    MR. BURCK:  Okay.  Thank you, your Honor.

5    BY MR. BURCK:

6    Q.  Please, go ahead.

7    A.  A wallet in the case of Eaze it's Circle.  It's what's

8    considered a staged wallet, where a consumer can use their bank

9    account or their debit card or credit card, in some cases, to

10   load value into the wallet.  So for us, as a bank, we see a

11   transaction that comes from Circle.  And a Circle transaction,

12   MCC code is called a wallet load.  It's a very specific thing.

13   Once the value is on Circle, then the owner of that Circle

14   wallet can shop at different marketplaces that support Circle

15   as a checkout process, and my understanding is Eaze is one of

16   those places.

17   Q.  So Eaze works with Circle, as far as you know?

18   A.  As far as I know.

19   Q.  Just for identification purposes, can I show the witness

20   Akhavan Exhibit 11,009?

21   I'm sure you've never seen this particular document,

22   but do you recognize it?

23   A.  It looks like a transaction detail screen.

24   MR. BURCK:  Your Honor, we would offer --

25   Q.  For Bank of America?

DJA1554

1255

L3BPWEI3                    Clow - Cross

1     MS. LA MORTE:  Objection.

2  A.  For --

3     MS. LA MORTE:  I'm sorry, are you done?  Objection.

4     THE COURT:  Well, it is ironic that after the sidebar,

5  the witness, who of course was not party to that sidebar,

6  opened the door.  But I think he has, to this limited extent.

7     MR. BURCK:  Your Honor, I'm going to show this

8  document, and then I've got three more questions.

9     THE COURT:  All right.  So received.

10     (Defendant's Akhavan Exhibit 11,009 received in

11  evidence)

12     MR. BURCK:  You can publish that to the jury, please.

13  BY MR. BURCK:

14  Q.  So, Mr. Clow, this is a Bank of America statement, correct?

15  A.  Yes.  It's a transaction detail summary, yup.

16  Q.  Got it.  And then it says the date is 11-9-2020?

17  A.  Correct.

18  Q.  And that's November 9th of last year, 2020?

19  A.  Yes.

20  Q.  Amount $226.22, right?

21  A.  Yes.

22  Q.  Debit card, type?

23  A.  Yes.

24  Q.  Purchaser is a gentleman by the name of Daniel Whelan,

25  right?

L3BPWEI3                    Clow - Cross

1   A.  Yes.

2   Q.  And then underneath that description, Circle Wallet star

3   Eaze, 11/07 purchase, London; do you see that?

4   A.  I do.

5   Q.  And then -- and that's the descriptor information, correct?

6   A.  Yes, that's a descriptor.

7   Q.  And then a couple down, there's a merchant category code,

8   6540; do you see that?

9   A.  Yes, I do.

10  Q.  Do you know what that is?

11  A.  Yes, that's a stored value card load or purchase.

12  Q.  Okay.  And then above that it says "merchant category:

13  Stored value card purchase or load," right?

14  A.  Yes.

15  Q.  And that's describing what this merchant does, right?

16  A.  Correct, stored value.

17  Q.  And then below that it says the merchant name is Circle

18  Wallet star Eaze, correct?

19  A.  Yes.

20  Q.  What does the star mean, do you know?

21  A.  Typically --

22  Q.  Or the asterisk.  I'm sorry.  Asterisk or star.

23  A.  So in a merchant name or transaction, typically the first

24  name is the merchant that is facilitating the transaction, and

25  then the star, and the name that would come after it would be a

L3BPWEI3                    Clow - Cross

1   merchant on the marketplace, or however the transaction would

2   be settled between the wallet and the merchant.

3   Q.  Okay.  So based on the information that's here, when it

4   says the merchant category is stored value card purchase, or

5   load, I think you testified that circle wallet, that's their

6   business, stored value card purchase or load?

7   A.  Correct.

8   Q.  And you testified about what you understand Eaze to be,

9   correct?

