# 21-1678-cr(L),
## 21-1708-cr(CON), 21-2214-cr(CON), 21-2466-cr(XAP)

# United States Court of Appeals
### *for the*
# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

JAMES PATTERSON,

*Defendant,*

RUBEN WEIGAND, AKA Sealed Defendant 1, HAMID AKHAVAN,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX FOR DEFENDANTS-APPELLANTS
### Volume 7 of 12 (Pages DJA1577 to DJA1852)

CHRISTOPHER TAYBACK
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000

WILLIAM A. BURCK
DEREK L. SHAFFER
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000

*Attorneys for Defendant-Appellant Hamid Akhavan*

*(For Continuation of Appearances See Inside Cover)*

IRA P. ROTHKEN
JARED R. SMITH
ROTHKEN LAW FIRM
3 Hamilton Landing, Suite 280
Novato, California 94949
(415) 924-4250

*Attorneys for Defendant-Appellant
Hamid Akhavan*

MICHAEL H. ARTAN, ESQ.
624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017
(213) 688-0370

*Attorneys for Defendant-Appellant
Ruben Weigand, AKA Sealed
Defendant 1*

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... DJA1

Sealed Indictment, dated March 31, 2020 ................. DJA59

Opinion and Order of the Honorable Jed S. Rakoff,
dated August 31, 2020 ........................................... DJA75

Government's Motion *in limine* To Preclude
Defendants' Experts, dated February 16, 2021 ......DJA119.1

    Exhibit A to Government's Motion *in limine* -
    Letter from Christopher Tayback to Christopher
    J. DiMase, Nicholas S. Folly and Tara LaMorte,
    with Enclosure, dated November 3, 2020........... DJA119.34

    Exhibit B to Government's Motion *in limine* -
    Letter from Michael J. Gilbert to Christopher J.
    DiMase, Nicholas S. Folly and Tara LaMorte,
    with Enclosure, dated November 3, 2020........... DJA119.46

    Exhibit C to Government's Motion *in limine* -
    Letter from Michael J. Gilbert to Christopher J.
    DiMase, Nicholas S. Folly and Tara LaMorte,
    with Enclosure, dated December 21, 2020 ......... DJA119.74

    Exhibit D to Government's Motion *in limine* -
    E-mail from Shriram Harid to Christopher J.
    DiMase, Nicholas S. Folly, Tara LaMorte and
    Emily Deininger, dated January 19, 2021........... DJA119.79

Letter Motion, by Third Parties Visa Inc. and Martin
Elliott, for an Order Granting Video Testimony of
Martin Elliott, dated February 17, 2021
(Unredacted version reproduced in
Confidential Appendix) ......................................... DJA120

ii

**Page**

Annexed to Letter Motion -
(i) Subpoena to Martin Elliott, dated
February 17, 2021 ................................................. DJA125

(ii) Subpoena to Visa Inc., dated
February 11, 2021 ................................................. DJA126

(iii) Declaration of Martin Elliott, dated
February 17, 2021
(Unredacted version reproduced in
Confidential Appendix) ......................................... DJA139

Superseding Information, filed on
February 19, 2021 ................................................. DJA141

Memorandum Order of the Honorable Jed S.
Rakoff, dated February 20, 2021 .......................... DJA146

Defendants' Request to Charge, filed on
February 23, 2021 ................................................. DJA159

Exhibit A to Defendants' Request to Charge -
Excerpts from The Court's Instructions of Law to
the Jury, in *USA v. Nkansah* (Southern District of
New York Case No. 08-cr-1234) .......................... DJA188

Government's Request to Charge, dated
February 23, 2021 ................................................. DJA193

Opinion and Order of the Honorable Jed S. Rakoff,
dated March 1, 2021 ............................................. DJA233

Transcript of Trial (Jury *Voir Dire*), dated
March 1, 2021 ...................................................... DJA258

Transcript of Trial (Openings), dated
March 1, 2021 ...................................................... DJA300

Transcript of Trial (Testimony of Michael Tassone),
dated March 2, 2021 ............................................. DJA402

iii

**Page**

Transcript of Trial (Testimonies of Michael Tassone
and John Verdeschi), dated March 3, 2021 ............   DJA595

Transcript of Trial (Testimonies of John Verdeschi,
Jessica Volchko and Oliver Hargreaves), dated
March 4, 2021 .......................................................   DJA787

Transcript of Trial (Testimony of Oliver
Hargreaves), dated March 8, 2021 ........................   DJA963

Transcript of Trial (Testimony of Oliver
Hargreaves), dated March 9, 2021 ........................ DJA1144

Transcript of Trial (Testimonies of Oliver
Hargreaves and Richard Clow), dated
March 10, 2021 ..................................................... DJA1291

Transcript of Trial (Testimonies of Richard Clow
and Robert Hupcher), dated March 11, 2021 ......... DJA1438

Transcript of Trial (Testimonies of Robert Hupcher
and James Patterson), dated March 12, 2021 ......... DJA1639

Transcript of Trial (Testimony of James Patterson),
dated March 15, 2021 ........................................... DJA1838

Transcript of Trial (Testimonies James Patterson,
Charles Brown, Darcy Cozzetto and Martin
Elliott), dated March 16, 2021 .............................. DJA2027

Transcript of Trial (Testimonies of Martin Elliott,
Darcy Cozzetto and Michael Steinbach), dated
March 17, 2021 ..................................................... DJA2212

Transcript of Trial (Testimonies of Michael
Steinbach, Jacob Pechet, John Wang and Ronald
Shimko), dated March 18, 2021 ............................ DJA2427

iv

Page

Transcript of Trial (Testimonies of Daniel Whelan
and Joao Paulo Reginatto), dated
March 19, 2021 ..................................................... DJA2614

Transcript of Trial (Summations), dated
March 22, 2021 ..................................................... DJA2735

Transcript of Trial (Jury Charge), dated
March 23, 2021 ..................................................... DJA2917

Transcript of Trial (Verdict), dated March 24, 2021 .. DJA2955

Trial Exhibits:

    GX 1901-T – Transcript of Ruben Weigand's
    Post-Arrest Interrogation ..................................... DJA2967

    HAX-5014 – Excerpts from Presentation of
    Cannabis and Hemp Products ............................. DJA2971

    HAX-10057 – Actors Federal Credit Union –
    Statements of Account .......................................... DJA2974

    HAX-14004 – Excerpt from List of Customer
    Card Transactions ................................................ DJA3014

    HAX-14005 – Circle Eaze Transaction
    Summary ............................................................... DJA3015

    HAX-14008 – Circle Eaze Transaction Record... DJA3016

The Court's Instructions of Law to the Jury, filed on
March 24, 2021 ..................................................... DJA3084

Verdict, dated March 24, 2021 .................................. DJA3106

Order of the Honorable Jed S. Rakoff, dated
June 18, 2021 ........................................................ DJA3107

Transcript of Sentencing of Defendant Hamid
Akhavan, dated June 18, 2021 .............................. DJA3108

v

**Page**

Opinion of the Honorable Jed S. Rakoff, dated
    July 2, 2021............................................................ DJA3146

Notice of Appeal by Defendant Ruben Weigand,
    dated July 7, 2021 ................................................. DJA3170

Transcript of Forfeiture Hearing, dated
    August 12, 2021 .................................................... DJA3172

Notice of Appeal by Defendant Hamid Akhavan,
    dated September 14, 2021..................................... DJA3231

Notice of Appeal by the Government, dated
    September 30, 2021 ............................................... DJA3235

DJA1577

L3BPWEI3                    Clow - Redirect

1   A.  Correct.

2   Q.  Okay.  So does Bank of America own that customer's wallet?

3   A.  No.

4   Q.  Does Bank of America have control over that, how the

5   customer uses the money in the wallet?

6   A.  No.

7   Q.  It's the customer's wallet, right?

8   A.  Correct.

9   Q.  Now, since we're on -- I'll withdraw that.

10          Let's put up Government Exhibit 2407.

11          This is the Bank of America credit card agreement that

12  you spoke about on cross; is that right?

13  A.  Correct.

14  Q.  Let's go down to -- hold on.  Go to the table of contents,

15  so we can find what page.  Let's try page 12.

16          Okay.  Do you see where it says

17  "Limitations/warnings"?

18  A.  Yes.

19  Q.  Mr. Levine, can you blow that up, along with the purposes

20  for using your account.

21          Do you recall that you testified on cross, you read

22  aloud portions of this paragraph, and among the things you read

23  aloud are, you may not use or permit your account to be used to

24  make any illegal transaction.  That's the second sentence.  Do

25  you recall that?

L3BPWEI3                    Clow - Redirect

1   A.  Yes.

2   Q.  Now, and then it was noted on cross-examination that an

3   example that's given is gambling, right?

4   A.  Yes.

5   Q.  And marijuana is not given as an example; is that correct?

6   A.  Correct.

7   Q.  Are there other illegal transactions that one can do with

8   their Bank of America card that are not listed in this

9   paragraph?

10  A.  Yes, there are a number of those transactions.

11  Q.  For example, purchases of other drugs, correct?

12  A.  Correct.

13  Q.  Prostitution, that kind of --

14  A.  Prostitution, yes.

15  Q.  And then we have this gambling example, and I believe you

16  testified on cross that gambling is legal in some jurisdictions

17  and not other jurisdictions; is that right?

18  A.  Yes.

19  Q.  Is it your understanding that marijuana sales are still

20  illegal globally at the federal level?

21  A.  Yes, it's illegal at a federal level.

22  Q.  Okay.  We can take that down.

23          Mr. Clow, so also on cross-examination you were asked

24  about Bank of America's reasons for not including

25  descriptor-level information in connection with its marijuana

DJA1579

L3BPWEI3                    Clow – Redirect

1     transaction monitoring system; do you recall that?

2     A.  Yes.

3     Q.  And one of the things that you testified about was that the

4     descriptor -- I believe it's words to the effect that, the

5     descriptor data is not structured?

6     A.  Correct.

7     Q.  Can you explain what that means, that the data isn't

8     structured?  You can start with that.  What does that mean?

9     A.  So the data not being structured is it's a longer field.

10    There's more space, where you can put characters in it and try

11    to describe things than the merchant name, which is a fixed

12    number of characters.  So it's easier to search for things like

13    names or phrases.

14    Q.  Okay.  So then just to put it another way, how does the

15    fact that the descriptor data is not structured affect Bank of

16    America's ability to do its various searches to try and

17    identify suspicious merchants?

18    A.  Well, in two ways.  One, it's more intense to do it on the

19    size of the data that we have.  It's very -- it's challenging.

20           And then secondly, there's the quality.  Just because

21    there's more space doesn't mean that the information there is

22    any better than in the merchant name.

23    Q.  Okay.  And then going back to the key word searches that

24    Bank of America does on merchant names to try and identify

25    suspicious merchants, if there is a merchant that's providing

L3BPWEI3                    Clow – Recross

1   false information to the network about its name, for example,

2   and other information, does that make it more difficult for

3   Bank of America to identify that merchant as a suspicious

4   merchant?

5   A.  Yes, it would be very hard.

6           MS. LA MORTE:  One moment, your Honor.

7           (Pause)

8           No further questions.

9           THE COURT:  I'm sorry, my apologies.  Any recross?

10          MR. BURCK:  Very brief, your Honor.

11          THE COURT:  Go ahead.

12          MR. BURCK:  I think Ms. LaMorte is having trouble

13  finding her mask.

14          MS. LA MORTE:  I think my mask dropped somewhere, your

15  Honor, and I'm trying to locate it.  Oh, here it is.  I'll get

16  it, Bill.

17  RECROSS EXAMINATION

18  BY MR. BURCK:

19  Q.  Mr. Clow, you were just asked questions about the wallet

20  process and debit cards; do you recall those questions?

21  A.  Yes.

22  Q.  And I'm just going to put on the screen Akhavan Exhibit

23  11,009.  And Ms. LaMorte asked you, gave you an example if

24  somebody goes to their ATM and withdraws money and then uses

25  that money to buy marijuana, she gave that example; do you

DJA1581

L3BPWEI3                    Clow - Recross

1  recall that?

2  A.  Yes.

3  Q.  And she asked you whether or not that would violate Bank of

4  America's policy, correct?

5  A.  Correct.

6  Q.  And you said no?

7  A.  Correct.

8  Q.  Correct?  Now, if you look at Akhavan Exhibit 11,009, this

9  was a credit card or debit card statement, correct?

10  A.  Yes.

11  Q.  And we talked about this before, but it says Circle Wallet

12  star Eaze, correct, is the description and the merchant name?

13  A.  Yes.

14  Q.  And this -- you understand Eaze to be a marijuana

15  distributor, correct?

16  A.  Yes.

17  Q.  Now, when a -- in the first example, when a debit card is

18  used to take money out and go to buy marijuana, does the

19  customer typically tell you that's what they did with their

20  money?

21  A.  No.

22  Q.  So you have no idea, correct, when they use their debit

23  card to withdraw money from the ATM, correct?

24  A.  That's correct.  We have no idea.

25  Q.  Here it says Eaze, correct?

DJA1582

L3BPWEI3                    Clow - Recross

1  A.  It says Circle Wallet Eaze.

2  Q.  Eaze, yes.  And then just a last couple of questions.

3  Ms. LaMorte was saying or this -- let me withdraw that.

4         The Eaze Circle Wallet transaction we see here is akin

5  to a debit card transaction, an ATM transaction, in your mind?

6  A.  It's slightly different.  You're loading a value into

7  Circle.

8  Q.  Okay.

9  A.  So if it's $100, instead of getting $100 out in cash, I'm

10 getting $100 worth of credits in Circle to do whatever I want.

11 Q.  And here, you're told it's used to buy Eaze products,

12 correct?

13 A.  Again, the asterisk and the information that comes after

14 the asterisk is optional by the merchant.  The merchant name

15 and the merchant of record would be Circle Wallet.

16 Q.  And you testified on redirect that you reported Eaze and

17 Circle Wallet to Visa and MasterCard, right?

18 A.  Yes, we reported Eaze.

19 Q.  You reported Eaze.  The same Eaze that appears here,

20 correct?

21 A.  Correct.

22 Q.  And that's because you're concerned that they're dealing in

23 marijuana, correct?

24 A.  Well, they are suspected of dealing in marijuana.  Their

25 public site says they do, and it's up to the networks to

DJA1583

L3BPWEI3                    Clow - Recross

1     determine if they're operating on the network in a compliant

2     way and a legal way.

3     Q.  And it's these types of transactions, the example we see

4     here, Circle Wallet star Eaze, that's why you became aware that

5     Eaze was still on the network, correct?

6     A.  No.  There's been a lot of press around Eaze.  That's

7     separate from our transaction histories that brought this to

8     our attention.

9     Q.  But your transaction history is a part of it, correct?

10    A.  Yes.

11    Q.  And you were concerned enough that you then sent it to the

12    network, to investigate, correct?

13    A.  Yes.

14    Q.  And that was when?

15    A.  Several weeks ago.

16    Q.  Several weeks ago.  And this case was indicted about March

17    of last year; is that correct?

18    A.  I don't know.

19              MR. BURCK:  Thank you, your Honor.  That's it.

20              THE COURT:  Anything else?

21              MR. GILBERT:  Yes, very briefly.

22    RECROSS EXAMINATION

23    BY MR. GILBERT:

24    Q.  Mr. Clow, in addition to referring the Eaze matter to Visa

25    and MasterCard, did Bank of America, to your knowledge, conduct

L3BPWEI3                        Clow - Recross

1    any investigation into the volume of transactions that Circle

2    Wallet Eaze that Bank of America had processed?

3    A.  Not to my knowledge.

4    Q.  Never looked at that information one way or the other?

5    A.  I don't know.  I was not asked to.

6    Q.  If we can bring up please Government Exhibit 2427.

7         Do you see -- Mr. Clow, do you have that in front of

8    you now?  I'm sorry.

9    A.  Yes.

10   Q.  Thank you.  About midway through the page there's a

11   transaction that says the merchant name is PayPal star

12   ADMCannabis; do you see that?

13   A.  Yes.

14   Q.  What's your understanding of what type of transaction that

15   is?

16             MS. LA MORTE:  Objection.  401, 403.

17             THE COURT:  Sustained.

18   Q.  Mr. Clow, do you have an understanding of the reference in

19   Government Exhibit 2427 to PayPal star AdmCannabis?

20             MS. LA MORTE:  Objection.  Same ground.

21             THE COURT:  Sustained.

22   Q.  Does to your knowledge does Bank of America accept payments

23   through PayPal?

24             MS. LA MORTE:  Objection.

25             THE COURT:  Sustained.

DJA1585

L3BPWEI3                     Clow - Recross

1  Q.  Mr. Clow, in addition to -- well, withdrawn.

2          Mr. Clow, are you aware whether, in addition to

3  referring the Eaze matter to the card schemes Visa and

4  MasterCard, Bank of America took any other steps in connection

5  with its -- in connection with that matter?

6  A.  To my knowledge, we haven't heard back about the

7  investigation.  So we wouldn't take action until we knew.

8  Q.  So you're just waiting to hear what Visa and MasterCard get

9  back to you and tell you?

10 A.  Yes.

11         MR. GILBERT:  Thank you.

12         THE COURT:  Anything else?

13         MS. LA MORTE:  No, your Honor.

14         THE COURT:  Thank you very much.  You may step down.

15         (Witness excused)

16         THE COURT:  Please call your next witness.

17         MS. DEININGER:  The government calls Robert Hupcher.

18         THE COURT:  You can take your mask off and remain

19 standing.

20  ROBERT HUPCHER,

21     called as a witness by the Government,

22     having been duly sworn, testified as follows:

23         THE COURT:  Please be seated.  State and spell your

24 full name.

25         THE WITNESS:  My name is Robert Hupcher, R-o-b-e-r-t,

DJA1586

L3BPWEI3                        Hupcher - Direct

1   H-u-p-c-h-e-r.

2   DIRECT EXAMINATION

3   BY MS. DEININGER:

4   Q.  Good afternoon, Mr. Hupcher.

5   A.  Good afternoon.

6   Q.  Can you hear me?

7   A.  I can.

8   Q.  Okay.  Good.  Mr. Hupcher, where do you work?

9   A.  I work for the FBI.

10  Q.  What's your title there?

11  A.  Special agent.

12  Q.  How long have you worked at the FBI?

13  A.  Since 2017.

14  Q.  And what unit are you assigned to work with?

15  A.  The securities fraud squad.

16  Q.  What are your duties and responsibilities as a special

17  agent?

18  A.  I investigate instances of complex financial crimes,

19  including securities fraud, bank fraud, investment fraud,

20  corporate fraud, and while doing that, I conduct

21  investigations, conduct interviews, execute searches, anything

22  of that nature.

23          THE COURT:  Are there any agents of the FBI who are

24  not special agents?

25          THE WITNESS:  Not to my knowledge, but there are other

DJA1587

L3BPWEI3                          Hupcher - Direct

1    agents.

2    Q.  Do you have any certifications relevant to your work in the

3    securities fraud unit at the FBI?

4    A.  Yes, I'm a CPA.

5    Q.  And what's a CPA?

6    A.  A certified public accountant.

7    Q.  How long have you held that certification?

8    A.  Since approximately 2012 or 2013.

9    Q.  Mr. Hupcher, did there come a time when you began to assist

10   in preparing for the trial of the defendants here, Hamid

11   Akhavan and Ruben Weigand?

12   A.  Yes.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

DJA1588

L3BMWEI4                    Hupcher - Direct

1   Q.  How did you assist in preparing for trial?

2   A.  So, I reviewed certain summary charts and I checked the

3   accuracy of those charts.

4   Q.  Prior to your review of those documents, did you have any

5   involvement in the investigation of this case?

6   A.  I did not.

7          MS. DEININGER:  Mr. Levine, if you can pull up what's

8   in evidence as Government Exhibit S1.  Can you display that for

9   everyone.  Thank you.

10  Q.  Mr. Hupcher, can you read paragraph 1 of this document?

11  A.  Sure.  GX-1803 is an Apple MacBook Pro, a laptop, that was

12  seized by Federal Bureau of Investigation, FBI agents, from

13  defendant Ruben Weigand on March 9, 2020, when he was arrested.

14  Q.  Thank you.

15         MS. DEININGER:  Mr. Levine, you can take that down and

16  you can pull up Government Exhibit 3707.  That's in evidence.

17  If you can publish it for everyone.  Thank you.

18  Q.  Mr. Hupcher, you see how the first column here says GX.

19  What is your understanding of what that stands for?

20  A.  Government exhibit.

21  Q.  You see the second column says MD5 hash?

22  A.  Yes.

23  Q.  The third column says file name?

24  A.  Yes.

25  Q.  The last column says date added?

**DJA1589**

L3BMWEI4                          Hupcher - Direct

1   A.  Yes.

2   Q.  Leaving that up, Mr. Hupcher, do you see Government Exhibit

3   1706 listed in this document?

4          MS. DEININGER:  Mr. Levine, I think we may need to

5   scroll to the second page.

6   A.  I do.

7          MS. DEININGER:  Mr. Levine, can you pull up Government

8   Exhibit 1706 just for the witness.

9          Your Honor, this was admitted through Ms. Volchko, but

10  I understand that the defendants have an objection, which is

11  why I pulled it up just for the witness for now.

12         THE COURT:  It has been received in evidence already?

13         MS. DEININGER:  It was received in evidence when

14  Ms. Volchko was testifying.

15         MR. HARID:  Your Honor, we preserved our objections at

16  that time.  We preserved them so we can object on a

17  document-by-document basis.

18         THE COURT:  We dealt with that yesterday, but you are

19  right to preserve that for the record.  You'll have a

20  continuing objection.  You don't have to keep raising it after

21  each exhibit.  That objection is denied.

22         MS. DEININGER:  Mr. Levine, if you can publish for the

23  jury.  Thank you.

24  Q.  Mr. Hupcher, do you see this document?

25  A.  I do.

DJA1590

L3BMWEI4                    Hupcher - Direct

1   Q.  What is it?

2   A.  It looks like an e-mail exchange.

3   Q.  Let's look at the e-mail at the bottom of the chain, the

4   one that's dated September 21, 2017 at 9:46 a.m.

5           Do you see that?

6   A.  I do.

7   Q.  Who sends that e-mail?

8   A.  Medhat Mourid.

9   Q.  Who is it sent to?

10  A.  It's sent to Ray and Ray Akhavan.

11  Q.  Can you read the two e-mail addresses used for the

12  individuals in the to line?

13  A.  Sure.  Ray@cestaff.com and rayakhavan@me.com.

14  Q.  What is the subject of this e-mail?

15  A.  Eaze history.

16  Q.  Can you read the body of the e-mail.

17  A.  Attached.  Not really sure what the data is supposed to

18  look like.  Take a look at what's attached and LMK if you need

19  more date/different formatting.

20  Q.  Can you tell whether there was an attachment included with

21  this e-mail?

22  A.  Yes, there appears to be.

23  Q.  What was the title of that attachment?

24  A.  Processing_six months.XLSX.

25          MS. DEININGER:  Let's move up one e-mail on this chain

**DJA1591**

L3BMWEI4                              Hupcher - Direct

1  to the response.

2  Q.  Who sends that response?

3  A.  Ray Akhavan.

4  Q.  Can you read the body of that e-mail for me.

5  A.  It needs to explain it properly to new processors without

6  naming the current banks.  Ruben is submitting it and is cc'd.

7  Q.  Thank you.

8          MS. DEININGER:  Mr. Levine, if you can zoom out and

9  let's look now at the last e-mail on this thread, the one at

10  the top.

11  Q.  Mr. Hupcher, who is this e-mail from?

12  A.  Ruben Weigand.

13  Q.  Who does he send it to?

14  A.  Ray Akhavan.

15  Q.  What's the date of the e-mail?

16  A.  September 21, 2017.

17  Q.  Can you read the body of the e-mail for me.

18  A.  Thanks, man.  It doesn't differentiate between VI and MC.

19  Do you know the split?  Best, Ruben.

20  Q.  Thank you.

21          MS. DEININGER:  Mr. Levine, can you pull back up

22  Government Exhibit 3707 and go to the second page.

23  Q.  Mr. Hupcher, do you see Government Exhibit 1709 listed

24  here?

25  A.  I do.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1592

L3BMWEI4                         Hupcher - Direct

1      MS. DEININGER:  Mr. Levine, can you pull up Government

2  Exhibit 1709, which is admitted into evidence.

3  Q.  Mr. Hupcher, looking at this document, generally, from your

4  experience and training, what is this?

5  A.  This is a conversation on WhatsApp.

6  Q.  How can you tell?

7  A.  You can see instances where it says WhatsApp.net and then

8  it also says source app is WhatsApp.

9  Q.  What is WhatsApp?

10  A.  WhatsApp is an encrypted messaging application.

11  Q.  What does it mean that it's encrypted?

12  A.  It means that when messages are sent between two people,

13  while they are in transit, they are not able to be read and

14  they only get decrypted when they are received by one of the

15  recipients.

16  Q.  Looking at the top of this document, what was the start

17  date of this exchange of messages?

18  A.  December 18, 2017.

19  Q.  And the date of the last activity?

20  A.  February 8, 2018.

21  Q.  Who were the participants?  You can just read the names and

22  not all of the numbers.

23  A.  Sure.  It looks like Vaida, Daniel, Ozan, Guy Mizrachi,

24  Ruben, Kat and Jolanta Narmontaite.

25      MR. HARID:  Your Honor, for the record, this document

DJA1593

L3BMWEI4                    Hupcher - Direct

1  has not been received in evidence and we have objections.  The

2  bases would be relevance and 403.

3         THE COURT:  Overruled received.

4  Q.  Near the top of the document where it says body, do you see

5  that?  Can you read for me what it says underneath that.

6  A.  Messages to this group are now secured with end-to-end

7  encryption.  Tap for more info.

8  Q.  Looking down the page just a bit, there is a message sent

9  on January 3, 2018 at 9:33 a.m.

10        Do you see that?

11 A.  I do.

12 Q.  Who sent that?

13 A.  Guy Mizrachi.

14 Q.  What does it say?

15 A.  I just added Ruben to our group.  He is channeling

16 communications with the submerchant payees and is providing

17 statements and client support, suppcommunicating with.

18 Q.  Can you keep reading the messages down the page for me,

19 indicating for each message who sent it.

20 A.  Sure.  Then Guy Mizrachi says:  Ruben, we -- we are in the

21 process of transferring funds to the submerchants.  Daniel and

22 his team at Settlego are doing a great job at processing the

23 incoming wires, doing the conversions, and handling the

24 payouts.  By the end of the day, Jolanta and Vaida will let you

25 know when the payments are completed and who was paid what.

L3BMWEI4                         Hupcher - Direct

1   Daniel responds:  Guy, USD was just made available to you.

2   Q.  If I can stop you right there, based on your training and

3   experience, what do you believe USD stands for?

4   A.  US dollars.

5   Q.  Thank you.  You can start again with the message right

6   below that.

7   A.  Sure.  Daniel says:  505K circa.  Then Guy Mizrachi

8   responds:  Perfect.  Thank you.  That means we have enough in

9   both accounts to handle the projected payout of $1,021,269.78

10  per the Excel sheet, which I attached once more for Ruben's

11  benefit.  Then Guy Mizrachi attaches a file called final

12  payout, January 3, 2017.XLSX.  Daniel responds:  Super duper

13  lemon trooper.

14  Q.  If you want to jump down to the third message from the

15  bottom of the page sent January 3, 2018 at 9:51, who sends

16  that?

17  A.  Ruben.

18  Q.  What does he say?

19  A.  He says:  Hey, everybody, with a winking face.

20  Q.  Does he send another message after that?

21  A.  Yes.  He says:  Perfect.  Will take care of the statements.

22  Q.  Thank you.

23          MS. DEININGER:  Mr. Levine, if you can turn to the

24  next page.  I'm sorry.  The one after that.

25  Q.  Mr. Hupcher, do you see the message exchange that starts on

L3BMWEI4                        Hupcher – Direct

1    January 12, 2018 at 16:22?

2    A.  I do.

3    Q.  Can you read that message from Daniel.

4    A.  Sure.  Daniel says:  Hey, team, let me know with regards to

5    the other accounts you've set up.

6    Q.  Now, if you look to the fifth message down, who is that one

7    from?

8    A.  From Daniel as well.

9    Q.  Can you read that?

10   A.  But a question.  Many of the accounts that we opened for

11   you are as yet unused.  Are we expecting any activity for them?

12           MS. DEININGER:  Mr. Levine, if you can scroll to the

13   next page now.

14   Q.  Mr. Hupcher, do you see a message from Guy Mizrachi at

15   January 15, 2018?

16   A.  Yes.

17   Q.  Can you read that for us.

18   A.  Sure.  He says:  Hi, Daniel.  The accounts are activated

19   when we are able to set up merchant processing.  Bielriso and

20   Paranthia will continue through the end of this month.  Then we

21   will likely shift to two other accounts, Knutled and Conetild.

22   Q.  Daniel then writes:  Ah, OK.  Got it.

23           Can you read for us Guy Mizrachi's response?

24   A.  Sure.  He says:  We probably won't use more than two or

25   three together at any one time for the foreseeable future.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**DJA1596**

L3BMWEI4                          Hupcher – Direct

1   Q.   Thank you.

2            Mr. Levine, you can take that down.

3            MS. DEININGER:  Your Honor, the government would now

4   offer into evidence a self-authenticating document, pursuant to

5   Rule 902(11), in the Court's February 14, 2021 memorandum and

6   order, Government Exhibit 4301.

7            MS. CLARK:  Objection, your Honor.

8            MR. HARID:  Join.

9            MS. CLARK:  403 and also, I believe, this document, at

10  least as it has been presented to us, currently contains a

11  significant amount of --

12           THE COURT:  I don't want Ms. Clark to repeat because

13  my rule is that objections should be no more than three words.

14  The objection is denied.  Received.

15           (Government Exhibit 4301 received in evidence)

16  Q.   Mr. Hupcher, looking at Government Exhibit 4301, near the

17  top left do you see where it says account information?

18  A.   Yes.

19  Q.   Can you read the title of the account for me.

20  A.   Quantum Solutions, Inc.

21  Q.   The address for that account holder.

22  A.   5146 Douglas Fir Road No. 205, Calabasas, California 91302.

23  Q.   Now, if you look just below that, to where it says business

24  entity information.

25  A.   Yes.

DJA1597

L3BMWEI4                          Hupcher - Direct

1    Q.  Can you read the business name for me?

2    A.  Quantum Solutions, Inc.

3    Q.  Then on the right-hand side of the page where it says date

4    established, what's the date?

5    A.  December 23, 2013.

6    Q.  What does it say for primary location?

7    A.  Los Angeles.

8    Q.  Back on the left-hand side, on the bottom, what does it

9    list under contact name?

10   A.  Hamid R. Akhavan.

11   Q.  What is the current title?

12   A.  President.

13        MS. DEININGER:  Mr. Levine, if you can go to page 27

14   of this document.

15   Q.  Mr. Hupcher, can you read the title of this document up at

16   the top of the screen.

17   A.  Minutes of first meeting of board of directors of Quantum

18   Solutions, Inc.

19   Q.  Can you just read the first paragraph for me.

20   A.  The first meeting of the board of directors of Quantum

21   Solutions, Inc. convened on the 27th day of December 2013,

22   pursuant to waiver of notice and consent to the holding thereof

23   executed by each director of the corporation.  Present were all

24   the directors.

25   Q.  If you can read the name of the two directors listed there.

L3BMWEI4                    Hupcher - Direct

1    A.  Hamid Ray Akhavan, Guy Mizrachi.

2    Q.  Thank you.

3         MS. DEININGER:  Mr. Levine, can you turn to the next

4    page, page 28 of this document.  Highlight just the paragraph

5    in the middle right above the handwritten names.

6    Q.  Mr. Hupcher, can you read this for me?

7    A.  The chairman called for the nomination of officers of the

8    corporation.  Thereupon, the following persons were nominated

9    for the officers of the corporation:  President, Hamid Ray

10   Akhavan; vice-president, Hamid Ray Akhavan; Guy Mizrachi;

11   treasurer, Hamid Ray Akhavan.

12   Q.  Thank you.

13        MS. DEININGER:  Mr. Levine, we can take this down now.

14        Mr. Levine, can you pull back up what's been admitted

15   in evidence as Government Exhibit 3707.

16   Q.  Mr. Hupcher, do you see Government Exhibit 1690 is listed

17   on this?

18   A.  Yes, it is.

19        MS. DEININGER:  Mr. Levine, can we pull up Government

20   Exhibit 1690.

21        MR. HARID:  Your Honor, objection.  Relevance.  403.

22        MS. DEININGER:  Mr. Levine, can you pull this up just

23   for the witness for one moment.

24        This was admitted in evidence when Ms. Volchko was

25   testifying.

DJA1599

L3BMWEI4                    Hupcher - Direct

1           THE COURT:  This is already in evidence?

2           MS. DEININGER:  This was admitted into evidence when

3    Ms. Volchko was testifying.

4           MR. HARID:  Your Honor, we have a dispute on this

5    issue.  We can take this up at a sidebar, if needed.  Our

6    understanding was that Ms. Volchko was just authenticating to

7    the documents.  We planned to object document by document.

8           THE COURT:  I'm sorry.  Unless objections were raised

9    when the document was received in evidence, they had been

10   waived.

11          MR. HARID:  Your Honor, we did.

12          THE COURT:  Excuse me?

13          MR. HARID:  We did, your Honor, as to all of these

14   documents when Ms. Volvo testified.

15          THE COURT:  I don't see a need for a sidebar.  The

16   objection is overruled.

17          MS. DEININGER:  Thank you.

18          Mr. Levine, if you can publish for the jury.

19   Q.  Mr. Hupcher, generally, what is this?

20   A.  E-mail exchange.

21   Q.  If we can look at the first e-mail in this exchange, which

22   is actually the one on the bottom, dated Thursday, February 22,

23   2018.

24          Mr. Hupcher, who is this e-mail from?

25   A.  Guy Mizrachi.

DJA1600

L3BMWEI4                          Hupcher - Direct

1   Q.  Who did he send it to?

2   A.  Medhat Mourid, Michael Burtscher, Ruben Weigand.

3   Q.  What e-mail address is Medhat Mourid using?

4   A.  Medhat@quantumsolutions.com.

5   Q.  Can you read the body of the e-mail for me.

6   A.  Medhat, Kalixa, Ruben, and Michael has been working hard to

7   earn your business.  They are boarding a bunch of new low risk

8   this month, and we should have some capacity in the millions in

9   the next month or so.  In the meantime, they have asked us to

10  increase our volume by another 100K per month.  Can you fill

11  that?  Thanks.  Guy.

12  Q.  Thank you.

13          MS. DEININGER:  Mr. Levine, we can now pull up the

14  response to this.

15  Q.  Mr. Hupcher, who sends this response?

16  A.  Medhat Mourid.

17  Q.  Who is it sent to?

18  A.  Guy Mizrachi, Michael Burtscher, and Ruben Weigand.

19  Q.  What e-mail address is Guy Mizrachi using?

20  A.  Guy@quantumsolutions.com.

21  Q.  Can you read this e-mail for me.

22  A.  The accounts through Wirecard were turned live yesterday,

23  so we should see an increased volume, and we will try to target

24  200K per month total.

25  Q.  Thank you.

DJA1601

L3BMWEI4                          Hupcher - Direct

1      MS. DEININGER:  Mr. Levine, we can take this down.

2      Can we go back to Government Exhibit 3707.

3   Q.  Mr. Hupcher, do you see Government Exhibit 1719 listed in

4   this document?

5   A.  I do.

6   Q.  What does Government Exhibit 3707 say under date added for

7   Government Exhibit 1719?

8   A.  June 6, 2018.

9      MS. DEININGER:  Mr. Levine, can we now pull up

10  Government Exhibit 1719.

11  Q.  Mr. Hupcher, what does it say on the top right of this

12  document?

13  A.  Visa.

14  Q.  Generally, what does this document appear to be?

15  A.  It looks like a letter from Visa.

16  Q.  Who is this letter sent to?

17  A.  Kalixa Accept Limited.

18  Q.  In what country does it indicate that Kalixa is located?

19  A.  United Kingdom.

20  Q.  What's the date of this letter?

21  A.  June 6, 2018.

22  Q.  Can you read the first paragraph for me under dear

23  acquirer.

24  A.  The Visa charge-back monitoring program, VCMP, is a

25  merchant-level charge-back monitoring program to help acquirers

DJA1602

L3BMWEI4                         Hupcher - Direct

1    identify merchants with excessive levels of charge backs and

2    implement corrective plans to protect the integrity of the

3    payment system.  This letter served as notification to Kalixa

4    Accept Limited that your merchant Hot Robots has been

5    identified in the VCMP early-warning report for the month of

6    June '18 by exceeding the VCMP thresholds based on charge-back

7    transactions submitted by issuers.

8    Q.  Now, do you see where it says next steps lower down in this

9    letter?

10   A.  Yes.

11   Q.  Can you read the paragraph for me under next steps.

12   A.  Although no action is currently required, it is strongly

13   recommended that your institution investigates the root causes

14   and drivers of the charge backs with the merchants and develops

15   a remediation plan to reduce the impact of charge backs or take

16   alternative actions as appropriate.

17   Q.  Thank you.

18           MS. DEININGER:  Mr. Levine, we can take this one down.

19           Mr. Levine, can we go back to Government Exhibit 3707.

20   Q.  Mr. Hupcher, do you see Government Exhibit 1506 listed on

21   Government Exhibit 3707?

22   A.  I do.

23           MS. DEININGER:  Mr. Levine, can we pull up Government

24   Exhibit 1506.

25   Q.  Mr. Hupcher, looking at this table, do you see where it

DJA1603

1304

L3BMWEI4                         Hupcher - Direct

1   says depots on the top left?

2   A.  Yes.

3   Q.  What does it say next to depots?

4   A.  Superior Health.

5   Q.  What does it say next to legal name?

6   A.  Superior Herbal Health.

7   Q.  What does it say next to bank account name?

8   A.  Panicle Management LLC.

9        MS. DEININGER:  Mr. Levine, can we pull up next to

10  Government Exhibit 1506 Government Exhibit 687, page 3.

11  Q.  Mr. Hupcher, the legal name in Government Exhibit 1506 was

12  Superior Herbal Health.  Do you also see that name on

13  Government Exhibit 687?

14  A.  I do.

15       MS. DEININGER:  One second, your Honor.

16       Mr. Levine, can you pull up Government Exhibit 1724

17  for the witness.

18       Your Honor, again, I'm just pulling this up for your

19  Honor and the witness because I understand that defendants

20  raised an objection.  Originally, this was authenticated by

21  Ms. Volchko, but I do understand that they had reserved the

22  right to renew objections when it was read into evidence.

23       THE COURT:  To the extent that they preserved the

24  objections, as they did in some cases, though I am not totally

25  clear in all, they may raise them again now and I'll rule.  The

DJA1604

L3BMWEI4                         Hupcher - Direct

1    objection they did not preserve is authentication.

2            Go ahead.  Is there an objection?  If you are waiting

3    for their objection, you first have to put the question to the

4    witness that you think responds to their objections.  So that's

5    why you put it up just before the witness.  Or have you just

6    put it up before the witness so they can state their objection?

7            MS. DEININGER:  I just put it up for the witness so

8    that they can let us know if they still have an objection.

9            THE COURT:  What are the objections?

10           MS. CLARK:  403.

11           MR. HARID:  Same, and relevance.

12           THE COURT:  403 and?

13           MR. HARID:  Relevance.

14           THE COURT:  Relevance?

15           MR. HARID:  Correct.

16           THE COURT:  Denied.  Received.

17           (Government Exhibit 1724 received in evidence)

18           MS. DEININGER:  Mr. Levine, can you please publish

19   this for the jury.  Thank you.

20   Q.  Mr. Hupcher, can you see Government Exhibit 1724?

21   A.  Yes.

22   Q.  What does this appear to be?

23   A.  A chat.

24   Q.  Can you see the date the message was sent?

25   A.  December 21, 2018.

DJA1605

L3BMWEI4                    Hupcher - Direct

1   Q.  On the left-hand side there is a blue box that says

2   Easycompany.

3           What is your understanding of what that represents?

4   A.  That represents the chat.

5   Q.  What's the name of the person that sends the message?

6   A.  John.

7   Q.  Can you read the message for me?

8   A.  Hey, we received the three new mids for HTH-EB.  Can we

9   make sure we have tracking pixels enabled for them.

10  Q.  Can you read those websites for me.  You don't have to read

11  everything at the end, but just the main www.

12  A.  Sure.  The first is starsstyles.com, the second is

13  outdoormaxx.com, and the third is fly2skyshop.com.

14  Q.  Thank you.

15          MS. DEININGER:  Mr. Levine, can we go back to

16  Government Exhibit 3707.

17  Q.  Mr. Hupcher, do you see Government Exhibit 1654 listed in

18  Government Exhibit 3707?

19  A.  I do.

20  Q.  What does Government Exhibit 3707 say under date added for

21  Government Exhibit 1654?

22  A.  April 5, 2019.

23          MS. DEININGER:  Mr. Levine, could you now pull up

24  Government Exhibit 1654, which is in evidence.

25  Q.  Mr. Hupcher, based on your training and experience,

DJA1606

L3BMWEI4                        Hupcher - Direct

1   generally, what does this appear to be?

2   A.  An invoice.

3   Q.  What company name is at the top of the invoice?

4   A.  1A Commerce.

5   Q.  What's the document date?

6   A.  March 28, 2019.

7   Q.  In the table where it says description, can you read for us

8   what it says under that.

9   A.  Annual renewal for corporations:  Lorry Limited, New Opal

10  Limited, Johnson NYC, International Standard Limited.

11  Q.  What's the amount in the bottom right corner of this table?

12  A.  28,665 euro.

13        MS. DEININGER:  Mr. Levine, can we now pull up next to

14  Government Exhibit 1654 Government Exhibit 3962, which is in

15  evidence.

16  Q.  Looking at the top right now of Government Exhibit 3962, do

17  you see that e-mail?

18  A.  Yes.

19  Q.  Who is that from?

20  A.  OH Syntrek.

21  Q.  Who is it to?

22  A.  Jawbreaker13.

23  Q.  Can you read the body of the message for me.

24  A.  Hi.  For your review, please see below outstanding invoice.

25  TKS, O.

DJA1607

1308

L3BMWEI4                    Hupcher – Direct

1    MS. DEININGER:  Mr. Levine, can we scroll down to page

2    3 of Government Exhibit 3962.

3    Q.  Mr. Hupcher, the invoice we were looking at a minute ago,

4    Government Exhibit 1654, said 1A Commerce at the top.

5    Does this attachment, Government Exhibit 3962, list

6    the same information at top?

7    A.  It does, with a different date.

8    Q.  Do these documents appear to follow the same general

9    format?

10   A.  They do.

11   MS. DEININGER:  Your Honor, I'd now like to show for

12   the jury what's been admitted into evidence as Government

13   Exhibit 1728.

14   MS. CLARK:  Objection.  403, 401.

15   MR. HARID:  The same.

16   THE COURT:  Overruled.  Received.

17   (Government Exhibit 1728 received in evidence)

18   Q.  Mr. Hupcher, based on your experience and training,

19   generally, what does this appear to be?

20   A.  A chat.

21   Q.  What is the date at the top of the chat?

22   A.  April 4, 2019.

23   Q.  Based on this page you are looking at right now, who are

24   the participants in this chat?

25   A.  Ray and Ruben W.

L3BMWEI4                    Hupcher - Direct

1   Q.  I'll have you read the messages from Ray, and I'll read

2   those from Ruben W.  Can you start at the top?

3   A.  Sure.  "Let me call you back in meeting."

4   Q.  "All right.  Important.  Please don't forget."

5           Mr. Hupcher, what's the date at the top of this next

6   exchange of messages?

7   A.  May 19, 2019.

8   Q.  Can you please read those messages from Ray.

9   A.  "Yo, did you guys get in touch with the dispensary?  Where

10  are we with that?"  Then it looks like there is a phone call

11  for 15 minutes.  Then Ray says:  "Hey, let's chat on Wickr Me.

12  Download the private messenger for free at the link.  My Wickr

13  ID is jawbreaker13.  This is the best apparently.  Get it,

14  please."  Then two similar messages follow.

15  Q.  Based on your experience and training, are you familiar

16  with Wickr?

17  A.  I am.

18  Q.  What is it?

19  A.  Wickr is an encrypted messenger application where one of

20  the features is that the messages automatically self destruct

21  after a certain amount of time.

22          MS. DEININGER:  Mr. Levine, I would now like to pull

23  up what's been admitted into evidence as Government Exhibit

24  1722.

25          MR. HARID:  Objection.  Relevance, 403.

DJA1609

L3BMWEI4                          Hupcher - Direct

1           MS. CLARK:  Join.

2           THE COURT:  Overruled.  Received.

3           (Government Exhibit 1722 received in evidence)

4    Q.  Looking just at this first page, Mr. Hupcher, what is this?

5    A.  Looks to be another chat.

6    Q.  Looking up at the very top, can you tell what type of chat

7    this is, what application it was being used?

8    A.  Yes.  Telegram.

9    Q.  Based on your training and experience, are you familiar

10   with Telegram?

11   A.  Somewhat.

12   Q.  What is Telegram?

13   A.  It's another encrypted messaging application.

14   Q.  What does it mean that it's an encrypted messaging

15   application?

16   A.  It means that messages, when they are sent, are not able to

17   be deciphered.  They get sent over the air and they are

18   encrypted, and then once they land at the recipient's device

19   they get decrypted just for that recipient to read.

20   Q.  What's the date at the top of this first page?

21   A.  January 16, 2019.

22           MS. DEININGER:  Mr. Levine, if you can scroll to page

23   2.

24   Q.  Mr. Hupcher, what's the date at the beginning of the

25   conversation at the top of this page?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3BMWEI4                    Hupcher - Direct

1   A.  May 2, 2019.

2   Q.  Can you read the message from Andrea Bricci.

3   A.  MC case with Esepa.  They are asking for list of any

4   additional merchant accounts that PXP identified who were

5   involved in the scheme.

6        MS. DEININGER:  Mr. Levine, if you can scroll to the

7   next page.

8   Q.  Mr. Hupcher, if you can keep reading.

9   A.  There are few more merchants not included in their list,

10  one to two terminated in the past, one had just started

11  processing in April, few that were testing in April.  The

12  terminated and the new one from April, they could potentially

13  identify themselves, too.  Should we put -- provide the details

14  as being additional merchants from this ISO?

15  Q.  Is there a response from Ruben W?

16  A.  Yes.

17  Q.  What's that response?

18  A.  He quotes the previous message from Andrea Bricci and says

19  good question.

20  Q.  Then what does Andrea Bricci say?

21  A.  Let me know what you think, please.  I need to respond to

22  them by tomorrow.

23  Q.  Thank you.

24        MS. DEININGER:  Mr. Levine, you can pull that down,

25  and I'd now like to pull up what has been admitted into

L3BMWEI4                          Hupcher - Direct

1    evidence as Government Exhibit 1730.

2             MR. HARID:  Objection.  Relevance, 403.

3             MS. CLARK:  Join.

4             THE COURT:  Overruled.  Received.

5             (Government Exhibit 1730 received in evidence)

6             MS. DEININGER:  Mr. Levine, can you scroll to the next

7    page.

8    Q.  Mr. Hupcher, under the top date, August 3, 2019, there are

9    several symbols with phones and numbers next to them.  Based on

10   your training and understanding, what do you understand that to

11   represent?

12   A.  Phone calls within the application.

13   Q.  Are you able to tell, is each one of those a separate phone

14   call?

15   A.  Yes.

16   Q.  Can you tell who those phone calls are being placed

17   between?

18   A.  It looks to be Ruben W and Ray.

19   Q.  Now, looking at the entry under 24 August 2019, do you see

20   that message from Ruben W?

21   A.  Yes.

22   Q.  Based on your training and experience, what is occurring

23   here?

24   A.  It looks like Ruben W is sending a file.

25   Q.  What's the name of the file?

L3BMWEI4                    Hupcher - Direct

1  A.  E.zip.

2  Q.  Are you familiar with zip files?

3  A.  I am.

4  Q.  Generally, what are zip files used for?

5  A.  Zip files are used to take multiple files in a folder and

6  compress them into a smaller format and make them into just one

7  file.

8  Q.  Can you tell whether Ruben W is sending or receiving this

9  file?

10  A.  It looks like he's sending it.

11  Q.  Who does he appear to be sending it to?

12  A.  It looks to be Ray.

13       MS. DEININGER:  Mr. Levine, if you can pull up what's

14  been admitted into evidence as Government Exhibit 1801.

15  Q.  Mr. Hupcher, do you recognize this?

16  A.  I do.

17  Q.  What is it?

18  A.  This is a folder structure for the E.zip file.

19  Q.  Have you reviewed the material contained in this folder?

20  A.  I have.

21  Q.  Are you familiar with its structure and contents?

22  A.  Generally, yes.

23  Q.  Just looking at what you see in front of you, can you walk

24  us through the top-level folders that you are able to see in

25  the E folder?

**DJA1613**

L3BMWEI4                    Hupcher - Direct

1   A.   Sure.  There is four.  There is ACQ-statements, Android,

2   Senjo-proofs-shares and supplier-statements.

3   Q.   Thank you.

4          MS. DEININGER:  Mr. Levine, we can now go back --

5   sorry.  This is a lot of document jumping -- to Government

6   Exhibit 1802.  We can show that just to the witness.

7   Q.   Mr. Hupcher, now we are showing you what's been marked for

8   identification as Government Exhibit 1802.

9          Do you recognize this?

10  A.   I do.

11  Q.   What is it?

12  A.   It's the same contents of the E.zip file, but just in

13  further detail.

14  Q.   Looking up at the top left, in the folder bar, do you see

15  the name of the zip file?

16  A.   Yes.

17  Q.   Can you read that.

18  A.   E.zip.

19  Q.   Is this a true and accurate screenshot showing the folder

20  structure of the E.zip folder?

21  A.   Yes.

22  Q.   Would reference to this aid your testimony today?

23  A.   It would.

24          MS. DEININGER:  Your Honor, the government offers

25  Government Exhibit 1802 into evidence.

**DJA1614**

L3BMWEI4                    Hupcher - Direct

1        MR. HARID:  No objection.

2        MS. CLARK:  No objection.

3        THE COURT:  Received.

4        (Government Exhibit 1802 received in evidence)

5        MS. DEININGER:  Mr. Levine, can you now publish that

6    for the jury.

7    Q.  Mr. Hupcher, what does the left-hand side of this page

8    show?

9    A.  It shows the structure of the zip file and it shows each of

10   the subfolders and then the subfolders within those folders.

11   Q.  Is it fair to say that it's a reflection of how the

12   contents of the E.zip folder were organized?

13   A.  That's fair.

14   Q.  Looking just at the top half, what are the folder names

15   below where it says ACQ-statements?

16   A.  There is ECP.  Below that is INST, Johnson, Linebeck, NO.

17   Then there is Kalixa-PXP.  Under that is Kalixa and PXP.  Under

18   PXP is Conetild, GIS, GM, INTLSTD, Johnson, Jonnur, Lanicaso,

19   Linebeck, Lytrej, New Opal, Prekaw, Torger, Veja and Wirelet.

20   Q.  Looking at the bottom half, under where it says supplier

21   statements, what are the folder names below supplier

22   statements?  Basically, the bottom third.

23   A.  Sure.  There is ECP with the same folders as above:

24   INTESTD, Johnson, Linebeck, New Opal.  Then PXP-Kalixa under

25   which is Kalixa.  Under that is HOTR.  Then there is PXP.

L3BMWEI4                    Hupcher - Direct

1  Under that is Conetild, GIS, GM, INTLST, Johnson, Jonnur,

2  Lanicaso, Linebeck, Lytrej, New Opal, Prekaw, Torger, Veja and

3  Wirelet.

4        MS. DEININGER:  Mr. Levine, if you can pull up just

5  for the witness Government Exhibit 3703 and then 3704 and then

6  3705.

7  Q.  Mr. Hupcher, do you recognize those?

8  A.  I do.

9  Q.  What are they?

10  A.  These are the summary tables that I talked about earlier.

11  Q.  Do these accurately summarize the information that you

12  reviewed from Government Exhibit 1801, the E.zip folder?

13  A.  They do.

14        MS. DEININGER:  The government offers Government

15  Exhibit 3703, 3704, and 3705 into evidence.

16        MR. HARID:  No objection.

17        MS. CLARK:  Same.

18        THE COURT:  Received.

19        (Government Exhibits 3703, 3704, and 3705 received in

20  evidence)

21        MS. DEININGER:  Mr. Levine, can you pull up Government

22  Exhibit 3704 for everyone.

23  Q.  Mr. Hupcher, can you just walk us through what each of

24  these columns -- first of all, what's the title of this

25  document?

DJA1616

L3BMWEI4                          Hupcher - Direct

1    A.   Summary table, E.zip, and ACQ-statements folder.

2    Q.   Is it fair to say that this table reflects contents of

3    documents that you reviewed in the ACQ-statements folder in the

4    E.zip?

5    A.   It does.

6    Q.   Can you just walk us through what each of these columns

7    represents.

8    A.   Sure.  The first one, the subfolder name and location is

9    where the folder is located within the structure of the file.

10   The second column, the categories of documents were the types

11   of documents that were in that folder.  The third column,

12   merchant name descriptor, where the various merchant names or

13   descriptors that were contained within the files, the number of

14   documents where -- the total number of documents in those

15   folders.  And then the date range was the overall date range

16   for the documents in those folders.

17              (Continued on next page)

18

19

20

21

22

23

24

25

L3BPWEI5                         Hupcher - Direct

1   Q.  And just briefly, Mr. Levine, can you pull up Government

2   Exhibit 1802 next to Government Exhibit 3704.  And on 1802, if

3   you can just zoom in on the Acq statement half of the left

4   side.  Okay.

5            So, Mr. Hupcher, how does the information in the first

6   column of Government Exhibit 3704 correspond to the folders

7   pictured under the Acq-statements in Government Exhibit 1802?

8   A.  So you'll see in the first line there's ECP, which was the

9   first folders you can see on the right, and then after the

10  arrow, there's INTST, which is the first subfolder, and then

11  the next line you'll see the next subfolder is Johnson, the

12  next subfolder is Linebeck and the next subfolder is NO.

13  Q.  And does this follow that pattern to reflect every

14  subfolder under the Acq-statement folder of the E.zip?

15  A.  It does.

16  Q.  So going back just to Government Exhibit 3704 -- you can

17  actually leave it open.  In Government Exhibit 3704, there are

18  several different types of documents listed under Categories of

19  Documents.  So let's just quickly look at what those are.  In

20  the first line, what's listed there?

21  A.  ECP merchant settlement statements.

22  Q.  Okay.  And then in the fifth line?

23  A.  Kalixa settlement report and fees invoice.

24  Q.  And then in the sixth line?

25  A.  PXP settlement report and fees invoices, PXP payment

**DJA1618**

L3BPWEI5                           Hupcher - Direct

1    requests.

2    Q.  All right.  I just want to briefly look at some examples of

3    those.  So, Mr. Levine, if we can go back to Government

4    Exhibit 1801, and then go into -- which you can show for

5    everyone.  And then go into the top subfolder for

6    Acq-statements and then to ECP, and then to Linebeck.

7             And we can see a number of documents that are

8    contained within this folder.  If you can scroll down within

9    the file titled Merchant Settlement Statement 5740 Linebeck

10   Organikals, USD 1-1-2019.

11            All right.  Mr. Hupcher, can you read the information

12   at the top of this document for me?

13   A.  Merchant settlement statement, ECP Ecom Processing.

14   Q.  And now, what's the -- what's indicated in the top of the

15   box on the left-hand side?

16   A.  Linebeck Organikal USD.

17   Q.  And on the right box on the right-hand side, what's the

18   settle -- what's the date of this document?

19   A.  January 1, 2019.

20   Q.  And what does it say below that?  What does it say next to

21   ISO/PSP?

22   A.  Esepa Finance.

23   Q.  Now, looking down, and we can kind of slowly scroll through

24   this document, what are the different category of fees and

25   other inputs listed under the reference column?

**DJA1619**

L3BPWEI5                          Hupcher – Direct

1   A.  Assessment fee, captured transaction fee, chargeback fee,

2   chargebacks, cross-border fee, gross sales.

3   Q.  We can keep going to the next page, Mr. Levine.

4   A.  Interchange fee, refund fee, refunds.

5   Q.  And keep going.

6   A.  And representatives, settlement, transaction authorization,

7   VBV monthly fee.

8   Q.  Okay.  And for this particular statement, what's the total

9   in the bottom right?

10  A.  $189,820.36.

11  Q.  Okay.  Did you review other documents in Government

12  Exhibit 1801, that's the E.zip folder, that generally followed

13  this same format?

14  A.  I did.

15  Q.  And are those all referred to in the summary chart marked

16  as Government Exhibit 3704 as ECP merchant settlement

17  statements?

18  A.  They are.

19  Q.  Mr. Levine, we can close this document.  And now going back

20  to Government Exhibit 1801, if we can go back out to -- under

21  to Acq-statements, and then to the Kalixa PXP folder.  Now to

22  the Kalixa subfolder, and then into the second file titled K

23  statement with a date that starts 03.05.  That one, yes.

24          Okay.  Mr. Hupcher, what does this document say at the

25  top?

DJA1620

L3BPWEI5                         Hupcher - Direct

1  A.  This says Kalixa, and it is a settlement report and fees

2  invoice.

3  Q.  And under Kalixa, what entity names is listed in bold?

4  A.  Hot Robots.

5  Q.  And to the right of that, what's the collection period?

6  A.  March 5th, 2018, to October 5th, 2018.

7  Q.  Now, again kind of just scrolling through this --

8  A.  Actually, I'm sorry.  I think with that one, that one, the

9  days are first.  So that one is probably May 3rd, 2018, to

10  May 10th, 2018.

11  Q.  Thank you.  I think you're right.

12          So now looking under payment method, if we can just

13  again kind of go through this document, and can you tell us all

14  what the categories are for this settlement report?

15  A.  Sure.  ECMC deposit, ECMC refund, ECMC chargeback, Visa

16  deposit, Visa refund, Visa chargeback.

17  Q.  And then for this particular statement, what was the net

18  settlement amount at the bottom right?

19  A.  672,656.95.  I don't know what currency, based on this.

20  I'm sorry, it says USD.  So that would be dollars.

21  Q.  And did you review other documents in Government

22  Exhibit 1801 that generally followed this same format?

23  A.  I did.

24  Q.  Are those all referred to in the summary chart marked as

25  Government Exhibit 3704, as settlement report and fees

**DJA1621**

L3BPWEI5                     Hupcher – Direct

1    invoices?

2    A.  They are.

3    Q.  All right.  Mr. Levine, we can now go back to Government

4    Exhibit 1801, and to the Acq-statement folder, and then to the

5    Kalixa.PXP folder.  This time there's a PXP subfolder, and then

6    into the Johnson subfolder, and the second file, the Jo payment

7    request to 11.3.19.

8             All right.  So, Mr. Hupcher, what information is at

9    the top of this document?

10   A.  This is a payment request, and it's PXP Financial.

11   Q.  And what entity is listed at the top left under PXP

12   Financial?

13   A.  Johnson NYC.

14   Q.  And what was the reporting -- report date for this payment

15   request?

16   A.  I think the report date was March 11th, 2019.

17   Q.  And again, what are the categories on the left, under

18   payment method?

19   A.  EMC chargeback, Visa chargeback.

20   Q.  And for this payment request, what's the net settlement

21   amount on the bottom right?

22   A.  109.76 Euros.

23   Q.  Okay.  Did you review other documents in Government

24   Exhibit 1801 that generally followed this same format?

25   A.  I did.

DJA1622

L3BPWEI5                        Hupcher - Direct

1    Q.  Did you review other documents in Government Exhibit 1801

2    that generally followed the same format?

3    A.  I did.

4    Q.  Are those all referred to in the summary chart labeled

5    Government Exhibit 3704 as PXP payment requests?

6    A.  They are.

7    Q.  All right.  One more example.  Mr. Levine, if you can go

8    back out to Government Exhibit 1801 now, to the acquired

9    statements folder, to the Kalixa PXP folder, to the PXP

10   subfolder, to the Johnson subfolder, and then to the documents,

11   I think it's the one we looked at Jo settlement report

12   2.03.12.18, on a couple up, fourth from the bottom -- I'm

13   sorry, fourth from the top.  There we go.  All right.

14          Mr. Hupcher, what information is at the top of this

15   document?

16   A.  Settlement report and fees invoice and PXP again.

17   Q.  And what entity is listed at the top left?

18   A.  Johnson NYC.

19   Q.  And what's the settlement date on this, for this settlement

20   report and fees invoice?

21   A.  December 3rd, 2018.

22   Q.  And looking at the payment method column on the left, what

23   are the different categories under that, where it says payment

24   method?

25   A.  ECMC deposit, ECMC refund, ECMC chargeback, Visa deposit,

DJA1623

L3BPWEI5                          Hupcher - Direct

1    Visa refund, Visa chargeback, Visa reverse chargeback.

2    Q.  And can we go to the next page.  For this settlement report

3    and fees invoice, what was the net settlement amount which is

4    the bottom right?

5    A.  160,128.99 Euros.

6    Q.  Did you review other documents in Exhibit 1801 that

7    generally followed this same format?

8    A.  I did.

9    Q.  And are these all referred to in the summary report as PXP

10   Financial statement report and fees in Government Exhibit 3704?

11   A.  They are.

12   Q.  Okay.  Mr. Levine, can we go back to Government

13   Exhibit 3704.  And if you can pull that up for everyone.  Thank

14   you.

15          Okay.  So, Mr. Hupcher, is it fair to say that each

16   one of these lines represents documents similar to the ones we

17   just looked at, that the entries in this -- is it fair to say

18   that the entries in this chart each reflect documents similar

19   to one of the categories that we just looked at?

20   A.  Yeah, I think that's fair.

21   Q.  And so let's look at just -- we don't need to look at every

22   line in this chart, but let's just look at -- let's scroll

23   down.  Let's go to the third page and the top row.

24          So looking at that, what categories of documents did

25   you find in the subfolder labeled New Opal, under Kalixa PXP,

DJA1624

L3BPWEI5                          Hupcher - Direct

1    PXP?

2    A.  Kalixa settlement report and fees invoices, PXP settlement

3    report and fees invoices and PXP payment requests.

4    Q.  And what merchant names or descriptors were referenced?

5    A.  New Opal and New Opal Limited.

6    Q.  And how many documents were in that folder?

7    A.  Seventy-three.

8    Q.  And what was the date range?

9    A.  August 2018 to June 2019.

10   Q.  Okay.  You can zoom out of that, Mr. Levine.  And we can

11   just scroll back up.

12           And looking at the second line from the top here, what

13   categories of documents did you find in the Kalixa PXP, PXP

14   International Standard folder?

15   A.  Kalixa settlement report and fees invoices, PXP settlement

16   report fees and invoices and PXP payment requests.

17   Q.  And what merchant name did you find referenced in those

18   documents?

19   A.  International Standard.

20   Q.  And what was the date range of the documents you found?

21   A.  August 2018 to May 2019.

22   Q.  Okay.  Thank you.

23           Mr. Levine, can you now publish Government

24   Exhibit 3703 in evidence for the jury.

25           Okay.  Mr. Hupcher, we're looking at a similar summary

DJA1625

L3BPWEI5                         Hupcher - Direct

1  chart here.  Can you read this title for us at the top?

2  A.  Summary table E.zip supplier statements folder.

3  Q.  And so does this chart reflect information that you

4  observed in the supplier statement subfolder at the E.zip file?

5  A.  It does.

6  Q.  And this chart also lists several different types of

7  documents.  We have looked at the second row, second column.  I

8  think that lists both of them.  What's listed there?

9  A.  Statements for provided services and depot bank account

10  information.

11  Q.  Okay.  So let's look at an example of each of those.

12         Mr. Levine, if we can go back to Government

13  Exhibit 1801.  And now, let's go into the supplier statements

14  folder.  And then the ECP folder and then New Opal.  Oh, I'm

15  sorry.  Can we go back to supplier statements and instead go to

16  the PXP Kalixa subfolder, and then PXP, and then New Opal.  And

17  then can we open the -- what's titled 585681-FU.zip, at the

18  top.

19         Okay.  We have a number of documents in here, too.  In

20  that zip folder can you open the document titled 585681-15.

21  Okay.  Thank you.

22         So, Mr. Hupcher, what does this say at the top left?

23  A.  Statement for provided services.

24  Q.  And what is the service period that's indicated?

25  A.  November 24th, 2018, to December 1st, 2018.

DJA1626

L3BPWEI5                          Hupcher - Direct

1   Q.  And below that, what's the partner name?

2   A.  Clear Lake Grove Fund Two, Inc.

3   Q.  What does it say as to where the partner is located?

4   A.  The address is in California.

5   Q.  On the right, to the right of that, what does it say next

6   to service?

7   A.  K-NewOp-Soniclogistix.

8   Q.  And then can you read the information under total

9   transactions?

10  A.  Number of approved transactions, 392; number of declined

11  transactions, 52; number of refunds, one; number of

12  chargebacks, two.

13  Q.  And then under turnover, can you read what it says for the

14  net turnover?  It's on the right side there.

15  A.  27,276.19 Euro.

16  Q.  Under deductions, can you read what it says for rates on

17  the right-hand side of the page?  There we go.

18  A.  12 percent, and 3,333.06 Euro.

19  Q.  And then a little bit below that, in a section called

20  payouts, what does it say for total settlement amount?

21  A.  23,805.03 Euro.

22  Q.  Did you review other documents in Government Exhibit 1801

23  that generally follows this same format?

24  A.  I did.

25  Q.  And are those all referred to in the summary chart marked

DJA1627

1328

L3BPWEI5                    Hupcher - Direct

1   Government Exhibit 3703 and statements for provided services?

2   A.  They are.

3   Q.  All right.  Mr. Levine, let's go back up to Government

4   Exhibit 1801 and to the supplier statements folder.  Let's go

5   back into the PXP-Kalixa folder and into Kalixa.  Sorry, after

6   PXP, let's go back.  Let's go to PXP instead of Kalixa, and

7   into Veja, and then into the zip folder 1585685-FTE.zip.  And

8   can you open the document that's labeled Bank Account Details.

9           Okay.  Mr. Hupcher, can you read the sentence at the

10  top of this document?

11  A.  "Hi, From the Earth is actually launching a second location

12  but will have different banking info for these.  The last three

13  wires to their first location have been successfully received."

14  Q.  And so looking at the table below that, what does it say to

15  the right of depots?

16  A.  From the Earth Ventura and From the Earth Orange County.

17  Q.  And what does it say for bank account name?

18  A.  DBO Investments LLC, for From the Earth Ventura and Earsa

19  Management LLC for From the Earth Orange County.

20  Q.  Did you review other documents in Government Exhibit 1801

21  that followed a format similar to this table?

22  A.  Yes.

23  Q.  And are those referred to in the summary chart in

24  Government Exhibit 1803 as depot bank account information?

25  A.  Yes.

DJA1628

L3BPWEI5                        Hupcher - Direct

1    Q.  Can we go back to Government Exhibit 3703.  Okay.

2            So again, this is a summary of information you

3    reviewed in the supplier statements folder, correct?

4    A.  Yes.

5    Q.  From the E.zip file, right?

6    A.  Yes.

7    Q.  So looking just at the fifth column, what are some of the

8    depots or service descriptors you found mentioned in the

9    documents in the suppliers statements folder?  And we can start

10   by looking at the second row, the second row, fifth column.

11   A.  Superior health and superior herbal health.

12   Q.  How about if we go to page 2 and the second and third rows?

13   A.  G-Greenteacha and G-Organikals.

14   Q.  And how about if we go down to page 4 and we look at the

15   second-to-last row?

16   A.  K-conetild-absolute.  K-conetild-essential surf,

17   K-conetild-happy puppy, K-cone tild-the hidden kitten, and

18   K-GIS.

19   Q.  And just to confirm, Mr. Levine, can you pull up what's

20   been admitted in Government Exhibit 3705 next to Government

21   Exhibit 1802.  Sorry, 3703.  Okay.  Sorry, can you pull up 3703

22   next to 1802?  Okay.

23           And so again just to confirm, looking at the bottom

24   half of Government Exhibit 1802, starting with where it says

25   Supplier Statements, how does the information on the first

**DJA1629**

L3BPWEI5                          Hupcher - Direct

1    column of Government Exhibit 3703 relate to what we're looking

2    at right now with Government Exhibit 1802?

3    A.  It shows the folder structure.  So, for example, with the

4    first entry, you'll see ECP, which is the main folder under the

5    supplier statements, and within that there is INTESTD, and then

6    within that is the zip file that contains the other documents.

7    Q.  All right.  Can we now pull up what's in evidence as

8    Government Exhibit 3705.  Sorry.

9              All right.  Mr. Hupcher, can you just briefly walk us

10   through these columns what the different categories of

11   information are?

12   A.  Sure.  The first one is categories of documents.  The next

13   one is the debtor name, if it was listed, and then the

14   beneficiary name, if it was listed, the total number of

15   documents in the folder, and then the date range of those

16   documents.

17   Q.  I should have had you start with this, but what's the title

18   of this chart?

19   A.  Sure.  It's Summary Table for E.zip, and it's the Senjo

20   Proofs Shares folder.

21   Q.  And does that mean that all of the information in this

22   chart is information that you reviewed from that Senjo

23   proofs-shares folder in the E.zip file?

24   A.  Yes.

25   Q.  Let's look at these two types of documents.  So,

L3BPWEI5                        Hupcher - Direct

1    Mr. Levine, if we can go back to Government Exhibit 1801, and

2    we're going to go into the Senjo-proofs-shares folder.  And

3    let's open the document titled wire-01.

4          Okay.  Mr. Hupcher, in this document, do you see where

5    it says Ultimate Debtor?  It's one of the pieces of information

6    kind of in the middle.

7    A.  Yes.

8    Q.  And who is listed there?

9    A.  Spinwild Limited.

10   Q.  And what entity is listed next to beneficiary?

11   A.  Senjo Payment Asia PTO Limited.

12   Q.  And what is the payment date?

13   A.  July 30th, 2018.

14   Q.  And what is the ordered amount?

15   A.  476,586 Euro.

16   Q.  And going down to the bottom left, can you read the first

17   line, where they provide contact information or what entity it

18   says to contact?

19   A.  Please contact Kantox.

20   Q.  Okay.  Did you review other documents in this folder of

21   Government Exhibit 1801 that generally follows this same

22   format?

23   A.  I did.

24   Q.  Are those all referred to in the summary chart marked as

25   Government Exhibit 3705, as Kantox proofs of wire payment?

**DJA1631**

L3BPWEI5                    Hupcher - Direct

1    A.  Yes.

2    Q.  Mr. Levine, we can close out of this document, but staying

3    in Government Exhibit 1801, open up the Excel file titled

4    Senjo-distribution.  And can we go to the tab titled 2018, and

5    scroll up to the top.

6            Okay.  So focusing on row 3, can you read what's in

7    columns B and C?

8    A.  Column B is Kalixa; Column C is Hot R.

9    Q.  And then if you keep following row 3 all the way over to

10   the right, to column O, can you read what's written in that

11   cell?

12   A.  Overpayment.  This amount needs to be wired back to the Hot

13   Robot's account.

14   Q.  So now, let's go back to the left, and focusing on the

15   second table, where it says "September" on the left-hand side.

16   Can you read the column, the kind of row headers in columns B

17   and C, below where it says September?

18   A.  Just the headers?

19   Q.  Yes.  Just the information in columns B and C from lines 18

20   to 25?

21   A.  Sure.  ECP and then INTST, ECP New OP, ECP John, ECP

22   Linebeck, and then Kalixa INTST, Kalixa New OP, Kalixa John,

23   Kalixa Linebeck.

24   Q.  And, Mr. Levine, if you can just scroll to the bottom of

25   this page briefly for us.  Thank you.  And now if you can just

DJA1632

L3BPWEI5                          Hupcher - Direct

1   open up, go to the page, the 2019 tab, and scroll up to the

2   top.

3            And let's look this time at the table labeled

4   November, the one kind of at the top.  Mr. Hupcher, if you can

5   read the information that's in Column B and C for lines 3 to

6   14.

7   A.  ECP INTST, ECP NewOp, ECP John, ECP Linebeck, Kalixa INTST,

8   Kalixa NewOp, Kalixa John, Kalixa Grandmoor, Kalixa Linebeck,

9   Kalixa Johnur, Kalixa torger, Kalixa conetild.

10  Q.  And now we can go to the totals tab.  Focusing just on the

11  content at the bottom of columns B, C and D, can you read what

12  that table says for us?

13  A.  Period is 2018 to 2019.  Shares for G team is 738,372.20

14  Euro; share for jaw 13/Senjo, 5,081,790.22 Euro.

15  Q.  Thank you.  All right.  Mr. Levine, we can close out of

16  Government Exhibit 1801 now.

17            THE COURT:  I think we've --

18            MS. DEININGER:  Your Honor, if I may pull up one more

19  thing?  I promise it's one question.

20            THE COURT:  All right.

21  BY MS. DEININGER:

22  Q.  If we can pull back up Government Exhibit 3707.

23            And, Mr. Hupcher, can you just confirm that Government

24  Exhibit 1801 is listed in Government Exhibit 3707?

25  A.  It is.

**DJA1633**

L3BPWEI5                        Hupcher - Direct

1    Q.  Thank you.

2              THE COURT:  All right.  Very good.  So, ladies and

3    gentlemen, I know it's hard for you to tear yourself away from

4    this rivetting testimony, but we will continue tomorrow at

5    9:45, our usual time.  So have a good evening.  We'll see you

6    then.

7              (Jury not present)

8              THE COURT:  You may step down.

9              (Witness temporarily excused)

10             Okay.  Please be seated.  So just to clarify the

11   record.  It was a little confused.  When some of these exhibits

12   were previously introduced, I dealt, outside the hearing of the

13   jury, with a number of global objections, which I denied, but I

14   gave defense counsel the right to reserve more specific

15   objections when the exhibits were reintroduced in effect

16   through this witness, and they did so.  And I considered them

17   in that context.  So those are all preserved.

18             So anything else we need to take up now?

19             MS. LA MORTE:  Yes, your Honor.  I have two things.

20   First is your Honor had asked whether the defense intends to

21   call the other Bank of America witnesses, in light of

22   Mr. Clow's testimony, and I believe that was one matter that

23   was going to be taken up now.

24             THE COURT:  Yes.  Thank you for reminding me.  So

25   what's the answer?

L3BPWEI5                          Hupcher - Direct

1      MR. TAYBACK:  No, we do not.

2      THE COURT:  Okay.  Excellent.

3      MS. LA MORTE:  The other matter, your Honor, is just

4  if your Honor is so inclined, your expectation as to what we

5  should expect tomorrow with respect to the expert witness

6  hearing?  If there's any guidance the Court has as to how your

7  Honor expects that to proceed?

8      THE COURT:  Well, I have to go back, and I will do so

9  tonight, and look at the objections that were raised.  Some of

10  them can be dealt with without reference to the witness'

11  testimony, but others require, I think, some inquiry of the

12  witness.

13      For example, I think there was a witness who was going

14  to be called to testify about reasonableness in this context,

15  and that's not going to be allowed.  But I think, by memory --

16  and I haven't gone back and looked -- there were some other

17  things that he may be talking about that were admissible.  So

18  that's the kind of thing that we need to deal with.

19      MR. TAYBACK:  On the subject matter of the hearing,

20  your Honor, I believe you indicated it could be conducted by

21  Zoom, and so we --

22      THE COURT:  Yes.

23      MR. TAYBACK:  My understanding is we have the

24  capability here.  You already have a camera.

25      THE COURT:  I'm happy to do it by Zoom, and I think we

**DJA1635**

L3BPWEI5                        Hupcher – Direct

1  should accommodate the witnesses in that respect because if I

2  rule them out, they won't have to come.

3          MR. TAYBACK:  Yes.

4          THE COURT:  And if I rule them in, they'll know that

5  they've got to get going.

6          MR. TAYBACK:  So we'll make the arrangements.

7          THE COURT:  Excellent.

8          MS. CLARK:  Your Honor, this is Sara Clark.  Your

9  Honor, I understand that I went over my red limit on my

10  objection to 4301, but I did want to raise -- we would like to

11  request, at a minimum, redactions of Social Security numbers

12  and driver's licenses on that document?  I believe --

13          THE COURT:  So if there's no objection, I'm all for

14  that, but there is this caveat.  There is a reporter who sent a

15  letter, which I forwarded to all you folks, objecting to

16  redactions.  I don't know that he understood these were mostly

17  redactions to protect the identity of people, things like

18  Social Security numbers and things like that, but I'm waiting

19  to get your responses to that by 8:00 tonight.

20          So but as a general matter, is there any objection to

21  redactions of Social Security numbers and driver's licenses?

22          MS. LA MORTE:  No, there's not.

23          THE COURT:  Okay.  So the only real question is going

24  to be the issue raised by the reporter of the Public Document

25  Doctrine, which, you know, after I see your responses tonight,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1636

L3BPWEI5                    Hupcher – Direct

1    I'll rule on it.  Okay.

2            MR. HARID:  Your Honor, we have a related redaction,

3    related request, and this concerns Government Exhibit 1733,

4    which hasn't been received in evidence yet.  Certain

5    individuals and entities that are not alleged to have been

6    co-conspirators are named in that document.  We would

7    respectfully request that those names be redacted.

8            THE COURT:  Any objection?

9            MS. DEININGER:  Yes, your Honor.  We would object to

10   that request.  This is not PII.  These are just individuals

11   that are referenced in a relevant conversation.

12           THE COURT:  All right.  I'll take a look at that

13   tonight as well and let you know when I make my rulings first

14   thing tomorrow.  So why don't we get together at 9:15 tomorrow.

15           MR. TAYBACK:  Thank you, your Honor.

16           MR. HARID:  Thank you.

17           THE COURT:  Very good.

18           (Adjourned to 9:15 a.m. on March 12, 2021)

19

20

21

22

23

24

25

1338

```
1                    INDEX OF EXAMINATION

2   Examination of:                          Page

3    RICHARD CLOW

4   Direct By Ms. La Morte . . . . . . . . . . .1144

5   Cross By Mr. Burck . . . . . . . . . . . . .1190

6   Cross By Mr. Gilbert . . . . . . . . . . . .1263

7   Redirect By Ms. La Morte . . . . . . . . . .1274

8   Recross By Mr. Burck . . . . . . . . . . . .1281

9   Recross By Mr. Gilbert . . . . . . . . . . .1284

10   ROBERT HUPCHER

11  Direct By Ms. Deininger  . . . . . . . . . .1287

12                   GOVERNMENT EXHIBITS

13  Exhibit No.                           Received

14   2413 through 2416  . . . . . . . . . . . .1156

15   2424, 2427, 2428, 2423 and 2425  . . . . .1169

16   2407    . . . . . . . . . . . . . . . . . .1196

17   2421    . . . . . . . . . . . . . . . . . .1229

18   2426    . . . . . . . . . . . . . . . . . .1236

19   4301    . . . . . . . . . . . . . . . . . .1297

20   1724    . . . . . . . . . . . . . . . . . .1305

21   1728    . . . . . . . . . . . . . . . . . .1308

22   1722    . . . . . . . . . . . . . . . . . .1310

23   1730    . . . . . . . . . . . . . . . . . .1312

24   1802    . . . . . . . . . . . . . . . . . .1315

25
```

1    3703, 3704, and 3705 . . . . . . . . . . . .1316

2                    DEFENDANT EXHIBITS

3    Exhibit No.                              Received

4    Akhavan 10017, 10018, and 10037  . . . . . .1240

5    11,009  . . . . . . . . . . . . . . . . . .1255

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DJA1639

L3CMWEI1                                                        1340

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4            v.                          20-CR-188 (JSR)

 5   RUBEN WEIGAND and
     HAMID AKHAVAN,
 6
                  Defendants.            Trial
 7
     ------------------------------x
 8
                                         New York, N.Y.
 9
                                         March 12, 2021
10                                       9:25 a.m.

11
     Before:
12
                      HON. JED S. RAKOFF,
13
                                         District Judge
14

15                          APPEARANCES

16   AUDREY STRAUSS
          United States Attorney for the
17        Southern District of New York
     BY:  NICHOLAS FOLLY
18        TARA MARIE LA MORTE
          EMILY S. DEININGER
19        Assistant United States Attorneys

20   DECHERT LLP
          Attorneys for Defendant Weigand
21   BY:  MICHAEL J. GILBERT
          SHRIRAM HARID
22        ANDREW J. LEVANDER
          STEPHEN PELLECHI
23        -and-
     MICHAEL H. ARTAN
24        Attorney for Defendant Weigand

25
                       APPEARANCES CONTINUED

                  SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

DJA1640

L3CMWEI1                                                          1341

QUINN EMANUEL URQUHART & SULLIVAN, LLP
        Attorneys for Defendant Akhavan
BY:  WILLIAM A. BURCK
        CHRISTOPHER TAYBACK
        SARA CLARK
        MARI HENDERSON
        DEREK SHAFFER
        PAUL SLATTERY
        -and-
ROTHKEN LAW FIRM LLP
        Attorneys for Defendant Akhavan
BY:  IRA P. ROTHKEN
        JARED R. SMITH

L3CMWEI1                                                        1342

1            (Trial resumed; jury not present)

2            THE COURT:  Before we turn to other matters, is the

3    government through their direct with this witness?

4            MS. DEININGER:  No, your Honor.  It should not be more

5    than another 45 minutes.

6            THE COURT:  Forty-five minutes?  You understand, this

7    is water torture so far, as the jury is concerned.

8            MS. DEININGER:  We will not be going back to those

9    particular set of documents again.

10           THE COURT:  Cross-examination?

11           MR. HARID:  Your Honor, because of the amount of stuff

12   covered, I would imagine about 45 minutes or so.

13           MS. CLARK:  Probably about ten minutes, your Honor.

14           THE COURT:  Who is the witness after that?

15           MR. FOLLY:  James Patterson.

16           THE COURT:  Next.  Thank you for your submissions on

17   the request from the reporter from Inner City Press to unredact

18   certain items, and I also received a reply from the reporter.

19   I will review all that over the weekend and get you a ruling

20   either by e-mail on Sunday or from the bench on Monday morning.

21           Next.  There is, as I understand it, an issue that is

22   liable to come up with Mr. Patterson, and we might as well at

23   least start on that now since the jury won't be up for another

24   15 minutes.

25           MS. DEININGER:  Your Honor, there is also the other

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

DJA1642

L3CMWEI1                                                        1343

1    issue that was raised with regard to Government Exhibit 1733.

2              THE COURT:  I'm sorry?

3              MS. DEININGER:  That's something that's expected to

4    come up with Mr. Hupcher.

5              THE COURT:  Let's take a look at that first.  That's

6    correct.  The defendants have an objection beyond the previous

7    objections to Government Exhibit 1733, which is a Telegram

8    chat.

9              Let me hear from defense counsel.

10             MR. TAYBACK:  Your Honor, if it's more convenient for

11   your Honor, the document itself doesn't have any pagination.

12   We hand-paginated a copy.  I can hand it up to you.

13             THE COURT:  Great.  Terrific.

14             MR. TAYBACK:  Your Honor, I'll start with the fact

15   that the government did make an effort to redact certain

16   provisions, I think consistent with your Honor's preliminary

17   orders in a motion we had made, motion *in limine*, I believe,

18   that redacts references to my client's drug addiction, as your

19   Honor is well familiar with that circumstance.

20             THE COURT:  Definitely that should be redacted.

21             MR. TAYBACK:  The concern I have is if you look at say

22   page 6, page 10 --

23             THE COURT:  Which one do you want me to look at?

24             MR. TAYBACK:  Start with page 10.  Maybe that's the

25   best example.

L3CMWEI1                                                          1344

1           THE COURT:  There is a reference there.

2           MR. TAYBACK:  My concern is --

3           THE COURT:  Excuse me.  Just so the record is clear,

4    for now let's try to keep it discrete, not to make it about Ray

5    and drugs, etc.  You want to redact, and drugs, etc.

6           MR. TAYBACK:  That has been redacted by the

7    government.  My concern is that the context of the conversation

8    is misleading in the absence of an understanding that he has

9    friends who are talking about trying to protect his assets

10   because he's got a serious addiction.

11          Now, I know the government's contention is there are

12   other aspects to this or at least that's an inference that

13   could be made from this chat.

14          THE COURT:  I am not sure -- the sentences right

15   before that, Mr. Mizrachi is saying the story is that Ray is no

16   longer in control because he transferred his ownership to an

17   asset protection trust in the Cook Islands to protect his

18   assets from creditor actions and issues relating out of certain

19   relations with Eaze.  That sounds pretty relevant to me.

20          MR. TAYBACK:  I do understand why that would be

21   relevant.  My concern is that in the overall context of the

22   reason to protect his assets, if you look at, also, page 6, for

23   example because it's a running conversation --

24          THE COURT:  Let me look at page 6.

25          This is a little more problematic than page 10.  Page

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

L3CMWEI1                                                              1345

1    6, Mr. Mizrachi says:  I asked Ray yesterday and he said what

2    government is going to trace that shit, acting like it's not

3    possible.  Then there is a redaction, but the next thing he

4    says, he was high on opiate.  Then Mr. Weigand says he's

5    freaking out on me, but I think everything goes even worse when

6    he has money.

7              I wonder why we shouldn't redact, he's freaking out.

8              MR. TAYBACK:  I would say the sentence prior to he was

9    high on opiate.  He was attributing a statement to him but then

10   he is qualifying it.

11             THE COURT:  Most of what is being discussed here has

12   nothing to do with his opiate addiction.  I'm not even sure

13   that Mr. Weigand's statement, he's freaking out on me, really

14   relates to that, but it might.

15             So in an excess of caution I'll have the government

16   redact that one.

17             MS. DEININGER:  Yes, your Honor.

18             THE COURT:  There was one other page you wanted to

19   look at.

20             MR. TAYBACK:  No.  Those were the pages.

21             MR. HARID:  Your Honor, we have a couple of pages.

22             THE COURT:  The last one was more to your benefit than

23   Mr. Akhavan since it relates to a statement by your client.

24   But, anyway, go ahead.

25             MR. HARID:  Yes, your Honor.  Thank you.

L3CMWEI1                                                    1346

1          On pages 6 and 7 there are certain references to other

2     entities, including B/S Concardis and Mirko and Worldline --

3          THE COURT:  Hold on.  Let me take a look at it.  Where

4     on page 6?

5          MR. HARID:  The top of page 6 this says:  In case he

6     tries to contact B/S or Concardis.

7          THE COURT:  I'm sorry?

8          MR. HARID:  I am not sure --

9          THE COURT:  I'm having a little trouble.  Not from

10    volume.  I think you are a little too close to the microphone.

11         MR. HARID:  Your Honor, the exchange beginning August

12    20 --

13         THE COURT:  Give me a time or just quote the line to

14    me.

15         MR. HARID:  Page 9 --

16         THE COURT:  You are using different pagination.

17         MR. HARID:  That's correct.

18         THE COURT:  That's clever.

19         Mr. Tayback, can you translate it into your pages?

20         MR. TAYBACK:  I just gave it --

21         MR. HARID:  Yes, your Honor.  He was kind enough to do

22    that.

23         The top of page 9 in Mr. Tayback's version.

24         THE COURT:  Top of page 9.

25         MR. HARID:  The sentence that says:  In case he tries

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

L3CMWEI1                                                          1347

1  to contact B/S or Concardis.  B/S and Concardis are not alleged

2  coconspirators in this case and we'd like those names --

3            THE COURT:  Hold on.  Let me read it.

4            This begins on the previous page.  Mr. Mizrachi says:

5  Ray has been told that he is no longer active or owner of the

6  companies:  5lions, Webops, Quantum, etc.  He is, of course,

7  threatening to kill all the banking activity that affect the

8  wires, etc.  Just want to give you a heads-up in case he tries

9  to contact B/S or Concardis and says that he is UBO, move the

10  money, etc.  Mr. Weigand replies:  Doesn't know the people

11  there.  Mr. Mizrachi replies:  The truth is, we move Ray's

12  shares from Ray to his asset protection trust.

13            MR. HARID:  Your Honor, the following sentence, we

14  will give Mirko a heads-up.  We would like the reference to

15  Mirko --

16            THE COURT:  We will give Mirko a heads-up.  Thank you.

17            MR. HARID:  We would like that removed.

18            THE COURT:  You would want to redact the first line

19  that says:  In case he tries to contact B/S or Concardis.

20            MR. HARID:  That's right.

21            THE COURT:  Then the line from your client:  He

22  doesn't know the people there since it's arguably a reference

23  to those other companies.  And then the line:  We will give

24  Mirko a heads-up.  Right?

25            MR. HARID:  That's right.

**DJA1647**

1           THE COURT:  Let me hear from the government.

2           MS. DEININGER:  Your Honor, our understanding is that

3    defendant Weigand's argument is it should be redacted because

4    they are not names of coconspirators, and they are not.  But

5    that does not mean that the names aren't relevant.  They are

6    part of a relevant conversation.  It's discussing where assets

7    might be, and the fact that they might be giving people a

8    heads-up about it tends to move or access those assets.

9           THE COURT:  I think in the context of this lengthy

10   conversation and the potential for confusion, we should err on

11   the side of caution, so I will redact those lines.

12          MR. HARID:  Your Honor, just one more name.  The top

13   of page 10 there is a reference to Worldline.  For the same

14   reasons, we request that that name be redacted.

15          MS. DEININGER:  Your Honor, Worldline has already been

16   discussed several times in the testimony as being involved in

17   meetings with Ray.

18          THE COURT:  Yes, I agree, so that will not be

19   redacted.

20          MS. DEININGER:  Just so I can be clear --

21          THE COURT:  The lines that are to be redacted on page

22   9 in the Tayback pagination are Mr. Mizrachi's statement:  In

23   case he tries to contact B/S or Concardis, and you can put in

24   three dots there or something, if you wish, so the jury will

25   know that it's not a grammatical error, so to speak, because it

L3CMWEI1                                                          1349

1    doesn't flow directly from the previous sentence.  And then

2    Mr. Weigand's statement:  He doesn't know the people there.

3    And then Mr. Weigand's further statement:  We will give Mirko a

4    heads-up.  Those are the lines.

5             MS. DEININGER:  Thank you.

6             MR. HARID:  Your Honor, just one final point on this

7    document.  We do have an overall objection to this document,

8    and I think the context is significant.  We see a number of

9    concerned friends of Mr. Akhavan reacting to drug addiction and

10   reacting to his arrest for something completely unrelated.  So

11   for that reason we think that is entirely more prejudicial than

12   probative, and the entire document should be excluded for that

13   reason.

14            THE COURT:  I don't really see that.  One or two

15   things that Mr. Tayback brought to my attention regarding drug

16   addiction I struck.  What else are you referring to?

17            MR. HARID:  Your Honor, the entire document is -- the

18   context is unrelated to the charged scheme and likely to

19   result --

20            THE COURT:  No.  The substance is related to the

21   charges here.  The fact that the call may have been

22   precipitated by X or Y or Z event is neither here nor there.

23   Overruled.

24            Hopefully the jury will be up in about two minutes.

25            Anything else we need to take up?

DJA1649

L3CMWEI1                                                             1350

1            MR. TAYBACK:  Did you want to talk about the Patterson

2     exhibit, which is Government Exhibit 423?

3            THE COURT:  Yes.  Let me find that one.

4            By the way, I assume you got the message from my law

5     clerk that we will begin with the experts at 4:30 rather than

6     4:00.

7            MR. TAYBACK:  Yes.  Thank you, your Honor.

8            Our objection is not to the text of the exhibit, just

9     to be clear.

10           THE COURT:  What's the objection?

11           MR. TAYBACK:  The government's proposal has redacted

12    all of the e-mails below it to which this e-mail responds,

13    including an e-mail or e-mails by the testifying witness.

14           Our contention is, the redactions should not be there.

15    They should be unredacted because it's all about filling

16    descriptors.  It gives all of the context for the portion of

17    this e-mail chain that they intend to introduce with none of

18    the people saying what they say that prompts the response.

19           THE COURT:  Let me hear from the government.

20           MR. FOLLY:  Yes, your Honor.

21           This issue really intersects with another issue that I

22    think we will also need to address.

23           The reason that the government wants to redact the

24    other e-mails that come before this e-mail is that they contain

25    several references to an individual named Jim Black, who is a

DJA1650

L3CMWEI1                    Hupcher – Direct                    1351

1    lawyer for Eaze, and the government has, by and large, avoided

2    exhibits that contain references to Jim Black, but there are

3    some in the e-mails --

4         THE COURT:  We are going to have to continue this.  My

5    apologies.  The jury is here.

6         (Jury present)

7         THE COURT:  Good morning, ladies and gentlemen.  Thank

8    you once again for your excellent promptness.

9         As you come in, I always take a look at what you are

10   wearing.  Most of the women always have wonderful colorful

11   outfits and the men are, with one or two exceptions, completely

12   drab, and I guess this is one of the few remaining gender

13   differences.  But it's very apparent to me and that some of the

14   men might want to consider, you know, a little bit of color.

15        Very good.

16   ROBERT HUPCHER, resumed.

17   DIRECT EXAMINATION

18   BY MS. DEININGER:

19   Q.  Good morning, Mr. Hupcher.

20   A.  Good morning.

21        MS. DEININGER:  To get us started today, Mr. Levine,

22   can you pull up again what's admitted into evidence as

23   Government Exhibit S1.

24        I am just going to focus on the first paragraph of

25   this one.  Government Exhibit 1803 is an Apple MacBook pro, the

DJA1651

L3CMWEI1                   Hupcher - Direct                   1352

1    laptop that was seized by the Federal Bureau of Investigation,

2    FBI agents, from defendant Ruben Weigand on March 9, 2020, when

3    he was arrested.

4           Mr. Levine, if we can now put that down and look back

5    to what's been admitted into evidence as Government Exhibit

6    3707.

7    Q.  Mr. Hupcher, do you remember looking at this yesterday?

8    A.  I do.

9    Q.  The summary chart with the government exhibit numbers and

10   the MB5 hashes and the file names?

11   A.  Yes.

12   Q.  Looking at page 2 of this chart, is Government Exhibit 1684

13   listed?

14   A.  It is.

15          MS. DEININGER:  Mr. Levine, can we pull up Government

16   Exhibit 1684, which has been admitted into evidence.

17   Q.  Mr. Hupcher, looking at this e-mail, who is it from?

18   A.  Ruben Weigand.

19   Q.  Who is it to?

20   A.  Guy.

21   Q.  What date was it sent?

22   A.  March 7, 2016.

23   Q.  Can you read the e-mail for me.

24   A.  Hey Guy, we're currently checking entities with Webshield

25   before boarding as our banks are using the tools as well, and

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

```
L3CMWEI1                    Hupcher - Direct                    1353
```

1   we need to know what they detect.

2          Webshield is already detecting related entities for

3   same phones numbers, support pages, etc.  Check attached.

4          This results in bad scores for the corps.

5          As more and more banks are using more sophisticated

6   crawlers, we should sit with Christian Chmiel to figure out how

7   we'll be able to avoid this.

8          What do you think?  It would be better to make sure

9   that crawlers won't roll up the structure.

10         Best, Ruben.

11  Q.  Thank you.

12         MS. DEININGER:  Mr. Levine, can you now pull up what's

13  been admitted into evidence as Government Exhibit 1686.

14  Q.  Mr. Hupcher, who is this e-mail from?

15  A.  Christian Chmiel.

16  Q.  Who is it to?

17  A.  Ruben Weigand and Ray.

18         MS. DEININGER:  Your Honor, my apologies.  My screen

19  just turned off.

20         I can try and keep going while Jimmy tries to figure

21  this out.

22  Q.  Let's start again.  Who is sending this e-mail?

23  A.  Christian Chmiel.

24  Q.  Who is it being sent to?

25  A.  Ruben Weigand and Ray.

DJA1653

L3CMWEI1                    Hupcher - Direct                    1354

1   Q.  What e-mail addresses are they using?

2   A.  Ruben Weigand is using rw@payment-consultants.com.  Ray is

3   using ray@ce staff.com.

4   Q.  Can you read the first two full paragraphs of this e-mail.

5   A.  Trust this e-mail finds you well.  I have reviewed the

6   associated merchant applications, and please find below the

7   identified issues.

8           Knutled Limited.  The phone number in the billing

9   descriptor, 844-222-3193, is not matching the website of

10  eazebilling.com, 888-612-5343.  The phone number on

11  eazebilling.com.  Easymedpay.net, ULT Ventures Limited, the

12  case that has already been identified by Visa.

13  Q.  You can actually stop there.

14          If we look down, do you see there is a paragraph under

15  Paranthia Limited?

16  A.  Yes.

17  Q.  Can you read that for me.

18  A.  The phone number in the billing descriptor, 844-817-8107,

19  is not matching the website of eazecharge.com, 888-612-5354.

20  The phone number on eazebilling.com, 888-612-5344, is the

21  historical phone number of easymedpay.net, ULT Ventures

22  Limited, the case that has already been identified by Visa.

23  Q.  You can stop.  Thank you.

24          Can you hear me?

25  A.  Yes.

DJA1654

L3CMWEI1                    Hupcher - Direct                    1355

1        MS. DEININGER:  If we scroll down the page a little

2   bit to a portion that says general issues.  Keep going down.

3   Q.  Can you just read those points that are bullet pointed

4   under general issues for me.

5   A.  Different support e-mail addresses not starting with CS.

6   Shift all URLs to a shared server environment, e.g. cloud

7   flare, with different IP ranges.  No templates anymore.  The

8   contract of the acquirer should be filled.  No Excel template

9   sent.  No batch uploads of merchant accounts.  Try to get rid

10  of support website.  This is a total red flags for miscoding.

11  It is strongly recommended to make the necessary changes before

12  moving forward here.

13  Q.  Thank you.

14        What was the date of this e-mail?

15  A.  September 29, 2017.

16  Q.  Thank you.

17        MS. DEININGER:  I'd now like to look at what's been

18  admitted into evidence as Government Exhibit 1688.  But, first,

19  I'd like to pull up -- one moment, your Honor.

20        Your Honor, I would just like to read from a

21  stipulation which is marked as Government Exhibit S6.

22        If you look at paragraph 2, it says:  Government

23  Exhibit 1688-TR is a true and accurate English translation of

24  the German language portions of Government Exhibit 1688.

25        Mr. Levine, if you can zoom out.

```
L3CMWEI1                      Hupcher - Direct                   1356
```

1    It is further stipulated and agreed that this

2    stipulation, which is marked as Government Exhibit S6, and

3    Government Exhibits 1901-T and 1688-TR may be received in

4    evidence as government exhibits at trial.

5         Your Honor, the government offers into evidence

6    Government Exhibit S6 and 1688-TR.

7         MS. CLARK:  No objection.

8         MR. HARID:  No objection.

9         THE COURT:  Received.

10        (Government Exhibits S6 and 1688-TR received in

11   evidence)

12        MS. DEININGER:  Mr. Levine, if you can now pull up

13   Government Exhibit 1688-TR.  If we can go to page 2 of that

14   document.

15   Q.  Mr. Hupcher, who is this e-mail from?

16   A.  Christian Chmiel.

17   Q.  What does it say after his name?

18   A.  Webshield and his address at webshieldlimited.com.

19   Q.  Who is this e-mail sent to?

20   A.  Ruben Weigand.

21   Q.  What is the subject?

22   A.  WG:  Do you have any feedback on the URLs?

23   Q.  Are there attachments to this e-mail?

24   A.  Yes.  There are three.

25   Q.  Can you read the file names for those attachments.

```
L3CMWEI1                    Hupcher - Direct                    1357
```

1    A.   Investigate-report International Standard Limited,

2    investigate-report Lorry Limited, investigate-report Hot Robots

3    Limited.

4            MS. DEININGER:  Mr. Levine, can we now pull up

5    Government Exhibit 3707 again.

6    Q.   Mr. Hupcher, do you see Government Exhibit 1596 listed here

7    on the second page?

8    A.   I do.

9    Q.   What is the file name for Government Exhibit 1596?

10   A.   Investigate-report Hot Robots Limited.

11   Q.   What was the date that it was added?

12   A.   April 17, 2018.

13   Q.   Below that, do you see Government Exhibit 1597 listed?

14   A.   I do.

15   Q.   What's the file name for that document?

16   A.   Investigate report Lorry Limited.

17   Q.   What was the date added?

18   A.   April 17, 2018.

19           MS. DEININGER:  Mr. Levine, can we now pull up what's

20   in evidence as Government Exhibit 1596.

21   Q.   Mr. Hupcher, what entity is named on the top right of this

22   document?

23   A.   Webshield Limited.

24   Q.   What about on the top left?

25   A.   Hot Robots Limited.

DJA1657

L3CMWEI1                        Hupcher - Direct                      1358

1   Q.  In the center what does the title of this document appear
2   to be?
3   A.  Investigate merchant report.
4   Q.  What does it say to the right of that?
5   A.  High risk.
6           MS. DEININGER:  If we can scroll down to page 3, where
7   there is a summary.
8   Q.  Can you read the first two paragraphs of that summary for
9   me.
10  A.  During the research, customer complaints and/or fraud
11  warnings for the researched contact details have been detected.
12          Very recently, registered websites have been detected.
13  Q.  Now, let's go back down to paragraph 7.  It starts with,
14  the entity seems.
15          Do you see that?
16  A.  Yes.
17  Q.  Can you read that one for me.
18  A.  The entity seems to be operating under the address of a
19  virtual address provider, e.g., registered by an incorporation
20  service.  Company formation agencies or corporation services
21  are an easy way to set up businesses or corporations in other
22  jurisdictions.  These kinds of agencies often offer a wide
23  range of services from the incorporation of the entity as well
24  as the provision of the so-called nominee directors or nominee
25  shareholders.

DJA1658

L3CMWEI1                    Hupcher - Direct                    1359

1   Q.  Now, three paragraphs below that, there is a paragraph that

2   starts, the researched websites.  Can you read that for me.

3   A.  The researched websites is -- are considered as having no

4   measurable visitors and therefore being inactive.  This needs

5   to be taken into account if the entity has provided a

6   processing history, especially for credit/debit card payments.

7   Q.  Then, lastly, the paragraph right below that, can you read

8   that for me.

9   A.  High-risk content websites, such as adult and gambling,

10  have been detected in the outgoing and back links scan.

11          MS. DEININGER:  Mr. Levine, if we can take that down

12  and pull up what's been admitted in evidence as Government

13  Exhibit 1597.

14  Q.  Mr. Hupcher, again, what does it say on the top right of

15  this document?

16  A.  Webshield Limited.

17  Q.  What about on the top left?

18  A.  Lorry Limited.

19  Q.  What's the title of the document?

20  A.  Investigate merchant report.

21  Q.  Let's go down to page 3 under summary and look at the

22  seventh full paragraph.  It starts with, a moderate.

23  A.  Yes.

24  Q.  Can you read the first four sentences of that paragraph.

25  A.  A moderate load balancing probability has been identified

**DJA1659**

1   for this entity.  Load balancing is a practice by which

2   entities establish multiple merchant accounts in order to

3   circumvent the detection of deceptive practices, excessive

4   fraud, and chargebacks.  Load balancing practices have also

5   been detected for certain business areas that are constantly

6   fighting with higher chargeback numbers, due to the occurrence

7   of friendly fraud by the cardholder, e.g., in the area of adult

8   entertainment, dating, or gambling.  The entity hereby

9   contracts with numerous acquirers to set up multiple merchant

10  accounts and cascades of transactions via numerous merchant

11  accounts until a successful authorization is obtained.

12  Q.  Thank you.  You can stop there.

13          MS. DEININGER:  Mr. Levine, we can take that down.

14          Mr. Levine, can we now pull up what's in evidence as

15  Government Exhibit 1695.

16          MR. HARID:  Your Honor, objection as to this document.

17  Relevance and 403.

18          THE COURT:  Overruled.

19  Q.  Mr. Hupcher, who is this e-mail from?

20  A.  Andreea Brici.

21  Q.  What e-mail address is she using?

22  A.  Andreea.brici@kalixa.com.

23  Q.  Who is this e-mail to?

24  A.  Ruben Weigand.

25  Q.  What's the subject?

L3CMWEI1                    Hupcher - Direct                    1361

1    A.  E-mail address for new apps.

2    Q.  And the date?

3    A.  July 16, 2018.

4    Q.  Can you read this e-mail for me.

5    A.  Please e-mail to pre Mapplication,

6    pre.mapplication@kalixa.com; copy Agota Kiss,

7    agota.kiss@kalixa.com; and myself, Andreea Brici, andreea

8    brici@kalixa.com.  Kind regards.

9            MS. DEININGER:  Can you now go to what's been admitted

10   into evidence as Government Exhibit 1696.

11           MR. HARID:  Objection.  Relevance and prejudice again.

12           THE COURT:  Overruled.

13           I must say, I'm finding it problematic to know the

14   basis on which those objections are being asserted.  We will

15   take that up at the next break if you want to enlighten me

16   further.

17           But on their face these documents are arguably

18   relevant sufficient to pass the very broad standards of Rule

19   401 and 402, and the notion that they are in any way confusing

20   or more prejudicial, it seems to me, not well founded.  Denied.

21           MR. HARID:  Thank you, your Honor.  I can deal with

22   this in cross-examination.  Thank you.

23           MS. DEININGER:  Mr. Levine, if we can scroll down this

24   document to the bottom e-mail.  There we go.

25   Q.  Mr. Hupcher, looking at this e-mail, who is it sent from?

L3CMWEI1                    Hupcher - Direct                    1362

1   A.  Mk@esepa.biz.

2   Q.  What date was it sent?

3   A.  July 16, 2018.

4   Q.  Who was it sent to?

5   A.  Pre.mapplication@kalixa.com.

6   Q.  Can you just read the body.

7   A.  Dear sirs, dear Agota, dear Andrea, please find attached

8   another merchant we would like to board.  Best regards.

9   Michael.

10          MS. DEININGER:  Mr. Levine, before we scroll up on

11  this, can you pull up Government Exhibit 1696 next to

12  Government Exhibit 1695.

13  Q.  Mr. Hupcher, looking at these two e-mails, do they appear

14  to be sent on the same date?

15  A.  They do.

16  Q.  And there are three names or e-mails listed in the body of

17  Government Exhibit 1695.  Do you also see those in the two cc

18  lines of the email we just looked at, in Government Exhibit

19  1696?

20  A.  I see one of them.

21  Q.  Do you see there are some names listed next to the e-mails?

22  A.  Yes.

23  Q.  Do those names appear to be the same?

24  A.  Yes.

25  Q.  Agota Kiss and Andreea Brici?

DJA1662

L3CMWEI1                    Hupcher - Direct                    1363

1   A.  Yes, they do.

2          MS. DEININGER:  Mr. Levine, if we can now go back just

3   to Government Exhibit 1696.  Scroll up to the e-mail above, the

4   one that we were looking at.  Actually, we can go all the way

5   to the e-mail that's second from the top.

6   Q.  Mr. Hupcher, who is this e-mail from?

7   A.  Risk.underwriting@kalixa.com.

8   Q.  Who is it sent to?

9   A.  MK@esepa.biz, cc'g Agota Kiss and Andreea Brici.

10  Q.  Looking at the bottom of the e-mail, can you just read it

11  through the starred statements.

12  A.  Dear all.  Thank you for submitting the application.

13  Meantime, one of the checks is still running.  We need the

14  following information missing the initial application in order

15  to proceed with the onboarding process for this merchant.

16          Please clarify how the company is operated.  If the

17  director lives in France.  Please clarify how the company is

18  related to the URL, greenedenvale.com.  Billing descriptor is

19  mission.  Please update the website.  Please provide company

20  rental agreement.

21  Q.  Thank you.

22          MS. DEININGER:  Mr. Levine, if we can go up to the top

23  e-mail on this chain.

24  Q.  Mr. Hupcher, who is this from?

25  A.  Andreea Brici.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

DJA1663

L3CMWEI1                    Hupcher - Direct                    1364

1   Q.  Who does she send it to?

2   A.  Ruben Weigand.

3   Q.  What does she say?

4   A.  Can you assist with the below request.  This is the cream

5   merchant.  Webshield result.

6   Q.  Thank you.

7           MS. DEININGER:  Mr. Levine, can you go back to

8   Government Exhibit 3707.

9   Q.  Mr. Hupcher, do you see Government Exhibit 1622 listed in

10  this document?

11  A.  I do.

12  Q.  What does it say for date added?

13  A.  July 12, 2018.

14          MS. DEININGER:  Mr. Levine, let's pull up what's been

15  admitted into evidence as Government Exhibit 1622.

16  Q.  Mr. Hupcher, what does the cover of this document say that

17  it is?

18  A.  It's a merchant processing application and agreement from

19  ECP processing.

20  Q.  If we scroll to the second page, what does it say under

21  applicant company details for the company's name?

22  A.  Johnson NYC Limited.

23  Q.  What country are they located in?

24  A.  United Kingdom.

25          MS. DEININGER:  Now we can go down to the next

                    SOUTHERN DISTRICT REPORTERS, P.C.

                            (212) 805-0300

1    section.  There is a section on beneficial owner.  Sorry.

2    Scroll up.

3            Where does the beneficial owner purportedly live?

4    A.  France.

5    Q.  What is her e-mail address?

6    A.  Support@greenteacha.com.

7            MS. DEININGER:  If we can zoom out.

8    Q.  On the next page, under business overview, do you see what

9    it lists as the website or URL?

10   A.  Greenteacha.com.

11   Q.  On the right where it says type of business?

12   A.  Powdered Japanese green tea.

13           MS. DEININGER:  Mr. Levine, can we go back to

14   Government Exhibit 3707.

15   Q.  Is Government Exhibit 1265 listed on Government Exhibit

16   3707?

17   A.  Yes.

18   Q.  What does it say in terms of date added?

19   A.  July 12, 2018.

20   Q.  What does it say for the file name?

21   A.  InternationalStandard2.zip.

22           MS. DEININGER:  Mr. Levine, if we can open up

23   Government Exhibit 1265.  If we can go into the folder that

24   says International Standard.  You can see there are a number of

25   documents.  Mr. Levine, can we open up the document titled

L3CMWEI1                    Hupcher - Direct                    1366

1  26.06.2018 Allied Wallet application.

2  Q.  Mr. Hupcher, what does it say at the top of this document?

3  A.  Allied Wallet merchant services application.

4  Q.  What does it say as the company's DBA?

5  A.  Goode Green Bazaar.

6  Q.  What about the legal business name?

7  A.  International Standard Limited.

8  Q.  Country of incorporation or organization?

9  A.  The UK.

10  Q.  Going down to the section under website, what does it say

11  for the website's URL?

12  A.  Goodeegreenbazaar.com.

13  Q.  Next to industry.

14  A.  Production and sale of sheet music.

15  Q.  If we look at page 2, under ownership, who does it state is

16  the owner of this company?

17  A.  Anna Sinkovska.

18  Q.  How much of the company does it say she owns?

19  A.  100 percent.

20  Q.  What's her currently of residence?

21  A.  France.

22          MS. DEININGER:  Mr. Levine, we can close out of this

23  document.  I just want to briefly look at what some of the

24  other documents in this folder are.  If you can open up the

25  third document and scroll down.

L3CMWEI1                    Hupcher - Direct                    1367

1   Q.  Mr. Hupcher, what does this appear to be?

2   A.  A Ukrainian passport for Anna Sinkovska.

3        MS. DEININGER:  Mr. Levine, you can close that.

4   Q.  How about the fourth document, Mr. Hupcher, what does this

5   appear to be?

6   A.  Looks to be some type of articles of incorporation.

7        MS. DEININGER:  We can close that one.

8        Mr. Levine, can you open up the fifth document.

9   Q.  Mr. Hupcher, what does this appear to be?

10  A.  A certificate of incorporation for International Standard

11  Limited.

12       MS. DEININGER:  Mr. Levine, you can close that.

13       Let's look at the eighth document that's titled Goode

14  Green invoice.

15  Q.  What company name is listed at the top of this?

16  A.  International Standard Limited.

17  Q.  What is in the logo on the top right?

18  A.  Goode and Green Bazaar.

19       MS. DEININGER:  You can close that one.  I think we

20  can close out of this document.

21       Mr. Levine, can you go back to Government Exhibit

22  3707.

23  Q.  Mr. Hupcher, do you see Government Exhibit 1449 listed on

24  here?

25  A.  I do.

L3CMWEI1                    Hupcher - Direct                    1368

1   Q.  What does Government Exhibit 3707 say for date added for

2   Government Exhibit 1449?

3   A.  August 1, 2018.

4           MS. DEININGER:  Now, Mr. Levine, can you pull up

5   what's been admitted into evidence as Government Exhibit 1449.

6   Q.  Mr. Hupcher, I just want to go through a couple of these

7   rows.

8           What does the first line tell us?

9   A.  It's the headers for the information below.

10  Q.  Sorry.  I meant the first line of information, the second

11  line.

12  A.  Got it.  The MID name is new Soniclogistix EUR.  The short

13  number is 5676.  Company name is New Opal Limited.  Address is

14  Park House, 10 Park Street, the code -- zip code in the UK.

15  URL is Soniclogistix.com.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

DJA1668

L3CPWEI2                    Hupcher - Direct                    1369

1   Q.  And the descriptor?

2   A.  Soniclogistix.com.

3   Q.  And what does it say for status ECP?

4   A.  Live.

5   Q.  Let's look at another example, going down to the line that

6   says Linebeck USD, what does it say for company name there?

7   A.  Linebeck Limited.

8   Q.  And what company -- what country is the address in?

9   A.  UK.

10  Q.  And what's the URL?

11  A.  Organikals.store.

12  Q.  And what does it stay for status at ECP?

13  A.  In application/due diligence at ECP.

14  Q.  And how about the very last line on this chart.  What's the

15  company name?

16  A.  Hot Robots Limited.

17  Q.  And what does it say under status at ECP?

18  A.  Declined.

19  Q.  Looking at information listed in the column on the far

20  right under MCC, do you see MCC code 8099 listed anywhere

21  there?

22  A.  No.

23  Q.  Mr. Levine, if you can pull up just for the witness what's

24  been marked for identification as Government Exhibit 3702.

25          Mr. Hupcher, do you recognize that?

DJA1669

L3CPWEI2                    Hupcher - Direct                    1370

1  A.  I do.

2  Q.  What is it?

3  A.  This is one of the summary charts that I looked at.

4  Q.  Did you review each entry in this chart and/or do the

5  corresponding government exhibits?

6  A.  I do.

7  Q.  And does this chart accurately summarize the information

8  you reviewed in the government exhibits?

9  A.  It does.

10         MS. DEININGER:  Your Honor, the government offers

11 Government Exhibit 3702 into evidence.

12         MR. HARID:  No objection.

13         MS. CLARK:  No objection.

14         THE COURT:  Received.

15         (Government's Exhibit 3702 received in evidence)

16         MS. DEININGER:  Mr. Levine, if you could publish this

17 for the jury?

18 BY MS. DEININGER:

19 Q.  So, Mr. Hupcher, where are all these companies purportedly

20 located?

21 A.  United Kingdom.

22 Q.  And from the documents that you reviewed, where are their

23 owners purportedly located?

24 A.  France.

25 Q.  Can you read from the documents, the last column, the

L3CPWEI2                    Hupcher - Direct                    1371

1    documents you reviewed, what types of businesses they purport

2    to be in?

3    A.  Production and sale of sheet music; secretarial support

4    services, research, copyrighting, data entry, pro transla;

5    logistics services for local deliveries; logistics service for

6    local courier delivery; e-commerce; custom skin care products;

7    online sales of powdered Japanese green tea.

8    Q.  And from your review of the documents that were the source

9    for these charts, do you remember any reference to these

10   companies being involved in the marijuana business?

11   A.  No.

12   Q.  Mr. Levine, can you pull up Government Exhibit 2309 side by

13   side with Government Exhibit 3702.  Both are admitted into

14   evidence.  And if we can just zoom in on the list of companies

15   under Government Exhibit 2309.

16          So Government Exhibit 3702 included information for

17   New Opal Limited.  Is that company also listed under MATCH

18   additional details in Government Exhibit 2309?

19   A.  Yes.

20   Q.  And Government Exhibit 3702 included information for

21   International Standard Limited.  Is that company also listed

22   under MATCH additional details in Government Exhibit 2309?

23   A.  Yes.

24   Q.  And can you just zoom out on Government Exhibit 2309 a

25   little or scroll up.

L3CPWEI2                    Hupcher - Direct                    1372

1    And can you read the -- who this e-mail is to?

2    A.   "Dear MasterCard Team."

3    Q.   And then on the second paragraph, the first sentence?

4    A.   "The termination date and addition to MATCH details have

5    been added to the file."

6    Q.   Thank you.  All right.  Mr. Levine, can we now go back to

7    what's been admitted into evidence as Government Exhibit 3707.

8    And, Mr. Hupcher, is Government Exhibit 1720 listed on

9    Government Exhibit 3707?

10   A.   It is.

11   Q.   Mr. Levine, can we now pull up what's been admitted into

12   evidence as Government Exhibit 1720?

13   MR. HARID:  Your Honor, objection, 403, relevance.

14   THE COURT:  Overruled.

15   Q.   Mr. Hupcher, can you read the title of this document?

16   A.   "Total contribution, April 18 to August 19."

17   Q.   And then just what's in the little blue boxes right below

18   that?

19   A.   "Actual, expected, shortfall/upside."

20   Q.   And then on the left, do you see where it says "acquiring"?

21   A.   Yes.

22   Q.   What entity is listed underneath that?

23   A.   Esepa.

24   Q.   And then what does it say under Esepa?

25   A.   "Volume, gross profit, post partner commission, margin,

L3CPWEI2                    Hupcher - Direct                    1373

1    gross profit, additional commission Ruben, Euro 260k.

2    Q.  Okay.  If we can zoom out and go down a little, there's

3    another line that says "gross profit less additional

4    commission."  Can you read that for me?

5    A.  "Gross profit less additional commission Ruben, assume 250K

6    for 2018, plus 250K for 2019 payable now."

7    Q.  All right.  And then there's a box there that says "total

8    of the above;" do you see that?

9    A.  Yes.

10   Q.  What does it say to the right of gross profits?

11   A.  2,726,500.

12   Q.  And what does it say to the right of gross profit post

13   Ruben commissions?

14   A.  1,966 500.

15   Q.  Thank you.  And now, Mr. Levine, if you can pull up what's

16   been admitted into evidence as Government Exhibit 1733.

17          MS. CLARK:  Your Honor, I think we had this objection

18   already, but objection, 403.

19          THE COURT:  Overruled.

20   Q.  All right.  Mr. Hupcher, I want to go -- what does this

21   appear to be?

22   A.  A chat between Ruben W and Guy Mizrachi.

23   Q.  And what is the date at the top, at the beginning of the

24   chat?

25   A.  The 6th of June, I believe, 2019.

L3CPWEI2                    Hupcher - Direct                    1374

1   Q.  I'd like to read these messages.  I'll read the ones

2   written by Guy Mizrachi, and you can read the responses from

3   Ruben W.

4           "Lots of craziness here.  Need some time today

5   regarding the Ray biz."

6   A.  "Bro, I'm pretty much up to speed, I think.  When are you

7   free?"

8   Q.  "As soon as I get off the call with the lawyer, I will text

9   you.  Okay, let's talk."

10          And now -- yup.  "Everything okay?"

11  A.  "Yep, as R wants the money," smily face.

12  Q.  "I asked Ray yesterday, and he said what government is

13  going to trace that shit, acting like it's not" -- can you put

14  this down, Mr. Levine.  Okay, take it down.

15          MS. DEININGER:  Your Honor, just one moment.

16          THE COURT:  Counsel, you need to wear your mask when

17  you're not --

18          MS. DEININGER:  Thank you for the reminder.

19          (Pause)

20          Okay.  If we can pull that back up.  And we were on

21  the next page, after -- Okay.

22  BY MS. DEININGER:

23  Q.  I am looking -- so, Mr. Hupcher, just to reorient us,

24  what's the date at the top of this chat?

25  A.  12, I believe, July 2019.

```
L3CPWEI2                    Hupcher - Direct                    1375
```

1    Q.  So I will again read the messages from Guy Mizrachi.

2           "I asked Ray yesterday and he said what government is

3    going to trace that shit, acting like it's not possible."

4    A.  "But I think everything goes even worse when he has money."

5    Q.  "Why doesn't Jan or Henry say to him, Bro, you can't take

6    that money, it belongs to our merchants and we will get fucked

7    if you do."

8    A.  "They are gutless.  H says he doesn't care."

9    Q.  That's -- thank you.  Now, Mr. Levine, if we can scroll to

10   the next page.  Okay.

11          Mr. Hupcher, what's the date of this portion of the

12   conversation?

13   A.  August 20, 2019.

14   Q.  I will again read the messages from Guy Mizrachi.

15          "Hey, buddy."

16   A.  "Hey, how are you?"

17   Q.  "Just a heads up that the shit has hit the fan between

18   Artie and Ray."

19   A.  "Fuck.  What's up?"

20   Q.  "Ray has been told that he is no longer active or owner of

21   the companies.  Five Lines, WeBops, Quantum, et cetera.  He is,

22   of course, threatening to kill all the banking activity, affect

23   the wires, et cetera.  Just wanted to give you a heads up, and

24   says that he is UBO money move the money, et cetera.  The truth

25   is, we moved Ray's shares from Ray to his asset protection

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300
```

L3CPWEI2                    Hupcher - Direct                    1376

1   trust to protect his business from lawsuits like Eaze,

2   et cetera; so he is no longer in control on paper."

3   A.  "I get it.  Haven't heard from him in a while."

4        THE COURT:  By the way, ladies and gentlemen, you'll

5   notice in a number of these exhibits that portions have been

6   blocked out.  That's because they relate to either someone

7   who's not involved in this case or some matter that's not part

8   of this case.  So to protect the reputations of other people

9   and to protect against identity theft and whatever, we redact

10  those things, but don't worry about it.  Nothing has been

11  redacted that's relevant to your concern.

12  BY MS. DEININGER:

13  Q.  Mr. Hupcher, what is the date of these messages that we're

14  looking at?

15  A.  August 20th, 2019.

16  Q.  Can you read this one for me?

17  A.  Sure.  Guy Mizrachi says "Of Five Lines it is now some Cook

18  Islands trust.  We may want to let Robert and Worldline know as

19  well.  The story is that Ray is no longer in control because he

20  transferred his ownership to an asset protection trust in the

21  Cook Islands to protect his assets from creditor actions and

22  issues arising out of certain relations like Eaze.  We will get

23  you the details for the trust, and eventually we will make the

24  KYC change with the banks.  For now, let's try to keep it

25  discrete, not to make it about Ray because we want to avoid the

L3CPWEI2                    Hupcher - Direct                    1377

1   crazy rumor wildfire.  Our enemies will only use that against

2   us.  Of course, with the people that are close to us, we should

3   be honest."

4   Q.  We can go to the next page, and you can continue.  Start --

5   go back up one page.  There we go?

6   A.  "But I am not sure that you" -- I can't read that part --

7   "under not looking."

8   Q.  Yeah.

9   A.  "Making it sound too bag shit crazy that people think the

10  wheels are coming off the bus."

11  Q.  I'll read the message from Ruben here.

12          "Agreed.  Let me know about Worldline.  For now, I

13  would only say he's not operational at the moment, personal

14  issue maybe."

15  A.  Guy Mizrachi says "Asset protection is the truth."

16  Q.  Okay.  Can we go to the last page of this document?  Wait.

17  Scroll up.  One more page.  Okay.

18          Here, what's the date of this message?

19  A.  Looks to be 20th of December.

20  Q.  Can you read the messages from Ruben W?

21  A.  "Hey darling.  I heard the news.  All okay on your end?"

22  Q.  "Hey, hey.  Yeah.  He hit me up this morning to say he is a

23  free man.  We shall see what develops.  Only time will tell."

24  A.  "Is he using his old number?

25  Q.  "1(310)739-5296.  Can you check Kat's e-mail regarding

L3CPWEI2                    Hupcher - Cross                    1378

1    closing these old merchant companies?  Better to get rid of

2    legacy stuff."

3           Can you scroll to the next page.

4           "But we don't want to mess up any reserves or merchant

5    deposits, et cetera."

6    A.  "When did she sent it, the JB13 number?"

7    Q.  And, Mr. Levine, the last thing to look at, we want stay on

8    this page -- oh, we're not going to be able to do it.

9           Mr. Hupcher, can you read again the telephone address

10   that we looked at that Guy Mizrachi wrote?

11   A.  310-739-5296.

12   Q.  And, Mr. Levine, if we can now briefly pull up what's been

13   in evidence as Government Exhibit 1728, page 4.

14           And can you read the -- is this available for

15   everyone?

16           Mr. Hupcher, can you read the number that's associated

17   in this contact entry for Ray?

18   A.  310-739-5296.

19   Q.  Were they the same two phone numbers?

20   A.  They are.

21           MS. DEININGER:  No further questions, your Honor.

22           THE COURT:  All right.  Cross-examination?

23   CROSS-EXAMINATION

24   BY MR. HARID:

25   Q.  Good morning, Special Agent Hupcher.  How are you?

**DJA1678**

L3CPWEI2                    Hupcher - Cross                    1379

1   A.  Doing well.  How are you?

2   Q.  Good.  My name is Mr. Harid.  I represent Ruben Weigand.

3   A.  Okay.

4   Q.  If you have trouble hearing me at any point, please let me

5   know.

6   A.  Thank you.

7   Q.  Mr. McLeod, can we begin by showing Mr. Hupcher Government

8   Exhibit 3707.

9          Agent Hupcher, you reviewed this document with

10  Ms. Deininger many times today and yesterday, yes?

11  A.  I've seen it several times, yes.

12  Q.  Correct.  And you checked the information in this document

13  for accuracy?

14          MS. DEININGER:  Objection.

15  Q.  Let me put it differently.  To your knowledge, the

16  information reflected in this --

17          MS. DEININGER:  Objection.  Foundation.

18          THE COURT:  I think he should be entitled to finish

19  the question.  Let me hear the full question.  You said:  "Let

20  me put it differently.  To your knowledge, the information

21  reflected in this --"

22          MR. HARID:  "Document is accurate," that was the end

23  of the question.

24          THE COURT:  Sustained.

25  BY MR. HARID:

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

```
L3CPWEI2                    Hupcher - Cross                   1380
```

1    Q.  Special Agent Hupcher -- Mr. McLeod, can you scroll down to

2    the bottom of this page -- do you see at the very bottom the

3    government exhibit, it says Government Exhibit 1801?

4    A.  Yes.

5    Q.  And that is the E.zip folder you reviewed with

6    Ms. Deininger, yes?

7    A.  That's the file I reviewed.

8    Q.  Okay.  Do you see that the heading on the column in the far

9    right says "date added"?

10   A.  Yes.

11   Q.  It's your understanding that that heading means the date

12   given Government Exhibit --

13           MS. DEININGER:  Objection.

14           THE COURT:  Counsel, you must let him finish the

15   question.  Let me hear the full -- "It's your understanding

16   that the heading means the date given Government Exhibit --"

17           MR. HARID:  "The date added field shows, to your

18   knowledge, the date a given document was added to Mr. Weigand's

19   laptop, yes?"

20           MS. DEININGER:  Objection.

21           THE COURT:  Do you have an understanding about that?

22           THE WITNESS:  I don't.

23   BY MR. HARID:

24   Q.  So just to be clear, you have no understanding of what

25   "date added" means?

DJA1680

```
L3CPWEI2                    Hupcher - Cross                   1381
```

1   A.  Not in this context.

2   Q.  It is correct that you reviewed this document in

3   preparation for your testimony?  Yes?

4   A.  I've seen this document before.  I didn't review it for

5   accuracy.

6   Q.  Can you explain exactly what you did to prepare for your

7   testimony today?

8   A.  Sure.  If you looked at that E.zip file --

9   Q.  Can you please speak up?

10  A.  Sure.  The E.zip file, so I reviewed the underlying

11  documents there, and then, based on my review, I ensured that

12  the government exhibits for the summary charts were accurate

13  based on the underlying data.  I didn't review this document

14  for accuracy.

15  Q.  Did you make any efforts to -- so you cannot say one way or

16  the other whether the Date Added column is accurate on this

17  document?

18          MS. DEININGER:  Objection.

19          THE COURT:  Ground?

20          MS. DEININGER:  Foundation.

21          THE COURT:  No, I'll allow it.  You may answer.

22  A.  No, I didn't do any review of that column.

23  Q.  And did you look at any of the metadata associated with the

24  files on this document, including when a given file was added

25  to Mr. Weigand's laptop?

DJA1681

L3CPWEI2                   Hupcher - Cross                    1382

1   A.  No.  I see that there is metadata listed here, but I didn't

2   do any review of that whatsoever.

3   Q.  I just want to be clear on the limits of your

4   understanding.  Let's take Government Exhibit 1518, which is

5   listed here.  It says on the far right that the date added was

6   January 19th, 2020.  Do you have any understanding what that

7   date added date is supposed to show?

8   A.  I do not.

9   Q.  Returning to Government Exhibit 1801, do you see that the

10  date added on the far right says January 19th, 2020, yes?

11  A.  Yes.

12  Q.  Mr. McLeod, can you please go to Government Exhibit 1802.

13          Agent Hupcher, you testified yesterday that this

14  document shows the layout, the structure of Government

15  Exhibit 1801, which is the E.zip folder, yes?

16  A.  Yes.

17  Q.  And the E.zip folder includes various subfolders, which are

18  shown here, yes?

19  A.  Yes.

20  Q.  And each of those subfolders includes various statements,

21  yes?

22  A.  I'm not sure if each one contains statements, but each

23  folder, as far as I know, contains files.

24  Q.  Correct.  Each folder contains files?

25  A.  Yes.

DJA1682

L3CPWEI2                    Hupcher - Cross                    1383

1   Q.  And you reviewed some of those files with -- Ms. Deininger

2   showed you some of those files yesterday, yes?

3   A.  Yes, she did.

4   Q.  Mr. McLeod, if you can zoom out slightly from this

5   document.

6           You see a list of subfolders and names on the

7   left-hand side, yes?

8   A.  Yes.

9   Q.  You don't see the name Wirecard anywhere on the left-hand

10  side, do you?

11  A.  No.

12  Q.  Agent Hupcher, you agree that each of these subfolders is

13  in the E.zip folder, yes?

14  A.  Yes.

15  Q.  And each of the statements in each of these subfolders is

16  in the E.zip folder, yes?

17  A.  Yes.

18  Q.  So it's true, correct, that these folders, and all of the

19  statements in them, would have been added to Mr. Weigand's

20  laptop when the E.zip folder was added to his computer?

21          MS. DEININGER:  Objection.

22          THE COURT:  Sustained as to foundation.

23  BY MR. HARID:

24  Q.  Mr. McLeod, can you please pull up Government Exhibit 3703.

25  Let's just return to Government Exhibit 1802 for a minute.

```
L3CPWEI2                    Hupcher - Cross                 1384
```

 1          Agent Hupcher, you testified yesterday that there were

 2    four key subfolders in -- four subfolders in the E.zip folder,

 3    yes?  Those four subfolders are reflected in the middle of this

 4    picture, right?

 5    A.   Yes.

 6    Q.   ACQ statements, yes?

 7    A.   Yes.

 8    Q.   Android?

 9    A.   Yes.

10    Q.   Senjo Proofs Shares?

11    A.   Yes.

12    Q.   Supplier statements?

13    A.   Yes.

14    Q.   Mr. McLeod, if you could please go to Government

15    Exhibit 3703.  Mr. McLeod, please place Government Exhibit 1802

16    along side this document.

17          Agent Hupcher, the document on the left of your

18    screen, Government Exhibit 3703, is a summary table of what's

19    in the supplier statement subfolder in the E.zip folder,

20    correct?

21          And, Mr. McLeod, if you could highlight for the jury

22    the supplier statements subfolder on the right-hand side.

23          So the document on the left is a summary of what's in

24    that supplier statements folder?

25    A.   That's correct.

DJA1684

```
L3CPWEI2                    Hupcher - Cross                    1385
```

1  Q.  And that supplier statements folder contains various

2  statements or files?

3  A.  Correct.

4  Q.  Mr. McLeod, could you please pull up a representative

5  supplier statement from -- any supplier statement from the

6  supplier statements folder.

7       Agent Hupcher, you see at the top there's a section

8  that says "service period from, to," yes?

9  A.  Yes.

10  Q.  And there's a date there, August 20th, 2018?

11  A.  Yes.

12  Q.  And there's a date next to the "to" line, August 26, 2018?

13  A.  Yes.

14  Q.  So just turning back to Government Exhibit 3703, the column

15  date range, Agent Hupcher, is designed to show -- it does show

16  the dates of the statements in each subfolder, yes?

17  A.  The range shows the earliest date that appears on the

18  statement and the latest date that appears on those statements.

19  Q.  But the column Date Range doesn't show when these folders

20  were added to Mr. Weigand's computer, yes?

21  A.  No.  The date range is of what is listed on the files

22  themselves.

23  Q.  All of these files were in all of these subfolders, and all

24  of the statements reflected in Government Exhibit 3703 are in

25  the E.zip folder, yes?

**DJA1685**

L3CPWEI2                     Hupcher - Cross                     1386

1   A.  Yes.

2   Q.  And turning to Government Exhibit 3707, Mr. McLeod, if you

3   could highlight for the jury the bottom right of this document

4   that says -- next page, please -- date added, January 19th,

5   2020.  Do you see that, Agent Hupcher?

6   A.  I do.

7   Q.  Once again, the date added for the E.zip folder is

8   January 19th, 2020, yes?

9   A.  Yes, that's what it says here.

10  Q.  Mr. McLeod, please return to Government Exhibit 3703.

11        Agent Hupcher, you don't know if any of the files

12  reflected in this summary were created by Mr. Weigand, do you?

13  A.  I don't know who created them.

14  Q.  You don't know if he ever looked at any of these

15  statements, do you?

16  A.  I have no idea who looked at them.

17  Q.  And you don't know if he ever sent them to anyone, do you?

18  A.  I don't know.

19  Q.  Mr. McLeod, if you could go to Government Exhibit 3704.

20        Once again, Agent Hupcher, you don't know if

21  Mr. Weigand authored any of the statements reflected in this

22  summary table, do you?

23  A.  I don't know.

24  Q.  And you don't know if he looked at any of the statements in

25  this document, do you?

DJA1686

L3CPWEI2                    Hupcher - Cross                    1387

1   A.  I don't know.

2   Q.  And you don't know if he sent them to anyone, do you?

3   A.  I don't know.

4   Q.  Agent Hupcher -- Mr. McLeod, if you could just pull up

5   Government Exhibit 1802 and place it alongside that document.

6   Highlight for the jury "ACQ statements" on the right.

7           Agent Hupcher, the document on the left -- excuse me.

8   Agent Hupcher, the document on the left shows the information

9   associated with the ACQ statements subfolder in the E.zip

10  folder as shown on the right-hand side of your screen, right?

11  A.  Correct.

12  Q.  Once again, all of the subfolders and all of the statements

13  shown in Government Exhibit 3703 are in the E.zip folder, yes?

14  A.  Did you mean 3704?

15  Q.  3704, correct.

16  A.  Yes.  Anything listed here would have been from the E.zip

17  folder.

18  Q.  Agent Hupcher, you don't know if Mr. Weigand authored any

19  of the statements in Government Exhibit 3704?

20  A.  I don't know.

21  Q.  Or if he saw them?

22  A.  I don't know.

23  Q.  Or if he sent them to anyone?

24  A.  I don't know.

25  Q.  And you don't know who sent them to him?

DJA1687

L3CPWEI2                    Hupcher - Cross                    1388

1  A.  I don't know who sent these.

2  Q.  If at all?

3  A.  I don't know.

4  Q.  Mr. McLeod, Government Exhibit 3705.  If you could

5  highlight for the jury and Mr. Hupcher, the Senjo Proofs Shares

6  folder on the right-hand side.

7           Agent Hupcher, Government Exhibit 3705 is a summary of

8  the contents of the Senjo Proof Shares subfolder shown on the

9  right-hand side, yes?

10  A.  Correct.

11  Q.  Once again, Senjo Proof Shares is in the E.zip folder?

12  A.  Correct.

13  Q.  Which, according to Government Exhibit 3707, was added to

14  Mr. Weigand's computer on January 19th, 2020?

15           MS. DEININGER:  Objection.

16           THE COURT:  Sustained.  Foundation.

17  Q.  Mr. McLeod, just one last time, can you pull up Government

18  Exhibit 3707.  Highlight the very bottom left, second page.

19           Agent Hupcher, this shows that Government

20  Exhibit 1801, the E.zip folder, has a date added date of

21  January 19th, 2020, yes?

22  A.  Yes.

23  Q.  Agent Hupcher, I'd like to review with you a document, a

24  spreadsheet Ms. Deininger showed you yesterday, and it's the

25  E.zip folder.

L3CPWEI2                    Hupcher - Cross                    1389

1          Government Exhibit 1801, please, Mr. McLeod.  Senjo

2     Proof Shares, please, and then the Senjo Distribution Excel

3     Spreadsheet.

4          Do you recall looking at this with Ms. Deininger

5     yesterday?

6     A.  Yes, I do.

7     Q.  You don't see the name Ruben anywhere in this document, do

8     you?

9     A.  Can you please zoom out?  Not that I can see at least on

10    this tab.

11    Q.  And if you just go 2019 and then totals, as well, just so

12    that he can look at those, too.

13         And just to keep things moving, I'd like you to look

14    for either the word Ruben -- the name Ruben or Weigand, and

15    just confirm that you don't see either Ruben or Weigand

16    anywhere in the entire document?

17    A.  I don't see it on this tab either.  And I don't see it on

18    this tab either.

19    Q.  You don't know who created this document, do you?

20    A.  I don't.

21    Q.  Returning to 2018, cell D17 -- Mr. McLeod, if you could

22    highlight that.

23         You don't know what GT means, do you?

24    A.  I don't.

25    Q.  You don't know -- E17, you don't know what Senjo is, do

**DJA1689**

L3CPWEI2                          Hupcher - Cross                          1390

1   you?

2   A.  I don't.

3   Q.  Do you see the cells C17 through C21, those say INTST and

4   then NewOp and then John and then Linbeck?

5   A.  Yes.

6   Q.  And those same names appear below for a different period,

7   yes?

8   A.  Yes, it looks that way.

9   Q.  Do you see the cell D26?

10  A.  Yes.

11  Q.  That is the sum of the eight cells above that cell, right?

12  A.  Yes.

13  Q.  And the cell to the right of it is the sum of the eight

14  cells above E26?

15  A.  Correct.

16  Q.  Mr. McLeod, my screen keeps fading in and out.  I'm not

17  seeing anything.

18          (Pause)

19          MR. HARID:  Your Honor, we're just having a technical

20  issue.  I'm unable to see anything on my screen at the moment.

21          THE COURT:  Well, can you see it from the screen --

22          MR. HARID:  We're back on now.

23          THE COURT:  Oh, it's back on now.  Okay.  Good.

24          MR. HARID:  Yes.

25  BY MR. HARID:

DJA1690

L3CPWEI2                    Hupcher - Cross                    1391

1   Q.  So returning to my last question, Agent Hupcher, cell E26

2   is the sum of the eight cells above it?

3   A.  Correct.

4   Q.  And the cell to the immediate right that has the number

5   382,088 is the sum of those two cells to its left, D26 and E26,

6   yes?

7   A.  It probably is.  It looks like it's the sum of the cells

8   above it.

9   Q.  Correct.  And those would be the -- would have the same

10  total?

11  A.  It looks to be that way.

12  Q.  Do you see that the number in G26, 382,088, is the same

13  number that appears in cell I17 -- I18, excuse me?

14  A.  Yes.

15  Q.  And if you -- Mr. McLeod, if you can scroll to the far

16  right.

17          Do you see on the far right the sentence "the EUR

18  totals has been converted to SGD and wired to Senjo"; do you

19  see that?

20  A.  I do.

21  Q.  And you see that the cell I17 is converted to the amount

22  reflected in cell J18, 605,137, yes?

23          MS. DEININGER:  Objection.

24  Q.  Do you see that number?

25  A.  I see the number.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

DJA1691

L3CPWEI2                    Hupcher - Cross                    1392

1   Q.  Mr. McLeod, could you please pull the corresponding wire

2   from the E.zip folder from the Senjo Proof Shares folder.

3           Mr. Hupcher, do you recall seeing wire confirmations

4   like the one -- Mr. McLeod, if you could keep that up, please.

5   Yes.

6           Do you recall seeing wire confirmations like this

7   yesterday?

8   A.  Yes.

9   Q.  All right.  And you agree that this is a -- this is proof

10  of a wire transfer?

11          MS. DEININGER:  Objection.

12  Q.  Can you read -- withdrawn.

13          Can you please review -- can you please read for the

14  jury the first line of this document?

15  A.  "Proof of payment for order" and then the order number.

16  Q.  Do you have any understanding what this document is?

17  A.  It looks to be a proof of payment.

18  Q.  Do you see -- can you read what it says next to "ultimate

19  debtor"?

20  A.  Spinwild Limited.

21  Q.  Can you read the number next to ordered amount?

22  A.  605,137.08 SGD.

23  Q.  Mr. McLeod, could you please pull up the spreadsheet again

24  and show him what's in cell J18.

25          That number in cell J18 is the same as the number in

L3CPWEI2                    Hupcher - Cross                    1393

1   the wire that I just showed you, yes?

2   A.  Yes.

3   Q.  Do you see -- can you read what's next to "beneficiary"?

4   A.  "Senjo Payment Asia PTE Limited."

5   Q.  And what does it say next to "beneficiary address"?

6   A.  "1 Raffles Place, 56-00, Singapore."

7   Q.  Agent Hupcher, this document appears to show a wire

8   transfer from Spinwild Limited, in the amount of 605,137, to

9   Senjo Payment Asia PTE Limited, yes?

10          MS. DEININGER:  Objection.

11          THE COURT:  Ground?

12          MS. DEININGER:  Characterization of the document.

13          THE COURT:  Overruled.

14  A.  Could you repeat that, please?

15  Q.  This wire confirmation appears to show or shows a wire

16  transfer in the amount of 605,137.08 from Spinwild to Senjo

17  Payment Asia, yes?

18  A.  So I can't say for certain that this is a wire, but this

19  looks like a proof of payment where the debtor is Spinwild and

20  the beneficiary or the person receiving the payment is Senjo

21  Payment.

22  Q.  To your knowledge, Mr. Weigand is not a member of Senjo

23  Asia, Senjo Payment Asia, is he?

24          MS. DEININGER:  Objection.

25          THE COURT:  Sustained.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**DJA1693**

L3CPWEI2                    Hupcher - Cross                    1394

1  Q.  Mr. McLeod, please return to government -- the spreadsheet

2  we had up.

3          Do you see the number in cell J28?

4  A.  Yes.

5  Q.  Mr. McLeod, if you could pull up the corresponding wire

6  confirmation from the Senjo Proof Shares folder.

7          Once again, Agent Hupcher, this is a proof of payment?

8  A.  Yes.

9  Q.  From ultimate debtor is Spinwild Limited to beneficiary,

10 Senjo Payment Asia PTE Limited, yes?

11 A.  Correct.

12 Q.  The amount, the ordered amount 930,038 matches the amount

13 in the cell I showed you on the spreadsheet?

14 A.  Yes.

15 Q.  Mr. McLeod, could you please highlight cell J41 and pull up

16 the corresponding wire.

17          Agent Hupcher, the ordered amount 991,448.19 matches

18 the number in the cell J42, yes?

19 A.  Yes.

20 Q.  Once again, returning to the wire, Mr. McLeod.

21          The wire shows a proof of payment from ultimate

22 debtor, Spinwild Limited, to beneficiary, Senjo Payment Asia

23 PTE Limited, with a beneficiary address of 1 Raffles Place,

24 56-00, One Raffles Place, Singapore, in the amount of

25 991,448.19, yes?

DJA1694

L3CPWEI2                    Hupcher - Cross                    1395

1  A.  Yes.

2  Q.  Returning to the spreadsheet, Mr. McLeod.  Do you see the

3  cell J54?

4          If you could pull up the corresponding wire.

5          The ordered amount 663,869.58, matches the number in

6  cell J55, yes?

7  A.  Yes.

8  Q.  Once again, this wire shows you -- appears to show a wire

9  in the amount of 663,869.58 from ultimate debtor Spinwild

10  Limited to beneficiary Senjo Payment Asia PTE Limited, yes?

11  A.  Yes.

12  Q.  Keep the spreadsheet open, please.

13          Agent Hupcher, based on what we've just been through,

14  do you agree that -- going up, please -- the numbers reflected

15  in cells J17, which is 605,137.08; the number reflected in cell

16  J29, 930,038.25; and the number reflected in cell J42, which is

17  991,448.19; and then finally, the number reflected in cell J55,

18  663.868.58, all of those sums were wired to Senjo Asia,

19  correct?

20          MS. DEININGER:  Objection.

21          THE COURT:  Overruled.

22  A.  The amounts listed here match the proof of payments we just

23  reviewed with the beneficiary of Senjo.

24  Q.  You reviewed this document when preparing for your

25  testimony today, did you?

DJA1695

L3CPWEI2                     Hupcher - Cross                     1396

1    A.  I had reviewed this.  I looked at this document.

2    Q.  And this document doesn't -- on its face, doesn't show any

3    flow of money from Senjo to any other individual or entity,

4    yes?

5    A.  I haven't reviewed this document enough to know what it

6    shows and doesn't show.  If you look at the summary chart,

7    there is limited information about this document that I

8    reviewed.

9    Q.  Can you please speak up?

10   A.  If you look at the summary chart that I was attesting to,

11   it's very limited in what it shows; so that is what I reviewed

12   for -- as part of my task.

13            MR. HARID:  Your Honor, this might be a good time to

14   break.  I hope to be done within --

15            THE COURT:  Well, the difficulty is I have an 11:15

16   conference all, and I didn't want to interrupt too much, but --

17            MR. HARID:  I can keep going.

18            THE COURT:  If you can for at least another five

19   minutes, that would be helpful.

20   BY MR. HARID:

21   Q.  Agent Hupcher, you reviewed a number of e-mails and

22   Telegram chats with Ms. Deininger, yes?

23   A.  Yes.

24   Q.  Let's begin with Government Exhibit 1684.  Do you see --

25   what do you see in the "from" line here?

**DJA1696**

L3CPWEI2                    Hupcher - Cross                    1397

1   A.  Ruben Weigand.

2   Q.  What is the e-mail address associated with Ruben Weigand?

3   A.  RW@payment-consultants.com.

4   Q.  You don't see the e-mail address

5   EUprocessing@ProtonMail.com, do you?

6   A.  I don't.

7   Q.  Mr. McLeod, if you could pull up Government Exhibit 3702,

8   place it alongside.

9          You reviewed this one with -- 3702, with

10  Ms. Deininger, yes?

11  A.  Yes, I reviewed this.

12  Q.  Do you see various names under the heading "company" on the

13  right side?  Yes?

14  A.  Yes.

15  Q.  None of those names appears in Government Exhibit 1684,

16  yes?

17  A.  No.

18  Q.  In fact, the name Eaze doesn't appear in Government

19  Exhibit 1684, yes?

20  A.  Correct.

21  Q.  Mr. McLeod, Government Exhibit 1686.

22          Who are the recipients on this e-mail?

23  A.  Ruben Weigand and Ray.

24  Q.  What's the e-mail address associated with Ruben Weigand?

25  A.  RW@payment-consultants.com.

L3CPWEI2                    Hupcher - Cross                    1398

1   Q.  You don't see the e-mail EUprocessing@ProtonMail.com, do

2   you?

3   A.  I don't.

4   Q.  Mr. McLeod, if you could please pull up 3702 again, place

5   it along 1686.

6           Agent Hupcher, do you see any of the names listed in

7   the first column in Government Exhibit 3702, do any of those

8   names appear in Government Exhibit 1686?

9   A.  Not that I can tell.

10  Q.  We can take a minute to have you look at it.

11  A.  No.

12  Q.  Do you see the "descriptors" column in Government

13  Exhibit 3702?

14  A.  Oh, company website and descriptors?

15  Q.  Yes.

16  A.  Yes.

17  Q.  Can you survey Government Exhibit 1686 and see if any of

18  those descriptors show up in Government Exhibit 1686?

19  A.  They do not.

20  Q.  Agent Hupcher, you don't see any response from Mr. Weigand

21  to Mr. Chmiel in this e-mail, do you?

22  A.  Not what I see here, no.

23  Q.  Mr. McLeod, 1688, please.

24          You reviewed this document with Ms. Deininger, yes?

25  A.  Yes.

DJA1698

L3CPWEI2                    Hupcher - Cross                    1399

1    Q.  What's the e-mail address associated with Ruben Weigand?

2    A.  RW@payment-consultants.com.

3    Q.  You don't see any response from Ruben Weigand to

4    Mr. Chmiel, do you?

5    A.  I do not.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DJA1699

L3CMWEI3                     Hupcher - Cross                    1400

1              MR. HARID:  1690, please.

2   Q.  Agent Hupcher, you don't see the name Eaze, E-a-z-e, in

3   Government Exhibit 1690, do you?

4   A.  I do not.

5   Q.  You don't see any of the names listed in Government Exhibit

6   3702 on your company, do you, beginning International Standard,

7   Hot Robots, New Opal, Lorry Limited, Linebeck Limited, or

8   Johnson NYC Limited.  None of those names appear in Government

9   Exhibit 1690?

10  A.  No.

11  Q.  Do any of the descriptors shown in Government Exhibit 3702

12  appear in Government Exhibit 1690?

13  A.  No.

14  Q.  Do you see the sentence in the first e-mail in Government

15  Exhibit 1690?  Can you read the second sentence in this

16  document?

17  A.  They are boarding a bunch of new low risk this month, and

18  we should have some capacity in the millions in the next month

19  or so.

20  Q.  The sentence includes the phrase new low risk, yes?

21  A.  Yes.

22              MR. HARID:  Government Exhibit 1695, please.

23  Q.  Agent Hupcher, what's the e-mail address associated with

24  Ruben Weigand in this document?

25  A.  RW@payment-consultants.com.

DJA1700

L3CMWEI3                    Hupcher - Cross                    1401

1    Q.  Do you see the name Eaze, E-a-z-e, anywhere on this

2    document?

3    A.  No.

4    Q.  Do you see any of the companies listed in Government

5    Exhibit 3702 in this document?

6    A.  No.

7    Q.  Do you see any of the descriptors listed in Government

8    Exhibit 3702 in Government Exhibit 1695?

9    A.  No.

10   Q.  Do you see any response from Mr. Weigand to Ms. Brici in

11   Government Exhibit 1695?

12   A.  No.

13   Q.  Do you see anything in Government Exhibit 1695 to show that

14   Mr. Weigand sent an application to the e-mail address

15   pre.application@kalixa.com?

16   A.  Not in this document, no.

17           THE COURT:  Counsel, I think now we will take our

18   midmorning break.

19           We will take a 15-minute break at this time, ladies

20   and gentlemen, and continue.

21           (Jury not present)

22           THE COURT:  The witness is excused.

23           How much more do you have, counsel?

24           MR. HARID:  I've got ten minutes, I think.

25           THE COURT:  Very good.  We will see you in 15 minutes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

L3CMWEI3                    Hupcher - Cross                    1402

1          (Recess)

2          THE COURT:  The jury is on their way up.

3          MR. HARID:  Your Honor, I will try to be as quick as I

4    can.  It may be closer to 15, but I will try to accelerate this

5    as much as possible.

6          THE COURT:  You originally told me 45 minutes, which

7    you went this morning.  But I'm just, by nature, so merciful

8    that I'll let you go another 15.

9          MR. HARID:  Thanks so much.

10          THE COURT:  Don't press your luck and go 16.

11          MR. HARID:  Thank you.

12          THE COURT:  So you all know, I'll tell this to the

13    jury, our lunch break today will be from 12:45 to 2 because I

14    have to give a speech from 1 to 2 at an obscure place called

15    NYU Law School.

16          MR. FOLLY:  Your Honor, while we are waiting, do you

17    want to continue the discussion --

18          THE COURT:  I thought we were going to discuss my

19    book, but, OK, if you insist.

20          MR. FOLLY:  Your Honor, this concerned the references

21    to Jim Black in the e-mail, the e-mails that come before the

22    portion that the government intends to offer.  Our

23    understanding is that the defense seeks to elicit testimony on

24    cross-examination that Jim Black was a lawyer.  Our view is

25    that that is improper and contrary to your Honor's prior ruling

DJA1702

L3CMWEI3                    Hupcher - Cross                    1403

1   and would suggest that the defendant was receiving or thought

2   he was receiving some sort of advice or approval by counsel.

3   The concern is just amplified with this particular set of

4   e-mails because there are several references to Jim Black in

5   the portions that we are seeking to redact, and we are trying

6   to minimize those references at trial so that we don't draw

7   attention on the fact that the lawyer was on those e-mails.

8          (Jury present)

9          THE COURT:  I do want to amend my prior comment and

10  note that juror no. 3 is wearing a very bright, colorful shirt

11  which he has been wearing, as soon as I can tell, from the

12  start of this trial, apparently without washing it.  It looks

13  great.

14         JUROR:  It's a sweater.

15         THE COURT:  Thank you very much.

16         Let's continue.

17  BY MR. HARID:

18  Q.  Welcome back, Agent Hupcher.

19  A.  Thank you.

20  Q.  How are you feeling?

21  A.  Fine.

22  Q.  Did you speak to any of the government prosecutors trying

23  this case during that break?

24  A.  No.

25  Q.  I'd like to just go over a few more government exhibits

DJA1703

L3CMWEI3                    Hupcher - Cross                    1404

1   with you, a few of the e-mails that you reviewed with Ms.

2   Deininger.

3          MR. HARID:  Beginning with Government Exhibit 1696.

4   Mr. McLeod.

5   Q.  What is the e-mail address associated with Ruben Weigand in

6   the top of this e-mail?

7   A.  RW@payment-consultants.com.

8          MR. HARID:  Mr. McLeod, can you go back to the e-mail.

9   Q.  Do you see a hyperlink that says greenedenvale.com?

10  A.  Yes.

11         MR. HARID:  Mr. McLeod, can you please place alongside

12  this document Government Exhibit 3701, which is in evidence.

13  Q.  Looking at Government Exhibit 3701, do you see

14  greenedenvale.com anywhere on Government Exhibit 3701?

15  A.  No.

16  Q.  Returning to Government Exhibit 1696, you don't see

17  Mr. Weigand responding to Ms. Brici in this e-mail, do you?

18  A.  Not in this e-mail.

19         MR. HARID:  Once again, returning to Government

20  Exhibit 3702, Mr. McLeod, 3702, please.

21  Q.  None of the names in 372 appear in Government Exhibit 1696,

22  do they, none of the names under the company heading?

23  A.  No, they do not.

24         MR. HARID:  Mr. McLeod, Government Exhibit 1709,

25  please.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**DJA1704**

L3CMWEI3                    Hupcher - Cross                    1405

1   Q.  I'd like you to look at Government Exhibit 1709 in the

2   contents and see if the name Eaze appears anywhere in that

3   document?  Let me know when you are done, Mr. Hupcher.

4   A.  I don't see it here.

5   Q.  You don't see the names of any of the companies listed in

6   Government Exhibit 3702 either, do you?

7   A.  Not in this document.

8        MR. HARID:  Government Exhibit 1720, Mr. McLeod.

9   Please place along side Government Exhibit 1720 -- let's try

10  Government Exhibit 1696.

11  Q.  Do you see how the name Ruben Weigand is spelled in

12  Government Exhibit 1696?

13  A.  Yes.

14        MR. HARID:  Turning to Government Exhibit 1720, the

15  body of 1720, please.  That was fine.  Return to that.  Please

16  highlight the name Ruben for Agent Hupcher.

17  Q.  Are those the same spellings?

18  A.  No.

19  Q.  Returning to Government Exhibit 1720, do you know who

20  created Government Exhibit 1720?

21  A.  No.

22  Q.  Or for what purpose?

23  A.  No.

24  Q.  The name Eaze doesn't appear anywhere in Government Exhibit

25  1720, does it?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

```
L3CMWEI3                    Hupcher - Cross                    1406
```

1   A.  Not what I can see, no.

2            MR. HARID:  Turning to 3702, Mr. McLeod, on the side.

3   Q.  None of the company names listed in 3702 appear in 1720, do

4   they?

5   A.  No.

6            MR. HARID:  1722, Mr. McLeod.

7   Q.  Scrolling through it, this is an exchange between Andreea

8   Brici -- and if you could go down, please, Mr. McLeod -- and

9   Ruben W, yes?

10  A.  Yes.

11  Q.  Based on a review of this document, the only contribution

12  that Ruben W makes is good question, right?

13  A.  I would have to look at the whole thing again.

14  Q.  Please do.

15  A.  From what I can see on here, that's the only response.

16  Q.  Going to the final message from Ms. Brici at the end of

17  this document, previous one, she says, let me know what you

18  think, please.  I need to respond to them by tomorrow.

19            That's what it says, right?

20  A.  Yes.

21  Q.  You don't see a response by Ruben W to that text, do you?

22  A.  Can you keep scrolling down, please?

23            No, I do not.

24            MR. HARID:  1728, please.

25  Q.  1728 is an exchange between Ray and Ruben W, yes?

**DJA1706**

```
L3CMWEI3                    Hupcher - Cross                    1407
```

1   A.  Yes.

2   Q.  And you see at the beginning Ruben W says:  All right.

3   Important.  Please don't forget.

4   A.  Yes.

5   Q.  Then scrolling down, you see various messages by Ray and --

6   keep going.  Then no response by Ruben W.  Yes?

7   A.  No text response, but there was a phone call.

8   Q.  I'd like to show you Government Exhibit 1265.

9          MR. HARID:  And place along side this, Mr. McLeod,

10  Government Exhibit 3707.

11  Q.  Looking at Government Exhibit 3707, Agent Hupcher, do you

12  see where it says GX-1265?

13  A.  I do.

14  Q.  This is one of the documents that Ms. Deininger showed you,

15  yes?

16  A.  Yes.

17         MR. HARID:  If you could blow up 3707, Mr. McLeod.

18  Q.  It says International Standard 2.zip.

19  A.  Yes.

20  Q.  That's a zip file?

21  A.  It appears to be.

22  Q.  That zip file includes various files within it, yes?

23  A.  It looks that way, yes.

24  Q.  Those files are listed below International Standard 2.zip,

25  yes?

```
   L3CMWEI3                    Hupcher - Cross                  1408
 1  A.  Yes.
 2  Q.  And the date added for International Standard 2.zip is July
 3  12, 2018, yes?
 4  A.  Yes.
 5          MR. HARID:  And returning to 1265, if you could blow
 6  that up, please, Mr. McLeod, maximize -- that's fine.  That's
 7  good.
 8  Q.  You see the date modified metadata there?
 9  A.  I do.
10  Q.  The files we are looking at right now are the files in the
11  zip file International Standard 2.zip, right?
12  A.  I am so.
13  Q.  And all of those files -- and you can take a minute to look
14  at them -- all of those files have a date, modified date that's
15  before July 12, 2018, yes?  You can take a look.
16  A.  Yes.
17          MR. HARID:  One minute, your Honor.
18          THE COURT:  Yes.
19          MR. HARID:  Nothing else, your Honor.
20          THE COURT:  Very good.
21          Counsel for Mr. Akhavan.
22  CROSS-EXAMINATION
23  BY MS. CLARK:
24  Q.  Good morning, Mr. Hupcher.  Can you hear me?
25  A.  I can, yes.
```

```
L3CMWEI3              Hupcher - Cross                  1409
```

1   Q.  My name is Sara Clark, and I'm counsel for Mr. Akhavan.

2           Mr. Hupcher, you testified that you are a special

3   agent with the FBI, correct?

4   A.  Yes.

5   Q.  You've been a special agent for about 3.5 years?

6   A.  Correct.

7   Q.  But you first became involved with this case only recently,

8   correct?

9   A.  Correct.

10  Q.  Was that in February of this year, last month?

11  A.  That sounds right.

12  Q.  Are you aware that the investigation in this case has been

13  going on for over two years?

14  A.  I don't know how long the investigation has been going on

15  for.

16  Q.  But you are aware it was going on before you joined the

17  case?

18  A.  Yes.

19  Q.  Is it your understanding that other agents collected the

20  evidence in this case?

21  A.  Yes.

22  Q.  And other agents conducted interviews in this case?

23  A.  I would assume so.

24  Q.  But you did not conduct any interviews in this case?

25  A.  Correct.

```
L3CMWEI3                    Hupcher - Cross                      1410
```

1   Q.  And you did not collect any evidence?

2   A.  Correct.

3   Q.  So you don't know anything about this case other than what

4   you've seen in the documents and files presented to you by the

5   government?

6   A.  Correct.

7   Q.  So you can really only read those and describe where you

8   located them, is that correct?

9   A.  That's correct.

10  Q.  And you don't know any of the background or the context for

11  those exhibits?

12  A.  Correct.

13  Q.  Mr. Hupcher, I understand you're a CPA as well, is that

14  correct?

15  A.  It is.

16  Q.  In this case you weren't asked to do any funds tracing,

17  were you?

18  A.  I was not.

19  Q.  And you did not undertake that exercise?

20  A.  No.

21  Q.  Mr. Hupcher, you testified before, I believe, that you are

22  familiar with Telegram, is that correct?

23  A.  Generally, yes.

24  Q.  Is that based on your experience working with the FBI?

25  A.  Yes.

**DJA1710**

```
L3CMWEI3                    Hupcher - Cross                    1411
```

1   Q.  You said Telegram is encrypted, correct?

2   A.  Yes.

3   Q.  Which means that you can't read it unless you have the

4   encryption key, is that correct?

5   A.  That's my understanding.

6   Q.  Both participants in a chat would have that key, correct?

7   Both participants in a chat would be able to view the message.

8   Is that your understanding?

9   A.  Yes.

10  Q.  Telegram also allows you to delete some information,

11  doesn't it?

12  A.  I don't know.

13  Q.  So you are familiar that Telegram just extends to its

14  encryption?

15  A.  My familiarity is just it's an encrypted application that

16  I've come across, but I don't really know a whole lot more than

17  that.

18  Q.  I think I understood your answer, but if you can speak a

19  little louder.

20  A.  Sure.

21  Q.  Are you aware of other chat platforms that have encryption?

22  A.  Yes.

23  Q.  For example, WhatsApp?

24  A.  Yes.

25  Q.  What about Facebook Messenger?

L3CMWEI3                    Hupcher - Cross                    1412

1   A.  I don't know if that's encrypted.

2   Q.  You don't know one way or the other?

3   A.  Correct.

4   Q.  But there are lots of other applications that have

5   encryption?

6   A.  There are other applications.  I don't know how many.  But

7   there are others.

8   Q.  Thank you.

9        MS. CLARK:  Mr. Levine, if you wouldn't mind putting

10  up Government's Exhibit 1733.

11        I don't have a screen, but I believe in myself, your

12  Honor, so I'll proceed.

13  Q.  When you reviewed this, you weren't familiar with any of

14  the participants in this chat, are you?

15  A.  No.

16  Q.  You don't know who Guy Mizrachi is?

17  A.  No.

18  Q.  You don't know who Ruben W is?

19  A.  No.

20  Q.  Are you familiar with any of the other individuals

21  referenced in this chat?

22  A.  No.

23        MS. CLARK:  Mr. Levine, would you mind going to page

24  7, please:  Give me one second.  Let me see if I can figure out

25  the pagination that you have.

DJA1712

L3CMWEI3                     Hupcher - Cross                     1413

1              Apologies, your Honor.

2              Can you pull it down for a second until I can find

3     this.

4     Q.  Mr. Levine, can you see that?  Page of 1733.

5     A.  Yes.

6     Q.  I believe earlier you read Ruben W's comments in this.

7     Could you just read the last line of that.

8     A.  Asset protection is the truth.

9     Q.  Sorry.  Where Ruben speaks.  Under Ruben W, the third line.

10    A.  For now I would only say he's not operational at the

11    moment.  Personal issue maybe.

12    Q.  Mr. Levine, you don't have any idea what was going on in

13    Mr. Akhavan's personal life at the time, do you?

14    A.  Mr. Hupcher, and no, I don't.

15    Q.  Sorry.

16    A.  It's OK.

17    Q.  Mr. Hupcher, what is the date on this exchange?

18    A.  August 20, 2019.

19              MS. CLARK:  Mr. Levine, would you go to the next page,

20    please.  Mr. Levine, can you pull that down.

21    Q.  Mr. Hupcher, do you see on here where it says, Guy Mizrachi

22    and the line below says:  To protect his business from

23    lawsuits, like Eaze?

24    A.  Yes.

25    Q.  What's the date on that message exchange?

**DJA1713**

L3CMWEI3                    Hupcher - Cross                    1414

1    A.  August 20, 2019.

2    Q.  Mr. Hupcher, are you aware of civil lawsuit involving Eaze

3    around that time?

4              MS. DEININGER:  Objection.

5              THE COURT:  Sustained.

6              MS. CLARK:  Mr. McLeod, would you please put up

7    Government Exhibit 1686.

8    Q.  Mr. Hupcher, can you read the date on this e-mail?

9    A.  September 29, 2017.

10              MS. CLARK:  Mr. McLeod, if you could scroll down.  You

11   can see it on here.

12   Q.  Mr. Hupcher, what are the first two URLs on this page?

13   A.  They are both eazebilling.com.

14   Q.  Do each of those contain the word Eaze, spelled E-a-z-e?

15   A.  Yes, they do.

16   Q.  If you look a little farther down the page where it says

17   Paranthia Limited, would you mind reading the first two URLs

18   that appear there?  I believe one of them is not highlighted in

19   blue.

20   A.  Eazecharge.com and eazebilling.com.

21   Q.  Do both of those contains the word Eaze, spelled E-a-z-e?

22   A.  They do.

23              MS. CLARK:  Mr. McLeod, if you can go to the second

24   page of that document where it begins:  The merchant is

25   directly.

L3CMWEI3                    Hupcher – Cross                    1415

1    Q.  Could you please read the first URL there.

2    A.  Ezeaccpay.net.

3    Q.  Thank you, Mr. Hupcher.  Nothing further.

4           MS. DEININGER:  Your Honor, as a preliminary matter,

5    the government would like to offer into evidence Government

6    Exhibits 1806, 1807, and 1808.  The foundation for these was

7    laid when Ms. Volchko was testifying, but in looking over my

8    notes, I realized I declined to actually offer them, and they

9    have not been admitted into evidence.

10          THE COURT:  Yes.  Those will be received.  If defense

11   counsel want any additional cross-examination relating to them,

12   they may have it after you finish your redirect.

13          MS. DEININGER:  Thank you.

14          (Government Exhibits 1806, 1807, and 1808 received in

15   evidence)

16   REDIRECT EXAMINATION

17   BY MS. DEININGER:

18   Q.  Mr. Hupcher, as Ms. Clark was asking you, you had no

19   personal involvement in this investigation, right?

20   A.  Correct.

21   Q.  And you weren't involved in extracting documents from

22   Weigand's laptop computer, right?

23   A.  I was not.

24   Q.  You weren't involved in creating that chart, Government

25   Exhibit 3707, that we have looked at several times?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

```
L3CMWEI3                    Hupcher - Cross                    1416
```

 1          MS. DEININGER:  Mr. Levine, if you can pull up

 2   Government Exhibit 3707.

 3   Q.  Mr. Hupcher, you weren't involved in creating this, right?

 4   A.  No, I was not.

 5   Q.  You didn't review the contents of this chart for accuracy,

 6   right?

 7   A.  No, I did not.

 8   Q.  Your involvement in this case has been reading certain

 9   documents, right?

10   A.  Correct.

11   Q.  And also reviewing the accuracy of certain other summary

12   charts the government provided to you for accuracy?

13   A.  Correct.

14   Q.  Based on your training and experience, do people sometimes

15   use multiple e-mail addresses?

16   A.  Yes.

17          MS. DEININGER:  Mr. Levine, if we can pull up

18   Government Exhibits 3703 and 3704.

19   Q.  Mr. Hupcher, you testified that these were summary charts

20   of information contained within the E.zip folder, correct?

21   A.  Correct.

22          MS. DEININGER:  If we scroll through these, and you

23   focus on the date range column.  If we can scroll for each one.

24   Q.  Are all these dates from the years 2018 and 2019?

25   A.  Yes.

DJA1716

L3CMWEI3                    Hupcher - Cross                    1417

1          MS. DEININGER:  Mr. Levine, if you can pull up

2   Government Exhibit 1730 and go scroll down here.

3   Q.  Looking at this August 24, 2019 message, what's the title

4   of the file that's sent?

5   A.  E.zip.

6   Q.  What was the date of that message?

7   A.  August 24, 2019.

8          MS. DEININGER:  Now, Mr. Levine, if we could pull up

9   Government Exhibit 1686 on one side and Government Exhibit 3703

10  at page 4 on the other.

11  Q.  Mr. Hupcher, you got asked about Government Exhibit 1686 on

12  cross-examination several times.

13          Do you remember that?

14  A.  Yes.

15  Q.  If you look at the bottom of 1686, the view we have right

16  now, do you see where it says Conetild Limited?

17  A.  Yes.

18  Q.  If we look at 3703, do you also see a reference to

19  Conetild?

20  A.  I do.

21  Q.  Can you read that for me.  That's on the second-to-last

22  line, right?

23  A.  It is.

24  Q.  What are the depots and service descriptors associated with

25  Conetild?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

**DJA1717**

L3CMWEI3                    Hupcher - Cross                    1418

1   A.  K-Conetild-Absolut-Essential Surf-Happy Puppy-The Hidden

2   Kitten.

3          MS. DEININGER:  Now, Mr. Levine, can you pull up

4   Government Exhibit 1806 for me.  Let's go to page 3.

5   Q.  Can you read what it says the name -- under file, where it

6   says name of a file, can you read that for me.

7   A.  Attachments-merchant six docs Linebeck, Kalixa

8   applications.zip.

9   Q.  Then under the bottom of that kind of portion of the chart

10  where it says KMD item wherefrom, can you tell me what website

11  that indicates the document came from?

12  A.  Mail.protonmail.com.

13         MS. DEININGER:  Can we turn to page 4.  The table that

14  is at the bottom, it goes to 4 to 5.

15  Q.  What's the name of that file?

16  A.  Attachments-re-forward WC enhanced due diligence docs.zip.

17  Q.  What website is indicated on the row that says KMD item

18  wherefrom?

19  A.  Mailprotonmail.com.

20         MS. DEININGER:  Can we go to page 7.

21         The table that's on the bottom that goes from page 7

22  to 8, what's the name of the file?

23  A.  International Standard 2.zip.

24  Q.  What's the website that's indicated next to KMD item

25  wherefrom?

```
     L3CMWEI3                    Hupcher - Cross                    1419
 1   A.  Mail.protonmail.com.
 2           MS. DEININGER:  Let's go to page 12.
 3   Q.  The bottom table, what's the name of the file?
 4   A.  Linebeck Limited.zip.
 5   Q.  What's the website that's indicated next to KMD item
 6   wherefrom?
 7   A.  Mail.protonmail.com.
 8           MS. DEININGER:  Can we go to page 18.
 9   Q.  What's the name of this file?
10   A.  MID list W descriptors mcc.xlsx.
11   Q.  What's the name of the website that's indicated next to KMD
12   item wherefrom?
13   A.  Mail.protonmail.com.
14           MS. DEININGER:  Finally, page 19.
15   Q.  What's the name of the file in the full table that we can
16   see?
17   A.  New Opal.zip.
18   Q.  What's the website that's indicated next to KMD item
19   wherefrom?
20   A.  Mail.protonmail.com.
21           MS. DEININGER:  Mr. Levine, if we can pull up
22   Government Exhibit 3707 briefly.
23   Q.  Mr. Hupcher, we just looked at a file name,
24   attachments-merchant 6 docs Linebeck Kalixa applications.
25           Do you also see that listed on Government Exhibit
```

DJA1719

L3CMWEI3                         Hupcher - Cross                        1420

1    3707?

2    A.  Yes.

3    Q.  We also looked at a file name International Standard 2.zip.

4          Do you also see that listed on Government Exhibit

5    3707?

6    A.  I do.

7    Q.  We looked at a file named Linebeck LTD.zip.

8          Do you see that on Government Exhibit 3707?

9    A.  I do.

10   Q.  We looked at a file called New Opal.zip.

11         Do you see that on Exhibit 3707?

12   A.  I do.

13   Q.  We also looked at attachments-RE_four word_WC enhanced due

14   diligence docs.zip.

15         Is that also on Government Exhibit 3707?

16   A.  Yes.

17   Q.  Looking at the date-added column for those documents, are

18   the dates added all in 2018?

19   A.  Yes.

20         MS. DEININGER:  Mr. Levine, can we pull up Government

21   Exhibit 1801.  Go into the Senjo proofs shares folder.  Let's

22   open up the Excel file, Senjo-distribution.

23   Q.  Mr. Hupcher, I want to draw your attention to the cell D3.

24         Do you see that?

25   A.  Yes.

L3CMWEI3                    Hupcher - Recross                    1421

1   Q.  What does it say in there before Senjo?

2   A.  Jaw13.

3   Q.  Do you see other references to jaw13 in this document?

4   A.  Yes.

5           MS. DEININGER:  Mr. Levine, can we now pull up

6   Government Exhibit 1728 at page 3.

7   Q.  Mr. Hupcher, who are these chats from?

8   A.  Ray.

9   Q.  Do you see that last sentence of the first paragraph?

10  A.  Yes.

11  Q.  Can you read it.

12  A.  My Wicker ID is jawbreaker13.

13  Q.  Thank you.

14          MS. DEININGER:  No further questions, your Honor.

15          THE COURT:  Any recross?

16          MR. HARID:  Yes, your Honor.

17  RECROSS EXAMINATION

18  BY MR. HARID:

19  Q.  Agent Hupcher, Ms. Deininger just showed you Government

20  Exhibit 1806.

21          MR. HARID:  Mr. McLeod, if you could pull that up,

22  page 3 of this document.

23  Q.  She showed you certain references to mail.protonmail.com,

24  including on this page, right?

25  A.  Yes.

DJA1721

L3CMWEI3                    Hupcher - Recross                    1422

1    Q.  Protonmail.com is a web service, right?

2            MS. DEININGER:  Objection.

3    Q.  Based on your experience and kind of in-depth technical

4    understanding of the FBI, do you understand protonmail.com to

5    be a web service, right?

6    A.  I understand that it's an e-mail provider.

7    Q.  It's an e-mail provider just as Google Mail is an e-mail

8    provider?

9    A.  They are both e-mail providers.

10   Q.  And Hot Mail is an e-mail provider?

11   A.  It is.

12   Q.  But protonmail.com is not a specific e-mail address, is it?

13   A.  No.

14   Q.  In fact, just by reviewing protonmail.com, which was a web

15   provider, you wouldn't know what the specific e-mail address

16   is, would you?

17   A.  Just from reading this, no.

18   Q.  Now, just looking at this particular file with the name

19   attachments-merchant six docs Linebeck, Kalixa

20   applications.zip, do you see that the source file row has the

21   word downloads in it?  You see that?

22   A.  That path, yes.

23   Q.  You see that the date added is July 12, 2018?

24   A.  Yes.

25            (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.

```
L3CPWEI4              Hupcher - Recross              1423
```

1   Q.  And you see the file immediately following this one, this

2   is a file whose source file is

3   merchant-6docs-Linebeck-Kalixa-applications?  In other words,

4   this file came from the source filed immediately above it,

5   right?

6           MS. DEININGER:  Objection.

7           THE COURT:  I'm sorry.  I don't have LiveNote to know.

8   What's the question?

9           MR. HARID:  The question is, does this file appear to

10  have come from the file immediately above it in the com

11  report -- I mean, from the zip file immediately above in the

12  com report.

13          THE COURT:  Sustained.

14  BY MR. HARID:

15  Q.  Going back to that file, do you see, Agent Hupcher, that it

16  has a date modified date of 7-12-2018?

17  A.  Yes.

18  Q.  Which is before the date added for the previous file?

19          You can scroll up, Mr. McLeod.

20          MS. DEININGER:  Objection.

21          THE COURT:  Overruled.

22  Q.  The question is, do you see that the document with file

23  named Kalixa-application-form-Linebeck-Organikals-signed has a

24  date modified date and time that is around four hours before

25  the date added for the zip file with the file name

L3CPWEI4                    Hupcher - Recross                    1424

1    attachments-merchant-6 docs-Linebeck-Kalixa-applications.zip?

2              THE COURT:  Well, as now phrased, sustained.  But if

3    you would like to ask a non-compound question, that would be

4    permissible.

5    Q.  Do you see, Agent Hupcher, that the file

6    Kalixa-application-form-Linebeck-Organikals-signed.pdf has a

7    date modified of July 12th, 2018, with the time stamp 3:19 a.m.

8    UTC?

9    A.  Yes.

10   Q.  And the date added for the zip file with the name

11   Linebeck-Kalixa-application.zip, that date and time follows the

12   date modified for the document immediately below it?

13   A.  Yes, it appears to be later that date.

14   Q.  I'd like to return to Government Exhibit 3707, the second

15   page, please.

16             Once again, Agent Hupcher, do you see that the date

17   added field for Government Exhibit 1801, which has the file

18   name E.zip, is January 19th, 2020?

19   A.  Yes.

20   Q.  Turning to Government Exhibit 1730, please, Mr. McLeod.

21             This is a Telegram chat, correct?

22   A.  Yes.

23   Q.  It is not a laptop -- it's not a communication from a

24   laptop, is it?

25             MS. DEININGER:  Objection.

L3CPWEI4                    Hupcher - Recross                    1425

1          THE COURT:  Sustained.

2    Q.  Scrolling down, please.  Do you see the phrase under

3    October, August 24th, 2018, do you see Weitergeleitete

4    Nachrichter?

5    A.  I think so.

6    Q.  Do you see that?

7    A.  Can you scroll down, please?

8    Q.  I'm not seeing it, Mr. McLeod.  Yes, the middle of this

9    page.

10   A.  Yes.

11   Q.  Do you know what that means?

12   A.  No idea.

13   Q.  Mr. McLeod, 1720, please.  The next page.  Can you blow up

14   the section that says "other amounts" at the bottom.

15          Agent Hupcher, can you read the first line under

16   "other amounts"?

17   A.  "Payments received-Senjo Payments Asia."

18   Q.  Mr. McLeod, turning to the spreadsheet we reviewed with

19   Mr. Hupcher before.

20          Do you see the table in the middle?  Do you see the

21   column that says G Team, Share G Team?

22   A.  Yes.

23   Q.  The cell in D38 is the sum of the eight cells immediately

24   above it?

25   A.  Yes.

L3CPWEI4                  Hupcher - Recross                1426

1  Q.  And the cell E38 is the sum of the eight cells above it?

2  A.  Yes.

3  Q.  And then the cell to the right of that -- and just to be

4  clear, cell E28 says "jaw13/Senjo"?

5  A.  Yes.

6  Q.  And then cell G38 includes the sum of both of those

7  preceding numbers in cell D38 and E38, yes?

8  A.  I believe so.

9  Q.  And as you testified before, that entire amount -- based on

10 the wire confirmations we reviewed, that entire amount was

11 transferred to Senjo Payment Asia, as indicated in the wire

12 transfer we reviewed, yes?

13          MS. DEININGER:  Objection.

14          THE COURT:  Ground?

15          MS. DEININGER:  Mischaracterizing -- foundation,

16 mischaracterizing his testimony.

17          THE COURT:  Well, I think the witness previously

18 indicated that's what it appears to say, and the jury

19 understands he has no personal knowledge of any of this.  This

20 is all from the face of the documents.

21          Why don't you put another question.

22 BY MR. HARID:

23 Q.  Agent Hupcher, based on your earlier testimony from this

24 morning, the sum, the entire sum, in cell J28 appears to have

25 been wired to an entity by the name of Senjo Payment Asia, yes?

```
L3CPWEI4                    Hupcher - Recross                    1427
```

1   A.   That amount appeared to have a beneficiary of Senjo Payment

2   Asia.

3   Q.   And same for J42?

4   A.   Yes.

5   Q.   And the same for J55?

6   A.   Yes, that amount is correct.

7   Q.   And scrolling up, the same for J18?

8   A.   Yes.  I don't remember the exact numbers now but that

9   sounds right.

10           MR. HARID:  One minute, your Honor.

11           (Pause)

12           Nothing else, your Honor.

13           THE COURT:  Very good.  Anything from counsel for

14   Mr. Akhavan?

15           MS. CLARK:  No, your Honor.  Nothing from us.

16           THE COURT:  Anything further from the government?

17           MS. DEININGER:  No, your Honor.

18           THE COURT:  Very good, you may step down.  Thank you

19   very much.

20           (Witness excused)

21           Please call your next witness.

22           MR. FOLLY:  The government calls James Patterson.

23           THE COURT:  In case you're wondering, ladies and

24   gentlemen, my law clerk does windows also.

25           Remain standing but take off your mask.

```
L3CPWEI4                    Patterson - Direct              1428
```

1    JAMES PATTERSON,

2        called as a witness by the Government,

3        having been duly sworn, testified as follows:

4            THE COURT:  Please be seated.  State and spell your

5    full name.

6            THE WITNESS:  My name is James Patterson, J-a-m-e-s,

7    P-a-t-t-e-r-s-o-n.

8            (Pause)

9            THE COURT:  Counsel?

10           MR. FOLLY:  Thank you, your Honor.

11   DIRECT EXAMINATION

12   BY MR. FOLLY:

13   Q.  Good afternoon, Mr. Patterson.

14   A.  Good afternoon.

15   Q.  How old are you?

16   A.  I'm 41 years old.

17   Q.  Where do you live?

18   A.  I live in Los Angeles, California.

19   Q.  Who are the members of your immediate family?

20   A.  I live with my wife, Jessica, and two children.

21   Q.  Are you currently employed?

22   A.  No.

23   Q.  What was your last paid position of employment?

24   A.  I was the CEO of Eaze.

25   Q.  What is Eaze?

```
L3CPWEI4              Patterson - Direct              1429
```

1    A.  Eaze is an online marijuana delivery platform.

2    Q.  What positions did you have while you worked at Eaze?

3    A.  I started at the company as the chief product and

4    technology officer, and then eventually was the CEO.

5    Q.  What time period did you work for Eaze?

6    A.  2016 to 2019.

7    Q.  During that time period you worked for Eaze, did you commit

8    any crimes?

9    A.  Yes.

10   Q.  What was the nature of the crime that you participated in?

11   A.  Conspiracy to commit bank fraud.

12   Q.  Were you eventually charged for committing that crime?

13   A.  Yes.

14   Q.  What crime were you charged with?

15   A.  Conspiracy to commit bank fraud.

16   Q.  Have you pled guilty to the bank fraud conspiracy that you

17   just mentioned?

18   A.  Yes.

19   Q.  Did you plead guilty under a cooperation agreement with the

20   government?

21   A.  Yes.

22   Q.  Can you describe generally how the bank fraud conspiracy

23   worked that you participated in?

24   A.  I coordinated with Ray Akhavan and others to enable people

25   to purchase marijuana on their credit cards by concealing the

```
L3CPWEI4                  Patterson - Direct                    1430
```

1   true nature of those transactions from the credit card

2   companies and banks, knowing that the credit card companies and

3   banks didn't allow marijuana transactions on their networks.

4   Q.  What was the underlying goal of that conspiracy that you

5   participated in?

6   A.  To enable the purchase of marijuana on credit cards.

7   Q.  You mentioned a moment ago that part of that conspiracy

8   involved hiding credit card transactions from banks and credit

9   card companies.  Can you explain what you mean by that?

10  A.  So in order to process the transactions, the marijuana

11  transactions on credit cards, the fact that they were marijuana

12  transactions had to be concealed from the credit card companies

13  and banks.

14          So in order to do that, phony merchant accounts were

15  created along with fake websites and descriptors that didn't

16  have anything to do with Eaze or the dispensaries that Eaze

17  worked with.

18  Q.  Where were the banks located that you were hiding the true

19  nature of those transactions from?

20  A.  In the United States.

21  Q.  During the time period you worked for Eaze, approximately

22  how much money was processed in the manner that you just

23  described?

24  A.  Between 100 and $150 million.

25  Q.  Did you participate in the bank fraud conspiracy by

L3CPWEI4                    Patterson - Direct                1431

1    yourself or with others?

2    A.  With others.

3    Q.  I'm going to ask you if you see anyone in the courtroom

4    that you committed any of those crimes with?

5    A.  Yes.

6    Q.  Can you identify that individual?

7    A.  Ray Akhavan.  He's in a suit and tie over there.

8         MR. TAYBACK:  So stipulated that Mr. Akhavan is seated

9    next to me.

10        THE COURT:  The record will reflect the identification

11   of Mr. Akhavan.

12   BY MR. FOLLY:

13   Q.  Did anyone else besides yourself and Ray Akhavan

14   participate in the bank fraud conspiracy you just described?

15   A.  Yes.

16   Q.  Who were the names of some of the other individuals who

17   participated in the conspiracy?

18   A.  People that worked for Ray that I knew as Medhat, Ozan,

19   Hussain, Ruben and Martin, as well as members of the Eaze

20   executive staff, board of directors and dispensaries that Eaze

21   worked with.

22   Q.  Before we go further, I'd like to ask you a few questions

23   about your education and your work experience.  How far did you

24   go in school?

25   A.  I have a bachelor's and master's degree.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

```
L3CPWEI4                    Patterson - Direct                  1432
```

1   Q.  What fields did you get those degrees in?

2   A.  My bachelor's is in computer science and my master's degree

3   is in political science.

4   Q.  When did you graduate?

5   A.  I graduated in 2001.

6   Q.  What did you do after you graduated?

7   A.  After I graduated, I joined the military.

8   Q.  Were you eventually deployed as part of your military

9   service?

10  A.  Yes.  In 2002 I was deployed to Kuwait as part of Operation

11  Enduring Freedom, and then I was also deployed to central

12  command headquarters later as part of Operation Iraqi Freedom.

13  Q.  In total, how long were you in the Air Force?

14  A.  I was active duty for four years, and then served four

15  years in the reserves.

16  Q.  Without going into detail, what types of jobs did you have

17  after leaving the Air Force, before joining Eaze?

18  A.  After I left the Air Force, I worked in computer network

19  security and then eventually web application development

20  companies.

21  Q.  Did you eventually work for a company named Yammer?

22  A.  Yes.

23  Q.  Approximately when was that?

24  A.  I started in Yammer in 2008.

25  Q.  What type of business was Yammer?

DJA1732

L3CPWEI4                      Patterson - Direct                    1433

1   A.  Yammer created enterprise software for companies,

2   specifically social networking communications software for

3   companies.

4   Q.  How long did you work for Yammer?

5   A.  Approximately four years.

6   Q.  Where did you work after Yammer?

7   A.  Yammer was -- the company was eventually acquired by

8   Microsoft; so I was a Microsoft employee for one year.

9   Q.  What did you do after that?

10  A.  After that, I co-founded another startup with some people

11  from Yammer called Cotap.

12  Q.  What was Cotap?

13  A.  Cotap was also enterprise communications software similar

14  to Yammer but focused on mobile and field service workers.

15  Q.  Where did you work after Cotap?

16  A.  After Cotap is when I joined Eaze.

17  Q.  Approximately when was that?

18  A.  That was May of 2016.

19  Q.  When did you first learn about Eaze?

20  A.  I first learned about Eaze in the early 2012, 2013,

21  actually prior to the company even being created.

22  Q.  How did you first hear about it at that time?

23  A.  Well, the founder of the company, Keith McCarty, we both

24  worked together at Yammer.  After the acquisition of Yammer, he

25  was thinking about leaving and starting Eaze and he told me

DJA1733

L3CPWEI4                    Patterson - Direct                    1434

1   about it.  He wanted me to also leave and join him to co-found

2   the company with him.

3   Q.  At the time, what was your understanding of what the

4   company was going to do?

5   A.  The way he explained it initially was that Eaze would -- it

6   would be an online company, but sell marijuana directly to

7   consumers.

8   Q.  When you first learned about the company, were you

9   interested or disinterested in joining?

10  A.  I was not interested.

11  Q.  Why not --

12          THE COURT:  I think the grammatical term is interested

13  or uninterested.  Disinterested means not having like a

14  financial interest or something like that.  But we'll continue

15  the grammar and usage lesson during the break.

16          MR. FOLLY:  Thank you, your Honor.

17  Q.  Uninterested, Mr. Patterson.

18  A.  I'm having trouble hearing you judge, but yes, I was

19  uninterested.  Sorry, was there another question?

20          THE COURT:  The question was, were you initially

21  interested or uninterested?

22  A.  I was uninterested.

23  Q.  Why not?  Why were you uninterested?

24  A.  The business model, how he explained it initially, just

25  made me uncomfortable.  The idea of selling marijuana directly

```
L3CPWEI4                    Patterson - Direct                    1435
```

1  to consumers online, it just seemed very risky to me.  I

2  actually said, I think:  If you're not careful here, you may

3  end up in jail.

4  Q.  How did you leave things with Keith at the time of that

5  conversation?

6  A.  I went off and started a different company with some other

7  people from Yammer, and Keith went off and started Eaze.

8  Q.  Did you eventually have any further discussions with Keith

9  about working at Eaze?

10  A.  Yes.  Over the next couple of years, after he started the

11  company, he would periodically reach out to me, give me updates

12  about the company, you know, specifically again letting me know

13  that he wanted me to join him at the company.

14  Q.  Did you eventually join him at Eaze?

15  A.  Yes.

16  Q.  When did you start working there?

17  A.  In May of 2016.

18  Q.  What was your position when you were first hired?

19  A.  Initially started as the chief product and technology

20  officer.

21          THE COURT:  Counsel keep in mind that we're going to

22  break for lunch in a couple of minutes; so find a good place.

23          MR. FOLLY:  Thank you, your Honor.

24  BY MR. FOLLY:

25  Q.  What were your responsibilities in that position?

L3CPWEI4                    Patterson - Direct                    1436

1    A.  I oversaw the engineering team; so specifically, I oversaw

2    building out the website, mobile applications, as well as the

3    logistics back end of the company.

4    Q.  Can you describe Eaze's business model at the time you

5    joined the company?

6    A.  Yeah, when I joined, the business model had changed

7    substantially.  Instead of selling directly, Eaze was now a

8    platform where Eaze partnered with dispensaries to be able to

9    sell their marijuana on the platform.  So a similar business

10   model to, for example, DoorDash or Grubhub, but instead of

11   food, it was working with -- instead of working with

12   restaurants, it was working with dispensaries.

13   Q.  You mentioned something just now called a dispensary, can

14   you explain what that is?

15   A.  Yeah, a dispensary is a marijuana retailer; so they're

16   licensed by the State specifically to sell marijuana.

17   Q.  Where was Eaze located?

18   A.  In San Francisco, California.

19           MR. FOLLY:  Your Honor, this might be a good place for

20   us to break.

21           THE COURT:  Very good.  All right.  Ladies and

22   gentlemen, we're going to take our lunch break.  Because of

23   another matter that I have to attend to, we will give you until

24   2:00, but we will start again promptly at 2:00.

25           (Jury not present)

L3CPWEI4                    Patterson - Direct                    1437

1          You can step down.  We'll see you at 2:00.

2          (Witness temporarily excused)

3          All right.  I'll see you all at 2:00.

4          (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3CMWEI5                     Patterson - Direct                1438

1                        AFTERNOON SESSION

2                             2:05 p.m.

3            MR. FOLLY:  Your Honor, I did want to just note that

4    the exhibit that we had started the discussion about earlier we

5    will likely get to during this witness' testimony today.

6            MR. TAYBACK:  Did you wish to take that up, your

7    Honor, outside the jury?

8            THE COURT:  Yes.  But then we have to excuse the

9    witness.

10           MR. TAYBACK:  I can make my objection and go to the

11   sidebar also.

12           THE COURT:  Since we don't have the jury, why don't

13   you come over.  We will have a sidebar right here.

14           (At the sidebar)

15           MR. TAYBACK:  I believe I was about to address your

16   Honor on this issue.

17           The e-mail as proposed by the government, 423, is

18   entirely blacked out after the e-mail from Mr. Akhavan to which

19   he responds.

20           If you look at the e-mail that it responds to, it's

21   e-mails from and between the lawyer, Jim Black, the lawyer for

22   Eaze, but not for my client, and I'm not asserting advice of

23   counsel.

24           And this witness, Mr. Patterson -- and Mr. Akhavan, in

25   order to understand anything he's talking about, all of

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

```
L3CMWEI5                  Patterson - Direct                1439
```

1    these -- all of the information is relevant.

2            THE COURT:  What I had proposed, when the issue of

3    Mr. Black came up earlier, not with reference to this exhibit,

4    was that if he was present, fine.  Just so long as there was

5    never any mention that he was an attorney because that would

6    begin to raise the wrongful implications that there was an

7    advice of attorney.

8            What's blacked out here, is he purporting to give

9    legal advice?

10           MR. TAYBACK:  No.  I can -- I do need to show that

11   he's affiliated with Eaze.

12           THE COURT:  Yes.  You can do that by saying, was he an

13   employee, executive even.

14           MR. TAYBACK:  I don't know his title.

15           THE COURT:  I think that's the way to handle it.

16           I am going to have you hear at the sidebar, if

17   necessary.

18           (Jury present)

19           THE COURT:  Ladies and gentlemen, I'm sorry for the

20   delay, but we were able to fix the microphone.

21           I want to ask you, though, throughout the rest of this

22   trial if at any time you can't hear either the witness for the

23   questioner, just raise your hand and I will stop the music and

24   we will fix it because, obviously, it's critical that you be

25   able to hear everything.

L3CMWEI5                        Patterson - Direct                    1440

1             We are ready to continue.

2             MR. FOLLY:  Thank you, your Honor.

3   BY MR. FOLLY:

4   Q.  Mr. Patterson, before the lunch break you had started to

5   describe Eaze's business model.  Using an example, can you walk

6   us through each of the players that are involved in the

7   business model and explain what their roles were.

8   A.  Yes.  It starts with a customer who would want to buy

9   marijuana, so they would download either Eaze's mobile

10  application or go to Eaze's website.  From there they would

11  enter their location.  They would be matched to a dispensary,

12  that's one of the businesses that sells marijuana, the

13  dispensary that was located near them.  They would be able to

14  browse the inventory at the dispensary.  They would select the

15  items, add them to their cart and then check out.

16            Then that order would be transmitted by Eaze system to

17  the dispensary.  An employee of the dispensary would create the

18  order, put the items in a bag, then a delivery driver that

19  worked for the dispensary would then drive the products using

20  Eaze's mobile app and a GPS system that would guide the driver

21  to the customer's location to do the final delivery.

22  Q.  What methods of payment were accepted when you first joined

23  Eaze?

24  A.  When I first joined, it was cash only.

25  Q.  Did Eaze eventually accept debit and credit cards?

```
L3CMWEI5                    Patterson - Direct                1441
```

1   A.  Yes.

2   Q.  Approximately when did Eaze first begin accepting debit and

3   credit cards?

4   A.  Approximately September 2016.

5   Q.  To your understanding, was the sale of marijuana legal or

6   illegal under federal law during the time period you worked at

7   Eaze?

8   A.  Illegal.

9   Q.  To your understanding, was the sale of marijuana legal or

10  illegal under California state law during the time period you

11  worked at Eaze?

12  A.  Legal.

13  Q.  You mentioned earlier that you participated in a bank fraud

14  conspiracy involving Eaze, is that right?

15  A.  Yes.

16  Q.  Can you describe generally how that conspiracy operated.

17  A.  To enable credit cards, so instead of paying cash to give

18  the options for customers to receive credit cards, merchant

19  applications were opened, but, as I mentioned, because Visa and

20  MasterCard didn't allow cannabis sales, the merchant accounts

21  were opened under fictitious names and as well as what are

22  called descriptor websites were set up associated with those

23  names.  So those merchant accounts were set up on behalf of the

24  dispensaries.  So when a customer made a purchase, the funds

25  went from their bank, the credit card issuing bank for the

L3CMWEI5                    Patterson - Direct                1442

1  credit card to the merchant bank, and then eventually the funds

2  were disbursed back to the dispensary.

3  Q.  You just mentioned that the merchant accounts were opened

4  under fictitious names.  Can you explain what you mean by that.

5  A.  So, in order to open the accounts, they couldn't have --

6  they couldn't be associated with Eaze or the dispensaries

7  because marijuana transactions weren't allowed, so Ray would

8  open bank accounts under phony names, so names that just had

9  nothing to do with Eaze or Eaze's dispensaries, in order to

10 have a merchant account.

11 Q.  You also mentioned earlier that there were fake websites

12 that were used in furtherance of the conspiracy.  Can you

13 describe what you mean by fake websites?

14 A.  So, when a purchase is made on a credit card, something has

15 to appear on the customer's credit card statement.  It's called

16 a descriptor.  That's what the customer, how they know what

17 they purchased.  So websites needed to be set up because since

18 the descriptor was not going to be Eaze or the dispensary, it

19 needed to be something, so those websites were set up

20 specifically so that when a customer made a purchase, if they

21 didn't recognize the transaction, they would go to that

22 website, and then the website would be set up in such a way

23 where the customer could be able to figure out whether it was

24 associated with Eaze.

25 Q.  Was this credit card processing operation based in the

L3CMWEI5                    Patterson - Direct                    1443

1    United States or overseas?

2    A.  Overseas.

3    Q.  Why did Eaze process cards overseas as opposed to

4    processing through a processor based in the United States?

5    A.  Because no U.S. banks would open merchant accounts for

6    cannabis businesses.

7    Q.  Did the credit and debit card operation through Ray's

8    organization stay the same or change over time?

9    A.  It changed over time.

10   Q.  What were some of those changes?

11   A.  Initially, I knew it as a Clearsettle.  So when it was

12   operating as Clearsettle, there was a single descriptor and

13   descriptor website so that all the transactions across all of

14   the dispensaries Eaze worked with were associated with a single

15   website descriptor.

16        Eventually, that changed to -- from Clearsettle to

17   something I knew as EUprocessing.  During EUprocessing the way

18   the descriptors worked also changed.  So instead of having a

19   single descriptor across all of the dispensaries, multiple

20   descriptors were used.  All in all, there were probably 15 --

21   12 or 15 total descriptors being used at any one time.

22   Q.  Focusing first on Clearsettle, did Ray operate Clearsettle

23   alone or did he work with others?

24   A.  He worked with others.

25   Q.  Who were some of the other individuals involved in the

```
L3CMWEI5                    Patterson - Direct              1444
```

1   Clearsettle operation?

2   A.  People I knew as Medhat, Ozan, and Hussein.

3   Q.  You also just mentioned that eventually the operation came

4   under the name that you knew as EUprocessing, is that right?

5   A.  Yes.

6   Q.  Approximately when was that change?

7   A.  That was in April of 2018.

8   Q.  What was your understanding of who was involved in the

9   EUprocessing phase of the operation?

10  A.  So Ray and Medhat from the Clearsettle, and then some new

11  people that became involved, people I knew as Ruben and Martin.

12  Q.  Going back to Clearsettle, when did you first hear about

13  Clearsettle.

14  A.  A few weeks after I joined the company, after I joined

15  Eaze.

16  Q.  Who told you about Clearsettle at that time?

17  A.  Keith McCarty, the then CEO.

18  Q.  At that point in time what forms of payment were available

19  to Eaze's customers?

20  A.  It was cash only.

21  Q.  What was the role of Clearsettle in Eaze's credit and debit

22  card processing?

23  A.  Clearsettle acted as the payment gateway, so Eaze's systems

24  would integrate into their payment gateway so when a customer

25  wanted to input their credit card information, as well as make

L3CMWEI5                    Patterson - Direct                   1445

1    a purchase, that would go through Clearsettle's system.  Also,

2    they set up the merchant accounts, as well as the descriptor

3    websites that were used.

4    Q.  What was the purpose of the merchant accounts that you just

5    mentioned?

6    A.  The purpose was to -- when you need a bank account when you

7    are making a credit card transaction.  However, in this case,

8    because the dispensaries couldn't have their own merchant

9    accounts, because they were marijuana dispensaries, the

10   merchant accounts here were set up under those fictitious names

11   to allow for the credit card process.

12   Q.  To your knowledge, who was in charge of the Clearsettle

13   operation?

14   A.  It was Ray.

15   Q.  Approximately when were you first introduced to Ray?

16   A.  I was introduced to him over -- via e-mail about a month

17   after I joined and then in person maybe six months after I

18   joined.

19              MR. FOLLY:  If we could show the witness only what's

20   been marked for identification as Government Exhibit 407.  If

21   we could just flip through so the witness can see all of it.

22   Q.  Mr. Patterson, do you recognize this?

23   A.  Yes.

24   Q.  What is it?

25   A.  This is the e-mail introduction that was introducing me to

L3CMWEI5                    Patterson - Direct                    1446

1   Ray.

2            MR. FOLLY:  The government offers Government Exhibit

3   407.

4            MR. TAYBACK:  No objection.

5            MR. GILBERT:  No objection.

6            THE COURT:  Received.

7            (Government Exhibit 407 received in evidence)

8   Q.  Focusing on the e-mail from Jim Patterson, yourself at

9   12:29, can you read that aloud.

10  A.  Sure.  Hey, Ray, nice to meet you.  I think an intro call

11  would be a good idea.  I'm pretty free tomorrow for Friday.

12  Jim.

13  Q.  Can you read aloud Ray's response directly above that.

14  A.  He writes:  Hi, Jim, sorry I missed you yesterday.  I'm

15  traveling and on the opposite time zone.  I'll be back home by

16  noonish tomorrow your time.  Can I call you tomorrow afternoon.

17  Thanks.  Ray.

18  Q.  Finally, can you read the message from Keith directly above

19  that.

20  A.  Keith says:  Please sync with Ray today.  Loop me in if

21  needed.

22  Q.  Can you remind us who Keith was?

23  A.  Keith was my boss.  He was the CEO and founder of Eaze.

24            MR. FOLLY:  If we can show the witness only what's

25  been marked as Government Exhibit 411.  If we can flip through

DJA1746

L3CMWEI5                    Patterson - Direct                    1447

1    it so the witness can see all of it.

2    Q.  Mr. Patterson, do you recognize this?

3    A.  Yes.

4    Q.  What is it?

5    A.  This is an e-mail chain that was forwarded to me by Keith.

6            MR. FOLLY:  The government offers Government Exhibit

7    411.

8            MR. TAYBACK:  No objection.

9            MR. GILBERT:  No objection.

10           THE COURT:  Received.

11           (Government Exhibit 411 received in evidence)

12           MR. FOLLY:  If we could publish that to the jury and

13   turn first to page 3.

14   Q.  Starting, first, with Keith's message at the bottom on July

15   1, 2016 at 8:12, can you read that aloud.

16   A.  Yes.  Keith writes:  Thanks, Ray.  I appreciate your help

17   on this.  I modeled this out and I'm not sure that 8.5 percent

18   is going to work.  Do you have any ideas on how the

19   dispensaries can get this closer to 6 percent.  Keith.

20   Q.  What is your understanding of what was being discussed in

21   this meeting?

22           MR. TAYBACK:  Objection.  Lack of foundation.

23           THE COURT:  Overruled.  You may answer.

24   Q.  You may answer, Mr. Patterson.

25   A.  Keith and Ray were negotiating over the processing rates

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

L3CMWEI5                    Patterson - Direct                    1448

1    that were going to be charged.

2    Q.  There is a specific reference to 8.5 percent.  What was

3    your understanding of what that 8.5 percent meant?

4    A.  So that's the rate that the processing would be charged.

5    So, for example, if there was a $100 credit card charge, $8.50

6    would be fees, the credit card fees that Ray would charge.

7             MR. FOLLY:  If we could zoom back out, focusing now on

8    the message directly above that, on July 1, 2016 at 3:52 a.m.

9    from Ray Akhavan.

10   Q.  Mr. Patterson, can you read that aloud.

11   A.  Yes.  Ray writes:  High Keith, absolutely.  If they are

12   willing to be the merchant of record and own the processing

13   merchant account and bank accounts and therefore take the legal

14   liability, we could possibly do six.  Please have them go look

15   at processing rates for legal high-risk like adult.  They start

16   at eight for the largest players and average is 14 percent.

17            I don't think it's reasonable for them to want better

18   rates for this than compliant legal high risk.  If they think

19   it's too much, they are welcome to find someone else who is

20   willing to take all their risk, or they can get their own

21   accounts and take the risk themselves.  I'm good with either

22   and would prefer they take the risk of course.

23            MR. FOLLY:  If we could highlight the sentence

24   starting with please have them go look, as well as the

25   following sentence.

L3CMWEI5                    Patterson - Direct                    1449

1           Ray writes here:  Please have them go look at

2     processing rates for legal high risk like adult.  They start at

3     eight for the largest players and average is 14 percent.  I

4     don't think it's reasonable for them to want better rates for

5     this then compliant legal high risk.

6     Q.  What was your understanding of what was being referred to

7     here?

8     A.  Well, Ray was comparing cannabis to adult pornography, and

9     he's saying that Keith shouldn't expect cannabis to be a lower

10    rate than adult because adult is legal whereas cannabis is not

11    federally legal.

12          MR. FOLLY:  Showing the witness now what's been marked

13    as Government Exhibit 413.

14    Q.  Mr. Patterson, do you recognize this?

15    A.  Yes.

16    Q.  What is it?

17    A.  This is an e-mail between Ray and his team and the Eaze

18    team.

19    Q.  Were you a participant in this e-mail chain?

20    A.  Yes.

21          MR. FOLLY:  The government offers Government Exhibit

22    413.

23          MR. TAYBACK:  No objection.

24          MR. GILBERT:  No objection.

25          THE COURT:  Received.

```
L3CMWEI5                    Patterson - Direct                1450
```

1          (Government Exhibit 413 received in evidence)

2    Q.  Starting at the bottom e-mail, dated July 26, 2016 at 10:29

3    a.m. from Jim Patterson, can you read aloud the first two

4    paragraphs of that e-mail.

5    A.  Yes.  Gentlemen; good news.  We shipped credit card

6    payments to production last night, starting way limited beta

7    rollout and are receiving our first credit card orders this

8    morning.  Thanks for everyone's hard work and responsiveness to

9    get us here.

10         We did the notice that the billing descriptor coming

11   across is web consultant -- Web Consultations, and we need to

12   change that to onlinebiller.net to match the text on our credit

13   card entry form and receipt.

14   Q.  Focusing on the first paragraph that you read that starts

15   with good news, can you explain what you were describing in

16   that first paragraph.

17   A.  Yes.  I was letting everyone know that we had shipped

18   credit card payments out to what's called a beta release, so

19   that means that we enabled it for a very small number of

20   customers in order to test things to see if there is any

21   problems before we would roll it out to the larger customer

22   base.

23   Q.  In the second paragraph you referenced that the billing

24   descriptor was coming across as Web Consultations.  Then you

25   said:  We need to change that to onlinebiller.net.

DJA1750

L3CMWEI5                    Patterson - Direct                    1451

1    What were you referring to there?

2  A.  Initially, when this was -- when this setup was explained

3  to me, I was told we would be using online biller.net as the

4  billing descriptor website and that was the website that

5  Clearsettle controlled that was going to be used as the

6  customer service portal, as well as where the e-mail receipts

7  would come from.

8    However, when we initially did our test, we saw that

9  the billing descriptor was not Online Biller.  It was coming

10  across as this Web Consultations.  At the time I didn't know

11  what Web Consultations was.  I thought it was a mistake.

12    So I'm essentially telling people here that we needed

13  to make the change to what it was supposed to be.

14  Q.  In that same paragraph you also reference matching the text

15  on our card entry form and receipt.

16    What were you referring to there?

17  A.  As part of this, there was a little blurb of text

18  underneath the area where the customer would enter in their

19  credit card details.  So, for example, where you would enter in

20  your card number, billing address, those kinds of things.

21    So underneath there was a little piece of text that

22  would alert the customer to the fact that the descriptor was

23  going to be onlinebiller.net so that there was no confusion

24  because they were purchasing on Eaze.  But the descriptor was

25  Online Biller, so we put that there to remind them that that's

**DJA1751**

L3CMWEI5                    Patterson - Direct                    1452

1   how the charge would come across.  So I'm saying that the

2   reason this is important is because we put the text

3   onlinebiller.net there, but it was coming up as Web

4   Consultations.

5   Q.  You also reference receipt in that same sentence.  What

6   were you referring to there?

7   A.  Well, the same thing.  So we also, when the customer would

8   make a purchase, they would get an e-mail receipt and that

9   e-mail receipt was supposed to come from onlinebiller.net.

10  Q.  Can you read aloud the third paragraph.

11  A.  I also notice that the domain onlinebiller.net was recently

12  registered.  I just want to confirm that that was someone on

13  your end and that you control that domain.  We're going to need

14  to have a landing page and e-mail forwarding set up on that

15  domain.

16  Q.  In the first sentence you refer to the domain

17  onlinebiller.net being recently registered.

18          What were you describing there?

19  A.  As part of this I did a lookup.  It's called a who-is

20  lookup where you can see when a domain was registered, who

21  owned it, and one of the things I noticed was that this

22  particular domain was very recently registered.  That was

23  surprising to me because I thought that onlinebiller.net was

24  something that Clearsettle was using in other parts of their

25  business, so that said to me that this particular domain was

L3CMWEI5                    Patterson - Direct                    1453

1    being set up just for the purposes of Eaze.  So I just wanted

2    to make sure here that it in fact was correct and that they

3    really did control that domain.

4    Q.  You also say in the second sentence, we are going to have a

5    landing page and e-mail forwarding set up on that domain.

6              Can you explain what you meant by that?

7    A.  Yes.  Because the domain was recently registered, it wasn't

8    already being used or there wasn't anything currently on the

9    site, so I said that we needed to have a landing page.  A

10   landing page is just the web page that the customer lands or

11   sees when they actually go to that domain.  So we needed to

12   have something set up there for customers, as well as e-mail

13   forwarding so that Eaze's systems would be able to generate

14   receipts, but then those receipts would actually come from the

15   onlinebiller.net domain.

16   Q.  Just to be clear, can you give us an example of where the

17   receipt would come from if an Eaze customer placed an order

18   through the Eaze website?

19   A.  So under this it would come from an e-mail address that was

20   receipts@onlinebiller.net or support@onlinebiller.net.

21   Q.  What was your understanding as to why the onlinebiller.net

22   domain was used to send receipts as opposed to the Eaze domain?

23   A.  So that there was -- so that there was no connection

24   between Eaze and the credit card processing.

25   Q.  Can you read aloud the first sentence of Ray's response

DJA1753

L3CMWEI5                    Patterson - Direct                    1454

1   above your e-mail.

2   A.  Yes.  Ray writes:  Jim, we did get that domain and are

3   implementing the change.

4           MR. FOLLY:  If we could show for the witness only

5   what's been marked for identification as Government Exhibit

6   417.

7   Q.  Mr. Patterson, do you recognize this?

8   A.  Yes.

9   Q.  What is it?

10  A.  This is an e-mail thread between Ray's team and the Eaze

11  team.

12  Q.  Were you a participant on this e-mail thread?

13  A.  Yes.

14          MR. FOLLY:  The government offers Government Exhibit

15  417.

16          MR. TAYBACK:  No objection.

17          MR. GILBERT:  No objection.

18          THE COURT:  Received.

19          (Government Exhibit 417 received in evidence)

20          MR. FOLLY:  If we could turn to page 2.

21  Q.  If you could read aloud just the first paragraph of your

22  e-mail on September 19, 2016.

23  A.  Yes.  Gentlemen, sounds like there was a bit of confusion

24  as to what domain we should use for credit card collection.  I

25  spoke with Ray and he said that we should be using the Web

```
L3CMWEI5                    Patterson - Direct                 1455
```

1   Consultants domain, which is the merchant of record.  So in

2   order to proceed we need three things.

3   Q.  Can you explain what you were describing here in this first

4   paragraph of the e-mail.

5   A.  Yes.  So, again, initially I thought -- I was under the

6   impression that everything was going to be done on this

7   onlinebiller.net domain.  However, at this point there was this

8   other domain, this Web Consultations domain.  When I spoke to

9   Ray about it, what he said was the way it was set up was the

10  Web Consultations was the actual merchant of record so that we

11  needed to make sure that when the customer was entering in

12  their credit card details, that actually occurred on the Web

13  Consultations domain and not the online biller domain.

14  Q.  You referred here to web consultants domain as being the

15  merchant of record.  Can you explain what you meant by merchant

16  of record?

17  A.  Yes.  So that was the website that was associated with the

18  actual merchant that was set up at the bank.

19  Q.  Going now to page 1, looking at the e-mail from Ray Akhavan

20  on September 19, 2016, can you read that aloud through the

21  second paragraph.

22  A.  Yes.  Ray writes:  Team, the domain that we should be using

23  for credit card collections is www.webconsultations.today.  The

24  domain that we should be using for our customer service

25  page/credit card descriptor is onlinebiller.net.

L3CMWEI5                    Patterson - Direct                    1456

1          From a payment processing perspective, a company has

2     to provide the bank with two URLs or a URL and a phone number.

3     The first URL is the URL of the business itself which in this

4     case is webconsultations.today.  That is the URL that the

5     business runs on and where the customers come and insert credit

6     card info.

7          The second is either a URL or a phone number for

8     customer service/credit card descriptor.  This is purely to

9     display to the customers, both digitally and on their paper

10    credit card statements, the URL or phone number where they can

11    go and get customer service of any kind.  In this case that URL

12    is onlinebiller.net and that is where the customers should be

13    going for all billing-related questions.

14    Q.  What was your understanding of Ray was explaining in this

15    e-mail?

16    A.  Well, he was saying that in order to set up these merchant

17    accounts you had to provide two URLs or a URL and a phone

18    number, so he was telling us in this case that the merchant URL

19    was webconsultations.today and that's where the credit card

20    collection should happen, and the customer service billing

21    descriptor URL was onlinebiller.net.  So that is the URL that

22    would be displayed to the customers on their billing statement.

23    Q.  Using an example of an Eaze customer making a purchase for

24    a marijuana product through the Eaze website, can you explain

25    how these two domains were used?

L3CMWEI5                    Patterson - Direct                    1457

1   A.   Yes.   When a customer is ready to check out, if they had

2   never purchased anything before, the first thing they would

3   need to do is add their credit card on file.   So in that case

4   that's when they would be redirected to the

5   webconsultations.today domain.   There they would enter in their

6   credit card details, card number, expiration date, billing

7   address, that kind of information, and then they would save it

8   and then their card would be sent to the Clearsettle system and

9   stored on file.

10          So once they had their card on file and then they

11  could go to their cart and check out, after they would check

12  out they would see -- they would get an e-mail receipt from the

13  onlinebiller.net domain and then on their credit card statement

14  they would see that the charge came from onlinebiller.net.

15  Q.   Was Eaze affiliated with webconsultations.today?

16  A.   No.

17  Q.   Were any of the dispensaries?

18  A.   No.

19  Q.   Can you explain what would happen if an Eaze customer were

20  to go to the Online Biller web page?

21          MR. TAYBACK:   Objection.   Lack of foundation.   Vague

22  as to time.

23          THE COURT:   The objection on lack of foundation is

24  overruled.   The objection on vagueness to time is sustained.

25  Q.   Mr. Patterson, to your recollection, what time period was

DJA1757

L3CMWEI5                    Patterson - Direct                    1458

1    the webconsultations.today being used during the Eaze credit
2    card processing?
3    A.  Early on, but I can't say how long.
4    Q.  Was it implemented around the time of this e-mail exchange?
5    A.  Yes.
6    Q.  So during the time period that it was being used by Eaze
7    for credit and debit card purchases, what would happen if a
8    customer went to the Online Biller web page?
9    A.  So, what they would see is, they would see that landing
10   page.  The landing page would -- was basically a form that
11   would collect certain information.  So the customer would be
12   asked to put in either their credit card number, their billing
13   zip code, I believe, order number.  So collecting a few pieces
14   of information so that the system could then actually look up
15   the account associated with that customer.
16   Q.  What if a non-Eaze customer were to go to that web page?
17   What would be visible to them?
18   A.  Well, they would see the same thing.  They just wouldn't be
19   able to put in any valid information to be able to look up a
20   transaction.
21           MR. FOLLY:  I'd like to show the witness now for
22   identification what's been marked as Government Exhibit 418.
23   If you could scroll through so the witness can see the full
24   e-mail.
25   Q.  Mr. Patterson, do you recognize this?

DJA1758

1   A.  Yes.

2   Q.  What is it?

3   A.  It's an e-mail between Ray's team and Eaze's team.

4   Q.  Were you a participant on this e-mail chain?

5   A.  Yes.

6         MR. FOLLY:  The government offers Government Exhibit

7   418.

8         MR. TAYBACK:  No objection.

9         MR. GILBERT:  No objection.

10        THE COURT:  Received.

11        (Government Exhibit 418 received in evidence)

12        MR. FOLLY:  If we can publish that.

13  Q.  Mr. Patterson, focusing on the first page, there appears to

14  be some text that is in black and some text that is in red.

15        Can you explain to us the distinction between those.

16  A.  Yes.  The red text is the things that I wrote.  The black

17  text are things that Ray wrote.  So I did it that way so I

18  could address his various points in line in the e-mail.

19        MR. FOLLY:  We could start by going to the second

20  page.  Focusing now on item No. 4, if we can blow that up with

21  the response below it.

22  Q.  Mr. Patterson, can you read item No. 4 aloud.

23  A.  Yes.  Ray writes:  The Web Consultations page is super

24  critical as that is the website on file with the bank which

25  means Visa and MasterCard monitor it.  We absolutely cannot

```
L3CMWEI5                    Patterson - Direct                    1460
```

1    ever mess or change that page in any way.  It has very strict

2    compliance issues and is currently compliant, so please, please

3    make sure no one ever messes with that page, as it must stay

4    compliant and functioning.  If that site goes down or is broken

5    for any reason, it will blow up the entire project.

6    Q.  When Ray wrote that the Web Consultations page is super

7    critical as that is the website on file with the bank, what was

8    your understanding of what Ray meant by that?

9    A.  Well, that was the website that was on file so that if, as

10   he says, if Visa and MasterCard were to monitor it, that would

11   be the website that they would look at.

12   Q.  The reference to bank here when it says that's the website

13   on file with the bank, what is your understanding of what bank

14   that was referring to?

15   A.  That was the merchant banks, the ones in Europe that Ray

16   was working with.

17   Q.  When Ray says that Visa and MasterCard monitor it, what was

18   your understanding of what that meant?

19   A.  That they either had automated or manual checks for that

20   website to make sure that it was functioning.

21   Q.  When Ray writes, we absolutely cannot ever mess or change

22   that page in any way and then goes on to say, if that site goes

23   down or is broken for any reason, it will blow up the entire

24   project, what was your understanding of what that meant?

25   A.  I didn't know specifically about any compliance issues on

L3CMWEI5                    Patterson - Direct                    1461

1    the page, but in terms of the page staying functioning, my

2    understanding was that because the transactions were actually

3    happening on Eaze and not on that page that it would be a red

4    flag if that page were to be not functioning but the

5    transactions were continuing to work.

6    Q.  Looking at your response in red below that, can you read

7    that aloud.

8    A.  Yes.  Got it.  We've added uptime monitoring for

9    www.onlinebiller.net and www.webconsultations.today, so we will

10   be notified if those sites are ever down.

11   Q.  You mentioned that you added uptime monitoring.

12            Can you explain what that was?

13   A.  Yes.  So Eaze had a system for monitoring its own internal

14   websites, so that if Eaze's websites were down, our engineers

15   would be notified.  So what we did is, we added these domains

16   to our own internal monitoring system.

17            MR. FOLLY:  If we could zoom back out.

18   Q.  Going to point No. 5 in the response below that, can you

19   read aloud point No. 5.

20   A.  Yes.  Ray writes:  We need to set up daily or weekly review

21   of the customer service practices so that we can be sure people

22   are getting their e-mails handled and applied to and also

23   getting refunds.  Angry people who complain do their banks can

24   blow our merchant account very easily.  Some kind of

25   monitoring, where for any reason, whether human or technical,

L3CMWEI5                    Patterson - Direct                    1462

1    if e-mails and refunds aren't being handled, we will know

2    immediately.

3    Q.  What was your understanding of what Ray was describing in

4    point No. 5?

5    A.  He was talking about the importance of making sure that

6    customers who were angry and complain are handled, meaning that

7    they are given a refund, specifically so that they don't

8    escalate the complaint to their bank.

9    Q.  What was your understanding of why it was important that

10   they not escalate the complaint to their bank?

11   A.  At some point Ray later said that the reason was that if a

12   customer complained to their bank, as part of that interaction

13   they could mention they bought cannabis on their credit card.

14   If they said that to their bank, then the bank could reach out

15   to Visa or MasterCard and that could cause the accounts to

16   become under investigation.

17   Q.  Which banks did you understand Ray was referring to when he

18   is referring to customers complaining to their banks?

19   A.  The card-issuing banks, so the banks in the U.S. where the

20   customers have their credit card accounts.

21   Q.  When Ray refers to angry people who can complain to their

22   banks, what was your understanding of who he was referring to

23   by angry people?

24   A.  Eaze's customers.

25   Q.  Can you read aloud your response in red.

L3CMWEI5                  Patterson - Direct                  1463

1   A.  Yes.  We have our head of customer support personally

2   monitoring the support@onlinebiller.net mailbox and have

3   trained our support team to deal with any inbound billing

4   inquiries that come directly to Eaze.  Their instructions are

5   to do whatever it takes to make the person happy, credits or a

6   full refund.  It would be great if we could do a call with

7   someone from your support org to go over best practices with

8   our team.

9           MR. FOLLY:  Zooming back out, if we could zoom in on

10  point No. 6.

11  Q.  Can you read aloud point No. 6.

12  A.  Yes.  Ray writes:  We need to start monitoring our

13  chargebacks and fraud.  I heard it's at 2.5 percent already,

14  which I need to confirm as it's very, very abnormally high.  I

15  am hoping that if that's a true number, that the reason is the

16  cash-advance issues which has been fixed.  We should blacklist

17  people who charge back or abuse in any way.

18  Q.  What was your understanding of what Ray was describing in

19  point No. 6?

20  A.  He was telling us that keeping chargebacks low was a really

21  important component because if the chargebacks would be -- were

22  too high, that could cause the accounts to become under

23  investigation.

24  Q.  What was your understanding of what a chargeback is.

25  A.  A chargeback is when a customer wants to dispute a charge

```
L3CMWEI5                    Patterson - Direct                1464
```

1   on their credit card.  So instead of going to the merchant,

2   they go to their bank and dispute the charge and there is a

3   formal chargeback procedure between the banks and the merchant.

4           MR. FOLLY:  We can take this down.  We can show for

5   the witness for identification Government Exhibit 422.  You can

6   scroll down so the witness can see this.

7   Q.  Mr. Patterson, do you recognize this?

8   A.  Yes.

9   Q.  What is it?

10  A.  It's an e-mail between Ray and the Eaze team.

11  Q.  Were you a participant in this e-mail exchange?

12  A.  Yes.

13          MR. FOLLY:  The government offers Government Exhibit

14  422.

15          MR. TAYBACK:  No objection.

16          MR. GILBERT:  No objection.

17          THE COURT:  Received.

18          (Government Exhibit 422 received in evidence)

19          MR. FOLLY:  If we could blow up the top half of the

20  e-mails through the end of the first e-mail.

21  Q.  Mr. Patterson, who is this e-mail from?

22  A.  It's from Ray.

23  Q.  It's dated September 26, 2016.  The subject is regarding

24  chargebacks.

25          Can you read aloud the body of the e-mail, Mr.

L3CMWEI5                    Patterson - Direct                    1465

1   Patterson.

2   A.  Yes.  The 30 chargebacks are no problem at all and having

3   high chargeback rates are no issue whatsoever in itself.  The

4   threshold for chargebacks is 1 percent and our own business

5   runs at 14 percent, so in itself it's not the issue.

6        The issue is that usually, with high chargebacks, you

7   have high complaints to the bank which can result in people

8   talking about the product, and you have a high number of, let's

9   say, Wells Fargo customers who complain about not liking the

10  weed or the weed card issuing doctors, the higher the chance

11  that Wells Fargo notices weed is being sold and then reaches

12  out to Visa and MasterCard saying this bank in the UK is doing

13  processing for weed.  That's really the only issue, but they

14  usually go hand in hand.

15  Q.  What was your understanding of what Ray was describing in

16  this e-mail?

17  A.  Well, he was making the connection between chargebacks and

18  people complaining to their banks.  And as part of that

19  process -- because when you make a chargeback you have to

20  describe -- the customer has to describe what the situation is,

21  so the concern was that as part of that conversation with the

22  bank they could mention that marijuana was being sold on the

23  credit card and that would tip off the bank and that they would

24  potentially reach out to Visa and MasterCard.

25       MR. FOLLY:  Your Honor, I'm hoping to show the witness

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

DJA1765

L3CMWEI5                         Patterson - Direct                     1466

1    the item we were discussing earlier.

2              THE COURT:  We will take a very short sidebar.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
L3CMWEI5                Patterson - Direct              1467
```

 1          (At sidebar)

 2          THE COURT:  Before we get to this, my law clerk got a

 3   note from juror no. 13 over the lunch break:  "I have a crown

 4   that is about to fall out.  I called my dentist while on lunch,

 5   and he can squeeze me in this upcoming Wednesday, March 17, at

 6   5 p.m.  Would it be possible to end an hour early to ensure I

 7   can make it to Westchester to make my appointment?  Or if you

 8   have another suggestion, I'm open to suggestion."  Signed by

 9   that juror.

10          I want to find out where he lives in Westchester

11   because I live in Westchester and it really shouldn't take that

12   long.  Shouldn't take more than an hour and a half.

13          MR. TAYBACK:  He may have St. Patrick's Day plans.

14   Just kidding.

15          THE COURT:  I won't pursue that.

16          Also, what I will do is ask my law clerk to say to

17   him, it would be helpful if I called his dentist and asked the

18   dentist to stay maybe until 5:30 instead of 5.  Because we have

19   lost too much time and I don't think -- push comes to shove,

20   maybe we will let the jury go a half hour early, but I would

21   rather not do it if we can avoid it.  I want to make sure that

22   everyone is in agreement on that.

23          MR. GILBERT:  Agreed.

24          MR. TAYBACK:  Yes, your Honor.

25          MR. FOLLY:  Yes, your Honor.

```
L3CMWEI5                    Patterson - Direct                 1468
```

1           THE COURT:  We were up to the government.

2           MR. FOLLY:  Yes, your Honor.  I think, just to focus

3    more directly on the areas concerned, if you go to page 2 of

4    the unredacted version, there is an e-mail of September 26 at

5    1:53 p.m.  It says:  I think Black will have an issue with

6    putting Eaze in there, especially if it's not Eaze MD, but he

7    may want to put something that is more around MMJ

8    recommendation, doctor evaluation, and so on.

9           There is an additional reference further down the page

10   to -- I am not sure what to do here.  I know our number-one

11   priority is supposed to be keeping chargebacks low.  But

12   because of the legal restrictions of not putting Eaze in the

13   billing descriptor, it's inevitable that people are going to

14   get confused.

15          And the concern is that both of these references

16   pertain potentially to -- they pertain directly to Mr. Black,

17   who is this lawyer.

18          (Continued on next page)

19

20

21

22

23

24

25

DJA1768

L3CPWEI6                    Patterson - Direct                    1469

1          THE COURT:  Well, they're not covered by the

2     attorney-client.

3          MR. FOLLY:  No, they're not privileged.  The only --

4     your Honor, I don't think any of this is necessary if you

5     understand the response, and I might propose that the e-mail

6     directly below the response be included, but not all of this

7     additional discussion, which is not necessary to understand the

8     defendant's statements.

9          THE COURT:  I hear what you're saying, but I mean, my

10    only real concern is with Mr. Black not being identified as an

11    attorney.  If he's just identified as someone who --

12         MR. TAYBACK:  An advisor or anything like that, I'm

13    totally willing to accept that.

14         THE COURT:  Executive?

15         MR. TAYBACK:  I don't know that he is an executive.  I

16    can look at it before my cross.

17         THE COURT:  Employee?

18         MR. TAYBACK:  I don't think he is an employee either.

19    My point is there are a lot of people who provide advice --

20         THE COURT:  Consultant?

21         MR. TAYBACK:  Something like that, I can find

22    something.

23         THE COURT:  Consultant I can live with.  Advisor is a

24    little too close.

25         MR. FOLLY:  Yes, I'm not sure what the relevance of

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

DJA1769

L3CPWEI6                    Patterson - Direct                    1470

1   providing advice on it is, other than the fact that he's a

2   lawyer.  It's coming --

3            THE COURT:  I'm going to allow the word "consultant"

4   and I'm going to allow the rest in.  Do you want to tell the

5   witness to refer to him only as a consultant?

6            MR. FOLLY:  Yes, I would like that.

7            THE COURT:  When we go out, just go up and tell him.

8            MR. FOLLY:  Thank you, your Honor.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3CPWEI6                    Patterson - Direct                    1471

1           (In open court)

2           THE COURT:  All right.  Go ahead.

3           MR. FOLLY:  Thank you, your Honor.

4    BY MR. FOLLY:

5    Q.  If we could show the witness for identification Government

6    Exhibit 423.  If we could scroll through so the witness can see

7    all of them.

8           Mr. Patterson, do you recognize this?

9    A.  Yes.

10   Q.  What is it?

11   A.  An e-mail from Ray to the Eaze team.

12   Q.  Were you a participant in this e-mail exchange?

13   A.  Yes.

14   Q.  If we can publish this to the jury.

15          THE COURT:  Yes.

16          MR. FOLLY:  Sorry, your Honor.  I didn't offer it.

17   The government offers Government Exhibit 423.

18          MR. TAYBACK:  No objection.

19          MR. GILBERT:  No objection.

20          THE COURT:  Received.

21          (Government's Exhibit 423 received in evidence)

22   BY MR. FOLLY:

23   Q.  If we could scroll to the second page and focusing --

24   actually, if we could scroll up just slightly, there's an

25   e-mail from Michael Selepec on September -- in September.  It's

```
L3CPWEI6              Patterson - Direct              1472
```

1    hard to tell the full date, but it looks like September 2016.

2           Focusing on the bottom portion of the e-mail that

3    starts with "Ray," can you read that aloud?

4    A.  Yes.  "Ray, Another reason we're seeing chargebacks is

5    because customers don't recognize the name, contact their bank,

6    and then find out that the charge is coming from Cyprus Turkey,

7    and then disputing the charge and even canceling their card in

8    some cases.  Are there plans to bring the transactions into the

9    U.S.?  This should reduce chargebacks as well."

10   Q.  If we could scroll up all the way to the top.

11          The top e-mail, it's from Ray Akhavan, September 26th,

12   2016.  Can you read aloud the first two full paragraphs?

13   A.  Yes.  "Michael, I totally understand the issue with the

14   Turkey/Cyprus, or any offshore bank for that matter, and its

15   affect on the average customer.  It's one of the biggest issues

16   in our own business.  We would love to move it to the States,

17   as I have my own billing company here in Florida that I'd

18   really like to use, but none of the U.S. banks want to touch

19   it.  I was hoping to convince them by showing that it has been

20   running for X months in the UK and that there hasn't been any

21   issue, et cetera, but I can't give you an accurate estimate of

22   when the banks here will be okay with it.  It's just not worth

23   the risk for a bank when there are so many other high-risk

24   businesses which don't pose the legal issues for them."

25   Q.  Focusing on the first sentence Ray writes: "We would love

L3CPWEI6                    Patterson - Direct                    1473

1   to move it to the States as I have my own billing company here

2   in Florida that I'd really like to use but none of the U.S.

3   banks want to touch it."  What was your understanding of what

4   Ray meant by this sentence?

5   A.  This was for opening up merchant accounts; so currently

6   when this e-mail is being written, the merchant accounts were

7   located in Europe or overseas, and he is saying he would prefer

8   to move it to the U.S. but no U.S. banks would open merchant

9   accounts for cannabis businesses.

10  Q.  Further down in the same paragraph he writes, it's not just

11  -- "It's just not worth the risk for a bank when there are so

12  many other high-risk businesses which don't pose the legal

13  issues for them."  What was your understanding of what he meant

14  by that section of this paragraph?

15  A.  Well, that because cannabis was federally illegal in the

16  U.S., it wasn't worth it for the U.S. banks to do cannabis

17  merchant processing when there were other types of businesses

18  that were high risk, which is higher fees, but they were also

19  legal.

20  Q.  Mr. Patterson, I apologize.  Would you mind trying to keep

21  your voice up a little.  I'm just having a little trouble

22  hearing you.  Thank you.

23          Turning to the third paragraph, could you read that

24  paragraph aloud?

25  A.  "There are many people here that are doing physical

L3CPWEI6                    Patterson - Direct                    1474

1   processing for dispensaries that are simply lying to the banks,

2   and we could do the same, but then if we have an issue, the

3   bank will screw us by holding all of our funds, et cetera.  I'm

4   sure we could set up with the banks in that manner, and it will

5   probably be okay eight times out of ten, but it's not an open

6   partnership where I can assure you guys that the banks won't

7   screw us the minute there is an issue.  If you want to look

8   into this, though, I'm happy to provide the intros."

9   Q.  In the first sentence Ray writes "there are many people

10  here that are doing physical processing for dispensaries that

11  are simply lying to the bank;" what was your understanding of

12  what he meant by that?

13  A.  That in the U.S. there were many dispensaries that were

14  doing credit card processing, and the way they were doing it

15  was by lying to the banks.  They wouldn't say that they were a

16  cannabis business.  They would open up a merchant account under

17  some other type of business.

18  Q.  He goes on to say, "We can do the same, but then if we have

19  an issue, the bank will screw us by holding all our funds,

20  et cetera."  And then in the next sentence he references not

21  having an open partnership.  What was your understanding of

22  what he was describing here?

23  A.  Well, one of the things Ray said was that the banks that he

24  worked with in Europe were aware that it was cannabis.  So one

25  of the advantages was that because they were aware, they

DJA1774

L3CPWEI6                    Patterson - Direct              1475

1   wouldn't seize the funds if there was a problem.

2   Q.  Were those the overseas banks that you were just

3   mentioning?

4   A.  Yes, the overseas.

5   Q.  And when you say he mentioned that the banks were aware,

6   did he say who at the banks was aware?

7   A.  What he said was that the owners of the bank were aware,

8   not necessarily every employee of the bank, but the owners were

9   aware.

10  Q.  Going back now to the top of this e-mail, to the first

11  sentence, there's a reference there to the issue with the

12  Turkish/Cyprus for any offshore bank, what was your

13  understanding of what Ray was referring to there?

14  A.  Well, at the time, I wasn't sure.  I was under the

15  impression that the bank that we were using here was in the UK.

16  However, when we started processing, we were getting complaints

17  from customers that the transactions were actually occurring in

18  Cyprus or Turkey.

19  Q.  There's a reference in the second paragraph to the option

20  of processing in the United States.  Did you have any

21  communications with any other processors based in the United

22  States about processing the Eaze transactions?

23  A.  Yes.

24  Q.  Who were some of those processors?

25  A.  So some of them were a company called Stripe, another

```
L3CPWEI6                    Patterson - Direct                 1476
```

1  called CardConnect, GreenBox, MTrac, so various companies.

2  Q.  Focusing on Stripe, approximately when did you speak with

3  someone from Stripe?

4  A.  Shortly after I became CEO; so that was January, February

5  of 2017.

6  Q.  What did you discuss with them at that time?

7  A.  I asked them if they could do merchant processing for Eaze.

8  I knew someone who worked there; so I had a line of

9  communication, and they looked into it, and then they came back

10  and then they said that they could not.  The bank that they

11  were working with was Wells Fargo.  They went and actually

12  asked the bank if they could do it, and Wells Fargo said no,

13  that they wouldn't allow merchant processing for cannabis.

14  Q.  Did there come a time -- we can take this exhibit down.

15         Did there come a time when you eventually met Ray

16  Akhavan in person?

17  A.  Yes.

18  Q.  Approximately when did you first meet him?

19  A.  Shortly after we began processing; so late September, early

20  October, say 2016.

21  Q.  What were the circumstances of that meeting?

22  A.  Keith wanted me to attend a meeting that he was having with

23  Ray.  So at the time, I was in San Francisco; so I flew down to

24  LA to meet Keith and go to the meeting.

25  Q.  Where did that meeting take place?

```
L3CPWEI6                  Patterson - Direct                  1477
```

1    A.  At Ray's office in Calabasas, which is about 30, 40 minutes

2    outside of LA.

3    Q.  Who attended the meeting?

4    A.  It was myself, Keith and Ray.

5    Q.  Prior to that meeting, did you have any discussions with

6    Keith McCarty about Ray's business?

7    A.  Yes.

8    Q.  What did you discuss with him?

9    A.  Well, he told me that Ray does a lot of credit card

10   processing primarily in adult porn, but he had connections with

11   European banks.  And what he said was that those banks wanted

12   to get into the cannabis business, and they trusted Ray; so he

13   was acting as a conduit for setting up these accounts based on

14   his existing relationships with them through his other

15   businesses.

16   Q.  Walk us through what happened when you arrived at Ray's

17   office the day of this meeting.

18   A.  So Keith and I arrived.  We walked into the office.  I

19   remember the first thing I saw -- so it was a two-story office

20   building.  On the first floor there was a big room about the

21   size of maybe half a football field and, you know, it was

22   people sitting at desks.  They had headsets, monitors.  It

23   appeared to be a call center, but I remember seeing on

24   everyone's screen, I saw porn pictures; so that was a pretty

25   shocking thing to see just in such a large room.  We went

L3CPWEI6                    Patterson - Direct                    1478

1    through there, walked upstairs, met Ray.  He introduced us, and

2    then we went into a conference room to start the meeting.

3    Q.  Showing you what's in evidence as Government Exhibit 106,

4    Mr. Patterson, do you recognize this?

5    A.  Yes.

6    Q.  What is it?

7    A.  This is Ray's office.  This is the office that we visited.

8    Q.  Where did the meeting take place in that office building?

9    A.  It was on the second floor.  There were -- that's where

10   Ray's office suites were.

11   Q.  You can take this down.  Who was present at the meeting?

12   A.  It was Keith, Ray and myself.

13   Q.  What was discussed during that meeting?

14   A.  Well, the main thrust of the meeting was actually Ray

15   had -- Ray said -- was telling Keith that actually he wasn't

16   making any money currently with the rate that Keith had

17   negotiated.  He said that, you know, he was willing to continue

18   working with Eaze because he felt that there was growth

19   potential.

20          And then based on that, they talked about setting up

21   what was called a closed-loop system.  So that would be

22   extending credit card payments beyond just Eaze customers,

23   leveraging Eaze's relationships to suppliers, manufacturers,

24   other cannabis businesses.  So it was focused on just growing

25   the overall credit card relationship over time.

```
L3CPWEI6                    Patterson - Direct                    1479
```

1  Q.  Was this meeting similar or different than other business

2  meetings you've been involved with?

3  A.  Different.

4  Q.  In what ways was it different?

5  A.  Well, first off, going into this meeting, my impression was

6  that we were doing business with a company called Clearsettle.

7  However, you know, in this meeting there was no mention of

8  Clearsettle whatsoever.  The building itself didn't have any

9  signs for Clearsettle, you know.  It was just a nondescript

10 building in an office -- more of a residential neighborhood.

11        You know, in the meeting itself, it was a little bit

12 upside down because, to my mind, Clearsettle was a vendor to

13 Eaze.  So normally the vendor is the one who travels and meets

14 with the client, but in this case, it was strange that Keith

15 had me coming down to meet with a vendor.

16        In the meeting itself, you know, I would say Ray was

17 really in charge of that meeting.  He did most of the talking.

18 You know, he had a very sort of alpha presence.  You know, this

19 stood out to me because Keith usually was the one who was

20 driving meetings.  Keith, himself, typically had that kind of

21 presence, but in this case, he was almost sort of like more

22 submissive.

23        I remember Ray was actually chain smoking through the

24 meeting, which is not something I've ever had -- experienced in

25 a business meeting before.  I'd say overall, I found Ray to be

```
L3CPWEI6                    Patterson - Direct                1480
```

1   very intimidating.  I left that meeting with a feeling that

2   this whole thing wasn't as legitimate as people had been

3   telling me.  I just -- I remember walking away and thinking

4   this whole --

5           MR. TAYBACK:  Object to the narrative.

6           THE COURT:  We'll leave the testimony where it is, but

7   put another question.

8           MR. FOLLY:  Thank you, your Honor.

9           If we could show the witness what's been marked for

10  identification as Government Exhibit 420.

11  BY MR. FOLLY:

12  Q.  Mr. Patterson, do you recognize this exhibit?

13  A.  Yes.

14  Q.  How do you recognize it?

15  A.  It's an e-mail thread that I was a part of.

16          MR. FOLLY:  The government offers Government

17  Exhibit 420.

18          MR. TAYBACK:  No objection.

19          THE COURT:  Received.

20          (Government's Exhibit 420 received in evidence)

21  BY MR. FOLLY:

22  Q.  If we could publish that.  If we could zoom in on the very

23  top e-mail.

24          The e-mail is from Keith at Eazeup.com, Monday,

25  September 26th, 2016.  Can you read aloud the e-mail,

```
L3CPWEI6                    Patterson - Direct                   1481
```

1  Mr. Patterson?

2  A.  Yes.  Keith writes:  "Sweet.  Nice work everyone.  Ray

3  Patterson and I will be in LA on Thursday; so let's keep the

4  conversation going here and plan to get a lot of this finalized

5  when we meet in person.  Send us a cal invite for times that

6  work for you to meet on Thursday."

7  Q.  Did this meeting take place?

8  A.  Yes, this was the meeting that I just described.

9  Q.  What was your position at Eaze at the time of this meeting?

10  A.  I was the CTO; so the engineering team.

11  Q.  Did your position eventually change?

12  A.  Yes.

13  Q.  When did your position change?

14  A.  In December of 2016.

15  Q.  What happened at that time?

16  A.  So around that time, there were some personal allegations

17  against Keith by some employees of misconduct that related to

18  Eaze's fund-raising.  As part of that, the board pressured

19  Keith to step down as CEO.  They asked me to step in as the

20  interim CEO until we could find a permanent replacement.

21  Q.  After you became CEO, what, if any, role did Keith McCarty

22  have at Eaze?

23  A.  So Keith remained on the board, board of directors, of

24  Eaze.  He also went to work directly with Ray on credit cards.

25  Q.  I'd like to switch topics and ask you some questions about

L3CPWEI6                    Patterson - Direct                    1482

1    how customer support worked at Eaze.  Who was involved with

2    customer support at Eaze?

3    A.  Well, so Eaze had a customer support team.  Sort of head of

4    customer support was Mick Frederick, and then at the beginning,

5    during Clearsettle, Ray's organization handled customer service

6    related to credit card transactions.

7    Q.  What type of customer support issues arose at Eaze

8    connected to debit and credit card transactions?

9    A.  So the main issue would be customer complaints or confusion

10   around the fact that the billing descriptors didn't say Eaze.

11   So that would cause a lot of confusion and chargebacks.  So a

12   big part of the customer service was handling that confusion.

13   So either by proactively reaching out to customers after they

14   made a purchase to remind them what the credit card descriptor

15   would be, or if they went to the billing descriptor website or

16   e-mailed, in making sure that they were satisfied, whether they

17   were -- if they were upset just about the billing descriptor or

18   they had some other issues, the instructions were to give them

19   full refunds so that they would not initiate a chargeback.

20   Q.  What was the concern about customers initiating

21   chargebacks?

22   A.  Well, as we explained before, the higher number of

23   chargebacks leads to a higher number of complaints; so any of

24   those complaints could lead to a customer mentioning to their

25   bank that they purchased marijuana.

DJA1782

L3CPWEI6                    Patterson - Direct                    1483

1   Q.  If we could show the witness only what's been marked as

2   Government Exhibit 315.  Mr. Patterson, do you recognize this?

3   A.  Yes.

4   Q.  What is it?

5   A.  So this is a chat log discussing Eaze's credit cards.

6   Q.  What type of chat log?

7   A.  It was an application called Telegram.

8   Q.  Were you a participant in this chat?

9   A.  Yes.

10          MR. FOLLY:  The government offers Government

11  Exhibit 315.

12          MR. TAYBACK:  No objection.

13          MR. GILBERT:  No objection.

14          THE COURT:  Received.

15          (Government's Exhibit 315 received in evidence)

16  BY MR. FOLLY:

17  Q.  If we can publish that.  Looking at the first page, there's

18  a message from someone named John at 20:44.  If we could zoom

19  in from there all the way down to the end.

20          Mr. Patterson, where it says "John" at the top, do you

21  know who that was?

22  A.  Yes, that was John Wang.  He worked at Eaze.  He was a

23  payments product manager.

24  Q.  Directly below that there's a reference there to Medhat and

25  Keith.  Do you know who Medhat was?

L3CPWEI6                    Patterson - Direct                    1484

1   A.  Medhat worked with Ray.  He was his technical lead.

2   Q.  What about the reference to Keith?

3   A.  That's Keith McCarty, the former CEO of Eaze.

4   Q.  If you could actually just zoom back out for just a moment.

5   Going to the top of the chat, can you read aloud the date of

6   the chat?

7   A.  3 September 2017.

8   Q.  Can you also read aloud the title in the upper left-hand

9   corner?

10  A.  "Eaze cc strategy."

11  Q.  If we could zoom back in, just where we were just a moment

12  ago.

13          Looking at John's message that starts at 20:44, can

14  you read aloud the top of that through point one?

15  A.  Yes.  He said:  "Medhat, Keith, thanks for the productive

16  meeting today.  Here's a quick summary and follow-up questions

17  to get the ball rolling:  No. 2, Continue to keep any mention

18  of payments off our FAQ pages."

19  Q.  What was being referenced here in the top introductory,

20  where it says "thanks for the productive meeting today"?

21  A.  So this was a -- so John was following up with a meeting,

22  an in-person meeting that happened at Ray's office between

23  Keith, John, myself and Ray.

24  Q.  What was your understanding of what John meant by in point

25  No. 1, continue to keep any mention of payments off our FAQ

DJA1784

L3CPWEI6                    Patterson - Direct                    1485

1   pages?

2   A.   So one of the points that Keith brought up in the meeting

3   was that he had went on Eaze's website and on our -- on Eaze's

4   FAQ, which are frequently asked questions, pages.  So that's

5   essentially the part of the website where you put in frequent

6   questions, and you just answer them for customers.

7            One of the questions was what forms of payment does

8   Eaze accept, and in there it says that Eaze accepted both

9   credit card and cash.  Keith said that we should remove that

10  from the website because it could be the case that he said Visa

11  and MasterCard may sort of have, like I think he termed it,

12  secret shoppers that may sometimes come to the website and look

13  at what's there, and he didn't want any public mention of

14  credit card payments being on the Eaze website.

15  Q.   What was your understanding of why it was important that

16  Visa and MasterCard not discover any public mention of credit

17  cards on the Eaze website?

18  A.   Well, because they didn't allow cannabis transactions on

19  their networks, and Eaze was known in the marijuana

20  marketplace.

21  Q.   Going now to point No. 2, do you see the sentence starting

22  with "Can we add"?

23  A.   Okay.  Yes.

24  Q.   Can you read that aloud?

25  A.   Yes.  He says:  "Can we add the Eaze logo to our descriptor

L3CPWEI6                    Patterson - Direct                    1486

1   if we cookie the user on Eaze.com?  Basically, same functional

2   behavior as easymedpay.net."

3   Q.  What was your understanding of what John was referring to

4   here?

5   A.  So the way that the descriptor websites were set up was

6   that they would use a cookie.  So a cookie is a special file

7   that a website can put into a web browser so that websites can

8   identify that user in the future.

9           So, for example, let's say you log onto Facebook, when

10  you log on, Facebook gives you a cookie, and that's how they

11  recognize you in the future and it also let's Facebook track

12  you between different websites.

13          So Eaze also used cookies, and the descriptor websites

14  were able to read those cookies so that if someone were to go

15  to a descriptor website -- so, for example, easymedpay.net --

16  and they were already an Eaze customer, meaning they already

17  had a cookie, they would be automatically redirected to a

18  different web page.  It would have their billing information,

19  and if they were not an Eaze customer, meaning they didn't have

20  a cookie, then they would see the generic landing page that was

21  set up at easymedpay.

22  Q.  What was the purpose of these cookies that you're referring

23  to?

24  A.  So the purpose was to give just two different website

25  experiences, depending if you either were an Eaze customer or

L3CPWEI6                    Patterson - Direct                    1487

1  were not an Eaze customer, but specifically was in case someone

2  from Visa or MasterCard were to go to these websites, since

3  they were not -- since they presumably would not be an Eaze

4  customer, they would see the generic landing page.  Whereas

5  someone who was an Eaze customer, would skip that page and be

6  automatically redirected to their account page.

7  Q.  Would the generic landing page that you just referred to

8  contain any reference to Eaze?

9  A.  No.

10 Q.  Would it contain any reference to the dispensaries?

11 A.  No.

12 Q.  Can you give us an example of what would happen when an

13 Eaze customer would go to the generic landing page?

14 A.  The browser would be -- so they would not see the actual

15 landing page.  They would be immediately redirected to an

16 account page that would have their purchase history.  So from

17 there, they'd be able to first see that it was actually Eaze

18 that was behind this website, and if they wanted to do a

19 chargeback or get customer service, then they would do it from

20 that page.

21 Q.  How would the Eaze customers be informed about the generic

22 landing pages that you're referring to?

23 A.  Well, either the descriptors that they would see on their

24 credit card billing statements.  So when they purchased on

25 Eaze, in this case the easymedpay.net is what actually would

```
L3CPWEI6                    Patterson - Direct                    1488
```

1  appear on their credit card billing statement.

2  Q.  And then if the Eaze customer went to easymedpay.net, is

3  that where the redirection would occur?

4  A.  Yes.  So if they went to easymedpay.net and there was a

5  cookie, they would be automatically directed to their Eaze

6  account.

7  Q.  Let's turn to page 2 of this same exhibit.  If we could go

8  down to the bottom, to the message at 11:18 from deleted

9  account, the very bottom.  Where it says "deleted account," do

10  you recognize that?

11  A.  Yes.

12  Q.  How do you recognize it?

13  A.  This is my message.  I wrote this.

14  Q.  Can you read the message aloud?

15  A.  "Medhat, I'm in San Diego meeting with our head of support.

16  We're going to make sure all the new team members know not to

17  talk about credit cards.  Is there a way we can hand off people

18  from Eaze to someone on the payments side if they contact us

19  first?"

20  Q.  When you wrote here "we're going to make sure all the new

21  team member know not to talk about credit cards," can you

22  explain what you meant by that?

23  A.  Yes.  So this was similar to -- so this came out of the

24  meeting.  This was similar to the FAQ page, where they said it

25  was important to make sure that if someone were calling in to

DJA1788

L3CPWEI6                    Patterson - Direct                    1489

1    Eaze's customer support, before we could verify that they were

2    actually a customer, to make sure that we did not mention that

3    we took credit cards as a form of payment.

4          So only once we verified that they were actually a

5    customer, then we would them hand them off to the support --

6    Ray's organization, his support team that was dealing at the

7    time with customer service.

8    Q.  What was the purpose of not initially mentioning credit

9    cards during that exchange?

10   A.  Well, what they said is that another thing that these sort

11   of secret shoppers from Visa and MasterCard would do, in

12   addition to going to the websites, would be to call in to

13   customer service number and inquire about what forms of payment

14   were accepted.

15   Q.  You mentioned -- you can take this down.

16         You mentioned earlier that you eventually replaced

17   Keith McCarty as the CEO of Eaze; is that right?

18   A.  Yes.

19   Q.  Approximately when was that?

20   A.  Late December, early January.  It was late December 2018,

21   early January 2019.

22   Q.  Sorry, is that when you replaced Keith as CEO?

23   A.  Yes, the end of the year of 2018.

24   Q.  Okay.  I think you testified earlier that --

25   A.  Sorry, excuse me.  2016.  I'm getting my dates confused.

L3CPWEI6                    Patterson - Direct                  1490

1   So December 2016.

2   Q.  And I believe you testified earlier that after you replaced

3   Keith McCarty as CEO, that he remained involved with Eaze's

4   credit card processing; is that correct?

5   A.  Yes.  Keith remained on the board of directors for Eaze,

6   and he was working directly with Ray on credit card processing.

7   Q.  Did there come a time when Keith's involvement with Eaze's

8   credit card processing came to an end?

9   A.  Yes.

10  Q.  Approximately when was that?

11  A.  That would have been around February 2018.

12  Q.  Without going into all the details, can you describe

13  generally what happened at that time?

14  A.  Yes.  So as part of Keith's settlement with the company, he

15  had a bunch of agreements.  One of those was a

16  non-disparagement agreement, which means he couldn't say any

17  bad things about the company or employees.  However, in March

18  of 2018, two employees, Michael Tassone and David Modalay were

19  at a bar in LA.  They ran into Keith, and they had an

20  altercation.  Keith said that -- he basically said that Eaze is

21  going out of business, that you have a weak CEO, that he was

22  starting a new company, that he controlled Eaze's credit card

23  payments, and he was working with Ray and they were going to

24  start a new company.  So he was kind of saying all these

25  things.  So the employees reported that to the company.  The

L3CPWEI6                    Patterson - Direct                    1491

 1   company took sworn statements from the employees and eventually

 2   initiated legal action against Keith.

 3          So as part of that, I called Ray and I told him what

 4   had happened and I said that --

 5          MR. TAYBACK:  Objection, hearsay.  Irrelevant.

 6          THE COURT:  I think it goes to the defendant's

 7   understanding.  Overruled.

 8   Q.  You can continue, Mr. Patterson.

 9   A.  So I called Ray, I told him what had happened and I said

10   that we couldn't be involved anymore with Keith in any way

11   because I knew that he was working with Ray at the time.

12   Q.  I want to switch topics and go back to Clearsettle for a

13   moment.  Did there come a time when Eaze stopped processing

14   through the Clearsettle channel?

15   A.  Yes.

16   Q.  Approximately when was that?

17   A.  So that was January of 2018.

18   Q.  What was the main reason Eaze stopped processing with

19   Clearsettle at that time?

20   A.  So in January of 2018 is when California switched from

21   medical marijuana to recreational or adult use.  So as part of

22   that transition, all of the dispensaries in the state had to

23   obtain a new license, a recreational sales license.  The

24   problem was was there was a delay at the state level; so most

25   of the dispensaries in the state, including most of Eaze's

L3CPWEI6                    Patterson - Direct                    1492

1   dispensaries, did not receive their license.

2          So Eaze made the decision to not allow sales on its

3   platform for any unlicensed dispensaries.  So on January 1st,

4   only one of our dispensaries actually had their license; so the

5   volume of sales dropped by about 90 percent on that day.  A few

6   days later, Ray called me up and wanted to meet.  So I happened

7   to be in LA; so I met him at his office, and what he said was

8   because the sales volumes had dropped so low, that the accounts

9   had gotten flagged and that they were most likely going to get

10  shut down by the end of the month.  He said maybe he could get

11  new accounts up but he wasn't sure.

12         So as part of that, you know, I had been talking to

13  other credit card processors that said that they would

14  potentially work with us once California transitioned to

15  recreational; so I saw this as an opportunity to shut things

16  down with Clearsettle in the hopes that we would start

17  processing with other processors moving forward.

18  Q.  Immediately after Eaze stopped processing with Clearsettle,

19  how did payments work at the company?

20  A.  They were cash only.

21  Q.  What, if any, financial effects did the termination of

22  credit cards have for Eaze?

23  A.  So when credit cards were down, the sales were probably

24  down around 40 percent.

25  Q.  Now, you mentioned a moment ago that there had been some

```
L3CPWEI6                    Patterson - Direct                 1493
```

1  discussions between Eaze and other processors; is that right?

2  A.  Yes.

3  Q.  Did Eaze eventually start processing with any of those

4  processors?

5  A.  Yes.

6  Q.  Who did it start processing with?

7  A.  So shortly after that meeting where we shut down with

8  Clearsettle, we started processing with another processor.  It

9  was called Icanpay.

10  Q.  What happened with the processing through Icanpay?

11  A.  After about two weeks, the accounts were frozen and all of

12  the reserves on the accounts were withheld.

13  Q.  Can you explain what reserves are?

14  A.  So the reserves are the money that a processor or bank

15  withholds on an account for security purposes so that in case

16  there's any chargebacks or other issues.  So typically on a

17  merchant account, they'll withhold about ten percent of sales

18  on a rolling, 30-day basis.  So in this case, all of those

19  reserves were frozen.

20  Q.  Where was Icanpay based?

21  A.  I believe the company was based in the U.S. but the bank

22  they were working with was based out of Asia.

23  Q.  Did Eaze process through any other processors?

24  A.  Yes.  So after that we started working with another

25  processor called CardConnect.

```
L3CPWEI6                    Patterson - Direct                1494
```

1  Q.  How long did the relationship with CardConnect last?

2  A.  About a month.

3  Q.  What happened at that time?

4  A.  The same thing happened, so after about a month, the

5  accounts were frozen and the reserves were withheld.

6  Q.  I'm going to direct your attention to early March of 2018.

7  Did anything significant happen involving you and the defendant

8  Ray Akhavan at that time?

9  A.  Yes.

10          THE COURT:  I tell you what, before you get into this,

11  maybe this is a good place to break.

12          MR. FOLLY:  Yes, your Honor.

13          THE COURT:  All right.  So, ladies and gentlemen,

14  we're going to break for the weekend.  I really feel compelled

15  to tell you how thrilled I am at your performance in this case.

16  You are so attentive.  You are so prompt.  You are just such a

17  good jury, and particularly given the events of the last year,

18  you are proving that the U.S. Constitution and its guarantee of

19  a jury trial is still a reality in the City of New York at this

20  time, in the Southern District of New York, and so you have my

21  great gratitude you are willing to serve.  Having said that, we

22  will expect you at 9:45 promptly on Monday morning.  So you are

23  excused.

24          (Jury not present)

25          THE COURT:  You are excused until 9:45 on Monday.

DJA1794

L3CPWEI6                    Patterson - Direct                    1495

1          (Witness temporarily excused)

2          I will see you all in a few, at 4:30, as soon as I

3    take care of this other matter.  Oh, and you might think about

4    the following issue, I don't know if there's any case law on

5    this issue or not.  The defense has maybe as their primary

6    defense, as I understand, is that a reasonable banker would not

7    have found these deceptive disguises material because they

8    didn't care, they wanted to process marijuana, but they wanted

9    plausible deniability so they wouldn't get in trouble with the

10   authorities if the government did decide to prosecute on the

11   federal level.  Do I have that as the gist of --

12          MR. TAYBACK:  Yes.

13          MR. GILBERT:  That's definitely one of our defenses,

14   your Honor.

15          THE COURT:  So the question is, as a matter of law --

16          MR. GILBERT:  But certainly not the only one.

17          THE COURT:  -- can it ever be reasonable for someone

18   to say I don't care about this, the possibility of this

19   deception, because I am happy breaking the law?  Can that ever

20   be what is meant by what a reasonable banker would do in these

21   situations, or is it *a fortiori*, or I should say *a priori*, not

22   reasonable to adopt an attitude which involves plausible

23   deniability of breaking the law?  So think about that, and I'll

24   be interested what your comments are.

25          (Recess)

DJA1795

L3CPWEIN6                    Trial                        1496

1           (In open court; jury not present)

2           THE COURT:  Please be seated.  We'll take up, at the

3    end of today, that question I put to counsel just before we

4    broke, but with all these folks in attendance, I want to move

5    straight to that.

6           So I think the best way to proceed is for defense

7    counsel to briefly state as to each expert witness, and we'll

8    take them one at a time what it is you think that they have

9    that is admissible either as expert testimony or as lay

10   testimony, and then I'll hear from the government, and then

11   I'll put some questions to the witness.  So one witness at a

12   time.

13          MR. TAYBACK:  I'm happy to start, your Honor.

14          THE COURT:  Very good.

15          MR. BURCK:  Your Honor, just one quick, we've

16   withdrawn one of our experts.  This is Bill Burck, your Honor.

17   We've withdrawn one of our experts.  So we only have two, not

18   three.  Ms. MacGregory has been withdrawn.

19          THE COURT:  Oh, thank you very much for letting me

20   know that.  I was looking at the screen, and all I saw were

21   people of the male gender and now, I know why.

22          MR. BURCK:  Yes, your Honor.  It was a very recent

23   decision, your Honor.  So that's why we didn't give you prior

24   notice until now.

25          THE COURT:  All right.  Go ahead.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

L3CPWEIN6          Trial                    1497

1      MR. TAYBACK:  I'll start with our proposed -- our

2   proffered expert Jeff Rankin, who has years of experience

3   working in the credit card industry both for a credit card

4   company but also for banks.  He has an expertise that, in our

5   case, although he can be an expert with respect to any aspect

6   of the credit card network, I think the part that is not

7   represented here in this trial by any lay witness, is the role

8   of the acquiring banks and including the roles of the various

9   intermediaries that we've heard about that act between or as

10  intermediaries between those acquiring banks and the merchants

11  themselves.  You've heard them called ISOs.  You've heard them

12  referred to in various terms by the witnesses, but I think the

13  role of the acquiring bank --

14      THE COURT:  On the one hand, I'm sympathetic to that

15  because there has been a gap in that respect.  On the other

16  hand, even when we filled in other parts of that chart, so to

17  speak, it wasn't clear to me what the relevance was.  The key

18  thing is the role of the issuing bank because that's the people

19  who are allegedly -- that the defendants allegedly conspired to

20  defraud.

21      MR. TAYBACK:  Yes, but the evidence has not been

22  limited to what the issuing banks saw --

23      THE COURT:  That is true, and I allowed it in.  I

24  don't recall there being any objection, but I allowed it in.

25  And so the argument might be that the jury needs to see the

```
L3CPWEIN6              Trial                    1498
```

1  whole picture.  So what is -- I'm sorry, which of these

2  gentlemen is Mr. Rankin?

3          MR. TAYBACK:  Mr. Rankin, on my screen, is in the

4  lower right-hand corner box.

5          THE COURT:  Ahh, there he is.  So what are you going

6  to say about this?

7          MR. TAYBACK:  You're asking that to Mr. Rankin?  Your

8  Honor, you're posing the question to Mr. Rankin?

9          THE COURT:  Yes.

10          MR. TAYBACK:  Mr. Rankin, go ahead and address the

11  court.

12          MR. RANKIN:  Your Honor, and others in attendance, I

13  think that MasterCard described their business as a four-party

14  system, and while that is correct, in this case, the acquiring

15  bank holds a lot of responsibility for what takes place, and

16  there is no contractual agreement between the cardholder and

17  the acquiring bank, nor is there contractual agreement between

18  the acquiring bank and the issuing bank.

19          Both of those parties hold contractual agreements with

20  Visa and MasterCard and both agree to abide by the rules, but

21  they don't have any contractual agreements with the

22  (indiscernible) and I think that is important because a lot of

23  the things that happen on this happens under the guidance of

24  the acquirer.  In other words, they sign up the merchant.  They

25  go through the background information.  They're the ones that

L3CPWEIN6                    Trial                         1499

1   are responsible for going through the KYC, know your customer,

2   process and making sure that they have the storefront, they

3   have the --

4              THE COURT:  So are you saying that a issuing bank

5   would rely, to a greater or lesser extent, on the acquiring

6   bank to ascertain whether these were marijuana purchases or

7   not?

8              MR. RANKIN:  They would rely on the acquiring bank to

9   have done their due diligence and to have informed the merchant

10  what is an acceptable transaction and what is an unacceptable

11  transaction.

12             THE COURT:  And defense counsel will correct me if I'm

13  wrong, I thought the defense here was that we don't really

14  care.  We're happy to assume it is marijuana, as long as we

15  have plausible deniability by the paper trail showing that --

16  apparently showing that it's not marijuana.

17             MR. TAYBACK:  That is a defense; although, we were

18  also -- I mean, really, the point that I think this goes to is

19  the evidence that the government has proffered showing, and

20  admitted, showing communications that they're going to argue

21  are from the defendants to the acquiring bank side of things,

22  that that's a dead-end, that doesn't actually influence the

23  issuing bank.  The acquiring bank has sole custody over most of

24  that information, and --

25             THE COURT:  Okay.  Well, that's a different point, but

L3CPWEIN6                    Trial                      1500

1    let me make sure.  Do you agree with that, I'm sorry,

2    Mr. Rankin?

3              MR. RANKIN:  Yes.  Yes, I do.

4              THE COURT:  So all right, let me go to the government.

5    Why isn't that last point relevant?

6              MS. LA MORTE:  I think we've already heard a

7    substantial amount of testimony regarding all of the points

8    that were just made by Mr. Rankin.  Visa and MasterCard have

9    testified about the four-party system.  They have testified, in

10   response to questioning on direct and cross-examination, the

11   lack of a privity or contractual relationship.

12             THE COURT:  I agree with that.

13             MS. LA MORTE:  Okay.

14             THE COURT:  That's why I limited my question, forgive

15   me, to the last point that was made.  The last point is, which

16   I don't think has been part of the evidence yet, but I could

17   stand to be corrected, is that much of the information given to

18   the acquiring bank will never itself go to the issuing banks --

19             MS. LA MORTE:  There is --

20             THE COURT:  -- because of the structure involved.

21             MS. LA MORTE:  Your Honor, I think there has been

22   substantial testimony on that because MasterCard already, as

23   well as Bank of America, have testified exactly in response to

24   the question, what information do you receive with respect to a

25   credit or debit transaction?  And they have clearly listed out

L3CPWEIN6                    Trial                         1501

1   category, merchant name, MCC, sometimes billing descriptor,

2   depending on what part in the process, location of the --

3         THE COURT:  I remember from MasterCard, but that's not

4   really the ultimate issue, but maybe you're right, that Bank of

5   America testified to that as well.

6         MS. LA MORTE:  I can find the transcript cite as well.

7   But they did clearly testify to the categories of information

8   they receive, and if your Honor may remember, they were subject

9   to substantial cross-examination about the data that they do

10  look at amongst the global group of data that they receive

11  in --

12        THE COURT:  All right.  Let me ask a different

13  question.  Assuming, for the sake of argument, that that

14  portion of Mr. Rankin's testimony would be cumulative, so what?

15        MS. LA MORTE:  Well, I think there's case law, your

16  Honor, regarding the need to have expert testimony that --

17        THE COURT:  I don't think --

18        MS. LA MORTE:  Well, one issue is whether -- is

19  accumulativeness, another issue is lay versus expert.

20        THE COURT:  You should understand, by the way, because

21  this is very different outside of the Second Circuit, it is

22  forbidden in the Second Circuit -- although I'm sorry to say

23  not all of my colleagues realize this -- for someone to say in

24  front of the jury, after they've brought out the credentials of

25  their expert witness:  We now proffer him as an expert in X, Y

```
L3CPWEIN6                    Trial                      1502
```

1    and Z.

2           And the reason that's forbidden is because when the

3    Court says yes, which is legally a much more limited ruling

4    than it sounds, the jury draws the wrong conclusion:  Oh, my

5    God, this guy is an expert.  We can turn off our minds now and

6    rely on the expert.  So that's forbidden.

7           MR. TAYBACK:  Understood, your Honor.  Totally

8    understood.

9           MS. LA MORTE:  Your Honor?

10           THE COURT:  Going back to the government.  So since

11    that's not going to happen, in my hypo or limiting his

12    testimony to that, what's the harm?

13           MS. LA MORTE:  Just so we're clear, your Honor, when

14    you say you're limiting his testimony to that aspect of it, you

15    mean the information that's transmitted to the issuing bank?

16           THE COURT:  Yes.  Well, I want to hear more from

17    Mr. Tayback, but at least up until now, that's the only thing I

18    heard that I thought might be admissible.

19           MS. LA MORTE:  Your Honor, again, the government comes

20    back to two points:  One -- and I know you're going to go back

21    to Mr. Tayback on this -- that is what's relevant in the case.

22    Second, we've already had two witnesses testify to that both on

23    direct and cross.

24           We are calling additional banks, as well as Visa, who

25    will testify to the same thing.  It's really not disputed, your

DJA1802

L3CPWEIN6                    Trial                       1503

1    Honor, the categories of information that flow from the

2    acquiring banks through the network to the issuing banks.  The

3    dispute is what the issuing bank --

4         THE COURT:  Excuse me.  Do you want to sign a written

5    stipulation to that effect?

6         MS. LA MORTE:  I'd be happy to stipulate to Bank of

7    America's testimony on that regarding the categories of

8    information.

9         THE COURT:  In fairness, we have to move this along,

10   and I'm going to take the liberty of interrupting because our

11   court reporter has to leave at 7:00.  I'm, of course, happy to

12   stay the entire night with you, but the court reporter says no.

13        So, Mr. Tayback, what else do you think would come

14   from Mr. Rankin that would be relevant and admissible?

15        MR. TAYBACK:  I believe it is captured by a

16   description generally that an acquiring bank's role in the

17   credit card network process.  There are subparts of that.  For

18   example, the selection of an MCC or merchant category code.

19   That is the acquiring bank's responsibility.  What goes into

20   that determination?

21        THE COURT:  Assuming I allow that, what we're talking

22   about, what, 20 minutes of testimony?

23        MR. TAYBACK:  Probably under half an hour.

24        THE COURT:  Okay.  All right.  Mr. Rankin, I'm going

25   to think about this over the weekend because I wouldn't want to

L3CPWEIN6                    Trial                      1504

1    wrist or create an anomaly, but I will let everyone know what

2    is allowed and not allowed by Monday morning, and then we'll

3    see how to proceed.  But you're welcome to stay, but you don't

4    have to stay now.  You can sign off, if you prefer.

5              MR. RANKIN:  Thank you, sir.

6              MR. TAYBACK:  Your Honor, Mr. Burck is going to

7    address our next proposed expert.

8              THE COURT:  I'm going to have to deny whatever he says

9    because I gave him a big compliment on the record, and that was

10   certainly improvident on my part.

11             MR. BURCK:  Judge, I was worried about what was going

12   to happen next, and I'm going to address Mr. Vardaman.  And

13   just before I start, I want -- we are going to propose to

14   narrow his testimony below where he was because we've listened

15   to the Court, and we've learned, and we're going to try to

16   propose a much more narrow.

17             So Mr. Vardaman is a former Treasury and DOJ senior

18   official.  He's very unique in the sense that he was one of the

19   drafters, principal drafters of the Cole memo, which is the

20   memo that continues to guide the government.

21             Your Honor, the key point of his testimony, the reason

22   why we think it's relevant to the jury is that what

23   Mr. Vardaman would testify to is only what the U.S. government

24   has officially been saying, not what the banks understand or

25   what they receive, or what they think about it.  Just, here is

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

DJA1804

L3CPWEIN6                    Trial                    1505

1  what the U.S. government has said about marijuana sales in this

2  particular context.  And there's been no testimony about that

3  in this trial.

4         The Court, of course, gave an instruction that was --

5  that summarized that, but we think it would be useful for the

6  jury and relevant for them to understand here's what the U.S.

7  government says officially about what types of marijuana

8  transactions it will prosecute.

9         THE COURT:  In written form?

10        MR. BURCK:  In written form, and that these are --

11        THE COURT:  Why isn't this -- I am, needless to say,

12 very impressed by Mr. Vardaman's resume, but why isn't this

13 just a question, at best, of simply introducing those

14 documents?

15        MR. BURCK:  Well, your Honor, we have -- we believe

16 the government would object to that.

17        THE COURT:  Well, I will hear that in a minute.

18        MR. BURCK:  Right.

19        THE COURT:  But that's all you now really want to get

20 from him?

21        MR. BURCK:  Your Honor, in a lot of ways, that is all

22 we want to get from him.  I think it would probably be helpful

23 to have a witness who can speak to it because I would expect

24 that the government's witnesses from the banks will probably

25 say that they have not read that guidance because they're not

DJA1805

L3CPWEIN6                    Trial                      1506

1   the lawyers at the banks, and they might just be able to say,

2   well, I'm aware of this because I've been told about this from

3   inside the bank.

4           And this is a person who can simply say, look, this

5   is -- here's the document, this is what it says.  You know, he

6   doesn't have to testify he was one of the drafters.  That could

7   be 403.  Just simply, I have experience, I know about this, and

8   this is what the government tells people, tells the world.

9           THE COURT:  So in those documents -- what in those

10  documents, without prejudice to other things, are you

11  particularly focused on?

12          MR. BURCK:  Your Honor, in particular, the Cole memo

13  itself lists exactly the types of offenses that the U.S.

14  government says they will prosecute even in states where it's

15  legal, where marijuana is legal, and those include things like

16  violent crimes, sales to minors, where you're hiding heroin or

17  some other more serious drug behind marijuana, or you're

18  engaged in marijuana trafficking, drug trafficking.

19          Now, there's a question, I think, out there whether or

20  not Eaze and some of these people are doing that, but that's

21  not, obviously, what the government's position is.  But those

22  are the types of things the government says they will

23  prosecute.  They have said they're not going to prosecute in

24  these states, at least for now and it's until this day, that

25  they're not going to prosecute individual purchases for

L3CPWEIN6                    Trial                    1507

1   personal use, which is all that's at issue in this case.  So

2   the doc- --

3          THE COURT:  All right.  I hear you on that.  So I'm

4   sorry, where on our screen?

5          MR. BURCK:  Mr. Vardaman is on the middle, lower, with

6   his hand up.

7          THE COURT:  There you are.  So, Mr. Vardaman, the

8   statute still allows the government, the federal government to

9   prosecute well beyond what the Cole memo says they will,

10  correct?

11         MR. BURCK:  Mr. Vardaman, you have to speak up.

12         MR. VARDAMAN:  Yes.

13         THE COURT:  And is there any reason why the

14  government, the attorney general or the president, couldn't

15  change their minds tomorrow?

16         MR. VARDAMAN:  Well, that could be viewed in both sort

17  of a policy question and a legal question.  As a legal

18  question, no.  Although, I would posit that anyone charged for

19  a violation of federal marijuana or related laws overnight

20  would have a series of very compelling defenses as to why the

21  government should not be able to do that in light of what

22  they've been doing through their actions and inactions for the

23  better part of 25 years, since they started legalizing

24  marijuana.

25         Relatedly, I would say that all of the underlying

L3CPWEIN6                    Trial                    1508

 1  policy justifications that underlie the government's policies

 2  that have been issued, actions that have been taken, and

 3  inactions are as compelling today as they have been because

 4  there are more states that have legalized and that --

 5          THE COURT:  I can -- forgive me for interrupting.  I

 6  guarantee you, I'm not going to allow you to testify to that,

 7  and the reason is it's not a question of what the government,

 8  as a matter of policy, would decide.  It's a question of what

 9  was or was not communicated to the issuing banks.  So, you

10  know, it's very interesting what you say, but that's not going

11  to be part of your testimony.

12          So let me go to the government now.  So are you

13  objecting to, say, the Cole memorandum coming in?

14          MS. LA MORTE:  Yes, we are objecting to all of this

15  coming in, your Honor.

16          THE COURT:  Because?

17          MS. LA MORTE:  It is of no relevance.  It is highly

18  prejudicial.  I have a number of responses to all of this.

19  First of all, it is absolutely wrong that the Cole memorandum

20  is the memorandum that governs and that governed during the

21  time period of the scheme.  It was rescinded at some point

22  during the scheme and replaced by the Sessions memorandum; so

23  it is not accurate to say that the Cole memorandum governs.

24          THE COURT:  But that's a different point.

25          MS. LA MORTE:  Sure.  I'm going through the list of

L3CPWEIN6                    Trial                      1509

1   points, your Honor.

2            THE COURT:  Okay.

3            MS. LA MORTE:  Second, your Honor, it is very clear

4   from the memorandum itself that this is a policy document that

5   prosecutors are directed to consider in connection with their

6   prosecutorial decisions.  It is not binding, and the memo

7   itself says, as with the department's previous statements on

8   this subject, this memorandum is intended solely as a guide to

9   be exercised in investigative and prosecutorial discretion.

10  This memorandum does not alter in any way the department's

11  authority to enforce federal law, including federal laws

12  relating to marijuana regardless of state law.

13           THE COURT:  All right.  So supposing we're trying to

14  figure out what a reasonable banker would consider important.

15  We're back to that.  Which I must say this is the only case

16  I've ever had where materiality remains in effect, but anyway,

17  the argument is that knowing that, at least as of now, as for

18  many years the federal government has said it won't prosecute

19  except in limited circumstance, that would make a banker less

20  concerned about the handling marijuana transactions.  He might

21  still want plausible deniability because of the possibility the

22  government might change their mind or just good PR, but it

23  would make him much less concerned about whether, in fact,

24  marijuana purchases were really involved because, as a

25  practical matter, the risk of getting indicted is very low.

L3CPWEIN6                    Trial                      1510

1      MS. LA MORTE:  Your Honor, in response to that, I

2  think first is the fact that the law is on the books and that

3  it is -- remains illegal.

4      THE COURT:  Yes, I'll bet there are a lot of laws.  I

5  don't know if in Massachusetts the law against witchcraft is

6  still on the books, but I wouldn't be surprised.  There's got

7  to be lots of examples that defense counsel would,

8  undoubtedly --

9      MS. LA MORTE:  Your Honor, the question on materiality

10  here, and I think this is important just in the general context

11  of everything we're discussing, is not whether the banks would

12  approve or reject these transactions.  The question on

13  materiality in this case is whether the banks want to know,

14  right, what they are processing so that then they are in a

15  position to determine whether or not to either allow the

16  transaction knowingly or not allow, you know, taking the risk.

17      THE COURT:  That, of course, is your argument, and

18  it's a strong argument, but they're saying, no, that's not --

19  it's not whether the banks would want to know.  It's whether

20  they even care.  That's what they're saying.

21      MS. LA MORTE:  Yes, but -- but --

22      THE COURT:  They're saying the banks couldn't care

23  less because they're going to make money out of this, and

24  that's what was important to them.

25      MS. LA MORTE:  If that was the case, and it was the

L3CPWEIN6                     Trial                        1511

1   case that the banks believed that they would not be subject to

2   prosecution, there would be no need for any of these banks to

3   have any policies to begin with.  The fact that there is even

4   the existence of a policy on --

5           THE COURT:  Their clever argument, and clearly on

6   summation, you may feel that it's a bit too clever and be able

7   to treat it accordingly, but their argument is, no, because of

8   the outside possibility that the government might change its

9   mind, they want to at least, as they put it, have plausible

10  deniability; so they want the paper trail to be clean.  And

11  it's also part of their more general policy, you know, we never

12  do anything illegal, et cetera; we are good citizens.

13          MS. LA MORTE:  Your Honor, I think this is a 401, 403

14  argument, and I think that it is really a stretch and I think

15  the Court recognizes this is a stretch under 401 relevance.

16  And then when you counterbalance that against the prejudice

17  that's going to arise from having to litigate DOJ enforcement

18  priorities, which are not as black and white as is being made

19  to appear in these memorandums, there are certain aspects of

20  the Cole memorandum that are priority areas that the government

21  is supposed to focus it's resources on.  And one of them has to

22  do with whether the activities implicating another crime, such

23  as bank fraud.  Bank fraud isn't listed but that's another

24  crime.

25          THE COURT:  That's a great argument for you, but I

```
L3CPWEIN6                    Trial                        1512
```

 1   think it's still just an argument.  Let me go back to defense

 2   counsel.

 3          MR. BURCK:  Yes, your Honor.

 4          THE COURT:  Assuming it's not just one document, and

 5   maybe --

 6          MR. BURCK:  It's two documents, your Honor.  There's a

 7   Vincent memo, which actually has never been -- which aligns

 8   with the DOJ, which has never been rescinded, and the Vincent

 9   document is also similar -- it has a similar, but it's the

10   building point for the entire position that the federal

11   government has taken.

12          THE COURT:  Assuming, these presumably are

13   self-authenticating documents.

14          MR. BURCK:  I would hope so, your Honor.

15          THE COURT:  So if I were to let them in -- I'm not

16   saying I will, but assuming I would -- what do we need this

17   witness for at all?

18          MR. BURCK:  Well, your Honor, we wouldn't have a

19   witness to speak to them, I don't expect.  I think the

20   government's witnesses are not going to be able to speak to

21   them.  They're going to say I don't know what this is.  I've

22   never seen it before.

23          THE COURT:  Yes, which is highly relevant, by the way.

24          MR. BURCK:  Well, but, your Honor, they've chosen one

25   witness out of, you know, the entire --

L3CPWEIN6                    Trial                       1513

1          THE COURT:  But this witness is not going to say that

2    he has personal knowledge of communicating one or both of those

3    memos to one of the relevant people from one of the issuing

4    banks involved in this case.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DJA1813**

L3CMWEI7                                                          1514

1          MR. BURCK:  I'm sorry, your Honor.  This witness,

2    Mr. Vardaman?

3          THE COURT:  I'm sorry.  Mr. Vardaman.

4          MR. BURCK:  Mr. Vardaman, he is going to simply say,

5    this is the government's policy.

6          THE COURT:  I'm just focusing on Mr. Vardaman, and I'm

7    saying, it sounds to me -- I would be delighted to have him in

8    my courtroom, and I understand he is going back to the

9    government and that, I assume, is because he wants to lead a

10   life of poverty.

11         But if it all comes down to the admission of these two

12   documents, I don't see why we should call him, and I see some

13   dangers in calling him to give a different aura than what is

14   simply a question of what is in the documents.

15         Mr. Vardaman, I am going to excuse you, but we will

16   very likely consider putting in those two documents.

17         MR. BURCK:  Thank you, your Honor.

18         MS. LA MORTE:  Your Honor, I don't know if your

19   intention is to make a ruling now.  To the extent that the

20   Court is inclined to let in the documents, we would ask to

21   submit a letter because there is no linkage, as everyone so far

22   has admitted here, between the existence of these documents and

23   what they say and the formulation of policies by the banks and

24   Visa and MasterCard.  We would just ask for that opportunity if

25   the Court is --

L3CMWEI7                                                          1515

1        THE COURT:  This was an easy ruling.  On the

2   admissibility of these documents, can you put in a letter

3   tomorrow?

4        MS. LA MORTE:  Yes.

5        MR. BURCK:  Your Honor, very briefly to respond to Ms.

6   La Morte, they actually put in documents through Bank of

7   America that refer specifically to federal law in the

8   footnotes.  They have a financial crimes document, I don't know

9   if you remember this, that was offered into evidence.  It

10  actually footnotes FINSEC and I believe, also, DOJ policy.  To

11  say that it hasn't been offered into evidence or --

12       THE COURT:  To the extent anyone wants to send me a

13  letter, there will be an opportunity to counter that letter as

14  well.

15       MR. BURCK:  Thank you, your Honor.

16       THE COURT:  Mr. Vardaman, again, you're welcome to

17  stay.  It's a public court.  If you would like to leave, you're

18  also welcome to do that as well.

19       Who is next?

20       MR. HARID:  Your Honor, I'd like to begin with

21  Mr. Vilfer, who is in the middle.  He is a fact witness and

22  should be uncontroversial, and he is not a payments-related

23  witness.  What he is going to be speaking to is Mr. Weigand's

24  laptop and his devices.  We have heard extensive testimony from

25  FBI Agent Hupcher --

L3CMWEI7                                                          1516

1          THE COURT:  I gather that.  I could tell from your

2     cross-examination today that you felt that there were serious

3     limitations on these documents.

4          What is he going to say?

5          MR. HARID:  Mr. Vilfer has looked at forensic images

6     of my client's laptop, and he will be in a position to speak to

7     the origins of various documents.

8          Right now the jury has a very incomplete picture of

9     what ended up in Mr. Weigand's laptop, very incomplete picture

10    of the back story behind that evidence.  And his testimony, his

11    factual testimony on how various documents got there will shed

12    light on exactly --

13         THE COURT:  Wait a minute.  How does he know that?

14         MR. HARID:  What he knows, based on his review of the

15    files in Mr. Weigand's laptop is when those files ended up on

16    the laptop and the exact context in which they ended up there.

17         THE COURT:  Why isn't that, unlike the witness, the

18    FBI agent who introduced those files, who was only able to say

19    in response to your numerous questions, I don't know.  This guy

20    is going to say, I know.  That can only be true if he's an

21    expert, right?

22         MR. HARID:  No, your Honor.  He is in the same

23    category as Ms. Volchko and Mr. Hupcher in the sense that it's

24    the same exact subject matter.

25         THE COURT:  Maybe I'm missing the point.  But if I

**DJA1816**

L3CMWEI7                                                          1517

1   seize some documents from a laptop or one of my fellow agents

2   seizes documents, and they are put into evidence and I'm asked,

3   well, what is this little thing that other dates mean, isn't

4   there a way to eliminate documents from this and all like that,

5   and I say, I don't know, I don't know, I don't know, that guy

6   is not an expert.  His testimony was offered for the limited

7   purpose of putting these in and now he is correctly answering

8   your questions.  When someone takes the stand and says, I do

9   know, based on my experience here is what happened, that's got

10  to be an expert.

11          MR. HARID:  Your Honor, the point is, we would like to

12  take whichever avenue which will make his testimony a

13  possibility.

14          THE COURT:  I am not sure anything turns on whether he

15  is an expert or not, but, from what you are telling me, I think

16  he can offer those opinions.

17          MR. HARID:  Correct.

18          THE COURT:  Only if he is an expert because opinion

19  evidence, it's not a question of lay opinion.  It's got to meet

20  the requirements of expert opinion under Rule 702, etc.

21          MR. HARID:  Mr. Vilfer's extensive background and

22  experience.  He has held multiple supervisory roles in the FBI.

23  He supervised the CART analyst team at the FBI which is where

24  Ms. Volchko works.

25          THE COURT:  As I noted already, everyone from the FBI

**DJA1817**

L3CMWEI7                                                          1518

1    is special.  But my real question is, give me an example of one

2    of the opinions he is going to offer.

3            MR. HARID:  Your Honor, we have had extensive

4    testimony about what was called the Eaze folder, the folder

5    that ended up in Mr. Weigand's laptop.  He would be able to

6    establish definitively when that ended up in the computer and

7    the context in which that ended up in his computer.

8            THE COURT:  Maybe I should -- which one of these

9    gentlemen?

10           MR. HARID:  The one in the middle, Don Vilfer.

11           THE COURT:  There you are.

12           How do you know that?

13           MR. VILFER:  Your Honor, I reviewed both system files

14   on the laptop, as well as the forensic examination of the USB

15   drive that was used to copy the files on to the laptop.

16           THE COURT:  What did you determine as a result?

17           MR. VILFER:  That the files were first created on a

18   USB drive, that USB drive -- those files were packed into a zip

19   file and they were -- the USB drive was then put into

20   Mr. Weigand's Mac laptop and the files were copied onto that

21   Mac.

22           THE COURT:  Let me go back to defense counsel.

23           So what?

24           MR. HARID:  Your Honor, the point is that the back

25   story, if I may provide some context for your Honor, is that

L3CMWEI7                                                              1519

1    this drive has information that Mr. Weigand was given as part

2    of his efforts to mediate a dispute between unrelated entities,

3    and it just so happened that this information ended up in this

4    computer.  It was not part of any effort on his part to

5    perpetuate the alleged scheme here.

6            THE COURT:  That's, of course, clearly relevant to his

7    defense, but this witness can't say that.

8            MR. HARID:  That's correct, your Honor.  But what he

9    can say is, he can -- we have had a very incomplete picture

10   from Special Agent Hupcher and Special Agent Volchko because

11   they have been unable to -- a lot of responses they gave us --

12           THE COURT:  Just on the point that you were just

13   making, I don't see how you can make out that defense without

14   calling a witness, either the defendant or some other witness

15   who is present, who says he was just arbitrating a dispute, or

16   whatever you want to say, and if there isn't such a witness,

17   then this is all irrelevant.

18           MR. HARID:  Your Honor, there are other issues that

19   are very relevant to this case, including Mr. Weigand's

20   Internet usage and the websites he accessed because it sounds

21   like ProtonMail is becoming an increasing part of the

22   government's case, and Mr. Hargreaves has associated

23   Mr. Weigand with a certain e-mail address,

24   EUprocessing@protonmail.com.  That's one such issue.

25           Mr. Vilfer is in a position to speak to Mr. Weigand's

L3CMWEI7                                                          1520

1    use of his laptop, and there is other aspects -- and various

2    other things.  Most importantly, he can speak to when the files

3    that are at issue ended up in his computer.

4            And the point is that they ended up on his computer

5    after the conspiracy had ended, after Eaze stopped processing

6    using credit cards that processed payments of marijuana, which

7    happened in the middle of 2019.  The files that ended up in his

8    computer ended up there, at the earliest, at the end of 2019,

9    after all of these efforts had ended.

10           So the primary point --

11           THE COURT:  Let me go back to the witness.

12           How do you know that?

13           MR. VILFER:  Your Honor, I located a number of

14   artifacts, including a log of when that thumb drive had been

15   inserted into the computer, which was August 20 of 2019.

16           THE COURT:  You examined that?

17           MR. VILFER:  Yes.

18           THE COURT:  You have expertise in this area of

19   computer study, so to speak?

20           MR. VILFER:  Yes, your Honor.  I've been doing digital

21   forensics for over 16 years, and I managed the computer

22   forensics and computer crimes squad at FBI in Sacramento.

23           THE COURT:  I remember Sacramento.  I passed it on the

24   way to various wonderful national parks, and I didn't feel

25   there was anything there worth stopping for, but, of course, I

L3CMWEI7                                                        1521

1   didn't know about your unit.

2          Anyway, I think it's time to hear from the government.

3          MS. DEININGER:  Yes, your Honor.

4          I think it would be one thing if Mr. Vilfer were just

5   going to be looking at an analysis of the laptop and testifying

6   the way Ms. Volchko did, based on what metadata he found.  It

7   sounds like a lot of the testimony is focusing on this USB

8   drive, which we have no way to authenticate where it came from

9   or what it is.  So I think any testimony regarding that USB

10  drive, until it is authenticated, would be inappropriate.

11         THE COURT:  For example, one of the things -- this

12  hasn't been mentioned yet, but it was mentioned today, and I

13  didn't understand.

14         MR. HARID:  Your Honor, we are having some trouble

15  hearing you.

16         THE COURT:  I'm sorry.

17         One thing that was mentioned today earlier on, when

18  the FBI agent was still on the stand, was, there was a column

19  date added, or something like that, and he was asked what's

20  that about.  He said, I don't know.

21         Now, my reading of the jury at that moment, and it's

22  little harder to read juries when they are masked and

23  otherwise, but what I would say is, after two weeks I think I

24  could read this jury, as I'm sure counsel can as well, is that

25  they were interested in that and they were a little

L3CMWEI7                                                              1522

1    disappointed when the answer was I don't know.

2              MS. DEININGER:  On that point Ms. Volchko did testify

3    to what that meant and that it was the date a document was

4    added to the laptop.  Mr. Hupcher just didn't have that

5    relevant knowledge.

6              But, again, this USB drive is not a drive that the

7    government seized.  There is no chain of custody.  We don't

8    know how Mr. Vilfer got it or where it came from or whether it

9    was just a thumb drive that Mr. Weigand already had the

10   documents on.

11             THE COURT:  That's good cross-examination.  Let's ask

12   the witness now.

13             MR. HARID:  Your Honor, I have a couple of responses

14   to that, but I'll let Mr. Vilfer --

15             THE COURT:  I'm sorry.

16             MR. HARID:  I have two responses to the

17   government's --

18             THE COURT:  I want to hear from the witness.

19             MR. HARID:  Sure.

20             THE COURT:  How did you get there?

21             MR. VILFER:  Mr. Weigand provided that drive to us for

22   forensic imaging, and then we obtained the serial number that

23   is inside the USB drive, and that same serial number was on the

24   laptop so that we could verify that that was in fact the USB

25   that had been inserted into the Mac.

L3CMWEI7                                                          1523

1       THE COURT:  Was this provided to the government as

2  well?

3       MS. DEININGER:  A copy of the USB drive was.

4       Your Honor, one question I had from what the expert

5  said is, I think he said that Weigand provided him the serial

6  number, that it's not something --

7       THE COURT:  He said Weigand provided the laptop, and

8  then they looked inside of it OR looked on it and found the

9  serial number, right?

10       MR. HARID:  The USB.

11       THE COURT:  I'm sorry.  USB.  I'm sorry.

12       MS. DEININGER:  It was unclear to me who provided the

13  serial number for the USB.

14       THE COURT:  We will ask the witness.  Who provided the

15  serial number?

16       MR. VILFER:  Your Honor, that was one of our examiners

17  who did the forensic imaging that obtained the serial number

18  from the USB.

19       MS. DEININGER:  All this witness will be able to

20  say -- to the extent that the USB could be authenticated, and I

21  still think we would argue that it can't, he is only going to

22  be able to authenticate it as a document that came from the

23  possession of Mr. Weigand.

24       THE COURT:  What's the rule that says you can't do

25  that?

DJA1823

L3CMWEI7                                                              1524

1          MS. DEININGER:  We don't have any other evidence of

2     where the USB came from, when the documents got added to that,

3     and we would have no way to probe on that unless Mr. Weigand

4     himself took the stand.

5          THE COURT:  You have known about this witness for a

6     long time.

7          MS. DEININGER:  We have not had any information on

8     what his statements would be until just now.  We have asked

9     repeatedly --

10          THE COURT:  You could have asked for a deposition of

11     him.

12          MS. DEININGER:  We have asked for expert statements

13     from 3500 many times.

14          THE COURT:  What have you received?

15          MS. DEININGER:  We have received nothing with regard

16     to this witness.

17          THE COURT:  Is that right?

18          MR. HARID:  Let me just put this in context.

19          THE COURT:  I'm happy to hear context after you

20     answer.

21          Have you provided expert disclosure from this witness

22     or not, yes or no?

23          MR. HARID:  We have provided an initial expert

24     disclosure.

25          THE COURT:  What does that mean?

L3CMWEI7                                                          1525

1      MR. HARID:  On November 3, we provided a three-page

2  letter to -- your Honor, we made disclosure -- we maintained

3  Mr. Vilfer as a fact witness for the same reasons that Jessica

4  Volchko and Mr. Hupcher are fact witnesses.  What's been

5  litigated is whether Mr. Vilfer is a fact witness or an expert

6  witness.  Up until now we have maintained that he is a fact

7  witness for the same reasons --

8      THE COURT:  If I understand that, if you did not

9  provide adequate disclosures because you thought he was a fact

10 witness, and if I then determine that his only relevant

11 testimony is expert witness, then he can't testify as an expert

12 because you didn't make adequate disclosures.

13     MR. HARID:  Not entirely accurate, your Honor.  We did

14 produce an expert disclosure in December of last year, a

15 supplemental expert disclosure, when we realized we were

16 retaining Mr. Vilfer, and that included the bases for his

17 expected testimony, which included his review of the USB drive

18 and his review of the forensic images.

19     THE COURT:  Here is where I come out.

20     MR. HARID:  Just for the record, your Honor, we

21 produced a copy of the contents of the USB to the government,

22 so they have had that for several months now.

23     THE COURT:  I will consider whether or not this

24 witness can testify and, if so, as to what, and let you know by

25 Monday.  But if I agree to let this witness testify, it will be

DJA1825

L3CMWEI7                                                      1526

1   contingent upon the government being given up to a three-hour

2   deposition of this witness before he testifies.  So just be

3   aware of that.

4            MR. HARID:  I understand.

5            THE COURT:  Let's go on.

6            Once again, Mr. Vilfer, like the others, you're

7   welcome to stay, you're welcome to leave, whatever you prefer.

8            MR. VILFER:  Thank you, your Honor.

9            THE COURT:  Anyone else?

10           MR. HARID:  We have one more witness, Mr. Mott, who is

11  on the bottom left-hand side.

12           THE COURT:  I was wondering.  Without prejudice to the

13  other fine gentlemen, Mr. Mott is a really distinguished

14  looking guy.  I'm just impressed looking at him.

15           MR. MOTT:  My mom would be very pleased, your Honor.

16           THE COURT:  Go ahead.

17           MR. HARID:  Your Honor, Mr. Mott is a long-time

18  veteran in the payments field.  He has been in the trenches

19  with MasterCard, and he has decades of experience in the

20  industry.

21           Just to set the table for this, your Honor, we direct

22  your Honor to the *Litvak* case from 2015 about how defense

23  counsel should be entitled to present their own nonmateriality

24  defense based on the testimony of an expert who can opine on

25  industry practice.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

DJA1826

L3CMWEI7                                                              1527

1      And what we are expecting is testimony from the

2   alleged victims in this case, the banks, who won't be

3   necessarily be able to shed light of what was objectively

4   reasonable, what amounted to an objectively reasonable

5   institution.

6           THE COURT:  Normally, the determination of what is

7   reasonable or not is a jury question.  In your everyday tort

8   case, for example, where this comes up all the time, we don't

9   have experts testify as to whether it is reasonable or

10  unreasonable for The City of New York to leave that crack on

11  the sidewalk that led to that injury.  The jury determines that

12  based on the facts presented.

13          So why is it different here?

14          MR. HARID:  Just to be more specific about his

15  expected areas of testimony, he would be speaking to, among

16  other things, the networks area-of-use rules and the lawful use

17  of proxy merchants.  We have heard that phrase come up a lot

18  over the course of this trial.  And that's a benign practice.

19  That's something he would be able to shed light on.  That's one

20  issue he would be able to shed light on.

21          He would also be able to speak to the difference

22  between the policies that these networks have on paper and what

23  happens in reality because he has been in the trenches working

24  for networks for several years, and he has also interfaced with

25  banks.  He has dealt with member banks on the network and

**DJA1827**

L3CMWEI7                                                          1528

1    devised protocols for those member banks.  He has had exposure

2    both to banks and to networks and will be able to speak what

3    actually mattered to them.

4             THE COURT:  Let me hear from the government.

5             MS. LA MORTE:  Your Honor, this is the first time we

6    are hearing that Mr. Mott will be testifying to those subject

7    matters.

8             I can hand up, if I could find it, in a second, which

9    I can, probably, the expert notice, but what I have here is, he

10   is going to be testifying to the mechanics of credit and debit

11   transactions, including the roles of the various participants,

12   the concerns and operating parameters of issuing banks.

13            Now, of course, we don't know what those concerns and

14   operating parameters are, but including factors that are

15   material or immaterial to them when determining whether to

16   approve or decline transactions, which is a jury question,

17   steps that issuing banks may take in order to detect and root

18   out fraud and other suspicious activity.

19            THE COURT:  Let me just stop on that one.  I agree

20   it's different from we were just discussing.

21            MS. LA MORTE:  There is more, but yeah.

22            THE COURT:  I don't know what he is going to say in

23   that regard.  We may ask him in a second.  Assuming the steps

24   the banks normally take are less than what was taken in this

25   case, hypothetically, that would be, the defense would argue,

L3CMWEI7                                                            1529

1    evidence of the fact they really didn't care.

2            MS. LA MORTE:  Only if you could show, according to

3    your Honor's ruling, No. 1, that the banks had the capability

4    of taking those steps, and I would say all issuing banks are

5    different:  Different sizes, different transaction monitoring

6    systems, different data.  So, one, you would have to show that

7    the issuing banks had the capability of doing that due

8    diligence and then, number two, you would have to show that

9    they consciously chose not to do it because they didn't care,

10   and this is the issue that came up at sidebar the other day.

11   Without those additional showings, then we are back in the land

12   of the case law which says that a lack of diligence is not

13   relevant to materiality.

14           I will also note, it seems from his resumé, that

15   Mr. Mott has not worked at banks in relevant years, so I don't

16   know the basis of the testimony.  But I would say that the

17   testimony will be irrelevant and prejudicial and confusing

18   without those additional steps which we discussed the other

19   day.

20           THE COURT:  Mr. Mott, let me ask you, what are you

21   going to say with respect to the steps that banks take or may

22   take to root out fraud?

23           MR. MOTT:  I have patent experience and related

24   commercial experience going back many years indicating that the

25   data that's taken off electronic commerce transactions, for

L3CMWEI7                                                                    1530

1    example, IP address, is something that is commonly provided in

2    the industry but rarely, if provided to the issuer, used by the

3    issuer to discern whether they are going to approve or decline

4    the transaction on an authorization request.

5              I have experience in 2014 with a presentation of Apple

6    Pay, and the big issue for Apple in rushing ahead in the

7    marketplace was thinking that their systems would cover them

8    for particularly the card loading fraud risk, and for the first

9    year had outrageous amounts of fraud because the issuers

10   weren't really understanding or appearing to see if there was

11   data in there, particularly about the mobile wallet, mobile

12   phone number, that sort of thing, and never really demanded of

13   Apple.  The industry got a big black eye on that for many

14   years.

15             THE COURT:  Let me just interrupt you.  Forgive me.

16   But that sounds to me, it doesn't support the theory on which I

17   thought the defense was offering this portion of this witness'

18   testimony, which is that more would normally be done than was

19   done in this case.  He is giving a good example of other cases

20   related to it.

21             MR. MOTT:  They could have done more.

22             THE COURT:  I understand they could have done more.  I

23   understand why counsel might have thought it is relevant.  But

24   for my theory I don't think it is necessarily relevant.

25             MR. HARID:  Your Honor, that's a fraction of what he

L3CMWEI7                                                          1531

1    would potentially be speaking to.  I think, more importantly,

2    he would be speaking to --

3              THE COURT:  If he comes in at all, he is coming in as

4    an expert.

5              MR. HARID:  That's correct.

6              THE COURT:  You are bound by whatever it was that you

7    represented he would say.  You may not have said enough.

8              For example, if all you said was generalities -- let

9    me look at your disclosure here.  This is a letter, dated

10   November 3, 2020, from Mr. Gilbert to the government and it

11   says as follows:  Mr. Mott will explain the mechanics of credit

12   and debit card transactions, including the roles of the various

13   participants in these transactions, especially merchants,

14   merchants acquiring banks, independent sales organizations,

15   payment service provider, payment networks, issuing banks,

16   payment gateways, third-party and management specialists and

17   cardholders.

18             Now, we have had a lot of that already.  I've

19   indicated, at least tentatively, I am going to let the other

20   expert in to say some more of that, so this now truly would be

21   cumulative, that part.

22             (Continued on next page)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

L3CPWEI8                    Trial                        1532

1          THE COURT:  And then the letter goes on:  "Mr. Mott

2    will testify as to concerns and operating parameters of issuing

3    blanks, including their consideration of customer

4    creditworthiness and the factors that are material and

5    immaterial to them in determining whether to approve or decline

6    credit and debit card transactions."

7          That, in my view, is a completely inadequate

8    statement.  That's like saying, we're going to offer -- or the

9    government, we're going to offer a forensic expert and he's

10   going to testify about a lot of things that forensic science

11   brings to this case.  What you should have disclosed is what

12   he's going to say.

13         For example:  Mr. Mott -- just to reread that

14   sentence.  "Mr. Mott will testify as to the concerns" -- what

15   concerns? -- "and operating parameters."  What parameters?

16   "Including their consideration of customer creditworthiness."

17   To what degree and in what respect?  "And the factors,"

18   unspecified, "that are material and immaterial to them when

19   determining whether to approve or decline credit card

20   transaction."  Totally inadequate disclosure.

21         And then it goes on:  "Mr. Mott will testify as to the

22   steps that issuing banks may take in order to detect and rule

23   out fraud and other suspicious activity."  Compare that vague,

24   extraordinarily vague, sentence with just what we heard from

25   the witness two minutes ago, which had at least some

L3CPWEI8                    Trial                        1533

1  particularity that I could put my arms around.

2          MR. HARID:  Your Honor, if I may for a minute?  We

3  were informed, to some extent, by the previous trial that

4  Mr. Burck participated in, and we understand this to be

5  somewhat novel terrain, experts in a criminal case.  Obviously,

6  we would have provided much more in the way of actual

7  disclosure if this were a civil case.  So we were kind of

8  uncertain as to what exactly the rules required on this topic.

9          THE COURT:  Yes.  So in the previous case, which was

10  in November, this issue came up, but on December 1st, the

11  Federal Rules of Evidence were changed to require, in criminal

12  cases, considerably more disclosure with respect to experts,

13  and reciprocally so, than had been previously required.

14          So the governing -- whereas in the November trial, the

15  most I could say is I think that the previous rule was

16  hopelessly inadequate.  Now, it's a question of the governing

17  rule, which requires a lot more.  You should take a look at the

18  amendment to the rules that were enacted on December 1st, and

19  you will see that this doesn't even come close to --

20          MR. HARID:  Your Honor, unfortunately, this disclosure

21  was made before the rules were updated, but we're prepared to

22  supplement this disclosure and beef it up.

23          MS. LA MORTE:  Your Honor, we directed the defense to

24  the transcript from your last trial, where you actually do

25  mention this issue.

L3CPWEI8                    Trial                    1534

1      This is frustrating because we have repeatedly asked

2   for additional disclosures.  We have asked for 3500.  With the

3   exception of one expert from defendant Akhavan, we haven't

4   received any of that.  It's unfair to put us in a position now

5   of having deal with supplemental disclosure.

6          THE COURT:  Well, I think that's particularly true,

7   arguably -- I'm not making any decision now -- with respect to

8   Mr. Mott, who covers, in a letter, a vast array of different

9   issues, none of which are specified, specified in the way the

10  rules now require.

11         Okay.  Nevertheless, I will think about all of this,

12  and, Mr. Mott, again thank you so much, and I will let counsel

13  know by Monday what testimony, if any, I will permit as to each

14  of the experts.

15         So here, counsel, is what I want from you.

16         MR. BURCK:  Should the witnesses drop off the Zoom

17  call, your Honor?

18         THE COURT:  I'm sorry?

19         MR. BURCK:  Should the witnesses drop off the Zoom

20  call?

21         THE COURT:  No, no, this is -- they can hear all of

22  this.

23         They have lived through my bad jokes already.  They

24  may as well live through something serious.

25         So I want a letter from defense counsel to be

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

L3CPWEI8                    Trial                         1535

1    submitted no later than 5:00 p.m. tomorrow saying, with

2    particularity, what it is that you want to elicit from your

3    experts, and in doing so, keep in mind a lot of my comments.

4    If you give me 20 things, and I've already indicated that 15

5    are very unlikely to be accepted, I will not consider that

6    responsive to my requests.  So your proffers are preserved for

7    appellate review and for time in memoriam, but I want something

8    narrow, specific and useful.

9            Then, the government can send me a letter by no later

10   than noon on Sunday raising any objections.  You don't have to

11   repeat the objections you've already raised except if you want

12   to list them, but you don't have to.  I'll remember what you

13   say.

14           MS. LA MORTE:  Yes.

15           THE COURT:  But if there is anything further you want

16   to say, in light of the defense letters, then you may do so.

17           And then the defense can file a reply letter -- I'll

18   give you the choice, and I know this will be a welcome

19   choice -- either midnight on Sunday or 9:00 a.m. on Monday.

20   Which would you like?

21           MR. TAYBACK:  9:00 a.m. on Monday, your Honor.

22           THE COURT:  Yes, that's what good associates are for.

23   So that's why they make the big bucks.  So, at any rate, I

24   will, by the end of the day Monday, let you know, so you can

25   advise the experts and proceed accordingly.  All right?

DJA1835

L3CPWEI8                    Trial                    1536

1          MR. TAYBACK:  Your Honor, may we keep our letters

2    focused to the substance of the testimony, not their background

3    qualifications?  We can simply attach their CVs again, if you'd

4    like.

5          THE COURT:  So I don't need the qualifications again.

6    I will rely on what you've already provided.

7          MS. LA MORTE:  Two questions, your Honor, or actually

8    just one question.  In the event that your Honor permits some

9    amount of expert testimony from the two experts you are

10   considering, we are entering our request on the record to the

11   extent that there is 3500 or other statements of these experts

12   that are in their possession, we would like them.

13         THE COURT:  Absolutely.

14         MR. TAYBACK:  One logistical issue is if these experts

15   are required to testify live, any of them who are outside the

16   state would need to come to New York.

17         THE COURT:  I have no objection to anyone, in the

18   current state of the world, testifying by Zoom.  You have

19   raised confrontation clause objections, but that, obviously,

20   doesn't apply to your people.  So it's really your choice.  If

21   you want to have them testify by Zoom, that's fine with me.

22         MR. TAYBACK:  Thank you, your Honor.

23         MR. HARID:  Just to clarify, in the case of

24   Mr. Weigand, this would apply as to both Mr. Vilfer and --

25         THE COURT:  I'm sorry.

DJA1836

```
L3CPWEI8                     Trial                        1537
 1            MR. HARID:  Your ruling will apply as to both
 2   Mr. Vilfer --
 3            THE COURT:  Everyone you want to call.
 4            MR. HARID:  Thank you.
 5            THE COURT:  All right.  Very good.  Thanks very much.
 6            MS. LA MORTE:  Thank you, your Honor.
 7            MR. TAYBACK:  Thank you, your Honor.
 8            THE COURT:  And we'll see you, why don't we say 9:15?
 9   Very good.  That will give me time to read the letters that
10   come in at 9:00.
11            (Adjourned to 9:15 a.m. on March 15, 2021.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1538

1        INDEX OF EXAMINATION

2    Examination of:                        Page

3    ROBERT HUPCHER

4    Direct By Ms. Deininger . . . . . . . . . .1351

5    Cross By Mr. Harid . . . . . . . . . . . . .1378

6    Cross By Ms. Clark . . . . . . . . . . . . .1408

7    Redirect By Ms. Deininger . . . . . . . . .1415

8    Recross By Mr. Harid . . . . . . . . . . . .1421

9     JAMES PATTERSON

10   Direct By Mr. Folly . . . . . . . . . . . .1428

11          GOVERNMENT EXHIBITS

12   Exhibit No.                          Received

13    S6 and 1688-TR . . . . . . . . . . . . . .1356

14   3702    . . . . . . . . . . . . . . . . . .1370

15   1806, 1807, and 1808 . . . . . . . . . . .1415

16   407    . . . . . . . . . . . . . . . . . . .1446

17   411    . . . . . . . . . . . . . . . . . . .1447

18   413    . . . . . . . . . . . . . . . . . . .1450

19   417    . . . . . . . . . . . . . . . . . . .1454

20   418    . . . . . . . . . . . . . . . . . . .1459

21   422    . . . . . . . . . . . . . . . . . . .1464

22   423    . . . . . . . . . . . . . . . . . . .1471

23   420    . . . . . . . . . . . . . . . . . . .1480

24   315    . . . . . . . . . . . . . . . . . . .1483

25

L3FPWEI1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                        20-CR-188 (JSR)

5   RUBEN WEIGAND and
    HAMID AKHAVAN,
6
                 Defendants.           Trial
7
    ------------------------------x
8
                                       New York, N.Y.
9
                                       March 15, 2021
10                                     9:15 a.m.

11
    Before:
12
                        HON. JED S. RAKOFF,
13
                                        District Judge
14

15                         APPEARANCES

16  AUDREY STRAUSS
         United States Attorney for the
17       Southern District of New York
    BY:  NICHOLAS FOLLY
18       TARA MARIE LA MORTE
         EMILY S. DEININGER
19       Assistant United States Attorneys

20  DECHERT LLP
         Attorneys for Defendant Weigand
21  BY:  MICHAEL J. GILBERT
         SHRIRAM HARID
22       ANDREW J. LEVANDER
         STEPHEN PELLECHI
23       -and-
    MICHAEL H. ARTAN
24       Attorney for Defendant Weigand

25                    APPEARANCES CONTINUED

L3FPWEI1                    Trial

1

QUINN EMANUEL URQUHART & SULLIVAN, LLP
2        Attorneys for Defendant Akhavan
   BY:  WILLIAM A. BURCK
3        CHRISTOPHER TAYBACK
         SARA CLARK
4        MARI HENDERSON
         DEREK SHAFFER
5        PAUL SLATTERY
         -and-
6   ROTHKEN LAW FIRM LLP
         Attorneys for Defendant Akhavan
7   BY:  IRA P. ROTHKEN
         JARED R. SMITH

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DJA1840**

L3FPWEI1                    Trial

1            (Trial resumed; jury not present)

2            THE COURT:  Please be seated.  So yesterday my

3    chambers received a call from juror No. 2, who had told the

4    following story.  Her nine-year-old daughter is at a school

5    where earlier Sunday a test for another student came back

6    positive for Covid-19, and even though, as I understand it,

7    juror No. 2's daughter was not in the same class, it's a small

8    school and so the school is having all the students tested

9    today for Covid-19.

10           But given the fact that this was only discovered on

11   Sunday, or at least that's when the test results came back, and

12   given the limited information that we had, I had one of our

13   experts talk to the juror.  And even though the chances that

14   the juror contracted anything are very low, the recommendation

15   I received was not to take the chance, and so I excused juror

16   No. 2 and replaced her with our remaining alternate.  Just

17   lending a little bit of excitement to the proceedings.

18           So anyone object to that?

19           MR. TAYBACK:  No, your Honor.

20           MR. HARID:  No, your Honor.

21           MS. LA MORTE:  No, your Honor.

22           THE COURT:  Very good.

23           Secondly, we had a letter motion from a reporter,

24   Mr. Matthew Russell Lee, asking that certain previously

25   redacted or sealed items be made public.  I have granted that

1542

L3FPWEI1                    Trial

1  motion and issued an order, which you all should have got a few

2  minutes ago, and I will follow that up with an opinion in due

3  course.

4           Third, and this is of no relevance to anyone but me,

5  but I have to share it with you.  So there will be officially

6  this morning nominated to the Supreme Court of New Jersey my

7  former law clerk, Rachel Wainer Apter, who, you know, she's

8  already 40 years old; so I mean, it's about time.  But in any

9  event, I'm very proud of her, and I wanted to share that with

10  you.

11           Okay.  What else do we have?

12           MR. HARID:  We have the papers we filed over the

13  weekend and this morning about the potential --

14           THE COURT:  I'm sorry.  It's not that I can't hear

15  your voice.  It's that when you get that close to the

16  microphone, it gets blurry.

17           MR. HARID:  Is this better, your Honor?

18           THE COURT:  Yes, it's better.

19           MR. HARID:  We filed a few letters over the weekend

20  and this morning about the potential expert witnesses we

21  discussed on Friday.

22           THE COURT:  So, you know, I haven't had a chance yet

23  to review the stuff that was due at 9:00 a.m. this morning with

24  the defense experts, but my understanding was there was

25  agreement reached that is to the introduction of certain

**DJA1842**

1543

L3FPWEI1                    Trial

1   memoranda --

2            MS. LA MORTE:  Yes, your Honor.

3            THE COURT:  -- obviating the need for that particular

4   expert.

5            MS. LA MORTE:  Correct.  That was Mr. Vardaman, and

6   there was an agreement on the memoranda.

7            THE COURT:  Yes, okay.

8            MR. HARID:  Your Honor, there was just one more issue

9   pending.  Both sides agree that Mr. Vilfer would subject

10  himself to a three-hour deposition on Wednesday evening, in the

11  event the Court permits him to testify.

12           THE COURT:  Very good.  Thank you very much.  Anything

13  else?

14           MS. LA MORTE:  Not from the government.

15           MR. TAYBACK:  Not on behalf of Mr. Akhavan.

16           MR. HARID:  Nothing else.

17           THE COURT:  All right.  Okay.  So why don't we take a

18  15-minute break and the jury should be up promptly at 9:45.

19           (Recess)

20           (Jury present)

21           THE DEPUTY CLERK:  If juror No. 13 could come to seat

22  No. 2 seat.  Thank you so much.

23           THE COURT:  Congratulations, juror No. 13.

24           JUROR:  Awesome.  Finally made it.

25           THE COURT:  Please be seated.

DJA1843

1544

L3FPWEI1                    Patterson - Direct

1   So, ladies and gentlemen, the following occurred

2   yesterday.  I want to make you aware of it.  The juror No. 2

3   has a nine-year-old daughter who received word, or the parent

4   received word, that another student in her daughter's school,

5   not even in the same class but in the school, had tested

6   positive yesterday for Covid-19.  So the school wants to test

7   all of the students in an excess of caution, not just those in

8   the same class, and the parent is going to be tested as well.

9   The likelihood that the parent has Covid-19 is really

10  very low, given that chain of events.  Nevertheless, the most

11  important thing for us is to make sure that you're safe at all

12  times, and so after talking with the experts, I was advised

13  that we should excuse juror No. 2.

14  And, fortunately, we have another alternate.  So, you

15  know, we'll continue to monitor it, and I'll report back to you

16  if there's anything more serious.  It doesn't sound to me like

17  it's serious at all, but I wanted you to be aware of it.

18  Okay.  Let's continue, counsel.

19  JAMES PATTERSON,

20  DIRECT EXAMINATION (RESUMED)

21  BY MR. FOLLY:

22  Q.  Good morning, Mr. Patterson.

23  A.  Good morning.

24  Q.  Before we finished on Friday, you had explained that Eaze

25  had stopped card processing with Clearsettle in around early

DJA1844

L3FPWEI1                     Patterson - Direct

1    2018; is that right?

2    A.  Yes, that's right.

3    Q.  And after card processing went down with Clearsettle, you

4    mentioned that Eaze had discussions with some additional card

5    processors?

6    A.  Yes.

7    Q.  Who were those processors?

8    A.  Well, we were talking to probably maybe a dozen, but the

9    two that were -- we started working with were Icanpay and

10   CardConnect.

11   Q.  Can you explain what happened with Icanpay and CardConnect?

12   A.  Yes.  So we started processing with Icanpay in February; so

13   shortly after all of our dispensaries finally received their

14   licenses.  After a few weeks of processing with Icanpay, the

15   accounts got frozen at the bank.

16   Q.  And you also mentioned that you had done some processing

17   with CardConnect.  Can you explain what happened with that

18   processing?

19   A.  Basically the same thing.  So after about a month of

20   processing with CardConnect, the accounts were frozen at the

21   bank.

22   Q.  Now, I want to direct your attention to approximately early

23   March of 2018.  Did anything significant happen involving you

24   and the defendant Ray Akhavan around that time?

25   A.  Yes.  I got some disturbing text messages from him

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1546

L3FPWEI1                          Patterson - Direct

1  regarding credit card processing.

2  Q.  Mr. Levine, if you could show the witness only what's been

3  marked for identification as Government Exhibit 301.

4          Mr. Patterson, do you recognize this?

5  A.  Yes.

6  Q.  What is it?

7  A.  These are the text messages that I received.

8  Q.  And what form did you receive these text messages in?

9  A.  They were over a messages app called Telegram.

10          MR. FOLLY:  The government offers Government

11  Exhibit 301.

12          MR. TAYBACK:  Objection, 403.

13          THE COURT:  Overruled.  Received.

14          (Government's Exhibit 301 received in evidence)

15          MR. FOLLY:  You can publish those, Mr. Levine.

16  BY MR. FOLLY:

17  Q.  Now, just focusing on the messages that are all at

18  7:09 a.m., who wrote those messages?

19  A.  Ray wrote those.

20  Q.  And who received those messages?

21  A.  I did.

22  Q.  And if you'll see in the upper left-hand corner, it says

23  Nick Fasano.  Can you explain why his name is shown here?

24  A.  After I received these, I took a screenshot of these

25  messages and later forwarded it to Nick Fasano.

L3FPWEI1                    Patterson – Direct

1  Q.  Can you read aloud the messages?

2  A.  "I see your processing with others while I pay for your

3  merchants.  Get ready to get fucked.  You're in deep shit."

4  Q.  Where were you at the time you received these messages?

5  A.  I was at my home in San Francisco.

6  Q.  Before we go through the messages themselves, what was your

7  reaction when you received the messages?

8  A.  Well, I knew that this was about that Ray found out that we

9  were working with another company, and this was something I

10  feared would happen.  I had seen him talk in threatening ways

11  to other people that had crossed him in the past.

12           MR. TAYBACK:  Objection.  Move to strike.  Lack of

13  foundation.  Hearsay.

14           THE COURT:  Overruled.

15  Q.  What did you do at the time you received the messages?

16  A.  Well, when I got the messages, I just remember my heart

17  started racing.  My mind was racing.  I remember I got up and I

18  actually just walked over to the window just to look to see if

19  anyone was out there.  I just felt that I was kind of being

20  watched.  I knew if I ignored these messages, that I wouldn't

21  feel safe; so I decided to call Ray to try to diffuse the

22  situation.

23  Q.  Before we get to that call, I want to talk about the

24  messages themselves.  In the first message it says:  "I see

25  you're processing with others while I pay for your merchants."

L3FPWEI1                          Patterson - Direct

1   What was your understanding of what Ray meant in that messages?

2   A.   That he had found out that we were working with another

3   company.

4   Q.   And in the second and third messages it says:  "Get ready

5   to get fucked.  You're in deep shit."  What was your

6   understanding what Ray meant in those messages?

7   A.   I took that as a physical threat to me.

8   Q.   You mentioned that you called Ray after receiving these

9   messages; is that right?

10  A.   Yes.

11  Q.   I'd like you to describe that call with Ray in as much

12  detail as possible, and just make sure you clearly identify who

13  said what during that call?

14  A.   Okay.  So, you know, I called him.  He picked up right

15  away, immediately started screaming at me very aggressive.  I

16  remember he said, you know:  You fucking piece of shit.  You

17  little worm.  I've lost tons of money working with you.  You go

18  behind my back.  You know, you better figure out some way to

19  make sure that I get paid back.

20          He talked -- he was very aggressive about how -- the

21  fact that he had lost money with Eaze.  He viewed me working

22  with others as a betrayal and, you know, that I needed to pay

23  him back.  I was just -- the thing that stuck out to me most

24  was just the personal nature of it.  It wasn't that this was a

25  company dispute that Eaze, the company, owed him money.  It was

**DJA1848**

L3FPWEI1                    Patterson - Direct

1  very much that I, personally, owed him money and I, personally,

2  better figure out a way to pay him back.

3  Q.  During that discussion with Ray, you mentioned that he had

4  indicated that he had lost money.  What was your -- what is

5  your recollection of what he said about that?

6  A.  Well, that the rate, the processing rate that he had

7  negotiated with Keith was such that he wasn't making any money

8  on that rate.  The other thing he said was that he was paying

9  for the customer service costs associated with the credit card

10  processing and that that alone had cost him hundreds of

11  thousands of dollars for -- just to be running the customer

12  service.

13  Q.  What did you say in response to Ray during that call?

14  A.  I just tried to placate him.  I told him that, look, we'll

15  figure it out.  I want to make sure that you're paid back; so

16  let me know -- I essentially told him, tell me what needs to be

17  done in order to pay that back.  And, ultimately, I agreed to

18  all of the demands that he had in terms of how to make this

19  right.

20  Q.  What were those demands?

21  A.  To restart processing, but now at a higher rate.  So

22  whereas before the rate was 8.5 percent, he wanted to increase

23  it to 10 percent.  In addition to that, Eaze would pay for all

24  of the customer service costs.  He wanted stock options in the

25  company and also to install a special server called a proxy

DJA1849

1550

L3FPWEI1                    Patterson - Direct

1    server on our system that would enable him to monitor all of

2    our credit card transactions, even ones that occurred with any

3    other processor.

4    Q.  What was Ray's demeanor during that phone conversation?

5    A.  I mean, at the beginning, just extremely aggressive,

6    threatening, at the beginning.  And towards the end, once I

7    agreed to continue processing at the higher rate, and he calmed

8    down, and so we ended it, I would say, you know, placated.

9    Q.  You mentioned a moment ago that you had interpreted his

10   text messages as being a physical threat.  Why did you

11   interpret that as being a threat to you physically?

12   A.  Well, I remembered an incident that happened about six

13   months prior to that.  I was at his office, at a meeting with

14   him and Keith, and he asked me if --

15              MR. TAYBACK:  Objection, your Honor.  403.

16              THE COURT:  Sustained.

17   Q.  You mentioned that after this phone call, you had, I

18   believe, taken a screenshot of the messages and sent them to

19   Nick Fasano; is that right?

20   A.  Yes.

21   Q.  Who was Nick Fasano?

22   A.  Nick -- well, Nick was, first and foremost, a friend of

23   mine.  I'd known him for about 15 years.  He also worked at

24   Eaze.  He was the chief revenue officer at Eaze.  He was the

25   first person that I recruited when I took over as CEO.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1850

L3FPWEI1                    Patterson - Direct

1   Q.  Approximately how long -- I believe you just said that, 15

2   years.

3           What did you do after that phone conversation with Ray

4   ended?

5   A.  Well, I mean, after my -- I really felt like alone and sort

6   of isolated.  I knew I wanted to tell someone.  I felt strongly

7   that I needed to tell someone.  You know, I considered

8   reporting it, but I just felt like that would lead to

9   retaliation.  I didn't want to tell my wife because she was

10  going through fertility treatments at the time, and I just

11  didn't want to add to her stress.  So ultimately, I decided to

12  call Nick just to tell somebody about what happened.

13  Q.  Did you, in fact, call Nick?

14  A.  Yes.

15  Q.  What was Nick's role at Eaze at the time?

16  A.  So Nick, his title was chief revenue officer; so he oversaw

17  the partnership with all of Eaze dispensary partners.

18  Q.  What time period did he work for Eaze?

19  A.  2017 to, I believe he still works there.

20  Q.  Did Eaze eventually resume credit card processing through

21  Ray's organization?

22  A.  Yes.

23  Q.  What was your role at the company at the time?

24  A.  I was -- I was the CEO.

25  Q.  As CEO, why did you make the decision to resume credit card

DJA1851

L3FPWEI1                    Patterson - Direct

1   processing through Ray's organization?

2   A.  I agreed to it because I just felt scared.  I didn't feel I

3   could ignore his threats, that I need to figure out how to pay

4   him back.

5   Q.  Going back to the phone conversation that you had with Ray,

6   you mentioned that there was a discussion about the rates that

7   were getting charged by Ray; is that right?

8   A.  Yes.

9   Q.  Prior to that conversation, what had the rates been that

10  Ray was charging?

11  A.  It was 8.5 percent.

12  Q.  After that conversation, when card processing resumed, what

13  were the rates that were being charged?

14  A.  10 percent.

15  Q.  Now, you just mentioned Eaze resumed card processing

16  through Ray's organization.  Approximately when did Eaze resume

17  the card processing?

18  A.  Late -- late April 2018.

19  Q.  Before card processing resumed with Ray's organization, did

20  you have any in-person meetings with Ray?

21  A.  Yes.

22  Q.  Approximately when was that?

23  A.  Late March 2018, shortly after the messages.

24  Q.  How did that meeting in late March of 2018 come about?

25  A.  So after we agreed to start processing again, I told Ray

DJA1852

L3FPWEI1                    Patterson - Direct

1  that, moving forward, that Eaze needed to have the dispensaries

2  be the ones that had the direct relationship with the

3  processors, since that's how we were doing it with the other

4  processors we were working with.

5          Ray said that was fine, but he wanted to meet all of

6  the dispensary owners face to face before starting processing

7  again.  So he requested a meeting at his office with all of the

8  heads -- the owners of all of the dispensaries; so we arranged

9  for that meeting.

10 Q.  Did Ray indicate why he wanted to meet with the

11 dispensaries before moving forward with card processing?

12 A.  What he said is he wanted to see everyone face to face and

13 explain how credit card processing worked so that everyone

14 fully understood what they were signing up for.

15 Q.  In the lead up to that meeting, who was responsible for

16 making the logistical arrangements for the meeting?

17 A.  So I tasked our VP of operations Darcy Cozzetto with

18 setting up the meeting.

19 Q.  Where did that meeting with Ray take place?

20 A.  At his office in Calabasas, California.

21 Q.  Is that the same office that you had testified about during

22 your testimony on Friday?

23 A.  Yes.

24 Q.  If we could show the witness what's been marked for

25 identification as Government Exhibit 441.