# 21-1678-cr(L),
## 21-1708-cr(CON), 21-2214-cr(CON), 21-2466-cr(XAP)

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

JAMES PATTERSON,

*Defendant,*

RUBEN WEIGAND, AKA Sealed Defendant 1, HAMID AKHAVAN,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX FOR DEFENDANTS-APPELLANTS
### Volume 8 of 12 (Pages DJA1853 to DJA2128)

CHRISTOPHER TAYBACK
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000

WILLIAM A. BURCK
DEREK L. SHAFFER
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street, NW, Suite 900
Washington, DC 20005
(202) 538-8000

*Attorneys for Defendant-Appellant Hamid Akhavan*

*(For Continuation of Appearances See Inside Cover)*

IRA P. ROTHKEN
JARED R. SMITH
ROTHKEN LAW FIRM
3 Hamilton Landing, Suite 280
Novato, California 94949
(415) 924-4250

*Attorneys for Defendant-Appellant
Hamid Akhavan*

MICHAEL H. ARTAN, ESQ.
624 South Grand Avenue, 22nd Floor
Los Angeles, California 90017
(213) 688-0370

*Attorneys for Defendant-Appellant
Ruben Weigand, AKA Sealed
Defendant* 1

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries .................................... DJA1

Sealed Indictment, dated March 31, 2020 ................ DJA59

Opinion and Order of the Honorable Jed S. Rakoff,
  dated August 31, 2020 ........................................... DJA75

Government's Motion *in limine* To Preclude
  Defendants' Experts, dated February 16, 2021 ......DJA119.1

  Exhibit A to Government's Motion *in limine* -
  Letter from Christopher Tayback to Christopher
  J. DiMase, Nicholas S. Folly and Tara LaMorte,
  with Enclosure, dated November 3, 2020........... DJA119.34

  Exhibit B to Government's Motion *in limine* -
  Letter from Michael J. Gilbert to Christopher J.
  DiMase, Nicholas S. Folly and Tara LaMorte,
  with Enclosure, dated November 3, 2020........... DJA119.46

  Exhibit C to Government's Motion *in limine* -
  Letter from Michael J. Gilbert to Christopher J.
  DiMase, Nicholas S. Folly and Tara LaMorte,
  with Enclosure, dated December 21, 2020 ......... DJA119.74

  Exhibit D to Government's Motion *in limine* -
  E-mail from Shriram Harid to Christopher J.
  DiMase, Nicholas S. Folly, Tara LaMorte and
  Emily Deininger, dated January 19, 2021........... DJA119.79

Letter Motion, by Third Parties Visa Inc. and Martin
  Elliott, for an Order Granting Video Testimony of
  Martin Elliott, dated February 17, 2021
  (Unredacted version reproduced in
  Confidential Appendix) ......................................... DJA120

ii

**Page**

Annexed to Letter Motion -
(i) Subpoena to Martin Elliott, dated
February 17, 2021 ................................................. DJA125

(ii) Subpoena to Visa Inc., dated
February 11, 2021 ................................................. DJA126

(iii) Declaration of Martin Elliott, dated
February 17, 2021
(Unredacted version reproduced in
Confidential Appendix) ........................................ DJA139

Superseding Information, filed on
February 19, 2021 ................................................. DJA141

Memorandum Order of the Honorable Jed S.
Rakoff, dated February 20, 2021 ......................... DJA146

Defendants' Request to Charge, filed on
February 23, 2021 ................................................. DJA159

Exhibit A to Defendants' Request to Charge -
Excerpts from The Court's Instructions of Law to
the Jury, in *USA v. Nkansah* (Southern District of
New York Case No. 08-cr-1234) .......................... DJA188

Government's Request to Charge, dated
February 23, 2021 ................................................. DJA193

Opinion and Order of the Honorable Jed S. Rakoff,
dated March 1, 2021 ............................................. DJA233

Transcript of Trial (Jury *Voir Dire*), dated
March 1, 2021 ...................................................... DJA258

Transcript of Trial (Openings), dated
March 1, 2021 ...................................................... DJA300

Transcript of Trial (Testimony of Michael Tassone),
dated March 2, 2021 ............................................. DJA402

iii

**Page**

Transcript of Trial (Testimonies of Michael Tassone
and John Verdeschi), dated March 3, 2021 ............  DJA595

Transcript of Trial (Testimonies of John Verdeschi,
Jessica Volchko and Oliver Hargreaves), dated
March 4, 2021 ......................................................  DJA787

Transcript of Trial (Testimony of Oliver
Hargreaves), dated March 8, 2021 ........................  DJA963

Transcript of Trial (Testimony of Oliver
Hargreaves), dated March 9, 2021 ........................ DJA1144

Transcript of Trial (Testimonies of Oliver
Hargreaves and Richard Clow), dated
March 10, 2021 ...................................................... DJA1291

Transcript of Trial (Testimonies of Richard Clow
and Robert Hupcher), dated March 11, 2021......... DJA1438

Transcript of Trial (Testimonies of Robert Hupcher
and James Patterson), dated March 12, 2021......... DJA1639

Transcript of Trial (Testimony of James Patterson),
dated March 15, 2021 ........................................... DJA1838

Transcript of Trial (Testimonies James Patterson,
Charles Brown, Darcy Cozzetto and Martin
Elliott), dated March 16, 2021 .............................. DJA2027

Transcript of Trial (Testimonies of Martin Elliott,
Darcy Cozzetto and Michael Steinbach), dated
March 17, 2021 ...................................................... DJA2212

Transcript of Trial (Testimonies of Michael
Steinbach, Jacob Pechet, John Wang and Ronald
Shimko), dated March 18, 2021 ............................ DJA2427

iv

**Page**

Transcript of Trial (Testimonies of Daniel Whelan
  and Joao Paulo Reginatto), dated
    March 19, 2021 ...................................................... DJA2614

Transcript of Trial (Summations), dated
    March 22, 2021 ...................................................... DJA2735

Transcript of Trial (Jury Charge), dated
    March 23, 2021 ...................................................... DJA2917

Transcript of Trial (Verdict), dated March 24, 2021 .. DJA2955

Trial Exhibits:

  GX 1901-T – Transcript of Ruben Weigand's
  Post-Arrest Interrogation ...................................... DJA2967

  HAX-5014 – Excerpts from Presentation of
  Cannabis and Hemp Products .............................. DJA2971

  HAX-10057 – Actors Federal Credit Union –
  Statements of Account .......................................... DJA2974

  HAX-14004 – Excerpt from List of Customer
  Card Transactions ................................................ DJA3014

  HAX-14005 – Circle Eaze Transaction
  Summary.............................................................. DJA3015

  HAX-14008 – Circle Eaze Transaction Record... DJA3016

The Court's Instructions of Law to the Jury, filed on
    March 24, 2021 ...................................................... DJA3084

Verdict, dated March 24, 2021 .................................. DJA3106

Order of the Honorable Jed S. Rakoff, dated
    June 18, 2021 ........................................................ DJA3107

Transcript of Sentencing of Defendant Hamid
    Akhavan, dated June 18, 2021 .............................. DJA3108

v

**Page**

Opinion of the Honorable Jed S. Rakoff, dated
July 2, 2021............................................................DJA3146

Notice of Appeal by Defendant Ruben Weigand,
dated July 7, 2021 .................................................DJA3170

Transcript of Forfeiture Hearing, dated
August 12, 2021......................................................DJA3172

Notice of Appeal by Defendant Hamid Akhavan,
dated September 14, 2021.....................................DJA3231

Notice of Appeal by the Government, dated
September 30, 2021 ...............................................DJA3235

DJA1853

1554

L3FPWEI1                          Patterson - Direct

1    Do you recognize this?

2  A.  Yes.

3  Q.  What is it?

4  A.  It's a calendar -- it's a calendar invitation for that

5  meeting.

6          MR. FOLLY:  The government offers Government

7  Exhibit 441.

8          MR. TAYBACK:  No objection.

9          MR. GILBERT:  No objection.

10          THE COURT:  Received.

11          (Government's Exhibit 441 received in evidence)

12  BY MR. FOLLY:

13  Q.  Mr. Patterson, can you read aloud the date listed on the

14  calendar invitation?

15  A.  Wednesday, March 24th -- 21st, 2018.

16  Q.  Can you also read aloud the address that's listed there?

17  A.  5146 Douglas Fir Road, Calabasas, California 91302.

18  Q.  We can take that down.  Let's now go through the events on

19  the day of that meeting.  What happened first?

20  A.  Well, everyone met at Eaze's office in LA.  Several of the

21  dispensary owners were flying in from northern California; so

22  everyone met at our office.  It was about ten to 12 people; so

23  we ordered two Uber cars to pick us all up, and we all drove

24  together to Ray's office.  It was about a 30, 40-minutes drive.

25  Q.  Who attended the meeting on behalf of Eaze?

DJA1854

L3FPWEI1                              Patterson - Direct

1  A.  So from Eaze it was myself, Darcy, Nick Fasano, and David

2  Amable, who is on Nick and Darcy's team.

3  Q.  Who attended the meeting on behalf of the dispensaries?

4  A.  It was the owners of the majority of Eaze's dispensaries;

5  so our largest dispensary partners.

6  Q.  Now, you mentioned that you drove from Eaze's office to the

7  meeting; is that right?

8  A.  Yes.

9  Q.  Can you describe the drive from Eaze's office over to the

10  meeting?

11  A.  Yes.  So in my car, I mean, the main thing is I -- since

12  I've been the only one that had met Ray in the past, I had been

13  to his office; so I just -- I gave the people in my car kind of

14  a view of what -- you know, what Ray was like.  So I said, so

15  first, is most of these dispensaries had been processing in the

16  past with Clearsettle, but I explained to them that we're

17  meeting with Ray, that it wasn't -- that really we weren't

18  working with Clearsettle anymore.  It was just Ray we were

19  working with.

20          The main thing was that the dispensaries -- the way

21  Eaze was operating then was the dispensaries, each one had to

22  make the decision to sign up separately.  It actually wasn't

23  required at the time to use any particular payment processors.

24  So I wanted the dispensaries to know what we knew; so I told

25  them about Ray's background, just everything I knew up to that

DJA1855

L3FPWEI1                    Patterson - Direct

1   point before we arrived.

2   Q.  Describe what happened when you first arrived at Ray's

3   office?

4   A.  So we all got there and went upstairs.  And so Ray was in a

5   meeting already; so we were just kind of waiting outside of his

6   office, his office suite.  Eventually that meeting ended.  He

7   came out with the people in that meeting.  There were some

8   introductions where we went in.

9            Since it was so many people, we had to pull in a lot

10  of chairs to be able to set up around his desk.  I remember I

11  was sitting there in Ray's office with Nick and Ray, and they

12  were -- he was talking to the people he was talking to before

13  in the meeting, and they were looking at something on his

14  phone.  And he turned to me and he showed me what they were

15  looking at, and it was an article about a bank being under

16  investigation by the FBI.  And he sort of said, in a almost

17  half-joking, half-bragging way that --

18           MR. TAYBACK:  Objection.  Hearsay.

19           THE COURT:  Overruled.

20  Q.  You may continue, Mr. Patterson.

21           THE COURT:  Maybe we need a sidebar.

22           (Continued on next page)

23

24

25

DJA1856

L3FPWEI1                    Patterson - Direct

1          (At the side bar)

2          THE COURT:  I wanted a sidebar really for several

3   reasons.  First, I do not understand how a statement of a party

4   adversary can ever be hearsay.

5          MR. TAYBACK:  This is why I think this conversation is

6   hearsay because it sounds like he's going to say -- the

7   reference, the prelude to this testimony was he was speaking to

8   somebody else about something on his phone, at which whatever

9   it is he's reading aloud or somebody is already commenting on,

10  somebody else, it sounds like it's not in furtherance of the

11  conspiracy.

12         THE COURT:  No, no, but that's what I thought.  It

13  doesn't matter whether it's in furtherance of the conspiracy.

14  It's the statement --

15         MR. TAYBACK:  It's my client's statement --

16         THE COURT:  -- of a party adversary.

17         MR. TAYBACK:  Agreed if it's my client's statement.

18  But there is a conversation happening with someone else, who

19  was clearly not part of the conspiracy.

20         THE COURT:  All right.  Noted it's still overruled.

21         Second, though, while I appreciate that the government

22  has avoided leading questions, what you have been inviting are

23  these long narratives that often include all sorts of things

24  that are either irrelevant or refer to this witness' state of

25  mind, which is only modestly relevant at best.

DJA1857

L3FPWEI1                      Patterson - Direct

1           And what I'm not hearing is facts.  I'm just hearing a
2     bunch of casual comments from this witness.  Now, I have not
3     intervened.  I was hoping the government would intervene and
4     just say, as you did at one point, let's move on to another
5     question.  If you don't do it, I will do it, and you won't like
6     it.  Understood?
7           MR. FOLLY:  Yes, your Honor.  The next section of his
8     testimony is going to be recounting statements that were made
9     by the defendant during a meeting; so I was going to do my best
10    to let him be the one to --
11          THE COURT:  How about a question like:  What did he
12    say to you and what did you say to him?  As opposed to:  What
13    was your state of mind?  Oh, and was the weather nice?
14          And by the way, I sustained the 403.  I do think that,
15    while it's not irrelevant what he felt physically, going into
16    details about it, which is where I sustained it, is gross
17    overkill and raises 403 problems.
18          I'm amazed counsel for the co-defendant sat there like
19    a bump on the long, but it's early in the day and maybe you're
20    just getting moving.
21          So understood, everyone?
22          MR. FOLLY:  Yes.
23          MR. TAYBACK:  Yes, your Honor.
24          THE COURT:  Good.
25          (Continued on next page)

L3FPWEI1                        Patterson - Direct

1    (In open court)

2    BY MR. FOLLY:

3    Q.  Mr. Patterson, before that break, I believe you had started

4    to testify about the statement that Akhavan had made to you

5    before the meeting started.  Could you just start there,

6    please?

7    A.  Yes.  So he showed me an article that they were looking at.

8    It was about a bank being under investigation by the FBI.  He

9    said that that was one of his banks, and he said that, you

10   know, basically, every three-letter agency is after me, again

11   in a sort of joking, bragging kind of way.

12          MR. TAYBACK:  Objection.  Move to strike.  403 and

13   404.

14          MR. GILBERT:  Join.

15          THE COURT:  No, that's -- I think that was within the

16   framework of what I can allow, and a modest of opinion as what

17   he perceives is permitted under the rules.

18   BY MR. FOLLY:

19   Q.  Mr. Patterson, I'd like to direct your attention now to the

20   meeting that took place, and I'd like you to describe what was

21   stated by Mr. Akhavan during that meeting.

22   A.  So the meeting started.  Ray said that he --

23          THE COURT:  I'm going to interrupt you, Mr. Patterson.

24   In a court of law, we have fairly strict rules of evidence,

25   which you're obviously not familiar with, but we all are.  When

DJA1859

L3FPWEI1                    Patterson - Direct

1   you're asked about what someone said, basically just say what

2   he said; what you said, if you're asked for that.  We don't

3   need the history of the universe as a preface to it.  Just what

4   was said.  Okay?

5             THE WITNESS:  Okay.

6             THE COURT:  Thank you.

7   A.  He said he wanted to meet with everyone, explain how credit

8   card processing was going to work, and so he proceeded to

9   actually white board various parts of the credit card

10  processing.

11  Q.  And when he white boarded those parts of the credit card

12  processing, can you explain what he said about that?

13  A.  Yes.  So he started by just talking generally about how the

14  credit card money flowed.  So starting with the credit card

15  owner and the issuing banks in the U.S., money would then flow

16  to the merchant banks that he worked with in Europe.  And then

17  from there, the money would come back to the U.S. to be

18  deposited into a dispensary's bank accounts.

19            So he talked about the money flow, and then he talked

20  specifically how in this case the merchant bank accounts that

21  were being set up were not going to be in the dispensary's

22  names.  They couldn't be because Visa and MasterCard didn't

23  allow for marijuana transactions.  He was going to take care of

24  that part of it.

25            Also, that the dispensaries were going to fill out

**DJA1860**

L3FPWEI1                     Patterson - Direct

1  applications, merchant processing applications.  He said that

2  the dispensaries should fill out the merchant processing

3  applications accurately and honestly, even going so far as to

4  put their marijuana business license attached to the

5  applications.  Those applications would be submitted to his

6  team.

7          So he mentioned that he had an associate, Ruben, who

8  was not at the meeting at the time but he said would be joining

9  us later at the meeting.  That Ruben would be the one

10 collecting the applications and opening the bank accounts.  He

11 also mentioned that he -- that they were working with someone

12 in Europe who was terminally ill, and that person would be the

13 person actually taking -- attaching their name to the new

14 applications that were being submitted to the bank.  So what he

15 said was with this setup made it so that the dispensaries

16 didn't have any --

17         MR. TAYBACK:  Object to the narrative.

18         THE COURT:  Well, finish just what you were saying

19 there, and then we'll go to another question.

20 A.  That the dispensaries didn't have any risk because they

21 were filling out applications honestly, so that if anyone ever

22 came looking, they could say that they filled out the

23 applications truthfully and that all of the risk was being

24 taken on by this middleman in Europe who was terminally ill.

25 Q.  During that meeting, did Mr. Akhavan give any indication of

L3FPWEI1                        Patterson - Direct

1    where Ruben was from?

2    A.  Germany.

3    Q.  Mr. Patterson, during that meeting, was there any

4    discussion of the topic of chargebacks?

5    A.  Yes.  Ray talked about chargebacks and the importance of

6    keeping chargebacks low because if they went above one percent,

7    that could automatically trigger an investigation.  And also,

8    that just generally, complaints by customers to their issuing

9    bank could also jeopardize the accounts if the bank found out

10   that marijuana was being processed.

11   Q.  Was this meeting the same or different than other business

12   meetings you had attended in the past?

13   A.  Different.

14   Q.  How so?

15   A.  Well, I would say the -- just the fact that there was

16   laying out a very clear criminal conspiracy on a white board is

17   just not something I've ever experienced in the past.

18   Q.  Did you stay for the full meeting?

19   A.  No, I had to leave early.

20   Q.  Why did you have to leave early?

21   A.  The meeting started late, and I had a flight to catch back

22   to San Francisco.

23   Q.  What was happening at the meeting at the time that you left

24   the meeting?

25   A.  So at the time I left was a break in the meeting, and what

DJA1862

L3FPWEI1                        Patterson - Direct

1    Ray said was that I guess he said that Ruben had arrived, and

2    he would be joining us.  So there was a break, and I left at

3    that point between when Ruben was going to join the meeting.

4    Q.  After the meeting, did you have any conversations with

5    anyone from Eaze who had attended the meeting?

6    A.  Yes.  So later that night, I followed up with Nick Fasano

7    about the meeting.

8    Q.  What did you discuss with him?

9    A.  Well, the first thing he said was, I can't believe you left

10   me there.  I understood what he meant and apologized, and then

11   he told me what had happened after I left.  He said that --

12   what he said was -- I'll just quote him.  He said:  Ray's

13   German banker showed up.  I took that to mean Ruben.  And he

14   said that the rest of the meeting was just going through the

15   application process whereby the dispensaries were told what

16   they should do, what they should fill out, that they should

17   submit the applications to a specific e-mail that was set up

18   for this purpose.

19   Q.  Mr. Levine, can you publish what's in evidence as, side by

20   side, Government Exhibit S2 with Government Exhibit 441.  And

21   going to the second paragraph, if we could zoom in on that, of

22   S2.

23            And, Mr. Patterson, if you could read aloud the second

24   sentence?

25   A.  Defendant Ruben Weigand --

DJA1863

L3FPWEI1                      Patterson - Direct

1   Q.  The second sentence, sorry.

2   A.  Weigand traveled from Frankfurt, Germany, to Los Angeles on

3   March 14th, 2018, and returned from Los Angeles to Frankfurt on

4   April 1st, 2018.

5   Q.  And can you also read aloud the date of the meeting on the

6   right in 441?

7   A.  Wednesday, March 21st, 2018.

8   Q.  We can take those down.

9           Mr. Patterson, after the meeting in March of 2018 that

10  you just described, did Eaze eventually resume credit and debit

11  card payments?

12  A.  Yes.

13  Q.  And was that through Ray's organization?

14  A.  Yes.

15  Q.  Approximately when did Eaze resume credit and debit card

16  payments?

17  A.  Approximately three weeks after the meeting; so mid- to

18  late April, 2018.

19  Q.  Was the arrangement at that time the same or different than

20  it had previously been under Clearsettle?

21  A.  Different.

22  Q.  In what ways was it different?

23  A.  Well, that was the point where it started to become known

24  to us as EUprocessing; so there was no more mention of

25  Clearsettle.  So it was now called EUprocessing.

DJA1864

L3FPWEI1                        Patterson - Direct

1     As I mentioned, the rate was higher.  Eaze was doing

2  the customer service for all of the credit cards, and to my

3  understanding, was there were differences in terms of how the

4  money was being paid out to the dispensaries.  Specifically, it

5  was being -- there was something to do with converting between

6  Euros and dollars.  That wasn't present in the first setup.

7  Q.  And if you recall during your testimony last week, you had

8  testified about at least one of the descriptors that had been

9  used during the Clearsettle phase of the processing; do you

10  recall that?

11  A.  Yes.

12  Q.  Was the use of descriptors the same or different in the

13  EUprocessing phase?

14  A.  It was different.  So when the -- in the Clearsettle phase,

15  there was one, single descriptor being used for all of the

16  transactions.  During the EUprocessing phase, there were

17  multiple descriptors being used; so at any one time, there were

18  ten or more descriptors being used across the whole system.

19          (Continued on next page)

20

21

22

23

24

25

DJA1865

L3FAWEI2ps                    Patterson - Direct

1    MR. FOLLY:  Mr. Levine, if you could show the witness

2  what's been marked for identification as Government Exhibit

3  302.

4  Q.  Mr. Patterson, do you recognize this?

5  A.  Yes.

6  Q.  What is it?

7  A.  It's a Telegram chat between Ray's team and the Eaze team.

8  Q.  Were you a participant in this chat?

9  A.  Yes.

10    MR. FOLLY:  The government offers Government Exhibit

11  302.

12    MR. TAYBACK:  No objection.

13    MR. GILBERT:  No object.

14    THE COURT:  Received.

15    (Government's Exhibit 302 received in evidence)

16  Q.  You just mentioned that this is a Telegram chat.  What is

17  Telegram?

18  A.  Telegram is an encrypted communications app you can install

19  on your phone to create one-to-one and group messages.

20  Q.  Are you aware of whether Telegram had any privacy features?

21  A.  Yes, it did.

22  Q.  What were some of those features?

23  A.  The primary one is the end-to-end encryption, meaning the

24  messages aren't stored unencrypted on any central server, so

25  they're only accessible on the devices themselves.  It also had

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1866

1567

L3FAWEI2ps                    Patterson - Direct

1    a feature where, if you don't use it for a period of time, it

2    automatically wiped all of the messages, deleted them.

3    Q.  Prior to the time period of these messages here, in April

4    2018, how did you typically communicate with Ray?

5    A.  So initially it was via Skype and email, and then changed

6    to using -- we changed to using Telegram.

7    Q.  Did you have any discussions with Ray about how the two of

8    you would communicate?

9    A.  Yes.  He said he preferred Telegram.  He said it was more

10   secure.  I knew he was -- he got very concerned about the

11   privacy of his messages.  Even at one point he said that he

12   didn't trust Telegram anymore, that he had -- he actually got a

13   special phone, with a different app on it but you needed to

14   have a special phone.  And he suggested that I get one of those

15   phones.

16   Q.  What was your understanding of what he meant by "more

17   secure"?

18   A.  The messages weren't able to be read or intercepted by law

19   enforcement.

20          MR. FOLLY:  Mr. Levine, if you could take this down

21   for a moment and publish what's in evidence as Government

22   Exhibit 1728.

23   Q.  Mr. Patterson, where it says "Ruben W," are you familiar

24   with who that is?

25   A.  Yes.  There was a Ruben W in the chat, so he was the one,

DJA1867

L3FAWEI2ps                    Patterson - Direct

1   to my knowledge, was processing applications.

2          MR. FOLLY:  If you could go to page 3.

3   Q.  Mr. Patterson, if you could read aloud the first three

4   messages from Ray.

5   A.  "Hey, let's chat on Wickr Me.  Download the private

6   messenger for free at me-download-Wickr.com.  My Wickr ID is

7   Jawbreaker13.

8   Q.  You can read the next two.

9   A.  "This is the best, apparently.  Get it, please."

10         MR. FOLLY:  You can take that down.

11         If we could go back to Government Exhibit 302, on

12  page 1.  Mr. Levine, if you could highlight the section

13  starting at 10:25 and downward.

14  Q.  Mr. Patterson, if you could read aloud the messages from

15  10:25 through 10:26 from Ray.

16  A.  So Ray writes, "Yes.  Medical-stf.com," and phone number.

17  "Medical-dsr.com," and phone number.  "These two should be the

18  current two.  I need to know if they are live.  And we urgently

19  need to set up CS that can answer calls that are forwarded from

20  those numbers."

21         Then Darcy writes, "I'll confirm with John right now.

22  Give me a moment."

23         And Ray writes, "But when they answer, they have to be

24  generic and answer as Medical STF and Medical DSR, not Eaze.

25  Just initially, they say they" --

DJA1868

1569

L3FAWEI2ps                    Patterson - Direct

1   Q.  You can pause there.  There's a reference to

2   medical-stf.com with an 877 number, as well as medical-dsr.com

3   with another 877 number.  What do each of those represent?

4   A.  So those were the initial descriptor, descriptor websites

5   that Ray set up for -- for this -- for restarting processing.

6   Q.  There's also 877 phone numbers listed here.  What was the

7   significance of those phone numbers?

8   A.  So those were phone numbers for customer service.  So

9   those -- calls to those numbers would be forwarded to the Eaze

10  customer service.

11  Q.  Were those phone numbers part of the descriptors or

12  separate from the descriptors?

13  A.  They would be part of the descriptor.

14  Q.  What was the purpose of those phone numbers?

15  A.  So that if a customer made a purchase on Eaze and they saw

16  this descriptor, they would either go to the website or call

17  the number, and if they would call the number, they would be

18  verified and then they would be told that it was an Eaze

19  purchase, just like if they went to the website they would be

20  able to sign in and see that it was an Eaze purchase, so that

21  they wouldn't initiate a chargeback.

22  Q.  In the section you just read at 10:26, Ray wrote, "But when

23  they answer they have to be generic and answer as Medical STF

24  and Medical DSR, not Eaze."  What was your understanding of

25  what that meant?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**DJA1869**

L3FAWEI2ps                    Patterson - Direct

1    A.  So that when -- if -- when Eaze customer service answered

2    the call that was forwarded from one of those numbers, they

3    shouldn't initially say that it's Eaze, but they should be --

4    what he says, give a generic answer before they're verified to

5    be an Eaze customer.  So this is related to what he had said

6    before, where sometimes people from Visa and MasterCard can

7    call these numbers or go to these websites, and they didn't

8    want to -- he didn't want to tip off the fact that this was

9    associated with Eaze before it could be verified that it was

10   actually an Eaze customer.

11   Q.  Was there anyone at Eaze who was in charge of customer

12   service?

13   A.  Yes.

14   Q.  Who was that?

15   A.  His name is Mick Frederick, who was our VP of customer

16   experience.

17   Q.  What time period did Mick Frederick work at Eaze?

18   A.  2019 to -- he was there when I left.

19          MR. FOLLY:  Below that message, if we could zoom back

20   out, and if we could just scroll down.  You could zoom in where

21   it says "Darcy Cozzetto 10:27."

22   Q.  Who was Darcy?

23   A.  So Darcy was our VP of operations.  So she was overseeing

24   the implementation of the credit cards here.

25   Q.  Can you read her message at 10:31.

L3FAWEI2ps                    Patterson - Direct

1   A.   She says, "Ray, we are still showing Hot Robots as our

2   descriptor.

3   Q.   What was your understanding of what Hot Robots was?

4   A.   Well, at the time I had no idea what Hot Robots was.  Ray

5   had told us the descriptors were going to be Medical DSR,

6   Medical STF.  However, what's happening here is, when Darcy did

7   test transactions, the descriptor was actually showing up as

8   Hot Robots.  I thought this was a mistake or a bug, and I think

9   she did too.  That's why she's telling Ray that it's coming up

10  and essentially saying it needs to be changed to Medical DSR.

11  Q.   Did your understanding of what Hot Robots was eventually

12  change?

13  A.   Yes.

14  Q.   How did your understanding change?

15  A.   I eventually found out that it was the actual name of the

16  merchant on this account.

17  Q.   How did you learn that?

18  A.   So Ray eventually shared a letter with me from Visa to the

19  bank that referenced this account.  It said Hot Robots was the

20  merchant name.

21  Q.   Let's turn to the bottom of page 14 of this chat.  Going to

22  the messages that start at 8:39, can you read that aloud.

23  A.   It says, Ray says, "I was just telling Jim if you guys or

24  the depots are OK with miscoding in the States, then that opens

25  up tons of possibilities, and if you're all good with that

DJA1871

L3FAWEI2ps                    Patterson - Direct

1    risk, I can help with those accounts."

2         MR. FOLLY:  If we can scroll down, see if it

3    continues.

4    Q.  And if you could continue, finishing that section.

5    A.  "If we're OK with not being up front with the bank, we can

6    get amazing rates and no reserves and daily settlements."

7    Q.  What was your understanding of what Ray was describing in

8    these messages?

9    A.  Well, here he was talking about -- he was talking about

10   setting up with merchant banks in the US as opposed to the

11   merchant banks he was working with in Europe, specifically

12   because he knew that we were talking to other processors, and

13   they were based in the US, so he was saying he could do that as

14   well; however, you have to not be up front with the banks, so

15   essentially lie to the banks in the US in order to open

16   US-based merchant accounts.

17        MR. FOLLY:  Mr. Levine, if you can turn to page 17 of

18   this same chat.  Now, if we could actually start -- we could

19   just zoom in from the very top through the bottom.

20   Q.  And if you could start at the very top with Ray's messages

21   that begin at 9:25.

22   A.  So Ray writes, "The not being able to afford reserves

23   changed everything on my side.  I need to totally change

24   strategy from friendly banks to basically doing what everyone

25   else does, which is use big tier 1 banks and not tell them what

L3FAWEI2ps                    Patterson - Direct

1   it is.  I'll be able to set up those accounts, but it's going

2   to take me two to three weeks.  I'm going to Europe on the 1st

3   through the 10th, pretty sure I'll be able to come back with

4   deals that are more like the Card Connect deal."

5   Q.  And then Darcy responds, "That's phenomenal.  Thank you."

6   And can you continue on with Ray's messages.

7   A.  He continues, "I'll set up more of my friendly banks for

8   surplus or backup volume for when and if your better domestic

9   solutions don't work.  The only thing I want to make sure you

10  guys know is two things.  Number one, I can't vouch or

11  guarantee the money when we aren't honest with banks or working

12  with people I trust.  Number two, we need to understand that if

13  something does occur with legal or law enforcement, the big

14  banks who don't know what they're processing will turn on your

15  depots or whoever officially owns the account, so they should

16  be very careful there.  If possible, you guys should do what

17  you did with us, which is everyone fills out and submits a 100

18  percent accurate application on the depot side but then some

19  middleman changes or alters it so no one can say Eaze or the

20  depots miscoded knowingly."

21  Q.  You can stop there.

22          Focusing on point no. 1, if we could just highlight

23  that.  What was your understanding of what Ray meant when he

24  said, "I count vouch or guarantee the money when we aren't

25  honest with banks"?

DJA1873

L3FAWEI2ps                    Patterson - Direct

1  A.  Well, that he -- he's contrasting what -- what he was

2  currently doing with European banks, who were aware, and versus

3  US banks, which would not be aware.  So he's saying that if we

4  were to work with US banks, he couldn't guarantee that they

5  wouldn't -- they wouldn't seize the funds if they found out it

6  was cannabis.

7  Q.  Focusing now on the first sentence of point no. 2.  When

8  Ray wrote, "We need to understand that if something does occur

9  with legal or law enforcement," what was your understanding of

10 what he meant by that part of the message?

11 A.  That if law enforcement investigated into what was

12 happening.

13 Q.  And then he says "the big banks who don't know what they're

14 processing will turn on your depots or whoever officially owns

15 the account, so they should be very careful there."  What was

16 your understanding of what he meant by that?

17 A.  That the large US banks would fully cooperate with law

18 enforcement and provide them all of the information about what

19 was going on in the accounts.

20 Q.  Now, in the second sentence of this same section, there's a

21 reference to the submission of applications that would be

22 changed by a middleman.  Can you explain your understanding of

23 what Ray was referring to there.

24 A.  Well, this is where he said in the meeting, was that the

25 dispensaries fill out the applications and then someone else

L3FAWEI2ps                    Patterson - Direct

1    alters them and submits different applications to the banks, so

2    that would give the dispensaries a plausible deniability that

3    they -- they actually filled out accurate applications so they

4    themselves weren't lying to a bank.

5              MR. FOLLY:  You can scroll down onto the top of the

6    next page.

7    Q.  Can you read aloud your response at 9:43.

8    A.  "Thanks, Ray.  So to confirm, when do we need to stop

9    sending transactions to the current bank?"

10   Q.  What did you mean when you asked when you needed to stop

11   sending transactions to the current bank?

12   A.  Well, at this time, previous to this, Ray had said that the

13   account -- the account he was using had gotten flagged, and

14   that it was going to be shut down by the end of the month, so I

15   was -- we were going to convert everything over to CardConnect,

16   our other processor, so I was confirming with him when exactly

17   we needed to stop sending him transactions on that account.

18   Q.  What was your understanding of how the account had been

19   flagged?

20   A.  What he said was the chargeback rate on the account was too

21   high and it had automatic -- been automatically flagged by Visa

22   and the account was being investigated for high chargebacks.

23   Q.  How did you learn about the Visa investigation?

24   A.  So Ray told me and also shared a document with me that was

25   from Visa to the bank.

DJA1875

L3FAWEI2ps                    Patterson - Direct

1        MR. FOLLY:  If we could show the witness what's been

2    marked for identification as Government Exhibit 2215.

3    Q.  Mr. Patterson, do you recognize this?

4    A.  Yes.

5    Q.  What is it?

6    A.  This is that document I referred to about the investigation

7    of the merchant account.

8        MR. FOLLY:  The government offers Government Exhibit

9    2215.

10       MR. TAYBACK:  No objection.

11       MR. GILBERT:  No objection.

12       THE COURT:  Received.

13       (Government's Exhibit 2215 received in evidence)

14   Q.  Mr. Patterson, could you read aloud the date of the letter

15   in the upper left corner.

16   A.  6 June 2018.

17   Q.  Can you also read aloud what it says directly below that.

18   A.  "Kalixa Accept Limited, United Kingdom."

19   Q.  Can you read aloud just the first sentence of the letter.

20   A.  "Dear Acquirer:  The Visa Chargeback Monitoring Program

21   (VCMP) a merchant-level chargeback monitoring program to help

22   acquirers identify merchants with excessive levels of

23   chargebacks and implement corrective plans to protect the

24   integrity of the payment system."

25   Q.  You can stop there.

DJA1876

L3FAWEI2ps                    Patterson - Direct

1        Going to where it says "merchant name," can you read

2   aloud?

3   A.   Merchant name is Hot Robots.

4   Q.   If we could go back to Government Exhibit 302, at page 22.

5   And if we could zoom in on the bottom half of the page,

6   starting at 10:02.  You can read the Ray Akhavan messages and I

7   will read the Dan Erickson response.

8   A.   Ray writes, "H'm, really?  Once everyone's stable and up

9   again, we should look at tweaking it.  Do you know what MCC is

10  being used?  I was hoping you'd see a 10 percent improvement in

11  sales authorized."

12  Q.   Dan Erickson says, "The SIC code is 5399 -- miscellaneous

13  general merchandise."

14       And then Ray says, "That's why.  In case you want or

15  can implement it, we used 8099 after testing a lot of MCCs,

16  including 5399, and 8099 is by far the best, and it's also nice

17  because it's medical services, not elsewhere classified.  If

18  you were under pressure, you could say you did pick an accurate

19  MCC."

20       MR. FOLLY:  Mr. Levine, if you could just highlight

21  that last sentence.

22  Q.   Mr. Patterson, where it says, where Ray wrote, "If you are

23  under pressure you could say you did pick a accurate MCC," what

24  was your understanding of what he meant by that?

25  A.   Well, he explained in the meeting at his office that the

L3FAWEI2ps                    Patterson - Direct

1  5399 code, because it was miscellaneous general, was nice

2  because it was technically the most accurate MCC code that was

3  available because the credit card company didn't actually have

4  an MCC code for marijuana, for marijuana dispensaries, so it

5  was a generic MCC, and he said that it's nice because if you

6  are under pressure, which I took to mean for legal and law

7  enforcement pressure, that the dispensaries could say that they

8  picked the most accurate MCC that was available.

9       MR. FOLLY:  Let's turn to page 49 of this same

10  exhibit.

11  Q.  Focusing on the bottom where it says 31 July '18 and below

12  that, can you read aloud the first two lines there.

13  A.  "Ray Akhavan invited Ruben W."

14       "Ray Akhavan invited Marty."

15  Q.  Where it says "Ray Akhavan invited Ruben W," what was your

16  understanding of what was happening in this part the chat?

17  A.  That he was adding Ruben and Marty to the chat.

18  Q.  What was your understanding of who Ruben W was?

19  A.  Ruben was the person he referenced in the prior meeting

20  who'd be collecting the applications and opening the accounts.

21       MR. FOLLY:  You can zoom back out.  If we could just

22  scroll down so we can see this page going on to the next page.

23  Q.  And Mr. Patterson, if you could start reading where it

24  says, starting at 10:50, on the top of the message from Ray

25  Akhavan.

DJA1878

L3FAWEI2ps                    Patterson - Direct

1   A.  So Ray writes, "I've add added Martin and Ruben."

2             "Morning, Dan.  I have good news."

3             Dan says, "I like good news."

4             Ruben says, "Hey everybody."

5             Ray says, "Martin and Ruben have both agreed to be

6   actively involved with helping us out.  Martin is handling all

7   reporting and reconciliation, and Ruben is interfacing with the

8   banks.  You all met Ruben in LA, and Martin will be out soon

9   hopefully as well."

10  Q.  There's a reference there where it says "you all met Ruben

11  in LA."  What was your understanding of what that was referring

12  to?

13  A.  The meeting in Ray's office in Calabasas.

14  Q.  There's also a reference here where it says, "Martin is

15  handling all reporting and reconciliation."  What was your

16  understanding of what that meant?

17  A.  So that was the payments that were being made out to the

18  dispensaries.

19  Q.  And directly below that it says, "And Ruben is interfacing

20  with the banks."  What was your understanding of what that

21  meant?

22  A.  That he would be collecting the applications and opening

23  the accounts.

24  Q.  And which banks were being referred to there?

25  A.  The banks in Europe, the merchant banks.

DJA1879

1580

L3FAWEI2ps                    Patterson - Direct

1  Q.  And if you could keep reading, picking up from where it

2  says, "So here's the situation."

3  A.  So Ray writes, "So here's the situation.  We have two

4  accounts that we have now and have been using.  The same bank

5  gave us two more accounts, and also agreed and fixed the

6  reserve issue and set it to zero.  We have another bank who has

7  given us two more accounts with a zero reserve as well.  Those

8  are the ones that Conal is supposed to set live today.  And

9  from that same bank we are getting more and more accounts."

10 Q.  Now, there's references here.  It says, "We have two

11 accounts that we have now and been using.  The same bank gave

12 us two more accounts."  What was your understanding of what

13 accounts were being referred to here?

14 A.  Merchant accounts at the banks.

15 Q.  What was your understanding of the purpose of those

16 merchant accounts?

17 A.  Well, the merchant accounts are being opened on behalf of

18 the dispensaries because the dispensaries themselves couldn't

19 directly have merchant accounts because they're cannabis

20 businesses.  So these accounts are being opened just to

21 essentially act as a one-to-one mapping between dispensaries

22 and these merchant accounts.

23        MR. FOLLY:  Let's go to the bottom of page 55 of the

24 same exhibit.

25 Q.  There's a message here, starting at 16:16, from John Wang.

DJA1880

L3FAWEI2ps                    Patterson - Direct

1  What was your understanding of who John Wang was?

2  A.  John -- so John is a product manager who worked for Eaze.

3  So he oversaw all of the payment processing on the Eaze side.

4  Q.  Can you read aloud his message, starting at 16:16.

5  A.  So he says, "I have the spreadsheet ready to walk through.

6  I want to make sure we're doing this right.  Can we get on a

7  call, a quick call to go over?  I can set up a conference

8  number, dial into a conference number room, or we can do a

9  Telegram call (not sure if they do group calls)."

10 Q.  In response, Ruben W wrote, "Hey John, Marty is out for

11 today.  I can give you a call in something like 20 to 30

12 minutes."

13       Going back to -- if we could actually continue down on

14 this.  Could you read aloud John's next message.

15 A.  He says, "Works for me.  I want to go over the game plan

16 for volume by MID by site ID (dispensary)."

17 Q.  What was your understanding of what John was referring to

18 here when he's referencing "the game plan for volume by MID by

19 site ID (dispensary)"?

20 A.  So him and Ruben are discussing, as I said, the matching

21 between dispensaries on the Eaze side and merchant accounts

22 that Ruben was opening.  So the MID, the mid, those are the

23 merchant accounts, and the site ID, those are dispensaries, so

24 they have to -- they were planning on mapping one to another,

25 so a specific Eaze dispensary would be mapped to a specific

**DJA1881**

L3FAWEI2ps               Patterson - Direct

1    merchant account on the other side.

2    Q.  Let's go now to page 59 of the same exhibit.  We could zoom

3    in starting at 10:50 and below.  And if you could read aloud

4    John's message through where it says 10:54.

5    A.  He says, John says, "I just looked at both websites and I

6    am concerned about chargebacks: No. 1, the website is very

7    product specific.  Unlike GoodeGreenBazaar, visitors will

8    immediately think they were mischarged and issue a chargeback.

9    No. 2, contact numbers are a little hidden -- it's not the very

10   first thing visitors see.

11          "To mitigate chargebacks, can we:  No. 1, put the

12   1-800 number on the descriptor so customers don't ever visit

13   the website in the first place; no. 2, put the 1-800 number

14   more prominently on the websites?"

15   Q.  Now focusing on the top portion of the message, John writes

16   that he had looked at the website and said, "The website is

17   very product specific.  Unlike GoodeGreenBazaar, visitors will

18   immediately think they were mischarged and issue a chargeback."

19   What was your understanding of what John was referring to here

20   in this message?

21   A.  Well, at the time I wasn't sure, but I later found out that

22   the new descriptor website --

23          MR. TAYBACK:  Objection, foundation.

24          THE COURT:  Sustained.

25   Q.  Did there come a time -- well, actually, we'll come back to

L3FAWEI2ps                    Patterson - Direct

1  this.

2          Focusing on the portion below that where John writes

3  "to mitigate CBs" what was your understanding of what "CBs"

4  meant?

5  A.  Chargebacks.

6  Q.  And in point no. 1 he says, "Put the 1-800 number on the

7  descriptor so customers don't ever visit the websites in the

8  first place."  What was your understanding of what he meant by

9  that?

10  A.  Well, to actually add the phone number to the descriptor so

11  that the phone number would appear on the customer's credit

12  card statement as opposed to the website so that if a customer

13  was confused as to what the purchase was, they would call the

14  1-800 number instead of going to the website.

15          MR. FOLLY:  If we could turn to page 63 of the same

16  exhibit.  Going into the middle of the page, at the message at

17  14:18.  Can you read that aloud.

18  A.  John Wang writes, "@Jawbreaker13.  Got two questions for

19  you:  No. 1, what do we need to do with the cookie

20  implementation?  No. 2, can we put the 1-800 number on the

21  descriptors so fewer customers need to visit the website?"

22  Q.  Focusing where it says @Jawbreaker13, what was your

23  understanding of who that was referring to?

24  A.  So that was Ray.  He at some point changed his user name to

25  Jawbreaker13.

L3FAWEI2ps                    Patterson - Direct

1  Q.  Now looking at the two questions posed by John, for

2  question no. 1, what was your understanding of what John meant

3  when he referred to "cookie implementation"?

4  A.  So the cookie implementation was something set up so that,

5  on these descriptor websites, they would automatically be able

6  to recognize an Eaze customer from someone who was not an Eaze

7  customer.  So that if an Eaze customer visited these websites,

8  they would be detected and automatically redirected to their

9  account page, so they wouldn't be confused as to what the page

10 was, because that account clearly said it was associated with

11 Eaze.  If they were not an Eaze customer, then the cookie

12 implementation would send them to a different landing page that

13 was set up to look like a generic website not associated with

14 Eaze or Eaze dispensaries.

15 Q.  What was your understanding of why there was not a redirect

16 feature for the non-Eaze customers?

17 A.  So what they said was that, in the case that someone from

18 Visa and MasterCard were looking into the accounts and visited

19 these websites, they wouldn't be able to detect that the

20 websites were associated with Eaze.

21 Q.  Looking at point no. 2 from John, he references putting a

22 "1-800 number on descriptors so fewer customers need to visit

23 the website."  What was your understanding of what he was

24 referring to there?

25 A.  Well, again, he was -- this is what he was asking for

**DJA1884**

L3FAWEI2ps                    Patterson - Direct

1   before, was, instead of putting a website, which could be

2   confusing, the cookie implementation didn't work a hundred

3   percent of the time, so he was proposing putting the phone

4   number in addition or instead of the website, so that customers

5   would call rather than visit a website.

6          MR. FOLLY:  If we could go to page 85.  Focusing on

7   the top half of the page.

8   Q.  Can you read those messages aloud, starting at 12:37.

9   A.  "Hey guys.  Hope all is well.  We have a chargeback issue

10  with Natoma.  They are way high.  Can we please look into it

11  and find out what's going on and why they would be different --

12  why would they be so different than anyone else, etc.?"

13  Q.  And at the top it says that this is from JB13.  What was

14  your understanding of who that was?

15  A.  That was Ray, Jawbreaker13.

16         MR. FOLLY:  If we could zoom back out.

17         Now if we could go to the series of messages that

18  start at 12:45 at the bottom, from John downward.

19  Q.  Can you read aloud these messages here.

20  A.  Yes.  John Wang writes, "I'll take a look on my end to see

21  if it's related to the new mid we recently put Natoma on."  And

22  then Ruben W says, "Hey John, thanks.  But the issue has been

23  there before.  I've asked the team to prepare an overview.

24  They are significantly higher than everybody else."

25  Q.  In John's message he refers to a new mid.  What was your

L3FAWEI2ps                    Patterson - Direct

1    understanding of what he was referring to there?

2    A.  So "mid" is a merchant account.  It stands for merchant ID.

3    So what he's saying here was that Natoma, which is one of the

4    Eaze dispensaries, had recently been put on a new account, and

5    they are speculating that that could be the reason that the

6    chargebacks are higher on this particular account.

7    Q.  There's a reference below that from Ruben.  He says, "But

8    the issue has been there before."  What was your understanding

9    of what Ruben meant by "the issue"?

10   A.  So he's saying that the chargeback issue existed before

11   they moved Natoma onto the new account.

12   Q.  He also says in that same message, "They are significantly

13   higher than everybody else."  What was your understanding of

14   what he meant there?

15   A.  Well, that this particular dispensary, Natoma, had a higher

16   chargeback rate than any of the other Eaze dispensaries.

17   Q.  If we could turn to page 87 now.  Focusing from 10:51 down,

18   can you read John's message aloud that starts at 10:51.

19   A.  John writes, "Hi there, pixel redirects for these sites are

20   broken.  Can we prioritize fixing the redirect to minimize

21   fraud and chargebacks?  SonicLogistix, desirescent.com,

22   feel-kvell.com.  Also, can we add the pixel redirect for

23   www.somepearls.com?  I'd like to have that up before that mid

24   is enabled."

25   Q.  You can pause there.  Where John writes, "Pixel redirects

DJA1886

L3FAWEI2ps                    Patterson - Direct

1   for these sites are broken," what was your understanding of

2   what that meant?

3   A.  Well, there he's referring to the cookie -- the cookie

4   feature, where it would detect -- these websites were set up in

5   such a way where they would detect if it was an Eaze customer

6   and then automatically redirect them away from these websites.

7   Q.  And there's three websites listed there, soniclogistix.com,

8   desirescent.com, and feel-kvell.com.  What was your

9   understanding of what those URLs that are listed there

10  represented?

11  A.  So those were descriptor websites that were set up by Ray's

12  team.

13  Q.  If we could go on the same page, could you read aloud your

14  message at 16:02.

15  A.  "Www.somepearls.com doesn't redirect and it's causing

16  confuse and potential chargebacks."

17  Q.  With a were you describing in this message?

18  A.  So here, what had happened is, I -- I did a test order

19  myself, and the descriptor website that I got was this website

20  somepearls.com.  But when I clicked it, the pixel redirect

21  didn't work, so I wasn't -- I was an Eaze customer, so I wasn't

22  redirected, so I actually saw the landing page that was at

23  somepearls.com.  So I was telling everyone that the redirect

24  wasn't working.

25  Q.  What did you observe when you had seen the landing page for

DJA1887

1588

L3FAWEI2ps                    Patterson - Direct

1    the somepearls URL?

2    A.  So when I went to this page, this page was very different

3    than the -- the -- the descriptor websites that I had seen in

4    the past.  So in the past, the descriptor websites I had seen,

5    they were set up to be more generic customer service-looking

6    portals, so they would have fields to enter in your credit card

7    number, order number, and it would be -- you know, they would

8    have a picture of someone with a headset.  This website was set

9    up to be -- it looked like a fake store, or a fake business of

10   some kind.  So this was the first time that I'd ever seen this

11   type of landing page being set up to look more like a fake

12   store.

13   Q.  To your recollection, was there any reference to Eaze on

14   that fake store web page?

15   A.  No.

16   Q.  What about any reference to the sale of marijuana on that

17   fake store web page?

18   A.  No.

19          MR. FOLLY:  We can take this down.

20   Q.  Mr. Patterson, I'd like to direct your attention to October

21   of 2020.  Did you begin cooperating with the government around

22   that time?

23   A.  Yes.

24   Q.  Had you been charged with any crimes at the time that you

25   started cooperating?

DJA1888

L3FAWEI2ps                    Patterson - Direct

1    A.  No.

2    Q.  Why did you decide to start cooperating with the government

3    at that time?

4    A.  Because I knew what we had done was wrong and I didn't want

5    to pretend otherwise.

6    Q.  Were you hoping for leniency by cooperating?

7    A.  Yes.

8    Q.  Around how many times have you met with the government?

9    A.  Around 15.

10   Q.  Were you truthful in those meetings with the government?

11   A.  Yes.

12   Q.  Was every one of those meetings to prepare to testify at

13   this trial, or were those meetings for other purposes as well?

14   A.  No.  Some of the meetings -- most -- the majority of the

15   meetings were to just provide information, and then some of the

16   meetings were to prepare for the trial.

17   Q.  As part of your cooperation, were you required to disclose

18   to the government all of the crimes that you had committed?

19   A.  Yes.

20   Q.  Did you do that?

21   A.  Yes.

22   Q.  Did you plead guilty in connection with this case?

23   A.  Yes, I did.

24   Q.  Approximately when was that?

25   A.  February of this year.

DJA1889

L3FAWEI2ps                    Patterson - Direct

1   Q.  What did you plead guilty to?

2   A.  Conspiracy to commit bank fraud.

3   Q.  What made you guilty of that crime?

4   A.  Well, that I coordinated with Ray to enable credit card

5   transactions by concealing the true nature of those

6   transactions from the banks and credit card companies.

7   Q.  What is the maximum sentence the judge can give you as a

8   result of your guilty plea?

9   A.  30 years in prison.

10  Q.  When you pled guilty, did you enter into a cooperation

11  agreement with the government?

12  A.  Yes.

13          MR. FOLLY:  If we could show the witness only what's

14  been marked for identification as Government Exhibit 2102.  We

15  could just flip through the pages all the way to the back page.

16  Q.  Mr. Patterson, do you recognize this?

17  A.  Yes.

18  Q.  What is it?

19  A.  This is the cooperation agreement that I entered into.

20          MR. FOLLY:  You could scroll down just two pages down.

21          The government offers Government Exhibit 2102.

22          MR. TAYBACK:  No objection.

23          MR. GILBERT:  No objection.

24          THE COURT:  Received.

25          (Government's Exhibit 2102 received in evidence)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3FAWEI2ps                    Patterson - Direct

1    Q.  Mr. Patterson, what are your obligations under this

2    cooperation agreement?

3    A.  So my obligations are to first and foremost tell the truth

4    about everything I know and what I did in connection with this,

5    as well as show up to meetings and court proceedings that

6    related to this case.

7    Q.  If you meet your obligations under this agreement, what is

8    your understanding of what the government will do?

9    A.  So if I meet my obligations, my understanding is that, at

10   the time of my sentencing, the government will provide to the

11   Court, in addition to my criminal conduct, an overview of the

12   nature and extent of my cooperation.

13   Q.  And is your understanding that will be in the form of a

14   letter to the Court?

15   A.  Yes.

16   Q.  What is your understanding of who writes that letter?

17   A.  The government, prosecution.

18   Q.  What is your understanding of who receives the letter?

19   A.  The judge who will sentence me.

20   Q.  What is your understanding of what type of information will

21   go into that letter?

22   A.  So it will -- an overview of my conduct, my criminal

23   conduct in the case, as well as the details about my

24   cooperation, the nature and extent of it.

25   Q.  What sentence are you hoping to get in this case?

DJA1891

L3FAWEI2ps

1      A.  Probation.

2      Q.  Have you been promised any particular sentence as you sit

3      here today?

4      A.  No.

5      Q.  Have you been promised that the government will write the

6      letter that you just referenced as you sit here today?

7      A.  Only if I'm truthful and fulfill my obligations.

8      Q.  What is your understanding of what will happen if you do

9      not tell the truth?

10     A.  Well, that -- one, I could be charged with an additional

11     crime, and that the -- that this agreement is null and void.

12     Q.  To your understanding, does the outcome of this trial

13     affect whether you will receive the letter that we've been

14     discussing here?

15     A.  No, it does not.

16          MR. FOLLY:  We could take this exhibit down.

17     Q.  Mr. Patterson, I'd like to direct your attention to March

18     of 2019.  Did anything --

19          THE COURT:  Maybe this is a good time, we take our

20     midmorning break?

21          MR. FOLLY:  Yes, your Honor.

22          THE COURT:  All right, ladies and gentlemen.  We'll

23     take a 15-minute break.

24          (Continued on next page)

25

DJA1892

1593

L3FAWEI2ps

1    (Jury not present)

2    (Witness excused)

3    THE COURT:  So how much longer, counsel, do you think

4    you'll be on direct?

5    MR. FOLLY:  Your Honor, I don't think this will be

6    more than 20 minutes.

7    THE COURT:  OK.  And this is not binding, but will

8    counsel for the defense give me a ballpark as to the length of

9    their cross-examination.

10    MR. TAYBACK:  Two hours, your Honor.

11    MR. GILBERT:  45 minutes.

12    THE COURT:  OK.  Very good.

13    Now, I had raised briefly on Friday an issue and to

14    since I'm going to be turning, fairly soon, to starting on the

15    draft charge to the jury, let me raise it again.  I think there

16    is at least a question in my mind, but I haven't researched it

17    yet, as to whether the defense argument on materiality is valid

18    as a matter of law.  And here's why I say that.  The defense

19    view is that the banks really did not care about the

20    representations being made by the defendants because they were

21    perfectly content to transact marijuana purchases as long as

22    they were disguised in a way to give them, quote, plausible

23    deniability.  And Mr. Tayback, I think you confirmed to me

24    Friday but just again, to be sure that's your basic argument

25    on -- it's not your only argument, but it's one of your

DJA1893

L3FAWEI2ps

1    arguments.

2              MR. TAYBACK:  Yes.  That's an accurate summary, your

3    Honor.

4              THE COURT:  Yes.  So my question is, since the

5    ultimate question is not what these banks thought, that's just

6    being introduced as a way of giving information to the jury

7    from which they can help assess materiality, but, rather, what

8    a reasonable banker would think.  As a matter of law, can it

9    ever be that a reasonable banker would not care about

10   representations made to them because the reasonable banker had

11   already concluded that it was OK to violate the federal law as

12   long as they had a good cover?  And I just wonder -- and as I

13   say I haven't researched this -- whether as a matter of law

14   that can really work.

15             So, lucky you, I'm going to ask all parties to give me

16   some learning on that, maybe by noon tomorrow?  Is that too

17   soon?

18             MR. TAYBACK:  That's fine, your Honor.

19             MR. GILBERT:  That's fine.

20             MS. LA MORTE:  That will work.

21             THE COURT:  Very good.  So just in letter form to my

22   law clerk and we'll take it from there.

23             MR. TAYBACK:  Your Honor, while I have you, can I

24   request oral leave to submit an application to exonerate

25   Mr. Akhavan's bond, given that he's in custody?  The government

DJA1894

1595

L3FAWEI2ps

1    does not oppose.

2              THE COURT:  I'm happy to agree to that, but I think

3    the Clerk's Office is going to want something in writing.

4              MR. TAYBACK:  Oh, yes.  I'm not asking it to be

5    exonerated, just to file the papers.

6              THE COURT:  Yes.  Sure.

7              MR. TAYBACK:  Thank you, your Honor.

8              THE COURT:  All right.  Very good.

9              (Recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3FPWEI3                    Patterson - Direct

1    (In open court; jury not present)

2    THE COURT:  The jury is on its way up.  So get the

3    witness back in the seat.

4    (Pause)

5    So while we're waiting, when is the government's

6    current estimate of when they will rest?

7    MS. LA MORTE:  I think we're still on track for

8    Thursday.  We're trying to see what we can do to make it

9    Wednesday, but we're still on track for Thursday.

10    THE COURT:  Okay.

11    (Jury present)

12    THE COURT:  Please be seated.  All right.  Counsel?

13    MR. FOLLY:  Thank you, your Honor.

14    BY MR. FOLLY:

15    Q.  Mr. Patterson, I want to direct your attention to March of

16    2019.  Did anything significant happen at Eaze around that

17    time?

18    A.  Yes.  So in March of 2019, we -- Eaze was served a legal

19    letter from a company called DionyMed.  DionyMed was a

20    Canadian-based public company.  They purchased one of Eaze's

21    dispensaries called Hometown Heart, and they actually operated

22    a competitor service to Eaze called Chill.com.

23    So they purchased one of Eaze's dispensaries, and then

24    immediately sent Eaze a legal letter stating that they intended

25    to sue Eaze because of our credit card processing they said was

L3FPWEI3                    Patterson - Direct

1    illegal and constituted an unfair business advantage.

2    Q.  Did you have any discussions with the defendant Ray Akhavan

3    regarding the situation with DionyMed?

4    A.  Yes.

5    Q.  Was that a discussion in person or over the phone?

6    A.  Over the phone.

7    Q.  Can you describe, in as much detail as possible, what you

8    discussed with Ray Akhavan during that call?

9    A.  Yes.  So after I received the letter, I called Ray and told

10   him about the letter, about the situation.  I explained that

11   one of our dispensaries was suing us, and they were essentially

12   claiming that the credit card processing was illegal and that

13   this was a problem because it was going to -- they were going

14   through all of the details of the credit card processing in the

15   complaint.

16          Ray initially got very angry.  He -- the first thing

17   he said was he didn't understand.  These guys came to my

18   office.  I explained everything to them.  Why are they doing

19   this?  I explained to him that it wasn't Hometown Heart

20   actually initiating.  It was this other company who acquired

21   Hometown Heart; so they were no longer in control of what was

22   happening.

23   Q.  What was Ray Akhavan's reaction when you explained to him

24   that it was not Hometown Heart that was in control of the

25   lawsuit at that point?

L3FPWEI3                    Patterson - Direct

1  A.  Well, like I said, at first, he got angry.  Then once I

2  explained the situation, he actually got a little panicked, I

3  would say.  It was the first time I'd ever seen really Ray more

4  out of control with panic like that.  He said:  You know this

5  fucks us.  Don't these guys know what they're doing?  He said:

6  They're going to tear my fucking bank apart.

7          He got really upset, and then started to ask me if

8  there's other ways we can figure out how to make this go away.

9  One of the things he asked about was could he purchase the

10  company, Hometown Heart and DionyMed.  I said:  I don't know.

11  But he asked how much I thought it would cost.  At the time,

12  DionyMed was a publicly traded company.  Their market cap was

13  around $20 million.  I told him that.  He said he actually

14  thought he could maybe get that money together and thought

15  about raising the money to buy the company.

16  Q.  Did Ray have any other suggestions about how to handle the

17  situation with DionyMed during that conversation?

18  A.  I mean, another thing he said was he asked me who these

19  people were, and I gave him the names of the guys who ran

20  DionyMed and he said, you know, maybe someone should pay these

21  guys a visit.

22          MR. TAYBACK:  Objection, move to strike.

23          THE COURT:  Overruled.

24  Q.  You can finish, Mr. Patterson.

25  A.  And I took that to mean go physically threaten them.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3FPWEI3                      Patterson - Direct

1    Q.  After that conversation that you just described with Ray

2    Akhavan, did card processing through Ray's organization

3    continue?

4    A.  Yes.

5    Q.  What, if anything, changed regarding the card processing

6    operation after that conversation?

7    A.  Well, after that conversation, shortly after that

8    conversation, MasterCard stopped working through Ray's

9    organization.

10   Q.  Can you explain what happened with MasterCard?

11   A.  So shortly after the conversation with DionyMed, Ray called

12   me up and asked me if I thought that someone had reported

13   things to MasterCard.  I had no information about that.

14        So then he called me a few days later, and he told me

15   that he had gotten some information that apparently someone who

16   is a high-level executive at MasterCard, a relative of theirs,

17   they had an underage person who was able to -- who was caught

18   with marijuana.  When their parents questioned them about where

19   they got it, they said that they had purchased it on Eaze with

20   their parent's credit card.

21        So this got reported to this executive at MasterCard,

22   and they sent an e-mail to the compliance department to look

23   into the descriptor that was used on Eaze on that credit card

24   purchase.  Ray said that he had someone who worked at

25   MasterCard who forwarded him the e-mail, the compliance e-mail,

L3FPWEI3                    Patterson - Direct

1   and that he was proactively going to shut down MasterCard

2   processing because of this incident.

3   Q.  Did there come a time when Eaze stopped card processing

4   through Ray's organization all together?

5   A.  Yes.

6   Q.  Approximately when was that?

7   A.  June 2018.

8   Q.  Can you explain the circumstances that led up to that?

9   A.  So June, that is when DionyMed officially filed the lawsuit

10  against Eaze, and as part of that, we had legal counsel

11  representing us in the lawsuit.  So also, when the letter came

12  in and I told Ray about it, that's when payments to the

13  dispensaries had stopped.

14          So credit cards had been processed for about two,

15  three months where no payments were being made to the

16  dispensaries.  So it was about $8 million that had not been

17  paid out.  So a call was set up to inquire about the missing

18  funds between Eaze's team -- Eaze's legal team and Ray and his

19  lawyer.  At the time, we were only communicating through

20  lawyers because of the lawsuit.

21          So on that call, Ray said that the funds had been

22  frozen by the banks because of the lawsuit; that they had found

23  out that -- that they had found out that the accounts were

24  associated with marijuana.  The funds were frozen and couldn't

25  be recovered.

L3FPWEI3                    Patterson - Cross

1    So after that call, Eaze made the decision to stop

2    processing completely through Ray's organization.

3    Q.  And just one question for clarification.  I believe you had

4    said that the card processing stopped in 2018.  Was it 2018 or

5    2019?

6    A.  Sorry, 2019.

7        MR. FOLLY:  No further questions.

8        THE COURT:  Cross-examination.

9    CROSS-EXAMINATION

10   BY MR. TAYBACK:

11   Q.  Mr. Patterson, can you hear me?

12   A.  Yes.

13   Q.  I'd like to start with the reference to the lawsuit.  The

14   company that sued Eaze was named Herbn, was that the name of

15   the company?

16   A.  That was the -- yes, that was the holding company that was

17   the parent company of DionyMed.

18   Q.  So if I call it "the Herbn lawsuit," you'll understand what

19   I'm referring to?

20   A.  Yes.

21   Q.  And that's H-e-r-b?

22   A.  I think it was H-e-r-b-n.

23   Q.  Now, Herbn was, I think you said, the holding company or a

24   part of the holding company that owned the competitor called

25   Chill?

DJA1901

1602

L3FPWEI3                    Patterson - Cross

1   A.   Yes.

2   Q.   So it was a competitor that filed the lawsuit against Eaze

3   regarding Eaze's use of credit cards, correct?

4   A.   Yes, that's correct.

5   Q.   Now, Eaze handled that lawsuit itself, correct?

6   A.   Yes.

7   Q.   Meaning it hired lawyers and defended the lawsuit?

8   A.   Yes.

9   Q.   Was Eaze's strategy in that case to blame the dispensaries

10  because they're the ones that submitted the applications?

11              MR. FOLLY:  Objection.

12              THE COURT:  Sustained.

13  Q.   Mr. Akhavan was not a party to that lawsuit, correct?

14  A.   No.

15  Q.   Eaze itself did stop processing credit cards, at least in

16  part, in reaction to that lawsuit, right?

17  A.   Yes, in reaction to the lawsuit.

18  Q.   And it wasn't because of an investigation by MasterCard or

19  Visa, correct?

20  A.   That's right.

21  Q.   And it wasn't because of any complaint by a U.S. issuing

22  bank that Eaze stopped processing credit cards, correct?

23  A.   That's correct.

24  Q.   Eaze ultimately settled that lawsuit, right?

25  A.   Yes.

DJA1902

L3FPWEI3                    Patterson - Cross

1  Q.  And as part of that settlement, Eaze acquired the

2  dispensary that used to be called Hometown Heart, correct?

3  A.  Yes.

4  Q.  So the result of that lawsuit is that Eaze acquired a

5  dispensary that not only -- that cultivated or produced

6  marijuana products that Eaze delivers, correct?

7  A.  Yes.

8  Q.  Now, even after that lawsuit resolved, Eaze, to your

9  knowledge, has not been blacklisted by Visa or MasterCard,

10 correct?

11          MR. FOLLY:  Objection.  Foundation.

12          THE COURT:  Well, lay a foundation.

13 Q.  As of the time you -- well, let me back up.  As of the time

14 you left the company, the company Eaze, to your knowledge, Eaze

15 had never been blacklisted by Visa or MasterCard, right?

16 A.  Not to my knowledge.

17 Q.  In fact, Eaze, to your knowledge, even at the time you

18 left, still accepted Visa or MasterCard debit cards, right?

19 A.  Yes.

20 Q.  Through a company called Circle Wallet?

21 A.  Not when I left.  When I left, it was through a different

22 company called MTrac.

23 Q.  Would you say the name again?

24 A.  MTrac, M-T-r-a-c.

25 Q.  Now, you're still a shareholder of Eaze?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1903

L3FPWEI3                    Patterson - Cross

1    A.  Technically, I have options, but --

2    Q.  Don't you also own shares that you purchased yourself?

3    A.  Yes.  I was a small investor when I first joined.

4    Q.  And you're still an investor, correct?

5    A.  Yes, I still have the shares.

6    Q.  And that investment is about 1.5 percent of the company?

7    A.  Approximately, yes.

8    Q.  Do you know what the company's valuation is?

9    A.  I don't know what the last valuation was.

10   Q.  What was the valuation at the time you left the company?

11   A.  Around $250 million.

12   Q.  Now, on the Eaze website, at the time you left, you were

13   familiar with the website that is shown to consumers, correct?

14   A.  Yes.

15   Q.  At the time you left, a customer could still use their

16   funds from any bank to pay for its Eaze purchases, right?

17   A.  I'm not sure about any bank.

18   Q.  Most banks?

19   A.  Some banks, yes.  I don't know what most or --

20   Q.  If you could put up WX2601, which is in evidence.

21        Do you recognize this as a page from the Eaze

22   application?

23   A.  Yes.

24   Q.  Or the Eaze app, I should say?

25   A.  Yes.

DJA1904

L3FPWEI3                    Patterson - Cross

1    Q.  And it describes some of major banks listed there on the

2    first page; do you see that?

3    A.  Yes.

4    Q.  But there are other banks, and you'll see that there's a

5    search bar that says:  Don't see your bank?  Search instead?

6    Do you see that?

7    A.  Yes.

8    Q.  So that's not an exhaustive list of banks that Eaze makes

9    available to its customer to use funds from to buy marijuana,

10   right?

11   A.  Well, no, that's not how this works.

12   Q.  How does it work?

13   A.  So this is a plug-in from a company called Plaid, where

14   they just list all of the banks that Plaid supports.  The

15   customer would insert their bank information and issue --

16   essentially sign into their bank account, and then try to do a

17   transaction.  At that point, some banks allowed it and some

18   banks didn't.  This list is only the banks that Plaid supports,

19   not necessarily that work on Eaze.

20   Q.  But through its relationship with Plaid, these banks' icons

21   are on the Eaze website, correct?

22   A.  Yes, it works through Plaid that way.

23   Q.  And to your knowledge, no bank has ever written Eaze and

24   said take our name down off of that app, correct?

25          MR. FOLLY:  Objection.

DJA1905

L3FPWEI3                    Patterson - Cross

1   A.  Not to my knowledge, no.

2   Q.  Let me ask you some questions about the Eaze business

3   model.  When you started with the company, what year was that?

4   A.  2016.

5   Q.  It was just a delivery platform, right?  Let me rephrase

6   the question.

7           It was a delivery platform for marijuana products, but

8   it didn't cultivate the plant itself?

9   A.  That's correct.

10  Q.  In fact, you had thought about joining Eaze prior to when

11  you actually joined Eaze, a couple of years before that, right?

12  A.  Yes.

13  Q.  Around 2014, I think you said?

14  A.  Yes.

15  Q.  And at that time, you declined to join Eaze because you

16  thought it was too risky, right?

17  A.  Yes.

18  Q.  In fact, you said that you were concerned that if you don't

19  do things right, you could wind up going to jail, correct?

20  A.  Yes.

21  Q.  You don't want to go to jail, right?

22  A.  No.

23  Q.  Now, between 2014 and 2016, what happened in your mind that

24  made it less risky?

25  A.  Well, the Eaze business model changed.  So initially Eaze

L3FPWEI3                    Patterson - Cross

1   was the one selling the marijuana.  So Eaze actually had the

2   marijuana in its inventory and were selling it directly to

3   consumers prior to me joining the company.

4            The company changed its business model, where it

5   partnered with dispensaries; so the marijuana being sold wasn't

6   actually owned by Eaze.  The drivers themselves weren't

7   employees of Eaze.  They were employees of the dispensaries.

8   So the company moved to this model that they called "We don't

9   touch the plant" and that made it seem less risky to me.

10  Q.  And so you viewed it as less risky to be the deliverer of

11  marijuana than to be one that cultivated or produced the

12  products, right?

13  A.  Well, we weren't delivering.  We were the technology

14  platform.  The delivery drivers were the employees of the

15  dispensaries.  They used our app to fulfill the orders.  It was

16  purely technology.

17  Q.  And you felt that that was less risky?

18  A.  Yes.

19  Q.  Now, at some point after you joined the company, didn't

20  Eaze become the employer of the drivers?

21  A.  No.  At no point when I was there, was that the case.

22  Q.  Do you know whether that occurred later?

23  A.  It occurred after I left.

24  Q.  And were you there when the Herbn lawsuit was settled?

25  A.  Officially, the official settlement happened after I left.

DJA1907

1608

L3FPWEI3                    Patterson - Cross

1  Q.  But you were still on the board, correct?

2  A.  Yes.

3  Q.  So you were aware of that?

4  A.  Yes.

5  Q.  And you approved that?

6  A.  Yes.

7  Q.  And that didn't create, in your mind, any additional risk?

8  A.  It did.

9  Q.  But not so much that you felt that you couldn't pursue that

10  venture, pursue that settlement?

11  A.  Again, I was just a board member.  I left shortly

12  thereafter.

13  Q.  Well, you say "just a board member."  Isn't the board the

14  ultimate authority for Eaze?

15  A.  Oh, yes, but I was just one vote of six.

16  Q.  And this is the same board that I believe you said were

17  co-conspirators with you?

18  A.  Some members, yes.

19  Q.  Some members, but not all of them?

20  A.  I'm not sure exactly what every single board member knew.

21  Q.  Well, my question is, do you believe that the board of

22  Eaze, the board of this company, were co-conspirators with you?

23  A.  The board, yes.

24  Q.  Because you talked to the board about what was happening

25  with credit card processing, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1908

1609

L3FPWEI3                    Patterson - Cross

1   A.  Yes.

2   Q.  And you sought their approval, correct?

3   A.  Yes.

4   Q.  And you shared with them what you understood the process

5   was, correct?

6   A.  They were aware of the high-level details but not all of

7   the low-level specific details.

8   Q.  Well, is it fair to say that you never told the board in

9   any of your meetings with them, as the chief technology officer

10  and later the CEO, that you believed what the company was doing

11  was illegal?

12  A.  I never said that, no.

13  Q.  You didn't say that because you didn't believe it at the

14  time you were meeting with the board, right?

15  A.  No, I wouldn't say that's true.

16  Q.  Now, let me go back to the process by which the Eaze

17  application works.  When you started, did the drivers carry

18  portable terminals to use like an ATM for people, for

19  customers?

20  A.  When I started at Eaze?

21  Q.  Yes.

22  A.  No.

23  Q.  At some point while you were there, did that happen?

24  A.  Yes.

25  Q.  Okay.  When did that happen?

DJA1909

L3FPWEI3                      Patterson - Cross

1   A.  After the -- after the Herbn lawsuit, when we switched to

2   using what's called the closed-loop system.

3   Q.  So when you first began with the company, did the company

4   have any system in place to accept any form of credit or debit

5   card before you began talking to Mr. Akhavan?

6   A.  No.

7   Q.  Now, you learned -- well, let me back up.

8          Well, you learned while working there that there were

9   good reasons to not have a cash-only operation for Eaze,

10  correct?

11  A.  Yes.

12  Q.  And what were those?

13  A.  Well, one was customers preferred it.  So it was more

14  convenient; therefore, it increased sales.  Another one was

15  that with cash transactions, it created a high number of

16  robberies.  So during the periods where Eaze was taking cash,

17  we would have an increase in driver and dispensary robberies.

18  Q.  And it also was good for business, correct?

19  A.  Yes, it increased sales.

20  Q.  And when you began to -- when you started with the company

21  and began to discuss how you might be able to accomplish a

22  cash-free method of Eaze doing business, you wanted to do so in

23  a manner that was compliant with the law?

24  A.  That was my understanding, yes.

25  Q.  That was your goal, right?

DJA1910

L3FPWEI3                    Patterson - Cross

1   A.  Yes.

2   Q.  And I believe you testified that during the period of time

3   of 2016, 2017, you spoke to a number of people, you consulted

4   with a number of people about ways to make that happen, that is

5   to say, people other than Mr. Akhavan?

6   A.  Well, not in 2016.  So when I took over as CEO in 2017 is

7   when I started looking for alternative processors.

8   Q.  Let me rephrase the question.  Before you began speaking to

9   Mr. Akhavan, you spoke to others within Eaze about the desire

10  to try to have a credit card or debit card solution, correct?

11  A.  Well, when I joined, Keith had already been talking to

12  Mr. Akhavan.  So I was told that we were integrating credit

13  card payments just as soon as I joined, and I was introduced to

14  Ray within weeks after I joined.

15  Q.  And you spoke to -- among the people within Eaze, though,

16  that you spoke to at the very inception of your efforts to find

17  a credit card solution were Mr. McCarty, correct?

18  A.  Yes.

19  Q.  He was the CEO at the time?

20  A.  Yes.

21  Q.  And there was also a person that I saw in an e-mail named

22  Michael Selepec?

23  A.  Michael Selepec, yes.

24  Q.  And who was that?

25  A.  He worked for Eaze.  He -- his job at the time was

DJA1911

L3FPWEI3                      Patterson - Cross

1    overseeing something called Eaze MD, which was a separate

2    service that operated video chats for doctors.  So the way that

3    worked was you needed a medical recommendation in California at

4    the time to purchase marijuana; so if a customer didn't have

5    the medical recommendation, there was a separate service called

6    Eaze MD, where they could consult with a doctor.  And after

7    that consultation, the doctor would issue them their marijuana

8    recommendation.

9    Q.  And that's because, in this early time period here, and I'm

10   referring to 2016 or 2017, in California, your understanding

11   was marijuana was only permissible with a medical prescription,

12   correct?

13   A.  That's right.

14   Q.  So Eaze was in the business of providing not only the

15   marijuana product itself, but a doctor who might be able to

16   provide a prescription?

17   A.  Yes.  Eaze ran a service that connected you with doctors.

18   Q.  And there's another name of someone within Eaze that

19   appears to be on the discussions that you've testified about in

20   direct, Dan Erickson.  Who is that?

21   A.  Well, Dan was the VP of engineering; so he was over all the

22   software engineering team.

23   Q.  And another person named Roie Edery, R-o-i-e.  Who was

24   that?

25   A.  Roie was one of the co-founders of Eaze, along with Keith.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1912

L3FPWEI3                    Patterson - Cross

1    He left right as I was starting at the company.

2    Q.  And what was his responsibility while he was there?

3    A.  He oversaw the technical; so essentially, I was replacing

4    him.

5    Q.  And then you also spoke with a consultant named Jim Black,

6    correct?

7    A.  Yes.

8    Q.  Now, it's true, isn't it, that Mr. Akhavan was never an

9    Eaze employee?

10   A.  That's true.

11   Q.  And he was never an officer of Eaze?

12   A.  That's true.

13   Q.  And he's never been a board member of Eaze?

14   A.  That's true.

15   Q.  And to your knowledge, he's never been a stockholder or

16   shareholder of Eaze, correct?

17   A.  Stock options.

18   Q.  To your knowledge, he doesn't own any stocks, correct?

19   A.  That's correct.

20   Q.  Now, when you --

21          THE COURT:  So the jury knows, what is meant by stock

22   options?

23          THE WITNESS:  Well, a stock option is the right to

24   purchase shares in the future at a specified price.  So you

25   don't actually own the stock; so therefore, you don't have any

L3FPWEI3                    Patterson - Cross

1     voting rights associated with that.  You just have a financial

2     option to purchase them in the future at a specific price.

3              THE COURT:  Go ahead.

4     BY MR. TAYBACK:

5     Q.  And is it your understanding -- withdrawn.

6              While you were at the company, you testified earlier

7     about a dispute with Mr. Akhavan about he was out-of-pocket

8     money, and hadn't been paid; do you recall that testimony?

9     A.  Yes, I do.

10    Q.  And at some point in time, you were authorized by the

11    company to offer him stock options, correct?

12    A.  Yes.

13    Q.  I think it was about $25,000 worth of stock options?

14    A.  Yes.

15    Q.  And they were at a price that was higher than the valuation

16    of Eaze at the time?

17    A.  Well, the options were, I believe, at a price lower.  That

18    was the -- that's the point.

19    Q.  And to your knowledge, though, the options were never

20    purchased, correct?

21    A.  That's correct.

22    Q.  And they're not available anymore, correct?

23    A.  I don't know.  I don't know anymore.

24    Q.  So as you are sitting here, to your knowledge, Mr. Akhavan

25    has never received -- has never obtained any stock in Eaze,

L3FPWEI3                    Patterson - Cross

1  correct?

2  A.  That's correct.

3  Q.  And when you left the company, you were the CEO?

4  A.  Yes.

5  Q.  And you had an annual salary of $250,000?

6  A.  Yes.

7  Q.  To your knowledge, did Mr. Akhavan ever get paid anything

8  from Eaze?

9  A.  Not directly, no.

10  Q.  He never received a check from Eaze, correct?

11  A.  Not that I know of.

12  Q.  You say "not directly," meaning you think he got paid

13  indirectly?

14  A.  Well, there were the credit card fees.  I'm not sure how

15  those got disbursed.

16  Q.  Meaning you have no idea one way or the other, correct?

17  A.  That's right.

18  Q.  You have no idea whether the banks, either the acquiring

19  banks, what their percentage was or what they took, correct?

20  A.  Correct.

21  Q.  And you don't know what the intermediaries, if there was an

22  ISO involved, you don't know what they took, correct?

23  A.  Correct.

24  Q.  And so you don't know whether Mr. Akhavan received

25  anything, correct?

**DJA1915**

L3FPWEI3                    Patterson - Cross

1   A.   That's right.

2   Q.   Do you know whether Mr. Akhavan contributed any costs of

3   his own to facilitate Eaze's efforts to try to find a credit

4   card solution?

5   A.   Sorry, can you rephrase the question?

6   Q.   Do you know whether he contributed any money of his own --

7   A.   I don't know.

8   Q.   -- to Eaze?  You don't know one way or the other, correct?

9   A.   Correct.

10  Q.   Now, when you were first introduced to Mr. Akhavan, your

11  understanding is -- was at the time, that he knew a lot of

12  people in the credit card processing business, right?

13  A.   Yes.

14  Q.   And he said to you that he knew people at banks in Europe

15  that represent merchants, correct?

16  A.   Yes.

17  Q.   Now, at the time, you didn't know much about credit card

18  processing?

19  A.   That's right.

20  Q.   But you learned that those banks are called acquiring

21  banks, right?

22  A.   The banks in Europe, I think, are called merchant banks.

23  Q.   Have you ever heard the term acquiring banks?

24  A.   I have now, yes.

25  Q.   And do you understand that the acquiring bank is the same

L3FPWEI3                    Patterson - Cross

1    as a merchant bank?

2    A.  I guess, no.

3    Q.  You don't know?

4    A.  No, I don't know.

5    Q.  One of the things that Mr. Akhavan did was introduce you to

6    people in the business of credit card processing, correct?

7    A.  I mean, other than people that he worked with directly, I

8    don't think he introduced me to anybody.

9    Q.  But when you say people he worked with directly, you met a

10   person named Ozan Ozerk?

11   A.  Yes, over e-mail.  Yes, we worked with him at the

12   beginning.

13   Q.  If you could put up Exhibit GX403, which is in evidence.

14   And if you could go down to the next page.  Actually, I'm

15   sorry.  It's up at the -- if you could go down to the next

16   page.

17          If you could look at the top of the e-mail, you'll see

18   this is from Ozan Ozerk, and it's dated May 13th, 2016?

19   A.  Yes.

20   Q.  And do you see you're one of the cc's on this, correct?

21   A.  Yes.

22   Q.  And if you look down to the second e-mail text there, where

23   it says -- it appears to say in a foreign language, Mai, M-a-i,

24   2016; do you see that?

25   A.  Yes.

1618

L3FPWEI3                    Patterson - Cross

1   Q.  And that's from that person Roie Edery that you described

2   before?

3   A.  Yup.

4   Q.  And he says:  Gentlemen, this e-mail is to connect --

5            MR. FOLLY:  Objection.  I don't believe this is in

6   evidence.

7            MR. TAYBACK:  I had it marked as in evidence.

8            If you could take it down from the screen please.

9   Q.  Do you recognize that as an e-mail --

10  A.  Yes.

11  Q.  -- that you received?

12  A.  Yes.

13           MR. FOLLY:  Can we show it to the parties?

14           MR. TAYBACK:  To the witness only.

15           (Pause)

16           MR. FOLLY:  Is there more?

17           MR. TAYBACK:  There's -- no, it's only one page.

18           MR. FOLLY:  Objection, hearsay.

19           MR. TAYBACK:  It goes to the witness' state of mind.

20           THE COURT:  Blow it up for me.

21           MR. TAYBACK:  It's the top part.

22           THE COURT:  Sustained.

23           MR. TAYBACK:  If you could place before the -- may I

24  have one moment.  If I could show the witness what's been

25  marked as Exhibit GX917.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3FPWEI3                    Patterson - Cross

1  BY MR. TAYBACK:

2  Q.  If you look at the middle e-mail?

3  A.  Yes.

4  Q.  For the witness.

5  A.  Yes.

6  Q.  Is that an e-mail from you?

7  A.  Yes.

8  Q.  Now, do you recall corresponding with, at any point in

9  time, Mr. Ozerk?

10  A.  Yes.

11  Q.  You can take this down.

12         And what was your understanding of why you were

13  corresponding with Mr. Ozerk?

14  A.  I mean, my understanding was everyone was under this

15  umbrella called Clearsettle, and they were the technical --

16  Roie referred to them as our technical counterparts.  So I

17  viewed them as the technical people that we would be working

18  with to do the integration into Clearsettle.

19  Q.  You had mentioned at one point in time yesterday, I

20  believe, or Friday, that when you wanted to look up a domain

21  name, you had Googled something called What Is It?

22  A.  WhoIs.

23  Q.  WhoIs.  Did you do anything to Google or look into who

24  Mr. Ozerk is?

25  A.  No, not -- I look at the company, Clearsettle, and I

**DJA1919**

L3FPWEI3                          Patterson - Cross

1  believe his company was called First Remit.  I looked up these

2  companies.  They have websites that just said they were payment

3  processing websites.

4  Q.  So you did looked up even the company Clearsettle, correct?

5  A.  Yes.

6  Q.  And did you see who was in charge of Clearsettle?

7  A.  It didn't say, no.

8  Q.  The website you looked at, did you see whether Mr. Akhavan

9  seemed to have any association with Clearsettle?

10  A.  I couldn't find one, no.

11  Q.  You knew that Mr. Akhavan was suggesting that Eaze work

12  with a bank in Europe, correct?

13  A.  Well, that Eaze wouldn't be working directly with any

14  banks.

15  Q.  You knew that he was suggesting you work with credit card

16  processors in Europe, correct?

17  A.  Yes.

18  Q.  And you knew, even in this early stage, that there would

19  have to be a merchant or acquiring bank -- a "merchant bank," I

20  think is the term you used -- correct?

21  A.  This -- at this early stage, no, I didn't know all of the

22  details of it.

23  Q.  Well, is it accurate to say that you viewed Mr. Akhavan's

24  role in this early stage as being a liaison between Eaze and

25  others who could facilitate credit card processing?

DJA1920

L3FPWEI3                      Patterson - Cross

1    A.   Initially that's how he was introduced to me.

2    Q.   And that's the term you used to describe him when you spoke

3    to the government, yes?

4    A.   Possibly.  That's how I viewed it at the beginning.

5    Q.   Now, when you worked with Mr. Akhavan in this period of

6    time, now we're focused on 2016, he answered your questions

7    about credit card processing, right?

8    A.   Yes.

9    Q.   And you didn't know that much about it, right?

10   A.   That's right.

11   Q.   So you consulted with him for the knowledge that he had in

12   the business, right?

13   A.   Yes.

14   Q.   If we could put up for the witness Exhibit GX423.  I

15   believe this exhibit is in evidence, if you could display it.

16          Do you recognize this e-mail exchange as an e-mail

17   exchange, I think, that you had that you testified about

18   earlier?

19   A.   Yes.

20   Q.   Now, if we could go down to the bottom.

21          You understand that e-mails, typically, you read from

22   the bottom to the top?

23   A.   Yes.

24   Q.   Go to the bottom.  That first e-mail in the thread is from

25   you, correct?

DJA1921

L3FPWEI3                    Patterson - Cross

1    A.  Yes.

2    Q.  And you're telling this group of recipients that it seems

3    like there were a high number of chargebacks, correct?

4    A.  Yup.  Yes.

5    Q.  And the date of this e-mail is September 26th, 2016.  So

6    this is the early stages of your consultation with Mr. Akhavan?

7    A.  Yeah, this is the beginning of credit card processing.

8    Q.  And in this early stage, where you're seeing what you

9    perceive to be a high number of chargebacks, you already knew

10   that chargebacks were bad, right?

11   A.  Yes, that's what Ray told me.

12   Q.  But you realized independently that customers who return

13   their product or want their money back, that that's bad?

14   A.  Yes.

15   Q.  And it's bad for business, correct?

16   A.  Yes.

17   Q.  And you also know that it's bad for -- that the credit card

18   companies perceived it as bad?

19   A.  Well -- well, my understanding was that there was a certain

20   threshold.  If you go above a certain threshold, then the

21   credit card companies would perceive that as bad, yes.

22   Q.  And because it means that something maybe is wrong with the

23   merchant, correct?

24   A.  Yes.

25   Q.  And that that was -- would be a problem for that merchant,

DJA1922

L3FPWEI3                    Patterson - Cross

1   ultimately, correct?

2   A.  Yes.

3   Q.  Now, you say in that second sentence:  I am not sure what

4   to do here.  I know our No. 1 priority is supposed to be

5   keeping chargebacks low, but because of the legal restrictions

6   of not putting Eaze in the billing descriptor, it's inevitable

7   that people are going to get confused and dispute the charge.

8           Do you see that?

9   A.  Yes.

10  Q.  Not putting "Eaze" in the billing descriptor, that wasn't

11  something that Mr. Akhavan suggested, correct?

12  A.  Well, at one point, he said that.  He said it would not be

13  a good idea to do that.

14  Q.  Well, let's keep looking at the e-mail here.  You ask --

15  you then say in the next sentence:  Is there any way -- and you

16  emphasize "any" -- that we can get comfortable with putting

17  Eaze somewhere in the billing descriptor?  Do you see that?

18  A.  Yes.

19  Q.  And then you offer a couple of suggestions, something like

20  "Eaze via Onlinebiller.net" or "Onlinebiller.net/Eaze"; do you

21  see those?

22  A.  Yes.

23  Q.  Now, Onlinebiller.net is a general descriptor, right?

24  A.  That's correct.

25  Q.  Meaning it doesn't mean anything, yes?

**DJA1923**

L3FPWEI3                    Patterson - Cross

1   A.  Yes.

2   Q.  And that's what was being used at that point in time,

3   correct?

4   A.  Yes.

5   Q.  That's what Mr. Akhavan suggested initially?

6   A.  Yes, Onlinebiller.net.

7   Q.  In consultation with you, correct?

8   A.  That's what he said was being used.  We didn't decide it.

9   We were just told that, working through Clearsettle, they were

10  going to use Onlinebiller.net as the descriptor.

11  Q.  Okay.  And if you go up to the next responsive e-mail, and

12  Mr. Akhavan responds and says:  Of course, we can work on it,

13  and if the only choice is to put 'Eaze' on there; we can.

14          Do you see that?

15  A.  Yes.

16  Q.  So he's saying that it would be fine to use "Eaze" as part

17  of the descriptor; you understood that, right?

18  A.  I mean, he's saying it's possible, yes.

19  Q.  So if you go up one more e-mail.  And you say -- he then

20  asks you why you think the number is high, correct, the number

21  of chargebacks, and he responds to that?

22  A.  Hang on one second.  Where are we looking?

23  Q.  If you go -- this is your response to Mr. Akhavan's e-mail

24  below; do you see that?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3FPWEI3                    Patterson - Cross

1  Q.  And then there's another response above that from

2  Mr. McCarty; do you see that?

3  A.  Yes.

4  Q.  Bring that one up, please.

5        And Mr. McCarty says:  I think Black will have an

6  issue with putting "Eaze" in there, especially if it's not Eaze

7  MD, but he may want to put something that is more around "MMJ

8  recommendation" or "doctor evaluation" or "video evaluation;"

9  do you see that?

10 A.  Yes.

11 Q.  And Mr. Black was the other consultant whose name came up,

12 correct?

13 A.  Yes.

14 Q.  And you see that Mr. McCarty's expressing to you the view

15 that somebody else, not Mr. Akhavan, might have problems

16 putting "Eaze" in the descriptor, right?

17 A.  Yes.

18 Q.  If you could go to the next response.

19       And this is, I believe, you pronounced his name

20 Selepec?

21 A.  Selepec.

22 Q.  Mr. Selepec, who is an Eaze employee, right?

23 A.  Yes.

24 Q.  And he responds:  We make it fairly obvious in the Eaze MD

25 receipt e-mail that the transaction name will appear as

L3FPWEI3                    Patterson - Cross

1    Onlinebiller.net voucher.  It's even in the subject line.

2              Do you see that?

3    A.  Yes.

4    Q.  So he's explaining why the customer should not be confused

5    because even though it's generic, they're advised that it

6    relates to their transaction, right?

7    A.  Yes.

8    Q.  Because the goal was to make sure that the customers knew

9    what they had bought, right?

10   A.  Yes, that was the reason for putting the Onlinebiller.net

11   in the e-mail receipt.

12   Q.  Now, you -- if you go up to the top, Mr. Akhavan writes

13   this longer e-mail that you testified about in direct; do you

14   recall that?

15   A.  Yup.

16   Q.  And he says to you that he understands the issue with the

17   foreign banks being involved, right?  That that could raise a

18   customer -- could increase the likelihood that the customer is

19   unfamiliar with the transaction, right?

20   A.  Yes.

21   Q.  But the banks he's talking about are the merchant banks,

22   right?  They're the merchant banks that are involved, right?

23   A.  Yes, the merchant banks.

24   Q.  They're not -- he's not talking about any issuing banks,

25   right?

DJA1926

L3FPWEI3                    Patterson - Cross

1    A.  Not here, no.

2    Q.  Now, as Eaze, you have no control over what banks

3    individual consumers bank with, correct?

4    A.  That's correct.

5    Q.  So as part of the discussion about how to process credit

6    cards, you never looked at, well, what are Bank of America's

7    policies or what are Wells Fargo's policies for customers using

8    credit cards, correct?

9    A.  That's correct.

10   Q.  That wasn't something you discussed with Mr. Akhavan,

11   correct?

12   A.  No, not individual bank policies.

13   Q.  And you've never read their policies, right?

14   A.  No.

15   Q.  Because that wasn't of concern with trying to come up with

16   a proposal, a solution to get credit cards and debit cards to

17   be used to purchase marijuana through Eaze, right?

18   A.  Well, to be clear, at this moment, I'm just the technology

19   person.  So I wouldn't say that all of the conversations I was

20   aware of, but in my conversations, it was just focused on the

21   technical component at this stage.

22   Q.  So the answer is for their purposes, to your knowledge,

23   there was no discussion about individual consumer banks'

24   policies, correct?

25   A.  That's right.

DJA1927

1628

L3FPWEI3                    Patterson - Cross

1    Q.  But you did discuss the use of these foreign merchant

2    banks, right?

3    A.  Yes.

4    Q.  And Mr. Akhavan said that there were lots of people -- if

5    you could bring that back up, please.

6            And if you look at the second paragraph, he says:  We

7    would love to move it to the States, as I have my own billing

8    company here in Florida that I'd really like to use, but none

9    of the U.S. banks want to touch it.

10            Do you see that?

11   A.  Yes.

12   Q.  And he's referring there to merchant banks, right?

13   A.  Yes, merchant banks.

14   Q.  Not issuing banks, correct?

15   A.  That's correct.

16   Q.  And if you go down to the third paragraph, it says:  There

17   are many people here that are doing physical processing for

18   dispensaries that are simply lying to the bank.

19            Do you see that?

20   A.  Yes.

21   Q.  And he says:  We could do the same, but then if we have an

22   issue with the bank -- if we have an issue, the bank will screw

23   us by holding all our funds, et cetera.

24            Do you see that?

25   A.  Yes.

**DJA1928**

L3FPWEI3                    Patterson - Cross

1   Q.  You understood Mr. Akhavan was saying you shouldn't use a

2   bank that you're going to have to lie to in order to set up a

3   merchant account, correct?

4   A.  Yes.

5   Q.  And he's saying you might get away with it eight times out

6   of ten, but it's not worth it in his opinion, correct?

7   A.  Yes.

8   Q.  He was saying it's better to use a merchant bank that

9   you're honest with, correct?

10  A.  Yes.

11  Q.  And so -- you can take this down, now.

12          As opposed to lying to the acquiring bank, you

13  understood that the foreign banks that Mr. Akhavan was

14  suggesting Eaze use as a merchant banks, knew that it was

15  marijuana?

16  A.  That was my understanding, yes.

17  Q.  And that was important to you to understand that, correct?

18  A.  Yes.

19  Q.  Because you believed as long as the merchants were honest

20  with the acquiring banks, that that was going to be good,

21  correct?

22  A.  Yeah.  At the beginning, yes.

23  Q.  And it was -- and you didn't just rely on Mr. Akhavan,

24  correct, in terms of trying to decide whether this was a good

25  proposal, correct?

DJA1929

L3FPWEI3                    Patterson - Cross

1    A.   That's right.

2    Q.   Because you spoke to the people we talked about, the board

3    and your colleagues and your other consultant, Mr. Black, and

4    others, correct?

5    A.   Yes.

6    Q.   Now, you never discussed anything that you were doing --

7    withdraw that.

8            At this point in time, in 2016, 2017, you didn't say

9    to anybody within Eaze, you know, I think we're committing bank

10   fraud, correct?

11   A.   No, I didn't say that.

12   Q.   In fact, you believed that the process you were going

13   through in order to try to implement the credit card solution

14   for Eaze was compliant, right?

15   A.   I'd say over the course of that year, I started to get

16   concerns of things that were happening, but I wasn't -- I was

17   being put under the impression that it was compliant, but I had

18   my own concerns of things that were happening.

19           (Continued on next page)

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1930

L3FAWEI4ps                    Patterson - Cross

1   Q.  But those concerns that you were expressing or saying that

2   you had now, you didn't express those to anybody at the time.

3   A.  Well, for example, in the email pointing out things like

4   not using the Eaze in the descriptor and other things, but I

5   didn't elevate any concerns to any official channel, no.

6   Q.  So, for example, there is no email that you sent to

7   Mr. McCarty or to the board or to any of your colleagues at

8   Eaze saying, I'm concerned with the legality of what we're

9   doing with credit cards.  Correct?

10  A.  Correct.

11  Q.  And that's true up to today.  Right?  You've never sent

12  such an email to anybody at Eaze.

13  A.  No email, no.

14  Q.  No other written communication of any sort, correct?

15  A.  Not written, no.

16  Q.  Now, when you first met with the government in October of

17  2020, you told them at that time that you had understood that

18  Mr. Akhavan had relationships with European banks, when you

19  first met him, right?

20  A.  Yes.

21  Q.  And you also told the government that you had an

22  understanding that Mr. Akhavan had experience with what's

23  called high-risk credit card processing?

24  A.  That was the phrase that was used, yes, high-risk credit

25  card processing.

DJA1931

L3FAWEI4ps                    Patterson - Cross

1   Q.  That was used from the very beginning, right?

2   A.  Yes.

3   Q.  Even before you had any concerns about whether or not what

4   you were doing was legal, the term "high risk" was used.

5   A.  Yes.

6   Q.  And you understood that "high risk" in that context means a

7   high risk of chargebacks, correct?

8   A.  Yes, high risk of chargebacks and fraud.

9   Q.  Could be a legal transaction or an other transaction, not

10  illegal transaction.  Correct?

11  A.  Yes.

12  Q.  And so "high risk" didn't in and of itself mean to you,

13  there's something wrong here, something illegal here, correct?

14  A.  That's correct.

15  Q.  You eventually came to understand that the use of

16  descriptors for the billing of the products that Eaze was

17  delivering would not create a lot of chargebacks; that was a

18  goal of those descriptors, correct?

19          Let me withdraw the question.  I messed it up.

20          You eventually came to understand that the goal for

21  the use of the descriptor was to ensure that the customer

22  recognized the transaction, correct?

23  A.  No.

24  Q.  What is your understanding of a descriptor?

25  A.  A descriptor is what appears on the customer's credit card

L3FAWEI4ps                    Patterson - Cross

1  statement.

2  Q.  Was it your understanding, was it ever your understanding,

3  that a goal of that descriptor is to make the customer be able

4  to recognize the transaction?

5  A.  Yes.  That's the goal of a descriptor, but just not, in

6  this case, wasn't the goal of the descriptors.

7  Q.  Wasn't the discussion that we just looked at about making

8  sure that the descriptor was sufficient to be able to allow a

9  customer to recognize the transaction, correct?

10  A.  No.  What we did is, that's why we had to add the

11  descriptor to the receipt and the card collection point, was

12  because it was completely unclear based on those descriptors

13  what the charge was -- where the charge was from.

14  Q.  You mean when it was onlinebiller.com?

15  A.  Yeah.  There is no connection to Eaze.

16  Q.  And that's why the reason, though, you wanted to insert

17  Eaze is because it would be clearer to the customer, correct?

18  A.  Yes.

19  Q.  Now, when you met with the government in October 2020 --

20  withdraw that.

21        The actual name of Eaze is Eaze Solutions, right?

22  A.  It's now called Eaze Technologies.  It was called Eaze

23  Solutions.

24  Q.  It was called Eaze Solutions?

25  A.  Yes.

DJA1933

L3FAWEI4ps                    Patterson - Cross

1   Q.   It change its name while you were CEO?

2   A.   Yes.  I changed the name.

3   Q.   If we could put up Exhibit GX 411, which I believe is in

4   evidence.  If you could take a look at this email and let me

5   know if you recognize it as an email that was forwarded to you

6   from Mr. McCarty?

7   A.   Yes.

8   Q.   In about July of 2016.  Do you see that?

9   A.   Yes, I do.

10  Q.   If I could direct your attention to the fourth page of this

11  document --

12              MR. TAYBACK:  May I have one moment, your Honor?

13              THE COURT:  You may.

14  Q.   And at this point in time in July of 2016, you were

15  discussing ways in which to enable credit card processing for

16  Eaze, correct?

17  A.   Well, at this point I was told that we were using

18  Clearsettle.  There wasn't any discussion about it.  I was told

19  we were using Clearsettle, and I was working on implementing

20  that.

21  Q.   And that was Mr. McCarty's decision ultimately?

22  A.   Yes.

23  Q.   And at this point in time, was there a discussion about

24  whether the merchant should be Eaze or should be the individual

25  dispensaries?

Case 21-2466, Document 28, 12/17/2021, 3230498, Page89 of 283

**DJA1934**

L3FAWEI4ps                    Patterson - Cross

1  A.  Yes.

2  Q.  And the resolution you reached at this point in time, in

3  2016, was that it would be Eaze, correct?

4  A.  No.  The resolution was that it should be the dispensaries.

5  The problem was, technically, that there was no way to

6  implement that, so there was a single merchant account and

7  subaccounts for each dispensary.

8  Q.  Because the -- one of the complications that you were

9  trying to work around in implementing the solution was that --

10         MR. TAYBACK:  You could take this down.  Thank you.

11  Q.  -- was that the dispensaries -- there are multiple

12  dispensaries, right?

13  A.  Yes.

14  Q.  And Eaze, Eaze's business model was to position itself as

15  an intermediary, correct?

16  A.  Yes.

17  Q.  And so you couldn't pick -- you couldn't pick just one of

18  the dispensaries to have a merchant account, correct?

19  A.  At the early stage, no.

20  Q.  And so, because there were many of them, you would have

21  needed multiple descriptors too, correct?

22  A.  Yes.

23  Q.  And that was a problem.

24  A.  Yes.  At the beginning it wasn't set up where we could do

25  multiple.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1935

L3FAWEI4ps                    Patterson - Cross

1   Q.  So that was a logistical problem that you consulted with

2   Mr. Akhavan to try to work around.  Correct?

3   A.  Yeah.  Technical problem.

4   Q.  OK.  Technical.  And that's why you wound up with

5   Onlinebiller, correct?

6   A.  Well, no.  I would say -- maybe why we ended up with

7   Onlinebiller is, is a single one instead of having multiple

8   versions of Onlinebiller.

9   Q.  And it's a single one because you understand the descriptor

10  couldn't refer to any one dispensary, if it was only going to

11  be one descriptor, correct?

12  A.  Yes.

13  Q.  Because you had a lot of dispensaries.

14  A.  Yes.

15  Q.  And so you were concerned about having it say Eaze, because

16  Eaze wasn't the dispensary.  Right?

17  A.  When you say I was concerned, you mean --

18  Q.  The company.

19  A.  The company, yes.

20  Q.  The company was concerned.

21  A.  Yes.

22  Q.  And you were one of the officers of the company, right?

23  A.  Yes.

24  Q.  And so you were looking out for the company's interest at

25  the time.

L3FAWEI4ps                    Patterson - Cross

1    A.  Yes.  I was focused on the technical aspect.

2    Q.  And Onlinebiller was at least generic, that it didn't

3    specify one particular dispensary over another.  Right?

4    A.  Yes.

5    Q.  Now, at the time, or, rather, eventually, Eaze did change

6    its mind and put Eaze into the descriptor, right?

7    A.  There was -- there was a short period where one of the

8    descriptors was, I believe it was eazepayments.com.

9    Q.  Eaze Payments.  That was one of the descriptors that went

10   into effect in September 11, 2017?

11   A.  Yes.

12           MR. TAYBACK:  If you could put up just for the witness

13   Exhibit GX 432.

14   Q.  And do you recognize this as an -- do you recognize what

15   this is?

16   A.  Yes.  This is a -- this is a message to an application

17   called Slack, an internal chat.

18   Q.  Was Slack one of the platforms used for Eaze employees to

19   chat internally?

20   A.  Yes.

21   Q.  And the person who's communicating this to you is Dan

22   Erickson?

23   A.  Yes.

24   Q.  And he was an engineer, you said, correct?

25   A.  Yeah.  He was the head of engineering.

L3FAWEI4ps

1          MR. TAYBACK:  I offer Exhibit 432 in evidence.

2          MR. FOLLY:  Objection, hearsay.

3          MR. TAYBACK:  State of mind of the witness.

4          THE COURT:  All right.  I'll tell you what.  I think

5     on this one I want to hear from counsel.  So we are just a few

6     minutes away from our lunch break, so we'll give the jury their

7     lunch break so we don't have to go to the sidebar room.

8          So, ladies and gentlemen, we'll take our lunch break

9     now and we'll reconvene at a quarter to 2.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DJA1938

L3FAWEI4ps

1           (Jury not present)

2           THE COURT:  You may step down.

3           (Witness excused)

4           THE COURT:  So how does this relate to a relevant

5    aspect of the witness's state of mind?

6           MR. TAYBACK:  This witness has testified that he

7    believed he was committing bank fraud, and he'd gone through

8    extensive testimony in direct describing a lot of the different

9    things that happened and changes that occurred in the manner

10   that they tried to implement a solution for credit cards, not

11   all of which, I would say, are nefarious.  There are a lot of

12   complicated aspects to the process by which credit card

13   processing is done.  And the debate, the lengthy debate, over

14   whether Eaze or Ease could be in the descriptor or not involved

15   a lot of considerations that have nothing to do with alleged

16   fraud, including minimizing the chargebacks here, which he's

17   testified about a little bit, and the descriptors were

18   effectively changed as of September 2017 to use Eaze.  It

19   wasn't an effort to conceal the name Eaze.

20          THE COURT:  What is the question you would put,

21   assuming this exhibit were received, what is the question you

22   would put to the witness?

23          MR. TAYBACK:  I would say it's a couple questions.

24   The first one is, by September of 2017, you had decided that

25   you could use Eaze as the descriptor.  And he did.  And the

DJA1939

1640

L3FAWEI4ps

1     reasons that he ultimately did that are what we just described,

2     I believe, so I don't need to go back into that.

3              THE COURT:  So why do you need this exhibit at all?

4              MR. TAYBACK:  Because of the date, that it was

5     implemented as of September.

6              THE COURT:  Let me hear from the government.

7              MR. FOLLY:  Your Honor, I think this is classic

8     hearsay.  This is a statement by Dan Erickson, not Jim

9     Patterson.  It's completely unclear how the defendant is trying

10    to use this for state-of-mind evidence as to Jim Patterson, who

11    then makes a statement.

12             The line of cross that he wants to pursue, he's asked

13    questions along similar lines already, he can ask him factual

14    questions if he wants to get at this topic, but I think he's

15    trying to use statements that are made here by Dan Erickson for

16    their truth, which is just precluded.  It's not permissible

17    under the rules.

18             THE COURT:  So I will sustain the objection.  Usually

19    the state-of-mind exception to the hearsay rule is satisfied by

20    a -- I'm sorry -- forgive me.  Before I continue that, who is

21    the author?  This is by Dan Erickson.

22             MR. TAYBACK:  The author is Dan Erickson.  A recipient

23    is listed at the bottom, Mr. Patterson.

24             THE COURT:  So usually the state-of-mind exception is

25    for statements made by the witness or a defendant to show -- or

L3FAWEI4ps                    Patterson - Cross

1   any other person -- to show what's in their mind at the time.

2   So it's not received for the truth of what that person said but

3   to show what was in that person's mind.  Here we have not a

4   statement by Mr. Patterson but a statement by Mr. Erickson that

5   makes a strong statement, quote, we made this change to

6   mitigate some risk, etc., etc., and goes on at some great

7   length to what is his understanding, Mr. Erickson's

8   understanding, his theory, etc., etc.  So the mere fact that

9   Mr. Patterson was a recipient doesn't mean that this in any

10  way, shape, or form shows his state of mind.

11          Furthermore, even if it did, there would be a 403

12  problem, given the length and the complexity of this particular

13  document.

14          So the objection is sustained.

15          See you all in an hour.

16          (Luncheon recess)

17          (Continued on next page)

18              A F T E R N O O N   S E S S I O N

19                      1:50 p.m.

20          (Jury not present)

21          THE COURT:  How much longer do you have, Mr. Tayback?

22          MR. TAYBACK:  I'd say about an hour to an hour and ten

23  minutes.

24          THE COURT:  OK.

25  JAMES PATTERSON, resumed.

DJA1941

L3FAWEI4ps                    Patterson - Cross

1     (Jury present)

2          THE COURT:  I should note for the record that Juror

3    No. 6 took me up on my suggestion.  Excellent.

4          OK.  Counsel, go ahead.

5    CROSS EXAMINATION (Cont'd)

6    BY MR. TAYBACK:

7    Q.  Mr. Patterson, where we left off was, the use of the term

8    Eaze Payments as a descriptor came into use at some point,

9    correct?

10   A.  Yes.

11   Q.  And you would agree that Eaze Payments is not misleading,

12   in terms of describing the service that the customer used if

13   they had Eaze deliver marijuana to them.

14   A.  Yes.

15   Q.  But Eaze itself is not a synonym for marijuana, correct?

16   A.  It's not a synonym, no.

17   Q.  But you had worked to establish brand recognition?

18   A.  Yes.

19   Q.  And by 2017, would you say that Eaze, in your opinion, was

20   well known in California as a marijuana delivery service?

21   A.  Yes, within California.

22   Q.  But it otherwise doesn't necessarily mean, the word Eaze

23   doesn't necessarily mean marijuana, other than the fact of

24   brand recognition, correct?

25   A.  Yes, correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1942

L3FAWEI4ps                    Patterson - Cross

1  Q.  If I could direct your attention --

2          THE COURT:  You may be getting too deep into the weeds

3  here.

4          MR. TAYBACK:  I'm moving on, your Honor.

5  Q.  If you could direct your attention to GX 302, which is in

6  evidence, and if you could go to page 59 of that document.

7          This is part of the longer chat, called, I think it's

8  entitled "Easy Company Chat."  Do you recall that?

9  A.  Yes.

10  Q.  I'm going to direct your attention to a portion of this

11  chat that I believe you talked about on direct.  Mr. Wong, what

12  was his job?

13  A.  Wang.  He worked for Eaze.  He was the product manager

14  overseeing the payment process.

15  Q.  I apologize.  He pronounced it Wang?

16  A.  Wang.

17  Q.  He says, "I just looked at both websites and I am concerned

18  about chargebacks."  He says, "1.  The website is very product

19  specific.  Unlike GoodeGreenBazaar, visitors will immediately

20  think they were mischarged and issue a chargeback."

21          What did you understand Mr. Wang's concern to be

22  there?

23  A.  That the descriptor websites, the new ones that he was

24  talking about, that they, instead of being ones that looked

25  like more customer service-oriented websites, that they looked

DJA1943

L3FAWEI4ps                    Patterson - Cross

1   like stores, like e-commerce product-specific -- I think when

2   he says "product specific," he's talking about the fact that

3   these websites look like they're selling other types of

4   products, not marijuana, but other types of products.

5   Q.  And just to be clear, in terms of timing, this is now in

6   the early period of time we talked about when the descriptor,

7   either Online Billing or then Eaze Payments was used, this is

8   now later, after Clearsettle, correct?

9   A.  Yes.

10  Q.  And you have at this point different acquiring banks, and

11  the merchants all have their own accounts, correct?

12  A.  Say that again?

13  Q.  This is now the time period where the merchants themselves,

14  the dispensaries, all have their own accounts, correct?

15  A.  Well, the merchants didn't have the accounts.  They were

16  mapped from the dispensaries to these -- to things like

17  GoodeGreenBazaar, to these other accounts.  Yes.

18  Q.  This is during the period are of time when you had decided

19  that the dispensaries should deal directly with the banks.

20  A.  The dispensaries should deal directly with the processor,

21  not the banks.

22  Q.  With the processor, as opposed to Eaze doing it on their

23  behalf, right?

24  A.  Yes.

25  Q.  So this is now a later time period, correct?

**DJA1944**

L3FAWEI4ps                    Patterson - Cross

1  A.  Yes.

2  Q.  And Mr. Wang says, "unlike GoodeGreenBazaar, visitors will

3  immediately think they were mischarged and issue a chargeback."

4  Why did you understand him to say "unlike GoodeGreenBazaar"?

5  A.  Well, GoodeGreenBazaar was a previous descriptor website

6  that was used.  In that one, what it looked like was more of a

7  customer service page.  So what they would see on that website,

8  so if you went to GoodeGreenBazaar.com, would be fields to

9  enter in your credit card information, to essentially look up

10  your account.  And then when you looked up your account, it

11  would tell you that you had purchased on Eaze.

12          So he's saying unlike that, this one looks like a

13  store, as opposed to a customer service website.

14  Q.  So is it your understanding, was it your understanding at

15  the time that GoodeGreenBazaar seemed to have customers, were

16  able to recognize that it was an Eaze transaction and go to the

17  right location?

18  A.  Well, only if they either were cookied, so there was that

19  redirect where if they were an Eaze customer, they could be

20  automatically directed away from that website, or the website

21  would prompt them to enter in their credit card information or

22  order details, and then that would do the redirect.

23  Q.  And those are the things that were put in place in order to

24  make that happen, correct?  Cookies and redirection.

25  A.  Yes.

**DJA1945**

L3FAWEI4ps                    Patterson - Cross

1   Q.  And then if you go down, he says, "We had successful tests

2   for Organikals and Greenteacha."  Do you see that?

3   A.  Yes.

4   Q.  What did you understand that to mean?

5   A.  Just that they -- they're actual -- they were actually

6   functioning, in terms of, when they tested the credit card

7   transactions, those descriptors were coming across.

8   Q.  And you understood that those descriptors were going to be

9   set up the same way as GoodeGreenBazaar, correct?

10  A.  At this time I didn't -- I didn't know.

11          MR. TAYBACK:  You can take that down.  Thank you.

12  Q.  When you began working with Mr. Akhavan, were you familiar

13  with something called a merchant category code?

14  A.  Prior to working with him?

15  Q.  Yes.

16  A.  No.

17  Q.  So you learned about it after you began talking to

18  Mr. Akhavan.

19  A.  Yes.

20  Q.  Didn't Eaze experiment with using different merchant

21  category codes even before it began working with Mr. Akhavan?

22  A.  Not that I'm aware of.

23  Q.  When you began to work on determining a merchant category

24  code, what was your understanding of who decided what a

25  merchant category code should be?

**DJA1946**

1647

L3FAWEI4ps                    Patterson - Cross

1  A.  I actually didn't know.  I, I actually didn't know who

2  decided.

3  Q.  If you could take a look at the --

4          MR. TAYBACK:  The witness only, Exhibit 415, GX 415,

5  not in evidence.  If you could just show the whole document to

6  the witness.

7  Q.  Mr. Patterson, do you recognize this document?

8  A.  Yes.

9  Q.  What is it?

10 A.  It's an email between -- it's an email internally to Eaze,

11 it appears.

12 Q.  And is it, at least at the top, it's from someone to you?

13 A.  Yes.

14 Q.  You're a recipient of this email, correct?

15 A.  Yes.

16 Q.  And is the general subject matter of this email merchant

17 category coding?

18 A.  Yes.

19 Q.  I need you to read it to yourself.

20 A.  Yes.  It's MCC codes.

21         MR. TAYBACK:  You can take that down for a moment.

22 Q.  Now, in September of 2016, isn't it true that you had --

23 you indicated that you had been working, you, Eaze, had been

24 using a merchant category code called 6012?

25 A.  Yes.  That was the one -- one of the ones used early on.

DJA1947

1648

L3FAWEI4ps                    Patterson - Cross

1  Q.  And that was because it was a financial institution code,

2  correct?

3  A.  Well, I'm not sure if that's why we used.  That's just what

4  it was.

5  Q.  Well, didn't Eaze initially code its transactions so that

6  it could accept debit cards, and have to make cash for

7  customers, if they took 20 or 40 dollars out?

8  A.  I'm not sure.

9  Q.  Well, what's your recollection of who selected 6012 as an

10  initial code?

11  A.  I mean, my recollection was, it was selected by

12  Clearsettle.  I don't know -- I know I didn't select it.

13  Q.  Well, let me ask you this.  Isn't it true that after you

14  had some issues with 6012 as a merchant category code, that you

15  raised that issue with Mr. Akhavan?

16  A.  Well, I -- yeah -- well, we had issues.  I didn't realize

17  it was because of the merchant category code.  So I said we

18  were having these cash advance issues, and he said it's because

19  of the merchant category code.

20  Q.  And he in fact said that's the code you shouldn't be using;

21  I recommended a different code.  Correct?

22  A.  Well, he said if he -- you used the financial services

23  code, then some customers are going to get charged a cash

24  advance fee.  So you had to use a different code if you didn't

25  want that to happen.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1948

1649

L3FAWEI4ps                    Patterson - Cross

1   Q.  He said the code you should use is 8099.  Isn't that what

2   he recommended?

3   A.  I believe so, yes.

4   Q.  And he said it was a code that means medical miscellaneous,

5   not otherwise described?

6   A.  Yes.

7   Q.  And he said that he thought that would be the most accurate

8   code.  Correct?

9   A.  He did.

10  Q.  And in fact after that you did in fact employ using 8099,

11  correct?

12  A.  Well, again, to be clear, we didn't -- we can't set -- Eaze

13  could not set the code.  They set the code.

14  Q.  And by "they" you mean the acquiring bank, the merchant

15  bank, right?

16  A.  Well, from my perspective it's Clearsettle.  I didn't

17  know -- I was only communicating with Ray and Clearsettle.  I

18  don't know who actually set it beyond that.

19  Q.  You said you were communicating with Ray, Mr. Akhavan, and

20  Clearsettle.  Who else at -- did you believe was affiliated

21  with Clearsettle that you were communicating with?

22  A.  The -- Ozan and Hussein.

23        MR. TAYBACK:  If you could put up for the witness

24  Exhibit 302, at page 2203, using the Bates stamp in the lower

25  right-hand corner, 2203.

DJA1949

L3FAWEI4ps                    Patterson - Cross

1   Q.  This is that same chat, correct?

2   A.  Yes.

3   Q.  Now, later on, you had another issue with a merchant

4   category code in which "miscellaneous general merchandise" was

5   being used.  Do you recall that?

6   A.  No, I'm not sure of the issue with the code.

7   Q.  Let me take a look -- let me have you take a look at the

8   chat that you testified about previously, Exhibit 302, looking

9   at the bottom communications.

10          MR. TAYBACK:  Actually, if you go up one more

11  communication.

12  Q.  You see this communication where, in this chat, Mr. Akhavan

13  says, "Do you know what MCC is being used"?

14  A.  Yes.

15  Q.  And Mr. Erickson says, calls it an SIC.  Do you know what

16  an SIC is?

17  A.  I think of that as synonymous with MCC.

18  Q.  And he said it's 5399, miscellaneous general merchandise.

19  You see that?

20  A.  Yes.

21  Q.  Now, that's Mr. Akhavan asking someone at Eaze what MCC is

22  being used, correct?

23  A.  Yes, for a different processor.

24  Q.  For -- but it suggests that Mr. Akhavan is not the person

25  deciding what code to use, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1651

L3FAWEI4ps                    Patterson – Cross

1    MR. FOLLY:  Objection.

2    A.  No, not at all.

3    THE COURT:  I'm sorry.  When there's an objection, you

4    have to wait.

5    I might have sustained the objection, but in light of

6    the answer given I'll just let it go.

7    Q.  Mr. Akhavan responds to Mr. Erickson and says, "In case you

8    want or can implement it, we used 8099 after testing a lot of

9    MCCs, including 5399, and 8099 is by far the best."  Correct?

10   A.  Yes.  That's what he says.

11   MR. TAYBACK:  You can take that down.

12   Q.  When you worked for Eaze, when you were the chief

13   technology officer and then the CEO, Eaze distributed products

14   beyond just marijuana, correct?

15   A.  Yes.  If you -- depending how you define "marijuana."

16   Q.  Let me put it slightly differently.  It sold things like

17   rolling papers, correct?

18   A.  Yes.

19   Q.  It sold on occasion things like T-shirts or hats, things

20   like that?

21   A.  Yes.

22   Q.  And it sold creams and oils that didn't have the active

23   ingredient, THC, in it?

24   A.  Yes.  CBD.

25   Q.  CBD.  So some things that Eaze sold during the time that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1951

L3FAWEI4ps                    Patterson - Cross

1   you were executive there did not have marijuana in it.

2   A.  Correct.

3   Q.  And it's true, isn't it, that T-shirts and hats and rolling

4   papers are not illegal under federal law, correct?

5   A.  That's right.

6   Q.  Now, Eaze never tracked whether a customer was ordering a

7   marijuana product or a product that did not contain marijuana,

8   correct?

9   A.  No.  That was absolutely tracked.

10  Q.  And was there a different code used at all for that, if you

11  know?

12  A.  At different points -- at some points yes, some points no.

13  Q.  So at some points individual codes were determined based

14  upon the product that the customer bought?

15  A.  Well, at some point there was a separate processor for CBD.

16  CBD's legal status changed and we were able to get a merchant

17  account for CBD.

18  Q.  When was that?

19  A.  I believe at some point in 2019, but -- around then.

20  Q.  And did Eaze ever have a separate merchant account for and

21  other nonmarijuana product like the T-shirts, hats, rolling

22  papers?

23  A.  No.

24  Q.  So it's fair to say that the transactions that one would

25  look at between 2016 and 2019 would be processed the same

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1952

L3FAWEI4ps                    Patterson - Cross

1    whether or not a customer bought marijuana or bought just

2    rolling papers.

3    A.  Yes.

4    Q.  And that information, that is to say, the information about

5    what the customer bought, that was never to your knowledge

6    transmitted to any bank.  Correct?

7              MR. FOLLY:  Objection.

8              THE COURT:  Ground.

9              MR. FOLLY:  Foundation.

10             THE COURT:  All right.  Lay a foundation.

11   Q.  Do you know whether that information, actual products that

12   an individual customer bought, were ever transmitted from Eaze

13   to any bank?

14   A.  Not directly, but I believe it was transmitted to the

15   processor, and then what happened to it past that I can't speak

16   to.

17   Q.  So the processor -- explain to me if you can.  Eaze would

18   communicate with the processor the list of specific items that

19   an individual customer bought?

20   A.  I'm not sure that -- I'm not sure if that information was

21   transmitted to the processor.  I think --

22   Q.  You don't know one way or the other, correct?

23   A.  That's right.

24   Q.  I'm going to ask you whether you're familiar generally with

25   the application that a customer uses during the time that you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1953

L3FAWEI4ps                    Patterson - Cross

1    were there when they were to buy something from Eaze.  You're

2    generally familiar with that?

3    A.  Yes.

4         MR. TAYBACK:  Your Honor, I'd like to place in front

5    of the witness an exhibit that's not -- for identification a

6    document marked HAX10058.  It is not yet in evidence.

7    Q.  I'm going to ask you to take a look at this generally and

8    ask if you --

9         MR. TAYBACK:  If you could bring up the full page so

10   we can see the full document.  Thank you, Ray.

11   Q.  Do you recognize this as the terms of service that a

12   customer uses for Eaze?

13   A.  Yes.

14        MR. TAYBACK:  Your Honor, I offer Exhibit 10058.

15        MR. FOLLY:  Can we see the remaining portions of the

16   exhibit.

17        MR. TAYBACK:  Yes.

18        You could flip through it.

19        MR. FOLLY:  You can keep going.

20        You can keep going.  You can keep going.  You can keep

21   going.  You can keep going.  You can keep going.  You can keep

22   going.

23        Objection on relevance grounds.

24        THE COURT:  Overruled.

25        (Defendant's Exhibit HAX10058 received in evidence)

DJA1954

1655

L3FAWEI4ps                    Patterson - Cross

1   Q.  Mr. Patterson, before I ask you some specific questions

2   about this document, there was some testimony you gave on

3   direct about an inquiry that arose from an incident where

4   somebody under age used somebody's credit card, their parents'

5   credit card, to buy marijuana, correct?

6   A.  Yes.

7           I mean, that's what Ray told me.  I have no

8   independent information about that.

9   Q.  OK.  That was your understanding of what happened,

10  occurred, correct?

11  A.  Yes.

12  Q.  And Eaze's policy is to require identification for any

13  purchase, correct?

14  A.  Yes.

15  Q.  So it ensures the person who's purchasing is over -- is of

16  age, correct?

17  A.  Correct.

18  Q.  And that's true when it was medical marijuana and when it's

19  for all purposes, right?

20  A.  Yes.

21  Q.  And so your understanding of that incident isn't the fact

22  that the credit card was used, because -- it's the fact that

23  the person was under age.  Correct?

24  A.  Yes.  I mean -- yes, that would --

25  Q.  That was the issue.

DJA1955

L3FAWEI4ps                    Patterson - Cross

1   A.   That was the issue.

2   Q.   Because whether they paid cash or they paid credit card,

3   they still have to be of age to make the purchase.  Right?

4   A.   Yes.

5   Q.   Now, let me ask you a question about the terms of service

6   and how these would work.  When a customer goes on a website,

7   they're asked to agree to the terms of service before they can

8   make a purchase, right?

9   A.   Yes.  When they first sign up, there's a chat box where

10  they agree to the terms of service.

11  Q.   And if you go to the second page, there's an acknowledgment

12  of federal law and an acknowledgment of California law.  You

13  see that?

14  A.   Yes.

15  Q.   And you identify for the customers that there is this

16  tension between the federal law and state law regarding the

17  legality of marijuana?

18  A.   Yeah.  I mean, it called that out.

19  Q.   It generally identifies the two different states of the

20  law, correct?

21  A.   Yes.  It says illegal under federal law, legal under state

22  law.

23  Q.   Then if you go to page 5, you have some conditions that

24  individual consumers have to agree to, to use the application,

25  correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3FAWEI4ps                    Patterson - Cross

1   A.  Yes.

2   Q.  And the first one says, "You will only use the service or

3   application for lawful purposes; you will not use the services

4   for sending or storing any unlawful material or for fraudulent

5   purposes."  You see that?

6   A.  Yes.

7   Q.  And was it your understanding on behalf of Eaze that a

8   consumer making a purchase was not, to agree to that, was not

9   violating the law?

10          MR. FOLLY:  Objection.

11          THE COURT:  Sustained.

12  Q.  So is it fair to say, Mr. Patterson, that you expected

13  customers to make purchases in compliance with your terms and

14  conditions, notwithstanding the statements of federal and state

15  law you put in here in terms of use?

16  A.  Yes.

17          MR. TAYBACK:  You can take that down, Mr. McLeod.

18  Q.  Now, after a customer agrees with the terms of use, they

19  also identify their method of payment, right?

20  A.  They identify the method of payment when they do their

21  first checkout.

22  Q.  So they make an order, and then they determine how they're

23  going to pay, correct?

24  A.  Yes.

25  Q.  And at that point their order would be processed?

1658

L3FAWEI4ps                    Patterson - Cross

1    A.  Yes.

2    Q.  And Eaze would make the delivery, right?

3    A.  The dispensary would make the delivery.

4    Q.  And at some later point in time -- well, withdraw that.

5              And then later, the payment to Eaze, or the payment to

6    the dispensaries, to fulfill the order, would have to be

7    reconciled, correct?

8    A.  If it was not a cash transaction, yes.

9    Q.  And that reconciliation process was done by Eaze?

10             Let me withdraw that.

11             At any point in time, was that reconciliation process

12   done by Eaze?

13   A.  I'm not sure whether you're -- I'm not sure what

14   encompasses "reconciliation process."

15   Q.  I'll rephrase the question.

16             So during the period of time when the billing

17   descriptor was Eaze Payments -- remember that, in 2016, 2017 --

18   isn't it true that those credit card payments ultimately went

19   to Eaze, for Eaze to distribute to the dispensaries?  Correct?

20   A.  A couple of things.  The descriptor is only Eaze Payments

21   for about three months.  And so my knowledge, no payments were

22   ever made directly -- no credit card disbursements were ever

23   made directly to Eaze.  It always went to the dispensaries.

24   Q.  You agree that, in the beginning, a concern was that the

25   dispensaries themselves didn't have the direct relationship of

DJA1958

L3FAWEI4ps                    Patterson - Cross

1   the processors, correct?

2   A.  Sorry, can you rephrase it?

3   Q.  Sure.  At some point in 2018, you decided the dispensaries

4   themselves should have the relationship with processors,

5   correct?

6   A.  Yeah.  So after recreational, so once the dispensaries had

7   business licenses, then the company decided that they should

8   fill out an application -- they should directly fill out

9   merchant applications, yes.

10  Q.  And prior to that, they weren't filling out those

11  applications, right?

12  A.  No, because they were not -- they were considered

13  nonprofits and didn't have business licenses.

14  Q.  And so the proceeds from the sales, through the credit card

15  companies, before these individual dispensaries opened

16  accounts, went where?

17  A.  My understanding is the money went to the merchant accounts

18  in Europe and then was disbursed to the dispense -- directly to

19  the dispensaries' bank accounts.

20  Q.  Because as you are sitting now you don't -- you didn't have

21  any visibility in that process?

22  A.  No.  Well, I know that the money didn't come to Eaze.

23  Q.  But it was in fact important to you to make sure the

24  dispensaries got paid, correct?

25  A.  Yes.

L3FAWEI4ps                    Patterson - Cross

1   Q.  Because they were your provider of your products, correct?

2   A.  Yes.

3   Q.  And in fact one of your goals, in finding a credit card

4   solution, was to ensure that everybody involved got paid what

5   they were owed, correct?

6   A.  Yes.

7   Q.  That meant that Eaze would make some money for the service

8   it was providing, correct?

9   A.  Yes.

10  Q.  And the dispensaries would be paid for the products they

11  were providing, correct?

12  A.  Yes.

13  Q.  And the consumers would get the products that they were

14  providing, or that they requested, correct?

15  A.  Yes.

16  Q.  And the banks and intermediaries in between would get the

17  percentages that they take under their agreement, correct?

18  A.  Yes.

19  Q.  You never intended to cause anyone to lose any money,

20  correct?

21  A.  That's right.

22  Q.  And to your knowledge, no one did lose any money on the

23  credit card purchases.  Correct?

24  A.  Correct, to my knowledge.

25  Q.  Now, you've talked a little bit about Clearsettle, and I

DJA1960

L3FAWEI4ps                    Patterson - Cross

1   think you said that you have identified it as being

2   Mr. Akhavan?

3   A.  Well, that was how it was explained to me, mostly through

4   Keith.  Keith just told me that we are working with Clearsettle

5   and that he -- the way he sort of described that was, that was

6   Ray.

7   Q.  And have you ever described Clearsettle as being just a

8   gateway?

9   A.  A payment gateway, yes.

10          MR. TAYBACK:  You could put up Exhibit 435 just to

11  this witness.

12  Q.  Do you recognize this document?

13  A.  Yes.

14  Q.  What is this?

15  A.  This is a Slack conversation within Eaze.

16  Q.  Before I ask you some questions about that, you've talked

17  about some various platforms on which people communicate.  I

18  think you've referred to Slack a couple times.  That's a

19  communication platform?

20  A.  Yes.  Internal only.

21  Q.  It was internal to Eaze, correct?

22  A.  Yes.

23  Q.  And then does -- did you also use a company called Facebook

24  Messenger?

25  A.  Yes.

1662

L3FAWEI4ps                    Patterson - Cross

1    Q.  It was also a platform for communicating internally?

2    A.  Internally, yes.

3    Q.  And I think you said you used Telegram, too, correct?

4    A.  Telegram is for external.

5    Q.  And you have used -- in fact your understanding was that

6    Telegram was something that was not uncommon in the cannabis

7    industry, right?

8    A.  That's right.

9    Q.  So before Mr. Akhavan, you were aware of Telegram, correct?

10   A.  Yes.

11   Q.  And Mr. Akhavan told you that he travels abroad a lot?

12   A.  He does, yes.

13   Q.  And did he tell you that Telegram was better for him when

14   he traveled abroad than other communication platforms?

15   A.  Yeah, better than -- better than text message, yes.

16   Q.  Now, you've talked about, briefly you've talked about the

17   fact that you can delete or auto-delete certain accounts on

18   Telegram.  Did you ever delete your accounts?

19   A.  Well, my account was automatically deleted because I

20   stopped using it for a year.

21   Q.  And to your knowledge, do you know whether Mr. Akhavan ever

22   deleted any of his communications with you?

23   A.  Well, there was a -- Telegram did have a feature called

24   "self-destruct timer," and during some conversations he did set

25   the self-destruct timer, which would automatically delete

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1962

L3FAWEI4ps                    Patterson - Cross

1    certain messages after a period of time, say a day or a week.

2    So sometimes that was used.

3    Q.  And that chat feature that you just described, is that

4    something that you saw at all in any of the chat messages that

5    you looked at?

6            That is to say, you looked at Telegram messages

7    earlier, correct?

8    A.  Yes.

9    Q.  And those appeared to be complete to you?

10   A.  Yes.  That particular feature is only available in one to

11   one, not group conversations.

12   Q.  And have you done anything to try to retrieve those chats

13   in any way?

14   A.  My phone was imaged by the company.

15   Q.  And have you done anything to see whether you still have

16   those chats?

17   A.  I logged into my Telegram account, and it's gone -- and

18   it's been deleted.

19   Q.  So when you say that was set, did you say anything to

20   Mr. Akhavan about setting this timer?

21   A.  Say that again?

22   Q.  Did you say anything to Mr. Akhavan about not -- this timer

23   when he told you that you were going to set a timer to delete

24   messages?

25   A.  Well, he didn't tell me.  He would just -- when you set it,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1963

1664

L3FAWEI4ps                    Patterson - Cross

1  the other person can see that it was set on particular

2  messages.  We never discussed the setting of it.

3          (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1964

L3FPWEI5                    Patterson - Cross

1   Q.  But you didn't ask.  You saw it, but you didn't ask?

2   A.  I saw it, and I didn't ask.

3   Q.  The messages, how often would you say he did that?

4   A.  It's hard to say.  Periodically.

5   Q.  But none of the messages that you've seen today were ever

6   subject to that deletion policy --

7   A.  That's correct.

8   Q.  -- is that correct?

9           Now, let me ask you to take a look at this Exhibit

10  435.  You're communicating here internally with people about

11  credit card processing issues?

12  A.  Yes.

13  Q.  If you could look at the middle box.  Withdraw that.

14          These messages read from top to bottom, correct,

15  unlike an e-mail?

16  A.  Yes.

17  Q.  Do you see there's a message from a person named Stef

18  VanDyke; do you see that?

19  A.  Yes.

20  Q.  Who is that?

21          MR. FOLLY:  Objection.  Not in evidence.

22          MR. TAYBACK:  I'll rephrase the question.

23  Q.  Who is Stef VanDyke?

24  A.  She was an Eaze employee who worked with the dispensaries.

25  Q.  This e-mail -- withdraw that.

DJA1965

1666

L3FPWEI5                    Patterson - Cross

1    MR. TAYBACK:  Your Honor, at this time, I'd offer

2    Exhibit 435 in evidence.

3    MR. FOLLY:  Objection.  Hearsay.

4    MR. TAYBACK:  Witness state of mind.

5    THE COURT:  Well, the statements of the witness might

6    be admissible to show his state of mind, but I don't see the

7    relevance of this state of mind to anything in the case.

8    MR. TAYBACK:  Let me ask a few more questions, your

9    Honor, if I may.

10   THE COURT:  Okay.

11   BY MR. TAYBACK:

12   Q.  Do you recall in late 2017, approximately, a discussion

13   about whether the dispensaries would be receiving the

14   settlements from Clearsettle, or whether they would go through

15   Eaze?

16   A.  No.  I mean, there was never any point that it was even

17   considered that payments -- settlements would go through Eaze.

18   Q.  Who is Marty?

19   A.  Marty is -- was the owner of Hometown Heart, which was one

20   of Eaze's dispensaries.

21   Q.  And do you recall being asked whether Marty at Hometown

22   Heart wanted to know who to hold accountable if they're not

23   getting paid, correct?

24   A.  Yes.

25   Q.  And isn't it true that your answer was:  We're responsible?

L3FPWEI5                    Patterson - Cross

1   Eaze is responsible; Clearsettle is just a gateway?

2   A.  Well, so there's a bit of confusion here in that

3   Clearsettle was a term that was used to describe everything,

4   but that there was also a Clearsettle that was actually a

5   company that was actually a payment gateway.

6        The problem was Marty was contacting Clearsettle, the

7   payment gateway, and that is true that they were not

8   responsible for the actual settlements.  So when we say we're

9   responsible, it's just that we wanted the dispensaries to

10  coordinate with us rather than them reaching out directly to

11  Clearsettle, which they didn't understand was just the

12  technical payment -- it actually, technically, was the payment

13  gateway.

14  Q.  So it is true, isn't it, that when you were asked in

15  December of 2017 who the dispensaries should contact regarding

16  ensuring payment, that they are paid timely, you said, you

17  should contact Eaze, not Clearsettle; they're just a gateway,

18  correct?

19  A.  Yes.

20  Q.  Now, you talked a little bit on direct about the

21  alternatives beyond the credit card processing arrangements

22  that Mr. Akhavan introduced you to; do you recall that?

23  A.  Yes.

24  Q.  You said that you had looked at dozens of alternatives?

25  A.  Yes.

DJA1967

1668

L3FPWEI5                         Patterson - Cross

1    Q.  I'm going to ask you about a few of them.  There is a

2    company called Icanpay; you used them?

3    A.  Yes.

4    Q.  They're an Asian acquiring bank, aren't they?

5    A.  Yes.  Yeah, the bank was based in Asia.

6    Q.  You didn't have any concern using a bank that was based

7    outside the United States, correct?

8    A.  Well, we were already using a bank in Europe; so, no.

9    Q.  So you did not, correct?

10   A.  I wouldn't say no, there were no concerns.

11   Q.  What were your concerns?

12   A.  Well, for one, we were not having visibility; and two, the

13   regulation overseas, that was a big one.  Our preference was to

14   find a U.S. bank -- a U.S. processor and U.S. bank, but this

15   particular one happened to be in Asia.

16   Q.  And you were hoping that it would work regardless of where

17   it was located, correct?

18   A.  Yes.

19   Q.  And did you ask them what merchant name they would use to

20   process these transactions?

21   A.  Well, this one, John Wang was doing most of the work.  I

22   know they had a descriptor.  I just don't remember what it was

23   in this case.

24   Q.  And do you know what merchant category code they were

25   using?

L3FPWEI5                    Patterson - Cross

1   A.  I don't know.

2   Q.  You weren't worried about that being a crime at that point

3   in time, correct?

4   A.  No, not at that point.

5   Q.  And, in fact, ultimately, that didn't work out, right?

6   A.  That's correct.

7   Q.  They were unsuccessful in terms of being able to process

8   the credit card transactions that Eaze had hoped?

9   A.  Yes.

10  Q.  Was currency conversion also an issue that you had to deal

11  with?

12  A.  The only time I remember doing currency conversion was with

13  the EUprocessing setup.

14  Q.  When Icanpay ceased working, were there monies still being

15  held by Icanpay?

16  A.  Either Icanpay or the banks.  The money was with -- the

17  reserves were withheld.

18  Q.  You mentioned the word "reserves;" what are reserves?

19  A.  Reserves are money that either a bank or processor

20  withholds, usually about ten percent of the transactions, to

21  cover any future chargebacks or fraud or other issues.  It's a

22  standard thing in payment processing, to my understand.

23  Q.  Now, when Eaze was processing through Clearsettle, did

24  Clearsettle insist on having reserves?

25  A.  Yes.

DJA1969

L3FPWEI5                    Patterson - Cross

1   Q.  Who paid for those reserves?

2   A.  Well, there was money withheld that was owed to the

3   dispensaries.

4   Q.  So when they first started, there were no reserves until

5   money accumulated; is that your understanding?

6   A.  Yes.

7   Q.  And then when the processing changed and moved to other

8   banks and entities in 2018, did those banks require reserves?

9   A.  Yes.

10  Q.  And how were those reserves funded?

11  A.  The same way.  They withhold a percentage of the payments

12  on a rolling basis.

13  Q.  But it's your understanding that there were no reserves

14  when they first began processing until they began to make

15  sales?

16  A.  Yes, that's right.  The reserves come from the -- come from

17  withholding the processing; so at the very beginning, it's

18  zero.

19  Q.  Did Mr. Akhavan ever tell you that he had used his other

20  businesses to collateralize reserves so that Eaze could access

21  these banks?

22  A.  Yes, he did say that.

23  Q.  So your understanding is there was a reserve available, and

24  Mr. Akhavan personally had placed it up through other

25  businesses he had?

**DJA1970**

L3FPWEI5                    Patterson - Cross

1   A.  Well, I'm not sure why you need a reserve when you weren't

2   processing, but he did say at times that when sometimes

3   reserves were withheld, that he used his other businesses to --

4   as collateral so that the Eaze merchants could get paid.

5   Q.  Now, other companies that you looked at were a company

6   called CardConnect, correct?

7   A.  Yes.

8   Q.  And they were based in the United States?

9   A.  Yes.

10  Q.  And that was not a successful solution for Eaze, correct?

11  A.  Correct.  About a month into processing, those accounts

12  were frozen.

13  Q.  And then 3Rodeo that was another solution?

14  A.  That one, I'm not familiar with.

15  Q.  How about Perfect Processing?

16  A.  Sounds familiar.  Possibly our CBD processor.

17  Q.  And how about Mile High Risk?

18  A.  Yes, Mile High Risk.

19  Q.  And did you use them?

20  A.  I think they were CBD, as well.

21  Q.  So you may have used them for CBD?

22  A.  Yes.

23  Q.  But is it safe to say that before you went back to using

24  the relationships that Mr. Akhavan had, that ultimately your

25  exploration of other alternatives were unsuccessful?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3FPWEI5                    Patterson - Cross

1   A.  Well, when we decided to go back, we actually were

2   processing with Icanpay.  After -- it got shut down after we

3   had sort of made the decision to start processing again.

4   Q.  Now, just to understand the timing.  I believe you said

5   that marijuana was legalized for all purposes effective

6   January 1st of 2018 in California, correct?

7   A.  Yes.

8   Q.  And at that time, you were anticipating -- well, withdraw

9   that.

10          At that time, you had to pause all credit card

11  processing because the dispensaries largely weren't licensed,

12  correct?

13  A.  Yes.

14  Q.  So they needed time to become licensed under this new

15  regime?

16  A.  Yes, they needed time.

17  Q.  And your idea to have the dispensaries have the

18  relationships directly with the processors, why did you do

19  that?  Why did you want that to happen?

20  A.  I'm not sure I can answer.  It wasn't necessarily my -- it

21  wasn't my decision.

22  Q.  But it wasn't Mr. Akhavan's decision?

23  A.  No, it wasn't his decision.

24  Q.  So someone else you were consulting with provided

25  information to you that led you to want to do it that way,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**DJA1972**

L3FPWEI5                    Patterson - Cross

1   correct?

2   A.  Yes.

3   Q.  And, in fact, when you raised it with Mr. Akhavan, his

4   response was, it's up to you what you want to do, yes?

5   A.  In terms of dispensaries filling out the applications or

6   not?

7   Q.  Yes.

8   A.  Yes.

9   Q.  And he said, if you want to do it that way, that's fine,

10  and if you want to do it through Eaze, that's fine, too,

11  correct?

12  A.  Yes.

13  Q.  He was leaving those decisions to you, as the CEO of Eaze,

14  correct?

15  A.  To the company, yes.

16  Q.  And you were the CEO at that time?

17  A.  Yes.

18  Q.  Now, you mentioned a meeting that occurred in early 2018 at

19  Mr. Akhavan's office.  Now, we saw an invitation that said

20  "Clearsettle meeting;" do you recall that?

21  A.  Yes.

22  Q.  That was an invitation that you had sent out, correct?  You

23  organized that meeting?

24  A.  Yeah, that particular calendar invitation was just for me

25  and Nick.  That wasn't what was sent out to the dispensaries.

DJA1973

L3FPWEI5                    Patterson - Cross

1   Q.  But the calling it a Clearsettle meeting, those were your

2   words, correct?

3   A.  Yes.

4   Q.  It wasn't Mr. Akhavan who sent that out, right?

5   A.  No.

6   Q.  And when you went to Mr. Akhavan's office for that early

7   meeting, or any meeting, you never saw any branding that

8   suggested Clearsettle was located there, correct?

9   A.  No.

10  Q.  Now, in a subsequent meeting, you indicated that

11  Mr. Akhavan had insisted that the dispensaries all have a

12  representative there, right?

13  A.  Yes.

14  Q.  You understood that he wanted to be able to explain to them

15  firsthand that if they were going to be the merchants of

16  record, that they needed to understand the whole process,

17  correct?

18  A.  Well, they were not going to be the merchants of record.

19  Q.  They were going to be the merchants who ultimately

20  benefited from the credit card processing, correct?

21  A.  Yes.

22  Q.  And so he explained that they needed to fill out the

23  applications for the bank accounts, correct?

24  A.  Yes.

25  Q.  And that's with the acquiring banks?

DJA1974

L3FPWEI5                          Patterson - Cross

1  A.  Yes.

2  Q.  The merchant banks you called them?

3  A.  Merchant banks.

4  Q.  And he said they need to be truthful, correct?

5  A.  He did.

6  Q.  And he explained how merchant category codes work?

7  A.  Yes.

8  Q.  And he explained how descriptors work?

9  A.  Yes.

10  Q.  And he explained again at that time to try to pick a

11  merchant category code or make sure to pick a merchant category

12  code that was closest to what describes what they do, right?

13  A.  He said that the ones he -- yes, the ones he used were the

14  closest because they were just generic medical services.

15  Q.  And around this time, you also had decided that you weren't

16  going to continue to use Clearsettle, right?

17  A.  Around the time of this meeting?

18  Q.  Yes.

19  A.  Well, no.  I'm not sure what you mean.

20  Q.  Well, at some point, I think you used to use the term

21  EUprocessors?

22  A.  I never used that term, no.

23  Q.  You never used the term EUprocessors?

24  A.  Well, so this whole -- the reason I even made the meeting

25  called Clearsettle meeting was because I was still under the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1975

1676

L3FPWEI5                    Patterson - Cross

1    impression that the setup was going to be the same as it was.

2    When things actually started working, it was clear that it was

3    different.  The API was different, and the e-mail that was set

4    up for the dispensaries, it was just called EUprocessing.  So

5    we just started calling it that.

6    Q.  When you say the API is different, what's the API?

7    A.  So that is the -- the technical endpoint that we were --

8    that Eaze's system was talking to, the gateway.  So it was no

9    longer Clearsettle's gateway.

10   Q.  One thing you were anticipating in this new arrangement is

11   that there would be multiple merchants who needed to get

12   applications on file, correct?

13   A.  Yes.

14   Q.  As opposed to one.  And that there were going to be a

15   larger volume of sales because marijuana had been legalized

16   more broadly in California, correct?

17   A.  Well, actually, the volumes of sales was lower,

18   substantially lower, because of the licensing issues.  It

19   really didn't reach parity for about a year into recreational.

20   Q.  Your expectation was that however long it would take, it

21   would become more because it was broadly legal?

22   A.  Yes, over time.

23   Q.  And that's what you were anticipating when you decided to

24   implement this new credit card solution in 2018?

25   A.  Well, I don't think the growth had anything to do with it.

L3FPWEI5                    Patterson - Cross

1   Q.  Did you ever ask why you seemed to be dealing with a

2   different processor?

3   A.  No.  At that point, I didn't ask any questions.

4   Q.  You talked about --

5           MR. FOLLY:  May I have one moment, your Honor?

6           THE COURT:  Okay.

7   Q.  You described how you felt threatened by Mr. Akhavan; do

8   you recall that?

9   A.  Yes.

10  Q.  You never saw Mr. Akhavan strike anybody, correct?

11  A.  That's correct.

12  Q.  You never saw Mr. Akhavan brandish a weapon of any sort,

13  correct?

14  A.  I never saw that, no.

15  Q.  In fact, Mr. Akhavan, would you say, is about

16  five-foot-nine?

17  A.  Yes, something like that.

18  Q.  About 150 pounds or so?

19  A.  Yes.

20  Q.  You found him intimidating, though, correct?

21  A.  Yes.

22  Q.  Did you ever report to anybody, the board of directors or

23  anybody, at Eaze that you thought Mr. Akhavan was intimidating

24  and you weren't comfortable doing business with him?

25  A.  I did say that I wasn't comfortable doing business with

L3FPWEI5                    Patterson - Cross

1  him.  I didn't say that -- I didn't tell the board that I had

2  been directly threatened.

3  Q.  Well, you say you were directly threatened.  Did

4  Mr. Akhavan -- when Mr. Akhavan -- can we put up that text, if

5  you can?  Put up the Exhibit 301.

6          Do you see this exchange that you have, that you

7  talked about on direct?

8  A.  Yes.

9  Q.  Shortly after this, in fact, the processing that you were

10  doing with other merchants was, in fact, shut down, correct?

11  A.  Yes.

12  Q.  And that was to your detriment, correct, the company's?

13  A.  We had other ones.  Icanpay shut down, and we started with

14  CardConnect.

15  Q.  And didn't Mr. Akhavan essentially tell you if you wind up

16  doing it with these other companies, that it could cause

17  problems?

18  A.  No.  I mean -- no.

19  Q.  Take it down.  He told you that if you deal with other

20  companies that are going to lie to the banks about what's

21  happening, that it's going to cause problems for your ability

22  to process going forward, correct?

23  A.  Well, he said -- yes, he said if -- what he said was if you

24  lie to the merchant banks, then they could seize your funds,

25  seize your reserve.

DJA1978

1679

L3FPWEI5                         Patterson - Cross

1  Q.  And that's, in fact, what happened, correct, with Icanpay?

2  A.  The funds were seized, yes.

3  Q.  Let me ask you some questions about your guilty plea.  So

4  when you heard that this case was charged, that was in March of

5  2020?

6  A.  Yes, March.

7  Q.  And you learned and you realized Mr. Akhavan had been

8  charged with bank fraud, conspiracy to commit bank fraud,

9  correct?

10  A.  Yes.

11  Q.  You didn't go to the government in March of 2020 and say

12  I've got information that's relevant to this, correct?

13  A.  Actually, I had my attorney reach out to them, yes.

14  Q.  But you didn't talk to the government in March, correct?

15  A.  No, I didn't.

16  Q.  You didn't talk to them in April?

17  A.  No.

18  Q.  You didn't talk to them in May?  Didn't talk to them in

19  June?

20  A.  No.

21  Q.  You didn't talk to them until October, correct?

22  A.  That's correct.

23  Q.  And the first time you talked to them was about four --

24  about five months ago now, correct?

25  A.  Six, yes.

**DJA1979**

L3FPWEI5                         Patterson – Cross

1   Q.  Isn't it fair to say that your first reaction when you

2   learned that the case had been charged, is that you don't want

3   to be implicated, correct?

4   A.  No, I wouldn't say that's fair to say, I don't want to be

5   implicated.

6   Q.  Was one of your first thoughts that you didn't want to go

7   to jail?

8   A.  Yes.

9   Q.  And one of your other thoughts is you really don't like Ray

10  Akhavan; so you're happy to see him go to jail?

11          MR. FOLLY:  Objection.

12  A.  No, I don't think that's true.  I'm not happy to see anyone

13  go to jail.

14  Q.  Well, it's true that you don't like him, correct?

15  A.  No, that's not true.

16  Q.  So when you agreed to plead guilty in this case, that

17  wasn't in October of 2020, correct?

18  A.  Sorry, say that again?

19  Q.  I'll withdraw it.

20          You agreed to plead guilty in this case on

21  January 25th of 2021, correct?

22  A.  Around then.

23  Q.  So you had been speaking to the government in October,

24  November, December and part of January, correct?

25  A.  Yes.

DJA1980

L3FPWEI5                    Patterson - Cross

1   Q.  All before you decided to actually plead guilty; is that

2   right?

3   A.  Yes.

4   Q.  And your guilty plea is subject to an agreement under which

5   you are hoping to get probation, right?

6   A.  Yes.

7   Q.  And you understand that one measure of your level of

8   cooperation is how you perform at trial, right?

9   A.  No, I wouldn't say that, how I perform.

10  Q.  You understand that it's the government that you've given

11  all your statements to, correct?

12  A.  Yes.

13  Q.  And it's the government that's going to make a

14  recommendation on your behalf if they believe that you're being

15  truthful, correct?

16  A.  I mean, my understanding is that I have to be -- I have to

17  be truthful, and they will make the recommendation.

18  Q.  And in terms of deciding whether you have been truthful or

19  not, you understand that the government's going to assess that?

20  A.  I mean, I'm just thinking about telling the truth.  It's

21  hard to say who's assessing the truth.

22  Q.  Now, one aspect of your plea agreement was not that you had

23  to forfeit any of the stock that you own in Eaze, correct?

24  A.  No, my understanding is that will be determined at

25  sentencing.

DJA1981

1682

L3FPWEI5                    Patterson - Cross

1  Q.  But no one has told you you have to forfeit the stock that
2  you own in Eaze, correct?
3  A.  No, not at this time.
4  Q.  And, in fact, you're hoping that Eaze goes on to become a
5  very successful company?
6  A.  I am.
7  Q.  That would inure to your benefit, right?
8  A.  Yes.
9  Q.  Your financial benefit?
10 A.  Yes.
11 Q.  Because you own 1.5 percent of the company, correct?
12 A.  Yes.
13         MR. TAYBACK:  May I have one moment, your Honor?
14         THE COURT:  Yes.
15         (Pause)
16         MR. TAYBACK:  I do have a couple more questions, but
17 they're brief.
18 BY MR. TAYBACK:
19 Q.  Mr. Patterson, at some point in time, you've said that
20 Mr. Akhavan had an obsession with customer service?
21 A.  Well, I think the obsession was around keeping chargebacks
22 low.
23 Q.  And we've talked about chargebacks; so I'm going to focus
24 on the customer service component.
25         It was Mr. Akhavan's idea to ensure that there were

DJA1982

L3FPWEI5                         Patterson - Cross

1   cookies that would redirect a customer, regardless of whatever

2   descriptor was used, that would redirect the customer himself

3   or herself to the Eaze website, correct?

4   A.  Was it his idea?

5   Q.  Was it?

6   A.  I actually don't know whose idea that was.

7   Q.  And the telephone number is intended to link -- the numbers

8   would be directed to the Eaze customer service office, right?

9   A.  In the second EUprocessing phase, yes.

10              MR. TAYBACK:  I have no more questions.

11              THE COURT:  All right.  Thank you very much.

12              Mr. Gilbert?

13  CROSS-EXAMINATION

14  BY MR. GILBERT:

15  Q.  Mr. Patterson, you testified that you started working at

16  Eaze in 2016, correct?

17  A.  Yes.

18  Q.  May of 2016?

19  A.  May, yes.

20  Q.  Eaze was an all-cash business at that time?

21  A.  That's correct.

22  Q.  You were there before they started taking any credit cards,

23  correct?

24  A.  Yes.

25  Q.  And you were there when Eaze first started accepting credit

DJA1983

L3FPWEI5                    Patterson - Cross

1   cards in 2016, correct?

2   A.  Yes.

3   Q.  And you've testified that that was done, to your knowledge,

4   using merchant accounts in Europe, correct?

5   A.  Yes.

6   Q.  And it was your understanding that the merchant banks in

7   Europe understood that the accounts were for marijuana,

8   correct?

9   A.  That at least some people at the banks knew, yes.

10  Q.  The powers that be at those merchant banks in Europe knew

11  that they were dealing with marijuana transactions, correct?

12  A.  Yes, the -- but what it was, the owners or executives.

13  Q.  And that system was in place in 2016, correct, a

14  Clearsettle system, as you've called it?

15  A.  Yes.

16  Q.  And in 2017?

17  A.  Through 2017.

18  Q.  And in that time period, you were promoted to the CEO of

19  the company, correct?

20  A.  It wasn't exactly a promotion.

21  Q.  Well, you were -- you were in a position that was lower

22  than the chief executive officer of the company, correct?

23  A.  Yes.  I was sort of the interim CEO.  I mean, the agreement

24  with the board.  It wasn't, in my mind, a promotion.

25  Q.  There's no higher position than the CEO of Eaze, correct?

DJA1984

1685

L3FPWEI5                    Patterson - Cross

1   A.  Sure, if you want to say "higher," but it...

2   Q.  And, Mr. Patterson, to the best of your knowledge, my

3   client, Ruben Weigand, had no involvement whatsoever with Eaze

4   credit card processing in 2016 or 2017, correct?

5   A.  That's correct.

6   Q.  The entire time the processing was done through

7   Clearsettle, you, sir, never spoke a word to Mr. Weigand,

8   correct?

9   A.  That's right.

10  Q.  And you had no communications of any kind with Mr. Weigand,

11  correct?

12  A.  Correct.

13  Q.  And to the best of your knowledge, not a single person at

14  Eaze had any contact in any form with my client, Ruben Weigand,

15  during the entire period Eaze was processing through

16  Clearsettle in 2016 and 2017; is that correct?

17  A.  Yes, that's correct.

18  Q.  And you became the CEO in December of 2016; is that

19  correct?

20  A.  Yes.

21  Q.  And while you were the CEO, it was important for you to

22  understand who it was the company was dealing with in important

23  relationships, correct?

24  A.  Yes.

25  Q.  It was important to know who the vendors were to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1985

1686

L3FPWEI5                    Patterson - Cross

1    company, correct?

2    A.  Yes.

3    Q.  Who the service providers were, correct?

4    A.  Yes.

5    Q.  And the consultants, correct?

6    A.  Yes.

7    Q.  And credit card processing was absolutely critical to the

8    business of the company, was it not?

9    A.  Yes.

10   Q.  A significant amount of the company's revenues were

11   generated through credit cards, correct?

12   A.  Yes.

13   Q.  In fact, there was a period of time you testified about

14   where the credit card processing stopped and the revenues

15   tumbled, didn't they?

16   A.  Yes, it would drop around 60 percent.

17   Q.  60?  I'm sorry, did you say 60 percent?

18   A.  Six-zero.

19   Q.  And in 2018, you testified that Eaze switched its credit

20   card processing mechanism to some extent, correct?

21   A.  Yes.  Well, we reengaged it.  It was a different setup the

22   second time.

23   Q.  And that started in approximately 2018?

24   A.  Yes.

25   Q.  And that -- have you referred to that as EUP?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1986

1687

L3FPWEI5                    Patterson - Cross

1  A.  Yeah, EUprocessing.

2  Q.  And that EUprocessing was used, to your knowledge, from

3  approximately April of 2018 through the time you left the

4  company in 2019; is that correct?

5  A.  No, not until I left the company.  We stopped working with

6  EUprocessing in June of 2019.

7  Q.  So it ran from approximately April of 2018 to approximately

8  June of 2019?

9  A.  Yes.

10  Q.  And when did you leave the company?  Was it June of 2019?

11  I'm sorry.

12  A.  In September of 2019.

13  Q.  And in all the time that you were the CEO of the company

14  while Eaze was using the EUP processing, it's true, is it not,

15  that you never spoke to Ruben Weigand?

16  A.  That's right.

17  Q.  You never met Ruben Weigand?

18  A.  No.

19  Q.  When the government asked you, on direct examination, to

20  point to anyone in the courtroom who worked with you in what

21  you say was a bank fraud, you did not identify Ruben Weigand;

22  is that correct?

23  A.  That's correct.

24  Q.  And to the best of your knowledge, Ruben Weigand was never

25  an employee of Eaze, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1987

1688

L3FPWEI5                     Patterson - Cross

1  A.  Correct.

2  Q.  He was never paid any money by Eaze for any services,

3  correct?

4  A.  Not to my knowledge.

5  Q.  Or for anything at all, correct?

6  A.  Correct.

7  Q.  To the best of your knowledge, Ruben Weigand never owned a

8  share of stock in Eaze?

9  A.  Correct.

10  Q.  To the best of your knowledge, Ruben Weigand never had any

11  stock options in Eaze, correct?

12  A.  Correct.

13  Q.  And to the best of your knowledge, Ruben Weigand never had

14  any kind of agreement with Eaze of any kind, correct?

15  A.  That's correct.

16  Q.  Now, you've testified on direct examination you believed

17  you were committing bank fraud from 2016 to 2019; is that

18  correct?

19  A.  No, I would say I believed -- it's hard to say exactly when

20  I started -- when I new for sure, but certainly before I left

21  the company.

22  Q.  What did you plead guilty to, sir?

23  A.  I'm saying I knew before I left the company.  Just, you're

24  saying from 2016 to 2019.

25  Q.  Yeah, no, my question is, in 2016, did you believe you were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1988

L3FPWEI5                    Patterson - Cross

1  engaged in the crime of bank fraud --

2  A.  No.

3  Q.  -- for your work at Eaze?  You did not?

4        Did you plead guilty to conspiracy to commit bank

5  fraud in the year 2016, to your knowledge?

6  A.  I'm not sure about the -- I'm not sure if it's scoped to a

7  specific --

8        THE COURT:  I think we may need a sidebar unless you

9  want to go on.

10        MR. GILBERT:  I'll move on, your Honor.

11  BY MR. GILBERT:

12  Q.  Did you believe you were committing bank fraud in the year

13  2017?

14  A.  I'd say I knew for sure in 2018.

15  Q.  You believed as of 2018, you were involved in bank fraud?

16  A.  Yes.

17  Q.  And what was it that made you come to that conclusion?

18  A.  Well, I mean, as I said, there were a lot of red flags,

19  things building up to that.  I would say the meeting at Ray's

20  office with the dispensaries, after that meeting, removed any

21  lingering doubts for me.

22  Q.  The meeting that you testified about in March of 2018,

23  correct?

24  A.  Yes.

25  Q.  Okay.  So before that meeting in March of 2018, you've

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1989

L3FPWEI5                    Patterson - Cross

1    testified that you felt that you were threatened by

2    Mr. Akhavan, correct?

3    A.  Yes.

4    Q.  And you considered telling your wife that you felt

5    threatened, but you decided against that, correct?

6    A.  Yes.

7    Q.  Because you didn't want to frighten her?

8    A.  Yes.

9    Q.  And you considered making a report to law enforcement and

10   decided against doing that as well, correct?

11   A.  Yes.

12   Q.  And you spoke to Mr. Fasano or communicated with Mr. Fasano

13   about your concerns about that threat, correct?

14   A.  Yes.

15   Q.  And then you've testified about this meeting that you just

16   mentioned in March of 2018, right?

17   A.  Yes.

18   Q.  And that meeting included dispensary partners of Eaze's,

19   correct?

20   A.  Yes.

21   Q.  These were the most critical business relationships that

22   Eaze had, right?

23   A.  Yes.

24   Q.  And these were dispensaries that you'd been working with

25   for some time?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3FPWEI5                          Patterson - Cross

1   A.  Yes.  Most of them had been with Eaze through prior to me

2   even joining the company.

3   Q.  And you, as the CEO of the company, directed others at the

4   company to invite members, representatives of all these

5   dispensaries to come to a meeting at Mr. Akhavan's office in

6   March of 2018, correct?

7   A.  Yes.

8   Q.  And you had other employees of yours join for that meeting,

9   correct?

10  A.  Yes.

11  Q.  So you were not so afraid of Mr. Akhavan that you thought

12  it would not be a good idea to bring Eaze's most important

13  business partners and some of your employees to a meeting in

14  his office in March of 2018, correct?

15  A.  Well, once we were doing what he wanted, no, I wasn't as

16  afraid.

17  Q.  You were no longer afraid of him?

18  A.  As long as we were processing and he was happy.

19  Q.  Now, one of the employees that you brought to this meeting

20  was Nick Fasano, correct?

21  A.  Yes.

22  Q.  And Nick Fasano was, I believe you testified on direct, not

23  only an employee of yours but one of your close personal

24  friends you'd known for 15 years?

25  A.  Yes.

DJA1991

L3FPWEI5                    Patterson - Cross

1  Q.  Who else did you bring from Eaze to this meeting?

2  A.  Darcy Cozzetto and David Amable were the other two Eaze

3  employees.

4  Q.  And Fasano, up until this meeting in March of 2018, had no

5  involvement in credit card processing for the company?

6  A.  No direct involvement.  I shared with him my concerns, even

7  prior to the phone call; so he knew my concerns about it, but

8  in his role, he had no direct involvement.

9  Q.  When you say you shared your concerns, what did you share

10  with him?

11  A.  My concerns about Ray, that I thought he was potentially

12  dangerous.

13  Q.  And did you share with him your concerns that you might be

14  engaging in conspiracy to commit bank fraud?

15  A.  I said that what was happening here was very shady, and it

16  made me uncomfortable, but I didn't use those particular words.

17  Q.  But in your mind, you had that concern?

18  A.  Yes.

19  Q.  Yet, you brought Mr. Fasano, your 15-year friend, to this

20  meeting; is that true?

21  A.  Yes.

22  Q.  And Ms. Cozzetto, at the time you directed her to come to

23  this meeting, she'd worked for the company about six months,

24  right?

25  A.  Something like that, yes.

DJA1992

L3FPWEI5                      Patterson - Cross

1   Q.  You didn't know her very well?

2   A.  No.

3   Q.  But you had no problem inviting her to come to this shady

4   meeting with somebody who had threatened you; is that your

5   testimony?

6   A.  Yes.

7   Q.  Did you tell the government that you were so uncomfortable

8   at this meeting, that you felt that you were trapped?

9   A.  I think I did say that, yes.

10  Q.  Did you tell them that you felt physically sick at this

11  meeting?

12  A.  Yes.

13  Q.  And did you tell the government that's why you left the

14  meeting early?

15  A.  Well, I did have a flight to catch, but I was definitely

16  happy to leave early.

17  Q.  You arranged the time and date of this meeting yourself,

18  correct?

19  A.  No.

20  Q.  Well, you knew it was an important meeting?

21  A.  Yes.

22  Q.  And you made an arrangement to be there?

23  A.  Yes.

24  Q.  And you made arrangement for your coworkers to be there

25  with you?

L3FPWEI5                          Patterson - Cross

1   A.  Yes.

2   Q.  And you understood that all of your dispensary partners had

3   been invited, and they were going to be there with you, as

4   well?

5   A.  Yes.

6   Q.  But you had a flight out?

7   A.  The meeting started late, and I did have to get home to

8   San Francisco that night.

9   Q.  So you left?

10  A.  Yes.

11  Q.  And you left Mr. Fasano behind?

12  A.  Yes.

13  Q.  Did you have any concerns about leaving your friend at this

14  meeting with Mr. Akhavan, who had threatened you?

15  A.  Yes.  In fact, it was the first thing when I called him and

16  I apologized.

17  Q.  You have any concerns about leaving Ms. Cozzetto there?

18  A.  I mean, the same kind of concern, just leaving people in

19  that situation, yes.

20  Q.  Did you ever talk to her about it?

21  A.  No.

22  Q.  Isn't it true, Mr. Patterson, that after this meeting with

23  the dispensaries in March of 2018, the decision was reached to

24  move forward with Mr. Akhavan's processing again, correct?

25  A.  Well, it was -- the decision was up to each individual

DJA1994

1695

L3FPWEI5                    Patterson - Cross

1   dispensary owner.  They all decided to move forward, with the

2   exception of one.

3   Q.  But you understood that there would be a continued

4   relationship, business relationship between Eaze and

5   Mr. Akhavan after this meeting in March of 2018?

6   A.  Yes.

7   Q.  And isn't it true that you made a decision to put Darcy

8   Cozzetto in as the point person to deal with the processing

9   through Mr. Akhavan and EUP?

10  A.  Well, it was naturally -- her particular role would have

11  been to deal with this because she was overseeing the

12  relationships with the dispensaries.  That was her job.

13  Q.  You made the decision about who was going to do what in the

14  company, you were the CEO?

15  A.  Yes.

16  Q.  You gave the job to her to be the point person on this; did

17  you not?

18  A.  Yes.

19  Q.  And did you have any concerns that you were putting her in

20  harm's way?

21  A.  No, because after that, she had no -- she had no reason to

22  meet with Ray in person ever again.

23  Q.  Did you have concerns, sir, that you were getting her

24  involved in a conspiracy to commit bank fraud and putting her

25  in as a point person for that?

DJA1995

1696

L3FPWEI5                        Patterson - Cross

1    A.  Yes, I'd say I had overall concerns about the whole

2    situation.  That was one of them.

3    Q.  Did you ever talk to Ms. Cozzetto about your concerns that

4    she was getting involved with something that you, at that

5    point, believed to be bank fraud?

6    A.  No.

7    Q.  You never mentioned it?

8    A.  No.

9    Q.  I'm sorry, was your answer "no"?

10   A.  "No."

11   Q.  Did it occur to you that -- withdrawn.

12         Now, everything that you testified about in direct

13   that related to Mr. Weigand, all of that was not based on your

14   personal knowledge; isn't that correct?

15   A.  I wouldn't say everything.  I mean, it depends on what

16   you're saying.  I never personally met him, no.

17   Q.  You never met him, correct?

18   A.  Correct.

19   Q.  You never had a phone conversation with him?

20   A.  No.

21   Q.  You never had any kind of conversation with him at all?

22   A.  I was in a group chat.

23   Q.  We'll talk about -- okay, we'll get to that.

24         Now, you said that after the meeting, you had left

25   early, and Mr. Fasano talked to you about what happened when

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA1996

L3FPWEI5                    Patterson - Cross

1    you left, right?

2    A.  Yes.

3    Q.  And he said that one of the things that he mentioned had to

4    do with my client, Mr. Weigand, correct?

5    A.  Yes.

6    Q.  And that Mr. Fasano relayed to you that after you left the

7    meeting, Mr. Weigand entered the meeting; is that right?

8    A.  Well, what he said was that Ray's -- the term he used was,

9    German banker; so I took that to mean Ruben.

10   Q.  But you had never heard the name Ruben Weigand before; so

11   why would you take that to mean Ruben Weigand?

12   A.  Before I left, Ray said that.  He did say that Ruben -- he

13   said the name -- that he would be joining us later in the

14   meeting and that we were waiting for him.  So I did know that

15   someone would be joining later, named Ruben.

16   Q.  You recall, as you sit here today, that Ray told you that

17   someone named Ruben was coming into the meeting?

18   A.  Yes.

19   Q.  Do you recall whether he even gave you his last name?

20   A.  No, he didn't.

21   Q.  He did not?

22   A.  No, I don't think so.

23   Q.  Did he tell you after the meeting what the, quote, unquote,

24   German banker was supposed to be doing in connection with this

25   credit card processing?

DJA1997

L3FPWEI5                    Patterson - Cross

1   A.  Are you referring to Nick?

2   Q.  Correct.

3   A.  Yes, that he was the one collecting all of the applications

4   from the dispensaries.  So they were given an e-mail address,

5   and they were supposed to fill out the applications and e-mail

6   the applications to an e-mail address to Ruben.

7   Q.  You also spoke to Ms. Cozzetto after that meeting about

8   this topic, correct?

9   A.  That, I can't remember.  I don't remember talking to her

10  specifically about this meeting.

11  Q.  Do you remember talking to her about the applications that

12  you just referenced?

13  A.  Generally, but not specifically.

14  Q.  Isn't it a fact that Ms. Cozzetto told you that she was

15  communicating with someone named Andreas with regard to the

16  applications?

17          MR. FOLLY:  Objection.

18          THE COURT:  Sustained.

19  Q.  Will you please show, just for the witness at this time,

20  WX118.

21          Do you have the exhibit in front of you now,

22  Mr. Patterson?

23  A.  Yes.

24  Q.  Thank you.  So this -- well, do you recognize this?

25  A.  It's an e-mail between the Eaze team, internal to the Eaze

DJA1998

1699

L3FPWEI5                    Patterson - Cross

1   team.

2   Q.  And you're a recipient of this e-mail?

3   A.  Yes.

4           MR. GILBERT:  I'll offer WX118.

5           MR. FOLLY:  Objection.  Hearsay.

6           THE COURT:  Sustained.

7           MR. GILBERT:  State of mind, your Honor.

8           THE COURT:  Sustained.

9   BY MR. GILBERT:

10  Q.  Now, you were asked a number of questions about an

11  Easycompany chat; is that correct?

12  A.  Yes.

13  Q.  If we could please bring up in evidence Government

14  Exhibit 302.  Is this the Easycompany chat you testified to

15  about earlier?

16  A.  Yes.

17  Q.  Now, Mr. Patterson, this page indicates that this

18  communication starts on April 27th of 2018, correct?

19  A.  Yes.

20  Q.  And if you go, please, all the way to the last page of this

21  document.  Do you see that it runs from April of 2018 all the

22  way through December 20th, 2018?  If you look in the middle of

23  the last page there.

24  A.  Yes, I see it.

25  Q.  I'm sorry?

DJA1999

1700

L3FPWEI5                    Patterson - Cross

1   A.  Yes, I see that.

2   Q.  I interrupted you.

3   A.  December 2018.

4   Q.  So this was a chat, a communication, that ran from April

5   all the way through December, correct?

6   A.  Yes.

7   Q.  And it runs -- if I were to tell you it's about 80-pages

8   long, would that sound about right to you?  You've read it

9   before?

10  A.  Yes.  It's many, many pages.

11  Q.  It's a lengthy document.  If we could look at 2186, there

12  are messages from May 3rd of 2018.  The bottom number is 2186.

13          Do you see the date near the top of the page that's in

14  front of you that says 3 May 2018?

15  A.  Yes.

16  Q.  And there's a discussion here that's taking place about the

17  customer service functions of Eaze's credit card processing?

18  A.  Yes.

19  Q.  Do you see, there's a reference here to Darcy Cozzetto?

20  That's the employee we've been discussing, correct?

21  A.  It is.

22  Q.  That you put in charge of this?

23  A.  Yes.

24  Q.  And do you see Ms. Cozzetto says:  I let Andreas know that

25  I could intro him to our VP CS?  That means customer service,

DJA2000

1701

L3FPWEI5                    Patterson - Cross

1    correct?

2    A.  Yes.

3    Q.  To review scripts and the process, and I'm happy to include

4    you, if you'd like.

5              Do you see that?

6    A.  I do.

7    Q.  Ms. Cozzetto, in this communication, indicates that she's

8    in communication with Andreas with regard to the processing,

9    correct?

10   A.  Yes.

11   Q.  If we could go to page 2205.  Do you see this is a

12   communication -- if you look at the top portion -- you may have

13   to turn to the prior page.  There's a date of June 29th, 2018?

14   A.  Okay, yup.

15   Q.  Do you see that?  And do you see there's a communication

16   here where Darcy says:  I also haven't heard back from Andreas

17   yet on either the EUprocessing statements for this week or the

18   four days missing from last; so any update there would be

19   appreciated?

20   A.  Yes.

21   Q.  Again, she's referring to Andreas, correct?

22   A.  Yes.

23   Q.  And not to Ruben Weigand; is that correct?

24   A.  Yes, to Andreas.

25   Q.  And if you look at page 2206, do you see a message there

L3FPWEI5                    Patterson - Cross

1  that Darcy Cozzetto sends:  Great, thanks.  I see the

2  settlements from Andreas?  The top of the page?

3  A.  Yes.

4  Q.  If you look at page 2214, on July 9th, 2018, do you see

5  there's a message from Darcy there that says:  I sent this to

6  Andreas as well, but the wire from last week has yet to hit

7  depot's bank accounts; do you see that?

8  A.  Yes.

9  Q.  This week's statement is only four days.  I'm hoping

10  Andreas can resolve for me, but wanted to make sure you were

11  aware.  Correct?

12  A.  Yes.

13  Q.  And again, there's no reference there to Ruben Weigand,

14  correct?

15  A.  Correct.

16  Q.  And it appears obvious to you that Darcy is communicating

17  with Andreas about the matters discussed?

18  A.  Yes.  So Andreas oversaw the settlements at this time.

19  Q.  If you look at page 2222, communication from July 24th of

20  2018.  Do you see there's a comment here that says:  Can you

21  please confirm if Andreas is still sending statements for the

22  newer solution.  Also, we are seeing that some wires are still

23  missing based on the statements.  Is there someone from

24  Andreas' team who can help reconcile?

25          Do you see that?

DJA2002

1703

L3FPWEI5                    Patterson - Cross

1    A.  Yes.

2    Q.  Again, there's no reference to Ruben Weigand here, correct?

3    A.  Correct.

4    Q.  And again, it appears that Darcy is working with Andreas on

5    these matters, correct?

6            MR. FOLLY:  Objection.

7            THE COURT:  No, I think that was waived by there being

8    no objection to the previous parallel.

9            Question:  How much longer do you have?

10           MR. GILBERT:  I would say about 20 minutes, your

11   Honor, maybe 15.

12           THE COURT:  Go ahead.

13   BY MR. GILBERT:

14   Q.  If you look at page 2223, there's a communication here that

15   says:  Hey, Darcy.  Sorry for the delay.

16           Do you see that?

17           I'm home?

18   A.  Yes.

19   Q.  And there's a reference to a Marty.  Marty25@ProtonMail; do

20   you see that?

21   A.  Yes.

22   Q.  So that's Marty's e-mail, he's going to handle everything

23   for you from now on; do you see that?

24   A.  Yes.

25   Q.  Do you know -- this is not the same Marty that you

L3FPWEI5                        Patterson - Cross

1   testified earlier from the Hometown Heart, correct?

2   A.  Correct, different Martys.

3   Q.  Which Marty is this, to your knowledge?

4   A.  This Marty works with Ray.  So he, I think, was replacing

5   Andreas in terms of handling the reconciliations in the

6   dispensaries payments.

7   Q.  And if you see on page 2225, on July 6th of 2018, Darcy

8   says:  Ray, Marty has been fantastic.  I got confirmation from

9   him that reserves were released, and Andreas just sent me the

10  statements and confirmed payments will be issued tomorrow.

11          Do you see that?

12  A.  Yes.

13  Q.  Again, there's no reference there to Ruben Weigand,

14  correct?

15  A.  Correct.

16  Q.  Now, you did testify on direct about a conversation in this

17  chat from July 31st, 2018, correct?  Do you recall that?

18  A.  The one where --

19  Q.  I'll help you.

20  A.  Okay.

21  Q.  If we can look at, please, page 2182 in this exhibit.  Do

22  you recall this?

23  A.  Which part?

24  Q.  I'm sorry, it's page 2230.  Thank you.  This communication

25  on July 31st of 2018?

DJA2004

L3FPWEI5                    Patterson - Cross

1    A.  Yes.

2    Q.  And if you go to the next page, please, there's a note here

3    that says:  I've added Martin and Ruben, correct?

4    A.  Yes.

5    Q.  And a little bit further down it says:  Hey, everybody,

6    from Ruben Weigand, or from Ruben W?

7    A.  Yup.  Yes.

8    Q.  So is it correct that this chat, which started in April,

9    the first appearance, to your knowledge, by Ruben was not until

10   the very end of July of 2018?

11   A.  Yes, that's when he was added to the chat.

12   Q.  And prior to that, he had no involvement, to your

13   knowledge?

14           MR. FOLLY:  Objection.

15           THE COURT:  Overruled.

16   Q.  Do you need me to repeat the question?

17   A.  Yes, please.

18   Q.  And prior to that, he had no involvement, to your

19   knowledge?

20   A.  I wouldn't say no involvement.  He wasn't part of this

21   particular chat.

22   Q.  You're not aware of any communications, other than the ones

23   that we're looking at here, prior to July 31st, 2018, that

24   involved Ruben Weigand in any way, correct?

25   A.  Well, other than being at the meeting, no.

DJA2005

1706

L3FPWEI5                    Patterson - Cross

1   Q.   Sorry, your testimony was that you left the meeting before

2   he arrived; isn't that true?

3   A.   Yes.

4   Q.   So you have no firsthand knowledge that he was at a

5   meeting, correct?

6   A.   No firsthand, that's right.

7   Q.   Now, you testified about having shares of stock in Eaze,

8   correct?

9   A.   Yes.

10  Q.   You said you own approximately 1.5 percent of the company?

11  A.   Fully diluted with the stock options, correct.

12  Q.   You said that the valuation that you were familiar with

13  was -- the last valuation was that the company was worth $250

14  million?

15  A.   Yes, I think around when I left, that's what I recall it

16  being.

17  Q.   So around when you left, if you owned 1.5 percent of a

18  company that's worth $250 million, you had over $3.7 million

19  worth of shares in the company, correct?

20  A.   Yes.

21  Q.   And, in fact, are you aware of any higher valuations for

22  the company since you left?

23  A.   I'm not aware, no.

24  Q.   Do you know what your shares are currently worth where you

25  own 1.5 percent of the company?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2006

1707

L3FPWEI5                    Patterson - Cross

1   A.  No.

2   Q.  It's not a matter of significance to you to know that?

3   A.  I mean, it's a private company, and they don't publish

4   their valuation.  And since I've left the board, I have no way

5   of knowing the valuation.  It's not public information.

6   Q.  Now, you testified about Hometown Heart.  Are you aware, or

7   do you have any familiarity with whether or not Hometown Heart,

8   in its physical location, accepted MasterCard and Visa?

9   A.  No, I don't.

10  Q.  And are you aware whether any of the dispensaries related

11  to Eaze accepted MasterCard or Visa cards at their physical

12  location?

13  A.  I believe one.  I'm aware of one that did, yes.

14  Q.  Which one is that?

15  A.  It was called Caliva.  They were located in San Jose.

16  Q.  I'm sorry, in San Jose?

17  A.  Yes.

18  Q.  And you're aware that they accepted MasterCard and Visa at

19  their physical location?

20  A.  Yes.  They offered to connect us to their payment

21  processor, and we talked to them; so that's how I know that.

22  Q.  Then when you met with the government, in addition to the

23  prosecutors, there were also representatives of the SEC

24  present?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2007

L3FPWEI5                          Patterson - Cross

1  Q.  And were you asked questions about your communications with

2  investors or potential investors in Eaze?

3  A.  Yes.

4  Q.  And, in fact, you, while you were the CEO in 2018 and in

5  2019, you had meetings with investors or potential investors,

6  correct?

7  A.  Yes.

8  Q.  And you've testified in that time period you believed you

9  were involved in the crime of conspiracy to commit bank fraud,

10  correct?

11  A.  Yes.

12  Q.  And in any of your communications with any investors or

13  potential investors, did you indicate to them that that was so;

14  that you believed you were committing bank fraud?

15  A.  No.

16  Q.  Were you asked any questions by investors or potential

17  investors about the manner in which Eaze was processing credit

18  card payments?

19  A.  Not usually.  Usually that was handled by the legal team.

20  Q.  But it did happen from time to time, correct?

21  A.  Yes; although, I wouldn't have been present for those.  The

22  diligence process was probably like two weeks of talking to

23  different people.

24  Q.  As you sit here now, do you recall being asked -- you,

25  personally -- any questions by any investor or potential

DJA2008

L3FPWEI5                    Patterson - Cross

1   investor in 2018 and 2019 about Eaze's credit card processing?

2   A.  I can't recall the specific question, but generally I might

3   have been asked general questions.  Generally investors were

4   aware that we were processing in Europe.

5   Q.  And generally, so you didn't make any investor or potential

6   investor aware of your belief that you were involved in the

7   crime of bank fraud, did you?

8   A.  No.

9   Q.  You didn't plead guilty to securities fraud, did you?

10  A.  No.

11  Q.  Do you have a concern -- well, withdrawn.

12          Now, you also testified that you believed that members

13  of the board of directors of Eaze were part of your -- what you

14  claim was a conspiracy, correct?

15  A.  Yes.

16  Q.  Who are those people?

17  A.  The members of the board were Keith McCarty, David Chow, PJ

18  Germalack and Jonathan Rosenthal.

19  Q.  Was there an individual named Gardner?

20  A.  Mark Gardner, but he wasn't a member of the board.

21  Q.  He wasn't on the board, but he was an investor in the

22  company?

23  A.  Yes.

24  Q.  What does he -- what are his business interests outside of

25  being an investor in Eaze, if you know?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2009

L3FPWEI5                    Patterson - Cross

1       MR. FOLLY:  Objection.

2       THE COURT:  Sustained.

3  Q.  During any board meetings that you can recall, were you

4  asked about the particulars of Eaze's credit card processing?

5  A.  Yes.

6  Q.  And were you truthful in your responses?

7  A.  Yes.

8  Q.  To your knowledge, did any member of the board of directors

9  raise a concern to you that what Eaze was engaging in might be

10  bank fraud?

11  A.  Not directly to me, no.

12  Q.  Somebody else?

13  A.  Yes.

14  Q.  Who was that?

15       MR. FOLLY:  Objection.

16       THE COURT:  Well, the objection is a little late.  It

17  should have been raised before the previous question, but I

18  will overlook that and sustain the objection.

19       MR. GILBERT:  No further questions at this time.

20       THE COURT:  Redirect.

21       MR. FOLLY:  Your Honor, there is one issue that we'd

22  like to briefly address at a sidebar.  If your Honor would

23  like, I will continue questioning the witness through the end

24  of the day, and then address that issue?  I don't think I'll

25  finish in that time.

L3FPWEI5                        Patterson - Redirect

1        THE COURT:  Okay.

2   REDIRECT EXAMINATION

3   BY MR. FOLLY:

4   Q.  Hi, Mr. Patterson.  You were asked some questions on

5   cross-examination regarding chargebacks; do you remember those?

6   A.  Yes.

7   Q.  Now, the issue of chargebacks was not that customers were

8   returning their products, correct?

9   A.  That's correct.

10  Q.  And the main issue with chargebacks was that customers were

11  confused about the descriptors that were showing up on their

12  card statements, correct?

13  A.  Yes.

14  Q.  Now, could we please publish for everyone what's in

15  evidence as Government Exhibit 422.  If we could zoom in on the

16  top half of the page here.  And this is an e-mail from Ray

17  Akhavan to you, among others, right?

18  A.  Yes.

19  Q.  And it's titled Regarding Chargebacks, correct?

20  A.  That's right.

21  Q.  Now, if you could read the e-mail starting where it says

22  "So in itself"?

23  A.  "So in itself it's not the issue.  The issue is that

24  usually, with high chargebacks, you have high complaints to the

25  bank, which can result in people talking about the product, and

L3FPWEI5                      Patterson - Redirect

1    if you have a high number of, let's say, Wells Fargo customers

2    who complain about not liking the weed or the weed card-issuing

3    doctors, the higher the chance that Wells Fargo notices that

4    weed is being sold and then reaches out to Visa and MasterCard

5    and saying this bank in the UK is doing processing for the

6    weed, that's really the only issue, but they usually go hand in

7    hand."

8                (Continued on next page)

DJA2012

1713

1    Q.  Now, the reference here to the complaints about, in this

2    case, not liking the weed, or the weed card issuing doctors,

3    that would be a reference, to your understanding, from the Eaze

4    customer, correct?

5    A.  Yes.

6    Q.  And that, in this scenario, that Ray Akhavan is describing

7    in this email, that would be a complaint that is being made to

8    that customer's issuing bank, correct?

9    A.  That's right.

10   Q.  And in this case he's giving an example of Wells Fargo as

11   the issuing bank, correct?

12   A.  Yes.

13   Q.  And the concern there that's being expressed here, when he

14   says that Wells Fargo would notice weed is being sold and then

15   reach out to Visa and MasterCard, what was your understanding

16   of why that would be a problem for Eaze?

17   A.  Well, because Visa and MasterCard didn't allow for

18   marijuana transactions, so if Wells Fargo found out, they could

19   reach out to Visa and MasterCard, and then that would cause the

20   accounts to get shut down.

21        MR. FOLLY:  We can take this exhibit down.

22   Q.  Now, Mr. Patterson, do you recall there were some -- there

23   was a reference on cross-examination to the credit card

24   processing that was being done through Ray's organization as

25   being compliant?  Do you recall that?

DJA2013

L3FAWEI6ps                    Patterson - Redirect

1   A.  No, not exactly.

2   Q.  Do you recall that there was a discussion about your

3   attempt to have the credit card processing be compliant?

4   A.  This is on cross-examination?

5   Q.  Yes, during your testimony on cross-examination.

6   A.  Sorry.  I'm just not fully getting what you're referring

7   to.

8   Q.  Let's just go to Government Exhibit 302, at page 17.  If we

9   could just zoom in on the bottom section, from 9:27 on.

10          Now, there's a reference here at the top, Ray Akhavan

11  says, "And I'll set up more of my friendly banks for surplus or

12  backup volume for when and if your better domestic solutions

13  don't work."

14          And then in point 2, can you read aloud what he says

15  in the first sentence of point 2.

16  A.  He says, "We need to understand that if something does

17  occur with legal or law enforcement, the big banks who don't

18  know what they're processing will turn on your depots or

19  whoever officially owns the account, so they should be very

20  careful there.  If possible you guys should do what you did

21  with us, which is, everyone fills out and submits a 100 percent

22  accurate application on the depot side but then some middleman

23  changes or alters it so no one can say Eaze or the depots

24  miscoded knowingly."

25  Q.  So in the first sentence of point no. 2, if we can

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3FAWEI6ps                    Patterson - Redirect

1   highlight the whole first sentence, there's a reference in the

2   first sentence, he says "we need to understand that if

3   something does occur with legal or law enforcement."  What was

4   your understanding of what Ray Akhavan was referring to when he

5   said "something occurring with legal or law enforcement"?

6   A.  What he's describing here was the -- setting up merchant

7   processing in the US, which would require lying to the banks.

8   So my understanding is, what he's referring to here is that if

9   there was a law enforcement investigation into the fact that

10  you wanted to open the accounts in the US, you'd have to lie to

11  the merchant banks.

12  Q.  Now, you understood that in connection with this

13  processing, card processing organization through Ray's

14  organization, that there were lies that were being communicated

15  to the credit card companies, as well as the issuing banks,

16  correct?

17  A.  Yes.

18  Q.  And you understood that it was wrong to lie to the credit

19  card companies and to the issuing banks, correct?

20  A.  Yes.

21          MR. TAYBACK:  Objection, leading and compound.

22          MR. FOLLY:  Your Honor, I believe there is an

23  objection.

24          THE COURT:  I'm sorry.

25          Overruled.

DJA2015

1716

L3FAWEI6ps                    Patterson - Redirect

1   Q.  Your answer was yes, Mr. Patterson?

2   A.  Yes.

3   Q.  You pled guilty to that crime, correct?

4   A.  Yes.

5   Q.  And you said on cross-examination that you knew that this

6   was a crime while you were committing the crime, correct?

7   A.  Yes.

8   Q.  Now, you were asked on questions on cross-examination

9   regarding merchant category codes; do you recall that?

10  A.  Yes.

11  Q.  Those are sometimes referred to as MCCs, correct?

12  A.  Yes.

13  Q.  And during the time period from 2016 through 2019, when you

14  were working with Ray's credit card processing operation, Eaze

15  did not select the merchant category codes, correct?

16  A.  That's correct.

17          MR. FOLLY:  You could go to Government Exhibit 302 at

18  page 22.  Zoom in on the bottom portion of the message.

19  Q.  And you were shown this message on cross-examination,

20  focusing on the bottom portion, from 10:05 downward.

21          MR. FOLLY:  If you could just highlight that whole set

22  of messages.

23  Q.  And, Mr. Patterson, you read the first portion of this

24  message on cross-examination.  Correct?

25  A.  Yes.

L3FAWEI6ps                    Patterson - Redirect

1  Q.  The second portion says, "If you were under pressure you

2  could say you did pick a accurate MCC."  That's Ray Akhavan,

3  right, in that message, right?

4  A.  Yes.

5  Q.  What was your understanding of what Ray Akhavan meant when

6  he said, "If you were under pressure you could say you did pick

7  a accurate MCC"?

8  A.  If there was ever a law enforcement investigation and it

9  came to the dispensaries, that they said -- they could say that

10  the code being used was technically the most accurate code,

11  since there actually wasn't a code for marijuana, this is a

12  general medical services code.

13  Q.  And there's a reference here in this message to 8099,

14  correct?

15  A.  Yes.

16         MR. FOLLY:  Go to Government Exhibit 2309 at page 4.

17  If we could zoom in on the second and the third columns in

18  their entirety -- sorry -- the third and the fourth.

19  Q.  And, Mr. Patterson, do you see where it says "Merch

20  Category Cd"?

21  A.  Yes.

22  Q.  If you could just look through those for a moment.  Do you

23  see 8099 listed here?

24  A.  No, I don't.

25         MR. FOLLY:  You could zoom back out for a moment.

1718

L3FAWEI6ps                    Patterson - Redirect

1          About two thirds down the page there's an entry that

2    says www.somepearls.com.  Can we zoom in on that row.

3    Q.  Mr. Patterson, I believe you testified about somepearls.com

4    early in your testimony.  Is that right?

5    A.  Yes.

6    Q.  Could you read aloud what's to the right of the entry that

7    says 5944.

8    A.  It says "clock jewelry watch and silverware store."

9    Q.  And can you remind us what somepearls.com was.

10   A.  Somepearls was one of the descriptors that was being used

11   in late 2018.

12   Q.  And was that one of the websites that you had visited the

13   merchant website for?

14   A.  Yes.  It was the one that I clicked on and saw that it was

15   a -- it was a store.

16   Q.  And did that store give any indication that it was selling

17   marijuana products?

18   A.  No.

19   Q.  Did the store give any indication that it was affiliated

20   with Eaze?

21   A.  No.

22   Q.  Did it give any indication it was affiliated with any of

23   the dispensaries?

24   A.  No, it didn't.

25          MR. FOLLY:  You can take this exhibit down.

L3FAWEI6ps                    Patterson - Redirect

1   Q.  Do you recall during cross-examination you were asked some

2   questions about a descriptor that was used that included the

3   word "ease"?

4   A.  Yes.

5   Q.  I believe you testified that that was used for

6   approximately three months.

7   A.  Yes.

8   Q.  Can we go to Government Exhibit 302 at page 55, and zoom in

9   on the top half of the page.  And there's a reference here to

10  Organikals.store as well as Greenteacha.co.  Do you see that?

11  A.  Yes.

12  Q.  Were those descriptors that were used during the credit

13  card processing foray's operation?

14  A.  Yes.

15  Q.  Was Ray Akhavan one of the participants on this Telegram?

16  A.  Yes, he was.

17  Q.  And there's a message further down, right here at 15:58,

18  that says "JB13."  What was your understanding who JB13 was?

19  A.  It was Ray -- it was, Jawbreaker13 was his user name.

20           MR. FOLLY:  We could go now to page 60 of the same

21  exhibit.

22           THE COURT:  Counsel, keep in mind we're going to stop

23  in about two minutes.

24           MR. FOLLY:  Thank you, your Honor.

25  Q.  If you go to the message at 12:56 from John Wang.  It says,

L3FAWEI6ps                    Patterson - Redirect

1   "Here's the dispensary to descriptor mapping," and it has

2   Sonicogistix, Organikals, Greenteacha, GoodeGreenBazaar,

3   Organikals.store.  Do you see all those?

4   A.  Yes.

5   Q.  Did any of those descriptors contain the word "ease"?

6   A.  No, none of them do.

7           MR. FOLLY:  If we could go quickly to pages 88 through

8   89 of the same exhibit.

9   Q.  At the bottom of the page there's additional references to

10  Starstyles, Outdoormaxx, Fly2skyshop.  Do you see those?

11  A.  Yes.

12  Q.  Were those additional descriptors that were used during the

13  credit card processing for Ray's organization?

14  A.  Yes, they were.

15  Q.  Now, there was no -- Eaze was not connected to any of these

16  descriptors that were listed here, correct?

17  A.  No.

18  Q.  There was no corporate affiliation with those names,

19  correct?

20  A.  That's correct.

21  Q.  These names were not -- these were not subsidiaries of

22  Eaze, correct?

23  A.  Yes.  No, they weren't.

24  Q.  And these were not names that Eaze was doing business with,

25  correct?

DJA2020

1721

L3FAWEI6ps

1    A.  Correct.

2            MR. FOLLY:  Your Honor, I think this would be a good

3    place to stop.

4            THE COURT:  OK, ladies and gentlemen.  So we're making

5    good progress, but tomorrow is another day, so be on time and.

6    We'll see you, and have a very good evening.  Thank you.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DJA2021

L3FAWEI6ps

1          (Jury not present)

2          (Witness excused)

3          THE COURT:  Before you raise the issue that you want

4     to raise, how much longer do you have?

5          MR. FOLLY:  Your Honor, no longer than 15 minutes.

6          THE COURT:  All right.  You will be held to 15 minutes

7     strictly, and if there's any recross, it will be no more than

8     five minutes a piece.  We are not proceeding with alacrity, and

9     things are bogging down.  This is an important witness, which

10    is why I let you drone on, both sides, but enough is enough.

11         Second, before we deal with the issue, with respect to

12    experts, first, Mr. Akhavan no longer needs to call

13    Mr. Gardovan because the whole memorandum and the guidance will

14    all be introduced.

15         Second, Mr. Rankin can testify to the subjects

16    indicated in the defense letter.

17         Third, as to Mr. Weigand's experts, Mr. Mott will not

18    be permitted to testify.  I will state the reasons for that

19    tomorrow morning, but I have a 4 o'clock matter by telephone

20    coming up, so I can't take the time now.

21         With respect to Mr. Vilfer, I'm skeptical about at

22    least some of his testimony, but I think we need to await his

23    deposition until I take a final determination, so when is the

24    deposition?

25         MS. LA MORTE:  Wednesday, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2022

L3FAWEI6ps

1    THE COURT:  OK.  We'll have oral -- I don't need

2  further written submissions, but right after that deposition,

3  the next morning we'll have oral argument.  I'll make any

4  determination.

5    MS. LA MORTE:  Yes, your Honor.

6    THE COURT:  All right.

7    Now what's this issue that you, counsel, want to tell

8  me about?

9    MR. FOLLY:  Yes, your Honor.  This is an issue with

10  something that the government had flagged in its motions in

11  limine concerning the current witness's discussion about the

12  text messages he received from Ray Akhavan and the ensuing

13  discussion that he had with Ray Akhavan in which he felt, both

14  in the text messages and in the discussion, that he was the

15  recipient of a physical threat.  There has been rather

16  extensive cross-examination now on the legitimacy of that fear.

17  And we had flagged in our motion that one of the reasons that

18  Mr. Patterson was concerned and felt threatened by Ray Akhavan

19  was because, prior to that conversation, he had learned that

20  Keith McCarty had visited his house and had walked into Ray

21  Akhavan's walk-in closet, and Jim Patterson had been told by

22  Keith McCarty that he had seen a walk-in closet that contained

23  numerous automatic weapons.

24    And this is relevant to his rightful fear of

25  Mr. Akhavan, which has been repeatedly questioned.  There were

L3FAWEI6ps

1     statements that he never saw Mr. Akhavan strike anyone, that he

2     never saw --

3              THE COURT:  Let me make sure I understand you.  Did

4     Mr. Patterson walk into Mr. Akhavan's closet?

5              MR. FOLLY:  No.  Keith McCarty did, and told

6     Mr. Patterson about that, before he attended a meeting in

7     Calabasas when he was --

8              THE COURT:  I think it is more prejudicial than

9     probative.  It will still be excluded.

10             Anything else?

11             All right.

12             MS. DEININGER:  Wait.  Sorry, yes, your Honor.  I just

13     wanted to flag that, tomorrow, we're expecting the video

14     testimony from Vita.

15             THE COURT:  Yes.  And I received, or, rather, my law

16     clerk received a call that the chief judge wanted to raise an

17     issue about that with me.  I didn't know what the issue is, but

18     I'm guessing, just -- this could be totally wrong.  I will find

19     out when she and I speak, as prearranged, at 9 o'clock tonight.

20     Well, probably the conversation won't go more than four or five

21     hours.  I think she may be concerned, there's a rule in this

22     courthouse, which I had forgotten about, that you can't

23     photograph any juror.  That's for the jurors' protection.  And

24     I wonder if she's concerned that, since arrangements were made

25     that the witness could see the jurors, that that created a

L3FAWEI6ps

1 problem.  I think she may be reassured when I tell her that, as

2 I understand it, he's going to be testifying from his lawyer's

3 office, and we can make sure they all know that no photographs

4 are to be taken and that any of the jurors may be excised after

5 the deposition or something like that.  We'll figure that out.

6 But I think that's her concern.  I'm sure we can figure out

7 something, but I just wanted to make mention of that.

8           One time -- is that the next item?

9           MS. DEININGER:  It's not the next witness.  We're

10 expecting to call Chuck Brown immediately after Mr. Patterson.

11 But I believe he will be briefer than many of the other

12 witnesses.  So the reason I was flagging it for your Honor's

13 attention is that while we are going to try and set up as much

14 as we can this afternoon, when it is time for his testimony it

15 will require setting up additional monitors and starting up the

16 Zoom calls.

17           THE COURT:  Yes.

18           MS. DEININGER:  It may require taking a brief recess,

19 depending on when --

20           THE COURT:  Depending on how long.  Well, why can't we

21 just arrange this so the testimony happens right after lunch,

22 and so you could spend the lunch time setting things up.

23           MS. DEININGER:  We can if your Honor doesn't mind it

24 breaking into other witnesses.

25           THE COURT:  I think the jury will understand

DJA2025

L3FAWEI6ps

1    completely why we may have to do that.  I do think it's not

2    appropriate for a judge to break into other people's houses,

3    but into other people's witnesses seems to be perfectly fine.

4            MR. TAYBACK:  Your Honor, I don't know how long it

5    will take, but we could use a midmorning break at the time to

6    set it up.

7            MS. LA MORTE:  Yes.  That works with the witnesses.

8            THE COURT:  That's a possibility.  We'll see how it

9    works, but I do think we are not in a position to take a long

10   recess.

11           MS. LA MORTE:  Understood.  And, your Honor, what time

12   should we be here tomorrow?

13           THE COURT:  9:15.

14           MS. LA MORTE:  OK.  Thank you.

15           (Adjourned to 9:15 a.m., March 16, 2021)

16

17

18

19

20

21

22

23

24

25

1727

1                     INDEX OF EXAMINATION

2    Examination of:                        Page

3     JAMES PATTERSON

4    Direct By Mr. Folly . . . . . . . . . .1544 sh

5    Cross By Mr. Tayback . . . . . . . . . . . .1601

6    Cross By Mr. Tayback . . . . . . . . . . . .1642

7    Cross By Mr. Gilbert . . . . . . . . . . .1683

8    Redirect By Mr. Folly . . . . . . . . . .1711

9                   GOVERNMENT EXHIBITS

10   Exhibit No.                          Received

11      301   . . . . . . . . . . . . . . . . . .1546
        441   . . . . . . . . . . . . . . . . . .1554
12      302   . . . . . . . . . . . . . . . . . .1566
        2215  . . . . . . . . . . . . . . . . . .1576
13      2102  . . . . . . . . . . . . . . . . . .1590

14                   DEFENDANT EXHIBITS

15   Exhibit No.                          Received

16     HAX10058   . . . . . . . . . . . . . . . .1654

17

18

19

20

21

22

23

24

25

DJA2027

1728

L3GAWEI1ps

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                         20-CR-188 (JSR)

5    RUBEN WEIGAND and
     HAMID AKHAVAN,
6
               Defendants.               Trial
7
     ------------------------------x
8
                                         New York, N.Y.
9
                                         March 16, 2021
10                                       9:15 a.m.

11
     Before:
12
                         HON. JED S. RAKOFF,
13
                                         District Judge
14

15                       APPEARANCES

16   AUDREY STRAUSS
          United States Attorney for the
17        Southern District of New York
     BY:  NICHOLAS FOLLY
18        TARA MARIE LA MORTE
          EMILY S. DEININGER
19        Assistant United States Attorneys

20   DECHERT LLP
          Attorneys for Defendant Weigand
21   BY:  MICHAEL J. GILBERT
          SHRIRAM HARID
22        ANDREW J. LEVANDER
          STEPHEN PELLECHI
23        -and-
     MICHAEL H. ARTAN
24        Attorney for Defendant Weigand

25
                    APPEARANCES CONTINUED

               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

DJA2028

1729

L3GAWEI1ps

QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Attorneys for Defendant Akhavan
BY:   WILLIAM A. BURCK
      CHRISTOPHER TAYBACK
      SARA CLARK
      MARI HENDERSON
      DEREK SHAFFER
      PAUL SLATTERY
      -and-
ROTHKEN LAW FIRM LLP
      Attorneys for Defendant Akhavan
BY:   IRA P. ROTHKEN
      JARED R. SMITH

L3GAWEI1ps

1          (Jury not present)

2          THE COURT:  As I suspected, the chief judge was

3  concerned about having photographs taken of the jurors, because

4  there is a ban on that in this courthouse.  I explained to her

5  the situation.  It is interesting.  You would think that the

6  confrontation clause would be satisfied by the defendants'

7  being able to see, hear, and completely observe the witness,

8  which of course we have arranged.  But there is case law that

9  says that the witness has to see the lawyers -- not just the

10  lawyer questioning, the way this makes sense, but also other

11  lawyers in the courtroom and most importantly the jury.  I

12  don't understand the rationale of those cases, but I'm willing

13  to abide by their suggestions, illogical though it seems to be

14  they are.

15          So what I have worked out, with the consent of the

16  chief judge, is that when Mr. Elliott testifies, he will see

17  the jurors, and he will be testifying from his lawyer's office.

18  They will -- they have already received an email that my clerk

19  sent them -- they will make no photographs or reproductions of

20  any of the jurors.  And they will destroy the pictures of the

21  jurors as soon as the testimony is over.

22          Now, with respect to the witnesses who are going to be

23  testifying remotely for the defense, I don't see any reason why

24  those witnesses have to see the jury.  Does any defense counsel

25  disagree with that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2030

1731

L3GAWEI1ps

1      MR. GILBERT:  No, your Honor.

2      THE COURT:  Mr. Tayback?

3      MR. TAYBACK:  Your Honor, I do think that, if I

4  understood your question, I do think the case law provides that

5  they're supposed to see -- you say that the witness is supposed

6  to see the jury?  I believe that that is what's required.

7      THE COURT:  Excuse me?

8      MR. TAYBACK:  I'm not sure I understood your question,

9  your Honor.

10      THE COURT:  Is there any reason -- the jurors have to

11  see the witness, of course.

12      MR. TAYBACK:  Yes.

13      THE COURT:  My question is, is there any reason why

14  the witness has to see the jurors?

15      MR. TAYBACK:  I think there is.

16      THE COURT:  Yes.  And what is your legal authority for

17  that ridiculous proposition?

18      MR. TAYBACK:  I believe it's the authority that we

19  previously submitted regarding the confrontation clause.

20      THE COURT:  Yes, but I'm talking about your witnesses.

21      MR. TAYBACK:  Our witnesses.  I apologize, your Honor.

22  I misunderstood the question.  No.  I agree.

23      THE COURT:  I'm sorry you misunderstood.  I would not

24  have spoken so abruptly.  I agree with you that the case law

25  says that when the government's witness testifies, he has to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2031

1732

L3GAWEI1ps

1    see the jurors, although I continue to believe that is without

2    any real logic.  But I know there's case law.  I'm going to

3    abide by it.  I see no reason why defense witnesses, where no

4    confrontation clause issue is involved, would have to see the

5    jurors.

6              MR. TAYBACK:  Agreed 100 percent.

7              MS. LA MORTE:  Your Honor, just one point of

8    clarification, and it may already be established, so you can

9    shut me down if that's the case:  The government just wanted to

10   confirm that the defense, understanding that when it's the

11   defense's own witnesses there generally isn't a confrontation

12   clause problem, but our understanding of the law -- and if you

13   need authority I can provide it at the lunch hour -- is that

14   the confrontation clause issue doesn't arise as a result of who

15   is calling the witness but whether the witness is going to be

16   adverse to the position of the party calling it or not.  And

17   so, for example, in this case, our understanding is that, among

18   the potential witnesses that the defense may call would be some

19   bank witnesses, which the government submits supports the

20   government's case.  And so we would just ask for the record

21   whether the defense, to the extent there is any confrontation

22   clause right in those types of circumstances, whether the

23   defense is waiving that right.

24             THE COURT:  Who are we talking about?

25             MS. LA MORTE:  The defense calling certain bank

DJA2032

L3GAWEI1ps

1    witnesses.

2         THE COURT:  Who?

3         MS. LA MORTE:  I believe Capital One, TD Bank, and

4    JPMorgan.

5         MR. TAYBACK:  I would need to talk to my client

6    briefly, if I can?

7         THE COURT:  I'm sorry?

8         MR. TAYBACK:  I need to speak to my client briefly

9    before waiv --

10        THE COURT:  You can speak all you want.  But I only

11   gave permission for the defense to call these people because I

12   didn't do the kind of analysis I did of the government's

13   witness.  If they can't agree to that, they'll testify live.

14        MR. TAYBACK:  Understood, your Honor.  I just think if

15   the question is, will we waive the constitutional right, I --

16        THE COURT:  I'm not asking you to waive a

17   constitutional right.  I'm asking you to produce these

18   witnesses for the defense here in court unless you want to

19   agree to Rakoff's rules.

20        MR. TAYBACK:  I understand, your Honor.  And we would

21   be inclined to agree.  That was our understanding.

22        THE COURT:  All right.  Consult with your client.

23        MS. DEININGER:  Scheduling-wise, your Honor, following

24   our discussion yesterday --

25        THE COURT:  I don't actually share the government's

1734

L3GAWEI1ps

1     view of the con -- I think the confrontation clause is

2     automatically waived when the defense calls someone that the

3     government hasn't called as part of the defense case.  Whether

4     they call them as a hostile witness or not is neither here nor

5     there, in my view.

6           MS. LA MORTE:  Hopefully it's a moot issue, but if

7     it's not, we'll look at the case law.

8           THE COURT:  All right.

9           Go ahead.

10          MS. DEININGER:  Scheduling-wise, I just wanted to

11    notify your Honor that following our conversation yesterday, we

12    would propose that, in terms of conducting this remote

13    testimony, that we get it all set up during lunch and then

14    Mr. Elliott begin his testimony immediately following lunch.

15    Our prediction at this point is that, prior to lunch, we will

16    be in the direct of Ms. Cozzetto, so we would just pause for

17    testimony to conduct the testimony of Mr. Elliott.

18          THE COURT:  That's fine.

19          MR. TAYBACK:  We would agree, your Honor.

20          THE COURT:  All right.  So I think we're all set.

21    Anything else we need to take up today?

22          MS. LA MORTE:  Not from the government, not this

23    morning.

24          MR. TAYBACK:  No, your Honor.

25          MR. GILBERT:  No, your Honor.

DJA2034

L3GAWEI1ps

1          THE COURT:  Very good.

2          MS. DEININGER:  Sorry, your Honor.  I actually think

3     there were objections to two documents that we expect to

4     introduce through Cozzetto, who could be this morning.

5          THE COURT:  OK.  Which are they?

6          MS. DEININGER:  The first one that the defense raised

7     an objection to is Government Exhibit 458.

8          MR. GILBERT:  With regard to Government Exhibit 458,

9     our objection is focused -- I don't know if it's available on

10    the screen -- thank you -- on emails that are from -- not from

11    the witness but from an email address Frenchy ESQ at

12    ProtonMail.com.  And those appear on page 7393, 7392, and 7391.

13         THE COURT:  Yes, all right.  Let me ask the government

14    before I hear further from the defense, because ostensibly it

15    looks like hearsay, what's the government's view?

16         MS. DEININGER:  Well, this whole exchange, there are

17    emails in here from Frenchy Esq., but the response to those is

18    by Darcy Cozzetto and Guy Mizrachi, who are co-conspirators,

19    and so those emails are necessary for the context of the

20    exchange.

21         THE COURT:  What does the defense say about that?

22         MR. GILBERT:  Briefly, these are, they're fairly

23    hearsay.  Frenchy Esq. does not come up in this trial at all

24    and appears to be one of the few individuals who is not a

25    co-conspirator.  So there's no co-conspirator.

DJA2035

1736

L3GAWEI1ps

1    THE COURT:  I don't think --

2    MR. GILBERT:  It's a separate trend -- I'm sorry.

3    THE COURT:  The claim is that Darcy is a

4    co-conspirator.

5    MR. GILBERT:  Right.  And that's so.  But the

6    communications from Frenchy, which are not independently

7    admissible, in our view, are unnecessary to understand the

8    context of the other communication.  It's a separate --

9    THE COURT:  Well, let me -- if someone can blow up

10   Mr. Darcy's response, I'll see what Frenchy has to say.

11   What's the relevance of all this?

12   That's a question for the government.

13   MS. DEININGER:  The relevance is that they are first

14   of all talking about the need to set up bank accounts for the

15   dispensaries that are unrelated to their actual marijuana

16   business.  And they're talking about --

17   THE COURT:  That's not stated in this particular

18   exhibit.

19   MS. DEININGER:  It is in the chain.  It's farther

20   down.  And then the addresses that are discussed, that Guy

21   Mizrachi is sending, they're talking about the corporate

22   addresses, and they show the lack of connection to the defense.

23   He says these are the corporate addresses for the new admin

24   companies.

25   THE COURT:  Do you have a hard copy of this?

DJA2036

L3GAWEI1ps

1          MS. DEININGER:  Sure.

2          THE COURT:  Because you keep going down the screen,

3     and then having to blow it up and so forth is not easy to

4     follow.

5          Which witness is this coming in for?

6          MS. DEININGER:  Darcy Cozzetto.

7          And then there is talk, after they talk about the --

8     after they talk about the need to set up the bank accounts,

9     they then discuss how settlement will be hitting the accounts,

10    and Darcy thanks everyone for the updated information provided.

11         THE COURT:  Yes.  So now that I've seen the whole

12    exhibit, I understand the government's point of view.  The

13    objection is overruled and they will be received.  It seems to

14    me clear that the other emails just set the context in which

15    Darcy's responses are relevant on the issues just mentioned.

16         (Government's Exhibit 458 received in evidence)

17         THE COURT:  So let me give this back to the

18    government.

19         So what's the next one?

20         MS. DEININGER:  The government one is Government

21    Exhibit 715.  And this is actually just a subset of the exact

22    chain that we looked at.  The reason that the government is

23    seeking to introduce this excerpt of it is that -- if you can

24    see, it's the last one we just looked at.  The only email

25    addresses visible at the top were Darcy Cozzetto and Frenchy

DJA2037

1738

L3GAWEI1ps

1     Esq.  But this one includes additional header information to

2     show the other parties that were involved at that point in the

3     conversation.  But it is otherwise in the exact same context.

4              THE COURT:  Yes.  So any other additional objection to

5     this from the defense?

6              MR. GILBERT:  The same objection.

7              THE COURT:  Thank you.  That objection is overruled.

8              (Government's Exhibit 715 received in evidence)

9              MS. DEININGER:  I believe there may have been

10    objection to Government Exhibit 303.  We have redacted the end

11    of this because there are messages -- it was going to be

12    authenticated by Darcy Cozzetto.  It's a Telegram exchange.

13    There are messages exchanged after she left Eaze, and my

14    understanding is that she never reviewed those messages and

15    would not be able to authenticate them, so we were going to

16    introduce a redacted version.  But if there is no objection to

17    authenticity, then we will produce the complete exchange.

18             MR. GILBERT:  There is no objection, your Honor.

19             MR. TAYBACK:  No objection.

20             THE COURT:  Very good.

21             (Government's Exhibit 303 received in evidence)

22             THE COURT:  All right.  Anything else?

23             MS. DEININGER:  Nothing further from the government.

24             THE COURT:  We'll see you all in about 12 minutes.

25             (Recess)

DJA2038

L3GAWEI1ps                    Patterson - Redirect

1      (Jury present)

2           THE COURT:  All right.  Our excellent jury is here and

3      they're on their way up.  So let's get the witness back on the

4      stand.

5           15 minutes, if I recall.

6           MR. FOLLY:  Yes, your Honor.

7           THE COURT:  You want the stopwatch to make a loud

8      sound at 15:01?

9      JAMES PATTERSON, resumed.

10          (Jury present)

11          THE COURT:  Good morning, ladies and gentlemen.  I'm

12     glad to see the world's greatest jury is back in session.

13          I also notice Juror No. 6 is doing his thing, and I

14     see Juror No. 4 is moving a little in that direction.  So there

15     we are.

16          All right.  We are ready to continue.

17          MR. FOLLY:  Thank you, your Honor.

18     REDIRECT EXAMINATION (Cont'd)

19     BY MR. FOLLY:

20     Q.  Good morning, Mr. Patterson.

21     A.  Good morning.

22     Q.  You were asked some questions on cross-examination

23     yesterday about Ruben.  Do you recall that?

24     A.  Yes.

25     Q.  And specifically you were asked about Ruben's involvement

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2039

L3GAWEI1ps                    Patterson - Redirect

1   in the Clearsettle operation during the 2016 to 2017 time

2   period.  Do you recall that?

3   A.  Yes.

4   Q.  He was not involved in the card processing operation during

5   that time period, correct?

6   A.  No, not to my knowledge.

7   Q.  And to your knowledge Ruben became involved in 2018, in a

8   card processing operation; is that right?

9   A.  Yes.

10  Q.  And that was when the name of the card processing operation

11  was EUprocessing.  Right?

12  A.  Yes.  That's correct.

13  Q.  Ray mentioned Ruben at the Calabasas meeting in 2018,

14  correct?

15  A.  Yes.

16  Q.  And the purpose of that meeting was to discuss credit and

17  debit card processing through Ray's organization, correct?

18  A.  Yes.

19  Q.  What did Ray say about Ruben specifically at that meeting?

20  A.  He said that he lived in Germany and he had connections to

21  the banks that would be used to set up the accounts, and that

22  specifically he was going to collect the applications from the

23  dispensaries via an email address that was set up, and that he

24  was responsible for opening the accounts.

25  Q.  I believe you testified that you left that meeting early,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3GAWEI1ps                    Patterson - Redirect

1   correct?

2   A.  Yes, I did.

3   Q.  At the time that you left the meeting, what was happening?

4   A.  There was a break in the meeting, and so everyone who was

5   in the company went to the bathroom.  And Ray had said that

6   Ruben would be joining us after -- at that point, before I --

7   before I left he said that, and then I didn't stay for the

8   second half, the second part of that meeting.

9   Q.  You testified that you spoke with Nick Fasano after the

10  meeting about the meeting?

11  A.  Yes.

12  Q.  Is that right?

13        What did Nick Fasano say had occurred at the meeting

14  after you left the meeting?

15        MR. GILBERT:  Objection, asked and answered.

16        THE COURT:  Overruled.

17  Q.  You can answer, Mr. Patterson.

18  A.  Well, he said that -- the quote he used was, he said Ray's

19  German banker joined the meeting, and then went through the

20  application process with the dispensaries.

21  Q.  Someone named Ruben W also participated in Telegram

22  messages discussing the card processing operation, correct?

23  A.  Yes.

24  Q.  You were also a participant in those messages, right?

25  A.  Yes, I was.

L3GAWEI1ps                    Patterson - Redirect

1          MR. FOLLY:  Can we show the witness what's in evidence

2    as Government Exhibit 302.  You can publish that to the jury

3    and the witness, at page 50.

4    Q.  And focusing on where it says 10:52 and downward, can you

5    read aloud just the first four messages there, from Ray

6    Akhavan.

7    A.  Yes.  "Martin and Ruben have both agreed to be actively

8    involved with helping us out.  Martin is handling all reporting

9    and reconciliation.  And Ruben is interfacing with the banks.

10   You all met Ruben in LA, and Martin will be out soon hopefully

11   as well."

12   Q.  You can stop there.  We can take this down.

13          Do you recall being asked questions on

14   cross-examination by Mr. Tayback about your understanding that

15   Ray had contacts at certain merchant banks who were aware that

16   the accounts were being used to conduct marijuana transactions?

17   A.  Yes.

18   Q.  And I believe you testified that your understanding was

19   that some members of those banks were aware that these were

20   marijuana transactions.

21   A.  Yes.

22   Q.  Now, I believe you had also indicated some of the employees

23   at the banks were not aware that these were marijuana

24   transactions.  Is that right?

25   A.  Yes.  That was my understanding.

1743

L3GAWEI1ps                    Patterson - Redirect

1   Q.  Such as employees who worked in compliance, right?

2   A.  That was one specific example, yes.

3   Q.  And I believe you had said that there were some situations

4   where those employees had found out that these accounts were

5   being used to process marijuana transactions?

6           MR. TAYBACK:  Objection as to time and leading.

7           MR. FOLLY:  Your Honor, I can rephrase it.

8           THE COURT:  Yes.  The objection on leading is

9   overruled.  But the objection on time is sustained.

10  Q.  Were there certain instances that Ray brought to your

11  attention where employees at some of the merchant banks had

12  found out that accounts were being used to process marijuana

13  transactions?

14  A.  Yes.  There was one instance I recall where an account had

15  gotten closed, so a new account had to be opened, and Ray said

16  that the owners of the bank were aware but that some people,

17  some lower-level people in compliance were not, so that they

18  were -- they let those people close the accounts, didn't tell

19  them what was going on, and I think he said what they said is

20  tell them "Good job," and then they reopened new accounts a

21  little bit later.

22  Q.  Now, it was your understanding that Visa did not know that

23  the fake merchant accounts were being used to process

24  marijuana, correct?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2043

L3GAWEI1ps                    Patterson - Redirect

1   Q.  It was your understanding that MasterCard did not know that

2   these were marijuana transactions, correct?

3   A.  Yes.

4   Q.  It was your understanding that the issuing banks in the

5   United States did not know that these were marijuana

6   transactions, correct?

7           MR. TAYBACK:  Objection, foundation.

8           THE COURT:  Sustained.

9   Q.  Mr. Patterson, was it your understanding that the purpose

10  of this credit card processing operation was to trick US

11  issuing banks into processing these transactions?

12          MR. TAYBACK:  Objection, leading and foundation.

13          THE COURT:  Overruled.

14          Overruled.

15  Q.  You can answer, Mr. Patterson.

16  A.  My understanding was the purpose was to conceal it from the

17  issuing banks and Visa and MasterCard, the fact that the

18  underlying transactions were marijuana.

19  Q.  And it was your understanding that, if the issuing banks

20  found out that these were marijuana transactions, that could

21  eventually lead to the termination or shutdown of the

22  operation, correct?

23  A.  Yes.

24          MR. TAYBACK:  Objection.

25          MR. GILBERT:  Joined.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2044

L3GAWEI1ps                    Patterson - Redirect

1       THE COURT:  Overruled.

2    Q.  You can answer, Mr. Patterson?

3       THE COURT:  He did answer yes.

4    Q.  And Mr. Patterson, Ray Akhavan in fact told you that,

5    correct?

6    A.  Yes.

7    Q.  And the underlying goal of the credit card operation was so

8    that Eaze customers could use their credit and debit cards to

9    purchase marijuana products through the Eaze website, correct?

10   A.  Yes, that's correct.

11   Q.  And in order to make that work, you needed to be able to

12   get the money from the Eaze customers' credit card accounts, or

13   bank accounts, to the accounts at the dispensaries, correct?

14   A.  Yes.

15   Q.  You were asked some questions on cross-examination about --

16      THE COURT:  Counsel, I allowed you to ask a series of

17   leading questions because the purpose of the objection on

18   grounds of leading is only relevant with respect to a witness

19   who can be easily led, which is, as one might infer, not

20   necessarily this witness, but I think you've gone as far as I'm

21   going to let you go on leading questions.

22   Q.  You were asked some questions on cross-examination about

23   whose idea it was to have the dispensaries have the

24   relationships directly with the processors; do you recall that?

25   A.  Yes.

L3GAWEI1ps                    Patterson - Redirect

1   Q.  And I believe you said that was not Ray Akhavan's decision,

2   correct?

3   A.  That's correct.  That was Eaze's decision.

4   Q.  Now, I'd like to ask you some questions about who was

5   making the decisions about how the credit card processing

6   operation worked.  Who was in charge of overseeing this credit

7   card processing operation?

8   A.  Ray.

9   Q.  Who was responsible for getting the fake merchant accounts

10  that were used for the credit card transactions?

11           MR. GILBERT:  Objection, leading.

12           MR. TAYBACK:  Joined.

13           THE COURT:  I can't imagine why you think that's

14  leading.  The question is "who," an open-ended question.  Could

15  be the man on the moon.  It could be -- well, I won't speculate

16  further, but it's certainly not leading.  Overruled.

17  Q.  You could answer, Mr. Patterson.

18  A.  Can you repeat the question?

19  Q.  Who was responsible for getting the fake merchant accounts

20  that were used to process the credit card transactions?

21  A.  My understanding was that during the Clearsettle phase it

22  was Ray, and then the EUprocessing phase was both Ray and

23  Ruben.

24  Q.  Who were some of the main people that Ray worked with

25  during the credit card processing operation?

L3GAWEI1ps                    Patterson - Recross

1   A.  Hussein, Ozan, Martin, Ruben, Andreas, are names that I saw

2   in the chats.

3   Q.  Mr. Patterson, did you an understanding that this was a

4   criminal scheme during the time period when you participated in

5   it?

6   A.  Yes.  It -- yes.

7   Q.  And you pled guilty to participating in the bank fraud

8   conspiracy?

9   A.  Yes.

10          MR. FOLLY:  No further questions.

11          THE COURT:  Any recross?

12          MR. TAYBACK:  Yes, your Honor.

13  RECROSS EXAMINATION

14  BY MR. TAYBACK:

15  Q.  Mr. Patterson, can you hear me?

16  A.  Yes, I can.

17  Q.  In a couple of places in the documents that you testified

18  about, the word "depots" is used.  "Depots" is a synonym for

19  dispensaries?

20  A.  Yes.

21          MR. TAYBACK:  If you could place before the witness

22  what's been marked and introduced as Exhibit GX 422.

23  Q.  This is an email that you discussed during the course of

24  your testimony.  Do you recognize it?

25  A.  Yes, I do.

1748

L3GAWEI1ps                    Patterson - Recross

1   Q.  I'd like to direct your attention to the sentence that

2   says, "So in itself it's not the issue."  Do you see that?

3   A.  Yes.

4   Q.  Mr. Akhavan says to you, "So in itself it's not the issue.

5   The issue is that usually, with high CBs" -- you understood

6   that to be chargebacks, correct?

7   A.  Yes.

8   Q.  -- "you have high complaints to the bank which can result

9   in people talking about the product, and if you have a high

10  number of, let's say, Wells Fargo customers who complain about

11  not liking the weed or the weed card issuing doctors" -- see

12  that?

13  A.  Yes.

14  Q.  Then we go to the next sentence.  It says, "The higher the

15  chance that Wells Fargo notices weed is being sold and then

16  reaches out to Visa and MasterCard" -- you see that?

17  A.  Yes.

18  Q.  Your understanding was that Visa and MasterCard were the

19  ones that had the rules against processing marijuana, correct?

20  A.  Yes.  I knew that they -- well, I knew that they didn't

21  have MCC codes for marijuana dispensaries.

22  Q.  And Visa and MasterCard were the ones that would be

23  potentially the ones to actually contact the merchant bank and

24  do -- and cause an investigation to occur, correct?

25  A.  Yes.

DJA2048

L3GAWEI1ps                    Patterson - Recross

1   Q.  And the events described here that you understand, the risk

2   was after the transaction, correct?  That somebody would say

3   afterwards they contact the bank and they didn't recognize

4   something on their bank statement?

5   A.  On this particular point, yes.

6          MR. TAYBACK:  Thank you.  You can take it down.

7   Q.  As I believe you indicated previously, you did not spend

8   time looking at the different banks' policies, what the issuing

9   banks would or wouldn't do, correct?

10  A.  That's correct.

11         MR. TAYBACK:  I have no further questions.

12         THE COURT:  Anything from -- yes.

13  RECROSS EXAMINATION

14  BY MR. GILBERT:

15  Q.  Mr. Patterson, you have no personal knowledge of Ruben

16  Weigand collecting applications for bank accounts, correct?

17  A.  That's correct.

18  Q.  You have no personal knowledge of Mr. Weigand submitting

19  any application to open a bank account, correct?

20  A.  That's correct.

21  Q.  And you have no personal knowledge of him getting what

22  you've described as fake merchant accounts, correct?

23  A.  That's correct.

24  Q.  And you understood that, from Ray, that Mr. Weigand was

25  supposed to be joining the meeting in March of 2018 that you

DJA2049

L3GAWEI1ps                    Patterson - Recross

1   testified about?

2   A.  Yes.

3   Q.  And after you learned that, you left the meeting.  Correct?

4   A.  Yes.

5   Q.  Before meeting with Mr. Weigand.

6   A.  That's right.

7   Q.  And it's true that you never requested of Mr. Akhavan that

8   he introduce you to Mr. Weigand at any time.  Correct?

9   A.  Correct.

10  Q.  And you never requested to speak to Mr. Weigand on the

11  phone.  Correct?

12  A.  Correct.

13  Q.  And in fact you never did.

14  A.  No, I've never spoken to him.

15  Q.  And you testified yesterday -- well -- that you believed

16  that you started committing bank fraud in the year 2018.  Isn't

17  that true?

18  A.  What I said is that that's when I would say the lingering

19  doubts that I had were removed.  Before that I was -- I knew it

20  was -- what we were doing was -- it felt wrong, but I didn't

21  know for sure, I would say, until after that meeting.

22  Q.  And that meeting was in the year 2018.  Correct?

23  A.  Yes.

24          MR. GILBERT:  Nothing further.

25          THE COURT:  Anything else?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1751

L3GAWEI1ps                    Brown - Direct

1     MR. FOLLY:  No, your Honor.

2     THE COURT:  Thank you very much.  You may step down.

3     (Witness excused)

4     THE COURT:  Please call your next witness.

5     MS. DEININGER:  The government calls Chuck Brown.

6  CHARLES BROWN,

7       called as a witness by the government,

8       having been duly sworn, testified as follows:

9     THE COURT:  Counsel.

10  DIRECT EXAMINATION

11  BY MS. DEININGER:

12  Q.  Good morning, Mr. Brown.

13  A.  Good morning.

14  Q.  Can you hear me OK?

15  A.  Yes, I can.

16  Q.  OK.  Please tell me if you are not able to at any point.

17       Mr. Brown, where do you work?

18  A.  I work at Actors Federal Credit Union.

19  Q.  Do you mind if for the purpose of our conversation I call

20  it Actors?

21  A.  Yes.  That's fine.

22  Q.  How long have you worked at Actors?

23  A.  Since 2008.

24  Q.  And what is your current role there?

25  A.  I'm the chief compliance and risk officer.

DJA2051

L3GAWEI1ps                    Brown - Direct

1   Q.   What do you do as the chief compliance and risk officer?

2   A.   My primary duties are to research and advise our board of

3   directors and the credit union staff on matters of regulatory

4   issues that come up in the course of business.

5   Q.   And do you specialize in any particular regulatory areas?

6   A.   Yes.  I'm a certified anti money laundering specialist.

7   Q.   What is anti money laundering?

8   A.   Well, money laundering is when the proceeds of an illegal

9   action are introduced into the US banks system in an effort to

10  obscure the origin of the funds or the fact that they came from

11  an illegal activity.  Anti money laundering would be monitoring

12  and setting up systems and personnel in place to look for signs

13  of that and report it to the property authorities.

14  Q.   What is an example of the types of proceeds from illegal

15  actions that might appear to be laundered?

16  A.   Well, for instance, if a drug dealer, you know, earns money

17  selling drugs on the street, then they would -- that would

18  probably be in the form of cash, and they would need to

19  introduce it into the system and pay their suppliers in some

20  way.  So they might try to do something like bring it into

21  their bank and deposit it in smaller amounts than would

22  normally need to be reported.  And then from there they might

23  even take more steps that are called layering.  They might send

24  a wire transfer to another bank or they might purchase money

25  orders and then take it perhaps to another institution and take

L3GAWEI1ps                    Brown - Direct

1    further steps from that until the actual origin of the funds is

2    no longer really very easily traced.

3    Q.  How long have you been the chief compliance and risk

4    officer at Actors?

5    A.  For a little over three years.

6    Q.  Did you hold any other role at Actors from the 2016 to 2019

7    time period?

8    A.  Yes.  I was the senior compliance officer before I was

9    named chief.

10   Q.  How was your role different as senior compliance officer,

11   if at all, from the role you hold now?

12   A.  It's slightly more expanded.  I have a larger staff that I

13   oversee, and some areas of regulatory issues have been expanded

14   as well.  I have a slightly broader definition for my job than

15   I did as senior compliance.  But otherwise it's basically the

16   same.

17   Q.  What type of company is Actors?

18   A.  Actors is a federally chartered credit union, which

19   essentially just means that it's a not-for-profit financial

20   cooperative, offering essentially the same services as banks.

21   Q.  But what does it mean that it's federally chartered?

22   A.  Well, there are two types of charters.  There's a federal

23   charter, or a state charter.  It means that, if we're federally

24   chartered, it means that we're regulated by the National Credit

25   Union Administration and insured by a division of that National

**DJA2053**

L3GAWEI1ps                    Brown - Direct

1   Credit Union Administration called the National Credit Union

2   Share Insurance Fund.

3   Q.  So is Actors insured by the National Credit Union Share

4   Insurance Fund?

5   A.  Yes, we are.

6   Q.  Where is Actors headquartered?

7   A.  We're headquartered in Manhattan in Times Square.

8   Q.  And what banking services does Actor offer its members?

9   A.  We offer full banking services, almost everything that a

10  commercial bank would offer.  We offer deposit accounts,

11  savings and checking accounts, debit cards.  We offer a variety

12  of sending products, personal loans, auto loans, mortgage

13  damages, credit cards, almost everything that you would find at

14  a bank.

15  Q.  With respect to the credit and debit card that you just

16  mentioned, is Actors what is referred to as the issuing bank?

17  A.  Yes, we are.

18  Q.  So during the 2016 to 2019 time period, what credit and

19  debit card brand did Actors partner with?

20  A.  Over 99 percent of our cards were branded with the Visa

21  logo.  We did have a few MasterCards left over in that time

22  from an earlier time period.

23              (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2054

L3GPWEI2                      Brown - Direct

1   Q.  So in your role, are you familiar with how transactions for

2   credit and debit card issued by Actors are processed?

3   A.  In given terms, yes.

4   Q.  And what is that understanding based on?

5   A.  Well, for every transaction for a credit or debit card,

6   there are a number of different entities involved.  There's the

7   cardholder, of course, or the customer --

8   Q.  Mr. Brown, if I can just pause you for a second?

9   A.  Sure.

10  Q.  I was just asking how you became familiar with how that

11  process works.

12  A.  Mostly just through experience, as well as reading some

13  rules and regulations.

14  Q.  And in your role, are you also familiar with Visa and

15  MasterCard's rules for the bank and its networks?

16  A.  Again, generally, yes.

17  Q.  Now, I think is where you were starting to say.  Can you

18  walk me through a little bit of your understand of how

19  transactions for Actors credit cards are processed?

20  A.  Sure.  There are a number of entities involved.  There is a

21  cardholder who holds an account at the issuing bank.  The

22  issuing bank, in this case us, might also use a third-party

23  payment processor.  Then there is the payment network, which we

24  mentioned Visa and MasterCard already, but another credit card

25  also might be Discover or American Express.  They might also be

DJA2055

L3GPWEI2                          Brown - Direct

1    the issuer if it's a credit card.

2            Then, on the other end of the transaction, is a

3    merchant, which is a business selling goods or services of some

4    type.  That merchant would have an account with an acquirer,

5    and that acquirer could be a financial institution, or they

6    also might be using a third-party payment processor.

7            So when the customer or cardholder makes a purchase

8    from a merchant, information about that card and about the

9    transaction and about the merchant are transmitted

10   electronically through the payment network to the issuing bank

11   or the issuing bank's payment processor.  The information

12   transmitted would be the card number and expiration date, the

13   CDB code.

14           MR. PELLECHI:  Objection.  Narrative, lacks

15   foundation.

16           THE COURT:  Well, the question called for a narrative,

17   and there was no objection; so I will allow him to answer that.

18           However, going forward, let's be a little careful

19   about that.

20           MS. DEININGER:  Yes, your Honor.

21           THE COURT:  You can finish your answer.

22   A.  The information would include the card number, expiration

23   date, the -- possibly the code on the back of the card, a PIN

24   validation code, if it was a transaction where the customer had

25   to put in a PIN number, the date, time and location and dollar

DJA2056

L3GPWEI2                    Brown - Direct

1   amount of the transaction, and then the merchant's name or a

2   merchant descriptor, and a merchant category code, which is the

3   classification for what types of goods and services this

4   particular merchant might fall under, under the definition of

5   the payment networks, Visa or MasterCard.

6   Q.  So just to be clear, Mr. Brown, what is your understanding

7   of what Visa and MasterCard's role is in this process?

8   A.  They establish the rules, but they also own essentially the

9   networks that the transaction travels through.  They also take

10  care of the settlement of the funds between the two parties.

11  Q.  And what is the role of the acquiring bank?

12  A.  The acquiring bank essentially sponsors the merchant into

13  the payment network.  They are required to abide by a certain

14  set of rules.  They essentially do what is sometimes called an

15  underwriting process of the merchant, meaning that the merchant

16  applies for an account and the acquirer verifies and does due

17  diligence on the merchant to make sure that they are -- they

18  are who they say they are and that they are providing the goods

19  and services that they say they provide.

20  Q.  And are there any other things that the acquiring bank is

21  looking to confirm during the due diligence process?

22          MR. TAYBACK:  Objection, foundation.

23          THE COURT:  Sustained.

24  Q.  Mr. Brown, taking a step back, you mentioned that one roll

25  of Visa and MasterCard is taking care of the transfers of funds

DJA2057

1758

L3GPWEI2                      Brown - Direct

1   between the two parties?

2   A.  Yes.

3   Q.  What's your understanding of what two parties -- what two

4   parties did you mean there?

5   A.  Well, it would essentially be the two institutions

6   involved, the issuing institution and the acquiring

7   institution.  When the transaction is made, the funds are

8   either --

9           MR. TAYBACK:  Objection.  It's a narrative.

10          THE COURT:  Sustained.  The first sentence will

11  remain.  The rest is stricken.

12          Go ahead.

13  BY MS. DEININGER:

14  Q.  Mr. Brown, what's your understanding of what the merchant's

15  responsibility is when they're being sponsored into the network

16  by an acquiring bank?

17          MR. TAYBACK:  Objection.  Foundation.

18          THE COURT:  Overruled.

19  A.  Their responsibility is to present themselves honestly and

20  accurately with information about their business and their

21  goods and services to the acquirer.

22  Q.  Now, you mentioned that issuers -- issuing banks can work

23  with a payment processor.  Does Actors employ a payment

24  processor?

25  A.  Yes, we do.

DJA2058

L3GPWEI2                        Brown - Direct

1  Q.  And what's the role of the payment processor?

2  A.  The payment processor's role is technological, and they are

3  the party involved in validating the transaction for security

4  and risk mitigation purposes.

5  Q.  And what does that mean, that they are responsible for

6  validating the transaction for mitigation purposes?

7  A.  So all of that information that was transmitted

8  electronically through the payment network has to be read by

9  our payment processor.  So they're verifying that it's a valid,

10  unexpired card; that the correct PIN code was used.  They're

11  looking to see if there is enough credit or funds available to

12  cover the transaction, and they're also looking for any signs

13  that it might be a prohibited transaction.

14  Q.  And so then, finally, what is Actors' role in the

15  transaction process?

16  A.  So once that information has been transmitted and gone

17  through the processor, our role is to verify whether there

18  is -- whether there are funds available, and we send a message

19  back through the payment processor -- our system does this

20  automatically; we don't have a human looking at it -- sends a

21  message back that either approves or declines the transaction.

22  Q.  Can you give me some examples of where a transaction would

23  be declined or blocked?

24  A.  Well, the most obvious one would be if there were not

25  available funds or available credit to cover the transaction.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2059

1760

L3GPWEI2                    Brown - Direct

1    But it might also be blocked if -- we, as Actors, had set up

2    certain parameters or certain rules to decline certain types of

3    transactions or certain merchants even.

4    Q.  And under what circumstances would Actors set up those type

5    of rules?

6    A.  Generally, it's in response to situations of fraud,

7    complaints by our cardholders, our members who have had cases

8    of fraud perpetrated against them.  Oftentimes it comes when we

9    have seen a pattern of fraud from a particular merchant or a

10   particular merchant in a particular geographic location.

11   Q.  Does Actors work with its payment processor to identify

12   those patterns of fraud?

13   A.  Yeah, the Actors is a small institution; so we don't really

14   have the personnel necessarily to do a deep investigation on

15   every case or pattern of fraud, but we work with our payment

16   processor.  Sometimes they also alert us if they see patterns

17   of fraud across multiple institutions, since they work with

18   more than us.

19   Q.  So a few minutes ago you listed a bunch of transaction

20   information that's received by the payment processor and Actors

21   in the course of the transaction authorization process.  One of

22   those was amount, right?

23   A.  Sorry?

24   Q.  One of those was the amount of the transaction, right?

25   A.  That's right.

L3GPWEI2                              Brown - Direct

1    Q.  And I think you also mentioned merchant name?

2    A.  Yes.

3    Q.  Or merchant descriptor?

4    A.  That's right.

5    Q.  And then is there also location information transmitted?

6    A.  Yes, yes.

7    Q.  And I think you mentioned a code.  What were you referring

8    to there?

9    A.  Merchant category code.  These are a series of codes that

10   are set up by Visa or MasterCard to indicate the type of

11   business involved.

12   Q.  And just remind us, so who is -- who is that information

13   transmitted to?

14   A.  It's transmitted from the acquirer, through the payment

15   network, to the issuing bank.

16   Q.  And again, how does the payment processor that Actors works

17   with utilize that information?

18   A.  They verify that it's a valid merchant category code, and

19   that information is transmitted to our system so that it can be

20   printed on the member's monthly statements.

21   Q.  And is that information utilized when they are looking for

22   patterns of fraud, like you mentioned earlier?

23   A.  Yes.  It could be that we've noticed or they have noticed

24   patterns of fraud amongst an electronic -- you know, in

25   electronics stores or something like that, so that might raise

1762

L3GPWEI2                          Brown - Direct

1    a red flag.

2    Q.  So this transaction information that the payment processor

3    Actors receives, is it important to Actors that that

4    information be accurate?

5    A.  Yes, it is.

6    Q.  Why?

7    A.  Well, the integrity of the entire payment system is --

8    depends on all parties playing by the same rules, and the

9    accuracy of that information is important from a consumer

10   protection point of view as well.  It's important that the --

11   what appears on the member's statements is accurate so that the

12   member of or the cardholder knows exactly what their purchase

13   was and who it was from.

14   Q.  Okay.  Thank you.  Once a transaction is approved, can you

15   describe how the money for the goods or services flows?

16   A.  The settlement process happens once a day and the payment

17   network is really in charge of that.  They are in charge of

18   deducting the funds from, in our case, our settlement account

19   at our corporate credit union, and depositing it into the

20   acquirer's settlement account, which might be at the Federal

21   Reserve or at their headquarters.

22   Q.  So you mentioned that funds are deducted from "our

23   settlement account;" is that an account held by Actors?

24   A.  That's correct.

25   Q.  And what information from card transactions ultimately goes

DJA2062

L3GPWEI2                          Brown - Direct

1  onto an Actors' customer's statement?

2  A.  The date, time, location, dollar amount and the merchant

3  name or descriptor.

4  Q.  Generally, what can happen if a customer sees a transaction

5  on their statement that they don't recognize?

6  A.  What can happen is that they might call us and say that the

7  transaction was not authorized.

8  Q.  And what would Actors do if they received that sort of call

9  from a customer?

10  A.  We would ask the cardholder for information, whether they

11  had had the card in their possession at the time of the

12  transaction or not, what all the facts were about the

13  particular transaction.

14        We would then send that information to our payment

15  processor, who would initiate an investigation.  We would be

16  required, within ten days of that cardholder reporting that

17  unauthorized transaction to us, to give the cardholder the

18  credit back for that, and if ultimately the transaction could

19  not be approved to be authorized, that credit would be

20  permanent.

21  Q.  Now, you mentioned that you had sent information you

22  received to your payment processor who would initiate an

23  investigation.  Do you have an understanding, based on your

24  role, of generally some of the types of things your payment

25  processor might do in that investigation?

DJA2063

1764

L3GPWEI2                    Brown - Direct

1  A.  Very generally, yes.

2  Q.  Generally, so what is your understanding?

3  A.  They would probably try to contact the merchant.  They

4  would look into the coding of the transaction to see whether a

5  PIN number was used or a signature was provided.  If it was a

6  signature, they would obtain proof, if they had a copy of the

7  proof of signature, to see if it was the cardholder's signature

8  or not.  And essentially that's my basic understanding of some

9  of the elements that would go into it.

10  Q.  You mentioned they might contact the merchant.  Do you know

11  how they might do that for an online merchant?

12  A.  I don't know that.  I'm sorry.

13  Q.  A minute ago we discussed how certain information regarding

14  each transaction is sent to Actors through the network,

15  correct?

16  A.  Yes.

17  Q.  How does Actors receive that information?

18  A.  It's sent to our server, essentially our computer system in

19  our main office in New York.

20  Q.  And so that office is here in New York City; that's where

21  the server is located?

22  A.  That's correct.  It's located in our Times Square office.

23  Q.  And was it located there in the 2016 to 2019 time period?

24  A.  Yes.

25  Q.  So based on your role, are you familiar with Actors'

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2064

L3GPWEI2                    Brown - Direct

1  policies prohibiting certain uses of Actors credit and debit

2  cards?

3  A.  Yes.

4  Q.  I'd like to, Mr. Levine, if you can pull up just for the

5  witness what's been marked for identification as Government

6  Exhibit 2717.

7         Mr. Brown, do you recognize this?

8  A.  Yes, I do.

9  Q.  What is it?

10 A.  It's our Visa credit card holder agreement.

11        MS. DEININGER:  Your Honor, the government offers

12 Government Exhibit 2717 into evidence.

13        MR. TAYBACK:  No objection.

14        MR. PELLECHI:  No objection.

15        THE COURT:  Received.

16        (Government's Exhibit 2717 received in evidence)

17        MS. DEININGER:  Mr. Levine, you can show that to

18 everyone.

19 BY MS. DEININGER:

20 Q.  Now, Mr. Brown, does this cardholder agreement apply to all

21 Actors' credit cards?

22 A.  Yes, it does.

23 Q.  And was a version of this cardholder agreement in effect in

24 the period between 2016 and 2019?

25 A.  Yes, it was.

1766

L3GPWEI2                          Brown - Direct

1   Q.   If we can scroll down to paragraph 8.  I think it might be

2   page 5.  There we go.

3            Do you see paragraph 8?

4   A.   Yes.

5   Q.   Can you read that for me?

6   A.   "Your card may not be used for any illegal transactions."

7   Q.   And is it -- what's your understanding of whether marijuana

8   transactions would be prohibited under this rule?

9   A.   They would be.

10   Q.   Why?

11   A.   Because marijuana purchases are still illegal at the

12   federal level and because they are against Visa rules.

13   Q.   In terms of the rule in this cardholder agreement, does it

14   make any difference whether the transaction is conducted in a

15   state that has legalized personal use of marijuana?

16   A.   No.

17   Q.   Did all versions of the cardholder agreement in effect

18   between 2016 and 2019 contain this rule?

19   A.   Yes.

20   Q.   Mr. Levine, you can take that down.  Thank you.  And can we

21   now show, just for the witness, what has been marked for

22   identification as Government Exhibit 2704.

23            Mr. Brown, do you recognize that document?

24   A.   Yes.

25   Q.   What is it?

DJA2066

L3GPWEI2                    Brown - Direct

1   A.  This is the terms and conditions of our account holder

2   agreement, including the account debit card.

3           MS. DEININGER:  Your Honor, the government offers

4   Government Exhibit 2704 into evidence.

5           MR. TAYBACK:  No objection.

6           MR. PELLECHI:  No objection.

7           THE COURT:  Received.

8           (Government's Exhibit 2704 received in evidence)

9           MS. DEININGER:  Mr. Levine, if you can show that to

10  everyone.

11  BY MS. DEININGER:

12  Q.  And so again, Mr. Brown, what's the title of this document?

13  A.  Terms and Conditions of Your Account.

14  Q.  And I think you said these terms and conditions apply to

15  all Actors' bank accounts; is that right?

16  A.  That's correct.

17  Q.  Was a version of these terms and conditions in effect in

18  the period between 2016 and 2019?

19  A.  Yes.

20  Q.  If we can go to page 5.

21          About a third from the top there's a paragraph, it

22  says in bold:  "Advisory against illegal use."  Do you see

23  that?

24  A.  Yes.

25  Q.  Can you read the sentence following that?

DJA2067

L3GPWEI2                    Brown - Direct

1  A.  "You agree not to use your cards for illegal gambling or

2  other illegal purpose."

3  Q.  You can stop there.  Actually, sorry.  Read the second

4  sentence?

5  A.  "Display of a payment card logo by, for example, an online

6  merchant does not necessarily mean that transactions are lawful

7  in all jurisdictions in which the cardholder may be located."

8  Q.  And just to be clear, there's a reference here to "cards."

9  What "cards" does this apply to?

10 A.  This applies to our debit cards.

11 Q.  And did all versions of the Actors' terms and conditions

12 effective between 2016 and 2019 have this rule?

13 A.  Yes.

14 Q.  What's your understanding of whether marijuana transactions

15 in the United States would be prohibited under this rule?

16 A.  They would be prohibited under this rule.

17 Q.  Why?

18 A.  For the same reasons as the credit card, the marijuana

19 purchases are not legal at the federal level and it is against

20 Visa/MasterCard rules.

21 Q.  So again, would it make any difference if the transaction

22 is conducted in a state that has legalized marijuana sales?

23 A.  No.

24 Q.  Mr. Levine, you can take that down.

25          Mr. Brown, does Actors collect any fees when its

L3GPWEI2                    Brown - Direct

1   members use their cards for transactions?

2   A.  Yes, we use get interchange income.

3   Q.  And how much are those fees on any given transaction?

4   A.  I really don't know for certain.  It's a few cents.

5   Q.  Is it important to Actors that it remain in compliance with

6   Visa's rules?

7   A.  Yes, it is.

8   Q.  Why?

9   A.  Not remaining in compliance could result in sanctions,

10  either from our federal regulators or from Visa themselves.

11  Q.  And what impact would it have on Actors' business if it

12  wasn't able to participate in the Visa network?

13  A.  It could be a huge impact.  We would likely no longer be in

14  existence.

15  Q.  Would Actors knowingly approve marijuana credit or debit

16  card transactions?

17  A.  No.

18  Q.  Are marijuana-related businesses permitted to open accounts

19  with Actors?

20  A.  No.

21  Q.  Why not?

22          MR. TAYBACK:  Objection.  Relevance.

23          THE COURT:  Overruled.

24  Q.  You can answer the question.

25  A.  While it's not explicitly prohibited by our federal

L3GPWEI2                          Brown - Direct

1    regulators, the requirements for banking marijuana businesses

2    are very stringent as a high-risk business, and Actors doesn't,

3    at this time, have the resources to conduct the level of due

4    diligence and take on the risk involved in banking marijuana

5    businesses.

6    Q.  And you mentioned that there were requirements for banking

7    marijuana business.  Generally, what requirements are you

8    referring to?

9    A.  Extensive due diligence on the businesses, as well as

10   almost constant reporting of transaction activity to the

11   Financial Crimes Enforcement Network.  In many cases, many

12   regulators feel that the institution's responsibility is to

13   follow every transaction from seed to sale.

14   Q.  So what, if anything, does Actors do to make sure it

15   doesn't open up an account for a marijuana-related business?

16   A.  We ask each business that opens an account for us what the

17   nature and purpose of their business is.  We do due diligence

18   by verifying that through their corporate documents, online

19   searches, things like that.  So if we were to receive an

20   application from a marijuana business, we would not accept it.

21   Q.  And just to be clear, what would Actors do if a

22   marijuana-related business applied for an account with Actors?

23   A.  We would decline the account.

24   Q.  What would Actors do if it learned that one of its bank

25   accounts that it already had was held by a marijuana-related

L3GPWEI2                    Brown - Direct

1   business?

2   A.  We would be required to report them to the Financial Crimes

3   Enforcement Network, or some form of law enforcement, and we

4   would close the account.

5   Q.  Is there a name for this type of report that you would

6   submit to the Financial Crimes Enforcement Network?

7   A.  It's called a Suspicious Activity Report, often referred to

8   as a SAR.

9   Q.  Is Actors required to submit SARs under certain

10  circumstances?

11  A.  Yes.

12  Q.  Can you generally tell me what -- when it's required to

13  submit a SAR?

14  A.  It's required to submit a SAR if we become aware of a crime

15  being committed or if we strongly suspect so.

16  Q.  So going back to debit and credit card transactions for a

17  minute.  What would Actors do if it became aware that a

18  particular transaction was fraudulent or illegal, after it was

19  approved?

20  A.  I'm sorry, could you rephrase the question?

21  Q.  Sure.  What would Actors do if it received a customer

22  complaint indicating that a transaction might have been

23  fraudulent or illegal, after it was approved?

24          MR. PELLECHI:  Objection.  Compound question.

25          THE COURT:  Sustained.

DJA2071

1772

L3GPWEI2                    Brown - Direct

1  Q.  What would Actors do if it received a customer complaint

2  indicating that a transaction might have been illegal, after it

3  was approved?

4  A.  We would initiate the investigation with our payment

5  processor, and if the customer said that the transaction was

6  not theirs, then we would give them the provisional credit

7  pending the completion of the investigation.

8  Q.  And what would Actors do if it received a customer

9  complaint indicating that a particular transaction was

10  fraudulent after it was approved?

11  A.  The same thing.

12  Q.  Can you give us some examples of how fraud or illegality

13  might come to Actors' attention?

14  A.  It would primarily be through our customers.

15  Q.  And would that generally be for transactions that had

16  already been processed?

17  A.  Yes, they would see it on their statements.

18  Q.  What would Actors do if it found out that a merchant was

19  submitting marijuana transactions into the Visa network for

20  payment?

21  A.  We would block that merchant.

22  Q.  And how would you do that?

23  A.  We would set up a rule, parameters with our payment

24  processor.

25          MS. DEININGER:  At this time, your Honor, the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2072

1773

L3GPWEI2                    Brown - Direct

1  government would like to offer into evidence as -- actually, my

2  apologies.

3          Mr. Levine, if you can pull up just for the witness

4  what has been marked for identification as Government

5  Exhibit 2705.

6  BY MS. DEININGER:

7  Q.  Mr. Brown, do you recognize this?

8  A.  Yes.

9  Q.  What is it?

10  A.  This is a signature card from one of our members.  It's an

11  account-opening application.

12  Q.  And, Mr. Levine, if you can now pull up, just for the

13  witness, Government Exhibit 2706 and 2707 next to each other.

14          Mr. Brown, do you recognize these?

15  A.  Yes.

16  Q.  What are they?

17  A.  2706 is a checking account application, and 2707 is an

18  application for membership.

19  Q.  Are these Actors' bank account records?

20  A.  Yes, they are.

21  Q.  Can we pull -- Mr. Levine, if you can pull up, just for the

22  witness, what's been marked for identification as 2708 and

23  2709.

24          Mr. Brown, do you recognize these?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**DJA2073**

L3GPWEI2                          Brown - Direct

1   Q.  Are these also Actors' bank account records?

2   A.  Yes, they are.

3   Q.  Mr. Levine, if you can pull up, just for the witness,

4   what's been marked for identification as 2710 and 2711.

5           Mr. Brown, do you recognize these?

6   A.  Yes.

7   Q.  Are these also Actors' bank account records?

8   A.  Yes, they are.

9   Q.  For individual accounts?

10  A.  Yes.

11  Q.  Mr. Levine, if you can now pull up, just for the witness,

12  what's been marked for identification as 2712 and 2713.

13          Mr. Brown, do you recognize these?

14  A.  Yes.

15  Q.  Are these also Actors' bank account records for individual

16  accounts?

17  A.  Yes, they are.

18  Q.  Mr. Levine, if you can pull up what's been marked for

19  identification as Government Exhibit 2714 and 2715.

20          Mr. Brown, do you recognize these?

21  A.  Yes.

22  Q.  Are these also Actors' bank account records?

23  A.  Yes, they are.

24  Q.  For individual accounts?

25  A.  Yes.

1775

L3GPWEI2                        Brown - Direct

1   Q.  And lastly, Mr. Levine, if you can pull up Government

2   Exhibit 2716.

3           Mr. Brown, do you recognize this?

4   A.  Yes.

5   Q.  What is it?

6   A.  It's also a bank record and application for an individual

7   account.

8           MS. DEININGER:  Your Honor, the government offers

9   Government Exhibits 2705 through 2716 into evidence.

10          MR. TAYBACK:  The government stipulates that they're

11  business records and no objection.

12          MR. PELLECHI:  No objection.

13          THE COURT:  Received.

14          MS. DEININGER:  Mr. Tayback, I believe you meant the

15  defense?

16          MR. TAYBACK:  I said the defense stipulates that they

17  are business records.

18          (Government's Exhibits 2705 through 2716 received in

19  evidence)

20  BY MS. DEININGER:

21  Q.  Mr. Levine, can you publish Government Exhibit 2705, page

22  5, for everyone.

23          All right.  Mr. Brown, can you explain what we're

24  looking at?

25  A.  It's a monthly statement of one of our members.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2075

L3GPWEI2                    Brown - Direct

1    Q.  And looking at the top, can you read the name and address

2    of the bank that's listed?

3    A.  Actors Federal Credit Union, 165 West 46th Street, New

4    York, New York 10036-2508.

5    Q.  And directing your attention to the very last entry on the

6    page, can you read that?

7    A.  It's from October 3rd, 2018, point of sale purchase for a

8    card number ending in 1332.  It's for $46.25, and the merchant

9    is Goodegreenbazaar.com, Leeds GB on 10-3-2018 at 20:23.

10   Q.  I think you -- who did you say -- based on this statement,

11   who does the merchant appear to be?

12   A.  Goodegreenbazaar.com.

13   Q.  And what's your understanding of what Leeds GB reflects?

14   A.  That would reflect the location.

15   Q.  Is that the location of the -- the location of who?

16   A.  It would be the location of the merchant.

17   Q.  Is there anything you can identify in this record that

18   links this transaction to a marijuana business in California?

19   A.  No.

20   Q.  Mr. Levine, if we can now publish what's in evidence as

21   Government Exhibit 2707 and go to page 11.

22          Mr. Brown, what is this?

23   A.  It is also a monthly statement.

24   Q.  And what city does this account holder reside in?

25   A.  New York.  Astoria, New York.  Queens, New York City.

DJA2076

L3GPWEI2                        Brown - Direct

1   Q.  Looking down at the page to an entry October 11th, 2018; do

2   you see that?

3   A.  Yes.

4   Q.  There we go.  All right.  Looking at that October 11th,

5   2018, entry, who does the merchant appear to be?

6   A.  Organikals.store.

7   Q.  And do you see where it says GB?

8   A.  Yes.

9   Q.  What's your understanding of what GB reflects?

10  A.  My understanding is that it stands for Great Britain.

11  Q.  And again, whose location is that supposed to be?

12  A.  The merchant's.

13  Q.  Is there anything you can identify in this statement of

14  accounts that links this transaction to a marijuana business in

15  California?

16  A.  No.

17  Q.  Now, if we can just go to page 12 of this same document.

18          And, Mr. Brown, if you can look to where there's an

19  entry from November 19th, 2018; do you see that?

20  A.  Yes.

21  Q.  And who does it indicate is the merchant in that

22  transaction?

23  A.  Greenteacha.com.

24  Q.  And based on the entry, where does it indicate that the

25  merchant is located?

DJA2077

1778

L3GPWEI2                        Brown - Direct

1    A.  Leeds, Great Britain.

2    Q.  Is there anything you can identify in that transaction that

3    links it to a marijuana business located in California?

4    A.  No.

5    Q.  One more.  Mr. Levine, can you publish for everyone what's

6    in evidence as Government Exhibit 2710, and we can go to page

7    14.

8           Mr. Brown, just again generally, what are we looking

9    at?

10   A.  It's another statement of account, a monthly statement.

11   Q.  And again, looking near the top of the statement where it

12   identifies the cardholder, can you tell me what city the

13   cardholder resides in?

14   A.  New York.

15   Q.  And what's the time period for this statement?

16   A.  This is a statement for the month of October 2018.

17   Q.  And now if we look down the -- actually, we can go to page

18   19.  If you can just scroll, I think this statement continues,

19   and we're looking for an entry from October 11th, 2018.  It

20   would be the fourth entry down.

21          Mr. Brown, do you see that?

22   A.  Yes.

23   Q.  And who does it indicate that the merchant was in that

24   transaction?

25   A.  Soniclogistix.com.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3GPWEI2                    Brown - Direct

1   Q.  And where does it indicate that the merchant was located?

2   A.  Great Britain.

3   Q.  Is there anything that you can identify in that transaction

4   information that links this transaction to a marijuana business

5   in California?

6   A.  No.

7   Q.  Now, Mr. Brown, directing your attention to 2020, did

8   Actors, at some point, receive a subpoena from the government

9   in connection with this case?

10  A.  Yes.

11  Q.  And does that subpoena identify the names of any merchants?

12  A.  Yes.

13  Q.  Did it identify -- does that include the names of the

14  merchants we just looked at --

15  A.  Yes.

16  Q.  -- on this bank account record?

17  A.  Yes, it did.

18  Q.  Did you conduct any investigation into the merchants

19  identified on the government's subpoena after you received

20  that?

21  A.  We did a preliminary investigation, yes.  Essentially, we

22  looked up their names on the internet.

23  Q.  And were you able -- what were you able -- were you able to

24  make any determinations as to their business?

25  A.  No, not really.  We found nothing definitive.

DJA2079

1780

L3GPWEI2                    Brown - Cross

1  Q.  And have you taken any other action with regard to the

2  merchants identified in the government subpoena to Actors?

3  A.  I'm sorry, could you repeat that?

4  Q.  Have you taken any other action with regard to the

5  merchants identified in the government's subpoena?

6  A.  Yes.  Once we understood a little bit more about the facts

7  of the case, which has been very recent, then we did institute

8  a rule with our payment processor to block transactions from

9  the merchant names that we knew about.

10 Q.  And roughly when was that done?

11 A.  It was done about a week ago.

12         MS. DEININGER:  No further questions, your Honor.

13         THE COURT:  All right.  Cross-examination.

14 CROSS-EXAMINATION

15 BY MR. TAYBACK:

16 Q.  Mr. Brown, can you hear me?

17 A.  Yes, thank you.

18 Q.  My name is Christopher Tayback, and I represent Mr. Akhavan

19 during this trial.  I have a few questions for you.

20         If you could -- if Mr. McLeod could bring up GX2704.

21         That's the debit cardholder agreement you testified

22 about.  It should be on the screen in front of you.  One

23 moment.  Do you have that in front of you?

24 A.  Yes.

25 Q.  If I could direct your attention to page 5?

L3GPWEI2                    Brown - Cross

1    And bring up the paragraph that says "advisory against

2    illegal use."

3    Do you see that?

4    A.  Yes.

5    Q.  You say there you agree not to use your cards for illegal

6    gambling or other illegal purpose.  You don't define in this

7    agreement anywhere illegal purpose, correct?

8    A.  That's correct.

9    Q.  You do give an example here as illegal gambling as one

10   specific example, correct?

11   A.  Yes.

12   Q.  Now, you understand that during the period of time in which

13   you testified that this agreement was in effect, marijuana was

14   legal in California for medicinal and then for all purposes?

15   A.  I'm not aware of when it became legal, but I am aware that

16   it has been made legal.

17   Q.  Now, there's nothing in this agreement to the customer that

18   specifically addresses marijuana, correct?

19   A.  That's correct.

20   Q.  And, in fact, Actors, the bank itself, the credit union

21   itself, has no policy anywhere, no written policy, with respect

22   to marijuana specifically, correct?

23   A.  That's correct.

24   Q.  Now, the sentence in this -- or this provision then goes on

25   with another sentence that says, "display of payment card logo

L3GPWEI2                        Brown - Cross

1    by, for example, an online merchant, does not necessarily mean

2    that transactions are lawful in all jurisdictions in which the

3    cardholder may be located."  Do you see that?

4    A.  Yes, I do.

5    Q.  When you say "all jurisdictions in which the cardholder may

6    be located," you mean there are some things that may be legal

7    in some places but not in others?

8    A.  Yes.

9    Q.  And the cardholder -- you understand Actors' cardholders,

10   they're free to use their card in any or all 50 states,

11   correct?

12   A.  As well as overseas.

13   Q.  And you don't specify here for your cardholders how they're

14   to determine the legality in a situation where something might

15   be legal in one jurisdiction versus illegal in another,

16   correct?

17   A.  I'm sorry, could you repeat that?

18   Q.  You don't give the customers any instruction about how to

19   determine whether or not a transaction is lawful in one

20   jurisdiction versus another, correct?

21   A.  That's correct.

22   Q.  Now, because you mentioned illegal gambling, it's clear

23   that Actors can specify specific kinds of activities that it

24   believes customers need to know are disapproved by Actors,

25   correct?

DJA2082

L3GPWEI2                    Brown - Cross

1   A.  We can.

2   Q.  And you did not do that for marijuana?

3   A.  That's correct.

4   Q.  And you say illegal gambling, is it your understanding that

5   gambling with your credit or, in this case, debit card is legal

6   in some states but not in others?

7   A.  No, that's not my understanding.

8   Q.  Your understanding is it's illegal, correct?

9   A.  My understanding is that it is illegal for a gambling

10  institution located in the United States.

11  Q.  To take a debit card?

12  A.  Correct.

13  Q.  Now, if I could have you, Mr. McLeod, put up

14  Exhibit GX2717.

15          And now, you recognize this as the credit card holder

16  agreement that you testified about?

17  A.  Yes, sir.

18  Q.  If you could bring up page 5830.  Now, this one just says,

19  "Your card may not be used for any illegal transactions."  Do

20  you see that?

21  A.  Yes.

22  Q.  You don't define illegal transactions anywhere in this

23  agreement either, correct?

24  A.  That's correct.

25  Q.  In fact, you don't even specifically mention illegal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2083

1784

L3GPWEI2                    Brown - Cross

1    gambling in this agreement, correct?

2    A.  That's correct.

3    Q.  Why is that?

4    A.  I don't know.  I wasn't the -- I didn't write it.

5    Generally, credit card agreements are taken directly from Visa.

6    Q.  Okay.  And you understand, as you just testified, that

7    marijuana, at least during some period of time when these

8    agreements were in place, was legalized in California?

9    A.  Yes.

10   Q.  So you understand that a customer might be confused, absent

11   further guidance, about whether or not a transaction to buy

12   marijuana with a credit card is legal or not legal?

13          MS. DEININGER:  Objection.

14          THE COURT:  Sustained.

15   Q.  It is correct that Actors have chosen not to give any

16   instruction in its cardholder agreements, debit or credit, to

17   its customers specifying what the rules are for marijuana,

18   correct?

19          MS. DEININGER:  Objection.

20          THE COURT:  Asked and answered, and also I think

21   ambiguous.  Sustained.

22   Q.  It is true that Actors chose not to modify this agreement

23   in any way, correct, to specify marijuana?

24   A.  That's correct.

25   Q.  I want to ask you a question about this particular

L3GPWEI2                    Brown - Cross

1    document.

2              If you go back to the first page.

3              As opposed to the debit agreement, that doesn't seem

4    to have any of the Actors' header on it; do you see that?  It

5    doesn't have the Actors logo on it?

6    A.  That's correct.

7    Q.  Do you know why that is?

8    A.  I believe it's because it's part of a larger document.

9    Q.  So this is only a portion of the document?

10   A.  It's the entire cardholder agreement.  I'm not actually

11   certain whether it is part of our application or a separate

12   agreement.

13   Q.  And if you look at the next page -- or, I'm sorry, the

14   final page, this paragraph sort of stands on its own on this

15   page.  Is that the way the agreement actually looks?

16   A.  I believe that this is a printout from our online

17   application; so it may not look that way online.

18   Q.  And if you could go back to the second page, I think you

19   said this was taken from a Visa form?

20   A.  The general language is, is my understanding.

21   Q.  And if you could take a look at the second page, the letter

22   C.  You'll notice in that first sentence, where it says

23   "cardholder agrees to pay Actors Federal Credit Union an annul

24   membership," that's a typo, right?

25   A.  Yes, it is.

DJA2085

L3GPWEI2                        Brown - Cross

1   Q.  That should be the word "annual," correct?

2   A.  Yes.

3   Q.  You can take that down.  So you describe how the bank

4   relies upon Visa for a variety of aspects of its credit and

5   debit card processing?

6   A.  We rely on Visa to provide the network for the transactions

7   to follow.

8   Q.  And I believe I understood you to say that if Actors was

9   not part of the Visa network, Actors might very well go out of

10  business; is that right?

11  A.  Yes.

12  Q.  And that's not just because of the fees that it earns

13  whenever any customer uses a credit or debit card, correct?

14  For other reasons as well?

15  A.  Yes, it is for other reasons.

16  Q.  In fact, it's in part because you want to please your

17  customers, correct?

18  A.  Yes.

19  Q.  Having access to a credit and debit card you can use around

20  the country is important to your customers, right?

21  A.  It would be, yes.

22  Q.  And you want to please them, correct?

23  A.  Yes.

24  Q.  Because you're a full -- you endeavor to be a full-service

25  credit union, like a full-service commercial bank?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2086

L3GPWEI2                        Brown - Cross

1   A.  That's correct.

2   Q.  Now, for this trial you were asked about some documents

3   that the government subpoenaed; do you remember that?

4   A.  Yes.

5   Q.  And you testified about a few of them.  I'm going to ask

6   you about some of those and some others.  You produced to the

7   government files for individual customers, correct, individual

8   consumers of the bank?

9   A.  That's correct.

10  Q.  If you could put up for the witness only GX2712.

11          I'd ask if you recognize this -- and maybe flip

12  through it -- as a portion of the file for one of those

13  customers.  Do you see that?

14  A.  Yes.

15  Q.  And then I'm going to have -- just if you can recall the

16  name of this particular --

17          MR. TAYBACK:  At this point, your Honor, I would offer

18  Exhibit GX2712.

19          MS. DEININGER:  I believe it's already in evidence.

20          MR. TAYBACK:  Okay.

21  BY MR. TAYBACK:

22  Q.  If this is in evidence, this is the particular customer I'm

23  going to show you.  I'm going to ask you, there are an

24  additional -- you produced all the bank statements for this

25  particular customer, correct?

DJA2087

1788

L3GPWEI2                    Brown - Cross

1   A.  I'm sorry?

2   Q.  I'll withdraw the question.  Let me show you what's been

3   marked but not yet introduced, HAX10054.  Now, do you recognize

4   this as additional bank statements produced by you with respect

5   to that same customer?

6   A.  Yes.

7           MR. TAYBACK:  At this time, I'd offer HAX10054.

8           (Pause)

9           THE COURT:  You need to reach a decision.

10          MS. DEININGER:  No objection.

11          THE COURT:  Received.

12          MR. TAYBACK:  Thank you.

13          (Defendant's Exhibit HAX10054 received in evidence)

14  BY MR. TAYBACK:

15  Q.  This is additional account information for the same

16  customer we just looked at, correct?

17  A.  That's correct.

18  Q.  Now, if I could direct your attention to page 32, an entry

19  for May 15th, 2019.  In order to be able to see it, I've

20  brought it up.

21          MR. TAYBACK:  Your Honor, at this time, we offer

22  Exhibit 10054.  We ask it to be displayed.  I can't see if it

23  is being displayed.  It is.  Thank you.

24  Q.  Now, you have in front of you a particular line item; do

25  you see that?

DJA2088

L3GPWEI2                        Brown - Cross

1   A.  Yes.

2   Q.  Now, do you see that it says OMO CBS/Medmen; do you see

3   that?

4   A.  Yes, I do.

5   Q.  Do you know that Medmen is a marijuana dispensary?

6   A.  No, I was not aware of that.

7   Q.  The first time you're hearing that is now?

8   A.  Yes.

9   Q.  So if there were a transaction for Medmen for this

10  particular customer on May 15th, on July 12th and on August 5th

11  of 2019, that's not something that Actors has done anything to

12  investigate, correct?

13          MS. DEININGER:  Objection.

14          THE COURT:  Ground?

15          MR. TAYBACK:  I can rephrase the question, your Honor.

16  BY MR. TAYBACK:

17  Q.  Is it true that you haven't done anything -- Actors hasn't

18  done anything to investigate this purchase?

19          MS. DEININGER:  Objection.  There's a motion in limine

20  on this point.

21          THE COURT:  I'm sorry?

22          MS. DEININGER:  I believe it was motion in limine 4.

23          THE COURT:  Oh, okay.  Now, I understand your

24  objection.  Sustained.

25  BY MR. TAYBACK:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2089

L3GPWEI2                        Brown - Cross

1  Q.  Now, Mr. Brown, I'd like to show you what's been introduced

2  as an exhibit, GX2713.  It's another customer's account file.

3  Do you see that?

4  A.  Yes.

5  Q.  Now, there were some additional bank statements also

6  produced for this witness, correct?

7  A.  Yes.

8  Q.  Did you do anything to investigate whether any of the

9  transactions reflected on that additional bank statement also

10 included other marijuana transactions?

11          MS. DEININGER:  Objection.

12          THE COURT:  Sustained.

13 Q.  The transaction we just looked at for that first customer,

14 do you know what the MCC was that was used for that

15 transaction?

16 A.  No.

17 Q.  In fact, it's fair to say that you can't tell from any of

18 the records what the MCC was for any of the transactions,

19 correct?

20          MS. DEININGER:  Objection.  Vague.

21          THE COURT:  Overruled.

22          THE WITNESS:  I'm sorry, I didn't hear the ruling.

23          THE COURT:  You can answer that question.

24 A.  Could you repeat the question?

25 Q.  In fact, looking at the transaction I just asked questions

1791

L3GPWEI2                    Brown - Cross

1     about previously, fair to say you can't tell what the MCC that

2     was used for this transaction was, correct?

3     A.  I can't tell, but our payment processor could.

4     Q.  At the time of the transaction, correct?

5     A.  Correct.

6              THE COURT:  How much more do you have?

7              MR. TAYBACK:  About 15 minutes, your Honor.

8              THE COURT:  So in about three minutes we'll give the

9     jury their mid-morning break.

10             MR. TAYBACK:  Understand.

11    Q.  Now, the transaction that we just looked at was processed,

12    as was the transactions that the government highlighted from

13    this customer, correct?

14    A.  Yes.

15    Q.  That means that Actors actually did make, whatever amount

16    it is, cents per swipe, correct?

17    A.  Yes.

18    Q.  And the customer, in the absence of any challenge to the

19    transaction, the customer presumably got what they were paying

20    for?

21    A.  I wouldn't know that.

22    Q.  You don't know one way or the other, correct?

23    A.  Yes.

24    Q.  But you didn't receive any complaints from the -- about the

25    transactions that the government showed you, correct?

L3GPWEI2                    Brown - Cross

1      MS. DEININGER:  Objection.  Foundation.

2      THE COURT:  Overruled.

3  A.  I'm not aware if the transactions were challenged or not.

4  Q.  And in your review of the files, the bank files of these

5  customers, you didn't see challenges to the transactions that

6  the government just highlighted, correct?

7  A.  That is correct.

8      MR. TAYBACK:  Your Honor, if you want to take the

9  break, I'm going to move to a slightly different subject.

10      THE COURT:  All right.  So we are going to take our

11  mid-morning break.  We'll see you in 15 minutes.

12      (Jury not present)

13      THE COURT:  You may step down.  I'll see you in 15

14  minutes.

15      (Witness temporarily excused)

16      Please be seated.  Anything anyone needs to raise with

17  the Court?

18      MR. TAYBACK:  No, your Honor.

19      THE COURT:  Okay.

20      MR. FOLLY:  Your Honor, this is not an issue that is

21  going to come up today, but we do anticipate it for tomorrow.

22  So we may be at the point where we were planning to introduce

23  the portion of defendant Weigand's post-arrest statement.

24      THE COURT:  I was waiting.

25      MR. FOLLY:  We had started that discussion but never

L3GPWEI2                    Brown - Cross

1    finished.

2            THE COURT:  All right.  So maybe at the end of today

3    we'll take that up.

4            MR. FOLLY:  Thank you.

5            MS. DEININGER:  Your Honor, after this witness, the

6    government is anticipating calling Darcy Cozzetto, and we'll

7    just need a brief sidebar before that to discuss her immunity

8    order.

9            THE COURT:  Okay.  We'll take a sidebar then.  Okay.

10   Very good.

11           (Recess)

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

L3GAWEI3ps

1      (Jury not present)

2          THE COURT:  The jury is on its way up.  That takes a

3   couple minutes.  So do you want to handle that immunity?

4          MS. LA MORTE:  Do you want me to get her?

5          THE COURT:  Yes.  We can do it right here in open

6   court.

7          You can just stand there.  That's fine for this

8   purpose.

9          So please state your name for the record.

10          MS. COZZETTO:  Darcy Cozzetto.

11          THE COURT:  And Ms. Cozzetto, is it your intention to

12   invoke your Fifth Amendment privilege against self-incrimina-

13   tion to any and all questions that might be put to you in this

14   matter?

15          MS. COZZETTO:  Yes, your Honor.

16          THE COURT:  And I will therefore grant the immunity

17   order.  You understand that if you fail to tell the truth in

18   any respect, that voids this immunity.  You understand that.

19          MS. COZZETTO:  Yes, sir.

20          THE COURT:  Also, you understand that this immunity

21   only protects against use of whatever you say here in court.

22   It doesn't protect against any independent accusation that

23   might be brought.  You understand that.

24          MS. COZZETTO:  Yes, sir.

25          THE COURT:  OK.  Very good.  You can return to the

DJA2094

L3GAWEI3ps                    Brown - Cross

1   witness room.

2           MS. COZZETTO:  Thank you.

3           THE COURT:  Then I'll give the signed order and

4   attachments to the government.

5           And let's get the witness back on the stand.

6   CHARLES BROWN, resumed.

7           (Jury present)

8           THE COURT:  All right.  Counsel, continue.

9   CROSS EXAMINATION (Cont'd)

10  BY MR. TAYBACK:

11  Q.  Mr. Brown, if I could ask Mr. McLeod to bring up GX Exhibit

12  2712.  You've previously looked at that.

13          MR. TAYBACK:  I apologize for the delay, your Honor.

14          THE COURT:  No problem.

15          MR. TAYBACK:  GX 2712.

16  Q.  Let me start by asking some questions -- there it comes.

17          If we go to the entry of the bank statement for April

18  8, 2019.  Now, you looked at this particular entry on your

19  direct examination, where it says "point-of-sale purchase,

20  soniclogistix.com."  You see that?

21  A.  Yes.

22  Q.  There is a number there that's after 18003052157.  Did you

23  ever try to call that number?

24  A.  No.

25  Q.  Did anyone from Actors?

DJA2095

1796

L3GAWEI3ps                    Brown – Cross

1    MS. DEININGER:  Objection, foundation.

2    Q.  If you know.

3         Do you know whether anyone from Actors ever tried to

4    call that number?

5         MS. DEININGER:  Objection, foundation.

6         THE COURT:  Sustained.

7    Q.  Did you ever try to call that number?

8    A.  No.

9    Q.  And you have no idea, then, what that number is, correct,

10   what it refers to?

11        MS. DEININGER:  Objection, foundation.

12        THE COURT:  Well, I don't know about that, but let's

13   see.  First you asked him, "Did you ever try to call that

14   number?"  He answered, "No."  Then you asked him, "Did you ever

15   try to call that number?"  He answered, "No."  And now you're

16   asking him, "And you have no idea, then, what that number is,

17   correct, what it refers to?"

18        "Objection, foundation."

19        I'll overrule it.  You want to ask that question twice

20   too?

21        MR. TAYBACK:  I'll withdraw the question when you put

22   it that way, your Honor.

23   Q.  Let me ask you this.  You produced documents, that is to

24   say Actors produced documents, to the government in February of

25   2020, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2096

L3GAWEI3ps                    Brown - Cross

1    A.  Yes.

2    Q.  In that intervening year or 13 months, did you do anything

3    to investigate any of the entries that the government asked you

4    about, until last week?

5    A.  Yes, we did.

6    Q.  And what did you do?

7    A.  We looked up the merchants online to see if we could

8    determine anything, any additional facts, about what the nature

9    of the case was, and then, when we had a little bit more

10   information, when we learned -- this was sometime later that we

11   learned it was related to marijuana, we contacted our payment

12   processor and asked them if there was a way for them to block

13   marijuana purchases.

14   Q.  You didn't contact the customers, correct?

15   A.  That is correct.

16   Q.  And you haven't terminated their cards, correct?

17   A.  That is correct.

18   Q.  And you haven't warned them not to engage in such

19   transactions in the future, correct?

20   A.  That is also correct.  They are not all still currently

21   cardholders with us.

22   Q.  But those who are, you haven't warned them not to engage in

23   those transactions in the future, correct?

24   A.  That is correct.

25   Q.  Now, if you could take a look at -- let me back up here.

DJA2097

L3GAWEI3ps                        Brown - Cross

1          MR. TAYBACK:  If you could bring up Exhibit GX 2705,

2    which is in evidence.

3    Q.  If you would look at the name of this particular cardholder

4    for Actors Bank.  You produced bank records for this particular

5    customer as well, in response to the subpoena, right?

6    A.  I believe so, yes.

7    Q.  Now, I want to ask you some questions about how descriptors

8    are used.  If I understood you correctly, there's no one at

9    Actors who actually looks at the descriptors to decide whether

10   or not to approve a transaction, correct?

11   A.  Not at the time of the transaction.

12   Q.  And in fact, is it your experience that the descriptors

13   don't always describe what it is that was purchased, correct?

14   A.  They don't describe what's purchased.  They describe the

15   business.

16          MR. TAYBACK:  If you could put up, just for the

17   witness, Exhibit HAX10057.

18   Q.  And you recognize this as the additional bank -- or bank

19   records for one of the customers that you produced bank records

20   for, correct?

21   A.  Yes.

22   Q.  And we looked at some of the account paper work for this

23   customer earlier, correct, in your direct?

24   A.  I believe so, yes.

25   Q.  If I could ask you to direct your attention to --

DJA2098

L3GAWEI3ps                    Brown - Cross

1               MR. TAYBACK:  What's the date of the next entry?

2    Q.  -- to the entries beginning March 12, 2019.  Do you see

3    that?

4    A.  Yes.

5    Q.  This is a true and accurate copy of the bank records

6    pertaining to that customer you testified about on direct,

7    correct?

8    A.  Yes.

9               MR. TAYBACK:  I would I'd offer Exhibit HAX10057 in

10   evidence.

11              MS. DEININGER:  Objection, relevance.

12              MR. TAYBACK:  May I be heard?

13              THE COURT:  Yes.

14              Go ahead.

15   Q.  If you look at the descriptors for --

16              THE COURT:  Oh, no, I meant --

17              MR. TAYBACK:  May I be heard?

18              THE COURT:  Yes.

19              MR. TAYBACK:  I believe this is an example of the

20   descriptors that do not provide any insight into the merchant.

21              THE COURT:  All right.  I'll allow it.  We'll see.

22              (Defendant's Exhibit HAX10057 received in evidence)

23   Q.  Do you see the descriptors that are here?

24   A.  Yes.

25   Q.  The first one is "FYESCT.com."  Do you see that?

DJA2099

1800

L3GAWEI3ps                    Brown - Cross

1   A.  Yes, I do.

2   Q.  You can't tell what that transaction is all about, correct?

3   A.  What the transaction is about?

4   Q.  What the product was or what the merchant was.  Correct?

5   A.  I would assume that the merchant was FYESCT.com.

6   Q.  But you don't know what they do or sell, correct?

7   A.  That is correct.

8   Q.  So you wouldn't know if they were a marijuana merchant or

9   otherwise, correct?

10  A.  I wouldn't personally know.

11  Q.  And as you sit here you don't know whether anybody would

12  know that?

13          MS. DEININGER:  Objection, foundation.

14          MR. TAYBACK:  Well, withdraw the question.

15  Q.  Is there anybody that Actors relies upon that you would

16  expect would know that answer?

17  A.  A payment processor.

18  Q.  And how would *they* know the answer?

19  A.  I don't know.

20  Q.  You'll see that there are other similar collections of

21  letters used as descriptors going down this page.  Do you see

22  that?

23  A.  Yes, I do.

24  Q.  Have you ever seen descriptors like that before?

25  A.  I have.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2100

1801

L3GAWEI3ps                    Brown - Cross

1   Q.  And they're not -- they don't communicate anything about

2   the merchant or the product, correct?

3   A.  My understanding is that if it's a dot-com like that, that

4   would be the address of the merchant, the URL address, the web

5   address.

6   Q.  But you've never gone to any of these URLs, correct?

7           MS. DEININGER:  Objection, irrelevant.

8   Q.  Let me ask the question another way.  That's not something

9   Actors does, go to various URLs of various descriptors,

10  correct?

11  A.  Unless we are alerted to for a particular reason.

12          MR. TAYBACK:  You can take that down.  Thank you.

13          If you could go to Exhibit 2705.

14  Q.  This is another customer, whose records you produced to the

15  government in this case, correct?

16  A.  Yes.

17  Q.  And you also produced his bank records, for this particular

18  customer, correct?

19  A.  Yes.

20          MR. TAYBACK:  If you could put up for the witness only

21  HAX10056.

22  Q.  And these are bank records that reflect the bank activity

23  of that same customer, correct?

24  A.  Yes.

25          MR. TAYBACK:  At this time, your Honor, I'd offer

DJA2101

L3GAWEI3ps                    Brown - Cross

1   HAX10056 in evidence.

2          MS. DEININGER:  Objection, relevance.

3          MR. TAYBACK:  May I be heard?

4          THE COURT:  I will receive it.

5          (Defendant's Exhibit HAX10056 received in evidence)

6   Q.  If you could go to page 5 of this document, I'm going to

7   show you a couple entries, and I blacked out the other one so

8   it's easier to see.

9          MR. TAYBACK:  If you go to the next page, actually.

10  Q.  On 2/27/2018 -- see that?  There is an entry that says

11  www.fantasysportsco.  Do you see that?

12  A.  Yes.

13  Q.  Do you know whether that's a gambling site?

14         MS. DEININGER:  Objection, motion in limine 3.

15         THE COURT:  Sustained.

16         MR. TAYBACK:  Take it down.  Thank you.

17  Q.  Does Actors have any processing place for identifying

18  gambling sites, something that's specifically prohibited by the

19  cardholder agreement in place?

20  A.  Our payment processor would be able to identify, by

21  merchant category code, if there was a gambling location

22  located in the United States.

23  Q.  But you don't know whether the descriptor plays any role in

24  that, correct?

25  A.  I do not know.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2102

L3GAWEI3ps                    Brown - Cross

1  Q.  There was -- there is a thing that customers can obtain

2  called overdraft protection, correct?

3  A.  Yes.

4  Q.  And if a customer has an overdraft protection, isn't it

5  true that the bank will cover an overdraft in certain

6  situations, up to a certain amount?

7  A.  Yes.

8  Q.  And then it charges the customer a fee, correct?

9  A.  That's correct.

10  Q.  What's that fee?

11  A.  I'm sorry?

12  Q.  What is that fee?

13  A.  In our case it was $27.

14  Q.  And the determination of whether or not to cover a

15  transaction is made by the bank, not the payment processor?

16  A.  That's correct.

17  Q.  So when the bank decides to approve a transaction, it's

18  looking to see whether the customer has some indicia of fraud,

19  like they're not in the location where the charge is occurring,

20  correct?

21  A.  I'm sorry.  I didn't understand the question.

22  Q.  Sure.  I want to find out the things that the bank looks at

23  before it approves a transaction to go through.

24  A.  If the customer has opted in for overdraft protection and

25  they are in good standing with the credit union, meaning that

DJA2103

1804

L3GAWEI3ps                    Brown - Cross

1    their account is on time, that they paid the fees back on time,

2    then we would cover a transaction.

3    Q.  As long as you're convinced that they have money or

4    overdraft protection and that they -- that it's their

5    transaction, correct?

6    A.  Yes.  We wouldn't know whether that was their transaction

7    unless they notified that it wasn't.

8    Q.  So really all you're looking for is, do they have enough

9    money or do they have overdraft protection, correct?  To

10   approve a transaction.

11   A.  We would also be looking to see if it was a valid unexpired

12   card, if the validation code was correct, and if there was any

13   indication that it was a prohibited transaction.

14   Q.  And the things you would look at for that last category,

15   you rely on your payment processor, correct?

16   A.  Yes.

17   Q.  You don't -- the bank doesn't look at the MCC or the

18   descriptor, correct?  The bank.

19   A.  That is correct.

20   Q.  And you don't know what the payment processor, how they --

21   how they determine whether an MCC should or shouldn't be put

22   through?  Correct?

23   A.  Well, I do know that if we have specifically prohibited a

24   particular merchant or merchant category code, then they would

25   not put it through.

DJA2104

L3GAWEI3ps                    Brown - Cross

1  Q.  And it's true, isn't it, that there is no merchant category

2  code for marijuana?

3  A.  That is correct.

4  Q.  So you haven't prohibited an MCC for marijuana, correct?

5          MS. DEININGER:  Objection, misleading.

6          THE COURT:  Sustained.

7  Q.  And you agree that the descriptors -- withdraw that.

8          In fact there are no descriptors for marijuana that

9  you have asked your payment processor to prohibit, correct?

10 A.  We have established a rule to prohibit the descriptors that

11 we know about.

12 Q.  And are those the ones that the government identified in

13 direct?

14 A.  Yes.

15 Q.  But none others, correct?

16 A.  Not yet.

17 Q.  So that was done in the last couple weeks?

18 A.  Yeah.

19          I'm sorry.  Yes.

20 Q.  Now, you mentioned FinCEN?

21 A.  I'm sorry?

22 Q.  I believe you mentioned your direct testimony a reference

23 to FinCEN?

24 A.  FinCEN, yes.

25 Q.  What is FinCEN?

DJA2105

L3GAWEI3ps                    Brown - Cross

1     A.   FinCEN is the Financial Crimes Enforcement Network.

2     Q.   And that is the federal government's guidance?

3     A.   It's a federal -- yeah.  It's a -- it's a -- it's a federal

4     entity that collects and distributes information about

5     financial crimes.  It's a law enforcement database.

6     Q.   And FinCEN has provided guidance to banks and credit unions

7     with respect to marijuana transactions, correct?

8     A.   To banking marijuana businesses.

9     Q.   Is it fair to say you don't consider the use of credit and

10    debit cards to be the same as banking marijuana businesses,

11    correct?

12    A.   No, I do not consider them the same.

13    Q.   When you talked about SARs being filled out, it's not your

14    understanding you have to complete a SARs form for the

15    transactions of your customers where they may have engaged in

16    purchasing marijuana, correct?

17    A.   The decision to file or not file a SAR is in large part up

18    to the discretion of the financial institution.

19    Q.   And you haven't filed any SARs with respect to the

20    transactions that the government identified with you on direct,

21    correct?

22    A.   I'm not entirely clear whether I am allowed to discuss the

23    existence of specific SARs.  It's prohibited.  They are highly

24    secret.

25    Q.   "SARs" stands for "suspicious activity report," correct?

DJA2106

L3GAWEI3ps                    Brown - Cross

1    A.  That is correct.

2         MR. TAYBACK:  May I have one moment, your Honor.

3    Q.  To be clear, among the information contained in the

4    descriptor, you understand that to be the URL for the merchant,

5    is one of the things?

6         MS. DEININGER:  Objection, misleading.

7         MR. TAYBACK:  I'll rephrase it.

8    Q.  Is your understanding of what's contained in a descriptor,

9    does it include the URL for the merchant?

10   A.  The examples that you showed me, that would be my best

11   guess.

12   Q.  But it's a guess by you, correct?

13   A.  I'm sorry?

14   Q.  A guess?  It's a guess by you?  That's what you said?

15   A.  Based on what you showed me for those specific examples.

16   Q.  And is it your understanding also that a telephone number

17   is often contained in the descriptor?

18   A.  I have seen them on statements.  I'm not sure which field

19   that is in the transaction code.

20   Q.  Is it also fair to say that you're not an expert in the use

21   of descriptors?

22   A.  That is fair to say.

23   Q.  And you're not an expert in merchant category codes,

24   correct?

25   A.  That is also correct.

L3GAWEI3ps                    Brown - Cross

1            MR. TAYBACK:  I have no further questions.  Thank you.

2            THE COURT:  OK.  Counsel for Mr. Weigand.

3            MR. PELLECHI:  May I proceed?

4            THE COURT:  Yes.

5    CROSS-EXAMINATION

6    BY MR. PELLECHI:

7    Q.  Good almost afternoon, Mr. Brown.  My name is Steve

8    Pellechi.  I'm an attorney for Mr. Weigand.

9            I just want to address a few of the things that you

10   had testified to on direct.  You had testified that marijuana

11   transactions are against Visa's rules, correct?

12   A.  Yes.

13   Q.  But Visa's rules don't specifically prohibit marijuana

14   transactions, correct?

15   A.  I have not seen it in the written rules, but I've seen a

16   statement by a Visa representative.

17   Q.  But visa's actual rules don't reference marijuana at all,

18   correct?

19   A.  Not to my knowledge.

20   Q.  And to your understanding, is marijuana legal in other

21   countries?

22   A.  I'm sorry.  Could you repeat that?

23   Q.  Is marijuana legal in other countries?

24            MS. DEININGER:  Objection.

25            MR. PELLECHI:  I'm sorry, your Honor.  Was there a

DJA2108

L3GAWEI3ps                    Brown - Cross

1    ruling?

2              THE COURT:  Yes.  Sustained.

3    Q.  Mr. Brown, you testified on direct that marijuana is not

4    prohibited by your federal regulators, correct?

5    A.  Banking marijuana businesses is not explicitly prohibited.

6    Q.  And it's your understanding that some credit unions

7    actually bank marijuana-related businesses, correct?

8    A.  Yes.

9    Q.  You had described that there's a heavy compliance burden

10   with respect to banking MRBs, marijuana related businesses,

11   right?

12   A.  That's correct.

13   Q.  And it was your testimony that you don't have the capacity

14   to conduct this due diligence, right?

15   A.  It's our judgment that we don't have the resources to do

16   so.

17   Q.  But, Mr. Brown, none of the documents that you have turned

18   over to the government with respect to this case involve

19   opening up a business account, right?

20   A.  I don't believe there are any business documents in this.

21   Q.  How is my volume, by the way?

22   A.  It's getting better.

23   Q.  OK.  Let me know if you can't hear me or if I'm too loud.

24   A.  OK.

25   Q.  Mr. Brown, you've never met with Ruben Weigand before,

DJA2109

1810

L3GAWEI3ps                    Brown - Cross

1   correct?

2   A.  That's correct.

3   Q.  You've never spoken to him?

4   A.  That's correct.

5   Q.  Never emailed him?

6   A.  No.

7   Q.  You never had any communications whatsoever with

8   Mr. Weigand.

9   A.  That is correct.

10  Q.  And you had testified that Actors had turned over a

11  collection of documents in response to a subpoena with respect

12  to this case?

13  A.  Yes.

14  Q.  Did you review those documents?

15  A.  Yes.

16  Q.  And you reviewed all those documents.

17  A.  Yes.

18  Q.  And do you know roughly how many documents you had turned

19  over to the government?

20  A.  It's been a long time.  I have no idea.

21  Q.  You've been prepping for this case for a while?

22  A.  We responded to the subpoena last February.  We didn't hear

23  anything else about it until much later in the year.

24  Q.  And, Mr. Brown, you don't recall ever seeing Ruben

25  Weigand's name on any of those documents, correct?

1811

L3GAWEI3ps                    Brown - Cross

1  A.  That is correct.

2  Q.  Now, you had testified on direct about Actors being a

3  nonprofit, right?

4  A.  That is correct.

5  Q.  Now, that's not unique amongst credit unions, correct?

6  A.  All credit unions are not profit.

7  Q.  Right.  And all credit unions are also financial

8  cooperatives, correct?

9  A.  That is correct.

10  Q.  And when you describe Actors as a nonprofit, that doesn't

11  mean that Actors doesn't produce income, right?

12  A.  That is correct.

13  Q.  And you had explained on direct that you offer a lot of the

14  same financial services that a bank would offer.

15  A.  Yes.

16  Q.  And in the same way a bank would make a profit off of those

17  financial services, so does Actors, right?

18  A.  Yes.

19  Q.  You earn interest on loans.

20  A.  Correct.

21  Q.  You earn a fee per every transaction that a cardholder

22  swipes on one of your cards, correct?

23  A.  Yes.

24  Q.  The only difference is that the profit for Actors, it goes

25  to the owners of Actors, right?

L3GAWEI3ps                    Brown - Cross

1  A.  That is correct.

2  Q.  And the owners are the members of Actors, correct?

3  A.  That is correct.

4  Q.  Now, on direct, you said that it was part of your role to

5  make recommendations to Actors' board, right?

6  A.  To the board of directors and the staff.

7  Q.  And that -- those recommendations, they relate to

8  compliance policies for Actors?

9  A.  Yes.

10 Q.  Do they relate to how well a compliance policy should be

11 communicated to Actors members?

12 A.  In some cases, yes.

13 Q.  And is it fair to say that one of the purposes for

14 instituting a compliance policy is to make members aware of

15 what is prohibited, right?

16 A.  I'm sorry.  Could you rephrase?

17 Q.  Sure.  Absolutely.

18      One of the reasons -- is it fair to say that a reason

19 for instituting a policy would be so that Actors members are

20 aware of what restrictions they're subject to?

21      MS. DEININGER:  Objection, foundation.

22      THE COURT:  Sustained.

23 Q.  Mr. Brown, in making your recommendations to the board of

24 Actors, do you discuss certain motivations for instituting a

25 policy?

DJA2112

L3GAWEI3ps                    Brown - Cross

1    A.  Yes.

2    Q.  And amongst those motivations for instituting a policy,

3    would it be to let Actors members know what restrictions

4    they're subject to?

5    A.  It depends on what type of policy.  Not all policies are

6    concerning member behavior.

7    Q.  If it does concern member behavior, is it fair to say that

8    that would be one of the motivations?

9    A.  Yes.

10   Q.  And do you believe it's particularly important to institute

11   a policy where Actors' position on a certain matter would

12   otherwise be unclear?

13          THE COURT:  Sustained.

14   Q.  Mr. Brown, on direct you had discussed this kind of general

15   provision in two agreements related to illegal transactions,

16   correct?

17   A.  Yes.

18   Q.  And it was your testimony that this provision encompasses

19   marijuana-related transactions.  Right?

20   A.  Yes.

21   Q.  Now, that's never been communicated to Actors members,

22   right?

23   A.  That is correct.

24   Q.  None of the documents you have produced to the government

25   in this case involve communications between Actors and Actors

DJA2113

L3GAWEI3ps                    Brown - Cross

1  members where you're clarifying that that provision relates to

2  marijuana transactions, correct?

3  A.  That is correct.

4  Q.  Now, you had discussed that Actors outsources its debit and

5  credit card payment processing, right?

6  A.  That is correct.

7  Q.  But Actors is the issuer on the Visa network, right?

8  A.  Yes.

9  Q.  So isn't it true that Actors is the party that's ultimately

10 responsible to Visa with respect to transactions that are

11 processed on Actors cards?

12 A.  Yes.

13 Q.  And you do have the ability, and I think you discussed

14 doing this on direct, but you have the ability to reach out to

15 these third-party processors to discuss what should be blocked.

16 Right?

17 A.  Yes.

18 Q.  And you had discussed reaching out to the third-party

19 processor for your debit cards, right?

20 A.  Yes.

21 Q.  That's Co-op?

22 A.  Yes, that's right.

23 Q.  Now from, 2016 to 2019, have you ever reached out to Co-op

24 with respect to marijuana transactions?

25 A.  Not that I'm aware of.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3GAWEI3ps                    Brown - Cross

1   Q.  You never told them that Actors had this policy that

2   prohibits marijuana transactions --

3           THE COURT:  In order to move this along, I need to

4   advise counsel, if an answer to one question precludes the

5   second question, why are you asking the second question?  The

6   first question was, "Now, from 2016 to 2019, have you ever

7   reached out to Co-op with respect to marijuana transactions?"

8   "A. Not that I'm aware of."

9           This next question began, "You never told them

10  that" -- etc., which was nothing but a rhetorical question,

11  given the answer to the first question.  Move on.

12          MR. PELLECHI:  Understood, your Honor.

13  Q.  Now, on direct, Mr. Brown, you had looked at a number of

14  debit card statements, correct?

15  A.  They were bank statements.  Yes.

16  Q.  Right.  And I think you testified on cross that you had

17  never reached out to these cardholders to let them know that

18  what they had done on their debit cards was against Actors'

19  policy, correct?

20  A.  Correct.

21  Q.  But Actors does have the ability to take certain reactive

22  measures when a member violates its policies, correct?

23  A.  Yes.

24  Q.  And the agreements that you had discussed on direct, they

25  give Actors the authority to take actions against those

DJA2115

L3GAWEI3ps                    Brown - Redirect

1   members, correct?

2   A.  Yes.

3   Q.  You could -- there's a number of things you can do, right?

4   You could issue a warning to the cardholder?

5   A.  Yes.

6   Q.  You can instruct them not to do it again?

7   A.  Yes.

8   Q.  You could invoke the limitation of services policy and take

9   away their cards?

10  A.  Yes.

11  Q.  And you didn't do any of that with respect to the

12  cardholders that you had discussed on direct, correct?

13  A.  That's correct.

14  Q.  And you also have the ability to amend your agreements with

15  the cardholders, correct?

16          MS. DEININGER:  Objection, foundation.

17          THE COURT:  Sustained, but also irrelevance sustained.

18          MR. PELLECHI:  One moment, your Honor.

19          No further questions at this time.

20          THE COURT:  Redirect.

21  REDIRECT EXAMINATION

22  BY MS. DEININGER:

23  Q.  Good after -- or still good morning.  Good morning,

24  Mr. Brown.

25          I think you testified a minute ago that Actors never

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2116

L3GAWEI3ps                    Brown - Redirect

1   reached out to the payment processor Co-op about any marijuana

2   purchased in the 2016 to 2018 time period.  Is that correct?

3   A.  During that time period we did not reach out to them that

4   I'm aware of.

5   Q.  And to your knowledge, did Actors become aware of any

6   marijuana merchant that it was processing transactions for

7   during that time period?

8   A.  Not that I'm aware of, no.

9   Q.  You also were asked on cross-examination whether Visa's

10  rules reference marijuana transactions.  Do you remember that?

11  A.  Yes.

12  Q.  And you said that they don't reference marijuana

13  transactions, right?

14  A.  That I recall.  I have not read every Visa rule there is.

15  It's a manual the size of *War and Peace*.

16  Q.  Do you know Visa does have rules prohibiting illegal

17  transactions?

18  A.  Yes.

19  Q.  Yes, they do?

20  A.  Yes, I do.

21          MS. DEININGER:  And if we can, Mr. Levine, if you can

22  pull up Government Exhibit 2704 in evidence, and I think it's

23  page 6.  Please scroll down.  Sorry.  Page 5.  OK.

24  Q.  Looking back at the section that had the "advisory against

25  illegal use" --

**DJA2117**

L3GAWEI3ps                    Brown - Redirect

1    A.  Yes.

2    Q.  -- this says you should not use your cards for illegal

3    gambling or other illegal purpose.  The reference to illegal

4    gambling, is that an example or an exhaustive list of all

5    illegal activity?

6    A.  It was an example.

7    Q.  Are there other types of illegal activity that are

8    prohibited that are not listed here?

9    A.  Yes.

10   Q.  Can you give me some examples?

11   A.  I was afraid you'd ask that.

12   Q.  Any example with other illegal activities that haven't

13   listed here that you can think of?

14   A.  I'm trying to think of them.

15   Q.  Well, sales of cocaine.

16   A.  That's correct.  That would also be illegal.

17   Q.  Or a sale of heroin.

18   A.  That would be illegal.

19           To purchase an unlicensed firearm would be illegal.

20   Q.  Now, you've been asked some questions about what data

21   Actors reviews before it approves transactions on

22   cross-examination, right?  Is that correct?

23   A.  Yes.

24   Q.  And one of the things you talk about is that that you check

25   the account balance, right?

DJA2118

1819

L3GAWEI3ps                    Brown - Redirect

1   A.  Our system checks that.  No, that's not done by human eye.

2   Transactions are taking place 24 hours a day.

3   Q.  But Actors also employs a third-party payment processor,

4   right?

5   A.  That's correct.

6   Q.  And the third payment processor, you testified on direct,

7   does additional review of transaction information before

8   transactions are approved.  Is that correct?

9   A.  That's my understanding, yes.

10  Q.  And they also do a broader review, to your understanding,

11  to look for patterns of fraud and illegality, right?

12  A.  That's correct.

13  Q.  And Actors relies on the work of the payment processor that

14  it has employed; is that correct?

15  A.  That's correct.

16  Q.  You also were asked on cross about whether there's a

17  merchant category code, an MCC, for marijuana.  Do you remember

18  that?

19  A.  Yes.

20  Q.  I believe you said that to your knowledge there's not,

21  right?

22  A.  That's correct.

23  Q.  In fact you went and asked your debit card payment

24  processor if there was one, right?

25  A.  I did.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2119

1820

L3GAWEI3ps                    Brown - Redirect

1   Q.  And that you could block marijuana transactions using that,

2   right?

3   A.  That's correct.

4   Q.  Now, if there had been one, what would you have done?

5   A.  We would have requested a block on marijuana purchases.

6   Q.  And that's because --

7   A.  Category code.

8   Q.  Is that because information about whether something is a

9   marijuana transaction is important to Actors?

10  A.  Yes.

11          MR. TAYBACK:  Objection, leading.

12          THE COURT:  Overruled.

13          He said yes.

14  BY MS. DEININGER:

15  Q.  And you were asked some questions about whether you had

16  closed the cardholder accounts for the bank statements that we

17  looked at earlier.  Do you remember that?

18  A.  Yes.

19  Q.  And you haven't closed any of those accounts, right?

20  A.  That is correct.

21  Q.  Why not?

22  A.  Because when the -- when they received the subpoena and

23  subsequently for most of the year, we did not know exactly what

24  the nature of the purchases were.  I still can't say I have

25  firsthand knowledge that it was our members making those

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2120

L3GAWEI3ps                    Brown – Redirect

1    purchases.  And I can't say for sure whether they knew that

2    what they were doing was illegal.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DJA2121

L3GPWEI4                    Brown - Recross

1          MS. DEININGER:  Thank you.  One minute, your Honor.

2          THE COURT:  Okay.

3          MS. DEININGER:  No further questions.

4          THE COURT:  Anything else?

5          MR. TAYBACK:  Very briefly.

6    RECROSS EXAMINATION

7    BY MR. TAYBACK:

8    Q.  Mr. Brown, you indicated in your last answer that you don't

9    know whether the customers that used their Actors cards to buy

10   marijuana knew what they were doing was illegal; do you

11   remember that?

12   A.  Yes.

13   Q.  You haven't called and asked them, correct?

14   A.  That's correct.

15   Q.  And Actors doesn't describe marijuana status regarding

16   legality in any of its consumer-facing documents, correct?

17   A.  That's correct.

18   Q.  It's true, isn't it, that you're not aware of anyplace in

19   the United States where cocaine is legal to buy for a consumer

20   off the street, correct?

21   A.  That is correct.

22   Q.  And the same with heroin?

23   A.  Yes.

24   Q.  You're not aware of any storefronts where you can go in and

25   buy cocaine and heroin, correct?

DJA2122

L3GPWEI4                    Brown - Further Redirect

1   A.  No.

2   Q.  It's your understanding that the -- I'll withdraw that.

3           MR. TAYBACK:  No further questions.

4           MS. DEININGER:  I have one question.

5           THE COURT:  Well, first, is there anything from

6   Mr. Weigand's counsel?

7           MR. PELLECHI:  Nothing further, your Honor.

8   FURTHER REDIRECT EXAMINATION

9   BY MS. DEININGER:

10  Q.  Mr. Brown, just one question.

11          To your knowledge, are there any states in the United

12  States where marijuana sales are legal under federal law?

13  A.  Not under federal law, no.

14          MS. DEININGER:  No further questions.

15          THE COURT:  Anything else?

16          MR. TAYBACK:  Nothing further.

17          THE COURT:  Thank you so much.  You may step down.

18          (Witness excused)

19          Please call your next witness.

20          MS. DEININGER:  The government calls Darcy Cozzetto.

21          THE COURT:  Remain standing but take off your mask.

22  Raise your right hand, please.

23   DARCY COZZETTO,

24      called as a witness by the Government,

25      having been duly sworn, testified as follows:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2123

1824

L3GPWEI4                    Cozzetto - Direct

1    THE COURT:  Please be seated.  State and spell your

2    full name.

3    DIRECT EXAMINATION

4    BY MS. DEININGER:

5    Q.  Ms. Cozzetto, if you could state and spell your name?

6    A.  Darcy Cozzetto, D-a-r-cy, C-o-z-z-e-t-t-o.

7    Q.  Good afternoon, Ms. Cozzetto.  Can you hear me okay?

8    A.  I can.  Thank you.

9    Q.  Okay.  Let me know if you have any problems.  Okay?

10    Ms. Cozzetto, how old are you?

11   A.  I'm 40 years old.

12   Q.  Where do you live?

13   A.  I live in Spokane, Washington.

14   Q.  What do you do for a living?

15   A.  I'm the chief operating officer of The Bouqs Company.

16   Q.  What is The Bouqs Company?

17   A.  Bouqs is a direct-to-consumer flower brand.

18   Q.  And what is your role there?

19   A.  My role as the chief operating officer is to run the

20   day-to-day business.

21   Q.  How long have you worked for The Bouqs?

22   A.  About two-and-a-half years, since November of 2018.

23   Q.  What did you do before you took a job at Bouqs?

24   A.  Prior to working at The Bouqs, I worked at Eaze Technology.

25   Q.  And what kind of company is Eaze Technologies?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2124

L3GPWEI4                    Cozzetto - Direct

1   A.  When I worked there, Eaze Technology was a technology

2   company in the legal cannabis space in California.

3   Q.  I think you described it as being in the legal cannabis

4   space; is that correct?

5   A.  Yes.

6   Q.  And what was your understanding, at the time you worked

7   there, of whether marijuana sales were legal under California

8   law?

9   A.  My understanding, when I worked at Eaze, was that

10  California sales were legal.  I'm sorry, cannabis sales were

11  legal under California law.

12  Q.  And what was your understanding of whether cannabis sales

13  were legal under federal law?

14  A.  My understanding was that cannabis sales were illegal under

15  federal law.

16  Q.  And you understood that at the time you worked at Eaze?

17  A.  Yes.

18  Q.  So when you referred to being in the legal cannabis space,

19  you were just referring to it being legal under state law?

20  A.  Yes, under California state law.

21  Q.  What was your role at Eaze?

22  A.  My role was senior vice president of operations.

23  Q.  And what were your general responsibilities at Eaze in that

24  role?

25  A.  I had three main components of my team.  One was

DJA2125

L3GPWEI4                     Cozzetto - Direct

1   interfacing with the depots or dispensaries; one was a team

2   method inventory planning and case pack allocation between and

3   pack point and the driver's cars; and the third piece is called

4   the live operations team.  It was a team that, in the moment of

5   a delivery if there was a problem with technology or with the

6   driver or customer service, they would help out.  That team was

7   also responsible for making sure that we hit our daily sales

8   goal.

9   Q.  How long did you hold that role?

10  A.  I worked there about 11 months.

11  Q.  So was that in -- what years was that in?

12  A.  I started October 2017 and left September of 2018.

13  Q.  Thank you.  At the time that you worked there, where was

14  Eaze located?

15  A.  When I worked at Eaze, there were two main corporate

16  offices, one was in San Francisco and one was in Los Angeles.

17  Q.  And where were Eaze's customers located?

18  A.  Eaze's customers were located in California.

19  Q.  And where were the dispensaries located?

20  A.  The dispensaries were also located in California.

21  Q.  So now drawing your attention to the 2017 to 2018 time

22  period, when you were working at Eaze, what payment methods did

23  Eaze offer its customers?

24  A.  When I worked at Eaze, the payment methods offered were

25  cash and credit card.

DJA2126

L3GPWEI4                         Cozzetto - Direct

1   Q.  And during that time period, did you participate in a

2   scheme to process Eaze credit and debit card payments?

3   A.  Yes.

4   Q.  In that scheme, was the information used to process the

5   credit card transactions truthful?

6   A.  No.

7   Q.  To your knowledge, what types of untruthful information

8   were included?

9   A.  To my knowledge, the merchant code was not accurate, and

10  also the information on the customer's credit card statement

11  was inaccurate.

12  Q.  And the information on the customer's credit card

13  statement, did that include a merchant descriptor?

14  A.  Yes, I believe it did.

15  Q.  Or a merchant name?

16  A.  Yes.

17  Q.  And were those merchant names and descriptors, were those

18  accurate?

19  A.  Not to my knowledge, no.

20  Q.  Who were some of the main people outside of Eaze, from your

21  perspective, involved in this credit card processing scheme?

22  A.  My main persons of contact were Ray, Guy and Andreas.

23  Q.  Do you know Ray's last name?

24  A.  I believe it's Akhavan.

25  Q.  And how about Guy's?

**DJA2127**

L3GPWEI4                    Cozzetto - Direct

1   A.  I believe Mizrahi.

2   Q.  Did you ever come to learn a last name for Andreas?

3   A.  No, I did not.

4   Q.  When you started at Eaze, were you initially involved in

5   credit card processing?

6   A.  No, I was not.

7   Q.  Did that eventually change?

8   A.  Yes, it did.

9   Q.  So roughly when did that start changing?

10  A.  It started changing in January of 2018.

11  Q.  Okay.  So directing your attention to March of 2018, did

12  you come to attend a meeting with Ray Akhavan?

13  A.  Yes, I did.

14  Q.  How was that meeting arranged?

15  A.  From my understanding -- well, what I know is that my boss,

16  Nick Fasano, told me that we were going to have the meeting.

17  It was my understanding that Jim, our CEO, had told Nick, and

18  Nick asked me to contact some of the dispensary owners to

19  attend the meeting as well.

20  Q.  You mentioned Nick Fasano, who is Nick Fasano?

21  A.  Nick Fasano was my direct manager when I worked at Eaze.

22  At the time, he was the chief revenue officer.

23  Q.  And you mentioned Jim Patterson, who was Jim Patterson?

24  A.  When I worked at Eaze, Jim Patterson was the CEO of the

25  company.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DJA2128

L3GPWEI4                    Cozzetto - Direct

1  Q.  Did they tell you who this meeting was going to be with?

2  A.  Yes, I believe they mentioned Ray's name.

3  Q.  Did you have an understanding of who Ray was at that time?

4  A.  I had heard his name from Jim and Nick in regards to the

5  Clearsettle credit card payment processing.

6  Q.  And what was -- and to your knowledge, what was your

7  understanding about what Clearsettle payment processing was?

8  A.  I didn't have a lot of details about what the Clearsettle

9  payment processing was.  I just knew that Eaze was processing

10  credit cards via Clearsettle.

11  Q.  What was the purpose of the meeting they were asking you to

12  help arrange?

13  A.  My understanding of the purpose of the meeting was Eaze had

14  left credit cards because the Clearsettle solution had gone

15  down, and Ray was going to propose a new solution so credit

16  cards could be back up.

17  Q.  Did Nick Fasano say anything to you about how he felt about

18  attending this meeting?

19  A.  I don't remember --

20          MR. TAYBACK:  Objection, hearsay.

21          THE COURT:  Sustained.

22          MS. DEININGER:  So relevant to the witness' state of

23  mind.

24          THE COURT:  Sustained.

25  BY MS. DEININGER:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300