10  A.  Correct.

11  Q.  Does Eaze do stored value card purchase or load, to your

12  understanding?

13  A.  Not to my knowledge.

14  Q.  And what about the merchant name, Circle Wallet, and it

15  says "Eaze," right?  I'm sorry.  Under merchant name it says

16  "Circle Wallet star Eaze"?

17  A.  Yes.

18  Q.  All right.  Anything on this statement say anything about

19  marijuana?

20  A.  No.

21  Q.  It doesn't say it's the merchant category code?

22  A.  No.

23  Q.  And it doesn't say --

24          THE COURT:  So counsel, you said you had three

25  questions.

L3BPWEI3                      Clow - Cross

1    MR. BURCK:  Your Honor --

2    THE COURT:  I've run out of fingers to count them.

3    MR. BURCK:  Your Honor, I am done with this document.

4    I'm moving on to my last three questions.

5    THE COURT:  All right.

6    MR. BURCK:  Now, maybe five questions, just two to

7    preface.

8    THE COURT:  In all seriousness, I'm going to -- we

9    have three minutes until we give the jury their lunch break.

10   That will conclude your examination.

11   MR. BURCK:  Okay.  Thank you, your Honor.

12   BY MR. BURCK:

13   Q.  So you testified that cardholders are the customers, the

14   clients of the bank with these card transactions, right?

15   A.  Yes.

16   Q.  You have a contract with them, right?

17   A.  Yes.

18   Q.  And you tell them they can't do illegal transactions,

19   right?

20   A.  Yes.

21   Q.  And that includes marijuana sales, correct?

22   A.  We don't tell them that that includes marijuana sales, but

23   marijuana sales is included.

24   Q.  Exactly right.  Thank you.  Has Bank of America terminated

25   a single, a single cardholder's card because they have used

**DJA1558**

L3BPWEI3                    Clow - Cross

1  their cards to buy marijuana, to your knowledge?

2  A.  Not to my knowledge.

3         MR. BURCK:  That's it, your Honor.  Thank you.

4         THE COURT:  Okay.  We'll take our lunch break and then

5  continue with this witness after lunch.  So we'll take an hour

6  for lunch.

7         (Jury not present)

8         THE COURT:  Please be seated.  The witness is excused.

9         (Witness temporarily excused)

10         I received an e-mail last night in which defense

11  counsel kindly brought to my attention that they had probably

12  underestimated their case when they said two days; that

13  depending on my rulings on various other witnesses, it might be

14  as much as three days.  So I think it's important that we get

15  those rulings made.  Most of them regarded, if I recall,

16  experts.  So are those experts all in New York?

17         MR. BURCK:  No, your Honor.  Some are -- we have to

18  bring to New York imminently in order for them to meet the --

19         THE COURT:  All right.  So what I'm thinking is that

20  maybe after we excuse the jury tomorrow afternoon, we might

21  have, if it can be arranged, a hearing where those witnesses

22  could appear by Zoom, and that way, they would know if they're

23  going to have to come or not.

24         But in terms of setting that up, I remind both sides

25  that whenever we have any of the Zoom stuff, it's the

DJA1559

L3BPWEI3                    Clow – Cross

1   responsibility of the party who wants to call a witness to set

2   it up and work with our folks.  We have all sorts of wires

3   ready to be connected, but it's not my responsibility, it's not

4   my law clerk's responsibility.  So why don't you figure out

5   what you want in that regard, and I'm willing to go Friday

6   evening as long as the marshals are willing to have Mr. Akhavan

7   remain here; so....

8           THE DEPUTY CLERK:  Judge, just so you know, we have a

9   proceeding at 4:00 p.m.  It should last to 4:30.

10          THE COURT:  What is that?

11          THE DEPUTY CLERK:  That's in re:  George Washington

12  Bridge, tomorrow.

13          THE COURT:  What's that about?

14          THE DEPUTY CLERK:  It's one of Audrey's cases.  I'll

15  find out.

16          THE COURT:  We may move that.  Why don't you plan at

17  least to have this begin at 4:00, and we'll go as long as we

18  can.

19          MR. BURCK:  Great.  Thank you, your Honor.  We will do

20  that.

21          MS. LA MORTE:  Your Honor, can I ask one clarifying

22  question?  With respect to what happened at the sidebar,

23  victory from the jaws of defeat type of thing, and this witness

24  opening the door, the government's position would be that this

25  is not an issue that's necessarily open for the rest of the

L3BPWEI3                         Clow - Cross

1    trial.  I'm just wondering what the Court's view is on this.

2    This witness opened the door with his testimony, but the

3    government --

4              THE COURT:  No, I think the questioning of this

5    witness was permissible for the reasons given, but the door has

6    not been opened to -- we're not going to hear about Circle and

7    cryptocurrency and all of that.  As I said at the sidebar, I

8    will permit, in a much more limited way, whether any of the

9    banks are still processing, knowingly processing Eaze

10   transactions.  That, I will permit, but not all the mishegoss.

11             MS. LA MORTE:  Mishegoss.  Thank you, your Honor.

12             THE COURT:  Yes.  The reporter has it down as

13   Michigan, but we'll correct that, and some of you will need a

14   translation from your fellow attorneys.

15             Okay.  We see you all in an hour.

16             MR. BURCK:  Your Honor, just one quick thing, and this

17   is really just to put it on your radar on the Circle issue.

18   Per your ruling that allowed us to subpoena documents from

19   Circle, this is how we know a lot of this about Circle.  We

20   have been in touch with Circle's counsel about having a

21   witness, in our affirmative case, from Circle to testify, and

22   we believe it will be very relevant.  And we want to -- again,

23   I'm not asking you to rule on it now, of course.  I just want

24   to make sure that that's on your radar screen.

25             THE COURT:  Okay.  Thank you for reminding me of that,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1262

L3BPWEI3                     Clow - Cross

1    and we'll deal with that when we get to that.

2               MR. BURCK:  Thank you, your Honor.

3               THE COURT:  Okay.

4               (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DJA1562

L3BPWEI3                        Clow – Cross

1    A F T E R N O O N   S E S S I O N

2                         1:47 P.M.

3           (In open court; jury not present)

4           THE COURT:  Please be seated.  The jury is on their

5    way up.  Please bring the witness up.

6           MR. BURCK:  Judge, I just want to note that

7    Mr. Akhavan is not here.

8           THE COURT:  Oh.

9           (Pause)

10          Okay.  So Mr. Akhavan is here now.

11          THE LAW CLERK:  Jury entering the courtroom.

12          (Jury present)

13          THE COURT:  Please be seated.  Counsel?

14          MR. GILBERT:  Thank you, your Honor.

15   CROSS-EXAMINATION

16   BY MR. GILBERT:

17   Q.  Good afternoon, Mr. Clow.  My name is Michael Gilbert.  I

18   represent Ruben Weigand in this case.  How are you?

19   A.  Good afternoon.

20   Q.  Mr. Clow, you were asked, I believe it was the last

21   question you were asked, on cross-examination whether there's

22   been any circumstances you're aware of in which Bank of America

23   terminated a cardholder because Bank of America determined that

24   cardholder had used the card to buy marijuana.  Do you recall

25   that question?

DJA1563

L3BPWEI3                    Clow - Cross

1    A.  Yes.

2    Q.  And your answer, sir, was that you're not aware of a single

3    situation where Bank of America has ever terminated a

4    cardholder based on a conclusion that that cardholder used the

5    card to buy marijuana, correct?

6    A.  That's my understanding.

7    Q.  And in fact, there have been circumstances, and you

8    testified today about them, where Bank of America has

9    determined that there were cardholders who were using a Bank of

10   America card to buy marijuana, correct?

11   A.  No.  I said that we have identified suspected merchants

12   where purchases took place.

13   Q.  So the process that Bank of America undertook, determined

14   that there had been cardholders who made purchases at merchants

15   such as Swiss Cannabis was one of them that we talked about,

16   correct?

17   A.  Correct.

18   Q.  And the process determined that there had been Bank of

19   America cardholders who made purchases at merchants named

20   Cannabis Consumers, correct?

21   A.  I can't recall that specific merchant.

22   Q.  Fair enough.  I'll help you.

23        If we could please, Mr. McLeod, show in evidence

24   Government Exhibit 2427.

25        Do you recall this exhibit, Mr. Clow?

L3BPWEI3                    Clow - Cross

1   A.  Yes.  Thank you.

2   Q.  You're welcome.  So you see there's a list of various

3   merchants in the column Merchant Name, and take a look?

4   A.  Yes.

5   Q.  If you'd like -- can we agree that they all appear to have

6   the word "cannabis" or "marijuana" in them?

7   A.  Yes.

8   Q.  And so the process that Bank of America undertook was to

9   determine that all of those merchants had been on the Bank of

10  America system, correct?

11  A.  No, those are transactions.  They're not necessarily -- so

12  it's data on our system.

13  Q.  It was data on the Bank of America system to indicate that

14  a Bank of America cardholder had made a purchase at all of the

15  merchants that are listed on this list, correct?

16  A.  That is correct.

17  Q.  And at the time that determination was made, that

18  transaction with the merchants on this list had taken place

19  several months earlier, correct?

20  A.  Correct.

21  Q.  And once Bank of America made the determination that there

22  had been purchases at the merchants reflected on Government

23  Exhibit 2427, Bank of America made a conscious decision not to

24  shut down that cardholder's account, correct?

25  A.  Correct.

1266

L3BPWEI3                      Clow - Cross

1   Q.  And did Bank of America take any steps to determine -- to

2   prevent that same cardholder from engaging in other

3   transactions that might be related to marijuana going forward?

4   A.  No.

5   Q.  So as of the time Government Exhibit 2427 was prepared,

6   Bank of America had actual knowledge that its cardholders had

7   made purchases at these merchants all including the name

8   "cannabis" or "marijuana," correct?

9   A.  Correct.

10  Q.  And at that point, then, had reason, you would agree, to

11  conclude that the cardholders who had made the purchases

12  reflected in Government 2427 would use the card again to buy

13  more marijuana, correct?

14  A.  I don't know that.

15  Q.  There's no way for you to know for sure, but would you

16  agree that that's a reasonable inference, that if a Bank of

17  America cardholder uses the card to buy marijuana on Monday,

18  that they may well look to buy marijuana again on Wednesday?

19          MS. LA MORTE:  Objection.

20          THE COURT:  Sustained.

21  Q.  Does Bank of America, to your knowledge, do anything to

22  increase its surveillance of the use of a card by a Bank of

23  America cardholder after it's been determined that that card

24  has been used to engage in a marijuana transaction?

25          MS. LA MORTE:  Objection.

L3BPWEI3                    Clow - Cross

1    THE COURT:  Sustained.

2    Q.  The transactions at the merchants listed on Government

3    Exhibit 2427 would have been, to your knowledge, reflected in

4    the monthly account statement for the Bank of America

5    cardholder, correct?

6    A.  Correct.

7    Q.  And the amounts of those transactions would have been

8    included in the determination of what interest payment was due

9    in any particular month, correct?

10   A.  The determination of the interest isn't a part of the

11   calculation for the month the transaction takes place.  It

12   would only take place in a month that they had not paid the

13   balance due.

14   Q.  So if a cardholder made a purchase at Auto Flowering

15   Cannabis in July of 2018, for example, that transaction would

16   be reflected in that month's statement for that cardholder?

17   A.  Correct.

18   Q.  And if that cardholder didn't make their payment on time,

19   then in the next month, interest would be charged by the bank

20   on the transaction that that cardholder made at that merchant,

21   correct?

22   A.  Correct.

23   Q.  And thereby, the Bank of America would have been collecting

24   interest on a transaction for marijuana, correct?

25   A.  Correct.

DJA1567

1268

L3BPWEI3                    Clow - Cross

1   Q.  Looking at Government Exhibit 2427, let me refer your

2   attention to a transaction at the top of the first page,

3   October of -- October the 5th of 2018.

4   A.  Okay, yes.

5   Q.  Do you see the merchant name that's listed there is

6   Cannabis Store Sanremo and the open date is October 5th, 2018,

7   correct?

8   A.  Yes.

9   Q.  And there's -- in the following column it says MCC 5499; do

10  you see that?

11  A.  I do.

12  Q.  Do you know what 5499 is?

13  A.  Not off the top of my head.

14  Q.  And this was a transaction, I believe -- well, withdrawn.

15  This was a transaction, according to the notes, that was

16  determined to be compliant because it was in Italy, where the

17  marijuana was legal; is that fair?

18  A.  That's what the notes say, yes.

19  Q.  And that transaction was processed under the code 5499,

20  correct?

21  A.  Correct.

22  Q.  And I think we've established that there is no code for

23  marijuana.  The code that was used here is 5499, which, to your

24  knowledge, is not a marijuana-specific code, correct?

25  A.  Correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1568

L3BPWEI3                    Clow – Cross

1   Q.  And if you go down two transactions below, it's also on

2   October 5th, 2018, and it says Cannabis Ischia, I believe, is

3   the merchant name.  Do you see that transaction?

4   A.  Yes.

5   Q.  And this transaction, too, the notes column appears to

6   reflect the same conclusion about the lawfulness of it in

7   Italy; is that fair?

8   A.  Yes.

9   Q.  And this transaction was coded 5411.  Do you know what that

10  one is for?

11  A.  Not off the top of my head.

12  Q.  And I believe Mr. Burck asked you about this one earlier,

13  but if you go down a little bit further in the page, there's

14  one also on October 5th of 2018 from Swiss Cannabis?

15  A.  Yes.

16  Q.  Do you see that one?

17  A.  Yes.

18  Q.  And that one, I believe you testified, was also deemed to

19  be a lawful marijuana transaction, correct?

20  A.  Correct.  It was deemed by the network, yes.

21  Q.  And it was coded 8099, and that one I think you knew what

22  the code was for?

23          MS. LA MORTE:  Objection.  I don't think that's

24  correct.

25  A.  I don't recall what 8099 is.  I know the wallet load.  I'm

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1569

L3BPWEI3                    Clow – Cross

1   not sure what the 8099 is.

2   Q.  But you do see that you've now looked at three transactions

3   involving lawful marijuana and there are three different MCC

4   codes connected to those transactions, correct?

5   A.  Correct.

6   Q.  And these transactions were all flagged by Bank of America

7   to be reviewed by Visa, correct?

8   A.  Correct.

9   Q.  And Visa determined that these were proper transactions,

10  correct?

11  A.  Correct.

12  Q.  Now, are you familiar, from your work at the bank, with ACH

13  transactions?

14  A.  Generally familiar, yes.

15  Q.  What are ACH transactions?

16  A.  ACH stands for automatic clearing house, and that's the way

17  that items like checks and account-to-account transfers are

18  managed in the United States.

19  Q.  So is it a way -- is it a direct connection -- well,

20  withdrawn.

21          If a holder of a Bank of America account engages in an

22  ACH transaction through a merchant, how does that work?

23          MS. LA MORTE:  Objection, your Honor.  401, 403, with

24  respect to ACH transactions.

25          THE COURT:  Sustained.

DJA1570

L3BPWEI3                    Clow – Cross

1   Q.  You testified that you're familiar with Eaze, correct?

2   A.  Yes.

3   Q.  Are you aware that Eaze permits its customers to engage in

4   ACH transactions?

5            MS. LA MORTE:  Objection, your Honor.

6            THE COURT:  Sustained.

7   Q.  I'd like to show the witness Weigand Exhibit 2601 in

8   evidence, and that's in evidence so you can display it.  Thank

9   you, Mr. McLeod.

10           Mr. Clow, the exhibit that's before you, sir, has the

11  word "Eaze" on top of it; is that correct?  And then it says:

12  "Select your bank"?

13  A.  Yes.

14  Q.  And then it's got a number of logos beneath it for various

15  institutions, including the Bank of America; do you see that?

16  A.  Yes.

17  Q.  And looking at this, do you have an understanding of how

18  this website is utilized in connection with the Bank of

19  America?

20           MS. LA MORTE:  Objection.

21           THE COURT:  Sustained.

22  Q.  Do you have an understanding of what this exhibit reflects?

23           MS. LA MORTE:  Objection.

24           THE COURT:  Sustained.

25  Q.  We can take it down, Mr. McLeod, thank you.

DJA1571

1272

L3BPWEI3                    Clow - Cross

1   And you were asked a number of questions on both

2   direct and on cross-examination about the authorization

3   process; do you recall that?

4   A.  Yes.

5   Q.  And I believe you testified that the bank's decision

6   whether or not to authorize a transaction is made in a matter

7   of seconds?

8   A.  Typically less than a second.

9   Q.  But is it the case that Bank of America regularly declines

10  transactions based on information it learns in that second?

11  A.  Typically, we do decline a small percentage of

12  transactions.

13  Q.  And one of the reasons Bank of America might decline a

14  transaction is because the cardholder hasn't paid the bill; is

15  that fair?

16  A.  Typically not paying a bill wouldn't, in and of itself, be

17  a reason why we declined the transaction.  If the account is in

18  good standing, then we would authorize the transaction in most

19  cases.

20  Q.  Would Bank of America decline a transaction if a cardholder

21  had exceeded their credit limit?

22  A.  Yes.

23  Q.  In a debit card transaction, would the Bank of America

24  have -- does the Bank of America regularly decline transactions

25  if a cardholder is seeking to withdraw more funds than are

DJA1572

L3BPWEI3                    Clow - Cross

1   available in the account?

2   A.  Yes.

3   Q.  And Bank of America can make that determination in a matter

4   of less than a second, correct?

5   A.  Correct.

6   Q.  And you'd agree that it's important to the bank's business

7   that it not approve a transaction for a cardholder who doesn't

8   have enough money in the account, correct?

9   A.  Yes.

10  Q.  Or has gone above their credit limit, correct?

11  A.  Yes.

12  Q.  And so the bank has made a conscious decision to set up a

13  system to capture those situations and decline those

14  transactions, correct?

15  A.  Correct.

16  Q.  Now, I believe you've testified that in the circumstances

17  where Bank of America determines that a transaction might have

18  been with a merchant selling marijuana, what Bank of America

19  does is refer that to Visa or MasterCard, correct?

20  A.  Correct.

21  Q.  And as far as you're aware, that is the extent of what Bank

22  of America does, correct?

23  A.  Well, we follow up with the networks and make sure the

24  investigation is completed, but yes.

25  Q.  And Bank of America doesn't report it to the government,

DJA1573

L3BPWEI3                        Clow – Redirect

1  correct?

2  A.  No, we do not.

3  Q.  Nor has Bank of America ever reported concerns about Eaze

4  to the government, as far as you know, correct?

5  A.  Not to my knowledge.

6          MR. GILBERT:  Just one moment, your Honor.

7          (Pause)

8          Thank you very much.  No further questions at this

9  time.

10         THE COURT:  All right.  Redirect?

11         MS. LA MORTE:  Yes, your Honor.

12  REDIRECT EXAMINATION

13  BY MS. LA MORTE:

14  Q.  Good afternoon, Mr. Clow.

15  A.  Good afternoon.

16  Q.  Mr. Levine, can we put up Government Exhibit 2426 in

17  evidence.

18         Mr. Clow, do you recall testifying about this document

19  in cross-examination?

20  A.  Yes.

21  Q.  Just briefly remind us what it is?

22  A.  This is a list of suspected merchants that we identified

23  based upon the transactions for our credit and debit cards.

24  Q.  And on cross-examination you also identified -- you did

25  identify terms like "cannabis" and "marijuana" as key words

L3BPWEI3                    Clow – Redirect

1   that Bank of America would use to search merchant names; is

2   that right?

3   A.   That's correct.

4   Q.   And in some of these names that have been identified

5   suspicious marijuana merchants, "cannabis" or "marijuana" do

6   not appear in the names; is that correct?

7   A.   Correct.

8   Q.   So understanding that Bank of America has a proprietary

9   interest in keeping all of its -- you know, not revealing all

10  of its key word terms, fair to say that there's more than

11  "marijuana" and "cannabis" when Bank of America is doing key

12  word searches?

13  A.   That's correct.  There is also an ad hoc process, where, as

14  I said, in the policy people can identify or report, whether

15  it's an employee or information in a news report, suspected

16  activity.

17  Q.   Do you recall that happening?  Do you recall any occasion,

18  even if you don't recall specifics?

19  A.   Eaze was one that was recently one of those types of

20  incidents.

21  Q.   Okay.  Let's talk about that for a minute.  What can you

22  tell can you tell us about Eaze being one of those types of

23  incidents being reported to Bank of America?

24  A.   There was a significant amount of publicity around Eaze,

25  and we did our investigation.  We identified the Circle Wallet

DJA1575

L3BPWEI3                    Clow – Redirect

1   and Eaze transactions, and we simply reported them to Visa and

2   MasterCard based upon the processes in place.

3   Q.  So Eaze is something that Bank of America did report for

4   further investigation?

5   A.  Yes.

6   Q.  Okay.  So since you mentioned it, there has -- you did talk

7   a little bit on cross-examination about Circle; do you recall

8   that?

9   A.  Yes.

10  Q.  Just briefly remind us your understanding of what Circle

11  is?

12  A.  Circle is what we refer to as a staged wallet.  It's a

13  place where I can take money out of my bank account or credit

14  card, I can put it into that staged wallet, and then I can buy

15  things wherever that wallet is accepted.

16  Q.  Okay.  So taking a step -- let's take a step back for a

17  minute.  We talked a lot about, on direct examination, about

18  how credit -- how typical credit and debit transactions are

19  processed.  Do you recall that?

20  A.  Yes.

21  Q.  And we talked about the flow of funds with respect to those

22  ordinary credit and debit transactions; is that right?

23  A.  Yes.

24  Q.  And you testified in substance that with respect to

25  settling such transactions, there are Bank of America accounts,

DJA1576

1277

L3BPWEI3                    Clow – Redirect

1   and money is leaving those Bank of America accounts for the

2   settlement process of a credit and debit transaction; is that

3   right?

4   A.   Correct.

5   Q.   Now, and we also talked a lot about, on direct and cross,

6   Bank of America's marijuana-related businesses policy?

7   A.   Yes.

8   Q.   Do you recall that?

9   A.   Yes.

10  Q.   And you talked about a few examples of things that would

11  violate that policy and things that might be permitted under

12  the policy; is that right?

13  A.   Yes.

14  Q.   Now, Mr. Clow, if a Bank of America customer uses a debit

15  card to withdraw cash from an ATM and then goes into a

16  marijuana dispensary and uses their cash to purchase a

17  marijuana product, does that violate Bank of America's

18  marijuana-related business policy?

19  A.   No.

20  Q.   And with respect to the wallet transactions that we're

21  talking about, Circle being an example, I believe you said that

22  the customer uses their debit card to put onto a wallet, right?

23  A.   Correct.

24  Q.   And then they can use those funds at anyplace where the

25  wallet is accepted, right?